UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,


   -against-             17-cr-0686 (LAK)


JAMES GATTO, et al.,

       Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**


Appearances:

  Aline R. Flodr
  Edward B. Diskant
  Noah David Solowiejczyk
  Robert Lee Boone
  Eli Jacob Mark
  Assistant United States Attorneys
  GEOFFREY BERMAN
  INTERIM UNITED STATES ATTORNEY


  Michael Steven Schachter
  Casey Ellen Donnelly
  David Angeli
  WILLKIE FARR & GALLAGHER

  *Attorneys for Defendant James Gatto*


  Andrew A. Mathias
  William W. Wilkins
  Mark C. Moore
  NEXSEN PRUET, LLC

  Johanna Rae Hudgens
  WINSTON & STRAWN LLP


  James Lawrence Bernard

Joel Cohen
Stroock & Stroock & Lavan LLP

*Attorneys for Defendant Merl Code*


Jennifer L. Brown
Federal Defenders of New York Inc.

Steven A. Haney, Sr.
Haney Law Group PLLC

*Attorneys for Defendant Christian Dawkins*


Lewis A. Kaplan, *District Judge.*

This matter is before the Court on defendants' joint motion to dismiss the indictment. The Court denied the motion in open court on February 15, 2018, but stated that it would render an opinion in due course. This is that opinion.


*Facts*

The following facts are alleged in the indictment,[1] the truth of which the Court is bound to assume when considering a motion.[2] The Court does not consider "[c]ontrary assertions of fact by the defendants."[3]

---

[1] DI 39 ("Ind.").

[2] *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985); *see also United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 33 n.2 (1963); *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952); *New York v. Tanella*, 374 F.3d 141, 148 (2d Cir. 2004).

[3] *Goldberg*, 756 F.2d at 950.

*A.* *The Parties*

This indictment charges a conspiracy among defendants, certain basketball coaches of the Universities of Louisville and Miami, and certain student basketball players and/or their families.

Defendant James Gatto is an executive at "Company-1," a multi-national corporation that designs and manufactures shoes, clothing, and accessories for various sports, including basketball. Company-1 sponsors the athletic programs of a number of universities with highly ranked National Collegiate Athletic Association ("NCAA") Division I men's basketball teams.[4] During the relevant period, defendant Gatto oversaw significant components of Company-1's high school and college basketball programs, defendant Merl Code consulted for Company-1 on its high school and college basketball programs, and defendant Christian Dawkins was an aspiring business manager for professional athletes.[5]

*B.* *NCAA Regulations*

The NCAA is a non-profit organization that regulates athletics for colleges and universities. NCAA member schools are organized into three separate divisions: Divisions I, II, and III. Division I is the "highest level of intercollegiate athletics sanctioned by the NCAA."[6] Schools with Division I athletics programs typically have the largest athletics budgets and offer the most

---

[4] Ind. at ¶ 4.

[5] *Id.* at ¶¶ 7-9.

[6] *Id.* at ¶ 12.

athletic scholarships, subject to NCAA regulations.[7]

One of the hallmarks of the NCAA is that the students who compete in NCAA programs must be amateur, rather than professional, athletes. To preserve the amateur status of any student-athlete that plays for an NCAA Division I school, the schools and current and prospective student-athletes are subject to certain rules, including that (1) any financial assistance to student-athletes other than from the school itself or from the athletes' parents or legal guardians is prohibited unless expressly authorized by the NCAA, and (2) student-athletes, prospective student-athletes, and their relatives are prohibited from accepting any benefits, including money, travel, clothing or other merchandise, directly or indirectly from a financial advisor or an agent (which is defined broadly to include anyone "who, directly or indirectly . . . seeks to obtain any type of financial gain or benefit . . . from a student-athlete's potential earnings as a professional athlete").[8]

Student-athletes who are recruited in violation of NCAA rules are ineligible to play.[9] In addition, the indictment lists various penalties to which any school or individual found to be in violation of an NCAA rule may be subject, including limitations on the school's participation in post-season play in the relevant sport, limitations on the school's funding from the NCAA, and various financial penalties.[10]

Accordingly, student-athletes and coaches are required to make certain

---

[7]      *Id.* at ¶ 13.

[8]      *Id.* at ¶¶ 14-16 (internal quotation marks omitted).

[9]      *Id.* at ¶ 17.

[10]      *Id.* at ¶ 23.

representations related to NCAA rule violations to the Division I schools for whom they play and work. Student-athletes are required annually to attest to their amateur status and to report any violations of NCAA rules involving the student-athlete and the school.[11] Coaches are required to certify annually that they have reported to their school any knowledge of NCAA rule violations involving the school.[12]

C.      *The Alleged Scheme*

The indictment alleges that defendants and their co-conspirators schemed to pay bribes to certain high school basketball players bound for NCAA Division I universities and/or their families in exchange for commitments by the students to matriculate at specific universities and then retain Dawkins' services and sign with Company-1 once they turned professional.

The allegations against defendants specifically relate to the University of Louisville and the University of Miami, both Division I schools.[13] With respect to the University of Louisville, the indictment alleges that defendants conspired to funnel approximately $100,000 from Company-1 to the family of a high school basketball player who had not yet committed to a particular university. The $100,000 payment was to be made to the family indirectly through a third-party in four installments, but the student's family received only one such installment payment before defendants

---

[11]
      *Id.* at ¶ 20.

[12]
      *Id.* at ¶ 21.

[13]
      *Id.* at ¶ 12.

were arrested.[14]  Similarly, the indictment alleges that defendants conspired to funnel approximately

$150,000 to a high-school basketball player and/or his family at the request of certain coaches at the

University of Miami in order to induce that player to matriculate at the University of Miami.[15]

      Defendants are charged with conspiring to use interstate or foreign wires in

furtherance of the scheme to defraud by making, agreeing to make, and concealing bribe payments

to the high-school basketball players and/or their families in exchange for the players' commitments

to play basketball at the University of Louisville and the University of Miami, thereby  (1) causing

the universities to agree to provide athletic scholarships to student-athletes who in fact were

ineligible to compete as a result of the bribe payments, and (2) depriving the universities of

significant and necessary information regarding the players' and coaches' non-compliance with

NCAA rules, thereby interfering with the universities' ability to control the use of their assets,

including the decision of how to allocate a limited amount of athletic scholarships, and exposing the

universities to tangible economic harm, including monetary and other penalties imposed by the

NCAA.[16]

## Discussion

      Although they do not put it in precisely these terms, defendants move to dismiss the

---

[14]  *Id.* at ¶¶ 24-26.  Defendants and certain coaches at the University of Louisville allegedly conspired also to pay a similar bribe the family of another prospective student.  Although the money was transferred from Company-1 to Dawkins, the indictment does not allege that the student or his family received the funds.  *Id.* at ¶¶ 27-28.

[15]  *Id.* at ¶¶ 30-32.

[16]  *Id.* at ¶¶ 3, 36-37.

indictment pursuant to Fed. R. Crim. P. 12(b)(3)(B)(v) and 47. They contend that the indictment fails to allege a crime because it fails to allege that:

- The purpose of the alleged scheme was to injure the universities. To the contrary, defendants claim that the indictment alleges that their goal was "to *help* them."

- The defendants "sought to obtain money or property *for themselves* from . . . the alleged victims."

- The defendants' purpose was to deprive the universities of money or property.

- The alleged scheme "was to be accomplished by means of material misrepresentations."[17]

These arguments disregard allegations contained in the indictment, depend upon assertions outside the indictment, are premature, or all three.

A.     *Criminal Rule 7*

Fed. R. Crim. P. 7(c)(1) states that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." "To satisfy the pleading requirements of Fed. R. Crim. P. 7(c)(1), an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged

---

[17] DI 59 ("Def. Br."), at 1-3 (second emphasis added).

crime."[18]  It is sufficient if the indictment, "first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."[19]  The "indictment 'need not be perfect, and common sense and reason are more important than technicalities.'"[20]

Defendants here are charged with conspiracy to commit wire fraud.  The federal wire fraud statute imposes criminal penalties on anyone who:

> "[H]aving devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."[21]

The 23-page indictment in this case tracks the language of Section 1343, which is incorporated by reference into Section 1349.[22]  As discussed below, the indictment contains also

---

[18]

*United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002) (quoting *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (quoting *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975))) (internal quotation marks omitted) .

[19]

*Id.* (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)) (internal quotation marks omitted) .

[20]

*United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *United States De La Pava*, 268 F.3d 157, 162 (2d Cir. 2001)).

[21]

18 U.S.C. § 1343.

[22]

*See* § 1349 ("Any person who . . . conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the . . . conspiracy.").

extensive factual allegations as to when, how and with whom the alleged scheme was undertaken. These allegations are more than sufficient to inform defendants of the particulars of the alleged conspiracy in which they are charged with having participated.

B.      *Injury to the Universities as Object of the Alleged Scheme*

The elements of wire fraud include "(1) a scheme to defraud (2) to get money or property (3) furthered by the use of interstate . . . wires."[23]  In order to establish a "scheme to defraud," the government must show "that some actual harm or injury was contemplated by the schemer."[24]

Defendants contend that this indictment fails by reason of the lack of any allegation that the purpose of the fraudulent scheme was to injure the universities that allegedly were its victims.  Indeed, they maintain that the indictment asserts that the object of the alleged scheme was to assist the universities by attracting basketball talent.  But the defendants ignore some of the indictment's allegations and misconstrue others.

The indictment alleges that the defendants and their co-conspirators, who included, among others, certain basketball coaches as well as prospective basketball players and/or their family members, "conspired . . . to obtain athletic-based financial aid for the student-athletes from [the] .

---

[23]
    Def. Br. at 12 (quoting *United States v. Autuori,* 212 F.3d 105, 115 (2d Cir. 2000)) (internal quotation marks omitted).

[24]
    *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir. 1970) (emphasis omitted).

. . universities ."[25]  It alleges in particular that the objects of the conspiracy included "causing the

universities to agree to provide athletic scholarships to student-athletes who . . . were ineligible to

compete as a result of the bribe payments."[26]  Those allegations, the truth of which must be assumed

for purposes of this motion, are fatal to this branch of defendants' motion.

　　　　　Nor may these allegations be ignored because the indictment alleges that (a) payments

to certain prospects or their families were intended to "assist" one or more coaches in securing the

prospects' commitments to the schools,[27] (b)  the plan to funnel money to a particular University of

Louisville prospect was developed "at the request and with the assistance of one or more coaches

at the University of Louisville,"[28] and (c) defendant Gatto told defendant Code that he already had

learned from a coach at the University of Miami about the university's "request for assistance in

securing" the commitment of a particular student to attend that institution.[29]  Of singular importance,

the indictment makes abundantly clear that NCAA rules prohibited the payments,[30] that the coaches

and other conspirators concealed the bribes from the universities "in order for the scheme to succeed

---

[25]　　Ind. at ¶ 3.

[26]　　*Id.* ¶ 36

[27]　　*Id.* ¶¶ 24, 30.

[28]　　*Id.* ¶ 25.

[29]　　*Id.* ¶ 32(a).

[30]　　*Id.* ¶¶ 15-18.

and for the student athletes to receive athletic scholarships,"[31] and that the universities stood to suffer substantial penalties if the payments were uncovered.[32] Assuming proof of these facts, a jury would be entitled to infer that the coaches were not acting solely in the interests of their employers. Indeed, the government would be entitled to prove that the coaches had substantial personal interests – financial, reputational, career, and competitive interests – in fielding the most successful teams possible and that those interests were not entirely aligned with the interests of their employers. In other words, it is quite possible that the coaches' motives were either entirely selfish or mixed – combining desires to "help" their schools by fielding winning basketball teams with actions contrary to their schools' interests because they violated the school's policies and subjected the schools to a risk of severe penalties that the schools would not have run had they known all of the facts.

The law on this point is abundantly clear. "[T]he principle that directors and officers may act on behalf of a corporation does not extend to acts of self-enrichment."[33] Thus, the defendants' attempt to equate the actions and statements of the coaches with actions of the universities is at best premature. Whether the government ultimately can establish that the coaches did not act in the sole and exclusive interests of their employers[34] is a matter for trial, not a Rule 12 motion.

This conclusion is consistent also with the case law to which defendants cite.

---

[31]

*Id.* ¶ 29; *see also id.* ¶ 33.

[32]

*Id.* ¶ 23.

[33]

*United States v. D'Amato*, 39 F.3d 1249, 1258 (2d Cir. 1994).

[34]

The Court expresses no view on whether such proof would be required in order to convict.

In *United States v. D'Amato*, the Second Circuit overturned a mail fraud conviction for insufficient evidence that the defendant had intended to harm the corporation he had been charged with defrauding. The court reasoned that "a person hired to perform services for [a] corporation . . . cannot be found to intend to harm a corporation or its shareholders through otherwise lawful misleading conduct *if he or she follows the instructions of an appropriate corporate agent who appears to be unconflicted and acting in good faith*."[35] But it is premature for defendants in this case to challenge the indictment on the theory that the basketball coaches were "unconflicted and acting in good faith."[36]

*United States v. Braunstein,*[37] a Ninth Circuit case on which defendants rely, is readily distinguishable. The defendant in that case was a computer distributor who bought computers from ALAC, a Latin American subdivision of Apple, Inc. Although the defendant ostensibly was obliged to sell the computers only to distributors who would resell them in Latin America, he in fact sold the computers to a distributor who resold them in the United States at below-market prices. The indictment eventually was dismissed voluntarily, but the Ninth Circuit awarded attorneys' fees to the defendant after concluding that "ALAC could not be deceived about practices that it actively endorsed" and, indeed, that the government "had reason to believe . . . that employees at ALAC knowingly sold computer products to distributors who resold the same products . . . outside of Latin

---

[35]

       *D'Amato,* 39 F.3d at 1258 (emphasis added).

[36]

       Indeed, it is telling that the defendant in *D'Amato* challenged the sufficiency of the evidence following trial, not the sufficiency of the indictment in which he was charged

[37]

       281 F.3d 982 (9th Cir. 2002).

America."[38]

This stage of these proceedings is a dramatically different case from *Braunstein.* The indictment alleges specifically that defendants and their co-conspirators concealed their scheme from the universities. That assertion is taken as true for purposes of this motion. And it at least permits the inference that the defendants well knew that responsible, unconflicted university officials had not and would not have approved their actions. Accordingly, defendants' challenge on this point fails.

C.     *Obtaining Money or Property from the Universities*

Defendants contend also that the indictment should be dismissed because it fails to allege that defendants "schemed to *obtain* money or property from [the Universities of] Louisville or Miami."[39] But they misconstrue the law in the Second Circuit and ignore allegations of the indictment.

Defendants rely principally on *United States v. Walters,*[40] in which the defendant, an aspiring sports agent, was convicted of mail fraud after he bribed college football players to let him represent them upon turning professional. The Seventh Circuit reversed the conviction. It held that although a jury could have concluded that the colleges would have saved athletic scholarship funds but for the scheme, the colleges "were not out of pocket *to Walters*" because "he planned to profit

---

[38]
    *Id.* at 996-97.

[39]
    Def. Br. at 18 (emphasis in original).

[40]
    997 F.2d 1219 (7th Cir. 1993).

by taking a percentage of the players' professional incomes, not of their scholarships."[41]  It added that "only a scheme to obtain money or other property from the victim by fraud violates § 1341."[42]

The fraud theory in *Walters* bears some superficial resemblance to this case in that the government alleged that the defendant in *Walters* had caused the universities to pay scholarship funds to athletes who had become ineligible as a result of the their agency contracts with defendants. But *Walters* neither controls nor is persuasive here for two independent reasons.

     *1.*    *Distinguishing* Walters *on the Law*

Setting aside for the moment the factual distinctions between *Walters* and this case, a defendant in this circuit, "'does not need to literally "obtain" money or property to violate the [mail and wire fraud] statute[s].'"[43]

In *Porcelli I*[44], the Second Circuit upheld the mail fraud conviction of a gas station operator, Porcelli, who failed to remit sales tax on the gas that he sold to New York State.  The government had not proved that Porcelli actually collected the taxes that he was obliged to pay to the State, but the Circuit nonetheless held that New York State's intangible interest in the unpaid

---

[41]

    *Id.* at 1224 (emphasis in original).

[42]

    *Id.* at 1227.

[43]

    *United States v. Finazzo*, 850 F.3d 94, 106 (2d Cir. 2017) (quoting *Porcelli v. United States*, 404 F.3d 157, 162 (2d Cir. 2005) ("*Porcelli IV*")); *see also Porcelli IV*, 404 F.3d at 162-63 (acknowledging that even if the court's interpretation of the statute fell outside the "plain meaning" of the mail fraud statute, Congress, which had amended the mail fraud statute four times since the Second Circuit initially had so interpreted the mail fraud statute, "is deemed to have relied on our construction").

[44]

    865 F.2d 1352 (2d Cir. 1989) ("*Porcelli I*").

sales tax was state property within the ambit of the mail fraud statute and that "Porcelli . . . obtained cash . . . whether or not he actually collected the sales tax on his gasoline sales" because "[i]f he did not collect the tax, then he obtained funds that an honest retailer, selling for the same price, would have remitted to the State."[45]  Porcelli thus had deprived the State of property because he was "obliged to pay the tax whether or not he collected it from the customers."[46]

In a subsequent challenge to his conviction, Porcelli argued that (1) the Supreme Court's then-recent decision in *Scheidler v. National Organization for Women, Inc.,*[47] which construed the Hobbs Act to require that a defendant actually "obtain" money or property from the alleged victim, should be carried over to the mail fraud statute, and (2) in the context of his case, it was impossible for Porcelli to have obtained money or property because he "already possessed the money or property of which he was convicted of scheming to acquire."[48]  The Second Circuit rejected that argument because "in contrast to the Hobbs Act, neither the mail or wire fraud statute requires that a defendant 'obtain' property before violating the statute."[49]  In other words, regardless of the verbiage used in *Porcelli I* – that is, "[i]f he did not collect the tax, then he obtained funds that an honest retailer, selling for the same price, would have remitted to the State" – Porcelli had committed mail fraud by depriving the State of money or property to which it was entitled, regardless

---

[45]

   *Id.* at 1359-60.

[46]

   *Id.* at 1361.

[47]

   537 U.S. 393 (2003).

[48]

   *Porcelli IV*, 404 F.3d at 161-62.

[49]

   *Id.* at 162 (internal quotation marks and citations omitted).

of whether or not Porcelli ever obtained the money for himself.

The Second Circuit extended this reasoning to the wire fraud statute in *United States v. Males*,[50] in which it upheld the wire fraud conviction of a defendant who had represented to an FBI agent who had posed as a potential investor, that he worked for a firm called the Bailey Group and promised the agent "exorbitant returns" on his investments if the agent (a) agreed to allow the defendant to freeze or reserve the agent's account in favor of the Bailey Group and (b) allowed Bailey Group's traders to be signatories on the account.  On appeal, the defendant argued that the jury should have been instructed that it could convict him of wire fraud only if it found that he had intended to obtain the victim's money – in other words, that it was not enough that Males intended to freeze the agent's account temporarily without transferring any money to himself or removing any money from the account permanently.  The Second Circuit rejected that argument.  It affirmed the conviction and held that "[f]or purposes of establishing this element under § 1343 . . . it is sufficient that a defendant's scheme was intended to deprive another of property rights, even if the defendant did not physically 'obtain' any money or property by taking it from the victim."[51]  That such deprivation may have been intended to be only temporary was of no moment.  As the Circuit concluded, "The requirement under § 1343 that the defendant devise a scheme or artifice for obtaining money or property is satisfied where a defendant fraudulently obtains the *use* of another person's money or property for a period of time, using it for his own personal profit, and depriving

---

[50]

459 F.3d 154 (2d Cir. 2006).

[51]

*Id.* at 158.

the owner of the ability to do so."[52]  Here again, the defendant was convicted of wire fraud on the basis that he deprived the fraud victim of money or property by cutting off its access to that money or property, not by obtaining the money or property for himself.

Finally, in *United States v. Finazzo,*[53] the Second Circuit affirmed the district court's instructions to the jury that the property of which a victim of wire or mail fraud must be deprived may include "intangible interests such as the right to control the use of one's assets" and that the right to control one's assets is "injured when a victim is deprived of potentially valuable economic information it would consider valuable in deciding how to use its assets."[54]  In *Finazzo*, the defendant, a former merchandising executive at Aéropostale, Inc., had caused Aéropostale to use a certain clothing vendor, South Bay, as its supplier of T-shirts and fleeces.  In exchange, the defendant received kickbacks from South Bay's profits.  The court upheld Finazzo's conviction of mail and wire fraud on the basis that he had deprived Aéropostale of its "right to control use of its assets."[55]

Accordingly, in the Second Circuit, one may be convicted of wire fraud without the victim being "out of pocket" to the defendant.  The question is not whether defendants are alleged to have obtained money or property from the universities, but whether they are alleged to have

---

[52]

     *Id.* at 158-59 (emphasis in original).

[53]

     850 F.3d 94 (2d Cir. 2017).

[54]

     *Id.* at 108; *see also id.* at 111 (concluding that "[d]epriving a victim of 'potentially valuable' information necessarily creates a risk of tangible economic harm" (emphasis omitted)).

[55]

     *Id.* at 96-97.

conspired to deprive the universities of money or tangible or intangible property.[56]  This indictment thus adequately charges a conspiracy to use the wires in furtherance of a scheme by which student-athletes and/or their families – alleged co-conspirators all – would obtain athletic scholarships, thereby depriving the victims of money or other property.

And it alleges also that defendants and their co-conspirators conspired to "defraud[] the universities . . . by depriving the universities of significant and necessary information regarding the non-compliance with NCAA rules by the relevant student-athletes and coaches," thereby:

> "[I]nterfer[ing] with the universities' ability to control their assets and creat[ing] a risk of tangible economic harm to the universities, including, among other things, decision-making about the distribution of their limited athletic scholarships; the possible disgorgement of certain profit-sharing by the NCAA; monetary fines; restrictions on athlete recruitment and the distribution of athletic scholarships; and the potential ineligibility of the universities' basketball teams to compete in NCAA programs generally, and the ineligibility of certain student-athletes in particular."[57]

*Finazzo*, in which the Second Circuit endorsed the "right to control" theory, governs here.

2.  *Distinguishing* Walters *on the Facts*

*Walters* is distinguishable also on its facts.

---

[56]

The Court is not persuaded by defendants' repeated citations to *dicta* in *Skilling v. United States*, 561 U.S. 358, 400 (2010) (citation omitted), that "[u]nlike fraud in which the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other, the honest-services theory targeted corruption that lacked similar symmetry."  As discussed above, the Second Circuit subsequently has held explicitly that the deprivation of the right to control one's assets can serve as a basis for criminal liability under the mail and wire fraud statutes.  *See Finazzo*, 850 F.3d at 108-111.

[57]

Ind. at ¶ 3, *see also id.* at ¶ 37.

In *Males*, the Second Circuit described *Walters* as holding that "without a showing of the defendant's intent to obtain money or property from the universities or the NCAA, the necessary connection between his actions and his victims' property was too attenuated to establish mail fraud."[58]  This followed because the defendant in *Walters* appealed his conviction only of the substantive crime of mail fraud; there was no conspiracy charge and the Circuit refused to consider the government's alternative theory that Walters was guilty as an aider and abettor.[59]

In contrast, defendants in this case are alleged to have conspired with prospective basketball players and/or their families, who in turn are alleged to have "obtain[ed] athletic-based financial aid for the student-athletes from NCAA Division I universities through false and fraudulent means."[60]  Accordingly, defendants' challenge fails also to the extent defendants argue that the indictment fails to allege a "necessary connection" between defendants' actions and the universities'

---

[58]

    *Males*, 459 F.3d at 159.

[59]

    *Walters*, 997 F.2d at 1227 (rejecting government's theory that Walter aided and abetted the students in defrauding the universities because "the indictment charged a scheme *by Walters* to defraud; it did not depict Walters as an *aide de camp* in the students' scheme," because the aiding and abetting theory had not been argued to the jury, and because of "the difficulty of believing that the students hatched a plot to employ fraud to receive scholarships that the universities had awarded them long before Walters arrived on the scene, and the lack of evidence that the students knew about or could foresee any mailings" (emphasis in original)).

[60]

    Ind. at ¶ 3; *see also id.* ¶ 36.

    The Court is unmoved by defendants' argument that "the Government now concedes that, at least with respect to the 'University of Miami scheme,' the family members of the student were definitely *not* scheme participants."  Even if the government had so conceded in a disclosure made subsequent to the indictment, defendants may not "challenge the sufficiency of the indictment by referencing documents and alleged facts that fall outside the four corners of the indictment . . . .  It is axiomatic that the allegations in the indictment control the analysis at this stage of the case."  *United States v. Binday*, 908 F. Supp. 2d 485, 491 (S.D.N.Y. 2012) (citing *Goldberg*, 756 F.2d at 950).

scholarships.[61]

D.      *Depriving Universities of Money or Property*

Defendants next assert that the indictment fails to "allege that the object of Defendants' fraudulent scheme was to *deprive* the Universities of money or property."[62]  They read the indictment to say that the alleged scheme had "the *effect* of potentially rendering the athletes ineligible to compete in college sports under NCAA rules" but "does not claim that causing these deprivations was the *objective*" of the scheme.[63]  Defendants argue further that the indictment "identifies only potential harms that, in fact, would have been *undesirable* to Defendants – *e.g.*, a determination that a scholarship recipient was ineligible to compete for the Universities, or the imposition of penalties on the Universities by the NCAA" and that the "alleged deprivations were not the goal of Defendants' scheme, but rather inadvertent consequences that would come to pass only if the scheme was uncovered."[64]

This argument also is without merit.  It is true that "[t]he 'essential elements of' [a mail or wire fraud violation] are '(1) a scheme to defraud, (2) *money or property as the object of the*

---

[61]

      *See* Def. Br. at 26 ("[T]he scholarships the Universities were allegedly deprived of were never, in any sense, obtained by, used by, or in the possession of, Defendants.").

[62]

      *Id.* at 28 (emphasis in original).

[63]

      *Id.* at 29.

[64]

      *Id.* at 30-31 (internal quotation marks and citations omitted).

*scheme*, and (3) use of the mails or wires to further the scheme.'"[65]   As discussed above, however, this indictment alleges that it was "part and object of the conspiracy" to "caus[e] the universities to agree to provide athletic scholarships to student-athletes who, in truth and in fact, were ineligible to compete" and to "conceal[] bribe payments to high school student-athletes and/or their families . . . , which deprived the University of Louisville and the University of Miami of their right to control the use of their assets."[66]   The indictment therefore is sufficient.

Defendants' reliance on two civil RICO cases is confounding.   In any event, both are readily distinguishable.

In *Tymoshenko v. Firtash*,[67] the district court dismissed a civil RICO complaint predicated on wire fraud.   The court reasoned that defendants, who allegedly had proposed sham real estate investments, were not alleged to have used "their misrepresentations to target a third party's money or property," but rather "to create the appearance that they were engaged in legitimate business activities."[68]   The court found that the complaint failed to adequately plead wire or mail

---

65

   *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015) (emphasis added) (quoting *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004)).

66

   Ind. at ¶¶ 36-37.

   Defendants' argument that the indictment fails because the deprivations alleged represented mere "potential harms" is unpersuasive.  *See Binday*, 804 F.3d at 576-77 ("The indictment need not allege . . . that the specified harms had materialized . . . or were certain to materialize in the future.  Rather, it suffices to prove that the defendants' misrepresentations deprived the [fraud victims] of economically valuable information that bears on their decision-making.").

67

   57 F. Supp. 3d 311 (S.D.N.Y. 2014).

68

   *Id.* at 321 (internal quotation marks omitted).

fraud because it failed to allege that the object of the alleged fraudulent conduct was money or property.[69]  The relevance of the case here is not apparent.

In *Westchester County Independence Party v. Astorino*,[70] the district court dismissed a civil RICO claim brought by officials of a county political party that a group of county executives had organized a fraudulent scheme to rig the outcome of the party's primary election by inducing and coercing individuals to switch their party affiliations and enlist in that political party.  The court concluded that control of a political party "cannot be considered property in the hands of the victim."[71]

But this case does not involve control of a political party.  Here, the alleged misrepresentations and omissions, *i.e.* the concealment of the NCAA rules violations, allegedly were made in order to obtain athletic scholarships for certain prospective basketball players and to deprive the universities of their right to control their assets.  Defendants do not dispute, nor could they, that both athletic scholarships and the right to control one's assets constitute "money or property" for purposes of the wire fraud statute.

E.      *False Representations of Material Fact*

Finally, defendants argue that the indictment "fails to allege that Defendants agreed to a scheme to defraud the Universities 'by means of false or fraudulent pretenses, representations

---

[69]     *Id.*

[70]     137 F. Supp. 3d 586 (S.D.N.Y. 2015).

[71]     *Id.* at 603.

and promises.'"[72] They are mistaken.

The indictment alleges that (1) "the defendants and their co-conspirators knew that, for the scheme to succeed and the athletic-scholarships to be awarded such that the athletes could play at an NCAA Division I university, the student-athletes and coaches described herein had to falsely certify to the universities that they were unaware of any rules violations, including the illegal payments;"[73] (2) "the defendants, and one or more coaches at the University of Louisville, made, intended to make, or caused or intended to cause others to make false certifications to the University of Louisville and the NCAA about the existence of the payments and the known violations of NCAA rules;"[74] and (3) "the defendants, and one or more coaches at the University of Miami, intended to make, or intended to cause others to make, false certifications to the University of Miami and the NCAA about the existence of the payments and the known violations of NCAA rules."[75] The indictment details also the various certifications that student-athletes and coaches were required to make pursuant to NCAA rules.[76] These allegations are sufficient to allege that defendants agreed to a scheme to defraud the universities by means of fraud.

Defendants nonetheless argue that the indictment is deficient because (1) it "does not allege any facts to support its contention that a certification from one of these students affirming that

---

[72]

Def. Br. at 31 (quoting 18 U.S.C. § 1343).

[73]

Ind. ¶ 3.

[74]

*Id.* at ¶ 29.

[75]

*Id.* at ¶ 33.

[76]

*Id.* at ¶¶ 20-21.

he was 'unaware of any [NCAA] rules violations' would be 'false,'"[77] and (2) the alleged false

certifications by the coaches are not alleged to be material because (i) "[t]he allegedly false

certifications . . . that they were unaware of NCAA violations could not possibly have affected their

own recruiting decisions," and (ii) it is not alleged that "the Universities would have made a different

decision but for the coaches' 'false' certifications."[78]

      As to falsity, the indictment alleges that "student athletes and/or their family

members" were among the co-conspirators who knew that the alleged false certifications would have

to be made to the universities. The use of the phrase "and/or" is immaterial at this stage. Moreover,

defendants' reliance on *United States v. Pirro*[79] is misplaced.

      In *Pirro*, the Second Circuit ordered dismissal of a count in an indictment that

charged the defendant with having failed to disclose his ownership interest in a company a tax return.

It reasoned that the government merely had alleged the defendant's omission of an "ownership

interest," rather than his "share ownership," and that it was not clear that defendant had a legal duty

to disclose an ownership interest other than share ownership.[80] It therefore held that the defendant

"was not adequately informed of the nature of the accusation against him, as is his right under the

Sixth Amendment" because "[t]he indictment allege[d] the omission of a fact that [the defendant]

---

[77]    Def. Br. at 32.

[78]    *Id.* at 33-34.

[79]    212 F.3d 86 (2d Cir. 2000).

[80]    *Id.* at 93.

might not have been required to report."[81]

The issue of sufficient notice is not implicated in this indictment because the phrase "and/or" includes the prospective basketball players among the alleged conspirators. Moreover, it should surprise no one that knowingly making a false representation in order to get financial aid from a university could give rise to criminal liability.

As to materiality, defendants' argument amounts essentially to a sufficiency of the evidence challenge, which is inappropriate at this stage of a criminal case. A statement is material if it has "'a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed.'"[82] The indictment alleges that universities found in violation of NCAA rules may be subject to numerous penalties,[83] that students recruited in violation of NCAA rules are not eligible to participate in NCAA Division I sports,[84] and that the scheme to facilitate the payment of bribes was concealed from the universities through affirmative misrepresentations as to the relevant student-athletes' status as amateurs and as to the conspirators'

---

[81]

*Id.* at 95.

[82]

*United States v. Gaudin*, 515 U.S. 506, 509 (1995) (quoting *Kungys v. United States*, 485 U.S. 759, 770 (1988)); *see also United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) ("[M]ateriality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes. To be material, the information withheld either must be of some independent value or must bear on the ultimate value of the transaction." (internal quotation marks and citations omitted)).

[83]

Ind. at ¶ 23.

[84]

*Id.* at ¶ 17.

knowledge of NCAA rules violations.[85]  If these allegations are proven, a jury would be entitled to

infer that the misrepresentations were material to the universities.  Accordingly, this question is a

matter for trial.


### Conclusion

For the foregoing reasons, defendants' motion to dismiss the indictment [DI 58] is

denied.

SO ORDERED.

Dated:          February 28, 2018

_____
Lewis A. Kaplan.
United States District Judge

---

[85]
    *Id.* at ¶¶ 3, 29, 33, 36-37.