I2CHGAT01

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3
                 v.                          17 Cr. 686 (LAK)
4
    JAMES GATTO,
5   MERI CODE,                               Oral Argument
    CHRISTIAN DAWKINS,
6
                     Defendants.
7   ------------------------------x
                                             New York, N.Y.
8                                            February 15, 2018
                                             9:45 a.m.
9
    Before:
10
                         HON. LEWIS A. KAPLAN,
11
                                             District Judge
12
                            APPEARANCES
13
    GEOFFREY S. BERMAN
14       Interim United States Attorney for the
         Southern District of New York
15  EDWARD DISKANT
    NOAH SOLOWIEJCZYK
16  ELI J. MARK
    ALINE R. FLODR
17       Assistant United States Attorneys

18  WILLKIE FARR & GALLAGHER LLP
         Attorneys for Defendant Gatto
19  MICHAEL S. SCHACHTER
    CASEY E. DONNELLY
20       -and-
    DAVID ANGELI
21
    NEXSEN PRUET, LLC
22       Attorneys for Defendant Code
    MARK C. MOORE
23       -and-
    STROOK & STROOK & LAVAN LLP
24  JAMES L. BERNARD

25  STEVEN A. HANEY, SR.
         Attorney for Defendant Dawkins
```

1          (Case called)

2          MR. DISKANT:  Good morning, your Honor, Edward

3    Diskant, Noel Solowiejczyk, Eli Mark, and Aline Flodr for the

4    government.

5          MR. SCHACHTER:  Good morning, your Honor, Michael

6    Schachter, Casey Donnelly, David Angeli on behalf of Mr. Gatto,

7    who is present in court.

8          MR. MOORE:  Mark Moore and James Bernard for Mr. Code.

9          MR. HANEY:  Good morning, your Honor, Steve Haney on

10   behalf of Christian Dawkins.

11         THE COURT:  Good morning.

12         Mr. Schachter.

13         MR. SCHACHTER:  Thank you, your Honor.

14         THE COURT:  You may proceed.

15         MR. SCHACHTER:  Your Honor, this is, at minimum, an

16   extremely unusual case.  I'm unaware of any circumstances in

17   which the Department of Justice has sought to criminally

18   prosecute people for wire fraud for conduct which a federal

19   Court of Appeals has squarely said does not constitute wire

20   fraud.

21         The Seventh Circuit's decision in *United States v.*

22   *Walters* is indistinguishable from this fraud theory.  The

23   theory there, your Honor, was a defendant was charged with

24   making payments to student athletes under circumstances which

25   the government claims would have violated NCAA rules and,

1    therefore, the government claimed that universities for which

2    those students played, they were giving scholarships to

3    students that were, in fact, ineligible to play, and that was

4    the government's fraud theory.  The Seventh Circuit Court of

5    Appeals examined that fraud theory and said that is not wire

6    fraud.

7              Exactly in the face of that decision by that federal

8    Court of Appeals the Justice Department said, we are going to

9    pursue that same theory, in any event.

10              If anything, your Honor, this set of facts, this

11    theory is even far more flawed than was the theory that the

12    government attempted to pursue in *Walters*.  I say that for two

13    reasons.  First, *Walters* was not acting at the request of and

14    for the purpose of assisting the universities for which those

15    students played.

16              THE COURT:  The indictment in this case says that it

17    was a necessary object of the conspiracy to conceal from the

18    universities what was going on, right?

19              MR. SCHACHTER:  It states that that was part of the

20    fraud.  Where I part company with your Honor is that it does

21    not say that that was the purpose of the fraud.

22              THE COURT:  Who said a purpose?  It was a part of the

23    conspiracy.

24              MR. SCHACHTER:  It was part of the conspiracy, I

25    submit, your Honor, that the first two paragraphs of this

1   indictment described what the purpose was of this alleged --

2          THE COURT:  I should just ignore everything else in

3   the indictment, right?

4          MR. SCHACHTER:  Absolutely not.  That's not my

5   suggestion.  But in analyzing whether something constitutes

6   wire fraud the defendants must be acting with the purpose to

7   injure.  That's what the Second Circuit said in *Regent Office*

8   *Supply*.  Paragraphs 1 and 2 describe plainly what the purpose

9   was of this activity.  The purpose was to assist the

10  universities in recruiting winning basketball teams.

11         THE COURT:  Let me put this to you.  I'm not saying

12  this is what happened.  I'm just posing a hypothetical.  Let's

13  suppose that a coach had a contract that gave him a million

14  dollar bonus for achieving a particular winning record.  Define

15  winning record in some way, some objective way.  And the coach,

16  for the purpose of assembling a team that, in his estimation,

17  would get him the million dollar bonus from the university,

18  entered into this conspiracy to have the other defendants pay

19  bribes to particular players, concealed those activities from

20  the university and that his purpose was to get the million

21  dollars.  I mean it might have been good in the sense that

22  everybody at the university loves a winning team and all that

23  good stuff.  Let's just assume that.

24         Would it be your position that an indictment alleging

25  those facts would not state a crime?

1          MR. SCHACHTER:  That would be my position.  First and

2    foremost, it still runs afoul of *Walters*, which is, you need to

3    have -- the scheme must be to take money out of the pockets of

4    the victim and transfer them to the pockets of the defendant.

5    That's what the United States Supreme Court said in *Skilling*.

6          THE COURT:  A conspirator.  Why not a conspirator?

7          MR. SCHACHTER:  A conspirator --

8          THE COURT:  On the hypothetical I put to you, the

9    coach is a conspirator and the object is to take the million

10   dollars out of the pocket of the university and put it into the

11   pocket of the coach.  How about that?

12         MR. SCHACHTER:  I think you have several problems.

13   First, I believe you still have a *Walters* problem because that

14   million dollars is not obtained through fraud.  I guess we have

15   several problems.  First of all, your Honor's hypothetical is

16   not anywhere close to what's in the indictment.  Those are not

17   the allegations in the indictment.

18         THE COURT:  Let's suppose this.  Let's suppose the

19   government actually offered that kind of proof in this case.

20   It would be admissible under this indictment, wouldn't it?

21         MR. SCHACHTER:  I believe it would be.

22         THE COURT:  So do I.  We don't know what the proof is

23   going to show.  Maybe they are going to prove something like

24   that.

25         MR. SCHACHTER:  The issue before us today, before your

Honor today is not what the evidence would show. We are

looking at the four corners of the indictment. This indictment

does not allege a scheme which has not run afoul of *Walters*.

This indictment lays out a scheme to help, not to injure and,

therefore, this indictment is inconsistent with the law. It

does not constitute wire fraud.

To address your Honor's hypothetical, I would like to

spend a little bit more time with it. First, it's not clear at

all that that $1 million would have been ill-gotten gains,

although I haven't focused that hard on it, because I don't

know what the allegations of such an indictment would look like

and whether or not that would have been a scheme in order to

procure that million dollars through the making of false

statements, which, of course, wire fraud requires. So it is a

little bit difficult to --

THE COURT: On that hypothetical, given the context we

are talking about, the coach would be falsely certifying to the

university compliance with the NCAA rules, which would have

been violated.

MR. SCHACHTER: I can imagine a circumstance, with the

hypothetical that your Honor laid out, could run afoul of the

wire fraud statute. It depends on how it's alleged and what

the facts are. It also might not. Those are not the facts

alleged in this indictment.

THE COURT: An argument that such an indictment would

1    be insufficient on the theory that it was to help the

2    university, not hurt it, would be quite a stretch, wouldn't it?

3           MR. SCHACHTER:  I am going to disagree there as well.

4    Because what *D'Amato* says, your Honor, in order to constitute

5    wire fraud, you need -- what the Court said specifically was

6    that the defendant cannot be found to be intending to harm an

7    entity when he engages in conduct that is otherwise lawful as

8    long as he is following the instructions of an appropriate

9    corporate agent, which the coach would be.

10          THE COURT:  You are saying that if the bad guy is

11   following his own instructions and he's employed by the victim,

12   then the conclusion necessarily follows that the victim

13   authorized what happened.

14          MR. SCHACHTER:  What *D'Amato* says, what the circuit

15   said is, the important issues are, is that corporate agent

16   unconflicted and acting in good faith.

17          THE COURT:  Would it be your position that the coach,

18   who is party to a conspiracy to pay bribes in order to trigger

19   a payment from the university to him in circumstances where but

20   for the bribes he might not otherwise have been entitled to the

21   payment is unconflicted, acting in good faith?  Are you kidding

22   me?

23          MR. SCHACHTER:  The point, your Honor, I guess I'm

24   suggesting is that the circuit thought that the important

25   trigger between conduct that could be violative of the wire

1   fraud statute and conduct that is not is whether or not that

2   person is acting in the interests of the employer or is acting

3   for self-enrichment.

4           THE COURT:  Is it in the interests of the employer on

5   my hypothetical to pay the million dollars in the circumstances

6   I've put to you?  Isn't the corporation's interest to pay such

7   compensation as they have agreed to without improper conduct by

8   the coach?

9           MR. SCHACHTER:  I guess what I'm saying, your Honor,

10  is that there would be a question to be analyzed as to whether

11  or not that presents a conflict of interest.

12          THE COURT:  It would be a jury question, wouldn't it?

13          MR. SCHACHTER:  Perhaps, if those facts were alleged.

14          THE COURT:  Let's come a little closer to this case.

15  Don't these coaches all have economic and reputational

16  interests in putting the most winning teams they can on the

17  floor?

18          MR. SCHACHTER:  Your Honor, I would submit that that

19  certainly makes sense.  That's not alleged in the indictment.

20  I don't know.  One can assume that those may be the facts.

21  Those are not the facts that are alleged in the indictment.

22  There is no suggestion that a grand jury considered such an

23  argument.

24          THE COURT:  Wouldn't such evidence be admissible and

25  couldn't jurors reasonably find that?

1              MR. SCHACHTER:  Well.

2              THE COURT:  We all know, as a matter of common sense,

3    what this is all about, or at least part of what it's all

4    about, how the industry works.  We do.

5              MR. SCHACHTER:  Your Honor, be that as it may, I think

6    that we need to analyze what the indictment says these

7    defendants had as their goal, and there is nothing in the

8    indictment that suggests that the goal of these defendants was

9    to put money in the pockets of these coaches.  It doesn't say

10   anything like that.  It does not say that this was a scheme to

11   enrich college basketball coaches to the disadvantage, which

12   the Court of Appeals says in *Regent Office Supply* it's got to

13   be lining your own pocket to the disadvantage of the victims.

14   This indictment does not suggest that that is what was on the

15   minds of any of these defendants.

16             To the contrary, to the contrary -- and it's not just

17   one coach.  It is, according to the indictment, multiple

18   coaches that said to these defendants, we really would like a

19   better basketball team.  Can you please assist us.

20             And reading this indictment, what was on the minds of

21   these defendants was to help the victims, and that's not wire

22   fraud.  This indictment does not lend itself to a suggestion

23   that the goal of these defendants was, we want to injure the

24   universities.  We are out to get the universities.  We want to

25   harm them.  And that is in every single wire fraud case.  There

10

1   are not wire fraud cases where people are even debating this

2   issue.

3          The government here has brought a wire fraud case

4   where, according to the grand jury's allegations, they thought

5   it was important to note that, in the words of the defendants,

6   this was a circumstance where they need to step up and help one

7   of their flagship schools.  That is not wire fraud.  The

8   Justice Department has not brought cases like that and this

9   indictment does not say, as your Honor's hypothetical lays out,

10  that, in fact, this would have been a scheme to line the

11  pockets of these coaches to the detriment of the universities.

12  There is nothing in this indictment that suggests that.

13         What is truly troubling is that they brought a theory

14  which is identical to one that the Seventh Circuit --

15         THE COURT:  I've heard you say that quite a number of

16  times.  The Seventh Circuit does not control my decision.  Of

17  course I read it with respect, and I will do what I think is

18  appropriate.

19         MR. SCHACHTER:  I understand that, your Honor.

20         THE COURT:  I follow the law of this circuit.

21         MR. SCHACHTER:  I understand that, your Honor, and I

22  would like the opportunity to address that.  I will say that

23  the law of *Walters* is the law of this country and that is why

24  the United States Supreme Court said in *United States v.*

25  *Skilling* that wire fraud prohibits schemes in which "the

victim's loss of money or property supply the defendant's gain

with one the mirror image of the other."  That does not fit

this indictment.  Put more appropriately, this indictment runs

afoul of what the Supreme Court said in *Skilling* is the

hallmark of a wire fraud scheme.

And it's an intuitive hallmark.  It is what everybody

thinks of when they think of wire fraud, that you are putting

money in your pocket to the disadvantage of somebody else.  You

are taking money from a victim and you are sticking the money

in your pocket.  That's wire fraud.

This indictment, this grand jury, they did not

conclude that that's what happened here.  That is the law.

*Walters* is the law.  Not just the Supreme Court says is the

law.  The Supreme Court recently visited the definition of

obtain in *United States v. Loughrin* under the bank fraud

context, and this is a scheme to obtain money from the

victimized financial institutions.  What the Supreme Court

said, that's what the word obtain means and, of course, that's

what the word obtain means.  One need look no further than the

dictionary, and we quoted it to your Honor from back in 1909,

when the words obtain were added to the wire fraud statute, and

they mean the same thing today.

THE COURT:  Mr. Schachter, I appreciate this is a case

of great immediate interest, but a jury argument is not all

that helpful.

 1              MR. SCHACHTER:  I understand, your Honor, and I

 2    apologize if I'm exercised.  But this case from the moment that

 3    I read the indictment -- I apologize, your Honor.  I will try

 4    to focus on the legal argument.

 5              The definition of obtain has a dictionary definition

 6    and it is to get hold of by effort.  And that means that the

 7    government, in order to bring a wire fraud case, needs to show

 8    that what was on these defendants' minds, the indictment needs

 9    to be alleged more precisely, the grand jury must have found

10    more precisely that what was on these defendants' minds is that

11    they want to get hold of money or property from the victims.

12              THE COURT:  Their students or their families wish to

13    get athletic scholarships from the victims.

14              MR. SCHACHTER:  The students did.

15              THE COURT:  Or families, right?

16              MR. SCHACHTER:  That's not what the indictment says.

17              THE COURT:  It says family and/or students or students

18    and/or families.  That's what it says.

19              MR. SCHACHTER:  Paragraph 36 of the indictment says

20    that the scholarships went to the students.  There is no

21    allegation that the scholarships --

22              THE COURT:  Of course they did.  Of course they did.

23    I've actually read the indictment.

24              MR. SCHACHTER:  Of course, your Honor.

25              THE COURT:  Carefully.

1        MR. SCHACHTER:  Of course.  It does not allege any

2   financial benefit to the families.  I understand that the

3   families may be happy that their sons received scholarships

4   from the universities, but that's not money or property.

5        And the indictment, in order to run afoul of the wire

6   fraud statute, the grand jury must have found that this was a

7   scheme by the defendants to obtain, or potentially a scheme

8   participant, to obtain money or property from the universities,

9   and the indictment does not say that.

10       Your Honor, the government doesn't cite not a single

11   case that looks like this.  The government does not cite a

12   single case in which the indictment is so replete with

13   allegations that the purpose of their activity is to assist.

14   More importantly, the government does not cite a single case --

15       THE COURT:  How about *United States v. Gray*?

16       MR. SCHACHTER:  Your Honor, *United States v. Gray*.

17       THE COURT:  Which basketball coaches at Baylor were

18   convicted for arranging for recruits to get fake academic

19   credits so that they could play for the Baylor basketball team.

20   How about that one?

21       MR. SCHACHTER:  Your Honor, *United States v. Gray* was

22   an honest services case.  The Fifth Circuit in *United States v.*

23   *Gray* specifically said that the only way that that case could

24   be sustained was because of Section 1346, that the theory

25   there, and it's the grounds of the Fifth Circuit's decision,

 1    was that what the coaches were doing there is, they were

 2    breaching their fiduciary duties to Baylor University.  That's

 3    the gravamen of the fraud.

 4           In distinguishing *Walters*, the Fifth Circuit

 5    specifically said the difference here is, that wasn't an honest

 6    services case.  1346 had not yet been passed at the time that

 7    *Walters* was decided.

 8           This case, this was a 1346 case.  The scheme was to

 9    deprive Baylor of the honest services of its employees.

10    Therefore, there was a breach of fiduciary duty which at that

11    point in time was sufficient to make out an honest services

12    fraud case.  The government has not charged honest services

13    fraud here, nor could they, because *United States v. Skilling*

14    subsequently said, that theory that was laid out in *Gray*,

15    that's not honest services fraud because honest services fraud

16    requires a bribe or kickback.  It shows just how far afield the

17    government has strayed from established jurisprudence because

18    the case that they so heavily relied on, *United States v. Gray*,

19    is a case that is under a completely different theory, 1346,

20    not charged here, and it is conduct which the Supreme Court

21    said is not unlawful.  *Skilling* has reversed *Gray*.

22           THE COURT:  If you have other points you want to

23    address, you might get to them.

24           MR. SCHACHTER:  First, your Honor, I would like to

25    address the government's points under *Walters*.  They tried to

1    distinguish *Walters*.  They make two arguments.  First, they say

2    that this case is distinguishable because scheme participants

3    obtained money.  In fact, there are two issues with that.

4         First, there are two schemes that are alleged here, a

5    Louisville scheme and a Miami scheme.  And with respect to the

6    Miami scheme, we now know that the scheme participants received

7    nothing at all because with respect to Miami --

8         THE COURT:  We now know how?  We know that because

9    it's alleged in the indictment or you got that from some

10   newspaper or otherwise?

11        MR. SCHACHTER:  From the government's disclosure.

12   They disclosed that, in fact, Brad Augustine --

13        THE COURT:  I hate to put this to you, I'm not

14   considering whatever might be in the disclosure, nor am I

15   considering anything else outside the indictment.

16        MR. SCHACHTER:  With respect --

17        THE COURT:  You have no summary judgment in this case.

18        MR. SCHACHTER:  Of course not, your Honor.  *Walters*,

19   your Honor, is the law of this circuit.

20        THE COURT:  *Walters* is the law of the Seventh Circuit,

21   not the Second Circuit.

22        MR. SCHACHTER:  What I meant to say, your Honor, is

23   the principle that's laid out in *Walters*, that wire fraud

24   requires a transfer from the pockets of the defendant to the

25   pockets of the victim, is the law of this circuit as well.  I

1    point to *Skilling*, I point to *Loughrin*, and I also point out --

2         THE COURT:  From the defendant to the victim?  Did I

3    hear you correctly?

4         MR. SCHACHTER:  I'm sorry.  I reversed that.  What I

5    meant, your Honor, of course, from the pockets of the victim to

6    the pockets of the defendant.  And that's why *Regent Office*

7    *Supply* says that the defendants must be acting to their own

8    advantage.  It's why in *United States v. Starr* the Second

9    Circuit said that the purpose of the scheme must be to garner

10   some benefit and cause harm, why *United States v. Carlo* says

11   that wire fraud is a scheme to obtain money or property by

12   means of a scheme that also contemplated harm.  And Judge

13   Parker in *Laurenson* said that wire fraud only exists when a

14   schemer is appropriating a benefit and there is a corresponding

15   loss.

16        All of these cases are saying exactly what the Supreme

17   Court said in *Skilling*, which is that money or property wire

18   fraud, in contrast to honest services fraud, money or property

19   fraud requires a scheme in which the victim's loss of money

20   supplied the defendant's gain.  That is a flaw that this

21   indictment has.

22        This indictment simply does not allege that the

23   victim's loss of money or property that these scholarships

24   supplied the defendants' gain with one being the mirror image

25   of the other, and the only cases that the government has to

1    cite are cases that are completely beside the point.  They rely

2    on *Gray*, which is an honest services case which, your Honor,

3    the Supreme Court said is distinguishable for money and

4    property fraud.  In honest services fraud it does not require

5    that transfer from the victim to the defendant.  That's what

6    *Skilling* is addressing when it lays out the requirements of

7    wire fraud.

8            The government focuses on language from *Finazzo* and

9    *Porcelli*.  Your Honor, I submit that if one gives those cases a

10   careful read, they do not intend to read out of the wire fraud

11   statute the word obtain.

12           What they are addressing, both of those cases, is

13   whether or not the defendant contemplated harm, which is a

14   separate requirement.  Wire fraud requires two things.  It

15   requires that the defendant be scheming to obtain money or

16   property from the victim and, separately, it requires that the

17   defendant contemplate, which the Second Circuit has said means

18   intends, harm to the victim.  It requires those two things.

19           In *Porcelli* a, the Second Circuit said, over and over

20   again as it reviewed the multiple appeals that Mr. Porcelli

21   brought, it noted over and over again the defendant obtained

22   money.  That wasn't the issue that they were addressing.  In

23   *Porcelli* 1, the Second Circuit said, Porcelli, quote, obtained

24   cash.  Jump cite of that is 1359 to 60.  It noted, if he did

25   not collect the tax, then he obtained funds that an honest

1    retailer selling for the same price would have remitted to the

2    state.  If he did collect the tax but failed to remit, then, of

3    course, he obtained money and surely deprived the state.

4         The Second Circuit noted that Porcelli gained

5    something tangible.  There was no question that Mr. Porcelli

6    obtained money or property.  The question was, and this is the

7    words of the Second Circuit, but did Porcelli deprive New York

8    of its property.  It was addressing the second element, whether

9    or not the defendant contemplated harm.  The issue was never

10   whether or not Porcelli obtained money.  He obtained money.

11        Similarly, in *Finazzo*, there is no question that

12   Mr. Finazzo obtained money from the victim.  He was getting

13   kickbacks.  He received $25 million from Aeropostale's

14   payments.  He obtained money or property.  The issue in *Finazzo*

15   was whether or not the deprivation was sufficient.  The

16   separate element about whether or not the defendant

17   contemplated economic harm to the victim is what the Court was

18   addressing.

19        It's for that reason, your Honor, that we say that the

20   rule that's laid out in *Walters* is the rule that's laid out

21   throughout the Second Circuit's decisions and, also, as we

22   note, it's the law of the circuit where Mr. Gatto resides, the

23   Ninth Circuit, as well --

24        THE COURT:  That has got absolutely nothing to do with

25   this, does it?

1          MR. SCHACHTER:  I think it poses a significant due

2     process issue, a real notice issue.

3          THE COURT:  I am sure if there is a conviction you

4     will raise it.

5          MR. SCHACHTER:  Your Honor, may I have a moment.

6          THE COURT:  Yes.

7          MR. SCHACHTER:  Thank you, your Honor.  Unless the

8     Court has any additional questions about our arguments.

9          THE COURT:  No.  Thank you.

10          Any further argument on the defense side?

11          MR. MOORE:  None from Mr. Code, your Honor.

12          MR. HANEY:  None on behalf of Mr. Dawkins.  Thank you,

13     your Honor.

14          THE COURT:  Let me hear from the government.

15          MR. DISKANT:  Your Honor, I think, from the

16     government's perspective, the Court is seeing these issues

17     correctly that many of the arguments made by Mr. Schachter and

18     the defendants either mischaracterize the allegations in the

19     indictment or turn on factual issues that can't possibly be

20     resolved at the motion to dismiss stage because there is no

21     evidence in this case.

22          We, in particular, dispute his characterization of the

23     indictment's allegations about the intent to harm rather than

24     help the universities, and we think the Court is absolutely

25     right to point out that there are myriad instances in which

1    fraud cases are brought in which an insider is alleged to be

2    involved, and this is one of those cases.

3           We believe that we have fully and fairly alleged a

4    scheme to defraud on two different theories, both the direct

5    tangible harm as well as the intangible right to control

6    theory.  We believe the indictment is sufficient and meet its

7    requirements.

8           Unless the Court has other questions from the

9    government, we are prepared to rest on our submission.

10          THE COURT:  Thank you.

11          Anything else, Mr. Schachter?

12          MR. SCHACHTER:  No, your Honor.  Thank you.

13          THE COURT:  It's my intention to deny this motion.  In

14   the event of a conviction, and perhaps, in any case, I will

15   write on it, but I do not find the arguments made by the

16   defendants at all persuasive.

17          I will just make a couple of comments on this theory

18   that there can be no mail fraud because the goal here was to

19   help rather than hurt the alleged victims, the universities.

20          The indictment alleges, first, that the defendants and

21   their coconspirators, the coconspirators including the

22   prospective basketball players and/or their family members, and

23   coaches -- not all coaches, but certain coaches -- conspired to

24   obtain athletic-based financial aid for attractive basketball

25   prospects.

1            The indictment alleges, also, that the objects of the

2    conspiracy included "causing the universities to agree to

3    provide athletic scholarships to student athletes who were

4    ineligible to compete as a result of" bribes paid as part of

5    the conspiracy.

6            Those allegations alone, in my view, the truth of

7    which I'm obliged to accept for purposes of this motion, are

8    fatal to at least this part of the defendants' motions.

9            The argument that in substance those allegations

10   should be ignored because payments to some of these prospects

11   or their families were intended to assist one or more of the

12   coaches in getting the prospects to their schools, that the

13   plan to funnel money to a particular prospect at Louisville was

14   developed "at the request and with the assistance of one or

15   more coaches," and that defendant Gatto told defendant Code

16   that he already had learned about a request by a coach at the

17   University of Miami about a request by Miami for assistance in

18   securing a particular player, is exceptionally unpersuasive.

19           The indictment alleges with great clarity that the

20   NCAA rules prohibited the payments.  It alleges that the

21   coaches and other conspirators concealed the bribes from the

22   universities in order for the scheme to succeed and to obtain

23   the scholarships and it alleges that the universities stood to

24   suffer substantial penalties if the payments were uncovered.

25   I'm obliged to assume all those facts.

1          Moreover, the jury would be entitled to hear evidence

2     which, if believed, would warrant a conclusion that the coaches

3     were not acting in the sole interests of the schools that

4     employ them.  The government would be entitled to prove that

5     the coaches had substantial personal interests, reputational,

6     financial, career, and possibly other interests in putting

7     winning teams on the floor and that those interests were not

8     completely aligned with the interests of their employers.

9          In other words, it is conceivable that the proof will

10    show that the coaches' motives were partly, or even entirely,

11    though that seems doubtful, selfish, that their motives were

12    mixed; in a sense, their motives may have been to help the

13    schools in the sense that, all other things being equal, the

14    schools would like to have the most winnings teams that they

15    can have.  But their interests may also have been in conflict

16    with the interests of the schools because it subjected them to

17    the risk of penalties.

18         Had the fact been fully disclosed, and the indictment

19    alleges that they were not, it's entirely possible that the

20    universities would never have permitted what went on here.  To

21    say in those circumstances that the goal, the singular goal

22    here was to help the universities is naive and just not

23    warranted, at least at this stage of the case, however powerful

24    a jury argument it might turn out to be at trial.

25         The Second Circuit, I believe, in *D'Amato*, wrote that

the principle that directors and officers may act on behalf of

a corporation does not extend to acts of self-enrichment.  So

the attempt to equate the actions and statements of the coaches

who, after all, are alleged to be parties to an illegal

conspiracy here, with the actions of their employers, is, at

best, premature.

What the evidence will show at trial remains to be

seen, but that's where we are going here.  This motion is very,

very likely -- it is now denied.  I will enter a written order.

As I said, I may write on it in more detail.

Certainly, I've had the benefit of extremely thorough

briefing.  I've considered this carefully.  But that's where I

come out, in part for the reasons that I've rather informally

sketched in these oral remarks, which may turn out to be

revised when I write, but that's the way I see it this morning.

I'm sufficiently confident of the bottom line, that the motion

is denied.

Anything else?

MR. SCHACHTER:  Nothing for Mr. Gatto, your Honor.

MR. DISKANT:  Nor from the government.

THE COURT:  Thank you.

o0o