I3m9gata

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                         17 CR 686 (LAK)

JAMES GATTO, ET AL.,

            Defendants.

------------------------------x

                             New York, N.Y.
                             March 22, 2018
                             4:16 p.m.

Before:

               HON. LEWIS A. KAPLAN

                             District Judge

                  APPEARANCES

GEOFFREY S. BERMAN
     Interim United States Attorney for the
     Southern District of New York
EDWARD B. DISKANT
ELI J. MARK
ALINE R. FLODR
NOAH D. SOLOWIEJCZYK
ROBERT L. BOONE
     Assistant United States Attorneys

WILKIE FARR & GALLAGHER
     Attorneys for Defendants James Gatto and Christian Dawkins
MICHAEL S. SCHACHTER
CASEY E. DONNELLY

STROOK STROOK & LEVAN
     Attorney for Defendant Merl Code
JAMES L. BERNARD

I3m9gata

```
 1            (Case called)

 2            MR. DISKANT:  Good afternoon, your Honor.  Edward

 3   Diskant, Eli Mark, Aline Flodr, Noah Solowiejczyk and Robert

 4   Boone for government.

 5            THE COURT:  Good afternoon.

 6            THE CLERK:  Defendant Gatto, are you ready?

 7            MR. SCHACHTER:  Good afternoon, your Honor.

 8            Michael Schachter and Casey Donnelly on behalf of

 9   Mr. Gatto.

10            THE COURT:  Mr. Schachter.

11            THE CLERK:  Defendant Code, are you ready?

12            MR. BERNARD:  Good afternoon, your Honor.  James

13   Bernard for Mr. Code.

14            THE CLERK:  Defendant Dawkins, are you ready?

15            MS. DONNELLY:  I'll be arguing for Mr. Dawkins today.

16            THE COURT:  And you are?

17            MS. DONNELLY:  Ms. Donnelly.

18            THE COURT:  Ms.?

19            MS. DONNELLY:  Casey Donnelly.

20            THE COURT:  Say it slowly and loudly.

21            MS. DONNELLY:  Casey Donnelly.

22            THE COURT:  I see, Ms. Donnelly.  OK.

23            Thank you.

24            MS. DONNELLY:  Sure.

25            THE COURT:  All right.  We'll start with the motion to
```

I3m9gata

1  suppress evidence from the search of the cellphones.  Who is

2  up.

3          MR. SCHACHTER:  I think that's me, your Honor.

4          Your Honor, does the Court have a preference for me to

5  argue from here or from the lecturn?

6          THE COURT:  Lecturn.

7          MR. SCHACHTER:  Thank you, your Honor.

8          THE COURT:  Has to do with audibility.

9          MR. SCHACHTER:  Your Honor, we seek to suppress any

10  evidence found from the searches of the cellphones of the three

11  defendants for several reasons.  The first is that there was

12  lacking probable cause in the search warrant affidavit in order

13  to search the data found on the cellphone.

14          With respect to Mr. Gatto, the only evidence that was

15  set forth in the search warrant affidavit, in the application,

16  with respect to Mr. Gatto was that he made eight telephone

17  calls.  And, of course, the evidence of those calls does not

18  reside on the cellphone.  And so the question is for what

19  reason would the existence of eight phonecalls give the

20  government probable cause to search for evidence on the

21  mountains of data which exists on a cellphone which, as we all

22  know, is somebody's internet search history, their photos,

23  their communications, their notes, bank records.  People

24  contain their entire lives or people hold their entire lives on

25  their cellphone.  We submit that there is no more probable

I3m9gata

1   cause to search the data on somebody's cellphone based solely

2   on the existence of telephone calls than there would be

3   probable cause to search their office or their home.

4           THE COURT:  Do you think it's a little more likely

5   that people who make and receive voice communications over

6   cellphones are more probable than the average bear to exchange

7   text messages?

8           MR. SCHACHTER:  I don't think there's any case that

9   says that.

10           THE COURT:  That's not what I asked you.

11           MR. SCHACHTER:  No.  I don't think that there is any

12   greater -- I think we are all --

13           THE COURT:  So you think somebody with a landline is

14   just as likely to exchange text messages as somebody who uses a

15   cellphone routinely for voice?

16           MR. SCHACHTER:  I guess the way I would answer that is

17   to say I think everybody is likely to engage in text messages.

18   Members of the government team, I am, everybody in the gallery,

19   sends text messages.  The question is really --

20           THE COURT:  Now we're getting somewhere.

21           MR. SCHACHTER:  The question really is:  Is there

22   probable cause to believe that evidence of criminal activity

23   will be found in those text messages simply because they

24   engaged in telephone conversations.  And I think there is no

25   greater --

I3m9gata

1        THE COURT:  That's such an oversimplification of this,

2    isn't it?

3        The probable cause analysis is not they made

4    phonecalls, therefore, there's probable cause to think there's

5    evidence of crime in the text messages.  It is that they made

6    telephone calls with particular types of content, right?

7        MR. SCHACHTER:  Yes.  The allegation is that they

8    engaged in criminal activity and that that criminal activity

9    was discussed by phone.

10        And I think it's clear that the fact that somebody

11    engages in a telephone call regarding criminal activity does

12    not open up their residence, their home, their -- their

13    residence, their office, their personal files to a search by

14    the government.

15        THE COURT:  Really?  How about this phonecall:

16    Charlie, I've got the records of the fraud that we're

17    perpetrating on Wells Fargo bank in my garage.

18        How about that?  Do you think that opens up a search?

19        MR. SCHACHTER:  Of course, yes.

20        THE COURT:  The vast broad statements, my bottomline

21    here, are not advancing your case.

22        MR. SCHACHTER:  Understood, your Honor.

23        I guess my point is that there are no telephone calls

24    involving Mr. Gatto in which they are referring to

25    communications by text message.  If there were, we wouldn't be

I3m9gata

1   making this argument.

2          The search warrant application with respect to

3   Mr. Gatto does not speak of where there may be other evidence

4   found.  They don't speak of text messages.  They don't speak of

5   e-mails.  They don't speak of any of the data which could be

6   found on their home and, therefore, the fact that they engaged

7   in these calls, we submit, does not create probable cause to

8   believe that there would be evidence in the data on his phone

9   anymore than there would be probable cause to believe that

10  there would be evidence in his home or in his office.

11         Our submission is that the government needs to do more

12  before they are going to search the data on somebody's phone.

13  They need to create some kind of probable cause to believe,

14  based on the evidence that they have, based on evidence that

15  there will be found, that there is likely to be found evidence

16  in a particular place.

17         THE COURT:  What appellate case says that?

18         MR. SCHACHTER:  Well, the Supreme Court said that in

19  Illinois v. Gates.

20         THE COURT:  In what year?  1962, perhaps?

21         MR. SCHACHTER:  I imagine that you're correct, your

22  Honor.

23         THE COURT:  Well it's just a law school memory.

24         MR. SCHACHTER:  1983.

25         THE COURT:  1983.  Were cellphones very common then?

I3m9gata

1          MR. SCHACHTER:  No.  Since that time the Supreme Court

2     has spoken on multiple occasions about really the significant

3     privacy interests that are at issue in people's phones.

4          THE COURT:  No doubt about that.

5          MR. SCHACHTER:  This is an issue that is a relatively

6     new issue that the law needs to confront because of the

7     enormity of personal data which exists on cellphones.

8          And so since 1983 I think that there is a greater

9     recognition, and the Supreme Court has spoken about that, there

10    is a greater recognition that we need to safeguard people's

11    privacy with respect to the data on their phones the same way

12    that we safeguard people's homes.  And certainly the

13    government, when they're able to show probable cause to believe

14    that there is going to be evidence of criminal activity in

15    somebody's home, the government may intrude on somebody's home.

16    They may search the residence.

17          THE COURT:  Does a warrant have to say there's

18    probable cause to believe it will be under the center cushion

19    on the couch?

20          MR. SCHACHTER:  It does not.

21          However, it does need to establish probable cause not

22    just that the person engaged in criminal activity but that

23    there will be evidence of that criminality in that particular

24    location.

25          THE COURT:  And here there is probable cause to

I3m9gata

1    believe they engaged in criminality on the telephone.

2            MR. SCHACHTER:  We obviously dispute whether or not

3    it's evidence of criminality but certainly accepting the

4    government's theory, then the government has laid out probable

5    cause to believe that there was evidence of criminality that

6    was discussed using that phone, that we submit, your Honor, is

7    very distinct from concluding that there is probable cause to

8    believe that there is evidence of criminality to be found in

9    the enormous amount of data which is found on that phone.  And

10   that is really the distinction.

11           The government did not seek a search warrant to search

12   Mr. Gatto's home based on the fact that he had made these

13   calls.

14           THE COURT:  Let me come back to the question that

15   elicited Illinois v. Gates from you which obviously has no

16   application to cellphones specifically in the sense that you're

17   speaking of.

18           Do you have a single appellate case that says that if

19   they have probable cause to believe the phone has been used to

20   discuss criminal activity they need to discuss probable cause

21   to look in each particular type of file on the phone as opposed

22   to getting a warrant for phone?

23           MR. SCHACHTER:  This issue has been discussed by

24   multiple district courts, but I'm unaware of an appellate

25   decision that discusses that squarely.

I3m9gata

1          THE COURT:  So now let's cut to the chase.  We have

2     here in the case of Mr. Gatto a warrant application that is, I

3     don't know, several dozen pages, right?

4          MR. SCHACHTER:  Yes, your Honor.

5          THE COURT:  And if a United States magistrate judge

6     found that an application to establish probable cause for the

7     search that was authorized, why aren't the agents entitled to

8     rely on that in good faith even if you are right?

9          MR. SCHACHTER:  Because one of the exceptions to the

10    good faith exception is where the search warrant application is

11    so lacking in indicia of probable cause that it would be

12    unreasonable to conclude that the search warrant application

13    provides probable cause to search the data on Mr. Gatto's

14    cellphone.  That is our position.

15         THE COURT:  So your position is that an agent, faced

16    with about a 40-page application, and a magistrate judge's

17    decision to issue the warrant authorizing the search of the

18    phone, and it is, first of all, chargeable with knowledge with

19    whatever the body of law is; secondly aware, therefore, that

20    there is no appellate case that supports your point of view,

21    your position is it is nonetheless unreasonable as a matter of

22    law for that agent to conclude that maybe the magistrate judge

23    got it right?

24         MR. SCHACHTER:  I suppose I would analyze that

25    question from just the opposite direction which is there are no

I3m9gata

1    cases that say that the existence of telephone calls provides

2    probable cause to conclude that there is evidence of

3    criminality in the data that is stored on the cellphone.  And

4    absent such case law, that is what should cause an agent to

5    conclude that it would not be a good faith search based on that

6    search warrant application.

7         There simply is no case law that says that simply the

8    fact that you have telephone calls involving criminal activity

9    creates probable cause to search somebody's home, somebody's

10   office, or the data on their cellphone.  And we think that's no

11   different.

12        THE COURT:  Would you estimate for me how many times

13   in the last ten days you have attempted to reach somebody by

14   telephone, failed, and sent a text or an e-mail instead.

15        MR. SCHACHTER:  That is extremely commonplace.  I

16   would certainly concede that.

17        I only submit that that does not meet the legal

18   threshold of establishing there's probable cause, that there's

19   fair probability that evidence of a crime will be found in a

20   particular place, here, the data on the phone.

21        THE COURT:  OK.  I have your argument.

22        Do you want to go on to the Miranda?

23        MR. SCHACHTER:  The other argument is that the search

24   warrant was overbroad which I can address but it's in our

25   papers, your Honor.

I3m9gata

         1          THE COURT:  Whatever you want.

         2          MR. SCHACHTER:  We also submit that the search warrant

         3   was overbroad in that it -- rather than confining the search to

         4   particular types of data on the phone, it permitted the

         5   government to search the entirety of the phone.  And we think

         6   that in that regard it is an overbroad general warrant which

         7   allows for the government to rummage through so much personal

         8   data when that is unnecessary.  The search warrant could have

         9   been tailored to particular places, certain types of data,

        10   rather, on the phone.  And that is how the search warrant

        11   should be crafted.

        12          THE COURT:  Give me an example.

        13          MR. SCHACHTER:  The search warrant protocol allows the

        14   government to search the entirety of the phone.  There is

        15   nothing on the phone that the government is not permitted to

        16   search.  If they wished to search Mr. Gatto's internet search

        17   history, they would be permitted to.  If they wished to search

        18   Mr. Gatto's photographs, they would be permitted to.

        19          There is no limitation, no direction to the government

        20   that they may only search, for example, text messages.

        21          THE COURT:  Isn't it possible and isn't it frequently

        22   done that word processing documents, text messages, e-mails,

        23   are converted into various types of graphic files and vice

        24   versa?

        25          MR. SCHACHTER:  I certainly would agree that that

I3m9gata

1    happens.

2         THE COURT:  And, therefore, if a phone is being used

3    to text, to e-mail, isn't it just a reasonable possibility,

4    maybe even a probability, but certainly a reasonable

5    possibility that what we would commonly refer to as image files

6    are, in fact, images of documents?

7         MR. SCHACHTER:  I certainly would agree with your

8    Honor that the government could speculate.  They could even

9    think that maybe there is evidence in lots of places on the

10   phone.

11        I suggest that the law is as Judge Nathan described it

12   in United States v. Wey.  When she was analyzing searchable

13   electronic data she said that the government must first explain

14   how and why each type of data they wished to search is

15   connected to criminal activity.  And I submit that when you are

16   talking about the search of the electronic data on somebody's

17   cellphone or on their computer, that the government must layout

18   in its application either why they believe that evidence of

19   criminality will be found, that there's probable cause that it

20   will be found throughout the entirety of the data and that's

21   why they need to search it, or they need to confine the search

22   warrant that's requested to only those -- a search of

23   categories of data where there is probable cause to believe

24   that evidence of a crime will be found in that particular

25   place.

I3m9gata

1          Your Honor, we submit that there --

2          THE COURT:  Let me ask you a question.  If the

3     sentence at the end of the warrant, right near the end, that

4     reads, "Depending on the circumstances, a complete review of

5     the seized ESI may require examination of all of the seized

6     data to evaluate its contents and determine whether the data is

7     responsive to the warrant" had been omitted or deleted you

8     wouldn't have the general warrant argument, right?

9          MR. SCHACHTER:  Your Honor, we would submit that we

10    would still have a problem, and the reason for that is that it

11    does not --

12         THE COURT:  You can tell me about your problem in a

13    minute.

14         MR. SCHACHTER:  That will take a long time.

15         THE COURT:  Answer my question first.  It's that

16    sentence that your general warrant argument hangs on, isn't it?

17         MR. SCHACHTER:  It is.  Although without that

18    sentence, the government is still being permitted to search the

19    cellphone.  There is no limitation.  If you take out that

20    sentence, you still don't have a limitation.  That sentence

21    makes clear that the warrant is without limitation.

22         THE COURT:  I'm not sure you're right.  But maybe you

23    are.  Let's work through it.

24         They complain they're looking for fruits of a

25    particular kind of crime.  They cite the statutes.  They list

I3m9gata

paragraphs (a) through (f) describing what kind of

communications and other data.  And then in the paragraph from

which I read the sentence they have what I guess in these days

is called the protocol about how they're going to go through

the data on the phone.  And it includes things like opening or

reading the first few pages of files to see whether they're

responsive.

          Now, what's wrong with that?

          MR. SCHACHTER:  Well, what's wrong with that is, your

Honor, we submit that it permits a general rummaging by the

government in a lot of places on that phone where they do not

have probable cause to believe that they will find evidence of

criminality.

          And not to suggest that there isn't a theoretical

possibility, but that's not the test.

          Surely, the government can articulate why they suspect

that maybe anywhere on that phone may be evidence of

criminality.  But that's not the test.  The test is that they

have to have a fair probability that evidence of a criminal

activity will be found in a particular place.  And that we

suggest, your Honor, renders the search warrant overbroad and

violative of the Fourth Amendment.

          THE COURT:  OK.  I think I have your argument.  Do you

want to say anything about the password?

          MR. SCHACHTER:  Yes, your Honor.  Although I note

I3m9gata

1      that --

2                  MR. BERNARD:  Your Honor, if --

3                  THE COURT:  I'm sorry.  I can't hear you.  You're

4      talking over each other.

5                  MR. BERNARD:  I'm sorry, your Honor.  If I may just

6      address the issue that you just raised with respect to

7      defendant Code.

8                  THE COURT:  Briefly.

9                  MR. BERNARD:  Your Honor, I would just point out that

10     the search warrant affidavit for Mr. Code actually is quite

11     specific with respect to what type of data the government is

12     allowed to review.  It goes directly to the point that counsel

13     was just making.  It's Exhibit 2 to the motion and there's two

14     relevant paragraphs, your Honor.

15                 Paragraph 6 says, "Based on my training, experience,

16     and participation in this investigation I know that the subject

17     devices can be used to make and receive telephone calls and

18     send and receive text messages and e-mails."  That's the limit

19     with respect to what type of data could be reviewed.

20                 THE COURT:  You're reading from what, the affidavit?

21                 MR. BERNARD:  The affidavit, yes, your Honor.

22                 THE COURT:  OK.  Go ahead.

23                 MR. BERNARD:  Paragraph 21 then elaborates on that.

24     It says, "Moreover and based on my training and experience, I

25     am aware that cellphones like the subject devices that had been

I3m9gata

1    used to communicate with others about fraud schemes often

2    contains records of that activity," and then here are the other

3    types of data "including call logs, voice mail messages, text

4    messages, e-mail correspondence, contact information, and other

5    identifying data regarding coconspirators, notes about calls,

6    and meetings relevant to the subject offenses, and the like,"

7    whatever and "the like" means.

8           I submit, Judge, that the point that was being made

9    regarding photographs, for example, to be specific, and

10   internet search histories, are noticeably absent from the

11   description in those two paragraphs of what would be, in the

12   view of the agent, based on the agent's review of all of

13   evidence at that point in time, appropriate to review on the

14   phone.  And, therefore, it would be appropriate in an

15   overbreadth analysis to limit the types of data that can be

16   searched to specifically those types of data that were outlined

17   in the affidavit.

18          THE COURT:  OK.  Thank you.

19          Mr. Schachter?

20          MR. SCHACHTER:  Yes.  With respect to the search of

21   Mr. Gatto's phone, we believe that that search was also

22   violative of his rights.  Mr. Gatto was handcuffed and he had

23   already invoked his right to counsel when the FBI agent asked

24   for his pass code.

25          THE COURT:  That's his version.  There's a proffer by

I3m9gata

1    the government that that's not exactly what happened, right?

2         MR. SCHACHTER:  Well surely there is no

3    counteraffidavit.  And so -- and the government concedes, I

4    believe, that they accept for purposes of this argument, they

5    accept Mr. Gatto's declaration as true.  So I don't know that

6    there is any meaningful dispute as to what happened.

7         Furthermore --

8         THE COURT:  Don't they, or do I misremember, reserve

9    the possibility that if I thought it relevant they would put

10   forth testimony?

11        MR. SCHACHTER:  I believe the government to have

12   suggested something to that effect.  However, they also say for

13   purposes of this motion they concede the accuracy of

14   Mr. Gatto's declaration.

15        Perhaps more importantly in their description of the

16   facts they specifically -- I don't think they do dispute that

17   Mr. Gatto had invoked --

18        THE COURT:  What they said they conceded, they said

19   they conceded for purposes of the brief.  Not the motion.

20        MR. SCHACHTER:  I would submit that if the government

21   wished to put forth a different set of facts or contradict what

22   Mr. Gatto had to say that the time to have done so would have

23   been in response to our motion to suppress when we put forth an

24   affidavit.  If the government does not put forth a

25   counteraffidavit which, of course, I don't know why they

I3m9gata

1   wouldn't if they disputed the facts, they had every opportunity

2   to submit a counteraffidavit to your Honor and chose not to.  I

3   would assume -- regardless of what the government says, it

4   seems like having failed to put forth a counteraffidavit that

5   for purposes of this motion the declaration is to be taken as

6   true.

7           More importantly though, your Honor, I think even in

8   the text of their brief I don't think they dispute the

9   following facts.  I do not believe there is a dispute --

10  although we'll hear from the government in a moment -- I don't

11  believe there is a dispute that Mr. Gatto was handcuffed.  I

12  don't think there is a dispute that he invoked his right to

13  counsel.  And I don't think that there is a dispute that while

14  handcuffed and after he invoked his right to counsel the FBI

15  agent asked for his pass code, quote, and I'm quoting now the

16  government, the purpose of that.  They say, and it's in a

17  footnote, they say that the purpose of that question was "to

18  confirm that the agent had correctly observed the pass code

19  that he believed he had seen Mr. Gatto's wife enter earlier."

20          So I don't -- based on that footnote I anticipate that

21  the government concedes that while handcuffed and after he had

22  invoked, the agent asked Mr. Gatto to reveal his pass code and

23  that he did so for a purpose.

24          THE COURT:  You took that so far out of context that

25  it's not even funny.  So let's move along.  You're just ignored

I3m9gata

1      the sentence before that.

2              I mean you really have to assume, Mr. Schachter, that

3      I've read the material.

4              MR. SCHACHTER:  I certainly apologize, your Honor, if

5      I'm mistaken about that.  I certainly read that to mean that

6      the agent asked Mr. Gatto to reveal his pass code.

7              THE COURT:  Yeah, he did, right after Gatto said to

8      the agent turn the phone off.

9              MR. SCHACHTER:  Well.

10             THE COURT:  And after the agent had observed him enter

11     the password earlier in the day.  Big deal.

12             MR. SCHACHTER:  Well, your Honor, you don't need a

13     pass code in order to silence an iPhone.  There's buttons on

14     the side.  There's simply a button to the right.  Nobody needs

15     to enter the pass code in order to silence the phone.

16             So I submit that that seems like an odd position for

17     the government to take if they're actually going to call the

18     agent to suggest that the reason why he asked --

19             THE COURT:  Do me a favor.  You may think it's an odd

20     position but don't tell me their position is they've conceded

21     the facts on the motion.  Because if you do that it seems to me

22     I'm entitled to accept that if the government tells me that

23     your position is something that isn't your position.

24             MR. SCHACHTER:  I apologize, your Honor.  I understood

25     the government's position that the agent asked in order to

I3m9gata

1    confirm the pass code.

2           THE COURT:  I assume everybody in this case is

3    operating in good faith.  I don't do otherwise.  I also

4    practiced law long enough to know one gets excited about an

5    argument and makes mistakes.  Fine.  No harm.  No foul.  Now

6    move on.

7           MR. SCHACHTER:  Your Honor, the moment that Mr. Gatto

8    had invoked, the government should not be asking him questions

9    that have an investigative intent.

10          And perhaps there is a dispute as to whether or not

11   that question was asked with an investigative intent.  I

12   understood the government to say that when the agent was asking

13   to confirm the pass code that that was to learn the pass code.

14   And we submit, your Honor --

15          THE COURT:  And the agent says for the purpose of

16   shutting off the phone.  And maybe he didn't understand how the

17   phone worked.  Who knows?

18          But it seems to me that unless your procedural default

19   argument has legs -- and I'm not passing judgment on that

20   now -- there needs to be a hearing on that issue, doesn't

21   there?

22          MR. SCHACHTER:  The argument would be a procedural

23   default one.  It would be that if the government wished to

24   contest that fact, then they should have put in a

25   counteraffidavit and they didn't.

I3m9gata

THE COURT:  I understood that argument.  That's your
procedural default argument.  It has legs or it doesn't.  I
understand it.

MR. SCHACHTER:  Certainly if the government had put
forward a declaration I believe that said that the purpose that
I had asked for that pass code, then we may need a hearing.

THE COURT:  Mr. Schachter, let's move on.  It's a
quarter to five.  This is the first of four motions and we have
to move through it with some dispatch.

MR. SCHACHTER:  Yes, your Honor.

It's our position that this was a question asked in
custodial interrogation with investigative intent and for that
reason the exclusionary rule applies and the evidence from the
search of the phone should be suppressed.

THE COURT:  Understood.

Thank you.  Anybody else on the defense side on this?

All right.  Government.

MR. DISKANT:  Just one moment, your Honor.

(Pause)

MR. DISKANT:  Ms. Flodr will handle argument for the
government.

THE COURT:  So, Ms. Flodr, while you're making your
way to the lecturn let me tell you what your time will be best
be spent on.

I am somewhat troubled by the language that I read to

I3m9gata

1   Mr. Schachter that he construes as a general warrant.  I am

2   less concerned but not unconcerned about his probable cause

3   argument.  I'm less concerned because it seems to me I don't

4   see how he gets around the good faith argument, at least right

5   now.  I am concerned about why the government didn't put in an

6   affidavit on the Miranda point and whether I shouldn't hold you

7   to that.

8         MS. FLODR:  Thank you, your Honor.

9         I will start with the overbreadth argument that

10   Mr. Schachter has made to this Court thus far.

11         As your Honor is well aware, incorporated as part of

12   each of these search warrant affidavits, the contents of these

13   calls were detailed in excruciating detail, which

14   unquestionably established that the calls pertained directly to

15   and helped further the charged crimes.

16         As the defendants know and they point out, phones,

17   including smartphones like the ones, most of ones that were

18   seized here, are not just used to make phonecalls, which is

19   precisely the point for seeking the search warrants in the

20   first place.  The fact that those phonecalls are heard and the

21   contents of those phonecalls are known, all of that leads to

22   the reasonable inference that evidence would be left behind of

23   those phonecalls.  All of the information about these

24   phonecalls are embedded in those phones.  The phone --

25         THE COURT:  Maybe that gets you into the call logs and

I3m9gata

1   stuff like that but why does it get you into photographs?

2          MS. FLODR:  Your Honor, with respect to photographs

3   the way that the defendants have articulated this point is that

4   digital media is somehow able to be parsed completely

5   separately into delineated categories, that your photographs

6   appear in one specific location and is stored just like that.

7   But that's not how the Second Circuit has even recognized that

8   that is how electronic media that is stored on your phone is

9   actually stored and can be searched in that proper way.

10         For example, take a contact list, just someone's

11  contact in a smartphone.  That is not just someone's textual

12  information like their e-mail address that's associated with

13  that contact.  That contact can also include all of the

14  photographs that have ever been sent back and forth between

15  that contact and the user of the cellphone.

16         THE COURT:  What's the evidentiary support for that

17  proposition?

18         MS. FLODR:  For that proposition.  Your Honor, I think

19  in terms of how the media is stored in these phones, you can't

20  separate out:  Oh, I'm just looking for the textual information

21  associated with that contact.  The media is not -- doesn't lend

22  itself to that kind of information separation.

23         THE COURT:  But I'm asking you where is the

24  evidentiary support for how these gizmos work and store

25  information and why it is that on showing of probable cause

I3m9gata

1    with respect to the content of telephone calls makes it

2    reasonably likely, or whatever the precise test is, that you

3    need to look at other things there beside the call log, to take

4    an example.

5          MS. FLODR:  Your Honor, at this point we'd have to put

6    in an affidavit from someone who is an expert in the field of

7    how this data is actually stored on each of these phones.  Each

8    of those phones in this case were not all iPhones.  There was

9    also a BlackBerry, and there was also a flip phone.  A flip

10   phone in this case, we were able to take down all of the call

11   logs and the messages associated that were -- the contact list

12   associated with that phone.  And that's like the type of media

13   that was stored on that phone.  But with respect to the other

14   phones we would have to put in an affidavit at this point to

15   explain how the media is stored on each of these phones.

16         THE COURT:  Where does the burden lie on this?

17         MS. FLODR:  Your Honor, it's our burden to show how

18   this data is stored and how we would execute -- one moment,

19   your Honor.

20         (Pause)

21         Your Honor, after conferring with cocounsel in this

22   case it is the defendant's burden to show that there is a

23   problem with the way that these phones have been executed.  And

24   the government is very happy, if necessary, to put in an

25   affidavit about how these phones maintain this data and the

I3m9gata

difficulties in separating out the data in the way that the

categories that the defendants have described to be parsed out

in the very specific manner that they have suggested.

             THE COURT:  Why shouldn't I give both sides the

opportunity to put in affidavits on this point?

             Mr. Schachter.

             MR. SCHACHTER:  Well, your Honor, I think that the

time -- the question as to whether or not this warrant is

overbroad is what information was provided to the magistrate at

the time that the search warrant was sought.  I think whether

or not the government can put forth an affidavit today is

really not -- that doesn't answer the question as to whether or

not the warrant was overbroad.

             THE COURT:  Well I'm not sure you're right about that.

Let's just work through this.

             I'm looking at Exhibit 1 and we have the affidavit of

the agent to which is attached Exhibit A, which I take to be an

exhibit to the agent's affidavit, right?  Any disagreement

about that?

             (Pause)

             And, in fact, we don't even have to go that far.

Because we can go to paragraphs 14 and 15 of the application,

and 16, especially 16, which says that in order to determine

whether they've got all the data responsive to the warrant they

may have to look at everything.  And then in -- attached on A,

I3m9gata

1    after giving specific techniques that they propose to use, talk

2    about it perhaps being necessary for the purpose of determining

3    what data is responsive to the warrant to look at other things.

4    So, that goes to the probable cause to look at everything.

5            There's at least an implication, and maybe a direct

6    statement, that in order to execute the warrant properly they

7    have to look more broadly.

8            Now, you're challenging that.  You haven't put in an

9    affidavit explaining why that's wrong.  Begins to border on a

10   Franks issue, although I don't suppose anybody was up to no

11   good in that sense.

12           If you don't want an opportunity to put in more proof,

13   I'll act accordingly.

14           MR. SCHACHTER:  Your Honor, I don't think we need an

15   opportunity to put forth a declaration because I don't think we

16   dispute that evidence of criminal activity can theoretically be

17   found anywhere on a phone.  And I don't dispute that if the

18   objective of the government is to search for any evidence of

19   criminality that exists anywhere on a phone, then they would --

20   they may wish to search the entirety of the electronic data.

21   The evidence can be hidden in lots of different places.  I

22   don't think we dispute that.

23           I think the issue is that when you're talking about

24   electronic data, that the government needs to come forward to

25   the magistrate with more than that.  They need to be able to

I3m9gata

1    say that there -- here is the particular pockets of electronic

2    data that we believe there's probable cause to believe that

3    there will be found evidence of criminality or in the

4    circumstances of Ulbricht which both sides have cited, which is

5    the Silk Road case, the courts have said there was permission

6    to search the entirety of electronic data on a laptop because

7    the evidence presented by the government was that the laptop

8    was permeated with fraud.  That is absent -- absent something

9    in the declaration, which is submitted to the Court, which says

10   that this cellphone is permeated with fraud.  By virtue of the

11   nature of this crime, we can anticipate that there would be

12   criminal activity throughout all the nooks and crannies of this

13   phone, which I don't think the government even suggests that

14   they have.

15        When they're talking about electronic data the

16   government needs to do more otherwise that warrant is

17   overbroad.  What they should have done is what Mr. Bernard

18   suggests, which is they should have limited this warrant to

19   particular categories of data for which they are able to come

20   forward with probable cause to believe that there is going to

21   be evidence that will be found, not might be.  Surely the

22   government can come forward with a declaration saying it might

23   be lots of places.  But that's not the test.

24        THE COURT:  Does the government want an opportunity to

25   put in an affidavit if the defense doesn't?

I3m9gata

1          MS. FLODR:  If your Honor would like one, we're happy

2     to submit one.

3          THE COURT:  Two weeks enough time?

4          MS. FLODR:  Yes, your Honor.

5          THE COURT:  All right.  You may do so.

6          Now what about the lack of an affidavit on the

7     password?

8          MS. FLODR:  Your Honor, the government submits that

9     even based on the evidence as put forth in the Gatto affidavit,

10    the facts as put forth there, as we said, still does not amount

11    to custodial interrogation in the way that custodial

12    interrogation has been defined in the jurisprudence.

13          In this case, and also in all of the other cases that

14    the defendants cite, contrary to the facts of this case, the

15    agents in those cases were very clearly initiating

16    communications with each of the defendants after they invoked

17    their right to counsel, multiple times on some occasions, with

18    the very clear purpose of trying to undermine the protections

19    of Miranda to obtain evidence for their cases and for their

20    investigations.

21          That is not what happened here, even based on the

22    facts that are put forth in the Gatto affidavit.

23          What happened here is that hours after Gatto had

24    invoked his right to counsel and questioning had indisputably

25    ceased, Mr. Gatto's cellphone began to ring.  Reacting to that

I3m9gata

1    ring the agent asked Mr. Gatto for his password, a question

2    that Mr. Gatto responded to.  There is no allegation that the

3    agent engaged in any kind of police misconduct or coercive

4    tactics to obtain that password from Mr. Gatto.  It was simply

5    a reasonable question, greeted with a reasonable response from

6    Mr. Gatto.

7              The notion that there might be some investigative use

8    to the response does not render that question a product of

9    custodial interrogation.

10             THE COURT:  So, is the government standing or falling

11   on this motion on Mr. Gatto's version of the facts?

12             MS. FLODR:  Your Honor, yes.  We are --

13             THE COURT:  So which one, standing or falling?

14             MS. FLODR:  We believe that even under the Gatto facts

15   as alleged in the Gatto affidavit that there is still not --

16   there are no allegations and there are no facts before this

17   Court that would suggest that this was custodial interrogation.

18             THE COURT:  So your view is if I conclude there's

19   enough there it's suppressed?

20             MS. FLODR:  Your Honor --

21             THE COURT:  On his version of the facts.

22             MS. FLODR:  For this statement, if the Court does

23   conclude that it was custodial interrogation for Mr. Gatto to

24   respond, then the statement itself, Mr. Gatto's response with

25   his password, would be suppressed, but not the fruits thereof.

I3m9gata

| | |
|---|---|
| 1 | THE COURT:  OK.  I think I have your position on that. |
| 2 | Anything else on this particular motion? |
| 3 | MS. FLODR:  Not from the government, your Honor. |
| 4 | THE COURT:  Thank you. |
| 5 | Any response from the defense? |
| 6 | MR. SCHACHTER:  No, your Honor. |
| 7 | We'd ask for an opportunity to the extent the |
| 8 | government submits an affidavit within two weeks we'd -- I |
| 9 | don't know that we'll need to but I would like an opportunity |
| 10 | to submit some kind of written response.  I don't know that |
| 11 | there would be an affidavit but I don't know what this |
| 12 | affidavit is going to look like and so to the extent necessary |
| 13 | we'd like an opportunity to put in a responsive writing. |
| 14 | THE COURT:  Sure.  You have a week for that. |
| 15 | MR. SCHACHTER:  Thank you, your Honor. |
| 16 | THE COURT:  The motion to suppress the wiretaps |
| 17 | pursuant to the April 7 order and extensions. |
| 18 | MR. DISKANT:  Your Honor, just so the record is clear |
| 19 | I presume Ms. Donnelly is representing, that Mr. Haney has |
| 20 | consented to her making the argument on his behalf. |
| 21 | THE COURT:  Thank you for noting that.  That's right, |
| 22 | right, Ms. Donnelly? |
| 23 | MS. DONNELLY:  That's correct. |
| 24 | THE COURT:  OK.  Fire away. |
| 25 | MS. DONNELLY:  Your Honor, Mr. Dawkins' application is |

I3m9gata

1    straightforward and it is based on the text of the statute

2    Title III as well as Supreme Court precedent.  Title III

3    Section 2518(4)(d) requires that every court order authorizing

4    a wiretap must identify by name the justice department official

5    who approved the wiretap request.

6         This information is clearly missing from the April 7

7    wiretap.

8         THE COURT:  Let me ask you this question.  Suppose the

9    authorizing official was Jones and the order said Smith.  Where

10   does that come out?

11        MS. DONNELLY:  If Jones is -- excuse me.  If Smith

12   himself is an authorized individual, meaning that both Smith

13   and Jones had authority to authorize the government's request,

14   then the order is facially sufficient and there is no basis for

15   suppression.

16        THE COURT:  How the do we know that it's facially

17   sufficient, simply because we know the name Smith?

18        MS. DONNELLY:  As I understand the Supreme Court's

19   precedent on this, and the case that most directly speaks to

20   your Honor's question is United States v. Chavez, the question

21   is if -- if you were just to simply look at the order and you

22   saw that it seemed to have the name of a justice department

23   official who's named there, it doesn't seem to be missing any

24   other information --

25        THE COURT:  How does the order with the name Smith,

I3m9gata

1    the incorrect name, Smith, tell you that Smith is, in fact, a

2    justice department official?  It's just a name, right?

3            MS. DONNELLY:  Correct.  But in each of the orders the

4    government is also required to say that -- to say Smith's

5    title.  So he is the acting assistant -- the assistant attorney

6    general or he's the acting assistant attorney general.  And in

7    that -- if he was identified as such, a reader of the order

8    could reasonably understand that he had authority and he

9    approved the request.

10           THE COURT:  Now, was there a title in this order?

11           MS. DONNELLY:  Yes, there was.

12           THE COURT:  So how do we know that Fill isn't the name

13   of a justice department official?

14           MS. DONNELLY:  Well, because Fill In is in all

15   capitals.

16           THE COURT:  Doesn't it say just Fill?

17           MS. DONNELLY:  No.  It says Fill In.  And also it's

18   spelled F-I-L-L versus P-H-I-L.

19           THE COURT:  Yes.  And I've met some people with very

20   odd names in my life.

21           MS. DONNELLY:  I believe that the government has

22   conceded that Fill In is not the name of a government official.

23           THE COURT:  No.  My hypothetical presupposes that.

24           MS. DONNELLY:  OK.  Well if, in fact, there was an

25   acting deputy assistant Attorney General whose name truly was

I3m9gata

Fill In, but, in fact, this application was approved by

Mr. McFadden, then the April 7 order would be sufficient on its

face.

THE COURT:  But it's sufficient on its face only by

reference to facts extrinsic to it; that is to say, the fact

that Fill In really was the name of an authorized justice

department official, true?

MS. DONNELLY:  That's correct.

THE COURT:  So, we can't take this notion of

sufficient or insufficient on its face to its logical extreme

no matter what.

MS. DONNELLY:  I would agree with you there although I

would argue that in this circumstance I don't believe we're

taking it to an extreme.  In fact, we're asking this Court to

find exactly as the D.C. Circuit did in United States v.

Scurry.

THE COURT:  I know that.  And if the Second Circuit

had so concluded, I would happily do so.  But it seems to me

that that decision in the D.C. Circuit is probably wrong.

MS. DONNELLY:  Well your Honor --

THE COURT:  With all respect.

MS. DONNELLY:  By all means, if I may try to persuade

you differently, footnote 14.

THE COURT:  I mean I stand with Sergeant Bumble here.

To reach that conclusion is to exalt form over substance to an

I3m9gata

1    outrageous degree, isn't it?

2              MS. DONNELLY:  I don't believe so.  And there's a

3    number of reasons why that is.  And the D.C. circuit said it

4    more articulately than I will.

5              THE COURT:  I'm not sure that's going to be true.

6              MS. DONNELLY:  The order identification requirement

7    was mandated by Congress because Congress intended for the

8    agent or the telecommunications official, whoever it is, that

9    is receiving this order, he or she needs to be able to look at

10   it and say, yes, this has every t is crossed every i is dotted.

11             THE COURT:  So they're supposed to do research, right?

12             MS. DONNELLY:  Well I don't think that they're

13   supposed to do research.  But I do believe, as I understand the

14   legislative history, Congress really did intend for a

15   telecommunications official or other agent to confirm for

16   themselves that the order was appropriate.  It's part of --

17             THE COURT:  That's the whole point.  It can't be done.

18   It doesn't make any sense if it read it literally.  And the

19   reason it can't be done is that unless you happen to have a

20   telephone company official who has memorized the organization

21   chart of the U.S. Department of Justice that person has

22   absolutely no idea from the fact that there's a name that

23   precedes deputy assistant attorney general whatever, in fact,

24   is such a person.  It's not available on the face of the order.

25             MS. DONNELLY:  Well let me ask you to look at it a

I3m9gata

1    slightly different way.

2          So, for example, in Scurry and I think here as well,

3    in Scurry there was asterisk, and here we have brackets and

4    then fill in.  So any reasonable person who is looking at this

5    is not wondering whether fill in or asterisks is possibly a

6    government official.

7          THE COURT:  Right.  But let me ask you to look at it

8    from a different way.

9          MS. DONNELLY:  By all means.

10          THE COURT:  Suppose it says J. Walter Thompson,

11    Assistant Attorney General, and in fact there is no J. Walter

12    Thompson who is an assistant attorney general, and you're

13    saying that Congress's purpose is served because anybody who

14    looks at it, and no matter whether the name is a real name, a

15    fictitious name, a name of somebody who works for the justice

16    department, a name of somebody in the road company of some

17    Broadway show, they're supposed to glean from the fact that

18    there is a name that it's actually an authorized official.

19    That's -- that doesn't make any sense to me.

20          MS. DONNELLY:  I would disagree with you only here,

21    because in that instance I believe the telecommunications

22    provider would be -- he would be -- it would be very reasonable

23    for him to assume that Mr. McLaughlin, or whatever name you

24    just used, that he was, in fact, a real official.  And then the

25    defendant would then argue that because Mr. McLaughlin is not

I3m9gata

employed by the justice department at all, that, in fact, the

order is insufficient under subsection one, right; that, in

fact, that we have a problem where the communications were

intercepted illegally, unlawfully.  That's not what we're

moving on here.

Here we are saying this is a facially insufficient

order, and that is a slightly different argument that would

apply in your Honor's hypothetical.

THE COURT:  The order refers to, it says it is entered

on the basis of the application.  And the application has the

right official.  It has the right letters of authority and

delegation.  And it's all there.

MS. DONNELLY:  True.

But I would respond again by pointing your Honor to

what the D.C. Circuit said in Scurry and what the Supreme Court

said in Giordano which is the order is the operative document.

The Verizon provider who is putting together the government

stuff, they don't have the application.

And I would also point to the D.C. Circuit explanation

of the fact that there was really two different requirements

here.  We have an application identification requirement, which

helps the magistrate or the district judge assure themselves

that the government is complying with Title III, and then there

is the order identification requirement.  And they really are

distinct propositions.

I3m9gata

1          THE COURT:  Look, the overall purpose is that there

2     should not be a Title III interception unless it is duly

3     authorized.  And there is just no way anybody in his right mind

4     could say this was not duly authorized.  And you don't say so,

5     to your credit.

6          What you have done is seized on poor Mr. Fill In and,

7     you know, you're saying what amounts to a piece of sloppiness

8     by somebody in the U.S. Attorney's Office that has affected

9     nobody's substantial rights whatsoever and said, in the public

10     interest here do something that will potentially give serious

11     criminals -- that's what they're alleged to be anyway, we'll

12     see -- a free pass.

13          MS. DONNELLY:  Do you mind if I respond just very

14     briefly.

15          THE COURT:  I don't mind.  Of course not.  This

16     argument -- it's not as overdrawn -- your argument is not as

17     overdrawn.  I take it seriously.  But I once sat on a panel in

18     the Court of Appeals where we had an appointed lawyer seeking

19     reversal of a criminal case and the argument was that the guy

20     in jail who was convicted by a jury was the wrong guy.  How do

21     we know this?  We know this because the inmate swore that he

22     never puts his name in writing in solid capital letters.  And

23     the person named in the indictment by the same name, all in

24     capital letters.  So the presiding judge of the panel -- I will

25     not identify who it was -- exploded with impatience about what

I3m9gata

1    a foolish argument this was.  And the lawyer, to his enormous

2    credit, said:  Your Honor, I didn't ask for this case.  You

3    appointed me to argue this case, and I'm doing the best I can.

4    And I appreciate you're doing the best you can, Ms. Donnelly.

5            You have a tough audience on this one.  Sorry.

6            MS. DONNELLY:  I would say, however, that I don't

7    believe the argument is just mine or Mr. Dawkins'.  I believe

8    that the solicitor general has also taken the same --

9            THE COURT:  I read those papers.  I did.  I'm aware of

10   that.

11           MS. DONNELLY:  And in light of your comments with

12   Mr. Schachter, I assume that you disagree with the way that we

13   characterized the solicitor general.

14           THE COURT:  I'm going to look carefully at what the

15   solicitor general had to say again and I will also, no doubt,

16   reflect on the proposition I learned a great many years ago at

17   a law school up in Cambridge that estoppel never runs against

18   the government and what application it might have here.  But I

19   understand your point on that.

20           MS. DONNELLY:  Would your Honor like to hear from me

21   on the questions of whether the good faith exception applies or

22   whether the independent source analysis is appropriate or no?

23           THE COURT:  Whether the independent, what did you say?

24           MS. DONNELLY:  The independent source analysis.

25           We argue that the subsequent wiretap orders, those

I3m9gata

1    beyond the April 7 order, are tainted, they are derivative

2    evidence.

3         THE COURT:  Right.  I don't think I need to hear

4    argument on that but I appreciate your argument and I thank you

5    for it and admire your courage.

6         MS. DONNELLY:  Thank you.

7         THE COURT:  The Brady motion.  Mr. Schachter.

8         MR. DISKANT:  Your Honor, just before we move on I

9    wanted to offer, if the Court has questions, we're happy to

10   address them particularly but if --

11        THE COURT:  I don't think we're going to take more

12   time on that one.

13        MR. DISKANT:  Thank you.

14        MR. SCHACHTER:  Thank you, your Honor.  Does your

15   Honor have a preference as to which motion -- which Brady

16   motion we address first, whether we speak of the evidence of

17   the conduct of the agents or whether we address our request for

18   additional witness statements?

19        THE COURT:  Witness statements.

20        MR. SCHACHTER:  Yes, your Honor.

21        Well, your Honor, our argument is that we identified a

22   number of -- let me backup.  It can be difficult sometimes for

23   the government to anticipate what exactly the defenses are

24   going to be.  So in an effort --

25        THE COURT:  I'm sure they're eternally grateful to you

I3m9gata

1   for pointing them out.

2          MR. SCHACHTER:  We're here to serve.

3          THE COURT:  Good for you.

4          MR. SCHACHTER:  Because we wanted the government to

5   have a better idea of what our position is so that they will be

6   able to scour their record and identify whether or not they

7   have evidence that could be material to the defense or could be

8   exculpatory.  And we are in a better position to make that call

9   than the government is, we submit.

10          So we tried to identify exactly what it is we're

11   looking for.  We have no doubt, or I should say it is great

12   likelihood that if there is a document, other than a witness

13   statement, we would anticipate that if the government has

14   received documents, that they have turned around and produced

15   those to us.  We think that it is likely, although we don't

16   know for sure, we believe it is likely that to the extent the

17   Brady evidence exists in the hands of the government it will be

18   in statements which have been made by witnesses to them during

19   the course of their investigation.  And, indeed, we do know

20   that there have been statements that have been made to the

21   government that are exculpatory.

22          For example, we know that Brad Augustine, who was

23   formerly a defendant in the complaint, has -- it's -- the

24   government has disclosed in a summary fashion to us,

25   paraphrased by the AUSA, they have summarized that

I3m9gata

1    Mr. Augustine says that, in fact, he was not in on the scheme

2    that is alleged in the indictment.  In fact, there was not

3    going to be any payment that was going to be made to

4    Mr. Little.  But effectively he was, in his own scheme to rip

5    off Mr. Gatto, Dawkins, and Code, at least that's what I glean

6    from the government's disclosure.

7         Given that disclosure, we submit that nearly every

8    word that Mr. Augustine likely told the government is

9    exculpatory and, therefore, we don't know why the government

10   would insist on only providing some kind of paraphrased

11   retelling of what they learned from Mr. Augustine as opposed to

12   the 302 that would actually capture the words, which do --

13   which may make a very big difference.

14        THE COURT:  And in due course if they call him you

15   will get it.  And it's conceivable you'll get it in our

16   circumstances.  But, I don't get why you need it now.

17        Need is not the right word.  Why you're entitled to it

18   now.

19        MR. SCHACHTER:  As Judge McMahon said that the

20   timeliness of Brady disclosures is the minute that the

21   government receives them.  There is no reason for delay.

22        THE COURT:  With all due respect to my colleague and

23   former partner, that's just not what the Supreme Court has

24   said.  What the Supreme Court has said is that you're entitled

25   to Brady material in sufficient time to make use of it.  I

I3m9gata

paraphrase, but it's close enough for my purpose.

We are at least six months away from trial.  You know all about Mr. Augustine.  You know in summary what he said. And I don't understand why you're entitled to a witness statement.

MR. SCHACHTER:  Your Honor, I agree that the test for this is really when we can make timely use of it.  Certainly the courts have encouraged the government not to play that close to the edge and have encouraged them to make early disclosure.  And I submit that when the government has evidence which is, at least with respect to Mr. Augustine, clearly exculpatory, there is no reason for them to delay.  I don't know what the reason would be -- certainly they can protect --

THE COURT:  One reason may be that you're not entitled to it.

MR. SCHACHTER:  Mr. Augustine's statement as summarized by the government is directly -- directly contradicts the allegations of the indictment.  And so it would be hard to believe that anything he said, at least if the summary of what the government provides is accurate, then he is saying that's -- that many of the allegations of the indictment are untrue.  And so --

THE COURT:  Many?  Where did that come from?

MR. SCHACHTER:  Well the entire portion relating to the University of Miami scheme lays out a scheme that includes

I3m9gata

1    Mr. Augustine and alleges that Mr. Augustine is speaking -- is

2    in a conspiracy with the defendants to get money from --

3            THE COURT:  And he's said I'm not part of any such

4    thing in substance, right?

5            MR. SCHACHTER:  Correct.

6            And I submit that given the fact that his statements

7    would be inconsistent.

8            THE COURT:  How do you know what else they talked to

9    him about?

10           MR. SCHACHTER:  We do not, your Honor.

11           THE COURT:  You do not.  Are you entitled to know

12   other things they talked to him about?

13           MR. SCHACHTER:  To the extent that it is exculpatory,

14   yes.

15           THE COURT:  Now, suppose they went on about whatever

16   he might know about the University of Louisville or about

17   Southern Cal or something else, suppose they talked to him

18   about lots of things, none of which, perhaps, is exculpatory of

19   anybody.  Maybe the answers are I don't know.  Maybe what I

20   heard about what happened at Louisville is the following.

21           Why are you entitled to use to, to use your words,

22   rummage through their files in the hopes that you'll find

23   something?

24           MR. SCHACHTER:  As is always the case for defense

25   counsel that is seeking Brady evidence, we don't know what the

I3m9gata

1   government has, of course.

2          THE COURT:  Right.

3          MR. SCHACHTER:  What we're asking for is given the

4   government's disclosure, that the Court -- that the Court

5   direct the government to examine these statements and in

6   particular with respect to the portion that is, according to

7   the government's summary, inconsistent with the indictment,

8   that we get not the government's retelling but we get the words

9   that Mr. Augustine used.

10          THE COURT:  Let's take what you said one at a time.

11   They said they're very conscious of their obligations and, of

12   course, they're going through whatever they have.

13          Not good enough for you?

14          MR. SCHACHTER:  Candidly, no, your Honor.  I think

15   we're entitled to not to Mr. Diskant's summary of what

16   Mr. Augustine says.

17          THE COURT:  That's a different question.  You said two

18   things.

19          You said it's not good enough for you that they say

20   they're going through everything.  You want me to tell them to

21   go through everything, and then come back.  And what do you

22   think the odds are they're going to say:  We did it again.

23   Here's what we have to say.  What do you think the odds of that

24   are?  99 percent?  A hundred percent?  What's the point of it?

25          So then we get to the second part.  And the second

I3m9gata

 1  part of what you've said is:  OK.  Witness said something

 2  exculpatory and they've told us in substance what it is.  Now

 3  we want to see everything he told them on any subject

 4  exculpatory or not.  That's your position here.  I don't see

 5  the justification for it.

 6           MR. SCHACHTER:  Let me pull back and reconsider that

 7  position.

 8           Certainly what I should say, your Honor, is that to

 9  the extent that Mr. Augustine made exculpatory statements, we

10  would like the words that he used as opposed to the

11  government's retelling.

12           THE COURT:  Suppose they don't have the words that he

13  used?  Suppose there are:  A, notes of an agent or an

14  assistant, sketchy notes.  Suppose what they have is a

15  recollection of what he says.  Suppose, case three, they have

16  an affidavit signed by him.  Those are three totally different

17  cases, aren't they?

18           MR. SCHACHTER:  Yes, your Honor.

19           And with respect to —— to the extent that the agents'

20  recollections as recorded in the FBI 302 is different in the

21  words that Mr. Diskant provided to us in his letter, then we

22  believe that we would be entitled to the agents' recollection

23  as recorded in that memoranda.

24           THE COURT:  Under what authority?

25           MR. SCHACHTER:  Under several.  First, simply Brady.

I3m9gata

If words are exculpatory, then Mr. Diskant has one version of those words and the agent, as recorded in his 302 has another version, then both would -- to the extent they're both exculpatory, unless one says something completely different, then both of those versions are exculpatory and there is no reason for the government to withhold that.  That should be turned over to us promptly.  And certainly, as your Honor states it, in time for us to make effective use of it at trial.

THE COURT:  So you know who Mr. Augustine is.  You probably, at least in a figurative sense, know where he lives.  You can go talk to him.  You can find out what he says are the facts.  No different than any other case.

What's the problem?

MR. SCHACHTER:  Your Honor, I believe that the government is obligated to do more than that.

THE COURT:  I know.  That's the conclusion.  But where is the reasoning?

MR. SCHACHTER:  The reasoning is that to the extent they've spoken to a witness who has made exculpatory statements, has been disclosed to us, that we are entitled to more than just the summary of Mr. Diskant's version.

Judge Rakoff in United States v. Gupta spoke of the fact that when multiple witnesses hear a statement then each of those versions may be independently probative of what that witness had to say.  We believe that we're entitled to not just

I3m9gata

1   the summary but also the FBI agents' 302 or any other recording

2   of those statements.

3         THE COURT:  No matter how much it says on other

4   subjects?

5         MR. SCHACHTER:  No.  Your Honor pointed out correctly

6   that that is an overbroad statement.  To the extent he said

7   things that are not exculpatory, we're not entitled to those.

8         I only ask for the statements which he made which were

9   exculpatory.

10        THE COURT:  Well but that's not what your motion is.

11   I understand you've receded from your motion.

12        Now, I've looked at your papers and it's not all just

13   obviously about Mr. Augustine.  What you've essentially tried

14   to do here is to serve interrogatories and Rule 34 notices that

15   would due credit to a plaintiff in a securities class action.

16   You want everything.  You want their whole file.  And I don't

17   see why it's my job to go through this grotesquely overbroad

18   set of requests and draft them for you, frankly, especially on

19   a Brady theory where the Second Circuit has said I'm in no

20   position to make determinations as to Brady before trial.

21        MR. SCHACHTER:  What we attempted to do, and I

22   certainly recognize that there are many of them, many such

23   requests.  What we attempted to do is identify the kind of

24   information that we thought were exculpatory to assist the

25   government in complying with its obligations.

I3m9gata

1          THE COURT:  There is no problem with that and I was

2   serious when I said they, no doubt, are grateful to you for it.

3   Maybe I was being a little ironic, but nonetheless it's in your

4   interests to do that.

5          But the question whether it's in your interests to do

6   it and whether it's useful to the government to know in advance

7   what it is you think might be exculpatory so they don't

8   inadvertently fail to produce some Brady material, it's no

9   doubt that's all helpful.

10          But you're asking me to turn the way the Brady rule

11  works, at least in this circuit, upside down and to decide

12  pretrial what is exculpatory in circumstances where I don't

13  fully know your case.  I wouldn't even if I spent time reading

14  your interrogatories and document notices, so characterized by

15  me, and then stop doing the rest of my job to look through the

16  government's whole investigative file for the next who knows

17  how many weeks or months.  That's not my job.

18          MR. SCHACHTER:  I understand, your Honor.

19          I suppose that our hope would be that the Court would

20  direct the government to identify whether -- to the extent that

21  your Honor agrees that the items that we have identified would

22  fall within the definition of exculpatory, that the Court would

23  direct the government to at least tell us whether it exists.

24  Because we don't know whether there are such witness statements

25  or there are not.

I3m9gata

1        THE COURT:  Look, which definition of exculpatory

2   should I use?

3        Doesn't it boil down to whether the evidence is so

4   dramatic that it would do something like show that a conviction

5   would be an injustice?  Isn't it something like that.  I can't

6   cite it from memory.

7        MR. SCHACHTER:  Your Honor, I think it would be that

8   there would be a reasonable probability that the outcome may be

9   different or that it would cast evidence in a different light.

10        THE COURT:  How am I supposed to do that before trial?

11        MR. SCHACHTER:  Your Honor --

12        THE COURT:  Take Mr. Augustine.  For all I know he's

13   going to cooperate with you, he's going to come in here and

14   he's going to testify, if it's relevant and admissible, to

15   precisely what you hope he's going to testify to.

16        Now, if the government hadn't given you his witness

17   statement now, if there is one, how would that failure be a

18   Brady violation if Augustine shows up and testifies to just

19   what you want him to say?

20        MR. SCHACHTER:  I think that the government's failure

21   to disclose -- the government still has the obligation to

22   disclose exculpatory information whether I am able to call

23   Mr. Augustine or not.

24        Now, if Mr. Augustine -- the charges against him have

25   been dismissed and I doubt very much that he is going to be

I3m9gata

1   willing to speak to me, and I doubt very much that he will be

2   willing to take the witness stand.

3            THE COURT:  He's subject to subpoena.

4            MR. SCHACHTER:  For sure.  However, he will

5   nonetheless have a Fifth Amendment right.

6            THE COURT:  Maybe.  Maybe not.

7            MR. SCHACHTER:  I believe -- and I don't believe that

8   the government has any intention of calling him as a witness.

9   And so I believe that the government intends to suppress the

10  words that Mr. Augustine told the government which were

11  inconsistent with the indictment's allegations and that would

12  be a Brady violation.  And there's nothing -- there's very

13  little I can do about that.

14           THE COURT:  I'm sorry.  I just told you the substance.

15  Right.

16           Now suppose you have the witness statement.  How are

17  you going to get it into evidence if he won't testify?

18           MR. SCHACHTER:  Well, armed with the witness

19  statement, your Honor, I may come before the Court and ask

20  for -- to the extent that the government does refuse to

21  immunize him, I may have a basis to ask for the Court to order

22  him to testify under a grant of immunity.

23           It is -- whether or not I wish to do that, that -- I

24  am entitled to more information that will instruct me on those

25  strategic decisions.  I'm entitled to exculpatory information.

I3m9gata

1        THE COURT:  I know why you want it.  But as I -- when

2   I was the father of a young child I often tried to explain "I

3   want" is different from "I get."

4        MR. SCHACHTER:  I believe I understand the Court's

5   views on this.

6        THE COURT:  There are respects in which I haven't made

7   up my mind about what to do about this.  You've got at least

8   two very big problems.  You've got the pretrial determination

9   problem and you've got the dramatic overbreadth of all of this.

10  So I'm just sharing my thoughts with you because you should be

11  able to answer them if you have something else you want to say

12  to those points.

13       MR. SCHACHTER:  Your Honor, I'm happy to narrow the

14  scope of them.  I attempted to do that in our papers.  If it

15  would be of assistance to the Court I can try to -- in fact, I

16  would welcome the opportunity to narrow the requests that we

17  are seeking with respect to our request for the 302s.

18       THE COURT:  You don't want me to regard your failure

19  to have done it in the first instance as a procedural default

20  that forecloses that avenue for you, right?

21       MR. SCHACHTER:  Absolutely not, your Honor.

22       THE COURT:  Look, if you want to try again and make it

23  narrower, you have the same two weeks I gave the government to

24  try to deal with the problem they perhaps have.  Fair is fair.

25  So see what you can do.

I3m9gata

1          MR. SCHACHTER:  Yes, your Honor.  We will do that.

2          THE COURT:  OK.  Anything else on this motion?

3          MR. SCHACHTER:  No, your Honor.

4          THE COURT:  OK.  Let me just see if I have any other

5    question on it before we leave it.

6          (Pause)

7          No.  Thank you very much.

8          OK.  So we now have the other motion.  Now that one

9    never got filed or is it filed under seal?

10         MR. SCHACHTER:  It's filed under seal, your Honor.

11         THE COURT:  Do you know the docket number offhand?

12   Don't bother.  You know, if you know what docket item number it

13   is, just call my law clerk tomorrow and tell Ms. Shapiro what

14   it is because, otherwise, I have start opening all the sealed

15   envelopes from the vault to figure out what it is.

16         OK.  Let's go briefly on that one because the hour

17   draws late.

18         MR. SCHACHTER:  Yes, your Honor.

19         Your Honor, the government disclosed to us that the

20   undercover agents and the case agents in this case are under

21   criminal investigation for misusing government funds to be used

22   for gambling and certain food and beverages during a very

23   significant undercover operation which forms much of the

24   allegations of the indictment.

25         We asked the government for additional information

I3m9gata

regarding the circumstances of that misappropriation, including how much money we're talking about, how precisely the federal funds were used, and more information about their roles in the investigation.  The government declined to provide us with that information, rather standing on their initial disclosure.

The Supreme Court has said that we are entitled to challenge the thoroughness and the adequacy of the investigation.  We are entitled to evidence that attacks the reliability of the investigation is what Kyles v. Whitley said. As the Supreme Court said, indications of conscientious police work will enhance probative value and slovenly work will diminish it.

There are, as we laid out, issues relating to the reliability of the Las Vegas operation.  There are many odd things about that -- about the evidence that has been turned over in connection with what happened in Las Vegas.  For example, we have in the line sheets numerous instances where there appears to have been a 45-minute long call and, yet, what is provided to us is that there is no audio content for that recording.

We have a monitored conversation where the case agent abruptly ended the recording without identifying himself by name, the time, and there is no indication as to why the recording device was turned off at that particular time.  Was it intentional?  Was it to hide something?  These facts we do

I3m9gata

1    not know.  We merely know that normal protocol associated with

2    many of the other recordings was not followed in this instance

3    by this case agent that is now under investigation.

4           We anticipate -- the government has said that they

5    have no intention of calling as a witness the case agent or the

6    undercover agent.  However, we anticipate that they do intend

7    to call the confidential witness, Marty Blazer.  Mr. Blazer was

8    present at the Las Vegas operation.  He may have been involved

9    in the misappropriation.  The food and beverages that were used

10   may have used to become inebriated, Mr. Blazer may have been

11   during the course of operation, and that may speak volumes to

12   his relationship with the undercover and the case agent.

13          We should be able to argue that these tapes don't --

14   the tapes that have been provided to us do not tell the whole

15   story.

16          There are more questions.  There is an allegation that

17   Mr. Augustine was provided with $12,700 ostensibly for the

18   purpose of providing it to the family of another athlete.  We

19   know that with respect to Mr. Little, Mr. Augustine had no

20   intention of taking any money and handing it to Mr. Little.

21   What happened with the $12,700 that Mr. Augustine received?

22   Was that shared with the case agent?  Was that shared with the

23   undercover agent?

24          There are many issues that address the thoroughness

25   and the reliability of this investigation.  And, as a result,

I3m9gata

we are entitled to more information, the information that we

have requested, regarding these criminal investigations of the

case agent and the undercover.  And the Second Circuit has

said, United States v. Jackson, that the government cannot

avoid disclosure of this kind of evidence which goes to

material impeachment of a government witness simply by saying

that they're not going to call those witnesses.

        In Jackson, the circumstances were, the Second Circuit

ruled, that the defense was entitled to impeachment evidence of

a confidential authority who had died prior to trial and

nonetheless the Second Circuit said that -- and even though

there was a video tape of the drug deal that was at issue in

that case, nonetheless the Second Circuit said that they were

entitled to information which may have been useful to impeach

the credibility of that confidential informant, including

evidence that the DEA may have terminated their relationship

with him in the past, which the defense suggested may indicate

some kind of misconduct by this confidential informant.

        The fact that they're not calling these witnesses,

which we understand why they would not, does not obviate their

disclosure obligation.  So we believe that we are entitled to

this information both under Brady and also under Rule 16, as

your Honor described the scope of Rule 16 in United States v.

Stein.  That is our argument.

        THE COURT:  OK.  Thank you.  I'll hear from the

I3m9gata

government.

          MR. MARK:  Just very briefly, your Honor.  The
government obviously takes any allegations of agent misconduct
very seriously.  There was a single incident of alleged
misconduct.  The defendants know about this incident because it
was disclosed by the government.  It was disclosed also to the
Court when the complaints were sworn out here.  There is
nothing that is being hidden from the defense.  There is no
other alleged misconduct that the government is aware of here.

          And this is obviously continuing.  There's an ongoing
investigation.  If there's other information known, we will
disclose that.  And we have not made any decision about whether
to call the case agent or the undercover in this case.  And
that's not an appropriate representation of the government's
position here.

          Unless the Court has any questions particularly we're
prepared to rest on our brief.

          THE COURT:  I don't.

          I'll take all of the motions under advisement.  You'll
hear from me over time.  And I thank you all.

          (Adjourned)