UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - v. –

JAMES GATTO, a/k/a "Jim,"
MERL CODE, and
CHRISTIAN DAWKINS,

          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

       **AGENT AFFIDAVIT**

       17 Cr. 686 (LAK)

STATE OF NEW YORK   )
                  ) ss.
COUNTY OF NEW YORK  )

     John Vourderis, Special Agent, Federal Bureau of Investigation, deposes and states under penalty of perjury that the following is true and correct:

## I.   Introduction

     1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI" or "Investigating Agency"). As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C) ("Rule 41"), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been a special agent with the FBI since 2014. Through my work in law enforcement, I have participated in a variety of investigations into fraud and public corruption offenses. As a part of those investigations, and among other investigative steps, I have conducted or participated in the execution of search warrants, including searches of electronic media.

2.      This Affidavit is based upon my participation in the investigation of the above-captioned matter, including my examination of reports and records, my conversations with other law enforcement agents and other individuals, and my own training and experience. Because this Affidavit is being submitted for a limited purpose, namely in response to a motion filed with respect to the search of certain cell phones recovered during the investigation, it does not include all the facts that I have learned during the course of this investigation. Where the contents of conversations with others are reported herein, they are reported in substance and in part. Similarly, actions, procedures, and search techniques described herein are described in summary fashion, and only in relevant part.

## II.    The Cell Phone Search Warrants

3.      On October 6, 2017, the Honorable Gabriel W. Gorenstein, United States Magistrate Judge for the Southern District of New York, issued a warrant pursuant to Rule 41 for the search of two cell phones, both iPhones, seized at the time of Christian Dawkins's arrest on September 25, 2017 (the "Dawkins Cell Phones").

4.      On October 10, 2017, the Honorable Katharine H. Parker, United States Magistrate Judge for the Southern District of New York, issued a warrant pursuant to Rule 41 for the search of an iPhone seized at the time of James Gatto's arrest on September 26, 2017 (the "Gatto Cell Phone").

5.      On November 3, 2017, the Honorable Barbara C. Moses, United States Magistrate Judge for the Southern District of New York, issued a warrant pursuant to Fed. R. Crim. P. 41 for the search of two cell phones, a Blackberry and a Kyocera, seized at the time of Merl Code's arrest

on September 26, 2017 (the "Code Blackberry" and "Code Kyocera," respectively") (collectively, the "Search Warrants" and the "Cell Phones").

6.       While I was not the affiant on each application described above, in advance of participating in the execution of the Search Warrants, I reviewed all of the Search Warrants, including any descriptions of the methods I and other law enforcement agents were to use to review the Cell Phones, as well as the attached riders which detail the materials the Search Warrants authorized law enforcement agents to seize.

**III.    Execution of the Search Warrants**

7.       Since the Search Warrants were obtained, and as detailed further below, I and other law enforcement agents assigned to the investigation have executed them.  I have personally been involved in the execution of each of those warrants, and what follows is based on my own participation, as well as my conversations with other law enforcement agents who have participated in the execution of the Search Warrants.

8.       In order to properly execute the Search Warrants, I and other law enforcement agents endeavored to extract copies of the contents of the Cell Phones.  In this case, I am aware that law enforcement agents were to create such extractions of the Dawkins Cell Phones, the Gatto Cell Phone, and the Code Kyocera.  By contrast, I and other agents were unable to extract a copy of the contents of the Code Blackberry, which was not compatible with the software used by the FBI to do such extractions.  Because the process of executing the warrant for the Code Blackberry is therefore different, I describe each process separately below.

3

**A.  Searches of the Dawkins Cell Phones, the Gatto Cell Phone, and the Code Kyocra**

9.       With respect to the Dawkins Cell Phones, the Gatto Cell Phone, and the Code Kyocera, as noted above, law enforcement agents were able to extract a copy of the contents of the phones (collectively, the "Extracted Phones").  Law enforcement agents did so because, as set forth herein, where possible, I and other agents conducted our review of the extracted content, and not of the original phones themselves.  In order to create the extractions, I understand that law enforcement agents used a program known as "Cellebrite" which in, turn, generates an extraction (a "Cellebrite Extraction") for each of the Extracted Phones.  I and other agents then used the Cellebrite Extraction of each Extracted Phone to search for and identify material that is within the scope of our warrants ("Identified Material").

10.       Based on my use of the Cellebrite program, including during and as a part of this investigation, I know that a Cellebrite Extraction automatically divides the content of a cell phone by category of data, such as "SMS Messages," "MMS Messages," "Chats," [1] "Emails," or "Voice Mail."  Moreover, within each such category of data, the Cellebrite program provides law enforcement agents a user-friendly interface to search a Cellebrite Extraction of a phone using common search terms and methodologies.  For example, using a Cellebrite Extraction, I and other law enforcements agents could search all "MMS Messages" on a cell phone for a particular name or phone number, or for key words such as "bribe" or "scheme" or "payment."

---

[1] Based on my training and experience, I am aware that "SMS" refers to "short message services" or traditional text messages, which are capped at 160 characters and cannot include multimedia.  By contrast, "MMS" refers to multimedia-message-service or multimedia text messages that have no length limits and can include or "attach" various forms of multimedia, such as images and videos.  "Chats" refers to other forms of similar communication, such as the "iMessage" feature available to users of iPhones or WhatsApp communications for users of the WhatsApp application.

11.     As noted above, to search the Extracted Phones, I and other law enforcement agents – all of whom reviewed the Search Warrants and accompanying riders before participating in the searches – used the Cellebrite Extractions from the Extracted Phones, rather than reviewing the original phones.  In so doing, I and other law enforcement agents focused primarily on the areas of the Cellebrite Extractions that contained categories of data that we believed would be most likely to yield Identified Material.  In particular, I and other law enforcement agents focused on data categories such as MMS Messages,  SMS Messages, Chats, Contacts, Call Logs, and Voice Messages, all of which we believed were most likely to contain communications or related information regarding or in furtherance of the criminal scheme charged in the above-captioned case, and, where applicable, the criminal scheme charged in *United States v. Evans et al.*, 17 Cr. 684 (ER).  In reviewing those categories of data, I and other agents primarily used search terms, including the names and numbers of known scheme participants, to locate and review text communications that might be within the scope of the Search Warrants.   In certain instances, I and other agents reviewed SMS and/or SMS Messages on the Cell Phones without the use of search terms where we believed an individual review would be likely to yield Identified Material.

12.     While I understand that the terms of the Search Warrants permitted myself and other agents to conduct a "complete review" of all of the data on the Cell Phones, no such review was actually undertaken.  Instead, because the Cellebrite Extraction is able to sort the contents of the Extracted Phones into categories of data that are, in turn, searchable, as detailed above, I and other agents chose to focus our review on certain categories of data, like SMS Messages, MMS Messages, and Chats, that we believed were most likely to yield Identified Material.  By contrast, with respect to data categories such as "Device Location," "Device Notifications, "Web

Bookmarks," "Web History," "Installed Applications," "Log Entries," and "Images," I and other

law enforcement agents limited our review, consistent with what I understand to be the protocol

identified in the Search Warrants, to a cursory review sufficient to satisfy ourselves that nothing

in that category of data was likely to constitute Identified Material.  By way of example, with

respect to "Web History," I opened that category of data on the Cellebrite Extractions to confirm

that it, in fact, contained nothing but a listing of websites and related information.   Upon

discovering that to be the case, I did not go further and, in particular, did not spend any time

reviewing particular websites visited by the phone user, because I did not believe such a review

would be likely to result in the identification of material within the scope of the Search Warrants.

Similarly, with respect to "Images," I opened that category of data to determine what kind of

Images were stored on the Phone – *i.e.*, photographs, documents, spreadsheets.  If, based on my

initial review, it appeared that the Images category consisted primarily of photographs, I did not

go further, and, in particular, did not spend any time reviewing particular photographs, as I did not

believe such a review would be likely to result in the identification of material within the scope of

the warrant.  By contrast, if the Images category contained documents or spreadsheets, I did review

at least some of those items to determine whether they were within the scope of the Search

Warrants. [2]

---

[2] With respect to images and related multimedia, and based on my review of MMS Messages and
Chats seized from the Extracted Cell Phones, I know that the scheme participants, including the
defendants, sent and received image and video files such as photographs, pdfs, jpegs, and other
types of multimedia, to each other via MMS message and/or one or more Chat function.  As
such, my review of MMS messages and Chats necessarily entailed, at times, a review of other
forms of media attached to or "embedded" in those text conversations, some of which fell within
the scope of the Search Warrants.

### B. Search of the Code Blackberry

13.     With respect to the Code Blackberry, it is my understanding that law enforcement agents were unable to create an extraction of the phone because it was not compatible with the Cellebrite program described above. Instead, the Code Blackberry had to be manually reviewed for Identified Material. I personally conducted that review.

14.     In order to complete that review of the contents of the Code Blackberry, I focused on the text messages contained on the phone, as I believed that area of the phone to be the most likely to yield Identified Material. In so doing, I manually reviewed those text message chains on the phone that I believed were most likely to be relevant to the charged schemes, taking still images of any text communication that I believed to be within the scope of the Search Warrant. I additionally reviewed certain "contacts" on the Code Blackberry, as well as certain documents and/or spreadsheets that were saved on the phone, taking still images of any contacts or documents within the scope of the Search Warrant. While I understand that the terms of the Search Warrant permitted myself and other agents to conduct a "complete review" of all of the data on the Code Blackberry, no such review was actually undertaken. In particular, as noted above, the review of the Code Blackberry was primarily limited to those text messages chains I identified as likely to be relevant, along with certain contacts and documents. Aside from my review of text messages, contacts, and certain documents as described above, I did not review any other area of the Code Blackberry.

15.     At this time, I and other law enforcement agents have substantially completed our review of the Extracted Phones and our identification of material from those phones that we believe to be within the scope of the Search Warrants – *i.e.*, the Identified Material.  It is my understanding that this Identified Material consists almost exclusively of SMS/MMS messages and Chats between scheme participants, as well as some contact and call log information.

Dated:  April 5, 2018
         New York, New York


John Vourderis
Special Agent
Federal Bureau of Investigation

8