USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8|14|18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :

         - v. -                     :          **SUPERSEDING
                                               INDICTMENT**

JAMES GATTO,                        :          S2 17 Cr. 686 (LAK)
    a/k/a "Jim,"
MERL CODE, and                     :
CHRISTIAN DAWKINS,
                                    :
         Defendants.
                                    :

- - - - - - - - - - - - - - - - - X


## Overview

1.   The charges in this Indictment stem from a scheme to defraud National Collegiate Athletic Association ("NCAA") Division I universities by causing them to issue athletic-based financial aid under false and fraudulent pretenses, and by intentionally concealing from them significant and material information necessary to the universities' ability to exercise their right to control their financial assets.  As set forth herein, scheme participants, who included individuals employed by and affiliated with a global athletic apparel company ("Company-1"), financial advisors and business managers, made or attempted to make illicit cash payments to the families of high school basketball players in connection with commitments by those student-athletes to matriculate at specific universities sponsored by Company-1, and with the further aim that these student-athletes would later sign

lucrative contracts with the scheme participants upon entering the National Basketball Association ("NBA").

2.     As alleged herein, JAMES GATTO, a/k/a "Jim," the defendant, an executive at Company-1, conspired with other Company-1 employees and/or consultants, including MERL CODE, the defendant, a consultant for Company-1 and its high school and college basketball programs, and another consultant for Company-1 ("CC-3"), to funnel payments to the families of high school basketball players in connection with commitments by those players to attend and play for Company-1 sponsored universities.   In addition, CHRISTIAN DAWKINS, the defendant, along with a co-conspirator not named as a defendant herein ("CC-1"), brokered and facilitated at least some of the payments to the families of high school basketball players described herein, in exchange for an expectation that these players also would retain the services of DAWKINS, a business manager, and CC-1, a financial advisor, upon turning professional.

3.     The scheme described herein served to defraud the relevant universities in several ways.   First, because the illicit payments to the families of student-athletes described herein rendered those student-athletes ineligible to participate in Division I athletics, scheme participants conspired to conceal these payments from the universities, thereby causing them to

2

provide or agree to provide athletic-based scholarships and financial aid under false and fraudulent pretenses. Indeed, the defendants and their co-conspirators, who included the families of the student-athletes and, in certain instances, one or more corrupt coaches at the universities, knew that, for the scheme to succeed and the athletic scholarships to be awarded, the illicit payments described herein had to be concealed from the universities, and that certifications, falsely representing that the student-athletes were eligible to compete in Division I athletics, would be submitted to the universities.

4. Second, the scheme participants further defrauded the universities, or attempted to do so, by depriving the universities of significant and necessary information regarding the non-compliance with NCAA rules by the relevant student-athletes and their families, and, in some cases, by certain corrupt coaches involved in the scheme. In doing so, the scheme participants interfered with the universities' ability to control their assets and created a risk of tangible economic harm to the universities, including, among other things, decision-making about the distribution of their limited athletic scholarships; the possible disgorgement of certain profit-sharing by the NCAA; monetary fines; restrictions on athlete recruitment and the distribution of athletic scholarships; and the potential ineligibility of the

3

universities' basketball teams to compete in NCAA programs generally, and the ineligibility of certain student-athletes in particular.

### Relevant Entities

5.     At all relevant times, Company-1 was a multi-national corporation that designed and manufactured shoes, clothing, and accessories for multiple sports, including basketball. Company-1 sponsored numerous high school, college, and professional basketball programs, including a program for amateur pre-college athletes, and sponsored the athletic programs of a number of universities that regularly had top-ranked NCAA Division I men's basketball teams, including the University of Louisville, the University of Miami, North Carolina State University, and the University of Kansas.

6.     At all relevant times, the University of Louisville was a public research university located in Kentucky. At all relevant times, the University of Louisville fielded multiple varsity sports teams in NCAA Division I competition, including men's basketball. At all relevant times, the University of Louisville athletics department maintained an exclusive apparel endorsement contract with Company-1.

7.     At all relevant times, the University of Miami was a private research university located in Florida. At all relevant

4

times, the University of Miami fielded multiple varsity sports teams in NCAA Division I competition, including men's basketball. At all relevant times, the University of Miami athletics department maintained an exclusive apparel endorsement contract with Company-1.

8.   At all relevant times, the University of Kansas was a public research university located in Kansas.   At all relevant times, the University of Kansas fielded multiple varsity sports teams in NCAA Division I competition, including men's basketball. At all relevant times, the University of Kansas athletics department maintained an exclusive apparel endorsement contract with Company-1.

9.   At all relevant times, North Carolina State University was a public research university located in North Carolina.   At all relevant times, North Carolina State University fielded multiple varsity sports teams in NCAA Division I competition, including men's basketball.   At all relevant times, the North Carolina State University athletics department maintained an exclusive apparel endorsement contract with Company-1.

## The Defendants and Relevant Individuals

10.   At all relevant times, JAMES GATTO, a/k/a "Jim," the defendant, was the head of Global Sports Marketing - Basketball for Company-1.   In that capacity, GATTO oversaw significant

components of Company-1's high school and college basketball programs, including a multi-million dollar annual budget, and facilitated payments to the families of student-athletes as a part of the scheme described herein.

11. At all relevant times, MERL CODE, the defendant, was a consultant for Company-1 and its high school and college basketball programs. In that capacity, CODE worked directly with amateur and college basketball coaches and players and facilitated payments to the families of student-athletes as a part of the scheme described herein.

12. From in or about 2015 until in or about May 2017, CHRISTIAN DAWKINS, the defendant, worked for a sports management company ("SMC-1"). DAWKINS was not a registered sports agent, and his work at SMC-1 primarily consisted of recruiting athletes as clients and maintaining client relationships for SMC-1. In or about May 2017, SMC-1 terminated DAWKINS in connection with DAWKINS's alleged misuse of an athlete's credit card to pay for expenses from a ride services company without the athlete's authorization. Beginning in May 2017, DAWKINS endeavored to start his own sports management business with CC-1, among others.

13. At all relevant times, CC-3 was a consultant for Company-1 and its high school and college basketball programs. In that capacity, CC-3 worked directly with amateur and college basketball

6

coaches and players and facilitated payments to players and their families as a part of the scheme described herein.

14. At all relevant times, CC-1 was a financial advisor and the founder of an investment services company in New Jersey.

15. At all relevant times, another co-conspirator not named herein ("CC-2") was the director of a high-school aged amateur athletic or "AAU" basketball team sponsored by Company-1.

### Background on the NCAA and Relevant NCAA Rules

16. The NCAA is a non-profit organization headquartered in Indianapolis, Indiana, which regulates athletics for over 1,000 colleges and universities, conferences, and other associations. As detailed herein, the NCAA also governs the recruitment of amateur student-athletes and the provision, by member schools, of athletic-based financial aid. In 2017, NCAA member schools provided more than $3.3 billion in athletic scholarships to more than 150,000 student-athletes and their families.

17. NCAA member schools are organized into three separate Divisions: Division I, Division II, and Division III. The University of Louisville, the University of Miami, the University of Kansas, and North Carolina State University are all in NCAA's Division I, which is the highest level of intercollegiate athletics sanctioned by the NCAA.

18. Division I schools typically have the biggest student

7

bodies, manage the largest athletics budgets and offer the most athletic scholarships. Among other things, Division I schools must offer a minimum amount of financial assistance (in the form of scholarships) to their athletes; however, at all relevant times, the NCAA set a maximum number of scholarships available for each sport that a Division I school could not exceed. In particular, at all relevant, schools could offer no more than 13 athletic scholarships for men's basketball.

19. Among the NCAA's core principles for the conduct of intercollegiate athletics is a directive that "[s]tudent-athletes shall be amateurs in an intercollegiate sport" and that "student-athletes should be protected from exploitation by professional and commercial enterprises." The NCAA Constitution further states that "an institution found to have violated the [NCAA]'s rules shall be subject to disciplinary and corrective actions as may be determined by the [NCAA]."

20. Consistent with the NCAA's core principles, NCAA rules, known as "bylaws," prohibit any financial assistance to current or prospective student-athletes other than from the university itself or the athletes' legal guardians without express authorization from the NCAA. In addition, under NCAA rules, neither student-athletes, prospective student-athletes, nor their relatives can accept benefits, including money, travel, clothing or other

merchandise directly or indirectly from outside sources such as agents, financial advisors, or apparel companies.

21.  At all relevant times, a student-athlete was rendered "ineligible" to participate in Division I sports if the athlete was recruited by a university or any "representative of its athletics interests," such as an outside sponsor of the university's athletic teams or a "booster," in violation of NCAA rules.  Under NCAA rules, the acceptance of prohibited financial benefits by the family of a current or prospective student-athlete renders the student-athlete ineligible to compete, regardless of whether the student-athlete has knowledge that his or her relatives have accepted such benefits.

22.  At all relevant times, coaches and other team staff at NCAA Division I schools also were subject to various prohibitions, including, among other things, prohibitions on arranging for or giving or offering any benefits (other than those expressly permitted by NCAA regulations) to prospective student-athletes and their friends and relatives.

23.  To enforce these core principles and related rules, at all relevant times, current and prospective student-athletes (and, in some cases, their parents or guardians), were required to complete various certifications regarding their compliance with NCAA rules and their eligibility to participate in NCAA-sponsored

sports.  Similarly, coaches and other staff members of university athletics departments were required to complete annual certifications regarding their compliance with NCAA rules and knowledge of NCAA rules violations occurring at their university.

24.  For example, at all relevant times, student-athletes attending Division I schools were required, on an annual basis, to "sign a statement . . . in which the student-athlete submit[ted] information related to eligibility, recruitment, financial aid, [and] amateur status," which was known as the "Student-Athlete Statement."  In the Student-Athlete Statement, the student-athlete represented, among other things, that "[a]ll information provided to the NCAA . . . and the institution's admissions office [wa]s accurate and valid, including . . . [his] amateur status" and further certified his understanding that "if you sign this statement falsely or erroneously, you violate NCAA legislation on ethical conduct and you will further jeopardize your eligibility."

25.  Consistent with these core principles, at all relevant times, many Division I universities required student-athletes (and, in some cases, their families) to complete additional certifications attesting to their amateur status as a condition of receiving athletic-based financial aid.  For example, at all relevant times, the University of Kansas required a student-athlete (and a parent or guardian, if the student-athlete was a

10

minor) to sign a "Financial Aid Agreement" in which the student-athlete certified his understanding that "to qualify for this athletic aid, I **must** . . . [m]eet and maintain the eligibility requirements for athletic participation and financial aid established by the [NCAA]." (emphasis in original).

26. Additionally, at all relevant times, coaches and staff members were required to certify annually that they had reported to their university any knowledge of violations of NCAA rules involving their institution. Moreover, at all relevant times the NCAA rules required any contracts between a member-school and a coach to include a stipulation that a coach found to have violated NCAA regulations shall be subject to disciplinary and corrective actions, including suspension without pay or termination of employment for significant and repetitive violations.

27. In addition, at all relevant times, the Bylaws prohibited student-athletes, coaches and staff members of athletics departments from "knowingly furnishing or knowingly influencing others to furnish the NCAA or the individual's institution false or misleading information concerning an individual's involvement in or knowledge of matters relevant to a possible violation of an NCAA regulation."

28. Violations of NCAA rules by a university or any individual affiliated with that university may lead to penalties

11

including, but not limited to, limitations on a university's "participation in postseason play in the involved sport"; financial penalties including "requirements that an institution pay a fine, return revenue received from a specific athletics event or series of events, or . . . reduction[s] in or elimination of monetary distribution by" the NCAA; "limitations on the number of financial aid awards that may be provided" by the university to student-athletes; and recruiting restrictions including on the ability to conduct off-campus recruiting activities or to communicate by telephone or letter with prospective student-athletes.

### Allegations Related to North Carolina State University

29.   In or around 2015, JAMES GATTO, a/k/a "Jim," the defendant, CC-3, and others known and unknown, conspired to illicitly funnel approximately $40,000 from Company-1 to the father of a student-athlete ("Parent-1") who was, at the time, widely regarded as the top high school recruit in the state of North Carolina and who had played for a Company-1 sponsored AAU team.  The payments were intended to help secure and maintain the student-athlete's commitment to play basketball at North Carolina State University, a school sponsored by Company-1.

30.   In or around September 2015, the student-athlete publicly committed to attend North Carolina State University, and

12

to play for its men's basketball team beginning in the fall of 2016. Shortly thereafter, and based on concerns that the student-athlete might change his mind and select another university, JAMES GATTO, a/k/a "Jim," the defendant, and CC-3, among others, agreed to make a payment to Parent-1 to ensure that the student-athlete remained committed to North Carolina State University. In particular:

a. In or around October 2015, a coach at North Carolina State University ("Coach-4") informed CC-3, in substance, that the student-athlete was not happy with his selection of North Carolina State University and was considering de-committing before the 2016-17 college basketball season that fall.

b. Accordingly, and to secure the student-athlete's willingness to remain committed to the university, GATTO and CC-3 agreed to make a payment of $40,000 to Coach-4, which Coach-4 would in turn deliver to Parent-1.

c. In or about October 2015, CC-3 withdrew $40,000 in cash from an account CC-3 controlled, and delivered the funds to Coach-4 in North Carolina. Coach-4, in turn, represented that the funds would be delivered to Parent-1. GATTO caused Company-1 to reimburse CC-3 for the cash payment by approving one or more transfers to CC-3 from Company-1 pursuant to sham invoices.

d. On or about December 2015, the student-athlete signed

13

a financial aid agreement with North Carolina State University and provided certifications necessary to establish his eligibility for an athletic scholarship.    In particular, the student-athlete was asked whether, in the past year, he "or any member of [his family] [had] been paid money, borrowed money, or received any benefit of any kind from an athletics booster, sports agent, runner, or financial advisor," to which the student-athlete answered "no."

e. Thereafter, the student-athlete enrolled at North Carolina State University and played for the university's men's basketball team for the 2016-17 NCAA season before entering the NBA draft in June 2017.

31.    The payment described above was designed to be concealed, including from the NCAA and officials at North Carolina State University, in order for the scheme to succeed and for the student-athlete to receive an athletic scholarship from North Carolina State University.    In particular, and as a part of the scheme, scheme participants, including, among others, JAMES GATTO, a/k/a "Jim," the defendant, CC-3, Parent-1, and one or more coaches at North Carolina State University, made, intended to make, or caused or intended to cause others to make false certifications to North Carolina State University and the NCAA about the existence of the payments and the known violations of NCAA rules.

14

## Allegations Related to the University of Louisville

32.  Beginning in approximately May 2017, and continuing into at least September 2017, JAMES GATTO, a/k/a "Jim," MERL CODE, and CHRISTIAN DAWKINS, the defendants, CC-3, and others known and unknown, conspired to illicitly funnel approximately $100,000 from Company-1 to the father of a student-athlete who was an All-American high school basketball player and considered at the time to be one of the top recruits in his class ("Parent-2").  The payments were intended to help secure the student-athlete's commitment to play basketball at the University of Louisville, a school sponsored by Company-1, and to further ensure that the student-athlete ultimately retained the services of DAWKINS.

33.  The plan to funnel $100,000 in payments to Parent-2 was formulated by JAMES GATTO, a/k/a "Jim," MERL CODE, CHRISTIAN DAWKINS, the defendants, and CC-3, among others, in or around May 2017, after most of the top high school basketball recruits from the Class of 2017 had already committed to various universities. At the time, the student-athlete had not yet committed to a particular university.

34.  On or about June 3, 2017, the student-athlete publicly announced his intention to enroll at the University of Louisville and to play for its NCAA Division I men's basketball team, becoming the highest-ranked recruit to commit to Louisville in nearly a

15

decade.   At the time, and as part of that commitment, the student-athlete completed certain paperwork required by the University of Louisville, including a Student Athlete Statement in which the student-athlete represented that "all information provided" regarding "your amateur status" is "accurate and valid," and further affirmed his "understand[ing] that if you sign this statement falsely or erroneously, you violate NCAA legislation and . . . will further jeopardize your eligibility."

35.   The scheme participants agreed to conceal the $100,000 payments, which was to be made to Parent-2 in four cash installments of $25,000 each, by causing the money to be transferred indirectly from Company-1 to third parties who then facilitated the cash payments to the student-athlete's family.   In particular, JAMES GATTO, a/k/a "Jim," and MERL CODE, the defendants, agreed to and caused the first two $25,000 installments to be wired by Company-1 pursuant to sham invoices to an organization under CODE's control, from which the payments were then funneled to an account controlled by CHRISTIAN DAWKINS, the defendant. DAWKINS, in turn, was responsible for delivering the cash payments to Parent-2.   In particular:

a.   On or about July 10, 2017, CODE spoke by telephone with CC-1, among others, about the payments to the student-athlete's family.   During the call, CODE explained the involvement

16

of Company-1 in funneling money to the athlete's family, noting that "this is one of those instances where we needed to step up and help one of our flagship schools in [the University of Louisville], you know, secure a five star caliber kid. Obviously that helps, you know, our potential business. . . and that's an [Company-1-sponsored] school." CODE explained that Company-1 was having difficulty generating the funds to pay the first installment of the money because of internal "processes" at Company-1 and asked DAWKINS and CC-1 to cover the first $25,000 payment, with the understanding that they would ultimately be reimbursed by Company-1.

b.    Consistent with the call described above, on or about July 13, 2017, Parent-2 traveled through New York, New York to receive the first cash payment, which he did during a meeting with CC-1 in New Jersey. In a subsequent telephone call with DAWKINS, CC-1 informed DAWKINS that, based on CC-1's conversation with Parent-2 at the time of the meeting, CC-1 believed that the student-athlete would sign with DAWKINS and CC-1 upon entering the NBA.

c.    On a telephone call in or around July 24, 2017, DAWKINS and CODE discussed how GATTO and others at Company-1 were inaccurately accounting for the unlawful transfer of funds to the student-athlete's family by booking it on Company-1's

17

records as a payment to an outside organization affiliated with CODE.  On the call, CODE confirmed that GATTO had identified the payments on Company-1's books "as a payment to my team, to my organization, so it's on the books, [but] it's not on the books for what it's actually for."

   d.   On or about August 1, 2017, GATTO approved a sham invoice for $30,000 from Company-1 to an AAU team managed by CODE. GATTO and CODE concealed the true purpose and destination of the payment by describing it on the Company-1 invoice as "July Travel Team Expenses" for the AAU team.  After the payment was wired by Company-1 to a bank account in the name of the AAU team, CODE caused $25,000 of the funds to be paid to DAWKINS as reimbursement for the first cash payment made to Parent-2, as described above.

   e.   On or about September 18, 2017, Company-1 wired another $25,000 to the same AAU team account associated with CODE pursuant to a second sham invoice, approved by GATTO, for an additional $25,000 for "Novmeber [sic] Travel Team Expenses" for the AAU team.  In fact, the $25,000 was intended to be funneled to Parent-2 as the second installment of the promised $100,000 for the student-athlete's attendance at the University of Louisville. After the payment was transferred by Company-1 to the AAU team, CODE caused $25,000 to be paid to a bank account controlled by DAWKINS.  However, before DAWKINS could make the second $25,000

18

payment to Parent-2, the defendants were arrested.

36.   The scheme participants also planned to influence another student-athlete to, among other things, attend the University of Louisville, in exchange for payments.   For example:

a.   On or about July 27, 2017, CHRISTIAN DAWKINS, the defendant, met with CC-2 and a men's basketball coach at the University of Louisville ("Coach-1"), among others.   During the meeting, DAWKINS and others discussed making payments to the family of another high school-aged student-athlete in order to secure his commitment to attend the University of Louisville, and then to retain the services of DAWKINS upon entering the NBA.

b.   At that meeting, and in the presence of Coach-1, an envelope containing approximately $12,700 in cash was handed to CC-2, which was intended to be funneled to the family of the student-athlete.   During the same meeting, DAWKINS described the role of another men's basketball coach at the University of Louisville ("Coach-2") in securing money from Company-1 to pay the student-athlete, as part of the scheme described in paragraphs 32 through 35, above.   Specifically, DAWKINS explained that while Coach-2 and the University of Louisville were recruiting the student-athlete, DAWKINS asked Coach-2 to call JAMES GATTO, a/k/a "Jim," the defendant, to request that Company-1 provide the money requested by the family of the student-athlete, which Coach-2

19

agreed to do.

37.  On or about August 23, 2017, in New York, New York, CC-1 received a cash payment of $20,000, of which $5,000 was intended to be provided by CC-1 and CHRISTIAN DAWKINS, the defendant, to CC-2 as part of the scheme to pay money to the family of the student-athlete described in paragraph 36, above.

38.  The payments described herein were designed to be concealed, including from the NCAA and officials at the University of Louisville, in order for the scheme to succeed and for the student-athletes to receive athletic scholarships from the University of Louisville.  In particular, and as a part of the scheme, scheme participants, including, among others, JAMES GATTO, a/k/a "Jim," MERL CODE, and CHRISTIAN DAWKINS, the defendants, Parent-2, and one or more coaches at the University of Louisville, made, intended to make, or caused or intended to cause others to make false certifications to the University of Louisville and the NCAA about the existence of the payments and the known violations of NCAA rules.

### Allegations Related to the University of Kansas

39.  Beginning in or around approximately October 2016, and continuing into at least in or around November 2017, JAMES GATTO, a/k/a "Jim," the defendant, CC-3, and others known and unknown, conspired to illicitly funnel approximately at least $90,000 from

Company-1 to the mother of a top high school basketball player ("Parent-3"). The payments were made in connection with a commitment by the student-athlete to attend the University of Kansas, a school sponsored by Company-1.

40. The agreement to funnel payments to Parent-3 was formulated by JAMES GATTO, a/k/a "Jim," and CC-3, among others, in or around October 2016, shortly after the student-athlete, who was considered one of the top recruits in his class, unofficially committed to attend the University of Kansas. The scheme participants further agreed to conceal the payments, which were made to Parent-3 in a series of installments, by causing the money to be transferred indirectly through an AAU team under CC-3's control, and pursuant to sham invoices approved by GATTO. Specifically, GATTO caused Company-1 to transfer funds to CC-3's team pursuant to those sham invoices, and CC-3 facilitated the payments to the student-athlete's family. In particular:

a. On or about October 21, 2016, GATTO caused Company-1 to make a $50,000 payment to an AAU team managed by CC-3, much of which was intended for Parent-3. To conceal the true purpose and destination of the payment, GATTO and CC-3 described it on the Company-1 invoice as a "Basketball Team Tournaments Fee" for the AAU team.

b. On or about October 31, 2016, CC-3 withdrew the

21

$50,000 payment from Company-1 in cash, and, thereafter, personally delivered approximately $30,000 to Parent-3 at a hotel room in New York, New York.

c. On or about November 9, 2016, the student-athlete and Parent-3 each signed certain paperwork submitted to the University of Kansas in connection with the student-athlete's intention to enroll and accept an award of athletic-based financial aid from the university. In those documents, the student-athlete certified his understanding that in order "to qualify for this athletic aid, I **must** . . . [m]eet and maintain eligibility requirements for participation and financial aid established by" the NCAA and the University of Kansas. (emphasis in original).

d. On January 18, 2017, GATTO caused Company-1 to make a $90,000 payment to the AAU team under CC-3's control, a portion of which was intended for Parent-3. To conceal the true purpose and destination of the payment, GATTO and CC-3 described it on the Company-1 invoice as "2017 1st Quarter Consultant Fee and T & E for 1st Quarter 2017." On or about January 19, 2017, CC-3 withdrew approximately $27,500 of those funds and subsequently delivered approximately $20,000 in cash to Parent-3 in a hotel room in Las Vegas, Nevada.

e. On or about May 31, 2017, GATTO caused Company-1 to make a $70,000 payment to the AAU team under CC-3's control, a

portion of which was intended for Parent-3.  To conceal the true purpose and destination of the payment, GATTO and CC-3 described it on the Company-1 invoice as "Tournament Activation/Fee."  On or about June 14, 2017, CC-3 transferred by wire $15,000 to Parent-3.

41.  The scheme participants also agreed to make payments to the legal guardian of another student-athlete who was a top-rated high school basketball player ("Guardian-1") in order to secure the commitment of the student-athlete to attend the University of Kansas rather than another school sponsored by a rival athletic apparel company.  For example:

a.  In or around August 2017, Guardian-1 informed CC-3 that Guardian-1 had received illicit payments in return for a commitment to steer the student-athlete to a university sponsored by a rival athletic apparel company.  According to Guardian-1, the student-athlete was more interested in attending the University of Kansas, but Guardian-1 would need to repay the illicit payments in order to do so.  CC-3 informed Guardian-1, in substance, that CC-3 and Company-1 would be willing to make payments to Guardian-1 to help secure the student-athlete's commitment to attend the University of Kansas.  CC-3 subsequently confirmed with JAMES GATTO, a/k/a "Jim," the defendant, that GATTO would approve of such payments and cause Company-1 to fund them.

23

b.    On August 30, 2017, the student-athlete announced he would not attend the school sponsored by the rival apparel company but would instead enroll at the University of Kansas.

c.    On or about September 11, 2017, CC-3 spoke with GATTO by phone.  During the call, CC-3 informed GATTO that CC-3 would need to make "another $20,000" payment to Guardian-1, as part of the scheme described above, and, in particular, to help get the student-athlete "out from under" the deal to attend the school sponsored by the rival athletic apparel company.  GATTO and CC-3 proceeded to discuss how GATTO and Company-1 would reimburse CC-3 for the payment.

d.    On or about November 13, 2017, the student-athlete and Guardian-1 each signed certain paperwork submitted to the University of Kansas in connection with the student-athlete's intention to enroll and accept an award of athletic-based financial aid from the university.  In those documents, the student-athlete certified his understanding that in order "to qualify for this athletic aid, I **must** . . . [m]eet and maintain eligibility requirements for participation and financial aid established by" the NCAA and the University of Kansas. (emphasis in original).

42.  The payments described herein were designed to be concealed, including from the NCAA and officials at the University of Kansas, in order for the scheme to succeed and for the student-

athletes to receive athletic scholarships from the University of Kansas.   In particular, and as a part of the scheme, scheme participants, including, among others, JAMES GATTO, a/k/a "Jim," the defendant, CC-3, Parent-3, and Guardian-1, made, intended to make, or caused or intended to cause others to make false certifications to the University of Kansas and the NCAA about the existence of the payments and the known violations of NCAA rules.

### Allegations Related to the University of Miami

43.   Beginning in approximately July 2017, and continuing into at least September 2017, JAMES GATTO, a/k/a "Jim," MERL CODE, and CHRISTIAN DAWKINS, the defendants, and others known and unknown, conspired to illicitly funnel approximately $150,000 from Company-1 to the family of another student-athlete who was a top high school basketball player expected to graduate in 2018, in an effort to secure the student-athlete's commitment to play basketball at the University of Miami, and to further ensure that the student-athlete ultimately signed with DAWKINS.

44.   On or about August 9, 2017, CHRISTIAN DAWKINS and MERL CODE, the defendants, spoke by telephone about the scheme to pay money to the family of the student-athlete described in paragraph 43, above, in order to secure his commitment to play at the University of Miami.   During the call, DAWKINS and CODE discussed the fact that a coach at the University of Miami ("Coach-3") would

need to call JAMES GATTO, a/k/a "Jim," the defendant, as part of the scheme.    As DAWKINS indicated to CODE, Coach-3 "knows something gotta happen for it to get done."

45.    On or about August 11, 2017, JAMES GATTO, a/k/a "Jim," and MERL CODE, the defendants, spoke by telephone about the scheme to pay money to the family of the student-athlete in order to secure his commitment to play at the University of Miami.    In particular, during the call:

a.    CODE informed GATTO that they had "another [University of Louisville] situation" — referring to the payments to a student-athlete to influence him to attend the University of Louisville, as described above in paragraphs 32 through 35 — and explained that coaches at the University of Miami, including Coach-3, wanted to recruit a particular high school athlete for its class of 2018.    GATTO confirmed that he already had learned about the request from coaches at the University of Miami for assistance in securing the particular student-athlete's commitment to attend the University of Miami, informing CODE that he had spoken to Coach-3 about the student-athlete.

b.    GATTO indicated his willingness to cause Company-1 to pay money to the family of the student-athlete in order to secure his commitment to attend the University of Miami but, with respect to the proposed $150,000 sum, GATTO asked CODE to try to

26

negotiate the payment down to $100,000, such that the amount was commensurate with what they had agreed to funnel from Company-1 to the family of the student-athlete described in paragraphs 32 through 35, above.

46. JAMES GATTO, a/k/a "Jim," MERL CODE, and CHRISTIAN DAWKINS, the defendants, among others, intended to conceal the planned payments to the family of the student-athlete from the NCAA and officials at the University of Miami, in order for the scheme to succeed and for the student-athlete to receive an athletic scholarships from the University of Miami.   In particular, and as a  part of the scheme, scheme participants, including, among others, JAMES GATTO, a/k/a "Jim," MERL CODE, and CHRISTIAN DAWKINS, the defendants, intended to make, or intended to cause others to make, false certifications to the University of Miami and the NCAA about the planned payments and resulting violations of NCAA rules.

## COUNT ONE
### (Conspiracy To Commit Wire Fraud)

The Grand Jury charges:

47. The allegations set forth in paragraphs 1 through 46 of this Indictment are repeated and realleged as if fully set forth herein.

48. From at least in or about 2015, up to and including in or about November 2017, in the Southern District of New York and

27

elsewhere, JAMES GATTO, a/k/a "Jim," MERL CODE, and CHRISTIAN DAWKINS, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud in violation of Title 18, United States Code, Section 1343.

49. It was a part and object of the conspiracy that JAMES GATTO, a/k/a "Jim," MERL CODE, and CHRISTIAN DAWKINS, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, GATTO, CODE, DAWKINS, and others known and unknown, including parents of certain student-athletes, as well as basketball coaches employed by certain of the universities, participated in a scheme to defraud, by telephone, email, and wire transfers of funds, among other means and methods, North Carolina State University, the University of Louisville, the University of Kansas, and the University of Miami, by making and agreeing to make, payments to the families of high school student-athletes in

28

connection with the student-athletes' commitment to play basketball for those universities, knowing and intending that the payments would be concealed from the universities, and thereby causing the universities to agree to provide athletic scholarships to student-athletes who, in truth and in fact, were ineligible to compete as a result of the payments, and depriving the universities of their right to control the use of their assets, including the decision of how to allocate a limited amount of athletic scholarships, and further exposing the universities to tangible economic harm, including monetary and other penalties imposed by the NCAA.

(Title 18, United States Code, Section 1349.)

### COUNT TWO
### (Wire Fraud - The University of Louisville)

The Grand Jury further charges:

50.   The allegations set forth in paragraphs 1 through 28, 32 through 38 of this Indictment are repeated and realleged as if fully set forth herein.

.  51.   From at least in or about May 2017, up to and including in or about September 2017, in the Southern District of New York and elsewhere, JAMES GATTO, a/k/a "Jim," MERL CODE, and CHRISTIAN DAWKINS, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent

29

pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, GATTO, CODE, and DAWKINS defrauded the University of Louisville by making and causing to be made payments to Parent-2 in connection with the commitment by Parent-2's son to play basketball for the university, knowing and intending that the payments would be concealed from the university, and thereby causing the university to agree to provide an athletic scholarship to Parent-2's son who, in truth and in fact, was ineligible to compete as a result of the payments, and depriving the university of the right to control the use of its assets, including the decision of how to allocate a limited amount of athletic scholarships, and further exposing the university to tangible economic harm, including monetary and other penalties imposed by the NCAA.

(Title 18, United States Code, Sections 1343 and 2.)

### COUNT THREE
### (Wire Fraud – The University of Kansas)

The Grand Jury further charges:

52. The allegations set forth in paragraphs 1 through 28, and 39 through 42 of this Indictment are repeated and realleged as if fully set forth herein.

30

53. From at least in or about October 2016, up to and including in or about November 2017, in the Southern District of New York and elsewhere, JAMES GATTO, a/k/a "Jim," the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted, by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, GATTO defrauded the University of Kansas by making and causing to be made payments to Parent-3 in connection with the commitment by Parent-3's son to play basketball for the university, knowing and intending that the payments would be concealed from the university, and thereby causing the university to agree to provide an athletic scholarship to Parent-3's son who, in truth and in fact, was ineligible to compete as a result of the payments, and depriving the university of the right to control the use of its assets, including the decision of how to allocate a limited amount of athletic scholarships, and further exposing the university to tangible economic harm, including monetary and other penalties imposed by the NCAA.

(Title 18, United States Code, Sections 1343 and 2.)

31

**FORFEITURE ALLEGATION**

54.   As a result of committing one or more of the offenses charged in Count One, Two and Three of the Indictment, JAMES GATTO, a/k/a "Jim," MERL CODE, and CHRISTIAN DAWKINS, the defendants, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses that the defendants personally obtained.

## Substitute Assets Provision

55.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

> a.   cannot be located upon the exercise of due diligence;

> b.   has been transferred or sold to, or deposited with, a third party;

> c.   has been placed beyond the jurisdiction of the Court;

> d.   has been substantially diminished in value; or

> e.   has been commingled with other property which cannot be subdivided without difficulty;

32

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) and 28 U.S.C. § 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981,
Title 21, United States Code, Section 853, and
Title 28, United States Code, Section 2461.)

_____
FOREPERSON

August 14, 2018

_____
ROBERT S. KHUZAMI
Attorney for the United States
Acting Under Authority
Conferred by 28 U.S.C. § 515

33

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

**- v. -**

**JAMES GATTO, a/k/a "Jim,"**
**MERL CODE, and**
**CHRISTIAN DAWKINS**

**Defendants.**

**SUPERSEDING**
**INDICTMENT**

S2 17 Cr.  686 (LAK)

(18 U.S.C. §§ 1343, 1349.)

ROBERT S. KHUZAMI
Attorney for the United States
Acting Under Authority
Conferred by 28 U.S.C. § 515

**A TRUE BILL**

_____
Foreperson.

8/14/18
_____
RL

Superseding Indictment

MJ Aaron
_____
U.S.M.J.