## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                :

UNITED STATES OF AMERICA,              :
                                                :

  v.                                         :
                                              :   Case No. S2 17-cr-00686 (LAK)

JAMES GATTO,                   :
a/k/a "Jim,"                       :
MERL CODE, and                :
CHRISTIAN DAWKINS,         :
                                              :

          Defendants.           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
## THE GOVERNMENT'S FIRST MOTION *IN LIMINE* TO PRECLUDE
## <u>DEFENDANTS' EXPERT WITNESS</u>

**NEXSEN PRUET LLC**
Mark C. Moore
Andrew A. Mathias
55 E. Camperdown Way, Suite 400
Greenville, South Carolina 29601
(864) 370-2211

**OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.**
Merl F. Code
300 North Main Street
Greenville, South Carolina, 29601
(864) 271-1300

*Attorneys for Defendant Merl Code*

**WILLKIE FARR & GALLAGHER LLP**
Michael S. Schachter
Casey E. Donnelly
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

*Attorneys for Defendant James Gatto*

**HANEY LAW GROUP PLLC**
Steven A. Haney
3000 Town Center Drive, Suite 2570
Southfield, Michigan 48075
(248) 414-1470

*Attorneys for Defendant Christian Dawkins*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND ....................................................................................................2

    A.    Dr. Rascher's Testimony Regarding the Value of a "Five Star" Men's Basketball Player to a D1 University. ...........................................................3

    B.    Dr. Rascher's Testimony Regarding the Qualitative Benefits Conferred Upon a University from a Successful Men's Basketball Team. .................6

    C.    Dr. Rascher's Testimony Regarding NCAA Rule Breaking. .....................6

ARGUMENT ...........................................................................................................................9

    I.    DR. RASCHER'S OPINIONS ARE RELEVANT. ...............................................9

    II.    DR. RASCHER'S OPINIONS ARE WITHIN HIS AREA OF EXPERTISE. ......16

    III.    DR. RASCHER'S METHODOLOGY IS RELIABLE. .......................................20

    IV.    DR. RASCHER'S OPINIONS WILL BE HELPFUL TO THE JURY ...............25

CONCLUSION .......................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                          Page(s)

*Bazemore v. Friday,*
 478 U.S. 385 (1986).............................................................................................24

*Cameron v. City of New York,*
 598 F.3d 50 (2d Cir. 2010)....................................................................................9

*Chambers v. Mississippi,*
 410 U.S. 284, 93 S.Ct. 1038 (1973).....................................................................9

*Cleveland v. United States,*
 531 U.S. 12, 121 S.Ct. 365 (2000).....................................................................10

*Faulkner v. Arista Records LLC,*
 46 F. Supp. 3d 365 (S.D.N.Y. 2014)...................................................................18

*IBM v. BCG Partners, Inc.,*
 No. 10-cv-128 (PAC), 2013 WL 1775437 (S.D.N.Y. April 25, 2013)..............14

*Int'l Cards Co., Ltd. v. MasterCard Int'l Inc.,*
 No. 13 CIV. 2576 (LGS), 2016 WL 7009016 (S.D.N.Y. Nov. 29, 2016)..........25

*Jarvis v. Ford Motor Co.,*
 No. 92-cv-2900 (NRB), 1999 WL 461813 (S.D.N.Y. July 6, 1999)..................19

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.,*
 103 F. Supp. 2d 268 (S.D.N.Y. 2000).................................................................20

*O'Bannon v. Nat'l Collegiate Athletic Ass'n,*
 7 F. Supp. 3d 955 (N.D. Cal. 2014),
 *aff'd in part, vacated in part,* 802 F.3d 1049 (9th Cir. 2015) ............................20

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.,* LLC,
 716 F. Supp. 2d 220 (S.D.N.Y. 2010).................................................................21

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,*
 691 F. Supp. 2d 448 (S.D.N.Y. 2010).................................................................25

*SEC v. Aly,*
 No. 16 CIV. 3853 (PGG), 2018 WL 1581986 (S.D.N.Y. Mar. 27, 2018)....18, 21

*United States v. Gabriel,*
 125 F.3d 89 (2d Cir. 1997)..................................................................................10

*United States v. Heimann,*
    705 F.2d 662 (2d Cir. 1983)...................................................................................12

*United States v. Johnson,*
    16-CR-457-1 (NGG), 2017 WL 5125770 (E.D.N.Y. Sept. 21, 2017)...............................12

*United States v. Litvak,*
    808 F.3d 160 (2d Cir. 2015)....................................................................................15

*United States v. Nkansah,*
    699 F.3d 743 (2d Cir. 2012)....................................................................................15

*United States v. Onumonu,*
    967 F.2d 782 (2d Cir. 1992)....................................................................................14

*United States v. Rossomando,*
    144 F.3d 197 (2d Cir 1998).....................................................................................16

*United States v. Russo,*
    74 F.3d 1383 (2d Cir. 1996)....................................................................................13

*United States v. Starr,*
    816 F.2d 94 (2d Cir. 1987)......................................................................................10

*U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.,*
    112 F. Supp. 3d 122 (S.D.N.Y. 2015).......................................................................24

**Statues, Rules and Regulations**
2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 401.04[2][[c]
(2013).....................................................................................................................9

Fed. R. Ev. 702 ........................................................................................................18

Fed. R. Ev. 704(b)....................................................................................................12

Defendants James Gatto, Christian Dawkins, and Merl Code respectfully submit this memorandum of law in opposition to the Government's first motion *in limine*.

<u>**PRELIMINARY STATEMENT**</u>

The Government has asked Your Honor to preclude Defendants from "offering the expert testimony of Dr. Daniel A. Rascher." (Gov. Br. 1). Dr. Rascher is an expert in the field of "sports economics," and is qualified to offer expert testimony regarding (1) the quantitative and qualitative benefits that a successful Division I ("D1") men's basketball program can confer upon a university; and (2) the financial impact that NCAA sanctions, including those identified in Paragraph 28 of the Indictment, have had, historically, on universities that have been found to have violated the NCAA's recruiting rules. Dr. Rascher's testimony is relevant to the Government's charges against Defendants, will be useful to the jury in its assessment of those charges, and should be admitted at trial.

Contrary to the Government's contention that the proposed expert testimony is irrelevant, Dr. Rascher's testimony goes to the heart of this case. The Government alleges that the "object" of Defendants' purported scheme was to deprive the universities identified in the Indictment out of money or property and that when Defendants offered financial assistance to the families described in the Indictment, they did so with the intent of causing financial injury to these schools. Dr. Rascher, however, will inform the jury of his opinion that the value provided to a D1 university by an elite men's basketball player is so substantial that even in instances where the athlete's recruitment involves the violation of NCAA rules, the quantitative and qualitative benefits provided by the athlete to the university generally outweigh the risks to the university from such rule-breaking, including the possibility that penalties will be imposed by the NCAA. This evidence corroborates Defendants' defense that they did not act with fraudulent intent, since they were not trying to cause financial harm to these schools, but rather were trying

to help them recruit a great basketball team that would bring in millions of dollars in revenue and bolster their national reputation. In addition, Dr. Rascher's testimony will assist the jury in evaluating the credibility of the Government's witnesses from these schools, who are likely to testify that the schools would not have offered the scholarships in question had they known of the payments. The fact that the schools stood to gain so much from the recruitment of these athletes, and in reality, had very little at risk, is important evidence that the jury should hear before accepting the Government's arguments concerning materiality.

The Government's argument that Dr. Rascher is not qualified to give his proposed opinions is baseless. Dr. Rascher is one of the foremost experts on issues of college sports economics and his proffered testimony is well within his area of expertise. Dr. Rascher has served as an expert in nearly every high-profile litigation involving the NCAA over the last decade, has been admitted in federal court as an expert in the fields of "sports economics" and "sports management," and has either performed substantial work or is well-acquainted with the work of other experts on every aspect of his proffered testimony.

The Government's argument that Dr. Rascher's analyses are not reliable is equally baseless. All of Dr. Rascher's analyses are based on standard econometric methodologies and data that experts in the field of economics regularly rely on in forming an opinions on these subjects. At bottom, the Government's objections to Dr. Rascher's testimony are not based on flaws in his modeling but rather the fact that Dr. Rascher's opinions are contrary to their theory of this case. That, however, is not a legitimate basis for preclusion. In light of these facts, a *Daubert* hearing is unnecessary and the Government's motion should be denied.

## FACTUAL BACKGROUND

Dr. Rascher's testimony will be organized into three sections. First, he will describe his research regarding the quantitative benefits provided by an elite men's basketball

player to a D1 university. Second, he will explain to the jury that a prominent D1 basketball program generates significant qualitative benefits for a university. Finally, Dr. Rascher will discuss the incidence of NCAA rule-breaking and the severity of the penalties ordinarily imposed, as well as his conclusion that even when the NCAA finds that a significant rule violation occurred, the sanctions historically imposed upon a violating university have no statistically significant impact on revenue.

### A. Dr. Rascher's Testimony Regarding the Value of a "Five Star" Men's Basketball Player to a D1 University.

Dr. Rascher will explain to the jury that he used his econometric expertise to quantify the financial value an elite men's basketball player provides the four Universities described as victims in the Indictment, namely, the University of Louisville ("Louisville"), the University of Miami ("Miami"), the University of Kansas ("Kansas") and North Carolina State University ("NC State," and with Louisville, Miami, and Kansas, the "Universities").

Dr. Rascher will explain that he relied on techniques commonly used by economists who are looking to measure the impact of a particular variable on a final result. For example, Dr. Rascher knows that the revenue generated by D1 men's basketball programs is not exclusively based on the athletic talent of their players. Revenue[1] is also attributable to factors such as the success of the "athletic conference" that a particular university belongs to since revenue is distributed among conference participants equally, even though the teams themselves have different win/loss records. Likewise, revenue might reflect the increased popularity of college basketball, generally, and in such an instance, it would not be appropriate for Dr. Rascher to attribute those dollars to the talent level of the particular athletes on that university's team.

---

[1] "Revenue" refers to the revenue generated by the men's basketball team. To the extent Defendants use generic phrases like "basketball revenue" or "basketball program," Defendants are referring only to men's programs. Dr. Rascher did not look at revenue generated from women's college basketball.

As these example demonstrate, Dr. Rascher needed to employ a methodology that would allow him to isolate the impact that a player's athletic skill had on revenue from the various other factors that contribute to revenue. The methodology that he chose was a "multiple regression analysis," which is a statistical tool used to understand the relationship between or among two or more variables. Multiple regression involves a "dependent" variable that the economist is looking to understand. In Dr. Rascher's model, the dependent variable was the revenue generated by D1 men's basketball programs. (Dkt. 196-2, at 2; Rascher Production ("RP")[2] at Rascher-00000006). Multiple regression also involves "independent" variables that are thought to produce or be associated with changes to the dependent variable (revenue). In Dr. Rascher's model, the independent variables included factors such as revenue from an athletic conference revenue-sharing program, or natural inflation, or overall increases in the popularity of college basketball. (*Id.*).

The independent variable that Dr. Rascher focused on was the "talent level" of the players, since he was trying to determine the financial value that an elite player conferred upon a university. In other words, the purpose of Dr. Rascher's multiple regression analysis was to isolate the effect of the talent level of the players (one independent variable) on the revenue generated by D1 men's basketball programs (the dependent variable) after controlling for all other potentially relevant variables and holding them constant. By controlling for other factors that might influence revenue, Dr. Rascher was able to calculate the influence of the variable of interest (the athletic talent of the players) upon the dependent variable, revenue.

---

[2] All references to the Rascher Production are included for the convenience of the Government and refer to Defendants' September 7 production disclosing the specific materials Dr. Rascher relied upon in reaching his conclusions and the economic models utilized by Dr. Rascher, including information identifying input data, assumptions and controls. Because these materials are voluminous and include technical aspects, such as program code, they are not attached as exhibits.

To run this multiple regression analysis, Dr. Rascher needed a way to represent "athletic talent" via measurable units that could be utilized by his model. Dr. Rascher ultimately decided to rely on the "star" ranking assigned to athletes by Rivals.com, a well-known college athlete recruiting service. Under the Rivals.com rating system, the "number of stars" approximate the level of athletic skill. Five stars represents the highest level of talent and only the most elite athletes (approximately 2%) obtain this ranking. Dr. Rascher chose to use the Rivals.com "star" system data because, as described more fully below, data from Rivals.com has been accepted as reliable by both the economics community and the courts. *Infra* at Part IV. Indeed, the Indictment's allegations reflect the usage of this "star" system. (*See* Ind. ¶ 35(a) (referring to Brian Bowen Jr. as a "five star caliber kid"); *see also* ¶ 50 (referring to Brian Bowen Jr. as the "highest-ranked recruit to commit to Louisville in nearly a decade."). Dr. Rascher totaled the "star" ratings of all D1 athletes recruited by college teams from the 2008-09 through the 2016-17 academic years (on a rolling five-year basis) and compared those values by school to the amount of basketball revenue reported by each school, controlling for all other variables. (RP at Rascher-00000006). This allowed Dr. Rascher to calculate the approximate value of one additional "point" of talent (*i.e.*, an additional rating "star"). (*Id.*).

Dr. Rascher's multiple regression analysis (the "Five-Star Valuation Model") demonstrated that that each additional point of talent—*i.e.*, every star added to a team— corresponds to an increase of approximately 1.64% of revenue. (*Id.*). Accordingly, on average, a "five-star" athlete is responsible for approximately 8.2% of a university's revenue from men's basketball. Dr. Rascher was then able to calculate the approximate monetary value that a "five-star" athlete would provide to each of the Universities by multiplying these percentages by the revenue generated from the men's basketball program at each of the Universities, as reported by

the Universities to the U.S. Department of Education. Dr. Rascher will explain to the jury that his research shows that, on average, a "five star" athlete is worth $3,604,760 to Louisville, $1,497,838 to Kansas, $1,198,138 to NC State, and $891,243 to Miami. (RP at Rascher-00000058).

## B. Dr. Rascher's Testimony Regarding the Qualitative Benefits Conferred Upon a University from a Successful Men's Basketball Team.

Dr. Rascher will also explain to the jury that a prominent D1 basketball program—which is dependent upon annually obtaining commitments from a limited pool of elite high school athletes—generates significant qualitative benefits for a university. These benefits include increased donations to the university, increases in both the quantity of applications and enrolled students, and improvements in the quality of the incoming freshman class (either due to better applicants and/or more applicants to choose from). Dr. Rascher will explain how all of these benefits are well documented in the academic literature. (Dkt. 196-1 at 5-7).

## C. Dr. Rascher's Testimony Regarding NCAA Rule Breaking.

Dr. Rascher will also inform the jury of his conclusion that the financial risk associated with breaking NCAA rules, including the possibility of NCAA-imposed sanctions, is generally outweighed by the benefits of rule violations that result in the commitment of a five-star basketball player to a university's basketball team. In economics, the relevant measure of the "cost" of violating rules is the expected penalty multiplied by the probability of punishment. Dr. Rascher will explain that while it is difficult to precisely measure a negative (that is, the rate at which rule violations go unpunished), reliable evidence supports the conclusion that NCAA rule-breaking frequently goes unpunished.

Dr. Rascher will explain to the jury that he sought to determine what effect the penalties imposed on D1 universities for "major" NCAA rule violations had upon the revenue

generated by their men's basketball programs. Dr. Rascher utilized the NCAA's "Major Infractions" database to review the cases involving "major" violations of NCAA recruiting rules by D1 men's basketball programs between the 2006-07 and 2016-17 academic years to assess the penalties imposed by the NCAA. Of the range of potential penalties, including disgorgement of conference revenue sharing, fines, post-season bans, a reduction in scholarships, and recruiting restrictions, *see* Ind. ¶ 28, Dr. Rascher found that imposition of the more serious penalties was highly unusual. In fact, of the 33 cases, only four involved the disgorgement of conference revenue sharing and only twelve of the cases involved fines, which ranged from $5,000-$100,000. (RP at Rascher-00000048). Much more common were less serious penalties such as restrictions on recruiting (28 cases) and reduction in the opportunity to provide financial aid (25 cases). (*Id.*).

In addition to his review of the relevant cases, Dr. Rascher also conducted a multiple regression analysis, in which he sought to isolate the effect of probation by the NCAA (one independent variable) on the revenue generated by men's basketball (the dependent variable), controlling for the impact of all other potentially relevant variables (the "Rule Violation Model"). (RP at Rascher-00000007). Dr. Rascher's Rule Violation Model considered all instances of "major" violations of NCAA recruiting rules by D1 men's basketball programs, from the 2006-2007 through 2016-17 academic years. The Rule Violation Model incorporated thousands of "observations"—each based upon annual team results—for D1 men's basketball programs and compared the revenue of schools that were not placed on probation with those that were. To capture probation severity, Dr. Rascher assigned numerical values from 0, which reflects zero years of probation, to 5, which reflects five years of probation. As with the Five-Star Valuation Model, Dr. Rascher also controlled for other factors that might influence revenue.

(*Id.*).  By controlling for these other factors, Dr. Rascher was able to calculate the influence that probation (the variable of interest) had upon the dependent variable, revenue.  Dr. Rascher will explain to the jury that the results of his analysis demonstrate that, across his models, the impact of NCAA sanctions ranges from having *no effect* on the revenue of a men's basketball program to suggesting that schools placed on probation by the NCAA actually saw statistically significant *increases* in the revenue for their basketball programs.

Dr. Rascher also conducted a benchmarking analysis to understand the effects of probation.  A benchmark methodology compares an injured firm's actual operations after the injury (here, being placed on NCAA probation) to a different business operation that did not experience the specific alleged harm, but otherwise participated in the same business environment for a similar time frame.  In other words, other similarly situated industries or firms or periods of time act as "benchmarks" that the injured firm's performance can be compared against.  Here, Dr. Rascher employed a benchmarking analysis to evaluate the potential competitive and economic impact of NCAA probation to a D1 university by considering the competitive and economic impact to other similarly situated universities previously placed on probation.  First, Dr. Rascher's benchmarking analysis considered the impact of probation on the average competitive outcomes (*i.e.*, effect on team win/loss records) and economic outcomes (*i.e.*, effect on team revenue) for all D1 schools that went on probation from the 2006-07 through 2016-17 academic years (the "D1 Probation Benchmark Analysis").  (RP at Rascher-00000050).[3] Second, Dr. Rascher also looked specifically at the economic impact of probation on individual schools on probation in the "Power Five" conferences (the ACC, Big 12, Big 10, SEC, and Pac

---

[3] Because Dr. Rascher's analysis required three years of pre-probation and three years of post-probation data, only schools with such information available were included in the analysis.  Schools which went on probation twice during the period were also excluded because there was no way to isolate the post-probation period from the first infraction from the pre-probation period for the second.

10) in the academic years 2006-07 through 2016-17, controlling for relevant alternative explanatory factors by using conference benchmarks (the "Power Five Probation Benchmark Analysis").[4]

Dr. Rascher will explain to the jury that the results of the D1 Probation Benchmark Analysis and the Power Five Probation Benchmark Analysis are consistent with that of his Rule Violation Model and demonstrate that at worst, NCAA sanctions have *no effect* on the revenue of a men's basketball program.

## ARGUMENT

## I.   DR. RASCHER'S OPINIONS ARE RELEVANT.

The bar for relevance, especially for a criminal defendant, is not high.  Rule 401 "uses a lenient standard for relevance. . . .To be admissible, evidence need only to alter the probabilities of a proposition; it need not sway the balance to any particular degree."  2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 401.04[2][c] (2013).  There is a "presumption of admissibility," *Cameron v. City of New York*, 598 F.3d 50, 61 (2d Cir. 2010), that takes on a constitutional dimension in a criminal case because it safeguards the defendant's right to a "fair opportunity to defend against the [government's] accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 1045 (1973).  As the Advisory Committee's Notes to Federal Rule of Evidence 702 explain, "Generally, the rejection of expert testimony is the exception rather than the rule."

Contrary to the Government's contentions, Dr. Rascher's testimony is relevant for several reasons.  The Government has alleged that Defendants engaged in a fraudulent scheme,

---

[4] The Power Five Benchmarking Analysis used the same criteria for inclusion as in the D1 Probation Benchmark Analysis, *see supra*, note 3.  Schools that did not go on probation during this period were excluded from the set of D1 Probation schools but were included in the conference benchmarks.

the object of which was to expose the Universities to tangible economic harm. (Ind. ¶¶ 49, 50). The Government claims that Defendants participated in this scheme because they "made payments" to the families of six basketball players, each of which was a five-star athlete, in order to "help secure and maintain the student-athlete[s]' commitment to play basketball" at the respective Universities. (*Id.* ¶ 29; *see also* ¶¶ 32, 36(a), 39, 41). For that conduct to be harmful, Defendants would have had to expect the delivery of these talented athletes to have a net negative financial impact on the Universities. Evidence from Dr. Rascher demonstrating that a "five-star" athlete was worth close to, or more than, a million dollars to each of the Universities will help Defendants contradict the Government's claim that the "object" of Defendants' purported scheme was to deprive the Universities out of money or property. *Cleveland v. United States*, 531 U.S. 12, 26-27, 121 S.Ct. 365, 377 (2000) (the mail and wire fraud statutes "require[] that the object of the fraud" be money or property). After hearing evidence from Dr. Rascher, the jury may well conclude that the "object" of the alleged scheme was to *assist* the Universities in recruiting a great basketball team that would bring in millions of dollars in revenue and bolster the national reputation of these Universities.

Likewise, the Government is required to prove, beyond a reasonable doubt, that Defendants "intended" to cause "some actual harm or injury to [the Universities]." *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) ("Although the government is not required to prove actual injury, it must, at a minimum, prove that defendants *contemplated* some actual harm or injury to their victims."); *United States v. Gabriel*, 125 F.3d 89, 96-7 (2d Cir. 1997) (the verb "'[c]ontemplate' is subject to at least two possible meanings—it could mean 'to think about' or it could mean 'to have in view as a purpose…to intend.' Our prior decisions have indicated

repeatedly that a defendant must have 'contemplated' harm, and when we have used that term, we have clearly meant the latter definition (to intend) rather than the former (to think about).").

As noted above, the Indictment states that Defendants "made payments" to the families of the six "five-star" athletes in order to "help secure and maintain" their "commitment[s] to play basketball" at the Universities. (Ind. ¶ 29; *see also* ¶¶ 32, 36(a), 39, 41). The jury will be asked to determine what was in the minds of Defendants when they were trying to "help secure and maintain" the athletes' "commitment[s] to play basketball" at the Universities: were they seeking to cause injury to the Universities through these actions or not? The fact that both Dr. Rascher's work and the relevant academic literature establish that "five-star" athletes are offer significant value to the Universities is relevant evidence that the jury should be permitted to consider when deciding this question.

Moreover, the Government's claim that this evidence is not relevant is contradicted by its own presentation ██████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ Indeed, Dr. Rascher provides a quantification of just how "great" these recruits were anticipated to be for the Universities.

Likewise, evidence from Dr. Rascher indicating that the NCAA has a variety of potential penalties to choose from, and that imposition of the more serious penalties is "highly unusual," *supra* at 6, is relevant to contradict the Indictment's allegation that Defendants were "intending" to "expos[e] the [U]niversities to tangible economic harm, including monetary and

other penalties imposed by the NCAA."[5] (Ind. at ¶¶ 49, 50). If the penalties historically imposed by the NCAA are most often a "slap on the wrist," rather than sanctions resulting in actual financial loss to the Universities, the jury may conclude that it is unlikely that Defendants' purpose in providing funds to the families was to expose the Universities to "tangible economic harm." (*Id.*) For the same reason, Dr. Rascher's conclusion that NCAA sanctions have no statistically significant effect on the revenue of a men's basketball program is also relevant to Defendants' lack of criminal intent. *United States v. Heimann*, 705 F.2d 662, 669 (2d Cir. 1983) ("[w]hile technically the success or failure of a scheme to defraud is irrelevant in a mail fraud case, realistically, when the contested issue is intent, whether or not victims lost money can be a substantial factor in a jury's determination of guilt or innocence.") (citations omitted); *United States v. Johnson*, 16-CR-457-1 (NGG), 2017 WL 5125770, *7 (E.D.N.Y. Sept. 21, 2017) (expert opinion admissible where testimony "tends to support Defendant's argument that no tangible economic harm was intended" and was valid evidence to counter the Government's "right to control" theory of fraud).

The Government's citation to several cases which stand for the proposition that an expert cannot offer an opinion about whether a defendant acted with intent is beside the point. (Gov. Br. at 5-6). Defendants agree that an expert cannot offer an opinion regarding whether the defendant possessed criminal intent, *see* Fed. R. Ev. 704(b), and Dr. Rascher is *not* going to offer such an opinion. However, Dr. Rascher's conclusions are relevant factual evidence that the jury should be permitted to consider when deciding whether Defendants acted with a specific intent to

---

[5] The Government intends to call a witness from the NCAA who "is expected to testify" about "[i]nformation about the NCAA enforcement division, including how enforcement actions are carried out, the *range of potential penalties* that the NCAA may impose [] for violations of NCAA rules, and examples where such penalties have been imposed." *See* Ex. 2 (Gov. August 1 Letter) at 2). If the Government intends to elicit testimony regarding the "range of potential penalties," Defendants must be permitted to offer factual statistical information regarding the rate at which certain penalties are imposed.

defraud the Universities. Indeed, in its brief, the Government failed to inform the Court that the

Second Circuit, in *United States v. Russo*, found that it was appropriate for an expert to present

factual evidence that is probative of a defendant's intent. *See* 74 F.3d 1383, 1395 (2d Cir. 1996)

(affirming admission of expert testimony that was relevant to the defendants' intent, but which

"focused solely on factual conclusions and did not involve any legal characterizations," such as

"whether the appellants had violated the securities laws" or whether they possessed "intent.").

The Government's claim that Defendants "intend" for Dr. Rascher's testimony

"to confuse the jury" into believing "that the defendants must not have intended to defraud the

[U]niversities because….statistically the universities were likely to end up profiting from the

defendants' conduct" is inaccurate. (Gov. Br. at 6-7). Defendants are not trying to "confuse the

jury," but rather are presenting evidence that supports their defense theory that they were trying

to help the Universities, not harm them. The fact of the matter is that it was common knowledge

to everyone involved in the world of college basketball that the rewards to universities for

violating the NCAA rules far outweighed the risks. Indeed, that was the conclusion recently

reached by the Commission on College Basketball—a committee chaired by former United

States Secretary of State Condoleezza Rice and established by the NCAA Board of Governors,

D1 Board of Directors and NCAA President Mark Emmert.[6]

---

[6] *See* Ex. 3, Commission on College Basketball, *Report and Recommendations to Address the Issues Facing College Basketball*, 2, 10 (2018) ("[c]urrently, the rewards for violating the rules far outweigh the risks."); *id.* at 18 ("Both D1 men's basketball and the NBA are multi-billion dollar enterprises…Where this much money is at stake, the incentives to break rules are high."); *id.* at 16 ("The Commission believes it is important to confront the uncomfortable fact that the challenges identified in this report have been part of landscape of pre-professional basketball for many years… Virtually all stakeholders and others providing information to the Commission at some point uttered the discouraging phrase, 'Everyone knows what's been going on.'"). In fact, this has been common knowledge in the college basketball community for the duration of the alleged conspiracy described in the Indictment. Ex. 4, John Solomon, *All quiet on the violations front … is NCAA enforcement dead?*, CBS Sports (May 24, 2014) ("a prevalent thought these days is that there's never been a better time to cheat in college sports than right now").

Notably, the Government has argued—for months—that certain knowledge can be attributed to Defendants given their role in the college basketball industry.[7] The Government cannot have it both ways. If Government is permitted to argue that Defendants' "experience and sophistication in the world of college basketball" demonstrates their criminal intent, the defense must be permitted to present factual evidence regarding the college basketball industry to counter the Government's theory. Dr. Rascher's testimony supports Defendants' theory of the case because it demonstrates that the belief that NCAA recruiting violations benefitted universities was not just a commonly-held perception, but was in fact statistically accurate and well-established in published, peer-reviewed academic literature. *See United States v. Onumonu*, 967 F.2d 782, 787 (2d Cir. 1992) (reversible error where district court excluded expert evidence that would "corroborate" defendant's argument about what "he believed he was doing" and which demonstrated that the "physical and economic realities" were consistent with defendant's proffered "belief"). To the extent that the Government disagrees with Dr. Rascher's conclusions, those concerns are "properly explored on cross-examination and [go] to….[the] testimony's weight and credibility—not its admissibility." *IMB Corp. v. BCG Partners, Inc.*, No. 10-cv-128 (PAC), 2013 WL 1775437, at *16 (S.D.N.Y. Apr. 25, 2013) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995).

---

[7] *See* Gov. Objs. To Defs. Req. to Charge, ECF No. 184, at 5-6 ("the Government will show at trial that the defendants – *all very experienced and sophisticated actors in the world of college basketball* – plainly understood both the fraudulent nature of their conduct and the potential effects of that conduct on the victim universities"); Gov. Br. In Opp. To Defs. Mot. To Dismiss, ECF No. 67, at 6 ("[t]he defendants, *all experienced and sophisticated players in the world of collegiate athletics*, fully understood that the amateur status of a student-athlete is the sine quon non of an athletic scholarship awarded by the Universities"); *id.* at 5, n.3 (arguing Defendants could be presumed to know that college athletes family members sign a particular form that "*defendants would have been intimately familiar with given their experience and sophistication in the world of college basketball*") (emphasis added).

Dr. Rascher's testimony is also relevant to Defendants' defenses concerning materiality. Defendants understand that the Government intends to call witnesses from each of the Universities to testify that if the Universities had known that the families of the relevant athletes had accepted financial assistance in violation of NCAA rules, the Universities would not have offered scholarships to those athletes. Defendants are entitled to present evidence— through an expert witness or otherwise—negating or undermining that testimony. After hearing Dr. Rascher's testimony concerning the significant quantitative and qualitative benefits that elite athletes confer upon a university, and his testimony concerning the likelihood that the NCAA will detect rule violations and significantly penalize a university for them, the jury may well find that the Government's witnesses were not credible when they claimed that the Universities would not have offered scholarships to these athletes. In *United States v. Litvak,* the Second Circuit held that a defendant is entitled to present expert testimony that is relevant to the "jury's determination of materiality," especially where that testimony will provide "[t]he full context and circumstances" in which the allegedly false statements were made. 808 F.3d 160, 182-83 (2d Cir. 2015) (reversible error to preclude defendant's expert witness on materiality).

Finally, Dr. Rascher's testimony is relevant to Defendants' good-faith defenses. For example, as Judge Lynch explained in *United States v. Nkansah*, a bank officer who is prosecuted for bank fraud for "mak[ing]" or "aid[ing]" a "borrower to make a false representation to the bank" with respect to a loan has a complete defense if the "officer believed in good faith that the misrepresentation was innocently intended to further a transaction that would in the end benefit the bank." 699 F.3d 743, 756-757 (2d Cir. 2012) (J. Lynch, concurrence). Dr. Rascher's testimony regarding the benefits to the Universities as a result of a five-star athlete will assist the jury in considering whether (or not) Defendants "believed in good

faith that the misrepresentation[s]" were "innocently intended to further a transaction that would in the end benefit the [Universities]." *Id.*; *see also United States v. Rossomando*, 144 F.3d 197, 200-01, n.5 (2d Cir 1998) ("If [defendant] was aware that he was withholding information from [the victim] but believed that the [victim] would not lose any money as a result, his defense that he lacked the requisite intent for mail fraud would have been legitimate.").[8]

Thus, there is no basis to exclude Dr. Rascher's testimony on relevance grounds.

## II.     DR. RASCHER'S OPINIONS ARE WITHIN HIS AREA OF EXPERTISE.

The Government makes several arguments as to why Dr. Rascher—who has a Ph.D. in Economics from the University of California, Berkeley and currently serves as the Director of Academic Programs for the Sport Management Master's Program at the University of San Francisco, where he is also a tenured professor teaching classes on sports economics, sports finance, and applied research methods—is not qualified to offer several of his proffered expert opinions.

The Government argues that Dr. Rascher is somehow not qualified to opine on issues regarding the economics of college sports because he "has never worked in an athletics department of a university, sat on a board of trustees for a University, or held any position related to assessing a university's finances, branding, or marketing" and does not have "any history of publishing or providing opinions on university admissions, recruiting, administration, and finances." (Gov. Br. at 6). It further argues that Dr. Rascher is not qualified because "substantially all" of his experience "pertains to unrelated areas, namely professional sports and

---

[8] The exception to this rule are instances in which the defendant intended for his actions to cause a loss of money or property to victim, but believed that he "ultimately" could work things out such that the victim would not be permanently harmed. *Rossomando*, 144 F.3d at 200-01. Defendants contend that they never intended for their actions to "cause a loss of money or property" to the Universities, *id.*, and this will ultimately be a question for the jury to decide.

leagues." (*Id.* at 9). The Government's argument is based on an irrelevant and counterfactual fallacy bearing no relationship to reality.

Dr. Rascher is one of the foremost experts in the country on issues of college sports economics vis-à-vis the NCAA's "amateurism" rules.[9] Dr. Rascher has served as an expert in nearly every high-profile litigation involving the NCAA over the last decade and has been admitted as an expert in the fields of "sports economics" and "sports management."[10] (*See* Ex. 5, Tr. of *O'Bannon v. NCAA*, No. 09-3329, at 608-613 (N.D. Cal. June 11, 2014)). He has testified in two federal trials, nine depositions, and authored eleven expert reports regarding the value of college athletes to their schools and the value of athletics to the greater university. He has also published in peer-reviewed journals and academic textbooks and participated in numerous academic seminars, conferences, and panels, on the subject.[11]

Despite that experience, the Government contends that "[s]ubstantial components of [Dr. Rascher's] proffered testimony are beyond the scope of Dr. Rascher's expertise." (Gov. Br. at 8). For example, it argues that Dr. Rasher is not qualified to opine on "issues of university administration and finance." (Gov. Br. at 13). Specifically, with respect to the qualitative benefits to a university of having a successful basketball program, the Government argues that

---

[9] We have prepared for the Court's convenience a complete list of Dr. Rascher's college sports related experience. It is attached as Appendix A.

[10] The Government uses quotation marks when describing the Sports Management Master's Program run by Dr. Rascher at the University of San Francisco and ranked as the 10th best program in the world by SportsBusiness International. (Gov. Br. 2, 9). To the extent that the Government is implying that Sports Management is not a legitimate discipline, the Government is mistaken. Sports Management, also sometimes referred to as Sports Administration, is a graduate degree program that trains professionals seeking positions within all sectors of the sports industry including, among others, administrative and compliance positions in D1 colleges' athletic departments. As part of this program, Dr. Rascher teaches courses which include modules on college athletic department finance and accounting practices. Notably, several witnesses the Government intends to call to testify on behalf of the respective Universities appear to have a degree from similar programs.

[11] *See e.g.* Ex. 6, Daniel Rascher et al., *The College Basketball Players' Labor Market: Ex Ante versus Ex Post Valuations*, Western Economics Association International (2015).

Dr. Rascher has "no first-hand experience or expertise" and intends to rely on the findings of others. (*Id.*). The Government makes a similar argument with respect to Dr. Rascher's proffered testimony regarding the true economic cost of a scholarship.[12] (*Id.* at 14).

As an initial matter, it is axiomatic that an expert is permitted to rely on the work of other experts in the field. Fed. R. Ev. 702 ("A witness [may be] qualified as an expert by *knowledge*, skill, experience, training, or education") (emphasis added); *SEC v. Aly*, No. 16 CIV. 3853 (PGG), 2018 WL 1581986, at *17 (S.D.N.Y. Mar. 27, 2018) ("Under Federal Rule of Evidence 703, '[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.' [I]f 'experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.'") (citations omitted); *Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 385 (S.D.N.Y. 2014) ("an expert may rely on [] the opinions of other experts in formulating their own expert opinions."). Indeed, part of the role of an expert is to synthesize the scientific work on a particular topic. Economists almost always begin their studies by performing a "literature review" of the relevant work of others.

Moreover, contrary to the Government's assertion, and as his CV makes clear, Dr. Rascher has personally done work on these topics. For example, Dr. Rascher performed an assessment of intercollegiate athletics at the University of San Francisco—at the request of the University's President and Athletic Oversight Board—that considered precisely these issues.[13]

---

[12] Dr. Rascher will testify that the "list price" of an athletic scholarship substantially overstates the "true cost" to a university. Dr. Rascher will explain that the true cost of a scholarship turns largely on the opportunity cost to a university. For example, the largest component of the scholarship—tuition for an athlete—costs a university $0 in out-of-pocket costs. There is only a true cost to the university if providing a scholarship to the athlete in question somehow prevented a full paying student from attending the university (or if it forced the university to provide an additional professor, for instance).

[13] *See* Ex. 7, JEREMY HOWELL AND DANIEL RASCHER, AN ANALYSIS AND ASSESSMENT OF INTERCOLLEGIATE ATHLETICS AT THE UNIVERSITY OF SAN FRANCISCO, (2011). He also performed a

Dr. Rascher has also previously testified regarding these very issues in federal court.[14]  As Defendants advised the Government, all of Dr. Rascher's proffered testimony on these subjects is extremely well supported by the studies—both peer reviewed and otherwise[15]—of other experts in the field.

The Government also argues that Dr. Rascher is not qualified to opine on issues regarding the incidence of NCAA recruiting violations because he "has no experience in college basketball recruiting, or NCAA compliance or enforcement."  (Gov. Br. at 10).  Here as well, Dr. Rascher has not only personally performed work on these subjects, he has reviewed the relevant work of other experts on the subject.  For example, Dr. Rascher has previously performed extensive work regarding the college basketball recruiting market[16] and NCAA probations.[17]  Here too, all of Dr. Rascher's proffered testimony is well supported by the studies—both peer reviewed and otherwise—of other experts in the field.[18]

---

similar project for the University of Alabama-Birmingham.  *See generally* Ex. 8, DANIEL RASCHER & ANDREW SCHWARZ, THE INCREMENTAL BENEFITS AND COSTS OF FOOTBALL, BOWLING, AND RIFLE AT THE UNIVERSITY OF ALABAMA AT BIRMINGHAM (2015); *see also id.* at 49.

[14] *See e.g.* Ex. 9, Transcript of *O'Bannon v. NCAA*, No. 09-3329, at 853-864 (N.D. Cal. June 13, 2014).

[15] *Jarvis v. Ford Motor Co.,* No. 92-cv-2900 (NRB), 1999 WL 461813, at *6 (S.D.N.Y. July 6, 1999) (the mere fact that an expert's findings have not been peer-reviewed or published is not a sufficient reason to exclude it), *aff'd in part, vacated in part,* 283 F.3d 33 (2d Cir.2002).

[16] *See e.g.* Ex. 10, *In re: Nat'l Collegiate Athletic Ass'n Grant-In-Aid Cap Antitrust Litigation,*  Expert Report of Daniel A. Rascher on Economic Liability Issues for the Injunctive Classes, 74-85 (N.D. Cal. Mar. 21, 2017).

[17] *See e.g.* Ex. 11, DANIEL RASCHER ET AL., CARTEL BEHAVIOR IN UNITED STATES COLLEGE SPORTS: AN ANALYSIS OF NATIONAL COLLEGIATE ATHLETIC ASSOCIATION FOOTBALL ENFORCEMENT ACTIONS FROM 1990 TO 2011 (2016).

[18] *See e.g.* Ex. 12, Francis T. Cullen et al., *Scandal and reform in collegiate athletics: Implications from a national survey of head football coaches,* 61.1 J. OF HIGHER EDUC., 50-64 (1990);  Ex. 13, Jill Harris, *The Demand For Student-Athlete Labor and the Supply of Violations in the NCAA,* 26.2 MARQ. SPORTS L. J., 411-432 (2016); Ex 14, Randall D. Smith, *It pays to bend the rules: The consequences of NCAA athletic sanctions,* 58.1 SOC. PERSPECTIVES, 97-119 (2015).

## III.     DR. RASCHER'S METHODOLOGY IS RELIABLE.

The Government admits that Dr. Rascher is qualified to offer an opinion based on a multiple regression analysis, but claims that "there is no indication that this method has been subject to peer (or any) review, or indeed has been adopted by anyone other than Dr. Rascher." (Gov. Br. 12-13).  To the contrary, "[n]umerous courts have held that regression analysis is a reliable method … and 'a mainstream tool in economic study.'"  *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.,* 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000) (regression analysis "methodology is well established as reliable.") (collecting cases).

The Government's claim that Dr. Rascher's use of data from Rivals.com renders the Five-Star Valuation Model unreliable because Rivals.com is an "unscientific website" is incorrect.  In fact, data from Rivals.com was admitted as reliable evidence by the Northern District of California in *O'Bannon v. NCAA*.  In fact, both Plaintiffs and the NCAA's own expert witness relied upon the Rivals.com data.  *See e.g.* Ex. 15 (Tr. of *O'Bannon v. NCAA*, No. 09-3329, at 2990-2997 (N.D. Cal. June 26, 2014)).  Judge Claudia Wilken also cited to the research that utilized the Rivals.com data in her opinion resolving the case, which was affirmed in substantial part by the Ninth Circuit, remanding on issues unrelated to the Rivals.com data. *O'Bannon v. NCAA,* 7 F. Supp. 3d 955, 966-67 (N.D. Cal. 2014), *aff'd in part, vacated in part*, 802 F.3d 1049 (9th Cir. 2015).

In addition, a recent study commissioned by, and presented to, the NCAA's D1 Presidential Advisory Group—authored by economists with degrees from Harvard, Princeton, and Stanford—utilized the Rivals.com "star ranking" of college recruits as an indicia of the athlete's talent.[19]  Moreover, sports economists regularly use "star" rankings assigned by

---

[19] *See* Ex. 16, YAIR EILAT ET AL., AN ECONOMETRIC ANALYSIS OF THE MATCHING BETWEEN COLLEGE ATHLETES AND COLLEGES (2015).

recruiting firms like Rivals.com in economic analyses regarding the value of athletes in academic literature.[20]

The Government can cross-examine Dr. Rascher on the fact that he used data from Rivals.com in his Five-Star Valuation Model and can argue to the jury that they should accord Dr. Rascher's opinion less weight as a result, but there is no basis for concluding that the use of Rivals.com data renders Dr. Rascher's opinion too unreliable to present to the jury. *Aly*, 2018 WL 1581986 at *17 ("The Second Circuit has instructed that expert testimony should be excluded only if it is based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and oranges comparison.'") (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 716 F. Supp. 2d 220, 224-25 (S.D.N.Y. 2010) ("Trial judges … should remember that they are ruling on the admissibility of evidence and not its weight or credibility. As the Supreme Court has explained, 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [expert testimony]'") (citation omitted).

The Government also claims that the Five-Star Valuation Model "conflate[s] 'correlation' with 'causation' in a manner than renders its outcome insufficiently reliable to be

---

[20] *See* Ex. 17, Richard Borghesi, *The Financial and Competitive Value of NCAA Basketball Recruits*, 19:1 J. OF SPORTS ECON., 31-49 (2018); Ex. 18, Trent J. Herda et al., *Can recruiting rankings predict the success of NCAA D1 football teams? An examination of the relationships among rivals and scouts recruiting rankings and Jeff Sagarin end-of-season ratings in collegiate football*, 5.4 J. OF QUANTITATIVE ANALYSIS IN SPORTS (2009); Ex. 19, Peter K. Hunsberger and Seth R. Gitter, *What is a blue chip recruit worth? Estimating the marginal revenue product of college football quarterbacks*, 16.6 J. OF SPORTS ECON., 664-690 (2015); Ex 20, Julianne Treme et al., *NCAA Basketball: when does recruiting talent translate into wins for power conferences*, 40 J. OF ECON. AND FIN. 739-753 (2016), Ex. 21, Matthew P. Makofske, *Are you hiring Johnny Football or Johnny Doe? Uncertain labour quality and the measurement of monopsony in college football*, 50.22 APPLIED ECON., 2415-2430 (2018); Ex. 22, Richard Borghesi, *Pay for play: the financial value of NCAA football players*, 49.46 APPLIED ECON., 4657-4667 (2017).

probative" but doesn't give any indication of what it means by that. In fact, Dr. Rascher employed a standard regression analysis, which is useful for eliminating the possibility of spurious correlation. Furthermore, by relating the talent pool from prior years to current year revenues, Dr. Rascher's analysis accounts for the possibility that revenues and team talent level are merely "correlated." The idea that an increase in player talent leads to higher revenues is not a controversial one: the literature is full of research that analyzes the way player talent and skill drive demand for various sports and leagues (e.g., attendance, television, revenues). As the Handbook of Sports Economics Research puts it, "fans get utility from quality, which leads to ticket sales and ultimately to revenues."[21]

The fact that a five-star athlete is worth different values to each of the Universities, *see supra* at 7, is not because Dr. Rascher's analysis is erroneous, but rather because his analysis reflects the variation in revenue for college basketball across the four schools. Just as an identical bottle of water can generate different amounts of revenue depending on whether it is sold at Madison Square Garden or the hot dog stand outside, simply because one is able to charge higher prices, an elite athlete has the potential to generate more revenue at a college basketball powerhouse. Louisville, for example, has one of the highest grossing men's basketball programs in the country, with a reported revenue of nearly $45 million in 2017.[22] Contrary to the Government's assertion, the differing values among the four Universities actually indicates that Dr. Rascher's model is appropriately sensitive and calibrated to the specific Universities, which is an indicator of its reliability rather than any supposed flaw.[23]

---

[21] John Fizel, *Handbook of Sports Economics Research*, M.E. Sharpe, at 175 (2006); *see generally* David Berry, *The Economic Value of Playing Talent*, Sports Economics (2018).
[22] Ex. 23, Louisville 2017 EADA Data, at *8.
[23] The Government claims that Dr. Rascher's explanation of the Five-Star Valuation Model to the jury "will necessarily entail lengthy testimony about players and universities of no relevance to this case." (Gov. Br. 13). Defendants are perplexed by this assertion and can represent to the Court that Dr.

The Government also objects to Dr. Rascher's opinions concerning the effect of NCAA probation on revenue on the basis that Dr. Rascher's "regression analysis" (the Rule Violation Model) and "benchmarking analyses" (the D1 Probation Benchmark Analysis and the Power Five Probation Benchmark Analysis) are unreliable. (Gov. Br. 13-14). The Government's concerns are not legitimate. Its claim that Dr. Rascher only "evaluat[ed] sanctions imposed at a limited number of schools" is simply incorrect. (Gov. Br. at 14). Contrary to the Government's assertion, Dr. Rascher did not perform a "sampling" exercise at all. Sampling requires one to take a small subset of the entire population under study. Instead, Dr. Rascher used the entire population of infractions cases over the designated period of time. That is, Dr. Rascher's Rule Violation Model examined the effects of all the "major" violations of NCAA recruiting rules by D1 men's basketball programs, which fit his methodological requirements,[24] for more than a ten year period. In addition, the Model controlled for factors including school fixed effects, conference-level fixed effects, year fixed effects, probation severity, and win/loss percentage for both the current and preceding year to account for the effect of the team's previous season's success on its current season's revenue. (RP at Rascher-00000007). Dr. Rascher's Rule Violation Model—and his conclusion that probation does not result in a statistically significant decrease in revenue—is also consistent with other recent peer reviewed academic literature.[25]

To the extent the Government's believes that Dr. Rascher should have included more, or different, independent variables in the Rule Violation Model that is not a basis for

_____

Rascher's testimony concerning the Five-Star Valuation model will not involve "lengthy testimony"—or likely any testimony—about players and universities beyond those described in the Indictment.
[24] That is, except for those schools which went on probation twice during the period or schools did not have three years of data available prior to and after the probation, for the same reasons discussed above. *Supra*, 8-9.
[25] Smith, *supra* note 18.

precluding Dr. Rascher's opinion. The Supreme Court has held that a "failure to include variables" in a regression analysis "will affect the analysis' probativeness, not its admissibility." *Bazemore v. Friday*, 478 U.S. 385, 331, 106 S.Ct. 3000, 3009 (1986).

Likewise, Dr. Rascher's Benchmarking Analyses are standard "before and after" economic analyses and the Government has not identified any way in which they deviate from acceptable practices. Here as well, the Government's claim that Dr. Rascher's Benchmarking Analyses only "evaluat[ed] sanctions imposed at a limited number of schools" is incorrect. As described above, Dr. Rascher looked at every D1 university that had been placed on probation by the NCAA from the 2006-07 through 2016-17 academic years that fit his methodological requirements. By testing whether being on probation has an effect on revenue, Dr. Rascher's approach is consistent with many academic studies that have looked at a probation variable, either as a dependent variable or an independent variable. In fact, the specific type of before-and-after analysis Dr. Rascher performed is an adaptation of work done by Dr. Arthur A. Fleisher and others on older data.[26]

Additionally, "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 134 (S.D.N.Y. 2015). Given these facts, there is no need for a *Daubert* hearing.

---

[26] *See* Ex. 24, (ARTHUR A. FLEISHER ET AL., THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION: A STUDY IN CARTEL BEHAVIOR; University of Chicago Press, 1992). More generally, studies utilizing NCAA probation as a dependent or independent variable are common in the academic literature. *See* Ex. 25, Joshua R. Smith & Sungho Cho, *An Outcome Determinant Analysis of NCAA Rules Violations: An Application of Multivariate Statistics to the Committee on Infractions' Decisions on Major Cases,* 2.1, J. OF GLOBAL SPORT MGMT, 1-21 (2017); Harris, *supra* note 18.

## IV.    DR. RASCHER'S OPINIONS WILL BE HELPFUL TO THE JURY.

For many of the reasons discussed above, Dr. Rascher's opinions will be helpful to the jury.  For example, Dr. Rascher's testimony—which quantifies the value provided by a five-star college athlete—will be helpful to the jury in assessing whether Defendants acted with a specific intent to defraud the Universities and cause them financial harm.  *Supra* at 12-13.  The exact valuation of a college athlete to his university is not something an ordinary juror is capable of accurately assessing on his or her own and for that reason, and Dr. Rascher's testimony will be useful.  *Pension Comm. of Univ. of Montreal Pension Plan, LLC*, 691 F. Supp. 2d at 462 (permitting an expert to testify where a "lay juror may well have difficulty understanding [things] without the aid of expert testimony").  Similarly, Dr. Rascher's testimony regarding the incidence of NCAA recruiting violations and the probability of NCAA sanctions will help the jury evaluate Defendants' arguments concerning their lack of intent to harm and also will assist the jury in considering the credibility of statements by Government witnesses from the Universities.  *Int'l Cards Co., Ltd. v. MasterCard Int'l Inc.*, No. 13 CIV. 2576 (LGS), 2016 WL 7009016, at *7 (S.D.N.Y. Nov. 29, 2016) (denying motion to preclude because expert's testimony regarding "industry practice and custom" "will provide background information that will help the jury understand the workings [of the industry]") (collecting cases).

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully submit that the Court should deny the Government's first motion *in limine*.

Dated: New York, New York
September 25, 2018

**NEXSEN PRUET LLC**

By: /s Mark C. Moore
Mark C. Moore
Andrew A. Mathias
55 E. Camperdown Way, Suite 400
Greenville, South Carolina 29601
(864) 370-2211

**OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.**
Merl F. Code
300 North Main Street
Greenville, South Carolina, 29601
(864) 271-1300

*Attorneys for Defendant Merl Code*

**WILLKIE FARR & GALLAGHER LLP**

By: /s Michael S. Schachter
Michael S. Schachter
Casey E. Donnelly
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

*Attorneys for Defendant James Gatto*

**HANEY LAW GROUP PLLC**

By: /s Steven A. Haney
Steven A. Haney
3000 Town Center Drive, Suite 2570
Southfield, Michigan 48075
(248) 414-1470

*Attorneys for Defendant Christian Dawkins*