Ia1dgat1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                          17 Cr. 686 (LAK)

5   JAMES GATTO, a/k/a "Jim,"
    MERL CODE,
6   CHRISTIAN DAWKINS,

7               Defendants.

8   ------------------------------x

9                                   October 1, 2018
                                    9:47a.m.
10
    Before:
11                      HON. LEWIS A. KAPLAN,

12                                      District Judge
                                         and a Jury
13

14                      APPEARANCES

15  ROBERT S. KHUZAMI
         Acting United States Attorney for the
16       Southern District of New York
    BY:  EDWARD B. DISKANT
17       NOAH D. SOLOWIEJCZYK
         ALINE R. FLODR
18       ELI J. MARK
         Assistant United States Attorneys
19
    WILLKIE FARR & GALLAGHER LLP
20       Attorneys for Defendant Gatto
    BY:  MICHAEL S. SCHACHTER
21       CASEY E. DONNELLY

22

23

24

25

Ia1dgat1

APPEARANCES (Cont'd)

NEXSEN PRUET LLC
        Attorneys for Defendant Code
BY:  MARK C. MOORE
            -and-
        MERL F. CODE

HANEY LAW GROUP PLLC
        Attorneys for Defendant Dawkins
BY:  STEVEN A. HANEY


Also present:  SONYA JACOBS, Paralegal
                SYLVIA LEE, Paralegal
                ANTHONY CASOLA, FBI

                          oOo

          (Case called; all sides ready)

          THE COURT:  Let me have, at the outset, the latest

projections of trial duration, because I have to say something

to the jury and it may as well be accurate.

          MR. DISKANT:  Your Honor, assuming that the Court

continues to sit on the schedule that we were advised, the

government firmly projects that its case in chief will last

approximately three weeks.  We do expect a defense case here,

although I'll obviously allow defense counsel to address that.

So, we continue to believe that approximately a month remains a

sound estimate of the trial length.

          THE COURT:  All right.  Let me hear from the defense.

          MR. SCHACHTER:  We agree with that estimate, your

Honor.

          THE COURT:  You agree that the government's case will

1    be about three weeks?

2           MR. SCHACHTER:  And the government estimated a defense

3    case of approximately one week and I think that is accurate.

4           THE COURT:  All right.  Anyone else?

5           MR. HANEY:  Your Honor, we agree as well on behalf of

6    Mr. Dawkins.

7           MR. MOORE:  As do we for Mr. Code.

8           THE COURT:  OK.  The second thing I wanted to address

9    is there was an application last week by ESPN for permission to

10   hook up to Courtroom Connect for the purpose of obtaining

11   realtime feed of the court reporter's draft transcript.  The

12   District Executive's office has denied it on the ground that it

13   would -- well, I won't even go into why.  I have the authority

14   to make an exception.  I declined to do so.  If it becomes

15   appropriate, I will explain in more detail later, but it is

16   denied.

17          I am reminded we need to arraign the defendants on the

18   Superseding Indictment Number 2.

19          Andy, would you do the honors?

20          THE CLERK:  Have the defendants received a copy of the

21   S2 Superseder?  Has the get Gatto, Mr. Schachter?

22          MR. SCHACHTER:  Yes, and we waive the public reading.

23          THE CLERK:  As to Defendant Code, Mr. Moore?

24          MR. MOORE:  Yes, we have, and we also waive the public

25   reading.

Ia1dgat1

1          THE CLERK:  As to Defendant Dawkins?

2          MR. HANEY:  Yes, we have, and we waive the public

3    reading.

4          THE CLERK:  Have you reviewed it with your client, Mr.

5    Schachter?

6          MR. SCHACHTER:  Yes.

7          THE CLERK:  Mr. Moore?

8          MR. MOORE:  Yes, we have.

9          THE CLERK:  Mr. Haney?

10         MR. HANEY:  Yes, we have.

11         THE CLERK:  And how does your client plead?  Mr.

12   Schachter?

13         MR. SCHACHTER:  Not guilty.

14         THE CLERK:  Mr. Moore?

15         MR. MOORE:  Not guilty, your Honor.

16         THE CLERK:  Mr. Haney?

17         MR. HANEY:  Not guilty.

18         THE COURT:  OK.  Now, let me just say this to each of

19   the defendants.  I'll probably raise it again later on but I'm

20   going to do it now anyway.

21         I advise each of you that the question of whether you

22   testify in your own defense in this case is something entirely

23   committed to your own personal decision.  You have the right to

24   the advice of your counsel concerning whether in your counsel's

25   view it is advisable for you to testify, but it is not up to

Ia1dgat1

1  your lawyer.  That's not a call your lawyer gets to make.  It

2  is a call only you get to make.

3         If we get to a point in the trial where the government

4  has rested and the time has come to present the defense case,

5  if your lawyer rests or in the case that your lawyer will put

6  on either no evidence at all or no further evidence beyond what

7  you will have heard by then and it is your wish to testify, you

8  have that right.  And what you are to do at that point if you

9  wish to testify is simply to stand up.  Don't say anything.

10  Wait for me to recognize you.  I will excuse the jury.  I will

11  see whether the reason you are standing is because you want to

12  testify, and if that's the case, you will be permitted to

13  testify.

14         If you don't stand up at that point, or if I don't

15  raise the question again with you correctly, you will have

16  waived your right to testify in this case.

17         Do you understand that, Mr.  Gatto?

18         DEFENDANT GATTO:  Yes, your Honor.

19         THE COURT:  Do you have any questions about that?

20         DEFENDANT GATTO:  No, sir.

21         THE COURT:  Mr. Code?

22         DEFENDANT CODE:  Yes, your Honor.

23         THE COURT:  And Mr. Dawkins?

24         DEFENDANT DAWKINS:  Yes, your Honor.

25         THE COURT:  All right.  Thank you.

Ia1dgat1

1      Now, we have these massive papers on the motions in

2  limine.  The government has moved for four kinds of relief.

3  I'll take them in reverse order.

4      What is described in the papers as the fourth branch

5  of the government's motion, which seeks an order precluding

6  certain testimony or examination regarding FBI agents, is

7  granted.  That inquiry is precluded.

8      Second, I have the motion with respect to the

9  defendants' proposed expert under consideration.

10      Is anybody intending to put in any more paper on that?

11      MR. DISKANT:  Not from the government, your Honor.

12      MS. DONNELLY:  The defense is not putting in any more

13  paper.

14      THE COURT:  OK.  So that is sub judice, and I will

15  make up my mind how I want to handle it.

16      Now, the other two branches of the government's

17  motions seek to preclude evidence, cross-examination, or

18  reference to past unrelated major NCAA rules violations

19  involving what I will refer to, because the parties have done

20  so, as the victim universities, Louisville, Miami, Kansas and

21  N.C. State, and also other institutions.  It seeks also to

22  require the defendants to specifically identify in advance each

23  past minor NCAA rule violation that it intends to question

24  anybody about or with respect to which they intend to offer any

25  evidence.

Ia1dgat1

1      In a letter of Friday, the government has scaled back

2  the scope of its request.  To the extent I understand the

3  government's present position, it is not seeking to preclude

4  cross-examination of its cooperating witnesses regarding NCAA

5  rule violations in which those witnesses themselves were

6  involved.

7      Am I right about that so far, Mr. Diskant?

8      MR. DISKANT:  Yes, your Honor.

9      THE COURT:  All right.  Thank you.

10      What I understand it now to be seeking to preclude are

11  two things, and I'm quoting their letter:  "Litigation and

12  relitigation of fact and events of no relevance to this case

13  and broad unsubstantiated claims like Division I schools across

14  the country regularly engaged in NCAA rule violations."

15      Do I have that right, Mr. Diskant?

16      MR. DISKANT:  Yes, your Honor.

17      I would just note with respect to the second that

18  that's where, you know, myriad minor violations that we have no

19  notice of might come up.

20      THE COURT:  Am I right in concluding that principally

21  what this motion is aimed at is preclusion of any discussion of

22  the events relating to the NCAA's University of Louisville

23  Public Infractions Decision of June 2017; is that what this is

24  really focused on?

25      MR. DISKANT:  I think, given the way all parties think

8

1    the evidence is coming out at this trial, your Honor is

2    correct, that is the prior violation that is most likely to

3    come and it is most troubling to the government.

4          THE COURT:  Mr. Schachter, is anything else of this

5    nature going to come up other than the Louisville matter?

6          MR. SCHACHTER:  Your Honor, it depends on what the

7    definition is of the word "NCAA rule violation."  If --

8          THE COURT:  Well, let's divide it into two pieces

9    right away.  "Major violations" are a term of art, and let's

10   talk about major violations first.

11         MR. SCHACHTER:  If there are violations found by the

12   NCAA, then I think that is going to be principally Louisville

13   as well as the Miami violation, which we mentioned.  And then,

14   as addressed in our motion in limine or the response to the

15   motion in limine with respect to Dr. Rascher's testimony, there

16   will be testimony regarding NCAA rule violations and how they

17   were dealt with by the NCAA and what the effect was on

18   universities, and that's addressed in that motion.

19         THE COURT:  But that's only expert testimony?

20         MR. SCHACHTER:  Correct.

21         May I confer?

22         THE COURT:  Insofar as we are talking about alleged --

23   yes, maybe not even alleged, but certainly alleged, at least --

24   major rule violations, we're talking only about the, for want

25   of a better term, adjudicated -- I put that in quotes -- major

Ia1dgat1

violations involving Louisville and Miami, and those are the

two recent ones, Louisville in 2017 and Miami in 2013; is that

correct?

        MR. SCHACHTER:  That is correct.

        THE COURT:  And nothing else?

        MR. SCHACHTER:  In the world of adjudicated NCAA rule

violations.

        THE COURT:  What about other major violations?

        MR. SCHACHTER:  Well, I do anticipate -- we were

confused a little bit as to what the government's motion was

directed to --

        THE COURT:  You are not alone.

        MR. SCHACHTER:  -- there certainly will be evidence

that informs the defendants' intent of their knowledge of other

conduct which violates NCAA rules.

        THE COURT:  So you are proposing to offer evidence of

defendants' state of mind based on their knowledge -- their

personal knowledge -- at relevant times of other alleged but

not adjudicated major violations, is that accurate?

        MR. SCHACHTER:  That is accurate.  In addition to --

in addition to -- I mean, I would also say that evidence of

which there may not be evidence of defendant -- so there

certainly is evidence that goes to their state of mind of which

the defendant have personal knowledge of, and that is captured

in the wiretap recordings.  Then there is evidence of which

1  defendants may not -- there may not be proof of them having

2  personal knowledge but the government has taken the position

3  that they are going to prove the defendants' fraudulent intent

4  based on their experience and sophistication in the college

5  basketball world.  And to the extent that that is going to be

6  the government's evidence, then the defense also believes that

7  it should be able to show what someone with sophistication and

8  experience in the college basketball world would know.  So I

9  put those in two buckets, your Honor.

10      THE COURT:  Well, one seems considerably more

11  problematic than the other.

12      All right.  It seems to me -- now, what about the

13  minor violations?

14      MR. SCHACHTER:  The minor violations, that is also a

15  subject that I believe is really going to, for the most part,

16  come up in Dr. Rascher's testimony.  To some extent, I do

17  anticipate some cross-examination of the university witnesses

18  in that regard.  Part of the government's case here is that

19  certifications -- the gravamen of this wire fraud case are

20  false certifications that were submitted.  Those certifications

21  say, in broad strokes, we certify that we are aware of no NCAA

22  rule violation.  However, it is the defense's position that

23  those certifications are not material.  They cover all NCAA

24  rule violations.  The universities are not relying on these

25  certifications for anything --

Ia1dgat1

1    THE COURT:  So your view, I take it then, would be

2    that there is no material difference between a tax return

3    signed by a taxpayer in which the taxpayer omits $20 million

4    worth of income and a tax return submitted by a taxpayer and

5    signed by him in which the understatement of income is $12.

6    MR. SCHACHTER:  I agree with your Honor, of course,

7    that there is a significant difference between those

8    circumstances.  My point is, rather, that when the universities

9    go through the motions of having student athletes sign

10   certifications, that they actually put no stock in them because

11   they understand, which should be our argument -- may be our

12   argument to the jury, that these are not important documents to

13   the university because the universities know that these

14   certifications get violated all the time.  They are not paying

15   any attention; they put no stock in these certifications.  We

16   think that that is a relevant argument that we should be able

17   to make to the jury on the subject of materiality.

18   THE COURT:  All right.  I think in light of the

19   conversation here, the government and the defense ought to

20   discuss this point further as to what's really at issue.  And I

21   think in light of the change in the government's position as of

22   Friday, and the elaboration this morning by the defense,

23   coupled with whatever further elaboration you can arrive upon,

24   I think we ought to start again with these papers, because the

25   papers that I got in the first place are not focused on what's

1    really at issue and it even wasn't clear to me what really was

2    in issue, and you need to do that quickly.

3         In the meantime, until I have new submissions and have

4    ruled, there will be no reference, either in arguments before

5    the jury or in testimony or other exhibits, to any NCAA rule

6    violations involving either the victim universities, or others,

7    save that the defendants of course are free to cross-examine

8    cooperating witnesses regarding any NCAA rules violations in

9    which the witness under examination was involved, and then

10   we'll sort out the rest of this as quickly as we reasonably

11   can.

12        And that takes care of that piece.

13        So I think that handles, as well as I can, the in

14   limine motions for the moment.

15        Mr. Schachter.

16        MR. SCHACHTER:  Your Honor, I just want to make sure

17   that I understand.

18        The Court's ruling relates to things like the

19   Louisville adjudicated NCAA resolution?  I ask that because the

20   Indictment itself speaks of other NCAA rule violations.  For

21   example, the Indictment references the fact that when the

22   request is made to provide payment to the family of the player

23   at Louisville, that it is because another university has made

24   another offer.  Similarly, there is an allegation with respect

25   to Miami, that there is a need -- the request comes in to match

1  a similar offer which has been made of $150,000 by the

2  University of Arizona Nike School that's in the Indictment.  I

3  assume that your Honor's restrictions on us focus on other

4  adjudicated NCAA rule violations that aren't part of the

5  gravamen of the charges?  I just want to make sure I understand

6  what --

7           THE COURT:  Mr. Diskant.

8           MR. DISKANT:  We have no objection to the particular

9  facts that Mr. Schachter referred to.

10          THE COURT:  OK.  That takes care of that.

11          MR. HANEY:  On behalf of Mr. Dawkins, the government's

12  evidence includes, against my client at least, evidence of

13  other NCAA violations.  So, they are attempting to use evidence

14  of NCAA violations that my client is alleged to have committed

15  that involve universities that are not a subject of this case.

16  It seems as if they are trying to use the same evidence that

17  now they want to be precluded from referencing on

18  cross-examination most notably of their witnesses, even the

19  noncooperators, your Honor.  They have a witness from the

20  University of Louisville Compliance Department who is going to

21  testify, and we should have the right to cross-examine that

22  witness as to the witness' credibility because a lot of the

23  violations that occurred occurred on the watch of that

24  particular compliance director, and we feel we should have the

25  right to cross-examine that witness as to why that witness took

Ia1dgat1

1   no action back when those violations occurred.

2           THE COURT:  Mr. Diskant.

3           MR. DISKANT:  Perhaps, as the Court suggested, we

4   should confer with defense counsel on that issue, which I am

5   happy to do.

6           I will say with respect to Mr. Dawkins' engagement in

7   other rules violations, the government has generally agreed not

8   to go there at the defendant's request.  I think the only other

9   significant conduct that is going to be coming in is conduct

10   the defendant engaged in with a government cooperator because

11   the defendants wanted to be able to cross-examine the

12   cooperator about that conduct.  If they don't want to cross

13   about that, you know, we can potentially agree to leave it out

14   of the case entirely.

15           THE COURT:  I think you should talk to each other.

16           Look, you know, the plain fact of it is that the

17   defense put in on this motion -- and it was recent -- over 500

18   pages of material.  I have had essentially -- well, not

19   "essentially."  I have had grossly inadequate time to consider

20   it.  This is an interim ruling to give me enough time to

21   understand exactly what is at issue and to rule on it, and

22   that's that.

23           OK.  Just to review briefly the calendar for next

24   week:  Monday is a dark day because it is a holiday.  My

25   present plan is to sit about a half a day Tuesday.  I have to

Ia1dgat1

1    be at a Judicial Conference committee meeting out of New York

2    by Tuesday night, and in order to catch a plane, I am just not

3    able to sit more than half a day.  I will be out Wednesday and

4    coming back bleary-eyed on Thursday.  We will sit on Thursday

5    and not Friday, as currently planned.  That could conceivably

6    change but it is not very likely.

7              OK.  Anything else we need to take up?

8              MR. DISKANT:  Your Honor, we just wanted to put on the

9    record the status of plea negotiations, or lack thereof --

10             THE COURT:  Yes.  Thank you.

11             MR. DISKANT:  -- of particular plea offers.

12             A formal written plea offer was extended to Defendant

13   Christian Dawkins.  Our understanding is that the terms of that

14   offer were conveyed by his counsel to him and that the offer

15   was rejected.

16             With respect to the other two defendants, there were

17   some informal plea talks but nothing that resulted in any sort

18   of a formal plea offer being extended.

19             THE COURT:  Mr. Dawkins, is that accurate?

20             MR. HANEY:  That would be correct, your Honor.

21             THE COURT:  I want to hear it from Mr. Dawkins.

22             DEFENDANT DAWKINS:  Yes.

23             THE COURT:  And that offer was in writing are, is that

24   correct?

25             DEFENDANT DAWKINS:  Yes.

Ia1dgat1

1              MR. DISKANT:  Yes.

2              THE COURT:  Mr. Dawkins, and you've seen the writing?

3              DEFENDANT DAWKINS:  Yes, sir.

4              THE COURT:  OK.  And is that accurate, Mr. Code?

5              DEFENDANT CODE:  Yes, your Honor.

6              THE COURT:  And Mr. Gatto?

7              DEFENDANT GATTO:  Yes, your Honor.

8              THE COURT:  OK.  Anything else before we start with

9       the jurors?

10             MR. DISKANT:  Not from the government.

11             THE COURT:  OK.  We will recess briefly because the

12      jurors are apparently down getting juror orientation but it

13      shouldn't be too much longer.

14             (Recess)

15             (Jury selection followed)

16             (Adjourned to October 2, 2018, at 9:30 a.m.)

17

18

19

20

21

22

23

24

25