IA28GAT1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                          17 Cr. 686 (LAK)

JAMES GATTO, a/k/a "Jim,"
MERL CODE,
CHRISTIAN DAWKINS,

                Defendants.

------------------------------x

                                        October 2, 2018
                                        9:50 a.m.

Before:
                    HON. LEWIS A. KAPLAN,

                                        District Judge
                                          and a Jury

                        APPEARANCES

ROBERT S. KHUZAMI
        Acting United States Attorney for the
        Southern District of New York
BY:  EDWARD B. DISKANT
        NOAH D. SOLOWIEJCZYK
        ALINE R. FLODR
        ELI J. MARK
        Assistant United States Attorneys

WILLKIE FARR & GALLAGHER LLP
        Attorneys for Defendant Gatto
BY:  MICHAEL S. SCHACHTER
        CASEY E. DONNELLY

IA28GAT1

```
 1                         APPEARANCES (Cont'd)

 2    NEXSEN PRUET LLC
           Attorneys for Defendant Code
 3    BY:   MARK C. MOORE
                -and-
 4    MERL F. CODE

 5    HANEY LAW GROUP PLLC
           Attorneys for Defendant Dawkins
 6    BY:   STEVEN A. HANEY

 7

 8    Also present:  SONYA JACOBS, Paralegal
                      SYLVIA LEE, Paralegal
 9                    ANTHONY CASOLA, FBI

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | (Jury not present) |
| 2 | THE COURT:  Good morning, everyone. |
| 3 | First things first.  We are still looking for two |
| 4 | jurors.  We have a note, which will be marked Court Exhibit A, |
| 5 | from Juror No. 84, Peter Best, who writes, "After some |
| 6 | reflection last evening, but certainly no Googling, I feel too |
| 7 | biased to be on this jury.  I am somewhat reticent and should |
| 8 | have spoken up about hearing media stuff most of this current |
| 9 | year.  Sorry, but I don't think I would be totally fair in this |
| 10 | case.  Thank you for trouble.  You run a nice courtroom." |
| 11 | Well, very happy to have that comment on Yelp. |
| 12 | Counsel, your pleasure. |
| 13 | MR. SCHACHTER:  We would challenge that juror for |
| 14 | cause. |
| 15 | MR. DISKANT:  We have no objection. |
| 16 | MR. HANEY:  We would agree. |
| 17 | THE COURT:  Juror No. 84 is excused. |
| 18 | Next, I distributed to counsel a ruling on the motion |
| 19 | by Mr. Sood to quash the defense subpoena.  I assume you all |
| 20 | have that, and I am sure Mr. Schachter will see to it that Mr. |
| 21 | Sood's lawyer gets it promptly. |
| 22 | Right, Mr. Schachter? |
| 23 | MR. SCHACHTER:  Yes, your Honor. |
| 24 | THE COURT:  Thirdly, I distributed a portion, the |
| 25 | substantive portion, of what I propose to say in my preliminary |

IA28GAT1

1    instructions, and I gather counsel has some comment on that.

2              MR. SCHACHTER:  Yes, your Honor.

3              Just a couple of comments.

4              On page 5, in the paragraph that starts "second."

5              THE COURT:  Yes.

6              MR. SCHACHTER:  The second sentence that starts,

7    "Defendants here deny that they had the requisite intent to

8    defraud," your Honor wrote "because" and that doesn't capture

9    our defense.  I guess our proposal would be, defendants here

10   deny that they had the requisite intent to defraud, and that

11   any actions that they may have taken were at the instruction of

12   one or more university coaches.

13             THE COURT:  I understand.

14             Anybody have a problem with that?

15             MR. DISKANT:  No objection.

16             THE COURT:  Fine.  I will make that change.

17             MR. SCHACHTER:  Thank you, your Honor.

18             Then two other points.

19             With respect to the first sentence of the next

20   paragraph, we would ask for a sentence to follow that which

21   says, "The issue, in part, is what the defendants understood."

22             Because whether the coaches, in fact, had known or

23   approved, we would submit in a fraud case, is not as important

24   as what the defendants knew or understood, because that is what

25   formed their intent.

IA28GAT1

1          THE COURT:  Mr. Diskant.

2          MR. DISKANT:  I guess my concern is, if we are not

3     going to elaborate on what it is the defendants need to have

4     understood or not need to have understood, I am not sure how

5     helpful or clarifying that is.

6          THE COURT:  Yes, I think I agree with that.  The key

7     point is that the next sentence says that I am going to give

8     full instructions later.  I make the point elsewhere, that

9     these are only partial, and I remind the jury immediately that

10    the burden of proving intent to defraud is on the government.

11    So I am going to let it stand as it is.

12         MR. SCHACHTER:  Understood, your Honor.

13         Just to preserve our objections, we had objected to

14    right-to-control instructions in our requests to charge.  So I

15    don't take issue with the Court's instructions here, but I just

16    want to note that we do not believe, notwithstanding the Second

17    Circuit's opinion in *Finazzo*, we do not believe that a

18    right-to-control theory applies here, and I just wish to

19    preserve that same argument that we had in our objections to

20    requests to charge.

21         THE COURT:  I am advised that all jurors are here.  We

22    are going to bring in all of them, except Mr. Best who is

23    excused, and we will get them seated appropriately, and then we

24    will move -- well, I want to make one further inquiry about

25    whether anybody has been exposed to media overnight, and then

IA28GAT1

1    following that we will move to challenges.

2          MR. DISKANT:  On that issue, your Honor, we looked

3    over the transcript last night.  I think we may have

4    inadvertently forgotten to tell the morning panel not to --

5          THE COURT:  You are correct.  But it is also true that

6    the film they all watched before they came upstairs had that

7    instruction.  So they were instructed in any case.

8          So you understand, there are ten peremptories for the

9    defendants, if you exercise jointly, six for the government.

10   With respect to the seating of the jury, there are three on

11   each side with respect to the alternates.  The ten and six will

12   be exercised in four rounds, two for the defendant, one for

13   government, and two rounds of one each in that order.  The

14   jurors will be the jurors with the lowest -- the 12 with the

15   lowest numbers that have not been challenged.  Likewise, the

16   alternates.  And for those of you who may not have figured it

17   out, using a peremptory right out of the box on number 51 is

18   probably a waste of time.  It's not a comment on that juror.

19   It's a comment on the process.

20         Do any counsel have a view of whether you want to do

21   the peremptories by passing the board in the courtroom or

22   orally in the robing room?  Anybody care?

23         MR. SCHACHTER:  We would prefer the robing room, your

24   Honor.

25         MR. DISKANT:  That's fine with the government.

IA28GAT1

| | |
|---|---|
| 1 | THE COURT:  Do the defendants themselves waive their |
| 2 | right, if they have one, to be present in the robing for that |
| 3 | process? |
| 4 | MR. SCHACHTER:  Mr. Gatto does. |
| 5 | DEFENDANT CODE:  Yes, your Honor. |
| 6 | MR. HANEY:  Mr. Dawkins does as well, your Honor. |
| 7 | THE COURT:  So we will do it in the robing room. |
| 8 | MR. SCHACHTER:  Is it acceptable to the Court if |
| 9 | Ms. Blackman accompanies me? |
| 10 | THE COURT:  Yes. |
| 11 | MR. DISKANT:  Similarly, with the Court's permission, |
| 12 | if the entire government team can participate? |
| 13 | THE COURT:  We will have to get a bigger robing room. |
| 14 | You remember, I think from last night, that we have something |
| 15 | like four or six chairs.  So let's try to hold it down to a |
| 16 | small throng. |
| 17 | MR. DISKANT:  Understood. |
| 18 | THE COURT:  Give me an idea of how long you will be on |
| 19 | openings. |
| 20 | Mr. Diskant, Mr. Solowiejczyk. |
| 21 | MR. MARK:  Mr. Mark will be doing it.  I will be |
| 22 | approximately 30 minutes, your Honor. |
| 23 | THE COURT:  OK. |
| 24 | MS. DONNELLY:  Mr. Gatto's opening will be about 35 |
| 25 | minutes. |

|  |  |
|---|---|
| 1 | MR. MOORE:  Mr. Code's will be about 28 minutes. |
| 2 | THE COURT:  Just about. |
| 3 | MR. MOORE:  I said about. |
| 4 | MR. HANEY:  Your Honor, Mr. Dawkins will be about 30 |
| 5 | minutes as well. |
| 6 | THE COURT:  Thank you. |
| 7 | The delay is no doubt attributable to the fact that |
| 8 | organizing 50 jurors is like herding cats. |
| 9 | MR. DISKANT:  Your Honor, I guess while we wait, I can |
| 10 | update the Court on the issue of the motion in limine regarding |
| 11 | NCAA violations.  The parties have conferred on that issue.  I |
| 12 | think we have at least agreed on what the actual issues in |
| 13 | dispute are. |
| 14 | THE COURT:  That's promising. |
| 15 | MR. DISKANT:  So with respect to issues like the fact |
| 16 | that a minor violation might or might not render a |
| 17 | certification ineligible, without getting into the particulars |
| 18 | of any specific violation, the parties are in agreement that |
| 19 | that is fair grounds for both direct and cross-examination. |
| 20 | So, for example, one of the questions that Mr. Schachter I |
| 21 | think posited yesterday is, could he explore with the |
| 22 | university witness, for example, does every misrepresentation |
| 23 | about amateur status render a student-athlete? |
| 24 | (Jury present) |
| 25 | THE DEPUTY CLERK:  The jurors are all here. |

IA28GAT1

1      THE COURT:  All right.  Good morning, everybody.

2      Before we begin, I have to ask one question.

3      Starting with the jury box, is there anybody in the

4  jury box who heard, read, or watched anything relating to this

5  case or discussed the case with anyone since we were last

6  together yesterday?

7      Same question to the folks in the back.

8      The record will reflect that no juror responded.

9      So let me tell you what happens now, folks.  We are up

10  to the point at which the lawyers get to make their decisions

11  about which of you they will excuse and which they will not.

12  After all of those persons, those to be excused, are

13  determined, the jury will consist of the 12 of you who have the

14  lowest numbers, and you're seated in your numerical order, and

15  the alternates will be the six jurors who next follow them in

16  order.  And then everybody else will be excused.  You will be

17  sworn.  There will probably be a very brief recess just to get

18  everybody physically organized and in the right seats.  I will

19  then give you some brief instructions about law and the conduct

20  of the trial and your behavior.  That will probably take ten

21  minutes.  And we will then hear opening arguments from all of

22  the parties.  That will take about two hours, plus some break

23  time.  And I guess that's going to take us probably till lunch.

24  We will have a lunch break, come back, and my present

25  expectation is we will be begin opening statements right after

IA28GAT1

1    lunch.

2           So that's how it will go.  The determinations about

3    who is going to be excused at this point by the lawyers are

4    going to take place in the robing room.  The lawyers and I will

5    adjourn to the robing room in a minute.  It should not take

6    very long, inside of fifteen minutes, maybe ten.  And then we

7    will be all set to go.

8           So, counsel, I will join you in the robing room.  And

9    if you all remain where you are seated.

10          (In robing room)

11          THE COURT:  Just for the record, are there any further

12   cause challenges?

13          MR. DISKANT:  Not from the government.

14          MR. SCHACHTER:  No, your Honor.

15          MR. HANEY:  No, your Honor.

16          MR. MOORE:  No, your Honor.

17          THE COURT:  So we will get to the peremptories.

18          The defendants will go first on the first four rounds.

19   You have two on each of the first four rounds and one each on

20   the last two.

21          Fire away.

22          MR. SCHACHTER:  The defense strikes jurors 31, Lisa

23   Depasquale, and 33, Maura Friend.

24          MR. DISKANT:  The government strikes Juror No. 17,

25   Nicholas Avery.

IA28GAT1

1          THE COURT:  Thank you.

2          Mr. Schachter.

3          MR. SCHACHTER:  The defense strikes jurors 22, Carolyn

4     Raphael, and juror 11, William Saive.

5          THE COURT:  Mr. Diskant.

6          MR. DISKANT:  Your Honor, the government strikes Juror

7     No. 7, John Peterson.

8          THE COURT:  Mr. Schachter.

9          MR. SCHACHTER:  Defense strikes Juror No. 3, Daphne

10    Galkin, and juror 32, Mary Difiore.

11         THE COURT:  Mr. Diskant.

12         MR. DISKANT:  The government strikes Juror No. 35,

13    Leslie Morris.

14         THE COURT:  Mr. Schachter.

15         MR. SCHACHTER:  The defense strikes -- can I have one

16    moment, your Honor, to confer?

17         THE COURT:  Yes.

18         MR. SCHACHTER:  Juror No. 8, Stephen Hutnik, and Juror

19    No. 23, Kathleen Bristol.

20         THE COURT:  Mr. Diskant.

21         MR. DISKANT:  The government strikes Juror No. 21,

22    Brian Seidman.

23         THE COURT:  You go again, Mr. Diskant.

24         MR. SCHACHTER:  Your Honor, before the government

25    strikes again, can I have just a moment to confer?

1        THE COURT:  Quickly.

2        MR. SCHACHTER:  Your Honor, at this time, we would

3    like to raise a *Batson* challenge.  This jury panel has very few

4    men on it, and three out of the four government strikes have

5    been men, and so we believe that this demonstrates a pattern of

6    discriminatory strikes focused on striking the very few men in

7    this very odd jury panel.

8        I think I would like to state for the record the

9    number of men which appear on the panel, but I can save that

10    until the end.  I don't want to delay the process.

11        I guess I should note that of the first 28, there were

12    only nine men out of the first 28, and the government has now

13    stricken three of them.  We believe their strikes represent a

14    pattern of discriminatory conduct.

15        THE COURT:  Do you want to comment, Mr. Diskant?  I am

16    not ruling yet on whether there is a prima facie case.

17        MR. DISKANT:  As a initial matter, I believe the

18    government has struck three men and the defense has struck two

19    men, and I have no assumptions about the defense motivations

20    being improper in that regard.  The government is happy to put

21    forward an independent basis for each of its strikes if the

22    Court would like to hear it, but I assure the Court it has

23    nothing to do with the gender, let alone some sort of intent to

24    intentionally strike based on gender.

25        THE COURT:  I will hear your point without saying

1    whether there is prima facie case.

2            MR. DISKANT:  With respect to Juror No. 17, Mr. Avery,

3    the government was concerned by his expression that he was a

4    big college basketball fan, that he followed the sport closely.

5    He indicated, based on our notes, that he knew approximately 25

6    to 30 of the names on the list of people who are likely to come

7    up at trial, and we were concerned that he might bring a lot of

8    background knowledge to the case and it would be hard for him

9    to put it out of his mind in evaluating the evidence.

10           With respect to Juror No. 7, Mr. Peterson, he

11   similarly indicated close ties to the sport.  He used the word

12   booster to describe some of his friends, in connection with the

13   University of Villanova.  Given that background, we similarly

14   had some concern that he might bring some preconceived ideas

15   about the issues to be decided in this case to the case.

16           The next strike is a woman.  I am happy to talk about

17   her if you want.  It certainly had nothing to do with her

18   gender.

19           Then our final strike was Mr. Seidman for

20   substantially the same reason, which is that he indicated he

21   was a college sports fan and followed college sports carefully.

22   He happens to work for a company based in North Carolina and

23   one of the universities at issue is the North Carolina State

24   University which is a very substantial public school in North

25   Carolina.  So we had some concern that he might bring some

IA28GAT1

1  background information and preconceived notions to the case

2  that might be difficult for him to put aside.

3          THE COURT:  Do you have anything else to say, Mr.

4  Schachter?

5          MR. SCHACHTER:  I just note that if the government

6  exercises another strike against a man, we would have three

7  male jurors on the first 12, and we think that in this case

8  that would be grossly unfair.

9          THE COURT:  I conclude that there is no prima facie

10  case, and if there were, I credit the government's

11  nongender-related response and find there is no *Batson*

12  violation.

13          Now, Mr. Diskant, you get the next strike.

14          MR. DISKANT:  The government strikes Juror No. 9,

15  Kakuna Kerina.

16          THE COURT:  Mr. Schachter.

17          MR. SCHACHTER:  Defense strikes juror 30, Kelly

18  Lincoln.

19          THE COURT:  Mr. Diskant, next one.

20          MR. DISKANT:  The government strikes Juror No. 20,

21  Alfreida Foster.

22          THE COURT:  Mr. Schachter, last one.

23          MR. SCHACHTER:  Defense strikes Juror No. 14, Maria

24  Williams.

25          THE COURT:  So the jury is number 1, Vickie Jones;

IA28GAT1

1    number 2, Samantha Jagrup; number 4, Carolyn Rodriguez; number

2    6, Secundina Garcia; number 10, Teri Savage; number 12, Joseph

3    Dillard; number 13, Sara Lichtstein; number 15, Deborah

4    Suchman-Zeolla; number 16, Vincent Giangola; number 19, Charles

5    Ballard; 26, Katherine A. Jardine; and number 37, Sean Green.

6              Are you all in agreement?

7              MR. DISKANT:  Yes, your Honor.

8              MR. SCHACHTER:  Yes, your Honor.

9              MR. HANEY:  Yes, your Honor.

10             MR. MOORE:  Yes, your Honor.

11             THE COURT:  We will move to the alternates.  Three

12   rounds.  We will start with the government.

13             MR. DISKANT:  The government strikes Juror No. 57,

14   Thomas Ritchie.

15             THE COURT:  Mr. Schachter.

16             MR. SCHACHTER:  The defense strikes juror 63, Jennifer

17   Miranda Holmes Socas.

18             THE COURT:  Mr. Diskant.

19             MR. DISKANT:  The government strikes Juror No. 65,

20   Connie Vitucci.

21             THE COURT:  Mr. Schachter.

22             MR. SCHACHTER:  64, Michelle Cerritos.

23             THE COURT:  Mr. Diskant.

24             MR. DISKANT:  The government strikes juror -- hold on.

25             The government strikes Juror No. 53, Alex Schenck.

IA28GAT1

| | |
|---|---|
| 1 | THE COURT:  Mr. Schachter. |
| 2 | MR. SCHACHTER:  One moment, your Honor. |
| 3 | THE COURT:  Going once. |
| 4 | MR. SCHACHTER:  We will strike juror 38, Raquel |
| 5 | Sanchez. |
| 6 | THE COURT:  All right.  Then Alternate No. 1 is number |
| 7 | 43, Keith Peterson; Alternate 2, number 56, Leonard Burger; |
| 8 | Alternate 3, number 67, Gary D'ambrosio; Alternate 4, Jake |
| 9 | Luttinger; alternate No. 5, number 70, David Buchholz; and |
| 10 | Alternate No. 6, Elizabeth McKnight. |
| 11 | I note for the record that the first five alternates |
| 12 | all are men. |
| 13 | OK.  We are all set. |
| 14 | (In open court) |
| 15 | THE COURT:  OK, folks.  Thank you for your patience. |
| 16 | The jury has been selected.  In a moment I am going to ask Andy |
| 17 | to read off the names of the 12 jurors and the six alternates |
| 18 | who will serve on this case.  We will then take a short break. |
| 19 | During the break, the 18 people who are going to serve as |
| 20 | jurors and alternates will go into the jury room, the entrance |
| 21 | to which is over there, I suspect most of you know.  Andy will |
| 22 | deal with the rest of you who will go down to room 160, and |
| 23 | Andy will arrange for you to get the cards.  When that's all |
| 24 | been done, we are ready to go.  We will come back in.  You will |
| 25 | be sworn.  I will give you some preliminary instructions and |

1   then we will move to the openings.

2           Andy, you want to read the news.

3           THE DEPUTY CLERK:  Juror No. 1, Vickie Jones.

4           Juror No. 2, Samantha Jagrup.

5           Juror No. 3, Carolyn Rodriguez.

6           Juror No. 4, Secundina Garcia.

7           Juror No. 5, Teri Savage.

8           Juror No. 6, Joseph Dillard.

9           Juror No. 7, Sara Lichtstein.

10          Juror No. 8, Deborah Suchman-Zeolla.

11          Juror No. 9, Vincent Giangola.

12          Juror No. 10, Charles Ballard.

13          Juror No. 11, Katherine Jardine.

14          Juror No. 12, Sean Green.

15          Alternate No. 1, Keith Peterson.

16          Alternate 2, Leonard Burger.

17          Alternate 3, Gary D'ambrosio.

18          Alternate 4, Jake Luttinger.

19          Alternate 5, David Buchholz.

20          Alternate 6, Elizabeth McKnight.

21          THE COURT:  OK.  There we are.

22          Now, we are going to take about ten minutes.  Andy

23  will get you organized.  When we rise in just a second, the 12

24  plus six names that were just read off go through that door,

25  the second door, the one that does not say exit.  Everybody

IA28GAT1

1    else remain in the courtroom.  Andy will see to your cards and

2    dispatch you down to the first floor.  And then we will

3    reconvene very shortly.

4              Thank you very much.

5              (Recess)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ia2dgat2

1          (Jury not present)

2          THE CLERK:  Please be seated.

3          THE COURT:  OK.  Let's bring in the jury.

4          (Jury present)

5          THE CLERK:  Please be seated, everybody.

6          THE COURT:  OK.  Andy, at your convenience, please

7    swear the jury.

8          (A jury of 12 and 6 alternates were sworn)

9          THE COURT:  OK, folks.  Good morning again.

10         In light of the subject matter of the case, I think it

11   might be useful to you in understanding the proof you are about

12   to begin hearing to have some preliminary instructions about

13   the charges and the law that you are going to apply at the end

14   of the trial.  Before I give you those instructions, however, I

15   need to emphasize that the instructions I am going to give you

16   now are only a brief and general summary.  They are preliminary

17   and, in fact, are subject to change.  I am going to give you

18   comprehensive legal instructions at the end of the trial.  And

19   if, perchance, something I say now turns out to be different in

20   some way from what I say at the end of the trial, you will

21   apply only my final instructions.  You must decide the case on

22   the basis of those final instructions and those complete

23   instructions alone.

24         But I do want to take a couple of minutes to talk to

25   you about the charges that the defendants are facing and some

1  of the basic concepts that are relevant to your decision so

2  that you can better follow the evidence you are going to hear

3  and understand in a general way why it is being presented to

4  you.

5          I walked you briefly through the Indictment yesterday,

6  but it bears a brief repetition.  There are three counts, which

7  means to say that there are three separate crimes alleged.

8  Count One charges all three defendants with the crime of

9  conspiracy to commit wire fraud.  It alleges, broadly and

10  generally speaking, that the three defendants, and others,

11  agreed to defraud North Carolina State University, the

12  University of Louisville, the University of Kansas, and the

13  University of Miami in connection with the alleged conspiracy.

14          Count Two charges all three defendants with the

15  substantive crime of wire fraud.

16          I will explain the difference between conspiracy and a

17  substantive crime in a minute.

18          Count Two involves an alleged scheme to defraud the

19  University of Louisville.

20          Count Three is brought only against defendant James

21  Gatto.  He is charged in that count with the substantive crime

22  of wire fraud.  Count Three involves an alleged scheme to

23  defraud the University of Kansas.

24          The defendants, as I've told you, deny all of these

25  charges.

Ia2dgat2

1    It is important that you remember that there are three

2    separate defendants here.  You need to focus individually on

3    each one of them.  You must determine separately with respect

4    to each of them whether the government has proved its charges

5    against them beyond a reasonable doubt, and you must consider

6    each of the three count separately.

7    Now, I am going to explain in brief summary what the

8    government has to prove beyond a reasonable doubt in order to

9    convict on each of these three charges to help you understand

10   the evidence you are going to hear.

11   Now, as I have just indicated, the case involves a

12   conspiracy charge, which is Count One, and two counts of wire

13   fraud, which are Counts Two and Three.  The wire fraud charges

14   we call a substantive offense crime.  Substantive crimes are

15   violations of particular, specific criminal laws.  For example,

16   bank robbery is a substantive crime.  I'm going to begin with a

17   very brief discussion of the crime of conspiracy and how it is

18   different from a substantive crime.

19   The essence of the crime of conspiracy is an agreement

20   or an understanding among two or more people to accomplish some

21   unlawful objective or objectives.  The agreement that

22   constitutes one element of the crime of conspiracy can be

23   explicit, as where people actually sit down and agree that they

24   are going to go out and try to accomplish some illegal purpose.

25   A conspiracy also may be implicit; that is, the agreement can

1    be simply a matter of understanding among the people involved

2    that they are going to work together toward some illegal

3    object.  The existence of an implicit agreement is something

4    that may be inferred from all the evidence in a case.

5            So let me try to give you a concrete example that I

6    think will help you understand the difference between a

7    conspiracy and a substantive crime, and I deliberately make up

8    a hypothetical example that has nothing to do with any facts or

9    anything like this case.  It is just to illustrate the

10   principle.

11           If two more people get together and decide to rob a

12   bank and one of them commits some overt act in furtherance of

13   that objective -- the objective of robbing a bank -- they have

14   committed the crime of conspiracy to commit bank robbery.  That

15   conspiracy is a crime separate and distinct from the

16   substantive crime of bank robbery.  People can agree to commit

17   a substantive offense and thus be guilty of conspiracy even if

18   the substantive offense is never committed.

19           In my bank robbery example, the crime of conspiracy is

20   committed as soon as the agreement is reached and one of the

21   conspirators does some act for the purpose of carrying out the

22   planned bank robbery.  For example, he might buy a bag to carry

23   the cash out of the bank.  And that's true regard regardless of

24   whether they ever robbed a bank.  Of course, if a defendant

25   participates in a conspiracy and then commits the crime that is

Ia2dgat2

1    the purpose of the conspiracy, the defendant may be guilty both

2    of the conspiracy -- the agreement to do the offense -- and of

3    the substantive crime which is the purpose of the conspiracy.

4    So, in my example, if two guys decide to rob a bank and then

5    they go rob it, there is a conspiracy to rob the bank and there

6    is a substantive crime of bank robbery.

7         Likewise, it is possible that a defendant may be

8    guilty of conspiracy and not the substantive crime, or vice

9    versa, a defendant can be guilty of either or both, or neither

10   of the crimes, depending on the circumstances.

11        That's the general principle.  And I tell you all that

12   because Count One is a conspiracy count, it charges a

13   conspiracy to commit mail fraud, and Counts Two and Three are

14   substantive mail fraud counts.

15        OK.  Now, let me talk for a minute about mail fraud.

16        MR. MARK:  Your Honor, I think wire fraud is charged

17   in this Indictment.  I apologize.

18        THE COURT:  Thank you, counsel.  You are absolutely

19   right.

20        Whenever I said mail fraud, strike "mail fraud."  It

21   is wire fraud.  The crimes are identical except one involves

22   using the wire and one involves mailing sending.  They are

23   identical in all other respects.

24        Thank you for the correction.

25        Now, as I mentioned, Count Two charges all three

defendants with the substantive crime of wire fraud.  Count

Three charges Mr. Gatto alone with wire fraud, a different wire

fraud.

         The government has to prove three elements beyond a

reasonable doubt to convict on any wire fraud charge.  First,

the government has to prove that there was a scheme to defraud

the victim of money or property by false or fraudulent

pretenses or statements.  The second element is that the

defendant whom you are considering knowingly and willfully

participated in that scheme to defraud, knowing its fraudulent

nature, and with the specific intent to defraud.  The third

element is that the defendant you are considering used, or

caused to be used, interstate wires -- including, for example,

cell phones, telephones, and emails -- to carry out the

fraudulent scheme.

         Now, I'm going to explain all of that in more detail

at the end of the case.  For now, I just want to make two other

points -- two related points -- about wire fraud.

         First, in order to prove that a scheme to defraud

existed, the government must prove beyond a reasonable doubt,

among other things, that the alleged scheme contemplated

depriving the victim of money or property.  I instruct you that

"property" may include tangible property interests, such as the

physical possession of some object or currency, money.  It can

also include intangible property interests, such as, in certain

Ia2dgat2

1    circumstances, the right to control the use of one's assets.

2    The right to control the use of one's assets constitutes

3    property for purposes of wire fraud if the scheme could have

4    caused, or did cause, tangible economic harm to the victim.

5         Now, the second point I want to make is that if a

6    defendant did not intend to deprive a victim of money or

7    property, or did not intend to deprive the victim of the

8    ability to control the use of its assets in a way that could

9    have caused tangible economic harm to the victim, that

10   defendant can't be convicted of wire fraud.  The defendants

11   here deny that they had the requisite intent to defraud, and

12   that any actions that they may have taken were at the

13   instruction of one or more university coaches who they say had

14   apparent authority to give those instructions and who appeared

15   to be unconflicted and acting in good faith.

16        I instruct you that the fact that one or more coaches

17   at a university knew or approved of a statement or an action

18   does not necessarily mean that the university itself knew or

19   approved of that statement or action.  I am going to talk to

20   you in considerably more detail about this at the end of the

21   trial, but I simply make that point right now so that you are

22   alert to that question.  I, of course, remind you that the

23   burden of proving intent to defraud is always on the

24   government.  The defendants have no burden of proving anything

25   at all in this trial.

1          Now, that takes care of the preliminary instructions

2     about the law that I am going to give you.  I remind you again

3     that this is only a quick summary of some of the law.  It's

4     tentative.  In reaching your verdict, I remind you that you are

5     going to apply the final instructions I give and only them, and

6     if they vary in any degree from what I've said so far, it is

7     the final instructions that control.

8          And I remind you, too, of course, just for emphasis,

9     that every defendant has denied all the charges.  They are all

10    presumed innocent of every charge unless and until the

11    government proves one or more of them guilty beyond a

12    reasonable doubt.  Only if you are unanimously convinced that

13    the government has carried that burden may you convict anyone

14    of anything.

15         Now, let me talk to you for a few minutes about your

16    conduct as jurors.  You, as jurors, must decide this case based

17    solely on the evidence presented here within the four walls of

18    this courtroom.  That means that during the trial you must not

19    conduct any independent research about the case, anything

20    involved in the case, or any of the individuals or corporations

21    or universities that are involved.  In other words, you are not

22    to consult dictionaries or reference materials, search the

23    Internet, go on websites, look at blogs, or use any other

24    electronic tools to obtain information about this case or help

25    you decide it.  You are not to try to find out any information

1     from any source, even books or newspapers, outside the confines

2     of this courtroom.

3              Until you retire to deliberate, you are not to discuss

4     the case among yourselves or with anyone else.  Once you retire

5     to deliberate, you may begin discussing the case together, all

6     of you, but you cannot discuss the case with anyone else until

7     you have reached a verdict and the case is over.

8              I know that many of you use cell phones and

9     BlackBerries and the Internet and all these wonderful

10    technology tools we have in this era.  You must not talk to

11    anyone at any time about this case.  You may not use any of

12    those electronic tools not only to do research but to

13    communicate, even among yourselves, but certainly with anyone

14    else, about the case.  That includes your family and friends.

15    No updates to the cousin in Cleveland or the wife or husband or

16    whatever.  You may not communicate with any anybody about the

17    case on your cell phone, your email, or anything else.  You are

18    to stay off social media insofar as it relates to the case

19    altogether.  I expect each of you to inform me if you become

20    aware that anyone else on the jury or among the alternates does

21    not adhere to those instructions.

22              Now, a couple of other things.

23              You are not to have any contact with the lawyers or

24    anybody working for either side in this case whatsoever.  Now,

25    I understand here we are in a New York highrise building.

Ia2dgat2

1    There are only a limited number of elevators.  It may well be

2    that you are going to wind up on an elevator with somebody

3    involved in the case, you are going to pass somebody in the

4    hall, something like that.  Lest there be any misunderstanding,

5    the ordinary rules of social politeness don't apply to you and

6    the people involved in this case, the lawyers and their staffs

7    and the defendants.  Discretion is the better part of valor.

8    Don't say good morning.  Don't greet anybody, no matter how

9    heartless it seems.  Why?  If there is any hint that there has

10   been communication by a juror with anybody involved in the well

11   on this case and it comes to my attention -- and occasionally

12   something like that happens -- I have to make a full inquiry as

13   to what happened, who said what, and what, if anything, other

14   jurors may have observed or learned about whatever happened.

15          And the case that I remember vividly -- and it just

16   illustrates my point and so I will tell you about it in one

17   minute -- is that a number of years ago we were trying it was a

18   civil case.  As it happens, there was an expert witness on the

19   stand.  There was a recess overnight.  The next morning it

20   snowed like ridiculous.  And there was the expert witness

21   sitting out in the hall and a juror got off the elevator

22   dripping, and you can imagine the scene.  And they had a couple

23   of words, which two hours later I knew with certainty were a

24   couple of words about the storm and whether the subways were

25   held up.  Somebody saw it.  Through outward appearances, we had

Ia2dgat2

a juror talking to a witness in the middle of a trial, and

because of that we had to stop the trial and I had to interview

the witness -- the juror who got off the elevator, the expert

witness, and everybody on the jury just to make sure nothing

had happened, and nothing had happened.  So, that's why I

emphasize the point.

Nobody is being rude to you if they don't greet you.

Nobody is going to take you as being rude to them.

Please try to keep an open mind throughout the case.

You know, trials are, in a way -- and I'll make a remark about

that in a minute -- they're in a way a little bit like a movie,

but they don't tell the story the same way.  Evidence comes in

at different times and the sequence is often dictated by when

witnesses are available and things of that nature.  So, you

don't get it in chronological order necessarily, and you don't

get the full picture -- you don't have the full picture until

the end.  So try to keep an open mind right 'til the end and

not to form any opinions.

You are welcome to take notes during the trial.  I

would just caution that it is difficult to take detailed notes

and pay full attention to what people are saying.  I take notes

habitually, and I know that from personal experience.  You are

also free not to take notes.  Just pay attention.  If you don't

take notes, you will not rely on the liberations on the notes

of others.  If you do take notes, don't discuss them with

anybody until you begin to deliberate.  Don't take them out of
the jury room at any point.  Leave them there overnight.  They
will be in safekeeping.  And at the end of the trial, we will
pick them all up.

Now, the trial is about to begin.  The government is
going to make an opening statement.  The opening statement is
simply an outline to understand what evidence the government
intends to present and, within some considerable limits, what
they think it adds up to.  The defense attorneys have the
right, but not the obligation, to make opening statements.
Opening statements are neither evidence nor arguments.  They
are an outline.  They are just to help you understand what's
coming.

I like to think of them as trailers at the movies, and
I find that a kind of helpful analogy.  Sometimes I see the
trailer of a movie and I say, wow, that looks like a great
picture and I go off and I see it and it is everything I
thought it was going to be.  And other times I see that trailer
and I go see the movie and I say, my God, there is no
connection between the trailer and the movie and the movie
stinks.  Just bear that in mind.  Sometimes the openings lead
to just what they say they are going to lead and other times
they don't.  It is just a preview.

Once we are done with the openings, which I imagine
will be by about 1 o'clock, maybe a few minutes afterward, we

1    will break for lunch.  We will resume after lunch and begin

2    with the first witness, and you will start hearing the

3    evidence.

4              OK.  When the evidence is all in on the government's

5    side, the government will rest.  I will probably have to spend

6    a little time with the lawyers dealing with legal matters at

7    that point.  In a trial of this length, I am usually able to do

8    this after you go home, but every once in a while I will have

9    to ask you to wait for us, perhaps.  The defense has the right,

10   but not the obligation, to present evidence.  When they are

11   finished, assuming they do so, we have another little tiny

12   break.  The government has the right, but not the obligation,

13   to put in rebuttal evidence.  I then confer with the lawyers

14   about what the final jury instructions will be.  They make

15   their closing arguments.  I give you the final instructions.

16   And then you deliberate.

17             We are going to do our best to eliminate, or reduce to

18   the absolute minimum, any downtime during the course of the day

19   while you are present.  But it is inevitable that there will be

20   some sidebar discussions, there may be some legal issues that

21   will require me to ask you to wait in the jury room for a

22   little bit.  But I'm telling the lawyers right now that I am

23   going to discourage that, and we are going to try to limit that

24   to what's absolutely necessary.  I'm very conscious of not

25   wasting your time or anybody else's time.

1          So, there we are.  That's what I have to say.  The

2     trial will now begin, and we will hear opening argument from

3     the government.

4          Mr. Mark.

5          MR. MARK:  Thank you.

6          On an afternoon in July 2017, a man drove to a parking

7     lot in New Jersey to pick up an envelope full of cash from a

8     stranger.  It was an illicit payment secretly financed by the

9     sportswear giant Adidas.  Almost $20,000 was in that envelope.

10    And it was the first installment of $100,000 that was promised

11    to that man, all because he was the father of a star high

12    school basketball player.  The man was getting that money in

13    exchange for a promise for his son to go to the University of

14    Louisville.

15         Who arranged that payment?  These men, the defendants.

16    Jim Gatto was a senior executive at Adidas, which sponsored the

17    University of Louisville's athletic teams, where that young man

18    was supposed to play.  Merl Code worked at Adidas with Gatto

19    and was in charge of recruiting top talent, like this young

20    basketball player.  And Christian Dawkins, he was a business

21    manager for professional athletes, and he connected that family

22    to Adidas.

23         Now, why did the defendants arrange that payment?  One

24    reason -- greed.  They wanted to profit off that young player's

25    future.  The defendants paid the families of student athletes

1    so they would attend Adidas schools, promote the Adidas brand,

2    in the hopes that when these kids made it to the NBA, then the

3    defendants could make millions off of them.

4         But the defendants knew that the only way to make

5    their scheme work, the only way for the defendants to get any

6    return on their investment, was to keep the payments secret,

7    because in the world of college basketball these payments were

8    prohibited.  Colleges could not, and would not, issue athletic

9    scholarships to players whose families had accepted money.  And

10   if the players didn't get these scholarships and if they

11   couldn't play college basketball and if they weren't able to

12   wear the Adidas brand and in games on national television, the

13   defendants couldn't make any money off of them.

14        So to make their scheme work, to make a profit, the

15   defendants did not simply have to make payments to the families

16   of student athletes.  They needed to conceal these payments

17   from the schools.  They had to lie about them in fake invoices.

18   They had to hide them using secret second phones and cash

19   handoffs in hotel rooms and parking lots, all to make sure that

20   the universities did not know, so that the schools would issue

21   athletic scholarships even though those players were no longer

22   eligible to compete.

23        And the defendants did this knowing that if the

24   payments were ever discovered, the players and the schools

25   would be in big trouble, and subject to very significant

1    potential harms, including financial penalties.

2              This is what corruption in college basketball looks

3    like.

4              And, ladies and gentlemen, when you lie, cheat, and

5    deceive to get a college to issue financial aid, that is a

6    crime.  And it is what this case is about, because over the

7    course of several years, the defendants lied, cheated, and

8    deceived, knowing that universities would issue athletic

9    scholarships to student athletes who were not eligible to pay

10   for them, who were not eligible for them because the defendants

11   had paid those students' families.  And that is why we are here

12   today.

13             Ladies and gentlemen, this opening statement is the

14   government's opportunity to give you a roadmap of the evidence

15   that you are going to see and hear in this case.  I want to use

16   this opportunity to tell you in a little more detail how this

17   scheme to pay the families of student athletes worked and how

18   the schools were defrauded, how the defendants' greed led them

19   to make these corrupt payments to get students to play

20   basketball for Adidas-sponsored colleges.  And I'm going to do

21   that in three parts.  First, I'm going to talk about what the

22   evidence is going to show; second, I'm going to give you a

23   brief description of the charges; and, third, I'm going to talk

24   about all the different types of evidence that will prove that

25   these defendants are guilty beyond a reasonable doubt.

1          So, what will the evidence show?  You will learn that

2     top colleges, like the University of Louisville, issue

3     scholarships each year to student athletes in a wide variety of

4     sports.  The primary qualification for receiving such a

5     scholarship is that the student athletes are eligible to

6     compete, because, as you'll learn, schools, like Louisville,

7     participate in a National Collegiate Athletic Association, or

8     NCAA.  It is an organization that oversees college sports

9     across the country.  And all members, including places like

10    Louisville, agree to follow the same rules.  And the most

11    fundamental rule there is is that only amateur athletes are

12    allowed to compete.  And you'll learn that what this means is

13    that the players can't be paid and their families can't try to

14    be paid either, regardless of whether their child knows or

15    doesn't know.

16         And you'll learn that universities must follow this

17    rule, because a lot is riding on it.  The university's failure

18    to follow this cardinal rule can result in all sorts of

19    financial penalties, including fines, loss of revenue,

20    probation, even the loss of a national championship.  Each of

21    these three defendants knew all about this because each worked

22    in the hypercompetitive sports business.  Jim Gatto was the

23    director of global sports marketing for Adidas.  Adidas is a

24    billion-dollar, German sportswear company, but it was a

25    smalltime player in basketball, where Nike controlled most of

1   the market.  Growing and marketing the basketball part of

2   Adidas' business was Gatto's job, and he was in charge of a

3   multimillion-dollar budget.  To do that, Gatto and Adidas

4   lavishly sponsored high school and college basketball teams,

5   giving them Adidas clothes and shoes to wear, in an effort to

6   win loyalty of young players who might some day be a star.

7        Gatto was in charge of identifying and recruiting top

8   basketball talent and convincing young players that when they

9   turn pro, they should enter into a marketing agreement with

10  Adidas, which was known in the industry as a shoe deal.  It was

11  his job to try to find the next Michael Jordan or Kobe Bryant,

12  LeBron James.  Gatto worked to develop relationships with top

13  players and their families starting when they were young,

14  sometimes as early as high school.

15       In fact, Gatto oversaw an entire team at Adidas who

16  worked at developing relationships with these players.  Merl

17  Code was a critical member of that team.  Code had worked at

18  Nike for years, and Gatto had recruited him to compete in the

19  shoe wars, Adidas' rivalry with the other largest sneaker

20  companies, like Nike and Under Armour.  And you'll learn that

21  to win the shoe wars, Gatto and Code and others sought an edge.

22       You'll also learn that Gatto and Code worked with

23  Christian Dawkins to make some of those secret payments to the

24  families of student athletes.  Dawkins was a young, aspiring

25  business manager of professional athletes.  Dawkins had worked

1    for a bigtime sports agent as a runner, somebody whose job it

2    was to identify and recruit top talent, before he went out on

3    his own in 2017.  And as you will learn, Dawkins, Gatto and

4    Code were not afraid to lie and deceive to get ahead.

5           And to get ahead, the defendants paid.  They paid the

6    families of high school and college-aged athletes using Adidas'

7    money.  Gatto and Code made payments for players, who were

8    willing to go to universities sponsored by Adidas, in the hopes

9    that the players would ultimately sign with Adidas upon

10   becoming a professional athlete.  And Dawkins, with his

11   connections to the players and their families, helped them

12   close these deals in the hopes that the players would

13   ultimately use him as their business manager when they became a

14   pro.

15          Now, in making these secret payments to the students'

16   families, you will learn that Gatto followed a standard

17   playbook.  These payments were made pursuant to fake invoices

18   that he approved, invoices made for them to look like

19   legitimate expenses, like travel expenses.  The money was then

20   routed through youth teams sponsored by Adidas to further

21   conceal the illicit payments.  And then the money was delivered

22   in cash to the family of the student-athlete, delivered in

23   stuffed envelopes, exchanged in parking lots, envelopes handed

24   off in hotel rooms and in Manhattan, in Las Vegas, envelopes

25   stuffed in the mail.  Sometimes these envelopes contained tens

1    of thousands of dollars.

2            Why are the defendants doing all of this?  Why the

3    cash and the fake invoices?  Because the defendants and the

4    families that got this money needed to hide it from the

5    universities, who had to follow the rules governing college

6    basketball.

7            So, let's talk about the players whose families Gatto

8    arranged to pay, sometimes with Code and Dawkins and sometimes

9    with other help.

10           And I want to start about the deal that resulted in

11   that cash payment in the New Jersey parking lot that I

12   mentioned a few moments ago, the deal that was struck to pay

13   the family of a student-athlete $100,000 to go to the

14   University of Louisville.  You will learn that that player's

15   name was Brian Bowen.  You'll learn that two months before his

16   father flew across the country to pick up that cash, Bowen was

17   trying to decide where to go to college.  He was from Michigan

18   and one of the top-ranked high school athletes in the entire

19   country.  He had received many athletic scholarships to go to

20   different schools, but he hadn't yet decided where he wanted to

21   go.  Bowen's father was friends with Dawkins, who had been

22   giving money to that father for years in the hopes of one day

23   securing Bowen as a client if he made it to the NBA.

24           In 2017, he was one of the last remaining top

25   prospects in his graduating class who had not yet committed to

1    go to a particular college.  This presented a golden

2    opportunity.  Dawkins knew that Gatto and Code would pay to

3    lure Bowen to go to the University of Louisville, one of

4    Adidas' premier schools, where Bowen could play on national

5    television and win games wearing the Adidas brand.

6         In just a matter of days, Dawkins, working with Code,

7    pulled that deal together.  Gatto would approve $100,000,

8    funded by Adidas, to Bowen's father if Bowen would go to the

9    University of Louisville.  Bowen's father agreed to that deal.

10        For the defendants, this was a huge win.  For Gatto,

11   Code and Adidas, this was a way to secure a top prospect to

12   play for an important Adidas college team and to wear an Adidas

13   Jersey on national television and to hopefully sign with Adidas

14   when he became a pro athlete.

15        For Dawkins, this was a key step in his plan to guide

16   Bowen to the NBA and to secure Bowen as a client for a

17   company -- a sports management company that he had just

18   founded, a client who could earn millions of dollars in fees

19   and commissions as a pro.

20        For this scheme to work, one thing had to happen:

21   Brian Bowen had to be able to play at the University of

22   Louisville, had to be able to wear that Adidas uniform.  But

23   the University could not and would not issue a scholarship to a

24   player whose family had received a large cash payment.  It was

25   a blatant and brazen violation of the most fundamental rule in

1   college basketball, that you can't pay to play.

2              Gatto, Code, Dawkins and Bowen's father of course knew

3   all of this.  They knew that these kinds of payments were

4   prohibited.  And they knew that the payment to Bowen's father

5   needed to be hidden from the University in order for his son to

6   get that athletic scholarship, in order for this scheme to

7   succeed.

8              So the defendants took four principal steps to conceal

9   that payment from the University of Louisville.  First, Gatto

10  and Code devise a plan to mask the payment.  Code would submit

11  a fake invoice to Adidas for a youth basketball team he

12  controlled, seeking reimbursement for travel expenses, which

13  Gatto would approve.  That way, as Code told Dawkins, it would

14  be "on the books," but not on the books for what it was

15  actually for.  Gatto, who had the authority, approved the

16  invoice, knowing full well that the money was actually destined

17  for Brian Bowen's father.

18             Second, to make the money even harder to trace, Code

19  then had the money wired to Dawkins, ostensibly as a consulting

20  fee, even though Dawkins had never done any consulting work for

21  Code or the amateur team that Code controlled.

22             Third, Dawkins arranged for the cash to be delivered

23  to Bowen's father in the parking lot that I talked about,

24  eliminating any trace of a connection between Adidas and the

25  Bowens.  In fact, you'll learn that Dawkins even gave Bowen a

1    cover story to use in case anybody followed those money moves.

2    Dawkins told Bowen's father to say he was a consultant for

3    Adidas, even though Bowen's father had never done any work for

4    Adidas, let alone acted as a consultant.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. MARK:  Fourth, they counted on Bowen to not

2     disclose any of this to The University of Louisville.  Not on

3     the financial aid agreement signed by Bowen and his mother or

4     on the other compliance forms that Bowen had to fill out.

5          You will learn that the university specifically asked

6     questions about eligibility and amateur status and required

7     student-athletes to complete those forms and certify that the

8     player is eligible to play.  And those forms make clear that

9     the scholarship would not have been approved if he wasn't.

10    Because, as you will learn, universities who choose to

11    participate in the NCAA have no choice but to take these rules

12    serious.

13         Whether the defendants liked or disliked the rules,

14    whether they agreed or disagreed with them, these rules

15    applied.  And everyone in college sports, including the

16    defendants, was very aware of this.  They knew that causing the

17    schools to issue scholarships to students who weren't eligible

18    risked significantly harming the schools who would face the

19    risk of potentially very serious consequences.

20         In fact, you will learn that because of the risks to

21    the schools, the universities have entire departments of

22    professionals charged with overseeing and ensuring compliance

23    with those rules.  Because the risks of giving a scholarship to

24    a player who isn't eligible is not just the loss of that

25    scholarship money, but the risk of fines, the loss of revenues,

1    probation, in the most extreme of cases the loss of the ability

2    to compete in college sports.

3            And you will learn that when, as a result of the

4    government's investigation, Louisville finally did find out

5    about this illicit payment to Bowen's father, after Louisville

6    had already committed tens of thousands of dollars in financial

7    aid, it immediately took Bowen off the court.  Because as the

8    defendants very well knew, no school would knowingly accept the

9    risk of playing a student-athlete whose family had agreed to

10   receive $100,000.

11           Ladies and gentlemen, the payment to Bowen's father

12   was not the first time that Gatto had authorized an illicit

13   payment to the family of a student-athlete.  You will learn

14   that the payments to Brian Bowen were just the latest part of

15   an ongoing scheme, one in which Gatto, working with others, had

16   funneled illicit payments to the families of student-athletes

17   willing to play for other Adidas schools as well, including the

18   University of Kansas and North Carolina State University,

19   schools where Gatto knew these players would be wearing Adidas

20   jerseys and shoes and winning games on national television, in

21   the hopes that these players would sign important deals when

22   they became professionals in the NBA.

23           So Gatto approved $40,000 to Dennis Smith to play at

24   North Carolina State University.  Another $90,000 to the family

25   of Billy Preston who committed to Kansas.  And $20,000 was

1   supposed to go to the guardian of Silvio De Sousa who was to

2   play at Kansas too.

3            In each instance Gatto took steps to conceal those

4   payments from the universities.  He counted on the players and

5   their families and the other people involved in the scheme to

6   lie to the schools about it.  Because, as Gatto knew, if the

7   University of Kansas or North Carolina State University found

8   out, their compliance departments would do exactly what

9   Louisville did with Bowen, take the players off the court, end

10  the scholarships.

11           Finally, you will hear evidence that in the summer of

12  2017 Gatto was discussing plans to approve yet another one of

13  these illicit payments.  Up to $150,000 to the family of

14  another high school athlete in exchange for a commitment to

15  play at the University of Miami, which was also an

16  Adidas-sponsored school.

17           Now, you will hear that this payment was actually a

18  little bit different.  This time Code and Dawkins never

19  actually intended to funnel that money through to the player.

20  They planned to pocket, at least a portion of it, themselves.

21  But Gatto didn't know that.  And just as he had approved other

22  large payments to the families of players willing to commit to

23  other Adidas-sponsored schools, Gatto indicated a willingness

24  to make a large cash payment to the family of this player.

25           You will hear he even tried to negotiate that number

1    down, down to $100,000, the amount that he had agreed to pay

2    the family of Brian Bowen.  Because this was business to Gatto

3    and he didn't want to pay more than he had to.

4             For all of this, the defendants are charged with wire

5    fraud and conspiring to commit wire fraud.  That is for

6    agreeing and working together to defraud the universities and

7    to issuing athletic scholarships under false pretenses, by

8    concealing these illicit payments which subjected the schools

9    to the very real risk of significant financial harm.

10            Now I going to turn to how we expect to prove these

11   payments.  We are going to prove all of this to you in several

12   different ways, but primarily by letting the defendants tell

13   you all about it themselves.

14            You are going to hear the defendants' own words

15   captured on dozens of calls that were intercepted by

16   court-authorized wiretaps that were done during the course of

17   this investigation.  You will hear the defendants explaining in

18   those calls in great detail the scheme that they were

19   committing, plotting how to make and conceal the payments from

20   the universities, how they were going to paper it over using

21   the youth team that Code controlled, and how they planned to

22   profit off of their deception.

23            In addition to these recorded calls, you will see

24   evidence of the defendants' efforts to conceal their crimes.

25   You will see fake invoices that Code and Gatto and others

1   created to help hide the money trail from Adidas to the

2   families of these student-athletes.

3           You will see how the defendants routed the money

4   through various different accounts and moved it around so as to

5   further hide the illicit payments.

6           Ladies and gentlemen, you are also going to hear from

7   three men who directly participated in these crimes with the

8   defendants.

9           One, you will hear from Bowen's father who received

10  that initial $20,000 payment in the New Jersey parking lot last

11  summer, the first installment of $100,000 for his son's

12  decision of where to go to school.

13          Two, you will hear from the man who delivered that

14  $20,000 payment to Bowen's father.  You will learn that he was

15  a financial adviser who worked with Christian Dawkins and was

16  hoping to manage Bowen's money when he became a pro.

17          Three, you will also hear from an Adidas consultant,

18  who, like Code, worked at Gatto's right hand, and sometimes

19  served as a bag man for delivering this money.  He delivered

20  this money in hotel rooms in Manhattan and Las Vegas.  He

21  sometimes sent this money in envelopes through the mail.  And

22  he got a slush fund of money from Adidas, all approved by Gatto

23  for just that purpose.

24          Now, all three of these men I mentioned will be

25  testifying pursuant to agreements with the government in the

1    hope of receiving leniency for their cooperation.

2           The Adidas consultant and the financial adviser have

3    already pled guilty to federal crimes for their role in this

4    scheme and they hope to get a lesser sentence, while the

5    government has agreed not to prosecute Bowen's father in

6    exchange for testifying here.

7           So you should keep all of that in mind as you evaluate

8    their testimony.  Ask yourself whether it's corroborated or

9    backed up by all of the other testimony and evidence that you

10   are going to see in this case.  When you do, I expect you will

11   see that their testimony will be corroborated and consistent

12   with all of the other evidence that I just described.

13          Finally, you are going to hear at this trial from

14   representatives at the universities, senior compliance

15   employees.  They will tell you that they had no idea about any

16   of these payments to the families of student-athletes.  They

17   will tell you that their universities did not condone any such

18   payments.  And they will also tell you, in no uncertain terms,

19   that the universities would not have issued athletic

20   scholarships to any of these players had they known about the

21   defendants' scheme.

22          Because, as they will explain, these payments, and the

23   defendants' efforts to recruit these players by making secret

24   payments to their families, were not helpful to the

25   universities.  Instead, they will tell you just how much harm

1    these payments have caused them as academic institutions, the

2    costs they have incurred as a result and the risks of even

3    further financial penalties that may be imposed at the

4    conclusion of this trial.

5              Now, I expect you will hear evidence indicating that

6    coaches at some of these universities may have been aware of or

7    even involved in facilitating some of the payments with the

8    defendants.  And I expect that every university will tell you

9    that if one of their employees was aware of such a payment, he

10   had a duty to report it to the school, and that if he was

11   involved in such a payment, he was not only in breach of his

12   contract but he was subject to immediate termination.

13             Ladies and gentlemen, this case may be set in the

14   world of college basketball, but at the end of the day, the

15   reason why we are here is simple.  Because these defendants

16   caused universities to give scholarships based on fraudulent

17   information, and that fraud occurred because of the defendants'

18   lies and deceit and greed.  Lies for scholarships, lies that

19   posed real economic harm to the universities, because as the

20   evidence will show, the defendants knew it is wrong to lie to

21   get money.  And because lying on financial aid forms and

22   deceiving a college in order to get a scholarship is a crime.

23   And the defendants knew all along that what they were doing was

24   wrong and it perpetrated a fraud.

25             At the close of this case, we are going to have an

1    opportunity to talk to you again.  But between now and then, I

2    am going to ask that you do three things:

3              First, pay close attention to the evidence;

4              Second, follow Judge Kaplan's instructions on the law;

5    and

6              Third, use your common sense.

7              And if you do those three things, then the government

8    will get a fair trial, the defendants will get a fair trial,

9    and you will come to the only conclusion that is consistent

10   with all of the evidence in this case:  that these three

11   defendants -- James Gatto, Merl Code, and Christian Dawkins --

12   acted corruptly in paying the families of student-athletes and

13   in deceiving schools, and that they are guilty as charged.

14             THE COURT:  Thank you, counsel.

15             Mr. Schachter.

16             MS. DONNELLY:  You are actually going to hear from me,

17   your Honor.

18             THE COURT:  Good.

19             MS. DONNELLY:  Good morning.

20             My name is Casey Donnelly, and I am working with my

21   colleague Mike Schachter, and we are here on behalf of Jim

22   Gatto.

23             I would like to start by thanking you today for being

24   here.  I know that a month-long jury trial is not anyone's idea

25   of a great time, and whatever your plans were for the next

1   month you have had to make significant adjustments to be here.

2   You should know that we recognize that and we appreciate it.

3           Ladies and gentlemen, I want to start today by

4   acknowledging that the story the government just told may have

5   made you feel like something not quite right happened here.

6   The government made it seem like this is going to be a trial

7   about illicit payments and backroom dealings and the knowing

8   violation of NCAA rules.  And so I want to start today right

9   from the beginning to let you know that NCAA rules were broken.

10  Jim and Adidas helped out financially a few families whose sons

11  are among the most talented athletes in America.  That

12  happened.  We are not going to waste your time pretending that

13  these families did not get funds.

14          But, ladies and gentlemen, if all the government had

15  to prove was that Jim helped these families, we wouldn't be

16  having a month-long trial.  But that's not what they have to

17  prove.  Jim is not charged with NCAA rule breaking.  He has

18  been charged with two federal offenses:  Wire fraud and

19  conspiracy to commit wire fraud against the universities.  And

20  that, ladies and gentlemen, that we are going to contest.  We

21  are going to fight like mad over the next month in an effort to

22  help you understand that even if Jim broke an NCAA rule, that

23  is a far cry from committing wire fraud.

24          You see, the NCAA's rules are not the laws of this

25  country.  The NCAA is not the U.S. Congress.  It's not a part

1    of the federal government or the state government.  It's not

2    associated with law enforcement.  So what is it?

3           The NCAA is just a voluntary organization made up of

4    administrators who help organize college basketball.  It's like

5    a kid's after school soccer league, except if that soccer

6    league also brought in a billion dollars a year.

7           And the rules that the NCAA writes down and puts in

8    its rule book, those aren't laws.  They are the equivalent of

9    your rules in your apartment building.  Yes, there are

10   consequences if you break them, but you have not committed a

11   crime.

12          The NCAA's rule that college athletes and their

13   families may not receive anything of value in connection with

14   their son's decision about where to go to college, that's also

15   not a law.  In fact, we know that.  If a kid's grandfather is a

16   diehard Michigan alum and he tells his grandson, if you go to

17   Michigan, I will buy you a new car to bring to campus.  Grandpa

18   hasn't committed a crime.  It's just awesome for the kid who

19   gets a new car.  And if grandpa agrees to fly the kid or fly

20   the kid's parents to visit him at Michigan every month, that

21   too, perfectly appropriate.  Although maybe less awesome for

22   the kid.

23          A supposed crime here isn't a violation of NCAA rules,

24   because it's not against the law to violate the NCAA's rules.

25   The crime alleged is federal wire fraud and conspiracy to

 1   commit wire fraud against the universities.  That's a very

 2   different thing.  You see, in order to make that case, the

 3   government is required to prove to you beyond a reasonable

 4   doubt --

 5          THE COURT:  Ms. Donnelly, the purpose of an opening

 6   statement is to explain to the jury what the evidence is going

 7   to be and not to have the lawyer do the judge's job.  So let's

 8   get on to it.

 9          MS. DONNELLY:  OK.

10          The question that is going to matter in this case is

11   not what happened, but why it happened.  What is in Jim's mind?

12   What he is thinking when he helped out these families?  Was he

13   hoping that his actions would cause harm and injury to these

14   schools?  Was he trying to harm these schools?  Or, was he

15   trying to help them?

16          Ladies and gentlemen, I submit to you that the

17   evidence will show that Jim had no intention of trying to harm

18   these universities, but in fact was trying to help them.

19          The evidence is going to show that from Jim's

20   perspective, this is a win-win-win situation.  It's a win for

21   the universities who end up with top-ranked plays who hopefully

22   lead the universities to basketball glory.  It's a win for

23   Jim's employer, Adidas, which is the corporate sponsor of these

24   universities and which would benefit from being associated with

25   a winning basketball team.  And it's a win for these kids and

1    their families who have a little something extra in their

2    pocket to tied them over until their son is able to play

3    professionally.

4          Jim is not here to swindle these schools out of

5    scholarships.  What Jim wants is exactly what the universities

6    want.  A nationally renowned basketball program, one that has

7    the entire campus cheering, that has the alumni pleased and

8    donating.  And yes, one that would also lead to the sale of

9    more Adidas-brand school sweatshirts.

10         And the evidence will show that the universities were

11   desperate to get these athletes to their school.  You see, the

12   evidence will show that these kids bring in millions of dollars

13   in revenue.  And the financial importance of basketball to

14   these schools, that's the part of the story that the government

15   didn't tell you about.  But in fact, evidence concerning the

16   financial realities of college basketball, that is key to

17   understanding this world that Jim and the other folks in this

18   case live in.

19         The reason that the government didn't talk to you

20   about the money that gets made from college basketball is

21   because when you understand how important basketball is to the

22   universities, to both their bottom line and also their sense of

23   school identity, their sense of school spirit, once you

24   understand that, you realize that what Jim was trying to do

25   here was not to harm these schools but, rather, to help them

1    recruit the kids that they very much wanted.

2            You realize that Jim didn't commit wire fraud or

3    conspiracy to commit wire fraud against these universities.

4    The evidence will show that he is just a guy who is doing his

5    job and trying to keep the universities happy.

6            So let me give you a preview of what the government

7    didn't.  Let me explain to you a little bit about what the

8    evidence will show about Jim's world, this world of college

9    basketball.

10           We are going to elicit evidence during this trial that

11   will demonstrate that a successful basketball program is the

12   equivalent of a winning lottery ticket.  A university that has

13   a successful basketball program brings in money from all the

14   viewers who watch it on television, whether that be on ESPN or

15   whatever the channel is, that is not only the fans of the

16   school's team but also the fans of the opposing team's side.

17   In addition, the universities bring in money from ticket sales,

18   from all the fans who pack the stadium.  They bring in money

19   from merchandise.  Even from food.  Actually, you guys are

20   probably all familiar with those seven dollar sodas and 16

21   dollar hamburgers that are for sale at sporting events.  That's

22   money in the university's pocket.

23           The point is the evidence is going to show that these

24   universities want these kids to come to their schools.  Why?

25   Because the universities stand to make serious money off of

1   these kids' athletic talents.

2           For example, you are going to learn during this trial

3   that in 2017, Louisville, one of the alleged victims in this

4   case, its men's basketball program brought in nearly $45

5   million in revenue.  Its head basketball coach, Rick Pitino,

6   made $7 million a year.  In fact, coach Pitino made more money

7   coaching at Louisville than he did when he coached the New York

8   Knicks, a professional NBA team.

9           The men's basketball team at the University of Kansas

10  brought in more than $18 million in 2017.  Kansas pays its head

11  basketball coach, Bill Self, $5 million a year.

12          And each of the apparel companies, Nike, Under Armour,

13  Adidas, they are able to sell millions of dollars in

14  merchandise -- T-shirts, jerseys, sneakers, you name it.

15          The kids on the court, however, the ones whose blood,

16  sweat and tears is making this game a billion dollar industry,

17  they are not allowed to earn a dime.  And the NCAA, those

18  bureaucrats who write the rule book and have decided that the

19  athletes themselves don't get a share --

20          MR. MARK:  Objection.

21          THE COURT:  Sustained.

22          MS. DONNELLY:  The NCAA made more than a billion

23  dollars in 2017.

24          Ladies and gentlemen, we are here today because the

25  government alleges that Jim Gatto committed two federal

1   offenses when Adidas took a tiny portion of the money that it

2   brought in and shared it with the families of the players on

3   the court.

4           Let me give you an example.  The government contends

5   that Jim committed two felonies because he purportedly agreed

6   to send $40,000 to the family of Dennis Smith, Jr.  This is a

7   family that lived in public housing down in Fayetteville, North

8   Carolina.

9           MR. MARK:  Objection.

10          THE COURT:  Sustained.  This is not appropriate.

11          MR. MARK:  Your Honor, we have actually never seen

12  this PowerPoint presentation before.

13          THE COURT:  I am not seeing a PowerPoint presentation

14  at all.

15          MR. DISKANT:  The jury can see it.

16          THE COURT:  Is the jury seeing a PowerPoint?

17          MS. DONNELLY:  Yes, they are.

18          THE COURT:  Counsel, in the robing room.

19          (In robing room)

20          THE COURT:  When did this PowerPoint start?

21          MS. DONNELLY:  The PowerPoint has been projected to

22  the jurors from the beginning of the opening.

23          THE COURT:  Has the government seen it in advance?

24          MR. SCHACHTER:  We understood it was presented on the

25  court's screen as well.  We had no idea that it was not.

1          THE COURT:  Had the government seen it in advance?

2          MR. SCHACHTER:  The government did not ask to see any

3     PowerPoints and we didn't ask to see the government's

4     PowerPoint.  It's standard, as I --

5          THE COURT:  Did the government use a PowerPoint?

6          MR. MARK:  We did not use a PowerPoint.  We did not

7     know they were going to use a PowerPoint.  We actually think

8     that some of those details in that PowerPoint might not be

9     accurate and consistent with the facts that will come in.

10         THE COURT:  Mr. Schachter, you just told me the

11    government used a PowerPoint.  Who is telling the truth?

12         MR. SCHACHTER:  I said that the government has a

13    standard operating procedure to use PowerPoints.

14         THE COURT:  You didn't use the word standard operating

15    procedure.  You said they used a PowerPoint.

16         MR. SCHACHTER:  If I did, then I apologize.

17         THE COURT:  Your colleague is agreeing with me.

18         MR. SCHACHTER:  What I meant to say was that it is

19    standard operating procedure for the government.  I know in

20    your Honor's last trial in opening statements the government

21    used a PowerPoint and we anticipated that the government would

22    be using --

23         THE COURT:  And I knew in advance and the defense knew

24    in advance and it was all approved.  This is a stunt and it's

25    unprofessional.

1          MR. SCHACHTER:  Your Honor, I can only say that I

2     assumed that the government's decision not to request our

3     PowerPoint was tactical and that they did not want to show me

4     theirs.  I had actually asked the question --

5          THE COURT:  Mr. Schachter, you said the government

6     made a decision not to request your PowerPoint.  Are you

7     representing to me that you had disclosed to the government

8     that you had intended to use a PowerPoint?

9          MR. SCHACHTER:  Absolutely not.  Nor did I understand

10     there would be any such obligation.

11          THE COURT:  Well, you have learned something.  Don't

12     ever do anything like that again.

13          MR. SCHACHTER:  I will not, your Honor.

14          THE COURT:  The PowerPoint is over.  You're not using

15     it.  I am instructing the jury to disregard it entirely.  And I

16     am shocked.

17          MR. SCHACHTER:  Your Honor, I can only say that in the

18     last number of trials I have had the government has always

19     employed some kind of PowerPoint, which of course needs to only

20     reflect what we believe to be the evidence.

21          THE COURT:  And it came as a surprise to you every

22     time and you didn't know it was being used from the very first

23     moment it was on the screen?  Are you telling me that?

24          MR. SCHACHTER:  I can only say that I was surprised

25     that the government did not employ a PowerPoint.  I expected

1    them to use a PowerPoint display as the government does on a

2    regular basis.

3             THE COURT:  Your argument holds no common sense, let

4    alone anything else.  This is outrageous behavior.

5             Let's go back.

6             And you, ma'am, you don't instruct the jury on the law

7    in an opening statement.

8             (In open court)

9             THE COURT:  Members of the jury, you are instructed to

10   disregard whatever PowerPoint you have seen altogether.  It is

11   out of this case.  You are to pay no attention.  It should not

12   have been shown to you without advance notice to the other side

13   or to the court.

14            Go ahead, Ms. Donnelly.

15            MS. DONNELLY:  Ladies and gentlemen, as I was --

16            THE COURT:  Just so it's clear, you saw it, but I saw

17   none of it and the government saw none of it.  Nobody knew it

18   was there.

19            Go ahead, Ms. Donnelly.

20            MS. DONNELLY:  Ladies and gentlemen, as I was saying,

21   the government contends that Jim is guilty of a crime because

22   he purportedly agreed to send $40,000 to the family of Dennis

23   Smith, Jr.  You will learn during this trial that Dennis Smith,

24   Jr. ended up going to his local state university, NC State.

25   The government says that Dennis agreed to go there because of

1    the help that Jim provided to his family.

2            The evidence will also show that actually Dennis had

3    wanted to go to NC State since he was a little kid.  His

4    grandmother was a diehard NC State Wolfpack fan and he had

5    grown up watching the basketball team.

6            But whatever Dennis's reasons were for why he wanted

7    to go to NC State, the facts will show that NC State achieved

8    all-time-high ticket revenue sales the years that Dennis played

9    for them.  Alumni donations, they went up by millions.

10           In fact, the evidence is going to show that NC State

11   was dying to get NC State -- to get Dennis in an NC State

12   jersey.  Indeed, we submit that all of the universities who are

13   alleged to be victims in this case were desperate to enroll the

14   kids whose families supposedly defrauded them.

15           Let me continue to use Dennis as an example.

16           By the time Dennis was 16 he was already a five-star

17   athlete.  That's the highest ranking that a high school

18   basketball player can have.  Out of the tens of thousands of

19   kids who play high school basketball, only about 30 of them are

20   good enough to achieve a five-star ranking.

21           These are the kids that are good enough to go straight

22   from high school basketball to the NBA.  Except that the NBA no

23   longer allows kids to come straight from high school to play

24   professionally.  They have to wait a year.  And so knowing that

25   Dennis would have to spend a year playing college ball, the

1    evidence will show that all the big name basketball teams were

2    knocking on his door, trying to convince him to come play for

3    him.

4              NC State, the alleged victim in this case, was

5    determined to beat out this competition.  In fact, the evidence

6    will show that NC State was so determined to get Dennis to

7    enroll that they actually paid for a pilot and rented a private

8    helicopter to fly the NC State basketball coach to Dennis's

9    high school, where they landed the helicopter right on the lawn

10   just as school was getting out so that the entire student body,

11   and in particular Dennis, would be suitably impressed.

12             And why is it that NC State is going to these

13   ridiculous lengths to get a high school kid to come to their

14   school?  Because as the evidence will show, NC State knows that

15   a basketball team led by Dennis Smith, Jr. is worth millions of

16   dollars in revenue.

17             What about Dennis himself?  The NCAA says that

18   Dennis --

19             MR. MARK:  Objection.

20             THE COURT:  Give me a moment.

21             Sustained.

22             MS. DONNELLY:  NCAA rules allow an athlete to be

23   provided with an athletic scholarship and a stipend of about

24   $5,000 a year.

25             Now, don't misunderstand me.  A scholarship for a year

1    of college is great, no question about it.  But the reality is,

2    and the evidence in this case will show that, we will be

3    talking about kids during the next month that are different.

4    These kids are special.  For them, the athletes that we are

5    talking about in this case, they are not in college to earn a

6    four-year bachelor's degree.  These kids are here to wait out

7    that one-year waiting period that the NBA imposes after high

8    school until they are allowed to play, to declare for the NBA

9    draft.  These kids, there is actually a name for them.  They

10   are called one and done kids.

11              Indeed, the evidence will show that one and done is

12   actually an overstatement.  Most of these kids don't even

13   finish a year.  Most of the five-star athletes end up leaving

14   school in March, right after the college basketball season

15   ends, to go train for the NBA tryout.

16              While they are enrolled, the evidence will show that

17   these one and done kids, they are not given the kind of

18   education that you and I might expect.  The evidence will show

19   that the universities enroll them in classes like strength

20   training and conditioning 101.

21              MR. MARK:  Objection.

22              THE COURT:  What is the objection?

23              MR. MARK:  Relevance.

24              THE COURT:  Sustained.

25              MS. DONNELLY:  The evidence will show that for these

1   kids they spend most of their school year traveling to and from

2   away games.  College for them is work.  And there is an

3   expectation that they will rack up wins and make money for

4   these universities.

5           The evidence is also going to show that the families

6   of these kids know exactly how much value their sons are worth.

7           THE COURT:  Sustained.

8           Could we talk about the case we are trying, please,

9   Ms. Donnelly.

10          MS. DONNELLY:  The evidence will show that these

11  families do what any smart business person would do.  They

12  negotiate with the various colleges that are trying to recruit

13  their sons.

14          In this case, you will see evidence that those

15  colleges then turn to their corporate sponsors, Adidas, Nike or

16  Under Armour, to give these parents what they were looking for.

17          At this point I want to take a moment and talk about

18  the role that the sneaker companies, like Adidas, play in this

19  college basketball world.  I want to explain to you a little

20  bit about what the evidence will show about Jim's job at

21  Adidas.

22          Jim got a job at Adidas right out of school, back in

23  1993.  He moved down to Georgia and he worked as a basketball

24  field rep, made $21,000 a year.  He has been with the company

25  ever since.  It's 25 years.  The job makes sense for him.

1   Jim's dad was a high school basketball coach and he is a

2   diehard basketball fan.

3           At Adidas, his job lets him work with athletes and

4   coaches all the time, which is a great gig if you're a sports

5   fan.

6           Now, the government in its remarks to you referred to

7   Jim as a senior executive at Adidas.  The evidence will show

8   that that's not true.  Jim works in Adidas's marketing

9   department.  After 25 years with Adidas, the evidence will show

10  that he has a take-home salary of $139,000 a year.  That's a

11  good living.  Jim and his family are making ends meet.  Don't

12  get me wrong.  But Jim is not exactly running this company.  He

13  is a middle manager.  And his job at Adidas is to help improve

14  Adidas's basketball brand.

15          As you will learn during the trial, one of the ways

16  that Adidas tries to market itself to customers is by

17  sponsoring college basketball teams.  Adidas pays these

18  colleges a lot of money and in return the college players, they

19  wear Adidas uniforms and Adidas sneakers during their games.

20          All four of the schools that are the alleged victims

21  here -- Louisville, Kansas, Miami, and NC State -- those are

22  all Adidas schools, meaning that Adidas is their sponsor.

23          As you will learn during this trial, these schools

24  charge a lot for the right to outfit the players in

25  Adidas-brand uniforms.  The evidence will show that Adidas had

1    to pay Louisville $160 million for the right to sponsor

2    Louisville athletics.

3         Nike and Under Armour, they also sponsor colleges,

4    just as Adidas does.

5         Now, to be fair, Adidas is not sponsoring these

6    universities out of the goodness of its corporate heart.  The

7    better that one of these colleges does on the basketball court,

8    the better it is for Adidas, which gets to be associated with a

9    winning team and in the end hopefully sells more sneakers.

10        And part of Jim's job, the evidence will show, is to

11   work with and to help these colleges that Adidas sponsored,

12   including the four colleges that we will be talking about

13   during this trial.

14        A lot of times this help involves relatively small

15   stuff.  The coach might ask for a special jersey or

16   custom-designed sneakers for the players.  But other times, the

17   evidence will show, the colleges asked Adidas for a different

18   kind of help.  The basketball coaches would ask for Jim's help

19   in recruiting particularly talented high school players to

20   their school.

21        I suspect you know what kind of help these coaches

22   were looking for.  After all, Jim is not a guidance counselor.

23   He works in the marketing department of a giant sports apparel

24   company.  And we are going to be straight with you here.  If a

25   basketball coach went to Jim and told him that he really wanted

1    a particular kid on that team and he asked Jim to make that

2    happen, Jim understood, Jim understood that to mean that Adidas

3    should help the kid's family out financially, if that's what

4    they wanted.

5         Now, I suspect that the government will argue that

6    it's not a defense that the coaches asked Jim to make these

7    payments.  But, ladies and gentlemen, the question here is what

8    Jim thought -- excuse me.  The question here, the question that

9    will be so important at this trial, is whether Jim thought he

10   was helping or harming these universities.

11        You will hear evidence during this trial that it was

12   the basketball coaches at the school that Jim and the other

13   Adidas folks, those are the people he is interacting with every

14   day.  Jim doesn't have any contact with the dean of students or

15   the head of the English department.

16        For Jim, and for many people, these coaches are the

17   public faces of the universities.  If you ask any fan of

18   college basketball to name an employee at the University of

19   Louisville, Rick Pitino would be the first name out of their

20   mouth.

21        The point is in Jim's mind, when these coaches are

22   asking for his help, he believes he is helping the

23   universities.  The evidence is going to show that for Jim, the

24   coaches and the universities are one and the same.  When they

25   asked him to do something and he did it, the evidence will show

1    that he believed he was helping the universities recruit the

2    players they wanted.

3           Moreover, you will see evidence throughout this trial

4    that Jim believed that Nike and Under Armour were also making

5    payments to families on behalf of the colleges that they

6    sponsored.

7           For example, Mr. Mark told you about a player named

8    Brian Bowen who is affectionally nicknamed Tugs.  But the

9    government hasn't told you the full story.  The evidence will

10   show that Oregon, a Nike school, offered Tugs astronomical

11   amounts of money if he went to Oregon.  The evidence is going

12   to show that Jim was then asked if Adidas would level the

13   playing field and offer $100,000 for Tugs to attend Louisville.

14          The prosecutor also mentioned an athlete by the name

15   of Silvio De Sousa.  The evidence will show that Jim was told

16   that Under Armour had paid $20,000 for De Sousa to go to the

17   University of Maryland, which is an Under Armour school.

18          The evidence will show that Jim was then asked if

19   Adidas could match that $20,000 so that De Sousa could go to

20   Kansas, which is an Adidas school.

21          The prosecutor also told you about a player named

22   Nassir Little.  You will hear evidence that Jim was told that a

23   Nike school, the University of Arizona, was going to pay or had

24   offered to pay $150,000 if Nassir would go to Arizona.  Jim was

25   asked if Adidas could match that offer.  Jim was asked if

1    Adidas would level the playing field so that Nassir would have

2    the opportunity to go to Miami, which is an Adidas school.

3          In other words, the evidence is going to show that

4    what Jim is being asked to do here is to level the playing

5    field so that the Adidas schools, these universities, are not

6    at a disadvantage compared to the Nike and the Under Armour

7    schools.

8          The funds that are being paid to these families are

9    intended to help these universities compete and keep up in this

10   industry.  The evidence is going to show Jim is not trying to

11   hurt these universities.  He is trying to help them.

12         Ladies and gentlemen, the world of college basketball

13   is a different one.  It's not the world that most of us live

14   in.  But this is the world that Jim lived in.  The evidence

15   will show that when Jim was helping these families, he thought

16   he was doing his job.  And indeed your common will tell you

17   that regular people, people with kids and friends and lives,

18   don't agree to do things that they believe are crimes unless

19   there is something pretty significant in it for them.

20         But here, there is not going to be a shred of evidence

21   that Jim stood to get a special bonus or any extra payments or

22   anything to agree to help these families.  The evidence is

23   going to show that doing what the coaches asked is part of

24   Jim's job in the marketing department, because he is supposed

25   to help these schools shine.

1          Now, the government suggested to you that Jim's

2     motivation here may have been to get these kids to eventually

3     sign a shoe deal with Adidas, if they were to turn pro.  But

4     here, too, we submit that the evidence will show that the

5     government's theory doesn't hold up.

6          Let's use Dennis Smith as an example one more time.

7          The government's theory is that Jim helped Dennis's

8     family because Jim was trying to ensure that when Dennis went

9     to the NBA, Dennis would sign a shoe deal with Adidas.  But in

10    fact, ladies and gentlemen, the evidence will show that Dennis

11    went to the NBA and he signed a shoe deal with Under Armour.

12         If the government's theory was correct, if helping the

13    Smith family was only so that Dennis would end up signing a

14    shoe deal with Adidas, you would think the evidence would show

15    that Jim was pretty steamed when Dennis ended up signing with

16    Under Armour and not Adidas.  But in fact, ladies and

17    gentlemen, what the evidence is going to show is that when Jim

18    found out that Dennis had signed with Under Armour, as opposed

19    to Adidas, Jim reached out and he told Dennis how proud he was

20    of the man that Dennis had become --

21         MR. MARK:  Objection, your Honor.

22         MS. DONNELLY:  -- that he wished him the very best.

23         THE COURT:  Just get on with it.

24         MS. DONNELLY:  The evidence will show that these

25    families, that Jim's helping these families, is not with the

1   expectation that these kids will end up signing a shoe deal.

2   Instead, he is helping these families because he thinks it

3   helps the universities.

4        If you think about it for a second, why would Jim

5   engage in a scheme to defraud to injure a school like

6   Louisville, that Adidas itself sponsored and spent so much

7   money to sponsor?  Harming Louisville, causing injury to

8   Louisville --

9        MR. MARK:  Objection, your Honor.  This is argument.

10        THE COURT:  Sustained.

11        Talk about what evidence you are going to put in,

12   counsel, or finish.

13        MS. DONNELLY:  Let me talk more about the NCAA.  Did

14   Jim understand that the NCAA didn't want these payments to get

15   made?  The evidence will show that, yeah, he did know that.

16   And did Jim understand that the NCAA, if it were to find out,

17   could penalize a university for playing a kid whose parents had

18   received money?  Yeah.  The evidence is going to show that he

19   knew that.

20        But the evidence will also show that Jim understood

21   that whatever risks existed, they were ones that the

22   universities had agreed to take on.  The evidence will show

23   that if a kid ends up sitting on the bench, per the order of

24   the NCAA, it's the basketball coach whose starting lineup has

25   been affected.

1          If the NCAA said that the university had to pay a

2    fine, the evidence will show that the fine gets taken out of

3    the coach's budget for the basketball program.  And yet the

4    evidence will show that it's the same coaches, basketball

5    coaches that are asking Jim for this help.

6          Now, you will see that there was an attempt to keep

7    these payments quiet.  Jim didn't want the universities or the

8    coaches to get any heat from the NCAA.  So what the evidence

9    will show is that Jim arranged for payments to be transferred

10   from Adidas to certain summer travel teams that Adidas

11   sponsored.  And the Adidas consultants that ran these travel

12   teams, like Mr. Merl Code, who is a defendant here, or a guy

13   named TJ Gassnola, who has pled guilty and decided to testify

14   rather than stand trial, they would pass these funds on.

15         The government has already described these invoices to

16   you as fake invoices, and has suggested that they are evidence

17   of a crime.  We suggest to you that the evidence will show the

18   opposite, that in fact these invoices themselves are evidence

19   that Jim was trying to help, not harm the universities.

20         The evidence will show that the invoices are submitted

21   under the radar.  Why?  The evidence will show that Jim was

22   trying to protect these schools to make sure that they got the

23   players they wanted, they had amazing basketball teams, and

24   that they wouldn't end up being scrutinized by the NCAA.

25         Moreover, these invoices, they never get sent to the

1   universities.  They are purely internal records that Jim uses

2   to keep track of his marketing budget at Adidas.

3          Ladies and gentlemen, I want to be candid.  We

4   recognize that breaking the NCAA's rules may not feel great.

5   You may feel disillusioned or disappointed.  But even if you

6   feel that Jim acted inappropriately, it's important to remember

7   that Jim is being charged here not with rule breaking, but with

8   wire fraud and conspiracy to commit wire fraud against the

9   universities.

10          And so the question that we submit matters in this

11   case, and the one that we hope that you will keep in mind as

12   the evidence comes in, is what is in Jim's mind when he is

13   agreeing to help these families?  What is he intending to do?

14          What unfolds in the next few weeks and the decision

15   that you ultimately come to as a jury is going to have enormous

16   ramifications for Jim.  This is serious.  And here in the

17   United States, we don't simply take the government's word for

18   it when they claim that a person has broken the law.  We allow

19   a defendant to stand up for himself, to plead not guilty and to

20   demand a trial.  And if the defendant asks for a trial, the

21   prosecutors must prove the real evidence that each of their

22   accusations are true.

23          Ladies and gentlemen, we are here today because when

24   the prosecutors made these allegations against Jim, he stood up

25   in front of Judge Kaplan and he declared himself not guilty.

1   Jim asked for his day in court.  He asked for his case to be

2   decided by a jury, by Americans who would hold the government

3   to its burden of proof, to actually put forth evidence showing

4   that he committed a crime, not just that he broke a rule.

5          By the end of this trial, we believe that each of you

6   will realize that the government's theory that Jim was out to

7   harm these schools, to injure them, doesn't make a lot of

8   sense.

9          We are asking, ladies and gentlemen, that you listen

10  to the evidence and that you follow the law.  And we believe

11  that if you do those things, you will conclude that Jim was

12  never trying to defraud any of these universities, and you will

13  find him not guilty.

14         Thank you.

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

Ia2dgat4

1          THE COURT:  Thank you.  We are going to recess for a

2     longer lunch than I anticipated to deal with some matters that

3     I have to deal with with the lawyers on.  So, members of the

4     jury, we will see you at 2 o'clock.

5          THE CLERK:  Will the jury please come this way.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ia2dgat4

1          (Jury not present)

2          THE COURT:  Be seated, folks.

3          Let me just get something up on my screen here.

4          (Pause)

5          My recollection, without having gotten it back up on

6   my screen yet -- ah, here it is -- is this:  Ms. Donnelly was

7   going on talking about Dennis Smith and some statement about

8   the family living in public housing.  Mr. Mark, you objected,

9   and I sustained it.

10          Mr. Mark, you then said, "Your Honor, we have actually

11  never seen this PowerPoint presentation before."  When was the

12  first moment you became aware, in relation to what I read, that

13  there was a PowerPoint being used by Ms. Donnelly?

14          MR. MARK:  We became -- I think there was a

15  presentation on the screen at the beginning of her argument.

16  It started.  We -- you know, we assumed that your Honor was

17  also seeing what we were seeing for the first time.  We didn't

18  want to stand up and object right that second, candidly,

19  because we wanted to give her some latitude in her opening

20  statement.  But then when it got to a certain point, it clearly

21  became objectionable and we raised that to your Honor.

22          THE COURT:  Did you know, before she began her

23  argument, that they had a PowerPoint that they intended to use?

24          MR. MARK:  We did not know that, your Honor.

25          THE COURT:  Ms. Donnelly, Mr. Schachter, did you

Ia2dgat4

1    disclose to the government, or to me, that you intended to use

2    a PowerPoint, yes or no?

3              MR. SCHACHTER:  No.

4              THE COURT:  Ms. Donnelly?

5              MS. DONNELLY:  No.

6              THE COURT:  As I said in the robing room, this

7    behavior is inappropriate.  I consider it to have had a

8    deceptive effect, whatever its intention was, and it was

9    unprofessional.

10             Now, I don't yet know from a technical standpoint how

11   you managed to get that on the screens in the jury box, and I

12   want to know that now, because it was not on any of the screens

13   that court personnel had.

14             Was it on your screen, Mr. Mark?

15             MR. MARK:  It was on our screen and we assumed it was

16   on your screen.  That is why we were so confused.

17             THE COURT:  How did you get that to happen?

18             MR. SCHACHTER:  I don't know the answer to that.  I

19   assumed it was on your Honor's screen as well.

20             (The law clerk conferred with the Court)

21             THE COURT:  On my display, the controls for video

22   publishing are all set to off.

23             MR. SCHACHTER:  We were of course, unaware of that,

24   your Honor.  I assumed that anything that could be displayed --

25   I assumed that nothing could ever be displayed before the jury

1    that your Honor was unable to see.

2              THE COURT:  Well, you can be sure that's always my

3    assumption because every system I've ever used left the final

4    control of what was displayed to the jury in my hands and my

5    deputy's.

6              Now, do you have an IT consultant here?

7              MR. SCHACHTER:  I do, your Honor.

8              THE COURT:  Who set this up?

9              MR. SCHACHTER:  That I don't know.

10             THE COURT:  All right.  I want an affidavit of how

11   they managed to accomplish that.

12             MR. SCHACHTER:  Yes, your Honor.

13             THE COURT:  And, furthermore, there will be no use of

14   any audio/visual until I am assured that the ability of the

15   lawyers to put anything in front of the jury before Andy or I

16   displays it is totally disabled.

17             Where did you ever get the idea that you could display

18   material to the jury without the Court being made explicitly

19   aware of it?

20             MR. SCHACHTER:  Your Honor, I have reached an age

21   where I cannot say that my memory is completely clear, but I

22   believe in my last trial against the Justice Department, the

23   government put on a PowerPoint and we put on a PowerPoint and

24   there was no exchange of PowerPoints.

25             THE COURT:  And you put it on two juries without the

Ia2dgat4

court knowing you were going to do it or seeing it at the same

time, you did that?

          MR. SCHACHTER:  Absolutely not, because we never in a

million years believed that your Honor could not see whatever

was displayed to the jury.  I would never, ever present

something to the jury that the Court was unable to see.  It was

my understanding -- I didn't even think that would be

technologically possible.  And we, of course, had no intent to

hide what was going on from the Court.

          I can only apologize and of course we'll find out

exactly how that happened.  But that was in no way our

intention and it would have been -- it would never have

occurred to me that that was a technological possibility.

          THE COURT:  All right.  Just one minute.

          (Pause)

          OK.  I'll see you at 2 o'clock.

          THE CLERK:  All rise.

          (Luncheon recess)

Ia2dgat4

**A F T E R N O O N  S E S S I O N**

2:12 p.m.

(Jury not present)

THE COURT:  Afternoon.  Be seated, please.

Bring in the jury.

(Pause)

While we are waiting for the jury, let me just say that on any other occasion when either side, should it ever occur again -- and I hope it won't -- sees the adversary putting in front of the jury something you haven't seen before, I want to know about it at that moment.

Who is going to open next?

MR. MOORE:  I am, your Honor.

THE COURT:  OK.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1        (Jury present)

2        THE CLERK:  Jury entering.

3        Please be seated, everyone.

4        THE COURT:  OK.  We will hear next from Mr. Moore.

5        MR. MOORE:  Thank you, your Honor.

6        THE COURT:  You may proceed.

7        MR. MOORE:  May it please the Court, counsel, and

8    ladies and gentlemen of the jury:

9        This case is all about intent and whether Merl Code

10   wanted to help Adidas-sponsored schools or harm them.  And this

11   case is all about college basketball, so let me tell you that

12   Merl Code played college basketball.  He grew up in Greenville,

13   South Carolina with dreams of being a professional athlete just

14   like his dad.  He played high school ball and then college

15   basketball at Clemson.  And after playing pro ball for a few

16   years in Europe, he decided to take a different path and he

17   began working for Nike.  He worked for Nike for 14 years.  And

18   after working for Nike, he struck out on his own as a

19   consultant with various clients, including Adidas, and at that

20   point he returned to Greenville, South Carolina, where he and

21   his family now live.

22       Now, as I told you, Merl was a college basketball

23   player.  And his world view of college basketball, and the NCAA

24   rules that regulate it, were profoundly affected by his time as

25   a college basketball player and his time at Nike.  And during

1  his 14 years at Nike, as we submit the evidence will show, Merl

2  used his skills, first at Nike and then as a consultant for

3  Adidas -- not an employee, but a consultant -- he used his

4  inside knowledge of college basketball to help recruit young

5  athletes to youth travel teams sponsored first by Nike and then

6  by Adidas.

7          And while consulting for Adidas, he helped Adidas

8  improve the relationships it had with the universities that it

9  sponsored.

10          And you will hear, ladies and gentlemen, that he also

11  did what he could do to help the families of players, because,

12  as the evidence will show, Merl knew that most of the families

13  of these phenomenally talented young athletes didn't have a

14  whole lot of money.

15          Now, in order to convict Merl of the charges in this

16  Indictment, the prosecutors here are required to prove that he

17  acted with specific intent, that he specifically agreed with

18  Jim Gatto, Christian Dawkins, and others, to defraud

19  universities that had a relationship with Adidas.  And the

20  government has to prove that he acted with specific intent to

21  harm these schools.

22          And while you are going to hear evidence that Merl

23  Code was not all that crazy about the NCAA, I submit that the

24  evidence isn't going to show that he was willing to defraud any

25  school, particularly those schools which were affiliated with

1    and sponsored by Adidas.

2            The charges that the government has brought in this

3    case require you to get inside Merl's head.  And because while

4    Merl doesn't have to prove anything, because he doesn't have

5    the burden of proof, I want you to understand up front, ladies

6    and gentlemen, that the best and most persuasive evidence, we

7    submit, that you're going to hear about Merl Code's intent

8    comes from a recording obtained by the government, where Merl

9    told an undercover officer that he -- that with respect to this

10   Bowen situation, that he wanted to step up and help one of

11   Adidas' flagship schools, help them land a five-star recruit.

12   And he was willing to do that even if NCAA rules were broken in

13   the process.

14           Now, I don't know how many of you have watched TV

15   shows like The Wire, or Blue Bloods, or Law and Order, or crime

16   shows, but this case isn't going to be anything like those

17   shows because most criminal cases are about the who or the

18   what.  Not this one.  This isn't going to be a "who did it"

19   kind of case or even so much of a "what did he do" kind of

20   case.  This case is all about the why.  Because we agree that

21   Merl Code helped facilitate payments to the family of Tugs

22   Bowen in order to get him to go to Louisville, an

23   Adidas-sponsored school.  And, again, the government must prove

24   that he acted with specific intent.  And we submit that the

25   evidence will show that rather than have a clearly identified

1   crime in this case with a search for who did it, you have facts

2   in search of a crime that doesn't exist.

3           And now, ladies and gentlemen, while some of you might

4   find this a little troubling, while it might bother you a

5   little bit, we're telling you up front that Merl Code made

6   these payments or helped make these payments to the families of

7   Tugs Bowen and he was willing to ignore NCAA rules in the

8   process.  But Merl isn't charged with defrauding the NCAA or

9   breaking its rules.  Breaking an NCAA rule to help a flagship

10  school, in his words, is light years away, ladies and

11  gentlemen, we submit, from scheming or conspiring to defraud

12  these schools.

13          Now, ladies and gentlemen, this is Merl Code right

14  here, second in.  You met him briefly yesterday during jury

15  selection.  He's pled not guilty and he's presumed innocent of

16  the charges against him.  And that means as he sits here today

17  he is innocent, and he stays innocent unless and until the

18  government proves its case beyond a reasonable doubt.

19          You also met my cocounsel, Merl F. Code, yesterday

20  briefly.  And you're going to be able to tell from both of our

21  accents, we aren't from around here.  Merl practices law in

22  Greenville, I practice law in Columbia.  And I will tell you as

23  a lawyer, I've often been told that I'm a lot like a New Yorker

24  with a southern accent.  I've always taken that as the highest

25  form of praise.

1          Now, Judge Kaplan is the judge of the law in this

2     case.  But, ladies and gentlemen, you are also judges.  You are

3     the judges of the facts, and you are the sole judges of the

4     facts.  You, and you alone, must decide whether the government

5     has met its burden of proof.  And you do so based on the

6     evidence that is admitted by His Honor, by using the

7     instructions that His Honor gives you, and by the application

8     of your own good common sense to the evidence that is submitted

9     in this case.  As I said earlier, Merl can't be convicted

10    unless and until the United States Department of Justice, his

11    accuser, proves the charges against him to each and every one

12    of you beyond a reasonable doubt.

13         And, yes, I said common sense.  I agree with Mr. Mark,

14    as he said in his opening remarks, that common sense is very

15    important.  And we're definitely going to ask you to use your

16    own good common sense and your own life experiences as you

17    think and listen to the evidence that is admitted in this case.

18         Now, as you've already heard, college basketball is a

19    big business.  Large shoe companies, as the government

20    mentioned, like Nike and Under Armour and Adidas, have

21    contracts with universities, where those companies invest money

22    into these schools, and in return the universities outfit their

23    players in sports apparel sponsored and made by the company

24    that sponsors the university, with both parties benefiting as a

25    result.

1      And Nike, where Merl worked for 14 years, is the

2   biggest, baddest dog on the block.  It has relationships with

3   far more schools than the other two, and it makes a lot of

4   money.  And as Ms. Donnelly told you, the shoe company gets

5   substantial exposures if the shoe company's team does well in

6   the NCAA tournament, and the university get substantial funds

7   by being sponsored by the shoe company.  So just as a winning

8   team at Duke or Kentucky can be a walking, talking ad for Nike,

9   a Final 14 and a national championship team at Louisville can

10  do the exact same thing for Adidas.

11      Now, I listened carefully to Ms. Donnelly, and I'm in

12  complete agreement with her about the billion-dollar business

13  of college basketball and the huge financial benefit that flow

14  to schools if they have a successful program.  So, I'm not

15  going to waste your time and try your patience and repeat

16  everything she said.  I am, however, as we talk about the

17  evidence in this case, going to ask you to think about that

18  world through Merl Code's eyes.

19      Now, I believe Mr. Mark referred in his opening

20  statement to shoe wars.  You're going to hear, ladies and

21  gentlemen, about that term.  And you're going to hear that the

22  competition between Nike and Under Armour and Adidas to help

23  their schools recruit the top basketball players can be pretty

24  intense.  And you're going to hear from Merl Code's own

25  statement that he, and others, referred to this competition as

1    "shoe wars," because in this conversation that you're going to

2    hear, that I've already spoken about once, when he talks about

3    stepping up to help one of his flagship schools, he talks about

4    the fact that this is a part of shoe wars.

5         What are shoe wars?  Well, Merl knows a lot about it

6    because he's been on different sides, first for Nike and then

7    for Adidas.  It refers to the competition between the big shoe

8    companies first to sign up and sponsor universities and then to

9    help those universities get the best players to play for that

10   team.  And given his years at Nike, Merl Code, before he ever

11   went to work as a consultant for Adidas, knew that universities

12   that want a successful program will do just about anything they

13   can to recruit the best players.  And the head coaches with

14   successful programs not only make a lot of money but they are

15   the most important people on their campuses -- the big dogs,

16   the decision makers, if you will.

17        And Merl also knew that the parents of these

18   phenomenally talented five-star recruits often asked for

19   financial assistance to support their child over and above what

20   the NCAA allows.  And Merl and others who live in this world

21   know that the elite coaches, the biggest and most important

22   people on their campuses, come, either on their own or through

23   an intermediary like an assistant coach, to get the shoe

24   company's help in providing and recruiting players by providing

25   money to the player's family in the hope that the athlete will

1   decide to play for their team.

2        Now, Mr. Mark talked a good bit about Brian Bowen, or

3   Brian Bowen Junior, who is often referred to -- and you'll hear

4   this name -- Tugs Bowen, to distinguish himself perhaps between

5   his father, Brian Bowen Senior, who is going to testify as a

6   witness for the government, and Brian Bowen Junior.  And the

7   government's case against Merl -- and I'm here to talk about

8   Merl, OK -- relates primarily to two Adidas schools and two

9   players, the University of Louisville and the recruitment of

10  Tugs Bowen and the University of Miami and the recruitment of

11  Mr. Little.

12       As Mr. Mark mentioned to you, the government's

13  evidence in this case was gathered, in substantial part, by the

14  use of court-authorized wiretaps and by the introduction of

15  undercover law enforcement agents who posed as sports

16  financiers and who recorded conversations with Merl and with

17  others.  And you're going to hear a lot of these wire-recorded

18  conversations.  And you're going to hear the FBI had secret

19  wiretaps -- and I say "secret" because when the FBI gets a

20  wiretap on someone's phone, they don't tell the person, hey, by

21  the way, we're about to tap your phone, OK, but when I say

22  secret wiretaps, on the phones of a government witness --

23  Mr. Sood, who Mr. Mark referred to -- as well as each of the

24  defendants in this case.  And I ask you, ladies and gentlemen,

25  to think about this for a moment.  You would expect that if

1   four people were trying to harm or defraud or cheat a school

2   out of anything, the government would have a recording where

3   they discussed it.  Pay close attention to these hours and

4   hours of calls, ladies and gentlemen.  I submit they don't have

5   any such recording.

6          Now, Merl's involvement in the Bowen situation is

7   pretty simple.  Merl learned that Oregon, a Nike school, was

8   going to pay Mr. Bowen money to go to Oregon.  And he was

9   approached by Mr. Dawkins about whether Adidas might help

10  persuade Bowen to go elsewhere, to an Adidas school.  And

11  you're going to hear that because Merl was a consultant -- not

12  an employee, for Adidas -- they called Mr. Gatto to see if

13  Adidas might be willing to help.  And you will hear evidence,

14  ladies and gentlemen, that Louisville Head Coach, Rick Patino,

15  and Assistant Coach Kenny Johnson really wanted Bowen to join

16  their program.  And Adidas stepped up to do what Patino, the

17  face of Louisville and the big dog there, wanted.

18         Now, the government asked you to speculate that Merl

19  did this because he was a part of a scheme and a conspiracy to

20  defraud Louisville, the school that was sponsored by the

21  company with whom he had a consulting arrangement.  And, ladies

22  and gentlemen, we submit now, and we will submit at the

23  conclusion of this case, that not only does this argument defy

24  common sense, but, thankfully, the government recorded the

25  conversation with Merl where Merl said exactly what was on his

1    mind:  We had to step up and help one of our flagship schools

2    recruit a five-star player.

3           And I've noticed -- because I'm sure this comes as no

4    surprise to you, that, you know, you're watching us as this

5    trial unfolds and we are paying attention to you -- I noticed

6    that some of you are taking notes.  OK?  If you don't write

7    anything else down that I say, OK -- and obviously you don't

8    have to write down anything I say -- but if you don't write

9    anything else down that I say, I'd ask you to think about that

10   conversation, because you're going to hear it and you're going

11   to see it.  And I ask you that every time you hear the

12   government suggest that Merl Code acted with the specific

13   intent to harm or defraud a school, because that's what they

14   have to prove, think about that conversation.

15          Now, the government has talked about in their opening

16   statement -- and I expect we're going to hear much about this

17   at trial -- the fact that these payments were not directly made

18   out in a check by Adidas to the Bowen family somehow means that

19   these payments were an indication and that the method of the

20   payments was an indication that they were trying to defraud

21   Louisville, the school that desperately wanted Mr. Bowen

22   because of his potential value to its program.

23          Let's think about that for just a minute.  Because we

24   submit that the evidence will show that Merl and the others in

25   the industry knew that players were paid at the request of

1   schools and that the schools were willing to assume the risk

2   that the NCAA might catch wise.  But nobody in the industry was

3   dumb enough to do this out in the open and wave a red flag in

4   the face of the NCAA.  And so while the government made a whole

5   lot about Merl's comments -- and there's a recorded comment

6   where he talks about doing business in cash.  I tell you that

7   up front.  While the government is going to make a whole lot

8   about that, think about whether he was doing this to defraud

9   the University or he was doing this to help the University and

10  its basketball program and that these transactions were

11  designed to help the players and the schools avoid the scrutiny

12  of the NCAA and not in any way to defraud the school.

13          And, ladies and gentlemen, we submit that when you

14  hear all the evidence with respect to Merl's involvement with

15  Brian Bowen Senior -- Brian Bowen Junior, and Senior, too, also

16  known as Tugs, you will understand that Merl believed that

17  making payments to Bowen helped Louisville by helping it gain a

18  good athlete, helped Adidas by furthering the interests of the

19  Adidas schools, and helped the Bowen family by helping them

20  support their child.

21          And while he wasn't trying to help the folks at the

22  NCAA, ladies and gentlemen, it's very important for you to

23  remember that he is not charged with conspiring or scheming to

24  defraud the NCAA.

25          With respect to the effort to recruit Nassir Little

1   from Miami, his involvement was similar.  Merl discovered that

2   Arizona, another Nike school, was going to pay Mr. Little's

3   family $150,000 to get him to attend Arizona.  And he also

4   discovered that Miami coach Jim Larranaga -- that name may not

5   be as well known outside college basketball as Rick Patino but

6   certainly well known inside college basketball -- he discovered

7   that Mr. Larranaga wanted Little for Miami, a school that was

8   sponsored by Adidas.  And, ladies and gentlemen, this is

9   exactly what Merl meant when he talked on recordings about shoe

10  wars, the thing that Mr. Mark referred to.  And there were

11  discussions about whether Adidas would help Miami by matching

12  the Arizona offer, but Adidas ultimately did not do it.

13          Now, I don't know exactly what calls the government

14  intends to introduce about this Little Arizona scenario, but I

15  will submit that in all of their hours of tape recordings,

16  there is no evidence that Merl Code conspired or agreed with

17  these two defendants, or anybody else, specifically to defraud

18  the University of Miami.

19          Now, I'm sure you'll be happy to here that I'm close

20  to the end of my remarks, because I'm sure you want to get on

21  with the business of listening to the evidence in this case.

22  But I would be remiss if I didn't leave you with a few things

23  to think about as you consider the government's evidence in

24  this case as it will unfold over the next couple of weeks.

25          Let's talk for just a minute about credibility.  As I

1   expect Judge Kaplan will tell you, just because a witness

2   testifies does not mean that you have to accept all or even a

3   part of what they say.  Mr. Mark told you about the fact that

4   three of their witnesses are testifying, two pursuant to plea

5   bargain deals with the government and one pursuant to an

6   immunity agreement.  And His Honor will tell you how you are to

7   consider that testimony at the conclusion of this case.

8          But, again, just because a witness is called by the

9   government doesn't mean that he, or she, is telling all or even

10  a part of the truth.  And so one of the things that you, ladies

11  and gentlemen, have to think about -- because ultimately you

12  decide what evidence is believable and what evidence persuades

13  you -- what you have to decide is whether those folks and the

14  other government witnesses are believable beyond a reasonable

15  doubt.

16         And I mentioned common sense again, because, just like

17  Mr. Mark, I agree that common sense and life experience will be

18  very important for you as you pay attention not only to what

19  these folks say, but what they don't say, and how they do on

20  cross-examination when some of their testimony is challenged.

21  And I ask you to pay particular attention to them and the way

22  they appear to you.

23         I'd also ask you to consider a couple of points about

24  the government's case.  The prosecutors in this case have

25  charged Merl with conspiring to defraud four separate

1    universities, despite the fact that there is no evidence that

2    he was involved in Dennis Smith, Billy Preston or Silvio De

3    Sousa's -- three names that you heard in opening statement from

4    the government -- no evidence that he was involved in any of

5    those scenarios.

6            I also ask you to consider the fact that the evidence

7    will show that the government brought these charges despite the

8    fact that they had been secretly taping him for months, and

9    listening to his calls, and when he told an undercover officer

10   exactly what was on his mind at a time when he did not know the

11   government was listening and he had no reason to be anything

12   other than completely honest, because, again, ladies and

13   gentlemen, I ask you to listen and look for a recording where

14   Merl Code, or anybody else, talks about scheming or conspiring

15   or agreeing to defraud or hurt or harm an Adidas school.  I

16   don't believe you're going to hear such a call.

17           Remember, the government bears the burden of proof in

18   this case, and they must prove each and every element of the

19   crimes that they have charged to each and every one of you

20   beyond a reasonable doubt.  We submit that when you listen to

21   all of the evidence, you will determine that the evidence does

22   not show, particularly beyond a reasonable doubt, that Merl

23   Code conspired, agreed, planned, or schemed to defraud any

24   school.  And we submit that the government will be unable to

25   meet its burden of proof, because the evidence will not show,

1   we submit, that he acted with specific intent to defraud any

2   school or university.

3          Again, ladies and gentlemen, with respect to some of

4   the evidence that was commented on by the government in its

5   opening statement, we submit that the government is trying to

6   take a series of events and convert them into a crime.  It is

7   not a crime to pay somebody in cash.  It is not a crime to

8   create a fake invoice.  It is only a part of the crime charged

9   in this Indictment if you do so with the specific intent to

10  defraud or harm a school.  And we're going to ask you to base

11  your decision on the evidence that you hear and not on

12  speculation.

13         Now, ladies and gentlemen, the right to a trial by a

14  jury of one's peers is a cornerstone of our American legal

15  system, and Merl Code appreciates your fairness, your patience,

16  and the fact that you, an impartial jury of his peers, people

17  from all walks of life, are the ones to get to make the

18  ultimate decision in this case and not the prosecutors.  He

19  didn't choose to have to defend himself hundreds of miles from

20  his home.  He has faith in you, ladies and gentlemen, as

21  impartial judges of the facts.

22         Now, as Ms. Donnelly said, jury service is never easy.

23  I actually sat on a jury once.  I was shocked that someone put

24  me on one.  But we all know that you have lots of other

25  important things to do in your life, in your job.  But your

1    service in this case is one of the most important things that

2    you will ever do during three or four -- hopefully no more --

3    of the most important weeks in Merl Code's life.  Merl Code

4    knows that you will be fair and impartial, and that's all he

5    asks.

6            And on behalf of myself, Merl Code, my co-counsel,

7    Merl F. Code, we thank you in advance for your patience, your

8    willingness to serve, and for your careful and your impartial

9    consideration of his case.

10           I'll leave you with one final comment.  I heard the

11   word "greed" twice from Mr. Mark.  I ask you to look for any

12   evidence that Merl Code would have made a single dime more from

13   Adidas if he got somebody to go to an Adidas school.

14           Thank you.

15           THE COURT:  Thank you, Mr. Moore.

16           Mr. Haney.

17           MR. HANEY:  Thank you, your Honor.

18           Good afternoon.  We've heard this word "intent" used

19   quite a bit today.  I can't count how many times.  I stopped

20   counting at about 50.  That word really means nothing other

21   than what is in somebody's mind.  That's what intent means.

22   And this case is predicated upon what you as jurors will

23   conclude was in the mind of my client, Christian Dawkins.  And

24   I submit that when you are presented with the evidence, which

25   you will very soon here, there will be no question left in your

1    mind that, based on the evidence, Christian Dawkins' intention

2    was to offer financial help to families in order, one day, to

3    become a prominent basketball agent.  That was it.

4            And on that road to hopeful prominence that young

5    Christian Dawkins was on, he never broke the law.  He never

6    hurt anybody, and certainly his mind acted with a single

7    intention, which never included harming, defrauding, cheating,

8    or swindling any of the universities named in this case and in

9    this Indictment.

10           In fact, I submit to you that when you hear the

11   evidence in this case, you will find that literally every

12   action that Christian Dawkins took was done with the express

13   opposite intention of defrauding or harming anyone.  The

14   evidence will show his intentions were clearly to help kids,

15   help families, help universities who were asking for his help,

16   help his employers -- and you'll hear about that in a moment --

17   and, yes, perhaps one day, if he got lucky, if he was fortunate

18   enough, to help himself, too.

19           Now, you just heard Mr. Mark who stood up and gave you

20   what he submitted to you was a window into the world of

21   Christian Dawkins, who he was, what he did, and, most

22   importantly, what he intended to do, an attempt that I submit

23   to you failed.

24           Now, it is time for me to open another window, one

25   that I submit will give you a better understanding of what was

1   in the mind of Christian Dawkins.  For, as Mr. Moore noted,

2   this is not a case of who or what, this is a case of why, and

3   why Christian Dawkins did what he did.  The evidence that will

4   show how Christian Dawkins, at the age of 21 years old, was

5   introduced and how he somehow permeated this world of

6   high-stakes basketball recruiting and multi-million-dollar

7   deals, and formed a company called Lloyd Inc. which stood for

8   "living out your dreams."

9           Here's what the evidence is going to show.  And you're

10  going to hear testimony from a friend of his, as the government

11  referenced, Brian Bowen Senior.  I'll discuss Brian Bowen

12  Senior in a moment, and you'll see him testify in this case.

13  Far more than a friend.  The evidence is going to show from the

14  age of 12 years old, Christian Dawkins was a basketball junkie.

15  It was in his blood.  He never had a chance, you see.  His dad

16  was a legendary high school coach at Saginaw High, two-time

17  Michigan State high school championship in the rough-and-tumble

18  City of Saginaw, Michigan.  A true family legacy of basketball,

19  if there ever was one, ingrained in the crime-ridden and often

20  violent community of Saginaw.

21          The Dawkins' name, in fact, was synonomous with

22  basketball in the city of Saginaw, and it cast a large shadow

23  and high expectations.  But despite all this storied history --

24  and there was a lot of it -- with Lou Dawkins and Saginaw High,

25  there was a problem -- Chris Dawkins couldn't play basketball.

1    He wasn't very good.  He was too slow, two short.  He is

2    probably getting mad at me right now for telling this story.

3    So, he had to make it in a different way.

4            So he had a solution to that problem.  He wasn't going

5    to let his family down.  He was going to make his dad proud.

6    He was going to maintain that proud basketball legacy in

7    Saginaw, Michigan.  So, unbeknownst to his mom and dad, he

8    would go down to the basement at night, wait for them to go to

9    sleep, and when they did, he went down and he created a

10   website, scouting and rating the top basketball players in the

11   State of Michigan.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    MR. HANEY:  And he called that Web site "Best of the

2  Best Skeleton," under a penname of course.  It was so good, so

3  professionally done, so meticulously active and descriptive in

4  its player valuations, college coaches all around the country

5  started accessing this Web site.  They even started going on

6  and paying for the player valuations of this guy writing on

7  this Web site.  He was 12.

8    Then you are going to see from the evidence that at

9  the age of 18, when he wasn't good enough to make it as a

10  player, he started an AAU program, and he named that program

11  Dorians Pride, and he unthinkably secured the first ever Under

12  Armour apparel deal in the history of the state of Michigan.

13  That same year he formed a foundation for the purpose of

14  mentoring young kids, including a particular kid in the center

15  of this case, a kid by the name of Tugs Bowen, and he called

16  that foundation Loyd Inc., living out your dreams.  Loyd was a

17  perfect name for Christian Dawkins, who was always dreamer, no

18  dream too big, no possibility too great.  His contribution to

19  the basketball legacy of the Dawkins family would never come

20  from the basketball floor.  It was going to come from his

21  prodigal mind, as a mentor, a business advisor, and hopefully a

22  prominent agent one day.

23    The evidence will show, at the age of 19, he packed

24  his bags and he left Saginaw, Michigan -- not too many kids did

25  it -- to make his own name in basketball, to escape the

1  hopeless city that raised him, and to get out of the shadow of

2  his father, to do something different, more remarkable, make

3  his own way, live out his dreams through Loyd.  So he embarked

4  upon this unthinkable path, this journey if you will, and with

5  each step he took along the way, each character that he met,

6  some of those characters are going to come in here and testify

7  against him in this case.  His journey ended here, sitting in

8  that seat, in this federal courtroom, with the government

9  proclaiming that Christian Dawkins, at the age of 21 years old,

10  defrauded, cheated, swindled multimillion dollar universities

11  and shoe companies in this wire fraud case.

12          Well, let me tell you what the government did not tell

13  you about the case, because that's sometimes more important

14  than what they do tell you.  They will tell you the real story

15  of Christian Dawkins and the allegations is that he defrauded

16  and harmed universities.  In April of 2014, at the incredible

17  young age of 21 years old, Christian Dawkins got hired to be

18  something called a runner at a sports agent.  The sports agency

19  was Andy Miller Sports, also called ASM.  It was one of the

20  biggest, most powerful agencies of basketball.  An agency named

21  after its namesake Andy Miller, who represented some of the

22  biggest names in the history of pro basketball.  First ballot

23  hall of famer Kevin Garnett; Chauncey Billups, Mr. Bigshot;

24  Carl Lowery; and your own New York Knicks star, Kristaps

25  Porzingis.  And you are going to learn that for a basketball

1    junkie like Christian Dawkins, at barely 21 years old, somehow

2    having the incredible fortune to land this job at the biggest

3    basketball agency arguably in the NBA, was a job he dreamed of

4    since he was that 12-year-old kid in the basement making his

5    Web site.

6            But you are going to learn from the evidence that

7    despite what the government is going to want you to believe,

8    that Christian Dawkins was some type of an agency mastermind,

9    you are going to find he wasn't even an agent.  The evidence is

10   going to show that Christian Dawkins couldn't even be an agent.

11   He didn't meet the most basic educational requirements to be an

12   agent.  All he had was a high school diploma, from Saginaw

13   High, an inner-city public high school in one of the toughest,

14   most dangerous cities in America.

15           I am from Michigan.  I am jealous of Mr. Moore's

16   accent.  I unfortunately have the Michigan accent that

17   everybody hates.  I am from Michigan.  We call the city of

18   Saginaw Sag Nasty, and you say it with pride if you're from

19   Saginaw.  So this kid from Sag Nasty went to ASM to be

20   somebody.  Because that's what you did if you ever made it out

21   of Saginaw.  Not too much kids did.  You made the most of

22   opportunities.  And the word opportunity and success and

23   Saginaw were rarely used in the same sentence.

24           Was Christian Dawkins ambitious?  Absolutely.  Was he

25   a networker?  Maybe the best.  Full of energy, youthful

1    exuberance, eager to learn the business and to be mentored and

2    trained and taught by the older guys, who did have the

3    licenses, who did have the certifications, who did have the

4    educational requirements, some of them even lawyers.  And the

5    evidence will show that when Christian Dawkins was at Andy

6    Miller Sports, he watched, listened, learned and followed

7    instructions.

8            And the evidence will show it was a perfect marriage

9    for ASM to hire Christian Dawkins, the younger African American

10   kid, who could hang out and relate to the largely younger

11   African American basketball clients that they had at ASM,

12   listen to the same music, play the same video games, go to the

13   same nightclubs, speak the same language.  Christian Dawkins

14   was literally sent out into the streets by Andy Miller, into

15   the hot summer gyms at the AAU tournaments, to hustle up the

16   business for the older guys at ASM, guys like Andy Miller,

17   Stephen Pina, who is an attorney, and all the other licensed

18   agents at ASM, to do all the work they couldn't do, or too old

19   to do, and didn't want to do, and if somebody got caught, they

20   could say they didn't do.

21           You see, these agencies needed a guy like Christian

22   Dawkins, all of the big agencies did, and Christian Dawkins was

23   very good at the role he filled.  And that role at ASM was well

24   defined.  Runners like Christian Dawkins were relationship

25   guys, they were the go-betweens, taught and trained that their

1    job was to take care of these families and provide them with

2    the financial resources they needed, for the purpose of

3    building relationships, trust and loyalty.  And you will hear

4    evidence that taking care of these families meant paying them.

5    There is no denying that.  You will hear evidence of that.

6    Paying them with other people's money was not only preferred,

7    but it was the model of the agencies, pay them with the shoe

8    company's money, don't use our money.

9           And you will learn from the evidence that providing a

10   poor family with financial benefits, regardless of how much or

11   little, is a violation of the NCAA rules.  Yet violating the

12   NCAA rules in helping these poor families was in fact what the

13   colleges wanted.  And not only was it what the colleges wanted,

14   it's what they sought and needed.  Guys like Christian Dawkins

15   were expected to bridge these families' financial hardships for

16   prospects the schools wanted on their campuses by any means

17   necessary.

18          And the evidence will direct you to see that for

19   Christian Dawkins everything he did at ASM was in his mind.

20   And remember what I said about this isn't a case of what is in

21   somebody's mind, this is a case of intent.  This was part of

22   the business of basketball he knew at 21 years old, how he was

23   trained, and certainly nothing he thought, ever, was he doing

24   illegal.

25          The evidence in this case will show that the most

1    distinguished college basketball programs in the country -- you

2    are going to hear evidence of this -- with the most widely

3    respected coaches in the game, they were reaching out to a

4    21-year-old kid seeking his assistance to break the NCAA rules,

5    for the purpose of finding the money to pay the top recruits

6    the universities wanted.

7            What we do know is both sides will agree, the evidence

8    will show, that ASM Sports actually trained Christian Dawkins

9    to break the rules -- not the federal law, but the NCAA

10   rules -- and they did it because the colleges asked them to.

11   And we expect the government to spend considerable time

12   presenting evidence of this rule-breaking, and in doing so,

13   will want you to dislike the fact that my client was breaking

14   the rules and helping families and helping schools secure the

15   commitments of these kids from those families.

16           You will hear telephone wiretaps where my client will

17   use language about breaking the rules.  You will hear my client

18   use bad words talking to people, coaches and others.  We don't

19   run from any of that.

20           Ladies and gentlemen, you take an oath to be a juror.

21   We are mindful of that oath and confident that you will fulfill

22   all the promises that you are going to make to be jurors, and

23   that when you do, and when you hear the evidence, we submit, if

24   you follow your oath and the law, we submit you will find

25   rule-breaking does not constitute law breaking.  They are two

1   distinctly separate things.

2           And based on the evidence, you will see that in

3   Christian Dawkins' mind, getting money from shoe companies, and

4   giving it to the family members of the players he sought, for

5   his company and himself, as future clients, was simply the way

6   you built loyalties, relationships, and took care of people.

7   That rather simple, logical thought process never included, one

8   second, the intent to defraud a university.  The universities

9   were feeders, and the necessary way station, and the mandatory

10  one-year stopping point for Christian Dawkins' hopeful clients

11  to one day get into the NBA, which was the only way Christian

12  Dawkins could make any money.  So what possible reason or

13  motive would he ever want to hurt the universities?

14          Now, the government in their opening statement offered

15  a theory that my client, Christian Dawkins, committed the crime

16  of wire fraud, somehow through his association with the father

17  of a former top high school basketball prospect by the name of

18  Brian Bowen, Jr.  I don't like nicknames, but I am going to

19  call him Tugs.  Because his dad's name is Brian too and I don't

20  want to confuse you.  Tugs Bowen committed to play at the

21  University of Louisville, but he never did.  But despite the

22  claims that the government has made about the relationship and

23  alleged illegal acts in relation to my client's association

24  with Brian Senior, the dad, let me tell you what they didn't

25  tell you.

1          They said that it was his friend.  Well, in reality,

2     the Dawkins and the Bowen family had a long-standing family

3     relationship that went decades back to where they all grew up,

4     in Saginaw, Michigan.  In fact, predated the birth of Tugs

5     Bowen.  That's how long they have known each other.  And the

6     evidence will show that when Tugs Bowen was as young as 12

7     years old, Christian Dawkins mentored him through his Loyd

8     foundation, coached him when he was in middle school on his AAU

9     basketball team called Dorians Pride.  Christian Dawkins

10    considered Tugs Bowen his little brother.

11         The evidence will show that long before Tugs Bowen

12    evolved into a bigtime basketball prospect, Christian Dawkins

13    supported him, paid for his travel expenses, his tournament

14    fees, gave him basketball shoes, even loaned his dad money on

15    occasion.  Imagine that.  The 19-, 20-, 21-year-old kid giving

16    money to Tugs Bowen's father because they were family.  And

17    Christian literally considered him as such.  And Brian Senior

18    is going to testify that they called Christian Uncle Chris,

19    unless he is going to lie.  We will see.

20         The evidence will show that, as Tugs Bowen did grow

21    older, and he did evolve into a five-star top basketball

22    player, and as the schools came calling, like Christian always

23    did, he was there for him, every step of the way, mentoring

24    him, giving him advice, giving him direction.  And the Bowen

25    family, the dad and the mom, looked to Christian Dawkins for

1    this advice, this support and information, and in monetary

2    assistance, which is fine by Christian.

3           That was the type of the relationship the families

4    had.  They were from Saginaw.  That may not mean anything to

5    anyone in this courtroom, but it will by the time we are done.

6    They had each other's backs, and that was a two-way street,

7    because that's the way the streets ran in Saginaw.  There are

8    no one-way roads in Saginaw, Michigan.  The Bowen family needed

9    help; they went to the Dawkins family.  The Dawkins family

10   needed help; they went to Bowen family.  They had been doing

11   that for decades.  That's what family was for.

12          Despite this theory of a conspiracy between my client

13   and Adidas, obviously you know now there are two Adidas fellows

14   sitting here and my client, and he is charged with conspiracy.

15   Ladies and gentlemen, you are going to see from the evidence,

16   throughout the entire time span involved in this investigation,

17   a few years, every single act my client engaged in, you are

18   going to find, he did for the benefit not of Adidas, but of

19   Adidas' archrival Nike.

20          Despite the theory that somehow Christian Dawkins

21   acted in some manner, with the intention of defrauding and

22   cheating the Adidas sponsor University of Louisville, by

23   influencing Brian Senior to have Tugs go to Louisville, the

24   reality of this case is going to be through the evidence, not

25   what I am telling you, because what I say is not evidence, but

1   you are going to see that during the final stages of the

2   recruiting process of Tugs Bowen, Christian Dawkins advised

3   Tugs Bowen and his dad he should go to five schools.  And you

4   are going to see evidence of that.  The five schools were

5   Oregon, Texas, Arizona, Michigan State and Creighton.  Not one

6   of those schools was Louisville.  And more unthinkably, not one

7   of those schools that I just named were sponsored by Adidas.

8   They were all sponsored by Nike.

9           In fact, you are going to learn from the evidence that

10  the primary school that Christian Dawkins was most strongly

11  advocating Tugs Bowen to attend, even insisting repeatedly to

12  his dad in text messages, go to Michigan State, go to Michigan

13  State.  There was a long history of Saginaw kids playing at

14  Michigan State and going on to the NBA.  Jason Richardson, for

15  one, that was Tugs Bowen's uncle.  Draymond Green, another one

16  from Saginaw, an all-star from the Golden State Warriors.

17  There was history at Michigan State.  Christian Dawkins is

18  texting the dad, go to MSU, a school located in East Lansing,

19  Michigan, an hour south of Saginaw, he could be home.

20          You are also going to learn that Michigan State, out

21  of those five schools I mentioned, was one of the only schools

22  that was not going to pay Brian Bowen to go there.  And you are

23  going to learn from the evidence that Brian Bowen, Sr. knew

24  that and so did Christian Dawkins.  Yet that school, Michigan

25  State, sponsored by Nike, not Adidas, was a school that if

1   Christian Dawkins had his way, Brian Bowen would have gone to,

2   and literally would be at right now.  A fact, I submit to you,

3   ladies and gentlemen, standing alone will be irreconcilable

4   with the government theory that Christian Dawkins schemed and

5   intended to influence Tugs Bowen's college decision by paying

6   his dad money to go to Louisville.  It is contrary to what you

7   are going to see in the evidence.  Christian Dawkins wanted

8   Tugs Bowen to go to a school where he could have the best

9   basketball fit.

10          Now, you are going to learn from testimony that not

11   until May 23, 2017 -- and Mr. Mark referenced this in his

12   opening statement.  This was at the eleventh hour.  This is

13   almost unheard of that a top prospect would wait this late to

14   make a college choice.  They have to be on campus in June.  So

15   we are at May 23, 2017, and at this point was the first point

16   where Tugs Bowen even considered to attend The University of

17   Louisville.  And he considered it as a possibility, not because

18   Christian Dawkins wanted him to go there, not because Christian

19   Dawkins influenced his dad to go there with money he got from

20   Adidas, but because, the evidence will show, certain kids left

21   certain schools and declared for the NBA draft, which is what

22   happens at that point of the year in May, and that opened the

23   door for Tugs Bowen to go to Louisville.  That is what the

24   evidence is going to show.

25          More specifically, the same week Tugs Bowen first gave

1   consideration to Louisville as a possibility, May of 2017, it

2   was only because the University of Louisville's star player

3   from the year before, Donovan Mitchell, who played the same

4   position as Tugs Bowen, he declared to the NBA draft and he

5   left Louisville.  And when he left Louisville, as a big

6   ball-skilled guard, like Brian Bowen, Jr., like Tugs was, that

7   opened the door for Tugs Bowen to go to Louisville and be his

8   replacement.  And you will see evidence of this.

9           Literally, at the same time that was occurring, you

10  are going to see evidence that Tugs Bowen was in fact ready to

11  go to the University of Arizona.  He had made his mind up.  But

12  unexpectedly a player, who played the same position, named

13  Rawle Alkins, he changed his mind about going to play in the

14  NBA, and he returned to the University of Arizona.  And when

15  that decision was made, Tugs Bowen and his father -- and you

16  will see evidence of this -- contacted Sean Miller, the coach

17  at the University of Arizona, and told Sean Miller that based

18  on the return of Rawle Alkins to Arizona, they did not feel

19  that Arizona would be the right place for Tugs Bowen anymore.

20          So, ladies and gentlemen, literally, had those two

21  things not have occurred, had not all the stars aligned,

22  literally, had Donovan Mitchell not left to go to the NBA, had

23  Rawle Alkins not returned to go to Arizona, Tugs Bowen never

24  would have gone to Louisville, period.  And we wouldn't even be

25  in this courtroom today, me and my client.

1      The evidence will show Tugs Bowen's recruitment and

2  last-second decision to go to the University of Louisville was

3  never orchestrated or influenced in any manner at all by

4  Christian Dawkins.  It was a product of a dad and a son sitting

5  down and making a decision of what was the best basketball

6  situation, and the government has simply missed it.

7      Now, there is going to be evidence, after Tugs Bowen

8  went to Louisville, not before, Christian Dawkins coordinated

9  for his dad to receive money.  There is going to be evidence of

10 that.  We don't run from that.  So what?  In fact, much of the

11 evidence the government will present in this case, as has been

12 noted, will be agreed upon.  But the disagreement will be the

13 application of the relevant law to those facts in evidence and

14 what the defendants intended to do by their actions.

15     And as that evidence is presented, you will hear

16 testimony and see evidence in this case that in Christian

17 Dawkins' mind he absolutely thought giving Brian Bowen, Sr., a

18 lifelong family friend, money was entirely allowed and

19 permissible under the relevant NCAA rules, which provided an

20 exception to a situation where, if you have a preexisting

21 relationship, you can give somebody money.  And you are going

22 to hear evidence that Christian Dawkins thought it was OK.

23     And the government will present the evidence that

24 eventually the money that was secured through Adidas to give to

25 Brian Senior was done after he went to Louisville.

1          You have heard from the judge that my client is

2    charged with the crime of defrauding universities.  The judge

3    has described the charges to you, and at the end of the trial

4    you will receive instructions on the law and the elements of

5    the crime of conspiracy and wire fraud, what the government

6    must prove beyond a reasonable doubt.  Proof beyond a

7    reasonable doubt is the highest level of proof we have in the

8    American legal justice system, and the government, not the

9    defense, has that burden of proof.

10          And as you sit here and listen to the evidence in

11   Christian's case, you will hear Christian's words on wiretaps.

12   You will hear him talking about what he needs to get players.

13   He will talk about how he needs to get money to give to Brian

14   Bowen, Sr., and give the money to others, including the AAU

15   basketball coach down in Orlando, Florida, named Brad

16   Augustine.

17          You see, for Christian, this is all part of his job,

18   doing what Andy Miller taught him to do, help poor families get

19   financial assistance, from any source available.  And the only

20   thing in Christian's mind, his only intent, is that those

21   payments would help families build trust, loyalty and

22   relationships that in the future make them his clients.

23          The best example of this government's charge is that

24   Christian Dawkins and Merl Code and Brad Augustine conspired to

25   defraud the University of Miami, when the evidence will show

1    the government got this completely wrong.  The government's

2    charge alleges that Christian Dawkins and Merl Code conspired

3    with a Florida AAU coach named Brad Augustine to pay $150,000

4    to the family of a top prospect named Nassir Little, in

5    exchange for his commitment to go to the University of Miami.

6    And in doing so, such agreement would have compromised Nassir

7    Little's eligibility and defrauded thereby the University of

8    Miami.  But, in actuality, that wasn't even close to what was

9    going on.

10          The evidence will show that Brad Augustine was

11   actually trying to con Adidas out of money.  There was nothing

12   he nor my client, Christian Dawkins, ever did, would, or could

13   have done that ever would have affected the eligibility of

14   Nassir Little.  There was no NCAA rule violation.  There was no

15   plan to violate any NCAA rule.  In fact, nobody ever had a

16   single conversation or dialogue with the family of Nassir

17   Little, and never had a single intention of giving Nassir

18   Little or his family money in exchange for a commitment to the

19   University of Miami.  You are not going to hear any evidence of

20   that because it doesn't exist.

21          Simply put, ladies and gentlemen, my client is charged

22   in this case for no other reason than he gave a lifelong family

23   friend, Brian Bowen, Sr., money, taking care of his family,

24   hoping one day the family would return the favor by their son

25   becoming a client.  Certainly, in doing so, he thought in his

1    mind he was helping everyone.  He certainly was helping Brian

2    Bowen, Sr., the dad.  He got paid.  And now he has cut a deal

3    to come into this courtroom and testify against a kid who he,

4    Brian Bowen, Sr., has been mooching off since he was a

5    teenager.

6            He was certainly helping the universities for getting

7    the benefit of a five-star McDonald's All-American, so they

8    could continue to make millions of dollars in revenue.  He

9    certainly was helping Tugs Bowen, by helping him find a school

10   where he could showcase his talents to go on to the next level,

11   to the NBA.  He certainly was helping his boss, Andy Miller,

12   who was directing him to cheat and break the rules so he could

13   get richer.  And like he was taught to do, he was also helping

14   himself so maybe one day he could be Andy Miller and live out

15   his dreams.

16           The evidence will show, ladies and gentlemen, bottom

17   line, Christian Dawkins could have cared less where Brian

18   Bowen, Jr. chose to continue his college basketball career,

19   provided that he chose a good basketball fit, that he chose him

20   when he was a manager, when he was done.  All these interests

21   were aligned, all these choices, no intention of cheating,

22   defrauding anybody.

23           Now, as Mr. Moore said, I would be remiss if I did not

24   thank you all for the incredible sacrifice you're making here

25   today, and are going to be making for the next several weeks,

1    as jurors in this case, and be away from your lives, your

2    families, your jobs, your loved ones.  It has been said that

3    jury service is the highest act of citizenship.  Those are not

4    my words.  Those were the words of Abraham Lincoln some 150

5    years ago, words that are appropriate today and apply as much

6    today as they ever have.  And thank you for the performance of

7    that civic duty.

8            So now that we embark upon the process of trial, and

9    that's what it is, a process to search for the truth, a search

10   of the facts, a search for justice, you all have this rare

11   opportunity, it seems to me, to be participants in this search

12   for truth and justice.  One of the greatest lawyers in the

13   history of this country named Clarence Darrow once said,

14   Justice has nothing to do with what goes on in the courtroom.

15   Justice is what comes out of the courtroom.  And as you embark

16   on this journey for justice, this search for truth, keep an

17   open mind so that people could look back one day at this trial

18   and say, that was a fair trial those guys got, and, more

19   importantly, they can say, those were fair people and justice

20   came out of that courtroom.

21           Thank you.

22           THE COURT:  Thank you, counsel.

23           We will take our afternoon break.  See you all in 15

24   minutes.

25           (Jury exits courtroom)

```
 1            (Recess)

 2            THE COURT:  The jury, please.

 3            MR. DISKANT:  Your Honor, would you like us to put the

 4    witness on the stand.

 5            THE COURT:  You are welcome to put him on the stand.

 6            You might tell us his name.

 7            MS. FLODR:  Her name is Special Agent Emily Eckstut.

 8            (Continued on next page)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              (Jury present)

2       EMILY ECKSTUT,

3            called as a witness by the government,

4            having so affirmed to tell the truth,

5            testified as follows:

6              THE DEPUTY CLERK:  State your name and spell your

7       first and last name for the record.

8              THE WITNESS:  Emily Eckstut, E-M-I-L-Y, E-C-K-S-T-U-T.

9              THE COURT:  You may inquire.

10      DIRECT EXAMINATION

11      BY MS. FLODR:

12      Q.  Special Agent Eckstut, where do you work?

13      A.  The FBI.

14      Q.  Is that also known as the Federal Bureau of Investigation?

15      A.  Yes.

16      Q.  What is your title?

17      A.  Special agent.

18      Q.  How long have you worked for the FBI?

19      A.  A little over four years.

20      Q.  Are you assigned to a particular group or unit at the FBI?

21      A.  Yes.  I work for a public corruption unit.

22      Q.  How long have you been on the public corruption unit?

23      A.  Since 2016.

24      Q.  What are your responsibilities as a special agent on the

25      public corruption unit?

1    A.   I work on crimes primarily involving public officials and

2    government fraud, including mail fraud, wire fraud, money

3    laundering, honest services fraud, among others.

4    Q.   Did there come a time when you became involved in the

5    investigation of James Gatto, Merl Code, and Christian Dawkins?

6    A.   Yes.

7    Q.   When was that?

8    A.   2017.

9    Q.   What was your role in the investigation?

10   A.   I monitored a wiretap.

11   Q.   What is a wiretap?

12   A.   Basically, a wiretap is when the government obtains

13   authorization from the court to listen in to certain phone

14   calls on a particular telephone line that could be evidence of

15   criminal activity.

16   Q.   During the course of this investigation, were phones

17   wiretapped?

18   A.   Yes.

19   Q.   Whose phones were intercepted?

20   A.   James Gatto, Merl Code, and Christian Dawkins.

21   Q.   Other than intercepting the phone calls of the individuals

22   you just listed, were there any other phones that were

23   intercepted?

24   A.   Yes, there were.  There were other individuals who were

25   being investigated whose phones were wiretapped.  In addition

1    to that, we had two undercover agents who had agreed to allow

2    their phones to be monitored.

3    Q.  Approximately how many wiretap investigations have you been

4    involved in in your career?

5    A.  About ten.

6    Q.  What types of cases involving wiretaps have you been

7    involved in?

8    A.  Mail fraud, wire fraud, money laundering, gangs, drugs,

9    just to name a few.

10   Q.  How does the FBI get authority to wiretap someone's phone?

11             MR. SCHACHTER:  Objection, your Honor.

12             THE COURT:  What is the objection?

13             MR. SCHACHTER:  Relevance.

14             THE COURT:  You have established that there was

15   authorization, right?

16             MS. FLODR:  Not yet, your Honor.

17             THE COURT:  Is there any dispute that there were

18   federal court-ordered wiretaps, all of them that the witness

19   has mentioned?

20             MR. SCHACHTER:  No.

21             THE COURT:  That's agreed by all?

22             MR. MOORE:  Yes.

23             MR. HANEY:  Yes.

24   Q.  Special Agent Eckstut, how long is a court-authorized

25   wiretap typically good for?

1    A.  30 days.

2    Q.  What happens at the end of 30 days?

3    A.  Either the government will seek to renew it or it will

4    expire.

5    Q.  In cases where the FBI continues to ask to continue to

6    intercept someone's phone calls, what process does the FBI have

7    to go through to get authority to do that?

8            MR. SCHACHTER:  Objection.

9            THE COURT:  Can't we move this along?

10            MS. FLODR:  Yes, your Honor.

11    Q.  Before the 30 days expires, do you have to provide any

12    updates to the court?

13    A.  Yes.  About every ten days we file what is called a ten-day

14    report with the judge, that will provide statistics about the

15    calls put down on the wiretaps.  For example, total number of

16    calls, the number of pertinent calls, meaning calls that are

17    relevant to the investigation, number of nonpertinent calls,

18    things like that.

19    Q.  After the FBI obtains court authorization for a wiretap,

20    what happens, technically speaking?

21    A.  So an agent will take the signed order back to our offices

22    and we will give it to the service provider -- AT&T, Verizon,

23    whoever it may be -- and they will then give us access to the

24    phone calls electronically.

25    Q.  Earlier you mentioned that you monitored the wiretaps in

1  these investigations.  What were you referring to when you said

2  that?

3  A.   That's right.  So after the order is signed, each agent

4  will review the sworn statement that describes the case, the

5  investigation, and we will literally go into a room called the

6  wire room, and it's got a security log with a code to get in,

7  and our unit has its own room set aside from all the other

8  rooms in the FBI because we deal with the most sensitive

9  investigations.  And certain agents who are working on the wire

10 are given access.  It's not something that any agent can do.

11 We are given access to the wire.  We go into the room.  We

12 enter our log-in information to get onto our computer.  We pull

13 up the wiretap software and we can listen to calls coming in in

14 realtime.

15 Q.   Is every part of every conversation recorded or only some

16 part of some conversation?

17 A.   Only some parts of some conversations.

18 Q.   Why are only some parts of some conversations recorded?

19 A.   Several reasons.  First, overnight we sometimes won't

20 monitor a telephone line because we might learn that the

21 subject sleeps at night, like most of us.  It could be that we

22 know that one of the subjects has a lawyer, and we know the

23 lawyer's number, so we will enter the lawyer's number into the

24 system so the calls are automatically blocked.

25         Also, when a wire goes up, every agent reviews what is

1  called minimization procedures, and given the intrusiveness of

2  a wire, given the invasion of privacy, we are required by law

3  to only listen to the calls that are relevant to the

4  investigation.  So what happens is when a call comes in, we

5  will listen to it for about two minutes and try to determine

6  whether it's relevant to the investigation.  If it's not, we

7  will shut it down, we will stop recording.  Then after about

8  another two minutes or so, we will do what we call spot-check,

9  which is we will just listen in for another 30 seconds or so to

10  see if the call has turned relevant.  If it hasn't, we will

11  shut down the recording again.  We will continue that until the

12  call is done.

13  Q.  When a call is recorded, what type of information is

14  captured?

15  A.  In addition to the audio, you get the telephone numbers of

16  the interceptees, you will get the time, the date, the duration

17  of the call.

18  Q.  How are these recorded calls saved for future use?

19  A.  They are just saved on the software.  You can quickly

20  listen to previous calls.

21  Q.  At the end of a court authorized period of interception,

22  what happens to the recorded calls?

23  A.  We have a whole technical team that sets up the wire, and

24  an agent from that team will download all of the data onto a

25  disk and bring that disk over to the courthouse, and a judge

1   will seal the disk in its chambers.  Then the agent will then

2   bring it back to our offices and we will store it in an

3   electronic evidence storage.

4   Q.  Why are the recordings maintained in this fashion?

5           MR. SCHACHTER:  Objection.

6           THE COURT:  Overruled.

7   A.  To preserve their integrity and because it's required by

8   law.

9   Q.  Earlier you mentioned that there were consensual wiretaps.

10  What are consensual wiretaps?

11  A.  That's when an FBI -- someone associated with the FBI has

12  agreed to have all of their calls monitored, or listened to,

13  recorded I should say.

14  Q.  In preparation for your testimony today, have you reviewed

15  records pertaining to the wiretaps that were obtained for

16  phones used by Mr. Gatto, Mr. Dawkins, and Mr. Code?

17  A.  Yes.

18  Q.  Does that include documents reflecting the call numbers for

19  those phones and the date ranges for the court-authorized

20  wiretaps?

21  A.  Yes.

22  Q.  Special Agent Eckstut, can you open the folder in front of

23  you and review what has been marked for identification as

24  Government Exhibit 3001.

25  A.  OK.

1    Q.  What is this?

2    A.  This is a chart indicating the names of the targets of the

3    wiretap, the telephone numbers, and the date range during which

4    the court authorized their phones to be wiretapped.

5    Q.  Have you reviewed this chart?

6    A.  Yes.

7    Q.  Does this accurately reflect the dates and phone numbers of

8    certain wiretaps relevant to this case?

9    A.  Yes, it does.

10          MS. FLODR:  The government offers Government Exhibit

11   3001 into evidence.

12          MR. SCHACHTER:  May I have just one moment?

13          No objection.

14          THE COURT:  3001 is received.

15          (Government's Exhibit 3001 received in evidence)

16          MS. FLODR:  Your Honor, may we publish this to the

17   jury?

18          THE COURT:  Yes.

19   Q.  Special Agent Eckstut, when was the first court-authorized

20   wiretap on Mr. Dawkins's phone obtained?

21   A.  June 19, 2017.

22   Q.  How long did the wiretap on Christian Dawkins's phone go on

23   for?

24   A.  It went through September 25, 2017, with the exception of a

25   period in between August 18 and August 22, 2017.

1    Q.  When was the first court-authorized wiretap on Mr. Code's

2    phone obtained?

3    A.  August 7, 2017.

4    Q.  How long did the wiretap on Mr. Code's phone go on for?

5    A.  Until September 26, 2017.

6    Q.  Was a wiretap obtained on Mr. Gatto's phone?

7    A.  Yes.

8    Q.  When was that?

9    A.  That was August 30, 2017 through September 26, 2017.

10   Q.  Were there consensual wiretaps that were obtained in this

11   case as well?

12   A.  Yes.

13   Q.  For whom were those consensual wiretaps obtained?

14   A.  Those were for the phones being used by our undercover

15   agents.

16   Q.  Where were those two undercover agents based?

17   A.  In New York.

18   Q.  In addition to these consensual wiretap recordings, did the

19   undercover agents record meetings as well?

20   A.  Yes, they did.

21   Q.  How were those types of recordings kept in the ordinary

22   course?

23   A.  So what happens is an agent will use an FBI recording

24   device that can pick up audio, video or both.  And when they

25   are done doing the recording, they will bring it back to our

1    offices, where they use computer software to download it onto a

2    disk, and they will then take that disk into our electronic

3    evidence storage.

4    Q.   In addition to the phone numbers we have been discussing

5    where there were wiretaps, during the investigation, did the

6    FBI identify other phone numbers associated with Mr. Code and

7    Mr. Dawkins?

8    A.   Yes.

9    Q.   How so?

10   A.   Through call records and listening to wiretapped calls.

11   Q.   Did the FBI obtain wiretaps to intercept those other phone

12   numbers?

13   A.   No.

14   Q.   Special Agent Eckstut, let's turn to another topic.

15              During your four years as a special agent, have you

16   been involved in the execution of search warrants on phones?

17   A.   Yes, I have.

18   Q.   How does the FBI obtain a search warrant for a phone?

19   A.   So what happens is when we believe that a particular phone

20   was used in connection with a crime, we work with the

21   prosecutors who prepare an application to be submitted to a

22   judge.  Within that application is a sworn statement by an FBI

23   agent detailing the facts, showing that we have probable cause

24   to believe that the phone contains evidence of a crime.

25   Q.   After the application is prepared, is it presented to

IA28GAT5                    Eckstut - Direct

1    anyone in particular?

2              MR. SCHACHTER:  Objection, your Honor.

3    A.  Yes.

4              THE COURT:  This is not a matter of controversy, is

5    it, Mr. Schachter?

6              MR. SCHACHTER:  No, your Honor.

7              THE COURT:  Let's go on.

8    Q.  Special Agent Eckstut, were the phone search warrants

9    obtained in this investigation?

10   A.  Yes.

11   Q.  On whose phones?

12   A.  On James Gatto, Merl Code, and Christian Dawkins.

13   Q.  How many phones did the government recover associated with

14   Mr. Dawkins?

15   A.  Two.

16   Q.  How many phones did the government recover associated with

17   Mr. Code?

18   A.  Two.

19   Q.  How many phones did the government recover associated with

20   Mr. Gatto?

21   A.  One.

22   Q.  How many phones did the FBI obtain warrants for?

23   A.  Five.

24   Q.  Was the FBI able to access all of these phones?

25   A.  No.  I understand that one of the phones belonging to

1   Christian Dawkins was password protected and we were not able

2   to retrieve the contents.

3   Q.  On the phones that the FBI was able to access the contents

4   of the phone, did the FBI identify text messages relevant to

5   this investigation?

6   A.  Yes.

7            MS. FLODR:  Your Honor, at this time, I would like to

8   read a part of a stipulation that has been marked for

9   identification as Government Exhibit S2.

10            THE COURT:  Members of the jury, a stipulation is an

11   agreement among all the parties to the case as to certain facts

12   that they want to put before you.  It is a way of presenting

13   the evidence more quickly and easily.  And of course it's

14   agreed by everybody to be true.

15            Government Exhibit S2 is such a stipulation.  It will

16   be available to you when you deliberate.  It has some

17   boilerplate recitals that you can look at in the jury room at

18   the end of the case if you are interested.  So counsel is just

19   going to read the substantive part.

20            I take it there is no objection and Government Exhibit

21   S2 is received, right?

22            MR. SCHACHTER:  No objection.

23            MR. MOORE:  No objection.

24            MR. HANEY:  No objection.

25            (Government's Exhibit S2 received in evidence)

1          MS. FLODR:  Paragraph 1.  Government Exhibits 101A

2     through 101Q, including all parts and subdivisions thereof, are

3     true and accurate copies of text messages and related content

4     sent or received using a cellular phone associated with the

5     call number 503-754-8013, and belonging to James Gatto, also

6     known as "Jim," the defendant.

7          Government Exhibits 103A through 103E, and 104A

8     through 104L, including all parts and subdivisions thereof, are

9     true and accurate copies of text messages and related content

10    sent or received using cellular phones associated with the call

11    numbers 708-314-3402, and 912-401-8240, respectively, and

12    belonging to Merl Code, the defendant.

13         Government Exhibits 102A through 102T, and 115A,

14    including all parts and subdivisions thereof, are true and

15    accurate copies of text messages and related content sent or

16    received using a cellular phone associated with the call number

17    989-493-4317 and belonging to Christian Dawkins, the defendant.

18    BY MS. FLODR:

19    Q.  Special Agent Eckstut, turning to one last topic.  Have you

20    been involved in the execution of search warrants on e-mail

21    accounts?

22    A.  Yes, I have.

23    Q.  Was an e-mail search warrant executed in this

24    investigation?

25    A.  Yes.

1   Q.  On whose account?

2   A.  An account associated with Christian Dawkins.

3   Q.  What was the e-mail address associated with that account?

4   A.  It was loydmgmt@gmail.com.

5          MS. FLODR:  At this time, I would like to read the

6   remainder of Government Exhibit S2, the stipulation.

7          THE COURT:  Go ahead.

8          MS. FLODR:  During the period of April 2015 through

9   March 2017, Christian Dawkins, the defendant, was the user of

10  the e-mail account loydmgmt@gmail.com maintained on the servers

11  of Google, Incorporated.  Government Exhibits 401 through 410

12  are true and accurate copies of certain e-mails and attachments

13  sent or received from that e-mail account.  The dates, times,

14  and identifying information of senders and recipients in these

15  documents are accurate.

16  BY MS. FLODR:

17  Q.  Special Agent Eckstut, other than monitoring the wiretap

18  and preparing for your testimony here today, did you have any

19  other involvement in the investigation of this case?

20  A.  No, I did not.

21         MS. FLODR:  No further questions.

22         THE COURT:  Thank you.

23         Cross-examination, Mr. Schachter.

24         MR. SCHACHTER:  Thank you, your Honor.

25         (Continued on next page)

1    CROSS-EXAMINATION

2    BY MR. SCHACHTER:

3    Q.  Good afternoon, Agent Eckstut.  My name is Mike Schachter.

4    I represent Jim Gatto.

5          Agent, you said that you monitored wiretaps as part of

6    your role in this investigation, is that correct?

7    A.  Yes.

8    Q.  And I believe you testified to something called

9    minimization instructions, is that right?

10   A.  Yes.

11   Q.  Those minimization instructions, are they also called

12   monitoring instructions?

13   A.  I believe so.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1    Q.  And the agents that monitored the defendants' cell phones

2    in this case were provided with monitoring instructions, is

3    that correct?

4    A.  Yes, that's right.

5    Q.  You discussed with the jury the kinds of things that an

6    agent needs to do before they walk into the room and start

7    monitoring people's calls, is that correct?

8    A.  Yes.

9    Q.  You testified that you go into a room, you listen to the

10   recordings, is that right?

11   A.  Yep.

12   Q.  In addition -- before doing that, however, every agent that

13   monitors one of the cell phones in this case was required to

14   read and sign those monitoring instructions that I just

15   mentioned, is that correct?

16   A.  They are supposed to, yes.

17   Q.  And every call that the agent -- withdrawn.

18          You testified that not all calls are recorded but --

19   are monitored because perhaps somebody may be asleep, is that

20   right?

21   A.  Right.

22   Q.  But when an agent does in fact monitor a call, that call is

23   required to be recorded, is that correct?

24   A.  Yes.

25   Q.  And you talked about how the agents that are monitoring

1    these calls, they determine whether the calls are the words you

2    used were pertinent or nonpertinent, is that correct?

3    A.   That is right.

4    Q.   So as an agent listens to a monitored call, they need to

5    make a determination whether that call is pertinent to the

6    investigation or nonpertinent, is that right?

7    A.   Yes.

8    Q.   And if the agent that is monitoring the call makes a

9    determination that the call is nonpertinent to the

10   investigation, then he or she is required to discontinue the

11   call and stop the recording, is that right?

12   A.   Yes, temporarily stops recording but after a certain period

13   of time you can start to listen again.

14   Q.   And that process is called minimization, I believe, is that

15   right?

16   A.   Yes, that's right.

17   Q.   But if the agent determined that the call in fact was

18   pertinent, then the agent should continue to monitor and record

19   the call, is that right?

20   A.   That's right, yes.

21   Q.   And every determination that an agent makes about whether

22   the call is pertinent or not is supposed to be recorded in a

23   log, is that right?

24   A.   Yes, we do mark whether it is pertinent or nonpertinent.

25   Q.   And that log -- where it's marked, the document that it's

1    marked in, those are called line sheets, is that correct?

2    A.  Yes.

3    Q.  And these line sheets are supposed to reflect every call

4    that the FBI monitors on the wiretapped calls, is that right?

5    A.  I believe so, yes.

6    Q.  And do you understand that these line sheets, they are

7    turned over to defense counsel if charges are brought in a

8    case, is that correct?

9    A.  That's my understanding, yes.

10   Q.  And in this case there were at least 37 different agents

11   that were assigned to intercept calls on the defendants'

12   phones, is that correct?

13   A.  I can't speak to the exact number of the agents, but I do

14   know that there were several agents.

15   Q.  If you were to look at the monitoring instructions that the

16   agents are supposed to sign and you were to count the number of

17   signatures, you would able to determine how many agents were

18   assigned, is that correct?

19   A.  How many agents were?

20   Q.  Were assigned to monitor the defendant' calls.

21   A.  Yes.

22   Q.  And do you know whether the number of signatures on the

23   monitoring instructions are about 37 different agents?

24   A.  I have never reviewed the signatures.

25   Q.  Do you know that there were over 6,670 calls on the

1   defendants' phones that were monitored during the roughly

2   three-month period that Ms. Flodr asked you about?

3   A.  No.  As I mentioned, my only role was to monitor the

4   wiretaps on certain days.  I have no knowledge of the total

5   number of calls recorded.

6   Q.  And those calls that you monitored, some were very short,

7   is that correct?

8   A.  Yes.

9   Q.  And some were much longer?

10  A.  Yes.

11  Q.  It could be a half an hour, it could be an hour?

12  A.  Sure.

13  Q.  And you understand that by marking the recorded calls as

14  pertinent or nonpertinent on these line sheets that are

15  provided to defense counsel, you understand that that provides

16  defense counsel with a roadmap to be able to identify which

17  calls the FBI thought were pertinent to the investigation, is

18  that correct?

19  A.  I'm not sure about a roadmap, but it should tell you

20  whether we thought it was relevant or not.

21  Q.  Thank you.  Now, as you said, you were one of the agents

22  who monitored the defendants' cell phones, correct?

23  A.  Right.

24  Q.  And you monitored calls on the defendants' cell phones as

25  early as July 1st of 2017, is that correct?

1   A.  I don't remember the specific date.

2           MR. SCHACHTER:  May I have a moment, your Honor?  I

3   have a binder of exhibits that we will use with Agent Eckstut.

4   May I pass that out to your Honor and to the government?

5           THE COURT:  Yes.

6           (Pause)

7           MR. SCHACHTER:  Your Honor, may I approach just to

8   provide it to defense counsel and the government counsel?

9           THE COURT:  Yes.

10          MR. SCHACHTER:  Your Honor, I have a binder for both

11  your Honor and your Honor's law clerk.

12          THE COURT:  Thank you.

13  BY MR. SCHACHTER:

14  Q.  The tabs are a little bit challenging to find, but if you

15  look in the -- on the right side, you'll see first GXs, or

16  government exhibits, and then you will see tabs for DXs, or

17  defense exhibits.  Do you see that, Agent?

18  A.  Yes, I do.

19  Q.  And can you turn to Defense Exhibit 201A.

20  A.  OK.

21  Q.  Does that refresh -- if you look to the second page, does

22  that refresh your recollection that you were monitoring the

23  defendants' cell phones as early as July 1st, 2017?  I just

24  direct your attention to the second line.

25          THE COURT:  The date is what?

Ia2dgat6                        Eckstut - cross

1              MR. SCHACHTER:  July 1st, 2017.

2      A.   Yeah.  I've never seen a line sheet in this case, but, yes,

3      this does seem to show that I was monitoring the wiretap on

4      July 1st.

5      Q.   And you testified regarding requirements that agents who

6      monitor the cell phones must read and sign the monitoring

7      instructions, is that correct?

8      A.   Yes, we're supposed to.

9      Q.   But is it correct that you did not actually sign -- you

10     didn't sign those instructions that are required by these FBI

11     procedures until two months after that?

12             MS. FLODR:  Objection.

13             Could we have a sidebar, your Honor?

14             THE COURT:  Yes.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. DISKANT:  I'm not quite sure where Mr. Schachter

3     is going with this.

4          THE COURT:  I will hear from the examining lawyer.

5          MS. FLODR:  Your Honor, it is unclear as to exactly

6     what relevance this line of questioning has to the testimony of

7     this agent.  She has indicated that she was monitoring

8     wiretaps, and the fact that -- I don't know exactly what is

9     going to happen.  And they are not challenging the authenticity

10    of the accuracy of the wires, that the minimization was

11    properly done in this case.

12         THE COURT:  What is the point?

13         MR. SCHACHTER:  The goes to the agent's creditability,

14    your Honor.

15         THE COURT:  To the agent's credibility?

16         MR. SCHACHTER:  Yes.

17         THE COURT:  Sustained.

18         (Continued on next page)

19

20

21

22

23

24

25

1          (In open court)

2     BY MR. SCHACHTER:

3     Q.   Now, Agent, you mentioned that every call that's monitored

4     by the agents is supposed to be marked as pertinent or

5     nonpertinent.  But is it correct that agents would sometimes

6     choose a third category, called "unknown"?

7     A.   It is entirely --

8              MS. FLODR:  Objection, your Honor.  Relevance.

9              THE COURT:  No.  I will allow that.

10    A.   So before agents monitor a wiretap, they will review

11    whatever directions are given to them by the case agents who

12    are managing the wiretap, and each case -- each wire has

13    different instructions based on what the case team wants to do

14    with marking -- whatever their marking system is.  I'm not -- I

15    can't recall exactly what the case seemed there, but there is

16    an option to choose.

17    Q.   I would like to -- you don't recall what the procedures

18    were in this case, is that correct?

19    A.   I don't.

20    Q.   I would like to direct your attention to Defense Exhibit

21    701 in that binder, and if you could -- I'm just going to

22    direct you to a portion of it.  If you could just read it to

23    yourself and let us know when you are done.  I will tell you

24    which portion.

25    A.   I'm there.

1          MR. SCHACHTER:  Can I have just a moment, your Honor?

2          (Pause)

3     Q.  If you could turn to page -- actually, let me ask you to

4     just flip a couple of documents earlier, to Defense Exhibit

5     698, and then ask you to look at page 11, the bottom half, the

6     last paragraph.  If you could just read that to yourself and

7     let us know when you are done, please.

8     A.  Are you talking about subsection F1?

9     Q.  F1 and then F2, please.

10         (Pause)

11    A.  OK.

12    Q.  Does that refresh your recollection that in fact there was

13    no direction to agents to classify any calls as unknown?

14         MS. FLODR:  Objection, your Honor.

15         THE COURT:  I don't think she testified one way or

16    another on that question.

17    Q.  Do you recall --

18         THE COURT:  Or has a lack of recollection.

19         MR. SCHACHTER:  OK.  I will move on, your Honor.

20    BY MR. SCHACHTER:

21    Q.  You understand that Mr. Gatto is charged in this case with

22    conspiracy to defraud certain universities, is that correct?

23    A.  Generally, yes.

24    Q.  And you reviewed I believe a, in order to -- well,

25    withdrawn.

1          And do you understand that one of those universities

2     that Mr. Gatto is charged with defrauding is the University of

3     Miami in connection with the recrement of a player named Nassir

4     Little?

5     A.   I believe so.

6     Q.   And isn't it true that there is a call that was marked as

7     "unknown" by the agents where Mr. Gatto indicates to Mr. Code

8     that he has not agreed to provide financial help in connection

9     with Miami's recruitment of Nassir Little?

10         MS. FLODR:  Objection, your Honor.

11         THE COURT:  And the objection is?

12         MS. FLODR:  This is hearsay.  There is also a

13    relevance argument here but it is hearsay.

14         THE COURT:  Sustained.

15    BY MR. SCHACHTER:

16    Q.   Agent, if you could please turn in your binder to Defense

17    Exhibit 200A.

18    A.   OK.

19         MR. SCHACHTER:  Your Honor, may I have a moment to

20    confer with government counsel?

21         THE COURT:  Sure.

22         (Pause)

23         MR. SCHACHTER:  Your Honor, may I have just one more

24    moment?

25         (Pause)

1    MR. SCHACHTER:  Your Honor, it has been stipulated

2  with government counsel that Defense Exhibit 200A is an excerpt

3  of the government's line sheets.

4  Q.  And do you see, Agent Eckstut, if you look to 200A --

5            THE COURT:  Let me find out whether that is the case.

6            Do you stipulate that that is what the document is?

7            MS. FLODR:  Yes, your Honor.  We did do that.

8            THE COURT:  All right.  Next.

9  BY MR. SCHACHTER:

10  Q.  Agent, if I could just direct your attention to the second

11  page of that exhibit.

12  A.  You are talking about 200A?

13  Q.  Yes.

14  A.  DX dot 200A?

15  Q.  Correct, Defense Exhibit 200A.

16  A.  OK, I'm there.

17  Q.  Do you see a portion of the government's line sheets dated

18  August 17, 2017, of a call --

19            THE COURT:  You are not allowed to discuss the

20  contents of a document that is not in evidence.

21            MR. SCHACHTER:  I see.  Thank you, your Honor.

22            Your Honor, we would offer Government Exhibit (sic)

23  200A, an excerpt of a line sheet of the government's.

24            MS. FLODR:  Objection, your Honor.

25            THE COURT:  Grounds?

1    MS. FLODR:  Hearsay, and also Special Agent Eckstut is

2    not even listed on this document, anywhere on this document.

3          THE COURT:  What is the answer to the hearsay,

4    Mr. Schachter?

5          MR. SCHACHTER:  Your Honor, it is -- the agent

6    testified regarding the wiretaps that are kept in the ordinary

7    course of business.  The line sheets of the wiretap, which are

8    kept in the ordinary course of the agent's business, the agent

9    described the requirement that agents identify calls as

10   pertinent or nonpertinent or -- pertinent or nonpertinent.

11   This is -- there will be evidence in this case that this is a

12   pertinent call.

13         THE COURT:  And that's an answer to the hearsay

14   objection, you are telling me, because of business records?

15         MR. SCHACHTER:  I can lay a further foundation.

16         THE COURT:  You might start by laying part of the

17   foundation.

18         MR. SCHACHTER:  Thank you, your Honor.

19   BY MR. SCHACHTER:

20   Q.  Agent, are line sheets kept in the ordinary course of

21   business of agents who are monitoring wiretaps?

22   A.  I'm not entirely sure.  This is what I know, that our

23   calls -- the calls that come into our wiretap come into our

24   software, and using that software you can download line sheets.

25   I'm not sure if we maintain that or for how long aside from,

1   you know, when we download the calls and have them sealed by

2   the judge and store them into evidence, I'm not sure if the

3   line sheets are kept on that same disc.  I just don't know.

4   Q.  But in the ordinary course of business as an FBI agent, as

5   you monitor calls, are you required to write down information

6   in a log, is that correct?

7   A.  We write down information into the computer software, and

8   then you can then create a report from the information.

9   Q.  And I believe you described in your testimony that that

10  kind of log is called a line sheet, is that correct?

11  A.  Yes.

12  Q.  And you -- every time you monitor a call, you log it in the

13  line sheets in the ordinary course of your business as a

14  monitoring FBI agent, is that correct?

15  A.  We log it into the software, and then the case agent will

16  then create log sheets from what we do.

17  Q.  And the case agent does that in the ordinary course of that

18  agent's business as an FBI agent?

19  A.  Yes.

20          MR. SCHACHTER:  Your Honor, we will offer 200A.

21          MS. FLODR:  Your Honor, we still stand on our

22  objection that this is hearsay and also hearsay within hearsay,

23  because in these line sheets, even the titles, maybe that could

24  constitute a business record, which we dispute, but in addition

25  to that, within the line sheets there are summaries of what the

Ia2dgat6

1    calls actually contain.  And that is the defendant's own

2    statement that Mr. Schachter would like to be offered for the

3    truth here, and that is hearsay within hearsay.

4              THE COURT:  OK.  Members of the jury, see you at 9:30

5    tomorrow morning.  I am not going to have this conversation

6    with you standing by sitting there.

7              THE CLERK:  Will the jury please come this way.  You

8    should bring your notebooks with you.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ia2dgat6

```
 1              (Jury not present)

 2              THE COURT:  Have a seat, folks.

 3              Maybe the agent should step out.  Would you just exit.

 4     And you are not needed for my purposes until 9:30 tomorrow.

 5              THE WITNESS:  OK.  Thank you, your Honor.

 6              THE COURT:  What are you trying to do, Mr. Schachter?

 7              MR. SCHACHTER:  Your Honor, the government is relying

 8     on wiretaps in this case substantially in order to prove their

 9     case as to what was discussed between -- amongst themselves

10     with basketball coaches, and, in fact, what we wish to adduce

11     evidence of is that the investigation instead was very

12     incomplete and we think that's information that the jury should

13     understand.  For example -- in two different ways.  One is that

14     the agents identified certain calls.  They didn't follow their

15     procedures in identifying calls as pertinent or nonpertinent,

16     these line sheets which go to defense counsel.  Instead --

17              THE COURT:  Mr. Schachter, how many calls did you say

18     were monitored just for sake of argument?

19              MR. SCHACHTER:  6,670.

20              THE COURT:  Now, your assertion to me now, among other

21     things -- and this is really collateral but I am just making a

22     point -- is that the instructions were, in all cases, that

23     there were two options, pertinent and nonpertinent, right?

24              MR. SCHACHTER:  That was the agent's testimony.

25              THE COURT:  Maybe/maybe not.
```

1          Look at the first page of this exhibit.  It says,

2     "Classification is nonpertinent, pertinent, no audio content,

3     not monitored, duplicate session, unknown, malfunction,

4     voicemail, administrative, filter applied."  Now, am I

5     misreading that or is "unknown" among the options printed on

6     this sheet?

7          MR. SCHACHTER:  But it is not an option on the

8     monitoring instructions that are provided to the agents.  I

9     don't know what this sheet of paper means.  I only got it from

10    the government.  I don't know what "unknown" is supposed --

11         THE COURT:  You have one piece of paper that had the

12    instructions for all 6,000 calls and then they are identical

13    for all of them; is that what you are telling me?  Or are you

14    pointing to one minimization order out of a vast bundle that

15    may or may not be the same?

16         MR. SCHACHTER:  Your Honor, in the binder I believe

17    are the monitoring instructions that the agent signed as well

18    as the other ones pertaining to the wiretaps of these

19    defendants.

20         THE COURT:  Might I please have an answer to the

21    question I asked?

22         MR. SCHACHTER:  I'm sorry, your Honor.  I didn't

23    understand it.

24         THE COURT:  Are you telling me there is one piece of

25    paper with identical monitoring instructions that cover all

1    6700 calls, or are there many pieces of paper?  And if there

2    are many pieces of paper, are they different, or not?

3              MR. SCHACHTER:  Your Honor, what I understand -- if I

4    may direct the Court's attention to Exhibit 699, for example?

5    These are monitoring instructions that the agents for the

6    entire month are supposed to follow --

7              THE COURT:  I'm sorry.  I couldn't hear everything you

8    said.  Agents for what?

9              MR. SCHACHTER:  That the agents are supposed to

10   review, follow, and they sign the instructions.  So this, for

11   example, I believe to be the instructions that all agents are

12   required to follow for the wiretap on these two phone numbers,

13   which I believe are Mr. Dawkins' phone numbers for the

14   one-month period.  I believe that the agents, as they go into

15   the wire room, are supposed to sign the instructions,

16   understanding that they are supposed to follow these

17   instructions.

18             THE COURT:  Understood.  Now, are you telling me that

19   there is one such document that covers 6,000 calls, or are you

20   not telling me that?

21             MR. SCHACHTER:  Exhibit 700 is a nearly identical

22   wiretap monitoring and -- I'm sorry, Exhibit 700, if I didn't

23   say that, is a nearly identical wiretap monitoring and

24   minimization instruction for phone number 708.314.3402.

25             THE COURT:  "Nearly identical."  What are the

Ia2dgat6

1  differences?

2          MR. SCHACHTER:  Well, it is no differences that they

3  invite agents to identify calls as unknown because that would

4  make it very difficult for defense counsel to identify what are

5  relevant calls.  When defense counsel receives line sheets --

6          THE COURT:  How about reading the line sheets?  Do you

7  think that might be a way?

8          MR. SCHACHTER:  Of course, your Honor.  However, when

9  they are identified as pertinent, those, of course, that's the

10  roadmap for counsel to identify which of the 6,670 calls --

11          THE COURT:  What is a roadmap for what particular FBI

12  agents at particular times on particular days, with universes

13  of knowledge that change over time as the investigation

14  developed, and understanding of the background of the case that

15  were not even necessarily common on the same day among all the

16  agents working on the matter?  And if defense counsel choose --

17  and I'm not commenting one way or the other -- to accept those

18  kinds of characterizations as being the "roadmap of the case"

19  and take the chance that agents were not fully informed, didn't

20  know facts that developed later that made something that

21  initially appeared not pertinent pertinent, and a host of other

22  variables and elected not to read the evidence, well, that's a

23  problem for you, perhaps.

24          MR. SCHACHTER:  I certainly understand that, your

25  Honor.  I just -- our purpose in going down this line of

1    examination is because we believe that we should be permitted

2    to cross-examine the FBI Agent who is testifying about the

3    wiretap procedures about different flaws in their procedures.

4    If your Honor disagrees, I certainly understand that and I

5    can --

6            THE COURT:  What are you talking about?  What flaws?

7            MR. SCHACHTER:  Well, for one thing, the monitoring

8    agent was unable to identify a very relevant and in our view

9    exculpatory call.  They didn't mark it as pertinent.  Rather,

10   they marked it in this unknown category such that it was

11   effectively buried.

12           THE COURT:  If this isn't the definition of a

13   situation where if the subject that you're seeking to go down

14   has any probative value whatsoever, the waste of time and the

15   risk of confusion so substantially outweighs it that nobody

16   should take another second on it.

17           MR. SCHACHTER:  Your Honor, I understand the Court's

18   view, and I understand that the objection will be sustained and

19   I have another line.

20           THE COURT:  I asked you a question.  I am inviting

21   persuasion.  But what it looks like to me so far --

22           MR. SCHACHTER:  That requires capability to persuade.

23           THE COURT:  -- is that if this line of cross

24   examination is going to be in any way indicative of the case, I

25   should tell the jury to be prepared to be here on Easter.

Ia2dgat6

1          MR. SCHACHTER:  Your Honor, I had really I think maybe

2     one more question, which was this call on this date was marked

3     as "unknown" by the agent agents monitoring the call.  That was

4     all I intended to do with respect to that call.

5          MS. FLODR:  Your Honor, that didn't require offering

6     these line sheets as evidence in the record, and we would have

7     no objection if that was the actual question.

8          MR. SCHACHTER:  I don't need to offer them --

9          THE COURT:  If that's the point, I presume you would

10     stipulate to it?

11          MS. FLODR:  Yes, your Honor.

12          THE COURT:  And, indeed, I don't understand why this

13     witness was called at all, because in virtually any case I have

14     tried, this stuff all would have been stipulated.  This is,

15     after all, as I understand it, a case in which, based on the

16     defense openings, there is really not much dispute as to any

17     event or thing that happened.  Your argument is all what was in

18     the minds of your clients when it occurred; right?

19          MR. SCHACHTER:  Your Honor, we stipulated to -- we

20     don't know why the government is calling this witness, either.

21     We have told the government that we would stipulate -- I

22     mean --

23          THE COURT:  I'm not all that excitedly happy with the

24     fact that they called the witness, either, frankly.

25          MR. SCHACHTER:  We don't believe there is issues on

1  authentication --

2          THE COURT:  It is beginning to sound to me like this

3  case could be tried in ten days if you people spoke reasonably

4  to each other.

5          MR. SCHACHTER:  I have found the government very

6  reasonable.  And we have I think had very productive

7  dialogues --

8          THE COURT:  I think Mr. Code agrees with me; right,

9  Mr. Code?

10          MR. CODE:  Yes, your Honor.  We'd be over in ten days

11  or less.

12          THE COURT:  I'm sorry?

13          MR. CODE:  We could be over in ten days or less, your

14  Honor.

15          THE COURT:  Yes, without a doubt.

16          MR. SCHACHTER:  So, your Honor, that was one line of

17  examination with respect to this witness.

18          The other line has to do with just explaining to the

19  jury the completeness of the wiretaps, or the lack of

20  completeness.  There are, for example, a number of very

21  important calls -- withdrawn.

22          There are a number of calls that occurred among --

23  that the defendants had with people that are very relevant to

24  this investigation and for whatever reason those calls simply

25  were not recorded at all.  We can demonstrate that.  For

1    example, there are multiple calls with -- one of the targets of

2    the wiretap is a person who was mentioned in opening statement,

3    Sean Miller, who is a coach at the University of Arizona.

4    There are many calls where the defendants have calls with

5    someone who is listed on the monitoring instructions as someone

6    that the agents are supposed to be focused on, and those calls

7    are not recorded, they are not on the line sheets, and we

8    believe it is important for us to be able to say that these

9    wiretaps are in no way the entirety of any kind of story

10   because --

11              THE COURT:  Well, I think you've already established

12   that, haven't you?

13              MR. SCHACHTER:  Well, your Honor --

14              THE COURT:  Not in the rhetorical fashion as you

15   express it, but isn't it clear and hasn't there been testimony

16   already this afternoon that there were lots of things that

17   weren't recorded?  Isn't that true?

18              MR. SCHACHTER:  Well, there was testimony that if

19   people were asleep -- once they learned that a target of the

20   wiretap was asleep, then perhaps it wasn't monitored.  I don't

21   believe that we -- or if it was privileged, they would turn off

22   the recording -- they would not listen to it.

23              THE COURT:  I'm sorry.  Once they learn that the

24   person was asleep?

25              MR. SCHACHTER:  The Agent's testimony was that once

170

Ia2dgat6

1    they learn that the practices of a particular target of a

2    wiretap was asleep at a particular hour --

3            THE COURT:  It was past bedtime.

4            MR. SCHACHTER:  -- then they wouldn't listen to it

5    because the agents would go to sleep, too, was the testimony of

6    the Agent.  Or the agent testified --

7            THE COURT:  I have been doing this a long time but I

8    haven't heard the sleep defense before.

9            MR. SCHACHTER:  Our defense is not entirely sleep,

10   your Honor.  Or the agent said that if they saw a phone number

11   which they knew was one of the target's lawyers, they would

12   also not listen to that call.  That's been the extent of the

13   testimony.

14           What we have is a series of calls that are patently

15   occurring between -- the phone records show are between the

16   defendants and, for example, Coach Sean Miller, and we wish to

17   establish that there are all of these calls which occurred,

18   according to the phone records, and there is no recording.

19           THE COURT:  Did you ever propose a stipulation to the

20   government with the naked facts that you are saying you are

21   trying to establish?  Put aside for the moment whether they are

22   relevant but let's just assume.  Did you ever do that?

23           MR. SCHACHTER:  I did not, your Honor, but I will.

24           THE COURT:  OK.  So we have 18 jurors, a judge and two

25   law clerks here because you haven't had a serious conversation

Ia2dgat6

1    about this.

2              MR. SCHACHTER:  I apologize, your Honor, and we will

3    prepare a stipulation this evening.

4              THE COURT:  You know, I'm not criticizing you alone.

5              Let he's go to work, all right, and let's see whether

6    we can begin shortening this trial not in a way that prejudices

7    anybody's rights at all.  Let's get to the meat of this.

8              MR. SCHACHTER:  Yes, your Honor.

9              THE COURT:  OK.  All right.

10             Anything else we can usefully accomplish this evening?

11             MR. DISKANT:  So along those lines, your Honor, I

12   think the parties have conferred regarding the issue of other

13   NCAA violations.  I started to raise this this morning.  I

14   think presently the only issue that requires Court action, at

15   least in the immediate future, is the nature of the facts

16   involving Louisville, that is, the incidents involving

17   prostitutes and the like that resulted in punishment for the

18   University of Louisville.  The government remains of the view

19   that that is not an appropriate subject for this trial.  But

20   aside from that, I think the parties, at least for now, have

21   reached agreement on the government exhibits.  There may be

22   defense exhibits we are going to object to and will object to.

23   But that seems to be the primary issue that may require the

24   Court's attention.

25             THE COURT:  All right.  So what exactly is it that the

| 1 | defense wants to do about the Louisville -- the previous

| 2 | Louisville scandal, and what's the government's objection to

| 3 | it?  Let's hear that now.

| 4 |           MR. HANEY:  Your Honor, when the University of

| 5 | Louisville asked for the assistance of my client particularly

| 6 | to break NCAA's rules, they were on probation at that time, and

| 7 | we think that is relevant to his state of mind as to how

| 8 | serious Louisville treated NCAA rules' violations.  So, it goes

| 9 | to credibility.  It goes to state of mind of the witness.

| 10 |           THE COURT:  All right.  But I asked you what exactly

| 11 | it is that you wished to put into evidence, as opposed to your

| 12 | closing argument?

| 13 |           MR. HANEY:  To introduce the existence of the fact

| 14 | that Louisville was on probation at the time they solicited and

| 15 | asked my client to help break rules to get players into

| 16 | Louisville.

| 17 |           THE COURT:  And the "they" was, no doubt, the Board of

| 18 | Trustees of the University of Louisville, right?

| 19 |           MR. HANEY:  It was the coaches, your Honor.  No.

| 20 |           THE COURT:  All right.  Now, is there any problem with

| 21 | the government stipulating to the naked fact that Mr. Haney

| 22 | says is what they want to prove?  Fact number one, on a date in

| 23 | question, whatever it was -- I don't know offhand, but whatever

| 24 | it was, the University of Louisville was on probation for a

| 25 | prior major violation of NCAA rules.  That's the essence of it,

right?

MR. HANEY: I would agree, and I think we can meet in the middle and not get into particularly the reasons for that.

THE COURT: Right.

MR. HANEY: As long as there is an understanding that it is relevant to the state of mind of my client that if they are asking him to do those things while they are on probation --

THE COURT: It is not relevant to the state of your client's mind unless and until there is competent evidence that he knew about it.

MR. SCHACHTER: Your Honor, the specifics of the incident are discussed on wiretapped calls, so --

THE COURT: I don't know what's on the wiretaps. So, obviously you are going to have to help me. I asked --

MR. SCHACHTER: We will put something in.

THE COURT: I asked what was the fact or facts you are trying to prove. Mr. Haney told me. And I responded to the very bare statement he gave me. If there is something else, somebody has got to tell me.

MR. HANEY: Your Honor, I would suggest we get together with the government and we have a conversation as the Court has noted and save the Court's time. We can work all this out if we just communicate. That's how I feel about it.

THE COURT: Well, I'm not surprised because I know

Ia2dgat6

1    I've got a lot of very talented lawyers in this room.  I'm just

2    surprised nobody has talked about this yet.

3          MR. DISKANT:  Your Honor, we are obviously happy to

4    continue talking with defense counsel.  We have talked about

5    it.  I have a feeling the problem is going to be -- and we

6    addressed this in a letter we filed last week -- the problem is

7    going to be that the facts are somewhat complicated and in

8    particular the facts with respect to whom at the University was

9    aware of this conduct giving rise to probation and the like.

10   All of this is very, very relevant to what I anticipate the

11   defense argument in closing is going to be.

12         THE COURT:  I'm unsure.  I mean, I rather imagine that

13   the government's position may be that if it was the coach who

14   knew what had been going on and it was the coach who provoked

15   whatever the defendants did in the Bowen case I guess it was,

16   that the knowledge and actions of the coach are not

17   attributable to the University, for reasons that we've

18   discussed previously.  I imagine that's your position, is it

19   not?

20         MR. DISKANT:  It is, your Honor.  But I think with

21   respect to the prior incident, my concern is that the

22   defendants are going to try and make arguments to the jury that

23   when John Carns, the Director of Compliance, testifies that he

24   and the compliance department and the University administration

25   take compliance seriously, that the jury should call that

1    statement into question because the University was already on

2    probation and coaches were nonetheless engaged in misconduct.

3    And that begins to confuse the issues if the jury is allowed to

4    hear just that because there is a lot more to it.

5              MR. HANEY:  May I respond briefly?

6              THE COURT:  Yes.

7              MR. HANEY:  It is important to note that when those

8    violations occurred, Mr. Carns will be testifying that it

9    occurred on his watch.  I believe it goes to his credibility

10   why he was a part of the process --

11             THE COURT:  So now you're quite a bit beyond wanting

12   to establish simply the fact that on the date of whatever the

13   relevant event in this case was, they were on probation; you

14   are going way beyond that, right?

15             MR. HANEY:  Only specific for my client to that one

16   particular witness at Louisville who was a compliance director

17   who was there in the Department of Compliance when those

18   actions occurred and he -- nobody else did anything about it.

19   They didn't fire any coaches.  Nothing happened.  Those coaches

20   didn't get fired when they went on probation.

21             THE COURT:  I'm sorry.  What coaches when they were on

22   probation --

23             MR. HANEY:  Their basketball coach, your Honor, did

24   not get fired when those events occurred.

25             THE COURT:  When which events occurred?

Ia2dgat6

1          MR. HANEY:  The events that gave rise to them being

2     put on probation in --

3          THE COURT:  What did the NCAA adjudication say about

4     his personal knowledge and involvement?

5          MR. SCHACHTER:  Your Honor --

6          THE COURT:  I'm sorry.  I'm asking Mr. Haney a

7     question.

8          MR. HANEY:  I'm not certain exactly what the NCAA

9     adjudication was about his knowledge and the --

10         THE COURT:  Well, isn't there something in that big,

11    fat document that you submitted to me this week -- the defense

12    submitted to me this week, maybe last week?

13         MR. MOORE:  Last week.

14         THE COURT:  Well, what does it say, Mr. Moore?  It

15    looks like you read it.

16         MR. MOORE:  I did.  I didn't write it but I read it.

17         THE COURT:  I am sure you didn't write it.

18         MR. MOORE:  And what it says is that Coach Patino

19    should have been more careful, should have taken pains, should

20    have done X, Y and Z.

21         THE COURT:  I.e., he didn't know.

22         MR. MOORE:  And it criticizes his actions failing to

23    supervise.  And then after the NCAA criticized his actions for

24    trying to supervise, the reaction from Louisville, from the

25    higher ups at Louisville, was to say that that was unfair --

Ia2dgat6

1   the NCAA findings with respect to Coach Patino were unfair and

2   they would appeal.  And so I think a point --

3           THE COURT:  And then what happened?

4           MR. MOORE:  That I don't know, to be honest with you.

5   I haven't looked any further than that.

6           THE COURT:  Mr. Schachter.

7           MR. MOORE:  Mr. Schachter probably knows that.

8           MR. SCHACHTER:  I know.

9           Your Honor, these events occur right at the -- right

10  in advance of the wiretaps in this case.  This is June 2017 is

11  when the NCAA comes out with its sanction against Louisville.

12  It finds that for a three-and-a-half year period, in the

13  basketball dormitory, with campus security outside, with

14  resident assistants there --

15          THE COURT:  I read your papers.

16          MR. SCHACHTER:  I apologize, your Honor.

17          That this went on for three-and-a-half years, and they

18  sanctions the University of Louisville.  They find specifically

19  that Coach Patino failed to rebut the presumption that he

20  should be held responsible for this conduct.  And

21  notwithstanding that very -- that negative finding by the NCAA,

22  the University of Louisville -- and this is just as -- as

23  Mr. Dawkins, as these events are occurring, where they are

24  interacting with coaches from the University of Louisville, it

25  is just after --

1          THE COURT:  OK.  And so your point is, I guess, that,

2     therefore, assuming the facts are as you say, therefore, the

3     jury is entitled to infer that everybody knew the University of

4     Louisville didn't really care what happened vis-a-vis NCAA

5     rules, perfectly fine to make payments to college kids to get

6     them to Louisville and all of that.  And so we are supposed to

7     reason from the prior Louisville scandal, because red cops were

8     in the dormitories when the hookers were brought in, that this

9     was all fine with the Board of Trustees?

10          MR. SCHACHTER:  I would say that that's not the point.

11     The point is --

12          THE COURT:  Of course, I'm guilty of a little

13     hyperbole, I know that, but I am making a point.

14          MR. SCHACHTER:  I think our point is more specific

15     than that.  It is not that everybody would draw that

16     conclusion.  Our point is that the jury should be able to draw

17     an inference or reject the inference --

18          THE COURT:  Right.  I understand --

19          MR. SCHACHTER:  -- of the defendants.  Because right

20     after this occurs, Mr. Dawkins is in a room with an assistant

21     coach of the University of Louisville as $12,700 in cash is

22     handed over to somebody.  And what the coach says, or the

23     discussion in front of the coach, is, well, we're on probation

24     so we need to keep this pretty quiet.  And there is discussion

25     that Mr. Dawkins had --

Ia2dgat6

1          THE COURT:  Pretty clear that coach didn't care what

2     was going on, I understand that.

3          MR. SCHACHTER:  Well, the issue is, to the defendants,

4     who is the University?  And that is an argument that the

5     government is going to say it's not the assistant coaches, it

6     is not the coaches.  The defendants had no ability -- they had

7     no right to think that this is something that the universities

8     wanted.  Our argument is to the contrary.  Our argument is this

9     was relevant to assessing their state of mind, the fact that

10    there was -- I apologize, your Honor.

11         THE COURT:  Look, I do not in any way minimize the

12    significance of the issue of who is the University of

13    Louisville here.  That is at the heart of the case.  I

14    understand that.  I understood it for a long time.

15         I understand what you want to argue.  The concern on

16    my part is how probative is the argument.  Is it one on a scale

17    of one to ten or is it eight or nine?  It's somewhere on the

18    scale.  It is not zero.  I give you that, it is not zero.  And

19    is it high enough -- and I don't mean to be playing with the

20    burden of proof, I'm just thinking out loud -- is it high

21    enough to warrant getting us into a trial of what happened with

22    the last Louisville problem, which is where this may logically

23    go?  Why is that not true?

24         MR. SCHACHTER:  Actually, we started to discuss this

25    with the government at the conclusion of court yesterday.  I

Ia2dgat6

1   think that -- as I said, I think that our questions of

2   Mr. Carns on this subject is probably 15 minutes.  Nobody --

3   our purpose would not be to -- I think, actually, many of the

4   facts, they are not in dispute, and so I don't think there is

5   an issue.  The NCAA found -- and I don't think the government

6   contests it and we are in no position to challenge it, and all

7   that matters is the facts that were out there that the

8   defendants heard, because it goes to their state of mind,

9   whether or not they are true, not true, we don't need to

10  litigate that because it is irrelevant.

11       THE COURT:  Look, the defendants' state of mind may or

12  may not be coextensive with whatever the facts were.  They may

13  have known a piece of the story.  Their states of mind may

14  include bits of truth and bits of unreliable gossip.  They may

15  have thought it was reliable.  Maybe they didn't think it was

16  reliable.  It's a subtle and difficult picture, and I'm trying

17  to see my way clear to a logical way to resolve what, if

18  anything, should come in about the Louisville earlier episode,

19  and that's why I asked Mr. Haney what I asked him.

20       What is it you wanted to prove?  So, he gave me a very

21  simple answer.  It looked very easy.  Now it is getting more

22  complicated.

23       MR. SCHACHTER:  With respect to Mr. Dawkins, he

24  actually describes what he knows or what he understands about

25  the Louisville incident that's captured on tape.  He discusses

1    it on multiple occasions and he also --

2            THE COURT:  Maybe.  I mean, I haven't heard any of

3    those tapes.  I don't know what's in them.  Don't know what his

4    motives were when he said whatever he said.  Don't know whether

5    he was trying to impress somebody, whether he was making it up

6    as we went along.  I cast no aspersions.  I make no judgment of

7    their credibility.  Nothing like that.  But we all know that

8    what goes down in a casual conversation may or may not

9    truthfully reflect the state of mind of the individual.

10           I understand it is a jury question, probably, but

11   to -- well, enough on that.

12           MR. SCHACHTER:  The Circuit, we cited a case called

13   United States v. Brant, I believe it is from 1952, which talks

14   about the idea that when you're talking about evidence in a

15   fraud case that goes to a defendant's intent, that

16   admissibility should be viewed extremely broadly.  And this is

17   evidence, your Honor, that the government can make arguments as

18   to what weight, what inferences the jury should draw --

19           THE COURT:  Yeah, sure.  But that goes to the

20   question, in my view principally, of evidence of what he said

21   at the time, because that either reflects his state of mind or

22   something else odd is going on, or it is said for effect, or

23   whatever.  I don't know what.

24           But now you're getting into a whole other kettle of

25   fish.  Based on what you say, he knew or thought he knew

Ia2dgat6

1   something about the prior Louisville scandal.  I'm sure he did.

2   That's a different matter from getting in everything anybody

3   wants to throw on the table about the prior Louisville scandal.

4           MR. SCHACHTER:  I think, your Honor, this is a very

5   difficult answer in the -- to discuss in the abstract.

6           THE COURT:  Yes.  I agree with you.

7           MR. SCHACHTER:  I think it might be easiest for the

8   Court if we were to provide something in writing which

9   identifies what are the particular facts that we are talking

10  about eliciting from Mr. Carns, because then the Court can see

11  it in black and white.  And I believe that if your Honor sees

12  that and if the government sees it -- we were talking about

13  having that discussion; we have not had that discussion yet --

14  I believe that everybody will see --

15          THE COURT:  It is a little past due.

16          MR. SCHACHTER:  This is no effort to have a minitrial

17  but, rather, this is a pretty compressed line of issues -- of

18  facts which I think at the end of the day are not going to be

19  in dispute between the government, us, and Mr. Carns, and so --

20          THE COURT:  That may be, absolutely may be.

21          MR. SCHACHTER:  So my suggestion would be that we give

22  it a shot at putting pen to paper on exactly what it is we are

23  talking about and discussing with the government and seeing if

24  we can't reach agreement.

25          THE COURT:  See what you can agree to and, if not,

crystalize the dispute the better. I agree. A blessing on your heads in doing it.

Anything else?

MR. MOORE: Can I ask one question, your Honor, because I am not from around here?

THE COURT: Oh, I've heard that line before. "I'm just a country lawyer."

MR. MOORE: Well, I'm a simple --

THE COURT: When I go to Georgia and down there, they never believe it when I put on that accent.

MR. MOORE: I probably would, Judge. So --

THE COURT: No, you wouldn't.

MR. MOORE: -- I'm not sure what the Court's practices are with respect to sequestration of witnesses and the like and I know that we haven't addressed that. If, for example, a witness is up, can the government talk to them after the day is done? I'm not sure what your Honor's practices are and so that's why I'm inquiring.

THE COURT: I don't exactly say that I have a practice.

What is the government's view on this, except you don't talk to the witness on cross?

MR. MOORE: Right.

MS. FLODR: Not on cross, your Honor, that is exactly right.

1              THE COURT:  OK.

2              MR. MOORE:  And I take it that the witnesses cannot

3     share with each other what happens in or outside the courtroom,

4     correct?  Inside the courtroom, they can't talk about it

5     outside?

6              THE COURT:  I have never done that.  If you have got

7     some authority for me, I will look at it.

8              MR. MOORE:  I will take a look at it.  I just wanted

9     to know what your Honor's practices are.  I'm not asking you to

10    do it yet.  I just wanted to know what you do.

11             THE COURT:  I can't say that I have a practice.  You

12    know, if somebody invokes the rule, the witnesses are excluded

13    from the courtroom except for a representative on each side or

14    a principal.  That's easy enough.  And the party who calls a

15    witness doesn't talk to the witness once cross begins, once

16    direct is over.

17             MR. MOORE:  OK.

18             THE COURT:  That is my practice.

19             MR. MOORE:  Yes, sir.

20             THE COURT:  If you want something else, I am happy to

21    entertain with regret.

22             MR. MOORE:  I will confer with my co-counsel tonight,

23    and we will talk about it in the morning.

24             THE COURT:  OK.  Great.

25             Anything else?

Ia2dgat6

1          MR. DISKANT:  Very quickly.  We are going to play

2     tomorrow a video recording in which the face of two FBI

3     undercovers is going to be pixilated.  We have conferred with

4     defense counsel.  They are amenable to that; we appreciate it.

5     Because of concerns that one of the undercovers is still an

6     active undercover.  We have agreed, and the defendants would

7     like the Court to instruct the jurors that it has nothing to do

8     with any sort of security threat in this case --

9          THE COURT:  A security threat in this case?

10          MR. DISKANT:  And that there is no suggestion that

11     these defendants are violent or that there is a need to protect

12     the undercover.

13          THE COURT:  If that is what you all want, I will do

14     that.  Remind me.

15          Anything further?  No?

16          OK.  Thank you, folks.

17          (Adjourned to 9:30 a.m. October 3)

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

EMILY ECKSTUT

Direct By Ms. Flodr . . . . . . . . . . . . 133

Cross By Mr. Schachter . . . . . . . . . . . 147

GOVERNMENT EXHIBITS

Exhibit No.                                  Received

 3001    . . . . . . . . . . . . . . . . . . 140

 S2    . . . . . . . . . . . . . . . . . . 144