Ia3dgat1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        17 Cr. 686 (LAK)

 5   JAMES GATTO, a/k/a "Jim,"
     MERL CODE,
 6   CHRISTIAN DAWKINS,

 7              Defendants.

 8   ------------------------------x

 9                                       October 3, 2018
                                         9:40 a.m.
10
     Before:
11                   HON. LEWIS A. KAPLAN,

12                                       District Judge
                                          and a Jury
13

14                   APPEARANCES

15   ROBERT S. KHUZAMI
          Acting United States Attorney for the
16        Southern District of New York
     BY:  EDWARD B. DISKANT
17        NOAH D. SOLOWIEJCZYK
          ALINE R. FLODR
18        ELI J. MARK
          Assistant United States Attorneys
19
     WILLKIE FARR & GALLAGHER LLP
20        Attorneys for Defendant Gatto
     BY:  MICHAEL S. SCHACHTER
21        CASEY E. DONNELLY

22

23

24

25
```

Ia3dgat1

1                          APPEARANCES (Cont'd)

2    NEXSEN PRUET LLC
          Attorneys for Defendant Code
3    BY:  MARK C. MOORE
              -and-
4    MERL F. CODE

5    HANEY LAW GROUP PLLC
          Attorneys for Defendant Dawkins
6    BY:  STEVEN A. HANEY

7

8    Also present:  SONYA JACOBS, Paralegal
                    SYLVIA LEE, Paralegal
9                   ANTHONY CASOLA, FBI

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ia3dgat1

```
 1              (Trial resumed; jury not present)

 2              THE COURT:  Good morning, everyone.

 3              ALL COUNSEL:  Good morning, your Honor.

 4              THE COURT:  A couple of things.  First, our lunch

 5     break is going to start a couple of minutes to 12 today because

 6     I have to be on a conference call.

 7              Second, Mr. Schachter, thank you for your letter.  The

 8     affidavit of Mr. McCloud is unresponsive to what I asked for.

 9     The question, as the transcript makes abundantly clear, I

10     think -- and I just reread it -- was how it is that you managed

11     to display a video to the jury, in other words, how it is you

12     controlled what they saw -- not my screen, theirs.  OK.  And,

13     of course, we took the precaution, you all know it, but for the

14     sake of record, I gather there was some kind of device on your

15     table that had something to do with that, and they were all

16     removed at the lunch break yesterday until we figure out what

17     else is going on here.

18              OK.  I gather we still have some jurors missing and

19     that you had something you wanted to discuss with me.

20              MR. DISKANT:  Your Honor, just a couple of matters.

21              First, the parties have conferred.  We understand that

22     Mr. Schachter's cross-examination of Special Agent Eckstut is

23     now complete and that the other two defense lawyers may have

24     some questioning, but we are otherwise resolving or have

25     resolved the issues with respect to that witness.
```

Ia3dgat1

1            Let me say more broadly that part of the issue is that

2    the government has not been getting in advance material from

3    the defendants that they plan to use with our witnesses.  So,

4    that huge binder of documents, something that we saw for the

5    first time in court yesterday with the witness, which made it

6    very difficult for us to try and work through and resolve these

7    issues, they have just given us another big binder of the stuff

8    they plan to use with our next witness.  We are going to review

9    it as quickly as possible in the hope that we can reach

10   agreement, but it is slowing us down.  Some of these are very

11   long transcripts of recordings that we can't possibly review

12   while we are here in court.

13            I also understand we are working on the Louisville

14   issue that came up before your Honor.  I candidly am not sure

15   we are going to reach agreement, but there have been back and

16   forth drafts of stipulations that we are working on resolving.

17   I do anticipate there are going to be some defense objections

18   to the testimony of Mr. Carns, which I will let Mr. Schachter

19   articulate, if he wants, but they have to do with the witness'

20   ability to testify about the harms to the university, which is

21   obviously a core issue in this case.  And, also, we have an

22   objection to the admissibility of the certification signed by

23   Mr. Bowen and his attorney.

24            THE COURT:  What do you have to say, Mr. Schachter, if

25   anything?

Ia3dgat1

1          MR. SCHACHTER:  Yes, your Honor.

2          First, Mr. Diskant is correct that I think we are

3    working on a stipulation with respect to Agent Eckstut's

4    testimony which will allow us to introduce through stipulation

5    what we would have inquired of during her cross-examination.

6          With respect to Mr. Carns, I think we really have two

7    issues.  The first is that we saw in the 3500 material that

8    Mr. Carns, who was a compliance person, we saw notes in the

9    agent's, or whoever was taking the notes that was provided to

10   us in 3500, that he estimates that Louisville, or Louisville

11   estimates $4 to $5 million of lost revenue as a result of the

12   FBI investigation.  Mr. Carns, as compliance person, I don't

13   think would have any kind of foundation or nonhearsay basis to

14   testify regarding the estimated loss of revenue to the

15   University of Louisville.  And without a nonhearsay -- so I

16   inquired of the government whether there is any nonhearsay

17   basis for this compliance professional to testify regarding

18   estimated loss, and I think that the -- I think that the answer

19   is that he does not have a nonhearsay basis to testify about

20   that, and so we would object to that evidence coming in.

21          That's issue one.

22          I don't know if your Honor wishes to take those in

23   turn or whether --

24          THE COURT:  Let me find out what the size of the room

25   is and then we'll see.

Ia3dgat1

1          MR. SCHACHTER:  OK.  The second issue is an

2     interesting one, I think.  The government has offered, or

3     intends to offer through this witness, a financial aid

4     agreement which is signed by Brian Bowen, Jr. and I believe and

5     his mother as well as something called a student-athlete

6     statement which is signed by Brian Bowen, Jr.  And I believe

7     that these are the alleged false statements that is at the

8     heart of this fraud case.

9          I inquired of the government whether they have any

10    evidentiary basis to show that Mr. Gatto knew anything about

11    these false statements or any false statements like them.  It

12    is a very unusual and I am unaware of any wire fraud case that

13    has ever been brought where there is no evidentiary basis to

14    conclude that the defendant charged with wire fraud knew

15    anything about the fraudulent statement.  And so while it is at

16    the heart of the charges in this case, I don't that simply

17    because it is included in the indictment, that that makes it

18    admissible unless the government is able to show that this

19    defendant intended to make false statements.

20         THE COURT:  Is this a real issue, or is this another

21    line sheet detour?  I thought I understood crystal clear from

22    all of the defense openings -- all of them -- that everybody

23    understood that these young people had to sign certifications

24    of compliance with the NCAA rules and the implication, at

25    least -- and maybe the explicit acknowledgment -- that the

Ia3dgat1

1    certification said in words or in substance "I got nothing from

2    anybody."

3              MR. SCHACHTER:  I think that is incorrect, your Honor.

4    I think that the openings were that everybody understood that

5    the payments violated the NCAA rules.  That is a far cry -- I

6    mean, payments, there is lots of -- the Second Circuit has said

7    multiple times that payments or transactions are not fraud.

8    That requires a false representation.  No question that the

9    defendants -- we will not be disputing that the defendants knew

10   that -- or at least I should only speak for Mr. Gatto, that he

11   knew that payments to families violated NCAA rules.  That is a

12   far cry from knowing anything about what is at the gravamen of

13   our wire fraud case, which is that there were false statements

14   being made to defraud the victim out of money or property.

15             There is -- and I think there is going to be no

16   evidence of anything like that.  I think the government has no

17   basis to conclude that Mr. Gatto knew anything about these

18   certifications in this case.  That is the fraud that they've

19   charged.  And I am unaware of any case -- and I don't believe

20   that there is a case -- where a defendant has been charged with

21   wire fraud --

22             THE COURT:  You are now cycling around for the second

23   time.

24             MR. SCHACHTER:  I apologize.

25             THE COURT:  OK.  Mr. Diskant, or did you want to add

Ia3dgat1

to this, Mr. Moore?

           MR. MOORE:  The only point that I would like to make,
and it will be brief, your Honor, is that I agree with
Mr. Schachter.  I didn't say anything in my opening about any
knowledge that my client might have had about these
certifications.  I think there is a difference between knowing
there is a violation of an NCAA rule and knowing that a
certification is going to be signed.  And I did not say
anything about that, because I do not believe that there is any
evidence from which anyone can conclude that my client knew
that these certifications were submitted.

           MR. HANEY:  Your Honor, briefly on behalf of Christian
Dawkins, I want to make it clear that in my opening I noted
that my client had the belief that there is a preexisting rule
that allowed people to pay money if there was a preexisting
relationship --

           THE COURT:  I heard you say that.

           MR. HANEY:  Thank you, your Honor.

           THE COURT:  All right.  On this point.

           MR. DISKANT:  Just very briefly, your Honor.  First
and foremost, none of this would be an impediment to offering
the document.  These are jury arguments for the defendants to
make.

           But, second of all, there is abundant information in
the opening from which a jury can conclude that it was

Ia3dgat1

1    reasonably foreseeable that these players would be making

2    representations to the university.  Mr. Moore opened on the

3    fact that his client was himself a college athlete and

4    therefore would himself have completed forms exactly like this

5    one in connection with him playing in Auburn.  Mr. Haney opened

6    on the fact that his client worked with student-athletes on a

7    variety of different issues from which a jury could readily

8    conclude that he was aware of the various different types of

9    things that student-athletes had to complete.

10          A financial aid agreement is itself a document that I

11   don't think requires a whole lot of elaboration.  And all of

12   these people knew that these kids were getting scholarships

13   from which a jury could reasonably infer that they knew they

14   were completing paperwork.

15          Again, these are all jury arguments.  They are not

16   impediments to admissibility

17          THE COURT:  Your argument is, at least in part, that

18   they are not offered for the truth; in fact, they are lies.

19          MR. DISKANT:  That is also true, correct.

20          THE COURT:  All right.  I'll think about it.

21          Mr. Schachter, the jurors all are present now.

22          MR. SCHACHTER:  Then I can perhaps take it up at

23   another time, your Honor.

24          THE COURT:  OK.  Let's do that.  Let's get the jury.

25          Feel free to brief this, quickly.

Ia3dgat1

1              MR. SCHACHTER:  Yes, your Honor.

2              (Pause)

3              (Continued on next page)

1              THE CLERK:  Jury entering.

2              (Jury present)

3              THE CLERK:  Please be seated.

4              THE COURT:  Good morning, everybody.  The jurors all

5    are present, as are the defendants who have been here

6    throughout.

7              Is there any further cross-examination of Agent

8    Eckstut?

9              MR. MOORE:  Just a few questions, your Honor.

10             THE COURT:  All right.  Let's bring her back into the

11   room.

12             MR. MOORE:  Yes, sir.

13    EMILY ECKSTUT,

14       Resumed, and testified further as follows.

15             THE COURT:  Good morning.  You are still under oath.

16             MR. MOORE:  May I proceed, your Honor?

17             THE COURT:  Yes, you may, Mr. Moore.

18             MR. MOORE:  Thank you.

19   CROSS-EXAMINATION

20   BY MR. MOORE:

21   Q.  Now, Special Agent Eckstut, I believe you told the ladies

22   and gentlemen of the jury yesterday that you had been employed

23   with the FBI for approximately four years, is that right?

24   A.  Yes.

25   Q.  And you were a monitor with respect to certain calls on

1    these wiretaps; you were not the case agent, correct?

2    A.  Right.  I monitored some calls.

3    Q.  OK.  But you weren't the case agent in this case, correct?

4    A.  That's right.

5    Q.  OK.  And you also weren't the administrative agent on the

6    wire, correct?

7    A.  Right.

8    Q.  OK.  Because in cases -- in wiretap cases, you have a case

9    agent and then you have an administrative agent who sort of

10   sets a schedule and makes sure that the wire system functions

11   properly, correct?

12   A.  It depends on the case, but I believe that was true in this

13   case, yes.

14   Q.  OK.  And so the administrative agent and the case agent,

15   they are the ones who make decisions about how long you are

16   going to monitor, for example, what hours you monitor on the

17   wire, correct?

18   A.  I think so, yes, maybe in conjunction with the prosecutors

19   as well.

20   Q.  OK.  But, I mean, you as a monitor don't make that

21   decision, right?

22   A.  Right.

23   Q.  OK.  You sign up for a shift, right?  They set shifts for

24   the monitoring room, correct?

25   A.  Yes.

Ia3dgat1                         Eckstut - cross

1    Q.  OK.  And you sign up for a shift, correct?

2    A.  Yes.

3    Q.  And you go in and you monitor, correct?

4    A.  Yes, though sometimes you sign up for a shift a week in

5    advance and, you know, you have a meeting scheduled later so

6    you can sometimes have somebody fill in for you.

7    Q.  And sometimes people get sick and so sometimes you have to

8    fill in and you have to pull double shifts, right, that

9    happens?

10   A.  Right.

11   Q.  OK.  And as a monitor, you're making decisions about

12   whether a call was pertinent, nonpertinent, based primarily on

13   information you receive in an affidavit, correct, and then what

14   you do -- your own experience when you listen to the calls on

15   wire, correct?

16        THE COURT:  Sustained as to form.  Let's have a clear,

17   simple question.

18        MR. MOORE:  Yes, sir.  I'm sorry, your Honor.

19   BY MR. MOORE:

20   Q.  In making decisions about what calls you mark as pertinent

21   and nonpertinent, you base those decisions, in part, on the

22   information that's provided to you by somebody else, correct?

23   A.  In part.

24   Q.  OK.  And also in part by your own listening to the calls,

25   correct?

1    A.  Yes.

2    Q.  All right.  Now, I believe one of the things that you

3    mentioned to Mr. Schachter yesterday is that you do what we

4    typically call minimization, correct?

5    A.  Yes.

6    Q.  OK.  And because you're only supposed to intercept

7    pertinent, relevant conversations, correct?

8    A.  Well, we intercept all of them and then we decide whether

9    or not they are pertinent.

10   Q.  OK.  But in making -- in doing --

11            THE COURT:  Just so we're clear, intercept as opposed

12   to listen to, is that correct?

13            THE WITNESS:  That's right.

14            THE COURT:  Right.

15            THE WITNESS:  The technology intercepts the call.  We

16   listen to it and determine whether it is pertinent or not

17   pertinent.

18   BY MR. MOORE:

19   Q.  The technology intercepts the call and you determine what

20   portions of the call you listen to, correct?

21   A.  The technology intercepts the call.  It pops up.  We listen

22   to it for two minutes, approximately, and then if we determine

23   that it is not pertinent, we will stop the recording

24   temporarily until it is time to spot check.

25   Q.  When you say "time to spot check," you come back on and off

1   during the call, is that right?

2   A.   Again, after a point of some period of time we will check

3   in to make sure that the call is still not pertinent or if it

4   is pertinent we will listen to it, listen to it until it

5   becomes not pertinent during that time.

6   Q.   During that period of minimization, if you will, when you

7   push a button and the call no longer records, right?

8   A.   Right.

9   Q.   OK.   During that portion, OK, if there is something that is

10  relevant or that is exculpatory, it's not captured, is that

11  correct?

12  A.   That's right.   It is not recording anymore.

13  Q.   OK.   So we don't know, when you minimize, what is actually

14  being said versus what is not being said, correct?

15  A.   Right.

16  Q.   OK.   And if there are calls -- the Court gives you the

17  authorization to intercept calls over a particular phone.   If

18  you choose not to monitor the wire for a time period, any calls

19  that come in are not intercepted and captured, correct?

20  A.   I believe they technically are intercepted but they are not

21  recorded.   So you could see a lot of the calls that came in --

22  for example, if the wire is not being monitored overnight, you

23  can see that there were calls made but they weren't recorded.

24  Q.   OK.   So if it comes in after no one is in the monitoring

25  room, these calls are not recorded and captured for evidentiary

1    purposes, correct?

2    A.  Right.

3    Q.  OK.  Now, you also indicated yesterday, I believe, that --

4    and there was a chart that was displayed with reference to the

5    dates of interceptions on the phones of my client, Mr. Code, as

6    well as the phones of Mr. Dawkins and Mr. Gatto, correct?

7    A.  Right.

8    Q.  OK.  You didn't put on that chart the dates of interception

9    on the phones of Munish Sood, did you, ma'am?

10   A.  No.

11   Q.  And I believe you also told us, from your chart, that there

12   was a seven-day period on the phone of Mr. Dawkins where there

13   was no monitoring, for example, from 8/18/18 to 8/25/17,

14   correct?

15   A.  No.  It was from 8/18 to 8/22.  I think that is five days.

16   Q.  8/22, OK.  Thank you.  So during that five-day period, you

17   didn't intercept any calls over that phone, correct?

18   A.  Over Christian Dawkins' phone, correct.

19   Q.  OK.  And you also indicated yesterday that the FBI was

20   aware that Mr. Code and Mr. Dawkins had two other phones,

21   correct?

22   A.  Yes.

23   Q.  OK.  And you didn't seek -- or the FBI didn't seek

24   permission to get a wiretap on either of those phones during

25   that time period, did they, Special Agent Eckstut?

Ia3dgat1                              Eckstut - cross

1    A.  We did not.

2    Q.  All right.  And so we don't know anything about the

3    conversations over those phones, do we, Special Agent Eckstut?

4    A.  We might.  They could have been picked up on wiretaps for

5    other individuals whose phones were being wiretapped.

6    Q.  But you don't have -- but if there is a call between

7    someone using that phone and someone whose phone is not being

8    wiretapped, you don't have any record of what was said in those

9    conversations, do you, Special Agent Eckstut?

10   A.  We would have a record based on interviews, but we would

11   not have had wiretap interceptions of those calls.

12   Q.  You don't have the actual recording or the actual

13   conversation with the words used, do you?

14   A.  We don't have the actual recording, no.

15   Q.  Thank you, Special Agent Eckstut.  I don't have any other

16   questions.

17             THE COURT:  Thank you.

18             Mr. Haney, anything?

19             MR. HANEY:  No, your Honor.  Thank you.

20             THE COURT:  Thank you.

21             Any redirect?

22             MS. FLODR:  No, your Honor.

23             THE COURT:  Thank you, Agent.  You are excused.

24             THE WITNESS:  Thank you.

25             (Witness excused)

Ia3dgat1

```
1            THE COURT:  Next witness.

2            MR. SOLOWIEJCZYK:  Your Honor, at this time the

3   government would like to offer two stipulations.

4            THE COURT:  All right.

5            MR. SOLOWIEJCZYK:  The first stipulation, your Honor,

6   is marked as Government Exhibit S5.

7            Excuse me.  The witness should exit the room.  I

8   apologize.

9            (Pause)

10           THE COURT:  OK.  S5 is being offered?

11           MR. SOLOWIEJCZYK:  Yes, your Honor.

12           THE COURT:  Received.

13           (Government's Exhibit S5 received in evidence)

14           MR. SOLOWIEJCZYK:  Government Exhibits 21, 22, 29 and

15  63 are true and accurate copies of recordings of calls and

16  portions of calls that were intercepted pursuant to

17  court-authorized wiretaps over a phone associated with call

18  number 989-493-4317, belonging to Christian Dawkins, the

19  defendant.

20           Government Exhibit 57 is a true and accurate copy of a

21  call that was intercepted pursuant to court-authorized

22  consensual wiretaps of a cell phone belonging to one or more

23  FBI agents acting in an undercover capacity.

24           Government Exhibits 21T, 22T, 29T, 57T, and 63T are

25  true and accurate transcripts of recorded conversations
```

Ia3dgat1

1    contained in Government Exhibits 21, 22, 29, 57 and 63,

2    respectively.  The identities of the participants, the voice

3    attributions, dates, and times reflected on Government Exhibits

4    21T, 22T, 29T, 57T, and 63T, are accurate.

5          Government Exhibits 75 and 75A are true and accurate

6    copies of video recordings of a meeting that took place on or

7    about June 20, 2017, in New York, New York, and that was

8    consensually recorded by one or more of the meeting

9    participants.

10         Government Exhibits 75T and 75A-T are true and

11   accurate transcripts of recorded conversations contained in

12   Government Exhibits 75 and 75A, respectively.  The identities

13   of the participants, voice attributions, dates, and times

14   reflected on Government Exhibits 75T and 75A-T, are accurate.

15         It is further stipulated and agreed that this

16   stipulation, which is Government Exhibit S5, may be received

17   into evidence as a government exhibit at trial.

18         And the government offers the stipulation at this

19   time, your Honor.

20         THE COURT:  Yes.  It has been received.

21         MR. SOLOWIEJCZYK:  Your Honor, in addition, the

22   government would offer at this time Government Exhibit 55 and

23   Government Exhibit 55T, which is a transcript of Government

24   Exhibit 55.

25         THE COURT:  Any objection?

Ia3dgat1

1          MS. DONNELLY:  No objection.

2          THE COURT:  Pardon?

3          MS. DONNELLY:  No objection.

4          THE COURT:  They are received.

5          (Government's Exhibits 55, 55T received in evidence)

6          MR. SOLOWIEJCZYK:  Your Honor, we would also offer

7   stipulation S6.

8          THE COURT:  Received.

9          (Government's Exhibit S6 received in evidence)

10          MR. SOLOWIEJCZYK:  If called to testify, a

11   representative of the National Basketball Players Association,

12   the "NBPA," would testify that:

13          First, the NBPA is a labor union representing

14   professional basketball players in the National Basketball

15   Association, otherwise known as the "NBA."  Among other powers,

16   the NBPA has the authority to certify sports agents who wish to

17   represent NBA players and to conduct investigations into

18   certain types of alleged misconduct by NBPA certified sports

19   agents.  While the NBPA is not a law enforcement agency and has

20   no ability to compel the production of documents from third

21   parties, it can require members, including sports agents

22   certified by the NBPA, to produce relevant materials as a

23   condition of maintaining their certified status.

24          Beginning in or around the summer of 2016, the NBPA

25   conducted an investigation relating to Christian Dawkins.  At

1    the time of this investigation, Dawkins was not himself a

2    certified sports agent but was employed by ASM Sports, a sports

3    agency controlled by an NBPA-certified sports agent that

4    represented various NBA players.

5            On May 4, 2017, the NBPA issued findings following the

6    conclusion of its investigation with respect to Dawkins.  Those

7    findings noted that, as of April 24, 2017, Dawkins was no

8    longer employed by ASM Sports.

9            Thereafter, and during the summer of 2017, the NBPA

10   investigated other potential misconduct by ASM Sports,

11   including by the certified sports agent responsible for the

12   operation of ASM Sports.

13           And it is further stipulated and agreed that this

14   stipulation, which is Government Exhibit S6, may be received

15   into evidence as a government exhibit at trial.

16           THE COURT:  OK.  It was received already.

17           Let me explain something to the jury.

18           The stipulations you heard previously were agreements

19   among all the parties that certain facts were true, and you are

20   obliged to accept those facts as being true.

21           In this case, we call this a testimonial stipulation.

22   They have agreed that if the person identified in what was just

23   read to you had been called as a witness, that person would

24   have testified under oath to the facts that were read out.  You

25   must accept that the person would have so testified if the

1    person had been called.

2              What you make of it, whether you believe it or don't

3    believe or believe part or not part -- or disbelieve a part is

4    up to the jury.  This is a means of avoiding the need for

5    calling a witness into court, where nobody really disputes what

6    the witness is going to say.  They may have different arguments

7    about whether it is significant, whether it is true, and so

8    forth.

9              OK.  Anybody object to my instruction?

10             All right.  Let's proceed.

11             MR. SOLOWIEJCZYK:  Your Honor, the government calls

12   Munish Sood at this time.

13             THE COURT:  Yes.

14             THE CLERK:  Sir, please take the stand.

15    MUNISH SOOD,

16        called as a witness by the government,

17        having been duly sworn, testified as follows:

18             THE CLERK:  Thank you.  Please be seated.

19             If you could please state your name and spell your

20   first and last names for the record.

21             THE WITNESS:  Sure.  Munish Sood, M-u-n-i-s-h; last

22   name S-o-o-d.

23             THE COURT:  All right.  You may proceed, counsel.

24   DIRECT EXAMINATION

25   BY MR. SOLOWIEJCZYK:

Ia3dgat1                        Sood - direct

1    Q.  Good morning, Mr. Sood.

2    A.  Good morning.

3    Q.  How old are you?

4    A.  46.

5    Q.  How far did you go in school?

6    A.  Undergraduate degree, finance.

7    Q.  In what industry have you primarily worked since graduating

8    college?

9    A.  In financial services.

10   Q.  Have you ever obtained any certifications or licenses in

11   the field of finance?

12   A.  Yes.

13   Q.  Will which ones?

14   A.  Four, a CFA and then FINRA licenses 6 -- sorry, 7, 63 and

15   24.

16   Q.  To obtain those licenses, did you have to pass any exams?

17   A.  Yes, for all four.

18   Q.  Generally speaking, what do those licenses allow you to do?

19   A.  Trade securities.

20   Q.  Mr. Sood, I want to direct your attention to July 13, 2017.

21   Do you recall that day?

22   A.  Yes.

23   Q.  What happened that day?

24   A.  That's the day I met Brian Bowen, Sr.

25   Q.  Who is Brian Bowen, Sr.?

Ia3dgat1                          Sood - direct

1   A.  The father of Brian Bowen, Jr., who was attending -- who

2   was playing basketball at University of Louisville.

3   Q.  When you met Brian Bowen, Sr. -- withdrawn.

4              Where did you meet Brian Bowen, Sr.?

5   A.  I met him in a parking lot in New Jersey.

6   Q.  What happened in the parking lot?

7   A.  I handed him $19,400 in cash.

8   Q.  Who, if anyone, promised Brian Bowen, Sr. this money?

9   A.  Christian Dawkins, Merl Code and Adidas.

10  Q.  Why did they promise this money to Bowen Senior?

11  A.  To ensure that Brian Bowen would attend University of

12  Louisville.

13  Q.  You mentioned Christian Dawkins.  Do you see him here in

14  the courtroom today?

15  A.  Yes.

16  Q.  Can you please identify Mr. Dawkins and describe an article

17  of clothing that he is wearing and where he is seated?

18  A.  It looks like row two and wearing a gray jacket, light

19  gray.

20  Q.  Can you just say -- explain where he is seated?

21  A.  Oh, second row, wearing a gray -- light gray jacket with a

22  blue tie.

23  Q.  You mentioned Merl Code.  Do you see him in the courtroom

24  today?

25  A.  Yes.

1   Q.  Can you please identify where he is seated and an article

2   of clothing he is wearing?

3   A.  Sure.  Again, second row, wearing a dark gray sports coat,

4   or suit jacket.

5          MR. SOLOWIEJCZYK:  Your Honor, may the record reflect

6   that the witness has identified the Defendant Christian

7   Dawkins?

8          THE COURT:  Yes.

9          MR. SOLOWIEJCZYK:  And that the witness has identified

10  the Defendant Merl Code?

11         THE COURT:  Yes.

12  BY MR. SOLOWIEJCZYK:

13  Q.  Mr. Sood, what was your understandings as to where Mr. Code

14  was employed at the time you made this payment?

15  A.  Adidas.

16  Q.  Have you pleaded guilty to a federal crime as a result of

17  your involvement in the payments to Brian Bowen, Sr.?

18  A.  Yes.

19  Q.  We'll come back to that later.  I want to ask you a few

20  more questions about your employment background.

21         Mr. Sood, where do you currently work?

22  A.  Princeton Advisory Group.

23  Q.  What kind of company is Princeton Advisory Group?

24  A.  Financial services.

25  Q.  Where is it based?

Ia3dgat1                        Sood - direct

1   A.  New Jersey.

2   Q.  Who owns the company?

3   A.  I do.

4   Q.  When did you found Princeton Advisory Group?

5   A.  2002.

6   Q.  Approximately how many employees do you have?

7   A.  Five.

8   Q.  And, generally, what kinds of services do you provide to

9   your clients?

10  A.  Primarily investment services to primarily investors,

11  doctors and professional athletes.

12  Q.  Does that include managing portfolios for clients?

13  A.  Yes, it does.

14  Q.  Mr. Sood, were you employed anywhere else before founding

15  Princeton Advisory Group?

16  A.  I worked at a couple of large banks in New York City.

17  Q.  You mentioned that some of your clients are professional

18  athletes.  How did you first get involved in working with

19  athletes?

20  A.  About in around 2011, I got involved with professional

21  athletes through someone I met based in Pittsburgh by the name

22  of Marty Blazer.

23  Q.  Did there come a time when you started a company with Marty

24  Blazer?

25  A.  Yes.

Ia3dgat1                        Sood - direct

1   Q.  What did Blazer want you to do with respect to these

2   athletes?

3   A.  Marty wanted me to actually do the financial management,

4   and he would handle the -- what they call concierge's

5   day-to-day services.

6   Q.  And approximately when did you start this business with

7   Blazer?

8   A.  I recall 2013.

9   Q.  Is it possible it was a little earlier than that, Mr. Sood?

10  A.  Sorry.  That's when we separated --

11         MR. HANEY:  Your Honor, I object.  He is leading the

12  witness.

13         THE COURT:  Overruled.

14  A.  Sorry.  2011.

15  Q.  Initially what types of athletes did you work with through

16  Blazer?

17  A.  Primarily NFL football players.

18  Q.  And for approximately how many years did you work with

19  Blazer.

20  A.  About two years.

21  Q.  Approximately how many athletes did you work with?

22  A.  About five.

23  Q.  Now, Mr. Sood, at the time you were working with Blazer,

24  what involvement, if any, did you have in recruiting new

25  players as clients?

Ia3dgat1                           Sood - direct

1    A.  Very limited.

2    Q.  Did there come a time when you eventually stopped working

3    with Blazer?

4    A.  Yes.

5    Q.  Why?

6    A.  There was an SEC investigation, and they discovered that

7    Marty Blazer had stolen money from at least one or two of his

8    players, clients.

9    Q.  Mr. Sood, prior to that SEC investigation, were you aware

10   that Blazer was misappropriating client funds?

11   A.  No, I was not.

12   Q.  What did you do after learning that Blazer had allegedly

13   stolen client funds?

14   A.  Immediately we bought him out for one dollar.

15   Q.  Did you cease your business relationship?

16   A.  Yes.

17   Q.  Now, did you continue working with certain professional

18   football players as clients after that?

19   A.  I did.

20   Q.  Mr. Sood, did there come a time after you ended the company

21   with Blazer where you began to be in contact with him again?

22   A.  Yes.  A few years later, he had reached out and stated that

23   he had addressed his SEC issues and he wanted to get back in

24   the business and -- but focus on basketball.

25   Q.  And how did Blazer propose you would be involved in these

1    new efforts?

2    A.   Something similar, just focus on the financial side and he

3    would worry about -- he said he could help on the recruiting

4    side.

5    Q.   At what point in their career were the athletes that Blazer

6    was focused on?

7    A.   Both college and professional.

8    Q.   Did Blazer introduce you to anybody else that was involved

9    in college basketball client services?

10   A.   Yes.  Christian Dawkins.

11   Q.   And do you recall approximately how many years ago that

12   was, or what year it was in?

13   A.   I believe about two, two-and-a-half years ago now.

14   Q.   When you first met Christian Dawkins, who was he employed

15   by?

16   A.   A sports agency called ASM.

17   Q.   And what types of athletes did ASM represent?

18   A.   Professional basketball players.

19   Q.   What was your understanding of who ran ASM at that time?

20   A.   A gentleman named Andy Miller.

21   Q.   And what did you know about Andy Miller?

22   A.   He was a registered sports agent.

23   Q.   Was Dawkins himself a registered sports agent?

24   A.   No.

25   Q.   What did Dawkins do for ASM?

Ia3dgat1                          Sood - direct

A.  I understood him to be a quasi-business manager slash what
you could call a runner, which is he was responsible for
management relationships with some of the younger players.

Q.  You mentioned the term "runner."  Does that include trying
to recruit new players?

A.  Yes.

Q.  And at what stage of their careers were these players that
Dawkins was involved recruiting?

A.  College.

Q.  Did you end up meeting Mr. Dawkins?

A.  I did.

Q.  What did Dawkins tell you, if anything, about how you could
be of assistance in his efforts?

A.  You know, he mentioned that since he has a pretty big
network of clients, he was looking to work with one or two
financial advisors.

Q.  And what was he offering to do for you with respect to
these players?

A.  Access to the players and have an opportunity to work with
them on the financial side.

Q.  What assistance, if any, was he looking for from you?

A.  Financial, to help cover some costs.

Q.  What you do mean by that, Mr. Sood?

A.  To -- there were times when players, their families, or
so-called their handlers required money and that's what he

1   would need support with.

2   Q.  When you say "support," do you mean asking you for money,

3   Mr. Sood?

4   A.  Yes, that's correct.

5   Q.  Mr. Sood, did you ultimately agree to provide certain of

6   these payments to Mr. Dawkins?

7   A.  Yes.

8   Q.  What were you hoping to get for providing this money?

9   A.  An opportunity to work with the players.

10  Q.  I want to direct your attention to what's been marked for

11  identification as Government Exhibit 516.  It is going to be in

12  the binder that is in front of you.

13        Do you recognize that document?

14  A.  Yes.

15  Q.  What is it?

16  A.  It's an email from Christian Dawkins on April 10, 2016.  It

17  was sent to myself and Marty Blazer.

18  Q.  What does the email generally pertain to?

19  A.  His plans, his goals.

20        MR. SOLOWIEJCZYK:  Your Honor, the government offers

21  Government Exhibit 516.

22        THE COURT:  Received.

23        (Government's Exhibit 516 received in evidence)

24        MR. SOLOWIEJCZYK:  Permission to publish?

25        THE COURT:  Yes.

1    BY MR. SOLOWIEJCZYK:

2    Q.  Mr. Sood, what was the subject line of the email?

3    A.  "Plans."

4    Q.  The players that are referenced in this email, were they

5    yet in the NBA?

6    A.  No.

7    Q.  And I would direct your attention to the first paragraph

8    and the sentence that starts with the words, "I will make sure

9    you guys."  Do you see that?

10   A.  Yes.

11   Q.  Could you just read that paragraph to the end of the

12   paragraph?

13   A.  Sure.

14            @"I will make sure you guys get Beasley and Isaiah

15   Whitehead this year and both could be first round picks.

16   Moving forward, I need confirmation on certain things to know

17   how I will be able to operate.  It can't be much gray area any

18   more.  The business is nonstop.  And I have to be able to

19   sustain things and have a clear picture if I can do things with

20   you guys or take opportunities elsewhere.  I took care of these

21   situations all the way through, and there is a lot of money

22   out."

23   Q.  Mr. Sood, just looking at that last sentence, "I took care

24   of these situations all the way through and there is a lot of

25   money out," what did you understand Dawkins to be saying?

Ia3dgat1                          Sood - direct

1   A.  That he had fronted money to players.

2   Q.  Anybody else?

3   A.  Also players' family members.

4           MR. HANEY:  Your Honor, objection.  This goes into the

5   witness speculating what my client may have meant by the email.

6           THE COURT:  The word "objection" will suffice.

7           MR. HANEY:  Thank you, your Honor.

8           THE COURT:  Unless I ask for more.

9           Sustained.

10  BY MR. SOLOWIEJCZYK:

11  Q.  Mr. Sood, in this section of the email, you reference

12  Beasley.  Who is Beasley?

13  A.  Malik Beasley.

14  Q.  And who is he?

15  A.  He was a college player at Florida State University and

16  transitioning to the NBA.

17  Q.  Did Dawkins ever facilitate a meeting with you with Malik

18  Beasley and you?

19  A.  He did, with his family, yes.

20  Q.  What was the point of that meeting?

21  A.  For them to consider working with me on the financial

22  services front.

23  Q.  What, if anything, did Dawkins tell the family of Malik --

24  withdrawn.

25           What did Mr. Dawkins tell you, if anything, as to what

Ia3dgat1                          Sood - direct

1    the family of Malik Beasley was looking for?

2    A.  He said that once -- whichever advisor he decided to go

3    with, he would require a loan for $50,000.

4    Q.  Did you end up providing that loan?

5    A.  I did.

6    Q.  And did Beasley enter the NBA draft?

7    A.  He did.

8    Q.  Was he selected?

9    A.  Yes.

10   Q.  The loan you are speaking of, was it provided before or

11   after Beasley declared for the NBA draft?

12   A.  It was provided after.

13   Q.  What, if anything, did Dawkins tell you about how the money

14   for the loan would be used?

15   A.  He mentioned that part of it would go back to pay back some

16   expenses owed to him.

17   Q.  Expenses he had previously provided, is that your

18   understanding?

19   A.  Yes.

20            MR. HANEY:  Your Honor, I object again.

21            THE COURT:  It is a little late out of the starting

22   gate.

23            MR. HANEY:  Your Honor, the question has already come

24   and been answered.  May I state my objection, your Honor?

25            THE COURT:  No.

1              MR. HANEY:  Thank you.

2       BY MR. SOLOWIEJCZYK:

3       Q.  There is also a reference to Isaiah Whitehead in this

4       email.  Do you see that?

5       A.  Yes.

6       Q.  Who was Whitehead?

7       A.  He was a college player at Seton Hall.

8       Q.  Did Whitehead enter the NBA draft?

9       A.  He did.

10      Q.  Was he selected?

11      A.  Yes.

12      Q.  Did you ever provide a loan to Whitehead or his family?

13      A.  I did.

14      Q.  How much?

15      A.  5,000.

16      Q.  Was this provided before or after he declared for the NBA

17      draft?

18      A.  After.

19              MR. HANEY:  I object, your Honor.

20              THE COURT:  Pardon me.

21              MR. HANEY:  I would object.

22              THE COURT:  Overruled.

23      BY MR. SOLOWIEJCZYK:

24      Q.  Did Whitehead ever become a client for you?

25      A.  No.

Ia3dgat1                         Sood - direct

1    Q.  Mr. Sood, further down the email there is a discussion of

2    Edmond Sumner.  Was Edmond Sumner also a basketball player?

3    A.  Yes.

4    Q.  At the time of this email, was he in the NBA or in college?

5    A.  College.

6    Q.  What was Dawkins requesting with respect to Sumner?

7    A.  Providing approximately -- providing almost 70 -- or

8    providing $75,000 over a course of one year.

9    Q.  Did you ever provide those funds?

10   A.  No.

11   Q.  Did Sumner ever enter the NBA draft?

12   A.  Yes.

13   Q.  Did he become a client for you?

14   A.  Yes.

15   Q.  Did you ever provide any funds to Sumner or his family?

16   A.  We provided him with a loan post draft.

17   Q.  Other than that loan, did you have to expend any other

18   funds to recruit Sumner as a client?

19   A.  Yes.

20   Q.  What did you have to do?

21   A.  Christian asked that I pay a different advisor I believe it

22   was $20,000 in order to have the business move over to me.

23   Q.  And you did that?

24   A.  Yes.

25   Q.  Further down in the email, there is a reference to Markelle

1  Fultz.

2  A.  Fultz.

3  Q.  And at what stage of his career was Mr. Fultz at the time

4  of this email?

5  A.  College.

6  Q.  What did Dawkins propose you do with respect to Fultz?

7  A.  He offered to help set up a meeting with his handler.  In

8  return, you know, helping his gentleman named Keith Williams,

9  Keith Williams' AAU program.

10 Q.  And what was he asking for from you specifically?

11 A.  $30,000.

12 Q.  Did you end up providing those funds to Mr. Dawkins?

13 A.  Yes, I gave a $30,000 loan.

14 Q.  What were you hoping to get out of making that payment?

15 A.  An opportunity to work with Markelle or at least meet his

16 team.

17 Q.  Did Fultz ultimately enter the NBA draft?

18 A.  Yes.

19 Q.  Was he selected?

20 A.  Yes.

21 Q.  Did he ever become a client for you?

22 A.  No.

23 Q.  Directing you to the bottom of this page, there is a

24 reference to Brian Bowen.  Do you see that?

25 A.  Yes.

Ia3dgat1                         Sood - direct

1    Q.  Can you just read that aloud, please?

2    A.  "Brian Bowen - He is a kid that is a little bit more of a

3    long term project, $1,500 a month is what he will need.  He is

4    a Saginaw Michigan kid, and I've known the family for years.

5    He's a for sure pro."

6    Q.  Prior to this email, had you ever heard of Brian Bowen?

7    A.  No.

8    Q.  Dawkins mentioned Bowen is a long term project.  What did

9    you understand Dawkins to mean when he wrote that?

10            MR. HANEY:  I would object, your Honor.

11            THE COURT:  Sustained.

12            MR. SOLOWIEJCZYK:  Could we have a sidebar briefly,

13   your Honor?

14            THE COURT:  No.  You need to lay a foundation.

15   BY MR. SOLOWIEJCZYK:

16   Q.  What sage of his career did you believe Bowen was in at

17   this point?

18   A.  High school.

19   Q.  And what was Dawkins specifically asking you for?

20   A.  $1,500 a month to support.

21   Q.  Did you make those payments at that time?

22   A.  I did not.

23   Q.  Mr. Sood, other than the players that are referenced in

24   this email, were you involved in making any other payments to

25   the families or associates of college basketball players?

1    A.  Yes.

2    Q.  Did you have any contact with anyone else employed by ASM

3    Sports?

4    A.  Yes.

5    Q.  Who was that?

6    A.  A sports agent by the name of Stephen Pina.

7    Q.  What was Stephen Pina's role at ASM Sports?

8    A.  He was a registered agent.

9    Q.  Did Mr. Pina ever request any funds from you?

10   A.  Yes.

11   Q.  What did he tell you the funds were for?

12   A.  Ultimately for handlers of players, college players.

13   Q.  What players were you specifically trying to recruit with

14   Mr. Pina?

15   A.  I recall Kyle Kuzma, Davon Reed.

16   Q.  Did you provide any money to Pina in an effort to recruit

17   Kuzma?

18   A.  Yes.

19   Q.  Did you know who that money was intended for?

20   A.  It was given to the handler.  It was provided to the

21   handler.

22   Q.  You have been talking about the term "handler."  Who do you

23   mean by that?

24   A.  Somebody who was like in the inner circle for a player.

25   Q.  Where did you learn the term handler?

Ia3dgat1                          Sood - direct

1    A.   From Christian Dawkins.

2    Q.   The payments you provided to Pina, were they when Kuzma was

3    still in college or afterwards?

4    A.   During college.

5    Q.   Did Kuzma ever enter the NBA?

6    A.   Yes.

7    Q.   Did he become a client of yours?

8    A.   Yes.

9    Q.   Is he still a client of yours today?

10   A.   Yes.

11   Q.   What, if anything, did you tell Mr. Kuzma about the fact

12   you pleaded guilty in this case?

13   A.   I told him the facts of what I pleaded guilty to.

14   Q.   And did you tell him you pleaded guilty?

15   A.   Yes.

16   Q.   You mentioned Davon Reed.  Is he another client of yours?

17   A.   Yes.

18   Q.   Did you ever provide any funds to Davon Reed?

19   A.   After the draft.

20   Q.   Post draft?

21   A.   Post draft.

22   Q.   So, Mr. Sood, prior to your being introduced to Christian

23   Dawkins, had you ever been involved in making payments to the

24   families or associates of college basketball players?

25   A.   No.

1    Q.  What about the families or associates of high school

2    basketball players?

3    A.  No.

4    Q.  What, if anything, did Dawkins tell you regarding the

5    rationale for making such payments?

6    A.  That if I was going to be successful in the business, it

7    came with the territory.

8    Q.  Now, Mr. Sood, you referenced certain loans that you made

9    to players after they declared for the NBA draft.  What was

10   your understanding at the time about whether those payments

11   were permitted under the NCAA rules?

12   A.  They were.  I believe they were permitted.

13   Q.  You also testified about certain funds you provided while

14   players were still in college.  What did you believe as to

15   whether those were permitted under the NCAA rules?

16   A.  They were not.

17   Q.  What was your understanding of what impact those payments

18   could have on the college players?

19   A.  Potentially loss of a scholarship or their amateur status.

20   Q.  Mr. Sood, directing your attention to May of 2017, did

21   there come a time when Christian Dawkins informed you that he

22   was leaving ASM Sports?

23   A.  Yes.

24   Q.  What did he tell you he was going to do?

25   A.  He wanted to set up his own sports management company.

Ia3dgat1                          Sood - direct

1   Q.  What, if anything, did Dawkins tell you regarding what his

2   relationship would be with ASM Sports?

3   A.  That he will no longer officially be employed by them but

4   he would maintain a relationship with ASM.

5   Q.  When Dawkins told you that he was planning to go on his

6   own, how, if at all, did he propose you be involved?

7   A.  I could -- if I could provide financial help or financial

8   assistance, I could potentially have access to his clients.

9   Q.  So what specifically was he asking you for?

10  A.  For capital, money.

11  Q.  What was the name of the new business Dawkins was starting?

12  A.  Loyd Management.

13  Q.  What did Dawkins tell you about the type of business he

14  planned to found?

15  A.  He had a good model.  He wanted to be what they call a

16  one-stop shop where we would help players select agents,

17  financial advisors, marketing, and other services.

18  Q.  How would Dawkins' new company earn fees?

19  A.  They would get a portion of the fees from agents, advisors

20  and marketing.

21  Q.  What was your role going to be with respect to the clients?

22  A.  I will be one of the -- or the only financial advisor.

23  Q.  Would you be managing portfolios?

24  A.  Yes.

25  Q.  When you managed these portfolios, is this before or after

Ia3dgat1                              Sood – direct

 1   the players become pros?

 2   A.   Typically a few years after they become pros.

 3   Q.   Why is that?

 4   A.   Because depending on when they get drafted, just the amount

 5   of money they are making takes a couple years.

 6   Q.   Were you interested in becoming involved in Dawkins' new

 7   venture?

 8   A.   Yes.

 9   Q.   Why were you interested?

10   A.   Because it helps me get a pipeline of clients.

11   Q.   Did there come a time when you suggested to Dawkins an

12   additional business partner?

13   A.   Yes.

14   Q.   Who was that?

15   A.   A gentleman named Jeff DeAngelo.

16   Q.   How did you first meet Jeff DeAngelo?

17   A.   So Marty Blazer had introduced me to Jeff DeAngelo.

18   Q.   At the time, who did you think Jeff DeAngelo was?

19   A.   Just a wealthy person trying to get into the sports

20   management business.

21   Q.   Did you end up meeting with Jeff DeAngelo?

22   A.   Yes.

23   Q.   Where did you first meet him?

24   A.   In Miami.

25   Q.   What was your understanding regarding the amount of funds

Ia3dgat1                          Sood - direct

1  Jeff DeAngelo had available to invest?

2  A.  It seemed like he had a substantial amount of money, you

3  know, that he would be able to infuse into this company.

4  Q.  Did there come a time when you learned that Jeff DeAngelo

5  was not in fact who he said he was?

6  A.  Yes.

7  Q.  What did you learn?

8  A.  The day I was arrested, I learned that he was an undercover

9  FBI agent.

10 Q.  Mr. Sood, you mentioned your arrest.  When were you

11 arrested?

12 A.  September 26, 2016.

13 Q.  2016?

14 A.  Sorry.  '17.

15 Q.  On the day of your arrest, did you speak with law

16 enforcement?

17 A.  Yes.

18 Q.  Were you questioned about your activities involving college

19 basketball?

20 A.  I was.

21              (Continued on next page)

22

23

24

25

1   Q.  When you were asked about the payments to Brian Bowen
2   Senior, were you truthful about what happened?
3   A.  I was not.
4   Q.  Were you truthful about the amount of money that you had
5   provided to Bowen Senior?
6   A.  I was not.
7   Q.  Were you truthful about the purpose of the payment?
8   A.  No.
9   Q.  Were you asked about various other activities that you had
10  been involved in in college basketball recruiting?
11  A.  Yes.
12  Q.  Were you truthful about those activities?
13  A.  No.
14  Q.  Why were you not truthful, Mr. Sood?
15  A.  I was scared, I was nervous, just been arrested.
16  Q.  After you were arrested, did you later decide to cooperate
17  with law enforcement?
18  A.  I did.
19  Q.  Did you meet with the government and tell the government
20  about your conduct?
21  A.  Yes.
22  Q.  At those meetings, were you truthful about your conduct?
23  A.  Yes.
24  Q.  In addition to discussing college basketball, did you also
25  meet with another U.S. attorney's office?

1    A.  I did.

2    Q.  What were you discussing with them?

3    A.  I was chairman of a community bank in New Jersey called

4    First Choice.  They had an open investigation so I voluntarily

5    went in and provided information.

6    Q.  Have you ever been charged with any crimes regarding your

7    involvement at First Choice Bank?

8    A.  No.

9    Q.  Mr. Sood, did there come a time when you pleaded guilty to

10   federal crimes?

11   A.  Yes.

12   Q.  Did you have any agreement with the government at the time

13   that you pleaded guilty?

14   A.  Yes.

15   Q.  What kind of agreement did you have?

16   A.  A cooperation agreement.

17   Q.  What benefit were you hoping to receive as a result of your

18   cooperation?

19   A.  The best sentence possible.

20   Q.  Have you met with the government in connection with your

21   cooperation?

22   A.  I have.

23   Q.  Many times?

24   A.  About a dozen times.

25   Q.  What is your understanding of what you are required to do

1   under your cooperation agreement?

2   A.  Tell the truth, provide relevant information, and not

3   commit any crimes.

4   Q.  If you live up your obligations under the agreement, what

5   is your understanding of what the government will do?

6   A.  They will tell my judge I cooperated and all the other

7   facts of my case.

8   Q.  Are they going to tell the judge just about your

9   cooperation or other things as well?

10  A.  Everything.

11  Q.  Does that include your crimes?

12  A.  Yes.

13  Q.  What are you hoping will happen as a result of the

14  government writing this letter to the judge?

15  A.  I hope to get the best sentence possible.

16  Q.  Will the government recommend a specific sentence to the

17  judge?

18  A.  No.

19  Q.  What is the highest sentence that you can get for all the

20  crimes that you pleaded guilty to?

21  A.  35 years.

22  Q.  In addition to the scheme to pay players and their

23  families, did you also plead guilty to bribing public

24  officials?

25  A.  Yes.

1    Q.   Who were those officials?

2    A.   Coaches.

3    Q.   Under this agreement, did you receive immunity for certain

4    things?

5    A.   Yes.

6    Q.   What did you receive immunity for?

7    A.   Lying to the FBI.

8    Q.   Is 35 years the maximum punishment even if the government

9    writes that letter to the judge?

10   A.   Yes.

11   Q.   Do you face any fines?

12   A.   Yes.

13   Q.   What is your understanding of who will ultimately decide

14   your sentence?

15   A.   A judge.

16   Q.   Is the judge required to give you a lower sentence if the

17   government writes a letter on your behalf?

18   A.   No.

19   Q.   If you violate the cooperation agreement, do you believe

20   that the government will still write that letter to the judge?

21   A.   No.

22   Q.   Have you been promised that you will get a lower sentence

23   as a result of your cooperation?

24   A.   No.

25   Q.   Have any promises been made to you about the sentence that

1    you will get?

2    A.  No.

3    Q.  Mr. Sood, do you believe that the outcome of this trial

4    will have any effect on whether the government writes that

5    letter to the judge?

6    A.  No.

7    Q.  What is your understanding of what does matter under the

8    agreement?

9    A.  I tell the truth.

10   Q.  What happens if you're not truthful?

11   A.  The government could tear up the agreement.

12   Q.  Are you still bound by your guilty plea at that point?

13   A.  Yes.

14            MR. SOLOWIEJCZYK:  Your Honor, the government offers

15   Government Exhibit 4 at this time.

16            Actually, my apologies.

17   Q.  Can I direct your attention in the binder that you have to

18   Government Exhibit 4.

19            My apologies.  2004, Mr. Sood.

20   A.  OK.

21   Q.  Do you recognize that document?

22   A.  Yes.

23   Q.  What is it?

24   A.  It's the cooperation agreement.

25   Q.  Can you turn to the last page?

1   A.  Yes.

2   Q.  Did you sign this agreement?

3   A.  I did.

4   Q.  Was that at the time you pleaded guilty?

5   A.  Yes.

6           MR. SOLOWIEJCZYK:  The government offers Government

7   Exhibit 2004.

8           THE COURT:  Received.

9           (Government's Exhibit 2004 received in evidence)

10  Q.  Mr. Sood, did you eventually go forward with forming a

11  company with Christian Dawkins and Jeff DeAngelo?

12  A.  Yes.

13  Q.  I want to direct your attention to what has been marked as

14  523 that is in front of you.

15          Do you recognize that document?

16  A.  Yes.

17  Q.  Generally what is it?

18  A.  It's a shareholders agreement between the partners.

19  Q.  Did you sign this agreement?

20  A.  I did.

21  Q.  Did you review it before you signed it?

22  A.  I did.

23          MR. SOLOWIEJCZYK:  The government offers Government

24  Exhibit 523.

25          THE COURT:  Received.

IA38GAT2                          Sood - Direct

1          (Government's Exhibit 523 received in evidence)

2     Q.  Mr. Sood, I want to direct your attention to the second to

3     last page of the document.

4          MR. SOLOWIEJCZYK:  Permission to publish, your Honor.

5     My apologies.

6          THE COURT:  Yes.

7     Q.  Who are the signatories to this agreement?

8     A.  Christian Dawkins, Jeff DeAngelo and myself.

9     Q.  Did you meet in person to sign this agreement?

10    A.  Yes.

11    Q.  Where did you meet?

12    A.  In Manhattan.

13    Q.  Directing you to the fourth page of the document, and the

14    provision number 5 in particular.

15    A.  OK.

16    Q.  Mr. Sood, were you going to be providing any funds to Loyd

17    as part of the formation of the company?

18    A.  Yes.

19    Q.  How much were you providing?

20    A.  I was providing 40,000.

21    Q.  And how much was Mr. DeAngelo providing?

22    A.  185,000.

23    Q.  What did Dawkins tell you regarding how these funds were

24    going to be used?

25    A.  A combination of salary, travel expenses, and to pay family

1    members or others.

2    Q.   Family members and others related to who?

3    A.   College players.

4    Q.   Directing your attention to the last page of the document.

5    A.   Yes.

6    Q.   What percentage stake were you going to be receiving in

7    Loyd?

8    A.   15 percent.

9    Q.   How about Mr. DeAngelo?

10   A.   35.

11   Q.   What about Mr. Dawkins?

12   A.   50.

13   Q.   Why was Dawkins getting the greatest percentage?

14   A.   He was going to be operating the business day-to-day.

15   Q.   What was his title within the company?

16   A.   President.

17   Q.   I want to direct you to page 6 of the document, the top of

18   that page.

19            MR. SOLOWIEJCZYK:   The next page, please.   The

20   addresses.

21   Q.   Where did you believe Jeff DeAngelo was based, Mr. Sood?

22   A.   Manhattan.

23   Q.   Did you end up providing the funds that are described in

24   this agreement?

25   A.   Yes.

1    Q.   Why did you provide those funds?

2    A.   In order to get clients.

3    Q.   I want to direct you now to Government Exhibit 520.

4         Do you recognize that document?

5    A.   OK.  Yes.

6    Q.   What is it?

7    A.   It's an e-mail from Christian Dawkins on May 24, 2017 to

8    me.

9    Q.   What does it generally relate to?

10   A.   A list of various potential clients.

11        MR. SOLOWIEJCZYK:  The government offers Government

12   Exhibit 520, your Honor.

13        THE COURT:  Received.

14        (Government's Exhibit 520 received in evidence)

15   Q.   What is the date of this e-mail, Mr. Sood?

16   A.   May 24, 2017.

17   Q.   What is the subject?

18   A.   Loyd Inc.

19   Q.   Directing you to the first section of the e-mail, "Below is

20   a list of guys I have retained."  Do you see that section?

21   A.   Yes.

22   Q.   What is your understanding as to what stage of their

23   careers these players were in?

24   A.   Either entering the NBA or in the NBA.

25   Q.   Going to the next section of the e-mail, Mr. Dawkins

1  stated, "Here is a list of guys I am involved with moving

2  forward."

3          What was your understanding of the stage of the

4  careers these players were in?

5  A.  College, except for one.

6  Q.  Who is the one?

7  A.  Brian Bowen.

8  Q.  What does it say as to Mr. Bowen?

9  A.  College undecided.

10 Q.  At the time you received this e-mail, did you know any

11 specifics about Brian Bowen's college decision?

12 A.  No.

13 Q.  Mr. Sood, I want to direct your attention to June of 2017.

14 Did there come a time when you travelled to Las Vegas?

15 A.  Yes.

16 Q.  Why did you go to Las Vegas?

17 A.  To attend the ASM Sports Day.

18 Q.  What was that?

19 A.  That's when the agency had all their prospective clients

20 attend and be met with -- be with coaches and professional NBA

21 coaches and scouts and general managers.

22 Q.  Who invited you?

23 A.  Christian.

24 Q.  Was he there as well?

25 A.  Yes.

1   Q.  Mr. Sood, did you frequently communicate with Mr. Dawkins

2   via text message?

3   A.  Yes.

4   Q.  I want to direct your attention to what has been marked as

5   Government Exhibits 102N-1, N-2, N-3, N-4, and N-5.

6           What are those documents?

7   A.  Text messages between myself and Christian.

8           MR. SOLOWIEJCZYK:  The government offers Government

9   Exhibits 102N-1, 102N-2, 102N-3, 102N-4 and 102N-5.

10          THE COURT:  Is there any objection?

11          MR. HANEY:  No objection.

12          MR. MOORE:  No objection.

13          MS. DONNELLY:  No objection.

14          THE COURT:  Government Exhibits 102N-1 through N-5

15  received.

16          (Government's Exhibits 102N-1, 102N-2, 102N-3, 102N-4,

17  102N-5 received in evidence)

18          MR. SOLOWIEJCZYK:  Permission to publish 102N-1.

19          THE COURT:  Yes.

20  BY MR. SOLOWIEJCZYK:

21  Q.  Mr. Sood, what time period does this exhibit cover?

22  A.  June 1st to June 3rd.

23  Q.  Were you in Las Vegas during this time period?

24  A.  Yes.

25  Q.  Was that for the ASM Sports Day?

1    A.  Yes.

2    Q.  Looking at the first message --

3              MR. SOLOWIEJCZYK:  If you could just zoom in on that,

4    Ms. Lee.

5    Q.  -- who is that message from?

6    A.  It's from me to Christian.

7    Q.  What was the Culinary Dropout restaurant?

8    A.  It's a restaurant in the Hard Rock Hotel & Casino.

9    Q.  Did you end up meeting with Mr. Dawkins there that day?

10   A.  Yes.

11   Q.  During that meeting, did there come a time when Dawkins

12   took a phone call?

13   A.  Yes.

14   Q.  Were you able to hear the other side of the call?

15   A.  No.

16   Q.  By the way Mr. Sood, was that meeting on the date of this

17   message?

18   A.  Yes.

19   Q.  When Dawkins got off the phone, what, if anything, did he

20   tell you about who he was speaking with?

21   A.  What I recall is that he was speaking with Rick Pitino.

22   Q.  Who is Rick Pitino?

23   A.  The former head coach of University of Louisville.

24   Q.  What did Dawkins tell you about the conversation he had

25   just had?

1   A.   That a player named Brian Bowen was going to go to

2   University of Louisville to play basketball.

3   Q.   Did he tell you anything else about the conversation?

4   A.   No.

5   Q.   What did Dawkins say to you that day, if anything, about

6   the role he had played in Brian Bowen's college decision?

7   A.   That he played an important role in helping him decide.

8   Q.   I want to direct you to the last page of the document,

9   102 -- the third page, the last message.

10          What date is this from?

11  A.   June 3rd.

12  Q.   Who is this message from?

13  A.   From me.

14          MR. SOLOWIEJCZYK:  Can you zoom in on it, Ms. Lee.

15  Q.   Was this a few days after the lunch meeting you had with

16  Mr. Dawkins?

17  A.   Yes.

18          THE COURT:  Which exhibit is this, please.

19          MR. SOLOWIEJCZYK:  102N-1, your Honor.

20          THE COURT:  Thank you.

21  Q.   Mr. Sood, around the time Loyd was formed, did Dawkins

22  introduce you to anyone that was affiliated with Adidas?

23  A.   Yes.

24  Q.   Who was that?

25  A.   Merl Code.

IA38GAT2                        Sood - Direct

1   Q.  What did Dawkins tell you about Merl Code?

2   A.  That he was in the -- he worked with Adidas in their

3   basketball group, and he had spent about 14 years at Nike and

4   now he was helping Adidas build their basketball practice.

5   Q.  What did Dawkins say, if anything, whether Code could be

6   helpful to your new business?

7   A.  Yes.  He said he had a tremendous amount of relationships

8   across players, coaches, and I guess AAU coaches as well.

9   Q.  Did you eventually meet with Mr. Code?

10  A.  Yes.

11  Q.  Where did that occur?

12  A.  In Manhattan.

13  Q.  What was generally the purpose of that meeting?

14  A.  To discuss how we can work together.

15  Q.  Mr. Sood, who was present for that meeting?

16  A.  Myself, Merl Code, Christian Dawkins, Marty Blazer, my

17  assistant Alicia, Jeff DeAngelo, and Jill Bailey.

18  Q.  You mentioned Jill Bailey.  Who did you think she was?

19  A.  At that time, I thought she was Jeff DeAngelo's business

20  partner.

21  Q.  What did you later learn about Jill Bailey?

22  A.  She was also an undercover agent.

23         MR. SOLOWIEJCZYK:  At this time, the government

24  requests permission to publish Government Exhibit 75 and

25  Government Exhibit 75T, which is a transcript of Government

1    Exhibit 75.

2              THE COURT:  Yes.

3              MR. SOLOWIEJCZYK:  Your Honor, permission to

4    distribute binders of the transcripts that we are going to be

5    going through during the examination to the jury.

6              THE COURT:  Yes.

7              Members of the jury, don't go leafing through these

8    transcripts.  Look only at the ones that counsel directs you to

9    and only when he is directing you to do that.

10             I should tell you also that the evidence of these

11   telephone calls, meetings, and other recorded events actually

12   is the recording.  The transcripts are an aid to you in

13   following the recordings, and if for any reason you hear some

14   difference between the recording and the transcript, it's the

15   recording that is the evidence as distinguished from the

16   transcript.  That holds throughout the case unless I tell you

17   otherwise.

18   BY MR. SOLOWIEJCZYK:

19   Q.  Mr. Sood, did you have an opportunity to review Government

20   Exhibit 75T before testifying?

21   A.  Yes.

22   Q.  Did you have an opportunity to correct any inaccuracies

23   within that transcript?

24   A.  Yes.

25   Q.  At the time of this meeting, did you know it was being

1    recorded?

2    A.  No.

3          MR. SOLOWIEJCZYK:  Ms. Lee, if you could play the

4    first clip.

5          (Video played)

6          MR. SOLOWIEJCZYK:  Can you pause for a second,

7    Ms. Lee.

8    Q.  Who is speaking just now?

9    A.  That was Christian Dawkins.

10         MR. SOLOWIEJCZYK:  You can proceed, Ms. Lee.

11         (Video played)

12         MR. SOLOWIEJCZYK:  Can you pause for a moment,

13   Ms. Lee.

14   Q.  Who is speaking right now, Mr. Sood?

15   A.  Merl Code.

16         MR. SOLOWIEJCZYK:  Thank you, Ms. Lee.

17         (Video played)

18   Q.  Mr. Sood, directing your attention back to page 7, line 19

19   of the transcript, and focusing your attention to the term

20   "shoe wars," what did you understand the shoe wars to be?

21   A.  When the top shoe companies, top shoe companies are trying

22   to retain basketball players to wear their sneakers and other

23   apparel.

24   Q.  Mr. Sood, did Christian Dawkins indicate to you why you

25   were meeting with Merl Code?

1   A.  So we could potentially work together in his relationships.

2   Q.  At this point, how long had you known Dawkins,

3   approximately?

4   A.  About a year.

5   Q.  Did you frequently communicate with him about the business

6   you were starting?

7   A.  Yes.

8   Q.  About your player recruitment strategy?

9   A.  Yes.

10  Q.  By phone?

11  A.  Phone, text, e-mail.

12  Q.  In person?

13  A.  Yes.

14  Q.  You formed a business together, is that right?

15  A.  Yes.

16  Q.  When he spoke to you and used certain terminology, did you

17  generally understand what he meant based on your existing

18  relationship?

19  A.  Yes.

20  Q.  Is that also true with Mr. Code once you met him at this

21  meeting?

22  A.  Yes.

23  Q.  I want to direct you to page 7, lines 21 to 25 of that

24  portion of the recording.

25              Mr. Code stated, "We all have our own leagues with our

1    own kids and we are trying to keep our kids obviously to see

2    them grow and develop but hopefully be able to sign them as

3    they become pros."

4         What was the purpose of Adidas grassroots basketball,

5    what was the ultimate objective?

6    A.  To build relationships early so they can follow through as

7    they turn pro.

8         THE COURT:  Is this a convenient spot for the morning

9    break?

10        MR. SOLOWIEJCZYK:  Yes, your Honor.

11        THE COURT:  Ten minutes.

12        The jury should know that we are going to take the

13   lunch break at 12 today, which is early, just because of other

14   commitments.

15        (Jury exits courtroom)

16        (Recess)

17        (Jury present)

18        THE COURT:  The jury and the defendants are present as

19   they have been throughout.

20        You may continue.

21   BY MR. SOLOWIEJCZYK:

22   Q.  Mr. Sood, by the time of this meeting, had you been

23   involved in paying player families for over a year?

24   A.  Yes.

25   Q.  Who was that involvement with?

1   A.   Christian Dawkins.

2   Q.   By the time of this meeting, had you been involved in

3   recruiting athletes as clients for a period of many years?

4   A.   Yes.

5   Q.   Prior to this meeting, did you have a discussion with

6   Dawkins in which he explained to you the purpose of this

7   meeting?

8   A.   Yes.

9   Q.   Did he explain to you what role Code would play in your

10  strategy?

11  A.   Yes.

12  Q.   Did you discuss all these matters before the meeting?

13  A.   Yes.

14  Q.   I want to direct your attention to page 8, lines 1 to 12.

15          THE COURT:   Referring to the transcript of the June

16  20.

17          MR. SOLOWIEJCZYK:   Yes.

18  Q.   When Code stated, "We all have our own leagues with our own

19  kids and we are trying to keep our kids obviously to see them

20  grow and develop but hopefully to be able to sign them as they

21  become pros," what did you understand Code to mean?

22          MR. MOORE:   Objection.   Speculation.

23          THE COURT:   Foundation.

24          MR. SOLOWIEJCZYK:   Your Honor, at this point we

25  believe we have laid a foundation that Mr. Sood was working

1   closely with Mr. Dawkins and Mr. Code and understood how this

2   space worked and operated.

3           THE COURT:  I think you need to do a little better.

4   BY MR. SOLOWIEJCZYK:

5   Q.  Mr. Sood, did you have an understanding of what Code's role

6   was going to be in your strategy to recruit players?

7   A.  Yes.

8   Q.  Did you believe that you had an understanding sitting in

9   that room --

10          THE COURT:  Where did you get the understanding of

11  what Mr. Code's role was to be?

12  Q.  That's the question, Mr. Sood.

13          THE WITNESS:  I'm sorry, your Honor.

14          THE COURT:  Where did you get your understanding,

15  whatever it was, as to what Mr. Code's role was supposed to be?

16          THE WITNESS:  Yes.  From Christian Dawkins.

17          THE COURT:  Next question.

18  Q.  What was your role --

19          MR. SOLOWIEJCZYK:  One moment, your Honor.

20          THE COURT:  Try this one.

21          What did Mr. Dawkins tell you about that?

22          THE WITNESS:  That Merl with his experience will be

23  able to introduce us to potential clients.

24          THE COURT:  Counsel.

25  Q.  Mr. Sood, directing you to page 8, lines 1 through 12, what

1    did you understand Code's strategy was going to be with kids in

2    grassroots basketball?

3              MR. MOORE:  Objection.

4              THE COURT:  The first thing is I have to hear the

5    question, right?  Because if I don't hear the question, then

6    all I am hearing is objection.

7              MR. MOORE:  Thank you.

8              THE COURT:  Now, let me see if I can read the

9    question.

10             Sustained in that form.

11   Q.  Sitting in that room, what did you believe the strategy

12   would be for your company Loyd Inc. with respect to players in

13   grassroots basketball?

14   A.  If we start working with them at that age, we will be able

15   to follow them through through college and hopefully to the pro

16   level.

17   Q.  How, if at all, did Adidas factor into that strategy?

18             MR. MOORE:  Objection.

19             THE COURT:  Overruled.

20   A.  Adidas would be able to provide support, either monetary or

21   other support.

22   Q.  How, if at all, was it relevant to your strategy where

23   grassroots players went to college?

24   A.  There will be less competition for us and higher

25   probability that we would get the players as clients.

1  Q.  Did it matter to your strategy whether the players went to

2  Adidas-sponsored schools?

3  A.  No.

4  Q.  Didn't Mr. Code work for Adidas, Mr. Sood?

5  A.  Yes.  Sorry.  So, obviously, with Adidas behind us, it will

6  be easier for us to get them as clients as they go pro.

7          MR. SOLOWIEJCZYK:  You can keep playing the video,

8  Ms. Lee.

9          (Video played)

10  Q.  Mr. Sood, what did that last portion of the meeting pertain

11  to?

12  A.  How the role that was played by Christian Dawkins, Merl and

13  Adidas in getting Brian Bowen to attend University of

14  Louisville.

15          THE COURT:  Counsel, help me out here.  This is

16  Government Exhibit 75A-T, is that right?

17          MR. SOLOWIEJCZYK:  No, your Honor.  It's 75T.

18          THE COURT:  Thank you.  Go ahead.

19          MR. SOLOWIEJCZYK:  We are on page 10, your Honor.

20          THE COURT:  Got that.

21          Go ahead.

22  Q.  What was your understanding of what Merl Code and Adidas

23  played in Bowen's college decision?

24  A.  He played a major role.

25          MR. SOLOWIEJCZYK:  You can keep going, Ms. Lee.

1            (Video played)

2            MR. SOLOWIEJCZYK:  Ms. Lee, we are going to move to

3    the text clip which begins at page 31, line 18 of the

4    transcript, 75T.

5            (Video played)

6    Q.  Mr. Sood, what did you understand Dawkins to mean when he

7    said -- withdrawn.

8            What did you understand Dawkins to be saying regarding

9    how Merl Code, if at all, could assist your recruiting efforts?

10           MR. MOORE:  Objection.

11           THE COURT:  Sustained.

12           MR. SOLOWIEJCZYK:  Your Honor, this is with respect to

13   Mr. Dawkins.

14           THE COURT:  I know.

15   Q.  Did you have an understanding as to how Merl Code, if at

16   all, could assist in your recruiting efforts?

17   A.  Yes.

18   Q.  What was that understanding based on?

19   A.  His relationships and his ability to get us access to

20   players at grassroot levels.

21           MR. SOLOWIEJCZYK:  You can keep going, Ms. Lee.

22           (Video played)

23   Q.  Mr. Sood, what did you understand Code to mean when he

24   stated there was no recourse -- my apologies.

25           Did you understand what Code meant when he said there

```
 1    was no recourse?

 2    A.  Yes.

 3    Q.  What was your understanding based on?

 4    A.  The fact that we are not supposed to be paying college

 5    players or their family members.

 6              MR. SOLOWIEJCZYK:  You can continue, Ms. Lee.

 7              (Video played)

 8              MR. SOLOWIEJCZYK:  You can play the next clip, which

 9    starts at page 37, line 21.

10              (Video played)

11    Q.  Mr. Sood, did you understand what Dawkins was saying when

12    he said, "But all those schools had a guy who was a top 15 pick

13    and I like, listen, whoever gets me the guy who is going to

14    have the best chance to be put in a position to get the kid, I

15    mean it was just the bottom line."

16    A.  Yes.

17    Q.  What was that understanding based on?

18    A.  Just the discussion that if Brian Bowen goes to a

19    particular school, in return, we would want a top player we

20    could work with right away.

21    Q.  What understanding did you have, if any, whether where

22    Brian Bowen went school would impact the bottom line for your

23    business?

24              MR. MOORE:  Objection.

25              THE COURT:  Foundation.
```

1          MR. SOLOWIEJCZYK:  Withdrawn, your Honor.

2     Q.  Did you discuss with Mr. Dawkins how where Brian Bowen went

3     to school could affect your business?

4     A.  Yes.  If he went to an Adidas school, there was a higher

5     probability he would work with us.

6     Q.  Did you believe, based on your conversations with Mr.

7     Dawkins, that he had control or a role in Bowen's decision of

8     where to go to college?

9     A.  Yes.

10    Q.  What was your understanding, if any, based on your

11    conversations with Dawkins, whether he was a deciding factor in

12    Bowen's decision?

13    A.  He played a critical role.

14         THE COURT:  Is that something he said to you or is

15    that a conclusion you came to in your mind?

16         THE WITNESS:  I believe it was a conclusion, your

17    Honor.

18         MR. MOORE:  Move to strike, your Honor.  He believes

19    it was a conclusion.  Didn't seem too certain.

20         THE COURT:  I will strike it, but the government can

21    try to lay a better foundation if it wishes.

22         The jury will disregard it for now.

23    Q.  Mr. Sood, did you have discussions with Mr. Dawkins about

24    how Brian Bowen ended up at the University of Louisville?

25    A.  Yes.

1   Q.   During those discussions, did Dawkins indicate to you the

2   role he had played in that decision?

3                THE COURT:  If any.

4   A.   Yes.

5                THE COURT:  What did he say?

6                THE WITNESS:  That he played a critical role in

7   getting Brian to go to the university.

8                MR. SOLOWIEJCZYK:  You can continue with the clip,

9   Ms. Lee.

10               (Video played)

11               MR. SOLOWIEJCZYK:  Your Honor, permission to publish

12  75A, which is a continuation of this video.

13               THE COURT:  All right.

14               MR. SOLOWIEJCZYK:  I believe we are going to begin at

15  page 2, line 14 of the transcript, which is 75AT.

16               (Video played)

17  Q.   Mr. Sood, based on this conversation, what, if anything,

18  did you think regarding the role Oregon had played in Brian

19  Bowen's college decision?

20  A.   I believe he was planning to attend Oregon.

21  Q.   Based on this portion of the conversation, what, if

22  anything, did you think Dawkins and Code wanted with respect to

23  that decision?

24               MR. MOORE:  Objection.

25               MR. HANEY:  Objection.

1          THE COURT:  Sustained.

2     Q.  Mr. Sood, did you believe that Merl Code played a role in

3     Brian Bowen going to the University of Louisville?

4     A.  Yes.

5     Q.  Was that based in part on the conversation that happened

6     here that day?

7     A.  Yes.

8     Q.  At line 19 of page 4, Mr. Dawkins stated, "By getting him a

9     good scholarship, that's how."

10          Based on your prior discussions with Christian

11    Dawkins, did you think that a scholarship was why Brian Bowen

12    went to Louisville?

13          MR. MOORE:  I object.

14          THE COURT:  Sustained.

15          Did something happen in this meeting immediately after

16    Mr. Dawkins said that?

17          Mr. Sood, did something happen?

18          You were there, right?

19          THE WITNESS:  Yes.

20          THE COURT:  What happened?

21          THE WITNESS:  Well, we had talked about -- they had

22    talked about --

23          THE COURT:  Was there any reaction by people to what

24    Mr. Dawkins said?

25          THE WITNESS:  I don't recall, your Honor.

IA38GAT2                          Sood - Direct

1    Q.  Directing you to the transcript, line 21.

2            MR. SOLOWIEJCZYK:  Can you replay that portion of the

3    clip, Ms. Lee.

4            (Video played)

5    Q.  Was there laughter after Dawkins said that?

6            MR. MOORE:  Objection.

7            THE COURT:  Overruled.

8            MR. SOLOWIEJCZYK:  You can go on to the next clip,

9    Ms. Lee.

10           It's at page 7, line 3.

11           (Video played)

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. SOLOWIEJCZYK:  Ms. Lee, we can go on to the next

2     clip, which begins at page 19, line 14.

3              (Video played)

4              MR. SOLOWIEJCZYK:  Turning to the next clip, it begins

5     at page 25, line 12.

6              THE COURT:  OK.  We are going to break here for lunch.

7              1:15, folks.

8              THE CLERK:  All rise.

9              Will the jury please come this way.

10             (Luncheon recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **A F T E R N O O N   S E S S I O N**

2                                  1:27 p.m.

3             (Jury not present)

4             THE COURT:  Good afternoon, everyone.

5             Let's get the jury.

6             (Pause)

7             THE CLERK:  Jury entering.

8             (Jury present)

9             THE CLERK:  Please be seated, everybody.

10            THE COURT:  Good afternoon, folks.

11            The jurors and the defendants all are present.

12            Let's get the witness on the stand.

13   MUNISH SOOD, resumed.

14            THE COURT:  All right.  The witness is still under

15   oath.

16            You may continue.

17   DIRECT EXAMINATION (Resumed)

18   BY MR. SOLOWIEJCZYK:

19   Q.  Mr. Sood, at the outset of your testimony, you stated you

20   were involved in making a payment to Brian Bowen, Sr.  Who did

21   you agree to make those payments with?

22   A.  Christian Dawkins, Merl Code, and Adidas.

23   Q.  Did you have any conversations about Bowen with Christian

24   Dawkins prior to the day you made the payment?

25   A.  Yes.

1   Q.  Did you have any conversations with Merl Code about Bowen

2   prior to the day you made the payment?

3   A.  Yes.

4   Q.  Did you believe these payments would be disclosed to the

5   University of Louisville?

6   A.  No.

7   Q.  Before our lunch break, we were reviewing Government

8   Exhibit 75A, which is a video of a meeting.  Was that meeting

9   one of the conversations you had with Christian Dawkins and

10  Merl Code about the Bowen payments?

11  A.  Yes.

12          MR. SOLOWIEJCZYK:  All right.  We are turning to page

13  25, line 12.

14          (Video played)

15  Q.  Mr. Sood, in that portion of the recording, Rick Patino is

16  mentioned.  Who is he?

17  A.  The former coach of the University of Louisville

18  basketball.

19  Q.  Sitting there in that room, did you believe that Rick

20  Patino had been told about the payments?

21  A.  I believe that he knew something but not everything.

22          MR. SOLOWIEJCZYK:  Turning to page 31, line 12.

23          (Video played)

24  Q.  Mr. Sood, in recruiting clients, how, if at all, would it

25  assist you to have access to grassroots basketball teams?

1    A.  It allows us to work with players at a much younger age

2    than at the pro level.

3    Q.  How, if at all, did you believe Merl Code could assist you

4    with that access?

5    A.  As he said, he had access to a lot of these programs'

6    coaches.

7    Q.  Was that in part based on his role at Adidas?

8    A.  Yes.

9            MR. SOLOWIEJCZYK:  We are going to turn to page 35,

10   line 16.

11           (Video played)

12           MR. SOLOWIEJCZYK:  Then, Ms. Lee, we are going to go

13   ahead all the way to page 72.

14           (Video played)

15           MR. SOLOWIEJCZYK:  Ms. Lee, just turn to page 73 for a

16   moment.

17   Q.  At line 20, Merl Code said, "Jim and I are meeting

18   tonight."

19           Mr. Sood, at that time did you know who Jim was?

20   A.  No.

21   Q.  Mr. Sood, after the meeting in New York that day, where did

22   you go?

23   A.  I went to the bank.

24   Q.  And why did you go to the bank?

25   A.  To make a deposit.

1   Q.  What account did you deposit money into?

2   A.  Loyd, Loyd Management.

3   Q.  Who controlled that account?

4   A.  Christian Dawkins.

5   Q.  What was that money for?

6   A.  For expenses and paying family members, handlers.

7   Q.  Was the branch you went to in Manhattan?

8   A.  Yes, it was.

9           MR. SOLOWIEJCZYK:  Your Honor, at this time the

10  government would like to publish Government Exhibit 21 and 21T,

11  the related transcript.

12          THE COURT:  Yes.

13          (Video played)

14          THE COURT:  What page of the transcript should we have

15  been looking at?

16          MR. SOLOWIEJCZYK:  My apologies, your Honor.  We are

17  starting at page 12, and I was -- your Honor, I also was just

18  going to note the first page of the transcript states the call

19  was on July 7, 2017, and the participants are Merl Code and

20  Christian Dawkins.

21          So, we are starting on page 12 at line 13.

22          THE COURT:  Try to keep things running in sync.  OK?

23          (Video played)

24          MR. SOLOWIEJCZYK:  And turning to page 19 of the

25  transcript.

1              (Video played)

2              MR. SOLOWIEJCZYK:  You can take that exhibit down,

3     Ms. Lee.

4     Q.  Mr. Sood, did there come a time when you learned more

5     details regarding the circumstances of Brian Bowen's commitment

6     to the University of Louisville?

7     A.  Yes.

8     Q.  Who did you first learn this from?

9     A.  From Christian.

10    Q.  Did you have a conversation with Dawkins regarding those

11    details?

12    A.  Yes.

13    Q.  Was it by phone?

14    A.  Yes.

15    Q.  During that telephone call, what did Dawkins tell you?

16    A.  He just mentioned that there was a delay at Adidas.

17    They -- they promised a hundred thousand to the father, to

18    Brian Bowen, Sr., and the first payment was about two -- a

19    couple of weeks late.

20    Q.  Why did they promise the hundred thousand to Bowen Senior?

21    A.  To ensure that his -- that Brian Bowen, Jr. goes to play

22    basketball at Louisville.

23    Q.  What, if anything, was being asked of you at that time?

24    A.  Provide a loan of 25,000.

25    Q.  When you say "a loan," what do you mean?

1   A.  That we would get paid back by Adidas hopefully in a few

2   weeks.

3           MR. SOLOWIEJCZYK:  I want to direct your attention to

4   Government Exhibit 22.  And with the Court's permission, we

5   would play that recording at this time.

6           THE COURT:  Yes.

7           MR. SOLOWIEJCZYK:  And 22T is the associated

8   transcript.

9           This call is dated July 7, 2017, and the participants

10  are Christian Dawkins and Munish Sood.

11          So, this is Government Exhibit 22, July 7, 2017.  The

12  participants are Christian Dawkins and Munish Sood, and we are

13  starting at page 1, line 1.

14          (Video played)

15          MR. SOLOWIEJCZYK:  Now turning to page 3, line 7 of

16  the transcript.

17          (Video played)

18          MR. SOLOWIEJCZYK:  You can take that down, Ms. Lee.

19  Q.  Mr. Sood, did you have a conversation with Jeff DeAngelo

20  regarding the payments?

21  A.  I did.

22  Q.  What was his reaction?

23  A.  You know, he was open to it but he wanted additional

24  information.

25  Q.  Open to doing what?

Ia3dgat3                        Sood - direct

1     A.   Providing the $25,000.

2     Q.   What steps, if any, did you take to find out more

3     information about the payments?

4     A.   I arranged for a conference call between myself, Jeff

5     DeAngelo and Merl Code.

6     Q.   At the time of this call, where did you believe Jeff

7     DeAngelo was based?

8     A.   In Manhattan.

9              MR. SOLOWIEJCZYK:  I want to direct your attention to

10    Government Exhibit 57.

11             And with the Court's permission, we would offer

12    that -- sorry, it is in evidence, to publish it and the

13    transcript as well.

14             THE COURT:  Yes.

15             MR. SOLOWIEJCZYK:  We are starting at -- my apologies.

16    Before we start, this is a call from July 10, 2017.  The

17    participants are Munish Sood, Merl Code and Jeff DeAngelo, and

18    we are starting at page 1, line 1.

19             (Video played)

20             MR. SOLOWIEJCZYK:  Pause there.  Thanks.

21    Q.   Mr. Sood, who was funding the payments for Mr. Bowen?

22    A.   Merl Code and Adidas.

23             MR. SOLOWIEJCZYK:  You can continue.

24             (Video played)

25    Q.   Mr. Sood, you ultimately participated in the payments to

Ia3dgat3                         Sood - direct

1    Brian Bowen, Sr., correct?

2    A.  Yes.

3    Q.  Who were you trying to help when you were involved in those

4    payments?

5    A.  We were trying to help ourselves and Adidas.

6            MR. SOLOWIEJCZYK:  You can continue, Ms. Lee.

7            (Video played)

8    Q.  Mr. Sood, based on your participation in this call, did you

9    believe the purchase orders and invoices Merl Code was

10   referring to -- withdrawn.

11           Mr. Sood, what, if anything, did you think about the

12   purchase orders and invoices Merl Code referred to on this

13   call?

14           MR. MOORE:  Objection.

15           MR. SCHACHTER:  Objection.

16           THE COURT:  Sustained.

17           MR. SOLOWIEJCZYK:  You can continue, Ms. Lee.

18           (Video played)

19   Q.  Mr. Sood, at the time of this call, did you believe that

20   Adidas could engage in a monetary relationship with an amateur

21   athlete?

22           MR. SCHACHTER:  Objection.

23           THE COURT:  Sidebar.

24           (Continued on next page)

25

1              (At the sidebar)

2              THE COURT:  What is the relevance of what this man

3      believed?

4              MR. SOLOWIEJCZYK:  He's testified that he is a member

5      of the scheme to make payments to Brian Bowen, Sr. along with

6      Merl Code and Christian Dawkins.  His state of mind is relevant

7      as a member of the conspiracy.  It is his understanding of what

8      the nature of these payments were and what disclosures were

9      going to be made about them.  Our understanding is there is

10     going to be cross-examination of this witness regarding what he

11     believed at the time about these payments.

12             THE COURT:  Well, I'm not ruling on the

13     cross-examination.

14             What is the response?  Whose objection is it?

15             MR. SCHACHTER:  It is my objection, your Honor.

16             The jury doesn't need to make a determination about

17     Mr. Sood's intent or his belief at the time.  They need to make

18     a determination as to what the defendants' beliefs were.  So

19     his testimony regarding his own belief is irrelevant and

20     prejudicial.

21             MR. MOORE:  And I would just add further, your Honor,

22     that I haven't heard any evidence thus far in this case which

23     would establish that he was a co-conspirator with our clients

24     in a conspiracy to defraud universities.  That's the crime

25     here.

1           THE COURT:  Yes.  But it also doesn't matter to the

2     admissibility question, does it?

3           MR. MOORE:  Perhaps not.

4           THE COURT:  There was obviously concerted action going

5     on here.

6           MR. MOORE:  I agree with that.

7           THE COURT:  And it is within the scope of the

8     concerted action.  So the question is is the mental state of

9     one of the conspirators -- "conspirator" for admissibility

10    purposes, not the charged crime -- admissible against the

11    others?

12          MR. MOORE:  And I would argue that it is not.

13          THE COURT:  Do you got a case?

14          MR. MOORE:  Not off the top of my head.

15          THE COURT:  How about you?

16          MR. SCHACHTER:  I do not.  And, actually, I actually

17    believe that the mental state of a co-conspirator is -- can be

18    relevant.  And in fact, you know, I do anticipate -- I wish to

19    hold the government to this position -- we do anticipate trying

20    to introduce evidence that is relevant to the mental state of a

21    co-conspirator.  And we do think it is relevant.  Nonetheless,

22    we believe that this man's testimony on the witness stand right

23    now, his belief, we suggest, is not a 401/403 analysis if the

24    prejudice outweighs the relevance.

25          THE COURT:  What do you have to say?

1          MR. SOLOWIEJCZYK:  Your Honor, it is obviously highly

2     probative given that he is a member of the conspiracy.  It is

3     obviously highly probative what he understood was being said on

4     these calls --

5          THE COURT:  That is a different question.  That is a

6     different question.

7          MR. SOLOWIEJCZYK:  His own belief goes to, among other

8     things, the illegality --

9          MR. SCHACHTER:  There is also another issue, your

10    Honor.

11         MR. SOLOWIEJCZYK:  It allows him to explain his own

12    conduct, which we understand, among other things, made things

13    happen.  His own understanding of his own conduct at the time

14    he was doing it it is going to be our understanding that they

15    are going to put at issue.

16         THE COURT:  How much longer are you going to be on

17    direct?

18         MR. SOLOWIEJCZYK:  I will try to keep it as short as

19    possible, your Honor.  Probably about an hour at most.  I am

20    trying to really cut out a lot of my questions, because I have

21    a sense that some of them your Honor may not be a big fan of.

22         THE COURT:  Pass over this and give me a heads up

23    before you come back to it.  Pass over it for now.  I want to

24    think about it.

25              (Continued on next page)

1            (In open court)

2            THE COURT:  OK.  Next question.

3            MR. SOLOWIEJCZYK:  You can continue playing, Ms. Lee.

4            (Video played)

5   Q.  Mr. Sood, following this call, did you make a payment to

6   Brian Bowen, Sr.?

7   A.  Yes.

8   Q.  Did you do it in cash?

9   A.  Yes.

10  Q.  Why did you do it in cash?

11  A.  That's what was requested.

12  Q.  Any other reasons?

13  A.  It was cleaned.

14           MR. SOLOWIEJCZYK:  You can keep playing, Ms. Lee.

15           THE COURT:  I'm sorry.  Pause.

16           Who made the request that it be done in cash?

17           THE WITNESS:  Merl Code.

18           THE COURT:  Go ahead.  Thank you.

19           MR. SOLOWIEJCZYK:  Thank you.

20           (Video played)

21           (Continued on next page)

22

23

24

25

1            (Video played)

2     BY MR. SOLOWIEJCZYK:

3     Q.  Mr. Sood, did Christian Dawkins ever tell you that he did

4     any consulting work for Adidas?

5     A.  No.

6            MR. SOLOWIEJCZYK:  You can keep playing, Ms. Lee.

7            (Video played)

8     Q.  Mr. Sood, what did Mr. Code tell you regarding how you

9     would be reimbursed the money?

10    A.  That he could not pay Loyd directly, but it had to go

11    through a 501(c)(3) foundation.

12           MR. SOLOWIEJCZYK:  You may continue, Ms. Lee.

13           (Video played)

14    Q.  Mr. Sood, did you ultimately agree after this call to be

15    involved in making a payment to Bowen Senior?

16    A.  Yes.

17    Q.  Why did you agree to make the payment?

18    A.  For the benefit of the business.

19    Q.  What business?

20    A.  The Loyd Management.

21    Q.  Is that the business you started with Dawkins?

22    A.  Yes.

23    Q.  Who actually provided the $25,000?

24    A.  Jeff DeAngelo.

25    Q.  How were you involved?

1    A.  I delivered it to the father.

2    Q.  How did you get the money from Jeff DeAngelo?

3    A.  Jeff DeAngelo came to my office the day before and dropped

4    off an envelope with the 25,000.

5            MR. SOLOWIEJCZYK:  Can I have one moment, your Honor.

6    Q.  Mr. Sood, did Christian Dawkins ever tell you that his

7    payments to Brian Bowen Senior would be disclosed to the

8    University of Louisville?

9            MR. MOORE:  Object, your Honor.

10           THE COURT:  Overruled.

11   A.  No.

12   Q.  Did Merl Code ever tell you that these payments to Brian

13   Bowen Senior would be disclosed to the University of

14   Louisville?

15   A.  No.

16   Q.  Mr. Sood, how did it matter to you, if at all, whether

17   Brian Bowen played college basketball?

18           MR. HANEY:  Objection.

19           THE COURT:  Overruled.

20   A.  Obviously, if he plays college basketball, it increases his

21   chances of making a pro basketball team.

22   Q.  At the time you made the payment, did you believe they were

23   permitted under NCAA rules?

24   A.  No.

25   Q.  Sir, I want to talk about the day you provided the payment,

1    Mr. Sood.

2              How much money did you provide to Mr. Bowen?

3    A.  19,400.

4    Q.  What did you do with the remainder of the 25,000?

5    A.  We deposited it in a bank.

6    Q.  Whose bank account?

7    A.  Loyd.

8    Q.  How much money did you give Bowen's father?

9    A.  19,400.

10   Q.  Where was Bowen's father coming from to meet you?

11   A.  From Louisville, Kentucky.

12   Q.  I want to direct you to 102N-3.  The page with the message

13   on July 12.

14             MR. SOLOWIEJCZYK:  It's a few pages ahead, Ms. Lee.

15   Q.  The middle of the page, can you just read the

16   message -- who sent that message to you in the first message?

17   A.  Christian Dawkins.

18   Q.  Could you just read it?

19   A.  "OK.  Cool.  Give him 19,400, put the rest in my account."

20   Q.  You said you did that, is that right?

21   A.  Yes.

22   Q.  What airport did Mr. Bowen fly into?

23   A.  LaGuardia.

24   Q.  Where did you end up meeting him?

25   A.  In a parking lot in an office building in northern New

1   Jersey.

2   Q.  Did you speak with Mr. Bowen by phone the day you met with

3   him?

4   A.  Yes.

5   Q.  Prior to meeting with Mr. Bowen, did you have a call with

6   Mr. Dawkins?

7   A.  Yes.

8   Q.  Was that soon before you provided the payment to Bowen

9   Senior?

10  A.  That's correct.

11  Q.  Directing you to Government Exhibit 63 and 63T.

12          MR. SOLOWIEJCZYK:  Your Honor, we would ask for

13  permission to publish this exhibit at this time.

14          THE COURT:  Yes.

15          MR. SOLOWIEJCZYK:  This is from July 13, 2017, and the

16  participants are Christian Dawkins and Munish Sood.

17          We are starting on page 1, line 1.

18          (Audio played)

19  Q.  Mr. Sood, as you were driving to meet Brian Bowen Senior,

20  how were you feeling?

21  A.  I was nervous.

22  Q.  Why were you nervous?

23  A.  I was driving around with 19,000, almost $20,000.

24  Q.  Had you ever been involved in delivering a cash payment

25  like this before?

1    A.  No.

2              MR. SOLOWIEJCZYK:  One moment, your Honor.

3    Q.  Mr. Sood, directing you to page 3, lines 18 to 22.

4              Who is Alicia?

5    A.  My assistant.

6              MR. SOLOWIEJCZYK:  You can take that down, Ms. Lee.

7    Q.  Where did you end up meeting Brian Bowen Senior?

8    A.  In a parking lot in northern New Jersey.

9    Q.  Why were you there in that parking lot?

10   A.  I had another meeting to attend.

11   Q.  Mr. Sood, can you describe what happened when you met with

12   Brian Bowen Senior in the parking lot?

13   A.  I got there first.  I was waiting for him.  He had a rental

14   car.  He pulled up next to me.  He came out.  I actually had

15   brought him a sandwich because he had been driving around so I

16   brought him a sandwich.  Then kind of small talk.  I gave him

17   the envelope with the money, and he invited me to come to

18   Louisville to watch his son play and meet the family.

19   Q.  Mr. Sood, after that meeting, did you speak with Christian

20   Dawkins again?

21   A.  Yes.

22   Q.  Was that by phone?

23   A.  Yes.

24             MR. SOLOWIEJCZYK:  Permission to publish Government

25   Exhibit 29 and 29T.

1          THE COURT:  Yes.

2          MR. SOLOWIEJCZYK:  This is a July 14, 2017 call

3    between Christian Dawkins and Munish Sood.  And we are going to

4    start at page 2, line 1.

5          (Audio played)

6    Q.  Mr. Sood, directing you to page 5, lines 18 through 20, you

7    mentioned here that you spoke to Jeff because Merl called me.

8    Did you have a conversation with Merl Code?

9    A.  Yes.

10   Q.  What was that conversation about?

11   A.  Merl was just, I recall was nervous about our previous call

12   between the three of us where I stated that Jeff -- it seemed

13   like Jeff was talking to somebody else in the background.

14   Q.  Directing you to page 6, lines 12 to 15, what, if anything,

15   did Merl tell you regarding text messages that had been sent to

16   him?

17   A.  I believe that Jeff was sending a number of -- multiple

18   text messages pretty much all day long.

19   Q.  To who?

20   A.  To Jeff -- sorry, to Merl Code.

21   Q.  What, if anything, did Merl say about his concerns

22   regarding that?

23   A.  It was making him nervous.

24          MR. SOLOWIEJCZYK:  At this time, the government would

25   request permission to -- the government offers Government

1    Exhibit 104L.

2              THE COURT:  Any objection?

3              Received.

4              (Government's Exhibit 104L received in evidence)

5              MR. SOLOWIEJCZYK:  If you could just zoom in, Ms. Lee.

6              Thank you, Ms. Lee.

7              MR. SOLOWIEJCZYK:  We are going to return now to

8    Government Exhibit 29 and pick up at page 8, line 13 of the

9    transcript.

10             (Audio played)

11             MR. SOLOWIEJCZYK:  You can take that down, Ms. Lee.

12   Q.  Mr. Sood, if I could direct your attention to Government

13   Exhibit 102N-4.

14   A.  OK.

15   Q.  Who are these text messages between?

16   A.  Myself and Christian.

17   Q.  Just looking at the first message at the top --

18             MR. SOLOWIEJCZYK:  If you could zoom in on that,

19   Ms. Lee.

20   Q.  -- who is this message from?

21   A.  From Christian.

22   Q.  Can you just read it?

23   A.  "Can you send the 6K today to my PNC account?"

24             MR. SOLOWIEJCZYK:  If you could go down to the next

25   set of messages, Ms. Lee, starting with "wire has been sent"

1   down to "Loyd."

2   Q.   Mr. Sood, did you in fact send the wire?

3   A.   Yes.

4   Q.   Which account did you send it to?

5   A.   Loyd.

6   Q.   If I could direct you to Government Exhibit 528.  It's in

7   your binder.  It's not yet in evidence.

8   A.   Which one is it, 528?

9   Q.   Yes.

10           Do you recognize that document?

11  A.   Hold on.

12  Q.   My apologies.

13  A.   OK.  Got it.

14  Q.   Do you recognize that document?

15  A.   Yes.

16  Q.   What is it?

17  A.   It's a wire transfer form.

18  Q.   From what account to what account?

19  A.   From a -- from MOGA Group to Loyd, to Loyd Inc.

20  Q.   What is MOGA Group?

21  A.   It's one of my entities.

22  Q.   Did you control the bank account for MOGA Group?

23  A.   Yes.

24  Q.   Did you cause this wire transfer to be sent?

25  A.   Yes.

1    Q.  You said it went to the Loyd Inc. account?

2    A.  Yes.

3           MR. SOLOWIEJCZYK:  The government offers Government

4    Exhibit 528, your Honor.

5           THE COURT:  Received.

6           (Government's Exhibit 528 received in evidence)

7           MR. SOLOWIEJCZYK:  Ms. Lee, turning back to 102N-4.

8           At the bottom of the page, if we can zoom in there.

9    Q.  Mr. Sood, directing you to the message from August 23, 2017

10   stating, "Is Jill bringing you my cash?," who sent that

11   message?

12   A.  Jill Bailey.

13   Q.  Who sent you that message?

14   A.  Sorry.  Christian Dawkins.

15   Q.  Did you meet with Jill Bailey?

16   A.  Yes.

17   Q.  Where did you meet?

18   A.  In Manhattan.

19   Q.  When you met with her, what happened?

20   A.  She gave me an envelope of cash.

21   Q.  Once you received that cash, did you have any discussions

22   with Christian Dawkins regarding what to do with it?

23   A.  Yes.

24   Q.  Is that discussed in the text messages on this chain?

25   A.  Yes.

1    Q.  Mr. Sood, around this time, did you begin to have more

2    discussions with Jill Bailey?

3    A.  Yes.

4    Q.  What about Jeff DeAngelo?

5    A.  He seemed to have -- I was told that he had left the

6    country to visit sick family members.

7    Q.  Did there come a time when Dawkins sent you an e-mail

8    regarding his upcoming plans for the business of Loyd Inc.?

9    A.  Yes.

10   Q.  I want to direct your attention to Government Exhibit 522.

11          Do you recognize that document?

12   A.  Yes.

13   Q.  What is it?

14   A.  It's an e-mail from Christian Dawkins on September 5, 2017

15   to me, subject breakdown.

16          MR. SOLOWIEJCZYK:  The government offers Government

17   Exhibit 522.

18          THE COURT:  Received.

19          (Government's Exhibit 522 received in evidence)

20   BY MR. SOLOWIEJCZYK:

21   Q.  Mr. Sood, can I direct you to page 2 of the exhibit.

22          Can you just read aloud the top paragraph, "company

23   strategy"?

24   A.  "Loyd Inc. will be marketed as management and marketing

25   company, but will essentially be an agency.  We want it to be a

1    one-stop shot for everything.  We will take a majority interest

2    in the sports agency, where we partner with certified agents,

3    who we will then have our players sign to.  Certified agency

4    will essentially be our sister company.  This way we can charge

5    3 percent on the team contract, 20 percent on marketing, half a

6    percent on accounting and half a percent on investment revenue.

7    If we have a player on the 50 million deal for four years,

8    who's also making half a million a year in marketing, we should

9    generate 2 million over those four years of one player."

10            MR. SOLOWIEJCZYK:  Ms. Lee, turning to the next page

11   of the document.

12   Q.  Mr. Sood, under the heading "prospective players," what

13   types of players are listed below that?

14   A.  College players.

15            MR. SOLOWIEJCZYK:  If you can zoom in on the paragraph

16   regarding Brian Bowen, Ms. Lee.

17   Q.  If you could read that, Mr. Sood.

18   A.  "$2,000 a month from September until April, if he stays in

19   school a second year, we will have to continue to pay.  We will

20   receive 3 percent on team contract, 20 percent on marketing

21   deals, half a percent on accounting and investment work.

22   Projected number 14 pick in 2019 draft."

23   Q.  Mr. Sood, what did you understand Dawkins to

24   mean -- withdrawn.

25            What was being promised to Brian Bowen for the

1  remainder of the year?

2  A.  $2,000 a month.

3  Q.  By whom?

4  A.  By Loyd Inc.

5  Q.  At this time, was he still enrolled at the University of

6  Louisville?

7  A.  Yes.

8  Q.  Was this money going to go to Brian Bowen Junior or to his

9  father?

10  A.  I believe to Senior.

11          MR. HANEY:  Objection, your Honor.  Foundation.

12          THE COURT:  Strike the answer.  Lay a foundation.

13  Q.  You had had prior discussions with Christian Dawkins

14  regarding the payments to Brian Bowen Senior, is that correct?

15  A.  Yes.

16  Q.  Based on those discussions, did you believe the payments

17  were going to go to Brian Bowen Senior or Brian Bowen Junior?

18          MR. HANEY:  Objection.

19          THE COURT:  Sustained.

20          Ask a proper question.

21          Did Christian Dawkins ever tell you anything about who

22  was to get the $2,000 a month?

23          THE WITNESS:  I do not recall, your Honor.

24          THE COURT:  Proceed.

25  Q.  Mr. Sood, before Mr. Dawkins sent you this e-mail that day,

1    did you have a phone call with him?

2    A.  Yes.

3    Q.  I want to direct your attention to Government Exhibit 55

4    which is in evidence.

5            MR. SOLOWIEJCZYK:  With your Honor's permission, we

6    would ask to publish this.

7            THE COURT:  Go ahead.

8    Q.  This is a call on September 5, 2017 between Christian

9    Dawkins and Munish Sood.  And we are going to start at page 1,

10   line 1.

11           (Audiotape played)

12   Q.  Mr. Sood, at the time of this conversation, who did you

13   understand Jill to be?

14   A.  She was a business partner of Jeff DeAngelo.

15   Q.  What line of work did you think she was in?

16   A.  I think she said she was in the nonprofit business.

17   Q.  Did you think she was in the sports business?

18   A.  No.

19   Q.  Prior to this call, what conversations, if any, had you had

20   with Christian Dawkins about Jill and Jeff?

21   A.  We were having concerns about where their money was coming

22   from.

23           MR. SOLOWIEJCZYK:  One moment, your Honor.

24   Q.  Mr. Sood, if I could direct your attention to Government

25   Exhibit 524.

1          If we could turn to the last -- first, what is this

2     exhibit, Mr. Sood?

3     A.   It's a copy of text messages between myself, Christian, and

4     Jill Bailey.

5          MR. SOLOWIEJCZYK:  Your Honor, the government offers

6     Government Exhibit 524.

7          THE COURT:  Received.

8          (Government's Exhibit 524 received in evidence)

9          MR. SOLOWIEJCZYK:  If you could go to the last page.

10         Permission to publish.

11         THE COURT:  Yes.

12         MR. SOLOWIEJCZYK:  If you could just zoom in on the

13    top message.

14    Q.   Who is this message from, Mr. Sood?

15    A.   From Christian.

16    Q.   What was Christian telling you in this message?

17    A.   How he allocated $19,000.

18    Q.   The names that are on this message, what are they?

19    A.   A few basketball players and then others as well.

20    Q.   Is Bowen mentioned in this message?

21    A.   Yes.

22         MR. SOLOWIEJCZYK:  One moment, your Honor.

23         We would request to take up at sidebar one issue with

24    the Court.

25         THE COURT:  All right.

1          (At the sidebar)

2          MR. SOLOWIEJCZYK:  Your Honor, we are at the point in

3     the questioning where we intended to ask certain questions of

4     Mr. Sood regarding his own understanding as a member of this

5     conspiracy about what was going to be disclosed to the

6     University of Louisville, what the consequences can be, that

7     line of questioning.

8          THE COURT:  And the basis of the understanding will be

9     what?

10          MR. SOLOWIEJCZYK:  His discussions with the other

11     participants in the scheme.

12          THE COURT:  Are you going to elicit anything they said

13     to him?

14          MR. SOLOWIEJCZYK:  We have elicited what they did not

15     say to him.  I could elicit from him his general understanding

16     about what the consequences would be if the payments were

17     disclosed which I think informs his understanding.

18          THE COURT:  So it's opinion testimony, is what it is.

19          MR. SOLOWIEJCZYK:  It goes to his state of mind as a

20     member of the conspiracy.

21          THE COURT:  Sure.  Why don't we get Mr. Avenatti in

22     here and see what he thinks about it.

23          MR. SOLOWIEJCZYK:  Fair enough, your Honor.

24          Mr. Sood's state of mind matters and Mr. Avenatti's

25     does not because, among other things, we need to establish that

1   there was a criminal conspiracy here, and his understanding as

2   a member of that conspiracy is relevant to that question, the

3   government respectfully submits.

4         MR. HANEY:  Your Honor, I would say he has no

5   foundation for that information for him to testify what the

6   consequences would be to Louisville.  He doesn't have the

7   proper information or foundation to testify to that.  How would

8   he know?  Is he going to get it from hearsay from other guys

9   who don't know?

10        THE COURT:  That sounded like the basis of the

11  defense.

12        We will take a break.

13        (In open court)

14        THE COURT:  Members of the jury, we will take a recess

15  now.

16        (Jury exits courtroom)

17        (Recess)

18        THE COURT:  What exactly is the question you want to

19  ask?

20        MR. SOLOWIEJCZYK:  Your Honor, we want to ask I think

21  maybe just three questions total.

22        THE COURT:  What are they?

23        MR. SOLOWIEJCZYK:  At the time he agreed to make the

24  payments, did he think they would be disclosed to the

25  University of Louisville?

1          We do think we can lay a foundation for that based on

2     his prior experience working and recruiting college basketball

3     players.

4          The second question is, Why not?

5          The third question is, Did he know what effect, if

6     any, these payments would have as to the student-athlete?

7          Then the last question might be the effect as to the

8     university.

9          THE COURT:  All right.  Question 1.  When he agreed,

10    did he think it would be disclosed?

11         This is admissible why?

12         MR. SOLOWIEJCZYK:  Your Honor, this defendant has

13    pleaded guilty to joining a conspiracy with these other

14    defendants related to the fact that scholarships would be

15    issued under false pretenses.  It helps explain, among other

16    things, some of the calls we listened to, why he's nervous, why

17    Dawkins and him are nervous about anything.

18         THE COURT:  Tell me what rule it's admissible under,

19    would you please?

20         What did he think at that time?  Why is that

21    admissible?

22         I know why you want it.  I really understand that.

23    Why are you entitled to it?

24         MR. SOLOWIEJCZYK:  Your Honor, our position is that

25    the state of mind at the time of these conversations and what

1    he understood based on what was told to him by these defendants

2    is relevant to --

3              THE COURT:  Those are potentially two divergent

4    things.  Are they not?

5              MR. SOLOWIEJCZYK:  I think Mr. Diskant would like to

6    address this.

7              MR. DISKANT:  I just want to make sure we understand

8    the Court's ruling.

9              THE COURT:  I haven't made a ruling yet.  I am trying

10   to find out what the questions are and what your legal position

11   is.  And I am having trouble.

12             MR. DISKANT:  I think part of the problem is, and as

13   the Court is likely to instruct the jury at the end of the day,

14   in a conspiracy, a lot is left to understanding.  And we are

15   trying to, one, develop a factual record for a predicate for

16   what the understanding was.

17             THE COURT:  A lot is left to the jury's inference from

18   facts properly in evidence.  Now, you just skipped over the

19   part about facts properly in evidence.

20             MR. DISKANT:  Right.  That's what we are trying to

21   work on here.

22             THE COURT:  Well, I know.  So tell me why it's

23   properly in evidence.

24             MR. DISKANT:  I think we can establish, one, I think

25   the question of whether or not Mr. Dawkins or Mr. Code ever

1    said anything about whether or not --

2                    THE COURT:  Of course you're entitled to that.  No

3    problem.

4                    MR. DISKANT:  So we can ask question number one.  In

5    all of your dealings with Mr. Code or Mr. Dawkins, did either

6    of them indicate that this payment would be disclosed to the

7    university?

8                    THE COURT:  I think you have asked that already.  Do

9    you want to ask it again?

10                   MR. MOORE:  They have asked it already.

11                   THE COURT:  Thank you.  If I need help I will ask.

12                   MR. MOORE:  I'm sorry, Judge.

13                   MR. DISKANT:  The second question is --

14                   THE COURT:  You have already changed the first

15   question.

16                   MR. DISKANT:  We are trying to respond to your

17   Honor's --

18                   THE COURT:  So you're abandoning the first question as

19   stated by your colleague.  You're now on to a different first

20   question which is, what, if anything, did they say?

21                   MR. DISKANT:  Correct.

22                   THE COURT:  So we are crossing question one off.  And

23   question two is either asked and answered already or it's

24   unobjectionable.

25                   Question two was?

291

1          MR. DISKANT:  Why?

2          THE COURT:  Why what?

3          MR. DISKANT:  Why is the payment not being disclosed

4     to the University of Louisville?  And this witness --

5          THE COURT:  You're asking him why he didn't disclose

6     it?

7          MR. DISKANT:  We can ask him that.

8          THE COURT:  Why is that relevant?

9          MR. DISKANT:  I think the bigger question is, why was

10    the payment not being disclosed by anyone?  I guess we could

11    ask a predicate question --

12         THE COURT:  Why are the Yankees pitching Severino

13    tonight?  That's a great question, and we can get a lot of

14    answers.  Maybe some of them more informed than others.

15         MR. DISKANT:  Mine would not be informed at all, I

16    assure you.

17         The point is I think this witness has an

18    understanding, and we can lay a foundation for this, because he

19    has experience working with college athletes; he has experience

20    working with these defendants.

21         THE COURT:  So you want to qualify him as expert?

22         MR. DISKANT:  No.  I think his understanding, as a

23    participant in this joint venture, as to what was or was not

24    going to be disclosed to the University of Louisville is a

25    relevant fact.

1      THE COURT:  So you want his opinion as to why other

2  people did or did not do things, right?

3      MR. DISKANT:  Absolutely.

4      THE COURT:  OK.  But not as an expert.

5      MR. DISKANT:  Correct.  Why other people within the

6  same joint venture took or did not take action.

7      THE COURT:  Let's pass over the same joint venture for

8  a moment.  We actually have a rule about that.  It's Rule 701.

9      Your argument about that one is, I presume, you want

10  him to testify that in his opinion other people didn't

11  disclose, and he is going to explain why that is rationally

12  based on his perception.

13      MR. DISKANT:  Correct.  Your Honor, respectfully, has

14  not allowed the government to do a lot to develop a record

15  about why it is based rationally on his perception.  We have

16  not been allowed to elicit from this witness his perception of

17  all of these calls and these meetings that we have been

18  playing.

19      THE COURT:  Well, you have another problem, and it's

20  one that I have been talking about for 20 years, and that is,

21  from time to time, assistants in your office, for which I have

22  the greatest admiration and respect, seem to be under the

23  impression that the hearsay rule disappears as long as you say

24  "what did you understand?"  And that's not the law.

25      MR. DISKANT:  I understand that.  Respectfully, the

1    questions here were all about statements of these defendants.

2    So I don't think there was a hearsay issue with respect to

3    them.

4              THE COURT:  We are past the question of can you ask

5    what they said.  No question.  You can.

6              Now what you're trying to do is to elicit the

7    witness's opinion about what was in their minds and their

8    motives.

9              MR. DISKANT:  The motives, yes.  And that I believe is

10   rationally based on the witness's perception.  For example, the

11   witness has already testified that Mr. Code was nervous and

12   anxious about the fact that he thought Jeff was disclosing the

13   scheme to other people.  He has disclosed that he himself -- he

14   testified that he himself was nervous about making this

15   payment.  He has talked about talking with Mr. Dawkins about

16   being nervous.  I believe it would be rationally based on his

17   perception --

18             THE COURT:  What were they being nervous about?

19   Walking around with 25 grand in cash in the city of New York.

20   Wouldn't you be nervous?

21             MR. DISKANT:  Absolutely.  But I would be even more

22   nervous if I thought that that $25,000 was part of an illicit

23   scheme, and we have not been allowed to establish that.  We

24   should be allowed to establish that it was part of an illicit

25   scheme, and he understood it was part of an illicit scheme, and

1    the reasons why he thought it was part of an illicit scheme.

2              THE COURT:  So question two is, What did he think was

3    the reason or reasons for their failure to disclose, is that

4    right?

5              MR. DISKANT:  I think question one -- the way we would

6    like to do this, your Honor, is question one is, Did you know

7    whether or not the payment was going to be disclosed?

8              My guess he will say he did not think it was going to

9    be disclosed.

10             THE COURT:  It's question one, version three.

11             MR. DISKANT:  We are trying to be responsive to your

12   Honor's concerns here.  We can ask the question any way the

13   Court would like.  But certainly question one --

14             THE COURT:  I am not trying this case.

15             MR. DISKANT:  I understand that.  And we are trying to

16   try it fairly within the ground rules that the Court is

17   setting, but we think we need to be able to elicit --

18             THE COURT:  I am not setting them either.  I am

19   applying them.

20             MR. DISKANT:  Fair enough.

21             (Continued on next page)

22

23

24

25

1          THE COURT:  You just told me this was the heart of

2     your case, and you come in here and I wouldn't say this is the

3     best prepared presentation I've ever heard.

4          MR. DISKANT:  Understood, your Honor.

5          What we would like to elicit from the witness is

6     whether or not he believed the payment was going to be

7     disclosed, why the payment was not going to be disclosed, his

8     understanding whether he had --

9          THE COURT:  That is one.  Did he believe it?  Next

10    question.

11         MR. DISKANT:  Why -- my guess the answer to you one is

12    going to be no.

13         THE COURT:  Why did he believe it wouldn't be

14    disclosed?

15         MR. DISKANT:  Correct.  Did he have an understanding,

16    based on his years of experience working with college and NCAA

17    athletes, of whether such a payment would have an impact on the

18    student athletes, if disclosed?

19         THE COURT:  And he's about the last guy you really

20    need for that one, right?  Isn't that true?

21         MR. DISKANT:  Your Honor, there will be plenty of

22    other people who will say that.  Having allowed the jury to

23    hear it from someone who participated in the scheme is powerful

24    and I submit it is relevant.

25         THE COURT:  All right.  Let's go on.

1          MR. DISKANT:  And, four, did he have an understanding,

2     based on the same, of whether making these payments might have

3     an impact or harm to the university?

4          THE COURT:  OK.  Who is going to address this from the

5     other side?

6          MR. SCHACHTER:  Your Honor, I would like to address

7     certainly questions three and four.  Those are clearly, under

8     702, as Mr. Diskant stated, he is going to be testifying based

9     on his years of experience.  In other words, this is based on

10    other specialized knowledge, which makes it within the scope of

11    Rule 702.  That would be impermissible lay testimony, and

12    Mr. Sood was not disclosed as an expert witness in advance of

13    trial.  So, I think questions three and four, which I would

14    like to address, are clearly lay opinion testimony and

15    improper.

16         The other two I think are not relevant to any fact

17    that is necessary for the jury's consideration.

18         THE COURT:  Question three and four are out.

19         Do you still want to ask the question of whether

20    anybody said anything to him about this?

21         MR. DISKANT:  You are talking about on the subject of

22    three and four --

23         THE COURT:  No, on the subject of what's left.  Well,

24    I guess on three and four.  I mean, if they made statements --

25    I don't "guess."  That is a ruling.

1          MR. DISKANT:  I don't believe the witness will say

2     that there were any statements made on those subjects so --

3          THE COURT:  Well, let's recall as to whether you have

4     questions.

5          MR. DISKANT:  Fair enough.

6          THE COURT:  So we are not going to allow did he

7     understand what the possible impact on the university was or on

8     the student.

9          You can ask him whether he disclosed the payments,

10    and, if not, why not.  You can ask him does he have an opinion

11    as to whether the other two were going to get a yes or no.  Ask

12    the basis for the opinion, without disclosing the opinion, and

13    then I'll rule.  And you can do the same thing -- well, I guess

14    that covers it.

15         MR. SCHACHTER:  Your Honor, I would just raise the

16    issue of whether the witness has a foundation to testify -- to

17    offer an opinion given the fact that, as I understand what the

18    prosecutors have to say, he had no conversations on that topic

19    with the defendants.  So I don't know how he would have -- I

20    don't think he would have foundation to offer an opinion on

21    why, given that they had no discussions about it.

22         THE COURT:  If two guys go into a bodega and one guy

23    is carrying a Mac-10 and you ask the other guy do you have an

24    opinion as to whether somebody might have gotten shot, and, if

25    so, what's the basis for it, do you think that might be

Ia3dgat5                          Sood – direct

1    rationally based on his perception?

2              MR. SCHACHTER:  Fair enough, your Honor.

3              THE COURT:  OK.  All right.  We are going to do it

4    that way.

5              And you need to keep the interrogation in the right

6    time period.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ia3dgat5                    Sood - direct

1              THE CLERK:  Jury entering.

2              (Jury present)

3              THE CLERK:  Please be seated, everyone.

4              THE COURT:  Thanks for bearing with us, folks.

5         The jurors all are present.  The defendants remain

6    present.

7              Put the witness on the stand, please.

8              (The witness resumed the witness box)

9              THE COURT:  All right.  Let's go.

10   BY MR. SOLOWIEJCZYK:

11   Q.  Mr. Sood, you previously testified about being involved in

12   payments to Brian Bowen's father.

13        Did you disclose those payments to the University of

14   Louisville?

15   A.  No.

16   Q.  Why not?

17   A.  Because it was illegal.

18              MR. HANEY:  I object, your Honor.

19              THE COURT:  Yes.  The answer is stricken.

20   BY MR. SOLOWIEJCZYK:

21   Q.  Mr. Sood, without characterizing the reason why, can you

22   explain why you did not disclose the payment yourself?

23              MR. SCHACHTER:  Objection.

24              THE COURT:  Let me ask a different question.

25         What were you referring to when you said "illegal"?

Ia3dgat5                              Sood - direct

1          THE WITNESS:  That we were not -- that I am not

2    supposed to be making payments to amateur players because that

3    would be a violation.

4          THE COURT:  Did you have an understanding as a

5    violation of what?

6          THE WITNESS:  Of at least NCAA rules.

7          THE COURT:  All right.  Go ahead, counselor.

8          MR. SOLOWIEJCZYK:  Your Honor, I have been informed by

9    one of my colleagues that while I thought I had offered

10   Government Exhibits 21, 22, 29, 57, 63, 75, 75A and the related

11   transcripts, apparently I forgot to actually formally offer

12   them.  So, at this time we offer 21, 22, 29, 57, 63 --

13         THE COURT:  Slow down.

14         MR. SOLOWIEJCZYK:  My apologies.

15         THE COURT:  What comes after 29?

16         MR. SOLOWIEJCZYK:  57.

17         THE COURT:  Please don't say "30."

18         MR. SOLOWIEJCZYK:  57, 63, 75, 75A, and then all of

19   those numbers with the letter T after them.

20         THE COURT:  Received.

21         (Government's Exhibits 21, 21T, 22, 22T, 29, 29T, 57,

22   57T, 63, 63T, 75, 75T, 75A, 75A-T received in evidence)

23         MR. SOLOWIEJCZYK:  Thank you, your Honor.

24         No further questions.

25         THE COURT:  Thank you.

1                Cross-examination.

2                MR. HANEY:  Your Honor, I will cross-examine.

3                THE COURT:  All right.  Thank you.

4     CROSS-EXAMINATION

5     BY MR. HANEY:

6     Q.  Mr. Sood, good afternoon.

7     A.  Good afternoon.

8     Q.  Sir, in 2011, you saw the business opportunity of providing

9     financial advice to athletes as an opportunity; is that a fair

10    statement?

11    A.  Yes.

12    Q.  And you learned of this financial opportunity by and

13    through a gentleman by the name of Marty Blazer, who is a

14    financial planner out of Pittsburgh, is that correct?

15    A.  Correct.

16    Q.  And Marty Blazer was known to work with football players

17    primarily; was that your understanding?

18    A.  Yes.

19    Q.  And then you and Marty Blazer started a company together,

20    in part to offer financial services to would be and

21    professional athletes; is that a fair statement?

22    A.  At that time, they were all professional athletes.

23    Q.  And at that time, they were all professional football

24    players, is that correct?

25    A.  Correct.

Ia3dgat5                         Sood - cross

1   Q.  And there came a point in time, as you've testified, where

2   you discontinued your business relationship with Marty Blazer

3   because, as you testified, he was stealing money from clients,

4   is that correct?

5   A.  That's correct.

6   Q.  Would it be unfair for me to call somebody who steals money

7   from clients a thief?

8   A.  No.

9        MR. SOLOWIEJCZYK:  Objection, your Honor.

10       THE COURT:  A little late.

11       MR. HANEY:  May I respond, your Honor?

12       THE COURT:  No.  There is no reason for you to

13   respond.

14       MR. HANEY:  Thank you, your Honor.

15   BY MR. HANEY:

16   Q.  So you claimed after you learned Marty Blazer was a

17   thief --

18       THE COURT:  Well.  Now, look --

19       MR. DISKANT:  Objection.

20       THE COURT:  No.

21       MR. HANEY:  Thank you, your Honor.

22       THE COURT:  You got away with one.  Now let's leave

23   it.  OK?

24       MR. HANEY:  It won't happen again, your Honor.

25   BY MR. HANEY:

```
1    Q.  You said you stopped working with him, didn't you?

2    A.  Yes.

3    Q.  Well, that wasn't true, was it?

4    A.  No.

5    Q.  Because you kept managing the football players of

6    Mr. Blazer's, didn't you?

7    A.  Yes.  We had several clients that stayed with me.

8    Q.  And you even continued to manage his wife's finances,

9    didn't you?

10   A.  Yes, we did.

11   Q.  But you bought him out for a dollar, right?

12   A.  Correct.

13   Q.  So that would look like you discontinued business with

14   Mr. Blazer; fair statement?

15   A.  No.  That was the advice on counsel on how the best way to

16   separate myself from him.

17   Q.  And then, as you sit here today, you have the

18   understanding, don't you, that your former business partner,

19   Marty Blazer, was actually indicted for illegal acts, wasn't

20   he?

21            MR. SOLOWIEJCZYK:  Objection.

22            THE COURT:  Sustained.  The jury will disregard it.

23   BY MR. HANEY:

24   Q.  You did testify, didn't you, that at some point you took

25   advice from Marty Blazer of who would be your new business
```

1   partner, correct?

2   A.  Yes.

3   Q.  So why would you take business advice from Mr. Blazer, who

4   you know stole money from clients, to refer you to a new

5   business partner?

6   A.  Well, unfortunately, you know, that was one of my biggest

7   mistakes where I gave him a second opportunity.  So, you know,

8   it is something I regret ever working with him a second time

9   around.

10  Q.  Then in reality this new business partner that Mr. Blazer

11  referred to you was actually an undercover FBI agent, right?

12  A.  Yes.  But I also met Christian Dawkins through him as well.

13  Q.  That wasn't my question.

14          The question was, this new business partner was not a

15  business partner, he was an undercover FBI agent, right?

16          THE COURT:  Asked and answered.  Let's move on.

17          MR. HANEY:  Thank you, your Honor.

18  Q.  And then you came to learn at some future time that

19  Mr. Blazer introduced this business partner to you because he

20  needed to set you up, correct?

21  A.  I should have done more due diligence on my new business

22  partners.

23  Q.  That was a yes or no question.

24          MR. SOLOWIEJCZYK:  We object to this line of

25  questions, your Honor.

1          THE COURT:  What is it you are objecting to exactly?

2          MR. SOLOWIEJCZYK:  We don't understand the relevance

3    of this line of questioning.

4          THE COURT:  Well, he sort of answered it and we will

5    move on.

6          MR. HANEY:  Thank you, your Honor.

7    BY MR. HANEY:

8    Q.  Now, you testified you met Christian Dawkins in March of

9    2016, correct?

10   A.  Yes.

11   Q.  And at that time that would have made him around 22 or 23

12   years old when you first met him; is that a fair estimate?

13   A.  Yes.

14   Q.  And when you first met Christian Dawkins, who you've

15   identified in the court, he was working for an agent named Andy

16   Miller, is that right?

17   A.  Yes.

18   Q.  And you knew that Andy Miller ran a sports agency called

19   ASM, correct?

20   A.  Yes.

21   Q.  Is it fair to say that you knew that ASM was a prominent

22   agency that specialized in the representation primarily of

23   multimillion-dollar basketball players?

24   A.  I knew they were one of the larger sports basketball

25   agencies in the business.

Ia3dgat5                        Sood - cross

1    Q.  And you knew, under management, that a number of those

2    players were millionaires, didn't you?

3    A.  Yes.

4    Q.  I mean, you are a financial guy, right?

5    A.  Correct.

6    Q.  So it's your business to know those types of things, isn't

7    it?

8    A.  Yes.

9    Q.  And, in fact, multiple clients of ASM ended up retaining

10   you to provide their financial advice; is that a fair

11   statement?

12   A.  Yes.

13   Q.  And to refresh your memory -- and correct me if I am

14   wrong -- that would have included NBA player Malik Beasley?

15   A.  Yes.

16   Q.  NBA player Edmond Sumner?

17   A.  Yes.

18   Q.  NBA player Davon Reed?

19   A.  Yes.

20   Q.  NBA player Kyle Kuzma, who currently plays for the Los

21   Angeles Lakers?

22   A.  Yes.

23   Q.  Correct?  Thank you.

24            And, in fact, once you were retained by these

25   basketball players, you provided these basketball players with

Ia3dgat5                          Sood - cross

1    what you consider sound financial advice; would you agree?

2    A.  Well, let me just -- can I clarify?

3    Q.  No.  It is just a question.

4           MR. HANEY:  Your Honor, I would ask him to answer it?

5           THE COURT:  Do you agree or don't you agree?

6           THE WITNESS:  Can you repeat that?

7           MR. HANEY:  Yes.

8    Q.  Once you were retained by these basketball players that I

9    just referenced, you provided these players with sound

10   financial advice, is that correct?

11   A.  Yes.

12   Q.  And in your opinion, you provided them with the best

13   financial guidance you could?

14   A.  Correct.

15   Q.  And you helped manage these players' finances, right?

16   A.  If they had it, yes.

17   Q.  Thank you.  Well, for those who did, you thought you could

18   help protect their money because that's what your job was,

19   wasn't it?

20   A.  Yes.

21   Q.  You weren't trying to exploit these athletes, were you?

22   A.  No.

23   Q.  And you understand that even though Christian Dawkins

24   worked at ASM, he was not a sports agent himself, correct?

25   A.  Yes.

1    Q.   And you knew that Christian Dawkins, he didn't even have

2    the qualifications to be an agent, didn't you?

3    A.   That's correct.

4    Q.   You knew Christian Dawkins pretty well; fair to say?

5    A.   Got to know him.

6    Q.   You knew him well enough to know that he never went to

7    college, right?

8    A.   I learned that, yes.

9    Q.   And you knew him well enough to know that Christian was

10   what was referred to, as you've testified, a runner for Andy

11   Miller, correct?

12   A.   Yes.

13   Q.   And it was your understanding, as you've testified, that a

14   runner was the guy who ran around and hustled up the business

15   for the actual licensed agents at the agency; is that a fair

16   summation of me of what a runner did?

17   A.   I guess.

18   Q.   You want to put it in your own words?  I don't want to

19   speak for you here today.

20   A.   I just knew Christian had strong relationships with a lot

21   of these young players.

22   Q.   And he got the business for Andy Miller and the other

23   agents at ASM, right?

24   A.   My understanding, that is correct.

25   Q.   And it's also your understanding -- correct me if I am

Ia3dgat5                              Sood - cross

1   wrong -- Christian Dawkins' job was to bring new clients to

2   ASM, correct?

3              MR. SOLOWIEJCZYK:  Objection.

4              THE COURT:  What is the objection?

5              MR. SOLOWIEJCZYK:  His understanding.  What is the

6   relevance of his understanding on this point?

7              MR. HANEY:  May I respond, your Honor?

8              THE COURT:  Yes.

9              MR. HANEY:  Well, it is cross-examination that goes to

10  his knowledge.  He has presented himself before the jury as a

11  guy who is in the business of basketball and he has a lot of

12  knowledge about how guys are represented, what managers do and

13  runners are.  It is just a follow-up question as to his

14  personal knowledge, to lay a foundation for further questions.

15             THE COURT:  Sustained.

16             MR. HANEY:  Thank you, your Honor.

17  BY MR. HANEY:

18  Q.  And it was your understanding, wasn't it, that Andy Miller

19  gave Christian Dawkins cash to give to high school athletes and

20  their families, wasn't it?

21  A.  I have no idea.

22  Q.  You have no idea.

23             MR. HANEY:  Your Honor, at this time I would like to

24  present only to the witness a record or document to refresh his

25  recollection of a prior statement that obviously would not be

1    in the presence of the jury.

2              THE COURT:  Now, look, Mr. Haney --

3              MR. HANEY:  Yes, sir.

4              THE COURT:  -- you don't get to refresh recollection

5    until somebody says I don't recall.  That didn't happen.

6              Secondly, you don't make a speech disclosing the

7    content of a document that you intend to use and don't know

8    whether you can use.  So, let's move on to something else.

9              MR. HANEY:  Thank you.

10   BY MR. HANEY:

11   Q.  Do you recall if Andy Miller directed cash to be paid to

12   families?

13   A.  I don't.

14             MR. HANEY:  Your Honor, may I now refresh his

15   recollection?

16             MR. SOLOWIEJCZYK:  Your Honor, he has already asked

17   and answered that question previously.

18             THE COURT:  No, sir.  There is no reason to think he

19   ever knew.

20             MR. HANEY:  Thank you, your Honor.

21   Q.  It is your understanding that when Christian Dawkins

22   recruited players for ASM, he was just doing what his boss Andy

23   Miller wanted him to do, is that right?

24             MR. SOLOWIEJCZYK:  Objection.

25             THE COURT:  Sustained.

1              I suggest you find a different way of formulating your

2    questions.

3    Q.   Were you aware of what Christian Dawkins' role was at ASM?

4    A.   Again, as I said, he was a runner and working with a number

5    of current and potential clients.

6    Q.   And did that include recruiting players?

7    A.   I believe that's correct.

8    Q.   Do you have any personal knowledge that the practices at

9    ASM were to do anything necessary to get those players?

10             THE COURT:   I couldn't understand the question.

11             MR. HANEY:   I'm sorry, your Honor.

12   Q.   Do you have personal knowledge it was the practices at ASM

13   to do whatever was needed to get those players?

14             MR. SOLOWIEJCZYK:   Objection.

15             THE COURT:   Sustained.   That would include blackmail,

16   shooting relatives.

17             Move on.

18             MR. HANEY:   Thank you, your Honor.

19   Q.   Mr. Sood, you are getting a deal, as you've testified here

20   today, against my client, aren't you?

21   A.   I agreed to cooperate with the government.

22   Q.   And you pled to multiple felonies for crimes of bribery and

23   fraud to get this deal; is that a fair statement?

24   A.   I did plead guilty to three charges.

25   Q.   My question was, did you plead guilty to crimes of bribery

1    and fraud to be here today to have your deal against my client,

2    yes or no?

3    A.   Yes.

4    Q.   And you met with the government prosecutors numerous times

5    before you finally reached that agreement to testify against

6    Christian Dawkins, is that right?

7    A.   Yes.

8    Q.   Now, you have the belief, as you are here today testifying

9    against Christian Dawkins, that you are helping yourself and

10   not hurting yourself?

11   A.   I hope so.

12   Q.   So you have something to gain by being here today to

13   testify against Christian Dawkins, is that right?

14   A.   As I said, I'm taking responsibility for my actions and

15   telling the truth.

16   Q.   My question was, do you feel you have something to gain by

17   being here today to testify against Christian Dawkins, yes or

18   no?

19   A.   As I said, I'm here testifying, telling the truth, and

20   that's what I'm doing.

21   Q.   And you understand by being here testifying, telling the

22   truth, you are potentially providing yourself with freedom,

23   isn't that right?

24   A.   Yes.

25   Q.   In fact, you even said on direct examination that the

1    consequences, if you would have been convicted of what you were

2    charged, with would have resulted in 35 years potentially in

3    prison, right?

4    A.  Yes.

5    Q.  And you are 46, aren't you?

6    A.  Yes.

7    Q.  I don't have good math, but would that have made you 81,

8    possibly, if you would have got out of prison?

9    A.  It is pretty old.

10   Q.  You are the math finance guy.  Would that make you 81?

11              MR. SOLOWIEJCZYK:  Objection.

12              THE COURT:  Sustained.

13   Q.  You would say anything, wouldn't you, Mr. Sood, to stay out

14   of prison for 35 years?

15              MR. SOLOWIEJCZYK:  Objection.

16              THE COURT:  Overruled.

17   A.  No.

18   Q.  You have kids, don't you?

19   A.  Yes.

20   Q.  How many kids do you have?

21   A.  Three.

22   Q.  You would say anything to avoid being separated from your

23   family for 35 years, wouldn't you?

24              MR. SOLOWIEJCZYK:  Objection.  Asked and answered.

25              THE COURT:  No.  Overruled.

1    A.  No.

2    Q.  No, you wouldn't?

3    A.  I'll tell the truth.

4    Q.  Even if that meant being away from your kids until you were

5    81?

6    A.  I am taking responsibility.

7    Q.  And your cooperation agreement you have with the

8    prosecutors requires you to answer the prosecutors' questions,

9    correct?

10   A.  Yes.

11   Q.  And you indicated on direct examination that you actually

12   met with the prosecutors a dozen times or so; is that fair to

13   say?

14   A.  Yes.

15   Q.  Fair to say they asked you hundreds of questions during

16   those meetings you had with the prosecutors?

17   A.  They asked a number of questions.

18   Q.  Hundreds?

19   A.  I don't recall hundreds.

20   Q.  Yet, in order to get this cooperation agreement from the

21   government, you told the prosecutors, didn't you, and the

22   government, that you learned the business from Christian

23   Dawkins, didn't you?

24   A.  Yes.

25   Q.  And you were a grown man when you met Christian Dawkins;

1   fair to say?

2   A.  Yes.

3   Q.  And you even called Christian Dawkins on numerous occasions

4   just a kid, didn't you?

5   A.  Yes.

6   Q.  You have a bachelor's in science and finance and

7   accounting, is that correct?

8   A.  Correct.

9   Q.  And you went to Rider University, am I right?

10  A.  Yes.

11  Q.  As you sit here today, you are currently a registered

12  investment advisor, is that right?

13  A.  No.  I have given up that license.

14  Q.  When did you give up that license?

15  A.  I can check for you.  A few months back.

16  Q.  A few months back.

17          Correct me if I am wrong, but from January 1999 to

18  April 2001, you were the senior portfolio manager at Global

19  Value Investors, is that right?

20  A.  Yes.

21  Q.  And then prior to holding that position at Global

22  Investors, you were a senior analyst and trader at Penn Capital

23  Management, is that right?

24  A.  Yes.

25  Q.  And you actually even held a chartered financial

1   designation?

2   A.   Correct.

3   Q.   Could you tell me what that means?

4   A.   It's an independent study three exam and you get a

5   designation called CFA.

6   Q.   Not everybody gets that, do they?  That is a pretty

7   distinct honor, wouldn't you agree?

8   A.   It's a lot of work.

9   Q.   And you are a member of the Investment Analyst Society of

10  New York, correct?

11  A.   I was.

12  Q.   And of the CFA Institute, right?

13  A.   Yes.

14  Q.   What is CFA Institute?

15  A.   It is a group of people that have that designation.

16  Q.   And then in 2002, you founded what was called the Princeton

17  Advisory Wealth Management, correct?

18  A.   Correct.

19  Q.   And, in fact, you even founded a bank, didn't you?

20  A.   I was one of the organizers.

21  Q.   Of the First Choice Bank in Lawrenceville, New Jersey, is

22  that right?

23  A.   That is correct.

24  Q.   Am I correct to say it was a $1.2 billion community bank,

25  is that right?

1    A.  Yes.

2    Q.  You were one of the founders of that bank, weren't you?

3    A.  Yes.

4    Q.  You even searched as the chairman of the board of that

5    bank, right?

6    A.  Yes.

7    Q.  You founded the investment firm involved in this case, the

8    Princeton Advisory Group, didn't you?

9    A.  Yes.

10   Q.  And you are the sole owner, you have employees?

11   A.  Correct.

12   Q.  And you are the CEO?

13   A.  Yes.

14   Q.  Right?

15          And, in fact, Princeton Advisory Group was registered

16   with the Securities Exchange Commission, am I right?

17   A.  That's correct.

18   Q.  And managed in excess of $500 million, isn't that right?

19   A.  That's correct.

20   Q.  So that's a fairly impressive résumé, wouldn't you agree?

21   A.  OK.

22   Q.  Well, you don't have to.

23   A.  Thank you.

24   Q.  Don't be humble.  You are welcome.

25          You have substantial education and experience in

1   business finance, and you were a co-founder of a billion-dollar

2   bank, weren't you?

3   A.  Yes.

4   Q.  And you took business lessons from a 20-year-old high

5   school graduate from Saginaw, Michigan?

6        THE COURT:  That's not what he said.  Come on.

7        Sustained.

8   Q.  But you learned the business from Christian Dawkins?

9   A.  I learned the basketball business from Christian Dawkins.

10  Q.  Aside from Christian Dawkins, you had business dealings

11  directly with other folks at ASM, didn't you?

12  A.  Through Christian Dawkins, I met another agent, yes.

13  Q.  My question was did you have other involvement with agents

14  at ASM other than Christian Dawkins, who was not an agent?

15  A.  Yes.

16  Q.  And one of those individuals was an agent named Stephen

17  Pina, correct?

18  A.  Correct.

19  Q.  And do you have personal knowledge that Stephen Pina was in

20  fact a licensed attorney?

21  A.  Yes.

22  Q.  And you have personal knowledge that Mr. Pina would give

23  cash to the families of college athletes to try to recruit them

24  to go with ASM?

25       THE COURT:  Sustained as to form.  "Athletes."

1    Q.  College athletes, basketball players?

2              THE COURT:  Sustained.

3              MR. HANEY:  Thank you.

4    Q.  Was there ever any point in time where ASM agent Stephen

5    Pina approached you and said he needed help recruiting players?

6    A.  Yes.

7    Q.  And you understood that "recruiting players" meant while

8    they were still in college, didn't you?

9    A.  Yes.

10   Q.  And he wanted your help to give them money, didn't he?

11   A.  Yes.

12   Q.  And, in fact, you agreed to fund those payments to college

13   athletes in change for Mr. Pina recommending you then later to

14   be the financial planner, right?

15   A.  Correct.

16   Q.  That was the deal you and Stephen Pina had, correct?

17   A.  Yes.

18   Q.  And it had nothing to do with Christian Dawkins, did it?

19   A.  No.

20   Q.  Because those weren't Christian Dawkins' clients because he

21   didn't have clients, correct?

22              (Pause)

23              Christian Dawkins had no clients at ASM if he wasn't

24   an agent, right?

25   A.  Again, I'm not sure what the definition is.

Ia3dgat5                         Sood - cross

1    Q.   For example, you worked with Stephen Pina from ASM to

2    funnel money to Kyle Kuzma when Kyle Kuzma was at the

3    University of Utah, didn't you?

4    A.   Again, I gave Stephen Pina money, and I believe he gave it

5    to his handler.  That's what I know.

6    Q.   To Kyle Kuzma's handler?

7    A.   Correct.

8    Q.   So you gave money to Stephen Pina, to Kyle Kuzma's handler,

9    correct?

10   A.   Correct.

11   Q.   And did you understand that by giving money to Kyle Kuzma's

12   handler, that would be against the NCAA's rules?

13   A.   Yes.

14   Q.   And you are not suggesting, are you, that you have personal

15   knowledge that violating an NCAA rule is committing a crime,

16   are you?

17           MR. SOLOWIEJCZYK:  Objection.

18           THE COURT:  Who objected?

19           MR. SOLOWIEJCZYK:  (Indicating).

20           THE COURT:  Overruled.

21           MR. HANEY:  I will move on.

22   Q.   In fact, there was another occasion, wasn't there, where

23   Mr. Pina set up a meeting with you to meet a guy named Shawn

24   Farmer; do you remember that?

25   A.   Yes.

1    Q.  And Mr. Pina and Farmer were trying to get you to get money

2    to pay a player at the University of Kentucky named Bam

3    Adebayo, is that right?

4    A.  Correct.

5    Q.  And Stephen Pina was trying to position you by paying Bam

6    Adebayo, and other kids at Kentucky, and he told you it would

7    be expensive, didn't he?

8    A.  Yes.

9    Q.  And you understood that to mean that you were going to have

10   to pay a lot of money to get those kids from Kentucky, didn't

11   you?

12   A.  Yes.

13   Q.  Did you know Kentucky was a Nike school?

14   A.  I did not at that time.

15   Q.  You do now?

16   A.  Since you brought it up, yes.

17   Q.  Don't take my word for it.  If you don't know, say I don't

18   know.

19          Now, Mr. Sood, at some point you realized that Andy

20   Miller, at ASM, and Christian Dawkins had parted ways publicly,

21   is that correct?

22   A.  Yes.

23   Q.  And we saw Government Exhibit 55 that referenced that there

24   was some investigation that Christian Dawkins may have some

25   concern of, is that right?

1  A.  Can I see that document again?  But I do recall.

2          MR. HANEY:  It is Government Exhibit 55, if he needs

3  to refresh his mind.  It is your exhibit.

4  A.  OK.  I have it.

5  Q.  It is a transcript, and it references that there was some

6  concern about Jill and a potential investigation.  Is that your

7  recollection, looking at that record?

8  A.  Yes.

9  Q.  Isn't it true that you and Christian both had concern about

10  Jeff and Jill, the investors, because of the association they

11  had with Marty Blazer, right?

12  A.  Yes.

13  Q.  Because Marty Blazer introduced you to Jeff and Jill,

14  didn't he?

15  A.  He did.

16  Q.  So you and Christian Dawkins had conversation about concern

17  of the investigation of Marty Blazer with his problems with the

18  SEC, right?

19  A.  We had concerns about that and also the fact that, as I

20  said earlier, where was the money coming from.

21  Q.  And that concern included being introduced to Jill because

22  she was associated and linked with this Marty Blazer guy?

23  A.  Correct.

24  Q.  And you also knew that there was this imminent threat with

25  ASM of being investigated by the NBA Players Association,

1   right?

2   A.  I did not.

3   Q.  You didn't know anything about there being an NBA Players

4   Association investigation into the practices of Andy Miller?

5           MR. SOLOWIEJCZYK:  Objection.

6           THE COURT:  Sustained.

7   Q.  Did you have personal knowledge that Christian Dawkins in

8   fact was so known by college coaches that other agencies were

9   trying to get him to be a runner?

10          MR. SOLOWIEJCZYK:  Objection.

11          THE COURT:  Sustained.

12  Q.  Did you have personal knowledge that college coaches would

13  reach out to Christian for help in recruiting players?

14          MR. SOLOWIEJCZYK:  Objection.

15          THE COURT:  Sustained.

16  Q.  Let's talk a little bit about Tugs Bowen, Mr. Sood.

17          You are aware that Christian and the Bowen family are

18  both from Saginaw, Michigan, isn't that correct?

19  A.  Yes.

20  Q.  And it was your understanding that the University of Oregon

21  had offered astronomical money to get Tugs Bowen?

22  A.  Yes.

23          THE COURT:  Sustained at least as to form.  The answer

24  is stricken.

25  Q.  There came to be an occasion where you met Brian Bowen,

1   Sr., is that right?

2   A.  Yes.

3   Q.  And that was in a parking lot apparently in Morristown, New

4   Jersey, is that right?

5   A.  Correct.

6   Q.  And as you've noted, Brian Bowen, Sr. was the father of a

7   prospect by the name of Tugs Bowen, correct?

8   A.  Yes.

9   Q.  And you had on several occasions had heard Chris Dawkins,

10  my client, refer to Tugs Bowen as his son?

11  A.  Yes.

12  Q.  And isn't it true that Christian had tried to convince you

13  that there was no problem paying Brian Senior because they knew

14  each other for a long time and it was OK?

15  A.  I don't recall that.

16  Q.  Did he ever have a conversation with you about a particular

17  rule of the NCAA that would allow people with preexisting

18  relationships to pay money to each other?

19  A.  I don't recall that.

20  Q.  You've testified that you paid Brian Bowen, Sr. money to

21  bridge payments that Adidas was supposed to pay because they

22  were taking too long to get the payment to him, is that

23  correct?

24  A.  Yes.

25  Q.  And this undercover FBI agent, who was also posing as your

1    investor, he told you it was important to get the money to

2    build a relationship with the Bowen family, isn't that right?

3    A.  Actually, Merl Code and Christian mentioned about giving

4    the money to -- because it was at their request for us to fund

5    it.

6    Q.  So your intent, though, in paying that money was to build a

7    relationship with Brian Bowen, Sr., correct?

8    A.  Yes.

9    Q.  For yourself, too?

10   A.  Of course.

11   Q.  So that possibly down the road you could become the

12   financial planner for his son Tugs Bowen?

13   A.  That was the hope.

14   Q.  Because Tugs Bowen was being projected as being a possible

15   NBA player, is that correct?

16   A.  Correct.

17   Q.  And you testified that you knew this payment was to be made

18   in exchange for a promise by Brian Bowen, Jr. to go to the

19   University of Louisville, right?

20   A.  I believe at that time he had already committed to

21   Louisville, so I think -- I believe it was just to honor their

22   agreement.

23   Q.  Well, you say "you believe," but you don't know that, do

24   you?

25   A.  What's that?

1   Q.  You don't know that, do you -- you said you believed it was

2   to honor their commitment.  You don't know that, do you?

3   A.  Well, I'm going on based upon conversations I had with them

4   whether on the phone or in person.

5   Q.  So when you say you believe something, that means you are

6   not too certain, is that right?

7           MR. SOLOWIEJCZYK:  Objection.

8           THE COURT:  Sustained.

9   Q.  So whose decision was it to give Brian Bowen, Jr. the

10  19,500 as opposed to the whole $25,000?

11  A.  That was based on the request by Christian how to separate,

12  divide the money up.

13  Q.  Anytime you paid a player in association with this case and

14  this partnership with Loyd, would you agree that the intent

15  behind the payments was to get the clients for future business?

16          THE COURT:  Sustained as to form, at least.

17  Q.  On how many occasions did you actually pay players outside

18  of the instance with Tugs Bowen?

19  A.  Just a few.

20  Q.  And on those few times, isn't it true that your logic for

21  doing so was to get them as future clients down the road,

22  correct?

23  A.  Correct.

24  Q.  You weren't just giving out money, you had a motive for

25  that, correct?

1    A.  Yes.

2    Q.  You didn't care where these kids went to school, did you?

3    A.  In general, no.

4    Q.  Just so long as they ended up being your client, correct?

5    A.  As long as we had an opportunity to work with them.

6    Q.  Right.  So if a kid went to a Nike school or an Adidas

7    school or an Under Armour school, that had no relevance to you

8    or to Christian Dawkins, did it?

9    A.  Not to me.

10          THE COURT:  Sustained as to Mr. Dawkins.

11          Answer as to yourself.

12   Q.  And you were already doing this with attorney Steve Pina

13   from the ASM Sports Agency, weren't you?

14   A.  Yes.

15   Q.  Were you familiar with the term "one and done"?  I've heard

16   it referenced during your direct examination.

17   A.  Yes.

18   Q.  So you knew it was necessary then for the top high school

19   basketball players to attend college for one year before they

20   could be draft-eligible under the NBA draft; is that a fair

21   statement?

22   A.  That is correct.

23   Q.  That is your understanding of "one and done," correct?

24   A.  Yes.

25   Q.  That there is a mandatory requirement that an NCAA college

1   player attend college one year before they could go into the

2   pro ranks, right?

3   A.  My understanding is they have to be out of college one

4   year.

5   Q.  But if they go to college, they've got to stay there a

6   year; is that your understanding?

7   A.  That is correct.

8   Q.  So correct me if I am wrong, but the universities were

9   essentially you and Christian Dawkins pipe lying for future

10  clients, right?

11  A.  Can you repeat that?

12  Q.  Yes.  The universities were you and Christian Dawkins and

13  your company, Loyd Management, pipe lying, or source, for

14  future clients, right?

15  A.  Yes.

16  Q.  You needed the university, didn't you?

17  A.  I mean that was a source of business, yes.

18  Q.  That was my question.

19        You even testified on direct examination that you

20  said, obviously, if Brian Bowen played college basketball, it

21  improved his chances of playing in the NBA, didn't you?

22  A.  I did.

23  Q.  Because then he can go to the tournament and get exposure

24  and become more prominent, right?

25  A.  Correct.

1    Q.  And every day he's on national television playing for

2    wherever, that increases his draft stock, doesn't it?

3    A.  Yes.

4    Q.  You know this business a little.  I can tell, right?

5    A.  I've learned it, yes.

6    Q.  So let me ask you this question.  If that's true what you

7    just said, what logical sense would it make that you or

8    Christian Dawkins or anyone from Loyd would try to harm a

9    university?

10             MR. SOLOWIEJCZYK:  Objection.

11             THE COURT:  Sustained.

12             MR. HANEY:  I have nothing else, your Honor.

13             THE COURT:  Thank you.

14             Any other cross?

15             MR. MOORE:  Yes, sir, your Honor, if it please the

16   Court.

17   CROSS-EXAMINATION

18   BY MR. MOORE:

19   Q.  Good afternoon, Mr. Sood.

20   A.  Good afternoon.

21   Q.  I believe you told Mr. Solowiejczyk on direct examination

22   that the first time you talked to the FBI you weren't

23   completely truthful, isn't that correct?

24   A.  Correct.

25   Q.  In fact, you were arrested at your house and in point of

1   fact you lied to the FBI when they asked you a series of

2   questions, did you not, Mr. Sood?

3   A.  That's correct.

4   Q.  So it wasn't that you just weren't fully candid, you lied

5   to them, correct?

6   A.  Correct.

7   Q.  And you know that lying to a federal agent is a crime, a

8   violation of Title 18, United States Code, 1001, which could

9   subject you to five years of imprisonment, correct?

10  A.  I knew what I violated was a crime.

11  Q.  And you also, as part of this deal that you cut with the

12  government, got immunity for lying to the FBI, correct?

13  A.  Yes.

14  Q.  And shortly after you lied to the FBI, you began a series

15  of meetings with the prosecutors and the agents in this case,

16  correct, Mr. Sood?

17  A.  That's correct.

18  Q.  And I believe you told Mr. Solowiejczyk that you recall

19  approximately 12 such meetings, is that right?

20  A.  Yes.

21  Q.  Now, Mr. Sood, you realize that when you sit down to talk

22  to an FBI agent and prosecutors, they take notes of what you

23  say and that's memorialized and provided to the defense,

24  correct?

25  A.  I'm not sure about the note taking.

1  Q.  Well, you saw agents taking notes when you talked to them,

2  didn't you, Mr. Sood?

3  A.  They were on their computers.  I couldn't see what they

4  were doing on their side.

5  Q.  And so, Mr. Sood, would you disagree with me that you met

6  or spoke on the phone with agents on October 23rd, 2017?

7  A.  I don't know.

8  Q.  And on November 1st, 2017?

9  A.  I would have to see a calendar.

10  Q.  And on November 16th, 2017?

11          (Pause)

12          And on December 11th, 2017?

13          MR. SOLOWIEJCZYK:  There is no answer, your Honor.

14          THE COURT:  I'm sorry.  You are talking over each

15  other.

16          MR. SOLOWIEJCZYK:  Objection, your Honor.  There has

17  been no answer to the first of these series of questions.

18          THE COURT:  I think that's a fair point.

19          The witness need a calendar?

20          THE WITNESS:  Yes.  That would be helpful, your Honor.

21          THE COURT:  Give the witness a calendar.

22          THE WITNESS:  Your Honor, I don't remember the exact

23  dates that I met with them.

24          THE COURT:  All right.  He doesn't remember the exact

25  dates.  Let's get on with it.

1             MR. MOORE:  Yes, sir, your Honor.

2     BY MR. MOORE:

3     Q.  Do you remember that you met with them or spoke to them at

4     least 17 times, Mr. Sood?

5     A.  I thought it was 12 but I guess it's possible.

6     Q.  And in point of fact, you met with them or talked to them

7     several times in the past week, isn't that correct?

8     A.  Yes.

9     Q.  I believe you met with them on September 25th,

10    September 27th, September 30th, and on Monday of this week,

11    October 1st, is that correct, Mr. Sood?

12    A.  Again, I remember Monday.  I would have to check the other

13    dates.

14    Q.  Well, you talked to them several times last week, did you

15    not, sir?

16    A.  I did.

17    Q.  OK.  And in those discussions, you talked with them about

18    the testimony that you would provide, and they also talked to

19    you about the questions that you might be asked on

20    cross-examination; isn't that correct, Mr. Sood?

21    A.  We talked about making sure I had my facts -- I want to

22    make sure I had my facts correct.

23    Q.  You wanted to make sure you had your facts correct, is that

24    right?

25    A.  Yes.

1    Q.  All right.  So you needed to meet with them on all of these

2    occasions so that you could make sure that you had your facts

3    correct; is that what you're telling these ladies and gentlemen

4    of the jury, Mr. Sood?

5    A.  That, and also I was reviewing the tapes before I came to

6    court.

7    Q.  Now, Mr. Sood, I want to talk to you for a few minutes

8    about some of the things that you said on direct examination.

9          You said that you know my client, Merl Code, is that

10   correct?

11   A.  Yes.

12   Q.  Although you continue to refer to hem him by the name

13   "Merl," isn't that right, sir?

14          MR. SOLOWIEJCZYK:  Objection.

15          THE COURT:  Sustained.

16   BY MR. MOORE:

17   Q.  In point of fact, Mr. Sood, you have only met Merl Code one

18   time, isn't that correct?

19   A.  That's correct.

20   Q.  OK.  And you've met with Merl Code during this meeting that

21   we saw between you and him and Christian Dawkins and two

22   undercover agents of the FBI and Mr. Blazer, who you now know

23   was working as an informant, correct?

24   A.  Correct.

25   Q.  And so that was the first and the only time that you met my

1    client, Merl Code, is that right?

2    A.  Yes.

3    Q.  Now, Mr. Solowiejczyk went through a series of phone calls

4    and meetings with you, correct?

5    A.  Correct.

6    Q.  OK.  And he paused at certain moments to ask you certain

7    questions, did he not, Mr. Sood?

8    A.  He did.

9    Q.  And one of the conversations that he asked you about was a

10   telephone call between you and Mr. DeAngelo, the undercover

11   officer, and Mr. Code, correct?

12   A.  Yes.

13   Q.  That occurred on July 10th, 2017, Government's Exhibit No.

14   57, correct, Mr. Sood?

15   A.  Yes.

16   Q.  OK.  And I believe you have a copy of that transcript in

17   front of you, do you not, Mr. Sood?

18   A.  I do.

19   Q.  OK.  I'd ask you to turn to page number 2 of that

20   transcript, because I'm going to ask you to pause for a moment

21   with respect to a couple of comments made on that page that

22   Mr. Solowiejczyk did not ask you to pause on.

23           And in point of fact, Mr. Sood, on page 2, you hear

24   Merl Code say that, This is kind of one of those instances

25   where we needed to step up and help one of our flagship schools

```
 1   in Louisville, you know, recruit a five-star caliber kid.

 2              That is what --

 3              MR. SOLOWIEJCZYK:  Objection, your Honor.  He misread

 4   the transcript, your Honor.  I just want the question to be

 5   accurate in the record.

 6              MR. MOORE:  I'll reread it, your Honor, if I misspoke.

 7              THE COURT:  Yes.

 8   Q.  "And so this is kind of one of those instances where we

 9   needed to step up and help one of our flagship schools in

10   Louisville, you know, secure a five-star caliber kid."

11              That is what Mr. Code told you and the undercover FBI

12   agent on that tape; is that not correct, Mr. Sood?

13   A.  If you read it, it continues.  It says, actually, it's

14   helping Adidas, on the next line.

15   Q.  I understand that, Mr. Sood.

16              My point is the line that I read to you is exactly

17   what Merl Code said, correct?

18   A.  On that line, yes.

19   Q.  OK.  And then he went on to say, "So obviously that helps,

20   you know, our potential business in terms of Adidas, correct?

21   A.  Correct.

22   Q.  Now, Mr. Sood, I'd ask you to flip a couple of pages over,

23   to page 5 of that transcript, again, another place where

24   Mr. Solowiejczyk did not pause.

25              And it says, according to this transcript, after Jeff
```

1    says the word "Right," "Get involved directly in those kind of

2    situation scenarios, but certainly when it helps one of our

3    flagship schools, you know, we're more apt to try to help that

4    business manager or that particular agent or, you know, because

5    that's, you know, helps them and it helps us."

6              Correct?

7    A.   Correct.

8    Q.   So on two separate points in that particular tape Merl Code

9    talks about helping one of Adidas' flagship schools, does he

10   not, Mr. Sood?

11             MR. SOLOWIEJCZYK:  Objection.

12             THE COURT:  Sustained.

13             Your question assumes that helping a business manager

14   or particular agent necessarily helps the school, and that's

15   sometimes true and sometimes it isn't true.  And we're going to

16   hear a lot more about that before this case is over.

17             MR. MOORE:  I understand that, your Honor.  I was just

18   reading the question.

19             THE COURT:  So your question is flawed.

20             MR. MOORE:  Yes, sir.

21   BY MR. MOORE:

22   Q.   Now, Mr. Sood, you were also asked some questions about

23   what -- did Christian Dawkins tell you that these payments

24   would be disclosed to Louisville; you recall being asked that

25   question, correct?

1    A.  Yes.

2    Q.  OK.  And you were also asked a question of whether Merl

3    Code told you that these payments would be disclosed to

4    Louisville, correct?

5    A.  Correct.

6    Q.  And you answered no, correct?

7    A.  Correct.

8    Q.  Now, Mr. Code -- Mr. Sood, isn't it a fact that you don't

9    know what, if any, conversations Christian Dawkins was having

10   with any of the coaches at Louisville during this time period;

11   you don't know that, do you, Mr. Sood?

12   A.  I don't.

13   Q.  You don't know if Mr. Dawkins had any conversations with

14   Kenny Johnson or Jordan Fair or Rick Patino, do you, Mr. Sood?

15   A.  I don't.

16   Q.  And you don't know what, if any, conversations Mr. Code was

17   having with anybody at Louisville during that time period, do

18   you, Mr. Sood?

19   A.  I don't know.

20   Q.  OK.  And you don't know what conversations, if any, that

21   anyone else at Adidas, or affiliated with Adidas, was having

22   with Mr. Patino, Mr. Fair, or Kenny Johnson, do you, Mr. Sood?

23   A.  I don't.

24   Q.  Or what conversations they might have been having with

25   other people at that school, do you, Mr. Sood?

Ia3dgat5                         Sood - cross

1    A.  Correct.

2              MR. MOORE:  Thank you, Mr. Sood.  I don't have any

3    further questions.

4              THE COURT:  All right.  Thank you.

5              Anything else?  Ms. Donnelly?

6              MS. DONNELLY:  Yes.

7    CROSS-EXAMINATION

8    BY MS. DONNELLY:

9    Q.  Good afternoon.

10   A.  Good afternoon.

11   Q.  Mr. Sood, you've never met Mr. Gatto, isn't that correct?

12   A.  That's correct.

13   Q.  You have never spoken with Mr. Gatto, is that correct?

14   A.  That is correct.

15   Q.  You don't have any personal knowledge about what

16   Mr. Gatto's job responsibilities are at Adidas, correct?

17   A.  That's correct.

18   Q.  You don't know what, if any, conversations Mr. Gatto has

19   had with the basketball coaches at Adidas-sponsored

20   universities, isn't that correct?

21   A.  Correct.

22   Q.  During your direct examination, Mr. Solowiejczyk asked you

23   about the agreement that you struck with the government.  I

24   have just a few additional questions.

25              You testified that you pled guilty to engaging in a

1   conspiracy to commit wire fraud, but you also pled guilty to

2   two other felonies, isn't that correct?

3   A.   Correct.

4   Q.   You also pled guilty to a completely separate charge of

5   conspiracy to commit bribery, honest services fraud, and Travel

6   Act offenses, isn't that correct?

7   A.   Correct.

8   Q.   And that charge, that charge that you pled guilty to, those

9   allegations did not involve Mr. Gatto, isn't that correct?

10  A.   I believe that's correct.

11  Q.   And the other felony that you pled guilty to was a

12  violation of Section 666(a)(2) of Title 18 of the United States

13  Code, which prohibits bribes to an agent of a federally funded

14  organization, is that right?

15  A.   Yes.

16  Q.   And that charge, which you pled guilty to, the allegations

17  there, they did not involve Mr. Gatto, isn't that correct?

18  A.   Ah --

19          MR. SOLOWIEJCZYK:   Objection, your Honor.

20          Can we have a brief sidebar on this?

21          THE COURT:   He either knows or he doesn't know.

22  A.   I don't know.

23  Q.   Mr. Sood, if instead of pleading guilty you had decided to

24  stand trial, you would have had to defend yourself in two

25  separate criminal trials, isn't that correct?

Ia3dgat5

1   A.   Yes.

2              MS. DONNELLY:  I have no further questions.

3              THE COURT:  All right.  Thank you.

4              Government?

5              MR. SOLOWIEJCZYK:  No redirect, your Honor.

6              THE COURT:  All right.  Mr. Sood, you are excused.

7   Thank you.

8              (Witness excused)

9              THE COURT:  Next witness.

10             MR. SOLOWIEJCZYK:  Your Honor, the government calls

11  John Carns from the University of Louisville.

12             While we get the witness, may we just briefly approach

13  on the matter we raised this morning?

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  OK.

3          MR. DISKANT:  Your Honor, the parties are continuing

4   to work on a stipulation regarding the prior violation.  We

5   don't have a final version yet.  It is my hope that we're going

6   to get there.  I just wanted to put on the record that I am

7   willing to do this direct examination as if we are going to

8   reach an agreement and therefore not raise this issue on the

9   understanding that defense counsel is not -- also not going to

10  raise this issue.

11         THE COURT:  Is that right?

12         MR. SCHACHTER:  I guess -- I don't know what the

13  direct examination is going to be, so I don't know if the

14  issue -- and I think we are agreeing on a set of facts;

15  however, I don't know if those facts are going to be

16  inconsistent with something that the witness says and,

17  therefore, would be relevant impeachment.  Without knowing

18  exactly what the direct examination is going to be, I don't

19  know how to answer that question.

20         MR. DISKANT:  Your Honor, the entire point of reaching

21  the stipulation was to keep the facts tight on this, and I

22  don't intend to ask this witness anything that should open a

23  door to it.  I have a concern that Mr. Schachter is going to be

24  looking for any excuse he can to get into this, but the whole

25  purpose of the stipulation --

Ia3dgat5

1          THE COURT:  Shocking.  Just shocking.

2          MR. DISKANT:  I know.

3          MR. SCHACHTER:  That does hurt.

4          MR. DISKANT:  The whole point of the stipulation, in

5    good faith, that the government has engaged in trying to reach

6    a stipulation is to keep this witness from being turned into a

7    forum to litigate these issues.

8          MR. SCHACHTER:  That we are in complete agreement

9    with.  I would not -- I believe that this stipulation is going

10   to I believe embody the full set of facts.  The only question

11   is whether or not one of facts in the stipulation would be

12   relevant to cross-examination of the witness.  I guess that

13   depends on the direct examination.  It may not be.

14         MR. DISKANT:  The stipulation has been entered --

15         THE COURT:  Look, how long are you going to be on

16   direct?

17         MR. DISKANT:  Probably -- we will probably not finish

18   today --

19         THE COURT:  That's what I thought.  So you are

20   probably going to finish this deal, if you are going to have

21   one, tonight, right?

22         MR. DISKANT:  Very good.

23         THE COURT:  OK.  Sufficient unto the day.

24         (Continued on next page)

25

1           (In open court)

2           THE COURT:  Step up, Mr. Carns.

3    JOHN CARNS,

4        called as a witness by the government,

5        having been duly sworn, testified as follows:

6           THE CLERK:  Please be seated.

7           If you could please state your name and spell your

8    last name for the record

9           THE WITNESS:  John Carns, C-a-r-n-s.

10          MR. DISKANT:  Your Honor, may I inquire?

11          THE COURT:  Yes, you may.

12          MR. DISKANT:  Thank you.

13   DIRECT EXAMINATION

14   BY MR. DISKANT:

15   Q.  Good afternoon, Mr. Carns.

16   A.  Good afternoon.

17   Q.  Where do you currently work?

18   A.  I work for the University of Louisville.

19   Q.  How long have you worked for the University of Louisville?

20   A.  Just past 20 years.

21   Q.  What is your title?

22   A.  I'm Senior Associate Athletic Director for Compliance.

23   Q.  How long have you served as the director of compliance for

24   Louisville?

25   A.  Since approximately 2002, I believe.

1   Q.  Were you employed prior to joining Louisville?

2   A.  Yes.  I was employed out of college in the City of

3   Binghamton, upstate New York, for approximately six-and-a-half

4   to seven years before going to law school and then going to

5   graduate school.

6   Q.  Which is my next question.  How far did you go in school?

7   It sounds like you have a Juris Doctorate?

8   A.  Yes, and also a graduate degree in sports administration.

9   Q.  Did you ever practice as a lawyer?

10  A.  I did not.

11  Q.  Let's talk a little bit more about your employer, the

12  University of Louisville.  Where is the University of

13  Louisville located?

14  A.  It is located in Louisville, Kentucky.

15  Q.  Is it a public or a private institution?

16  A.  It's a public institution.

17  Q.  Approximately how many students attend the University of

18  Louisville?

19  A.  I believe there is approximately 22,000 total students.

20  Around 15,000 of those are undergraduate, I believe.

21  Q.  So in addition to an undergraduate program, the University

22  offers graduate degrees and programs?

23  A.  Yes.

24  Q.  Are you assigned to any particular division or component of

25  the university?

1   A.  I work for the Department of Athletics.

2   Q.  And are you familiar with something called the University

3   of Louisville Athletic Association, or the "ULAA"?

4   A.  Yes.

5   Q.  What is the ULAA?

6   A.  The ULAA is basically a 501(c) corporation that serves as

7   the athletic arm of the university.

8   Q.  So just to be clear, the relationship between the ULAA and

9   the University is what?

10  A.  The ULAA is part of the University.

11  Q.  Does the Athletic Department at the University of

12  Louisville have a budget?

13  A.  Yes, it does.

14  Q.  And as part of your job responsibility, do you have

15  familiarity with things like the budget for the Athletic

16  Department?

17  A.  Somewhat, yes.

18  Q.  What is your understanding of the size of the budget?

19  A.  I believe it's over a hundred, a hundred million,

20  approximately 104 million.

21  Q.  And who controls the Athletic Department's budget?

22  A.  The President of the University has ultimate control for

23  all of athletics, including the budget.

24  Q.  Through your job, have you developed an understanding of

25  where the money to fund the Louisville Athletic Department

1    comes from?

2    A.   Yes.

3    Q.   Where?

4    A.   The money comes from donations, ticket sales, corporate

5    sponsorships, other areas.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  And if those various sources of revenue are insufficient to

2    fully fund the department, where does the shortfall come from?

3    A.  The university would ultimately cover the shortfall.

4    Q.  Through your job, do you have an understanding of the

5    general amount of revenue that the athletics department

6    generates?

7    A.  Not specifically.

8    Q.  How many athletic teams does the university have?

9    A.  We have 23 teams.

10   Q.  Does that include both mens and women's?

11   A.  Yes, it does.

12   Q.  What are some of the sports that Louisville fields teams

13   in?

14   A.  We field teams in baseball, football, men's and women's

15   basketball, men's and women's golf, men's and women's swimming,

16   men's and women's soccer, volleyball.

17   Q.  How many student-athletes university-wide compete on the

18   University of Louisville athletic team?

19   A.  We have approximately 600 student-athletes.

20   Q.  Of those, approximately how many receive some sort of

21   athletic scholarship?

22   A.  Roughly 450, I would estimate.

23   Q.  Does the university have an apparel sponsor?

24   A.  Yes.

25   Q.  Who is that?

1    A.   Adidas.

2    Q.   What does it mean to have an apparel sponsor?

3    A.   It's basically a sponsorship agreement; the primary purpose

4    of it is for Adidas to outfit our student-athletes and staff

5    with apparel, shoes, equipment needed to compete.

6    Q.   As the director of compliance, do you have any direct role

7    in dealing with Adidas?

8    A.   We get involved when our marketing department gets involved

9    with them, perhaps to monitor student-athlete likeness, making

10   sure that there is no current student-athlete whose name, image

11   or likeness is being used by the corporation.

12   Q.   Do you have any involvement in drafting or negotiating the

13   contract with Adidas?

14   A.   No.

15   Q.   You have mentioned that you have been with the University

16   of Louisville for approximately 20 years.  Has the university

17   changed over that time?

18   A.   Yes.  It's changed significantly.

19   Q.   Can you tell us a little bit about that?

20   A.   Speaking just about athletics, we have had the four women's

21   teams in that time period.  In terms of facilities, I think

22   each sport has had a new facility built during that time

23   period.  Our graduation rates for student-athletes have

24   increased significantly during that time.

25   Q.   How about the size and scope of the university itself?

A.   Yes.   The university, when I first got there, which is in

1998, was primarily a commuter school, and through development

of housing on campus and surrounding the campus, it's turned

more into a residential college.   It has also increased the

student profile by building additional buildings on campus as

well, research buildings and things.

Q.   From your vantage point in the athletic department, what

role, if any, has the athletic department played in that

development and growth?

A.   I think it's been a partnership.   Obviously, athletics is

nationally known.   We have also gone from a Conference USA to

the Big East Conference to the Atlantic Coast Conference, which

is a qualified conference, which has also increased the profile

not only of the athletic department but of the university as

well.

Q.   You mentioned a whole bunch of different conferences.   For

folks who don't know a lot about college basketball, can you

tell us what a conference is?

A.   A conference is basically a group of schools that are under

one umbrella that compete against each other, share revenues,

expenses, and things of that nature.

Q.   Are there any conferences that are more or less significant

from purposes of sports?

A.   Not necessarily significance, but obviously size of

programs and things matter in different conferences.

1    Q.  So you mentioned that your job is the director of

2    compliance.  Can you tell us a little bit more about what your

3    job entails?

4    A.  Yes.  We work with -- it's myself and a full-time staff of

5    seven when we are fully staffed.  Currently we have six

6    additional staff members.  But our job basically is to ensure

7    that the athletic department, everyone is following university

8    rules and regulations, making sure that the university is

9    following institutional control, as set forth by the NCAA, in

10   terms of compliance with their rules and regulations, and also

11   following rules and regulations of the Atlantic Coast

12   Conference, the ACC.

13   Q.  ACC is the conference that Louisville is a part of?

14   A.  Correct.

15   Q.  Let's talk more about that in a minute.  You said you had a

16   staff?

17   A.  Yes.

18   Q.  What qualifications do you look for in hiring your staff?

19   A.  At this point, obviously prior compliance experience is a

20   benefit, legal experience we have been successful with; we have

21   two attorneys on our staff in addition to myself.  So those are

22   two key areas.

23   Q.  To whom do you report?

24   A.  I report to the vice president for athletics.

25   Q.  Also known as the athletic director?

1    A.   Correct.

2    Q.   So you mentioned that one of the things that you ensure

3    compliance with are NCAA rules?

4    A.   Yes.

5    Q.   What is the NCAA?

6    A.   The NCAA is basically the governing body for all of the

7    universities that compete under their umbrella.

8    Q.   Is that also known as the National Collegiate Athletic

9    Association?

10   A.   Yes, it is.

11   Q.   Is the University of Louisville a member of the NCAA?

12   A.   Yes, it is.

13   Q.   What are some of the benefits to Louisville of membership

14   in the NCAA?

15   A.   Obviously, competing against other members in that

16   conference and the association, sharing revenue with those

17   sports.

18   Q.   Just to pause there for a minute, if the University of

19   Louisville were not a member of the NCAA, could it compete in

20   NCAA games?

21   A.   No, it cannot.

22   Q.   Does the NCAA establish rules that member universities are

23   required to follow?

24   A.   Yes, it does.

25   Q.   Focusing your attention on scholarships, which we discussed

1    a moment ago, are there any particular rules that are of

2    relevance?

3    A.   Yes.  There's individual limits as to how much a

4    scholarship value is worth, and also team limits, in terms of

5    how many scholarships each team can be allotted, and those vary

6    from sport to sport.

7    Q.   Does the NCAA set requirements for eligibility to receive

8    and maintain a scholarship?

9    A.   Yes.

10   Q.   What are some of the eligibility requirements established

11   by the NCAA?

12   A.   There are academic benchmarks both as an incoming student

13   and a continuing student, in terms of progress towards a degree

14   and things of that nature, and there is also an amateurism

15   aspect of that also.

16   Q.   We will come back to the academic in just a moment, but

17   let's start with the amateur status.

18           What does it mean under NCAA rules to be amateur?

19   A.   Basically, you cannot professionalize yourself as an

20   athlete to compete under their rules.

21   Q.   Can a student-athlete receive payment for his or her

22   performance in a sport and remain an amateur?

23   A.   Outside of some exceptions, no.

24   Q.   How about the family of a student-athlete?

25   A.   No.

```
 1   Q.  Are there penalties if a school like Louisville is found to

 2   have allowed a player who is ineligible to compete?

 3   A.  Yes, there are.

 4   Q.  Tell us about those.

 5   A.  There are financial penalties for games that they played

 6   in.  There would be a withholding for the student-athlete for

 7   those games as well.  If it was during a tournament or a

 8   conference tournament, potential loss of forfeiture of those

 9   games and loss of revenues perhaps.

10   Q.  So you mentioned some financial penalties.  Can the NCAA

11   impose fines?

12   A.  Yes.

13   Q.  What kinds of fines can the NCAA impose?

14   A.  It can impose -- in that case, it can impose fines for the

15   number of contests that the student-athlete competed in

16   ineligible.

17   Q.  You mentioned loss of revenue?

18   A.  Yes.

19   Q.  How would the university potentially lose revenue?

20   A.  If they had competed in an NCAA tournament, for instance,

21   and then ultimately had to forfeit those games, that could also

22   result in the loss of revenue, the revenue that they would

23   received for competing.

24   Q.  You mentioned that part of your job as the director of

25   compliance is to ensure that the university complies with NCAA
```

1   rules?

2   A.  Yes.

3   Q.  What, if anything, do you and your staff do to ensure

4   compliance with NCAA rules?

5   A.  We do a number of things.  Primarily what we try to do is

6   educate.  We educate our student-athletes, our staff, coaches,

7   boosters, anyone that is around our department.  We also put in

8   place monitoring systems to ensure that we are following those

9   rules.  And then ultimately, if there are situations that

10  arise, we investigate violations and report those violations as

11  necessary to the NCAA.

12  Q.  So starting with the first of the things you mentioned, the

13  education component of it, do you and your staff provide

14  training to student-athletes?

15  A.  Yes, we do.

16  Q.  Do you provide training to staff members?

17  A.  Yes.

18  Q.  If I could direct your attention -- there should be a

19  binder in front of you -- to what has been marked for

20  identification purposes as Government Exhibit 1623.

21          Mr. Carns, do you recognize this document?

22  A.  Yes.

23  Q.  What do you recognize it to be?

24  A.  This is our incoming student-athlete guide that we provide

25  to all students who have committed -- either signed a letter of

1    intent or financial agreement or committed to attend the

2    university as a student-athlete.

3    Q.  And is it part of your education effort with respect to

4    NCAA rules?

5    A.  Yes.

6    Q.  Did you participate in the production of this document?

7    A.  Yes.

8              MR. DISKANT:  Your Honor, the government offers 1623.

9              MR. SCHACHTER:  No objection.

10             THE COURT:  Received.

11             (Government's Exhibit 1623 received in evidence)

12             MR. DISKANT:  With the Court's permission, we will

13   publish this.

14             THE COURT:  Yes.

15             MR. DISKANT:  Ms. Lee, if we could turn to page 4 of

16   the PDF.

17   Q.  So, Mr. Carns, right up top it says, "Protect your

18   eligibility.  Top five pre-enrollment tips."

19             MR. DISKANT:  I apologize, Ms. Lee.  Can we go back to

20   page 1 for just a minute.

21   Q.  So this is called the "Incoming student-athlete guide -

22   everything you need to know to be a cardinal."

23             Do you see that?

24   A.  Yes.

25   Q.  Who is the target audience for this particular guide?

 1  A.  All of our committed student-athletes who have committed to
 2  coming to the university.
 3         MR. DISKANT:  Now if we can turn to page 4, Ms. Lee.
 4  Q.  Focusing up top, "Protect your eligibility.  Top five
 5  pre-enrollment tips."  Do you see that?
 6  A.  Yes.
 7  Q.  What eligibility are you referring to?
 8  A.  NCAA eligibility.
 9  Q.  So number 1 says "extra benefit."  What is an extra
10  benefit?
11  A.  As it says, "Any special arrangement or preferential
12  treatment given to a student-athlete or family and relatives or
13  a friend not expressly authorized by NCAA rules."
14  Q.  Would you read, if you don't mind, that first paragraph for
15  us?
16  A.  "Individuals (including University of Louisville staff and
17  coaches) other than your family and relatives, may not provide
18  extra benefits or preferential treatment to you or your family.
19  Acceptance of an extra benefit or preferential treatment pre or
20  post enrollment by you or your family will result in a
21  violation of NCAA rules affecting your eligibility."
22  Q.  Now, Mr. Carns, you and the guide here highlight "you or
23  your family."  Why do you do that?
24  A.  Because of the benefits provided to either the
25  student-athlete or the family, there is still eligibility

1    consequences for the student-athlete.

2    Q.  So if a family member receives an improper benefit without

3    the student-athlete's knowledge, does that affect the

4    student-athlete's eligibility?

5    A.  Yes.

6    Q.  Why do you provide this guidance to all incoming

7    student-athletes?

8    A.  We want to obviously get in front of the rules education as

9    early as possible for our prospective student-athletes because

10   these are rules that they are responsible for throughout their

11   entire time on campus.  So the earlier we can get this

12   information to them, the earlier they can understand that

13   information, and the family can understand that information,

14   and we can hopefully move forward without incident.

15   Q.  What are some of the consequences if a student-athlete

16   receives an improper benefit?

17   A.  Possible ineligibility, repayment of the benefits, and if

18   there is institutional staff involved, potential institutional

19   penalties as well.

20   Q.  We will come back to that in just a minute.

21          Are all improper benefits treated equally under the

22   NCAA rules?

23   A.  No.

24   Q.  Can you tell us a little bit more about that?

25   A.  Basically, there's different levels of benefits that are

1    provided, and obviously different penalties resulting from the

2    value of those benefits.

3    Q.  For example, I think one of the examples you gave us a

4    moment ago of an improper benefit was a free meal.

5          If a student-athlete accepts a free meal, how would

6    the University of Louisville typically respond to that?

7    A.  We would report the violation, and depending upon the

8    amount of the meal, either they would directly -- if it was

9    less $200, they would repay that benefit before becoming

10   eligible.  If it was a benefit more $200, we would have to

11   declare them ineligible.

12   Q.  Are there various gradations or levels of NCAA violations?

13   A.  Yes.

14   Q.  Go ahead.

15   A.  There's basically three levels.  Level one and level two

16   violations are more serious or severe violations.  They were

17   formerly called major violations by the NCAA.  Then level three

18   are considered inadvertent or isolated incidents in most cases,

19   and those are what used to be referred to as secondary

20   violations by the NCAA.

21   Q.  So if I understand you correctly, it sounds like level one

22   and level two are sort of in one category and level three is in

23   another?

24   A.  Yes.

25   Q.  As part of its compliance program, does the university

1   impose compliance obligations on its employees?

2   A.  Yes.

3   Q.  What are those obligations?

4   A.  To follow the rules and regulations of the NCAA, to be

5   educated on those, and to report any potential violation or

6   information either of a violation or a potential violation to

7   the director of athletics in our office.

8   Q.  Would that extend to members of the men's basketball

9   coaching staff?

10  A.  Yes, it would.

11  Q.  Are those expectations of the university documented

12  anywhere?

13  A.  Yes.

14  Q.  Where are they documented?

15  A.  For staff they are documented in their employment

16  contracts.

17  Q.  Are you familiar with someone named Richard or Rick Pitino?

18  A.  Yes, I am.

19  Q.  How are you familiar with him?

20  A.  He was the former head men's basketball coach at the

21  University of Louisville.

22  Q.  Did Mr. Pitino have a written contract with the university?

23  A.  Yes, he did.

24  Q.  Is that a document you would have had access to in the

25  ordinary course of your work?

1    A.  Yes.

2    Q.  Mr. Carns, if I could direct your attention to what has

3    been marked for identification purposes as Government Exhibit

4    1617 and ask you if you recognize this.

5    A.  Yes, I do.

6    Q.  What do you recognize it to be?

7    A.  The employment contract for Rick Pitino.

8            MR. DISKANT:  The government offers 1617.

9            MR. SCHACHTER:  No objection.

10           MR. MOORE:  No objection.

11           MR. HANEY:  No objection.

12           THE COURT:  It's received.

13           (Government's Exhibit 1617 received in evidence)

14   Q.  Just starting right up top, it looks like this is an

15   employment contract between the ULAA -- that's the athletic

16   department you were telling us about before?

17   A.  Yes.

18   Q.  -- and Richard A. Pitino below that?

19   A.  Yes.

20           MR. DISKANT:  Ms. Lee, if we could turn to page 9.

21           If you could highlight under "employees' duties"

22   section 4.1.3 down at the bottom.  It looks like this may

23   continue on to the next page.

24   Q.  Mr. Carns, if you could just read that for us?

25   A.  "Know, recognize, and comply with the laws, policies,

1   rules, and regulations governing employer and its employees,

2   including conflict of interest policies and the rules of the

3   NCAA and any conference with which the university is now or

4   subsequently affiliated, as now constituted or as they may be

5   amended during the term hereof, to diligently supervise

6   compliance of assistant coaches and any other employees for

7   which the employee is administratively responsible for the

8   aforesaid policies, rules, and regulations, and to immediately

9   advise the athletic director if employee has cause to believe

10  violations by such subordinates have occurred or will occur."

11  Q.  Mr. Carns, consistent with that language, is Rick Pitino

12  allowed to engage in or facilitate violations of NCAA rules?

13  A.  No, he's not.

14  Q.  If he learns of such violations, are requirements imposed

15  upon him?

16  A.  Yes.

17  Q.  What are those requirements?

18  A.  To report the information.

19  Q.  Does this contract provide for potential consequences if

20  Mr. Pitino were to fail to honor or to violate this particular

21  provision?

22  A.  Yes.

23  Q.  What do those consequences include?

24  A.  Termination of employment.

25           MR. DISKANT:  Ms. Lee, if we can turn to page 12 of

1    this document, and focus in on the bottom half, "termination

2    for just cause."

3    Q.  This provides a section, "The employer has the right to

4    terminate the employment contract for just cause or impose

5    other appropriate discipline."

6              Mr. Carns, can you read 6.1.3?

7              MR. SCHACHTER:  Objection.  The document is in

8    evidence.

9              THE COURT:  I will allow it.

10   A.  "Major violation of any rule or bylaw of employer, the

11   athletic conference with which the university is then

12   affiliated or the NCAA, including level 1 and/or level 2 NCAA

13   violations, which violation damages employer or the university

14   in a material fashion."

15   Q.  Thank you.

16             In addition to these provisions, does the contract

17   also provide for compensation?

18   A.  Yes, it does.

19   Q.  Is a component of Mr. Pitino's compensation based on the

20   performance of the athletic term?

21   A.  Yes, it is.

22   Q.  Are provisions like these -- that is, those pertaining to

23   honoring and not violating NCAA rules -- contained in contracts

24   for all of the assistant coaches as well?

25   A.  Yes.

1    Q.  Are you familiar with someone named Jordan Fair?

2    A.  Yes, I am.

3    Q.  How are you familiar with Mr. Fair?

4    A.  Jordan was a former assistant basketball coach for the

5    University of Louisville.

6             MR. DISKANT:  If we can bring up for the witness, or

7    if you would turn in your binder to what has been marked for

8    identification purposes as Government Exhibit 1601.

9    Q.  Mr. Carns, do you recognize this document?

10   A.  Yes, I do.

11   Q.  What is it?

12   A.  It's the employment contract for Jordan Fair.

13            MR. DISKANT:  The government offers 1601.

14            MR. SCHACHTER:  No objection.

15            THE COURT:  Received.

16            (Government's Exhibit 1601 received in evidence)

17   Q.  Now, Mr. Carns, you told us that Jordan Fair was an

18   assistant coach for the men's basketball team?

19   A.  Yes.

20   Q.  Did he hold that position in the summer of 2017?

21   A.  Yes, he did.

22   Q.  If we can turn to page 3, and just focus on paragraph 10

23   which says, "If during the contract period any situation arises

24   wherein an employee is found to have knowingly encouraged or

25   allowed violations of the existing NCAA rules or regulations,

1    the ULAA's obligations covered by this contract will be

2    terminated immediately."

3              Do you see that?

4    A.  Yes.

5    Q.  Just remind us again, the ULAA is what?

6    A.  University of Louisville Athletic Association.

7    Q.  Are you familiar with someone named Kenny Johnson?

8    A.  Yes.

9    Q.  Who is Kenny Johnson?

10   A.  Kenny was the associate head coach for the University of

11   Louisville men's basketball program.

12   Q.  Did he also have a contract?

13   A.  Yes, he did.

14             MR. DISKANT:  If we can bring up for the witness what

15   has been marked for identification as Government Exhibit 1602.

16   Q.  Mr. Carns, do you recognize this document?

17   A.  Yes, I do.

18   Q.  What do you recognize it to be?

19   A.  The employment contract for Kenny Johnson.

20             MR. DISKANT:  Government offers 1602.

21             MR. SCHACHTER:  No objection.

22             THE COURT:  1602 is received.

23             (Government's Exhibit 1602 received in evidence)

24   Q.  Focusing up on the top, Mr. Carns, was this contract in

25   effect between May and September of 2017?

1    A.  Yes, it was.

2            MR. DISKANT:  Ms. Lee, if we can turn to page 2 and

3    take a look at paragraph 6 of this contract.

4    Q.  Mr. Carns, this says, "Employee is expected to show

5    exemplary sensitivity to the spirit as well as the letter of

6    such rules."

7            Which rules is the contract referring to?

8    A.  NCAA rules.

9    Q.  Does this contract also provide for the possible

10   termination or other employment action for a violation of NCAA

11   rules?

12   A.  Yes, it would.

13   Q.  Why does the university include provisions like these in

14   its employment contracts for its coaches?

15           MR. SCHACHTER:  Objection.  Lack of foundation.

16           THE COURT:  Sustained.

17   Q.  As the director of compliance, do you have an understanding

18   of why it is the university requires its employees to follow

19   NCAA rules?

20           MR. SCHACHTER:  Objection.

21           THE COURT:  Sustained.

22   Q.  Mr. Carns, if you were to learn that a coach had been

23   involved in making or facilitating a payment to a player, what

24   would you do?

25           MR. SCHACHTER:  Objection.

1          THE COURT:  Overruled.

2   A.  We would investigate the information, report a violation if

3   necessary, and recommend to the athletic director appropriate

4   sanctions to the coach.

5   Q.  We talked a moment ago about athletic scholarships.  Does

6   the university issue athletic scholarships?

7   A.  Yes, they do.

8   Q.  Focusing your attention on men's basketball, how many

9   athletic scholarships does the university issue?

10  A.  Men's basketball is permitted by NCAA rules 13

11  scholarships.

12  Q.  Does the university incur a cost with respect to the

13  issuance of a scholarship?

14  A.  Yes.

15  Q.  Focusing your attention on the 2017-2018 academic year,

16  what approximately was that cost?

17  A.  Approximately $41,000.

18  Q.  Is that an actual number?

19  A.  No.  That would be an average cost of the whole scholarship

20  for that academic year.

21  Q.  Where does the average come from?

22  A.  The average comes from the permissible elements, which are

23  tuition, books, room, board, and miscellaneous expense which

24  would take the student-athlete up to the full cost of

25  attendance that the university allows to provide.

Q.   Does the university also calculate the actual cost of the

scholarship?

A.   Yes.

Q.   How does the actual cost typically compare to the average?

A.   Depending upon the tuition.  So the number of classes

they're enrolled in, the types of classes they are enrolled in,

and also the amount of their books and things.  It could be

higher or lower depending upon residency and online courses

versus brick-and-mortar courses, things like that.

Q.   If I understand that correctly, based on, say, for example,

the courses the student actually chooses, that might impact the

cost of the scholarship?

          MR. SCHACHTER:  Objection.  Lack of foundation.  There

has been no foundation that this witness, in his role of

compliance, is involved in calculating the cost of a

scholarship.

          THE COURT:  Overruled.

A.   Yes.  Can you just repeat the question?

Q.   I was trying to make sure I understood your last answer.

It sounded like you were saying that based on, for example,

which course a particular student chose, that might have an

impact on the actual cost?

A.   Yes.  There's different costs for an online class as

opposed to a brick-and-mortar class, in-state versus

out-of-state, things like that.

1   Q.   Where does the money come from for the scholarship?

2   A.   The money comes from the University of Louisville Athletic

3   Association or the athletic department.

4   Q.   Does the university have criteria for awarding athletic

5   scholarships?

6   A.   Yes.

7   Q.   What are some of those?

8   A.   A student-athlete has to meet university requirements

9   academically and also NCAA requirements, both amateurism and

10  academic requirements.

11  Q.   Now, why do some of those requirements matter to the

12  university?

13          MR. SCHACHTER:   Objection.

14  A.   For the fact --

15          THE COURT:   Sustained.

16  Q.   Does the university, to your knowledge, issue scholarships

17  to student-athletes who are ineligible to compete?

18          MR. SCHACHTER:   Objection.

19          THE COURT:   Overruled.

20  A.   No, they do not.

21  Q.   Why not?

22  A.   Why don't they?  Because if they are ineligible to compete,

23  you're using the scholarship for somebody that could be

24  eligible primarily.

25          MR. DISKANT:   Your Honor, I am about to switch to

IA38GAT6                        Carns - Direct

1    another subject.

2              THE COURT:  And I am about to take another case.

3              Folks, 9:30 tomorrow morning.  Thank you.

4              (Jury exits courtroom)

5              THE COURT:  Be seated, folks.

6              You're free to go, unless you have something you need

7    to take up with me now.

8              (Adjourned to October 4, 2018, at 9:30 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                              Page

 3     EMILY ECKSTUT

 4    Cross By Mr. Moore . . . . . . . . . . . . . 197

 5     MUNISH SOOD

 6    Direct By Mr. Solowiejczyk . . . . . . . . . 208

 7    MUNISH SOOD

 8    Cross By Mr. Haney . . . . . . . . . . . . . 301

 9    Cross By Mr. Moore . . . . . . . . . . . . . 329

10    Cross By Ms. Donnelly  . . . . . . . . . . . 338

11     JOHN CARNS

12    Direct By Mr. Diskant  . . . . . . . . . . . 343

13                        GOVERNMENT EXHIBITS

14    Exhibit No.                              Received

15     S5   . . . . . . . . . . . . . . . . . . . 204

16     55, 55T  . . . . . . . . . . . . . . . . . 206

17     S6   . . . . . . . . . . . . . . . . . . . 206

18     516  . . . . . . . . . . . . . . . . . . . 217

19     2004   . . . . . . . . . . . . . . . . . . 236

20     523  . . . . . . . . . . . . . . . . . . . 237

21     520  . . . . . . . . . . . . . . . . . . . 239

22     102N-1, 102N-2, 102N-3, 102N-4, 102N-5 . . 241

23     104L   . . . . . . . . . . . . . . . . . . 278

24     528  . . . . . . . . . . . . . . . . . . . 280

25     522  . . . . . . . . . . . . . . . . . . . 281
```

524    . . . . . . . . . . . . . . . . 285

21, 21T, 22, 22T, 29, 29T, 57, 57T, 63, . . . 300

            63T, 75, 75T, 75A, 75A-T

1623    . . . . . . . . . . . . . . . . 355

1617    . . . . . . . . . . . . . . . . 360

1601    . . . . . . . . . . . . . . . . 363

1602    . . . . . . . . . . . . . . . . 364