IA48GAT1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                        17 Cr. 686 (LAK)

JAMES GATTO, a/k/a "Jim,"
MERL CODE,
CHRISTIAN DAWKINS,

           Defendants.

------------------------------x

                            October 4, 2018
                            9:35 a.m.

Before:

                 HON. LEWIS A. KAPLAN,

                            District Judge
                             and a Jury

                       APPEARANCES

ROBERT S. KHUZAMI
     Acting United States Attorney for the
     Southern District of New York
BY:  EDWARD B. DISKANT
     NOAH D. SOLOWIEJCZYK
     ALINE R. FLODR
     ELI J. MARK
     Assistant United States Attorneys

WILLKIE FARR & GALLAGHER LLP
     Attorneys for Defendant Gatto
BY:  MICHAEL S. SCHACHTER
     CASEY E. DONNELLY

IA48GAT1

1                     APPEARANCES (Cont'd)

2    NEXSEN PRUET LLC
          Attorneys for Defendant Code
3    BY:  MARK C. MOORE
                -and-
4    MERL F. CODE

5    HANEY LAW GROUP PLLC
          Attorneys for Defendant Dawkins
6    BY:  STEVEN A. HANEY

7

8    Also present:  SONYA JACOBS, Paralegal
                    SYLVIA LEE, Paralegal
9                   ANTHONY CASOLA, FBI

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IA48GAT1

| | |
|---|---|
| 1 | (Trial resumed; jury not present) |
| 2 | THE COURT:  Good morning, everybody. |
| 3 | We are still missing some jurors, I think. |
| 4 | I have had the benefit of quite a lot of paper |
| 5 | overnight.  The government, remind me, offered yesterday or did |
| 6 | not yet offer Government Exhibits 1607 and 1609. |
| 7 | MR. DISKANT:  We have not yet offered. |
| 8 | THE COURT:  Do you have anything you have to say with |
| 9 | respect to Mr. Schachter's letter on that subject? |
| 10 | MR. DISKANT:  Yes, your Honor. |
| 11 | I think the fundamental problem is that Mr. Schachter |
| 12 | starts with the wrong premise, and I am reading from page 3. |
| 13 | The premise being that in order for these documents to be |
| 14 | admissible, they need to tend to make it more or less probable |
| 15 | that the defendants agreed to participate in the wire fraud |
| 16 | scheme. |
| 17 | That's not the standard.  The standard is whether or |
| 18 | not it makes a material fact more or less probable.  Plainly in |
| 19 | this case, the issue of whether false statements were made to |
| 20 | the university is a material fact and these documents tend to |
| 21 | make that more or less probable. |
| 22 | THE COURT:  Any parting shot on this, Mr. Schachter? |
| 23 | MR. SCHACHTER:  No, your Honor.  I don't need to |
| 24 | belabor the point.  I think we laid it out in our papers. |
| 25 | Without any evidentiary connection between the defendants and |

| | |
|---|---|
| 1 | these certifications, they are of no relevance to the jury.  It |
| 2 | doesn't make any difference that allegedly false certifications |
| 3 | were put in unless they can show the defendants had any |
| 4 | awareness of that.  The government has no link between a |
| 5 | defendant's knowledge or intent and these documents. |
| 6 | THE COURT:  Your objection is overruled.  They are |
| 7 | going to come in.  I couldn't disagree with you more. |
| 8 | Then you advise me that you have not reached agreement |
| 9 | on a stipulation.  Does that remain true? |
| 10 | MR. SCHACHTER:  Yes, your Honor. |
| 11 | THE COURT:  Well, if you have no agreement, what is |
| 12 | there for me to decide now? |
| 13 | MR. SCHACHTER:  I don't know that -- well, I don't |
| 14 | know that there is anything for the court to decide until this |
| 15 | comes up on cross-examination.  The government had made a |
| 16 | motion in limine in advance of trial that was briefed. |
| 17 | Certainly part of the government's motion addressed this |
| 18 | incident.  And the defense had replied to that.  And so that |
| 19 | was briefed.  But I do believe your Honor that this is a matter |
| 20 | that can be taken up during the examination of the witness on a |
| 21 | question-by-question basis. |
| 22 | THE COURT:  No, it isn't going to be.  It's going to |
| 23 | be dealt with now.  Because I am not going to let you, assuming |
| 24 | for the sake of argument I rule against you or I am inclined to |
| 25 | rule against you, put the whole thing in in the form of |

1    questions, as well you know.

2          All right.  Each side has sent me a proposed

3    stipulation to which it would agree that the other will not

4    agree.  You either come to an agreement or you don't come to an

5    agreement.  I take it there is no agreement and as far as I can

6    see, the issue before me is whether the defense -- and I am

7    quoting from Mr. Schachter's letter -- "permitted to

8    cross-examine the government's witness from Louisville, John

9    Carns, about the facts of the Louisville COI decision."  Right?

10         MR. SCHACHTER:  Yes, your Honor.  Although I will say

11   that I think with respect to the distance between the parties

12   it is really on whether or not the jury will hear the actual

13   nature of the violation or whether --

14         THE COURT:  It's like this.  If you're negotiating to

15   buy a used car and you are offering $8,000 and the seller wants

16   $8,100, you are not agreed on $8,000, and somebody else decides

17   whether an extra hundred is to be provided.  What you have is

18   no deal.  That's what you have.

19         MR. SCHACHTER:  That is correct.  I only wish to

20   highlight I believe an agreement can be reached on all of the

21   other provisions other than the nature of the --

22         THE COURT:  Maybe you will come to agreement and maybe

23   you won't.

24         The bottom line of all of this is that the dispute

25   between you is to the relevance of the facts of the Louisville

1    COI decision, correct?

2              MR. SCHACHTER:  Yes, your Honor.

3              THE COURT:  That's the only dispute.  Putting aside

4    whether you have an agreement.

5              MR. SCHACHTER:  Other issues remain part of

6    discussions, but I believe that is the heart of the dispute.

7    That's the only thing --

8              THE COURT:  The dispute for me, not the argument

9    you're having with the government.

10             MR. SCHACHTER:  Correct, your Honor.

11             THE COURT:  You are not cross-examining on the "facts

12   of the Louisville COI decision."  They are not "facts."  They

13   are somebody's opinion of what the facts were.  Somebody else's

14   opinion is not admissible for the truth of any of those facts.

15   There is no foundation for receiving it on any other basis.

16   The only issue is relevance.  And I exclude it under 403.  And

17   should it ever become -- 403 of course is an alternative

18   ground -- and should it ever really matter in this case, I will

19   write on it in all likelihood, but it's not happening today.

20             Now, we are still missing one juror.  Anything else we

21   can usefully accomplish today, this morning?

22             MR. DISKANT:  Just a very brief housekeeping matter.

23   The government yesterday offered Government Exhibits 1601 and

24   1602, which were the employment contracts for coaches Kenny

25   Johnson and Jordan Fair.  We inadvertently offered a version of

1    the exhibit that had bunch of documents from the personnel file

2    attached.  None of those were displayed to the jury.

3           With the court's permission, we would like to

4    substitute a reduced version of the exhibit, which omits the

5    irrelevant pages.

6           THE COURT:  Does everybody agree on this?

7           MR. SCHACHTER:  That's fine, your Honor.

8           MR. MOORE:  Yes, your Honor.

9           MR. HANEY:  No objection.

10           THE COURT:  Fine.

11           We are still missing one juror.  If there is nothing

12    else that we can usefully accomplish until the jury gets here,

13    I will go finish my coffee.

14           MR. DISKANT:  Your Honor, if we have a couple of

15    minutes.  I did want to address more fully, because the court

16    asked for it, and I apologize.

17           THE COURT:  For what?

18           MR. DISKANT:  I wanted to address more fully an issue

19    that I perhaps was not as clear on as I should have been

20    yesterday, which are two types of objections that we understood

21    the court to sustain during the testimony of Mr. Sood.  And

22    because I expect it may come up during the testimony of Brian

23    Bowen, who is the next government witness, I wanted to take a

24    better and more informed shot at trying to articulate our

25    position.

1          THE COURT:  All right.

2          MR. DISKANT:  The two issues at least from the

3    government's perspective were, one, that the court sustained a

4    number of objections to the government asking or trying to

5    elicit from the witness his understanding of what was said

6    during a particular conversation.  And I would certainly admit

7    that the government can sometimes abuse that particular tactic.

8    We are going to endeavor --

9          THE COURT:  For generations.

10         MR. DISKANT:  For generations.

11         We are going to endeavor with Mr. Bowen to be

12   extremely judicious with our use of that type of questioning

13   and to lay a foundation for it.  But I anticipate that there

14   will be a number of recordings in which Mr. Bowen and Mr.

15   Dawkins are speaking in code.  That is, intentionally avoiding

16   saying what they mean.  And we do think, one, there is a

17   foundation for Mr. Bowen as a participant in the call and as

18   someone who had many similar conversations --

19         THE COURT:  Sure.  Assuming there is a proper

20   foundation and it's an appropriate circumstance, that's a

21   well-established use.  God knows how many law enforcement

22   officials have testified that Cadillacs means cocaine and

23   something else means heroin and so on.  Absolutely.

24         MR. DISKANT:  Thank you, your Honor.

25         The second issue was, we had tried to elicit through

1  Mr. Sood his understanding of certain issues that we believe

2  were relevant to his testimony, including his understanding,

3  for example, of whether or not a payment to a player would

4  render a student-athlete ineligible.  Our understanding of the

5  court's ruling was premised on 701 grounds, that is, that it

6  was improper opinion testimony.

7          Our understanding of the law, and admittedly the

8  Second Circuit has never to our knowledge written very clearly

9  on this issue, but a number of other circuits have.

10         THE COURT:  I won't tell them you said that.

11         MR. DISKANT:  Thank you.

12         What we are eliciting is an opinion that informs the

13  own witness's world view.  I hesitate to use the word state of

14  mind because it's not a 803 issue.  It is why the witness acted

15  the way the witness acted.  That's not considered expert

16  opinion testimony.  That is considered permissible under Rule

17  701.  And the reasons for that are two-fold, which is, first,

18  he is not being offered for the truth.  That is, it's not being

19  offered so that the jury can infer this person on, the witness

20  is an expert on the NCAA rules and therefore I should assume

21  because Mr. Sood believed it is a rules violation it is.

22  Certainly if the defendants want some sort of instruction, the

23  government is fine with.

24         It is being offered for different purpose, which is

25  why it is the witness was nervous, why it is the witness did

1    not tell the University of Louisville.  And with respect to Mr.

2    Bowen in particular, we believe that such questions are going

3    to be fundamental to his testimony because he is going to

4    testify, he is going to have to testify, that he did not

5    disclose this information to the university and why.

6          He is also going to testify, we expect, about his use

7    of coded language, about his use of a second phone, which he

8    referred to as his bat phone.  We believe it is essential for

9    the jury to understand his own mindset in doing all of those

10   things, which is his understanding based on having a son who

11   played basketball, based on his interactions with all sorts of

12   people in this space, that NCAA rules prohibited this payment,

13   that the University of Louisville would not issue a scholarship

14   to his son if it was aware of this payment, and things along

15   that sort.  Again, it is not coming in for the truth of the

16   statement.

17         THE COURT:  So you are offering it to explain why he

18   did what he did.

19         MR. DISKANT:  Correct.

20         THE COURT:  Mr. Schachter.

21         MR. SCHACHTER:  Your Honor, it depends on the

22   question.  The question that I think we objected to for Mr.

23   Sood was -- I'm paraphrasing a bit -- based on your years of

24   experience effectively called for his interpretation of the

25   NCAA eligibility rules, and that question was impermissible lay

1   opinion testimony.  It's difficult to answer it in the

2   abstract.  I am sure that Mr. Diskant is correct depending on

3   what the question may be, but that question was objectionable.

4           THE COURT:  Thank you.

5           OK.  Still missing?

6           I will see you when we have a jury.

7           (Recess)

8           THE COURT:  OK.  We have a jury.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Good morning, everybody.

3           The jurors all are present.  The defendants are here,

4    as they have been all morning.

5           Let's get Mr. Carns.

6     JOHN CARNS, resumed.

7           THE COURT:  Good morning, Mr. Carns.  You are still

8    under oath.

9           Mr. Diskant, you may proceed when you're ready.

10   DIRECT EXAMINATION (Cont'd)

11   BY MR. DISKANT:

12   Q.  Good morning, Mr. Carns.

13   A.  Good morning.

14   Q.  When we left off yesterday we were talking about the

15   process by which the University of Louisville issues athletic

16   scholarships.

17   A.  Yes.

18   Q.  Can you just remind us, are there certain criteria or rules

19   governing the process by which the university can issue an

20   athletic scholarship?

21   A.  Yes.  Generally what we do is for an incoming prospective

22   student-athlete ensure that through the NCAA eligibility center

23   they are certified both academically and their amateurism as

24   well, and also make sure they are admissible through the

25   university.

1   Q.  Let's talk about each component of that.  You mentioned the

2   NCAA eligibility center.  What is that?

3   A.   The eligibility center, it's basically a clearing house

4   where any prospective student-athlete who wants to compete in

5   either division, Division 1 or Division 2 athletics, in the

6   NCAA provides their academic transcripts, test scores on the

7   academic side, and also answers a section online regarding

8   amateurism.  And then at two different points, both the

9   eligibility, their academic eligibility will be certified or

10  not certified, as well as their amateurism.

11  Q.  Let's talk about each component of that.

12          Just very briefly, what are the academic components of

13  the certification?

14  A.   It's a sliding scale based on your grade point average and

15  your test score, SAT or ACT score, generally determines your

16  academic eligibility.

17  Q.  And the amateur side of the certification?

18  A.   The amateur side is basically that the prospective

19  student-athlete answers questions related to their past

20  athletic performance and whether they have accepted money,

21  competed on national teams, and ultimately a decision is made

22  to certify their amateurism as well.

23  Q.  What, if any, significance do you and your staff ascribe to

24  those certifications made by the student-athletes in deciding

25  whether or not to award a scholarship?

1    A.  We rely obviously on the fact that they are providing

2    truthful information, providing the correct information both to

3    the university and to the eligibility center so that we can

4    ensure that they are properly certified.

5    Q.  Does the University of Louisville have the ability to

6    conduct its own investigations into student-athlete?

7    A.  We have a limited ability to do that.  We don't have

8    subpoena power or anything of that nature.

9    Q.  Does the university have the ability to rescind or cancel a

10   scholarship once it's been issued?

11   A.  Yes.

12   Q.  What might cause the university to do so?

13   A.  If a prospective student renders himself ineligible, there

14   is serious misconduct that happens during that time, falsely,

15   providing false information on documents, things of that

16   nature.

17   Q.  Who makes the ultimate determination as to whether or not a

18   student-athlete is eligible?

19   A.  The university's -- from the university side it would be

20   the university's registrar's office certifies the eligibility

21   of the student-athlete based on the NCAA eligibility center as

22   well.

23   Q.  If a coach disagrees with a determination made by the

24   registrar's office, who wins?

25   A.  The registrar's office has the final say.

1    Q.  In addition to the scholarships themselves are you and your

2    staff involved in the recruiting process?

3    A.  Yes.

4    Q.  How?

5    A.  Basically monitoring the recruiting activities of our

6    coaches, visits to campus, off-campus evaluations or contacts,

7    phone calls, those things.

8    Q.  I want to switch gears and talk to you about an individual

9    named Brian Bowen.

10              Are you familiar with Mr. Bowen?

11   A.  Yes.

12   Q.  How are you familiar with him?

13   A.  Brian was former member of our men's basketball program.

14   Q.  Did you and your staff have any involvement in his

15   application and enrollment at the university?

16   A.  Just to the point of monitoring and making sure he was

17   eligible and providing the information to the registrar to

18   certify him.

19   Q.  So you mentioned that a moment ago that your staff has

20   access to certifications that are made to the NCAA, is that

21   right?

22   A.  Yes.

23   Q.  Were such certifications made by Mr. Bowen?

24   A.  Yes.

25   Q.  In addition to the NCAA certifications, does the university

1    have its own documents and paperwork regarding the conditions

2    or terms under which a scholarship is issued?

3    A.  Yes.

4    Q.  Mr. Carns, if I can ask you to turn in the binder that is

5    hopefully in front of you to what has been marked for

6    identification as Government Exhibit 1607.

7    A.  OK.

8    Q.  Mr. Carns, do you recognize this document?

9    A.  Yes.

10   Q.  What do you recognize it to be?

11   A.  It's a University of Louisville athletic financial aid

12   agreement for Brian Bowen.

13   Q.  Did you sign this particular document?

14   A.  Yes, I did.

15            MR. DISKANT:  Government offers 1607.

16            THE COURT:  Received.

17            (Government's Exhibit 1607 received in evidence)

18            MR. DISKANT:  Permission to publish.

19            THE COURT:  Yes.

20   BY MR. DISKANT:

21   Q.  Mr. Carns, what are we looking at?  What is this document?

22   A.  This is basically a financial aid agreement for a

23   scholarship for Brian.

24   Q.  Up top is the name of the student-athlete, Brian Bowen, II,

25   correct?

1    A.   Yes.

2    Q.   In section 2 it says "type of award" and "period of award."

3         Do you see that?

4    A.   Yes.

5    Q.   And this is a multi-year award?

6    A.   Yes.

7    Q.   What does that mean?

8    A.   We basically were guaranteeing that scholarship for the

9    four-year period that's listed there provided that he meet the

10   eligibility standards.

11   Q.   Down below there are four academic years beginning with

12   2017, 2018 and continuing through 2020, 2021 and below each it

13   says "full."

14        Do you see that?

15   A.   Yes.

16   Q.   What does that mean?

17   A.   That means with basketball and several other sports, they

18   are what's called counter sports.  So you either get a full

19   scholarship or don't get any scholarship.  So each of those

20   elements were covering the full cost of each of those elements

21   for that prospect.

22   Q.   As of 2017, 2018, what was the approximate cost to the

23   university of a full scholarship?

24        MR. SCHACHTER:  Objection.  Calls for hearsay.  Lack

25   of foundation.

1          THE COURT:  Overruled.

2     A.  Approximately $41,000.

3     Q.  So as written, this particular grant was for approximately

4     $164,000 over four years?

5     A.  Yes.

6          MR. DISKANT:  Ms. Lee, if we can zoom in on the bottom

7     half there.

8     Q.  Mr. Carns, it says:  "Please read carefully the terms and

9     conditions on the back of this form and indicate your

10    acceptance of this athletic grant in aid and its terms by

11    signing this agreement below."

12         Do you see that?

13    A.  Yes.

14    Q.  Do you recognize the signatures below that?

15    A.  Yes.

16    Q.  Just focusing on the first, is that Mr. Bowen's signature,

17    the student-athlete?

18    A.  Yes.

19    Q.  Below there is a signature of a parent or guardian.

20         Do you see that?

21    A.  Yes.

22    Q.  Why does the university require a parent or guardian to

23    sign this form?

24    A.  We require similar to the national letter of intent

25    requirements as well that all parents of a prospect under the

1    age 21 sign the financial aid agreement.

2    Q.   Below that there is the signature of the head coach?

3    A.   Yes.

4    Q.   Then a signature of the director of financial aid or a

5    designee?

6    A.   Yes.

7    Q.   Who is the last signature?

8    A.   That's my signature.

9    Q.   If a student-athlete is unable or unwilling to sign this

10   certification, what if any significance does that have on the

11   university's decision to issue the scholarship?

12   A.   We wouldn't issue the scholarship without that

13   certification.

14          MR. DISKANT:  If we can turn to page 2, Ms. Lee.

15   Q.   The terms and conditions of the athletic tender agreement.

16          Do you see that?

17   A.   Yes.

18          MR. DISKANT:  Ms. Lee, if we can zoom in on the first

19   set of bullet points.

20   Q.   "I understand this tender may be immediately reduced or

21   canceled at any time if I," the first bullet point says,

22   "render myself ineligible for intercollegiate competition."

23          Do you see that?

24   A.   Yes.

25   Q.   How might a student-athlete render himself ineligible?

1    A.  Not meeting NCAA amateurism or academic requirements, not

2    being admissible to the institution.

3    Q.  The next line, "fraudulently misrepresent any information

4    on an application, letter of intent, or financial aid

5    agreement."

6            Do you see that?

7    A.  Yes.

8            MR. DISKANT:  We can zoom back out.

9            If we can focus in on the second set of bullet points.

10   Q.  "I understand this tender must be immediately reduced or

11   canceled if I," and the second bullet point says, "accept

12   compensation for participating in an athletics contest."

13           Do you see that?

14   A.  Yes.

15   Q.  Why is that a basis for canceling the financial aid

16   agreement?

17   A.  The amateurism would not be valid at that point if that

18   happens.

19   Q.  Mr. Carns, does it matter if the compensation is accepted

20   by the student-athlete or his family?

21   A.  No.

22   Q.  This is a university form?

23   A.  Yes, it is.

24   Q.  In addition to the university form, does the NCAA have

25   paperwork that requires a student-athlete to make

1    certifications regarding his eligibility?

2    A.  Yes, it does.

3    Q.  Are you familiar with something called a student-athlete

4    statement?

5    A.  Yes.

6    Q.  What is that?

7    A.  That's a statement on a form that is required by the NCAA

8    that students complete each year.

9    Q.  Are all student-athletes at the University of Louisville

10   required to complete a student-athlete statement?

11   A.  Yes.

12   Q.  Did Mr. Bowen complete a student-athlete statement?

13   A.  Yes, he did.

14   Q.  If I could direct your attention to what has been marked

15   for identification purposes as Government Exhibit 1609.

16          Would you take a look at that and let me know if you

17   recognize it.

18   A.  Yes.

19   Q.  What is this?

20   A.  This is the NCAA drug testing consent and student-athlete

21   statement for Brian Bowen.

22          MR. DISKANT:  Government offers 1609.

23          MR. SCHACHTER:  No objection.

24          THE COURT:  Received.

25          (Government's Exhibit 1609 received in evidence)

1          MR. DISKANT:  If we can turn, Ms. Lee, to page 5 and,

2    with the court's permission, publish that.

3          THE COURT:  Yes.

4    BY MR. DISKANT:

5    Q.  Mr. Carns, it should hopefully be on your monitor as well.

6    A.  Page 1 is on my monitor.

7    Q.  Do you recognize what you are looking at?

8    A.  Yes.

9    Q.  What is it?

10   A.  The student-athlete statement.

11   Q.  Who is the name of the student for whom this is filled out

12   for?

13   A.  Brian Bowen, II.

14   Q.  And down below it says "This form has six parts."  The

15   first part says "a statement concerning eligibility."

16          Do you see that?

17   A.  Yes.

18          MR. DISKANT:  And, Ms. Lee, if we can turn to the next

19   page, which is the statement concerning eligibility, and zoom

20   in on the text in part 1.

21   Q.  Mr. Carns, it says, "By signing this part of the form you

22   affirm the following."

23          There are series of representations.  But if you could

24   down to the fourth paragraph:  "All information provided to the

25   NCAA and the NCAA eligibility center and the institution's

1    admissions office is accurate and valid, including ACT or SAT

2    scores, high school attendance, completion of course work and

3    high school grades, as well as your amateur status."

4            Do you see that?

5    A.  Yes.

6    Q.  The NCAA eligibility center, is that the eligibility center

7    you were telling us about a few moments ago?

8    A.  Yes.

9    Q.  The institution in this respect would be who?

10   A.  University of Louisville.

11   Q.  The representation about your amateur status, is that the

12   amateur status we have been talking about this morning?

13   A.  Yes.

14   Q.  Then the last paragraph, "You affirm that you understand

15   that if you sign this statement falsely or erroneously, you

16   violate the NCAA legislation on ethical conduct and you will

17   further jeopardize your eligibility."

18   A.  Yes.

19           MR. DISKANT:  If we can zoom out.

20   Q.  This particular document is signed by the student-athlete?

21   A.  Yes, it is.

22   Q.  What if any significance is it to the university that the

23   student-athlete sign the document?

24   A.  It's significant because he is attesting to all of the

25   statements above that he signed.

1    Q.   Would the university issue the scholarship if the

2    student-athlete did not or would not sign this document?

3    A.   No, it would not.

4    Q.   Did there come a point when the university had to certify

5    the eligibility of Mr. Bowen and the rest of the men's

6    basketball team?

7    A.   Yes.

8    Q.   When was that?

9    A.   I believe for men's basketball it probably would have been

10   in August or September.

11   Q.   Is there something that might refresh your memory as to the

12   date?

13   A.   Yeah, the certification of eligibility form.

14   Q.   Let's turn to that.  If you would take a look at what we

15   have marked for identification purposes as Government Exhibit

16   1603 and let me know if you recognize that.

17   A.   Yes.

18   Q.   What do you recognize it to be?

19   A.   It is our university certification of eligibility form.

20   Q.   Does it include Brian Bowen?

21   A.   Yes, it does.

22              MR. DISKANT:  Government offers 1603.

23              MR. SCHACHTER:  No objection.

24              THE COURT:  Received.

25              (Government's Exhibit 1603 received in evidence)

1    BY MR. DISKANT:

2    Q.  Do you recognize the signatures on the document?

3    A.  Yes.

4    Q.  Who signed it?

5    A.  Rick Pitino and Lauren Rust, who works in our compliance

6    center.

7    Q.  She works for you?

8    A.  Yes.

9            MR. DISKANT:  Government offers 1603.

10           MR. SCHACHTER:  No objection.

11           THE COURT:  Received.

12           MR. DISKANT:  With the court's permission, if we could

13   publish that document, Ms. Lee, on page 1.

14   Q.  What is this form, Mr. Carns?

15   A.  This is the form that actually certifies that each of those

16   student-athletes are eligible for both practice and competition

17   on the date of the certification.

18   Q.  Prior to making the certification, what if any steps do

19   your staff take?

20   A.  Simply providing the information we have to the registrar's

21   office and then they take that information and create the

22   eligibility form.

23   Q.  If we can turn through to page 2 of this document.

24           What is this?

25   A.  This is the certification of eligibility for the fall of

1    2017.

2    Q.  You talked a few moments ago when we were talking about

3    certifications of both academic and amateur eligibility.

4    A.  Yes.

5    Q.  Which component of that does this pertain to?

6    A.  Both.

7    Q.  OK.  Mr. Bowen is listed second there?

8    A.  Yes.

9    Q.  Then if we can turn finally to the third page.

10           This is a document called The Squad List.  What is a

11   squad list?

12   A.  A squad list is a required NCAA document that lists each

13   student-athlete for that year and also the amount of financial

14   aid they are receiving.

15           MR. DISKANT:  If we can zoom in, Ms. Lee, on the

16   second listed student.

17   Q.  That's the Brian Bowen we have been talking about this

18   morning?

19   A.  Yes.

20   Q.  With athletic aid amount of $41,350 a year?

21   A.  Yes.

22   Q.  Mr. Carns, I want to direct your attention to June of 2017

23   and really the summer months of 2017.

24           What if anything did you know about a plan to make a

25   payment of $100,000 to the family of Brian Bowen in connection

1    with his decision to attend the University of Louisville?

2    A.  I knew nothing.

3    Q.  Had you been aware of such a plan or such a payment, would

4    it have affected the university's decision to award or maintain

5    Mr. Bowen's scholarship?

6    A.  Absolutely.

7    Q.  How or why?

8    A.  Basically because of the fact that he would have at that

9    point jeopardized his amateurism we wouldn't have issued a

10   scholarship or canceled a scholarship that had already been

11   signed.

12   Q.  Would it have mattered if the student-athlete had

13   disclaimed any knowledge of the payment.

14   A.  No.

15   Q.  Why not?

16   A.  Because regardless of whether the student-athlete or their

17   family member accepts a benefit, the student-athlete is still

18   culpable for that violation.

19   Q.  Did there come a point when you learned of allegations of

20   such a payment?

21   A.  Yes.

22   Q.  When was that?

23   A.  I believe it was September 26, 2017.

24   Q.  Was that in connection with this case?

25   A.  Yes.

1  Q.  Did you and the university take any action as a consequence

2  of learning of those allegations?

3  A.  Yes.

4  Q.  What did you do?

5  A.  We withheld Brian from practice and competition and then

6  put on leave two assistant coaches and the head coach as well.

7  Q.  By Brian, you are referring to Brian Bowen?

8  A.  Yes.

9  Q.  Why did you remove him from practice, as you said?

10  A.  We removed him from practice and competition just basically

11  because of the allegations and wanted to protect the

12  university.

13  Q.  Did there come a point when you learned that Mr. Bowen's

14  parents had also relocated to Louisville?

15  A.  Yes.

16  Q.  When was that?

17  A.  That same day.

18  Q.  September of 2017?

19  A.  Yes.

20  Q.  How did you react to that information?

21  A.  I was surprised.  I hadn't heard the information prior to

22  that.

23  Q.  Had you been aware of such information would you have taken

24  action?

25  A.  Yes.  I mean, there is nothing per se wrong with a

1    student-athlete's parents relocating, but generally in those

2    situations we do want to look at the circumstances surrounding

3    the move.

4    Q.  You also mentioned that the head coach and two assistant

5    coaches were placed on leave.

6    A.  Yes.

7    Q.  I want to ask you a couple of questions about that.

8              Sitting here today, do you have any firsthand

9    knowledge of whether any of them was or was not aware of or

10   involved in any payment?

11   A.  No.

12   Q.  If Mr. Pitino was involved, did he as a university employee

13   have the authority or authorization to facilitate a payment to

14   the family of a student-athlete?

15             MR. SCHACHTER:  Objection.

16             THE COURT:  Try it another way, Mr. Diskant.

17   Q.  Mr. Carns, as the director of compliance are you familiar

18   with the compliance obligations the university imposes on its

19   staff?

20   A.  Yes.

21   Q.  Do those compliance obligations touch on the issue of

22   knowing violations of NCAA rules?

23   A.  Yes.

24   Q.  Is a coach like Mr. Pitino permitted to engage in knowing

25   violations of NCAA rules?

1          MR. SCHACHTER:  Objection.

2          THE COURT:  Overruled.

3   A.  No, he is not.

4   Q.  Are there consequences if a coach is found to have been

5   aware of or engaged in knowing violations of NCAA rules?

6          MR. SCHACHTER:  Objection.

7   A.  Yes.

8   Q.  What are those consequences?

9   A.  Potential termination of employment.

10  Q.  Mr. Carns, focusing on the same time period, the summer of

11  2017, what if anything did you know about a $1300 payment that

12  Kenny Johnson made to the family of Brian Bowen?

13  A.  I didn't know anything about that.

14  Q.  Had you been aware of such information, what if any action

15  would you have taken?

16  A.  I would have investigated that information and then

17  reported that to the NCAA.

18  Q.  What if anything during the same time period did you know

19  about an approximately $900 payment that Jordan Fair made as

20  part of the recruitment of a different student-athlete?

21  A.  I didn't know anything about that.

22  Q.  Had you been aware of such a payment, what if any action

23  would you have taken?

24  A.  I would have taken the same action and investigated and

25  reported the violation.

IA48GAT1                    Carns – Direct

1    Q.  Is paying a family of a student-athlete to secure his

2    commitment to attend the University of Louisville helpful to

3    the university?

4            MR. SCHACHTER:  Objection.

5            THE COURT:  I think it's a matter of argument.

6            Sustained.

7    Q.  What are some of the penalties that might be imposed as a

8    result of a payment being made to the family of a

9    student-athlete.

10           MR. SCHACHTER:  Objection.  Asked and answered.

11           THE COURT:  Overruled.

12   A.  If there is institutional involvement with that penalty,

13   then it could result in significant NCAA violations.

14   Q.  Just focusing on something you just said, institutional

15   involvement.  If a coach is found to have been involved in such

16   conduct, can it have an impact on the penalties?

17   A.  Yes.

18   Q.  How?

19   A.  That will make it an institutional violation.

20   Q.  What would that mean?

21   A.  That would mean the institution would be subject to

22   penalties, NCAA penalties.

23   Q.  And if a member of the school's athletic apparel sponsor,

24   that is, if a representative of Adidas were involved in such a

25   payment, would that have an impact on the penalties?

IA48GAT1                    Carns - Direct

1    A.   Potentially that can as well.

2    Q.   Why?

3    A.   Because of the fact that sponsors per NCAA rules are

4    considered representatives of the university's athletic

5    interests.

6    Q.   Leaving aside the NCAA, has the university suffered any

7    other consequences as a result of the alleged payments to Mr.

8    Bowen?

9              MR. SCHACHTER:  Objection.

10             THE COURT:  What is the objection?

11             MR. SCHACHTER:  Your Honor, this is going to, I

12   believe going to call for hearsay and lack of foundation.

13             THE COURT:  Work on the foundation, Mr. Diskant.

14   Q.   Mr. Carns, you mentioned before that you have been an

15   employee of the University of Louisville for approximately 20

16   years?

17   A.   Correct.

18   Q.   You testified that you have observed changes in the

19   university over those 20 years?

20   A.   Yes.

21   Q.   As a member of the senior athletic staff, is it part of

22   your job responsibility to have familiarity, at least at a high

23   level, with things like fund raising and ticket sales and the

24   budget of the athletic department?

25   A.   Yes.

IA48GAT1                        Carns – Direct

1    Q.  Based on your experience at the university and based on

2    your own observations over the last nine months, without

3    getting into specific numbers or details, have you observed an

4    effect on the university as a result of the allegations?

5             MR. SCHACHTER:  Objection.

6             THE COURT:  Overruled.

7    A.  I have.

8    Q.  Can you tell us what you have observed?

9    A.  During that period there has been a reduction in revenue,

10   season tickets, season sales, donations, corporate sponsors.

11            MR. SCHACHTER:  Objection.  Move to strike.

12            THE COURT:  The testimony is stricken.

13            MR. DISKANT:  Can I try to direct the witness to a

14   slightly different subject?

15   Q.  Focusing on the university's reputation, on dollars and

16   cents, just a sort of intangible issue.

17            THE COURT:  I'm sorry.  Representation plus dollars

18   and cents?  Reputation as distinguished from -- I didn't

19   understand the question.

20            MR. DISKANT:  Let me take a step back.

21   Q.  Mr. Carns, from your vantage point --

22            MR. DISKANT:  Give me just one second, your Honor.

23   Q.  Mr. Carns, has the allegations regarding Mr. Bowen had an

24   impact on the university's reputation?

25            MR. SCHACHTER:  Objection.

1          THE COURT:  Sustained.

2    Q.  Has it had an impact on donations?

3          MR. SCHACHTER:  Objection.

4          THE COURT:  Sustained.

5          MR. DISKANT:  May I have one moment?

6          Your Honor, other than this line of questioning, which

7    I would like to be heard on, we have nothing further for this

8    witness.

9          THE COURT:  I will hear you at the sidebar.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. DISKANT:  As an initial matter we think that the

3    harm to the university is an element or if not an element,

4    certainly a relevant fact that we need to establish here.

5          THE COURT:  That might be.

6          MR. DISKANT:  This witness has firsthand knowledge of

7    the effects on the university, including the fact that the

8    university has suffered a substantial reputational harm.  He

9    has testified without objection, and I imagine Mr. Schachter is

10   going to get into this on cross-examination, about the fact

11   that the university has grown and developed dramatically over

12   20 years because of the success of the athletic department and

13   the embarrassment that this has caused to the university is

14   substantial.

15         He sits in weekly meetings in which he gets updates as

16   part of the job responsibility on finances of the athletic

17   department, including ticket sales and donations.  I was not

18   planning to get into specific numbers, but I do believe he is

19   qualified to say he knows things like ticket sales have dropped

20   since 2017.  All of it goes to directly to the harm that the

21   university has suffered.

22         MR. SCHACHTER:  This witness's testimony about the

23   updates that he just received while sitting in the meeting is

24   the definition of hearsay and that is inadmissible.

25         The testimony regarding his opinion on the harm to the

1    reputation of the university is lay opinion testimony.  We

2    received no expert notice about Mr. Carns, that he was going to

3    be testifying as an expert offering an opinion on the impact of

4    the university.

5              That is our objection.

6              In addition to that, it really does open the door to a

7    discussion of what happened to the university's reputation,

8    ticket sales, donations, when on June 15, 2017 they had a major

9    infraction and nothing happened.  That is completely fair game

10   based on this line of questioning.

11             THE COURT:  The objection is sustained.  You didn't

12   even get to the point of asking something that he is much more

13   arguably an appropriate witness on, which is did ticket sales

14   fall off after, putting aside the question of why, did

15   donations fall off after, putting aside the question of why.

16   And all of that on your own explication of the rationale here

17   is you want him to then go ahead and say, assuming a factual

18   predicate of that nature, which you haven't laid, you want him

19   to give his opinion as to why that happened.

20             He is not an appropriate witness for that.  He is not

21   qualified.  You didn't make an expert disclosure about it, as I

22   understand.  That's just not going to happen.

23             MR. DISKANT:  I don't believe we think that is expert

24   testimony.  The defendants have opened and argued extensively

25   this was helpful to the university.

1              THE COURT:  Well, let's see if they can get any

2     evidence of that in.

3              MR. DISKANT:  Can I ask the question that your Honor

4     just asked, which is, without asking the witness to opine on

5     why, does he know whether or not ticket sales are where they

6     were year ago, donations are where they were a year ago.

7              I take Mr. Schachter's point about the fact that

8     repeating what someone says in a meeting is hearsay, but as a

9     matter of efficiency there is no reason why this witness,

10    senior member of the athletic department, he has testified it's

11    part of his job, he is familiar with these issues, should not

12    be able to represent the university at a high level.

13             MR. SCHACHTER:  There is no efficiency exception to

14    the hearsay rule.  These ticket sale numbers are actual

15    numbers, and if the government --

16             THE COURT:  Mr. Schachter, assuming this were a

17    different kind of trial and you were a witness, would you be

18    competent to testify whether your law firm made money last year

19    without a hearsay problem?  You think that would be appropriate

20    testimony?

21             MR. SCHACHTER:  Your Honor, I would have to think that

22    through, but a falloff of ticket sales -- by the way, I am not

23    at all sure that it is.  We have received no discovery that

24    would show a falloff in ticket sales.

25             THE COURT:  We are not talking about discovery,

1   Mr. Schachter.  Try to stay with the point.

2            MR. SCHACHTER:  And if there is falloff in ticket

3   sales, which I have no idea because this is information that's

4   coming from some out-of-the-court declarant, if there is, it

5   may very well be because of the June 15, 2017 minority hall

6   incident, and I should be able to examine on that.

7            THE COURT:  If he assigned a reason, that would

8   probably be true.

9            MR. SCHACHTER:  If he going to testify, then I should

10  be able to explore on cross-examination what the reasons are,

11  what are the contributing factors to that.  And I should be

12  able to explain why there is a falloff in ticket sales, why

13  there are less fans because of the salacious nature of the

14  prior infraction.

15           MR. DISKANT:  I do want to note for the reasons Mr.

16  Schachter has articulated, I expect if he tries to, he wants to

17  show this witness detailed accountings from the university and

18  I am going to object.  This witness does not have firsthand

19  knowledge of that material.

20           THE COURT:  Look, I don't want to get into this

21  tit-for-tat controversy between the lawyers.  I have had about

22  enough of that.

23           I take it you're withdrawing the question.

24           MR. DISKANT:  Correct.

25           (Continued on next page)

1           (In open court)

2           THE COURT:  Members of the jury, the question has been

3   withdrawn.

4           MR. DISKANT:  I have no further questions.

5           THE COURT:  Cross-examination.

6   CROSS-EXAMINATION

7   BY MR. SCHACHTER:

8   Q.  Good morning, Mr. Carns.

9   A.  Good morning.

10  Q.  My name is Mike Schachter.  I represent Mr. Gatto.

11          Sir, you testified that you have worked for the

12  University of Louisville for approximately 20 years, is that

13  correct?

14  A.  Correct.

15  Q.  That means you started in around 1998?

16  A.  Yes.

17  Q.  I believe that you testified that back at the time that you

18  started in 1998, I believe you called Louisville at that time a

19  small commuter school.

20          Were those your words?

21  A.  I did use commuter campus, not small.

22  Q.  It was much smaller than it is today, is that correct?

23  A.  I believe so.

24  Q.  You testified on direct about how some of the significant

25  changes that the University of Louisville has seen since you

1    started in 1998, is that correct?

2    A.  Correct.

3    Q.  You described how the University of Louisville changed from

4    being a commuter school to what you called a residential

5    school, is that correct?

6    A.  Yes.

7    Q.  Can you describe to the jury what you mean by residential

8    school?  How is that different from the commuter school that

9    you had started at in 1998?

10   A.  I think with the development of housing both around the

11   campus and out of campus there are more students on campus,

12   more activity on campus, along with obviously the athletic

13   facilities.

14   Q.  I would like to speak to you about some of the things that

15   have happened at the University of Louisville since you started

16   in 1998.

17            A couple of years after you started at the University

18   of Louisville, back in 2001, the University of Louisville hired

19   Rick Pitino as the head basketball coach, is that correct?

20   A.  Correct.

21   Q.  And Coach Pitino, before deciding to coach in college at

22   the University of Louisville, he had coached for the New York

23   Knicks, a professional team, is that correct?

24   A.  Yes.

25   Q.  He had also been the head basketball coach for another

1    professional team called the Boston Celtics, is that right?

2    A.  Yes.

3    Q.  After Coach Pitino arrived at the University of Louisville,

4    the men's basketball team had become much more successful, is

5    that correct?

6    A.  Yes.

7    Q.  In fact, after Coach Pitino arrived, the University of

8    Louisville made it to the NCAA tournament in 13 of the next 16

9    years, is that correct?

10   A.  I believe so.

11   Q.  It made it to the Final Four in 2005 and 2012?

12   A.  Yes.

13   Q.  Can you describe to the jury what the Final Four is?

14   A.  The Final Four is the last four teams during the NCAA

15   tournament.  There are 64 teams that start in the tournament

16   and the final four are the semifinal and final games for that

17   tournament.

18   Q.  Is that NCAA tournament that you just described also called

19   March Madness?

20   A.  Yes.

21   Q.  And that final game, when those four teams compete and then

22   the winners of those teams, do they compete in something called

23   The National Championship?

24   A.  Yes.

25   Q.  In 2013, did Louisville not only make it to the Final Four,

1    but also won The National Championship?

2    A.   Yes.

3    Q.   Coach Pitino was inducted into the basketball Hall of Fame,

4    is that correct?

5    A.   Yes.

6    Q.   As the men's basketball program improved at the University

7    of Louisville, so did revenue and donations, is that correct?

8    A.   I believe so.

9            MR. DISKANT:  Objection, your Honor.

10           THE COURT:  Sustained.

11           The answer is stricken.

12   Q.   You described on direct examination about new facilities

13   that had been built at the University of Louisville since you

14   started in 1998.

15           Do you recall that testimony?

16   A.   Yes.

17   Q.   When Coach Pitino started, the men's basketball team played

18   in a stadium built in 1956?

19   A.   Correct.

20   Q.   Today the University of Louisville basketball team plays in

21   something called the KFC Yum! Center, is that correct?

22   A.   Yes.

23   Q.   Is it true that that college basketball stadium has more

24   seats than any professional basketball stadium in the country?

25           MR. SCHACHTER:  Objection.

1          THE COURT:  Sustained.

2     Q.  On direct examination Mr. Diskant asked you about whether

3     athletics had played a role in the changes at the University of

4     Louisville over the last 20 years.

5          Do you remember that question?

6     A.  Yes.

7     Q.  Is it fair to say that athletics has had a big role in

8     changes at the University of Louisville in the last 20 years?

9     A.  I would say so, yes.

10    Q.  You testified on direct examination, when Mr. Diskant asked

11    you, about the amount of revenue that the men's basketball team

12    brought in.

13         Do you remember him asking you that question?

14    A.  Not specifically about the men's basketball program.

15    Q.  Do you remember him asking you questions about the amount

16    of revenue that the athletics program brought into the

17    University of Louisville, any questions about that?

18    A.  I remember him asking about the amount of revenue.

19    Q.  You said you did not know.

20         Do you recall that testimony?

21    A.  Yes.

22    Q.  Sir, you were interviewed by the prosecutors on a number of

23    occasions before testifying yesterday.  Is that right?

24    A.  Yes.

25    Q.  How many times have you met with them?

1          MR. DISKANT:  Your Honor, I think he is trying to

2     elicit --

3          THE COURT:  I can't hear you.

4          MR. DISKANT:  I think we are going to an inconsistency

5     that wouldn't be a proper question under the court's ruling

6     anyway.

7          THE COURT:  I don't know where we are going.

8          MR. DISKANT:  It has to do with the amount of revenue

9     the school took in on a particular subject.

10         THE COURT:  I don't know that.  Is that where we are

11    going?

12         MR. SCHACHTER:  I asked the witness whether he asked

13    on direct examination about the amount of revenue.

14         THE COURT:  Do you remember my question, Mr.

15    Schachter.  Should I have it read back to you?

16         MR. SCHACHTER:  No, thank you.  I apologize, your

17    Honor.  Yes, I intend to examine the witness about an

18    inconsistency with the testimony that he provided on direct on

19    that topic.

20         THE COURT:  Bring my attention to the testimony on

21    direct, please.

22         MR. SCHACHTER:  May I have a moment, your Honor?

23         THE COURT:  Yes.

24         MR. SCHACHTER:  It's transcript page 347, lines 4

25    through 7.

1          THE COURT:  Go ahead.  Let's see.

2    Q.  Were you asked on direct examination:  "Through your job,

3    do you have an understanding of the general amount of revenue

4    that the athletic departments generate?"

5          Your answer was:  "Not specifically."

6          Do you recall giving that testimony yesterday?

7    A.  Yes.

8    Q.  You had said you met with the prosecutors a number of

9    times, is that right?

10         MR. DISKANT:  Can we approach on this?

11         THE COURT:  No.  Let's see what happens.

12   Q.  You were interviewed by Mr. Diskant and the rest of the

13   prosecution team on September 26, 2018, is that correct?

14   A.  Yes.  I don't recall the exact date.

15   Q.  That was about eight days ago.  You recall about eight days

16   you met with the prosecutors?

17   A.  Yes.

18         THE COURT:  Do you think we can all work that out in

19   our own minds how many days it was, Mr. Schachter.

20         MR. SCHACHTER:  I find that calculation challenging so

21   I wanted to have it written down.  I apologize.

22   Q.  When you met with the prosecutors, did you tell the

23   prosecutors that the men's basketball program brought in $29

24   million in 2017?

25   A.  Yes.

1    Q.  In fact, sir, isn't it correct that that number is actually

2    an understatement?

3           MR. DISKANT:  Which is precisely the line of his

4    questioning which is why we object to it.

5           MR. SCHACHTER:  I will withdraw the question and try a

6    different way.

7    Q.  You talked about Louisville's interaction with the NCAA, is

8    that correct?

9    A.  Yes.

10   Q.  And there is a report that the University of Louisville, an

11   official report of the University of Louisville, which I

12   believe you said is a state university, is that correct?

13   A.  Yes.

14   Q.  A file, an official report to the NCAA that includes the

15   amount of revenue that the men's basketball program brought in?

16   A.  Correct.

17   Q.  And that's called the membership financial reporting system

18   report, is that correct?

19   A.  Yes.

20          MR. SCHACHTER:  Your Honor, we would offer -- may

21   I -- I don't need to bother with the binders if there will be

22   an objection.  I would like to introduce as Defense Exhibit 605

23   the membership financial reporting system report from the

24   University of Louisville.

25          MR. DISKANT:  We object.

1          THE COURT:  Sustained.

2    Q.  Now, you testified on direct about the benefits that the

3    University of Louisville receives from competing in NCAA

4    athletics.

5          MR. SCHACHTER:  Transcript page 351, line 13.

6    Q.  Do you recall providing that testimony?

7    A.  Yes.

8    Q.  Mr. Diskant asked you about the benefits that the

9    University of Louisville receives from competing in NCAA

10   competition, is that correct?

11   A.  Yes.

12   Q.  And you answered that question.  Yes, sir?

13         THE COURT:  Would you get to a point, please.  Move

14   along.

15   Q.  And you said on direct examination that one of the benefits

16   that the University of Louisville receives from competing in

17   the NCAA is that it gets to share revenue from the NCAA.

18         Do you recall that testimony?

19   A.  Yes.

20   Q.  The NCAA makes about a billion dollars from the NCAA

21   tournament, is that correct?

22         THE COURT:  Sustained.

23   Q.  One of the ways that the University of Louisville shares in

24   the revenue received from the NCAA is by virtue of its

25   participation in this NCAA tournament, this March Madness, is

1    that correct?

2    A.   Yes.

3    Q.   It receives TV revenue from the television stations that

4    display that, broadcast the NCAA tournament, is that correct?

5    A.   I believe so, yes.

6    Q.   And the University of Louisville, by virtue of its

7    participation in the tournament, gets to share in that revenue

8    received by the NCAA.  That's what you meant by the benefits?

9         THE COURT:  You just asked and he just answered that

10   question.

11        MR. SCHACHTER:  I will move on, your Honor.

12   Q.   The University of Louisville also makes money from ticket

13   sales, is that correct?

14   A.   Yes.

15   Q.   Now, is it fair to say that having a successful men's

16   basketball program as you described has also helped the

17   university's academics?  Is that correct?

18        THE COURT:  Sustained.

19   Q.   You testified about a growth in the number of students that

20   attend the University of Louisville since you started in 1998,

21   is that correct?

22   A.   Yes.

23   Q.   And one portion of the increase in number of students at

24   the University of Louisville that you have seen over the time

25   that you have been there has been the increase in out-of-state

1    enrollment, is that correct?

2    A.  Yes.

3    Q.  And out-of-state students, they pay higher tuition to the

4    University of Louisville than do in-state enrollees, is that

5    correct?

6            MR. DISKANT:  Objection.

7            THE COURT:  Overruled.

8    A.  Yes.  Higher tuition costs.

9    Q.  Since Coach Pitino started as head coach in 2001

10   out-of-state enrollment at the University of Louisville has

11   nearly doubled, is that correct?

12   A.  I don't know.

13   Q.  Do you know that there have been increases to the average

14   GPA and SAT scores of new students coming to the University of

15   Louisville?

16           MR. DISKANT:  Objection.

17           THE COURT:  Sustained.

18   Q.  Now, the other thing that came to the University of

19   Louisville since hiring Coach Pitino is corporate sponsorship,

20   and I believe you testified about that on direct, is that

21   correct?

22   A.  Yes.

23   Q.  That was a lot of questions.

24           Mr. Diskant asked you about Louisville's corporate

25   sponsorship with Adidas, is that correct?

IA48GAT1                    Carns - Cross

1     A.   Yes.

2     Q.   The University of Louisville did not have a corporate

3     sponsorship with Adidas before it hired Coach Pitino in 2001,

4     did it?

5     A.   I don't believe so, no.

6     Q.   Mr. Diskant asked you about Louisville's corporate

7     sponsorship agreement with Adidas.

8             Do you remember those questions?

9     A.   Yes.

10    Q.   It's actually not a relationship between the University of

11    Louisville and Adidas, is it?

12            THE COURT:   It sure isn't Princeton.

13    Q.   Are you familiar with a corporate entity called University

14    of Louisville Athletics Association?

15    A.   Yes.

16    Q.   I believe Mr. Diskant did ask you about the University of

17    Louisville Athletics Association.

18            Do you recall that?

19    A.   Yes.

20    Q.   And you said that that was part of the University of

21    Louisville, is that correct?

22    A.   Yes.

23    Q.   We are going to get to that in a moment.  I want focus on

24    the corporate sponsorship arrangement.

25            Adidas pays University of Louisville's athletic

422

1    association approximately 16 million dollars a year for the

2    right to sponsor the University of Louisville, is that correct?

3              MR. DISKANT:  Objection.

4              THE COURT:  Overruled.

5    A.  I don't know the exact amount.

6    Q.  For the amount of money that Adidas pays the University of

7    Louisville, Adidas gets to have its logo on basketball jerseys

8    and other things that the basketball players wear, as well as

9    items in the bookstore, is that correct?

10   A.  Yes.

11   Q.  In fact, the University of Louisville Athletic

12   Association -- withdrawn.

13             Do you recall that Mr. Diskant asked you, he showed

14   you the financial aid agreements of Brian Bowen?

15   A.  Yes.

16   Q.  Do you remember that it was signed on June, the 1st, 2017?

17   A.  Yes.

18   Q.  Do you happen to know that that is the same date when the

19   University of Louisville extended its arrangement with Adidas

20   for it to be a sponsor of the University of Louisville?

21   A.  I did not know that.

22             THE COURT:  The jury should not assume it's true

23   either just because it's in a lawyer's question.  Maybe, maybe

24   not.

25   Q.  Mr. Diskant showed you Government Exhibit 1617.

1          Do you still have the binder of the government

2     exhibits before you?

3     A.  Yes.

4          MR. SCHACHTER:  Your Honor, this is in evidence.  May

5     we publish 1617?

6          THE COURT:  Yes.

7     Q.  I believe you testified, sir, that this is the employment

8     contract between that entity we talked about, the University of

9     Louisville Athletic Association, and Coach Pitino, is that

10    correct?

11    A.  Correct.

12    Q.  Coach Pitino actually, he was employed by this separate

13    entity, the University of Louisville Athletic Association, is

14    that correct?

15    A.  According to the contract, yes.

16    Q.  Now --

17         MR. SCHACHTER:  If it's acceptable to the court, may I

18    ask Mr. McLeod to turn to pages in the exhibit?

19         THE COURT:  Yes.

20         MR. SCHACHTER:  Can you please turn to second page of

21    Government Exhibit 1657.

22    Q.  This contract that Mr. Diskant asked you about, it lays out

23    some information about Coach Pitino's compensation, is that

24    correct?

25    A.  Yes.

1    Q.  Shows that there is a component A of Coach Pitino

2    compensation and also a component B, is that correct?

3    A.  Yes.

4    Q.  And it breaks that out.

5           So this contract would show that in the year 2016 to

6    2017, the University of Louisville Athletic Association paid

7    Coach Pitino approximately $4.3 million, is that correct?

8    A.  Yes.

9    Q.  Now, in addition to that $4.3 million, Coach Pitino got

10   some of the money that Adidas was paying to the University of

11   Louisville Athletic Association as part of its corporate

12   sponsorship arrangement, is that correct?

13          THE COURT:  Sustained.

14   Q.  Do you know, sir, that Coach Pitino was the highest paid

15   coach in America in 2017?

16          MR. DISKANT:  Objection.

17          THE COURT:  Sustained.

18          The jury will disregard the question.  It assumes

19   facts to which there is no evidence.

20   Q.  Now, in this contract, which lays out -- withdrawn.

21          MR. SCHACHTER:  Mr. McLeod, can we turn to the third

22   page, paragraph 3.1.3.

23          Highlight that whole paragraph.

24   Q.  Now, this contract also says that Coach Pitino gets some

25   bonuses if the University of Louisville advances in the NCAA

1  tournament, is that correct?

2  A.  Yes.

3  Q.  For example, it suggests that if he brings the team to the

4  Final 16 -- is that also called the Sweet 16?

5  A.  Yes.

6  Q.  If Louisville advances to the Sweet 16, he gets $50,000, is

7  that correct?

8  A.  Yes.

9  Q.  And you would agree with me that is a pretty small part of

10 his overall compensation at the University of Louisville?

11         THE COURT:  Sustained.  It is whatever it is.  Can we

12 move along.

13         MR. SCHACHTER:  Yes, your Honor.

14 Q.  Now, I believe that you signed one of the documents that

15 the government showed you as the designee of the athletic

16 director, is that correct?

17 A.  Yes.

18 Q.  And the athletic director that you were signing on behalf

19 of, that's a man named Tom Jurich, is that correct?

20 A.  Yes.

21 Q.  And do you have any information about how much Tom Jurich

22 is paid at the University of Louisville?

23         MR. DISKANT:  Objection.

24         THE COURT:  Sustained.

25 Q.  Mr. Diskant showed you Government Exhibit 1602.  Would you

1    please turn to that exhibit in your binder.

2    A.   Sure.

3         MR. SCHACHTER:  This is in evidence, your Honor.

4         May we display it for the jurors?

5         THE COURT:  Yes.

6    Q.   Government Exhibit 1602 is the employment agreement between

7    assistant coach Kenny Johnson and the University of Louisville

8    Athletic Association, is that correct?

9    A.   Yes.

10   Q.   Can we turn just to the, it is the third page of the

11   exhibit, the signature lines.  It's actually the fourth page of

12   the contract.

13        You see that it is signed by Tom Jurich on behalf of

14   the University of Louisville Athletic Association?  Do you see

15   that?

16   A.   Yes.

17        MR. SCHACHTER:  Can we go back to the first page,

18   Mr. McLeod.

19   Q.   Can we focus on paragraph 1 in the middle of the page,

20   please.

21        Now, this contract which Mr. Diskant asked you about

22   shows that the University of Louisville Athletic Association

23   paid its assistant basketball coach $550,000 a year.  Is that

24   correct?

25   A.   Yes.

1    Q.  It also says that he gets a bonus of what would be a little

2    under 10 percent of that if the University of Louisville makes

3    it to the Sweet 16, is that correct?

4    A.  Yes.

5    Q.  Mr. Diskant showed you Government Exhibit 1601.  Would you

6    mind turning to that in your binder, please.

7    A.  Sure.

8    Q.  This is the employment agreement of another assistant

9    basketball coach at the University of Louisville, is that

10   correct?

11   A.  Yes.

12   Q.  That assistant coach name is Jordan Fair, is that right?

13   A.  Yes.

14   Q.  If you can just take that back.

15            Let's take a look at his compensation.

16            This contract provides that this other assistant

17   basketball coach at the University of Louisville is paid

18   $200,000 a year, is that correct?

19   A.  Yes.

20   Q.  In this contract there is actually no reference to any kind

21   of special bonus that this coach is going to receive if the

22   University of Louisville advances in the tournament, is that

23   correct?

24   A.  Yes.

25   Q.  But there is a reference to a performance bonus.  It says,

1    in paragraph D:  "From time to time the University of

2    Louisville Athletic Association may award a performance bonus

3    that, if awarded, shall not create any entitlement or

4    obligation for subsequent bonus awards."

5              Is that correct?

6    A.   Yes.

7    Q.   But nothing about any special allocation of money for

8    advancing?

9    A.   Correct.

10   Q.   We talked a little bit -- I mentioned, I think perhaps

11   incorrectly, that Kenny Johnson, I called him assistant

12   basketball coach.

13             Do you recall that?

14   A.   Yes.

15   Q.   Is his title, do you know, actually assistant head coach to

16   Coach Pitino?

17   A.   I believe it was associate head coach.

18   Q.   Is that like the Coach Pitino's deputy or second in

19   command?

20   A.   He would be the first assistant coach.

21   Q.   Let's now turn to Brian Bowen.

22             Mr. Diskant asked you about his admissions to the

23   university, is that correct?

24   A.   Yes.

25   Q.   Just because we have now Brian Bowens in our case, is he

1  also referred to as Tugs Bowen?  Correct?

2  A.  I believe so.

3  Q.  Tugs Bowen was called a five-star recruit?

4         MR. DISKANT:  Objection.

5         THE COURT:  Overruled.

6  A.  I am not sure what star he was.

7  Q.  That is not something you would have paid attention in your

8  role?

9  A.  Not specifically, no.

10  Q.  Did you have any sense when he was admitted to the

11  university of whether the University of Louisville viewed him

12  as a talented basketball player?

13         MR. DISKANT:  Objection.

14         THE COURT:  Sustained.

15         MR. SCHACHTER:  I will move on.

16  Q.  Now, in your role of compliance, you do get to see when

17  people usually -- when prospects for the men's basketball team

18  normally apply to and gain admission to the university, is that

19  correct?

20  A.  Yes.

21  Q.  Do you know -- if this is area you don't know about, please

22  let us know -- do you know when the most highly sought-after

23  basketball recruits normally commit to the University of

24  Louisville, is that something you see as part of your job?

25  A.  There's generally two signing periods, one in the fall and

1    one in the spring.

2    Q.  That first signing period you talked about, that's in

3    November, is that correct?

4    A.  Yes.

5    Q.  The second signing period you're talking about, that's in

6    April into May, is that right?

7    A.  Yes.

8    Q.  You testified that Brian Bowen committed to the University

9    of Louisville, I believe we saw the financial aid agreement was

10   dated June 1, is that correct?

11   A.  Correct.

12   Q.  And that is unusual in your experience to have a basketball

13   prospect sign his financial aid agreement that late in the

14   process, is that right?

15              MR. DISKANT:  Objection.

16              THE COURT:  What is the objection?

17              MR. DISKANT:  I will withdraw the objection.

18              THE COURT:  Go ahead.

19   Q.  Now, you testified on direct examination that the NCAA only

20   allows schools to give out 13 men's basketball scholarships per

21   year.

22              Do you remember testifying to that yesterday?

23   A.  Yes.

24   Q.  Now, on April, the 6th of 2016 --

25              MR. SCHACHTER:  Your Honor, may I approach just for

IA48GAT1                    Carns - Cross

1    one minute?  I want to make sure I understand the contours of a

2    prior ruling.

3              THE COURT:  All right.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At the sidebar)

2           MR. SCHACHTER:  I think I understood it, but I want to

3    make crystal clear that I do.

4           I am certainly not, given the court's ruling, going to

5    inquire about the nature of the violation.  In other words,

6    that it involved exotic dancers and prostitutes.  I believe I

7    am entitled to inquire on the fact there was a level one

8    recruiting violation and what the University of Louisville did

9    in response to that.

10          MR. DISKANT:  I intentionally avoided that subject on

11   direct because the court had ruled it's not admissible.

12          THE COURT:  It's beyond the scope at least.

13          MR. MOORE:  Your Honor, I don't know that it's beyond

14   the scope of direct examination.  If you're telling us that we

15   may have to recall this gentleman in our case in chief to ask

16   him those questions, is that what the court is suggesting?

17          THE COURT:  For now I am saying it's beyond the scope

18   and you are not going to cross him.  I am not going to deal

19   with the question of the implications of the prior ruling now.

20   If you try to recall him, I will deal with it then.

21          MR. SCHACHTER:  May I inquire, the next question I was

22   going to ask, I was not going to speak about this, but with

23   respect to the admission of Brian Bowen, the University of

24   Louisville imposed, self-imposed a reduction in the number of

25   scholarships it could issue.  So the University of Louisville

1    had said, in light of this investigation, we are going to make

2    it 12 scholarships, not 13.

3              THE COURT:  Yes.

4              MR. SCHACHTER:  However, when it came time for Brian

5    Bowen to show up, they forgot all about it and they decided,

6    you know what, I know we have this self-imposed ban, but we

7    want this player, we are going to take him.  I think that's

8    very important to establishing how much this player meant to

9    the University of Louisville.  And the compliance director

10   would certainly know they had a self-imposed ban and they chose

11   to ignore it in order to admit this student.

12             MR. DISKANT:  I don't think it's accurate.  Assuming

13   it is, I am not sure I understand the relevance.  This case

14   turns on whether or not the statements Mr. Bowen made to the

15   university are true or not.

16             What he is trying to get in through this witness is

17   something the witness does not have firsthand knowledge of,

18   which is whether or not he is a basketball player that the

19   University of Louisville wanted.  There will be other

20   witnesses, including the next witness, who I would think

21   probably will have a lot more information about that subject.

22             If Mr. Schachter wants to cross-examine Brian Bowen,

23   Sr. on how interested the university was in his son and how

24   great of a basketball player his son was, that's the witness

25   through which to do it.

1      MR. SCHACHTER:  Your Honor, I am not asking the

2    witness how important this basketball player is.  He already

3    said he couldn't know about this player.  What he does know is

4    that they had a self-imposed ban and disregarded it in bringing

5    in Brian Bowen.  Those are the facts I wish to explore with

6    this witness.

7      THE COURT:  They disregarded it.  In other words, they

8    changed their mind.

9      MR. SCHACHTER:  Correct.

10      THE COURT:  You may, if he knows, elicit that at a

11    relevant point in time the university decided, for some reason,

12    to give only 12 athletic scholarships for men's basketball and

13    they subsequently determined to give 13.

14      MR. SCHACHTER:  OK.

15      THE COURT:  And the time line of that.

16      MR. SCHACHTER:  I am afraid -- I just want it make

17    sure I get it exactly right.

18      THE COURT:  Good.

19      MR. SCHACHTER:  Your Honor said for some reason.  So

20    is that the words that I may use in the question, that for some

21    reason the university?

22      THE COURT:  For reasons satisfactory to itself.

23      MR. SCHACHTER:  OK.

24      MR. MOORE:  Could I ask one quick question because I

25    know at some point your Honor is going to be taking a morning

1    break at some point, I would assume.  Perhaps I shouldn't

2    assume.  I think it might behoove us to have another chat with

3    the government about these issues so that they don't

4    continually reoccur.  I am just asking if your Honor would at

5    some point this morning --

6              THE COURT:  I always take a morning break.

7              MR. MOORE:  I understand.

8              MR. SCHACHTER:  We are not going to get to anything

9    about this until after the morning break.

10              THE COURT:  Are you moving on to a new subject?

11              MR. SCHACHTER:  These questions I am going to cover,

12    but then I will move on.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

IA48GAT1                    Carns - Cross

1        (In open court)

2             THE COURT:  Let's continue.

3             MR. SCHACHTER:  The white noise is on.

4             THE COURT:  I'm sorry.  I can't hear you.

5             Let's move on.

6   BY MR. SCHACHTER:

7   Q.  Bear with me, Mr. Carns.  Please pay close attention to my

8   question and just answer my question.  OK?

9   A.  OK.

10  Q.  Is it true that on or about April 6th of 2016 that the

11  University of Louisville, for some reason, had reduced, had

12  made a decision to impose a limit on the number of scholarships

13  that it would issue in men's basketball from 13 to 12?

14            THE COURT:  No, it wasn't.  Rephrase it.

15  Q.  Is it correct that on April 6, 2016 that the University of

16  Louisville for some reason had chosen to reduce the number of

17  scholarships it would issue in men's basketball for the

18  2017-2018 season by one scholarship?

19  A.  Yes.

20  Q.  So in June of 2017, the University of Louisville had made a

21  decision to only issue 12 scholarships, is that correct, in

22  men's basketball?

23            THE COURT:  I think the date you used in the last

24  question was April 6, 2016.

25            MR. SCHACHTER:  I apologize.  I am sorry, your Honor.

1    Let me restate.

2    Q.  As of June, the 1st, 2017, when the University of

3    Louisville signed its financial aid agreement with Brian Bowen,

4    the University of Louisville had made a decision to only issue

5    12 athletic scholarships in men's basketball, is that correct?

6            THE COURT:  That's completely confusing.

7            MR. SCHACHTER:  I will try one more time.

8    Q.  You testified that the University of Louisville entered

9    into a financial aid agreement giving an athletic scholarship

10   to Brian Bowen on June 1, 2017, is that correct?

11   A.  Yes.

12   Q.  And on that date, for some reason, the University of

13   Louisville had chosen -- had decided that it would not give out

14   the full 13 scholarships but would give out 12, is that

15   correct?

16           THE COURT:  Can we back up?

17           I think, sir, you testified earlier that the

18   University of Louisville, at least at some point in time,

19   granted up to 13 athletic scholarships for men's basketball.

20   Is that right?

21           THE WITNESS:  13 scholarships is the NCAA limit that

22   any men's basketball program can provide.

23           THE COURT:  Thank you.

24           Did the University of Louisville, for reasons

25   satisfactory to itself, on or about April 6, 2016, decide to

1    give only 12 men's athletic basketball scholarships in the

2    ensuing period?

3              THE WITNESS:  We made a decision to reduce those.  I

4    don't recall right now specifically what time period that was

5    for.

6              THE COURT:  Did it subsequently increase that number?

7              THE WITNESS:  Again, I don't recall specifically the

8    time period for when that reduction was to take place.

9              THE COURT:  But after the reduction took place, did it

10   subsequently increase the number?

11             THE WITNESS:  We were at the full 13 for the 2017-'18

12   season, yes.

13             THE COURT:  When did that happen?

14             THE WITNESS:  I believe when Brian Bowen signed the

15   financial aid agreement, it would have been the 13.

16             THE COURT:  Thank you.

17   Q.  I believe the government showed you Government Exhibit

18   1603.  Can you turn to that in your binder, please.

19             MR. SCHACHTER:  Your Honor, may we display that to the

20   jurors?  It's in evidence.

21             THE COURT:  Yes.

22   Q.  Do you recall this document signed by Coach Pitino and

23   Lauren Rust from your office that you were asked about earlier

24   today?

25   A.  Yes.

1    Q.  If I could ask Mr. McLeod to turn to the page which the

2    government had identified as the squad list.

3              Do you recall that?

4    A.  Yes.

5    Q.  Does this reflect -- that's the page -- thank you.

6              You see that certain of the players are on athletic

7    scholarship and certain reflects a zero for athletic grant

8    amounts, is that correct?

9    A.  Yes.

10   Q.  Notwithstanding the prior decision to make it 12, the squad

11   list that the government showed you reflects 13, decision to

12   make 13 athletic scholarships in order to award a scholarship

13   to Brian Bowen?

14             MR. DISKANT:  This has been asked and answered.

15             THE COURT:  We have covered that.

16             MR. SCHACHTER:  I will move on, your Honor.

17   Q.  Now, you testified on direct examination that Louisville

18   would not have given out scholarship to an ineligible athlete,

19   is that correct?

20   A.  Yes.

21   Q.  I would like to talk to you about what a scholarship really

22   is.  OK?

23             You testified on direct examination that the actual

24   cost of a scholarship at the University of Louisville is

25   approximately $41,000.

IA48GAT1                     Carns - Cross

1      Do you recall that testimony yesterday?

2  A.  Yes.

3  Q.  To be clear, sir --

4      MR. DISKANT:  I think the question mischaracterized

5  the testimony.  I do not think the testimony was about actual

6  cost.

7      THE COURT:  Give me a second.

8      My general recollection is that both terms were used

9  in different contexts.

10     MR. SCHACHTER:  I believe it's 366, lines 15 through

11 20.

12     MR. DISKANT:  Which is the basis of the objection.

13     THE COURT:  Sustained.

14 Q.  Do you recall testifying yesterday about the average cost

15 of a scholarship to the University of Louisville being $41,000

16 for the academic year 2017 to 2018?

17     Do you remember that testimony?

18 A.  Yes.

19 Q.  Now, sir, you are in compliance, is that correct?

20 A.  Yes.

21 Q.  You are not in finance at the University of Louisville, are

22 you?

23 A.  No.

24 Q.  You do not work for the bursar's office, do you?

25 A.  No.

1    Q.  And it is not your job to calculate the actual or average

2    cost of a scholarship at the University of Louisville; you

3    don't do that in your job, do you?

4    A.  Yes.  For squadless purposes we are involved in creating

5    that average cost.

6    Q.  In your meetings with the government did they show you a

7    single document that would reflect this calculation of the cost

8    of a scholarship that you performed in your job?

9              MR. DISKANT:  Objection.  Relevance.

10             THE COURT:  Sustained.

11   Q.  Do you know, sir, that the defense served a subpoena on the

12   University of Louisville in this case?

13             MR. DISKANT:  Objection.

14             THE COURT:  Sustained.

15   Q.  It is not part of your job to calculate the cost of paying

16   teachers at the University of Louisville, is it?

17   A.  No.

18   Q.  It is not part of your job to figure out what it costs to

19   pay the dormitory for the dormitory services that are provided

20   to students, is it?

21   A.  No.

22   Q.  So any calculation that you do of the scholarship costs

23   would be reflective of information that you are receiving from

24   somebody else at the University of Louisville, is that correct?

25   A.  Yes.

1    Q.  You take these numbers from somebody else, however they are

2    calculated, and then you try to apply them to the basketball

3    team, is that correct?

4    A.  Yes.

5    Q.  Now, a scholarship of an average of $41,000 does not mean

6    that the University of Louisville cuts a check to the student

7    of $41,000, does it?

8    A.  No.

9    Q.  A scholarship is comprised of a number of components.  I

10   believe you described some of them on your direct testimony.

11   Is that correct?

12   A.  Yes.

13   Q.  That includes tuition, is that right?

14   A.  Yes.

15   Q.  And room, dormitory room?

16   A.  Yes.

17   Q.  Books?

18   A.  Yes.

19   Q.  Food?

20   A.  Yes.

21   Q.  Now, the University of Louisville employs professors to

22   teach classes, is that correct?

23   A.  Correct.

24   Q.  And even if Tugs Bowen is not sitting in the classroom, the

25   University of Louisville still pays the professor that is

1    teaching that class?

2              MR. DISKANT:  Relevance.

3              THE COURT:  Pardon me?

4              MR. DISKANT:  Relevance.

5              THE COURT:  Let's take the break now.

6              Members of the jury, 15 minutes.

7              Counsel remain, please.

8              (Jury exits courtroom)

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. DISKANT:  Your Honor, would you like us to excuse

2     the witness?

3          THE COURT:  Sure.

4          Take a break, please, Mr. Carns.

5          (Witness excused)

6          THE COURT:  Mr. Diskant.

7          MR. DISKANT:  Yes, your Honor.

8          THE COURT:  Do you have an objection?

9          MR. DISKANT:  I do, your Honor.  It seems like Mr.

10     Schachter is about to -- having laid a very fulsome foundation

11     on the scope of this witness's knowledge, or lack thereof, of

12     university finances, it seems like he is now going to engage in

13     a line of questions about stuff that this witness probably has

14     no firsthand knowledge of and is of no relevance to any issue

15     in dispute in this case.

16          THE COURT:  Thank you.

17          Mr. Schachter.

18          MR. SCHACHTER:  Your Honor, Mr. Diskant chose to

19     elicit from this witness the average cost of the scholarship to

20     the University of Louisville.  Not only did he say that was the

21     cost for one year, but if you add it up, it's $164,000.  I

22     should be able to explore on cross-examination whether or not

23     that actual number is right or wrong.  If they choose to go

24     down this road, I should be entitled to explore that area.

25          THE COURT:  There is a cost-benefit analysis here.  I

1   imagine that we can spend three weeks with this witness going

2   down this road.  Naturally, I am not serious about three weeks.

3   But my point is an awful lot of time.  And what the jury would

4   have learned that would be helpful in resolving this case would

5   be essentially nothing.

6              It seems to me that there are some pretty obvious

7   facts.  The university grants an athletic scholarship, at least

8   in theory.  They don't collect the tuition, right?  You all

9   agree on that.  Yes?

10             Yes, Mr. Schachter?

11             MR. SCHACHTER:  Yes.

12             THE COURT:  If instead of granting the athletic

13   scholarship, they take Bill Gates' offspring, who happens to be

14   a great basketball player, and that individual pays tuition,

15   they are ahead of the game by the amount of the tuition, right?

16             MR. SCHACHTER:  That would be true if they were fully

17   enrolled and Tugs Bowen's admission meant that they couldn't

18   take Bill Gates' son.  That is not the evidence.

19             (Continued on next page)

20

21

22

23

24

25

1          THE COURT:  Look, we're not going down that trail.

2     You had a point to make.  You made it.  The amount of time and

3     effort that could be spent on this, and which you seem to be

4     determined to spend, will be confusing, a tremendous waste of

5     of time, and contribute very little, if anything, to the

6     resolution of this case.  So, you are done with it.

7          MR. SCHACHTER:  Yes, your Honor.

8          THE COURT:  OK.  See you in a few minutes.

9          THE CLERK:  All rise.

10     (Recess)

11          THE CLERK:  Jury entering.

12     (Jury present)

13          THE CLERK:  Please be seated, everyone.

14          THE COURT:  OK.  Members of the jury, thanks for

15     bearing with us.  Little emergencies arise in other cases that

16     need to be taken care of sometimes.

17          The witness is still under oath.

18          Mr. Schachter, let's go.

19          MR. SCHACHTER:  Thank you, your Honor.

20     BY MR. SCHACHTER:

21     Q.  Mr. Carns, I would like to begin by talking about the

22     payments for these scholarships.

23     A.  Yes.

24     Q.  You testified that the money that is used to pay the

25     scholarships comes from an entity called the University of

1    Louisville Athletic Association, is that correct?

2    A.  Yes.

3    Q.  You testified yesterday that the University of Louisville

4    Athletic Association is I think the words you used were a part

5    of the university.  Do you recall that testimony?

6    A.  Yes.

7    Q.  Now, the University of Louisville Athletic Association is

8    related to the University of Louisville, correct?

9    A.  Correct.

10   Q.  But it is not part of the University of Louisville, is it?

11          MR. DISKANT:  Your Honor, I think he is

12   mischaracterizing the testimony.

13          THE COURT:  No.  I think that's exactly what he said.

14   A.  The Athletic Department is part of the University.

15   Q.  The University of Louisville Athletic Association is a

16   separate corporation which is not part of the University, is

17   it?

18   A.  I don't know that specifically, but.

19   Q.  It's true, is it not, that the University of Louisville

20   Athletic Association, Inc. is a completely separate corporate

21   entity that the University of Louisville, isn't that correct?

22          THE COURT:  Mr. Schachter, come on.

23          (Continued on next page)

24

25

1          (At the sidebar)

2          THE COURT:  My understanding of the facts, which

3     frankly is gleaned from the Internet, is that you are right, it

4     is a not-for-profit Kentucky corporation, and the University is

5     a different corporate entity.  I suspect the witness is not

6     going to be the professor on corporation law.  I have looked at

7     the original articles of incorporation of the University of

8     Louisville Athletic Association.  It had at the inception three

9     directors -- the president of the University, a vice president

10    of the University, and somebody else.  I gather it may now have

11    a lot more directors.  Look, if this is not something you can

12    stipulate as to what they are, my confidence in all of you is

13    misplaced.

14         Now, did he make a technical misstatement?  Sure, he

15    did.  Is he going to explain this in any coherent, educated

16    way?  No.  Or at least it's not worth the time trying to get

17    him to do it.

18         Can't we just move along?

19         MR. SCHACHTER:  Two points:  First of all, your Honor

20    must get less sleep than any of us do.

21         THE COURT:  I'm sure that's true.

22         MR. SCHACHTER:  Very impressive.

23         The second is that this is actually very important

24    because the University of Louisville, the identified victim in

25    this case, actually loses nothing per scholarship.  It costs

1    the University of Louisville absolutely nothing.  Here's why.

2    The University of Louisville Athletic Association, it pays the

3    University of Louisville for all of the athletic scholarships.

4                THE COURT:  It writes a check for $41,000.

5                MR. SCHACHTER:  It writes a check for about 20 -- $15

6    million a year.

7                THE COURT:  I didn't ask you that.  I didn't ask you

8    that.  I am sure it writes lots of checks.  Answer my question.

9                MR. SCHACHTER:  The University of Louisville provides

10   scholarships to the students, but it is not out of pocket, not

11   one nickel, because the University of Louisville Athletic

12   Association --

13               THE COURT:  Focus on my question, Mr. Schachter.

14               Does the Athletic Association cut a check --

15   figuratively speaking, of course, but transfer whatever the

16   number is, 41,000, 39,000, 29,000, for each athletic

17   scholarship student to the University of Louisville?

18               I understand it is probably part of a bigger check,

19   but you understand my point.

20               MR. SCHACHTER:  I may not.  And I don't know the

21   answer -- I don't know the direct answer to your Honor's

22   question.  The only thing that I know is that in this year that

23   we're talking about, the University of Louisville issued

24   approximately $12 million of scholarships, and I know that the

25   University of Louisville says that the money for its

scholarships comes from a self-sustaining entity, called the
University of Louisville Athletic Association, such that the
scholarship cost the victim in this case nothing.

THE COURT: You started out today, and your position
was, I'm going to nitpick the $41,000 because they would have
been paying the professors anyway and so forth, all of which
presupposed the suggestion that there was a $41,000 cost to the
University was wrong, it was overstated, at least in part, and
maybe much more than in part.

Now, we didn't go down that alley. Now you are into
another alley. The alley you're in is they didn't lose
anything because the University of Louisville Athletic
Association actually paid them the money regardless of the
eligibility of any of these kids and so forth.

Now, these are easily determinable facts. And if your
point is what I think it is now, which is different from what
it was at 10:30, namely, that the University of Louisville
Athletic Association was paying the money to the University and
it didn't matter to the University, that's another point. OK.
But right now what you're trying to do is to cross-examine a
guy, who is a compliance guy in the Athletic Department, part
of the University of Louisville, on the subject of the
corporate relationship between two entities that he apparently
regards as one entity, mistakenly, as a matter of corporation
law, it would seem.

Ia4dgat2                    Carns - cross

1          MR. SCHACHTER:  Your Honor, I know that his

2     subordinates are employed not by the University of Louisville

3     but by the ULAA.  I imagine it is two.  I don't know the answer

4     to that question.  I would have to ask him that.

5          THE COURT:  Who cares?  What does it matter to

6     anything?  Whatever it is, that it is a separate entity, that's

7     obvious, and if you can't stipulate to that, I don't know

8     what's going on here.  And I rather imagine it's easily and

9     objectively determinable by both sides as to exactly what, if

10    any, money changes hands between the ULAA and the university in

11    relation to the athletic scholarships.

12         MR. SCHACHTER:  That is verifiable, and I intended to

13    elicit it through this witness, but if we can reach a

14    stipulation with the government, then that is unnecessary.

15         THE COURT:  But we start out with the proposition that

16    this witness doesn't even know, as far as I can see, that they

17    are separate corporations.

18         MR. SCHACHTER:  Well, your Honor, I think he actually

19    testified on direct that it was a 501(c)(3).  I think he does

20    know.  I think that the government was -- I think they

21    recognize the issue that the victim lost nothing, and I think

22    that they are trying to -- I think they tried on Mr. Carns'

23    direct to muddy the waters a little bit and I am just trying to

24    clarify the fact that -- and I think it is relevant evidence --

25    that in fact the victim actually lost nothing.

1          THE COURT:  Maybe.  But look at the time you are

2    wasting.

3          MR. SCHACHTER:  We think it is an important point,

4    your Honor.  We can work it out through a stipulation.  We will

5    talk to the government about a stipulation, and I will move on

6    to something else.

7          THE COURT:  Yes.  Good plan.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  OK.  Next, Mr. Schachter.

3          MR. SCHACHTER:  May I have just a moment, your Honor?

4          THE COURT:  Yes.

5          (Pause)

6     BY MR. SCHACHTER:

7     Q.  Mr. Carns, you testified a little bit about the criteria

8     that the University of Louisville considers in awarding

9     scholarships, is that correct?

10    A.  Yes.

11    Q.  I believe Mr. Diskant asked you about that yesterday and

12    again today, is that right?

13    A.  Yes.

14    Q.  I want to talk to you a little bit about that criteria.

15          The University of Louisville's mission is to educate

16    students, is that correct?

17    A.  Yes.

18    Q.  And the University of Louisville is not out to make money

19    off of the backs of its student-athletes, correct?

20          MR. DISKANT:  Objection.

21          THE COURT:  Sustained.

22    BY MR. SCHACHTER:

23    Q.  Let me put it this way, sir.  None of the criteria that the

24    University of Louisville considers is how much money -- in

25    awarding a scholarship is how much money the University of

 1    Louisville is going to make off of its student-athletes, is

 2    that correct?

 3              MR. DISKANT:  Objection.

 4              THE COURT:  Sustained.

 5    Q.  The University of Louisville does not consider the awarding

 6    of a scholarship to be a business decision, does it?

 7    A.  No.

 8    Q.  Now, I want to speak with you about who makes the decision

 9    to award a scholarship.

10              According to Louisville's policies, scholarships are

11    awarded upon the recommendation of the head coach and the

12    approval of the director of athletics, is that correct?

13              THE COURT:  Is that a question or is that testimony?

14              MR. SCHACHTER:  It was -- I will ask you.

15    Q.  Are scholarships awarded upon recommendation of the head

16    coach and approval of the director of athletics?

17    A.  Yes.

18    Q.  I would like to now talk about what happens when Louisville

19    decides to offer someone an athletic scholarship.  OK?

20    A.  Yes.

21    Q.  After the basketball coach decides to have a scholarship

22    awarded, he submits what's called a National Letter of Intent

23    and/or Financial Aid Agreement Request Form to the compliance

24    department, is that correct?

25    A.  Yes.

1    Q.  And then compliance reviews that request form, correct?

2    A.  Yes.

3    Q.  Signs it at the bottom?

4    A.  Yes.

5    Q.  And it provides the coaching staff with that signed version

6    of the financial aid agreement to send to the athlete, is that

7    correct?

8    A.  Correct.

9    Q.  And then the athlete also signs the financial aid

10   agreement, is that correct?

11   A.  Yes.

12   Q.  I would like to go through with you step-by-step what

13   happened with the scholarship awarded to Brian Bowen.

14           Now, Kenny Johnson was an assistant coach at the

15   University of Louisville -- I'm sorry.  Withdrawn.

16           Kenny Johnson was the I believe you said associate

17   head coach at the University of Louisville?

18   A.  Yes.

19   Q.  And he was involved in the recruitment of Brian Bowen, is

20   that correct?

21   A.  Correct.

22   Q.  You testified on direct examination that you monitor the

23   recruiting activities of the basketball coaching staff, is that

24   correct?

25           MR. DISKANT:  Objection.  Mischaracterizes.

1            THE COURT:  Overruled.

2    A.  Yes.

3    Q.  You said that you review phone records; is that part of the

4    monitoring that you do?

5    A.  Yes.

6    Q.  And in the ordinary course of your business, you also

7    review the text messages of the assistant coaches?

8    A.  Not in the ordinary course -- you are talking about the

9    actual text message?

10   Q.  Well, let me back up.

11           So, the coaches are provided cell phones by the

12   University of Louisville, is that correct?

13   A.  Yes.

14   Q.  And those cell phones are subject to monitoring by the

15   compliance staff, isn't that correct?

16   A.  Yes.

17           THE COURT:  Clarify the question.  "Subject to"

18   meaning they can be monitored, or meaning they are monitored

19   and in what sense?

20           MR. SCHACHTER:  I don't know the answer to that

21   question.  I was going to put that question to the witness.

22           THE COURT:  Well, go right ahead.  That would be the

23   best place to start.

24   Q.  Sir, how are the -- do you have access to the coaches' cell

25   phones?

1    A.  Yes.

2    Q.  And what steps, if any, do you take to monitor those cell

3    phones?

4    A.  Generally, there are random reviews of them.  If there is

5    an issue that potentially arises, we will dig in deeper to

6    those records.

7    Q.  And do these random reviews of the cell phones include

8    reviews of text messages?

9    A.  No.

10   Q.  In this circumstance, sir, you actually have reviewed the

11   text messages of Assistant Coach Kenny Johnson, isn't that

12   correct?

13   A.  Yes, some of them.

14   Q.  And you know that Kenny Johnson communicated with the Bowen

15   family on his cell phone in his efforts to recruit Brian Bowen,

16   is that correct?

17             MR. DISKANT:  Objection.

18             THE COURT:  Basis?

19             MR. DISKANT:  As phrased, I will withdraw, but we are

20   getting towards objectionable territory.

21             THE COURT:  Let's take it one step at a time.  All

22   right?  Overruled.

23   BY MR. SCHACHTER:

24   Q.  I just want to establish some timing of the scholarship

25   process.

1          Brian Bowen submitted his application to the

2     University of Louisville on June the 1st at approximately

3     1:17 a.m., is that correct?

4     A.   I don't know exactly when he applied.

5     Q.   OK.  Do you know it was on June the 1st, 2017?

6     A.   Not specifically, no.

7     Q.   And do you -- Lauren Rust, you said, was one of your

8     subordinates, is that correct?

9     A.   Yes.

10    Q.   And do you know that in the very early hours of June the

11    1st that Coach Johnson reached out to Ms. Rust?

12              MR. DISKANT:  Objection.

13              THE COURT:  Sustained as to form.

14    Q.   Who is Michael Bowden?

15    A.   Michael Bowden is the former director of operations for the

16    men's basketball program.

17    Q.   That is a member of the coaching staff?

18    A.   He is not a coach, no.  He is not a coaching staff member.

19    Q.   And Mr. Bowden was required to submit the request for the

20    FAA form in the very early hours of June the 1st; do you know

21    that, yes or no?

22    A.   No.

23    Q.   Do you know that compliance had signed off on the National

24    Letter of Intent and/or Financial Aid Agreement Request Form by

25    noon on June the 1st?

```
 1    A.   I didn't know the time period specifically, no.

 2    Q.   Sir, I'm going to show you -- may I have just a moment,

 3    your Honor?

 4              THE COURT:  Yes.

 5              (Pause)

 6    Q.   Sir, I would like to show you and just -- not for the jury

 7    at this time -- Defense Exhibit -- hold on for just one moment.

 8              May I have a moment with Mr. McCloud?

 9              (Pause)

10              MR. SCHACHTER:  May I speak to the government for just

11    one moment, your Honor?

12              (Pause)

13    BY MR. SCHACHTER:

14    Q.   Actually, may I show you Defense Exhibit 1627.

15              Do you recognize Defense Exhibit 1627?

16    A.   Yes.

17    Q.   And is this the form of the National Letter of Intent

18    and/or Financial Aid Agreement Request Form that you described

19    a moment ago?

20    A.   Yes.

21              MR. SCHACHTER:  Your Honor, the government -- I'm

22    sorry.  The defense offers -- Mr. Gatto offers Defense Exhibit

23    1627.

24              MR. DISKANT:  No objection.

25              THE COURT:  Received.
```

1              (Defendant's Exhibit 1627 received in evidence)

2    BY MR. SCHACHTER:

3    Q.  So this is the form that you said is required to be

4    completed whenever a coach requests a financial aid agreement

5    be issued to a student-athlete, is that correct?

6    A.  Yes.

7    Q.  Is it correct -- withdrawn.

8              So this form, it requires the coaching staff to tell

9    compliance some basic information, like the name and the

10   address, correct?

11   A.  Yes.

12   Q.  And also the eligibility center ID number that has to do

13   with the NCAA eligibility process, the eligibility center that

14   you described a moment ago, is that right?

15   A.  Yes.

16   Q.  And there is, however, nothing on this form, aside from the

17   eligibility center ID number, in which there is any

18   representation about the student being eligible under NCAA

19   rules, is there?

20   A.  No.

21   Q.  And this form, which is submitted in order to have the FAA

22   issued, is supposed to be signed by the compliance office, is

23   that correct?

24   A.  Yes.

25   Q.  And do you know whether the compliance office approved Tugs

1   Bowen's scholarship the very same day that it was completed,

2   June the 1st?

3            MR. DISKANT:  I think this question has been asked

4   several times and he doesn't.

5            THE COURT:  Sustained.

6            You know, I have to again say to the jury, it's the

7   answers that are the evidence, not the questions.

8            Go ahead.

9   BY MR. SCHACHTER:

10  Q.  And is it correct that, in fact, the University of

11  Louisville does not actually have the completed National Letter

12  of Intent and/or Financial Aid Request Form for Mr. Bowen's

13  scholarship?

14  A.  I don't know that, Mr. Schachter.

15  Q.  Have you seen it in any time that you have been preparing

16  for your testimony today, have you ever seen a completed

17  National Letter of Intent and/or Financial Aid Agreement

18  Request Form?

19  A.  No.

20  Q.  Now, at the moment that the FAA, the Financial Aid

21  Agreement, is completed, at that point in time Louisville is

22  bound to Brian Bowen, is that correct?

23  A.  Yes, provided he meets eligibility requirements.

24  Q.  And academic requirements, is that correct?

25  A.  Yes, our requirements to receive the scholarship.

1   Q.  You talked a little bit about the University's academic

2   requirements which are applied to incoming students?

3   A.  Yes.

4   Q.  And according to Louisville's admission standards, the

5   minimum qualifications that a student needed to receive was a

6   20 ACT score and a 2.5 GPA, is that correct?

7   A.  Is that the minimum?

8   Q.  That's my question to you.  My question is not evidence.

9   Your answer would be.

10          Do you know that the time that Tugs Bowen applied to

11  the University of Louisville that the minimum standards were a

12  20 ACT and a 2.5 GPA?

13  A.  That could be the minimum.  There are exceptions to the

14  minimum requirements.

15  Q.  Do you recall that an exception was made --

16          THE COURT:  Excuse me.  You said that "could be the

17  minimum," or are you saying it is the minimum, with exceptions?

18          THE WITNESS:  I don't have -- I don't specifically

19  know exactly if that is the minimum.  I'm pretty confident that

20  that is the published minimum, yes.

21  BY MR. SCHACHTER:

22  Q.  Thank you.  And, sir, you talked about -- I think

23  Mr. Diskant asked you about the academic requirements for

24  admission.  Do you recall those questions?

25  A.  Yes.

1   Q.  And is it true that, in fact, the University of Louisville

2   chose to admit Brian Bowen even though he did not meet those

3   academic requirements that Mr. Diskant asked you about?

4   A.  Yes.

5   Q.  All right.  Let's talk about the financial aid agreement,

6   and let me back up.

7        You talked about -- you've talked a little bit on your

8   direct testimony about the NCAA rules.  Do you recall that?

9   A.  Yes.

10  Q.  And those rules are in a big, thick manual, is that

11  correct?

12  A.  Yes.

13  Q.  About 400 pages, is that right?

14  A.  Correct.

15  Q.  And during the course of your business, you regularly turn

16  to the NCAA rules manual, is that right?

17  A.  Among other things, yes.

18  Q.  Among other things.

19       And one of the things that you also turn to is the

20  NCAA's website, is that correct?

21  A.  Yes.

22  Q.  The NCAA has helpful information in what's called a FAQ, or

23  frequently asked question, section of their website, is that

24  correct?

25  A.  Yes.

1    Q.  And you review that from time to time, is that correct?

2    A.  That would depend on the section.

3    Q.  And according to the NCAA, the financial aid agreement is

4    not a contract, is it?

5    A.  Yes.

6    Q.  Yes, it is not a contract?

7    A.  Yes, it is not a contract.

8    Q.  Thank you.  Let's take a look at the financial aid

9    agreement which the government showed you.

10            MR. SCHACHTER:  Mr. McCloud, could you put up

11   Government Exhibit 1607, which is the financial aid agreement

12   that the government...

13   Q.  Can you turn -- you can either look at it on the screen or

14   in your binder, sir, whatever is easier for you, obviously.

15            This is the Brian Bowen financial aid agreement that

16   the government asked you about, is that correct?

17   A.  Correct.

18   Q.  Now, sir, you I believe called this document a

19   certification in your testimony, is that correct?

20   A.  No.

21   Q.  You don't recall this morning referring to it as a

22   certification?

23            MR. SCHACHTER:  Oh, I'm sorry.  May I publish

24   Government Exhibit 1607?  I think I neglected to do so, your

25   Honor.

Ia4dgat2                    Carns - cross

1          THE COURT:  OK.

2     Q.  This is the -- now that the jury has it, this is the

3     financial aid agreement that Brian Bowen signed, is that

4     correct?

5     A.  Yes.

6     Q.  And you don't recall this morning calling this a

7     certification?

8     A.  If I did, I was mistaken.  That was our certification

9     eligibility form.

10    Q.  Right.  And that would be mistaken, because there is

11    nothing in this document that contains a certification by Brian

12    Bowen or by his mother, does it?

13          Well, withdrawn.  Let's go through the document.

14          MR. SCHACHTER:  May I have just a moment?

15    Q.  OK.  Let's look at the -- thank you, Mr. McCloud.  Let's

16    look at the first page.  You see where it says in the middle --

17    I think the government highlighted this language for you -- it

18    says, "Please read carefully the terms and conditions on the

19    back of this form."  Do you see that in the middle right above

20    the signatures?

21    A.  Yes.

22    Q.  And then those terms and conditions are on the second page

23    of this financial aid agreement, are they not?

24    A.  Yes.

25          MR. SCHACHTER:  And can you blow up, Mr. McCloud,

Ia4dgat2                    Carns - cross

1    please the section that begins, "I understand this tender may

2    be immediately reduced or canceled."

3    Q.   The FAA results in the -- withdrawn.

4           Mr. Bowen, by signing this document, he says that he

5    understands things that may happen which may result in the

6    tender, or the scholarship, being reduced or canceled, is that

7    correct?

8           THE COURT:  The words "they have" I think are not in

9    the document.

10          MR. SCHACHTER:  You are of course right, your Honor.

11   I apologize.

12   Q.   In this document, Mr. Bowen signs and says, "I understand

13   that this tender must be immediately reduced or canceled if,"

14   certain things happen, is that correct?

15   A.   Correct.

16   Q.   And it lists the things that, if they happened, would

17   result in the scholarship being reduced or canceled in the

18   future, is that correct?

19   A.   Correct.

20   Q.   Now, anywhere on this document, does Brian Bowen say the

21   words, "I am eligible"?

22   A.   No.

23   Q.   He does not represent in this document that he is eligible,

24   does he?

25   A.   Not in this document, no.

1    Q.  In fact, he does not even promise that he will remain

2    eligible; does he make that promise?

3    A.  Not in this document.

4    Q.  In fact, what it says is that if in the future certain

5    things happen, then his scholarship may be reduced or canceled,

6    is that correct?

7    A.  Correct.

8    Q.  And this financial aid agreement certainly does not say

9    anything about the athlete's father doing something that could

10   affect his eligibility, does it?

11   A.  Not in that section, no.

12   Q.  Well, can you pull that back just so that -- and the

13   document, you can read it, it is in your binder -- anywhere in

14   this document, does it say anything about the athlete's father

15   doing something that could affect his eligibility?

16   A.  No.

17           MR. SCHACHTER:  But can we just blow up the sentence

18   that says, "I understand this tender," that section, the first

19   section there.

20   Q.  It does say that if Brian Bowen Junior, Tugs Bowen, renders

21   himself ineligible for intercollegiate competition, then if

22   that happens, then the scholarship may be reduced or canceled,

23   isn't that correct?

24   A.  Correct.

25   Q.  And those words -- that word "myself" is referring to Brian

1    Bowen Junior, correct?

2    A.  Yes.

3             MR. SCHACHTER:  You may take that down, Mr. McCloud.

4    Thank you.

5    Q.  Now, you testified about the NCAA Eligibility Center; do

6    you recall that, sir?

7    A.  Yes.

8    Q.  And you talked about some kind of certification that you

9    understand is submitted to the NCAA Eligibility Center, or

10   something that the athlete does with the NCAA Eligibility

11   Center, is that correct?

12   A.  Correct.

13   Q.  And I believe that you said that that was important to the

14   University of Louisville that that had happened?

15   A.  Yes.

16   Q.  Now, we saw that the financial aid request form that is

17   submitted before the financial -- well, withdrawn.

18            The financial aid request form, that black form that

19   we saw a moment ago, that is at least supposed to be completed

20   before the financial aid agreement is issued, is that correct?

21   A.  Yes.

22   Q.  And so that request form that had that eligibility ID

23   number, that was completed sometime before the financial aid

24   agreement was executed on June the 1st, is that correct?

25   A.  Correct.

1    Q.  And that eligibility certification that is completed with

2    the NCAA Eligibility Center, whatever that may be, that is

3    retrospective, meaning that the student-athlete signs this

4    certification saying that that person has not done anything

5    before the certification is entered that would have rendered

6    him ineligible, is that correct?

7    A.  Yes.

8    Q.  So it would only apply, it would only be a certification as

9    to whether Tugs Bowen had done something before June the 1st

10   that would have rendered him ineligible because that's -- it

11   would have been some point, either on June 1st or before, that

12   he would have completed this document, is that correct?

13            MR. DISKANT:  It was completed June 9th.

14   Q.  I'm sorry.  The financial aid agreement is June the 1st, is

15   that correct?

16   A.  Yes.

17   Q.  And the financial aid request form is supposed to be

18   completed before the financial aid agreement is entered into,

19   is that correct?

20   A.  Correct.

21   Q.  And the financial aid agreement, that was entered on June

22   the 1st, is that correct?

23   A.  Correct.

24   Q.  And I believe Mr. Diskant asked you about what

25   investigative work the compliance department does on

1  student-athletes.  Do you remember him asking you about those
2  questions?
3  A.  Yes.
4  Q.  And you testified that the compliance department has only a
5  very limited ability to do any kind of investigation.  Do you
6  recall telling that to Mr. Diskant?
7  A.  Yes.
8  Q.  And, in fact, you really had no involvement with Brian
9  Bowen Junior's recruitment process, did you?
10  A.  In what respects?
11  Q.  Well, you had no involvement -- compliance had no
12  involvement with Mr. Bowen Junior's recruitment process outside
13  of signing forms and being made generally aware that Louisville
14  was recruiting Brian Bowen; wasn't that the extent of your
15  personal involvement?
16  A.  My personal involvement?
17  Q.  Yes.
18  A.  Yes.
19  Q.  Now, your job, I believe you described -- part of your job
20  is to educate coaches and students about NCAA rules, is that
21  correct?
22  A.  Yes.
23  Q.  But you don't provide any education to any student before
24  they sign the financial aid agreement, do you?
25  A.  No, ordinarily no.

1  Q.  Ordinarily you leave that to the coaching staff, isn't that

2  correct?

3  A.  Coaching staff or obviously when there is -- you know, when

4  they are going through the NCAA Eligibility Center, there is

5  information there.  High schools provide them information.

6  Q.  Sir, I'm just asking about you.  You usually leave to the

7  coaching staff to help an athlete and the family with the

8  financial aid agreement form, isn't that correct?

9  A.  For the financial aid agreement form?

10  Q.  Yes, sir.

11  A.  Yes.

12  Q.  And you never spoke to Brian Bowen Junior about his

13  financial aid agreement form, correct?

14  A.  Correct.

15  Q.  And you certainly never explained the NCAA rules to either

16  Brian Bowen's mother or his father, correct?

17  A.  Personally, no.

18  Q.  Now, the government asked you on direct examination about a

19  different form, something called the student-athlete statement,

20  is that correct?

21  A.  Yes.

22  Q.  And I believe that you testified that his -- well,

23  withdrawn.  Let me see if I can't just find that.

24        I believe that they showed you Government Exhibit

25  1609, which I think is in evidence.

Ia4dgat2                      Carns - cross

1            MR. SCHACHTER:  And, your Honor, may I publish

2     Government Exhibit 1609 for the jurors?

3            THE COURT:  Yes.

4     Q.  So, sir, this is the student-athlete statement that you

5     talked about on direct examination, is that correct?

6     A.  Correct.

7     Q.  And I believe that you testified -- well, one moment,

8     please.

9            MR. SCHACHTER:  If you can turn, Mr. McCloud, please

10    to the third page.

11    Q.  And here is Brian Bowen's signature, correct?

12    A.  Yes.

13    Q.  And he signed the student-athlete statement on June the

14    9th, 2017, is that correct?

15    A.  Correct.

16    Q.  Now, to be clear, the financial aid agreement in which

17    Louisville agreed to provide Brian Bowen a scholarship, that

18    was signed eight days earlier, on June the 1st of 2017, is that

19    correct?

20    A.  Correct.

21    Q.  So the student-athlete statement was executed after the

22    University had already entered into the financial aid agreement

23    with Mr. Bowen, correct?

24    A.  Correct.

25            MR. SCHACHTER:  And can we go to the first page of

1   that, please.

2   Q.  You testified that all student-athletes complete the

3   student-athlete statement, isn't that correct?

4   A.  Yes.

5   Q.  And that's right.  The student-athlete statement is signed

6   every year by every college athlete regardless of whether they

7   are on scholarship, isn't that correct?

8   A.  Correct.

9   Q.  The purpose of the student-athlete statement is to

10  establish eligibility to participate, to play in NCAA games,

11  isn't that correct?

12  A.  Yes.

13  Q.  You do not have a completed student-athlete statement

14  before the University provides scholarships to

15  student-athletes, correct?

16  A.  No.

17  Q.  Now, I want to talk about the certifications that are

18  contained in the student-athlete statement.

19          I would like to direct your attention, please, to the

20  page that is Bates stamped at the bottom 935.

21          Do you see that this form contains an affirmation of

22  status as an amateur athlete, do you see that?

23  A.  Yes.

24  Q.  And it says, "You affirm that you have read and understand

25  the NCAA amateurism rules."  Do you see that?

1    A.  Yes.

2    Q.  Now, you've read them, sir.  They are pretty complicated,

3    aren't they?

4            MR. DISKANT:  Objection.

5            THE COURT:  Sustained.

6    Q.  All right.  Let's look at the language that Brian Bowen

7    actually signs.  He says, "By signing this part of the form,

8    you affirm that" -- what do the words -- well, "you affirm

9    that, to the best of your knowledge, you have not violated

10   amateurism rules since you requested a final certification from

11   the NCAA Eligibility Center or since the last time you signed a

12   Division I student-athlete statement, whichever occurred

13   later," is that correct?

14   A.  Correct.

15   Q.  Now, I don't believe that Mr. Diskant showed you this part

16   of the student-athlete statement, did he?

17   A.  I don't recall.

18   Q.  He showed you a different part of this form, which I would

19   now like to show you, and that is on -- may I have just a

20   moment, your Honor?

21           It is the page that I believe is 933.  And I think

22   this is -- I think Mr. Diskant showed you this section.  This

23   is a "Statement Concerning Eligibility;" do you see that?

24   A.  Yes.

25   Q.  That is a different part of the form.

1          And this document is signed on June the 9th.  In this

2     document, Mr. Bowen attests that, "All information provided" --

3     and that would be provided before this date, correct?

4     A.  Yes.

5     Q.  "All information provided to the NCAA, the NCAA Eligibility

6     Center, and the institution's admissions office, is accurate

7     and valid, including scores and your amateur status," correct?

8     A.  Correct.

9     Q.  So here he is attesting to the fact that the information

10    that he himself provided before this date is accurate?

11    A.  Yes.

12    Q.  Thank you.

13          MR. SCHACHTER:  Could we go back to that other

14    section?  The amateur athlete section.  Right there.  You got

15    it.  I'm sorry.

16    Q.  Now, this certification talks about the amateurism rules.

17    Do you see that?

18    A.  Yes.

19    Q.  And here Mr. Bowen is -- Mr. Bowen Junior, Tugs Bowen, is

20    certifying that he has not violated any amateurism rules,

21    right?

22    A.  Yes.

23    Q.  And these amateurism rules, let's talk about those.  I

24    believe that you described them generally in your direct

25    testimony.  And I believe that you said that those rules

1   provide, outside of some exceptions, a student-athlete cannot

2   receive payment for his or her performance in a sport and

3   remain an amateur; do you recall that?

4   A.  Yes.

5   Q.  But those amateurism rules are actually contained in the

6   NCAA manual, are they not?

7   A.  Yes.

8   Q.  And I would like to show you the actual rule, as opposed to

9   your recollections of them.

10          MR. SCHACHTER:  I believe -- your Honor, I will offer

11  Government Exhibit 1503, which is the NCAA Division Manual?

12          MR. DISKANT:  Objection.

13          THE COURT:  Hand it up.

14          (Pause)

15          THE COURT:  What is the objection, Mr. Diskant?

16          MR. DISKANT:  Relevance, among other things.

17          THE COURT:  I can't hear you.

18          MR. DISKANT:  Relevance, among other things.

19          THE COURT:  What other things?

20          MR. DISKANT:  Can we ask to approach on this briefly?

21          THE COURT:  Sure.

22          (Continued on next page)

23

24

25

1          (At the sidebar)

2          MR. DISKANT:  Your Honor, we did mark this six weeks

3   ago.  We had no intention of offering it or calling anyone from

4   the NCAA because the rules are somewhat complicated and the

5   actual text of the rules is of no relevance to this case

6   whatsoever.  I don't believe there is any dispute that the

7   rules were violated, and I think all three defendants on the

8   fact that we were going to learn than the rules were violated.

9   So, it is not clear to me what the relevance is of getting in

10  400 pages of text on the particular rules.

11         MR. SCHACHTER:  Your Honor, I am somewhat curious that

12  the government objects to the NCAA rules.  In this particular

13  case, they are relevant.

14         THE COURT:  Just respond to their point.

15         MR. SCHACHTER:  Yes, your Honor.

16         The certification that is signed by Mr. Bowen speaks

17  specifically about the amateurism rules.  And, in fact, the

18  conduct here, while it may have violated rules in the manual,

19  does not violate the amateurism rules -- it does not violate

20  the amateurism rules -- and, therefore, his certification is

21  true.

22         THE COURT:  So what rules were violated?

23         MR. SCHACHTER:  There is a separate set of rules,

24  which are called offers and inducements.  It is in a completely

25  different chapter of the NCAA manual.  Your Honor, I believe

1    that I should be able to establish that the actual

2    certification, the allegedly false statement, is not false.

3           MR. DISKANT:  Your Honor, the gravamen of the

4    certification is that the student-athlete is eligible.  By

5    accepting the $100,000 payment, he is not eligible.

6           More importantly, for purposes of this particular

7    representation, it is the understanding of the University, not

8    the actual rule that even matters.  I don't begin to understand

9    why we need to get into this, because I don't understand anyone

10   would seriously dispute that a hundred-thousand-dollar payment

11   to the student-athlete violates the amateur rules and renders

12   him ineligible.

13          THE COURT:  I just heard Mr. Schachter say it violates

14   a different rule.

15          MR. DISKANT:  Again, this is complicate, and I am not

16   an NCAA rules expert.  It violates a rule that renders the

17   student-athlete ineligible.  For example, had we gotten into

18   the issue that your Honor is keeping out, the University was

19   penalized because providing an improper benefit to the recruit

20   rendered the student-athlete ineligible.  And playing an

21   ineligible athlete is what the school is penalized for.

22   Whichever precise chapter of this manual's rules this falls

23   into, there is no question that by virtue of accepting that

24   payment, Mr. Bowen's father rendered his son ineligible, and it

25   is, therefore, incorrect for the student-athlete to represent

1    that he was eligible and an amateur.

2            MR. SCHACHTER:  Your Honor, if I may?  I do know a

3    fair amount of these rules at this point in this case.

4            First of all, this case, the government is not the

5    enforcement staff of the NCAA.  The issue is not whether or not

6    the rules were violated or not.  The issue is did fraud occur.

7    the gravamen of fraud is the false statement.  The amateurism

8    rules, which would render -- a violation of the amateurism rule

9    does render a student-athlete ineligible.  That wasn't

10   violated.

11           There is a separate chapter, called Offers and

12   Inducements, that can under certain circumstances render a

13   student-athlete ineligible only if, and only if, and not until

14   the NCAA makes a determination regarding and render -- it is a

15   complicated rule.  It is a separate rule, but there is no

16   automatic ineligibility under the Offers and Inducement section

17   of Chapter 13, or Bylaw 13, which is Offers and Inducements.

18   In any event, I believe we certainly should be permitted to

19   show that this certification that the government's entire case

20   rests on is not false.

21           MR. DISKANT:  Your Honor, the question to this

22   witness, and the question that was put to this witness, is did

23   you have any awareness or knowledge of the payment.  The answer

24   was no.  The question was would it have affected your ability

25   or your willingness to issue a scholarship.  The answer was

1    yes.  The question was why.  The answer was because it would

2    have rendered the student-athlete ineligible, which is true.

3    What Mr. Schachter is leaving out -- and this is why this is

4    hideously complicated and not a good use of the jury's time --

5    is because the NCAA doesn't make eligibility determinations in

6    the first place, the institution does.  The University of

7    Louisville is charged with making the determination about

8    whether or not the player is eligible or not, which is why when

9    the University found about the payment, they immediately sat

10   the kid out.

11             This is not a good use of the jury's time.  This

12   entire manual is not admissible through this witness.

13             THE COURT:  What knowledge does the witness have

14   that's relevant that depends on this manual?

15             MR. SCHACHTER:  Well, he has testified on direct

16   examination about the NCAA rules.  He has reviewed them.  He is

17   familiar with them.  He applies them.  The government asked him

18   on direct examination.  This is his job is to apply the NCAA

19   rules.

20             THE COURT:  I bring your attention back to what I

21   asked you.

22             MR. SCHACHTER:  I require that frequently, and I

23   apologize for that, your Honor.

24             What special knowledge does he have?  Well, the

25   government has chosen to use this witness to describe the

481

Ia4dgat2                    Carns - cross

amateurism rules to the jury.  He specifically asked him -- and

I can find the transcript -- when he asked the witness to

explain what the amateur rules provide, and then he provided a

specific answer, which I believe I just restated on

cross-examination, the government believes that he has special

knowledge in the ability to interpret -- and they wish to do it

separate and apart from the actual rule -- they intend to tell

the jury that the amateurism rules provide something that they

do not.  And I should be entitled on cross-examination to

establish what the rule actually applies, not the witness.  The

jury shouldn't be left with the witness' incorrect

characterization of a rule that is central to whether or not

there is a false representation.

THE COURT:  I don't think you answered my question.  I

mean, you are excited and you said a lot of words, but I don't

think you answered my question.

MR. SCHACHTER:  Your Honor, you are always right.

THE COURT:  No.

MR. SCHACHTER:  Your precision is very impressive.

I certainly do not need this witness in order to read

the words of the amateurism rules.  Your Honor is absolutely

correct.  However --

THE COURT:  Nor does he have any light to shed on what

was understood by the word "amateurism rules" when the young

man signed the form, if anything.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          MR. SCHACHTER:  Certainly true.  I would think that it

2     is relevant evidence whether the rule is -- whether the

3     signature is actually a false attestation or not, given the

4     nature -- given it is wire fraud.

5          THE COURT:  Or, indeed, whether he understood

6     technically, he knew that the answer, standing alone, with the

7     omission of information about the payment to the father, was

8     misleading and deliberately so.

9          MR. SCHACHTER:  All those things are true and relevant

10     facts and consequence.  I would think that one relevant fact

11     for the jury's consideration is whether or not -- the

12     indictment alleges this is a false certification.  We should be

13     able to contest the specific allegation in the indictment and

14     show that the indictment's allegation is incorrect in a wire

15     fraud case.  And evidence can be displayed multiple ways, of

16     course --

17          THE COURT:  Get back to the witness.  What about the

18     witness?

19          MR. SCHACHTER:  Well, I believe that I should be able

20     to correct the witness' -- correct the record, correct the

21     witness' testimony to show that he is -- I can impeach the

22     witness by showing that he provided testimony about what the

23     amateurism rules say, and I should be able to impeach the

24     witness with the fact that he is wrong, that that's not what

25     the rule says.

Ia4dgat2                    Carns - cross

1          MR. DISKANT:  To be clear, we are not conceding what

2     he just said is right.  I don't think what he just said is

3     right.

4          As an initial matter, I think the question to the

5     witness did use the world "rules."  I asked him what the

6     amateurism requirement was all about, and his answer was it

7     means you can't accept money in connection with the team.  That

8     is an unquestionably true statement.  I don't hear anyone

9     disputing that principle.  So, I am not sure there is anything

10    to impeach, nor anything to get into.

11         THE COURT:  I am going to send the jury out to lunch.

12    And you are going to find now the direct testimony that you

13    think would be impeached by reference to this manual.  All

14    right?

15         MR. SCHACHTER:  Yes, your Honor.

16         (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Members of the jury, lunchtime for you.

3    2 o'clock.

4          Counsel, remain.

5          (Continued on next page)

6          (Jury not present)

7          THE COURT:  Be seated, folks.

8          MR. DISKANT:  Your Honor, do you want us to excuse the

9    witness?

10          THE COURT:  Oh, yes.  Of course.  Thank you.

11          (Witness not present)

12          THE COURT:  OK.  Counsel is going to be enlightening

13    me on why this is relevant impeachment.

14          MR. SCHACHTER:  Your Honor, I believe there was

15    testimony about this this morning as well, but on transcript

16    page 352, lines 18 through 23, Mr. Diskant asked --

17          THE COURT:  You don't have to read it to me.  Thank

18    you.

19          MR. SCHACHTER:  I'm sorry.  It is actually through

20    line 25 is the relevant portion.

21          THE COURT:  Now, Mr. Schachter, you were speaking of

22    an amateurism section.

23          MR. SCHACHTER:  Yes, your Honor.

24          THE COURT:  Which you think, or said, were the

25    amateurism rules.

1          MR. SCHACHTER:  Yes.

2          THE COURT:  And it was your argument that, if I

3    understand it -- and I'm stating it to be sure I understand

4    you -- that the restriction in the rules that would make it

5    inappropriate for a payment such as was made to the Bowen

6    family is not an amateurism rule.  It is perfectly all right to

7    give dad a hundred grand in cash so far as the amateurism rules

8    are concerned, although it's bad under another section, and,

9    therefore, there isn't a problem with the certification, or

10   whatever the right name for the document is, because it

11   referred to "amateurism rules;" right?

12         MR. SCHACHTER:  Yes, your Honor.

13         THE COURT:  Is that your argument?

14         MR. SCHACHTER:  Yes.

15         THE COURT:  And the amateurism rules -- what you're

16   now calling the amateurism rules consist of Bylaw Article 12

17   and nothing else, is that right?

18         MR. SCHACHTER:  Yes.

19         THE COURT:  That's the premise of this whole argument?

20         MR. SCHACHTER:  Yes.

21         THE COURT:  All right.  Now, I've only had 30 seconds

22   to look at this document.  But Section 2 of the NCAA, or

23   Article 2, Constitution, speaks in terms of the NCAA's

24   legislation and its objectives.  And Section 2.9, which is

25   headed, "The principle of Amateurism," reads:  "Student-

1    athletes shall be amateurs in intercollegiate sport, and their

2    participation should be motivated principally by education and

3    by the physical, mental, and social benefits to be derived.

4    Student participation in intercollegiate athletics in an

5    avocation, and Student-athletes should be protected from

6    exploitation by professional and commercial enterprises."

7              And then, I note, Bylaw Article 16 -- now, is that the

8    part that you say -- that you acknowledge makes it

9    inappropriate for Mr. Bowen Senior to have been paid that

10   money?

11             MR. SCHACHTER:  No, your Honor.  That would be in

12   Title 13, entitled "Recruiting" -- or Article 13, entitled

13   "Recruiting."

14             THE COURT:  13, "Recruiting."  And what part in

15   particular?

16             MR. SCHACHTER:  Chapter 13.2.1, under "Offers and

17   Inducements."

18             (Pause)

19             THE COURT:  All right.  So this is a little bit long,

20   but it begins by saying:  "An institution staff member, or any

21   representative of its athletics interests, shall not be

22   involved, directly or indirectly, in making arrangements for,

23   or giving, or offering to give, any financial aid or benefits

24   to a prospective student-athlete or to his or her relatives or

25   friends, other than expressly permitted by NCAA regulation,

1    receipt of a benefit by a prospective student-athlete, or his

2    or her relatives or friends, is not a violation of NCAA

3    legislation if it is determined that the same benefit is

4    generally available to the institution's prospective students

5    or their relatives or friends or to a particular segment of the

6    student body."

7              So -- and on the specific prohibitions, it

8    specifically applies to cash payments.

9              Now, so your argument, as I get it, is that if it's

10   not in Bylaw Article 12, no matter that what went on violated

11   the NCAA principle in the Constitution and Article 2, and

12   involved the receipt by the student-athlete, or his family, of

13   prohibited cash payments, that's not an amateurism problem,

14   right?

15             MR. SCHACHTER:  Correct.

16             THE COURT:  Good luck.

17             MR. SCHACHTER:  Your Honor --

18             THE COURT:  Good luck in the Court of Appeals with

19   that one.

20             MR. SCHACHTER:  Your Honor, may I direct the Court's

21   attention for a moment to 12.1.2, which is the rule that deals

22   with amateur status?

23             THE COURT:  Sure.  Yes.

24             MR. SCHACHTER:  Your Honor, we would submit that this

25   is the rule that is the amateurism rule that is being

1   referenced in this and Title 12, entitled --

2           THE COURT:  Well, it is certainly among them.

3           MR. SCHACHTER:  Title 12 is entitled, "Amateurism and

4   Athletics Eligibility."  We submit that that is the amateurism

5   rule.  12.1.2 specifically -- if I can just explain to your

6   Honor my position as to why the certification is not false?

7           12.1.2 says, "An individual loses amateur status and,

8   thus, shall not be eligible for intercollegiate competition in

9   a particular sport if the individual" -- and then it lists what

10  the individual would have to do in order to lose amateur

11  status.  And it is not a violation of this rule.

12          THE COURT:  I hear you.  The only question before me

13  at this moment is the scope of the cross of this witness.  You

14  have my ruling on that.  We are not going to nitpick through

15  this manual again at all.

16          I'm not ruling on whether you can get all or part of

17  it in.  That's for another day.

18          When I was doing for a living what you're doing, I

19  made close textual arguments like this myself.  Rarely did I

20  ever win one, but my clients paid me to do it.  And I respect

21  it and admire it.  And God bless you, you know every word of

22  this.  Three cheers for you, and I'm not being facetious.

23  You're doing your job, and I respect that.  And we'll see how

24  it comes out on the admissibility of the document, but we are

25  not going to waste time with this witness on this.

1           MR. SCHACHTER:  Yes, your Honor.

2           THE COURT:  OK.  See you at 2.

3           THE CLERK:  All rise.

4           (Luncheon recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IA48GAT3                    Carns - Cross

1                        AFTERNOON SESSION

2                           2:00 p.m.

3              THE COURT:  Good afternoon, folks.

4              Let's get our witness, please.

5              (Jury present)

6      JOHN CARNS, resumed.

7              THE COURT:  Welcome back, folks.

8              The jurors all are present.  The defendants are

9      present, as they have been.

10             The witness is on the stand.  Let's continue.

11             MR. SCHACHTER:  Thank you, your Honor.

12     BY MR. SCHACHTER:

13     Q.  Good afternoon, Mr. Carns.

14     A.  Good afternoon.

15     Q.  Mr. Carns, I believe that you testified earlier about the

16     potential penalties that a school can face even if a

17     student-athlete doesn't know of a payment to a father.

18     A.  Yes.  I was explaining the penalties that the institution

19     can face, yes.

20     Q.  Isn't it true, sir, that whether or not the individual

21     student-athlete knew or was culpable in the violation is viewed

22     by the NCAA as a significant mitigating factor?

23             MR. DISKANT:  Objection as to culpable.

24             THE COURT:  Sustained.

25     Q.  Isn't it true that whether or not the student-athlete was

1   aware of the payment is a significant mitigating factor?

2   A.   It could be a mitigating factor in the student-athlete's

3   reinstatement.

4   Q.   This reinstatement, there is something called the

5   reinstatement guidelines, is that right?

6   A.   Yes.

7   Q.   And can you tell the jury a little bit what reinstatement

8   is?

9   A.   When a violation is committed that affects a

10  student-athlete's eligibility, the institution where the

11  student-athlete goes to school is to acknowledge a violation,

12  first of all, declare the student ineligible, and then request

13  reinstatement.

14  Q.   There are a set of reinstatement guidelines that govern

15  that reinstatement process?

16  A.   Yes.

17  Q.   Isn't it true that the reinstatement guidelines say that

18  the culpability of the prospective student-athlete should be

19  assessed?

20          MR. DISKANT:  Objection to the relevance of any of

21  this.

22          THE COURT:  Sustained.

23  Q.   Do you recall a former men's basketball player for the

24  University of Louisville named Shaqquan Aaron?

25          MR. DISKANT:  Objection to where this is going.

1          THE COURT:  Sustained.

2    Q.   Were you involved in a reinstatement request on behalf of

3    the University of Louisville involving a men's basketball

4    player named Shaqquan Aaron?

5          MR. DISKANT:  Same objection.

6          THE COURT:  Relevance?

7          MR. DISKANT:  Yes.

8          THE COURT:  Sidebar.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         (At the sidebar)

2         THE COURT:  Mr. Schachter, why is it relevant?

3         The first question is why is it not beyond the scope

4    of the direct.  The second question is why is it relevant.

5         MR. SCHACHTER:  I believe that Mr. Diskant asked the

6    witness about the potential penalties that the institution will

7    face, among other circumstances, where even if a

8    student-athlete doesn't know about the payments.

9         In Shaqquan Aaron's case, Shaqquan Aaron's parents

10   received $50,000 in impermissible benefits, and the University

11   of Louisville went to the NCAA and said the kid didn't know

12   anything about, and the NCAA agreed and the penalty was, under

13   the reinstatement guidelines, he sat a couple of games and that

14   was it.

15        Mr. Diskant's direct examination left the jury with

16   the impression that even though the student-athlete doesn't

17   know about it, the potential penalties are enormous, when in

18   fact under the reinstatement guidelines they are actually a

19   maximum of 30 percent of the season if the kid does not know

20   about the payment.  So the penalties in this circumstance are

21   actually really pretty minimal.

22        MR. DISKANT:  Two responses.

23        The first is that this is precisely the sort of

24   specific incident that we asked the defendants to tee up in

25   advance so that we could deal with this.

1           The second is that Mr. Schachter is conflating two

2   different things.  As the witness just said, there are

3   penalties for the individual.  That has nothing to do with the

4   penalties for the institution, which I elicited and what he has

5   testified about and what is relevant here.

6           THE COURT:  The issue here, correct me if I am wrong,

7   is that it's the possibility or contemplation of the

8   possibility of harm to the victim as distinguished from the

9   fact.  Is that also true?

10          MR. DISKANT:  Yes, your Honor.

11          THE COURT:  Mr. Schachter.

12          MR. SCHACHTER:  The fact of harm and even the range of

13  potential harms is irrelevant, and we are talking about

14  relevance.

15          THE COURT:  You say it is irrelevant?

16          MR. SCHACHTER:  It is relevant.  We are just talking

17  about a very low hurdle under 401, and I think the jury -- it's

18  our position that the jury should know that when a

19  student-athlete doesn't actually know anything about the

20  payment, that the maximum potential penalty to the university

21  is eight or nine games out of the season.  That's it.  There is

22  no parade of horribles.  That is the circumstance.  And this

23  example --

24          THE COURT:  Sustained.

25          It's beyond the scope and it's not relevant and the

1  risk of confusion and waste of time outweighs any probative

2  value.

3              (Continued on next page)

1              (In open court)

2              THE COURT:  Any more questions?

3              MR. SCHACHTER:  Yes, your Honor.

4    BY MR. SCHACHTER:

5    Q.  Mr. Carns, is it fair to say you're unaware of any NCAA

6    decision ever to impose a vacation of wins or disgorgement for

7    violations where the student-athlete was neither culpable or

8    himself received a meaningful benefit?

9              MR. DISKANT:  Objection.

10             THE COURT:  Sustained.

11   Q.  Is it true that violations should not affect eligibility

12   where the athlete lacks control over the situation?

13             MR. DISKANT:  Objection.

14             THE COURT:  Sustained.

15   Q.  Mr. Carns, when the -- you talked about how Coach Pitino

16   was hired in 2001.

17             Do you remember that?

18   A.  Yes.

19   Q.  And it's true, sir, is it not, that the University of

20   Louisville hired him even though he had previously been found

21   guilty of violating NCAA recruiting rules?

22             MR. DISKANT:  Objection.

23             THE COURT:  Sustained.

24   Q.  Sir, we talked this morning and Mr. Diskant showed you a

25   number of forms relating to Mr. Bowen's recruitment and

1    admission to the university.

2             Do you recall that?

3    A.  Yes.

4    Q.  One of the -- well, withdrawn.

5             I would like to show you Government Exhibit 1616B,

6    which is not in evidence.  I am not sure if it is in your

7    binder or not.

8             Do you recognize Government Exhibit 1616B?

9             THE COURT:  Do you mean does he recognize the kind of

10   document it is or the specific document?

11            MR. SCHACHTER:  The specific document.

12   A.  Yes.

13   Q.  What is it?

14   A.  It is an unofficial visit record that our sport programs

15   provide at the completion of an unofficial visit by a prospect.

16   Q.  This is the unofficial visit record for Brian Bowen?

17   A.  Yes.

18            MR. SCHACHTER:  Defense offers 1616B.

19            MR. DISKANT:  Can I voir dire on this?

20            THE COURT:  Yes.

21   VOIR EXAMINATION

22   BY MR. DISKANT:

23   Q.  Have you seen a different version of this document?

24   A.  Yes.

25            MR. DISKANT:  We would ask that the correct version be

1    offered.

2              MR. SCHACHTER:  I was going to show that next, your

3    Honor.

4              THE COURT:  What is the objection, if there is one, to

5    this?

6    BY MR. DISKANT:

7    Q.  Prior to today, have you ever seen this version of the

8    document?

9    A.  Yes.

10             MR. DISKANT:  Fair enough.  No objection.

11             THE COURT:  It's received.

12             (Government's Exhibit 1616B received in evidence)

13             MR. SCHACHTER:  May we publish it, your Honor?

14             THE COURT:  Yes.

15   BY MR. SCHACHTER:

16   Q.  So just to familiarize ourself with this document, you

17   described this as the unofficial visit record.  Is that a form

18   that is to be completed at the University of Louisville when a

19   recruit has an unofficial visit at the university?

20   A.  Yes.

21   Q.  It has the recruit's name, is that correct?

22   A.  Yes.

23   Q.  And it identifies who the recruit is accompanied by on the

24   unofficial visit, is that correct?

25   A.  Correct.

1   Q.  And this form states that Mr. Bowen had this visit with the

2   university on May 28 through May 30.

3               Do you see that?

4   A.  Yes.

5   Q.  The form is signed at the bottom, is that correct?

6   A.  Yes.

7   Q.  It says, signature of coach, then it says Michael Bowden.

8               Do you see that?

9   A.  Yes.

10  Q.  Was Michael Bowden the director of basketball operations?

11  A.  Yes, he was.

12  Q.  He is not the coach, or he is a coach?

13  A.  He is a noncoaching staff member.

14  Q.  But nonetheless he signs as coach on this form?

15  A.  Yes.

16  Q.  You see where it says "compliance approval?"

17  A.  Yes.

18  Q.  No one signed this form approving on behalf of compliance,

19  is that correct?

20  A.  Correct.  At that point, yes.

21  Q.  Now, isn't it true, sir --

22              THE COURT:  Excuse me just for a moment.

23              When was the first time you saw this particular

24  document, Mr. Carns?

25              THE WITNESS:  It was after September 26, 2017.

1          THE COURT:  Go ahead.

2     Q.  After that date, did you or somebody from compliance ask to

3     have this document modified?

4     A.  We asked for the form to be submitted at that point.

5     Q.  I would like to now show you what has been marked as

6     Government Exhibit 1616A.

7          Do you recognize that?

8     A.  Yes.

9     Q.  Is this a modified version of the document that we just

10    saw?

11    A.  Yes.

12         MR. SCHACHTER:  The defense offers Government's

13    Exhibit 1616A.

14         MR. DISKANT:  No objection.

15         THE COURT:  Received.

16         (Government's Exhibit 1616A received in evidence)

17         MR. DISKANT:  May I also display the document side by

18    side?

19         THE COURT:  Yes.

20    Q.  You say that you saw this document sometime after September

21    26 of 2017, is that correct?

22         THE COURT:  Well, now let's be clear.  We have two

23    documents on the screen.

24    Q.  You mentioned that when you were asked about Government

25    Exhibit 1616B, I believe you testified that you first saw that

IA48GAT3                    Carns - Cross

1   document after September 26, 2017, is that correct?

2   A.  Correct.

3   Q.  September 26, 2017, that was the date of the charges in

4   this case, is that correct?

5   A.  Correct.

6   Q.  And it was -- I would like to go through with you the

7   difference between 1616A and 1616B.

8           Does 1616B, the document that was completed on -- it

9   bears the date of May 31, 2017.  Does it indicate whether

10  Christian Dawkins accompanied Mr. Bowen?

11  A.  The second form?

12  Q.  1616B.

13  A.  No, it does not.

14  Q.  At some point before the charges in this case, this form

15  was modified, is that correct?

16  A.  Yes.

17          THE COURT:  Which form?

18          MR. SCHACHTER:  You're right again.  I apologize, your

19  Honor.

20  Q.  1616B is the original version of this form, is that

21  correct?

22  A.  Yes.

23  Q.  After the charges in this case, Michael Bowden modified

24  this document, is that correct?

25  A.  Correct.

IA48GAT3                      Carns - Cross

 1   Q.  And that was at some point after September 26, 2017, is

 2   that correct?

 3   A.  Yes, the same time I received the first form.

 4   Q.  So after the charges in this case, the University of

 5   Louisville -- Michael Bowden, the director of basketball

 6   operations, went back and added a name to the unofficial visit

 7   record, is that correct?

 8   A.  Can I explain?

 9           THE COURT:  Just answer the questions, please.

10   Q.  Is there any indication on this document as to when the

11   name Christian Dawkins was added to the form?

12   A.  No.

13   Q.  Even in the modified form, the date of Michael Bowden's

14   signature remains May 31, 2017?

15   A.  Yes, the same form.

16   Q.  After it was modified after September 26, 2017, had anybody

17   from compliance signed the unofficial visit record for Mr.

18   Bowen's visit?

19   A.  No.

20           THE COURT:  Have you ever seen 1616A before the date

21   charges were filed in this case?

22           THE WITNESS:  No.

23           THE COURT:  Did you know of its existence before then?

24           THE WITNESS:  No.

25           THE COURT:  Did you know of the existence of 1616B

1      before then?

2                  THE WITNESS:  No.

3                  THE COURT:  Do you have any personal knowledge as to

4      whether anybody in compliance had ever laid eyes on either one

5      of these pieces of paper before the charges were filed in this

6      case?

7                  THE WITNESS:  My understanding is no one in

8      compliance --

9                  THE COURT:  I didn't ask about your understanding.  I

10     asked about your personal knowledge.

11                 THE WITNESS:  Yes.

12                 THE COURT:  "Yes" what?

13                 THE WITNESS:  I have knowledge that the form wasn't

14     seen by our staff before the charges.

15                 THE COURT:  That's something somebody told you, right?

16                 THE WITNESS:  Yes.

17                 THE COURT:  The jury will disregard that.

18                 Go ahead, Mr. Schachter.

19                 MR. SCHACHTER:  Thank you.

20     BY MR. SCHACHTER:

21     Q.  Mr. Carns, I would like to now show you what has been

22     received in evidence as Government Exhibit 1603.

23                 MR. SCHACHTER:  Your Honor, may we publish this to the

24     jury?

25                 THE COURT:  Yes.

1    Q.  This I believe Mr. Diskant showed you on direct

2    examination.  This is -- I believe -- did you refer to this

3    document as a certification?

4    A.  The certification form is the other document.  Yes, we use

5    this form.  This is an internal form to simplify it for the

6    coaches to see who is eligible and not eligible.

7              MR. SCHACHTER:  Mr. McLeod, can we back up so we can

8    see the title of the document.

9    Q.  Does this say Men's Basketball Certification of

10   Eligibility?

11   A.  Yes.

12   Q.  Now, it's signed by the head coach, Rick Pitino, as well as

13   some in compliance named Lauren Rust, is that correct?

14   A.  Correct.

15   Q.  You are aware, sir, I believe you testified, that assistant

16   coaches are regularly involved in recruiting activities with

17   prospective student-athletes, is that correct?

18   A.  Correct.

19   Q.  This certification of eligibility, however, is only signed

20   by the head coach Rick Pitino, is that correct?

21   A.  Yes.

22   Q.  The University of Louisville does not have any of the

23   assistant coaches sign this certification of eligibility, does

24   it?

25   A.  No.

1  Q.  Now, you testified that after the charges in this case were

2  brought that the University of Louisville withdrew Brian Bowen

3  from practice, is that correct?

4  A.  Yes.

5  Q.  And that occurred -- actually, you pulled him off the

6  practice floor within 24 hours of the government's accusations

7  in this case, is that correct?

8  A.  We didn't pull him off the floor, but yes.

9  Q.  You said he couldn't practice with the team anymore based

10  simply on the allegations in this case?

11  A.  Correct.

12  Q.  At that time, when you made that decision to prevent Tugs

13  Bowen from practicing, you didn't actually have any facts, did

14  you?

15          THE COURT:  Was the question about Bowden or Bowen?

16          MR. SCHACHTER:  I apologize, your Honor.  Tugs Bowen,

17  the basketball player.

18  Q.  You prevented him from practicing with the team even though

19  you actually had no facts or evidence about whether he himself

20  had done anything wrong, is that correct?

21          MR. DISKANT:  Objection to facts in evidence.

22          THE COURT:  Sustained, at least in that form.

23  Q.  You had no personal knowledge as to whether Tugs Bowen

24  himself had done anything wrong, isn't that correct?

25  A.  We pulled him -- we pulled him from practice and

1    competition based on the information we had from the federal

2    charges.

3    Q.  You read the allegations, correct?

4    A.  Yes.

5    Q.  Now, you testified about Coach Johnson.  He is currently a

6    basketball coach at La Salle University, isn't that correct?

7              MR. DISKANT:  Objection.

8              THE COURT:  What is the ground?

9              MR. DISKANT:  Relevance.

10             THE COURT:  Sustained.

11   Q.  You testified, sir, on direct that the University of

12   Louisville would not give a scholarship to an ineligible

13   athlete, is that correct?

14   A.  In the circumstance, yes.

15             MR. DISKANT:  Haven't we been over this a couple of

16   times?

17             THE COURT:  I thought so.  He answered.  Let's go on.

18   Q.  The University of Louisville could have canceled Tugs

19   Bowen's scholarship if it wanted to, isn't that correct?

20             MR. SCHACHTER:  Withdrawn.

21   Q.  Let's just go right to the point.  In fact, the University

22   of Louisville permitted Tugs Bowen to remain on scholarship for

23   all four years if he wanted to, isn't that correct?

24   A.  Correct.

25   Q.  And the University of Louisville has not canceled its

1    contract with Adidas, has it?

2              MR. DISKANT:  Objection.  Relevance.

3              THE COURT:  Sustained.

4              MR. SCHACHTER:  I have no further questions, your

5    Honor.

6              THE COURT:  Thank you.

7              MR. CODE:  No questions for this witness.

8              THE COURT:  Mr. Haney.

9              MR. HANEY:  Your Honor, I will be brief.

10   CROSS-EXAMINATION

11   BY MR. HANEY:

12   Q.  Good afternoon, Mr. Carns.

13   A.  Good afternoon.

14   Q.  I am going to get right to the point today, Mr. Carns.

15             You have testified that you understand that one matter

16   at issue in this case is a payment that was made to the father

17   of University of Louisville basketball commit and

18   student-athlete Brian Bowen Junior, is that correct?

19   A.  Correct.

20   Q.  It's been your testimony that the payment that was

21   ultimately received by Brian Bowen Junior's father caused

22   ineligibility of Tugs Bowen to play at the University of

23   Louisville, is that correct?

24             MR. DISKANT:  I think that mischaracterizes --

25             THE COURT:  I couldn't hear you.

1          It was not you I couldn't hear.  I thought somebody

2     else was speaking.

3          MR. DISKANT:  He mischaracterized the testimony there.

4          THE COURT:  Try again.

5     Q.  Has it been your testimony today that there was a payment

6     made to the father of Brian Bowen Junior, Brian Bowen Senior,

7     and that payment ultimately affected the eligibility of Brian

8     Bowen Junior, correct?

9     A.  Yes.

10    Q.  But you as the senior associate athletic director of

11    compliance at University of Louisville, you are aware there

12    exists an exception to the preferential treatment rule, aren't

13    you?

14    A.  I don't know.

15    Q.  You're in compliance, correct?

16    A.  Yes.

17    Q.  You know what the preferential rule treatment rule is?

18    A.  Yes.

19    Q.  You know there is a exception to the preferential treatment

20    rule that involves preexisting relationships, don't you?

21    A.  Yes, there is.

22    Q.  It's called a preexisting relationship rule or exception to

23    the preferential rule, is that correct?

24    A.  Yes.

25    Q.  It's not a trick question.

1    A.   I understand.

2    Q.   And that exception to the preferential treatment rule,

3    which is the preexisting relationship rule, affords in certain

4    circumstances -- and correct me if I am wrong -- that benefits,

5    including cash, can be paid and received by a student-athlete

6    or a prospective student-athlete's family where there exists a

7    prior relationship between parties, is that a fair statement?

8    A.   Subject to --

9    Q.   Yes or no, there does exist that exception?

10            THE COURT:  You have tried to state the exception and

11   the witness is quarreling with your statement of it.  That's

12   the problem.

13            MR. HANEY:  Can I rephrase the question?

14            THE COURT:  Yes.

15   Q.   As the director of compliance, would you agree that there

16   does exist a circumstance called a preferential, under the

17   preferential treatment rule, where if there is a preexisting

18   relationship between parties cash can be paid under certain

19   circumstances?

20   A.   Under the circumstances listed in that interpretation, yes.

21   Q.   Thank you.

22            Will you also agree that special circumstances could

23   include payments to the father of a prospective

24   student-athlete?

25            THE COURT:  I don't get where this concept of special

1   circumstances got into your question from.

2          MR. HANEY:  Can I rephrase the question?

3          THE COURT:  Yes.

4   Q.  You understand that there are special circumstances that

5   can cause the father of a prospective student-athlete to

6   receive benefits and it would not be impermissible, correct?

7   A.  Yes.

8          MR. HANEY:  Can we please put up Government Exhibit

9   1623.

10         It's already been before the jury, your Honor.  May we

11  publish?

12         THE COURT:  Yes.

13         MR. HANEY:  Thank you, sir.

14  Q.  If we can turn to page 3 and highlight the portion where it

15  states "if you and/or your family have a preexisting

16  relationship."

17         Now, Mr. Carns, if you would focus on that portion of

18  Government Exhibit 1623 where it says, "if you and/or your

19  family have a preexisting relationship."  Would you read that

20  to yourself, please.

21  A.  Yes.

22  Q.  Thank you.

23         Again, this is the incoming student-athlete guide that

24  we are looking at, correct, in that government exhibit?

25  A.  Yes.

1    Q.  And in the incoming student-athlete guide, you would

2    acknowledge, then, that this preexisting relationship is

3    referenced in the guide, correct?

4              THE COURT:  It's right there.

5              MR. HANEY:  Thank you, your Honor.

6    Q.  And you are familiar that there is a four-prong test that

7    determines whether or not the preexisting relationship rule

8    applies between parties, is that fair to say?

9              MR. DISKANT:  Objection, your Honor, to this entire

10   line.

11             MR. HANEY:  May I respond?

12             THE COURT:  Over here.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. HANEY:  There will be evidence from the next

3    witness that there was a long-standing relationship between

4    Brian Bowen's father and my client which included cash payments

5    predating the kid becoming a prominent basketball player and

6    that falls into the preexisting rule exception.  As the

7    director of compliance he should have made an analysis of that

8    before he declared the kid ineligible.

9          MR. DISKANT:  The payment here is not payment to

10   Christian Dawkins, it's from Adidas.  This entire exception has

11   no applicability to this case.  I will now have to get up on

12   redirect and clarify that.

13         THE COURT:  My inclination, but not ruling, is that it

14   may well be an appropriate subject when Mr. Bowen is on the

15   stand.  But I don't see the propriety of this or the

16   permissibility of this examination with this witness.

17         What is your argument?  That somehow there is a big

18   problem because they were negligent in not investigating the

19   relationship when their own manual says, if there is any

20   question about it, you're supposed to report it to us before

21   you take the money and clear up any questions?  I just don't

22   get it.

23         MR. HANEY:  My point would be they didn't make an

24   inquiry into the preexisting relationship between the parties.

25   As a compliance director --

1          THE COURT:  He never told him about the payment.  What

2     are you talking about?

3          MR. HANEY:  The kid didn't know about the payment.

4     The payment to the father was based on a prior relationship

5     with my client --

6          THE COURT:  So your position is the kid is ignorant,

7     the kid didn't report the payment because he was ignorant, and

8     this guy was negligent for not looking into whether there was a

9     preexisting relationship that might have justified the payment

10    that nobody told him about and that the kid didn't know about?

11    Please.

12         MR. HANEY:  When he learned of the payment, he didn't

13    make any inquiry into the background and history of that

14    payment, and there was a preexisting relationship between the

15    parties.

16         THE COURT:  When?  After the charges came down in this

17    case?  After there was an indictment?  Give me a break.

18              (Continued on next page)

19

20

21

22

23

24

25

1              (In open court)

2              MR. HANEY:  Your Honor, nothing further.

3              THE COURT:  Thank you.

4              Counsel.

5              MR. DISKANT:  Very briefly, your Honor.

6              Ms. Lee, if we could just bring up the document that

7    was just up.  1623, at page 4.

8    REDIRECT EXAMINATION

9    BY MR. DISKANT:

10   Q.  Mr. Carns, you were asked a series of questions about the

11   preexisting relationship exception.

12             Do you recall those?

13   A.  Yes.

14   Q.  And those would cover a payment from a neighbor or a

15   college roommate or a friend, correct?

16   A.  Yes, those are examples.

17   Q.  Would it cover a payment from Adidas?

18   A.  No.

19             MR. DISKANT:  Ms. Lee, can we bring up next to each

20   other 1616B and 1616A.

21   Q.  Mr. Carns, you were asked a series of questions about these

22   documents on cross-examination.

23             Do you recall that?

24   A.  Yes.

25   Q.  I think you wanted to explain your understanding, your

1    knowledge, rather, of these documents.  Can you do so?

2    A.   Yes.   After these charges we got together documentation of

3    recruitment of Brian Bowen.  In looking at that, one of my

4    staff members, Daniel Gossom, realized they had never received

5    an unofficial visit record from the basketball staff for this

6    visit.

7              He requested the document be sent over.  The document

8    was sent over.  The first document sent over was 1616B.  Based

9    off of the information that we had from the federal charges, we

10   simply asked him to -- there is an understanding there may be

11   more people involved in this visit.  So this is an internal

12   form that we keep and we wanted the form filled out accurately

13   and completely.  So upon sending the form back to Michael

14   Bowden, he returned the form, the second form, which included

15   Christian Dawkins's name on the form.

16   Q.   Just to be clear, prior to learning of the federal charges

17   had you seen either of these forms?

18   A.   No.

19   Q.   Mr. Schachter asked you some questions about Brian Bowen

20   Junior and his ability to retain his scholarship.

21   A.   Yes.

22   Q.   As a result, did you have as of September 2017 firsthand

23   knowledge of the facts giving rise to the federal

24   investigation?

25   A.   Once the charges came out.

1   Q.  Did you have firsthand knowledge of the underlying

2   allegations?

3   A.  Just from what I read.

4           THE COURT:  You mean the underlying allegations or

5   underlying facts?

6   Q.  I misspoke.

7           Did you have firsthand knowledge of the underlying

8   facts or just what you read?

9   A.  Just what I read, yes.

10  Q.  The last series of questions I want to ask you about is

11  Government Exhibit 1609, the student-athlete statement.

12          MR. DISKANT:  Ms. Lee, if we could turn to page 6 of

13  that.

14  Q.  Mr. Carns, you were asked a series of questions by Mr.

15  Schachter about this document.

16          Do you recall that?

17  A.  Yes.

18  Q.  Focusing down on the second to last paragraph, "you have

19  reported to the director of the athletics or his or her

20  designee of your institution any violations of NCAA regulations

21  involving you and your institution."

22          Do you see that?

23  A.  Yes.

24  Q.  Does that duty end on the date this form is signed?

25  A.  No, it does not.

1        MR. SCHACHTER:  Objection.

2        THE COURT:  Sustained.  Answer stricken.  Jury will

3   disregard.

4   Q.  Does the university have policies on whether or not

5   student-athletes are required to disclose their knowledge of

6   violations?

7        MR. SCHACHTER:  Objection.

8        THE COURT:  Does the university have policies that are

9   routinely made available to students?  You want to rephrase the

10  question?

11       MR. DISKANT:  Certainly, your Honor.

12  Q.  Does the University of Louisville have policies that are

13  made available to students that govern the issue of disclosure

14  of knowledge of violations?

15       MR. SCHACHTER:  Objection.

16       THE COURT:  Sustained in that form.

17  Q.  Let's break it down.

18       Does the university have something called a

19  student-athlete handbook?

20  A.  Yes.

21  Q.  Is that provided to all students?

22  A.  Yes.

23  Q.  Does it have provisions that cover the issue of disclosure

24  of knowledge of violation of NCAA rules?

25  A.  Yes.

1    Q.  What, if any, obligations are imposed on student-athletes

2    who are at the University of Louisville?

3                THE COURT:  Sustained.

4                Is it in evidence?

5                MR. DISKANT:  It is not.

6                May I have a moment, your Honor?

7                THE COURT:  I am assuming this was the best evidence

8    objection?

9                MR. SCHACHTER:  Yes, your Honor.

10               THE COURT:  Mr. Schachter, do you have, not

11   necessarily here, but do you or your co-counsel have a copy of

12   this document that Mr. Diskant is talking about?

13               MR. DISKANT:  We all have it.  I am just not sure it

14   needs to come into evidence at this point.

15               THE COURT:  OK.

16   Q.  Mr. Carns, you testified on direct about the training that

17   you provide to student-athletes.

18   A.  Yes.

19   Q.  Does a component of that cover the issue of disclosure of

20   knowledge of student-athlete obligations of violations?

21   A.  Yes.

22   Q.  What do you train student-athletes on in this respect?

23               MR. SCHACHTER:  Objection.

24               THE COURT:  Connect it to Mr. Bowen.

25   Q.  Was Mr. Bowen himself trained on his compliance violations?

1              MR. SCHACHTER:  Objection.

2              THE COURT:  On what ground?

3              MR. SCHACHTER:  The question is was he trained as

4    opposed to did you train.  I don't know if this witness has

5    personal knowledge.

6    Q.  Do you have personal knowledge whether Mr. Bowen received

7    training on NCAA rules?

8    A.  Yes.

9    Q.  Have you in fact reviewed certifications he signed in that

10   regard?

11   A.  Yes.

12   Q.  Was he trained on the issue of his duty to disclose

13   violations?

14             MR. SCHACHTER:  Objection.

15             THE COURT:  What is the objection?

16             MR. SCHACHTER:  It's a foundation question, your

17   Honor.  I don't believe that this witness was involved in any

18   training and has personal knowledge.

19             THE COURT:  First of all, the question was:  "Do you

20   have personal knowledge whether Mr. Bowen received training on

21   NCAA rules?"

22             Answer:  "Yes."

23             MR. SCHACHTER:  I believe the witness said he hasn't

24   spoken to Mr. Bowen about the NCAA rules.

25             THE COURT:  Well, if he said that, it wasn't recently.

1              Objection is overruled.

2    BY MR. DISKANT:

3    Q.  Was Mr. Bowen trained on the issue of whether or not he had

4    an obligation to disclose knowledge of NCAA rules?

5              MR. SCHACHTER:  Objection.

6              THE COURT:  Overruled again.

7    A.  Yes.

8    Q.  Would that duty extend past June 9?

9    A.  Yes.

10             MR. DISKANT:  Nothing further.

11             THE COURT:  Thank you.

12             Mr. Schachter, I am sure.

13             MR. SCHACHTER:  Very briefly, your Honor.

14             May I publish 1616A and 1616B, your Honor?

15             THE COURT:  Yes.

16   RECROSS-EXAMINATION

17   BY MR. SCHACHTER:

18   Q.  These are official forms of the Office of Athletics

19   Compliance, is that correct?

20   A.  Yes.

21   Q.  Do you see that in the upper right-hand corner?

22   A.  Yes.

23   Q.  And it was somebody in compliance, I believe you mentioned

24   the name Daniel Gossom, that asked Michael Bowden to add

25   information to this form after the charges in this case, is

1   that correct?

2   A.  He asked me to complete, to have the form completed.

3   Q.  The only date that reflects Mr. Bowden's signature is May

4   31, 2017?

5   A.  Yes.

6   Q.  Is there anything on this official form that indicates when

7   the name Christian Dawkins was added to anyone that would be

8   looking at this form?

9   A.  No.

10          MR. SCHACHTER:  You can take that down.

11  Q.  I want to just ask you about the form that Mr. Diskant just

12  showed you.  It's Government Exhibit 1609, page 933.

13          MR. SCHACHTER:  If you could just highlight the same

14  paragraph that Mr. Diskant just did.  "You have reported to the

15  director of athletics or his or her designee."  Do you see that

16  paragraph, Mr. McLeod?

17  Q.  Mr. Carns, you talked about the training that's provided to

18  student-athletes, is that correct?

19  A.  Yes.

20  Q.  Do you train student-athletes that they are required to

21  report things that they know nothing about?

22          THE COURT:  Sustained.

23          MR. SCHACHTER:  I have no further questions.

24          THE COURT:  Mr. Moore.

25          MR. MOORE:  Nothing.

1           THE COURT:  Mr. Haney.

2           MR. HANEY:  Nothing, your Honor.

3           THE COURT:  The witness is excused.

4           Thank you, sir.

5           Next witness.

6           (Witness excused)

7           MR. DISKANT:  The government calls Brian Bowen Senior.

8    BRIAN BOWEN SENIOR,

9        called as a witness by the government,

10       having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. DISKANT:

13   Q.  Good afternoon, Mr. Bowen.

14   A.  Good afternoon.

15   Q.  I want to direct your attention to September 26th of 2017.

16           Do you remember that day?

17   A.  Yes, I do.

18   Q.  Why do you remember that day?

19   A.  It's the day when the FBI came to my nephew's house to

20   interview me.

21   Q.  Had the FBI ever come to your house to interview you

22   before?

23   A.  No.

24   Q.  Did the FBI ask you questions?

25   A.  Yes, they did.

1    Q.  What in a general level was the FBI interested in?

2    A.  They wanted to know about my involvement in a scheme for my

3    son to get $100,000 from Adidas to attend the University of

4    Louisville.

5    Q.  Had you in fact been involved in a plan to receive a

6    $100,000 from Adidas in connection with your son's decision to

7    attend Louisville?

8    A.  Yes, I had.

9    Q.  Who had facilitated that payment?

10   A.  Christian Dawkins.

11   Q.  Do you see Mr. Dawkins in the courtroom today?

12   A.  Yes.

13   Q.  Can you identify him by an article of clothing he is

14   wearing?

15   A.  He has on a tan sweater.

16   Q.  In which row is he sitting?

17   A.  The second row.

18          MR. DISKANT:  May the record reflect he has identified

19   Mr. Dawkins?

20          THE COURT:  Yes.

21   Q.  Mr. Bowen, when you were asked by the FBI about that plan,

22   were you truthful?

23   A.  No.

24   Q.  Why not?

25   A.  I didn't want to get myself in trouble or anyone else in

1  trouble.  I didn't want, you know, my son lose his college

2  eligibility either.

3  Q.  We will come back to that, but let's take a step back.

4        When and where were you born?

5  A.  I was born in Saginaw, Michigan.  My birthday is 2/12 of

6  '68.

7  Q.  How far did you go in school?

8  A.  Two years into college.

9  Q.  When did you finish your two years of college?

10  A.  Right around 1990.

11  Q.  Were you employed after college?

12  A.  Yes, I was.

13  Q.  How were you employed?

14  A.  I was a -- by the City of Saginaw.  I was a police officer.

15  Q.  For how long were you a police officer in the City of

16  Saginaw?

17  A.  Approximately ten years.

18  Q.  So from approximately 1990 to approximately 2000?

19  A.  Yes, sir.

20  Q.  How big is the City of Saginaw?

21  A.  Now it's probably 50 to 60,000, 50,000.

22  Q.  Did there come a time when you stopped working for the City

23  of Saginaw police department?

24  A.  Yes.

25  Q.  Why was that?

1   A.   I was injured on the job.

2   Q.   What kind of an injury?

3   A.   It was an elbow injury which resulted in my hand having

4   damage.

5   Q.   Did you want to stop working for the police department at

6   that time?

7   A.   No.  I liked the job.

8   Q.   Did you receive any sort of a pension or disability payment

9   as a result?

10  A.   Yes, police pension.

11  Q.   Do you still receive that?

12  A.   Yes.

13  Q.   How much do you receive?

14  A.   Roughly like $3700 a month.

15  Q.   Were there any restrictions on what you could or couldn't

16  do as a result of receiving that payment?

17  A.   I can't be a police officer anymore.

18  Q.   Have you worked since then?

19  A.   Yes, I have.

20  Q.   Are you familiar with something called the Jason Richardson

21  Foundation?

22  A.   Yes, I am.

23  Q.   What is the Jason Richardson Foundation?

24  A.   Well, first of all, Jason is my nephew.  He played 13, 14

25  years in the NBA and his foundation, what we did was we went to

1    all types of underprivileged areas and did food drives, all

2    kinds of stuff in the community for underprivileged kids,

3    basically.

4    Q.  How long did you work for the Jason Richardson Foundation?

5    A.  Roughly ten years.

6    Q.  Why did you stop?

7    A.  He shut the foundation down.

8    Q.  How have you made money since then?

9    A.  Kind of jack of all trades.  I own like landscaping

10   businesses, construction, all kinds of stuff, rental

11   properties.

12   Q.  How many rental properties do you own?

13           THE COURT:  Would you sit a couple of inches away from

14   the microphone.

15           THE WITNESS:  Yes.

16           THE COURT:  Thank you.

17           Go ahead, Mr. Diskant.

18   Q.  How many rental properties do you own?

19   A.  Like now three.

20   Q.  How much income do you make off of those?

21   A.  Like 300 bucks a month.

22   Q.  Are you familiar with someone named Brian Ballard?

23   A.  Yes.

24   Q.  How are you familiar with him?

25   A.  He's a friend of mine and also a business associate; he's

1    from Saginaw.

2    Q.  You have gone into business with him you said?

3    A.  Yes.

4    Q.  When was that?

5    A.  2016, in the year 2016.

6    Q.  What kind of business was it?

7    A.  He wanted to open up a grow for medical marijuana.

8    Q.  What was your role in the business?

9    A.  I helped him purchase the building.

10   Q.  Aside from helping him purchase the building, did you have

11   any involvement in the marijuana side of it?

12   A.  No.

13   Q.  Did there come a time when the Saginaw authorities shut

14   down the business?

15   A.  Yes.

16   Q.  Do you know why?

17   A.  It wasn't authorized to be there.

18   Q.  Were you accused of any wrongdoing in connection with that?

19   A.  No.

20   Q.  Mr. Bowen, are you married?

21   A.  No, I'm not.

22   Q.  Do you have a partner?

23   A.  Yes, I do.

24   Q.  What is her name?

25   A.  Carrie Malacke.

1    Q.   How long have you and Ms. Malacke been together?

2    A.   20 something years.

3    Q.   Does Ms. Malacke work?

4    A.   No.

5    Q.   Did she work at one point?

6    A.   Yes.

7    Q.   What kind of work?

8    A.   Substitute teacher.

9    Q.   Why does she no longer work?

10   A.   She has some health issues.

11   Q.   Do you and Ms. Malacke have any children?

12   A.   Yes, we have one.

13   Q.   A boy or a girl?

14   A.   A boy.

15   Q.   How old he is?

16   A.   Just turned 20.

17   Q.   What is his name?

18   A.   Brian Bowen II.

19   Q.   Does he go by any nicknames?

20   A.   Tugs.

21   Q.   Can we call him Tugs for purposes of your testimony today?

22   A.   Sure.

23   Q.   Is Tugs presently in college?

24   A.   No, he is not.

25   Q.   Why not?

1          MR. DISKANT:  Your Honor, perhaps now would be a time

2     for us to just take a moment.

3          THE COURT:  OK.  We'll take 15 minutes.

4          THE CLERK:  All rise.

5          (Recess)

6          THE CLERK:  All rise.

7          (Jury not present)

8          THE COURT:  OK.  Let's go.

9          (Jury present)

10         THE CLERK:  Please be seated, everyone.

11         THE COURT:  OK.  The jurors all are present.  The

12    defendants are present, as they have been throughout.

13         Mr. Bowen, you are still under oath.

14         And there is a pending question.

15         MR. DISKANT:  With the Court's permission, I may just

16    withdraw that and move on.

17         THE COURT:  All right.

18    BY MR. DISKANT:

19    Q.  Mr. Bowen, what is your son currently doing?

20    A.  He's playing professional basketball in Australia.

21    Q.  When did your son first start playing basketball?

22    A.  He's played his whole life, basically since he was probably

23    3/4, his whole life.

24    Q.  Have you been involved at all in your son's training and

25    development as a basketball player?

1    A.   Yes.  I was the main person in training, yes, full-time.

2    Q.   Do you have a background yourself in basketball?

3    A.   I played basketball and I was a coach of high school

4    basketball.

5    Q.   Did there come a point when you and Tugs began thinking

6    about the prospect of him playing professionally?

7    A.   Well, it's every kid's dream.  I mean, you know, when they

8    first start playing basketball, everybody wants to go to the

9    NBA.

10   Q.   OK.  And how about the NCAA?

11   A.   That was definitely a goal of ours as well.

12   Q.   And why was the NCAA a goal?

13   A.   Well, I mean, if he got a college scholarship to go play

14   basketball somewhere, that would definitely take a burden off

15   of me.  And the NCAA is like the main proving ground for any

16   athlete trying to play basketball for NBA scholars.

17   Q.   Through your son, have you gained exposure to the NCAA?

18   A.   Yes.

19   Q.   Have you gained exposure to its rules?

20   A.   Yes, I have.

21   Q.   Can you just tell us a little bit, without getting into the

22   rules themselves, about how you gained exposure to NCAA rules?

23   A.   There has been parent conferences and stuff like that that

24   I've attended throughout the years, and they tell you the NCAA

25   rules.  And, of course, my nephew also played college

531

Ia4dgat4                    Bowen Senior - direct

1   basketball, and I was involved in his process also.  So --

2   Q.  And you are referring to Jason Richardson?

3   A.  Yes.

4   Q.  Through that exposure, through some of those parent

5   conferences and the like, do you know whether the NCAA has

6   rules that are relevant to you?

7   A.  Yes, of course.

8   Q.  Tell us about some of the rules you believe are relevant to

9   you.

10          MR. SCHACHTER:  Objection, your Honor.  Best evidence.

11          THE COURT:  Well, what is it offered for?

12          MR. DISKANT:  The defendant's knowledge -- excuse me.

13   The witness' knowledge and understanding.

14          THE COURT:  For that purpose.

15          Members of the jury, obviously, to the extent the

16   rules themselves are relevant and material, that is significant

17   to the case.  The detail, the wording and so forth, they will

18   in one way or another, no doubt, be before you at some point.

19   But this is offered to understand what this gentleman did, what

20   he knew when he did it, and why he did it.

21          MR. DISKANT:  And with the Court's permission, let me

22   withdraw my prior question and ask a slightly more focused one.

23   BY MR. DISKANT:

24   Q.  Mr. Bowen, to your knowledge, under NCAA rules, are you, as

25   the parent of a prospective student athlete, allowed to receive

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   payment in connection with your son?

2   A.  No, I'm not allowed to receive payment.

3   Q.  To your knowledge, what might the consequences be for your

4   son of you receiving such a payment?

5   A.  He would -- it would deem him ineligible.

6   Q.  And to your knowledge, does it matter whether or not your

7   son knew that you had accepted the payment?

8   A.  No, it doesn't matter.

9   Q.  Let's talk a little bit about Tugs' playing career.  Did he

10  play for a high school team?

11  A.  Yes, he did.

12  Q.  And in addition to playing for a high school team, did he

13  play for any additional teams?

14  A.  He played you could call it club basketball, AAU

15  basketball.

16  Q.  You mentioned "AAU."  What is AAU?

17  A.  It is amateur basketball where kids from mainly the same

18  area or same state or whatever, they travel for a team and they

19  go to different venues and play as a team against --

20  competitively against other teams that have been brought

21  together in the same manner, usually sponsored by like a shoe

22  company, mostly circuits -- call it circuits.

23  Q.  So sort of like a little league?

24  A.  Yeah, kind of, basketball.

25  Q.  What was the first AAU team that Tugs played for?

1   A.   Jason Richardson Ballers.

2   Q.   Is that the same Jason Richardson you have been telling us

3   about?

4   A.   Yes.

5   Q.   And do you recall approximately how old Tugs was when he

6   played for the Jason Richardson Ballers?

7   A.   Oh, man.  Fifth grade, maybe, fourth/fifth grade.

8   Q.   Over the course of time, did your son play for additional

9   AAU teams?

10  A.   Yes, he did.

11  Q.   What are some of those teams?

12  A.   He played for King James.  He played for Mean Streets,

13  Michigan Mustangs, Dorians Pride.  I think that's pretty much

14  it.

15  Q.   Let's start with the last one you mentioned, Dorians Pride.

16  You told us previously that you know someone named Christian

17  Dawkins?

18  A.   Yes.

19  Q.   How are you familiar with Mr. Dawkins?

20  A.   We're from the same hometown.  You know, Dawkins' family,

21  his daddy is a really renowned kind of famous kind of couch at

22  a really good school.  Christian also played at that school,

23  and that's it.

24  Q.   OK.  Did he have any connection with the team, that Dorians

25  Pride, that you were telling us about a moment ago?

1    A.  Yes.

2    Q.  What was that connection?

3    A.  He was -- like Dorian was his brother.  He was like the

4    administrator of that team, or over the team.

5    Q.  OK.  And how did Tugs come to play for Dorians Pride?

6    A.  Christian was asking -- you know, Tugs was one of the top

7    players in the city and state, so, you know, he wanted him to

8    play for him.

9    Q.  How old was Tugs, approximately, or what grade was he in

10   when he played for Dorians Pride?

11   A.  I would say ninth grade, I think it was, the ninth grade.

12   Q.  Did there come a point where you and Mr. Dawkins discussed

13   the possibility of Tugs playing for a different team?

14   A.  Yes.

15   Q.  When was that?

16   A.  That would be when Tugs was like probably the beginning --

17   going into his sophomore year, maybe in his sophomore year.

18   Q.  Like 2015?

19   A.  Yes.

20   Q.  And can you tell us a little bit about how, if at all, Tugs

21   had developed as a basketball player between when he played for

22   Dorians Pride and his sophomore year?

23   A.  He had grown.  He was in middle school, ninth grade, he

24   probably was 6'3", 6'2" and he was a very efficient shooter and

25   ball handler for a guy his size.  And by the time like, you

1    know, into the ninth grade, ninth grade year summer, he

2    probably had grown another three inches at least at that time,

3    and, you know, he was getting, you know, more national

4    attention, just like state attention.  So, he started getting

5    ranked.

6    Q.  So let's talk about that last thing you just said,

7    rankings.

8           Are there rankings for high school players?

9    A.  Yes, there is?

10   Q.  How high was Tugs ranked?

11   A.  At some point, as high as top ten in the country.

12   Q.  Now, you mentioned that as of his sophomore year

13   Mr. Dawkins talked to you about the possibility of Tugs joining

14   another AAU team.  What team was that?

15   A.  The Michigan Mustangs.

16   Q.  And in that conversation, did Mr. Dawkins tell you why he

17   thought your son should join the Michigan Mustangs?

18   A.  Yes.  First, it was a good circuit, and by the players

19   therein, there was possible money to be gained from him playing

20   for me.

21   Q.  Did he explain how there was possible money to be gained if

22   your son were to play for the Michigan Mustangs?

23   A.  Basically, Adidas would pay it.

24   Q.  Adidas would pay whom?

25   A.  Would pay me.

1    Q.  Did the Michigan Mustangs have an apparel sponsor?

2    A.  Adidas.

3    Q.  And did Mr. Dawkins indicate why Adidas would pay you if

4    your son played for the Michigan Mustangs?

5    A.  I mean, just he's a, you know, top player in the country,

6    you know, one of the top players in the country, a top

7    prospect, and, you know, for them to have -- you know, every

8    shoe company wants good players wearing their brand.

9    Q.  In the prior season, had Tugs played for an AAU team?

10   A.  Yes, yeah.

11   Q.  And did that team have an athletic sponsor, or an apparel

12   sponsor, I should say?

13   A.  Yes, they did.

14   Q.  Who was that?

15   A.  Nike.

16   Q.  So a rival company?

17   A.  You could say that, yes.

18   Q.  And as of this time period, as of 2015, did you know

19   whether Mr. Dawkins was employed?

20   A.  I didn't know really what Dawkins -- I knew he worked for

21   ASM, Andy Miller Agency.

22   Q.  Let me ask a slightly different question.

23        Did you and Mr. Dawkins discuss his employment?

24   A.  Kind of.  I knew what he did, I mean, pretty much.

25   Q.  What did he say to you about his employment?

1    A.  I worked for, you know, an agency.  I didn't know in what

2    capacity, runner or something.

3    Q.  I'm sorry.  What was the last word you said?

4    A.  A runner or something maybe, I guess.

5    Q.  What is a runner?

6    A.  Worked for an agency but maybe not really an agent, I

7    guess, in a sense.  Get talent, players, whatever.

8    Q.  Did Mr. Dawkins ever express any professional interest in

9    Tugs?

10   A.  I mean, of course, yes.

11   Q.  What did he say to you?  What did you say to him?

12   A.  I mean, you know, at some point he would, you know, of

13   course, want to do his own thing as far as getting his own

14   agency, I guess, and of course he would want, you know, Tugs to

15   be one of his clients.

16   Q.  And just to be clear, the "he" there was Mr. Dawkins?

17   A.  Yes.

18   Q.  Did there come a point when you met with an Adidas

19   representative about the prospect of receiving a payment should

20   your son play for the Michigan Mustangs?

21   A.  Yes.

22   Q.  Who did you meet with?

23   A.  I met with -- you said Adidas.  TJ Gaston -- Gassnola, TJ

24   Gassnola.

25   Q.  We can call him "TJ."

1          When did that meeting occur?

2    A.   It had to be like, my son was a sophomore, 2015.  So that

3    had to be before the AAU season, so like in February,

4    January/February, you know, in the winter months, somewhere in

5    there.

6    Q.   January/February 2015?

7    A.   Yeah, right in there somewhere.

8    Q.   Where did it occur?

9    A.   In Saginaw.  It was at a restaurant or something.

10   Q.   Who was present?

11   A.   Myself, Carrie, which is Tugs' mother, TJ, and then

12   Christian.

13   Q.   Did you invite Tugs to join you as well?

14   A.   Of course not, no.

15   Q.   Why not?

16   A.   I mean, I don't want him to be involved in something that's

17   wrong or something like that.  I didn't want him involved in

18   that.

19   Q.   At some point during this meeting, was money discussed?

20   A.   Yeah, near the end, yes.

21   Q.   Who was present?

22   A.   Just myself and, you know, TJ kind of just pulled me aside

23   and kind of talked to me a little bit.

24   Q.   And in that moment, what did you say to TJ and what did TJ

25   say to you?

1   A.  Well, he just basically told me that the money would be all

2   set.  I could get you whatever, you know.  And I said OK.

3   Q.  Did you discuss a number?

4   A.  25,000.

5   Q.  Mr. Bowen, prior to this point, had you ever been offered

6   money in connection with your son or his basketball

7   performance?

8   A.  No.  No.

9   Q.  Did TJ say anything to you about why Adidas was willing to

10  pay you $25,000?

11  A.  I mean, it was just -- he was playing that circuit.  I

12  mean, that goes without saying.

13  Q.  Did your son end up playing for the Michigan Mustangs?

14  A.  Yes, he did.

15  Q.  And did you receive any money from Adidas?

16  A.  Yes.  Yeah, I got the money.

17  Q.  Did you receive it all at once?

18  A.  No, I didn't.  I did not.

19  Q.  You received it in parts?

20  A.  Yeah.  Just --

21  Q.  And who did you receive it from?

22  A.  I got some from Christian, of course, and then Chris, Chris

23  Rivers.

24  Q.  So breaking that up, you said "Christian."  Is that

25  Christian Dawkins?

1   A.   Yes.

2   Q.   And you mentioned Chris Rivers.  Who is Chris Rivers?

3   A.   He is like a grassroots guy.  He is like a big guy at

4   Adidas, yes.

5   Q.   At Adidas?

6   A.   At Adidas, yes.

7   Q.   Did Mr. Rivers give you money once or more than once?

8   A.   More than once.

9   Q.   How did he pay you?

10  A.   One time he gave me cash, and then another time he gave me

11  a check.

12  Q.   So, focusing on the cash, can you just tell us what you

13  recall about the situation in which you received cash from

14  Mr. Rivers?

15  A.   We were at a -- I don't know what the name of the

16  tournament was, but it was like probably, I'm sure, Adidas,

17  they were playing there, an Adidas-sponsored event.  And I kind

18  of went outside with her, and, you know, gave me some cash, and

19  I said, you know, thank you, you know.

20  Q.   Do you remember how much cash it was?

21  A.   I think it was like four grand maybe, or something; I'm not

22  certain.

23  Q.   You mentioned that you also received money from

24  Mr. Dawkins?

25  A.   Yes.

1    Q.  And how did Mr. Dawkins get you money?

2    A.  Cash or money order -- I mean, or like Western Union,

3    something like that.

4          MR. DISKANT:  Your Honor, at this time I would like to

5    read a portion of Government Exhibit S2, which is a stipulation

6    between the parties.

7          THE COURT:  Members of the jury, you remember my

8    instructions about stipulations.

9          MR. DISKANT:  This is Government Exhibit S2, which is

10   in evidence.

11         During the period April 2015 through March 2017,

12   Christian Dawkins, the defendant, was the user of the email

13   account loydmgmt@gmail.com, maintained on the servers of

14   Google, Incorporated.  Government Exhibits 401 through 410 are

15   true and accurate copies of certain emails and attachments sent

16   or received from that email account.  The dates, times, and

17   identifying information of senders and recipients in these

18   documents are accurate."

19         And at this time the government would offer Government

20   Exhibits 407, 409, 403 and 401.

21         THE COURT:  They are received without objection.

22         (Government's Exhibits 407, 409, 403 and 401 received

23   in evidence)

24         MR. DISKANT:  If we can simply publish Government

25   Exhibit 409?

1          And Ms. Lee if we can highlight down at the bottom the

2     amount sent.

3          And the date of the order.

4          And the receiver name.  You can start there.

5          And then the sender.

6          And if we can publish Government Exhibit 401, which is

7     dated 5/29/2015.

8          And, Ms. Lee, if you can highlight the transaction

9     date.

10         And the name of the sender, Christian Dawkins, and the

11    receiver, Brian Bowen.

12         I think we may need the next page for the amount.

13         2,500.

14         Thank you, Ms. Lee.

15    Q.  Mr. Bowen, when Mr. Dawkins would send you these payments

16    during this time period, did he tell you where the money was

17    coming from?

18    A.  No.  I knew where it was coming from.

19    Q.  Where did you know it to be coming from?

20    A.  From the arrangement with Adidas.

21    Q.  Did Tugs continue to play for the Michigan Mustangs after

22    the 2015 season?

23    A.  No.

24    Q.  Why not?

25    A.  He went to a different team.

1    Q.  Did you continue to receive payments from Chris Rivers at

2    Adidas?

3    A.  I think like maybe one payment.

4    Q.  And how did you receive that one payment?

5    A.  I think it was a Western Union, also, check -- it might

6    have been a check.

7            MR. DISKANT:  And, your Honor, at this point I would

8    like to read a portion of what has been marked for

9    identification as Government Exhibit S3, which is another

10   stipulation between the parties, which I would offer at this

11   time.

12           THE COURT:  Government Exhibit S3 is received.

13           (Government's Exhibit S3 received in evidence)

14           MR. DISKANT:  And paragraph 14:

15           If called as a witness, a custodian from Bank of the

16   West would testify that Government Exhibit 311, including all

17   parts and subdivisions thereof, is a true and correct copy of

18   records obtained from Bank of the West regarding an account

19   opened and maintained at Bank of the West; that the original

20   records were all made at or near the time by, or from

21   information transmitted by a person with knowledge of the

22   matters set forth in the records; that they were kept in the

23   ordinary course of Bank of the West's regularly conducted

24   business activity; and that it was the regular practice of the

25   business activity to make the records.

1           And the government would offer 311.

2           THE COURT:  311 is received.

3           (Government's Exhibit 311 received in evidence)

4           MR. DISKANT:  Ms. Lee, if we could start on page 1.

5    And if you could highlight up top the account name, "In Your

6    Eye Sports Inc."  And just below that, the name of the

7    signatory, Christopher W. Rivers.

8           And, Ms. Lee, if we can go to page 12, and just blow

9    up that check.

10   Q.  Mr. Bowen, do you recognize this check?

11   A.  Yes, I do.

12   Q.  Did you receive this check?

13   A.  Yes, I did.

14   Q.  Who gave it to you?

15   A.  Chris Rivers.

16   Q.  And do you see in the memo line, someone has written "Staff

17   Help."

18          Did you ever provide any staff help for Mr. Rivers?

19   A.  No.

20   Q.  Did you ever provide any staff help for Adidas?

21   A.  No.

22   Q.  After your son finished his season on the Michigan

23   Mustangs, did you continue to receive money from Mr. Dawkins?

24   A.  Yes.

25   Q.  How much?

1    A.  Periodically like 1,500, $2,000 a month, whatever would

2    come to me.

3    Q.  And you indicated a few moments ago that Mr. Dawkins had

4    talked with you about the possibility of representing Tugs one

5    day if he were to become a professional, is that right?

6    A.  Yes.

7    Q.  Had you made any representations in that regard?

8    A.  I knew it was -- I mean, we -- we talked about it.  We knew

9    that's what would happen.  He would be his representative.

10   Q.  Did Tugs play for any AAU teams after his season with the

11   Michigan Mustangs?

12   A.  Yes, he did.

13   Q.  Who was the next team he played for?

14   A.  He played for Mean Streets out of Chicago.

15   Q.  And did Mean Streets have an apparel sponsor?

16   A.  Nike.

17   Q.  Did you receive money in connection with Tugs' decision to

18   play for Mean Streets?

19   A.  Yes, I did.

20   Q.  How much?

21   A.  It was like 5/$8,000.

22   Q.  And what was that money for?

23   A.  Just him playing with them.

24   Q.  How was the payment made?

25   A.  It was cash.

1    Q.  Did you receive offers from any other AAU teams?

2    A.  Yes.

3    Q.  Which team or teams?

4    A.  Spiece out of Indiana.

5    Q.  Is that S-p-i-e-c-e?

6    A.  Yes.

7    Q.  How much was Spiece offering?

8    A.  It was like 18 grand.

9    Q.  Who conveyed that offer?

10   A.  Christian.

11   Q.  Mr. Dawkins?

12   A.  Yes.

13   Q.  That was more than Mean Streets was offering?

14   A.  Yes.

15   Q.  Why did you not accept the higher offer?

16   A.  I just felt that -- I mean, the first thing is always my

17   son.  I felt that the team at Mean Streets and the position

18   that he would be playing was a better fit for him basketball

19   wise.

20   Q.  What high school did Tugs play for?

21   A.  He played two years in Saginaw, Michigan, where we are

22   from, Arthur Hill High School, and then he played two years in

23   Indiana, La Lumiere High School.

24   Q.  So just to be clear, Mr. Bowen, you moved to Indiana?

25   A.  Yes.

1   Q.  Was La Lumiere -- is La Lumiere a public school or a

2   private school?

3   A.  It is a private school.

4   Q.  Did your son receive financial aid to attend?

5   A.  Yes.

6   Q.  In addition to your son's financial aid, did you receive

7   any other payments in connection with your son's decision to

8   attend La Lumiere?

9   A.  Yes.

10  Q.  From whom?

11  A.  From the coach.

12  Q.  Who was the coach?

13  A.  Shane Heirman.

14  Q.  How much money were you receiving from Shane Heirman?

15  A.  Like two grand a month.

16  Q.  And what were you using the money for?

17  A.  Rent and expenses.

18  Q.  How did your son come to play for La Lumiere?

19  A.  A guy that I know and Christian, of course, knew.  A guy

20  from my hometown and also Christian knew, I guess, the coach, I

21  guess.

22  Q.  I just want to break that down.  It sounds like you said

23  there was a guy you knew and then Christian?

24  A.  Christian, yeah.

25  Q.  I didn't hear the end of the answer.

1   A.  Christian was also, he was a part of that.

2   Q.  And in addition to receiving money from the coach, did

3   Mr. Dawkins also continue to provide money to you?

4   A.  Yes.

5   Q.  Mr. Bowen, did you communicate with Mr. Dawkins by text

6   message?

7   A.  Yes, we have, yes.

8   Q.  OK.  Were some of those text messages about payments and

9   money?

10  A.  Yes, I'm sure.

11          MR. DISKANT:  If we can bring up for the witness only

12  what has been marked for identification as Government Exhibit

13  106D-1.

14  Q.  Mr. Bowen, do you recognize this text chain?

15  A.  Yes.  That's between myself and Christian.

16          MR. DISKANT:  The government offers 106D-1.

17          THE COURT:  Received.

18          (Government's Exhibit 106D-1 received in evidence)

19          MR. DISKANT:  With the Court's permission, if we can

20  publish that, please?

21          THE COURT:  Yes.

22  Q.  Mr. Bowen, just to orient us, your text messages are the

23  ones in blue on the right, and Mr. Dawkins is the one in gray

24  on the left, is that correct?

25  A.  Yes.

1   Q.  OK.  And up top you write, "What's up C?  Hey, you think

2   you can take care of that for last month.  Want to get those

3   taxes out of the way.  Your boy got me behind."

4           When you wrote, You think you can take care of that,

5   what were you referring to?

6   A.  Money.

7   Q.  And "your boy," who is your boy?

8   A.  Shane.

9           MR. DISKANT:  Ms. Lee, if we can zoom back out.

10  Q.  And Mr. Dawkins responds:  Yes.  Who is Sugar Shane?

11  A.  Yes.

12  Q.  Down a little bit further below, towards the middle,

13  Mr. Dawkins then sends you a numeral sign.  Do you see that?

14  A.  Yes.

15  Q.  And it is a little bit hard to see, but you respond with a

16  screenshot that has an account number and a routing number.  Do

17  you see that?

18  A.  Yes.  I see it, yes.

19  Q.  Why were you sending him your bank number?

20  A.  So he could make that payment arrangement.

21  Q.  You mentioned a little bit ago that receiving a college

22  scholarship was always a goal for your son.  Did there come a

23  point where you and Tugs ban talking more formally about his

24  college process?

25  A.  Yes, of course.

1    Q.  When was that?

2    A.  You know, I think he was probably a freshman, sophomore,

3    you know.  He really started getting -- that's when he really

4    started getting a lot of national attention as far as schools

5    all over the country.

6    Q.  And moving ahead a little bit to his junior year in

7    particular, were there any specific schools that Tugs was

8    interested in?

9    A.  You know, from being from the State of Michigan, Michigan

10   State, Arizona; numerous schools, I mean.

11   Q.  OK.  As of this time period, junior year and into senior

12   year, who were the primary participants in your son's college

13   search?

14   A.  Myself, Carrie, of course Tugs, and Christian.

15   Q.  How did Mr. Dawkins, how did Christian, come to be a

16   participant in your son's college search?

17   A.  I mean, just we always just kind of kept in contact, and he

18   was kind of helping, helping me out, too, with money.  So, he

19   knew basketball.

20   Q.  You said helping you out with money?

21   A.  Yeah.

22   Q.  Did you and your son visit any schools of interest?

23   A.  Yes, of course.

24   Q.  Are you familiar with the term "official visit"?

25   A.  Yes, I am.

1   Q.  What is an official visit?

2   A.  An official visit is a visit that this, or anywhere,

3   basically it is a where a university or college can pay for the

4   visit for the athlete and the family.

5   Q.  How about an unofficial visit, what is an unofficial visit?

6   A.  An unofficial visit is when not the athlete, but the

7   athlete's family has to take care of the cost of getting there

8   and everything else.

9   Q.  Did you and Tugs make any unofficial visits?

10  A.  Of course, yes.

11  Q.  Who paid for those?

12  A.  Christian.

13  Q.  Did Mr. Dawkins indicate why he was willing to pay for

14  them?

15  A.  I mean, just -- he wanted to represent my son one day, so,

16  I mean, that was kind of -- that was par for the course.

17              THE COURT:  Well, did he say that?

18              THE WITNESS:  What?

19              THE COURT:  Did he ever say that?  Did Christian ever

20  say that?

21              THE WITNESS:  At some point, yeah.  I mean, I knew

22  that.  We just knew that.

23              MR. DISKANT:  Your Honor, if I may, I can try and lay

24  out a slightly different foundation.

25  Q.  Mr. Bowen, did you and Mr. Dawkins talk regularly during

1   this time period, that is, your son's college recruitment?

2   A.  Yes.

3   Q.  Did you talk regularly about your son?

4   A.  Yes, of course.

5   Q.  Did you also talk regularly about Mr. Dawkins and what he

6   did for a living?

7   A.  Yes.

8   Q.  During these conversations, did Mr. Dawkins indicate an

9   interest in representing your son?

10          MR. HANEY:  Your Honor, I object.  He just led the

11  witness with four questions.

12          THE COURT:  Well, there is a contemporaneous objection

13  rule, Mr. Haney, as I'm sure you know.

14          MR. HANEY:  I'm sorry.

15          THE COURT:  Do you want to rephrase the last question?

16  BY MR. DISKANT:

17  Q.  Did Mr. Dawkins express any professional interest in your

18  son?

19  A.  Yes.

20  Q.  What professional interest in your son did he express?

21  A.  That he wanted to represent him one day.

22  Q.  And during this same time period, did you receive any money

23  from Mr. Dawkins?

24  A.  Yes.

25  Q.  How frequently did you receive money from Mr. Dawkins?

1   A.  I mean, whenever he would come up with it, every month,

2   every other few months, whatever.

3   Q.  Mr. Bowen, did you believe as of this time period, that is,

4   the fall of your son's senior year in particular, that you and

5   Mr. Dawkins had developed an understanding with respect to your

6   son?

7   A.  Yes.

8   Q.  What did you believe that understanding to be?

9   A.  I mean, that he would be my son's agent or representative

10  at some point.

11  Q.  Did there come a point where you and Mr. Dawkins discussed

12  the possibility of your receiving a payment in connection with

13  Tugs' selection of a college?

14          MR. HANEY:  Objection.

15          THE COURT:  What is the objection?

16          MR. HANEY:  Leading.  He is testifying.

17          THE COURT:  I disagree.  Overruled.

18  A.  Yes.

19  Q.  Who brought the subject up?

20  A.  Christian.

21  Q.  And in that conversation, what did Mr. Dawkins say to you?

22  A.  In particular?  That schools would, you know, give you

23  money for, you know, a top player for like my son to go to a

24  school.

25  Q.  Did you and Mr. Dawkins discuss any specific offers in

1    consideration with your son's evaluation of specific schools?

2    A.   Yes, we did.

3    Q.   In consideration with your son's -- excuse me.  Did you

4    discuss offers in connection with one school or multiple

5    schools?

6    A.   There were multiple schools.

7    Q.   You mentioned that the University of Arizona was one of the

8    universities that your son was considering, correct?

9    A.   Yes.

10   Q.   In connection with your son's consideration of the

11   University of Arizona, did Mr. Dawkins convey a financial

12   offer?

13   A.   Yes.

14   Q.   What was that offer?

15   A.   Like 50 grand.

16   Q.   Did Mr. Dawkins indicate who would provide the 50 grand?

17   A.   Coach Joe Pasternak.

18   Q.   At the University?

19   A.   Yes.

20   Q.   Mr. Bowen, did you ever yourself talk with Joe Pasternak

21   about a financial offer?

22   A.   No.

23   Q.   Focusing your attention on Oklahoma State University, did

24   you and Mr. Dawkins have a conversation about a financial offer

25   in connection with your son's consideration of Oklahoma State

1   University?

2   A.   Yes.

3   Q.   What did Mr. Dawkins say to you with respect to Oklahoma

4   State University?

5   A.   They were like $150,000 cash, $80,000 for a car, and some

6   undisclosed amount to buy a house, I guess, too.

7   Q.   And you learned about this offer through Mr. Dawkins?

8   A.   Yes.

9   Q.   Did Mr. Dawkins indicate who would make these payments to

10  you?

11  A.   Lamont Evans.

12  Q.   Who is Lamont Evans?

13  A.   Oklahoma, Assistant Coach.

14  Q.   Did your son consider the University of Texas?

15  A.   Yes.

16  Q.   And in consideration with your son's evaluation of the

17  University of Texas, did Mr. Dawkins say anything about a

18  financial offer?

19  A.   I think something like they would just help me with

20  housing, or something.

21  Q.   And did he indicate who at the University of Texas would

22  help you with housing?

23  A.   Mike Morrell, Assistant Coach.

24  Q.   Did you ever personally discuss such an offer with anyone

25  at the University of Texas?

1    A.  No.

2    Q.  And I think I skipped this question, but going back to

3    Oklahoma state, did you ever personally talk with Lamont Evans

4    about a financial offer?

5    A.  I talked to him but not -- no.

6    Q.  Did your son consider attending Creighton University?

7    A.  Yes.

8    Q.  And in connection with his consideration of Creighton

9    University, did you and Mr. Dawkins discuss a financial offer?

10   A.  Yes.

11   Q.  What did Mr. Dawkins say to you?

12   A.  They would pay like a hundred thousand dollars and like a

13   good job or something, like a lucrative job.

14   Q.  Did Mr. Dawkins indicate who at Creighton University would

15   make that payment?

16   A.  Yes.  Preston Murphy, an assistant coach.

17   Q.  Did you and Preston Murphy ever have a conversation about a

18   financial offer?

19   A.  No.

20   Q.  Did your son consider attending the University of Oregon?

21   A.  Yes, he did.

22   Q.  And in connection with consideration of the University of

23   Oregon, did you and Mr. Dawkins have a conversation about a

24   financial offer?

25   A.  I don't recall that.

1    Q.  Just to be clear, with respect to each of the offers we've

2    just talked about, how did you learn about the offers?

3    A.  Through Mr. Dawkins.

4    Q.  Did you accept any of those offers?

5    A.  No.

6    Q.  Why not?

7    A.  My main concern has always been what's the best basketball

8    scenario for my son.  If he's going to be able to play -- be in

9    a position I thought he should play in, what kind of team they

10   had, and, you know, how that team would play during the year.

11   Q.  Focusing your attention on the spring of 2017, had Tugs

12   committed to a school yet?

13   A.  No, he hadn't.

14   Q.  Did he have a particular favorite at that time?

15   A.  I'd say it was Arizona.

16   Q.  And was there any reason he hadn't yet committed to the

17   University of Arizona?

18   A.  He -- there were a couple of players that were trying to go

19   to the NBA and they didn't know if they were going to be

20   drafted that played the exact same pretty much position that my

21   son did, and they were older, of course, and they were in like

22   a logjam.  It would have been tough for him to get minutes

23   there to play.

24   Q.  Who were those players?

25   A.  Allonzo Trier and Rawle Alkins.

1    Q.  And just so I understand, the issue was if those two

2    players returned, would there be a spot for your son?

3    A.  No, not at this spot, no.

4    Q.  Are you familiar with something called the Jordan Brand

5    Classic?

6    A.  Yes, I am.

7    Q.  What is that?

8    A.  The Jordan Brand Classic is basically most people probably

9    identify it like an all-star game where the best players -- it

10   is an invitational tournament where the best players -- say the

11   best 24 players in the country are invited to play against each

12   other, three other teams.

13   Q.  And in 2017, was Tugs invited to play in the Jordan Brand

14   Classic?

15   A.  Yes, he was.

16   Q.  Where was that game held?

17   A.  It was in New York.

18   Q.  Did you attend it?

19   A.  Yes, I did.

20   Q.  Did Mr. Dawkins attend it?

21   A.  Yes.

22   Q.  Before we get to the game, did you and Mr. Dawkins have a

23   meal together in New York around that time?

24   A.  Yes, we did.

25   Q.  What meal was it?

1  A.  It was at a restaurant.

2          MR. DISKANT:  If we can bring up for the witness only

3  what has been marked for identification as Government Exhibit

4  106D-7.

5  Q.  And, Mr. Dawkins -- excuse me, Mr. Bowen, do you recognize

6  this chain?

7  A.  Yes, I do.

8  Q.  It is between you and Mr. Dawkins?

9  A.  Yes.

10         MR. DISKANT:  The government offers 106D-7.

11         THE COURT:  Received.

12         (Government's Exhibit 106D-7 received in evidence)

13         MR. DISKANT:  Ms. Lee, if we can publish that.

14  BY MR. DISKANT:

15  Q.  Mr. Bowen, this chain is dated April 13, 2017.  Is that at

16  or around the time of the Jordan Brand Classic game we've been

17  talking about?

18  A.  Yes.

19  Q.  And on the left-hand side up at the top, you see

20  Mr. Dawkins texts you the name Philippe and then an address?

21  A.  Yes, I do.

22  Q.  Is that a restaurant?

23  A.  Yes, it is.

24  Q.  What was the purpose of the dinner that you had with

25  Mr. Dawkins in New York on the night of the 13th?

Ia4dgat4                    Bowen Senior - direct

1   A.  You know, to meet and I think there was another guy from

2   the agency that was going to be there, so kind of like a

3   business meeting.

4   Q.  The agency you are referring to is what agency?

5   A.  Andy Miller Agency.

6   Q.  The agency that Mr. Dawkins worked for?

7   A.  Yes.

8   Q.  And you mentioned it was kind of a business dinner?

9   A.  I mean, informal -- I mean, those guys there were from the

10  agency.

11  Q.  Who paid for it?

12  A.  I guess Christian did.

13  Q.  All right.  Back to the Jordan Brand Classic itself.  How

14  did the game go?

15  A.  It went well.  My son was MVP so it couldn't get any better

16  than that.

17  Q.  You were at the game?

18  A.  Yeah, I was there.

19  Q.  Was Mr. Dawkins at the game?

20  A.  Yeah, he was there.

21  Q.  Were you sitting together at the game?

22  A.  No, I wasn't sitting together.

23  Q.  Did you text during the game?

24  A.  Yeah, we texted.

25          MR. DISKANT:  All right.  If we can show the witness

1   only what has been marked for identification as Government

2   Exhibit 106D-24.

3   Q.  Mr. Bowen, are these some your texts with Mr. Dawkins

4   during the Jordan Brand Classic?

5   A.  Yes, it is.

6           MR. DISKANT:  The government offers 106D-24.

7           THE COURT:  Received.

8           (Government's Exhibit 106D-24 received in evidence)

9   BY MR. DISKANT:

10  Q.  Again just to orient us, Mr. Bowen, these are your texts on

11  the right and Mr. Dawkins' on the left, correct?

12  A.  Yes.

13  Q.  So up top, Mr. Dawkins writes:  Tugs is earning himself

14  some money.

15  A.  Yeah, I see it.

16  Q.  And down below:  They better give him MVP.

17  A.  Yes.

18  Q.  Did he get the MVP?

19  A.  Yes, he did.

20  Q.  Then down below, all the way at the bottom, Mr. Dawkins

21  writes that:  He did exactly what we needed him to do, perfect

22  timing.

23  A.  Yes.

24  Q.  Why was the timing perfect?

25  A.  I mean, just it was like all eyes on that stage.  I mean,

1    it was one of the last events of the year, and, you know,

2    everybody is watching -- colleges, NBA scouts, everybody.

3    Q.  Now, we're talking a little bit about the University of

4    Arizona.  As of this time, had Tugs committed to a school yet?

5    A.  No.

6    Q.  I think you told us a few moments ago that he was waiting

7    to see what two other players did?

8    A.  Yes.

9    Q.  Did there come a point when you learned that Allonzo Trier,

10   one of those players, was returning to the University of

11   Arizona?

12   A.  Yes.  Yes.

13   Q.  And did there come a point when you learned that Rawle

14   Alkins was also going to be returning to the University of

15   Arizona?

16   A.  Yes.

17   Q.  What was the effect for you and your son of both of those

18   players deciding to return?

19   A.  I mean, just like I said before, essentially that would be

20   the spot that he would have played, so there wouldn't really be

21   a good spot for him there.

22          MR. DISKANT:  Ms. Lee, can we bring up for the witness

23   only what has been marked for identification as Government

24   Exhibit 106D-6 and 106D-10.

25   Q.  Mr. Bowen, do you recognize these text chains?

1   A.  It is kind of small.

2   Q.  We can zoom in.

3   A.  I see my name.

4   Q.  These are between you and Mr. Dawkins?

5   A.  Yes.

6           MR. DISKANT:  The government offers 106D-6 and -10?

7           THE COURT:  Received.

8           (Government's Exhibits 106D-6 and 106D-10 received in

9   evidence)

10  BY MR. DISKANT:

11  Q.  And starting with 106D-6, if we can just zoom in at the

12  top.  Mr. Dawkins writes:  Trier is returning.

13          Who is Trier?

14  A.  Allonzo Trier from Arizona.

15  Q.  OK.  And you write:  You call Sean back, and, if so, what

16  he say.

17          Who is Sean?

18  A.  Sean is Sean Miller, the coach of Arizona.

19          THE COURT:  From where?

20          THE WITNESS:  The University of Arizona.

21          THE COURT:  Thank you.

22  BY MR. DISKANT:

23  Q.  And you write below that:  I don't know what to do.  Might

24  try and get J till to roll with Tugs and do NC State.

25  A.  Yes.

1   Q.  All right.  And then if we can go to 106D-10 and zoom in on

2   the very top.

3              Mr. Dawkins writes:  Rawle is returning.

4              Who is Rawle?

5   A.  Rawle Dawkins.

6   Q.  And the date of this is May 19, 2017?

7   A.  Yes.

8   Q.  As of May 19, 2017, with both of these players returning,

9   did Tugs have a backup plan?

10  A.  Well, I mean he had schools that were still interested in

11  him but he didn't have like a stand out favorite.

12  Q.  Did you and Mr. Dawkins discuss other options?

13  A.  Yes.

14  Q.  What other options did you discuss?

15  A.  He brought up the University of Louisville at that time.

16  Q.  Prior to May of 2017, had you and your son considered the

17  University of Louisville?

18  A.  Well, the University of Louisville, they offered my son a

19  scholarship back when he might have been a freshman, or

20  something like that, but we had really lost -- they were off

21  the radar.  We hadn't talked to them.

22  Q.  So aside from offering your son a scholarship in his

23  freshman year, had the university done anything to try and

24  recruit him?

25  A.  No, not really, no.

1    Q.  Had your son ever expressed any interest in Louisville?

2    A.  Not really, no.

3    Q.  Up to that point, had you and your son visited Louisville?

4    A.  No.

5    Q.  You mentioned that at this time Mr. Dawkins raised

6    Louisville as a possibility?

7    A.  Yes, he did.

8    Q.  And focusing on your initial conversation with him, what

9    did Mr. Dawkins say to you and what did you say to him?

10   A.  You know, he had a player Donovan Mitchell that I think at

11   that time that was trying to test the waters for the NBA.  He

12   got drafted.  You know, Pitino is a good coach, good league,

13   all that stuff, and good fit.  He could play the two guard,

14   and, also, there could be some money involved.

15   Q.  All right.  So let's talk about each of those things.

16        You mentioned that someone named Donovan Mitchell was

17   leaving.  Was Donovan Mitchell a then current player at the

18   University of Louisville?

19   A.  Yes.

20   Q.  And what was the significance of him leaving?

21   A.  He played the perfect position that I want my son to play.

22   He played two guard, which is right by the point guard, and he

23   had tested the waters for the NBA and he left and went to the

24   NBA, so that opened up a spot that wasn't there before.

25   Q.  I think the next thing you mentioned was that Mr. Dawkins

1    said Pitino was a good coach.  Who was Pitino?

2    A.   Rick Pitino.

3    Q.   What was he the coach of?

4    A.   He was the coach of the Louisville basketball team.

5    Q.   Then the final thing you said was that there might be money

6    involved?

7    A.   Yes.

8    Q.   Did Mr. Dawkins indicate who would be providing money?

9    A.   Adidas.

10   Q.   Did he tell you why Adidas would be providing you money?

11   A.   Just, you know, just try to keep that relationship and have

12   my son, you know, wearing Adidas gear, basically.

13   Q.   Just focusing on the last point.  Did Louisville have an

14   apparel sponsor?

15   A.   Adidas.

16   Q.   In that initial conversation, did Mr. Dawkins indicate how

17   much you might receive from Adidas if your son were to play for

18   Louisville?

19   A.   I think it was like 60 to $80,000.

20   Q.   How did the call end?

21   A.   He said he got -- I think he said he would talk to the

22   people at Adidas and probably the people at Louisville also.

23   Q.   Did Mr. Dawkins indicate who at Louisville he was dealing

24   with?

25   A.   Talking to?  The head coach, Pitino.

1  Q.  Did Mr. Dawkins say anything about what, if any,

2  relationship he had with Mr. Pitino?

3  A.  He said they were, you know, friends.  He knew him.  He was

4  cool.

5          MR. DISKANT:  If we can bring up for the witness only

6  what has been marked for identification as 106D-11.

7  Q.  Mr. Dawkins, do you recognize this chain -- excuse me,

8  Mr. Bowen, do you recognize this chain?

9  A.  Yeah.  Yeah.

10 Q.  Is this between you and Mr. Dawkins, dated May 24, 2017,

11 yes?

12 A.  Yes, yes.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1      MR. DISKANT:  The government offers 106D-11?

2      THE COURT:  Received.

3      (Government's Exhibit 106D-11 received in evidence)

4   Q.  Up top Mr. Dawkins says, "After you talk to Rick hit Kenny

5   Johnson to set up the visit details."  And you say, "OK"?

6   A.  Yes.

7   Q.  Who is Rick?

8   A.  Rick Pitino, the head coach.

9   Q.  Who is Kenny Johnson?

10  A.  Kenny is an assistant coach at Louisville.

11  Q.  Did you speak with Rick Pitino that day?

12  A.  I think so.

13  Q.  Leaving aside the date, do you recall talking with Mr.

14  Pitino by phone during this time period?

15  A.  During that period I did.

16  Q.  Tell us what you recall of that conversation.  What did he

17  say to you and what did you say to him?

18  A.  Just, you know, he told me, of course, about Donovan

19  leaving and what kind of player he thought my son was, and how

20  he thought he could further his career and make him a better

21  player and turn him into a long-term pro, basically, NBA

22  player.

23  Q.  During that call with Mr. Pitino, what, if anything, did

24  you say about your plan to receive a payment from Adidas?

25  A.  Nothing.

1       MR. DISKANT:  If we can bring up for the witness only

2    what has been marked as Government Exhibit 106-A.

3    Q.  Mr. Bowen, do you recognize this chain?

4    A.  Yes.

5    Q.  It's between you and Coach Pitino?

6    A.  Yes, it is.

7    Q.  On the same date, May 24, 2017?

8    A.  Yes.

9       MR. DISKANT:  The government offers Government Exhibit

10   106-A.

11      THE COURT:  Received.

12      (Government's Exhibit 106-A received in evidence)

13      MR. DISKANT:  With the Court's permission, if we could

14   publish that, Ms. Lee.

15      THE COURT:  Yes.

16   Q.  Mr. Bowen, this is you on the right and Coach Pitino on the

17   left?

18   A.  Yes.

19   Q.  And you write, "Coach, are you available to talk to Tugs

20   right quick?"

21   A.  Yes.

22   Q.  And "Brian, we call him Tugs," you're referring to your

23   son?

24   A.  Yes.

25   Q.  To your knowledge, did Coach Pitino and your son speak by

1   phone?

2   A.  Yeah, they did.

3   Q.  If we can go back to 106-D-11.  This is in the late

4   afternoon on the 24th.

5        Down later that evening, about 7:00, you text Mr.

6   Dawkins, 7:26 to be precise, "Hit me back."  "Pick back up."

7   And, "Man this Adidas stuff is" -- I will let everyone read it

8   for themselves.

9        Focusing on the Adidas component, what were you

10  referring to, "this Adidas stuff"?

11  A.  We had previously discussed the money about Adidas, and I

12  just wasn't feeling Adidas.  I didn't really want to deal with

13  Adidas like that.

14  Q.  Why didn't you want to deal with Adidas?

15  A.  I felt that -- I had a little animosity in the sense that

16  they had, I felt, slighted my son on a spot in the All-Star

17  Game, that they invited a lot guys and they didn't invite him,

18  and I thought he should have been invited.

19  Q.  Did there come a point when you and Tugs planned a visit to

20  Louisville?

21  A.  Yes.

22  Q.  When was the visit scheduled to occur?

23  A.  29th, I think.

24  Q.  May 29?

25  A.  Yes.

1    Q.  Do you remember what day of the week that was?

2    A.  Monday.  I'm pretty sure it was a Monday.

3              MR. DISKANT:  At this time, the government would

4    offer -- we haven't documented it, but pursuant to a

5    stipulation between the parties, what has been marked for

6    identification as Government Exhibit 58 and offer as an aid to

7    the jury Government Exhibit 58T.

8              THE COURT:  Hearing no objection, 58 is received, 58T

9    as well.

10             (Government's Exhibits 58 and 58T received in

11   evidence)

12             THE COURT:  Members of the jury, you will remember

13   it's the audio recording that is the evidence.  The transcript

14   is only an aid to you in listening.

15             MR. DISKANT:  If the Court would direct the jurors,

16   they should have a transcript binder.

17             THE COURT:  Yes.  You should have that binder, and

18   Government Exhibit 58T should be in it.

19             MR. DISKANT:  It will also be on your monitors, if

20   that is easier for you.

21             Ms. Lee, if we could publish that when you have a

22   moment.

23             THE COURT:  Are we all set?

24             MR. DISKANT:  We can come back to this, Judge.

25             THE COURT:  The stipulation covers the attribution?

1      MR. DISKANT:  Yes.

2      THE COURT:  So it's agreed that the caller is

3    defendant Jim Gatto.

4      MR. DISKANT:  We may be having a technology issue.  We

5    can probably come back to this particular call.

6      THE COURT:  It's about time someone other than I had

7    one.

8      (Audio played)

9      MR. DISKANT:  Just to be clear, that was a call dated

10   May 27, or a voice mail I should say, dated May 27, 2017, at

11   1:19 p.m., from Jim Gatto to the voice mail of Rick Pitino.

12   BY MR. DISKANT:

13   Q.  Mr. Bowen, we were talking about your visit to the

14   University of Louisville on May 29th of 2017.  Who paid for

15   that trip?

16   A.  Christian did.

17   Q.  Who attended?

18   A.  Myself and my son, of course, his mother, my son's friend

19   Nate, and Christian.

20   Q.  By Christian you mean Mr. Dawkins?

21   A.  Yes.

22   Q.  Had Mr. Dawkins attended any of your other unofficial

23   school visits?

24   A.  No.

25   Q.  Did he tell you why he wanted to attend this one?

1    A.  He said he knew him, him and Pitino were friends, and I am

2    sure he probably wanted to talk about the Adidas deal.

3              THE COURT:  Is that what he said to you or is that

4    what you're supposing?

5              THE WITNESS:  I can't recall exactly, but he went to

6    the meeting with us.

7              MR. DISKANT:  If we can show for the witness only what

8    has been marked for identification as Government Exhibit 1619.

9    Q.  Mr. Bowen, do you recognize this document?

10   A.  Yes.

11   Q.  Does it pertain to your son's unofficial visit to the

12   University of Louisville?

13   A.  Yes.

14             MR. DISKANT:  Government offers 1619.

15             THE COURT:  Received.

16             (Government's Exhibit 1619 received in evidence)

17             MR. DISKANT:  If we can publish that, Ms. Lee, and

18   turn to the second page.

19   Q.  Mr. Bowen, do you recall having meetings with

20   representatives from academics and nutrition and strength and

21   conditioning and the like during your unofficial visit?

22   A.  Yes.

23   Q.  While not reflected here, did you also meet with anyone

24   from admissions?

25   A.  Yes.

1  Q.  Then the final meeting is with Coach Pitino.  Do you see

2  that?

3  A.  Yes.

4  Q.  Who is present for the meeting with Coach Pitino?

5  A.  The same people in the visit.  Myself, Carrie, Tugs, of

6  course, Christian and Nate and Coach Pitino.

7  Q.  Focusing on yourself and Mr. Dawkins and Mr. Pitino, what

8  did each of you say during this meeting, to the best you can

9  recall?

10  A.  Just kind of talked basketball, you know, how Tugs would

11  fit in and, you know -- kind of the same things, what he would

12  do with him as a player, how he can get him ready for the next

13  level basically.

14  Q.  During all of your meetings on campus that day, what, if

15  anything, did you say to any university employee about your

16  plan to accept money from Adidas in connection with your son's

17  decision to attend Louisville?

18  A.  Nothing.

19  Q.  During these meetings, what, if anything, did you hear Mr.

20  Dawkins say about that subject?

21  A.  I didn't hear him say anything.

22  Q.  You said, I didn't hear him say anything?

23  A.  I didn't.

24  Q.  The unofficial visit was May 29.  Did Tugs make a decision

25  on that day?

1    A.   No.

2    Q.   Did there come a point where Tugs made the decision to

3    attend the University of Louisville?

4    A.   Yeah.  The 1st of June.

5    Q.   Did Tugs publicly announce the decision at that time?

6    A.   No, he didn't.

7    Q.   Why not?

8    A.   As I recall, Christian told us to wait on the

9    decision -- on announcing it, actually.

10            MR. DISKANT:  If we can bring up for the witness only

11   what has been marked for identification as Government Exhibit

12   106D-12.

13   Q.   Mr. Bowen, do you recognize this chain?

14   A.   Yes.

15   Q.   This is a chain between you and Mr. Dawkins spanning May 25

16   to June 1 of 2017?

17   A.   Yes.

18            MR. DISKANT:  Government offers 106D-12.

19            THE COURT:  Received.

20            (Government's Exhibit 106D-12 received in evidence)

21   Q.   Mr. Bowen, you mentioned that your son made his decision to

22   attend the university on June 1st?

23   A.   Yes.

24   Q.   And just to orient us, Mr. Dawkins's texts are on the left

25   here?

1    A.  Yes.

2    Q.  June 1, 9:02 a.m., Mr. Dawkins writes, "Make sure Tugs

3    doesn't announce yet.  I have got to talk to you about that."

4           Do you see that?

5    A.  Yes.

6           MR. DISKANT:  Your Honor, pursuant to the same

7    yet-to-be-committed-to-writing stipulation, the government

8    would now like to offer and play Government Exhibit 59, and

9    offer as an aid to the jury Government Exhibit 59T, which is a

10   transcript.

11          MR. SCHACHTER:  No objection.

12          THE COURT:  All right.  And it covers the

13   attributions, does it?

14          MR. DISKANT:  It does.  As well as the date and time

15   of the call.

16          THE COURT:  Members of the jury, turn to Government

17   Exhibit 59T in your binders.

18          THE COURT:  Agreed that it is a voice mail recorded

19   June 1, 2017.

20          MR. DISKANT:  It's from Jim Gatto to the voice mail of

21   Rick Pitino.

22          THE COURT:  If I didn't receive those exhibits, I do

23   so now.

24          (Government's Exhibits 59 and 59T received in

25   evidence)

1           (Audio played)

2     BY MR. DISKANT:

3     Q.   Just remind us, Mr. Bowen, as of June 1st, the date of this

4     call, had Tugs publicly announced his decision to attend the

5     University of Louisville?

6     A.   No.

7     Q.   Remind us, when did he announce?

8     A.   June 3rd.

9           MR. DISKANT:  If we can show for the witness only what

10    has been marked for identification as Government Exhibit

11    106D-13.

12    Q.   Do you recognize this chain?

13    A.   Yes, I do.

14    Q.   It's between you and Mr. Dawkins?

15    A.   Yes.

16    Q.   From the dates June 2nd through June 3rd of 2017?

17    A.   Yes.

18          MR. DISKANT:  Government offers 106D-13.

19          THE COURT:  Received.

20          (Government's Exhibit 106D-13 received in evidence)

21          MR. DISKANT:  Ms. Lee, if we could publish.

22          THE COURT:  Yes.

23    Q.   So, Mr. Bowen, again you're on the right and Mr. Dawkins is

24    on the left?

25    A.   Yes.

1    Q.  And up top you write, "Yo, call me."

2            Do you see that?

3    A.  Yes, I do.

4    Q.  And Mr. Dawkins responds, "Give me two secs with Adidas."

5            Do you see that?

6    A.  Yes.

7    Q.  During this time period, did you have a subsequent

8    conversation with Mr. Dawkins about the deal with Adidas?

9    A.  Yes.

10   Q.  During that subsequent conversation, did Mr. Dawkins

11   provide additional information about a payment from Adidas?

12   A.  Yes.

13   Q.  Did he give you a number?

14   A.  Yes, he did.

15   Q.  What number did he tell you you would receive?

16   A.  At that point, 100,000.

17   Q.  And remind us, when you and Mr. Dawkins had initially

18   spoken about this subject, about a week or ten days earlier,

19   how much money were you and Mr. Dawkins talking about at that

20   time?

21   A.  Like 80,000, 60 to 80,000.

22   Q.  Did Mr. Dawkins indicate why the number had risen from 60

23   to 80,000 to 100,000?

24   A.  There was a player kind of similar to my son, I guess that

25   went to an Adidas school, Kansas, Billy Preston, and he had

1   gotten 100,000.

2   Q.  You said that player was Billy Preston?

3   A.  Yes.

4   Q.  Did Mr. Dawkins indicate to you whether you would get all

5   of the money at once?

6   A.  Yes, he did.  He indicated it would be payments,

7   installments.

8   Q.  Of how much?

9   A.  Four installments.  So that would be 25,000.

10  Q.  Did Mr. Dawkins indicate who at Adidas he had been

11  communicating with on this issue?

12  A.  Like the big guy, Gatto, Jim Gatto, James Gatto.

13  Q.  Did you know James or Jim Gatto?

14  A.  I had met him a couple of times on occasion, on the

15  circuit.  You can only meet somebody once, but I have seen him

16  a couple of times.

17  Q.  You have used "the circuit" a couple of times during your

18  testimony today.  What are you referring to?

19  A.  Like what I was explaining about the AAU teams go and play

20  or shoot for a brand shoe team.

21  Q.  So you had seen Mr. Gatto at various circuit events, is

22  what you said?

23  A.  A couple of times I had.

24  Q.  Had you ever talked with Mr. Gatto about money?

25  A.  No.

1    Q.  And in this conversation with Mr. Dawkins about the offer,

2    did he indicate how you should describe the payments from

3    Adidas to others?

4    A.  As a consultant; I would be a consultant.

5    Q.  You would be a consultant?

6    A.  Yes.

7    Q.  Were you actually a consultant for Adidas?

8    A.  No.

9    Q.  Did you ever do any consulting work for Adidas?

10   A.  No.

11   Q.  Did you ever have a conversation with anyone at Adidas

12   about being a consultant?

13   A.  No.

14         MR. DISKANT:  I am about to move on to another

15   substantial chunk, if this might be a convenient time.

16         THE COURT:  It would be.

17         Members of the jury, Tuesday morning at 9:30.

18         Before everybody gets up, I have another brief matter

19   that I have to take promptly.  So as soon as the jury and the

20   witness leave, just clear the front table, not all your stuff,

21   just step back so I can handle it, and it shouldn't take very

22   long.  Thank you.

23         The other matter isn't here yet.  So we will break as

24   far as this case is concerned, unless counsel need me before we

25   break for the day.

1            OK.  Have a good weekend, everybody.

2            (Jury exits courtroom)

3            (Adjourned to October 8, 2018, at 9:30 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2    Examination of:                          Page

3     JOHN CARNS

4    Direct By Mr. Diskant . . . . . . . . . . . 383

5    Cross By Mr. Schachter . . . . . . . . . . 410

6    Cross By Mr. Haney . . . . . . . . . . . . 507

7    Redirect By Mr. Diskant  . . . . . . . . . 514

8    Recross By Mr. Schachter . . . . . . . . . 520

9     BRIAN BOWEN SENIOR

10   Direct By Mr. Diskant . . . . . . . . . . . 522

11                  GOVERNMENT EXHIBITS

12   Exhibit No.                            Received

13    1607   . . . . . . . . . . . . . . . . . 387

14    1609   . . . . . . . . . . . . . . . . . 392

15    1603   . . . . . . . . . . . . . . . . . 395

16    1616B  . . . . . . . . . . . . . . . . . 498

17    1616A  . . . . . . . . . . . . . . . . . 500

18    407, 409, 403 and 401  . . . . . . . . . 541

19    S3   . . . . . . . . . . . . . . . . . . 543

20    311  . . . . . . . . . . . . . . . . . . 544

21    106D-1  . . . . . . . . . . . . . . . . . 548

22    106D-7  . . . . . . . . . . . . . . . . . 559

23    106D-24  . . . . . . . . . . . . . . . . 561

24    106D-6 and 106D-10 . . . . . . . . . . . 563

25    106D-11  . . . . . . . . . . . . . . . . 568

1    106-A  . . . . . . . . . . . . . . . . 569

2    58 and 58T . . . . . . . . . . . . . . 571

3    1619   . . . . . . . . . . . . . . . . 573

4    106D-12  . . . . . . . . . . . . . . . 575

5    59 and 59T . . . . . . . . . . . . . . 576

6    106D-13  . . . . . . . . . . . . . . . 577

7                    DEFENDANT EXHIBITS

8    Exhibit No.                          Received

9    1627   . . . . . . . . . . . . . . . . 460

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25