Ia9dgat1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                              17 Cr. 686 (LAK)

5  JAMES GATTO, a/k/a "Jim,"
   MERL CODE,
6  CHRISTIAN DAWKINS,

7              Defendants.

8  ------------------------------x

9                                          October 9, 2018
                                           10:04 a.m.
10

   Before:
11              HON. LEWIS A. KAPLAN,

12                                         District Judge
                                             and a Jury
13

14                    APPEARANCES

15 ROBERT S. KHUZAMI
        Acting United States Attorney for the
16      Southern District of New York
   BY:  EDWARD B. DISKANT
17      NOAH D. SOLOWIEJCZYK
        ALINE R. FLODR
18      ELI J. MARK
        Assistant United States Attorneys
19

   WILLKIE FARR & GALLAGHER LLP
20      Attorneys for Defendant Gatto
   BY:  MICHAEL S. SCHACHTER
21      CASEY E. DONNELLY

22

23

24

25

Ia9dgat1

1                          APPEARANCES (Cont'd)

2    NEXSEN PRUET LLC
            Attorneys for Defendant Code
3    BY:  MARK C. MOORE
                -and-
4    MERL F. CODE

5    HANEY LAW GROUP PLLC
            Attorneys for Defendant Dawkins
6    BY:  STEVEN A. HANEY

7

8    Also present:  SONYA JACOBS, Paralegal
                    SYLVIA LEE, Paralegal
9                   ANTHONY CASOLA, FBI

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Jury not present)

2        THE COURT:  Good morning, everybody.

3        I gather you have something you want to raise while we

4   wait for the juror to get here from the fender-bender on the

5   way?

6        MR. DISKANT:  We do, your Honor.  So, following the

7   cross-examination of Mr. Carns, the University of Louisville

8   compliance staff member, last week, the parties conferred on

9   the issue that Mr. Schachter had tried to explore on

10  cross-examination regarding the distinction, if any, between

11  the University of Louisville and the University of Louisville

12  Athletic Association.  We have drafted a proposed stipulation,

13  which I can hand up, if the Court would like to take a look.

14       THE COURT:  OK.

15       MR. DISKANT:  And the parties -- Mr. Schachter and I

16  have spent a great deal of time immersing ourselves in the

17  corporation documents.  I think the parties are in agreement

18  about enough facts to come to a stipulation.  The government's

19  position, however, remains that notwithstanding agreement on

20  facts, these are issues that under 403 should be precluded,

21  because for all intents and purposes, the ULAA is the

22  University of Louisville.  The distinction is a fine one that

23  turns on niceties of corporate law that really have nothing to

24  do with this case.  And so the risk of undue prejudice and

25  confusion of the issues we believe substantially outweigh any

1    probative value of this information.

2            THE COURT:  So is this stipulation that you've just

3    handed me actually agreed between the parties?

4            MR. DISKANT:  The facts are.  And basically where the

5    parties have landed on this is that the parties agree to the

6    facts set forth in the stipulation, and the government has

7    reserved the right to make the 403 argument to your Honor.

8            THE COURT:  OK.  So have you both signed it?

9            MR. DISKANT:  We can.  We can do that right now.

10           THE COURT:  Good plan.

11           (Pause)

12           THE COURT:  Let me take a minute to read it.

13           (Pause)

14           OK.  What is your objection?

15           MR. DISKANT:  Our objection is that we're not -- and

16   it may make sense to have Mr. Schachter articulate the argument

17   he intends to make because I don't want to mischaracterize his

18   position, but I think there may be some argument along the

19   lines that the University of Louisville didn't actually suffer

20   a loss here because the scholarships are funded by the

21   University of Louisville Athletic Association.  And we believe

22   that that is a distinction without a difference, and there are

23   certainly facts from this stipulation from which we could make

24   that argument to the jury, among them being that the ULAA

25   exists exclusively for the benefit of the University of

1    Louisville, the University of Louisville president controls,

2    the University of Louisville Athletic Association -- in fact,

3    the University of Louisville's annual audited financial

4    statements includes the finances of the ULAA, reflecting the

5    fact that they are, for all intents and purposes, one and the

6    same.  We just don't believe we need to waste the jury's time

7    or potentially confuse them with these issues.

8            THE COURT:  Mr. Schachter.

9            MR. SCHACHTER:  Your Honor, we do believe it is

10   relevant that the victim charged in the Indictment in fact did

11   not suffer harm.  The government elicited from Mr. Carns the

12   cost of education that was borne by the University of

13   Louisville.  We think that it is 401 relevant for the jury to

14   be able to hear that in fact the University of Louisville did

15   not ultimately bear that cost.  The Second Circuit, in a case

16   called United States v. Heiman, H-e-i-m-a-n --

17           THE COURT:  Before we get to that, where in this

18   stipulation does that assertion appear, that the University did

19   not bear any cost?

20           MR. SCHACHTER:  In paragraph 5, your Honor.  It is the

21   last sentence.

22           THE COURT:  But that doesn't say what you say it says.

23           MR. SCHACHTER:  No.  Your Honor, what I believe it

24   says -- and it was carefully word smithed with us and the

25   government -- is that the University of Louisville Athletic

Association pays to fund the athletic scholarships for all

University of Louisville student-athletes.  In other words, the

University of Louisville does not pay the cost of scholarships

for its student-athletes.  That is paid for by the University

of Louisville Athletic Association.

THE COURT:  If you and I chip in money to help

somebody buy a car and we chip in half the cost and the person

who buys the car pays the rest, the following statement would

be totally accurate.  You and I paid X dollars to fund the

purchase of the car.  Right?

MR. SCHACHTER:  Yes.

THE COURT:  So the statement that you are relying on

for the proposition that the University of Louisville bore no

cost doesn't say that.  What it says is the Athletic

Association paid money to fund.  It doesn't say it paid all the

money to fund.

MR. SCHACHTER:  I'm sorry, your Honor.  I wasn't

clear.  So it says, during the same period, the University of

Louisville Athletic Association paid that $15 million to fund

athletic scholarships for all University of Louisville

student-athletes.  So the entirety of the cost was borne --

THE COURT:  Totally consistent with the view that they

made a contribution toward the cost of all of the

student-athletes.  It could have been one percent.  It could

have been a hundred percent.  It could have been anywhere in

1    between.  Right?  It is a matter of the English language.

2         MR. SCHACHTER:  Your Honor, I think that the

3    government and we were attempting to write this stipulation to

4    say that it covers all.  Just by way of background, there was a

5    an additional sentence in the stipulation which discussed the

6    amount of money that the University of Louisville pays to cover

7    the cost of the scholarship that's actually less than the

8    amount that they received from the University of Louisville

9    Athletic Association.

10        THE COURT:  But the stipulation you signed is not the

11   one you are telling me about.

12        MR. SCHACHTER:  Well, your Honor, in -- we believe --

13   the government urged that the last sentence accomplish the same

14   thing that we were suggesting, and I tend to agree.  Maybe your

15   Honor disagrees.  But I thought --

16        THE COURT:  All I am doing is reading the words on the

17   piece of paper.

18        MR. SCHACHTER:  What was intended -- and perhaps it is

19   insufficiently clear and we can revise the stipulation and

20   present that for the court's consideration --

21        THE COURT:  I don't know if there is a disagreement

22   yet.

23        MR. DISKANT:  There isn't, your Honor.

24        THE COURT:  There is or there is not?

25        MR. DISKANT:  There is not.  I think the government

Ia9dgat1

1    would agree that for bookkeeping matters both the costs

2    generally associated with the athletic program, including the

3    scholarships and the revenues generated from the athletic

4    program, including all of the financial benefits of having an

5    athletic program, are accounted for on the ULAA books.

6            THE COURT:  That's not exactly a direct response to

7    Mr. Schachter's proposition.

8            MR. DISKANT:  That is true, your Honor.  And I don't

9    have firsthand knowledge, and my guess is Mr. Schachter doesn't

10   either, of whether or not all of the costs attendant from

11   having a student on campus are borne out of the ULAA budget.

12   That is absolutely true.

13           THE COURT:  So we don't have anything other than the

14   agreement on the piece of paper at the moment.  Maybe you will

15   get there.

16           MR. SCHACHTER:  We will submit an additional

17   stipulation for your Honor's consideration.

18           THE COURT:  . OK.  Anything else?

19           OK.  We don't know where the juror is at the moment,

20   although Andy seems to have a tracker on her car.  We are

21   getting frequent updates.

22           All right.  I will see you when we have a jury.

23           THE CLERK:  All rise.

24           (Recess)

25           (Continued on next page)

1              (Jury not present)

2              THE COURT:  OK.  Let's get the jury.

3              (Jury present)

4              THE CLERK:  Jury entering.

5              THE COURT:  Good morning, everyone.  I hope you all

6      had a good weekend.

7              The jurors are all present.  The defendants are

8      present.

9              Mr. Bowen, you are still under oath.

10             As soon as everyone is seated, you may continue,

11     Mr. Diskant.

12             MR. DISKANT:  All right.  Thank you, your Honor.

13      BRIAN BOWEN, Sr.,

14         resumed, and testified further as follows:

15     DIRECT EXAMINATION (resumed)

16     BY MR. DISKANT:

17     Q.  Good morning, Mr. Bowen.

18     A.  Good morning.

19     Q.  When we left off last week, we were talking about a

20     hundred-thousand-dollar offer that you had received from

21     Adidas.  Can you just remind us, who had relayed that offer to

22     you?

23     A.  Christian Dawkins.

24     Q.  And had Christian indicated to you with whom at Adidas he

25     was working with on that deal?

1   A.  Gatto, James Gatto.

2   Q.  Who is Mr. Gatto?

3   A.  He is an Adidas executive, I guess.

4   Q.  Why was Adidas making this offer to you?

5           MR. SCHACHTER:  Objection.

6           THE COURT:  Sustained as to form.

7   Q.  Did Mr. Dawkins tell you why Adidas was willing to pay you

8   money?

9   A.  My son was a top prospect, and they wanted him to go to,

10  you know, an Adidas school.

11  Q.  Which Adidas school did your son end up attending?

12  A.  Louisville.

13  Q.  In connection with your son's decision to attend the

14  University of Louisville, did he have to provide certain

15  information about himself to the NCAA?

16  A.  Yes, of course.

17  Q.  Did he have to provide information about himself to the

18  University of Louisville?

19  A.  Yes.

20  Q.  How do you know that?

21  A.  I dealt with the college process before and I saw some of

22  the paper work.

23  Q.  The paperwork your son completed?

24  A.  Yes, some of it.

25  Q.  To your knowledge, was your son required to provide

1    information about his status as an amateur?

2                MR. SCHACHTER:  Objection.

3                THE COURT:  Let's work on the foundation a bit.

4    Q.  Your Honor -- Mr. Bowen, you said just a moment ago that

5    through your prior experiences you are familiar with the types

6    of information that a student provides to the NCAA?

7    A.  Yes.

8    Q.  And I believe you also said that you saw some of the forms

9    and paperwork that your son completed?

10   A.  Yes.

11   Q.  OK.  Through that experience and through your own

12   observation of the forms he saw, do you know whether or not

13   your son was required to provide information about his status

14   as an amateur?

15               MR. SCHACHTER:  Objection, your Honor.  Lack of

16   foundation.  Best evidence.

17               THE COURT:  Overruled.

18   Q.  Do you know, Mr. Bowen?

19   A.  Yes.

20   Q.  Yes, he was?

21   A.  Yes.

22   Q.  Were those representations accurate?

23               MR. SCHACHTER:  Objection.

24               THE COURT:  Let's wind down to something specific

25   please.

1    Q.  Did your son represent to the University of Louisville and

2    the NCAA that he was an amateur?

3              MR. SCHACHTER:  Objection.

4              THE COURT:  Mr. Bowen, did you see any piece of paper

5    that your son filled out or signed that discussed the question

6    of whether he was an amateur?

7              THE WITNESS:  Yes.

8              THE COURT:  And was that a paper for the University of

9    Louisville?

10             THE WITNESS:  Yes.

11             THE COURT:  Proceed, counselor.

12   BY MR. DISKANT:

13   Q.  And just to add to that, Mr. Bowen, did you see any

14   documents or online forms involving the NCAA?

15   A.  Yes.

16   Q.  And did those forms ask questions about his status as an

17   amateur?

18   A.  Yes.

19   Q.  Were the answers that your son provided to those questions

20   accurate?

21             MR. SCHACHTER:  Objection.

22             THE COURT:  Overruled.

23   A.  No.

24   Q.  Why not?

25   A.  Because of my involvement in the money scheme.

1    Q.  Mr. Bowen, at any point did you personally disclose to the

2    University of Louisville that you had agreed to accept money

3    from Adidas?

4    A.  No.

5    Q.  Why not?

6    A.  I didn't want my son to lose his scholarship.

7    Q.  Was that scholarship of value to you?

8    A.  Of course it was, yes.

9    Q.  Why?

10   A.  A scholarship from a Division I school with everything

11   included, that could be, like, worth a couple of hundred

12   thousand dollars.

13   Q.  At the time, did you and your partner have the ability to

14   afford college without financial aid?

15   A.  No.  Not like that, no.

16   Q.  And in terms of your son's professional development, what

17   was the significance of attending an NCAA school?

18            THE COURT:  If any?

19   Q.  If any?

20   A.  Well, a Division I school, that is a major proving ground

21   and that is like the next step to his ultimate goal of being,

22   like, in the NBA.

23   Q.  What, if anything, did you tell your son about your

24   agreement to accept a hundred thousand dollars from Adidas?

25   A.  Nothing.

1    Q.  Why not?

2    A.  I wouldn't want him to be involved in something that's

3    wrong.

4    Q.  How about your partner, Ms. Malecke, what, if anything, did

5    you tell her about your agreement to receive money from Adidas?

6    A.  Nothing.

7    Q.  Mr. Bowen, we talked very briefly on Thursday about the

8    date, September 26, 2017, when you told us the FBI came to

9    visit you.  Do you recall that?

10   A.  Yes.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  At the time did you have an attorney with you?

2   A.  No.

3   Q.  Did the FBI ask you questions?

4   A.  Yes.

5   Q.  What sorts of questions did the FBI ask you?

6   A.  They asked me about my knowledge or involvement in a

7   $100,000 scheme for my son to go to the University of

8   Louisville.

9   Q.  How did you initially respond to those answers, or

10  questions?

11  A.  I denied any knowledge of it.

12  Q.  Was that true?

13  A.  No.

14  Q.  Did there come a point during that interview when the FBI

15  agents played an audio recording for you?

16  A.  Yes.

17  Q.  Was your voice on that recording?

18  A.  Yes.

19  Q.  After hearing the recording, did you make any additional

20  statements?

21  A.  Yes.

22  Q.  What did you say?

23  A.  I acknowledged that you knew about it, my voice was there.

24  Q.  During that conversation, did the FBI ask you about other

25  subjects?

1   A.  Yes, of course.

2   Q.  Did the subject of whether or not you had received offers

3   from other schools come up?

4   A.  Yes, that came up.

5   Q.  What did you say?

6   A.  I didn't really make acknowledgment of really knowing what

7   was offered, basically.

8   Q.  Was that true?

9   A.  No.

10  Q.  Did the FBI ask you about someone named Kenny Johnson?

11  A.  Yes.

12  Q.  Who is Kenny Johnson?

13  A.  Louisville assistant coach.

14  Q.  What did you say about Kenny Johnson?

15  A.  They asked me if he gave me money, and I said no.

16  Q.  Was that true?

17  A.  No.

18  Q.  Did the subject of receiving money from Christian Dawkins

19  come up?

20  A.  Yes.

21  Q.  What did the FBI ask you about that?

22  A.  They asked me about certain amounts of money that I had

23  received, if I had received money from him, and I basically

24  said no.

25  Q.  Was that truthful?

1   A.  No.

2   Q.  With respect to each of these issues, why were you not

3   truthful in your answers?

4   A.  The FBI was there.  I didn't want to get anybody in

5   trouble.  I didn't want to get myself in trouble, and I

6   definitely didn't want my son to lose his college eligibility.

7   Q.  Did there come a point in September when you spoke to the

8   FBI agents who had interviewed you again?

9   A.  Yes.

10  Q.  Was that in person or by phone?

11  A.  By phone.

12  Q.  Who initiated the call?

13  A.  I did.

14  Q.  Why did you call the agents?

15  A.  I knew I had deceived Louisville and there was a lot of

16  stuff going on and I wanted to just try to clear some things

17  up, I guess, before I did any more damage, try to save my son's

18  scholarship and not hurt anybody else.

19  Q.  In this followup call in September of 2017, were you

20  entirely truthful?

21  A.  No.

22  Q.  What did you say that was not truthful?

23  A.  Just like, I said I hadn't received any money from Kenny

24  Johnson, I believe, as I recall.  I told them I felt like we

25  were like the victims.

1   Q.   Is that true?

2   A.   I still think my son is a victim, and I always will, but I

3   can't say I was a victim at this point.

4   Q.   Since September of 2017, have you retained counsel?

5   A.   Yes.

6   Q.   Since retaining counsel, have you met with the government?

7   A.   Yes, I have.

8   Q.   When was the first time you met with the government?

9   A.   Sometime probably in January, I imagine.

10  Q.   January of 2018?

11  A.   Yes.

12  Q.   Why did you meet with the government in January of 2018?

13  A.   I mean after retaining my counsel, I mean under their

14  advice and just from all the things that had been going on, I

15  just felt -- I just had to come pretty much clean.

16  Q.   How many times have you met with the government since then?

17  A.   I don't know.  Several.

18  Q.   What sorts of subjects have you discussed in those

19  meetings?

20  A.   The case, of course.  The case.

21  Q.   You mentioned that one of the things you wanted to do was

22  come clean.  In your meetings with the government, have you

23  been truthful?

24  A.   Yes.

25            MR. DISKANT:  Ms. Lee, if we can bring up only for the

1  witness and for counsel what has been marked for identification

2  as Government Exhibit 2002.

3  Q.  Mr. Bowen, you should also have this in a binder in front

4  of you.

5          Do you recognize this document?

6  A.  Yes, I do.

7  Q.  What do you recognize it to be?

8  A.  It has my name on it.  It's an agreement between myself and

9  the U.S. government.

10 Q.  And if we can turn to the last page of the document.

11         Mr. Bowen, did you sign this agreement?

12 A.  Yes, I did.

13 Q.  Who else signed it?

14 A.  One of my attorneys and the U.S. government attorneys.

15 Q.  Prior to signing the agreement, Mr. Bowen, did you review

16 it?

17 A.  Yes, of course.

18 Q.  Did you understand it?

19 A.  Yes.

20 Q.  In this document, what do you agree to do?

21 A.  The main thing is I agree to testify truthfully.

22 Q.  Focusing on your finances, does this agreement impose any

23 requirements in that respect?

24 A.  Yes, it does.

25 Q.  What are those?

1    A.  I have to pay back the 25,000, of course, that I received.

2    I have to make some adjustments to my taxes.

3    Q.  Focusing on your taxes, have you made those adjustments to

4    your taxes?

5    A.  I am in the process of doing that now.

6    Q.  With respect to the repayment of money, have you done that?

7    A.  I have come up with a financial arrangement with the

8    government to pay them back on a monthly basis.

9    Q.  Have you started making those payments?

10   A.  Yes.

11   Q.  If you comply with your obligations under this agreement,

12   what is your understanding of what the government will or will

13   not do in return?

14   A.  It won't prosecute me.

15   Q.  Not prosecute you for what?

16   A.  For my involvement in the money scheme and the other -- and

17   the other stuff.

18   Q.  Focusing on the other stuff, as part of your cooperation

19   with the government have you been required to disclose your

20   involvement in other wrongdoing?

21   A.  Yes.

22   Q.  What have you disclosed to the government?

23   A.  I received -- I didn't receive.  I bought a couple of SNAP

24   cards from a couple of people in this time frame between '09

25   and '17.

1   Q.  What is a SNAP card?

2   A.  It's a food stamp card.

3   Q.  You mentioned that you bought it?

4   A.  I had to give the person money.

5   Q.  And you gave him cash?

6   A.  Yes.

7   Q.  Were you allowed to do that?

8   A.  No.

9   Q.  Does this agreement cover that conduct as well?

10  A.  Yes.

11  Q.  What happens if you lie, Mr. Bowen?

12  A.  I will be prosecuted.

13  Q.  To your understanding does the outcome of this trial have

14  any impact on you or on this agreement?

15  A.  No.

16          MR. DISKANT:  The government offers Government Exhibit

17  2002.

18          THE COURT:  Received.

19          (Government's Exhibit 2002 received in evidence)

20          MR. DISKANT:  With the court's permission, if we can

21  publish this.

22          THE COURT:  Sure.

23          MR. DISKANT:  Ms. Lee, if we can zoom in on the first

24  paragraph.

25  BY MR. DISKANT:

1    Q.  Mr. Bowen, I just want to focus your attention on the very

2    last clause of the first paragraph in which it says, "Bowen has

3    previously acknowledged and hereby affirms that he engaged in

4    the scheme in order to obtain something of value for his son

5    and his family, namely, a college scholarship, under false

6    pretenses, and he understood at the time he engaged in the

7    scheme that the university would be misled, and that he knew

8    that what he was doing was wrong and illegal."

9              Do you see that?

10   A.  Yes, I do.

11   Q.  Can you tell us in your own words what it is you did that

12   was wrong?

13   A.  I had certified that my son was basically an amateur

14   athlete and he wasn't basically.

15   Q.  You mentioned that you certified.  Did you ever personally

16   make a certification to the university?

17   A.  What do you mean?

18   Q.  Did you ever sign anything with the university?

19   A.  I didn't sign it.

20   Q.  Who did?

21   A.  My son and his mom did.

22             MR. DISKANT:  We can take that down.

23   Q.  How did you typically communicate with Mr. Dawkins?

24   A.  By phone.

25   Q.  How many phones did you use?

1    A.   Two phones.

2    Q.   Why did you have two phones?

3    A.   Well, one phone I had basically wasn't connected to my name

4    and the other phone was.

5    Q.   Focusing on the phone that wasn't connected to your name,

6    did you have a particular term for that phone?

7    A.   Like a bat phone.

8    Q.   Why did you call it a bat phone?

9    A.   It's just -- that's just a term, slang.

10   Q.   What sorts of subjects did you discuss with Mr. Dawkins on

11   your bat phone?

12   A.   Stuff like the Adidas deal.

13   Q.   Why did you use your bat phone to discuss those subjects?

14   A.   Because it wasn't connected to my name.  There is no -- I

15   mean, if you're doing something wrong, you don't want to be

16   connected to your name.

17   Q.   How many phones did Mr. Dawkins have?

18   A.   I guess at least two.

19   Q.   Did Mr. Dawkins tell you why he had multiple phones?

20   A.   No.  I mean I just kind of know.  The same reason I had

21   one.

22   Q.   Mr. Bowen, I am having some difficulty hearing you.  If you

23   could try to keep your voice up, I would appreciate it.

24   A.   I said no.  The same reason I had one.

25   Q.   Do you still have your bat phone?

1    A.  No.

2    Q.  Why not?

3    A.  I threw it away.

4    Q.  When did you throw it away?

5    A.  September 26.

6    Q.  The same day the FBI visited you?

7    A.  Yeah.

8    Q.  Did you throw away the bat phone before or after the FBI

9    visited you?

10   A.  After.

11   Q.  Did the FBI agents give you a subpoena?

12   A.  Yes, they did.

13   Q.  Did it call for your communications with Mr. Dawkins?

14   A.  Yes.

15   Q.  Do you remember the phone number for your bat phone?

16   A.  No.  I never memorized it.

17          MR. DISKANT:  Ms. Lee, if we can bring up for the

18   witness only, or, Mr. Bowen, if you would prefer to turn in

19   your book to what has been marked for identification as

20   Government Exhibit 106D-5.

21   Q.  Mr. Bowen, do you recognize this chain?

22   A.  Yes.

23   Q.  This is a chain between you and Mr. Dawkins dated April 9,

24   2017?

25   A.  Yes.

1          MR. DISKANT:  Government offers Government Exhibit

2     106D-5.

3          THE COURT:  Received.

4          (Government's Exhibit 106D-5 received in evidence)

5          MR. DISKANT:  If we can publish this.

6          THE COURT:  Yes.

7     BY MR. DISKANT:

8     Q.  So, Mr. Bowen, up at the top, top right, you wrote, "Hey, I

9     just hit you on your other."

10         And Mr. Dawkins responds, "On a plane to Vegas."

11         Do you see that?

12    A.  Yes.

13    Q.  What were you referring to when you wrote, "Hey, I just hit

14    you on your other"?

15    A.  The other phone, the bat phone.

16         MR. DISKANT:  If we can bring up what has been marked

17    for identification only as Government Exhibit 106D-14 just for

18    the witness.

19    Q.  Mr. Bowen, do you recognize this chain?

20    A.  Yes.

21    Q.  This is a chain between you and Mr. Dawkins dated June 12,

22    2017?

23    A.  Yes.

24         MR. DISKANT:  Government offers Government Exhibit

25    106D-14.

1          THE COURT:  Received.

2          (Government's Exhibit 106D-14 received in evidence)

3          MR. DISKANT:  With the court's permission if we could

4    publish that.

5          THE COURT:  Yes.

6    BY MR. DISKANT:

7    Q.  Mr. Bowen, you write, "Hey check your other joint."

8          And Mr. Dawkins replies, "Got it.  Call you in the

9    a.m."

10          What are you referring to by "your other joint?"

11   A.  The bat phone.

12   Q.  So just to be clear, Mr. Dawkins had a bat phone as well?

13   A.  Yes.

14   Q.  As of this time period, as of the middle of June of 2017,

15   where were you living?

16   A.  In Louisville, Kentucky.

17   Q.  Why were you living in Louisville?

18   A.  Went down to support my son, so I can see the games.

19   Q.  How was the transition?

20   A.  Kind of rough at first.

21   Q.  Can you tell us a little bit more about that.  Why was it

22   rough?

23   A.  We were trying to find a place and staying in a hotel and

24   weren't getting much help in.  It was a new area.

25   Q.  Where in Louisville did you end up living?

1    A.   In the Galt House.

2    Q.   What is the Galt House?

3    A.   It's a hotel that has like apartments in it.

4    Q.   Where is the Galt House located?

5    A.   It's in downtown Louisville.

6    Q.   How much was the rent at the Galt House?

7    A.   2300.

8    Q.   How did you intend to cover that monthly rent payment?

9    A.   With some of the money I was getting from Christian.

10   Q.   By some of the money you were getting from Christian, are

11   you referring to the money from Adidas or to something else?

12   A.   That would be some of it, but basically other money,

13   $2,000.

14   Q.   Had you and Mr. Dawkins had a conversation about other

15   money?

16   A.   Yes.

17   Q.   What did he say to you and what did you say to him?

18   A.   He told me that as far as money was concerned that Coach

19   Kenny Johnson would be giving me a couple thousand dollars for

20   rent.

21   Q.   We are going to get there in just a moment.

22            To be clear, that would be money in addition to the

23   money from Adidas or part of it?

24   A.   In addition.

25            MR. DISKANT:  If we can bring up for the witness only

1   what has been marked for identification as Government Exhibit

2   106D-16.

3   Q.  Mr. Bowen, do you recognize this chain?

4   A.  Yes.

5   Q.  You can look at it in hard copy in a binder in front of you

6   if that's easier.

7   A.  Yes.

8   Q.  Is this a chain between you and Mr. Dawkins dated June 16

9   through June 17 of 2017?

10  A.  Yes.

11          MR. DISKANT:  Government offers 106D-16.

12          THE COURT:  Received.

13          (Government's Exhibit 106D-16 received in evidence)

14          MR. DISKANT:  With the court's permission, if we could

15  publish this for the jury.

16          THE COURT:  Yes.

17  BY MR. DISKANT:

18  Q.  Mr. Bowen, starting up top, you write, "Man, this program

19  sucks.  There is no family atmosphere here."

20          What are you referring to?

21  A.  The Louisville program.

22  Q.  You mentioned a few moments ago that the transition had not

23  been easy.  Was this during that same time period?

24  A.  Yes.

25  Q.  And Mr. Dawkins responds, "I will talk to Rick tomorrow."

1          Who is Rick?

2     A.   Coach Pitino.

3          MR. DISKANT:  Ms. Lee, if we can scroll down a little

4     bit.

5     Q.   You then write, "I left Pitino a message this morning."

6          Do you see that?

7     A.   Yes.

8     Q.   Did you have a conversation with Mr. Pitino during this

9     time period?

10    A.   No, I didn't talk to him.

11    Q.   So you left him a message but never connected?

12    A.   Yeah.

13    Q.   Then zooming down to the bottom of this chain, the last

14    three or four exchanges, you write, "Hit me on my joint when

15    you're free, the bat."

16         Mr. Dawkins says, "OK, hit you in a few."

17         Remind us, what sorts of subjects did you use your bat

18    phone to discuss?

19    A.   Subjects that -- well, stuff that wasn't right, like

20    $100,000, stuff like that.

21         MR. DISKANT:  If we can bring up for the witness what

22    is marked for identification only 106D-17.

23    Q.   Mr. Bowen, do you recognize this chain?

24    A.   Yes.

25    Q.   Who is it between?

1   A.  Myself and Christian.

2   Q.  Mr. Dawkins?

3   A.  Yes.

4   Q.  Dated June 23, 2017?

5   A.  Yes.

6            MR. DISKANT:  Government offers 106D-17.

7            THE COURT:  Received.

8            (Government's Exhibit 106D-17 received in evidence)

9   BY MR. DISKANT:

10  Q.  Mr. Bowen, you start by writing, "Hey, pick up on your

11  other" -- I think you meant -- "one."

12           What are you referring to?

13  A.  The bat phone.

14  Q.  Then you write, "We got to get this done ASAP."

15           Do you see that?

16  A.  Yes.

17  Q.  You told us a few moments ago that you were expecting to

18  get some additional money in connection with your rent payment

19  that month.

20           Had you received that money at this point?

21  A.  No.

22  Q.  Now, you mentioned a moment ago something about Kenny

23  Johnson.  Did you have a conversation during this time period

24  with Mr. Dawkins about Kenny Johnson?

25  A.  Yes.

1   Q.  During that conversation, what did Mr. Dawkins say to you

2   and what did you say to him?

3   A.  You know, basically told him Kenny was supposed to be

4   getting me some money.  I said it hadn't happened of course.

5   Q.  Prior to this time, had Mr. Dawkins ever said anything to

6   you about a coach providing -- the University of Louisville

7   providing money to you?

8   A.  No.  Not that I recall.

9   Q.  After that conversation with Mr. Dawkins, did you set up a

10  time to speak with Kenny Johnson?

11  A.  Yes.

12  Q.  Was that by phone or in person?

13  A.  I talked to him on the phone.

14  Q.  Did you set up a meeting in person?

15  A.  Yes.

16  Q.  Where did that meeting occur?

17  A.  At a gas station in Louisville.

18          MR. DISKANT:  If we can bring up for the witness only

19  what has been marked for identification as Government Exhibit

20  106B-2.

21  Q.  Mr. Bowen, do you recognize this text chain?

22  A.  Yes.

23  Q.  It's between you and the Kenny Johnson you have been

24  telling us about dated June 26 of 2017?

25  A.  Yes.

1              MR. DISKANT:  Government offers Government Exhibit

2     106B-2.

3              THE COURT:  Received.

4              (Government's Exhibit 106B-2 received in evidence)

5     BY MR. DISKANT:

6     Q.  Mr. Bowen, this is you on the right and Kenny Johnson on

7     the left, correct?

8     A.  Yes.

9     Q.  So up top you write, "Hey, Kenny.  How's it going.  Hey,

10    let's meet up today so we can get some things hashed out."

11             Do you see that?

12    A.  Yes, I do.

13    Q.  Is that the meeting that you were telling us about a moment

14    ago?

15    A.  Yes.

16    Q.  Down below you give an address, 300S 1st Street Baders.

17             Do you see that?

18    A.  Yes.

19    Q.  What address is that?

20    A.  That's the gas station in downtown Louisville.

21    Q.  Did you end up meeting Mr. Johnson on the afternoon of June

22    26?

23    A.  I'm not sure if it was 26, but I met him.

24    Q.  When you met him, did you have a conversation with him?

25    A.  Yes.

1  Q.  Where did the conversation take place?

2  A.  We were in his car at the gas station.

3  Q.  During that conversation, to the best of your memory, what

4  did Coach Johnson say to you and what did you say to him?

5  A.  Well, I kind of eased into it.  I kind of just told him,

6  you know, this was what was told to me.  I didn't want to jump

7  right on him.  I was told by Christian you were supposed to

8  give me $2,000 for some rent.  Basically that's it.

9  Q.  How did Mr. Johnson respond?

10  A.  He was flabbergasted, basically.  He was shocked.  He said

11  he didn't know anything about it.  He was like he couldn't do

12  that and his wife would kill him and all kinds of stuff.

13  Q.  Prior to this moment had you had any conversation with

14  Coach Johnson about money?

15  A.  No, never.

16  Q.  After hearing this from Coach Johnson did you communicate

17  with Mr. Dawkins?

18  A.  Yeah.  I got him on the phone.

19  Q.  What did you say to Mr. Dawkins and what did he say to you?

20  A.  Well, I asked him about it and I told him, you know, Kenny

21  was adamant that he knew nothing about it, you know.  And he

22  said, well, he should know about it and he will just take care

23  of it himself.  He will work that out with him.

24  Q.  When you say he will just take care of it yourself, who is

25  the "he" you are referring to?

1    A.  Christian.

2    Q.  Did you receive any money from Kenny Johnson that day?

3    A.  No.

4    Q.  Did Mr. Dawkins end up taking care of the payment?

5    A.  I think so eventually, yes.

6            THE COURT:  Could I hear that answer again?

7            THE WITNESS:  I think he did, yes, eventually.

8            THE COURT:  Thank you.

9    Q.  Sticking with Mr. Johnson, did there come a point when you

10   received a payment from Kenny Johnson?

11   A.  Yes.

12   Q.  Do you recall approximately when that was?

13   A.  In the summertime sometime.  Maybe July.  End of June

14   maybe.

15   Q.  The summer of 2017?

16   A.  Yeah.

17   Q.  Where did you receive the payment?

18   A.  In his car, outside where we were standing at the Galt

19   House.

20   Q.  How much did you receive?

21   A.  $1300.

22           MR. DISKANT:  If we can bring up for the witness only

23   what has been marked for identification as Government Exhibit

24   106B-3.

25   Q.  Mr. Bowen, do you recognize this text exchange?

1   A.  Yes.

2   Q.  Is it between you and Kenny Johnson?

3   A.  Yes.

4   Q.  Is it dated August 23, 2017?

5   A.  Yes.

6           MR. DISKANT:  Government offers Government Exhibit

7   106B-3.

8           THE COURT:  Received.

9           (Government's Exhibit 106B-3 received in evidence)

10          MR. DISKANT:  If we can publish that with the court's

11  permission.

12  BY MR. DISKANT:

13  Q.  Mr. Bowen, you write to Kenny Johnson, "Hey, Ken, how's it

14  going?  Wanna get together to square up."

15          Do you see that?

16  A.  Yes.

17  Q.  What were you referring to?

18  A.  Money of course.

19  Q.  You mentioned that Mr. Johnson provided you the money

20  outside the Galt House?

21  A.  Yes.

22  Q.  In his car?

23  A.  Yes.

24  Q.  Did you and Mr. Johnson have a conversation at that time?

25  A.  We talked about a lot of things, but he also said and he

1    made it pretty clear --

2    Q.  Yes or no, did you have a conversation with Mr. Johnson?

3    A.  Yes.

4    Q.  What did he say to you and what did you say to him?

5    A.  He made it pretty clear this was a one-time deal for him,

6    that -- he said that Louisville didn't need to pay players,

7    they got plenty of players.

8    Q.  Did you receive any other money from Kenny Johnson?

9    A.  No.

10   Q.  Did you and Mr. Johnson ever discuss your plan to receive

11   $100,000 from Adidas?

12   A.  No.

13   Q.  By the way, you mentioned that Mr. Dawkins took care of the

14   rent payment that you were expecting from Mr. Johnson back in

15   June.

16   A.  Right.  Yes.

17   Q.  Did Mr. Dawkins provide you with other money during the

18   summer of 2017?

19   A.  Yes.

20   Q.  Approximately how much money would he provide you with?

21   A.  Just different, from 1,000 to 2,000 dollars a month.

22   Q.  How frequently?

23   A.  Whenever he could come up with it.

24          MR. DISKANT:  At this time the government would offer

25   Government Exhibit 51, which is a call between Brian Bowen

1   Senior and Christian Dawkins, dated August 16, 2017, and offer

2   as an aid to the jury Government Exhibit 51T, which is a

3   transcript of that call.

4                THE COURT:  Received.

5                MR. DISKANT:  With the court's permission we could

6   publish the transcript, and I believe the jurors should have

7   copies of it in their binder.

8                THE COURT:  Turn to Government Exhibit 51T, members of

9   the jury.  Same instruction as before with respect to the

10  transcript and the recording.

11               (Government's Exhibits 51 and 51T received in

12  evidence)

13               (Audio played)

14  BY MR. DISKANT:

15  Q.  Mr. Bowen, do you recognize the voices on the recording?

16  A.  Yes.

17  Q.  Who do you recognize them to be?

18  A.  Myself and Christian.

19  Q.  At the time of this call did you know you were being

20  recorded?

21  A.  No.

22  Q.  For this call were you using your regular phone or your bat

23  phone?

24  A.  Regular phone.

25  Q.  When you and Mr. Dawkins would talk about money on your

1   regular phone, would you use the term money typically?

2   A.  No.

3   Q.  How would you typically describe things like money when

4   using your regular phone?

5   A.  Shit or just slang words.

6   Q.  Did you have conversations using those kind of slang words

7   on more than one occasion with Mr. Dawkins?

8   A.  Say that again.

9   Q.  Did you have conversations using that type of slang on more

10  than one occasion with Mr. Dawkins?

11  A.  Yes.

12  Q.  Focusing your attention on the portion of the call we just

13  listened to, when Mr. Dawkins said to you, "How am I going to

14  get you this shit," did you understand what he was saying?

15  A.  Yes.

16  Q.  What did you understand him to be saying?

17  A.  How he was going to get me some money.

18          MR. DISKANT:  Ms. Lee, if we can continue playing the

19  call.

20          (Audio played)

21  BY MR. DISKANT:

22  Q.  Mr. Bowen, in that portion of the call we just listened to,

23  what are you and Mr. Dawkins discussing?

24  A.  The $2,000.

25  Q.  Turning back to page 1 for just a moment, on lines 14 and

1    15, after he says, "How am I going to get this shit," two lines

2    below you say, "I'm going to call you on my other phone."

3            Do you see that?

4    A.  Yes.

5    Q.  What are you referring to.

6    A.  The bat phone.

7            MR. DISKANT:  Ms. Lee, if we can play the second clip

8    of that call which begins on page 5 of the transcript.

9            (Audio played)

10   BY MR. DISKANT:

11   Q.  Mr. Bowen you and Mr. Dawkins both used a phrase "one and

12   done."

13           What does that mean?

14   A.  That's going to college for one year and then going to the

15   pros the next year.

16   Q.  When you said Tugs can be one and done, what did you mean

17   by that?

18   A.  He can go to school for one year and then get drafted.

19   It's possible.

20   Q.  I want to turn back to Adidas and the $100,000.  Remind us,

21   were you expecting to receive all of that money at once or in

22   installments?

23   A.  In installments.

24   Q.  How many installments?

25   A.  Four.

1    Q.  Of how much?

2    A.  25,000.

3    Q.  Did there come a point when you received the first

4    installment?

5    A.  Yes.

6    Q.  When, approximately, was that?

7    A.  In July.

8    Q.  Where did you receive it?

9    A.  In New Jersey.

10   Q.  Who did you receive it from?

11   A.  Munish Sood.

12   Q.  Who is Munish Sood?

13   A.  He is like business partner of Christian's, like a money

14   guy, I guess.

15            MR. DISKANT:  At this time the government would offer

16   and seek to publish Government Exhibit 23, which is a recording

17   of a call between Brian Bowen and Christian Dawkins, dated July

18   7, 2017, and offer as an aid to the jury Government Exhibit

19   23T.

20            THE COURT:  They will be received.  The same

21   instruction with the transcript and tape.

22            MR. DISKANT:  The jury should have a copy of this

23   transcript in their binder, but we will have it on their

24   screen.

25            THE COURT:  Please turn to Government Exhibit 23T.

1              (Government's Exhibits 23 and 23T received in

2      evidence)

3              MR. DISKANT:  Ms. Lee, if we can play the first clip

4      which begins on page 1.

5              (Audio played)

6              MR. DISKANT:  Ms. Lee, if we can play the second clip

7      which begins on page 6 of the transcript at line 13.

8              (Audio played)

9              MR. DISKANT:  Can we pause here.

10     BY MR. DISKANT:

11     Q.  Mr. Bowen, during this call were you using your regular

12     phone or your bat phone?

13     A.  Regular phone.

14     Q.  When Mr. Dawkins says to you, "What is your plans for being

15     able to get something," did you understand what he meant?

16     A.  Yes.

17     Q.  What did you understand him to be asking?

18     A.  How could he get me, you know, money, some of the money.

19             MR. DISKANT:  Ms. Lee, can we keep going.

20             (Audio played)

21             MR. DISKANT:  Ms. Lee, if we can play the final clip

22     of this call which begins on page 12, line 19.

23             (Audio played)

24     BY MR. DISKANT:

25     Q.  Mr. Bowen, if we can go back to page 13 of the transcript

1    for just a minute.

2              In this conversation you and Mr. Dawkins talk about

3    you traveling to New York.  Why did you need to travel to New

4    York?

5    A.   To meet Munish.

6    Q.   And Mr. Dawkins says to you, at line 4, "He may have 25 on

7    him right now."

8              How much money were you expecting to receive in New

9    York?

10   A.   25,000.

11   Q.   Did you make plans to travel to New York?

12   A.   Yes, I did.

13   Q.   How did you get there?

14   A.   A flight.

15             MR. DISKANT:  If we can bring up for the witness only

16   what has been marked for identification as Government Exhibit

17   106D-18.

18   Q.   Mr. Bowen, you should have a hard copy there in front of

19   you if that is easier.

20             Mr. Bowen, do you recognize this chain?

21   A.   Yes, I do.

22   Q.   This is a chain between you and Mr. Dawkins dated July 11,

23   2017?

24   A.   Yes.

25             MR. DISKANT:  Government offers 106D-18.

1          THE COURT:  Received.

2          (Government's Exhibit 106D-18 received in evidence)

3          MR. DISKANT:  With the court's permission if we can

4     publish that, Ms. Lee.

5          THE COURT:  Yes.

6     BY MR. DISKANT:

7     Q.  So starting at the top, Mr. Bowen, this is Mr. Dawkins in

8     the gray on the left and you in the blue on the right, correct?

9     A.  Yes.

10    Q.  "When are you going?

11         "Probably today at 1."

12         MR. DISKANT:  Ms. Lee, if we can scroll down a little

13    bit.

14    Q.  Mr. Dawkins asks you what airport you would be flying into.

15         You respond, "LaGuardia.  I'm going to call you in a

16    minute now.  The price doubled."

17         Do you see that?

18    A.  Yes.

19    Q.  Did you have a phone conversation with Mr. Dawkins that

20    morning?

21    A.  Yes.

22         MR. DISKANT:  The government would offer Government

23    Exhibit 25, which is a call between Brian Bowen and Christian

24    Dawkins that morning, July 11, 2017, and as an aid to the jury

25    what has been marked as Government Exhibit 25T.

1          THE COURT:  Both received.

2          Same instruction, members of the jury.

3          Turn to Government Exhibit 25T in your books, if you

4  wish.

5          (Government's Exhibits 25 and 25T received in

6  evidence)

7          (Audio played)

8  BY MR. DISKANT:

9  Q.  Mr. Bowen, in this call Mr. Dawkins says, "You're about to

10  get some money, you're about to get some racks."

11          What was the purpose for your trip to New York?

12  A.  To pick up money, 25,000.

13  Q.  Down below, at lines 20 through 22, you say -- actually

14  starting a little bit above that, you say at line 14, "Let me

15  use my other phone."

16          Then down below that, "I don't trust this phone."

17          Mr. Bowen, at the time this call was made, did you

18  know your call was being recorded?

19  A.  No.

20  Q.  At the time you said "I don't trust this phone," did you

21  believe that the NCAA had the ability to intercept your calls?

22  A.  No.

23  Q.  Did you believe the University of Louisville did?

24  A.  No.

25  Q.  Did you make it to New York?

1   A.   Yes.

2   Q.   Where did you land?

3   A.   LaGuardia Airport.

4   Q.   When, approximately, did you get here?

5   A.   July, the 12th.  I am pretty sure.

6   Q.   Where did you spend the night?

7   A.   In a Howard Johnson's hotel in Queens.

8   Q.   What did you plan to do the next day?

9   A.   Meet with Munish.

10           MR. DISKANT:  If we can bring up, Ms. Lee, for the

11  witness only what has been marked for identification purposes

12  106 F.

13  Q.   Mr. Bowen, do you recognize this chain?

14  A.   Yes.

15  Q.   Does this involve you, Christian Dawkins and Munish Sood?

16  A.   Yes.

17  Q.   From July 12 to July 13, 2017?

18  A.   Yes.

19           MR. DISKANT:  Government offers 106F.

20           THE COURT:  Received.

21           (Government's Exhibit 106F received in evidence)

22           MR. DISKANT:  With the court's permission, Ms. Lee, if

23  we could publish that.

24           THE COURT:  Yes.

25  BY MR. DISKANT:

1    Q.  Mr. Bowen, just to orient us, the blue bubbles on the

2    right, is that you?

3    A.  Yes.

4    Q.  And the C bubbles in gray, is that Christian?

5    A.  Yes.

6    Q.  And the M bubbles, is that Munish?

7    A.  Yes.

8    Q.  So a little bit down the page, at about 11:42 p.m. on July

9    12, you write, "Finally made it.  See you in the a.m."

10            Do you see that?

11   A.  Yes.

12   Q.  Then Munish writes back, "Wow.  Long day.  Let's plan on

13   meeting 11:15, 11:30.  Can we please meet at terminal C

14   arrivals outside.  I will double park.  We will meet outside

15   the door closest to Starbucks."

16            Do you see that?

17   A.  Yes.

18   Q.  Where did you think you were meeting Mr. Sood?

19   A.  At the LaGuardia Airport.  Yes.

20   Q.  When you woke up the next morning did you head to

21   LaGuardia?

22   A.  Yes.

23            MR. DISKANT:  Your Honor, at this point we would offer

24   Government Exhibit 28, which is a call between Mr. Bowen and

25   Mr. Dawkins, dated July 13, 2017, at 11:19 a.m., and as an aid

1   to the jury Government Exhibit 28T.

2            THE COURT:  Received.

3            (Government's Exhibits 28 and 28T received in

4   evidence)

5            THE COURT:  Members of the jury, you may turn to

6   Government Exhibit 28T.

7            MR. DISKANT:  Ms. Lee, if we can play that.

8            (Audio played)

9   BY MR. DISKANT:

10  Q.  Mr. Bowen, at the end of that call, when Mr. Dawkins says,

11  "Munish has 19,5 for you and I'll take care of everything

12  else," what did you understand him to mean?

13  A.  Munish had $19,500, and the rest of it will be

14  covered -- he will give me the rest of.

15  Q.  "He" being Mr. Dawkins?

16  A.  Yes.

17  Q.  Did you end up meeting with Mr. Sood that day?

18  A.  Yes.

19  Q.  Where did you meet with him?

20  A.  In New Jersey.

21  Q.  How did you get from LaGuardia Airport to New Jersey?

22  A.  I drove.  I had to go through Manhattan and over like

23  George Washington Bridge pretty much and then somewhere into

24  New Jersey.

25  Q.  What was the nature of the location at which you met Mr.

1  Sood?

2  A.  It was like a business complex or something.

3  Q.  What happened when you arrived?

4  A.  He gave me like a sandwich because we were supposed to meet

5  for lunch.  He gave me an envelope and then we just talked a

6  little bit.

7  Q.  During that conversation, to the best of your memory --

8  first, how long did it last?

9  A.  I'm not certain.  It wasn't very long.

10  Q.  During that conversation, to the best of your memory, what

11  did you say to Mr. Sood and what did he say to you?

12  A.  It was very simple.  Just basically introduced ourselves

13  because we never actually met and just small talk.

14  Q.  Was there a discussion about meeting in Louisville?

15  A.  Yeah.  Before we left he said he wanted to come to

16  Louisville and see my son.

17  Q.  You said before that Mr. Sood worked with Mr. Dawkins.  Had

18  Mr. Dawkins told you what if any work Mr. Sood did with him?

19  A.  He's a money guy.  Financial planner or something like

20  that.

21  Q.  Had Mr. Dawkins told you where the money you had been

22  receiving that day had come from?

23  A.  Supposedly coming from Adidas, but I wasn't sure at that

24  point where it was coming from.

25  Q.  At that particular moment did it matter to you where it was

1    coming from?

2    A.   No.

3    Q.   Did there come a point when you received the remaining

4    $6500?

5    A.   Yes.

6    Q.   How did you receive that?

7    A.   Through, like sent to me.

8    Q.   Who?

9    A.   Christian did.

10   Q.   Where did he send it to you?

11   A.   The Galt House.

12   Q.   The Galt House in Louisville?

13   A.   Yes.

14   Q.   Mr. Bowen, we were just talking about the first $25,000

15   installment.  Did there come a point where you learned that you

16   would be receiving the second $25,000 installment from Adidas?

17   A.   Yes.

18   Q.   When approximately was that?

19   A.   I'm not certain.  Sometime in the summer after that.

20   Q.   We will come back to the date in just a moment.

21            How did you learn it?

22   A.   Christian informed me of it.

23            MR. DISKANT:  At this time the government would offer

24   Government Exhibit 1, which is a call between James Gatto and

25   Christian Dawkins, dated September 7, 2017, and as an aid to

1    the jury 1T.

2              THE COURT:  All right.  This might be -- they are

3    received.

4              (Government's Exhibits 1 and 1T received in evidence)

5              THE COURT:  This might be a good place to take our

6    morning break.

7              15 minutes, folks.

8              (Jury exits courtroom)

9              (Recess)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (Jury present)

2            THE CLERK:  Jury entering.

3            THE COURT:  The jurors and the defendants all are

4    present.

5            You may proceed, Mr. Diskant.

6            MR. DISKANT:  Thank you.

7    BY MR. DISKANT:

8    Q.  Mr. Bowen, before we took a break, we were talking about a

9    time when you learned that you would be receiving a second

10   payment of the Adidas' $100,000?

11   A.  Yes.

12           MR. DISKANT:  OK.  And, your Honor, we were about to

13   publish what I believe was already received by the Court as

14   Government Exhibit 1, which is a call between Jim Gatto, James

15   Gatto and Christian Dawkins, dated September 7, 2017, and the

16   jurors should have this transcript in their binders as well.

17           THE COURT:  Yes.  Turn to Government Exhibit 1T,

18   please.  Let's go.

19           MR. DISKANT:  And the first clip --

20           (Audio played)

21           MR. DISKANT:  And we can play a second clip that

22   begins on page 6 at line 17.

23           (Audio played)

24   BY MR. DISKANT:

25   Q.  Mr. Bowen, we talked a little bit about this last week but

1    just remind us, what position did your son play?

2    A.   He played like a shooting guard, small forward.

3            MR. DISKANT:   And then if we can offer Government

4    Exhibit 56 and the accompanying transcript, 56T, which is a

5    call between Christian Dawkins and Brian Bowen Senior, dated

6    September 22, 2017, at 7:28 p.m.

7            THE COURT:   Received.

8            (Government's Exhibits 56 and 56T received in

9    evidence)

10           THE COURT:   The same instruction, members of the jury.

11   You may turn to Government Exhibit 56T.

12           MR. DISKANT:   And the first clip of this transcript

13   that we are going to offer begins at page 6, line 23.

14           Ms. Lee, if we can give folks a moment.

15           (Audio played)

16   BY MR. DISKANT:

17   Q.   Mr. Bowen, in this call were you using your regular phone

18   or your bat phone?

19   A.   Regular phone.

20   Q.   And when Mr. Dawkins said to you on page 6 at line 25, "It

21   should be Christmas like next week or the week after," what did

22   you understand him to mean by that?

23   A.   The second payment should be coming in.

24   Q.   Did you ever receive the second payment?

25   A.   No.

1   Q.  We'll come back to that in just a moment.  But did there

2   come a point where you saw Mr. Dawkins in Louisville in

3   September?

4   A.  Yes.

5   Q.  Did you know why Mr. Dawkins was in Louisville?  Did he say

6   so?

7   A.  There was a lot of guys from Adidas was there and some

8   other recruits and stuff were there also.

9   Q.  Who were some of the other guys from Adidas that

10  Mr. Dawkins was with?

11  A.  I think James Gatto and I think Merl Code and some other

12  guys.  I'm not certain.

13  Q.  So, James Gatto.  Is that the same Mr. Gatto you told us

14  about before?

15  A.  Yes.

16  Q.  And Merl Code.  Who is Merl Code?

17  A.  He's an Adidas' guy is all I know.  He works with Adidas, I

18  guess.

19  Q.  Prior to -- did you meet him in Louisville in September?

20  A.  I might have said hi to him.  I can't recall it.  I don't

21  really know.

22  Q.  Prior to that, had you ever seen him before?

23  A.  If I did, I wouldn't know, no.  I don't recall.

24  Q.  When you saw Mr. Code and Mr. Gatto in Louisville in

25  September, did you have a conversation with either of them?

1   A.   Just basic conversation.  You know, I might have said hi,

2   or nothing.

3   Q.   Any discussion about money?

4   A.   No.

5   Q.   OK.  You mentioned that you never received the second

6   payment from Adidas?

7   A.   No.

8   Q.   Why not?

9   A.   The whole investigation unfolded.

10  Q.   When the news of the investigation became public, did the

11  University of Louisville take any action with respect to your

12  son?

13  A.   Yes.

14  Q.   What was that action?

15  A.   They took him off the basketball team.

16  Q.   Did you have an understanding of why?

17  A.   Oh, yes, because of my involvement with, you know, the

18  money scheme.

19  Q.   Did your son ever play a single game for the University of

20  Louisville?

21  A.   No.

22  Q.   Did there come a point where your son tried to transfer to

23  another school?

24  A.   Yes.

25  Q.   What was that school?

1   A.   University of South Carolina.

2   Q.   Did he ever play for the University of South Carolina?

3   A.   No.

4   Q.   Why not?

5   A.   The same deal with them, you know, eligibility.

6          MR. DISKANT:  Your Honor, may I have just a moment?

7          THE COURT:  Yes.

8          (Pause)

9          MR. DISKANT:  Nothing further.

10         THE COURT:  Thank you.

11         Cross-examination.

12         MR. HANEY:  Thank you, your Honor.

13         THE COURT:  You may proceed, Mr. Haney.

14         MR. HANEY:  Thank you, your Honor.

15  CROSS-EXAMINATION

16  BY MR. HANEY:

17  Q.  Mr. Bowen, as you noted, your son also goes by the name of

18  "Tugs," is that correct?

19  A.  Yes.

20  Q.  And would you agree with me that your son is in fact a very

21  talented basketball player?

22  A.  Yes.

23  Q.  Would you agree with me that in most recent memory, he's in

24  fact one of the better basketball players that come out of

25  Michigan, fair to say?

1    A.   That's fair.

2    Q.   And with that status, as you've noted, many schools

3    recruited your son to be a college basketball player at their

4    institution, is that correct?

5    A.   Yes.

6    Q.   Would it be fair to say he had more than 25 Division I

7    scholarship offers?

8    A.   Yes, that's fair.

9    Q.   In fact, from some of the most distinguished universities

10   in America, correct?

11   A.   Yes.

12   Q.   Michigan State, right?

13   A.   Yes.

14   Q.   Michigan, correct?

15   A.   Yes.

16   Q.   And as we all know, in 2017, in June, he ended up going to

17   the University of Louisville, correct?

18   A.   Yes.

19   Q.   You testified that you coached him since he was a little

20   kid, right?

21   A.   I did.

22   Q.   Spent hours with him in the gym, I imagine?

23   A.   That's correct.

24   Q.   Ball handling, shooting, training.  You are a former

25   player, aren't you?

1    A.  I played, yes.

2    Q.  And your primary goal for your son that you worked with

3    from the point where he was young and small was that he would

4    go where he could find the best basketball fit, is that

5    correct?

6    A.  He wanted to play college basketball, of course.

7    Q.  I'll ask that question a little bit easier for two

8    basketball guys to understand.

9            You wanted your son to go somewhere he was going to be

10   a guard, didn't you, at six-foot-seven?

11   A.  That would have worked out well for him, of course.

12   Q.  Because that's what he would been playing in the NBA,

13   right?

14   A.  You never know when you get to the NBA how they put you.

15   That's what I wanted for him, but I don't know what the NBA

16   would do.

17   Q.  You didn't want him to go to a situation in college where

18   they might put him at the forward position, did you?

19   A.  No.  Of course not.

20   Q.  And by best basketball fit, as you stated, that meant play

21   guard and not have a lot of other guys playing his position at

22   whatever school he would go to, correct?

23   A.  I wanted him to have opportunities, sure.

24   Q.  Well, you used the term "logjam" if I recall, did you not?

25   A.  I don't recall that.

1    Q.  If you say log-jammed at a position, that means there are

2    too many guys playing that position at a particular university;

3    is that a fair statement?

4    A.  Yes.

5    Q.  And you mentioned that at the University of Arizona that

6    certain circumstances occurred that caused that situation to be

7    a logjam of guards; do you remember that?

8    A.  Vaguely.  I vaguely remember it.

9    Q.  Well, is that true or not?  I don't want to put words in

10   your mouth sir.

11   A.  I can't say verbatim, but yes.

12   Q.  Thank you.  Would you agree with me, Mr. Bowen, that nobody

13   could have offered you money to influence your son to go to a

14   situation that would have been a bad basketball fit for him,

15   would they have?

16           MR. DISKANT:  I don't understand that question.

17   A.  State that again.  I don't understand.

18           THE COURT:  Sustained.

19   Q.  Would you agree, Mr. Bowen, that nobody could have

20   influenced your decision with respect to your son to go to a

21   situation where there would be a bad basketball fit?

22           MR. DISKANT:  The same objection.

23           THE COURT:  Overruled.

24   A.  OK.  Say that again.  I'm sorry.

25   Q.  Would you agree nobody could have influenced you or offered

 1    you money to cause your son to go to a basketball school where

 2    it wouldn't be a good fit for him?

 3              THE COURT:  Well, you have asked two different

 4    questions now.

 5              MR. HANEY:  I am trying to clarify the question for

 6    the government and the witness, your Honor.  If you want, I can

 7    rephrase the question.

 8              THE COURT:  Please do.

 9              MR. HANEY:  Thank you, your Honor.

10    BY MR. HANEY:

11    Q.  Mr. Bowen, would you agree there is nobody who could have

12    offered you money to influence your son to go to a situation

13    where it would have been a bad basketball fit for him?

14              THE COURT:  The problem with the question, Mr. Haney,

15    is this.  Somebody could have offered him money to become a

16    playboy bunny but it probably wouldn't have worked out.  You

17    are just phrasing it in terms of could somebody have offered

18    him money.  That is not what you are getting at.

19              MR. HANEY:  Would you have made -- may I ask another

20    question, your Honor?

21              THE COURT:  Of course.

22              MR. HANEY:  Thank you, sir.

23    Q.  Mr. Bowen, you would have not made a decision, would you

24    have, based on money that would have resulted in your son being

25    in a bad basketball situation?

1   A.  You said I wouldn't have made a decision?

2   Q.  You would not have advised your son to go to that type of a

3   situation, correct, based on money?

4   A.  Of course.

5   Q.  Of course not, right?

6   A.  Not, correct.

7   Q.  And your son ended up at the University of Louisville

8   because you two felt there was a good basketball fit at

9   Louisville, correct?

10  A.  It was a good basketball fit, yes.

11  Q.  And you all ended up at Louisville because that's where

12  your son wanted to go to school, correct?

13  A.  Yes.

14  Q.  So neither you nor Ms. Malecke nor Christian Dawkins ever

15  made Tugs Bowen go to Louisville, did you?

16  A.  I mean, I never made him but, I mean, I'm his father.

17  Whatever he does, I'm sure I influenced him.

18  Q.  But it was his choice to go there; is that right or wrong?

19  A.  Yes, it's his choice, but I'm sure I had influence with

20  him.

21  Q.  And when Tugs made that decision to go to Louisville, you

22  felt that it was a good decision in picking the University of

23  Louisville, didn't you?

24  A.  I agreed with it.

25  Q.  And there was no doubt that you believed that University of

1   Louisville had a great basketball program for your son,

2   correct?

3   A.  Yes.

4   Q.  And you thought that your son was a great fit for the

5   University of Louisville basketball team, too, didn't you?

6   A.  Yes.

7   Q.  Because they needed a big, talented guard like your son,

8   didn't they?

9   A.  Yes.

10  Q.  Is it true that you believed also that Louisville was lucky

11  to have Tugs?

12  A.  They had plenty of players.  I can't say that they were

13  lucky.  I don't know that.  They had plenty of good players.

14  Q.  You have testified you agree that the University of

15  Louisville had just lost a player to the NBA who was a similar

16  type player to your son, correct?

17  A.  Yes.

18  Q.  And that player was named Donovan Mitchell, right?

19  A.  Correct.

20  Q.  Would you agree with me that Donovan Mitchell was a big

21  ball handling, skilled guard somewhat comparable favorably to

22  your son?

23  A.  The same kind of -- they are similar, in a sense.

24  Q.  When Donovan Mitchell declared for the NBA draft, your son,

25  you and Christian felt that at that point the University of

1   Louisville could be a good basketball fit, is that right?

2           MR. DISKANT:  Objection to anyone other than himself.

3           THE COURT:  Sustained.

4           MR. HANEY:  I will re-ask the question, your Honor.

5   Q.  Mr. Bowen, when Donovan Mitchell declared for NBA draft,

6   did you feel at that point the University of Louisville became

7   a good basketball fit for your son?

8   A.  I mean, not immediately.  Once, you know, Christian had

9   mentioned it to me.  I didn't really think about Louisville.

10  Q.  That wasn't what I asked you, sir.

11          When you became aware that Donovan Mitchell had left,

12  did you believe at that point that Louisville was a good

13  basketball fit for your son?

14          THE COURT:  Asked and answered.

15  A.  I didn't think it.

16          THE COURT:  Disregard the answer, please.

17  BY MR. HANEY:

18  Q.  Mr. Bowen, you were no stranger to the recruiting game,

19  were you?

20  A.  I've dealt with it.

21  Q.  You've testified that you dealt with it years ago, is that

22  correct?

23  A.  Years ago, yes.

24  Q.  Been through the whole recruiting process some 25 years

25  earlier with your own nephew, who ended up being an NBA

1    Allstar, is that right?

2    A.  I'm not saying it was 20 years ago.  He wasn't an Allstar

3    but he was pretty good.

4    Q.  Jason Richardson, correct?

5    A.  Yes.

6    Q.  So you had a real good understanding of how this worked,

7    didn't you?

8    A.  A lot of things have changed over the years.

9    Q.  You knew that big schools like Louisville made millions of

10   dollars from the men's basketball team, though, right?

11             MR. DISKANT:  Objection.

12             THE COURT:  Sustained.

13   BY MR. HANEY:

14   Q.  Mr. Bowen, when you your son chose the University of

15   Louisville, it wasn't to hurt the University of Louisville, was

16   it?

17             MR. DISKANT:  Objection.

18             THE COURT:  Sustained.

19   Q.  During the recruiting process, Mr. Bowen, did you,

20   Christian Dawkins ever have a conversation about how you guys

21   could rip off Louisville?

22             MR. DISKANT:  Objection.

23             THE COURT:  Sustained as to form.

24   Q.  Mr. Bowen, was there ever an occasion between all the

25   conversations you and Christian Dawkins had where you discussed

1    the reason to go to the University of Louisville?

2    A.   That's kind of open.  I don't -- what do you mean?

3    Q.   Is that a yes or no?  Did you have a conversation about the

4    choice to go to the University of Louisville with Christian

5    Dawkins?

6    A.   Of course.

7    Q.   Included in those conversations, was there ever any

8    conversation about how you wanted to defraud the University of

9    Louisville?

10             MR. DISKANT:  Objection.

11             THE COURT:  Sustained.

12   Q.   You've testified that Christian Dawkins' intention was to

13   become Tugs Bowen's future agent, isn't that right?

14   A.   He wanted to work with him, of course.

15   Q.   During the recruiting process, you and Christian Dawkins

16   discussed where Tugs Bowen should play his college basketball,

17   is that correct?

18   A.   That's correct.

19   Q.   And you and Christian Dawkins go way back; is that fair to

20   say?

21   A.   Yeah.  I knew him from the same city.

22   Q.   Well, you can be from the same city and not go way back

23   with somebody, right?

24   A.   When you say "way back," I was about Dawkins' age so it

25   can't be that far back.

1    Q.  I mean, you've known his family your entire life, haven't

2    you?

3    A.  You said Christian?

4    Q.  I asked you his family.  You've known the family your whole

5    life, haven't you?

6    A.  I've known them for a while, yes.

7    Q.  You know his parents, Tish and Lou, correct?

8    A.  I knew his dad.

9    Q.  Fair to say you've known his dad for decades?

10   A.  It's been a while, yes.

11   Q.  What do you mean by "it's been a while?"

12   A.  You said decades.  I can't say for sure decades.

13   Q.  Tell us for sure how long that would be you've known the

14   family.

15            MR. DISKANT:  Your Honor --

16            THE COURT:  It is unreasonable.  Sustained.

17   BY MR. HANEY:

18   Q.  In fact, when Tugs was only 12 years old, Christian was an

19   AAU basketball coach wasn't he?

20   A.  He was one of them.

21   Q.  On the Dorian's Pride AAU team, correct?

22   A.  Yes.

23   Q.  Fair to say that Christian considered Tugs a little

24   brother?

25            MR. DISKANT:  Objection.

1              THE COURT:  Sustained.

2    Q.  Would you agree that the Dawkins family and the Bowen

3    family would help each other out if they ever needed help?

4              MR. DISKANT:  I don't understand that.

5              THE COURT:  Sustained.

6              MR. HANEY:  Your Honor, may we have a sidebar?

7              THE COURT:  Sure.

8              MR. HANEY:  Thank you.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (At the sidebar)

2            MR. HANEY:  Your Honor, the history of the family is,

3    I submit, relevant.  There is evidence that in the state of

4    mind of my client is there was a pre-existing relationship

5    between Mr. Bowen and himself that predated several years at

6    Saginaw, Michigan.  I am not allowed to even get into the

7    history of the previous relationship?

8            THE COURT:  That is not right.  The problem here is

9    that you are asking this witness to testify as to what the

10   Dawkins family would have done in hypothetical circumstances.

11   You are asking him in the same question what he thinks he would

12   have done in hypothetical circumstances.  And he's not a

13   competent witness on any of that.  And what he now thinks

14   doesn't matter.

15           MR. HANEY:  I'm not asking for his thoughts, your

16   Honor.

17           THE COURT:  Of course you are.

18           MR. HANEY:  I'm asking for his history of the family

19   and his knowledge, his personal knowledge --

20           THE COURT:  Believe me, I have listened to the

21   question.  I mean, obviously your client has no obligation to

22   testify.  You know that as well as I.  If your client wants to

23   talk about what he thought, that might be relevant.

24           MR. HANEY:  Thank you, your Honor.

25           (Continued on next page)

1               (In open court)

2               THE COURT:  Next question, please.

3               MR. HANEY:  Thank you, your Honor.

4       BY MR. HANEY:

5       Q.  Mr. Bowen, you were not unfamiliar with the concept that

6       people would pay your son money to play on their basketball

7       teams, were you?

8       A.  What do you mean?

9       Q.  What do I mean?  You just testified, sir, that you received

10      substantial amounts of money from different basketball teams

11      throughout your son's career, correct?

12      A.  I wouldn't say substantial.  We got --

13      Q.  You got paid, didn't you, sir?  Yes or no?

14      A.  I received money, yes.

15      Q.  OK.  And even when your son was in high school, there were

16      basketball teams that were willing to pay your family to have

17      Tugs Bowen play there; is that a fair statement?

18      A.  Say that again.

19      Q.  When your son was in high school, there were high school

20      basketball teams that were willing to pay your family money to

21      have your son play there, right?

22      A.  I received money for housing.  I wouldn't say paying my son

23      to play there, but.

24      Q.  Your son started his career at Saginaw Arthur Hill High

25      School, is that right?

1  A.  High school, yes.

2  Q.  And then after his sophomore year -- correct me if I am

3  wrong -- he transferred to a school in La Porte, Indiana called

4  La Lumiere Prep School, is that correct?

5  A.  Yes.

6  Q.  And you obviously are aware that every single high major

7  college basketball team in the country is sponsored by shoe

8  companies, right?

9  A.  That's fair.  Most of them, I guess.  I don't know about

10  every one.

11  Q.  But even some high schools are sponsored by shoe companies,

12  aren't they?

13  A.  Some of them.

14  Q.  Including La Lumiere Prep School, correct?

15  A.  Yes.

16  Q.  And they were sponsored by Nike, weren't they?

17  A.  I think so, yes.

18  Q.  And as you were considering what prep school your son

19  should go to after leaving high school, you visited a number of

20  prep schools to find the right basketball fit for your son,

21  didn't you?

22  A.  Yes.  We visited schools.

23  Q.  What other schools did you visit?

24  A.  Atlanta.  We had visited -- I can't remember the schools

25  now.  We visited Montverde.

1   Q.  Where is Montverde?  It is in Florida, isn't it?  I will

2   help you out.

3   A.  Yes.

4   Q.  Down by Orlando, right?

5   A.  Right.

6   Q.  Where else did you visit?

7   A.  We went to a school in Atlanta.  I can't really recall the

8   names of the schools.  We visited a few schools.

9   Q.  And they all wanted your son, correct, to player

10  basketball?

11  A.  Yes.

12  Q.  You decided that La Lumiere would be the best basketball

13  fit for your son, is that correct?

14  A.  Well, we did.  Not me.

15  Q.  Who is "we"?

16  A.  My son of course had to --

17  Q.  And the head coach at La Lumiere was a guy by the name of

18  Shane Heirman, is that right?

19  A.  Yes.

20  Q.  And Shane Heirman is now the assistant coach at DePaul

21  University; is that your understanding?

22  A.  Yes.  That's fair.

23  Q.  And DePaul is a Nike school, isn't it?

24  A.  I don't keep up with all of that.

25  Q.  Now, you've indicated that your son went to La Lumiere

1    Prep, and the head basketball coach, Shane Heirman, paid you

2    $8,000, is that right?

3    A.  He helped me out with expenses.

4    Q.  That's not what I asked you, sir.

5         MR. DISKANT:  The question mischaracterizes his

6    testimony.

7         THE COURT:  Sustained.  Try again.

8    BY MR. HANEY:

9    Q.  Mr. Bowen, did the head basketball coach Shane Heirman pay

10   you $8,000 to go to La Lumiere -- for your son to go to La

11   Lumiere or not, yes or no?

12   A.  He didn't pay for him to go to La Lumiere.  He helped me

13   out with expenses.

14   Q.  Did he pay you $8,000 cash, yes or no?

15   A.  Over a period of time, yes.

16   Q.  And that was on top of rent, wasn't it?

17   A.  No.

18   Q.  Do you remember being interviewed by the FBI in January 24,

19   2018?

20   A.  Yes, of course.

21   Q.  Isn't it true that you told the FBI during that interview

22   that Shane Heirman gave you $8,000 on top of rent?

23   A.  I don't recall that.

24        MR. HANEY:  Your Honor, may we introduce only for the

25   witness' reference 3502-07, not for publication?

1          THE COURT:  Yes.

2          MR. HANEY:  Thank you, your Honor.

3          THE COURT:  Show it to him.

4     BY MR. HANEY:

5     Q.  Mr. Bowen, do you see that statement before you on the

6     screen?

7     A.  Yes.

8     Q.  For a moment, read that to yourself, please, and then I

9     will ask you a question.

10    A.  I've read it.

11    Q.  Do you see the highlighted portion, Mr. Bowen?

12    A.  Yes.

13         THE COURT:  Look, Mr. Haney, you can show him whatever

14    you want, within reasonable limits, to refresh recollection,

15    but you can't in the course of doing it effectively communicate

16    the contents of what you're showing him to the jury because it

17    is not in evidence.  So, stop doing that, please.

18         MR. HANEY:  Understood, your Honor.

19    BY MR. HANEY:

20    Q.  Mr. Bowen, does this refresh your recollection, in reading

21    this statement, with regards to what you told the FBI on

22    January 24, 2018, yes or no?

23    A.  No, it doesn't.

24    Q.  So you didn't tell the FBI that?

25    A.  I don't recall saying that, no.

1  Q.  The FBI wouldn't have any reason to lie, would they?

2        MR. DISKANT:  Objection.

3        THE COURT:  Sustained.

4  Q.  And obviously the money you did receive from Shane Heirman

5  at La Lumiere Prep School, that would have been years before

6  you received the $19,500 in this case, wouldn't it have,

7  Mr. Bowen?

8        MR. DISKANT:  Objection to "years before."

9        THE COURT:  I can't hear you.

10        MR. DISKANT:  Objection to "years before."

11        THE COURT:  Sustained as to form.

12  BY MR. HANEY:

13  Q.  Mr. Bowen, the money you received from Shane Heirman, the

14  $8,000, would have been prior to the money you received at

15  issue in this case in June of 2017, correct?

16  A.  Correct.

17  Q.  But that wasn't all Shane Heirman gave you, was it,

18  Mr. Bowen, $8,000?

19  A.  What else did he give me?

20  Q.  He also gave you $1,400 a month in rent, didn't he?

21  A.  As I recall, that was the same thing.

22        MR. HANEY:  Your Honor, may we reference again for the

23  witness' recollection 3502-07, not for publication?

24        THE COURT:  No.  You've covered this.

25        MR. HANEY:  It is a different statement, your Honor.

1          THE COURT:  You've covered it.

2    BY MR. HANEY:

3    Q.  Mr. Bowen, the rent money that was provided to you by Shane

4    Heirman, the coach at La Lumiere, that was paid to live on a

5    condo on a lake, wasn't it?

6          MR. DISKANT:  Objection.  Relevance.

7          THE COURT:  Sustained.

8    Q.  Mr. Bowen, you knew receiving any money from Shane Heirman

9    was against the NCAA rules, didn't you?

10   A.  Yes.

11   Q.  And at the conclusion of the high school season, in April,

12   kids in Michigan would then begin planing travel basketball, or

13   AAU basketball, is that right?

14   A.  Yes.

15   Q.  And for the jury's education, AAU basketball would be where

16   the top kids in Michigan would join certain AAU teams to play

17   other AAU teams around the country; is that a fair statement?

18   A.  Are you asking me?

19   Q.  Yes.  Is that a fair statement?

20   A.  Oh, I thought you were talking to -- ah, yes.

21   Q.  And some of those teams, such as the ones that your son

22   played for, were sponsored by shoe companies, correct?

23   A.  Of course.

24   Q.  And for the most part, the better kids, who played for the

25   shoe-sponsored teams, would get to travel around country and

1    play in tournaments; is that a fair statement?

2    A.   Kids that made the team, of course.

3    Q.   And you are familiar with the Nike EYBL, right?

4    A.   Yes.

5    Q.   And the Adidas Gauntlet Circuit, correct?

6    A.   Yes.

7    Q.   And when your son was still in high school, you were

8    actually even offered $18,000 to play for a team out of

9    Indiana, called the Spiece Indy Heat, correct?

10   A.   Yes.

11   Q.   And the Spiece Indy Heat team, they weren't an Adidas team,

12   were they?

13   A.   I don't know what they were, I can't remember.

14   Q.   So you are telling me, Mr. Bowen, you didn't know that the

15   Spiece Indy Heat was a Nike EYBL team?

16   A.   I don't recall that.

17          MR. DISKANT:  Asked and answered.

18   A.   I don't recall.

19   Q.   Tugs chose not to play for that team, didn't he?

20   A.   Correct.

21   Q.   He instead chose to play for a team out of Chicago called

22   the Mean Streets, is that right?

23   A.   That's correct.

24   Q.   And you knew the Mean Streets were run by a former NFL

25   player named Tai Streets, is that correct?

1    A.  His name was on the team, yes.  Yes.

2    Q.  And Mean Streets was sponsored by Nike and played on the

3    Nike EYBL circuit, is that right?

4    A.  Yes, they did.

5    Q.  And you accepted $5,000 cash from that Nike AAU program for

6    your son to play there, didn't you?

7    A.  I accepted it, yes.

8    Q.  In fact, you received that money from Tai Streets, didn't

9    you?

10   A.  Yes.

11   Q.  When did Tai Streets give you that $5,000 cash?

12   A.  I don't recall the date.

13   Q.  So even though you could have been paid three times more

14   money to play for the Spiece Indy Heat, you didn't because you

15   felt the Mean Streets were a better basketball fit for your

16   son, right?

17   A.  Correct.

18   Q.  So you weren't influenced by the money being offered by the

19   Spiece AAU program, were you?

20   A.  I just thought --

21   Q.  I'm sorry?

22   A.  I just thought the Nike team was a better time.

23   Q.  A better fit?

24   A.  A better fit.

25   Q.  They played where you would rather have your son play,

1    correct?

2    A.  I guess that's fair.

3    Q.  They played a little faster, didn't they?

4            MR. DISKANT:  Objection.  Relevance.

5    A.  Different style.

6            MR. HANEY:  May I respond, your Honor?

7            THE COURT:  No.  You have had an answer to the

8    question.  Let's move on.

9    BY MR. HANEY:

10   Q.  So in making these decisions of where your son should play,

11   going all the way back to be high school, basketball fit and

12   playing style were the primary driving factors, weren't they?

13           MR. DISKANT:  Objection.

14           THE COURT:  Sustained.

15   Q.  So even when your son was in high school, you are accepting

16   money from Nike, years before, in June of 2017, you accepted

17   the money at issue in this case, correct?

18           MR. DISKANT:  Objection.

19           THE COURT:  Sustained.  Let's move along.

20   Q.  Mr. Bowen, you knew receiving that $5,000 cash from Tai

21   Streets was an NCAA rules violation, didn't you?

22   A.  It is.  I didn't think about it like that but it is.

23   Q.  How did you think about it when you took the money?

24   A.  I don't know how I thought about it.  It was a while call.

25   Q.  Christian Dawkins didn't make you take that money then, did

1  he?

2              MR. DISKANT:  Objection.

3              THE COURT:  Sustained.

4  Q.  But you also failed to mention during your testimony you

5  also received cash from the head coach of Mean Streets, too,

6  didn't you?

7  A.  Yes.

8              MR. DISKANT:  Objection as to "failed to mention."

9              THE COURT:  Yes.  The answer is stricken.  The

10 question is stricken.

11             You can inquire properly, Mr. Haney.

12             MR. HANEY:  Thank you, your Honor.

13 Q.  In addition to Tai Streets, you also received cash from the

14 coach of Mean Streets, didn't you?

15 A.  I received reimbursement for travel.

16 Q.  Well, you can't do that.  You know, right, Mr. Bowen?

17 That's a violation, isn't it?

18 A.  It was no different than every other kid -- an AAU team can

19 pay for travel and lodging.

20 Q.  So everybody breaks the rules so it is OK for you, too?

21             MR. DISKANT:  Objection.  That is not what he said.

22             THE COURT:  Sustained.

23 Q.  Mr. Bowen, Tim Anderson paid you $1,500 cash, didn't he?

24 A.  That's what we were talking about, the reimbursement.

25 Q.  The actual amount was $1,500?

1    A.  As I recall, yes.

2    Q.  And Tim Anderson now coaches along with Shane Heirman at

3    DePaul, doesn't he?

4              MR. DISKANT:  Objection.  Relevance.

5              THE COURT:  Sustained.

6    Q.  And before your son played for the Mean Streets, he played

7    for a team called the Michigan Mustangs, didn't he?

8    A.  Yes.

9    Q.  And that team is sponsored by Adidas, correct?

10   A.  Yes.

11   Q.  And Adidas offered financial assistance to your family in

12   connection with the agreement that your son would play for the

13   Michigan Mustangs, is that right?

14   A.  Yes.

15   Q.  In fact, you got paid $4,000 cash from Chris Rivers to play

16   for the Michigan Mustangs, didn't you?

17   A.  Yes.

18   Q.  And you took that money because you believed Adidas was

19   trying to make things easier for your family; is that a fair

20   statement?

21             MR. DISKANT:  Objection.

22             THE COURT:  Sustained.

23   Q.  When did you receive that money, Mr. Bowen, from Chris

24   Rivers from Adidas to play for the Michigan Mustangs?

25   A.  Sometime during that season.  I can't recall the date.  I

1    don't know.

2    Q.  Would you agree, that would have been before June of 2017?

3    A.  Yes.

4    Q.  You also testified at some point you met an Adidas

5    representative by the name of TJ Gassnola, is that right?

6    A.  Yes.

7    Q.  And isn't it true that TJ Gassnola told you he could

8    arrange for $20,000 to be paid if your son would leave the Nike

9    family out of Detroit to go play for the Adidas Michigan

10   Mustangs, correct?

11              MR. DISKANT:  Objection.

12              THE COURT:  What is the objection?

13              MR. DISKANT:  Hearsay, among other things.

14              THE COURT:  For what purpose is it offered?

15              MR. HANEY:  Well, it not offered for its truth, your

16   Honor.  It's his -- if we could have a sidebar?  I don't want

17   to editorialize in front of the jury.

18              THE COURT:  Come on up.

19              MR. HANEY:  Thank you.

20              (Continued on next page)

21

22

23

24

25

1          (At the sidebar)

2          MR. HANEY:  Well, your Honor, under 401 it is

3    relevant, and under 608(b) it is certainly impeachable.  And

4    this whole case is about money he took from my client.

5          THE COURT:  Under 401, why is it relevant?

6          MR. HANEY:  Because his whole case is predicated on

7    money he took from my client, and now to compromise his son's

8    eligibility, he has been taking money for years.

9          THE COURT:  He testified on direct at enormous length

10   that he has been taking money for years.  So?

11         MR. HANEY:  I don't think he testified truthfully on

12   direct on who he took it from and how he got it, and I think

13   that will bear out as I go further.

14         THE COURT:  Didn't your question start out by saying

15   didn't you testify on direct that you took money from TJ

16   Gassnola?

17         MR. HANEY:  I can rephrase the question.  I don't

18   believe I said that, though, because you admonished me and I've

19   learned from that admonishment I'm not going to ask that

20   question anymore.

21         THE COURT:  Mr. Diskant.

22         MR. DISKANT:  Your Honor, he did testify about this on

23   direct.  And if Mr. Haney wants to elicit that Mr. Gassnola

24   offered him money, I have no problem with that.

25         Mr. Haney is asking long questions that insert all

1    sorts of facts and in this case hearsay into the question, and

2    I think that is improper and that was the basis for my

3    objection.

4              THE COURT:  Well, it is sustained as to the form.  You

5    can try again.

6              MR. HANEY:  Thank you, your Honor.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          MR. HANEY:  May I continue, your Honor?

3          THE COURT:  You may.

4          MR. HANEY:  Thank you, your Honor.

5    BY MR. HANEY:

6    Q.  Mr. Bowen, you had a conversation, did you not, with an

7    Adidas representative named TJ Gassnola about a payment of

8    $20,000 if your son played for the Michigan Mustangs?

9    A.  I had a conversation with him.

10   Q.  And then you did receive money in connection with that

11   promise, correct?

12   A.  Yes.

13   Q.  And you received that money before you received the $19,500

14   in June of 2017 in this case, didn't you?

15   A.  That's correct.

16   Q.  And on another occasion, Chris Rivers, from Adidas, wrote

17   you a $2,000 check, didn't he?

18   A.  Yes.

19   Q.  And on the memo of that check from Chris Rivers, it said

20   that you had provided staff help at some AAU event, is that

21   right?

22   A.  As I recall, yes.

23   Q.  But you never gave any staff help, did you?

24   A.  No.

25   Q.  And you knew when you took that $2,000 check from Chris

1   Rivers you were breaking NCAA rules, didn't you, sir?

2   A.  I didn't think about it like that.

3   Q.  Would you agree that that $2,000 check you received from

4   Chris Rivers was before June of 2017, when you received the

5   money involved in this case?

6   A.  Yes.

7   Q.  Mr. Bowen, I would like to speak with you about how your

8   son ended up at the University of Louisville.

9           You've testified -- I'm sorry, Mr. Bowen, when your

10  family was going through the recruiting process of choosing

11  colleges, is it fair to say that Christian Dawkins informed you

12  that a number of schools were offering money for your son?

13  A.  Yes, that's fair to say.

14  Q.  And Creighton University was one of those schools, is that

15  correct?

16          MR. DISKANT:  Objection.

17          THE COURT:  What is the objection?

18          MR. DISKANT:  The characterization of Creighton

19  University being the one making the offer.

20          MR. HANEY:  I don't think that was my question, your

21  Honor.

22          THE COURT:  I don't think so, either.

23          MR. HANEY:  I will rephrase the question, Judge.

24  BY MR. HANEY:

25  Q.  Mr. Bowen, Creighton University was offering money for your

```
 1   son, is that right?

 2           MR. DISKANT:  Objection.

 3           THE COURT:  What is the objection this time?

 4           MR. DISKANT:  Creighton University was offering.

 5           THE COURT:  Just give me one second.

 6           (Pause)

 7           Sustained.

 8           MR. HANEY:  Thank you, your Honor.

 9   BY MR. HANEY:

10   Q.  Mr. Bowen, you agree that there was a particular basketball

11   coach at the University of Crayton that was offering money for

12   your son to go to Crayton, is that right?

13   A.  I mean, not directly to me.

14   Q.  It was your understanding, though, through that coach, it

15   was an offer of a hundred thousand dollars for your son to go

16   to Crayton, is that right?

17           MR. DISKANT:  Mischaracterizes the testimony.

18           THE COURT:  Sustained.

19   Q.  What was your understanding, Mr. Bowen, of what amount of

20   money Creighton University was going to pay for your son?

21           MR. DISKANT:  Objection.

22           THE COURT:  Sustained.

23   Q.  Mr. Bowen, in conversation with Christian Dawkins, were you

24   made aware that a basketball coach from Creighton University

25   had offered money for your son to play basketball?
```

1  A.  Yes.

2  Q.  And what was your understanding?

3  A.  It was an offer for a hundred thousand dollars, according

4  to Christian.

5  Q.  And it wasn't just money that was willing to be paid, was

6  it?

7  A.  A job, a high-paying job.

8  Q.  A job for you and Ms. Malecke making over a hundred

9  thousand dollars a year, right?

10  A.  I don't recall the amount but it was a good job.  He said

11  it would be a good job.

12          MR. HANEY:  Your Honor, may I introduce to the witness

13  only 3502-07, dated January 24, 2018?

14          THE COURT:  Yes.

15  Q.  And at page 6 --

16          THE COURT:  Now, don't do that.

17          MR. HANEY:  I am not going to reference, your Honor.

18          Would you please read that to yourself, Mr. Bowen.

19  A.  I read it.  I see it.

20  Q.  So, Mr. Bowen, would you agree that you told the FBI --

21          MR. DISKANT:  Objection.

22          THE COURT:  Sustained.

23  Q.  Mr. Bowen, was it your understanding that Crayton was

24  willing to offer --

25          THE COURT:  Sustained.

1       The question starts with the words:  Has anything you

2  read refreshed your recollection on the subject concerning

3  which he professed a lack of recollection?

4  Q.  Mr. Bowen, does this refresh your recollection, reading

5  this particular statement?

6  A.  Yes.

7  Q.  Upon reading this statement, what is your understanding

8  that Crayton was going to offer in terms of employment?

9       THE COURT:  Sustained as to form.

10  Q.  Based on your refreshed recollection, Mr. Bowen, isn't it

11  true that Crayton was going to offer money for employment?

12       THE COURT:  Sustained.

13       Based on your recollection, your refreshed

14  recollection, what is it that Mr. Dawkins told you in relation

15  to Crayton?

16       THE WITNESS:  Are you talking to me, Judge?

17       THE COURT:  I sure am.

18       THE WITNESS:  What was on the thing, that Crayton

19  would offer -- not Crayton but he said one of the coaches would

20  offer a hundred thousand dollars that coached for Crayton.

21  BY MR. HANEY:

22  Q.  Mr. Bowen, University of Oregon was another team that was

23  recruiting your son, is that correct?

24  A.  Correct.

25  Q.  And that team was also sponsored by Nike, correct?

1    A.  I guess.  I don't know.  I can't -- I don't keep up with

2    who is sponsored by whom.

3    Q.  Was it your understanding from Christian that if your son

4    went to Oregon, they were offering to pay your family's housing

5    and travel costs?

6           MR. DISKANT:  Objection to "they."

7           THE COURT:  Sustained.

8    Q.  Mr. Bowen, through your conversations with Mr. Dawkins, did

9    you have an understanding of what Oregon would offer your son

10   to play at Oregon?

11          MR. DISKANT:  Objection.

12          THE COURT:  Sustained.

13          Look, the problem here, Mr. Haney, is quite simple.

14   What he testified to before are statements that your client

15   made to him.  You want to ask him about those questions, those

16   statements?  Fine.  If you want to try to -- well, I won't go

17   on.  You understand my point.

18          MR. DISKANT:  To be clear, also about the nature of

19   the individual making the offer as opposed to the institution.

20          THE COURT:  Yes.  That's also clear.

21   BY MR. DISKANT:

22   Q.  Mr. Bowen, based on statements from my client to you,

23   conversation, you understood that the basketball coach, or a

24   basketball coach, at the University of Oregon was to offer

25   money for your son to play there, is that correct?

1   A.  I just don't recall the University of Oregon.

2              MR. HANEY:  Your Honor, may I pull up 3502-7 again?

3              THE COURT:  Yes.

4              MR. HANEY:  Thank you.  At page 6.

5   Q.  Mr. Bowen, does that refresh your recollection as to what

6   you told the FBI on January 24, 2018?

7              THE COURT:  Sustained.  Don't do that again,

8   Mr. Haney.

9              MR. HANEY:  Thank you, your Honor.

10  Q.  Does that refresh your recollection, sir?

11  A.  Not really.  No.

12  Q.  Do you remember that statement being made by you?

13  A.  I don't recall that.  I just don't remember it.

14  Q.  Isn't it true that you took an unofficial visit to the

15  University of Oregon?

16  A.  That's true.

17  Q.  And on that unofficial visit, you met with one of the

18  assistant basketball coaches, is that correct?

19  A.  I met with everybody.

20  Q.  Did you meet with a Coach Stubblefield at the University of

21  Oregon, Tony Stubblefield?

22  A.  He was there, yes.

23  Q.  Is it true that Coach Stubblefield gave you $3,000 cash?

24  A.  I don't recall that.

25             MR. HANEY:  Could we pull up his statement, your

1  Honor, 3502-7, page 6?

2              MR. DISKANT:  We just looked at it, your Honor.

3              THE COURT:  You are not allowed to do that, Mr. Haney.

4  This is not his statement.  You know what you are allowed to

5  do.  I told you what you are allowed to do.  If you want to

6  continue to examine the witness, you are going to do it the way

7  I've directed or you can sit down.

8              MR. HANEY:  Yes, your Honor.

9              Your Honor, may I refresh his recollection?

10             THE COURT:  Yes.

11             MR. HANEY:  By pulling up 3502-7?

12             THE COURT:  I have already said yes.

13             MR. HANEY:  Thank you, your Honor.

14             (Pause)

15 Q.  Mr. Bowen, does that refresh your recollection about any

16 money you received from the University of Oregon coach?

17 A.  No, it doesn't.

18 Q.  I'm sorry?

19 A.  No, it doesn't.

20 Q.  Is it your testimony you never received any cash from the

21 University of Oregon?

22 A.  I just don't recall it.

23 Q.  Oklahoma State was another school that was recruiting your

24 son, is that correct?

25 A.  Correct.

1    Q.  And, in fact, you spoke directly to an assistant basketball

2    coach at Oklahoma State University about your son, too, didn't

3    you?

4    A.  About basketball, yes.

5    Q.  Was that coach Lamont Evans?

6    A.  Yes.

7    Q.  And isn't it true that the offer conveyed by Mr. Evans, the

8    coach at Oklahoma State University, was $150,000 in cash and

9    $80,000 for a car?

10   A.  You say he told me that?

11   Q.  Yes.

12   A.  I don't recall him telling me that.

13           MR. HANEY:  Your Honor, may I refresh his recollection

14   again with 3502-7?

15           THE COURT:  Yes.

16           MR. HANEY:  Thank you, your Honor.

17           (Pause)

18   BY MR. HANEY:

19   Q.  Mr. Bowen, does that refresh your recollection as to the

20   offer conversation you had with Lamont Evans at Oklahoma State?

21   A.  I remember talking to Lamont Evans but not about cash or

22   anything.

23   Q.  Do you recall in the conversation with Lamont Evans him

24   also offering free housing if your son played at Oklahoma

25   State?

1   A.  I don't recall any arrangements with Lamont Evans about

2   cash.

3   Q.  You do recall, however, the $150,000 offer being made to

4   your son to go to Oklahoma State, correct?

5            MR. DISKANT:  Objection.

6            THE COURT:  Sustained as to form.

7   Q.  Were you at some point made aware that there was a $150,000

8   offer for your to go to Oregon -- to Oklahoma State?

9            MR. DISKANT:  The same objection.

10            THE COURT:  You had better be more specific,

11  counselor.

12  Q.  Mr. Bowen, through Christian Dawkins or anyone else, were

13  you made aware of information by the coaching staff of Oklahoma

14  State University that in connection with your son going and

15  choosing Oklahoma State University, you would receive $150,000?

16  A.  Could you say that again?  That was kind of a long

17  statement.

18  Q.  Through any conversations with Christian Dawkins or anyone

19  else, do you recall being offered $150,000 for your son's

20  commitment to Oklahoma State University?

21  A.  I recall it, yes.

22  Q.  And certainly that was more money than the 100,000 to go to

23  Louisville, correct?

24  A.  Yes.

25  Q.  But you your son didn't go to Oklahoma State, did he?

1   A.   No.

2   Q.   He ended up going and picking Louisville, correct?

3   A.   Yes.

4   Q.   Did the coaches at Oklahoma State say they wanted your son

5   to play basketball at their school?

6              MR. DISKANT:  Objection.

7              THE COURT:  Sustained.

8   Q.   If your son would have ended up at Oklahoma State

9   University, would that have been a bad thing for Oklahoma State

10  University?

11             MR. DISKANT:  Objection.

12             THE COURT:  Sustained.

13  Q.   Mr. Bowen, UCLA was also recruiting your son, is that

14  correct?

15  A.   Yes.

16  Q.   And you, through your son's former coach Tim Anderson,

17  conveyed an offer for your son to go to UCLA, is that right?

18  A.   I don't recall that at all.

19  Q.   The university of Texas was recruiting your son, is that

20  correct?

21  A.   Yes.

22  Q.   And isn't it true that Texas had offered your family free

23  housing?

24             MR. DISKANT:  Objection.

25             THE COURT:  It is the same point as before,

1    Mr. Diskant?

2              MR. DISKANT:  Yes, your Honor.

3              THE COURT:  Sustained.

4    Q.  Mr. Bowen, was there a point in time where you learned,

5    through Christian Dawkins or anyone else, that the University

6    of Texas was offering money for your son to commit to Texas?

7              MR. DISKANT:  The same objection.

8              THE COURT:  Sustained.

9    Q.  Mr. Bowen, you knew that the University of Arizona had

10   offered $50,000 to your family if your son would go to play

11   basketball at their school, is that correct?

12             MR. DISKANT:  Your Honor, may I have one moment?

13             THE COURT:  Yes.

14             (Pause)

15             MR. DISKANT:  I have an objection to that question.

16             THE COURT:  Just a moment.  This is Arizona?

17             MR. DISKANT:  Yes.

18             THE COURT:  Sustained.

19             MR. HANEY:  Thank you, your Honor.

20   BY MR. HANEY:

21   Q.  Mr. Bowen, were you made aware from a basketball coach at

22   the University of Arizona that they would pay you $50,000 for

23   your son to attend the University of Arizona?

24             MR. DISKANT:  The same objection.

25             THE COURT:  Sustained as to form, at least.

1    Q.  At some point during the recruiting process, Mr. Bowen,

2    you, your son, and Christian Dawkins were considering Arizona

3    as an option, is that correct?

4    A.  Yes, that's correct.

5    Q.  And Christian Dawkins told you he didn't think Arizona

6    would be a good option for your son, is that right?

7              MR. DISKANT:  Objection.

8              THE COURT:  Sustained.

9    Q.  Was your conversation about why between yourself, Christian

10   Dawkins and your son Arizona may not have been a good fit for

11   him?

12             MR. DISKANT:  I don't understand that question.

13             THE COURT:  I'm sorry?

14             MR. DISKANT:  I don't understand the question.

15             THE COURT:  Sustained as to form.

16   Q.  Mr. Bowen, was there a time where you, Christian and your

17   son had a conversation about The University of Arizona as a

18   possible place for him to play basketball?

19   A.  Yes.

20   Q.  And isn't it true that Christian Dawkins felt that that

21   would not be a good basketball program for your son?

22             MR. DISKANT:  Objection.

23             THE COURT:  Sustained.

24   Q.  Did you arrive at some point where you felt that that would

25   not be the right fit for your son?

1  A.  At some point, yes.

2  Q.  And isn't it true that had to do with the fact that they

3  had two players there named Rawle Alkins and Allonzo Trier, is

4  that correct?

5  A.  That's correct.

6  Q.  And when it appeared that Allonzo Trier and Rawle Alkins

7  may leave to go to the MBA, Arizona became an option; is that

8  fair to say?

9  A.  Yes.

10  Q.  And you and Christian Dawkins had a conversation about

11  that, didn't you?

12  A.  Yes.

13  Q.  There was a point in time where Rawle Alkins and Trier

14  changed their minds about the NBA and decided they were going

15  to stay at Arizona, that right?

16  A.  Yes.

17  Q.  And at that point, you and Christian felt that was not the

18  right place for your son to be, is that correct?

19          MR. DISKANT:  Objection.

20          THE COURT:  Sustained.

21  Q.  Mr. Bowen, did you feel that if Trier and Alkins returned,

22  there would be a logjam of players playing his position at the

23  University of Arizona?

24  A.  There would be too many players there, yes.

25  Q.  And that's why your son didn't go to Arizona, correct?

1                MR. DISKANT:  Objection.

2                THE COURT:  Sustained.

3    Q.  Was the return of Rawle Alkins and Allonzo Trier a factor

4    in your decision -- your son's decision of where to go to

5    college, namely, Arizona?

6                MR. DISKANT:  Objection as to his son.

7                THE COURT:  Sustained.

8    Q.  Mr. Bowen, you felt Arizona was a bad basketball fit for

9    your son because Rawle Alkins and Allonzo Trier returned,

10   correct?

11   A.  Well, his position would -- yes.  In a sense, yes.

12   Q.  Because they shot too much and hogged the ball too much, is

13   that right?

14   A.  There are a number of reasons.

15   Q.  And if your son would have gone there, that could have not

16   been the right fit for him to get to the NBA; is that a fair

17   statement?

18               THE COURT:  It has been asked and answered at least

19   twice.  Let's go on.

20   Q.  Mr. Bowen, Tugs going to a school where he could become a

21   pro was your top concern, is that right?

22   A.  I wanted him to be in a good environment, of course.

23   Q.  I would like to turn your attention to May 18, 2010.  At

24   that point, Tugs Bowen still had not chosen a school to play

25   for, is that your recollection, in the middle of May?

1  A.  Correct.

2  Q.  And at that point, am I fair in saying that the decision

3  where your son should attend school was narrowed to Oregon,

4  Michigan State, Texas, Creighton or Arizona, is that correct?

5           THE COURT:  Do you appreciate, Mr. Haney, that the

6  date you used was 2010?

7           MR. HANEY:  I'm sorry, your Honor.  2017.

8  A.  I mean, I don't know exactly when he's -- he's moved teams

9  around.  I'm not certain of the date.  I can't be that

10  specific.

11          THE COURT:  This seems like a good place to break for

12  lunch.  Members of the jury, 2 o'clock.

13          But before you go, I do want to say this.  At some

14  point tomorrow I will have to be on a conference call for a

15  period of time.  I hope to have more information later in the

16  afternoon about when.  Depending on when it is, I will either

17  send the jury home somewhat early or we'll interrupt when I

18  need to do that.  I regret that, but it is better than having

19  half a day today and no day tomorrow.

20          OK.  See you at 2.

21          THE CLERK:  All rise.

22          (Continued on next page)

23

24

25

1          (Jury not present)

2          THE COURT:  Counsel can be seated.

3          Mr. Bowen, you can step down and step out.

4          Everybody can be seated.

5          THE COURT:  Maybe I will do this at the sidebar.

6          (Continued on next page)

7          (At the sidebar)

8          THE COURT:  Mr. Haney, I'm sure you are extremely

9    frustrated, and that's not my objective.  You are asking all of

10   these questions in a form, the point of which is to try to get

11   the witness to say that these offers, of which he obviously has

12   no personal knowledge at all, came from the schools and taking

13   your client out of the equation.

14         Now, those are objectionable because he doesn't have

15   any personal knowledge.  What he knows about is, assuming it

16   happened, is what your client told him.  That's the problem, to

17   a large extent, with your questions, and you wouldn't have had

18   the problem if you had asked the question differently.  So I

19   just thought I would tell you why you are having a problem.

20         MR. DISKANT:  May I just add one, your Honor?

21         From the government's perspective, the second

22   component of the problem is that Mr. Haney is continually

23   phrasing these as offers from the universities, and the

24   testimony has not been that.  It has been the coaches at the

25   universities as relayed from Mr. Dawkins.

1              THE COURT:  Understood.  The same point.

2              MR. SCHACHTER:  Your Honor, may I ask one question?

3         There have been some occasions where the witness has

4    said that he did not recall making the statement to the agent

5    where, at least according to the agent's notes, there was

6    reference that a particular statement was made.  For example, I

7    believe that the 302 says that, for example, Coach Lamont Evans

8    specifically directed --

9              THE COURT:  Yes.

10             MR. SCHACHTER:  -- spoke to the witness.

11        For proving up the impeachment in the defense case,

12   would the FBI enter into a stipulation --

13             THE COURT:  There has to be a foundation laid with the

14   witness, I understand that, but nobody was laying that

15   foundation.

16             MR. SCHACHTER:  I understand that.  So my question, I

17   suppose, is -- and we can speak to the government -- as to

18   whether in order to prove up that impeachment, whether it will

19   be necessary for Mr. Haney to go back to those questions and

20   say isn't it true that you did say that to the agent, and have

21   him deny it or -- I just want to know if that predicate would

22   be necessary in order to prove up through the agent's statement

23   the actual statement that was made, according to the agent's

24   notes.

25             THE COURT:  In my view, if the government insists on

1   it, it's necessary.  Whether they will insist on it I don't

2   know.

3          MR. SCHACHTER:  OK.  Thank you, your Honor.

4          MR. MOORE:  Maybe that is something we could discuss

5   with them at lunch, your Honor.

6          THE COURT:  Maybe it is.  OK.  Thanks.

7          (Luncheon recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        AFTERNOON SESSION

2                           2:00 p.m.

3              (Jury not present)

4              THE COURT:  At the end of the day, folks, I am going

5     to ask for an update on the schedule from you.

6              Let's get the jury.

7              (Jury present)

8     BRIAN BOWEN, resumed.

9              THE COURT:  The jurors are present.  The defendants

10    are present.

11             The witness is reminded that he is still under oath.

12             Mr. Haney.

13    BY MR. HANEY:

14    Q.  Mr. Bowen, you testified on direct about conversations with

15    Christian Dawkins about where your son would go to school, is

16    that correct?

17    A.  Yes, that's correct.

18    Q.  One of those schools that was discussed was Michigan State

19    University, is that a correct statement?

20    A.  Yes, it is.

21    Q.  You understood, did you not, that Mr. Michigan State was

22    not going to pay any money for -- the coaches at Michigan State

23    were not offering any money for your son to go to Michigan

24    State, is that a fair statement?

25    A.  That's a fair statement.

1   Q.  In fact, on several occasions Christian Dawkins advised

2   that he felt Tugs Bowen should go to Michigan State, is that

3   correct?

4            MR. DISKANT:  Objection.

5            THE COURT:  Sustained.

6   Q.  Was Christian Dawkins recommending that your son go to

7   Michigan State?

8            MR. DISKANT:  Same objection.

9            THE COURT:  Sustained.

10  Q.  Did Christian Dawkins tell you that your son should go to

11  Michigan State?

12           MR. DISKANT:  Same objection.

13           THE COURT:  Sustained.

14  Q.  In your conversations with Christian Dawkins, did you

15  discuss how Michigan State could be a good basketball fit?

16           THE COURT:  That's a yes or no question.

17  A.  Yes.

18  Q.  And you knew that Michigan State had a history of having

19  success with kids from Saginaw, Michigan, is that right?

20  A.  Yes, they have done well.

21  Q.  Including one being your nephew Jason Richardson, right?

22  A.  Yes.

23  Q.  And Draymond Green, correct?

24  A.  Yes.

25  Q.  And you told Christian Dawkins that your son didn't want go

1   to go Michigan State, is that right?

2   A.  Yes.

3   Q.  So it was your son's choice to go to Michigan State or not

4   go to Michigan State, is that a fair statement?

5   A.  Of course.

6   Q.  Just like it was your son's choice to go or not go to

7   Louisville, correct?

8   A.  Of course.

9   Q.  And there was conversation about other schools with

10  yourself and Christian that would possible suitors for your son

11  at the college level, would you agree?

12  A.  Say that again.  I'm sorry.

13  Q.  There were other schools that you discussed including

14  DePaul, correct?

15  A.  Yes.

16  Q.  Creighton, correct?

17  A.  Yes.

18  Q.  Oregon, correct?

19  A.  Yes.

20  Q.  ULNE, correct?

21  A.  Yes.

22  Q.  And Michigan State obviously, correct?

23  A.  Yes.

24  Q.  And you knew Michigan State was a Nike school, didn't you?

25  A.  I didn't concentrate on which team they were, which brand

1   they were.

2   Q.  It's your testimony you don't know Michigan State is a Nike

3   school, sir, under oath?

4          THE COURT:  Are you asking him whether he knows that

5   now?

6          MR. HANEY:  Yes, sir.

7   A.  I know now, but I didn't concentrate on getting a Nike

8   school.

9   Q.  My question is did you know they were a Nike school when

10  they were recruiting your son, yes or not, under oath?

11  A.  I guess I would have.

12         THE COURT:  Do you know whether you knew that then or

13  not?

14         THE WITNESS:  I never even thought about it.  Yeah,

15  they were a Nike school.  They were a Nike school.

16  Q.  And you know that because you have been to the games and

17  you have seen the Nike uniforms and logos, correct, Mr. Bowen?

18  A.  Yes.

19  Q.  Did you know Creighton was a Nike school?  Yes or no.

20  A.  No.

21  Q.  Did you know DePaul was a Nike school?  Yes or no.

22  A.  No, I didn't concentrate.

23  Q.  Did you know Oregon was a Nike school?  Yes or no.

24  A.  No.

25  Q.  Texas a Nike school?  Yes or no.

1   A.  No.  I just never concentrated on what the school was.

2   Q.  Mr. Bowen, I want to jump to the conversation about the

3   University of Louisville.

4           You knew, didn't you, that Rick Pitino, the head

5   basketball coach Rick Pitino, had a track record of putting

6   guys like Tugs Bowen, like your son, into the NBA?  Is that a

7   fair statement?

8   A.  Yes, that's fair.

9   Q.  You are familiar with a guy named Terry Rozier who went on

10  to play in the NBA, correct?

11  A.  I did know him, yes.

12  Q.  And obviously Donovan Mitchell who went to the NBA,

13  correct?

14  A.  Of course.

15  Q.  After Tugs decided to go to the University of Louisville,

16  Christian told you that he could find a way to get your family

17  financial assistance, is that correct?

18          MR. DISKANT:  Objection to that.

19          THE COURT:  What is the objection?

20          MR. DISKANT:  One, it's hearsay.  Two, as to the

21  timing.

22          THE COURT:  I'm sorry?

23          MR. DISKANT:  Two, as to the timing.

24          THE COURT:  Sustained.

25  Q.  After June of 2017, when your son decided to go Louisville,

1    isn't it true that Christian told you he would try to get you

2    financial help?

3                 MR. DISKANT:  Same objection.

4                 THE COURT:  Sustained.

5    Q.  At some point it was your understanding that Christian got

6    financial help for your family after your son decided to go to

7    Louisville, is that correct?

8                 MR. DISKANT:  Objection.

9                 THE COURT:  Sustained.

10   Q.  Mr. Bowen, you know today that Adidas is sponsored -- the

11   University of Louisville is sponsored by Adidas, is that

12   correct?

13   A.  Yes.

14   Q.  You have testified that Christian got money from Adidas to

15   give you after your son committed to go to Louisville, did you

16   not?

17                MR. DISKANT:  It mischaracterizes.

18                THE COURT:  Sustained.

19   Q.  Mr. Bowen, have you testified that after your son decided

20   to go Louisville, Christian --

21                MR. HANEY:  You are objecting before there is a

22   question?

23                MR. DISKANT:  If it mischaracterizes.

24                THE COURT:  The objection is apparent as far as you

25   have gone.

1          Sustained.

2    Q.  Mr. Bowen, did you believe that you received money from

3    Adidas through Christian Dawkins because your son went to

4    Louisville?

5    A.  Yes.

6    Q.  Certainly you didn't believe Nike was going to provide you

7    any money at an Adidas school, right?

8             MR. DISKANT:  Objection.  Relevance.

9             THE COURT:  Sustained.

10   Q.  Mr. Bowen, you have a history of getting or taking money

11   from Christian Dawkins, don't you?

12   A.  Have I taken money from him before?  Yes.

13   Q.  Do you have a history of taking money from Mr. Dawkins?

14   Yes or no.

15            THE COURT:  Sustained.

16            Define a history.

17   Q.  Have you received money from Christian Dawkins in the past?

18   A.  Yes.

19   Q.  In fact, in the past he has actually provided your family

20   with financial assistance, is that a fair statement?

21            THE COURT:  Sustained as to form.

22   Q.  Mr. Bowen, have you ever asked Christian Dawkins for money?

23   A.  Yes, money that he says he is going to give me.

24   Q.  Have you ever asked him for money for travel expenses?

25   A.  Not that I recall.  I didn't need to.

1   Q.  You have asked him for money to pay your rent before,

2   haven't you?

3   A.  I just asked him for the money that he said he was going to

4   give me.

5   Q.  Christian Dawkins first offered financial assistance to

6   your family when your son began playing for the Dorian's Pride

7   team, is that correct?

8           MR. DISKANT:  Objection.

9           THE COURT:  Sustained.

10          The problem is financial assistance, counsel.

11          MR. HANEY:  Thank you, your Honor.

12  Q.  You first received cash, did you not, Mr. Bowen, when your

13  son was playing for the Dorian's Pride team from Christian

14  Dawkins?

15  A.  I don't recall receiving cash at that point from Christian.

16  Q.  When your son was playing for Dorian's Pride, was it your

17  understanding Christian Dawkins was the program director?

18  A.  Yes.

19  Q.  That he founded the team, correct?

20  A.  I don't know if he founded it.  I can't say that.

21  Q.  You witnessed Christian Dawkins paying for team meals on

22  the road, didn't you?

23  A.  I didn't witness that.  I am sure he probably paid for

24  certain kids, I guess.

25          THE COURT:  The question was whether you observed him

1  doing it.

2         THE WITNESS:  No.

3  Q.  Do you have any person knowledge if he ever bought your son

4  shoes when he was playing for Dorian's Pride?

5  A.  All the kids get shoes.

6  Q.  I am asking about your son who is on the team.  Would he

7  have bought your son's shoes?

8         THE COURT:  What do you know, sir?

9  Q.  What personal knowledge do you have, Mr. Bowen, with

10  respect to my client Christian Dawkins buying your son shoes

11  when he played for Dorian's Pride?

12  A.  I don't know if he bought shoes.  He probably got him

13  shoes.  I can't say if he bought them.  I don't know.

14  Q.  Mr. Bowen, you testified that you are aware that my client

15  Christian Dawkins worked for an agent by the name of Andy

16  Miller, is that correct?

17  A.  That's correct.

18  Q.  And you stated that you knew him to be what was called a

19  runner, is that right?

20  A.  That's right.

21         THE COURT:  Sustained as to form.

22         Who was a runner?

23  Q.  Christian Dawkins, you knew him to be a runner, Mr. Bowen?

24  A.  That's what I figured him to be.

25  Q.  You knew Christian Dawkins was never an actual agent,

1  correct?

2  A.  I didn't think he was.  No, I didn't think he was.

3  Q.  Do you have personal knowledge if Christian Dawkins ever

4  went to college?

5           MR. DISKANT:  Objection.

6           THE COURT:  Sustained.

7  Q.  You know that Christian Dawkins graduated from Saginaw High

8  School, is that correct?

9  A.  That's correct.

10 Q.  Would you agree with me that Saginaw is a tough town?

11          MR. DISKANT:  Objection.  Relevance.

12          THE COURT:  Sustained.

13 Q.  Mr. Bowen, you testified on direct that there was an

14 understanding between you and Christian Dawkins that one day he

15 would be Tugs' representative, is that right?

16 A.  Correct.  Yes.

17 Q.  And based on the relationship between yourself, your son

18 and Christian Dawkins, it was your belief that your son would

19 sign Christian Dawkins regardless if any money was paid to you,

20 is that correct?

21 A.  The money was a part of it.  That's a part of it.  It was

22 their relationship.

23 Q.  But you also indicated there was an unspoken agreement

24 where eventually your son would sign with Christian Dawkins, is

25 that right?

1    A.  I believe I did, yes.

2    Q.  But if your son became a pro and decided, for whatever

3    reason, he didn't want to sign with Christian, you wouldn't

4    have forced your son to sign with Christian Dawkins?

5    A.  Of course not.

6    Q.  It would have been his choice, wouldn't it?

7    A.  Of course.

8    Q.  Christian and you had conversations, did you not, that

9    Christian believed it was OK that he was paying you money

10   because you had a preexisting relationship?

11              MR. DISKANT:  Objection.

12              THE COURT:  Sidebar.

13              (Continued on next page)

1           (At the sidebar)

2           THE COURT:  What is the objection?

3           MR. DISKANT:  He is trying to cheat in his client's

4    statements which are inadmissible hearsay.

5           MR. HANEY:  I am simply asking him for a recollection

6    of conversations between he and my client.

7           THE COURT:  I understood that.  You know that.

8           MR. HANEY:  I know that.

9           THE COURT:  You think if he asks him about

10   conversations with anybody in the world it can come in simply

11   because you're asking about conversations with somebody?

12          MR. HANEY:  I am asking his understanding of what the

13   conversation was between the two.  Mr. Bowen's personal

14   knowledge.  The state of mind of Mr. Bowen.

15          MR. DISKANT:  He wants to elicit what this witness

16   said to establish Mr. Dawkins's state of mind.

17          THE COURT:  What this witness said?

18          MR. DISKANT:  I am not understanding the state of

19   mind.

20          THE COURT:  Why isn't what Dawkins said admissible for

21   Dawkins's state of mind?

22          MR. DISKANT:  It could be, but I think that before he

23   asks a leading question, there should be some foundation to

24   establish whether or not the conversation even occurred.  For

25   example, did you ever talk with my client about whether or not

1   it would be permissible for you to receive such payments?  If

2   so, what did my client say about that subject?  The problem is

3   Mr. Haney is leading him.

4           THE COURT:  It's cross-examination.

5           MR. DISKANT:  It is.  Also, I don't think he has a

6   good faith basis to believe that the answer to that question --

7           THE COURT:  Tell me the good faith basis.

8           MR. HANEY:  There is other direct evidence in this

9   case and my client articulates his belief that the preexisting

10  relationship made the payments to Bowen permissible.  Phone

11  calls between him and the undercover agent where he is telling

12  the undercover I can make these payments as a preexisting

13  relationship with the NCAA.

14          MR. DISKANT:  That is a complete mischaracterization

15  of those calls.  In the very same calls he refers to these

16  payments as illegal.

17          THE COURT:  Who refers?

18          MR. DISKANT:  Mr. Dawkins.  He says they can't all be

19  documented because they are illegal and in violation of NCAA

20  rules.  There is no statement along the lines of what Mr. Haney

21  says.

22          THE COURT:  Let me see the transcript.

23          MR. DISKANT:  This is Government Exhibit 49T.  Prior

24  to this Mr. Dawkins sends the undercover a list of payments

25  which includes a payment to Mr. Bowen, one of these monthly

1    payments that Mr. Bowen is testifying about, and this is how

2    Mr. Dawkins describes it.

3              THE COURT:  First of all, is this, Mr. Haney, what

4    you're referring to?

5              MR. HANEY:  No.  I am referring to a different call

6    with a different undercover.

7              THE COURT:  Maybe you should get that one too.

8              MR. HANEY:  Can we get that?

9              MR. SCHACHTER:  Ms. Donnelly is looking for it.

10             THE COURT:  Mr. Diskant, you said what precedes this

11   is what?

12             MR. DISKANT:  Mr. Dawkins sends Ms. Bailey a list of

13   specific payments that he is going to need to give money to

14   make.  One of them is Mr. Bowen.  He also discusses the payment

15   to Mr. Bowen a little bit later in the same call.  We have

16   redacted it because there are discussions of other payments.

17             THE COURT:  These other payments are what payments?

18             MR. DISKANT:  To players and coaches.

19             THE COURT:  Through Dawkins?

20             MR. DISKANT:  Correct.

21             Your Honor, we have elicited through this witness the

22   fact that he owns a bat phone to talk about money, the fact

23   that he uses coded language.

24             THE COURT:  Thank you.

25             MR. HANEY:  I would say this particular gentleman, he

1   may be using a bat phone for a lot of other business.

2              THE COURT:  What about your client's bat phone?

3              MR. HANEY:  I am not denying that.

4              MR. MOORE:  I am glad no one is inquiring about mine.

5              THE COURT:  So I am being handed --

6              MS. DONNELLY:  It's been marked as DX5T.  It doesn't

7   have a stamp on it.

8              THE COURT:  All right.  What are you referring to

9   specifically here, Mr. Haney?

10             MS. DONNELLY:  The top of page 3.

11             MR. HANEY:  It refers specifically to this particular

12  witness's payments, that there exists -- "everybody knows about

13  us.  It's not a secret anymore."  Talking about the kid.

14             Sorry, your Honor.

15             THE COURT:  OK.  I am satisfied there is a good faith

16  basis.

17             Now, let's step back.  And whose is this?

18             MR. DISKANT:  Mine.

19             MR. SCHACHTER:  Can I raise one additional issue?

20  Your Honor sustained some questions earlier to Mr. Haney's

21  questions about Mr. Dawkins's recommendation to go to Michigan

22  State even though Michigan State was not offering to make any

23  payments.  I didn't intend to be the proponent of this

24  evidence, but I believe it's relevant to the existence of the

25  conspiracy.

1          THE COURT:  The rulings have been made and that's the

2     way it is.  We are on another subject.

3          Step back, folks.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Put another question, Mr. Haney.

3          MR. HANEY:  Thank you, your Honor.

4     BY MR. HANEY:

5     Q.   Mr. Bowen, was there an occasion where you and Mr. Dawkins

6     had a conversation about how payments to you were OK because

7     there was a preexisting relationship between the two of you,

8     you had known each other?

9     A.   No, I don't recall that.

10    Q.   On the date of July 13, 2017, you met a man named Munish

11    Sood in Morristown, New Jersey, and he paid you $19,500 in

12    cash, is that correct?

13    A.   Yes, it is.

14    Q.   And it was your understanding that this payment was made at

15    the direction of Christian Dawkins, is that right?

16    A.   Yes.

17    Q.   Just so we are clear, on that date of July 13, 2017, your

18    son had already committed to the University of Louisville over

19    a month and a half earlier, is that right?

20    A.   Yes.

21    Q.   So your son had committed to Louisville long before you

22    received this cash from this guy named Munish Sood?

23          MR. DISKANT:  Asked and answered.

24          THE COURT:  Sustained.

25    Q.   You testified on direct, Mr. Bowen, that there was an

1   occasion where the head associate basketball coach at the

2   University of Louisville, Kenny Johnson, gave you $1300 cash

3   outside the Galt House apartments in Louisville, is that right?

4   A.  Yes.

5   Q.  And you know that the head associate coach is the

6   number-two guy on the coaching staff behind the head coach, is

7   that right?

8   A.  Yes.

9   Q.  And that payment by you to -- by the head associate coach

10  at the University of Louisville, Kenny Johnson, that would be a

11  violation of the NCAA rules, wouldn't it?

12  A.  Yes.

13  Q.  So would you agree that this action by the head associate

14  coach at the University of Louisville could have affected your

15  son's eligibility in the exact same way that Christian

16  Dawkins's did?

17          MR. DISKANT:  Objection.

18          THE COURT:  Sustained.

19          MR. DISKANT:  I will withdraw the objection.

20          THE COURT:  Answer the question, please, Mr. Bowen.

21          MR. HANEY:  May I ask the question again?

22          THE COURT:  Sure.

23  Q.  So this action by the head associate coach at the

24  University of Louisville, Kenny Johnson, paying you cash could

25  have affected Tugs' eligibility in the exact same way Christian

1    Dawkins did, agreed?

2    A.   Both violations, yes.

3    Q.   So when Kenny Johnson gave you that $1300 cash, did he tell

4    you he wanted to defraud Louisville?

5              MR. DISKANT:  Objection.

6              THE COURT:  Sustained.

7    Q.   When you received that money from Kenny Johnson, did you

8    feel that he was just trying to keep you happy as a parent?

9              MR. DISKANT:  Objection.

10             THE COURT:  Sustained.

11   Q.   Mr. Bowen, let's talk about your non-prosecution agreement

12   for a moment, your deal with the government.

13             This non-prosecution agreement means that in exchange

14   for your testimony here today you are not going to be

15   prosecuted for having anything to do with the money in

16   connection with your son going to Louisville, is that your

17   understanding?

18   A.   That's part of it, yes.

19   Q.   And so we are clear, that's the $19,500 in the summer or

20   June of 2017?

21             MR. DISKANT:  Objection.

22             THE COURT:  Sustained.

23   Q.   Mr. Bowen, isn't it true that just prior to receiving the

24   $19,500 through Christian Dawkins, your house in Saginaw had

25   burned in a house fire?

1          MR. DISKANT:  Objection.  Relevance.

2          THE COURT:  Overruled.

3    A.  Say that again.

4    Q.  Isn't it true just prior to receiving the $19,500, your

5    house in Saginaw had burned in a house fire, right?

6    A.  That was quite a while after.

7    Q.  Your saying the house fire happened after you got the

8    19,500?

9    A.  No, I am saying I got the money but it wasn't right after

10   it.  It was like -- one was like January or December and other

11   one was, what, July.

12   Q.  Mr. Bowen, your house burned in Saginaw before you got the

13   money --

14   A.  Yes.

15   Q.  -- correct?

16   A.  Yes.

17   Q.  And you didn't have homeowner's insurance on that house

18   either, did you?

19   A.  No.

20   Q.  You needed money for the repairs to that house, didn't you?

21   A.  I wanted to get it fixed.

22   Q.  You asked Christian for money to help fix your house,

23   didn't you?

24   A.  I didn't ask him for money to fix the house.  I told him

25   that was the situation I was dealing with.

1   Q.  So my client, young Christian Dawkins, is just calling

2   people up and asking them if they want free money; is that your

3   belief, Mr. Bowen?

4               MR. DISKANT:  Objection.

5               THE COURT:  Overruled.

6   A.  Say that again.

7   Q.  Do you believe my young client Christian Dawkins is calling

8   people up, giving free money away, asking them if they need

9   money?  Does that make sense?

10              THE COURT:  Overruled.

11  A.  I don't know how to answer a question like that.  Is that a

12  yes or no question?  I am not sure.

13  Q.  You want me to ask it again?

14  A.  Yes.

15  Q.  Do you think my young client Christian Dawkins, 20 years

16  old, is just calling people up asking to give away free money?

17  Does that make sense?

18              MR. DISKANT:  It's not even true.  He wasn't 20 years

19  old.

20              THE COURT:  Do the best you can, Mr. Bowen.

21              THE WITNESS:  Yes, your Honor.

22  A.  I don't know how to answer it.  I'm sorry.

23  Q.  Christian Dawkins is some 25 years younger than you, isn't

24  he?

25  A.  Yes.

IA98GAT4                    Bowen Senior - Cross

1    Q.  And you're getting a free pass here to testify against him

2    today, aren't you?

3    A.  Free pass?

4    Q.  Free pass.  Not getting prosecuted.  Right?

5    A.  I have a non-prosecution agreement.

6    Q.  And you went on disability when you were injured as a

7    member of the Saginaw police force, is that correct?

8    A.  That's correct.

9    Q.  You injured your elbow?

10   A.  That's correct.

11   Q.  And then when you left the force, you got a pension, is

12   that correct?

13   A.  That's correct.

14   Q.  And you never told the Saginaw police department, did you,

15   that you were receiving all this cash from these AAU basketball

16   teams and different folks under the table, did you?

17   A.  What would it matter to them?

18   Q.  I am asking you if you did or not.

19            Did you tell them you got all of this money?

20   A.  I would have no reason to tell them that.

21   Q.  Would you have a reason to tell the IRS that?

22   A.  I have told the IRS that.

23   Q.  You didn't file taxes in 2015, did you?

24   A.  I am filing them now.

25   Q.  I didn't ask you that question.

1          Did you file your taxes back in 2015 just like

2   everyone else has to?

3          MR. DISKANT:  Objection.

4          THE COURT:  Sustained.

5   Q.  Did you file your taxes in 2015?

6   A.  I got an extension.

7   Q.  Did you file your taxes in 2016?

8   A.  I have an extension.

9   Q.  Well when you got your extension in 2015, did you ever file

10  them?

11  A.  They are on extension.

12  Q.  Forever?

13  A.  No.  My tax guy is dealing with that.

14  Q.  Three years later?

15         MR. DISKANT:  Your Honor.

16         THE COURT:  Sustained.

17  Q.  You didn't file taxes in 2017 either, did you, Mr. Bowen?

18  A.  Not yet.

19  Q.  You aren't getting prosecuted for tax evasion either, are

20  you?

21         THE COURT:  That's enough of that.

22  Q.  When you were a police officer, you filed a police report

23  regarding your friend's supposed --

24         MR. DISKANT:  We had an agreement on this.

25         MR. HANEY:  Can we have a sidebar because that's not

1   my recollection, unless I can talk to counsel.

2           THE COURT:  Why don't you talk to him first.

3           (Pause)

4           THE COURT:  I hope we are not going to have to have a

5   trial of who said what to whom here.

6           MR. MOORE:  We are not.

7           THE COURT:  Members of the jury, I am sure it will not

8   surprise you to know that lawyers in the ordinary course reach

9   all kinds of agreements about all kinds of things that affect

10  the scope of trial and sometimes people have different

11  recollections and it needs to get sorted out.  That's all that

12  is going on here.

13          Are we close to an answer, gentlemen and ladies?

14          MR. MOORE:  I am looking, Judge.

15          THE COURT:  Mr. Haney, do you have something else you

16  can go on to?

17          MR. HANEY:  I am almost done.  If we can't sort this

18  through, I will move forward.

19          THE COURT:  The clock is ticking.

20          MR. MOORE:  I found the e-mail.

21          MR. HANEY:  I am not going to debate this.  We are

22  going to move on.

23          THE COURT:  OK.

24  BY MR. HANEY:

25  Q.  Mr. Bowen, on direct you referenced what was called the

1    Jason Richardson Foundation, right?

2    A.   Yes.

3    Q.   Correct me if I am wrong, but the mission of the foundation

4    was in part to help the poor people of the community of

5    Saginaw, is that right?

6    A.   It was to help the community, yes.

7    Q.   You helped run that foundation?

8    A.   Yes.

9    Q.   Did you run that foundation?

10   A.   I didn't run it, no.

11   Q.   Would you agree it was to make a difference in the hometown

12   of Saginaw and give back to underprivileged families in the

13   Saginaw community?  Correct?

14        MR. DISKANT:  Combination of asked and answered and

15   relevance.

16        THE COURT:  Sustained.

17   Q.  But in reality, despite that mission, Mr. Bowen, isn't it

18   true that you have in fact been stealing from the poor people

19   of Saginaw, haven't you?

20        THE COURT:  Certainly sustained in that form.

21   Q.  Mr. Bowen, you have been committing welfare fraud for six

22   years, haven't you?

23   A.  No.

24   Q.  No.  So you don't call it welfare fraud when you take food

25   stamps and sell them from people and give them 60 cents on the

1    dollar?  That's what you were doing, weren't you?

2    A.  60 cents on the dollar?  I will answer that question for

3    you.

4         There is something called ethics and then morality

5    too.  I deal with a lot –– Saginaw is a depressed area and I

6    deal with a lot of people, young ladies in this situation,

7    young ladies that had like five kids, kids that don't want to

8    go back to school because people are teasing them.

9         MR. MOORE:  I am going to move to strike as

10   nonresponsive.

11        THE COURT:  You can't all speak together.  That's a

12   recipe for disaster.

13        MR. DISKANT:  I think Mr. Moore and I agree that this

14   answer should be stricken and a new question should be asked.

15        MR. HANEY:  May I proceed, your Honor?

16        THE COURT:  After I strike the answer.

17        The answer is stricken.

18   BY MR. HANEY:

19   Q.  Mr. Bowen, you bought food stamp cards from poor people?

20   Yes or no.

21   A.  Yes.

22   Q.  You didn't give them the full value of those cards, did

23   you?

24   A.  No.

25   Q.  And you characterize that as helping a poor person?

IA98GAT4                    Bowen Senior – Cross

1          MR. DISKANT:  Objection.

2          THE COURT:  Sustained.

3    Q.  You understand that's a federal crime, don't you?

4    A.  Yes.  I agreed to that in my agreement, yes.

5    Q.  So it is welfare fraud, isn't it?

6          THE COURT:  Sustained.

7    Q.  You didn't do that one time, you did that over six years,

8    didn't you, Mr. Bowen?

9    A.  Not straight six years.  It was periodically, when somebody

10   needed help.

11   Q.  So you were helping them by cheating them on their food

12   stamps?

13         MR. DISKANT:  Objection.

14         THE COURT:  Sustained.

15   Q.  Lying to the FBI also is a crime, isn't it?

16   A.  Of course.

17   Q.  And you lied to the FBI on several occasions, didn't you?

18   A.  Yes.

19   Q.  Not prosecuted for that either, are you?

20   A.  No.

21   Q.  Police officers aren't very popular in prison, are they,

22   Mr. Bowen?

23         MR. DISKANT:  Objection.

24         THE COURT:  Sustained.

25   Q.  Mr. Bowen, your family hired a lawyer to sue Adidas for

1    money, isn't that right?

2            MR. DISKANT:  Objection.  Relevance.

3            THE COURT:  Sustained.

4            MR. HANEY:  Nothing further.

5            THE COURT:  Thank you.

6            Any other cross?

7            MR. CODE:  There is, your Honor.

8            THE COURT:  All right.

9            Mr. Code, proceed.

10   CROSS-EXAMINATION

11   BY MR. CODE:

12   Q.  Mr. Bowen, I want to ask you questions that will require

13   just a yes or no and you may explain.  I don't want to prolong

14   our time here.

15           Is that all right, sir?

16   A.  Yes.

17   Q.  Should I ask you a question that you do not understand -- I

18   am not trying to trick you -- just please ask me to rephrase it

19   in a way that you understand it.

20           Is that OK, sir?

21   A.  Yes, sir.

22   Q.  In your direct examination by Mr. Diskant and your

23   statement to the FBI on January, the 24th, 2018, you stated you

24   did not even know Merl Code, correct?

25   A.  I didn't recall who he was.  I knew his name.

 1   Q.  You had never met Merl Code, is that correct?

 2            MR. DISKANT:  As of when?

 3            THE COURT:  I can't hear you, Mr. Diskant.

 4            MR. DISKANT:  As of when?

 5            THE COURT:  The objection is sustained.

 6            Make it more specific in time.

 7   Q.  Had you met Merl Code in results of the recruiting of your

 8   son Tugs?

 9   A.  No, I don't recall.

10   Q.  Thank you, sir.

11            Mr. Bowen, you told Mr. Diskant that the first time

12   the FBI came to see you you lied, is that correct?

13   A.  Yes.

14   Q.  In point in fact, you admitted that you lied to the FBI on

15   multiple things, including receiving funds from Adidas, is that

16   correct?

17   A.  Receiving what, sir?  I'm sorry.

18   Q.  In point in fact, you admitted that you lied to the FBI

19   about multiple things, including receiving funds from Adidas?

20   A.  Yes.  That's correct.

21   Q.  And you are aware, sir, that lying to the FBI is a real

22   federal crime for which you can get five years in jail?  Is

23   that correct?

24            MR. DISKANT:  I think this has been asked and

25   answered.

1          THE COURT:  Mr. Diskant, you are just going to have to

2     be a little bit more audible.

3          MR. DISKANT:  I'm sorry.  I think this has been asked

4     and answered.

5          MR. CODE:  I didn't ask it.

6          THE COURT:  We are not going to repeat the whole

7     cross-examination.

8     Q.  You told Mr. Diskant on direct that after that first FBI

9     interview in which you lied, you called the FBI and then you

10    lied to them again, isn't that correct?

11    A.  That's correct, yes.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  And did you understand at that time, sir, that lying to the

2  FBI would be another federal crime?

3  A.  I didn't know at that time but I know it now.

4  Q.  After the first or second meeting with the FBI, the FBI did

5  not arrest you or give you an arrest warrant or lock you up,

6  did they?

7  A.  No.

8  Q.  You told Mr. Diskant on direct that the FBI did bring you a

9  federal grand jury subpoena for your phone communications, is

10  that correct?

11  A.  That's correct.

12  Q.  After you received that grand jury subpoena, you got rid of

13  what you called a bat phone because you knew that phone

14  contained info relevant to this case, isn't that correct?

15  A.  That's fair.

16  Q.  And you were aware, sir, that destroying evidence in a

17  legal federal crime is called obstruction of justice; are you

18  aware of that?

19  A.  I mean, I'm not a lawyer.  I knew it was wrong.  I can't

20  say I knew it was obstruction of justice.

21  Q.  Let me change the subject matter for you just a second or

22  two.

23  A.  All right.

24  Q.  You talked about that bat phone.  Was the bat phone the

25  phone you used to make calls or receive calls that may be in

Ia9dgat5                    Bowen Senior - cross

1   violation of anything?

2           MR. DISKANT:  I don't understand that.

3           THE COURT:  I think you maybe ought to try a different

4   formulation.

5           MR. CODE:  Let me go on further.

6   BY MR. CODE:

7   Q.  While in New York City to pick up your money from Mr. Sood,

8   in a July the 12th, 2018 call that was wiretapped by the FBI

9   between you and Christian, did you tell Christian -- excuse my

10  language, sir -- "Fuck, I need some ass in New York City?

11          MR. DISKANT:  Objection.

12          THE COURT:  Sustained.

13          MR. CODE:  Let me lay a foundation, your Honor, if

14  that is all right?

15          THE COURT:  That's not the problem.

16  BY MR. CODE:

17  Q.  Mr. Bowen, this is probably my last question.

18          You have been negotiating with shoe companies and

19  basketball teams for the talents of your basketball playing son

20  since he was 14 years old, isn't that true, sir?

21          MR. DISKANT:  Objection as to "negotiating."

22          THE COURT:  Overruled.

23  A.  You say I've been negotiating?  Say that again, sir.

24  Q.  You have been receiving money from basketball -- AAU

25  basketball teams, Nike-sponsored basketball teams,

1   Adidas-sponsored basketball teams, and some colleges and

2   universities since your son was -- since the year of 2014, when

3   he was about 14 or 15 years old, is that correct?

4           MR. DISKANT:  Your Honor, there are compound and there

5   are multiple mischaracterizations baked into it.

6           THE COURT:  The witness can answer.

7   A.  I'm not sure -- well, his first time was like in 2015 I

8   think it was.  So, whatever age he was then.  He's 20 now.

9   Q.  And you received those dollars for his talents?

10  A.  He wasn't 14, that's for sure.

11  Q.  When he was in high school?

12  A.  High school.

13  Q.  When he was in prep school?

14  A.  I didn't receive money.  I received funding to help out

15  with housing.

16  Q.  Isn't it true, Mr. Bowen, that because of Tugs' talents,

17  you have been pimping your namesake since he was 15 years old?

18          MR. DISKANT:  Your Honor --

19          THE COURT:  Sustained.

20          MR. CODE:  No further questions.

21          THE COURT:  Thank you.  Anyone else?

22          MR. SCHACHTER:  No questions on behalf of Mr. Gatto,

23  your Honor.

24          THE COURT:  Thank you.

25          Let's take a break for the afternoon before redirect.

1          Is there going to be redirect?

2          MR. DISKANT:  There is not, your Honor.

3          THE COURT:  No redirect.  Then the witness is excused

4     and we will get started on the next one.  We will take the

5     break a little later.

6          Mr. Bowen, you are excused.

7          (Witness excused)

8          MR. DISKANT:  Does your Honor still want to take a

9     break?

10          THE COURT:  I'm sorry.  I can't hear you.

11          MR. DISKANT:  Does your Honor still want to take a

12     break or should we wait for the next witness?

13          THE COURT:  We will do it a little later.

14          THE CLERK:  Be seated, everyone.

15          MR. SOLOWIEJCZYK:  Your Honor, with the Court's

16     permission, we are going to read a portion of a stipulation and

17     then seek to offer an exhibit.

18          THE COURT:  All right.

19          MR. SOLOWIEJCZYK:  Your Honor, we would seek to read

20     from Stipulation S2, which is already in evidence.

21          THE COURT:  All right.  Go ahead.

22          MR. SOLOWIEJCZYK:  Ms. Lee, if you could publish

23     paragraph 3 of that stipulation.

24          Sorry, I'm not seeing anything.

25          There we go.  Thank you.

Ia9dgat5

1          "Government Exhibits 102A through 102T, and 115A,

2   including all parts and subdivisions thereof, are true and

3   accurate copies of text messages and related content sent or

4   received using a cellular phone associated with the call number

5   989-493-4317 and belonging to Christian Dawkins, the

6   defendant."

7          And at this time, your Honor, the government would

8   offer Exhibit 115A-1, which is a text message from Christian

9   Dawkins to Jill Bailey.

10          THE COURT:  Received.

11          (Government's Exhibit 115A-1 received in evidence)

12          MR. SOLOWIEJCZYK:  Permission to publish, your Honor?

13          THE COURT:  Yes.

14          MR. SOLOWIEJCZYK:  And, Ms. Lee, if you could zoom in

15   on the top half of that text message.

16          This is from August 13, 2017.  It is a text message

17   from Christian Dawkins to Jill Bailey.  I am just going to read

18   the top half of it.

19          "What we need to get done.  Tomo if possible -- can be

20   deposited in bank account Tomo.  I can give you account info

21   over phone.  DTCTB4K cash in one account.  2K a month after

22   this.  Starts again in October.  RGHMS-7K cash in one account -

23   2K a month after this.  Starts again in September.

24          "This week:  MCA-8K -- can deposit in my account, and

25   I can meet him.  Monthly.

Ia9dgat5

1        "PC-6K-guy can meet you this week in NYC monthly.

2    CKH- 6K - can deposit in my account and I can meet him.  Won't

3    need again until winter.

4        "ADP-SH-7K, can deposit in bank account or deposit in

5    mine & I can give to him -- quarterly.

6        "DBBS, LV-2K-monthly."

7        And, your Honor, at this time, the government would

8    seek to offer Government Exhibit 49 and Government Exhibit 49T,

9    which is a transcript aid that is associated with the

10   recording.

11       THE COURT:  Received.

12       (Government's Exhibits 49, 49T received in evidence)

13       MR. SOLOWIEJCZYK:  And with the Court's permission, we

14   would seek to play this recording for the jury.

15       THE COURT:  Yes.

16       MR. SOLOWIEJCZYK:  So, this is an August 16, 2017 call

17   between Christian Dawkins and Jill Bailey.  And we're going to

18   start on page 2.

19       THE COURT:  OK.

20       (Audio played)

21       MR. SOLOWIEJCZYK:  OK.  And, Ms. Lee, if we could

22   proceed to the next clip, which begins at page 10.

23       (Audio played)

24       MR. SOLOWIEJCZYK:  And we're turning to page 13, line

25   6.

Ia9dgat5

1          (Audio played)

2          MR. SOLOWIEJCZYK:  If we could turn to the next clip,

3  Ms. Lee, which begins at page 20 of the transcript.

4          I'm no longer seeing the transcript, Ms. Lee, just so

5  you know.

6          (Pause)

7          (Audio played)

8          MR. SOLOWIEJCZYK:  And, Ms. Lee, if we could turn to

9  page 24 and the next clip.

10          (Audio played)

11          MR. SOLOWIEJCZYK:  And then, Ms. Lee, if we could turn

12  all the way to page 49.

13          (Audio played)

14          MR. SOLOWIEJCZYK:  You can take that down, Ms. Lee.

15  Thank you.

16          Your Honor, we are going to call a witness, unless the

17  Court wants to take the break now.

18          THE COURT:  We will take the break now.

19          15 minutes, members of the jury.  Counsel, please be

20  back in ten.

21          THE CLERK:  All rise.

22          (Recess)

23          (Continued on next page)

24

25

Ia9dgat5

```
1              (Jury not present)

2              THE COURT:  Be seated, folks.

3          So, where are we in terms of remaining trial days?

4              MR. DISKANT:  Your Honor, I think, as of right now,

5   the government anticipates -- I should ask, does the Court

6   still expect to have about a half day tomorrow?

7              THE COURT:  I would imagine at least.

8              MR. DISKANT:  Great.  OK.  So I think the government's

9   case --

10             THE COURT:  But I'm not sure.

11             MR. DISKANT:  I think the government's current

12  estimate is that we will likely rest towards the middle of next

13  week, perhaps Tuesday, or Wednesday, depending on how the

14  proceedings proceed.

15             THE COURT:  All right.  And the defense?

16             MR. SCHACHTER:  Your Honor, I think we don't know.  We

17  have received your Honor's order, which we are reviewing and we

18  will have to consider.

19             THE COURT:  OK.  Make parameters.

20             MR. SCHACHTER:  It certainly would not be more than a

21  week, I think, your Honor, and maybe substantially less than

22  that.

23             THE COURT:  Meaning four days?

24             MR. SCHACHTER:  Meaning four days and maybe

25  substantially less.
```

1          THE COURT:  So we're likely to have the case to the

2   jury the week of the 22nd, worst case?

3          MR. SCHACHTER:  Worst case, your Honor.

4          THE COURT:  OK.  Thank you for that.  And I'll ask you

5   for a refinement tomorrow.

6          OK.  Let's get the jury.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Jury present)

2          THE CLERK:  Please be seated, everyone.

3          THE COURT:  OK, folks.  The jurors are present.  The

4   defendants are present.

5          Members of the jury, I thought I would give you an

6   update after talking with the lawyers.  The timing is still a

7   little uncertain but we are running ahead of schedule, and we

8   anticipate that you will get the case not later than the week

9   of October 22nd, with some chance of getting it a little

10  earlier.  So, it seems to me quite unlikely that you will still

11  be here in November at all.  Time will tell.

12         OK.  Next witness.

13         MR. SOLOWIEJCZYK:  Your Honor, the government calls

14  Carrie Doyle.

15   CARRIE DOYLE,

16      called as a witness by the government,

17      having been duly sworn, testified as follows:

18         THE CLERK:  Thank you.  Please be seated.

19         And if you can please state your name and spell your

20  first and last name for the record.

21         THE WITNESS:  Yes.  My name is Carrie Doyle.  It's

22  spelled C-a-r-r-i-e; Doyle, D-o-y-l-e.

23         THE COURT:  You may proceed, counsel.

24  DIRECT EXAMINATION

25  BY MR. SOLOWIEJCZYK:

1   Q.   Good afternoon, Ms. Doyle.

2   A.   Good afternoon.

3   Q.   Where are you currently employed?

4   A.   North Carolina State University.

5   Q.   Is there a common acronym that's used for North Carolina

6   State University?

7   A.   Yes.  It's NC State.

8   Q.   Where is NC State located?

9   A.   In Raleigh, North Carolina.

10  Q.   And what is your position at NC State?

11  A.   I'm the senior associate athletics director for compliance.

12  Q.   How long have you held that position?

13  A.   Approximately eight years.

14  Q.   Are you assigned to a particular division or department,

15  Ms. Doyle?

16  A.   Yes.  The athletics department.

17  Q.   Prior to working at NC State, were you employed at any

18  other universities?

19  A.   Yes.  I was employed at the University of New Hampshire for

20  approximately six-and-a-half years.  Before that was -- five

21  years I was self-employed, and then before that I was employed

22  at the NCAA national office for 12 years; seven of those years

23  as an enforcement representative, which is an investigator, and

24  five of those years was as the director of student-athlete

25  reinstatement.

1    Q.  How far did you go in school, Ms. Doyle?

2    A.  I have two master's degrees.  Actually, I have a BS in

3    Education from Cortlandt State, which is part of the State

4    University of New York system, and then I have two master's

5    degrees from the University of Iowa.  One is in Athletics

6    Administration and the other is an MBA.

7    Q.  In your role as senior associate athletic director at NC

8    State, who do you report to?

9    A.  I report to the Chancellor.

10   Q.  What's the Chancellor's role at the University?

11   A.  He's the top official at the University.

12   Q.  As the senior associate athletic director, what are your

13   main job responsibilities?

14   A.  So I'm primarily responsible for making sure that everyone

15   associated with NC State athletics is following NCAA rules.  I

16   supervise four other people who are assigned to specific

17   sports, and all five of us are trying to make sure that we're

18   minimizing our risks of violating NCAA rules and, thus, having

19   penalties imposed on us.

20   Q.  Does your role include educating and training the campus of

21   NC State?

22   A.  Yes, it does.

23   Q.  Is NC State a public or a private University?

24   A.  We are a public university.

25   Q.  Approximately how many students attend NC State?

1    A.   Approximately 33,700.

2    Q.   How many athletic teams does NC State field?

3    A.   23.

4    Q.   Is men's basketball one of those teams?

5    A.   Yes, sir.

6    Q.   Does NC State have an apparel sponsor?

7    A.   Yes.

8    Q.   Which one?

9    A.   Adidas.

10   Q.   As the compliance officer, do you have any direct role in

11   dealing with Adidas?

12   A.   No.

13   Q.   Did you play any role in the negotiation or drafting of any

14   contracts with Adidas?

15   A.   No.

16   Q.   You mentioned one of your chief job responsibilities is

17   NCAA rules compliance.  Is NC State a member of the NCAA?

18   A.   We are.

19   Q.   Is participation in the NCAA mandatory or voluntary?

20   A.   It's voluntary.

21   Q.   What are the benefits, if any, to membership in the NCAA

22   for a university?

23   A.   Well, the NCAA serves as a governing organization for

24   intercollegiate athletics, and so some of the benefits include

25   the fact that they organize championships and they help

1    establish the rules and they provide interpretations, and when

2    we participate in championships, we benefit from the revenue

3    that's generated.

4    Q.  If NC State were not a member of the NCAA, could it

5    participate in any of those competitions you just mentioned?

6    A.  No.

7    Q.  As the senior associate athletic director, do you play a

8    role in training the staff and employees of NC State?

9    A.  Yes.

10   Q.  What steps does NC State take to train its employees and

11   its coaches?

12   A.  So the compliance staff is divided by sport, as I mentioned

13   earlier, and we meet with each of our coaching staff members

14   and noncoaching sports specific staff members periodically.

15   For men's basketball and football, we meet with those staffs

16   monthly.  For all of our other teams, we meet with them twice a

17   semester, so four times during the year.  They also ask

18   questions almost every day with regard to how a particular rule

19   may apply, and so we provide them with an interpretation via

20   writing via email.

21   Q.  When you say "particular rule," do you mean NCAA rule?

22   A.  Yes, sir.

23   Q.  You mentioned you meet with the basketball team once a

24   month.  Is that just the coaches?

25   A.  Yes.

1    Q.  What is the purpose of those meetings?

2    A.  To educate them with regard to the proper application of

3    NCAA rules so that we can avoid violations.

4    Q.  Does NC State take any steps to train its student-athletes?

5    A.  Yes.

6    Q.  What do you do?

7    A.  So we meet with our student-athletes twice a year in

8    person, and we meet with them at the beginning of the year and

9    we provide them with an exhaustive educational session with

10   regard to a variety of NCAA rules.  And then at the end of the

11   year we meet with them again to try to provide them with the

12   rules that are applicable to that period of the year, which is

13   primarily summer.

14   Q.  Do you take any steps to train the parents of

15   student-athletes?

16   A.  Yes.  So we put together an educational document for our

17   parents.  We provide that educational document to our coaches,

18   and then the coaches or their administrative assistant sends

19   that out to the parents associated with the student-athletes

20   that are participating on their team.

21   Q.  Under NC State's policies, what responsibility, if any, do

22   NC State coaches have to report potential NCAA violations?

23   A.  Yes.  They have an affirmative obligation to report either

24   their involvement in violations or their knowledge of possible

25   violations.

1    Q.  What about student-athletes?

2    A.  They have the same obligation.

3    Q.  Ms. Doyle, as part of your role as the head of the

4    compliance department, do you engage in any forms of monitoring

5    for NCAA rules compliance?

6    A.  Yes, we do.

7    Q.  Can you describe generally what you do?

8    A.  Yes.  So we use this system called ARMS, and it's got a

9    variety of functionality to it.  Our coaches use it for

10   organizing their recruiting efforts.  Compliance uses it for a

11   variety of work flows.  In fact, we have about 140-some work

12   flows, and the job of those work flows is to elicit responses

13   from either coaches or staff or student-athletes so that we can

14   monitor whether those NCAA rules are being adhered to or not.

15   Q.  What, if anything, do you do with respect to telephone

16   records?

17   A.  So every single month we collect telephone records from

18   landlines as well as mobile phones and we send those to ARMS.

19   ARMS does a cross check for us, and then they send us kind of

20   potential red flags, potential violations of NCAA rules that we

21   then have to look at.

22   Q.  And the telephones that you conduct those checks on, are

23   they University-issued telephones?

24   A.  Yes.

25   Q.  Does NC State's compliance department have the power to

1   listen in to phone calls?

2   A.  No.

3   Q.  Do you have the power to compel individuals not associated

4   with the University to turn over documents to you?

5   A.  No.

6   Q.  Do you have the power to compel individuals not associated

7   with the University to turn over electronic devices to you?

8   A.  No.

9   Q.  What about the NCAA, do they have the power to listen in on

10  calls?

11  A.  No.

12  Q.  Force people to turn over electronic devices?

13  A.  No.

14  Q.  Ms. Doyle, changing gears slightly.

15          Does the NCAA have the power to impose penalties on

16  universities for NCAA rules violations?

17  A.  Yes.

18          MR. HANEY:  Objection.

19          THE COURT:  I'm sorry?

20          MR. HANEY:  Objection.

21          THE COURT:  Overruled.

22  BY MR. SOLOWIEJCZYK:

23  Q.  I will just ask you again.  Does the NCAA have the power to

24  impose penalties on universities as a results of violations?

25  A.  Yes, they do.

1  Q.  What types of penalties can the NCAA impose on

2  universities?

3  A.  So there is a variety of penalties that they can impose.

4  They can impose financial fines.  They can impose recruiting

5  restrictions, scholarship reductions, post-season bans.  They

6  can force a team to forfeit games or vacate those records.  And

7  if in fact a student participated while ineligible during an

8  NCAA championship, they can require the institution to return

9  those championship revenue funds back to the NCAA.

10 Q.  Do all violations of NCAA rules result in the same

11 penalties?

12 A.  No.

13 Q.  Do the penalties vary?

14 A.  Yes.  So the penalties depend upon the severity of the

15 violation.  If it's a small violation, there will be small

16 penalties.  If it is a very large violation, there will be very

17 large penalties.

18 Q.  Does the NCAA have the power to place a school on what's

19 known as probation?

20 A.  Yes.

21 Q.  If a school commits another NCAA rules violation while on

22 probation, what are the possible consequences?

23 A.  The NCAA could impose additional sanctions.

24 Q.  Are there aggravating and mitigating factors when it comes

25 to imposition of penalties?

1   A.  Yes, there are.

2   Q.  Is being on probation an aggravating factor?

3   A.  Yes.

4   Q.  Ms. Doyle, you testified a few minutes ago about the coach

5   obligations to report violations.  Is that memorialized in the

6   coach's employment agreement?

7   A.  It is.

8   Q.  If I could direct your attention to what's been marked for

9   identification as Government Exhibits 1943 and 1944.  It should

10  be in the binder in front of you.

11          Do you recognize those two documents?

12  A.  I do.

13  Q.  What is Government Exhibit 1944, generally?

14  A.  It's an employment letter.  It is a letter of appointment.

15  Q.  And what about 1943?

16  A.  It's an employment agreement attachment.

17  Q.  And with respect to which individual?

18  A.  Orlando Early.

19          MR. SOLOWIEJCZYK:  The government offers Government

20  Exhibits 1943 and 1944, your Honor.

21          MR. SCHACHTER:  No objection, your Honor.

22          THE COURT:  They are received.

23          (Government's Exhibits 1943 and 1944 received in

24  evidence)

25  BY MR. SOLOWIEJCZYK:

1   Q.  You mentioned Orlando Early, Ms. Doyle.  Who is Orlando

2   Early?

3   A.  Orlando Early was a former assistant men's basketball coach

4   at NC State.

5   Q.  You said "former."  Is he no longer the assistant coach at

6   NC State?

7   A.  That's correct.

8   Q.  Approximately when did he stop coaching for NC State's

9   basketball team?

10  A.  I would say in the spring of 2017.

11  Q.  Was he an assistant coach during the 2015/2016 season?

12  A.  Yes.

13  Q.  And the 2016/2017 season?

14  A.  Yes.

15  Q.  You said he is was an assistant coach, is that right?

16  A.  Yes.

17  Q.  Were there any compliance-related issues that led to Coach

18  Early's employment ending?

19  A.  No.

20  Q.  Why did his employment end?

21  A.  Because the head coach got fired, and, generally speaking,

22  when the head coach gets fired, the assistants are fired as

23  well.

24        MR. SOLOWIEJCZYK:  Permission to publish Government

25  Exhibit 1943, your Honor?

1              THE COURT:  Yes.

2              MR. SOLOWIEJCZYK:  And, Ms. Lee, if we could actually

3    put up the second page.

4    BY MR. SOLOWIEJCZYK:

5    Q.  And just looking at the bottom, Ms. Doyle, who signed this?

6    A.  Orlando Early.

7    Q.  And when was it signed?

8    A.  September 30th, 2013.

9              MR. SOLOWIEJCZYK:  Ms. Doyle -- sorry.  Ms. Lee, if

10   you could zoom in on the top half of the document.

11   Q.  Ms. Doyle, directing your attention to the "Duties and

12   Responsibilities" section of this page.  Could you just read

13   that aloud for us?

14   A.  Yes.

15             "Coach agrees to devote his or her best efforts to the

16   full performance of his or her duties at NC State, to give

17   proper time and attention to applicable policies, rules,

18   regulations and laws of NC State, The University of North

19   Carolina, The National Collegiate Athletic Association, The

20   Athletic Coast Conference, the State of North Carolina, and the

21   United States of America.  Failure to abide by such policies,

22   regulations and rules may be deemed a violation of this

23   employment agreement and may be grounds for termination for

24   cause."

25   Q.  So, Ms. Doyle, under this section of the agreement, what

1  were the consequences, if any, if Coach Early failed to abide

2  by NCAA rules?

3  A.  He could be terminated for cause.

4  Q.  Did the condition that Coach Early follow NCAA rules apply

5  during all of his years at NC State?

6  A.  Yes.

7  Q.  Ms. Doyle, consistent with the language in this agreement,

8  was Coach Early permitted to engage in or facilitate violations

9  of NCAA rules?

10  A.  No.

11  Q.  I would like to direct -- you can take that down, Ms. Lee.

12        Ms. Doyle, I would like to direct your attention now

13  to what's been marked for identification as Government Exhibit

14  1948.  It is in the binder in front of you.

15        Do you recognize that document?

16  A.  I do.

17  Q.  What is it?

18  A.  It's the third employment agreement for the head men's

19  basketball coach.

20  Q.  Who?

21  A.  For Mark Gottfried.

22  Q.  Is this a document you would have had access to in the

23  ordinary course of your work?

24  A.  Yes.

25        MR. SOLOWIEJCZYK:  Your Honor, the government offers

1    Government Exhibit 1948.

2              MR. SCHACHTER:  No objection, your Honor.

3              THE COURT:  Received.

4              (Government's Exhibit 1948 received in evidence)

5              MR. SOLOWIEJCZYK:  Permission to publish, your Honor.

6              THE COURT:  Yes.

7    BY MR. SOLOWIEJCZYK:

8    Q.  So, Ms. Doyle, you mentioned Mark Gottfried.  Was he the

9    head men's basketball coach during the 2015/2016 men's

10   basketball season?

11   A.  Yes.

12   Q.  How about the 2016/2017 season?

13   A.  Yes.

14   Q.  Was Coach Early his assistant coach?

15   A.  Yes.

16   Q.  Ms. Doyle, under this agreement, could Coach Gottfried be

17   terminated for cause in the event he participated in an NCAA

18   rules violation?

19   A.  Yes.

20   Q.  Under this agreement, what responsibilities, if any, did

21   Coach Gottfried have to ensure rules compliance by his

22   assistant coaches?

23   A.  It's his responsibility to make sure both he and his

24   assistant coaches are following NCAA rules.

25   Q.  Is there in fact an NCAA rule specifically about that?

Ia9dgat5                    Doyle - direct

1    A.   There is.  It's called the head coach responsibility rule.

2                    MR. SOLOWIEJCZYK:  You can take that down, Ms. Lee.

3    Thanks.

4    Q.   Ms. Doyle, does NC State offer athletic-based scholarships

5    to its student-athletes?

6    A.   We do.

7    Q.   What does an athletic scholarship pay for?

8    A.   A full cost of attendance athletic scholarship covers

9    tuition, fees, room, board, books, and then miscellaneous

10   transportation, miscellaneous personal supplies and

11   transportation area.

12   Q.   What is the approximate actual cost of scholarship at NC

13   State?

14                    MR. SCHACHTER:  Objection.

15                    THE COURT:  Sustained in that form.

16   Q.   Ms. Doyle -- withdrawn.

17                    What is the actual costs to NC State of each athletic

18   scholarship?

19                    MR. SCHACHTER:  Objection.

20                    THE COURT:  It is the same question.

21   Q.   How much is -- all of the things you just described, how

22   much does that approximately cost?

23                    MR. SCHACHTER:  Objection.

24                    THE COURT:  Overruled.

25   A.   So for an in-state student the total cost of that would be

1    approximately $23,900, and for an out-of-state student it would

2    be approximately 43,500.

3    Q.  Ms. Doyle, is there a maximum number of athletic

4    scholarships that can be issued in the sport of men's

5    basketball?

6    A.  Yes.  The number would be 13.

7    Q.  Is that on an annual basis?

8    A.  Yes.

9    Q.  Who sets that limit?

10   A.  The NCAA.

11   Q.  Do incoming students have to meet certain requirements to

12   be eligible for athletic scholarships?

13   A.  Yes.

14   Q.  Are you familiar with an amateurism requirement?

15   A.  I am.

16   Q.  If a student-athlete accepts payment in connection with

17   their decision to commit to a particular university, does that

18   affect their eligibility to compete?

19   A.  It could.  It depends on the specific fact scenario.

20   Q.  If a family member of a student-athlete receives a payment

21   in connection with their child's commitment to a particular

22   university, can that affect a student-athlete's eligibility?

23          MR. SCHACHTER:  Objection, your Honor.  Best evidence

24   is the actual rule.

25          THE COURT:  Overruled.

1    A.  I'm sorry.  The question again?

2    Q.  If a family member of a student-athlete received a payment

3    in connection with their child's commitment to a particular --

4    to play sports at a particular school, how, if at all, would

5    that affect the student-athlete's eligibility?

6    A.  Yes.  That would definitely negatively impact the student's

7    eligibility.

8    Q.  Does it matter whether the student-athlete has knowledge of

9    the payment to their parent?

10            MR. SCHACHTER:  Objection.

11            THE COURT:  Sustained at least as to form.

12   Q.  With respect to the question of a student-athlete's

13   eligibility, if a parent received a payment and the

14   student-athlete was not aware of it, could that payment still

15   affect the student-athlete's eligibility?

16            MR. SCHACHTER:  Objection, your Honor.

17            THE COURT:  Overruled.

18            MR. SCHACHTER:  It is opinion testimony.

19            THE COURT:  Overruled.

20   A.  Yes.

21   Q.  Ms. Doyle, as the head of NC State's athletic compliance

22   department, if you became aware of information of a potential

23   ineligibility of a student-athlete, what responsibility, if

24   any, do you have at that point?

25   A.  So we have the responsibility to thoroughly investigate the

1    matter, determine whether a violation of NCAA rules has

2    occurred or not, and if it has, report that to the NCAA and

3    declare the student-athlete ineligible.

4    Q.  Ms. Doyle, I want to switch gears.

5            Are you familiar with an individual names Dennis Smith

6    Junior?

7    A.  Yes.

8    Q.  How are you familiar with Dennis Smith Junior?

9    A.  Dennis Smith Junior was a member our men's basketball team.

10   Q.  In what seasons?

11   A.  He arrived at NC State in January of 2016, and so he was a

12   part of our squad for the spring semester of the '15/'16

13   academic year as well as the '16/'17 academic year.

14   Q.  Did you and your staff have any involvement in Smith's

15   application and enrollment with the University?

16   A.  Yes.

17   Q.  During the recruitment process of Dennis Smith Junior, did

18   the compliance department have to become involved on certain

19   occasions?

20   A.  Yes.

21   Q.  OK.  I want to just go through a few of those with you,

22   Ms. Doyle.

23           Ms. Doyle, was there an occasion when Coach Gottfried

24   and Coach Early used a helicopter in connection with certain

25   recruiting activity relating to Dennis Smith Junior?

Ia9dgat5                    Doyle - direct

1   A.  Yes, they did.

2   Q.  What was the helicopter being used for specifically?

3   A.  Coach Gottfried and Coach Early were going off campus to

4   have an off-campus contact with two prospects and they used the

5   helicopter as transportation to those two different locations.

6   Q.  Was one of the prospects Dennis Smith Junior?

7   A.  Yes.

8   Q.  Did anyone tell you anything about this in advance?

9   A.  No.  In fact, when I found out about it, it was because the

10  coaches were tweeting about it.  It was on Twitter.  And we

11  were learning about it in realtime.  And I was -- I was

12  irritated about that.

13  Q.  Why were you irritated?

14  A.  Well, the coaches, generally speaking, run all of these

15  kinds of things by the compliance staff to make sure that

16  whatever it is they're going to do is in accordance with NCAA

17  rules and that we're avoiding potholes and pitfalls, and in

18  this instance they didn't do that.

19  Q.  After you learned about the use of the helicopter, what

20  concerns, if any, did you have from an NCAA rules perspective?

21  A.  So there were two possible violations of NCAA rules that we

22  were concerned with.  The first one had to do with where they

23  landed the helicopter.  And they landed it on school grounds,

24  and there is an NCAA rule that you can't be on school grounds

25  while the school day is in session.  And so we had to figure

1    out when the school day ended for that particular school on

2    that particular day and the time that they landed the

3    helicopter.

4    Q.  With respect to that concern, what steps did you take to

5    investigate?

6    A.  So we were paying attention to the Twitter feed.  We also

7    contacted the high school to talk with the people in charge,

8    and determined that the school day ended at approximately 1:30

9    that day and the helicopter landed at approximately 1:58 --

10   1:50, 1:58, I can't remember the exact time.  In any event, it

11   was after the school day had ended, and, therefore, we

12   concluded that a violation of NCAA rules did not occur.

13   Q.  You mentioned that you had a second concern.  What was

14   that?

15   A.  Yes.  So the second concern was about publicity, and this

16   involved a second prospect.  This was after they had lifted off

17   from the visit with Dennis Smith, had gone to a second location

18   to visit with a second prospect.  In that instance, there was a

19   concern about publicity.  Coaches cannot publicize their

20   off-campus visits with prospects.  And we had learned that a

21   news crew had videotaped the visit that Coach Gottfried was

22   having with this second prospect at a church annex where they

23   were practicing basketball.

24   Q.  Did you take any steps to investigate that concern at that

25   point, Ms. Doyle?

1   A.  Yes.  So I traveled to that second location, and I wanted

2   to get a sense of what the location looked like.  Because I had

3   talked, obviously, with Coach Gottfried and Orlando Early to

4   determine why they were meeting with a prospect in that

5   location.  And they had indicated to me that there were several

6   other college coaches there who were talking with other

7   prospects and that all of them were meeting in this location on

8   the other end of this annex, and the media were at the other

9   end of the annex.  And so I wanted to see for myself how big

10  was this annex.

11          So I drove to that second location with a tape measure

12  in hand, and I measured the distance from where our coaches

13  were sitting to where the media was filming this, and

14  determined that it was approximately 85 feet and that the media

15  was actually filming this surreptitiously through the railings

16  of a staircase.

17  Q.  Based on all of those steps, did you believes an NCAA rules

18  violation had occurred?

19  A.  I did not believe that a violation had occurred.

20  Q.  Did you report anything to the NCAA about these two

21  concerns?

22  A.  So I did prepare a memorandum to Leon Zeller, who works in

23  the legislative interpretations area of the NCAA, and setting

24  forth the scenario, our analysis, as well as our conclusions.

25  Q.  Did the NCAA ever impose any penalties as a result of the

1   use of the helicopter?

2   A.   They did not.

3   Q.   Ms. Doyle, are you familiar with an individual named Eric

4   Leak?

5   A.   Yes.

6   Q.   And had Leak previously been involved in an NCAA rules

7   violation involving NC State athletes?

8   A.   Yes.  He was involved with a couple of violations of NCAA

9   rules by providing impermissible benefits to different

10  student-athletes around 2010/2011.

11  Q.   What, if anything, did the university do with respect to

12  Leak at that point?

13  A.   We investigated those incidents thoroughly.  In fact, the

14  NCAA was involved, kind of did a dual or joint investigation at

15  that time, and as a result of that investigation we submitted a

16  report to the NCAA admitting to those two rules violations, and

17  we ended up disassociating that individual from our program.

18  Q.   You used the term "disassociating."  Can you just explain

19  what that means?

20  A.   Yes.  So what that means is that we essentially cut ties

21  with that individual.  The individual can't provide any

22  financial donation to the University's athletics program.  They

23  can't buy season tickets.  They can't buy a suite.  They're

24  barred from entering all athletics facilities, and they are

25  barred from communicating or contacting any of our coaches or

1   our athletic staff or our student-athletes or even future

2   student-athletes.

3   Q.  Ms. Doyle, did there come a time when you learned that Eric

4   Leak might be in contact with the family of Dennis Smith

5   Junior?

6   A.  Yes.

7   Q.  At that point, did you direct that any steps be taken?

8   A.  Yes.  So my understanding is that Coach Gottfried was the

9   one that brought forward the information that Eric Leak might

10  be in contact with Dennis Smith Senior, and so we met as a

11  group -- myself, Coach Gottfried, and our director of

12  athletics.

13  Q.  You mentioned Dennis Smith Senior.  Who is that?

14  A.  He is the father of Dennis Smith junior.

15  Q.  Go ahead.

16  A.  And so myself, Coach Gottfried and the director of

17  athletics, Debbie Yow, met to determine how best to figure out

18  what was going on.

19  Q.  What did you decide to do?

20  A.  We decided that Orlando Early, being the primary recruiting

21  coach, should go and talk with Dennis Smith Senior and

22  determine the extent to which these conversations were

23  occurring and determine whether anything else was going on.

24  Q.  To your knowledge, did Coach Early have that conversation

25  with Dennis Smith's father?

1    A.  He did.

2    Q.  Did he report back to you?

3    A.  He did.

4    Q.  Based on his report back to you, were your concerns

5    satisfied?

6    A.  Yes.

7    Q.  At around this time, did compliance take any other steps to

8    provide additional training to the men's basketball coaching

9    staff?

10   A.  Yes.  So we invited Julie Roe Lach, who at that time was

11   the former vice president for enforcement at the NCAA, to come

12   in and talk with our men's basketball staff about the head

13   coach responsibility bylaw.  Julie was the one who actually

14   wrote the head coach responsibility bylaw, and so we were

15   really fortunate to be able to bring her in to talk with our

16   coaches and educate them about this bylaw.

17   Q.  Ms. Doyle, I think you've already testified, Dennis Smith

18   Junior ultimately did commit to NC State, right?

19   A.  He did.

20   Q.  Now, did Smith Junior come to NC State at the beginning of

21   the academic year or at some other point?

22   A.  He came at the middle of the academic year.  So, he came in

23   January of 2016.

24   Q.  Did Smith Junior start receiving athletic-based financial

25   aid as soon as he enrolled?

1   A.  No.  He didn't receive athletically-based financial aid

2   until the summer of 2016.

3   Q.  Did he receive a full athletic scholarship for the

4   2016/2017 year?

5   A.  Yes.

6   Q.  Now, you previously testified that compliance trains its

7   student-athletes, correct?

8   A.  Yes.

9   Q.  Was Smith Junior trained?

10  A.  Yes, he was.

11  Q.  Were any additional steps taken to train Dennis Smith

12  Junior beyond the typical training that's provided?

13  A.  Yes.  So there were two individuals on the '16/'17 team

14  who, at least according to the coaches, had pro potential, and

15  so we wanted to make sure that we had met with those two

16  individuals to provide them with additional training having to

17  do with agents and extra benefits and other NCAA rules.

18  Q.  Ms. Doyle, after Dennis Smith Junior enrolled, did there

19  come a time when you became aware of an individual named Shawn

20  Farmer?

21  A.  Yes.

22  Q.  Who did you understand Shawn Farmer to be at that time?

23  A.  We understood him to be a close family friend of the Smith

24  family and also a trainer and a coach.

25  Q.  What steps, if any, did the compliance department take

1  regarding Farmer?

2  A.   So we took steps to educate Shawn Farmer so that he

3  understood his role with regard to NCAA rules and Dennis Smith.

4  Q.   Why did you decide to do that with Shawn Farmer?

5  A.   Well, generally speaking, if there's someone around our

6  program who is closely associated with a student-athlete, we

7  want to make sure that we're minimizing our risks with regard

8  to violations of NCAA rules.  So, we want to make sure we're

9  educating those people thoroughly.

10 Q.   Ms. Doyle, I want to switch gears and talk for a few

11 minutes with you about the University's process for certifying

12 eligibility.

13           Are you familiar with the NCAA Eligibility Center?

14 A.   I am.

15 Q.   What is it?

16 A.   The NCAA Eligibility Center is a clearinghouse that all

17 first-time incoming freshmen have to register with, and they

18 provide the Eligibility Center with academic documents like

19 their high school transcripts and ACT or SAT test scores and

20 they also answer an amateurism questionnaire.

21 Q.   How, if at all, do the responses that are provided to the

22 NCAA Eligibility Center matter to NC State scholarship

23 decisions?

24 A.   So a student has to be what's called a qualifier, which

25 means the Eligibility Center has evaluated the information and

1   determined that they're eligible.  And if they're eligible, we

2   will provide them with a scholarship.  If they are a

3   nonqualifier, they would not be eligible for a scholarship.

4   Q.  Who ultimately makes the final eligibility determination

5   with respect to student-athletes?

6   A.  The institution does.

7   Q.  When you say "the institution," do you mean the University?

8   A.  Yes.

9   Q.  In the process of making final eligibility determinations,

10  does NC State require its student-athletes to make certain

11  representations and certifications regarding their eligibility

12  to compete?

13  A.  Yes.

14  Q.  Approximately how many forms relating to student-athlete

15  eligibility does NC State require its student-athletes to

16  complete?

17  A.  Yeah.  There are approximately 15 forms or work flows in

18  this ARMS system that I talked about earlier.

19  Q.  Why does the University make student-athletes complete so

20  many forms?

21  A.  Because there are a lot of NCAA rules, we're trying to make

22  sure that they are adherent to all of those rules and they meet

23  all of the rules prior to us determining that they're eligible.

24  Q.  Ms. Doyle, how, if at all, do the response on these forms

25  matter to the University in its awarding of and continued

1    payment of athletic scholarships?

2    A.  So in the forms that they fill out, they have to be

3    eligible in order for us to provide them with athletics aid.

4    Q.  Ms. Doyle, I now want to direct your attention to the

5    binder that's in front of you and to the exhibits that have

6    been marked for identification as -- and I'll go slowly,

7    Ms. Doyle, so you can take a look at each of these -- 1908,

8    1914, 1924, 1917, 1912, 1915, 1916, 1909, and 1927.

9             If you could just briefly take a look at each of those

10   and look up when you are done reviewing them.

11            (Pause)

12            Which student-athlete do these documents pertain to?

13   A.  Which document are you on right now?

14   Q.  All the ones I just named.

15   A.  Oh, Dennis Smith Junior.

16   Q.  OK.  And the documents that I just listed for you, were

17   they completed and submitted by Dennis Smith Junior in

18   connection with his attendance at NC State?

19   A.  Yes.

20   Q.  And do those documents contain certain representations

21   regarding Smith Junior's eligibility to compete?

22   A.  They do.

23            MR. SOLOWIEJCZYK:  Your Honor, the government offers

24   Government Exhibits 1908, 1914, 1924, 1917, 1912, 1915, 1916,

25   1909 and 1927.

Ia9dgat5                    Doyle - direct

1                MR. SCHACHTER:  No objection, your Honor.

2                THE COURT:  Received.

3                (Government's Exhibits 1908, 1914, 1924, 1917, 1912,

4        1915, 1916, 1909 and 1927 received in evidence)

5                MR. SOLOWIEJCZYK:  With the Court's permission, we

6        would ask to publish 1908.

7                THE COURT:  Yes.

8                MR. SOLOWIEJCZYK:  Ms. Lee, if we could actually turn

9        to the second page first.

10       Q.  Ms. Doyle, it is up on the screen for you, I believe,

11       right?

12       A.  Yes.

13       Q.  What are we looking at here?  What is this?

14       A.  This is a national letter of intent.

15       Q.  What is a national letter of intent?

16       A.  So a national letter of intent essentially binds a recruit

17       to the institution.

18       Q.  By signing this document, what is the student-athlete

19       committing to?

20       A.  Committing to attending -- committed to attend that

21       particular institution.

22       Q.  And directing you to the bottom of the page, who signed

23       this document?

24       A.  Dennis Smith Senior, Dennis Smith Junior, and, farther up

25       in the document, the director of athletics, Debbie Yow.

1   Q.  The signature of the athletic director is at the top of the

2   page, right?

3   A.  Yes, sir.

4   Q.  Why does the parent sign this document, Ms. Doyle?

5   A.  A parent or a legal guardian's signature is required if the

6   prospective student-athlete has not reached his or her 21st

7   birthday.

8               (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. SOLOWIEJCZYK:  If we can turn to the first page,

2     Ms. Lee.  Just zoom in on the top portion, the very top.

3     Q.  Ms. Doyle, what is this document that we are looking at?

4     A.  This is a scholarship agreement, a financial aid agreement.

5     Q.  For which athlete?

6     A.  Dennis Smith.

7     Q.  Next to the period of award it states "four academic

8     years."  What does that mean?

9     A.  That means that this award is applicable for four years.

10    And on the second line it indicates that those years are

11    specifically 2016-17, 2017-18, 2018-19, and 2019-20.

12    Q.  When was this document signed, Ms. Doyle?

13         MR. SOLOWIEJCZYK:  It's on the bottom of the page,

14    Ms. Lee.

15    A.  November 11th of 2015.

16    Q.  Is that the same date the national letter of intent was

17    signed?

18    A.  Yes.

19    Q.  What signed it?

20    A.  Dennis Smith, Jr., Mark Gottfried, and Krista Domnick.

21         MR. SOLOWIEJCZYK:  Ms. Lee, if we can zoom back in on

22    the top of the page in the section under, "Eligibility of

23    Student-athlete for Financial Aid."

24    Q.  If you could read aloud, Ms. Doyle, the first bullet point

25    that starts "a student-athlete"?

1    A.   "A student-athlete must be all applicable NCAA, conference

2    and institutional regulations to be eligible for institutional

3    financial aid."

4    Q.   Would that provision include NCAA rules on eligibility and

5    amateurism?

6    A.   Yes.

7            MR. SOLOWIEJCZYK:  If we can go to the middle of the

8    page, Ms. Lee, and the section under, "Conditions of Reduction

9    Renewal and Nonrenewals."

10   Q.   If you could just read, Ms. Doyle, the first bullet point

11   under that heading?

12   A.   "Athletically related financial aid may be reduced or

13   canceled during the period of the award if the recipient:

14   Renders himself or herself ineligible for intercollegiate

15   competition; fraudulently misrepresents any information on an

16   application, letter of intent or financial aid agreement;

17   engages in serious misconduct warranting substantial

18   disciplinary penalty; or voluntarily withdraws from a sport at

19   any time for personal reasons."

20   Q.   Ms. Doyle, under this agreement, if Dennis Smith, Jr. were

21   rendered ineligible from competition in men's basketball, what,

22   if anything, could the university do with respect to Smith

23   Junior's athletic scholarship?

24           MR. SCHACHTER:  Objection, your Honor.  The document

25   speaks for itself.

1            THE COURT:  Sustained.

2    Q.  Ms. Doyle, if a student-athlete is unable or unwilling to

3    sign this financial aid agreement, what, if any, significance

4    does that have to the university's decision whether to issue

5    them an athletic scholarship?

6    A.  We would not issue them the scholarship or disburse the

7    money.

8    Q.  By signing this document, what, if anything, was Dennis

9    Smith, Jr. representing to the university?

10           MR. SCHACHTER:  Objection.

11           THE COURT:  Sustained.

12           MR. SOLOWIEJCZYK:  If we can publish Government

13   Exhibit 1914.

14           THE COURT:  All right.

15   Q.  Just looking at the first page -- it should be on your

16   screen, Ms. Doyle.  Do you see it?

17   A.  I do.

18   Q.  What is this document?

19   A.  This is the NCAA student-athlete statement.

20   Q.  For which student-athlete?

21   A.  Dennis Smith, Jr.

22   Q.  Which academic year?

23   A.  2015-16.

24   Q.  You mentioned it's an NCAA student-athlete statement.  Who

25   does this form actually get submitted to?

1    A.  The institution.

2    Q.  By the institution, do you mean the university?

3    A.  Yes.

4    Q.  If a student-athlete were unwilling or unable to sign this

5    document, would he be eligible to compete?

6    A.  No.

7    Q.  Would you issue or continue to provide athletic scholarship

8    funds to a student-athlete who is unwilling or unable to

9    complete this form?

10   A.  No.

11   Q.  I want to direct you to the middle of the page, to the line

12   that states "purpose."

13          What is the purpose of this form, Ms. Doyle?

14   A.  To assist in certifying eligibility.

15   Q.  Directing you to the next line down, the effective date,

16   what time period is this student-athlete statement in effect

17   for?

18   A.  It's in effect from the date this document is signed and

19   remains in effect until a subsequent Division 1 student-athlete

20   statement form is executed.

21          MR. SOLOWIEJCZYK:  If we can turn to page 2, Ms. Lee.

22          If we can focus on the bottom half of the page under

23   the heading, "Part 1:  Statement concerning eligibility."

24   Q.  Ms. Doyle, what is Dennis Smith, Jr. representing, if

25   anything, in this section of the document?

1          MR. SCHACHTER:  Objection.  It speaks for itself.

2          THE COURT:  Overruled.

3    Q.  You may answer.

4    A.  That he is eligible for competition.

5    Q.  Can you read the section that starts "all information

6    provided to the NCAA"?

7    A.  "All information provided to the NCAA, the NCAA eligibility

8    center and the institution's admissions office is accurate and

9    valid, including ACT or SAT scores, high school attendance,

10   completion of coursework and high school grades, as well as

11   your amateur status."

12   Q.  If you could just read the next two sentences, Ms. Doyle.

13   A.  "You have reported to the director of athletics or his or

14   her designee of your institution any violations of NCAA

15   regulations involving you and your institution.

16          "You affirm that you understand that if you sign this

17   statement falsely or erroneously, you violate NCAA legislation

18   on ethical conduct and you will further jeopardize your

19   eligibility."

20   Q.  Ms. Doyle, focusing on the last sentence, can it constitute

21   a separate violation of NCAA rules if the information provided

22   on this form is incorrect?

23   A.  Yes.

24   Q.  Does it matter if the student-athlete knew that the

25   information was incorrect?

1           MR. SCHACHTER:  Objection.

2           THE COURT:  You're relying on this highlighted

3     portion, counsel?

4           MR. SOLOWIEJCZYK:  Yes.

5           THE COURT:  Overruled.

6     Q.  You may answer, Ms. Doyle.

7     A.  It doesn't matter.

8     Q.  When was this document signed by Dennis Smith, Jr.?

9     A.  December 17th of 2015.

10    Q.  Did Dennis Smith, Jr. receive athletic-based financial aid

11    from NC State University after the date on which this document

12    was signed?

13    A.  Yes.

14    Q.  How frequently does the student-athlete need to complete

15    this form?

16    A.  Once a year.

17    Q.  Did Dennis Smith, Jr. complete a similar form for the

18    2016-2017 year?

19    A.  Yes.

20    Q.  In that form did he represent that he was eligible?

21    A.  Yes.

22          MR. SCHACHTER:  Objection.

23          THE COURT:  What is the objection?

24          MR. SCHACHTER:  The document speaks for itself, your

25    Honor.

1          THE COURT:  Do you have the document, Mr.

2     Solowiejczyk?

3          MR. SOLOWIEJCZYK:  Sure.  We can go through it.  It's

4     Government Exhibit 1924.

5          If you could publish it, Ms. Lee.

6          Actually, your Honor, I will move on.  It's in

7     evidence.

8          THE COURT:  All right.

9          MR. SOLOWIEJCZYK:  Your Honor, permission to publish

10    Government Exhibit 1917.

11         THE COURT:  Yes.

12         MR. SOLOWIEJCZYK:  Ms. Lee, if you could put up the

13    first page.

14    Q.  Ms. Doyle, what is this document?

15    A.  This is a beginning of the year statement of amateurism

16    document.

17    Q.  Is this a university-specific form?

18    A.  It is.

19    Q.  What is the purpose of this form?

20    A.  It's to determine whether the student-athletes have

21    violated any provisions of the amateurism bylaws.

22    Q.  How often must it be completed?

23    A.  At the beginning of each academic year prior to

24    competition.

25    Q.  What student-athlete completed this form?

1  A.  Dennis Smith, Jr.

2  Q.  For what year was it completed?

3  A.  2015-16.

4  Q.  Directing you to page 2 of the document.

5      MR. SOLOWIEJCZYK:  And if we can zoom in on question

6  12, Ms. Lee.

7  Q.  Can you just read that question aloud, Ms. Doyle?

8  A.  "In the past year, have you, or has any member of your

9  family, been paid money, borrowed money or received any benefit

10 of any kind from an athletics booster, sports agent, runner or

11 financial advisor?"

12 Q.  What did Dennis Smith, Jr. respond to that question?

13 A.  His answer was no.

14     THE COURT:  1917, is that what you're saying?

15     MR. SOLOWIEJCZYK:  Yes, your Honor.  Page 2.

16     THE COURT:  Thank you.

17 Q.  In that question there is a reference to an athletics

18 booster.  Would that term include an Adidas apparel sponsor?

19     MR. SCHACHTER:  Objection.

20     THE COURT:  Sustained.

21 Q.  This is a university-specific form, Ms. Doyle?

22 A.  Yes.

23 Q.  What does the university understand the term on its own

24 form "athletics booster" to mean?

25     MR. SCHACHTER:  Objection.

1          THE COURT:  Sustained.

2    Q.  Is this question inquiring about both payments to the

3    student-athlete and their family?

4    A.  Yes.

5    Q.  Ms. Doyle, if the answer to this question had been yes,

6    what, if any, steps would you have taken at that point?

7    A.  We would have thoroughly investigated the matter to

8    determine whether in fact any violations of NCAA rules had

9    occurred or not.

10   Q.  And if your investigation had determined that in fact there

11   had been a violation and an eligibility violation, what would

12   the university do with respect to the student-athlete's

13   eligibility?

14   A.  So it depends.  It depends on the possible violation of

15   NCAA rules.  If it's a small violation of NCAA rules, we would

16   have declared the student-athlete ineligible and sought

17   restitution or reinstatement through the NCAA.  If it was a

18   large violation, we might have made the choice not to seek

19   reinstatement.

20          MR. SOLOWIEJCZYK:  Your Honor, permission to publish

21   Government Exhibit 1915.

22          THE COURT:  Yes.

23          MR. SOLOWIEJCZYK:  Ms. Lee, if we can publish page 1

24   and focus on the top half of the page.

25   Q.  What is this document, Ms. Doyle?

1    A.   This is a beginning of the year form.  It's called the

2    signature page.

3    Q.   Is it a university-specific form?

4    A.   It is.

5    Q.   How often must it be completed?

6    A.   Once a year, at the beginning of the year, prior to

7    competition.

8    Q.   For which year does this apply?

9    A.   2015-16.

10   Q.   It's for Dennis Smith, Jr., right?

11   A.   Yes, sir.

12   Q.   Right in the middle of the page, if we could just focus on

13   the sentence starting "knowingly providing."

14         If you could read that aloud, Ms. Doyle.

15   A.   "Knowingly providing false or misleading information on

16   this form could result in the university erroneously certifying

17   you eligible for practice, competition or athletics aid (you

18   have the responsibility, under NCAA rules, to tell the truth).

19   Competition while ineligible always results in forfeiture of

20   contests, which affects your entire team, the athletics

21   department and the university."

22   Q.   Ms. Doyle, there is a reference there to "forfeiture of

23   contests."  Do you see that?

24   A.   I do.

25   Q.   Can you explain that?

1    A.  Yes.  Forfeiture of contests would mean that if you won the

2    contest while a student-athlete competed while ineligible, you

3    would essentially lose that contest and vacate that record.

4            MR. SOLOWIEJCZYK:  Ms. Lee, if we could focus on the

5    bottom half of the page, below where it says "please choose

6    one."

7    Q.  There are two options here, right, Ms. Doyle?

8    A.  Yes.

9    Q.  Which response did Dennis Smith, Jr. choose?

10   A.  He chose option B, which is, "I have not been involved in a

11   possible violation of NCAA rules, or I do not have knowledge of

12   a possible violation of NCAA rules."

13           MR. SOLOWIEJCZYK:  If we could publish Government

14   Exhibit 1927, your Honor.

15           THE COURT:  Yes.

16           MR. SOLOWIEJCZYK:  I will tell you we are nearing the

17   end.

18           If we could zoom in on the section of the page that

19   states "rules compliance."  It's section A.

20           Actually, zoom out, Ms. Lee.

21   Q.  What is this document, Ms. Doyle?

22   A.  This is also a beginning of the year document.  It's our

23   code of conduct.

24           MR. SOLOWIEJCZYK:  Ms. Lee, if we could zoom in on

25   that section now.

1   Q.  Can you just read that one section aloud, Ms. Doyle?

2   A.  "Student-athletes must abide by all NCAA and ACC rules, in

3   fact and in spirit.  I am responsible for knowing the rules

4   that govern me and my sport -- ignorance is not an excuse.

5   'Ask before you act' is a slogan I will follow."

6   Q.  You can stop there.  Thanks.

7         MR. SOLOWIEJCZYK:  If we could turn to page 3 of the

8   document, Ms. Lee.  And the section in the middle of the page,

9   "Report violations and comply with remedial actions."

10  Q.  Ms. Doyle, what authorities govern the conduct of

11  student-athletes at NC State?

12  A.  Team rules, the student-athlete code of conduct, the

13  university code of student conduct, Atlantic Coast Conference

14  or other affiliated conferences, National Collegiate Athletic

15  Association, State of North Carolina, and the laws of the

16  United States.

17  Q.  If you could just read the sentence right below that.

18  A.  "In addition to any remedial actions for violations of

19  laws, rules and regulations by any of these authorities, the

20  athletics department may impose additional, progressive

21  remedial actions, up to and including the loss of scholarship

22  and participation privileges."

23        MR. SOLOWIEJCZYK:  You can take that down, Ms. Lee.

24  Q.  Ms. Doyle, you previously testified that the university is

25  responsible for making final eligibility determinations for

1   each student-athlete, is that correct?

2   A.  Yes.

3   Q.  The forms that we just reviewed, how are they used, if at

4   all, by the university in making those final eligibility

5   determinations?

6   A.  So we use all of those forms in order to evaluate whether

7   each student-athlete is eligible for competition.

8   Q.  If I could direct your attention now to what has been

9   marked for identification as Government Exhibits 1901, 1902 and

10  1905 that should be in the binder in front of you.

11  A.  Yes.

12  Q.  If you could just take a quick look at those documents.

13          Do you recognize those documents?

14  A.  I do.

15  Q.  What are those?

16  A.  Those are certification documents.

17          MR. SOLOWIEJCZYK:  The government offers 1901, 1902

18  and 1905, your Honor.

19          THE COURT:  Received.

20          (Government's Exhibits 1901, 1902 and 1905 received in

21  evidence)

22          MR. SOLOWIEJCZYK:  If we would just publish 1901 with

23  the Court's permission.

24          THE COURT:  Yes.

25          MR. SOLOWIEJCZYK:  If you could zoom in on the top

1  half of the page, Ms. Lee, just the section above all the

2  signatures.

3          All the way down the middle of the page.

4  Q.  What is this actual document?  What is done with this

5  document, Ms. Doyle?

6  A.  This is a document that actually brings together kind of

7  disparate pieces of aspects of eligibility.  So we have to look

8  at a variety of pieces of data in order to determine whether a

9  student-athlete is eligible for competition.  And this is the

10  document that actually brings it into one place, and this is

11  the document where we all sit around and we evaluate the

12  information on the form to determine whether a particular

13  student is eligible for competition.

14  Q.  What does NC State University do with this document?

15  A.  This document is used to certify eligibility for each

16  student.

17  Q.  Are you required to maintain a copy of it?

18  A.  Yes.

19  Q.  With respect to Dennis Smith, Jr., what time period is this

20  document for?

21  A.  This is for the '15-'16 academic year.

22  Q.  With respect to Dennis Smith, Jr., what final eligibility

23  determination was made?

24  A.  He was eligible for practice and competition.

25  Q.  What eligibility determination was made in the fall

1   semester?

2   A.  So for the fall semester 2016, it was also determined that

3   he was eligible for practice and competition.

4   Q.  And the spring of 2017?

5   A.  Yes.  The same.

6           MR. SOLOWIEJCZYK:  You can zoom out, Ms. Lee.

7   Q.  Who signs this document, Ms. Doyle?

8   A.  So the certifying officer at our institution is the faculty

9   athletics representative, and at the time that was Roby

10  Sawyers.  The head coach also signs this form so that he is

11  aware of who is eligible and who is not eligible for

12  competition.  Then the sports supervisor who is the designee

13  for the athletics director signs the form as well, and that was

14  Chris Boyer.

15          MR. SOLOWIEJCZYK:  You can take that down, Ms. Lee.

16  Q.  Ms. Doyle, I want to direct your attention to the time

17  period of 2015 to June 2017.

18          What, if anything, did you know about a payment of

19  approximately $40,000 to the father of Dennis Smith, Jr. in

20  connection with Smith Junior's decision to attend NC State

21  University?

22  A.  I have no knowledge.

23  Q.  Had you been aware of such a payment, would it have

24  affected the university's decision to award or maintain Smith

25  Junior's athletics scholarship?

1    A.   Yes.

2    Q.   How?

3    A.   If we had found out about it before we had issued the

4    financial aid and it was determined to be valid and true

5    information, we would never have provided the athletics

6    scholarship.  If we found out about it after the aid had

7    already been disbursed, we would not award future aid.

8    Q.   Would it have mattered if Smith Junior had no knowledge of

9    the payments to his father?

10   A.   No.

11   Q.   Ms. Doyle, what, if anything, do you know about the

12   involvement of an Adidas consultant in facilitating such a

13   payment to Smith Junior's father?

14   A.   I have no knowledge.

15   Q.   Ms. Doyle, what, if anything, did you know about the

16   involvement of an assistant coach for NC State's men's

17   basketball team in facilitating such a payment to Smith

18   Junior's father?

19   A.   I have no knowledge.

20   Q.   What would have been the consequences to the assistant

21   coach if he had in fact been involved in facilitating such a

22   payment?

23   A.   He would have been fired.

24   Q.   Ms. Doyle, if an assistant coach for NC State or a

25   consultant for Adidas were involved in facilitating such

1    payments to Smith Junior's father, what penalties could the

2    NCAA impose under those circumstances?

3              MR. SCHACHTER:  Objection.

4              THE COURT:  Overruled.

5    A.  So the NCAA has a variety of penalties that they can

6    impose, starting with financial fines, scholarship reductions,

7    recruiting restrictions, post-season ban, vacation or

8    forfeiture of games and vacation of records, as well as the

9    return of any NCAA tournament money if that was applicable.

10             MR. SOLOWIEJCZYK:  One moment, your Honor.

11             No further questions, your Honor.

12             THE COURT:  All right.  Thank you.

13             Ladies and gentlemen, 9:30 tomorrow morning, please.

14             Counsel, anything else you need to see me about this

15   afternoon?

16             OK.  Have a good evening all.

17             (Adjourned to October 10, 2018, at 9:30 a.m.)

18

19

20

21

22

23

24

25

1              INDEX OF EXAMINATION

2   Examination of:                          Page

3   BRIAN BOWEN, SR.

4   Direct By Mr. Diskant . . . . . . . . . . . 592

5   Cross By Mr. Haney . . . . . . . . . . . . . 638

6   Cross By Mr. Code . . . . . . . . . . . . . 712

7    CARRIE DOYLE

8   Direct By Mr. Solowiejczyk . . . . . . . . . 724

9              GOVERNMENT EXHIBITS

10  Exhibit No.                          Received

11   2002   . . . . . . . . . . . . . . . . . . 604

12   106D-5   . . . . . . . . . . . . . . . . . 608

13   106D-14   . . . . . . . . . . . . . . . . . 609

14   106D-16   . . . . . . . . . . . . . . . . . 611

15   106D-17   . . . . . . . . . . . . . . . . . 613

16   106B-2   . . . . . . . . . . . . . . . . . 615

17   106B-3   . . . . . . . . . . . . . . . . . 618

18   51 and 51T . . . . . . . . . . . . . . . . 620

19   23 and 23T . . . . . . . . . . . . . . . . 624

20   106D-18   . . . . . . . . . . . . . . . . . 626

21   25 and 25T . . . . . . . . . . . . . . . . 627

22   106F   . . . . . . . . . . . . . . . . . . 628

23   28 and 28T . . . . . . . . . . . . . . . . 630

24   1 and 1T . . . . . . . . . . . . . . . . . 633

25   56 and 56T . . . . . . . . . . . . . . . . 635

115A-1      . . . . . . . . . . . . . . . . 719

49, 49T    . . . . . . . . . . . . . . . 720

1943 and 1944   . . . . . . . . . . . . . 733

1948      . . . . . . . . . . . . . . . . 737

1908, 1914, 1924, 1917, 1912, 1915, . . . . . 752

            1916, 1909 and 1927

1901, 1902 and 1905   . . . . . . . . . . . 766