IAA8GAT1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

   v.        17 Cr. 686 (LAK)

JAMES GATTO, a/k/a "Jim,"
MERL CODE,
CHRISTIAN DAWKINS,

    Defendants.

------------------------------x

           October 10, 2018
           9:35 a.m.

Before:

     HON. LEWIS A. KAPLAN,

           District Judge
           and a Jury

        APPEARANCES

ROBERT S. KHUZAMI
   Acting United States Attorney for the
   Southern District of New York
BY: EDWARD B. DISKANT
   NOAH D. SOLOWIEJCZYK
   ALINE R. FLODR
   ELI J. MARK
   Assistant United States Attorneys

WILLKIE FARR & GALLAGHER LLP
   Attorneys for Defendant Gatto
BY: MICHAEL S. SCHACHTER
   CASEY E. DONNELLY

IAA8GAT1

APPEARANCES (Cont'd)

NEXSEN PRUET LLC
        Attorneys for Defendant Code
BY:  MARK C. MOORE
            -and-
MERL F. CODE

HANEY LAW GROUP PLLC
        Attorneys for Defendant Dawkins
BY:  STEVEN A. HANEY


Also present:  SONYA JACOBS, Paralegal
               SYLVIA LEE, Paralegal
               ANTHONY CASOLA, FBI

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning, all.  We are still missing

3     one juror, but I thought I would inquire of Mr. Schachter what,

4     if any, impact the order of yesterday has.

5          MR. SCHACHTER:  It was impactful.  I think that in

6     light your Honor's decision, I think we are not going to be

7     calling Dr. Rascher.

8          THE COURT:  Does that change the trial estimate any,

9     the estimated duration of the trial?

10         MR. SCHACHTER:  It shortens it, I suppose.  I think it

11    shortens it substantially, your Honor.  I don't anticipate,

12    unless something changes significantly in the government's

13    evidence regarding Mr. Gatto's intent to defraud, I don't

14    anticipate any significant defense case.  We will have some

15    stipulations, I think, that we are working out with the

16    government on a couple of issues.

17         Let me say this.  It is within the realm of

18    possibility that we would potentially use Dr. Rascher to

19    introduce certain facts and figures, but I think I am nearly

20    certain that that won't be the case, because I think what we

21    will be doing is we will have stipulations with the government

22    that we will be presenting to the court to make a relevancy

23    determination, and depending on the relevancy determination,

24    the evidence will likely come in by stipulation.

25         THE COURT:  The bottom line of this is the defense

1    case, if any, is on the low side rather than on the high side.

2         MR. SCHACHTER:  Mr. Moore is absolutely right.  We

3    also have a number of recordings and text messages that we

4    intend to play and that we are discussing with the government.

5    We have sent them over to the government to determine whether

6    or not they have any objections.

7         THE COURT:  I am really not trying to be rude, but I

8    asked you how long.  I didn't ask you what you were going to

9    use the time for.

10         MR. SCHACHTER:  With respect to Mr. Gatto, your Honor,

11    I think we are talking about low of half a day to high of two

12    days.

13         THE COURT:  And for the defendants all collectively?

14         MR. MOORE:  I think that's correct for -- I think that

15    estimate is accurate.

16         THE COURT:  For everybody.

17         MR. MOORE:  For everybody.

18         MR. HANEY:  I would agree as well, your Honor.

19         MR. MOORE:  I would note that my client hasn't made a

20    final decision as to whether he will or will not testify, and

21    we will cross that bridge when we get to it.  That could affect

22    matters, but I though I should mention that.

23         THE COURT:  I appreciate that.  That estimate is

24    assuming none of the defendants take the stand.

25         MR. MOORE:  That is correct, your Honor.

IAA8GAT1

1          I assume that our objection to your Honor's ruling

2     with respect to the exclusion of much of Dr. Rascher's proposed

3     testimony is preserved for the record.

4          THE COURT:  Well, it is what it is.

5          MR. MOORE:  I just want to make sure my objection is

6     noted.

7          THE COURT:  OK.  Therefore, it looks quite likely that

8     the case does go to the jury the week of the 22nd, is that

9     right?

10          MR. DISKANT:  In light of the fact that we are going

11     to get to close to a full trial day today, I think it is

12     conceivable that the government will rest on Monday.

13          We have actually conferred with defense counsel on

14     this subject.  Because of the amount of time we are going to

15     get today, there is a possibility that we will finish with TJ

16     Gassnola, who is not the next witness but the witness after

17     tomorrow.  The government and the defendants would propose,

18     should we finish with Mr. Gassnola tomorrow before 4:30, that

19     we send the jury home a little bit early rather than call a

20     next witness, because the next two witnesses both are flying in

21     from a considerable distance and the government would prefer,

22     if at all possible, not to force them to come back on Monday.

23     If the court is amenable to that, that is how we will proceed.

24          But assuming that we do finish Mr. Gassnola tomorrow,

25     the government expects to have approximately three, maybe at

IAA8GAT1

1    the most four additional witnesses, and it think it is

2    conceivable that we will be done on Monday.

3                    THE COURT:  These people flying in from a considerable

4    distance, they will both testify on Monday?

5                    MR. DISKANT:  Correct.

6                    MR. MOORE:  That is amenable to the defense, your

7    Honor.

8                    THE COURT:  All right.  We are still missing one

9    juror.

10                   Anything else useful that can be accomplished while we

11   wait?

12                   OK.  We will be in recess until we have a jury.

13                   (Recess)

14                   THE COURT:  Bring in the jury.

15                   (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Good morning, everybody.

3          The jurors all are present.  The defendants are here.

4          We are going to break so that I can deal with a

5    conference call that I told you would occur today at about

6    11:00 for about a half hour.  It's going to be shorter than I

7    had anticipated.

8          Let's get the witness and continue.

9     CARRIE DOYLE, resumed.

10         THE COURT:  Ms. Doyle, you are still under oath.

11         Cross-examination, Mr. Schachter.

12         MR. SCHACHTER:  Thank you, your Honor.

13   CROSS-EXAMINATION

14   BY MR. SCHACHTER:

15   Q.  Good morning, Ms. Doyle.

16   A.  Good morning.

17   Q.  Ms. Doyle, NC State had been recruiting Dennis Smith, Jr.

18   for a little more than a year before he had committed to NC

19   State, is that correct?

20   A.  I think that's right.

21   Q.  It's fair to say he was one of the very best high school

22   basketball players in the country?

23   A.  Yes.

24   Q.  He now plays in the NBA for the Dallas Mavericks?

25   A.  Yes.

IAA8GAT1          Doyle - Cross

1   Q.  He was from North Carolina.  He grew up near NC State, is

2   that right?

3   A.  He did.  He grew up in Fayetteville, North Carolina.

4   Q.  And fair to say that NC State really wanted him to play at

5   NC State, is that correct?

6   A.  Yes.

7   Q.  And you described yesterday how NC State's head coach, his

8   name is Mark Gottfried?

9   A.  Yes, correct.

10  Q.  You explained Mark Gottfried chartered a helicopter and

11  flew to Dennis Smith's high school for one of his recruiting

12  visits, is that right?

13  A.  He did.

14  Q.  I believe that you testified that you learned about that

15  because the coaches had actually tweeted about that trip on the

16  helicopter to go visit Dennis Smith at his high school, is that

17  correct.

18  A.  Yes.  There were multiple tweets.

19  Q.  And you said that you were irritated about that?

20  A.  I was, yes.

21  Q.  That's because the coaches hadn't told you anything about

22  chartering a helicopter to go pay this visit to Dennis Smith at

23  his high school, correct?

24  A.  That's correct.

25  Q.  Coach Gottfried did that without informing compliance in

IAA8GAT1                    Doyle - Cross

1   advance, is that correct?

2   A.  I don't know if he talked to anyone else in compliance but

3   he didn't talk to me.

4   Q.  I believe you said that coaches are supposed to inform

5   compliance about activities that they engage in that may

6   violate or implicate NCAA rules, is that right?

7   A.  We encourage all of our coaches to ask before they act in

8   order to avoid possible violations of NCAA rules.

9   Q.  But sometimes they don't?

10  A.  Sometimes rules violations happen.

11  Q.  Coach Gottfried did not inform, at least not you in advance

12  of this trip?

13  A.  That's correct.

14  Q.  I believe you said that this helicopter trip raised two

15  concerns, is that right?

16  A.  Yes.

17  Q.  There was an issue about whether the coach had landed at

18  Dennis Smith's high school during school hours.  That was the

19  first concern?

20  A.  On school property.

21  Q.  The second concern related to publicity, is that correct?

22  A.  Correct.

23  Q.  And that's because there is an NCAA rule which prohibits a

24  college from inviting media to a recruiting visit, is that

25  correct?

1   A.   That's correct.

2   Q.   You had said that a news crew had filmed coach Gottfried's

3   visit to a second prospect's -- to visit a second prospect.

4   You weren't talking about Dennis Smith?

5   A.   That's correct.

6   Q.   That second prospect is a basketball player called Bam

7   Adebayo?

8   A.   That is correct.

9   Q.   Coach Gottfried's visit there had been, to visit Bam

10  Adebayo had been filmed by a news crew, right?

11  A.   So the news crew was already there.  They were actually

12  talking with several prospects who were members of Bam's team

13  and so they were already at the church annex when Coach

14  Gottfried had arrived.

15  Q.   Did you ask Coach Gottfried whether he had invited the news

16  media to that other visit?

17  A.   I did.

18  Q.   And he said he did not?

19  A.   Correct.

20  Q.   That it was just a coincidence that the news media happened

21  to be there that day?

22  A.   Yes.  They with already there talking to the other

23  prospects.

24  Q.   And you described the investigation that you conducted with

25  the tape measure, is that right?

1    A.  Correct.  And there were also multiple other, four or five

2    or six other institutions there, coaches from other

3    institutions there talking with other prospects.

4    Q.  You were satisfied?

5    A.  Yes.  We were satisfied that in both of those possible

6    violations of NCAA rules that a violation had not occurred.

7    Q.  I see.  Isn't it true that the news media wasn't only

8    present for Coach Gottfried's visit with Bam Adebayo that day,

9    isn't that correct?

10   A.  I don't know that to be the case.

11   Q.  Isn't it true that when Coach Gottfried was landing in the

12   helicopter at Dennis Smith's high school there was a reporter

13   from The Fayetteville Observer who also was there and was able

14   to shoot it by video and photograph?

15            MR. SOLOWIEJCZYK:  Objection.

16            THE COURT:  Do you know?

17            THE WITNESS:  Yes.  My understanding is that there was

18   a reporter from The Fayetteville Observer.

19            MR. SOLOWIEJCZYK:  It's hearsay, your Honor.

20            THE COURT:  Do you know that of your own knowledge or

21   was that something somebody told you?

22            THE WITNESS:  In our investigation of the matter when

23   we talked with Coach Gottfried, he told us that there was a

24   reporter there when they landed.  He went and shook the guy's

25   hand but then walked away and didn't talk to the reporter.

1      THE COURT:  This answer and the last answer are

2   stricken.

3   Q.  You saw a photograph of Coach Gottfried's helicopter coming

4   in for a landing at Dennis Smith's high school that ran in The

5   Fayetteville Observer.  Didn't you see that photograph?

6   A.  I did not.  I only saw the Twitter posts that were

7   occurring at the time.

8      MR. SCHACHTER:  May I have a moment, your Honor?

9      I will move on.

10  Q.  You spoke to Coach Gottfried regarding whether the

11  involvement of the media in this visit to Dennis Smith was a

12  violation of NCAA rules, is that correct?

13  A.  Yes.  We talked with Coach Gottfried, because we had a

14  concern that either Coach Gottfried or someone from our staff

15  had notified the media in advance so that they would be there

16  when he landed or when he landed the second time, and he

17  assured us that he did not contact the media.

18  Q.  You accepted that and you were satisfied?

19  A.  We were.

20      We also talked with the Trinity Christian High School

21  people and apparently one of those guys there had contacted the

22  media, and so they were there at his request and not our

23  coach's request.

24  Q.  Thank you.

25      In any event, the media was present for both visits

1  with the helicopter that day, Bam Adebayo and Dennis Smith,

2  Jr.'s visit, is that correct?

3  A.  When the coaches landed, the media were there.  But again,

4  we have to evaluate whether the media was a part of the coach's

5  visit with the prospect, and we were convinced and assured that

6  those two things were separate.

7  Q.  Thank you.

8      I believe you testified yesterday that you wrote a

9  memo to the NCAA about this media presence at these visits, is

10 that correct?

11 A.  So we addressed both concerns.  So, yes, I did write a memo

12 to Leeland Zeller.  He works at the NCAA, the membership

13 services legislative section of the NCAA.  They provide

14 interpretations and determine whether an institution -- whether

15 a set of facts constitutes a violation of NCAA rules.  And so I

16 submitted our -- the facts as we could determine them, our

17 analysis, as well as our conclusions in that memo.

18 Q.  The NCAA was satisfied that the media presence at both

19 visits was not a violation of NCAA rules, is that correct?

20 A.  That's correct.

21 Q.  Thank you.

22     Now, you testified that there came a time when you

23 learned that a man named Eric Leak might have been in contact

24 with the family of Dennis Smith, Jr., is that correct?

25 A.  That's correct.

IAA8GAT1                    Doyle - Cross

1   Q.  And I believe you said yesterday that Leak had been

2   involved in, your words, a couple of violations of NCAA rules

3   involving NC State athletes, is that correct?

4   A.  That's correct.

5   Q.  You said that he had provided what are called impermissible

6   benefits under the NCAA rules to athletes, is that correct?

7   A.  Yes.

8   Q.  As a result of one of those violations, one of the players

9   competed in 21 games while ineligible, is that correct?

10  A.  I'm not aware of that.  Who are you referring to?

11  Q.  You talked about violations that this man Eric Leak had

12  been involved in.  Do you recall that one of those violations

13  resulted in a player competing in 21 games while ineligible?

14  A.  No.  Once we determined -- once we investigated thoroughly

15  and determined that violations of NCAA rules had occurred, we

16  declared the student-athlete ineligible and sought

17  reinstatement through the NCAA.

18  Q.  Do you recall that as a result of that NC State, as a

19  result of playing a player in 21 games, while ineligible, NC

20  State was fined $5,000?  Do you recall that?

21  A.  No.  That's incorrect.

22          THE COURT:  Next question.

23          MR. SCHACHTER:  May I approach, your Honor?

24          THE COURT:  Yes.

25          MR. SOLOWIEJCZYK:  He is trying to refresh her

IAA8GAT1                    Doyle - Cross

1   recollection, but she hasn't testified to a lack of memory.

2               THE COURT:  I haven't heard the question.

3               MR. SCHACHTER:  Your Honor, I have another binder for

4   the court.

5               THE COURT:  That's in addition to this one?

6               MR. SCHACHTER:  For your Honor's law clerk or deputy.

7               THE COURT:  Thank you.

8   Q.  I am going to ask you to turn in that binder, please, to

9   Defense Exhibit 1951.  It's a confusing binder.  You will see a

10  bunch of exhibits that are listed as GX tabs, and then you will

11  see defense exhibit tax tabs.  If you just turn to 1951.

12  A.  Is that the GX or the DX section?

13  Q.  DX.  So it's really towards the back of the binder.

14  A.  What was that number again?

15  Q.  It's D, as in David, X 1951.

16              If you would just take a moment to review that,

17  please.

18  A.  OK.

19  Q.  Is this an e-mail that you sent to Deborah Yow on October

20  24, 2014?

21  A.  Yes.

22  Q.  And does it regard the violations of NCAA rules by Eric

23  Leak?

24  A.  Yes.

25  Q.  Does it describe the penalties that NC State faced?

1        THE COURT:  Penalties it faced, meaning what?

2   Q.  The penalties that NC State paid as a result of Mr. Leak's

3   violation.

4   A.  This particular document does not.

5   Q.  OK.  You can put it aside.

6        In any event, you described that this man Mr. Leak had

7   been involved in a number of violations with NC State athletes,

8   is that correct?

9   A.  Yes.

10  Q.  As a result, I believe you told the jury that he had been

11  disassociated from NC State, is that correct?

12  A.  Yes.

13  Q.  And that means -- in fact, he had been barred for a decade

14  from having any contact with any current or future NC State

15  athlete, is that correct?

16  A.  That's correct.

17  Q.  He could not speak with any NC State Department of

18  Athletics employee regarding any athletics matter, is that

19  correct?

20  A.  Yes.

21  Q.  And you understood that Eric Leak had been ignoring NC

22  State's ban on him, isn't that correct?

23  A.  I don't know what you're referring to.

24  Q.  You understood that Eric Leak continued to have contacts

25  with employees of NC State, is that correct?

1    A.   I was not aware of that, no.

2    Q.   Do you recall being interviewed by members of the FBI and

3    the prosecution team on July 16, 2018?

4    A.   That sounds about right.

5    Q.   And in that interview, did you tell the FBI that, even post

6    disassociation letter, that Eric Leak was still in touch with

7    an NC State University recruiter?  Did you say that?

8    A.   I don't recall saying that specifically.  I do know that

9    after Eric Leak was involved with a variety of violations in

10   2010-11, we kept hearing about him.  He was being investigated

11   by the Secretary of State for being involved in agent

12   activities, even though he wasn't registered with the State of

13   North Carolina, and we would read articles in the newspaper

14   periodically about him wanting to be an agent.  And so we knew

15   he was around our program.

16   Q.   But you don't recall telling the FBI agents that he had

17   been still in touch with an NC State University recruiter?

18   A.   No.

19   Q.   I am going to show you just for --

20               MR. SCHACHTER:  May I show just the witness 3508-02,

21   page 4?

22               THE COURT:  Yes.

23   Q.   If you could just take a look at that and read that to

24   yourself, Ms. Doyle.  Just read it to yourself.  That's all.

25   A.   I am done.

1    Q.  Does that refresh your recollection that you told the FBI

2    and the prosecutors that even post disassociation letter, that

3    Mr. Leak was still in touch with an NC State University

4    recruiter?  Just yes or no.

5    A.  I don't recall saying this.  And I don't know who the NC

6    State recruiter would be.

7    Q.  Thank you.

8            Now, you said yesterday that you attended a meeting

9    with Coach Gottfried and the athletic director about Eric

10   Leak's connections to Dennis Smith's family.

11           Do you recall testifying to that yesterday?

12   A.  Yes.

13   Q.  I believe that you testified yesterday that Coach Gottfried

14   had brought forward information that Eric Leak had been in

15   contact with Dennis Smith Senior, that's Dennis Smith father.

16   A.  Yes.

17   Q.  And Coach Gottfried explained that he needed to be able to

18   recruit talent regardless of whether they had relationships

19   with Eric Leak, isn't that correct?

20           MR. SOLOWIEJCZYK:  Objection your Honor.  It's hearsay

21   and mischaracterizes the testimony.

22           THE COURT:  Sustained.

23   Q.  In this meeting that you described yesterday, Coach

24   Gottfried described Eric Leak as Dennis Smith's financial

25   adviser, isn't that correct?

1    A.  I don't remember necessarily whether it was described in

2    that meeting that way, but I do recall that there was some

3    rumor that Eric Leak was a financial adviser to Dennis Smith

4    Junior or Dennis Smith Senior.  I don't remember where I heard

5    that from.

6    Q.  Can you please turn in your binder, please, to Defense

7    Exhibit 1925.

8            If you can just take a moment and review that.

9    A.  Yes.

10   Q.  Have you reviewed it recently?

11   A.  I think I have read it within the last couple of weeks.

12   Q.  OK.  This is a memorandum that you prepared in your

13   ordinary course of business as a compliance official at NC

14   State, is that correct?

15   A.  Yes.

16   Q.  And you maintained a copy of this record of the meeting

17   that you described yesterday in the ordinary course of business

18   as a compliance professional at NC State?

19   A.  Yes.

20           MR. SCHACHTER:  We offer Defense Exhibit 1925.

21   Q.  You also made this close in time to the meeting on October

22   30, 2014, is that correct?

23   A.  Yes.

24           MR. SCHACHTER:  We offer Defense Exhibit 1925.

25           MR. SOLOWIEJCZYK:  Objection your Honor.  It is not a

1    business record.  It contains hearsay within hearsay.

2                    THE COURT:  Because?

3                    MR. SOLOWIEJCZYK:  It's a report of a meeting.  It's a

4    one-off ad hoc event.  It's not something that is normally kept

5    in the course of business.

6                    THE COURT:  See if you can lay a better foundation,

7    Mr. Schachter.

8    Q.  Ms. Doyle, in the normal course of your work as an NC State

9    compliance professional, compliance issues come up, is that

10   correct?

11   A.  I'm sorry?

12   Q.  I wasn't clear.

13              In the normal course of your business as a compliance

14   official at NC State compliance issues arise, is that correct?

15   A.  They do.

16   Q.  Things come up that are red flags as to potential NCAA rule

17   violations, is that correct?

18   A.  Yes.

19   Q.  And one of the things that you do is you memorialize those

20   issues as they come in in the ordinary course of your business

21   as a compliance professional, isn't that correct?

22   A.  Yes.

23   Q.  And that's why you memorialized this meeting on October 30,

24   2014, isn't that correct?

25   A.  Yes.

IAA8GAT1                      Doyle - Cross

Q.  That's because a compliance red flag issue had come up, is

that correct?

A.  Yes.

Q.  And in the normal course of business of a compliance

professional you memorialized it, isn't that correct?

A.  Yes.

          MR. SCHACHTER:  Your Honor, I offer Defense Exhibit

1925.

          MR. SOLOWIEJCZYK:  Your Honor, can we approach for a

moment on this?

          THE COURT:  All right.

          (Continued on next page)

1          (At the sidebar)

2          MR. SOLOWIEJCZYK:  The government does not believe

3   this is a business record.  It is basically memorializing

4   statements that were made, the same way an arrest report would

5   memorialize such statements.  It contains hearsay of what the

6   coaches say during this meeting.  We don't believe it's

7   particularly relevant, the details of what went on in this

8   particular meeting.  She has testified to the substance.

9          MR. SCHACHTER:  Your Honor, two issues.  I believe we

10  did lay an adequate business record foundation, considering

11  what her job is.

12         Second, none of this is being offered for the truth of

13  the matter asserted.  What we are offering this for is to show

14  how NC State compliance department responded to compliance

15  issues that were raised with respect to this particular athlete

16  and that we think, your Honor, is relevant to materiality.

17         MR. SOLOWIEJCZYK:  Your Honor, the law is that --

18  obviously negligence is not an issue in this case.  That

19  doesn't go to anything.  This was a memo that Dennis Smith,

20  Jr. -- maybe we are having a different conversation.  It

21  relates to Dennis Smith, Jr. generally, but this is about some

22  other individual who happened to be associated with the

23  university and then looking into a concern.  There is nothing

24  about this that goes to materiality.  The statements that are

25  material to the university don't go to any of that.  It's

1    really a tangential issue at best.

2              THE COURT:  Where do you propose to go with this?

3              MR. SCHACHTER:  I propose to introduce the document

4    and talk about a few components of red flags that were raised

5    to compliance in connection with the recruiting of Mr. Smith,

6    and I want to address compliance's response, that they were

7    satisfied, just as the government addressed yesterday red flags

8    that were raised with respect to the recruitment of Dennis

9    Smith and how compliance responded.  They specifically asked

10   about this exact meeting.

11             MR. SOLOWIEJCZYK:  He can do that without introducing

12   this document and inquire about what the concerns were, how

13   they ran them down, but this doesn't really add much value.

14             THE COURT:  Let me see the document.

15             I am going to allow it, not for the truth of anything

16   here.  I am not going to let this go on ad infinitum.

17             MR. SCHACHTER:  Understood.

18             (Continued on next page)

19

20

21

22

23

24

25

1        (In open court)

2        THE COURT:  Members of the jury, Defendants' Exhibit

3    1925, which is you will see in a minute this memorandum that's

4    been spoken of, is received in evidence, but it's received only

5    for a limited purpose.  So inasmuch as this is the first time

6    this is occurring in this trial, let me explain what that

7    means.

8        As you will see, the memorandum is the author's

9    account of what various people said at this meeting.  None of

10   that is to be considered for the truth of the things that were

11   said at the meeting.  It is offered for the purpose of showing

12   that these things were said and to address the question of

13   what, if anything, the compliance folks at NC State did in

14   consequence of what was said.

15       Now, let me give you a very practical, simple analogy.

16   If for some reason it was relevant that somebody said at a

17   meeting that the moon is made of green cheese, I would allow

18   that statement on exactly the same basis.  That is to say, to

19   prove that somebody said the moon is made of green cheese.  You

20   could consider that for the fact that somebody made that

21   statement.  You could not consider it for the truth of the

22   contention that is the moon really is made of green cheese.

23       That's what this is all about.  That's the analogy.

24       OK.  Let's proceed.

25       (Defendant's Exhibit 1925 received in evidence)

1          MR. SCHACHTER:  Thank you.

2          Your Honor, may I publish Defense Exhibit 1925 for the

3     jury?

4          THE COURT:  Yes.

5     BY MR. SCHACHTER:

6     Q.  This is the memorandum that you prepared, Ms. Doyle, is

7     that correct?

8     A.  That's correct.

9     Q.  I just want to highlight a couple of portions of this.

10         You recorded that Ms. Yow -- that's the athletic

11    director, is that correct?

12    A.  Yes.

13    Q.  And you noted in the second paragraph that she began the

14    meeting expressing concern about any prospect who may have ties

15    to Desmond Eastmond or Eric Leak, is that correct?

16    A.  Yes.

17         MR. SCHACHTER:  Then if you can go to the second

18    paragraph, please, Mr. McLeod.

19    Q.  In the first sentence the Mark, is that Coach Mark

20    Gottfried?

21    A.  It is.

22    Q.  It states, "Mark indicated that he needed to be able to

23    recruit talented young men who may or may not have a

24    relationship/ties with either Desmond Eastmond or Eric Leak."

25         Do you see that?

1    A.  I do.

2    Q.  You described yesterday, I believe, the steps that were

3    taken following this meeting.  Do you recall Mr. Solowiejczyk

4    asking you about that?

5    A.  Yes.

6    Q.  And that's reflected in this memorandum, is that correct?

7    A.  Yes, at least to some degree.  In this memo Mark said he

8    would find out about the extent of the relationship by talking

9    to them over the phone.  That didn't happen.  Instead we

10   decided to let Orlando Early, who was an assistant coach at

11   that time, go and talk with the Dennis Smith Senior in person

12   and ask questions that way.

13   Q.  What did you learn from that?

14   A.  We learned that there was just communication, that there

15   was just phone calls that were occurring between Eric Leak and

16   Dennis Smith Senior.

17   Q.  You learned that from Coach Early's report back to you, is

18   that correct?

19   A.  The report as well as subsequent conversations.

20   Q.  Coach Early reported that Dennis Smith Senior had confirmed

21   the relationship but he declined to elaborate, isn't that

22   correct?

23   A.  That's what he put in his memo.  I remember having a

24   conversation with a variety of people afterwards and the thing

25   that we were most concerned about was the telephone calls,

1    right, that were occurring between Eric Leak and Dennis Smith

2    Senior.

3            The information reported back to us didn't include any

4    information related to any benefits being provided or an agency

5    agreement being signed or anything that would pique our

6    interest that this was more serious than simply phone calls

7    that were occurring, which, by the way, are not a violation of

8    NCAA rules.

9    Q.  You mentioned a report that you received from Coach Early a

10   moment ago and I would just like to show that to you.  Can you

11   please turn in your binder to Defense Exhibit 1958.

12           Do you recognize that?

13   A.  I do.

14   Q.  After asking Coach Early to speak to Dennis Smith Senior,

15   is this the report that he submitted to you that you just

16   mentioned a moment ago?

17   A.  It's a letter.  I wouldn't call it a report.

18   Q.  But this was sent to you at your request, is that right?

19   A.  It was.

20   Q.  And this is a letter that you then -- you made that request

21   in the ordinary course of your business as a compliance

22   professional at NC State, is that correct?

23   A.  We try to document everything.

24   Q.  And this is that documentation that you normally document?

25   A.  Yes.

1  Q.  And you kept this in your files in the ordinary course of

2  your business as a compliance professional, is that correct?

3  A.  Yes.

4         MR. SCHACHTER:  Defense offers Defense Exhibit 1958.

5         MR. SOLOWIEJCZYK:  Objection.  Hearsay, among other

6  things.

7         THE COURT:  Sustained.

8  Q.  As you looked into the Dennis Smith Senior matter, do you

9  recall that you received no elaboration on what the

10  relationship was between Eric Leak and Dennis Smith Senior?  Do

11  you recall that?

12  A.  So my main concern at that time was not the phone calls per

13  se because those aren't violation of NCAA rules.  My primary

14  concern was about any benefits being provided or any agency

15  agreements being signed.  And in the conversations that I had

16  with people, those concerns were assuaged.

17  Q.  I see.  How?

18  A.  I don't recall the exact conversation I had with Coach

19  Early, but I would have had a conversation with him when he

20  returned.

21  Q.  Is it fair to say whatever information he provided to you,

22  it was no elaboration on the extent of his conversation with

23  Dennis Smith Senior directly?  Is that correct?

24  A.  Well, Orlando Early isn't used to putting together

25  enforcement memorandum where he is talking about what he asked

1    and what the answer was in full detail.  I understand that this

2    memo doesn't provide very much information, but I would have

3    talked with him when he returned to determine whether

4    compliance needed to be more concerned with regard to this

5    relationship, and we were not.

6    Q.  Had Coach Early provided information that he received from

7    Dennis Smith Senior about the reason why he had a relationship

8    with this financial adviser, you presumably would have recorded

9    that and documented it in the ordinary course of your business

10   as a compliance professional, is that correct?

11   A.  Well, let me break that into a couple of different pieces

12   and make sure I understand your question.

13         First of all, your question assumes that Eric Leak is

14   a financial adviser and I don't think there is any information

15   to suggest that that's true.

16         The other part of your question, if in fact Coach

17   Early came back and said benefits were being -- I learned that

18   benefits had been provided or an agency agreement was signed or

19   verbally agreed to, that would have certainly meant that

20   compliance needed to get more involved and we would have had to

21   go and do those interviews ourselves.

22   Q.  I see.  It's fair to say there is nothing in your

23   compliance files that recorded any explanation provided from

24   Dennis Smith's father as to the nature of his relationship with

25   Eric Leak, is that correct?

IAA8GAT1                    Doyle - Cross

1    A.  That's correct.

2    Q.  Did you seek to interview Dennis Smith Senior yourself?

3    A.  Not at that time, no.

4         What we had decided was, at least with the information

5    that we had at that time, the only thing that was occurring

6    were telephone calls between Eric Leak and Dennis Smith Senior.

7    And we decided to monitor that situation and if in fact more

8    information became available that would suggest a possible

9    violation of NCAA rules, then we would have taken additional

10   steps after that.

11   Q.  Now, more information did come to your

12   attention -- withdrawn.

13        During the admission process of Dennis Smith Junior

14   you became aware that the family had no income, isn't that

15   correct?

16        MR. SOLOWIEJCZYK:  Objection, your Honor.

17        THE COURT:  What is the objection?

18        MR. SOLOWIEJCZYK:  Relevance.  And hearsay.

19        THE COURT:  Yes.

20        MR. SCHACHTER:  It's not offered for truth, your

21   Honor.  It's offered for the actions that were taken, or

22   inactions.

23        THE COURT:  I will allow it for the moment.  Not for

24   the truth of what information was provided, but for the fact

25   that such information was provided, if it was.

1    Q.   During the admission process of Dennis Smith Junior, did

2    you become aware of the fact that Dennis Smith, that the Smith

3    family had no income?

4              THE COURT:  Sustained as to form.  You're presupposing

5    that that fact is a fact.

6              MR. SCHACHTER:  Thank you, your Honor.

7    Q.   During the admission process, information was brought to

8    your attention regarding the information that had been provided

9    by the Smith family to NC State regarding their financial

10   condition, is that correct?

11   A.   It wasn't provided to me.  I am not involved in the process

12   that the financial aid office deals with with regard to the

13   FAFSA form.  It's a form that families fill out in order to

14   declare their income to the financial aid office as well as the

15   federal government.  I am not involved in that process.  I

16   heard that they had reported zero income much later in the

17   process, probably after he enrolled.

18   Q.   OK.

19             THE COURT:  Can we get some clarity on that?

20             Is it that after he enrolled you learned that

21   information to that effect had been provided before he enrolled

22   or are you saying that everything happened after he enrolled,

23   both your learning of it and the provision of the information?

24             THE WITNESS:  My understanding is that families have

25   to fill out forms that are developed by the federal government,

IAA8GAT1                    Doyle - Cross

1    and those forms are submitted to the financial aid office in

2    order for the financial aid office to determine what type of

3    federal and state need-based aid the student should be awarded.

4    So that happened.  But my knowledge of what was on the form in

5    terms of him submitting that they had zero income was much

6    later than that.  I can't even tell you when it was, but it

7    would have been subsequent to his enrollment and it might have

8    been as we were looking at documents having to do with this

9    case.

10   Q.  Let me see if I can refresh your recollection.  Can you

11   turn to Government Exhibit 1962 in your binder.

12              MR. SCHACHTER:  I will just show it to the witness,

13   your Honor.

14   Q.  I will direct your attention to that first paragraph.  You

15   can just read it to yourself.  It's not that long.

16              Please don't discuss the document.  If you could just

17   review it to yourself, please.

18   A.  Yes.  That's helpful.  Thank you.

19   Q.  Does this refresh your recollection that it was around

20   January 5th of 2016 when it was brought to your attention that

21   NC State needed something in writing from Dennis Smith Senior

22   documenting how he and Dennis had lived on so little income in

23   2014?

24   A.  Yes.

25   Q.  After receiving that information, did you then inquire why

IAA8GAT1                    Doyle - Cross

1   Dennis Smith Senior would need to have a relationship with a

2   financial adviser if they were living on no income?

3           MR. SOLOWIEJCZYK:  Objection, your Honor.  It

4   presupposes facts that are not her testimony.

5           THE COURT:  Sustained.

6   Q.  Is it fair to say that you believed that Coach Gottfried

7   was protective of the recruiting relationship that he and Eric

8   Leak had with potential athletes?

9   A.  I can only speak to what I believe Coach Gottfried's sense

10  was.  I can't speak to what Eric Leak's sense is.

11  Q.  Just speaking --

12          MR. SOLOWIEJCZYK:  Objection, your Honor.  If she is

13  going to speak about what Coach Gottfried thought, this is an

14  inappropriate line of questioning.

15          MR. SCHACHTER:  I will rephrase.

16  Q.  Based on your interactions with Coach Gottfried regarding

17  Eric Leak and Dennis Smith Senior, was it your impression that

18  he was protective of the recruiting relationship that he had

19  with Eric Leak and potential athletes?

20  A.  I don't know that Coach Gottfried had a relationship with

21  Eric Leak.

22  Q.  OK.  Do you recall being interviewed -- I think you said

23  that you did -- that you were interviewed by the FBI and

24  members of the prosecution team on July 17, 2018.

25          Do you recall that?

1    A.   That date sounds about right.

2    Q.   In that interview, did you say Coach Gottfried was

3    protective of the recruiting relationship that he and Eric Leak

4    had with potential student-athletes?  Did you say that to the

5    government?

6    A.   My understanding and my memory is that Coach Gottfried was

7    protective of his recruiting relationships, but I don't

8    remember that link between Eric Leak and Coach Gottfried and

9    recruiting relationships.

10   Q.   OK.  I am just going to --

11            MR. SCHACHTER:  May I show the witness 3508-2, page 4?

12            THE COURT:  Just a moment.

13            MR. SCHACHTER:  I will move on, your Honor.

14            THE COURT:  All right.

15   A.   We had spent a great deal --

16            THE COURT:  There is no question.  Thank you.

17            Next question.

18   Q.   Coach Gottfried told you that he didn't want compliance to

19   speak to Dennis Smith Senior, is that correct?

20   A.   He didn't say that explicitly, no.

21   Q.   Did he say that he wanted any contact with Dennis Smith

22   Junior to be made through the basketball program since it was

23   the program that had the relationship with Dennis Smith?

24            MR. SOLOWIEJCZYK:  Objection.  Hearsay.

25            MR. SCHACHTER:  It's not offered for the truth, your

1  Honor.

2          THE COURT:  It's not offered for the truth.  Is there

3  an objection?

4          MR. SOLOWIEJCZYK:  It's fine, your Honor.

5          THE COURT:  All right.  This is received not for the

6  truth of any statement attributed to Mr. Gottfried but for the

7  fact that it was said.

8  Q.  I will repeat the question.

9          Did Coach Gottfried say that he wanted any contact to

10  Dennis Smith to be made through the basketball program since it

11  was the basketball program that had the relationship with

12  Dennis Smith?

13  A.  Yes.  And of course, that has to do with logistics and

14  other kinds of questions.  If in fact we became aware of --

15          THE COURT:  Ms. Doyle, we are going to do a lot better

16  here if you just answer the questions and then wait for the

17  next one.

18          THE WITNESS:  Thank you, your Honor.

19  Q.  In any event, I believe you said yesterday that your

20  concerns regarding this matter were satisfied, is that correct?

21  A.  Yes, they were.

22          MR. SCHACHTER:  May I have just a moment, your Honor?

23  Q.  Now, I believe that you testified about next steps that

24  were taken, is that correct, yesterday?

25  A.  With regard to what?

1    Q.  I believe you said there was additional training that you

2    brought in after this interaction with Coach Gottfried

3    regarding Eric Leak, is that correct?

4    A.  Yes.

5    Q.  In choosing that step, you wanted to both protect the

6    university but also not harm recruiting for the men's

7    basketball program, is that correct?

8    A.  I think the primary reason for bringing in Julie Roe Lach

9    was to make sure that our coaches understood the head coach

10   responsibility bylaw and their responsibilities within that

11   bylaw.

12   Q.  And in choosing that step, one of your conversations was a

13   desire not to harm recruiting under the men's basketball

14   program, is that correct?

15   A.  Well, I think in all instances we don't want to harm

16   recruiting.  But to the extent that we can do that, if in fact

17   we become aware of possible violations of NCAA rules, we are

18   certainly going to investigate those thoroughly and get to the

19   bottom of them.

20   Q.  Sure.  Because you have multiple considerations in mind,

21   correct?

22   A.  Yes.

23   Q.  One is protecting the university, correct?

24   A.  Yes.

25   Q.  And the other is not harming recruiting for the men's

1    basketball program, is that correct?

2    A.  Yes.  As well as following NCAA rules.

3    Q.  Thank you.

4         Is it correct that at NC State it is the head

5    basketball coach who decides who will get a basketball

6    scholarship with the approval of the athletic director?

7    A.  Yes.

8    Q.  Now, I believe that you testified yesterday -- actually,

9    maybe we can put on the screen.

10        MR. SCHACHTER:  May we publish Government Exhibit 1908

11   in evidence, your Honor?

12        THE COURT:  Yes.

13   Q.  Is this the financial aid agreement?  This is the

14   scholarship agreement provided to Dennis Smith Junior, is that

15   correct?

16   A.  Yes.

17   Q.  And the date of that is November 11, 2015, is that correct?

18   A.  Yes.

19   Q.  Is it fair to say that the chancellor of the university was

20   happy that Coach Gottfried was able to recruit Dennis Smith,

21   Jr., is that correct?

22        MR. SOLOWIEJCZYK:  Objection.

23        THE COURT:  Sustained.

24   Q.  I believe you were shown yesterday, if we can put them up

25   side by side please, Coach Gottfried's contract extension.

1       Do you recall testifying about that yesterday?

2   A.  I do.

3       MR. SCHACHTER:  Your Honor, may we publish Government

4   Exhibit 1948 in evidence?

5       THE COURT:  Yes.

6   Q.  I believe that you said that the financial aid agreement

7   given to Dennis Smith Junior, that was dated November 11, 2015.

8       Do you see that date on that page?

9   A.  I do.

10  Q.  That's at the bottom, is that correct?

11  A.  Yes, sir.

12  Q.  And then if we can just look at the date of Coach

13  Gottfried's contract extension.  What was the date of that

14  agreement in evidence?

15  A.  November 12, 2015.

16  Q.  That's the next day?

17  A.  Yes, sir.

18  Q.  You were asked a number of questions regarding Coach

19  Gottfried's contract and I want to ask you about that.

20      MR. SCHACHTER:  We can take down 1908.

21  Q.  If you recall, the government asked you about specific

22  provisions relating to NCAA compliance that are found in Coach

23  Gottfried's contract.

24      Do you recall those questions yesterday?

25  A.  I do.

IAA8GAT1                    Doyle - Cross

1   Q.  He asked you whether you had access to this contract in the

2   regular course of your business, is that correct?

3   A.  If I asked for it, I would receive it.  Yes.

4   Q.  Did you at any time send the specific provisions of this

5   contract to Jim Gatto at Adidas?

6   A.  I did not.

7   Q.  You were also shown Coach Early's contract.

8           Do you recall that yesterday?

9   A.  I do.

10  Q.  And you were asked about specific details, provisions

11  regarding NCAA compliance that are found in Coach Early's

12  contract.

13          Do you recall those questions yesterday?

14  A.  Yes.

15  Q.  Did you at any time ever send a copy of Coach Early's

16  contract to Jim Gatto at Adidas?

17  A.  No.

18  Q.  All right.  Let's look at a number of provisions of

19  Government Exhibit 1948.

20          MR. SCHACHTER:  If we can please turn to the fifth

21  page of the contract.

22  Q.  Do you see where it shows what Coach Gottfried is going to

23  be compensated at NC State?

24  A.  Yes.

25  Q.  It reflects that he is going to be paid a salary of

IAA8GAT1                    Doyle - Cross

1    $760,000.  Is that correct?

2    A.  Yes.  That's what it says.

3    Q.  Then the next section is entitled Supplemental

4    Compensation, is that correct?

5    A.  Yes.

6    Q.  And that shows that he is going to be paid a supplemental

7    compensation of $1,725,000, is that correct?

8    A.  That's what the document says, yes.

9    Q.  That's about nearly $2.5 million a year, is that correct?

10   A.  I can't do math in my head.  I assume you're correct.

11   Q.  Now, Coach Gottfried was, you said he was fired in February

12   of 2017, is that correct?

13   A.  Yes, I believe February was correct.

14   Q.  And you said yesterday that that had nothing to do with

15   NCAA rule violations, is that correct?

16   A.  That's correct.

17   Q.  He just wasn't winning enough games for NC State, isn't

18   that correct?

19   A.  I don't know the exact reason why he was fired.  I wasn't

20   in those meetings.

21   Q.  Do you understand it had to do with his performance as a

22   basketball coach?

23            MR. SOLOWIEJCZYK:  Objection.

24            THE COURT:  Sustained.

25   Q.  He was replaced with a -- the new coach at NC State is

IAA8GAT1                    Doyle – Cross

1    Kevin Keatts, is that correct?

2    A.   That's correct.

3    Q.   Now, you testified yesterday that NC State's compliance

4    department -- withdrawn.

5            You testified yesterday that NC State issues

6    telephones to their coaching staff, is that correct?

7    A.   That's correct.

8    Q.   And you said that those phones are monitored for red flags

9    and potential violations of NCAA rules, is that correct?

10   A.   That's correct.

11   Q.   These cell phones actually belong to the university, is

12   that correct?

13   A.   Yes.

14   Q.   Do you collect those cell phones periodically and review

15   the text messages on those cell phones that are issued to the

16   coaching staff?

17   A.   We do not.

18   Q.   Let's just take a moment and look at Coach Early's

19   contract.

20           MR. SCHACHTER:  Your Honor, may I publish Government

21   Exhibit 1944 in evidence?

22           THE COURT:  Yes.

23           MR. SCHACHTER:  Mr. McLeod, just highlight the body of

24   the document.

25   Q.   Does this reflect that Coach Early is paid a salary of

1   $238,865?

2   A.  Yes.

3   Q.  It doesn't say anything about any particular additional

4   compensation that is to be paid to Coach Early for advancing in

5   the NCAA tournament or winning any games, does it?

6   A.  It does not.

7          MR. SCHACHTER:  You can take that down, Mr. McLeod.

8   Q.  You testified yesterday that the NCAA let's a school issue

9   a maximum of 13 athletic scholarships.  Do you recall that?

10  A.  Yes.

11         THE COURT:  Inasmuch as you're changing subjects we

12  will break here and we will resume after my call.

13         MR. SCHACHTER:  Yes, your Honor.

14         (Jury exits courtroom)

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

Iaadgat2                    Doyle - cross

1          (Jury present)

2          THE CLERK:  Please be seated, everyone.

3          THE COURT:  Let's get the witness.

4          OK, the jurors and the defendants are present.

5          All right.  The witness is still under oath.

6          You may continue, Mr. Schachter.

7          MR. SCHACHTER:  Thank you, your Honor.

8   BY MR. SCHACHTER:

9   Q.  Ms. Doyle, can we just start by -- with Government Exhibit

10  1908, please, Mr. McCloud.  This is in evidence.

11         MR. SCHACHTER:  And, your Honor, may I just publish

12  this to the jury?

13         THE COURT:  Yes.

14  Q.  This is the financial aid agreement for Dennis Smith, is

15  that correct?

16  A.  That's correct.

17         MR. SCHACHTER:  And if you can please, Mr. McCloud,

18  just put up the second page of this exhibit.  Can you put them

19  up side by side, please?

20  Q.  So the government marked this as one exhibit but these are

21  two documents, is that correct?

22  A.  That is correct.

23  Q.  So one, the financial aid agreement, is on the left, and

24  that is signed just by Dennis Smith Junior, is that correct?

25  A.  Dennis Smith Junior, Mark Gottfried and Krista Domnick.

Iaadgat2                    Doyle - cross

1    Q.  Thank you.  And on the right is a different document, and

2    that is called a National Letter of Intent, is that correct?

3    A.  Correct.

4    Q.  That's the document that has Dennis Smith Senior's

5    signature on it as well?

6    A.  Yes.

7    Q.  Just a question about the National Letter of Intent.  You

8    said that it binds the athlete, is that correct?

9    A.  Yes.

10   Q.  Can you describe what you mean by that?

11   A.  Yes.  So when prospective student-athletes sign a National

12   Letter of Intent, it binds that particular prospective

13   student-athlete to that specific institution and all recruiting

14   ceases, and if in fact the student doesn't enroll at the

15   institution, then there are penalties for that.

16   Q.  Can you just describe that?  Can that student-athlete

17   transfer to a different school and play there?

18   A.  If they sign a National Letter of Intent, the answer would

19   be no, unless they are released.

20   Q.  OK.  Thank you.

21        Now, looking at the financial aid agreement, the first

22   page, as we talked about, that is dated November 11, 2015,

23   Dennis Smith Junior had not been cleared for competition before

24   NC State entered into the financial aid agreement with him, is

25   that correct?

Iaadgat2                    Doyle - cross

1    A.  That's correct.

2    Q.  That happened sometime after the financial aid agreement,

3    is that right?

4    A.  Yes.

5    Q.  And, in fact, do you recall that that didn't happen for

6    nearly two months after the scholarship was awarded to

7    Mr. Smith?

8    A.  So, my memory is that we would have evaluated him for

9    competition prior to the beginning of class -- either prior --

10   well, certainly before the first competition for men's

11   basketball in the spring.

12   Q.  Sure.  And you don't -- sitting here today, do you recall

13   the particular date?

14   A.  I don't recall the particular date.

15           MR. SCHACHTER:  Can I just for witness, your Honor,

16   may I show Government Exhibit 1956?

17   Q.  And just looking at that, does that refresh your

18   recollection as to when Dennis Smith Senior had actually been

19   cleared for competition?

20   A.  Yes.

21           THE COURT:  Not "Dennis Smith Senior."

22           MR. SCHACHTER:  I'm sorry.  Of course.  Thank you,

23   your Honor.

24   Q.  Does this refresh your recollection as to when Dennis Smith

25   Junior was cleared for competition?

1   A.  Yes.

2   Q.  And when was that?

3   A.  January 1st of 2016.

4   Q.  OK.  Thank you.

5          Now, is it also true that NC State had issued

6   Mr. Smith a scholarship before he had actually even completed

7   an application to the school?

8   A.  I don't -- I don't know when he would have applied to the

9   school.  I don't have that knowledge.

10  Q.  Sure.  May I show you what's been marked as Government

11  Exhibit 1952, for identification?

12         MR. SCHACHTER:  And we would offer Government Exhibit

13  1952.

14         MR. SOLOWIEJCZYK:  Objection, your Honor.

15         THE COURT:  Sustained at this point, anyway.

16         MR. SCHACHTER:  OK.

17  Q.  Do you recognize Government Exhibit 1952 as a business

18  record of NC State that would show when he applied to the

19  school?

20  A.  This is not a document that I have access to in my normal

21  everyday business dealings.

22         MR. SCHACHTER:  OK.  I'll withdraw it.

23  Q.  Thank you.  Now, when they apply, athletes at NC State are

24  required to meet the same standards as other students, is that

25  correct?

Iaadgat2                    Doyle - cross

1   A.  Are you talking about in the application process?

2   Q.  Correct.

3   A.  Yes.

4   Q.  They have to meet the same academic standards as everybody

5   else, is that correct?

6   A.  That's correct.

7   Q.  Is it correct that in 2016 the average SAT score for new

8   students at NC State was 1261?

9           MR. SOLOWIEJCZYK:  Objection.  Relevance.

10           THE COURT:  Sustained.

11  BY MR. SCHACHTER:

12  Q.  Well, do you -- did you know that -- well, withdrawn.

13           Do you know one way or the other whether Dennis Smith

14  Junior met the academic standards at NC State?

15  A.  So I work in the compliance office and I don't work in

16  academic support so I don't know those details.

17  Q.  Fair enough.  Thank you.

18           Now, I think that you noted on your direct examination

19  that the FAA, the Financial Aid Agreement, awarded Dennis Smith

20  a scholarship for four academic years.

21           MR. SCHACHTER:  Can we just throw that up, 1908, in

22  evidence?

23  A.  Yes.

24  Q.  And I think that Mr. Solowiejczyk asked you about this.  It

25  says the period of award is four academic years, is that

Iaadgat2                    Doyle - cross

1    correct?

2    A.  Yes.

3    Q.  Correct that Dennis Smith Junior was actually at NC State

4    for only one year, is that correct?

5    A.  He was at NC State for a year and a half.

6    Q.  Right.  I see.  He started -- he left high school early, is

7    that correct --

8    A.  My understanding --

9    Q.  -- to rehab a knee or something like that, is that correct?

10   A.  He graduate from high school early.

11   Q.  I see.  But he wasn't playing for that first semester that

12   he was at NC State?

13   A.  That's correct.

14   Q.  Is that because he had a knee injury and was

15   rehabilitating, do you remember?

16   A.  That is my understanding, yes.

17   Q.  OK.  So then he played for NC State, however, just for one

18   season; that's 2016 to 2017, is that right?

19   A.  That's correct.

20   Q.  And so does that make what is called a one-and-done player?

21   A.  I suspect so, yes.

22   Q.  And can you just explain to the jury what that means, what

23   is a one-and-done player?

24            MR. SOLOWIEJCZYK:  Objection, your Honor.

25            THE COURT:  I think they've had that quite a few

Iaadgat2                    Doyle - cross

1    times.

2            MR. SCHACHTER:  Fair enough, your Honor.  I will move

3    on.

4    Q.  You testified on direct examination about the forms that

5    Dennis Smith Junior completed.  Do you recall that?

6    A.  I do.

7    Q.  And these were completed online, is that correct?

8    A.  Yes.

9    Q.  The Financial Aid Agreement was November 11, 2015.  And I

10   think Mr. Solowiejczyk showed you a number of compliance forms

11   that were -- that were completed on December 17, 2015, or a

12   little bit more than a month later, is that correct?

13   A.  Yes.

14   Q.  And then he didn't play until the fall of 2016, is that

15   correct?

16   A.  Yes.

17   Q.  And then he completed -- I think you said they need to

18   renew these forms, is that correct?

19   A.  Yes.

20   Q.  And he completed another set of those forms on August the

21   15th of 2016, is that correct?

22   A.  Yes.

23   Q.  Before -- you need to have those forms completed before the

24   2016 to 2017 season begins, is that right?

25   A.  Correct.

1   Q.  And the government showed you what's in evidence as

2   Government Exhibit 1927.

3           MR. SCHACHTER:  Could we put that up on the screen,

4   please, Mr. McCloud?

5   Q.  And you described this as the student-athlete code of

6   conduct, is that correct?

7   A.  Yes.

8   Q.  And this is the one from December 11, 2015?

9   A.  Yes.

10  Q.  And I would just like to show you the form for August 15,

11  2016.  I am just going to show you Government Exhibit 1928.  I

12  think it is not yet in evidence but we will offer it.  Well,

13  withdrawn.

14          Can you just show the witness, please, Government

15  Exhibit 1928.

16          It is in the binder.  Do you recognize Government

17  Exhibit 1928?

18  A.  Yes.

19  Q.  This is the same form that Mr. Solowiejczyk asked you,

20  except this is the one that was completed on August 5, 2016, is

21  that correct?

22  A.  It was created August 5, 2016.

23  Q.  Sure.

24          MR. SCHACHTER:  Can you please show the witness all

25  the pages?

Iaadgat2                    Doyle - cross

1   A.  Yes.  So, August 15, 2016.

2           MR. SCHACHTER:  OK.  We will offer Government Exhibit

3   1928.

4           MR. SOLOWIEJCZYK:  No objection.

5           THE COURT:  Received.

6           (Government's Exhibit 1928 received in evidence)

7   BY MR. SCHACHTER:

8   Q.  And just to show the jurors, so this is the same -- the

9   same form that Mr. Solowiejczyk asked you about except it is

10  August 5, 2016, right?

11          THE COURT:  Do you think we could move this along?

12          MR. SCHACHTER:  I'm sorry, your Honor.

13  Q.  Now, you said that there were approximately 15 different

14  forms that are important to compliance, is that right?

15  A.  Yes.

16  Q.  And you testified that you use all of those forms to

17  evaluate whether a student-athlete is eligible for competition,

18  is that correct?

19  A.  We do.

20  Q.  And may I also show you, just for the witness for now,

21  Government Exhibit 1920?  I don't intend to publish it at this

22  moment.

23          This is one of those forms that we rely on to evaluate

24  eligibility?

25  A.  Yes.

Iaadgat2                    Doyle - cross

1              MR. SCHACHTER:  We'll offer Government Exhibit 1920.

2              MR. SOLOWIEJCZYK:  No objection.

3              THE COURT:  Received.

4              (Government's Exhibit 1920 received in evidence)

5              MR. SCHACHTER:  We don't need to publish it right now,

6      your Honor.  Thank you.

7      Q.  All right.  So let's look at -- if we could go back,

8      Mr. McCloud, to Government Exhibit 1928, in evidence.  That is

9      the August 5, 2016 Code of conduct.

10             And there are some electronic -- this is an electronic

11     form that Dennis Smith reviews, and then he acknowledges that

12     he has -- that he agrees to this -- to the statements in this

13     form, is that correct?

14     A.  Yes.

15     Q.  And this is a four-page, single-spaced code of conduct, is

16     that correct?

17     A.  Yes.

18     Q.  And could we just show that -- starting with the first

19     page, so it covers he is going be to be responsible for his

20     actions, he has to act with integrity, is that correct?

21     A.  Yes.

22     Q.  Then if we could look at the second page.

23             He has to engage fully in his academic pursuits and

24     treat his body with respect on care.  There is a section on

25     that, is that correct?

1   A.  Yes.

2   Q.  Then if we could look at the third page.

3           It talks about being a leader and role model and

4   reporting violations and comply with remedial actions; do you

5   see that?

6   A.  Yes.

7   Q.  That is paragraph 6?

8   A.  Yes.

9   Q.  And this is the section that Mr. Solowiejczyk had you read

10  during your direct testimony, do you recall that, the language

11  underneath there?

12  A.  Yes.

13  Q.  OK.  And this language is important to NC State, is that

14  correct?

15  A.  It is.

16  Q.  The whole document is important to NC State, is that right?

17  A.  It is.

18          MR. SCHACHTER:  Can you turn to the last page of it,

19  please, Mr. McCloud.

20  Q.  So this form actually reflects, as well -- oh, has this not

21  been published to the jury?  I apologize.  May I publish

22  Government Exhibit 1928 for the jury, your Honor?

23          THE COURT:  Yes.

24  Q.  I hate to do this and I will do it quickly, but can you go

25  back to page 1.

Iaadgat2                    Doyle - cross

1          This is -- the jurors can just look at it first --

2     1928.  I won't belabor the court reporter.  If we look at the

3     first page.  And then the second page.  And then the third

4     page.

5          And you said, I'm sorry, Ms. Doyle, but paragraph 6 is

6     the language that Mr. Solowiejczyk asked you about yesterday?

7          THE COURT:  The repetition is getting really

8     excessive.

9     A.  Yes, sir.

10         MR. SCHACHTER:  I apologize, your Honor.

11    Q.  If we can turn to the fourth page.

12         This indicates that Mr. Smith online completed this

13    form on August the 15th, 2016 --

14    A.  Yes.

15    Q.  -- at 6:10:53, is that correct?

16    A.  Yes.

17    Q.  It shows when it was completed to the second, is that

18    correct?

19    A.  Correct.

20    Q.  I would like to now -- if we can just put the last page of

21    Government Exhibit 1920, or show us 1920, if we could publish

22    that for the jurors, please?  It is in evidence.

23         1920 is called an "Information Sheet," is that

24    correct?

25    A.  Yes.

Iaadgat2                    Doyle - cross

1    Q.  This is another form completed by Mr. Smith, is that right?

2    A.  Correct.

3          MR. SCHACHTER:  If we could turn to the last page of

4    that, Mr. McCloud.

5    Q.  And so does this show that Mr. Smith completed this form

6    on August the 5th, 2016 at 6:10:41?

7          THE COURT:  August 15th.

8          MR. SCHACHTER:  Yes.  I'm sorry, your Honor, if I was

9    unclear.

10   Q.  August 15th, 2016, he completed one of the forms at

11   6:10:41, is that correct?

12   A.  Yes.

13   Q.  And then Dennis Smith -- and this information is available

14   to the compliance office, is that correct?

15   A.  Yes.

16   Q.  And this reflects that Dennis Smith reviewed the four-page

17   single-spaced code of conduct and signed off on that about 12

18   seconds later, is that correct?

19   A.  It appears that way, yes.

20   Q.  So available to the compliance office is that Mr. Smith

21   took 12 seconds to review --

22         MR. SOLOWIEJCZYK:  Objection, your Honor.

23   Q.  -- the code of conduct, is that correct?

24         THE COURT:  Well, that is one possibility.  Another is

25   that he reviewed them both at his leisure over four hours and

Iaadgat2                    Doyle - cross

 1    then signed off on them within 12 seconds.

 2            MR. SCHACHTER:  Thank you, your Honor.

 3            THE COURT:  Come on.  Let's move this along.

 4    BY MR. SCHACHTER:

 5    Q.  I would like to now show you Government Exhibit 1916.  This

 6    is a form that Mr. Solowiejczyk asked you about.  Do you recall

 7    that?

 8    A.  Yes.

 9    Q.  And this is the form in which he reads and then affirms

10    that he understands that the information in the middle of the

11    page -- and may I publish it to the jury, your Honor?

12            THE COURT:  Yes.

13    Q.  And this is language that Mr. Solowiejczyk asked you about

14    yesterday; do you recall that?

15    A.  Yes.

16    Q.  And it shows that Mr. Smith completed this form at 6:09:08,

17    is that correct?

18            MR. SOLOWIEJCZYK:  Your Honor --

19            THE COURT:  Sustained.

20            MR. SOLOWIEJCZYK:  -- these documents speak for

21    themselves.

22            THE COURT:  Yes.  It doesn't show -- let's just move

23    on.  Go to something else.

24            MR. SCHACHTER:  Your Honor, may I publish the time of

25    the form -- may I publish a document that is in evidence just

Iaadgat2                    Doyle - cross

1    to show the time that it was completed?

2                    THE COURT:  Fine.  Then go on to something else.

3                    MR. SCHACHTER:  Yes.

4                    Mr. McCloud, can you also put up Government Exhibit

5    1912, please.  And Government Exhibit 1912 is a statement of

6    amateurism.  If you could show the first page, please.

7                    And does this reflect -- it is a little bit hard with

8    the blowing up, Mr. McCloud.  If you can zoom out.  And then

9    just show the last pages of both of these documents.

10   Q.  Does this reflect that the statement of amateurism was

11   completed at 6:08:53, and then the next document, the signature

12   page that Mr. Solowiejczyk showed you, was completed at

13   6:09:08, or about 15 seconds later?

14   A.  I'm sorry.  What two documents are you comparing?

15   Q.  Sure.

16                    MR. SOLOWIEJCZYK:  Can you zoom out, please.  And if

17   we can just show the last page of both exhibits.

18                    And if you can show the last page of Exhibit 1916,

19   please?

20                    Oh, I see.  OK.

21                    Can you go back to 1916.  I see.  It is in the bottom.

22   It is right there.  I apologize.

23   Q.  Do you see that 1916 is completed at 6:09:08, and the form

24   before that, the amateurism questionnaire, is completed at

25   6:08:53?

Iaadgat2                    Doyle - cross

1   A.  Yes, I see that.

2   Q.  That is about 15 seconds later.

3   A.  It appears to be, yes.

4   Q.  Thank you.  And if I can just show you briefly -- the last

5   one -- Government Exhibit 1912 and 1910.

6           MR. SOLOWIEJCZYK:  Your Honor, objection.  It is

7   cumulative and these documents speak for themselves.

8           MR. SCHACHTER:  This is the last one.  I am just

9   showing what is in evidence, your Honor.

10          THE COURT:  No.  The last one was the last one.  Move

11  on.

12          MR. SCHACHTER:  Yes, your Honor.

13          THE COURT:  I think I've said that already.

14  BY MR. SCHACHTER:

15  Q.  OK.  I would like to now show you Government Exhibit 1914.

16  And this is the student-athlete statements.  I believe the

17  government showed you that.

18          MR. SCHACHTER:  If we could publish it to the jury,

19  please.

20  Q.  Now, you testified, I believe, that in this -- I believe

21  Mr. Solowiejczyk asked you, and I believe you said, that in

22  this document the athlete represents that he is eligible.  Do

23  you recall him asking you that question?

24  A.  Yes.

25  Q.  That is not exactly right, is it?

Iaadgat2                    Doyle - cross

1   A.  I'm not sure I understand your question.

2   Q.  Sure.  This document does not contain the words "I am

3   eligible," does it?

4   A.  By signing this document, the student-athlete is attesting

5   to the words in the document and --

6   Q.  So let's look at the words on the document.

7            THE COURT:  Let the witness finish.

8            MR. SCHACHTER:  I apologize, your Honor.

9   Q.  Were you done, Ms. Doyle?

10  A.  Sure.  Go ahead.

11  Q.  OK.  Let's look at the words in the document.  If we can

12  please turn to the fifth page of the document, which has the

13  Bates stamp at the bottom, 80.

14           And if we can zoom out, the full first section.  You

15  got it.  Thank you.

16           And here -- and as you said, what Mr. Smith is doing

17  is he is affirming in this document the words that are on the

18  page, is that correct?

19           MR. SOLOWIEJCZYK:  Objection, your Honor.

20  Mischaracterizes the witness' testimony.

21           THE COURT:  Well, he is only asking about the document

22  at this moment.

23           MR. SOLOWIEJCZYK:  This wasn't the section of the

24  document that she testified about on direct.

25           THE COURT:  That may be or it may not be.  The jury

Iaadgat2                    Doyle - cross

1   will remember, but he's asking a question about this now.

2   Q.  Maybe Mr. Solowiejczyk didn't show you this part of the

3   form.

4           THE COURT:  Well, now, look --

5           MR. SCHACHTER:  I apologize, your Honor.  We'll just

6   look at the document.

7   Q.  In this document, Mr. Smith says that he affirms that he

8   has read and understands -- read and understand the NCAA

9   amateurism rules, is that correct?

10  A.  Yes.

11  Q.  And -- well, I will spend a moment on that.

12          The NCAA manual is about 400 pages, is that correct?

13  A.  That is correct.

14  Q.  And it has a pretty lengthy chapter entitled "Amateurism

15  and Athletics Eligibility," is that correct?

16  A.  Yes.

17          MR. SOLOWIEJCZYK:  Objection.

18  Q.  That is in Article 12 of the NCAA manual?

19          MR. SOLOWIEJCZYK:  Objection.  It is not in evidence.

20          THE COURT:  Pardon me?

21          MR. SOLOWIEJCZYK:  This document is not in evidence.

22          THE COURT:  Sustained.

23  BY MR. SCHACHTER:

24  Q.  OK.  He says by signing this part of the form, you affirm

25  that to the best of your knowledge -- do you see that?

Iaadgat2                    Doyle - cross

1   A.  I do.

2   Q.  -- you have not violated any am -- you have not violated

3   any amateurism rules since you requested a final certification

4   from the NCAA Eligibility Center or since the last time you

5   signed a Division I student-athlete statement, whichever

6   occurred later, is that correct?

7   A.  Yes.

8   Q.  All right.  And now if we can just take a look at the

9   actual language that you were shown I believe yesterday, and

10  that is on -- hold on one second.  OK.  Withdrawn.

11          MR. SCHACHTER:  Your Honor, I think there will be an

12  objection which may be sustained, but I am going to just make

13  sure that I understand --

14          THE COURT:  Well, perhaps you should come to the

15  sidebar then, instead of getting the question out.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

Iaadgat2                    Doyle - cross

1              (At the sidebar)

2              MR. SCHACHTER:  Very brief.  I was going to inquire of

3    the specific amateurism rule and to explore the meaning of the

4    word amateurism rules in that document.  I believe that your

5    Honor sustained a very similar if not identical question with

6    respect to Mr. Carns.

7              THE COURT:  Well, I am sustaining it again.

8              MR. SOLOWIEJCZYK:  Your Honor didn't allow this

9    question --

10             THE COURT:  Yes.  I am not going there.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Iaadgat2                    Doyle - cross

1          (In open court)

2          THE COURT:  Let's go.

3          MR. SCHACHTER:  Then if we could also please continue

4    to look at Government Exhibit 1914.  And if we can look at the

5    second page of the exhibit, the second half.

6    Q.  And this, I believe -- do you recall Mr. Solowiejczyk

7    showing you this language yesterday?

8    A.  Yes.

9    Q.  And let's just take a look at the actual language of the

10   actual statement.  It states, "By signing this part of the

11   form, you affirm the following."  Do you see that?

12   A.  Yes.

13   Q.  It says that "your institution has provided you a copy of

14   the summary of NCAA regulations."

15   A.  Yes.

16   Q.  And then it goes on to say, "You have knowledge of and

17   understand the application of NCAA Division I bylaws related to

18   eligibility, recruitment, financial aid, amateur status and

19   involvement in gambling activities," is that correct?

20   A.  Yes.

21   Q.  And then it says, two paragraphs down:  "All information

22   provided to the NCAA, the NCAA Eligibility Center and the

23   institution's admissions office is accurate and valid,

24   including ACT or SAT scores, high school attendance, completion

25   of coursework and high school grades, as well as your amateur

Iaadgat2                    Doyle - cross

1   status."  Is that correct?

2   A.  Yes.

3   Q.  So in that paragraph, what Mr. Smith is saying is that the

4   information that he has provided in the past is accurate,

5   correct?

6   A.  Yes.

7          MR. SCHACHTER:  OK.  You can take it down.

8   Q.  You testified on direct that if an NC State employee was

9   aware that an athlete received impermissible benefits, that he

10  or she should report it, is that correct?

11  A.  Yes.

12  Q.  And that's because there could be an amateurism issue, is

13  that correct?

14  A.  There could be a variety of issues.

15  Q.  You are aware that when Dennis Smith Junior was at NC

16  State, he repeatedly got parking tickets, is that correct?

17  A.  Yes.

18  Q.  He frequently parked his car in the employee lot.  Was that

19  an issue?

20  A.  He did from time to time.  Again, I'm hearing these things

21  kind of second- and third-hand.

22  Q.  He had certified on his compliance forms, however, that he

23  did not have a car on campus, isn't that correct?

24  A.  I understand that to be the case, yes.

25  Q.  You know he certified that both on December 11, 2015 and

Iaadgat2                    Doyle - cross

1    also on August 15, 2016, is that correct?

2              MR. SOLOWIEJCZYK:  Objection, your Honor.

3              THE COURT:  Sustained.

4    Q.  Was there any investigation that you performed about how

5    Dennis Smith Junior was able to afford a car given his

6    financial condition?

7    A.  We did not -- I remember seeing one photograph from the

8    parking department.  In fact, it was our department -- our

9    parking department on campus that initially brought this to our

10   attention, and I remember seeing a photograph.  I think it was

11   a Nissan Altima, and that didn't raise flags for us.  If it had

12   been a more expensive luxury car, that certainly would have

13   raised red flags for us.

14   Q.  OK.  Thank you.

15             THE COURT:  Excuse me.  Do you know, Ms. Doyle, of

16   your own personal knowledge, who that car belonged to?

17             THE WITNESS:  I do not.

18             THE COURT:  Let's move on.

19   BY MR. SCHACHTER:

20   Q.  Did you also know that Dennis Smith Junior had a personal

21   trainer with him on campus?

22   A.  My understanding was that Shawn Farmer was a close family

23   friend of the Smith family, who was also a trainer as well as a

24   coach.

25   Q.  And he was with him on campus?

Iaadgat2          Doyle - cross

1  A.  I don't know whether he was with him on campus.  We met

2  Shawn Farmer a couple of different times to talk about issues

3  related to Dennis.

4  Q.  OK.  Thank you.

5        Now, I believe that you testified about the NCAA

6  permitting schools to issue a maximum of 13 athletic

7  scholarships, is that correct?

8  A.  Yes, sir.

9  Q.  You used to work at the NCAA, is that correct?

10  A.  I did.

11  Q.  Why doesn't the NCAA let schools offer more athletic

12  scholarships so they --

13        MR. SOLOWIEJCZYK:  Objection.

14        THE COURT:  Sustained.

15  Q.  Coach Gottfried didn't use all 13 scholarships as a general

16  matter, is that correct?

17  A.  Yeah, there were some years where he didn't use all 13.

18  Q.  He sometimes used only 11 or 12, is that correct?

19  A.  That's correct.

20  Q.  Now, I believe you testified that assistant coaches -- you

21  were aware that assistant coaches in men's basketball are

22  involved in recruiting activities, is that correct?

23  A.  Yes.

24  Q.  And, in fact, you mentioned Coach Early was involved in

25  recruiting, is that correct?

Iaadgat2                    Doyle - cross

1    A.   Yes.

2    Q.   And the government showed you Government Exhibit 1901.

3              MR. SCHACHTER:  Your Honor, may I show that to the

4    witness and publish it to the jury?

5              THE COURT:  Yes.

6    Q.   And this document is the eligibility checklist that you

7    described in your direct examination, is that correct?

8    A.   Yes.

9    Q.   And you testified that there are signatures at the bottom?

10   A.   Yes.

11   Q.   And one of them is the head coach, is that correct?

12   A.   Yes.

13   Q.   But NC State did not -- there is no requirement that any of

14   the assistant coaches sign this eligibility checklist, is

15   there?

16   A.   That's correct.

17             MR. SCHACHTER:  You can take that down, Mr. McCloud.

18   Q.   Now, you testified yesterday that the approximate cost of a

19   scholarship was $23,900 for in-state students; do you recall

20   that?

21   A.   I do.

22   Q.   You also testified that the approximate cost of a

23   scholarship for out-of-state students was $43,500?

24   A.   Yes.

25   Q.   And a scholarship, that includes room, board, tuition,

Iaadgat2                    Doyle - cross

1    things like that?

2    A.  Yes.  It includes tuition, fees, room, board, books, and

3    then what we call the gap, which is personal and miscellaneous

4    supplies as well as transportation expenses.

5    Q.  I want to explore why there is such a significant

6    difference between the cost of a scholarship for an

7    out-of-state student versus an in-state.

8            Do they eat more?  Do the out-of-state students eat

9    more than the in-state students?

10           MR. SOLOWIEJCZYK:  Objection.

11           THE COURT:  Sustained.

12           Move on to something else.

13   BY MR. SCHACHTER:

14   Q.  The largest component of that cost of a scholarship is the

15   tuition component, is that correct?

16   A.  Yes.

17   Q.  And included in that tuition component is the cost of, I

18   suppose -- is it -- does it include teachers?

19   A.  I honestly don't know.

20   Q.  You don't know.

21           Do you know if NC State pays the teachers any less if

22   Dennis Smith is not in the classroom?

23           MR. SOLOWIEJCZYK:  Objection.

24           THE COURT:  Look, this line is foreclosed.  You are

25   not going here.

Iaadgat2                    Doyle - cross

1          MR. SCHACHTER:  Yes, your Honor.  I will move on.

2   BY MR. SCHACHTER:

3   Q.  All right.  You talked a little bit about the ben -- well,

4   you described -- Mr. Solowiejczyk asked you about the benefits

5   that NC State receives from being part of the NCAA, is that

6   correct?

7   A.  Yes.

8   Q.  And you said, on direct testimony, that one of those

9   benefits is revenue, is that correct?

10  A.  Yes.

11  Q.  And some of that revenue is derived from things like March

12  Madness, the March annual basketball tournament, is that

13  correct?

14  A.  Yes.

15  Q.  NCAA receives a lot of money in tuition -- in TV revenue

16  for displaying that, is that correct?

17  A.  Yes.

18  Q.  And some of that money is shared with NC State, is that

19  correct?

20  A.  Yes.

21  Q.  And, in fact, NC State has been to the Final Four 20 times,

22  is that correct?

23  A.  I don't know that.

24  Q.  All right.  Now, in 2015, NC State was in the middle of a

25  five-year plan to become recognized as one of the top 25

Iaadgat2                    Doyle - cross

1   athletics programs in the country, is that correct?

2   A.  Yes.

3   Q.  Fair to say that Dennis Smith Junior was the highest ranked

4   recruit that NC State ever had?

5   A.  Yes.  I think that's fair.

6   Q.  And as a freshman he led the team in points, assists and

7   steals?

8   A.  I don't know that.

9   Q.  He was ACC conference freshman of the year?

10  A.  Again, I don't know that.

11  Q.  And he had the highest scoring average of any freshman in

12  NC State history, is that correct?

13          MR. SOLOWIEJCZYK:  The same objection.

14  A.  I don't know that, either.  I don't follow status and

15  statistics.

16  Q.  OK.  Well, do you know -- do you know whether NC State had

17  its all-time high revenue from ticket sales that year?

18          MR. SOLOWIEJCZYK:  Objection.

19          THE COURT:  Sustained.

20          MR. SCHACHTER:  Almost done.  A couple of last

21  questions.

22  Q.  Ms. Doyle, do you know that Dennis Smith Junior was drafted

23  in the top ten of the 2017 draft?

24          MR. SOLOWIEJCZYK:  Objection.

25          THE COURT:  Sustained.

Iaadgat2                    Doyle - redirect

1   Q.  Is it true that the NCAA has not to date imposed any

2   sanction on NC State for anything relating to Dennis Smith

3   Junior?

4              MR. SOLOWIEJCZYK:  Objection.

5              THE COURT:  Sustained.

6              MR. SCHACHTER:  I have no further questions, your

7   Honor.

8              THE COURT:  Thank you.

9              Mr. Moore.

10             MR. MOORE:  I have no questions for Ms. Doyle, your

11  Honor.

12             MR. HANEY:  I have no questions either, your Honor.

13  Thank you.

14             THE COURT:  Any redirect?

15             MR. SOLOWIEJCZYK:  Very briefly, your Honor.

16  REDIRECT EXAMINATION

17  BY MR. SOLOWIEJCZYK:

18  Q.  Ms. Doyle, I believe in cross-examination you were asked

19  about the role of the head coach in deciding which

20  student-athletes get athletic scholarships?

21  A.  Yes.

22  Q.  Do you recall that?

23  A.  I do.

24  Q.  Does the head coaches play a role in deciding which

25  student-athletes he wants on his team?

1   A.  Yes.

2   Q.  We looked at a number of forms that were filled out by

3   Dennis Smith Junior during your direct testimony.  Do you

4   recall that?

5   A.  Yes.

6   Q.  Do those forms relate to eligibility?

7   A.  Yes.

8   Q.  If a student-athlete would not or could not complete those

9   forms regarding eligibility, would NC State still continue to

10  provide them with athletic scholarship money?

11  A.  No.

12  Q.  Would it matter if the head coach disagreed with that

13  decision?

14  A.  That would not matter.

15          MR. SOLOWIEJCZYK:  If we could just put up -- if we

16  could publish Government Exhibit 1914 for a minute?

17          If we could turn to the second page, bottom half.

18  Q.  Ms. Doyle, Mr. Schachter asked you a number of questions

19  about this.  Do you recall?

20  A.  Yes.

21  Q.  What is this section of the document called?

22  A.  "Statement Concerning Eligibility."

23          MR. SOLOWIEJCZYK:  No further questions.

24          THE COURT:  Thank you.

25          Any further cross, Mr. Schachter?

Iaadgat2                    Smith – direct

1              MR. SCHACHTER:  No, your Honor.

2              THE COURT:  Mr. Moore?

3              MR. MOORE:  No, your Honor.

4              THE COURT:  Mr. Haney?

5              MR. HANEY:  No, you.

6              THE COURT:  All right.  Thank you, Ms. Doyle.  You are

7    excused.

8              THE WITNESS:  Thank you, your Honor.

9              (Witness excused)

10             THE COURT:  What's next, folks?

11             MS. FLODR:  The government calls Jeff Smith.

12    JEFF SMITH,

13        called as a witness by the government,

14        having been duly sworn, testified as follows:

15             THE CLERK:  Thank you.  Please be seated.

16             If you can please state your name and spell your last

17    name for the record.

18             THE WITNESS:  Jeff Smith, S-m-i-t-h.

19             THE COURT:  You have may proceed, Ms. Flodr.

20    DIRECT EXAMINATION

21    BY MS. FLODR:

22    Q.  Good afternoon, Mr. Smith.

23             Where do you currently work?

24    A.  I work at the University of Kansas.

25    Q.  And how long have you worked for the University of Kansas?

Iaadgat2                    Smith - direct

1   A.  This is my second time at the University of Kansas.  I came

2   back in September of 2017.

3   Q.  What is your position at the University of Kansas?

4   A.  I am the senior director of compliance.

5   Q.  How long have you been the senior director of compliance?

6   A.  About one month.

7   Q.  And what position did you hold previously?

8   A.  Director of compliance.

9   Q.  Is your role now substantially different than it was as

10  director of compliance?

11  A.  It is not.

12  Q.  In your role as senior director of compliance, who do you

13  report to?

14  A.  I report to David Reed, the senior associate athletic

15  director for compliance and student services.

16  Q.  Prior to working at the University of Kansas, were you

17  employed?

18  A.  Yes, I was.

19  Q.  What were some of the positions you held?

20  A.  Prior to September 2017, I was at the Ohio State University

21  from July of 2016 until September 2017.  Prior to that I was at

22  University of Kansas from -- that would have been October '15

23  to July '16.  And prior to that I was at the Big 12 Conference

24  office from July '14 through July '15.

25  Q.  With respect to all of your prior jobs, were they all in

Iaadgat2                    Smith - direct

1    compliance?

2    A.  Yes, they were.

3    Q.  How far did you go in school?

4    A.  I earned my law degree from the University of Tennessee.

5    Q.  Did you ever practice as a lawyer?

6    A.  I did not.

7    Q.  Let's turn to some background on your employer.

8         Where is the University of Kansas located?

9    A.  Lawrence, Kansas.

10   Q.  Is it a public or a private institution?

11   A.  It is a public institution.

12   Q.  How many students, approximately, attend the University?

13   A.  About 20,000.

14   Q.  How many athletic teams does the university field?

15   A.  Oh, we have about 17 teams.

16   Q.  Is men's basketball one of those teams?

17   A.  Yes, it is.

18   Q.  Does the University of Kansas have an apparel sponsor?

19   A.  Yes, it does.

20   Q.  Who is that?

21   A.  Adidas.

22   Q.  As the senior director of compliance, do you have any

23   direct role in dealing with Adidas?

24   A.  No, I do not.

25   Q.  What are your main job responsibilities?

Iaadgat2                    Smith - direct

1    A.  My main job responsibilities are to educate people and our

2    constituents about NCAA rules, so that includes employees of

3    the University of Kansas, the Athletics Department, the local

4    area in Lawrence, and any boosters -- anybody else that touched

5    our sports programs.

6    Q.  You stated these NCAA rules.  Is the University of Kansas a

7    member of the NCAA?

8    A.  Yes, it is.

9    Q.  What are some of the benefits to the University of Kansas

10   of being a member of the NCAA?

11   A.  There is national exposure, and it also allows our

12   student-athletes to compete at the highest level.

13   Q.  Is participation in the NCAA mandatory or is it voluntary?

14   A.  It's voluntary.

15   Q.  As a result of the school deciding to join the NCAA, are

16   there certain rules that the University is required to follow?

17   A.  Yes, there are.

18   Q.  Focusing on athletic scholarships, are there NCAA rules

19   that govern the issuance of athletic scholarships?

20   A.  Yes, there are.

21   Q.  Do those rules include eligibility with respect to

22   amateurism?

23   A.  Yes.

24   Q.  What, generally speaking, does it mean to be an amateur?

25   A.  To be an amateur means that a --

1           MR. SCHACHTER:  Objection.

2           THE COURT:  Overruled.

3   A.  To be amateur, it means that a student-athlete or

4   prospective student-athlete hasn't received monies to -- from a

5   professional organization or other organization that hasn't --

6   that they haven't professionalized, that they haven't been paid

7   for their athletics reputation.

8   Q.  Can a student-athlete receive payment for his or her

9   performance in a sport and remain an amateur?

10  A.  No, they may not.

11  Q.  Can a family member of a student-athlete receive such a

12  payment?

13  A.  No, they may not.

14          MR. SCHACHTER:  Objection, your Honor.

15          And I would like to be heard.

16          THE COURT:  Overruled.  I've heard it already.

17  BY MS. FLODR:

18  Q.  Are there penalties that the University of Kansas could

19  face if it was found to have allowed a player to compete who is

20  ineligible?

21  A.  Yes.

22  Q.  What are some of the penalties the University could face?

23  A.  There will be a vacation of records for the games that the

24  athlete participated in along with loss of revenue from those

25  games.  The NCAA could impose more penalties such as recruiting

1    penalties on the coaches as well as fines to the university.

2    Q.  What steps, if any, does the University of Kansas undertake

3    to ensure that it remains in compliance with the NCAA rules?

4    A.  We have seven full-time members in our compliance

5    department.  The compliance department, our main core values, I

6    would say, are to educate, monitor, and enforce.  Basically, we

7    try to educate as much on the front end so that way we don't

8    have to do as much enforcement on the back end.  And so we try

9    to educate prospective student-athletes prior to enrolling all

10   the way through enrollment.  I even meet with former

11   student-athletes when they are back on campus to remind them of

12   the rules.  And then we have our own monitoring processes that

13   monitor NCAA rules through enrollment, and then enforcement is

14   on the back end.

15   Q.  As part of that process, do you provide training to

16   employees of the University of Kansas?

17   A.  Yes, I do.

18   Q.  And what about the coaches?

19   A.  Yes.  I meet with the coaches as well.

20   Q.  Does the University of Kansas take any additional steps to

21   educate members of the men's basketball team?

22   A.  Yes, we do.

23   Q.  What are those additional steps?

24   A.  The men's basketball team, they are considered elite

25   student-athletes, so we meet with them more frequently, every

Iaadgat2                    Smith - direct

1    month and then at the beginning of the year and at the end of
2    the year and during summer activity as well.
3    Q.  Why does the university take these additional steps with
4    elite student-athletes?
5    A.  Our elite student-athletes are more susceptible to rules
6    violations because they are in the public eye more.
7    Q.  Do you educate the parents of these student-athletes as
8    well?
9    A.  Yes, I do.
10   Q.  Could you describe why the University of Kansas takes steps
11   to educate the parents of the elite student-athletes?
12   A.  It's important for us to educate the parents of the
13   student-athletes because parents need to understand that their
14   actions can affect their son's eligibility at the institution
15   and their ability to play intercollegiate athletics.
16   Q.  During these education sessions with parents, does the
17   compliance department usually hand out documents to the
18   parents?
19   A.  Yes, we do.
20   Q.  What kinds of documents?
21   A.  We have a student-athlete parent brochure that speaks about
22   generally NCAA rules and what we want them to understand about
23   the NCAA rules.
24   Q.  I would like to direct your attention to a document in the
25   binder next to you that has been marked for identification

1    purposes as Government Exhibit 1822.

2             Mr. Smith, do you recognize this document?

3    A.  Yes, I do.

4    Q.  And what do you recognize this document to be?

5    A.  This is the student-athlete parents' brochure.

6    Q.  Was this a document made and used by the compliance

7    department as part of the rules education effort you have been

8    describing for us?

9    A.  Yes, it is.

10            MS. FLODR:  Your Honor, the government offers

11   Government Exhibit 1822.

12            MR. SCHACHTER:  No objection, your Honor.

13            THE COURT:  Received.

14            (Government's Exhibit 1822 received in evidence)

15            MS. FLODR:  With the Court's permission, we will

16   publish this?

17            THE COURT:  Yes.

18   BY MS. FLODR:

19   Q.  Mr. Smith, who is this handbook provided to?

20   A.  Student-athlete parents.

21            MS. FLODR:  Ms. Lee, if you could turn to page 2.

22   Q.  Mr. Smith, focusing on the bottom paragraph on the

23   left-hand side, if you don't mind, would you read the first two

24   sentences of that paragraph.

25   A.  "Adhering to NCAA rules and legislation is the

Iaadgat2                    Smith – direct

1   responsibility of everyone associated with or supportive of the

2   university.  In helping Kansas athletics achieve its goal of a

3   higher purpose, we are asking for your assistance in continuing

4   to build compliance awareness.  If you have any questions or

5   become aware of any potential violations, please contact the

6   Kansas athletics compliance office."

7   Q.  Now, Mr. Smith, in this paragraph, it appears that the

8   compliance department, through this guide, is asking for

9   assistance from members of the community.  What type of

10  assistance is the compliance department seeking?

11  A.  Well, our main goal, like I said, is to educate these

12  individuals and give them a basic understanding of NCAA rules.

13  So if any questions may arise, they can reach out to the

14  compliance department.  Additionally, if they know of any

15  potential violations, we ask them to report it to the

16  University so we can look into them.

17  Q.  And turning to page 3 of this document, focusing on that

18  paragraph underneath "Your Role as a Parent/Legal Guardian of a

19  Student-Athlete," underneath it says, in the second sentence:

20  "First, there are rules that govern the actions and

21  interactions between institutions and parents, other relatives

22  and friends of student-athletes, like extra benefits for

23  instance."

24          What are extra benefits?

25  A.  Extra benefits are anything that's provided to a

1   student-athlete that is not available to the general public

2   based on their reputation as a student-athlete.

3   Q.  So if a family member receives an extra benefit without the

4   student-athlete's knowledge, could that affect the

5   student-athlete's eligibility?

6   A.  Yes, it could.

7   Q.  What are some of the consequences if a student-athlete

8   receives an improper extra benefit?

9   A.  Well, depending on the value, it could start with a

10  repayment of the value of the extra benefit, but it could also

11  lead to ineligibility of the student-athlete.

12  Q.  Mr. Smith, as part of its compliance program, does the

13  University impose compliance obligations on its employees?

14  A.  Yes, it does.

15  Q.  What are some of those obligations?

16  A.  Employees are expected to ask any questions regarding NCAA

17  rules before they act and that if they know of any potential

18  rules violations, all employees are expected to report that to

19  the compliance department.

20          (Continued on next page)

21

22

23

24

25

1    Q.  Does that apply equally to members of the men's basketball

2    coaching staff?

3    A.  Yes, it does.

4    Q.  Are those obligations documented anywhere?

5    A.  Yes, they are.

6    Q.  Where are they documented?

7    A.  They are documented in any contracts that a member of the

8    athletics department would sign as far as employment contracts.

9    Also, any time that I meet with somebody regarding rules

10   education, they sign a document that states that they had the

11   opportunity to ask any questions or report any potential

12   violations.

13   Q.  Are you familiar with someone named Bill Self?

14   A.  Yes, I am.

15   Q.  How are you familiar with him?

16   A.  He is the head coach of the men's basketball program at the

17   University of Kansas.

18   Q.  Does Bill Self have a written contract with the university?

19   A.  Yes, he does.

20   Q.  Is that a contract you would have access in the ordinary

21   course of your work?

22   A.  Yes, it is.

23   Q.  Mr. Smith, if I could direct your attention to what has

24   been marked for identification purposes as Government Exhibit

25   1824.

1           Do you recognize this document?

2    A.   Yes, I do.

3    Q.   What do you recognize it to be?

4    A.   This is the contract for Bill Self and the university of

5    Kansas.

6           MS. FLODR:   The government offers Government Exhibit

7    1824.

8           MR. SCHACHTER:   No objection.

9           THE COURT:   Received.

10          (Government's Exhibit 1824 received in evidence)

11          MS. FLODR:   Permission to publish.

12          THE COURT:   Yes.

13          MS. FLODR:   Ms. Lee, if we could turn to page 3 of

14   this contract, and highlight the first four lines of subsection

15   A underneath NCAA violations.

16   Q.   Mr. Smith, could you read that for us?

17   A.   "Head coach agrees to promote an atmosphere for compliance

18   and to monitor the compliance of all other persons under his

19   supervision, including coaches and student-athletes, with the

20   rules and regulations of the National Collegiate Athletic

21   Association (NCAA), the Big 12 conference, and such rules and

22   regulations concerning intercollegiate athletics, athletics

23   personnel, and student-athletes as may from time to time be

24   promulgated by KU and athletics."

25          MS. FLODR:   Ms. Lee, can we turn to page 4 of this

1   document and highlight the last sentence of subsection C.

2   Q.  Mr. Smith, could you read that last sentence?

3   A.  "Additional, if head coach knew or should have known of

4   significant or repetitive violations or NCAA regulations, he

5   agrees that he may be suspended without pay and/or terminated

6   for cause following the procedures set forth on the attached

7   Exhibit A."

8   Q.  Mr. Smith, consistent with these provisions that we have

9   read, is Mr. Self allowed to engage in or facilitate violations

10  of NCAA rules?

11  A.  No.

12          MR. SCHACHTER:  Objection.  It speaks for itself.

13          THE COURT:  I couldn't understand what was said.

14  Q.  Mr. Smith, consistent with the provisions of this contract,

15  is Mr. Self allowed to engage in or facilitate violations of

16  NCAA rules?

17          MR. SCHACHTER:  The document speaks for itself.

18          THE COURT:  I have given vast latitude to you and to

19  both sides on this.  Overruled.

20  A.  No, he may not.

21  Q.  If he learns of such violations, are requirements imposed

22  upon him?

23  A.  Yes, they are.

24  Q.  What are those requirements?

25  A.  He must report them to the compliance office.

1   Q.  What are the potential consequences if Mr. Self were to

2   fail to honor or to violate the provisions we have been

3   discussing?

4   A.  He may be suspended without pay or terminated for cause.

5   Q.  Mr. Smith, are you familiar with someone named Kurtis

6   Townsend?

7   A.  Yes, I am.

8   Q.  Who is Kurtis Townsend?

9   A.  He is an assistant coach for the men's basketball program

10  at the University of Kansas.

11  Q.  Does he also have a contract?

12  A.  Yes, he does.

13  Q.  Mr. Smith, if I could direct your attention to what has

14  been marked for identification purposes as Government Exhibit

15  1827.

16          Do you recognize this document?

17  A.  Yes, I do.

18  Q.  What do you recognize it to be?

19  A.  This is an employment contract between Kurtis Townsend and

20  the University of Kansas.

21          MS. FLODR:  The government offers Government Exhibit

22  1827.

23          MR. SCHACHTER:  No objection, your Honor.

24          THE COURT:  Received.

25          (Government's Exhibit 1827 received in evidence)

1          MS. FLODR:  Permission to publish this document, your

2     Honor.

3          THE COURT:  Yes.

4          MS. FLODR:  Ms. Lee, if we can turn to page 3 of this

5     document and highlight the second sentence of subsection A

6     under NCAA violations.

7     Q.  Mr. Smith, could you read that for us?

8     A.  "Additionally, if assistant coach knew or should have known

9     of significant or repetitive violations or intentional

10    violations of NCAA regulations and he fails to promptly report

11    it to the director and the senior associate athletics director

12    of compliance, he agrees that he may be suspended without pay

13    and/or terminated for cause, as set forth in Section 10 below."

14         MS. FLODR:  Ms. Lee, could we scroll down and

15    highlight subsection C of NCAA violations.

16    Q.  Mr. Smith, could you read this section for us?

17    A.  "Assistant coach further agrees that he shall report

18    promptly to the director any violations known to the assistant

19    coach of governing athletics rules, including NCAA and/or Big

20    12 rules, or athletics or KU rules, regulations or policies by

21    assistant coaches, student-athletes, or other persons under the

22    direct control or supervision of assistant coach."

23    Q.  Mr. Smith, consistent with these provisions, is Mr.

24    Townsend allowed to engage in or facilitate violations of NCAA

25    rules?

1    A.  No, he is not.

2    Q.  Does this contract also provide for the possible

3    termination or other employment action for a violation of NCAA

4    rules committed by Mr. Townsend?

5    A.  Yes, it does.

6    Q.  Mr. Smith, if you were to learn that a coach had been

7    involved in making or facilitating a payment to a player, what

8    would you do?

9    A.  I would immediately report that to my superiors and we

10   would be begin investigating the allegations.

11   Q.  Why would you do that?

12   A.  Any allegations are taken extremely seriously because they

13   can affect the eligibility of our student-athletes.

14   Q.  Mr. Smith, earlier you mentioned that University of Kansas

15   issues athletics-based scholarships.  Is there a maximum number

16   of scholarships?

17   A.  Yes, there are.

18   Q.  What is that maximum number?

19   A.  For men's basketball it's 13.

20   Q.  Who sets that limits?

21   A.  The NCAA.

22   Q.  Does the university have criteria for awarding athletics

23   scholarships?

24   A.  Yes, it does.

25   Q.  What are some of those criteria?

1   A.  The prospective student-athlete needs to be eligible both

2   academically and amateurism.

3   Q.  Focusing on eligibility, are student-athletes required to

4   certify their eligibility with the NCAA?

5   A.  Yes, they are.

6   Q.  How do they do that?

7   A.  They certify their eligibility through the eligibility

8   center, which is a database that is run by the NCAA.  They are

9   asked questions to certify their amateurism in that database.

10  Q.  Does the NCAA make a determination as to amateurism based

11  on that information?

12  A.  Yes, they do.

13  Q.  What, if any, significance do you and the compliance staff

14  ascribe to those certifications made by the student-athletes in

15  deciding whether or not to issue an athletic scholarship?

16  A.  We rely on the information provided by the prospective

17  student-athletes and student-athletes that it's truthful.

18  Q.  In the ordinary course, does the university issue

19  scholarships to student-athletes who are ineligible to compete?

20  A.  No.

21  Q.  Why not?

22  A.  If they were ineligible to compete, then they wouldn't be

23  able to participate in intercollegiate athletics at our

24  university.

25  Q.  Does the university have the ability to rescind or cancel a

1  scholarship once it's been issued?

2  A.  Yes, it does.

3  Q.  What might cause the university to do so?

4  A.  If there is a violation of rules or the student-athlete

5  becomes ineligible to compete.

6  Q.  Mr. Smith, in addition to rules education, is the

7  compliance department involved in the recruitment process of

8  prospective student-athletes?

9  A.  Yes, we are.

10  Q.  How are they involved?

11  A.  There are many, many NCAA rules surrounding recruiting, and

12  we are involved in monitoring the recruiting process.

13  Q.  Is the compliance department involved in monitoring

14  official visits?

15  A.  Yes, we are.

16  Q.  What is an official visit?

17  A.  An official visit is a visit that the University of Kansas

18  athletics department will pay for to bring a prospective

19  student-athlete out on campus.

20  Q.  Does the compliance department maintain forms for reporting

21  official visits?

22  A.  Yes, we do.

23  Q.  What type of information is recorded on these forms?

24  A.  We have the dates of the official visits, where the

25  student-athlete or prospective student-athlete would have

1   stayed on the official visit, any meals or entertainment that

2   was provided during the official visit, and who came with the

3   student-athlete on the official visit.

4   Q.  Mr. Smith, I want to direct your attention to what has been

5   marked for identification as Government Exhibit 1808.

6           Do you recognize this document?

7   A.  Yes.  This is the official visit report form.

8   Q.  Who does this document pertain to?

9   A.  This document pertains to Billy Preston.

10          MS. FLODR:  The government offers Government Exhibit

11  1808 into evidence.

12          MR. SCHACHTER:  No objection, your Honor.

13          THE COURT:  Received.

14          (Government's Exhibit 1808 received in evidence)

15          MS. FLODR:  May we publish to the jury?

16          THE COURT:  Yes.

17  Q.  Mr. Smith, who is Billy Preston?

18  A.  Billy Preston is a former student-athlete on the men's

19  basketball program at the University of Kansas.

20  Q.  What was the purpose of this document?

21  A.  This document is to gather information regarding Billy

22  Preston's visit to campus.  It is his official visit.

23  Q.  When was Billy Preston's official visit?

24  A.  September 30, 2016 to October 2, 2016.

25  Q.  Who did he visit with?

1  A.  Timika Kirby and Nichelle Player came with Billy Preston on

2  his visit.

3  Q.  What were their relationships with Billy Preston?

4  A.  His mother and stepmother.

5  Q.  Turning to page 2 of this document, where did Billy Preston

6  stay during his official visit?

7  A.  The Oread Hotel.

8  Q.  Turning to page 3 of this form, who signed it?

9  A.  Kurtis Townsend signed it.

10 Q.  Who is that again?

11 A.  That's the assistant coach on the men's basketball program.

12 Q.  Mr. Smith, does the University of Kansas require its

13 student-athletes to complete certain forms before the

14 university agrees to provide them with an athletic scholarship?

15 A.  Yes, we do.

16      THE COURT:  This seems like a good place to stop for

17 lunch.

18      2:00, folks.

19      (Jury exits courtroom)

20      (Continued on next page)

21

22

23

24

25

RULES                         Smith - Direct

1          THE COURT:  I gather the government has something they

2    want to raise?

3          MR. SOLOWIEJCZYK:  There is a recording that the

4    government intends to offer, potentially later today or

5    tomorrow.  It's Government Exhibit 34.  I am happy to pass up a

6    copy of the transcript to your Honor.  We are going to be

7    talking about specific language in it.

8          It's our understanding from the defendants that -- we

9    plan to play page 4, line 16, through page 7, line 24 of this

10   transcript.  We plan to play other portions.  There is no

11   dispute as to those.  My understanding is there is a dispute

12   whether the government should be able to play this portion or

13   just a section.

14         THE COURT:  The defense plans to play it?

15         MR. SOLOWIEJCZYK:  We plan to play.  I believe there

16   is a defense objection.

17         THE COURT:  The objection pertains to which part, page

18   4, line 6?

19         MR. SOLOWIEJCZYK:  I am going to let them say it

20   because I want to make sure I am getting it right.

21         THE COURT:  OK.

22         MR. MOORE:  Yes, your Honor.  I have concerns about it

23   generally, but I have worked through most of my concerns with

24   the government.

25         So the government has proposed to redact certain

1   lines, beginning on page 4, line 21 -- excuse me, page 5, line

2   21, through the end of page 5, line 24.  I'd prefer to redact

3   from page 5, line 19, through page 6, line 5.

4        I am concerned that if the government persists in

5   wanting the lines on the top of page 6 -- "Look, they ain't

6   cutting me no checks for shit.  They going to pay you and you

7   going to pay me" -- I don't see the relevance of that

8   particular section.  I also believe that, to the extent that

9   the government contends that it is relevant, that 403 concerns

10  should step in.  It is more prejudicial than probative.  It's

11  also entirely speculative as to what my client meant by that.

12       Normally, in this case, the government has offered

13  testimony providing background to some of these conversations.

14  It is my understanding that they are not going to offer any

15  testimony that provides any background or context to this

16  particular conversation.  So I object to those particular

17  lines.

18       THE COURT:  One of those lines is very easily handled.

19  You want page 5, line 19, if I understood you correctly,

20  redacted, but it has no content.

21       MR. MOORE:  I prefer to stop there, your Honor, stop

22  on line 19, and cut from line 20 --

23       THE COURT:  To 24.  Is that what you said?

24       MR. MOORE:  I preferred to cut from line 20 through

25  page 6, line 5, in its entirety.

1          THE COURT:  The government has agreed with you on the

2     first five lines, is that right?

3          MR. MOORE:  The government has agreed with me on

4     redactions for the first five lines, and I am OK with that.

5          MR. SOLOWIEJCZYK:  We are not redacting the full first

6     five lines.  We would be redacting, starting on line 21, the

7     word "and," starting there, through line 24, "No, that's not

8     true, for sure."

9          MR. MOORE:  That's correct, your Honor.

10          THE COURT:  All right.  So the point in dispute now

11     starts at page 5, line 25, and goes to page 6, line 5, right?

12          MR. MOORE:  That's correct, your Honor.

13          THE COURT:  What does the government have to say?

14          MR. SOLOWIEJCZYK:  Your Honor, the government's

15     position is this is evidence of consciousness of guilt.  Mr.

16     Moore said that there was no background testimony about these

17     defendants having any concerns about Jeff DeAngelo and Jill

18     Bailey.  That's actually not true.  Munish Sood testified that

19     around this time they did have concerns about being associated

20     with those two individuals and the fact that they couldn't find

21     out information about them.

22          The point is this, your Honor.  If Mr. Moore wants to

23     argue otherwise to the jury, he can.  Certainly a very

24     reasonable interpretation of this portion of the call is,

25     because they are engaged in something that they know is wrong,

1    they want to make sure they know who they are working with.  If

2    they can't figure out who these people are, it makes them

3    nervous.

4          THE COURT:  The videotaped meeting with the male

5    undercover, and maybe both of the undercovers, and Mr. Code and

6    Dawkins, if I remember, occurred on what date?

7          MR. SOLOWIEJCZYK:  That was June 20, your Honor,

8    before this.  This is July 24.

9          THE COURT:  What else puts this in context?

10         MR. SOLOWIEJCZYK:  What else puts this in context?

11         THE COURT:  If anything.

12         When is the Las Vegas meeting?

13         MR. SOLOWIEJCZYK:  That's July 29, I believe, your

14   Honor.

15         THE COURT:  Is it already on the books by now, by the

16   date of this conversation?

17         MR. SOLOWIEJCZYK:  They are trying to work that out, I

18   think, in part of this call.  I think it's part of them trying

19   to schedule it.  It bears noting that Munish Sood testified

20   that he had gotten money from Jeff DeAngelo at his office to

21   give to Brian Bowen.  And that all happened prior to this as

22   well.

23         THE COURT:  Well, look, Mr. Moore, it seems to me that

24   it's not pure speculation and that it's admissible for the

25   reason the government says.  Why not?

1          MR. MOORE:  Well, I think it is pure speculation

2     because they have no testimony from Mr. Sood or anybody else

3     that puts this in context.  I understand that they have

4     testimony from Mr. Sood, but they do not have testimony Mr.

5     Sood about this particular call or about any instance that

6     occurred at or around this particular time frame.  And so I

7     think, without more context with respect to this particular

8     day, it is entirely speculative.

9          And Mr. Solowiejczyk is correct.  If your Honor admits

10    it, I am going to argue other inferences.  I think that the

11    inference that Mr. Solowiejczyk wishes the jury to draw from

12    this particular conversation, given the evidence that the

13    government has introduced thus far, is entirely speculative,

14    and I would ask your Honor to exclude it under 403.

15          THE COURT:  Denied.

16          (Luncheon recess)

17

18

19

20

21

22

23

24

25

1                    AFTERNOON SESSION

2                         2:10 p.m.

3            (Jury present)

4    JEFF SMITH, resumed.

5            THE COURT:  Good afternoon, folks.

6            The jurors are all present.  The defendants are all

7    present.

8            The witness is reminded he is still under oath.

9            You may continue.

10   BY MS. FLODR:

11   Q.  Mr. Smith, when we last left off you were discussing the

12   types of forms that the University of Kansas requires before it

13   issues athletic-based scholarships.  Is one of those forms a

14   financial aid agreement and national letter of intent?

15   A.  Yes, it is.

16   Q.  Mr. Smith, I want to direct your attention to Government

17   Exhibit 1820.

18            Do you recognize this document?

19   A.  Yes, I do.

20   Q.  What do you recognize this document to be?

21   A.  This is a financial aid agreement for Billy Preston.

22            MS. FLODR:  The government offers Government Exhibit

23   1820.

24            MR. SCHACHTER:  No objection, your Honor.

25            THE COURT:  Received.

1              (Government's Exhibit 1820 received in evidence)

2              MS. FLODR:  Your Honor, may we publish?

3              THE COURT:  Yes.

4    Q.  Mr. Smith, is the title of this document a multiyear

5    financial aid agreement?

6    A.  Yes.

7    Q.  What does that mean?

8    A.  It means that the university is offering financial aid to

9    the student-athlete over multiple years.

10   Q.  What time period does this financial aid agreement cover?

11   A.  The academic year 2017-18 through academic year 2020-2021.

12   Q.  Looking at the first sentence of the second paragraph under

13   the signatures on this first page, could you read that out

14   loud?

15   A.  "My athletic aid shall not be reduced or canceled during

16   the period of this award as long as I remain eligible in

17   accordance with NCAA, Big 12 Conference, and University of

18   Kansas rules and guidelines."

19   Q.  Can you turn to the next page and read the first sentence

20   and the first two bullets under, "Conditions of this athletic

21   scholarship."

22   A.  "I understand that to qualify for this athletic aid, I must

23   fulfill the admissions requirements of the University of

24   Kansas, meet and maintain the eligibility requirements for

25   athletic participation and financial aid established by the

1    National Collegiate Athletic Association (NCAA), the Big 12

2    Conference, and/or the University of Kansas."

3    Q.  Did the NCAA regulations referenced here include the NCAA

4    rules on eligibility and amateurism?

5    A.  Yes.

6    Q.  How might a student render himself ineligible?

7                MR. SCHACHTER:  Objection.

8                THE COURT:  Do you think we need to really do this all

9    over again?

10                MS. FLODR:  We can move on, your Honor.

11                THE COURT:  Thanks.

12   Q.  Mr. Smith, directing your attention towards the middle of

13   the second page and the bullets under the paragraph that begin

14   with, "I am aware the amount of this athletic aid may be

15   immediately reduced or canceled during the period of the award

16   if I become ineligible for intercollegiate competition."  Do

17   you see that?

18   A.  Yes.

19   Q.  Directing your attention to the last set of bullets, do you

20   see where it states, "I am also aware that my athletic aid must

21   be reduced or canceled if I accept money or the promise of

22   money for the use of my athletic skill or participation in my

23   sport"?

24   A.  Yes.

25   Q.  Was this financial aid agreement signed?

1    A.  Yes, it was.

2    Q.  Who signed it?

3    A.  It appears to be signed by Billy Preston.

4    Q.  When was it signed?

5    A.  November 9, 2016.

6    Q.  Turning to the third page of this document, what is this

7    part of the document?

8    A.  This is the national letter of intent.

9    Q.  What is a national letter of intent?

10   A.  The national letter of intent, or NLI, is a document that

11   binds the university to a prospective student-athlete.

12   Q.  Is there a reason the financial aid agreement and the

13   national letter of intent are maintained together?

14   A.  Yes.  Per NCAA rules, for an NLI to be valid it must be

15   accompanied by a financial aid agreement.

16   Q.  Was the NLI signed?

17   A.  Yes, it was.

18   Q.  By whom?

19   A.  Sheahon Zenger, the director of athletics; Billy Preston,

20   the prospective student-athlete; and the parent of Billy

21   Preston, Nichelle Nicole Player.

22   Q.  When was it signed?

23   A.  November 9, 2016.

24   Q.  Mr. Smith, if a student-athlete or his parents were

25   unwilling or unable to sign this agreement, what, if any,

1    significance would that have had on the university's decision

2    to issue an athletic scholarship?

3    A.   The university wouldn't have offered a scholarship.

4    Q.   Mr. Smith, earlier you testified that in the course of your

5    duties, you participate in rules education sessions for the

6    parents of prospective student-athletes.  During those

7    sessions, does the compliance department document those

8    trainings?

9    A.   Yes, we do.

10   Q.   How does it document them?

11   A.   There is a sign-in sheet for anybody that attends the rules

12   education session.

13   Q.   Mr. Smith, I want to direct your attention to what has been

14   marked as Government Exhibit 1806.

15          Do you recognize this document?

16   A.   Yes, I do.

17   Q.   What type of document do you recognize it to be?

18   A.   This is the sign-in sheet for prospective student-athlete

19   education.

20          MS. FLODR:  The government offers Government Exhibit

21   1806.

22          MR. SCHACHTER:  No objection.

23          THE COURT:  Received.

24          (Government's Exhibit 1806 received in evidence)

25          MS. FLODR:  May we publish it to the jury?

1        THE COURT:  Yes.

2    Q.  Mr. Smith, could you read what the first paragraph of this

3    document says?

4    A.  "My signature confirms the following:  I have received

5    education on NCAA rules.  I understand the rules and

6    regulations I must follow.  I have reported any violations in

7    which I am aware, and I have been given the opportunity to ask

8    questions regarding the NCAA, Big 12, and Kansas athletics

9    compliance rules and regulations."

10   Q.  Was this document signed?

11   A.  Yes, it was.

12   Q.  Who is it signed by?

13   A.  It's signed by my boss, David Reed, and Nichelle Nicole

14   Player.

15   Q.  Are you familiar with something called the compliance

16   information form?

17   A.  Yes, I am.

18   Q.  What is that?

19   A.  This is a form that is provided to all entering

20   student-athletes that they must complete.

21   Q.  Are these standard forms maintained by the compliance

22   department?

23   A.  Yes, they are.

24   Q.  Did Mr. Preston complete a compliance information form?

25   A.  Yes, he did.

1   Q.  Directing your attention to what is in your binder and

2   marked for identification as Government Exhibit 1807.

3           Do you recognize this document?

4   A.  Yes, I do.

5   Q.  What do you recognize it to be?

6   A.  This is the compliance information form for Billy Preston.

7           MS. FLODR:  The government offers Government Exhibit

8   1807 into evidence.

9           MR. SCHACHTER:  No objection, your Honor.

10          THE COURT:  Received.

11          (Government's Exhibit 1807 received in evidence)

12          MS. FLODR:  May we publish it to the jury, your Honor?

13          THE COURT:  Yes.

14  Q.  Mr. Smith, what are the various component parts of this

15  document?

16  A.  There is general information about the student-athlete, the

17  parents of the student-athlete, there is housing information,

18  vehicle information, competition information, academic

19  information.  It's general information about the

20  student-athlete.

21  Q.  What is the purpose of gathering this information?

22  A.  There are a lot NCAA rules that surround all of these

23  areas, and so the compliance office is looking for the

24  information in order to look for any red flags that may appear.

25  Q.  Turning to the last page of this document, could you read

1   the paragraph right before the signature?

2   A.  "I attest that the provided information is accurate to the

3   best of my knowledge.  I certify that, to the best of my

4   knowledge, I am eligible for athletic participation under the

5   rules and regulations governed by Kansas athletics, the Big 12

6   Conference, and the NCAA.  I understand that it is my

7   responsibility to report any violation of which I am aware of.

8   Further, I understand that providing false or misleading

9   information could jeopardize my eligibility for practice,

10  competition, and athletic-related financial aid."

11  Q.  When this affirmation references being eligible for

12  athletic participation, does that include the amateurism rules

13  we were discussing earlier?

14  A.  Yes, it does.

15  Q.  When it states that the student-athlete has the

16  responsibility to report violations that the student-athlete is

17  aware of, does that include the NCAA violation?

18  A.  Yes, it does.

19  Q.  How long does that responsibility extend for?

20  A.  That responsibility extends until the exhaustion of

21  eligibility and preferably beyond.

22  Q.  Is the student-athlete required to initial different

23  acknowledgements in this form and electronically sign it at the

24  end?

25  A.  Yes, they are.

1   Q.  What, if any, significance is it to the university that the

2   student-athlete sign this document?

3   A.   The university depends on this information.  As I said, we

4   use the information for monitoring compliance information.  So

5   we rely on the information provided by the student-athlete that

6   it's truthful.

7   Q.   Did Mr. Preston sign this form?

8   A.   Yes, he did.

9   Q.   When did he sign it?

10  A.   July 28, 2017.

11  Q.   Mr. Smith, is there a point at which the university has to

12  certify the eligibility of members of the men's basketball

13  team?

14  A.   Yes, there is.

15  Q.   When does that generally occur?

16  A.   Prior to the first competition.

17  Q.   Are you familiar with the squad list?

18  A.   Yes, I am.

19  Q.   What is a squad list?

20  A.   A squad list is a list that keeps track of everybody on the

21  men's basketball squad.

22  Q.   Is it a required NCAA document that the university

23  maintains?

24  A.   Yes, it is.

25  Q.   Directing your attention to what is in your binder and

1   marked for identification as Government Exhibit 1823.

2          Do you recognize this document?

3          THE COURT:  Can we pause for a minute?

4          Do you still have Government Exhibit 1807 in front of

5   you, Mr. Smith?

6          THE WITNESS:  Yes, I do.

7          THE COURT:  Do you see the signature on the last page?

8          THE WITNESS:  Yes.

9          THE COURT:  Did you see Billy Preston affix his

10  signature there?

11         THE WITNESS:  I did not.

12         THE COURT:  How do you know that's his signature?

13         THE WITNESS:  It's an electronic signature.

14         THE COURT:  Andy, is Government Exhibit 1803 in

15  evidence?

16         THE DEPUTY CLERK:  No.

17         THE COURT:  Do you know of your own personal knowledge

18  whether Billy Preston caused that electronic signature to be

19  affixed?

20         THE WITNESS:  I did not witness him electronically

21  sign it.

22         (Continued on next page)

23

24

25

Iaadgat4                    Smith - direct

1          THE COURT:  All right.  Go head.

2     BY MS. FLODR:

3     Q.  Mr. Smith, we were discussing what had been marked for

4     identification as Government Exhibit 1823.

5          Do you recognize this document?

6     A.  Yes.

7     Q.  And what do you recognize this document to be?

8     A.  This is the squad list report.

9     Q.  And is there a specific year for this squad list report?

10    A.  Yes.  This is men's basketball team for 2017/2018.

11         MS. FLODR:  The government offers Government Exhibit

12    1823 into evidence.

13         MR. SCHACHTER:  No objection.

14         THE COURT:  Received.

15         (Government's Exhibit 1823 received in evidence)

16         MS. FLODR:  Your Honor, may we publish?

17         THE COURT:  Yes.

18    BY MS. FLODR:

19    Q.  Mr. Smith, if you can zoom in on the first unredacted name

20    on this page.  Do you see that?

21    A.  Yes.

22    Q.  What is the name there?

23    A.  Silvio De Sousa.

24    Q.  Who is Silvio De Sousa?

25    A.  He is a current player on the men's basketball team.

1  Q.  We will return to him in a little bit.

2          MS. FLODR:  Ms. Lee, if we could turn to the second

3  page of this document and zoom in on the unredacted name on the

4  send page.

5  Q.  Mr. Smith, who is -- is this the same Billy Preston we have

6  been discussing?

7  A.  Yes, it is.

8  Q.  And if you look under the amount of athletics grant, how

9  much is listed there?

10  A.  $41,078.

11  Q.  Mr. Smith, you started at the University in September of

12  2017.  As of that time, what, if anything, did you know about a

13  scheme to pay the family of Billy Preston $90,000 in connection

14  with his decision to attend the University of Louisville?

15  A.  I didn't know anything about that.

16  Q.  Had you learned of such information, what actions would you

17  have taken, if any?

18          I apologize.  I misspoke.

19          Mr. Smith, you started at the University of Kansas in

20  September of 2017.  As of that time, what, if anything, did you

21  know about a scheme to pay the family of Billy Preston $90,000

22  in connection with his decision to attend the University of

23  Kansas.

24  A.  I didn't know anything about that.

25  Q.  Had you learned such information in September of 2017, what

Iaadgat4                    Smith - direct

1   actions would you have taken, if any?

2   A.  I would have immediately reported it to my superiors and

3   began investigating the potential violations.

4   Q.  Would the University -- if the University had been aware of

5   such a problem, would it have affected the University of

6   Kansas' decision to award Billy Preston an athletic

7   scholarship?

8           MR. SCHACHTER:  Objection.

9           THE COURT:  Overruled.

10  A.  Yes, it would have.

11  Q.  Why?

12  A.  The University would not have offered him a scholarship

13  since he would have been ineligible to play basketball.

14  Q.  Would it have mattered if Billy Preston had disclaimed any

15  knowledge of such information?

16  A.  No.

17  Q.  Did Billy Preston play any official games for the

18  University of Kansas in the 2017/2018 season?

19  A.  No, he did not.

20  Q.  What is your general understanding as to why he was

21  withheld from competition?

22          MR. SCHACHTER:  Objection, your Honor.

23          THE COURT:  Sustained.

24  Q.  Mr. Smith, in the course of your duties in compliance, did

25  there come a time that you became aware of Mr. Preston being

1   withheld from competition?

2           MR. SCHACHTER:  Objection, your Honor.  It calls for

3   hearsay.  The witness was not employed at the University at the

4   time.

5           THE COURT:  Overruled.

6   A.  Yes.

7   Q.  What was your general understanding as to why?

8           THE COURT:  Sustained.

9   Q.  Mr. Smith, in the course your duties, did you come to

10  review any types of documents regarding Mr. Preston and the

11  reasons he might have been withheld from competition?

12  A.  Yes.

13  Q.  And based on your general duties in compliance, what

14  were -- was there a reason that he was being withheld from

15  competition?

16          MR. SCHACHTER:  Objection.

17          THE COURT:  Sustained.

18  BY MS. FLODR:

19  Q.  Mr. Smith, were you personally involved into an

20  investigation into Billy Preston's eligibility in the fall of

21  2017?

22  A.  No, I was not.

23  Q.  Is Billy Preston currently enrolled in the University of

24  Kansas?

25  A.  No, he is not.

Iaadgat4            Smith - direct

1   Q.  Mr. Smith, earlier you mentioned a student athlete named

2   Silvio De Sousa, is that right?

3   A.  Yes.

4   Q.  Has he played games for the University of Kansas men's

5   basketball team?

6   A.  Yes, he has.

7   Q.  Mr. Smith, I want to direct your attention to what has been

8   marked as Government Exhibit 1815.

9           Do you recognize this document?

10  A.  Yes, I do.

11  Q.  What do you recognize it to be?

12  A.  This is a multi-year Financial Aid Agreement between the

13  University of Kansas and Silvio De Sousa.

14          MS. FLODR:  The government offers Government Exhibit

15  1815 into evidence.

16          MR. SCHACHTER:  No objection.

17          THE COURT:  Received.

18          (Government's Exhibit 1815 received in evidence)

19          MS. FLODR:  Mr. Smith -- your Honor, permission to

20  publish this to the jury.

21          THE COURT:  Yes.

22  BY MS. FLODR:

23  Q.  Mr. Smith, is this a multi-year Financial Aid Agreement

24  similar to the one we've discussed earlier for Billy Preston?

25  A.  Yes, it is.

Iaadgat4                    Smith - direct

1   Q.  And directing your attention to the top of the page, what

2   time period does this Financial Aid Agreement cover?

3   A.  This begin spring 2018 and runs through academic year

4   2020/2021.

5   Q.  And turning to the second page, was this Financial Aid

6   Agreement signed?

7   A.  Yes, it was.

8   Q.  And who signed it?

9   A.  It appears to be the signature of Silvio De Sousa and Fenny

10  Falmagne.

11  Q.  Turning to the last page of this document, was this part of

12  the document?

13  A.  This is the National Letter of Intent.

14  Q.  And was this document signed?

15  A.  Yes, it was.  It was signed by Sheahon Zenger, the director

16  of athletics, Silvio De Sousa and Fenny Falmagne.

17  Q.  Mr. Smith, what, if anything, was Mr. De Sousa representing

18  about his eligibility?

19             MR. SCHACHTER:  Objection.

20             THE COURT:  What is the objection?

21             MR. SCHACHTER:  The document speaks for itself, your

22  Honor, as to --

23             THE COURT:  I can't hear you.

24             MR. SCHACHTER:  The document speaks for itself as to

25  what his representations are.

1          THE COURT:  I will allow it.

2     A.  He is representing that he is eligible under NCAA Big 12

3     and University of Kansas rules and regulations.

4     Q.  Mr. Smith, what, if anything, was Mr. Falmagne representing

5     about Mr. De Sousa's eligibility?

6     A.  He is representing the same.

7     Q.  Mr. Smith, what significance, if any, would it have had on

8     the University's decision to extend a scholarship to Mr. De

9     Sousa if either he or Mr. Falmagne were unwilling or unable to

10    sign this agreement?

11    A.  The University would not have offered the scholarship.

12    Q.  Did Mr. De Sousa complete a compliance information form?

13    A.  Yes, he did.

14    Q.  Directing your attention to the Government Exhibit 1813.

15          Do you recognize this document?

16    A.  Yes, I do.

17    Q.  What --

18    A.  It is the compliance information form for Silvio De Sousa.

19          MS. FLODR:  Your Honor, the government offers this

20    into evidence.

21          MR. SCHACHTER:  No objection.

22          THE COURT:  Received.

23          (Government's Exhibit 1813 received in evidence)

24    BY MS. FLODR:

25    Q.  Mr. Smith, did Mr. De Sousa sign this form?

1    A.  Yes, he did.

2    Q.  And when was that?

3    A.  December 27, 2017.

4    Q.  Is this a document --

5            THE COURT:  Excuse me.

6            This is another electronic signature, is that right?

7            THE WITNESS:  Yes, your Honor.

8            THE COURT:  And did you see it affixed by Mr. De

9    Sousa?

10           THE WITNESS:  I did not.

11           THE COURT:  Go ahead.

12           THE WITNESS:  Might I add something?

13           It is just that there is a specific login given to

14   each student-athlete when they were filling out these forms, so

15   that's how we would expect Silvio to sign it and how he is able

16   to affix his signature personally.

17           THE COURT:  That's how what?

18           THE WITNESS:  That is how he would be able to affix

19   his signature personally.

20           THE COURT:  All right.  Go ahead.

21   BY MS. FLODR:

22   Q.  Mr. Smith, is this document provided to every

23   student-athlete?

24   A.  Yes, it is.

25   Q.  If this compliance information form is not complete, is the

1    athlete allowed to compete?

2    A.   No, they are not.

3    Q.   And what, if any, significance is it to the University that

4    Mr. De Sousa signed this document?

5    A.   The student-athlete is attesting, to the best of their

6    knowledge, that they are eligible for participation under NCAA

7    Big 12 and University of Kansas rules and regulations.

8    Q.   Mr. Smith, what, if anything, do you know about a plan to

9    pay Mr. De Sousa's guardian $20,000 in connection with his

10   decision to attend the University of Kansas?

11   A.   I don't know anything about the plan.

12   Q.   Had you learned of such a payment, would it have affected

13   the University of Kansas' decision to award Mr. De Sousa an

14   athletic scholarship?

15   A.   Yes.

16   Q.   Why?

17   A.   Mr. De Sousa would not have been eligible to participate

18   and so the university would not have offered financial aid.

19   Q.   Would it have mattered if Mr. De Sousa had disclaimed any

20   knowledge of such information?

21   A.   No.

22   Q.   Is Mr. De Sousa currently enrolled at the University of

23   Kansas?

24   A.   Yes, he is.

25   Q.   Did there come a time when you became aware of allegations

Iaadgat4                    Smith - direct

1  involving a payment to Mr. De Sousa's legal guardian?

2  A.  Yes.

3  Q.  When, approximately, did you become aware of these

4  allegations?

5  A.  April 2018.

6  Q.  Has Mr. De Sousa played again since you became aware of

7  these allegations?

8  A.  No, he has not.

9  Q.  To your knowledge, what, if anything, did the University do

10 in response to these allegations?

11 A.  In response to these allegations, the University general

12 counsel was working with outside counsel, with the prosecutors

13 in this case, regarding these allegations.

14 Q.  At present, do you have any firsthand knowledge of conduct

15 that would render Mr. De Sousa ineligible?

16 A.  I do not.

17 Q.  Mr. De Sousa played in many games last season, is that

18 right?

19 A.  Yes, he did.

20 Q.  If he was ineligible by virtue of a payment to his

21 guardian, what potential penalties might the University face?

22 A.  There would be a vacation of records, there would be loss

23 of revenue, other fines and other penalties as described by the

24 NCAA.

25 Q.  Mr. Smith, one final question, and this refers back to an

1    earlier discussion we were having about Mr. Preston.

2              If the University had discovered this scheme to pay

3    the family of Billy Preston $90,000 in connection with his

4    decision to attend the University of Kansas after Mr. Preston

5    had already enrolled at the University of Kansas, would that

6    have made a difference?

7              MR. SCHACHTER:  Objection.

8              THE COURT:  Overruled.

9    A.  A difference in?

10   Q.  Would that have mattered to the University with respect to

11   Mr. Preston's financial aid?

12   A.  Yes.  His financial aid would have been canceled

13   immediately.

14   Q.  And, Mr. Smith, would it have mattered if Mr. Preston did

15   not have any knowledge of that payment?

16   A.  No, it would not have mattered.

17             MS. FLODR:  One moment, your Honor.

18             (Pause)

19             Nothing further.

20             THE COURT:  Thank you.

21             Cross-examination.

22             MR. SCHACHTER:  Thank you, your Honor.

23   CROSS-EXAMINATION

24   BY MR. SCHACHTER:

25   Q.  Good afternoon, Mr. Smith.

Iaadgat4              Smith - cross

1    A.  Good afternoon.

2    Q.  Hi.  My name is Mike Schachter.  I represent Jim Gatto.

3    A.  Nice to meet you.

4    Q.  Nice to meet you.

5          The Kansas men's basketball team is coached by Bill

6    Self, is that correct?

7    A.  That is correct.

8    Q.  Fair to say he is sort of a legendary figure at the

9    University of Kansas?

10   A.  Yes.

11   Q.  He's in the Basketball Hall of Fame?

12   A.  I believe so.

13          MS. FLODR:  Objection.

14          THE COURT:  Sustained.  The answer is stricken.

15          Let's try to finish this case this year,

16   Mr. Schachter.

17          MR. SCHACHTER:  Yes, your Honor.

18   BY MR. SCHACHTER:

19   Q.  He took the team to the Final Four last year?

20          MR. SCHACHTER:  Just one.

21          THE COURT:  Don't even try.

22          MR. SCHACHTER:  OK.  Got it.  All right.

23   Q.  All right.  The government showed you Government Exhibit

24   1824.

25          MR. SCHACHTER:  May I publish that to the jury, your

1  Honor?

2              THE COURT:  Yes.

3  Q.  This is the employment contract of Bill Self, is that

4  correct?

5  A.  Yes, that's correct.

6  Q.  And the government asked you about particular provisions

7  relating to NCAA policies.

8              I take it, sir, you have no knowledge of this

9  agreement being sent to Jim Gatto at Adidas, is that correct?

10 A.  No.

11 Q.  I would like to direct your attention to paragraph 3A.

12             And in this provision, does it describe Coach Self's

13 salary as being $230,000 per year?

14 A.  Yes.

15 Q.  And now I would like to direct your attention to paragraph

16 8A.  I'm sorry.  Yes, 8A.

17             Do you see where it says that "Athletics shall pay to

18 BCLT II" -- do you understand that to be a corporation

19 controlled by Bill Self?

20             MS. FLODR:  I object.

21             THE COURT:  Sustained.

22             MR. SCHACHTER:  May I have just a moment, your Honor?

23             Well, why don't we -- the document will speak for

24 itself.

25 Q.  Sir, this employment -- this is part of the employment

Iaadgat4                    Smith - cross

1   agreement with Bill Self, is that correct?

2   A.  Yes.

3   Q.  And it says that the entity BCLT is going to be receiving

4   $2.75 million per year, is that correct?

5         THE COURT:  That's what it says.  Let's move on.

6   Q.  And then I would like to direct your attention, sir, to --

7   this is a -- there is multiple documents within this exhibit,

8   is that correct?

9   A.  That's correct.

10  Q.  And separately there is something called a retention

11  payment agreement.  Can you turn to that?

12        Do you have that in your binder?

13        (Pause)

14        Tell me when you are there, please.  It says copy

15  three of four.

16        There is also an amended retention payment agreement,

17  and we will get to that in just a moment.

18        Are you at the retention payment agreement?

19  A.  Yes.

20        MR. SCHACHTER:  It comes afterwards in the exhibit,

21  Mr. McCloud.

22  Q.  And in this retention payment agreement, I would like to

23  direct your attention to the -- at the very top, do you see

24  where it says it is between Kansas athletics and Bill Self?

25  A.  Yes.

Iaadgat4                    Smith - cross

1    Q.  And under the paragraph 1, "Retention Payment," does it

2    reflect that the Head Coach is going to be paid an initial sum

3    of $2.628 million on March 31, 2015?

4    A.  Sorry.  I didn't write the agreement so I'm trying to find

5    this.

6    Q.  Sure.

7         MR. SCHACHTER:  I'll tell you what.  Mr. McCloud, can

8    you just highlight the first sentence of that paragraph and the

9    jury can look through it for themselves.

10        THE WITNESS:  Yes.

11        MR. SCHACHTER:  And then, Mr. McCloud, if you could

12   just highlight the sentence that starts, "Beginning on April 1,

13   2019."

14   Q.  OK.  Sir, can you -- in addition to the retention -- hold

15   on one second.

16        That retention payment agreement is actually -- if you

17   could turn to the last page, Mr. McCloud -- it's signed by both

18   Coach Self and the Director of Athletics.  One signs on August

19   the 17th, one signs on August the 21st.  Do you see that?

20   A.  Yes.

21   Q.  Included in this government exhibit, there is also

22   something called an amended retention payment agreement.  It is

23   a little bit earlier in the exhibit.  And even though it is

24   called an amended retention payment agreement, if you flip a

25   few pages in, do you see that it is actually signed and dated

Iaadgat4                    Smith - cross

1   on the same day as the -- what was called the retention payment

2   agreement?

3           MS. FLODR:  Objection.

4           THE COURT:  Mr. Schachter, if you would like to

5   testify in this case, I'm sure we can arrange it.  Could we

6   move along?

7           MR. SCHACHTER:  Yes, your Honor.  I am just publishing

8   certain portions of what is in evidence, your Honor, but I will

9   move on.

10  Q.  All right.  Have you reviewed that this amended retention

11  payment agreement that the government showed you also talks

12  about an additional payment of an additional $2 million to

13  Coach Self in the first paragraph, number 1, of the amended

14  retention payment agreement?

15  A.  Yes.

16  Q.  And do you see -- I would like to direct your attention to

17  the sentence in the middle of the paragraph that says:  "Head

18  Coach will be entitled to receive the after-tax sum of $500,000

19  per annum through March 31, 2018, as an additional payment."

20  Do you see that?

21  A.  Sir.

22  Q.  And let's, if we can -- I just want to direct your

23  attention to a couple of other provisions.  If you can please

24  turn to the first -- the employment agreement, the first part

25  of this government exhibit.

Iaadgat4                    Smith - cross

1              MS. FLODR:  Your Honor --

2    Q.  And if you could turn to page 6, please.

3              THE COURT:  Ms. Flodr, did you have something to say?

4              MS. FLODR:  Your Honor, this witness has very limited

5    knowledge of the entire provisions of this contract and all of

6    the minutia, and the document speaks for itself.

7              THE COURT:  At the moment, we are establishing that he

8    is literate in the English language, which I think we all

9    assume.

10             Look, Mr. Schachter, I've given both sides a lot of

11   latitude about bringing the attention of witnesses to parts of

12   documents that both sides think have some relevance.  But there

13   does come a limit, and the limit is, I think, essentially what

14   you are doing now.  You are just delivering part of your

15   closing argument by piecing together things about which you are

16   not inquiring.

17             MR. SCHACHTER:  Yes, your Honor.

18             THE COURT:  Other than to establish that the witness

19   has 20/20 eyesight.

20             MR. SCHACHTER:  Yes, your Honor.  I will move on.

21   BY MR. SCHACHTER:

22   Q.  You were asked, sir, about -- may I have just a moment,

23   your Honor?

24             THE COURT:  Yes.

25             (Pause)

1   Q.  OK.  Could I please show you, sir, what has been received

2   in evidence as Government Exhibit 1806.

3          MR. SCHACHTER:  May I publish that, your Honor?  It is

4   in evidence.

5          THE COURT:  Yes.

6   Q.  Sir, you said that this signature confirms that he has

7   received an education under NCAA rules, is that correct?

8   A.  The signature on the second line, that Nichelle Nicole

9   Player, received an education.

10  Q.  OK.  The NCAA rules, that is a 400-page manual, is that

11  correct?

12         MS. FLODR:  Objection.

13         THE COURT:  Sustained.

14         Move on.

15  Q.  You were not present for this session between Mr. Reed and

16  Ms. Player, is that correct?

17  A.  That is correct.

18  Q.  Mr. Reed is your boss, is that correct?

19  A.  That is correct.

20  Q.  So you have no personal knowledge of what, if any,

21  education Mr. Preston's mother received, is that correct?

22         MS. FLODR:  Objection.

23         THE COURT:  Overruled.

24  A.  I know my boss, and I know that if he signed a document

25  saying that he provided education, then he provided the

1  education.

2  Q.  But your boss isn't here today, is he, sir?

3  A.  No, he's not.

4  Q.  And you have no personal knowledge of what, if any,

5  education Mr. Reed provided to Ms. Player on this date, isn't

6  that correct?

7  A.  I was not there.

8  Q.  I would like to direct your attention to Government Exhibit

9  1807.  This is the compliance information form that you spoke

10  about earlier, is that correct?

11  A.  That is correct.

12  Q.  And is it correct that -- turn your attention to the last

13  page.

14         This document calls for a signature of a compliance

15  official, is that correct?

16  A.  That is correct.

17  Q.  And nobody from compliance signed it, is that correct?

18  A.  Typically a compliance person would not be signing this.

19  As I said, this is just to gather information, have us look

20  through it, and follow up for any red flags that are spotted.

21  Q.  So this is an official form of the University of Kansas

22  Compliance Department, is that correct?

23  A.  Correct.

24  Q.  And in compliance's form, does it call for a compliance

25  signature?

Iaadgat4          Smith - cross

1    A.  There is a signature line, yes.

2    Q.  And nobody from compliance signed it, is that correct?

3    A.  That is correct.

4    Q.  Thank you.

5         I would like to direct your attention to Government

6    Exhibit 1808, in evidence.

7         MR. SCHACHTER:  May I publish it, your Honor?

8         THE COURT:  Yes.

9    Q.  And this you described as an official visit report form, is

10   that correct?

11   A.  That's correct.

12        MR. SCHACHTER:  Can you please turn to the last page,

13   Mr. McCloud.

14   Q.  And did anybody -- does this form call for a signature from

15   somebody from compliance at Kansas?

16   A.  Yes.

17   Q.  Did anybody from Kansas sign it?

18   A.  They did not.

19   Q.  I would like to direct your attention to -- well,

20   withdrawn.

21        THE COURT:  Well, somebody from Kansas signed it,

22   didn't they?

23        THE WITNESS:  Sorry.  Yes.  The recruiting coach did.

24   BY MR. SCHACHTER:

25   Q.  I'm sorry.  My question wasn't clear.

1          Anybody from compliance, sir?

2    A.   No.

3    Q.   Thank you.

4          You discussed a player named Silvio De Sousa, is that

5    correct?

6    A.   Yes.

7    Q.   After Silvio De Sousa signed his Financial Aid Agreement,

8    sir, you became aware of facts suggesting that he may have

9    violated the NCAA amateurism rules, is that correct?

10   A.   In April of 2018.  I believe he signed it December of '17.

11   Q.   Sir, you became aware that Mr. De Sousa may have had a

12   relationship with a sports agent named Boaz Bar Dayan, is that

13   correct?

14   A.   No.

15   Q.   Were you tasked, sir, into looking into NCAA questions that

16   were raised about Mr. De Sousa's relationship with that sports

17   agent?

18   A.   I don't recall.

19          MR. SCHACHTER:  May I have a moment, your Honor?

20          May I approach, your Honor?

21          MS. FLODR:  Objection, your Honor.

22          THE COURT:  What is it, Ms. Flodr?

23          MS. FLODR:  Could we have a sidebar?

24          THE COURT:  Yes.

25          (Continued on next page)

Iaadgat4                    Smith - cross

1           (At the sidebar)

2           MS. FLODR:  Your Honor, I don't believe that this

3      witness has any firsthand knowledge about the investigation

4      into Mr. De Sousa before he became enrolled at the University

5      of Kansas.  There was an investigation into the eligibility of

6      this individual, Mr. De Sousa, based on an allegation that he

7      had signed an agent agreement and he had signed with a national

8      team in Spain.  They did that investigation but Mr. Smith --

9           THE COURT:  They did that investigation?

10          MS. FLODR:  At the University of Kansas before he

11     played a single game at the University of Kansas.  But

12     Mr. Smith was not involved in that investigation other than to

13     obtain -- find potential signature experts to look over

14     signatures on those agreements and assess whether those

15     signatures were accurate signatures for Mr. De Sousa and his

16     mother at the time.

17          MR. SCHACHTER:  Your Honor, in Defense Exhibit 1863 is

18     an email from his boss to Mr. Smith, dated November 28, 2017,

19     where questions had just been raised by the NCAA regarding

20     Mr. De Sousa and his relationship with his agent.  And his boss

21     says to him, "Jeff, please review and get back to me if you see

22     anything that sticks out."  From that moment, Mr. Smith has

23     been involved in obtaining, as Ms. Flodr stated -- so the issue

24     that was raised was whether Mr. De Sousa had signed, or

25     actually had contracts, signed contracts, of Mr. De Sousa with

Iaadgat4                    Smith - cross

1    a professional team in Spain -- obviously, a violation of the

2    amateurism rules -- as well as a signed agreement with a sports

3    agent named Mr. Dayan, which is also a clear violation of the

4    amateurism rules.  They retained a handwriting -- actually, two

5    handwriting experts, Mr. Smith did.  They retained two

6    handwriting experts to see if perhaps they would be able to

7    show that the signature on this agreement for this professional

8    team was not Mr. De Sousa's.  Both handwriting experts say,

9    nope, we can't say that, and we note that the signature of

10   Mr. De Sousa on the Spanish professional team and the agency

11   agreement look like they are the same.

12        So I think --

13        THE COURT:  This is all very interesting, but what is

14   it you propose to elicit from this witness?

15        MR. SCHACHTER:  I do not intend to spend much time.  I

16   intend to show that --

17        THE COURT:  I didn't ask how long.  I said what.

18        MR. SCHACHTER:  That he was involved in this

19   investigation of Mr. De Sousa where facts were brought to

20   Kansas' compliance department's attention that Mr. De Sousa had

21   signed a contract with a professional sports team in Spain, an

22   agency agreement.  They hired a handwriting expert, and the

23   handwriting expert could not conclude that it was not Mr. De

24   Sousa's signature.

25        THE COURT:  So the handwriting expert could not

Iaadgat4                    Smith - cross

1   conclude.  That is hearsay, right?

2              MR. SCHACHTER:  I'm not offering it for the truth of

3   the analysis.  What I am offering it to show is the reaction by

4   the compliance department, that the compliance department did

5   not care whether or not Mr. De Sousa was an amateur or not.

6   That is what I am using it to show.

7              THE COURT:  That's what you are using it to show?

8              MR. SCHACHTER:  Yes.

9              THE COURT:  Finished.

10             In order to do that, you have to do one of two things.

11  You have to have an authoritative witness who said we did not

12  care, or at least I did not care, that's number one, or you've

13  got to offer it for the truth, it seems to me

14             Am I wrong about that?

15             MR. SCHACHTER:  Your Honor, I think it is --

16             THE COURT:  Answer my question.

17             MR. SCHACHTER:  I am fearful, but I do disagree with

18  your Honor.  I believe that it is relevant evidence that these

19  facts regarding his lack of amateurism was brought to the

20  Kansas compliance department's attention and they did not, as

21  he testified, immediately reduce or cancel his scholarship

22  nor -- and their investigative efforts I think are relevant.  I

23  say that with fear.

24             THE COURT:  Well, aptly so.  How are you going to

25  prove any of that without one of the two things or both of them

1  that I articulated?

2          MR. SCHACHTER:  My intention -- I guess I will be

3  unsuccessful -- my intention was to inquire of the witness of

4  facts that were brought to his attention in his role at

5  compliance and what followed.

6          THE COURT:  All of which, if it is being adduced to

7  show that facts were brought to his attention --

8          MR. SCHACHTER:  Yes.

9          THE COURT:  -- depends on the truth and accuracy of

10 the statements made to him.

11         MR. SCHACHTER:  You see, my disagreement, your Honor,

12 would be that it really doesn't matter.  What matters is here's

13 the facts that were brought to his attention and what is the

14 reaction of the university of Kansas' compliance department.  I

15 believe that it is relevant to showing -- to the materiality

16 issue.  The government's case is that if facts were brought to

17 Kansas' compliance department's attention, then they would have

18 immediately reduced, canceled, the scholarships.

19         THE COURT:  You are, I suppose, entitled to say did

20 there come a time when something occurred?  In consequence, you

21 did something about Mr. De Sousa?

22         The government disagree with that?

23         MR. DISKANT:  No, your Honor.  But I would just note

24 that Mr. Schachter is wrong.  The University of Kansas obtained

25 a clearance from the NCAA, presenting all of this evidence,

Iaadgat4                Smith - cross

1   including this handwriting evidence, and only allowed Silvio De

2   Sousa to play after that.  I don't know how much firsthand

3   knowledge this witness has of any of that, which is part of why

4   we are concerned about it.

5           MS. FLODR:  Yes.

6           THE COURT:  Does the government have a problem with

7   that?

8           MS. FLODR:  No.

9           THE COURT:  Then you are perfectly entitled to say,

10  "What did you do?"

11          MR. SCHACHTER:  OK.  I want to be perfectly clear

12  because I don't wish to be incarcerated.  It would be

13  something --

14          THE COURT:  You are not at high risk right now,

15  Mr. Schachter.

16          MR. SCHACHTER:  That's a relief.  I am nervous,

17  nonetheless.

18          The something -- I just want to be perfectly clear on

19  what I may ask and what I may not.  May I ask whether it was

20  brought to his attention that there were contracts which

21  appeared to be signed by Mr. De Sousa with this Spanish team

22  and this agency and what did you do about it.

23          THE COURT:  How are you going to prove that there were

24  contracts that appeared to be signed by De Sousa?

25          MR. SCHACHTER:  It bore a signature with his name on

1    it.  Then the question is what did you do.  I can't say it is

2    his signature.  That I cannot of course do.  My only intention

3    is what are the facts --

4              THE COURT:  I'm glad you recognize that.

5              MR. SCHACHTER:  What are the facts that were brought

6    to your attention and what did you do about it?

7              THE COURT:  There you go again.

8              MR. SCHACHTER:  I'm sorry, not facts.  This is

9    information that was brought to your attention.

10              Your Honor, I think it is appropriate to instruct the

11    jury that the issue here is not whether or not he in fact did

12    sign this contract but, rather, these are documents that were

13    brought to his attention and what did they do with those

14    documents.

15              THE COURT:  What did he do?

16              MR. SCHACHTER:  What did he do, correct, he

17    individually.

18              THE COURT:  So what you are going to come out of this

19    with is there came a time when he was shown a document that

20    contained the name De Sousa.

21              MR. SCHACHTER:  Correct.

22              THE COURT:  In handwriting, is that what it is?

23              MR. SCHACHTER:  It is a signature.

24              THE COURT:  In handwriting?

25              MR. SCHACHTER:  Yes.

Iaadgat4                    Smith - cross

1          THE COURT:  As opposed to computer?

2          MR. SCHACHTER:  Yes.

3          THE COURT:  Did he do something about that?

4          MR. SCHACHTER:  Yes.

5          THE COURT:  What did he do?

6          MR. SCHACHTER:  Yes.

7          MR. DISKANT:  Can we just make clear that it is not

8     one of the documents that we have been looking at?

9          THE COURT:  That seems to be appropriate.

10          MS. FLODR:  So the way that this occurred, including

11     in this email, is that his boss, David Reed, had been the point

12     person on this entire issue that has been brought to his

13     attention.  And so in the process of him running this

14     investigation, because he knew that there would be amateurism

15     issues, but the fact that he now had a document that appeared

16     to be signed by Mr. De Sousa, he asked Mr. Smith to assist him

17     with finding experts in signatures.

18          THE COURT:  Look, you are telling me a whole long

19     story, the bulk of which you object to on the ground that it is

20     hearsay, right?

21          MS. FLODR:  Yes.

22          THE COURT:  So why are you telling it to me?

23          MS. FLODR:  I am giving context to the reasons why we

24     don't think that Mr. Smith has any firsthand knowledge of the

25     facts that Mr. Schachter had proffered.

1          THE COURT:  Of course he doesn't.  But he has

2     firsthand knowledge of something.

3          MS. FLODR:  Yes.

4          THE COURT:  He has firsthand knowledge that he was

5     presented with a piece of paper with what purported to be a

6     signature of De Sousa and he did something about that, right?

7          MS. FLODR:  I don't know if he was actually presented

8     with the document.

9          THE COURT:  Do you know?

10         MR. SCHACHTER:  He sent it to the handwriting experts.

11    He retained the handwriting experts, and I believe that he did.

12         MS. FLODR:  He did retain -- he did find the

13    handwriting experts.

14         THE COURT:  So information was presented to him, in

15    consequence of which he retained a handwriting expert?

16         MS. FLODR:  Correct.

17         THE COURT:  To examine the signature, or more than one

18    signature.

19         I don't think there is any objection to that, is there

20         MS. FLODR:  No.

21         THE COURT:  But I am not going to let you tell this

22    whole hearsay story through questions addressed to somebody

23    absent showing he has some personal knowledge.

24         MR. SCHACHTER:  Yes, your Honor.

25         (In open court)

1          MR. SCHACHTER:  May I proceed, your Honor?

2          THE COURT:  Yes.

3    BY MR. SCHACHTER:

4    Q.  Mr. Smith, did there come a point in time when you were

5    presented with a document which purported to be an agreement

6    between Mr. De Sousa and a professional basketball team in

7    Spain?

8    A.  I believe I saw that document.

9    Q.  And did there -- was there on that document something which

10   purported to be a signature of Silvio De Sousa?

11   A.  Yeah.  I believe I was asked by my boss to --

12          THE COURT:  Let's just stop with the answer to the

13   question.

14   A.  Yes.

15   Q.  And did there also come a time when you were presented with

16   what purported to be an agreement between Silvio De Sousa and a

17   professional sports agent in Israel?

18   A.  I can't recall.

19   Q.  Maybe that was -- had too many facts in that question.  Let

20   me pull back and rephrase.

21          Did there come a point in time when you were presented

22   with a document which purported to be an agreement between

23   Mr. De Sousa and a sports agent?  Do you recall that?

24   A.  I don't know exactly which documents I was given.

25   Q.  And did Kansas then take additional steps to look into that

Iaadgat4                    Smith - cross

1    matter?

2    A.   Yes.

3             MR. SCHACHTER:  May I have a moment, your Honor?

4             THE COURT:  Yes.

5             (Pause)

6    Q.   At no time did the University of Kansas cancel Mr. De

7    Sousa's scholarship, is that correct?

8    A.   Not to my knowledge.

9    Q.   And Mr. De Sousa is a member of the Kansas basketball team

10   today, is that correct?

11   A.   Yes.

12            MR. SCHACHTER:  I have no further questions.

13            THE COURT:  Thank you.

14            Let's take our afternoon break.

15            THE CLERK:  All rise.

16            (Recess)

17            (Jury present)

18            THE CLERK:  Please be seated, everyone.

19            THE COURT:  All right.  Mr. Mark, any cross?

20            MR. MOORE:  I have no cross, your Honor.

21            THE COURT:  Mr. Haney?

22            MR. HANEY:  I have none, your Honor.  Thank you.

23            THE COURT:  The jurors all are present.  The

24   defendants are present.

25            Ms. Flodr, any redirect?

Iaadgat4                    Smith - redirect

1            MS. FLODR:  Very briefly, your Honor.

2     REDIRECT EXAMINATION

3     BY MS. FLODR:

4     Q.  Mr. Smith, at the end of cross you were asked a series of

5     questions about documents regarding Mr. De Sousa, and you

6     testified that Kansas -- the University of Kansas took

7     additional steps to look into the matter, correct?

8     A.  Yes.

9     Q.  Did those additional steps resolve the concern?

10    A.  Yes.

11    Q.  Did Mr. De Sousa play a game while the University resolved

12    those concerns?

13    A.  Not to my knowledge.

14            MS. FLODR:  Nothing further, your Honor.

15            THE COURT:  All right.  Thank you.

16            Mr. Schachter?

17            MR. SCHACHTER:  No.  Thank you, your Honor.

18            MR. MOORE:  No, your Honor.

19            THE COURT:  Mr. Haney?

20            MR. HANEY:  No, your Honor.  Thank you.

21            THE COURT:  OK.  The witness is excused.

22            Thank you, Mr. Smith.

23            THE WITNESS:  Thank you.

24            (Witness excused)

25            THE COURT:  Next witness.

1          MR. MARK:  Your Honor, before the government calls its

2     next witness, we would like to play one call.  And we will

3     offer Government Exhibits 34 and 34T as an aid to the jury,

4     which is a call dated July 24, 2017 between Christian Dawkins

5     and Merl Code.

6          We offer that right now.

7          THE COURT:  All right.  Received, both of them.

8          Members of the jury, the same instruction as before

9     about the tape.

10          (Government's Exhibits 34 and 34T received in

11     evidence)

12          MR. MARK:  All right.  Ms. Lee, you can start playing

13     that call now.

14          (Audio played)

15          THE COURT:  Is there a problem or are you ready to

16     call a witness?

17          MR. DISKANT:  Your Honor, why don't we call a witness

18     and then we will resolve the technical issues before we play

19     the rest of it.

20          MR. MARK:  So we will return to the rest of this, but

21     in the interim, your Honor, the government calls as its next

22     witness Thomas Gassnola.

23          (Continued on next page)

24

25

1    THOMAS JOSEPH GASSNOLA,

2         called as a witness by the government,

3         having been duly sworn, testified as follows:

4              THE DEPUTY CLERK:  State your name and spell your last

5    name for the record.

6              THE WITNESS:  Thomas Joseph Gassnola, G-A-S-S-N-O-L-A.

7              THE COURT:  You may proceed, counsel.

8    DIRECT EXAMINATION

9    BY MR. MARK:

10   Q.  Mr. Gassnola, do you have any nicknames?

11   A.  TJ.

12   Q.  Where did you work?

13   A.  Adidas America.

14   Q.  Who did you report to at Adidas America?

15   A.  Jim Gatto.

16   Q.  What was Mr. Gatto's position at Adidas?

17   A.  Director of global sports marketing for basketball.

18   Q.  How long have you known Mr. Gatto?

19   A.  15 years.

20   Q.  Mr. Gassnola, did there come a time earlier this year that

21   you pled guilty to a federal crime?

22   A.  There did.

23   Q.  What was that crime?

24   A.  Conspiracy to commit wire fraud.

25   Q.  Were you in fact guilty of that crime?

1  A.  I was.

2  Q.  Can you tell us in your own words what you did that made

3  you guilty of that crime?

4  A.  Concealed payments to the families of student-athletes and

5  kept them from the universities.

6  Q.  When you made these payments, were you working for Adidas?

7  A.  I was.

8  Q.  Where did the money to make these payments come from?

9  A.  Adidas.

10  Q.  Did you make these payments alone?

11  A.  I did not.

12  Q.  Do you see anyone in the courtroom who was involved in

13  making these payments with you?

14  A.  I do.

15  Q.  Who do you see?

16  A.  Merl Code, Christian Dawkins, and Jim Gatto.

17  Q.  Initially, with Merl Code, could you please identify

18  Mr. Code and describe an article of clothing he is wearing and

19  where he is sitting.

20  A.  The second row, dark suit.

21        MR. MARK:  May the record reflect the witness has

22  identified Mr. Code?

23        THE COURT:  Yes.

24  Q.  As to Mr. Dawkins, could you please identify an article of

25  clothing he is wearing and where he is sitting?

1   A.  Second row, gray shirt.

2           MR. MARK:  May the record reflect the witness has

3   identified Mr. Dawkins?

4           THE COURT:  Yes.

5   Q.  Lastly, as to Mr. Gatto, could you please identify him by

6   describing an article of clothing he is wearing and where he is

7   sitting?

8   A.  Third row, dark suit.

9           MR. MARK:  May the record reflect that the witness has

10  identified Mr. Gatto?

11          THE COURT:  Yes.

12  Q.  When you worked for Adidas, how many families of

13  student-athletes were you involved in making payments to?

14  A.  Five.

15  Q.  Who were the student-athletes whose families you were

16  involved in paying?

17  A.  Brian Bowen, Billy Preston, Dennis Smith, Silvio De Sousa,

18  and DeAndre Ayton.

19  Q.  Why did you make these payments?

20  A.  These players were either part of our grassroots circuit,

21  we wanted them on our grassroots circuit, they were going to

22  our universities or in the possess of going to our

23  universities.

24  Q.  Did you try to conceal these payments?

25  A.  I did.

1    Q.   From whom?

2    A.   The universities.

3    Q.   Now, let me ask you some background questions.

4              How old are you, Mr. Gassnola?

5    A.   46.

6    Q.   How far did you go in school?

7    A.   High school graduate.

8    Q.   After high school what sort of work did you do?

9    A.   I was in the nightclub and bar business.

10   Q.   Did there come a time that you got involved in youth

11   basketball.

12   A.   I did.

13   Q.   Is youth basketball also sometimes referred to as

14   grassroots basketball?

15   A.   It is.

16   Q.   When did you become involved in youth basketball?

17   A.   Late 90s, early 2000s.

18   Q.   Are you still involved in youth basketball?

19   A.   I am not.

20   Q.   When were you last involved in youth basketball?

21   A.   September 2017.

22   Q.   When was your first involvement in youth basketball, what

23   was the nature of it?

24   A.   Late 90, early 2000s, in my hometown Springfield, Mass, I

25   got involved with a few young athletes that ended up being

1  really good basketball players that took me to North Jersey.

2  Q.  Did there come a time that you started your own youth

3  basketball program?

4  A.  I did.

5  Q.  Approximately when was that?

6  A.  Around 2004, 2005.

7  Q.  What was the name of your program?

8  A.  The New England Playaz basketball club.

9  Q.  What sort of programs did the New England Playaz basketball

10 club run?

11 A.  It was a high school all-star team comprised of the best

12 high school players in my area, sophomores in high school all

13 the way up to juniors in high school.

14 Q.  In running your program, what goals did your program have

15 for these players?

16 A.  To obtain an athletic scholarship and go on to college.

17 Q.  How many of your players played in college?

18 A.  Over 150.

19 Q.  Did they get athletic scholarships?

20 A.  They did.

21 Q.  Did the New England Playaz have any athletic sponsors?

22 A.  They did.

23 Q.  Who sponsored the program?

24 A.  Adidas America.

25 Q.  When did this sponsorship with Adidas begin?

1    A.   2004.

2    Q.   When did it end?

3    A.   2017.

4    Q.   Approximately when in 2017?

5    A.   October 2017.

6    Q.   Now, you mentioned Adidas.  Just generally, what is that

7    company?

8    A.   A global apparel brand.

9    Q.   Where is the company's global headquarters?

10   A.   Germany.

11   Q.   Where is the company's U.S. headquarters?

12   A.   Portland, Oregon.

13   Q.   Let me show for the witness only Government Exhibit 1145.

14        Mr. Gassnola, do you recognize this document?

15   A.   I do.

16   Q.   What is it?

17   A.   It's an endorsement agreement between myself and Adidas

18   America and New England Playaz.

19        MR. MARK:  The government offers Government Exhibit

20   1145.

21        MR. SCHACHTER:  No objection.

22        THE COURT:  Received.

23        (Government's Exhibit 1145 received in evidence)

24        MR. MARK:  May we publish, your Honor?

25        THE COURT:  Yes.

1  Q.  Mr. Gassnola, let me direct your attention to the top

2  paragraph of this document.  Who are the parties to this

3  agreement?

4  A.  The New England Playaz basketball program, myself, and

5  Adidas.

6  Q.  How does this contract refer to you?

7  A.  As a consultant.

8  Q.  What is the term of this contract?

9  A.  Two years.

10 Q.  I just want to go through briefly a couple of the terms in

11 this contract.

12        Let me direct your attention to what is marked as

13 Section 2.  Where it says "team merchandise allotment," what

14 does that refer to?

15 A.  Basketball shoes, uniforms, bags, the type of stuff that

16 you get for your program.

17 Q.  How much did the contract provide for your program during

18 this agreement?

19 A.  $75,000.

20 Q.  Now, let me direct your attention to the next page, Section

21 6.  If we can highlight just that section.

22        When it refers to "travel allotment," what is that?

23 A.  The cash that I received to travel around the country with

24 the kids, airfare, hotels, car rentals, any expenses that come

25 with running a team.

1    Q.  How much did the contract provide for during this term?

2    A.  $70,000.

3    Q.  Now, in addition to having a basketball program the New

4    England Playaz that was sponsored by Adidas, did you have an

5    additional role with the company?

6    A.  I did.

7    Q.  What additional role did you have?

8    A.  I was an outside consultant.

9    Q.  What responsibilities did you have as an outside consultant

10   for Adidas?

11   A.  I worked mainly with our colleges and our grassroots

12   division.  I spent a lot of time working on relationships for

13   our colleges and our coaching staffs.  And there was a few of

14   us in the basketball marketing, we all worked together on the

15   grassroots side, so we all kind of worked together.

16   Q.  What goals, if any, did you have in working with those

17   college programs?

18   A.  It was all about relationships and having access to the

19   college programs was key for basketball marketing.  You wanted

20   to provide the best relationships and access to those schools,

21   and our relationships needed to be better than what they were

22   when I first started with Jimmy.  So the relationships were a

23   big part of it.

24   Q.  You mentioned Jimmy.  Just so the record is clear, who are

25   you referring to there?

1    A.   Jim Gatto.

2    Q.   How did you anticipate that those relationships with

3    college coaches would be beneficial to Adidas?

4    A.   Jimmy's job was to sign NBA prospects.  So having access to

5    those universities -- you know, it didn't have to just be

6    Adidas, but having access to those universities and being able

7    to talk to college coaches and assistant coaches and find out

8    when shooter rounds were going to practice and be able to get

9    on campus and access those schools was good.  Because if they

10   had an athlete that was on Jimmy's radar, you wanted to be able

11   to form relationships so that if they were lucky enough to

12   become a shoe kid we'd have a relationship to sign them.

13   Q.   Approximately when did it begin that you had this role as

14   an outside consultant to try to expand the relationships that

15   Adidas had?

16   A.   Around 2013.

17   Q.   Were you paid by Adidas in connection with your work as an

18   outside consultant?

19   A.   I was.

20   Q.   Did you have a contract for that work?

21   A.   I did not.

22   Q.   How would you get paid for your work as an outside

23   consultant?

24   A.   Through an invoice or I would ask Jimmy for the money.

25   Q.   After you would submit an invoice or ask Jimmy for the

1    money, how would you get the money?

2    A.  Either wire into my account or sometimes a check.

3    Q.  When you said your account, which account would that be?

4    A.  My New England Playaz account.

5    Q.  If you submit an invoice, to whom would you submit that

6    invoice?

7    A.  Jim Gatto.

8             MR. MARK:  Ms. Lee, can we show to the witness only

9    what has been marked as Government Exhibit 306G and Government

10   Exhibit 306F.

11   Q.  Mr. Gassnola, do you recognize these two documents?

12   A.  Yes.  It's my Hampton Bank and Berkshire Bank New England

13   Playaz account.

14   Q.  Is there any relationship between Hampton Bank and

15   Berkshire Bank?

16   A.  Hampton Bank was the original bank and they were bought out

17   by Berkshire.

18             MR. MARK:  The government offers Government Exhibit

19   306F and 306G.

20             MR. SCHACHTER:  No objection.

21             THE COURT:  They are received.

22             (Government's Exhibits 306F and 306G received in

23   evidence)

24             MR. MARK:  May we publish?

25             THE COURT:  Yes.

1              MR. MARK:  Ms. Lee, can we first go to 306G, at page

2    102.

3    Q.  Mr. Gassnola, once again, which account is this for?

4    A.  My New England Playaz account.

5    Q.  Who controlled that account?

6    A.  I did.

7    Q.  By way of example, what is reflected on the entry at 1/18

8    there?

9    A.  A wire deposit into my account from Adidas.

10   Q.  How would you get that wire from Adidas?

11   A.  I would submit an invoice or ask Jimmy for the money.

12             MR. MARK:  Ms. Lee, could we just take a look briefly

13   at 306F.  If we can go to page 6.

14   Q.  What is reflected on this document?

15   A.  This is a check I received.

16   Q.  Who is it from?

17   A.  Adidas.

18   Q.  Is this to the New England Playaz account?

19   A.  Yes.

20   Q.  How would you get a check like this?

21   A.  I would submit an invoice.

22   Q.  To whom?

23   A.  Jim Gatto.

24   Q.  Now, focusing your attention on the time period of 2015 to

25   2017, approximately how much were you compensated for your role

1   as an outside consultant at Adidas?

2   A.   $150,000.

3   Q.   Were you also entitled to reimbursement of expenses?

4   A.   I was.

5   Q.   Who at Adidas agreed to that arrangement?

6   A.   Jim Gatto.

7   Q.   Focusing your attention on that same time period, 2015 to

8   2017, approximately how much in expenses a year did you submit

9   to Adidas for your work as an outside consultant?

10  A.   It went from 200 to $300,000.

11  Q.   Did you discuss any limits on those expenses with Mr.

12  Gatto?

13  A.   I did.

14  Q.   What, if anything, did Mr. Gatto tell you about any limits?

15  A.   Jimmy always expressed to me that I needed to abide by what

16  was allowed to spend for a hotel room or a flight or a rental

17  car.

18  Q.   Did you follow those limits?

19  A.   I did not.

20  Q.   Did you exceed them?

21  A.   I did.

22  Q.   How did you exceed those limits?

23  A.   I would stay in nice hotels, fly first class, rent nice

24  cars.

25  Q.   Did you ever discuss this with Mr. Gatto?

1    A.  I did.

2    Q.  What did he say to you and what did you say to him about

3    that?

4    A.  He would reprimand me; he would tell me you can't do this,

5    you have to do it a certain way.

6    Q.  Did Mr. Gatto continue to approve your expenses?

7    A.  He did.

8    Q.  Now, talking about your expenses, did Mr. Gatto tell you if

9    anything needed to be submitted as backup for those expenses?

10   A.  Yes.

11   Q.  What did he say about that?

12   A.  He said I had to submit itemized receipts, credit card

13   bills, credit card statements, and itemized invoices to back up

14   what I was spending.

15   Q.  How, if at all, did you generally follow this request?

16   A.  A little bit, not like I should have.

17   Q.  Now, you mentioned earlier that you made payments to the

18   families of student-athletes.

19        Where did that money come from?

20   A.  Adidas.

21   Q.  How did you get that money from Adidas?

22   A.  I would ask Jimmy.

23   Q.  Now, have you paid any taxes on the money you received from

24   Adidas?

25   A.  I have not.

1    Q.  Did you receive any tax forms from Adidas for any of the

2    money that you or your program received from Adidas?

3    A.  I did not.

4    Q.  How much do you currently owe the IRS?

5    A.  $60,000.

6    Q.  Do you owe the IRS anything in connection with the money

7    that you received from Adidas?

8    A.  I don't know yet.  It's in the process of being amended

9    now.

10   Q.  What are you doing to amend those tax returns?

11   A.  My accountant is working on my New England Playaz stuff and

12   my personal taxes to amend those, and hopefully in the next

13   couple of months, before the year end, I will have the number

14   that I owe.

15   Q.  Now, Mr. Gassnola, you mentioned at the outset of your

16   testimony that you pled guilty to a crime in connection with

17   paying families of student-athletes.  We are going to talk

18   quite a bit more about that, but is that the only crime you

19   ever pled guilty to?

20   A.  No, I have not.

21   Q.  Were those prior crimes federal or state crimes?

22   A.  State crimes.

23   Q.  What kinds of crimes did you plead guilty to?

24   A.  Larceny, writing bad checks.

25   Q.  How old were you when you pled guilty to those crimes?

1    A.   In my 20s.

2    Q.   How long ago was that?

3    A.   20-some-odd years ago.

4    Q.   You mentioned you pled guilty to writing bad checks.  Did

5    that happen once or more than once?

6    A.   More than once.

7    Q.   What were those checks for?

8    A.   I was living beyond my means at the time, so for services

9    and bad business decisions.

10   Q.   What types of businesses were you involved in at the time?

11   A.   In the car business and real estate.

12   Q.   How large were the amounts for these checks?

13   A.   Anywhere from 500 to $2,000.

14   Q.   Now, with respect to the real estate business that you just

15   mentioned, were you involved in that alone or with others?

16   A.   With others.

17   Q.   Did you ever mislead any of the buyers in that real estate

18   business?

19   A.   We did.

20   Q.   Did you also plead guilty to a crime involving that

21   conduct?

22   A.   I did.

23   Q.   Was that around the same time period as the other crimes

24   that you mentioned?

25   A.   It was.

1    Q.  On any other occasions, have you ever failed to pay money

2    that you have owed to anyone?

3    A.  I have.

4    Q.  Please just describe generally what you did.

5    A.  I had some investors in some properties that me and my

6    partners had and took money from people and never reimbursed

7    them.  They were businesses that didn't work out.

8    Q.  Do you currently have any judgments outstanding against

9    you?

10   A.  I do.

11   Q.  How many?

12   A.  A handful, five, six.

13   Q.  Have you ever had any tax liens?

14   A.  I have.

15   Q.  From which tax authorities?

16   A.  State and federal.

17   Q.  Do you currently have any state tax liens?

18   A.  I do not.

19   Q.  How about federal?

20   A.  I do.

21   Q.  How much is the federal?

22   A.  $60,000.

23   Q.  How long have you had that one?

24   A.  Seven years.

25   Q.  Have you paid off any part of that tax lien?

1   A.   In recent years when I filed my taxes any refund I would

2   get would go towards that bill that I owed.

3   Q.   When you filed those tax returns, were they accurate?

4   A.   They weren't.

5   Q.   Have you underreported your income?

6   A.   I have.

7   Q.   Have you engaged in any tax avoidance strategies?

8   A.   I have.

9   Q.   What did you do?

10  A.   Instead of taking some income, I had the income put in my

11  New England Playaz account as a donation instead of personal

12  income to me.

13  Q.   Was that to avoid declaring that money as income on your

14  tax returns?

15  A.   That's correct.

16  Q.   Have you filed accurate tax returns for the New England

17  Playaz program?

18  A.   I have not.

19  Q.   Now, switching gears a little bit, where do you currently

20  live?

21  A.   Ludlow, Massachusetts.

22  Q.   Are you planning to move soon?

23  A.   I am.

24  Q.   Where are you planning to move to?

25  A.   Belchertown, Massachusetts.

IAA8GAT5                    Gassnola - Direct

1   Q.  Who owns that home in Belchertown, Massachusetts that you

2   plan to move to?

3   A.  Danielle Labarre.

4   Q.  What is your relationship to Ms. Labarre?

5   A.  She is my fiance.

6   Q.  Is she employed?

7   A.  She is.

8   Q.  Is there a loan or mortgage in connection with that house?

9   A.  There is a construction loan on the house.

10  Q.  In whose name?

11  A.  Danielle Labarre.

12  Q.  Did you provide Ms. Labarre any help in getting that loan?

13  A.  I did.

14  Q.  What did you do to help her?

15  A.  I gave her $70,000.

16  Q.  How did you give her that money?

17  A.  In the form of a transfer from my New England Playaz

18  account to her personal account.

19  Q.  Why did you transfer her that money?

20  A.  I wanted to enhance her getting that loan so I thought that

21  would help.

22  Q.  In connection with Ms. Labarre getting that loan, did you

23  submit any paperwork to the lender?

24  A.  There was a gift letter that I was required to fill out and

25  I filled out and sent it to the bank along with the money.

1    Q.  Was that gift letter that you are referring to that you

2    sent to the bank, was that letter accurate?

3    A.  It was not.

4    Q.  Did Ms. Labarre get that loan?

5    A.  She did.

6    Q.  Is she current on her payments?

7    A.  She is.

8    Q.  Now, turning back to your work at Adidas, during the time

9    that you were working as an Adidas consultant, an outside

10   consultant, where did you live?

11   A.  Ludlow, Massachusetts.

12   Q.  Where was the New England Playaz basketball program based?

13   A.  Massachusetts.

14   Q.  Once again, when did you start running that program?

15   A.  Around 2004, 2005.

16   Q.  Did you set up a company to run that program?

17   A.  I did.

18   Q.  What was it called?

19   A.  New England Playaz Basketball, Inc.

20   Q.  When you set up the company, did you intend to set it up as

21   a nonprofit or a for-profit entity?

22   A.  I intended to set it up as a nonprofit.

23   Q.  Was it incorporated as a nonprofit entity?

24   A.  It was.

25   Q.  Do nonprofits have certain filing and registration

1    requirements?

2    A.  Yes, they do.

3    Q.  Did you follow them?

4    A.  I did not.

5    Q.  While you were running the program, did you receive any

6    salary for the work of running the program?

7    A.  No, I didn't.

8    Q.  Did you use New England Playaz' money to pay for your

9    expenses in running the program?

10   A.  I did.

11   Q.  Did you also use New England Playaz' money to pay for your

12   personal expenses?

13   A.  Yes.

14   Q.  While you were running the New England Playaz program, did

15   you have any other employment?

16   A.  I did.

17   Q.  Now, you testified earlier that you pled guilty this year.

18   When was that?

19   A.  March 30, 2018.

20   Q.  Prior to that date, had you been approached by FBI agents

21   about your work for Adidas?

22   A.  I had.

23   Q.  When was that, approximately?

24   A.  October 2017.

25   Q.  Where were you approached by those FBI agents?

1    A.   At my home.

2    Q.   Did you speak to those FBI agents at your home?

3    A.   I did.

4    Q.   What did those FBI agents say they wanted to speak with you

5    about?

6    A.   They wanted to speak to me about my employment at Adidas.

7    Q.   Anything in particular with your employment at Adidas?

8    A.   Payments to families of student-athletes.

9    Q.   In that initial meeting with the FBI agents, were you

10   entirely forthcoming?

11   A.   No, I was not.

12   Q.   Did there come a time that you started meeting with the

13   government?

14   A.   Yes.

15   Q.   When did you start meeting with the government?

16   A.   The first week of December 2018 –– 2017, first week of

17   December 2017.

18   Q.   Why did you start meeting with the government in December

19   of 2017?

20   A.   After talking to my attorney, both of us thought it was in

21   the best interest of me to come down and talk to the government

22   and be truthful.

23   Q.   Before you pled guilty to the crime that you just

24   mentioned, approximately how many times did you meet with the

25   government?

1   A.   Four.

2   Q.   In those meetings with the government, were you truthful?

3   A.   I was.

4   Q.   When you pled guilty, did you have any agreement with the

5   government?

6   A.   I did.

7   Q.   What kind of agreement was it?

8   A.   A cooperation agreement.

9   Q.   What crime again did you plead guilty to?

10  A.   Conspiracy to commit wire fraud.

11  Q.   In your own words, what did you do that made you guilty of

12  that crime that you pled guilty to?

13  A.   Concealed payments to others, to give money to the families

14  of student-athletes, concealed that from the university.

15  Q.   Why did you conceal those payments to the families of

16  student-athletes?

17  A.   I didn't want the universities -- I didn't want people to

18  find out.  I wanted to keep it quiet.

19  Q.   From which universities in particular?

20  A.   Kansas, NC State, and Louisville.

21  Q.   With whom, if anyone, did you agree to make and conceal

22  these payments?

23  A.   Merl Code, Christian Dawkins, and Jim Gatto.

24  Q.   As a result of your plea, what is the maximum potential

25  sentence you're facing?

1    A.   20 years.

2    Q.   What benefit are you hoping for as a result of your

3    cooperation?

4    A.   Get a 5K letter from the government.

5    Q.   We will talk more about that 5K letter in a minute.

6         Have you met with the government in connection with

7    your cooperation?

8    A.   I have.

9         MR. MARK:   Now, Ms. Lee, let's show to the witness

10   only what has been marked for identification as Government

11   Exhibit 2003.

12   Q.   Mr. Gassnola, do you recognize this document?

13   A.   I do.

14   Q.   What is it?

15   A.   It's my cooperation agreement with the government.

16   Q.   Could you turn to the last page.

17        Is that your signature on this document?

18   A.   It is.

19   Q.   Who else signed it?

20   A.   My attorney.

21   Q.   Anyone from the government?

22   A.   Yes.

23        MR. MARK:   At this time, the government offers

24   Government Exhibit 2003 into evidence.

25        MR. SCHACHTER:   No objection.

1          MR. MOORE:  No objection.

2          THE COURT:  Received.

3          (Government's Exhibit 2003 received in evidence)

4          MR. MARK:  Ms. Lee, can we go to the first page.

5          Your Honor, may we publish it to the jury?

6          THE COURT:  Yes.

7   Q.  Mr. Gassnola, you said Government Exhibit 2003 is your

8   cooperation agreement --

9   A.  Yes.

10  Q.  -- with the government?

11          When is it dated?

12  A.  March 30, 2018.

13  Q.  What is your understanding of your principal obligations

14  under the agreement?

15  A.  Testify truthfully, and if I am asked to meet with the

16  government, I meet with them.

17  Q.  Are there any requirements relating to your taxes in this

18  agreement?

19  A.  That my taxes are amended for both New England Playaz and

20  personally, and before sentencing they are amended.  I got to

21  pay the government for back taxes.

22  Q.  Have you refiled your taxes for yourself and your program

23  yet?

24  A.  It's in the process now.

25  Q.  Does this agreement give you any protection for tax crimes?

1   A.  It does not.

2   Q.  Now, if you live up to your obligations under the

3   agreement, what is your understanding of what the government

4   will do for you?

5   A.  They will write a 5K letter on my behalf.

6   Q.  What is your understanding of what information would be in

7   that 5K letter?

8   A.  Outlining the crimes I committed, my cooperation with the

9   government.

10          MR. MARK:  Ms. Lee, we can take that down.

11  Q.  What are you hoping will happen as a result of the

12  government writing this 5K letter?

13  A.  No jail time.

14  Q.  To whom does that letter get addressed to?

15  A.  A judge.

16  Q.  Will the government recommend a specific sentence to the

17  judge?

18  A.  They won't.

19  Q.  Do you also face any fines in connection with your crime?

20  A.  I do.

21  Q.  Do you also face any other financial consequences?

22  A.  Restitution for the victims.

23  Q.  Who are the victims here?

24  A.  The universities.

25  Q.  What is your understanding of who will decide your

1    sentence?

2    A.  A judge.

3    Q.  Is the judge required to give you a lower sentence if the

4    government writes that 5K letter?

5    A.  He's not.

6    Q.  If you violate the cooperation agreement, do you believe

7    the government will still write that letter to the judge?

8    A.  No, they won't.

9    Q.  Have you been promised that you will get a lower sentence

10   as a result of your agreement?

11   A.  I have not.

12   Q.  Have any promises been made to you about the sentence you

13   are going to get in your case?

14   A.  No.

15   Q.  To your understanding, does the outcome of this trial right

16   here have any effect on whether the government writes that

17   letter to the judge?

18   A.  No.

19   Q.  What is your understanding of what does matter?

20   A.  That I testify truthfully.

21   Q.  What happens if you are not truthful?

22   A.  Then my cooperation agreement gets ripped up.

23   Q.  Would you still be bound by your guilty plea?

24   A.  I would.

25   Q.  Turning back to Adidas, where you worked, what part of the

1  business did you work in?

2  A.  Basketball sports marketing.

3  Q.  What was the responsibility of the basketball sports

4  marketing group?

5  A.  Put as many shoes, products that were coming out or were

6  the newest product in the basketball division, on young

7  athletes, grassroots players, college players, NBA players.

8  Q.  Which companies sell the most basketball apparel and shoes?

9  A.  Adidas, Nike, Under Armour.

10  Q.  Which of those sells the most?

11  A.  Nike.

12  Q.  Was the basketball sports marketing group where you worked

13  at Adidas a competitive business?

14  A.  It was.

15  Q.  Now, you mentioned earlier that you reported to Mr. Gatto,

16  is that right?

17  A.  I did.

18  Q.  Generally, what were his responsibilities at Adidas?

19  A.  He was a director of global sports marketing for

20  basketball.  Jimmy's main job was to sign NBA players and

21  maintain those relationships with the NBA players.

22  Q.  How, if at all, did your work for Adidas help further that

23  goal?

24  A.  When Jimmy brought me on, it was because of my

25  relationships with so many years in grassroots basketball, so I

1   had relationships with college coaches because of that.  So for

2   me to be able to open up doors with different universities, no

3   matter what the shoe brand was, and open doors for players that

4   were on Jimmy's radar was easier for me.

5   Q.  You mentioned opening doors at universities.  At those

6   universities, in connection with your work for Adidas, who

7   would you interact with at those schools?

8   A.  Head coaches, assistant coaches.

9   Q.  Now, are you familiar with the term "flagship school"?

10  A.  I am.

11  Q.  What does that term refer to?

12  A.  A flagship school is a school that's got a really good

13  football program, a really good basketball program, they

14  maximize television exposure, is on TV a lot.  That would be my

15  explanation of it.

16  Q.  How, if at all, does that assist a sportswear company to

17  have maximum exposure on national television?

18  A.  People get to see the universities wearing our brand,

19  wearing our product, and they relate to it and hopefully they

20  go out and buy it.

21  Q.  Did Adidas sponsor any flagship schools?

22  A.  It did.

23  Q.  Now, earlier you mentioned a term "grassroots basketball."

24  Could you just remind us what that refers to?

25  A.  Grassroots basketball, in its infinite stages, as kids grow

1   and they get better, they grow into being a respected athlete

2   at a university, where they are recruited by colleges, and

3   hopefully that they grow into NBA players.  Grassroots is where

4   they start and where they grow.

5   Q.  As an outside consultant for Adidas, how important, if at

6   all, was it to you that players who played on Adidas grassroots

7   programs also attended Adidas flagship schools?

8   A.  It was important that they attend Adidas schools, not just

9   the flagship schools; it was important that they went to

10  schools that represented our brand.

11  Q.  Why was it important that they went to schools that were

12  sponsored by Adidas?

13  A.  It was important to us in the basketball division, because

14  if you had these kids in our grassroots programs, you cultivate

15  them, they have to show brand loyalty, you want them to

16  continue on in our schools.

17  Q.  Did you discuss this subject with Mr. Gatto?

18  A.  I did.

19  Q.  How about with Mr. Code?

20  A.  I did.

21  Q.  Based on those discussions, do you know whether they shared

22  your view on that subject?

23  A.  They did.

24  Q.  Now, earlier you mentioned that you concealed payments to

25  families of student-athletes.  Did any of those

942

1    student-athletes enroll in any Adidas-sponsored schools?

2    A.   They did.

3    Q.   Which schools?

4    A.   NC State, Kansas.

5    Q.   How about Louisville?

6            MR. HANEY:  Object.

7            THE COURT:  Overruled.

8    A.   Yes.

9    Q.   Is Louisville a flagship school of Adidas?

10   A.   It is.

11   Q.   Is NC State a flagship school of Adidas?

12   A.   Yes.

13   Q.   Is Kansas a flagship school of Adidas?

14   A.   Yes.

15   Q.   Now, switching topics, you mentioned that Christian Dawkins

16   was involved with you in paying the families of

17   student-athletes, is that right?

18   A.   Yes.

19   Q.   How long have you known Mr. Dawkins?

20   A.   Almost ten years.

21   Q.   Did Mr. Dawkins ever play for the New England Playaz

22   program?

23   A.   He did.

24   Q.   When was that?

25   A.   Somewhere around '08, '09, in the fall of that year.

1    Q.   How long did he play for one of your teams?

2    A.   Just a practice.

3    Q.   Why did he only play for one practice on your team?

4    A.   He wasn't good enough.

5    Q.   Even though he played only one practice, did you remain in

6    contact with him thereafter?

7    A.   I did.

8    Q.   Did there come a time that you helped Mr. Dawkins get a

9    job?

10   A.   Yes.

11   Q.   Approximately when was that?

12   A.   Around 2015.

13   Q.   Where was that job?

14   A.   ASM Sports.

15   Q.   What is ASM Sports?

16   A.   It's a sports agency that represents pro athletes.

17   Q.   Who is Andy Miller?

18   A.   He owns ASM Sports; he is an NBA agent.

19   Q.   Did Mr. Dawkins get the job at ASM Sports?

20   A.   He did.

21   Q.   When Mr. Dawkins was working at ASM Sports, what was his

22   role there?

23   A.   To recruit NBA prospects and bring them to the agency.

24   Q.   From talking with Mr. Dawkins, was he able to recruit any

25   of those players?

1    A.  Yes, he was.

2    Q.  Now, I would like to ask you a few questions about

3    Mr. Code, who you also mentioned was involved in paying the

4    families of student-athletes with you.

5           When did you first meet Mr. Code?

6    A.  Around 2016.

7    Q.  Was he working at the time?

8    A.  He was not.

9    Q.  Where had he worked before that?

10   A.  He was working in Nike.

11   Q.  How did it come about that you met Mr. Code at that time?

12   A.  Over a period of time, Andy and Christian, they spoke

13   highly of Merl all the time, and they thought that he would be

14   an asset to Adidas and they kept telling me that we should

15   bring him on.  I told that to Jimmy.  Jimmy and I had those

16   conversations.

17   Q.  When you say "those conversations," was that with Mr.

18   Gatto?

19   A.  About bringing Merl on, yes.

20   Q.  Did you make any recommendations to Mr. Gatto?

21   A.  I said we should bring Merl on; he will be an asset to the

22   company.

23   Q.  Did Mr. Code join Adidas?

24   A.  He did.

25   Q.  Approximately when was that?

1    A.   Around 2016.

2    Q.   What was Merl Code's role at Adidas?

3    A.   He was an outside consultant, like myself.

4    Q.   Were his responsibilities at Adidas similar to yours?

5    A.   Yes.

6    Q.   Now, let's talk about the details of some of the payments

7    to the families of student-athletes that you mentioned earlier.

8             Once again, on behalf of Adidas, how many families did

9    you arrange payments for?

10   A.   Five.

11   Q.   Who are those student-athletes again?

12   A.   Brian Bowen, Dennis Smith, Billy Preston, Silvio De Sousa,

13   and DeAndre Ayton.

14   Q.   So let me start with Brian Bowen.

15            How did you first come to be familiar with Brian

16   Bowen?

17   A.   Christian reached out to me around Brian's sophomore year

18   in high school.  He told me about Brian and that Brian was

19   looking -- his family was looking to leave the AAU team he was

20   with, the grassroots team he was with at the time, he was

21   looking to leave that team.

22   Q.   You mentioned that Mr. Bowen was a sophomore in high

23   school.  When approximately was this?

24   A.   2014, 2015.

25   Q.   What did Mr. Dawkins say about Brian Bowen's interest in

1    leaving his AAU team?

2    A.   That the family was interested in leaving and making a move

3    to another team.

4    Q.   Did Adidas have a grassroots team in Michigan?

5    A.   We did.

6    Q.   What was the name of that program?

7    A.   The Michigan Mustangs.

8    Q.   After you had this conversation with Mr. Dawkins about

9    Brian Bowen leaving his program, did there come a time that you

10   watched Brian Bowen play basketball?

11   A.   Yes.

12   Q.   Approximately when was that?

13   A.   I want to say February of 2015.

14   Q.   Where did you see him play?

15   A.   Saginaw, Michigan.

16   Q.   Why did you travel all the way to Saginaw, Michigan to

17   watch him play?

18   A.   I wanted to see if Brian was good, and if he was, introduce

19   myself to the family and let them know we were interested in

20   him.

21   Q.   After you saw Brian Bowen play basketball, what was your

22   impression of him?

23   A.   He had potential.  He was young.  He did a lot of things at

24   that age that I thought he had a bright future.

25   Q.   After you saw Brian Bowen play, did you discuss him further

1   with Christian Dawkins?

2   A.  I did.

3   Q.  Did you discuss any payments in connection with Brian Bowen

4   changing grassroots teams?

5   A.  Yes.  Christian informed me that the family wanted to make

6   the move and needed $25,000 to make that move.

7   Q.  How did you respond to Mr. Dawkins when he said the family

8   needed $25,000 to make that move?

9   A.  I don't remember my exact response, but I told him I would

10  take care of it.  However I would, I said I would get it done

11  and take care of it.

12  Q.  When you were in Michigan to watch Brian Bowen play, did

13  you meet with Mr. Bowen's family?

14  A.  I did.

15  Q.  Who did you meet with when you were there?

16  A.  His mother, father, himself, and Christian Dawkins.

17  Q.  Where did this meeting occur?

18  A.  It was in Saginaw at a restaurant.

19  Q.  After that meeting with Christian Dawkins and Brian Bowen's

20  family, did Brian Bowen switch teams?

21  A.  He did.

22  Q.  To which team?

23  A.  Michigan Mustangs.

24  Q.  That's the Adidas sponsored one?

25  A.  It is.

1  Q.  Did you arrange for money to be provided to Brian Bowen's

2  family?

3  A.  Yes.  I sent -- I don't know which person I sent it to,

4  whether it was Brian Senior or Christian, but I sent $7,000 to

5  one of them, and Chris Rivers at Adidas took care of the rest

6  it.

7  Q.  You mentioned that you sent approximately how much money

8  again?

9  A.  $7,000.

10  Q.  How did you send that $7,000?

11  A.  In cash in a magazine in an envelope.

12  Q.  Where was that money to come from?

13  A.  Adidas.

14        THE COURT:  Who is it you said took care of the rest

15  of it, Mr. Gassnola?

16        THE WITNESS:  Chris Rivers.

17  Q.  Did Chris Rivers work at Adidas?

18  A.  He did.

19  Q.  What was his role at Adidas?

20  A.  Director of grassroots.

21  Q.  Who, if anyone else, at Adidas did you discuss this payment

22  with at the time?

23  A.  I remember vividly discussing it with Chris.  I don't know

24  who else.

25  Q.  Now, Mr. Gassnola, let me direct your attention to

1    Government Exhibit 1141.

2                MR. MARK:  Show this to the witness only.

3    A.  Yes.

4    Q.  Do you recognize this document?

5    A.  I do.

6    Q.  What is it?

7    A.  It's an e-mail from Chris to all of us in the basketball

8    marketing department.

9    Q.  Is Mr. Gatto on this document?

10   A.  He is.

11               MR. MARK:  The government offers Government Exhibit

12   1141.

13               MR. HANEY:  No objection.

14               MR. MOORE:  No objection.

15               THE COURT:  Received.

16               (Government's Exhibit 1141 received in evidence)

17               MR. MARK:  May we publish, your Honor?

18               THE COURT:  Yes.

19   Q.  What is the date of this e-mail from Mr. Rivers?

20   A.  Tuesday, February 17, 2015.

21   Q.  You were a recipient on this e-mail?

22   A.  I was one of them, yes.

23   Q.  You mentioned that Mr. Gatto is CC'd on it?

24   A.  Yes.

25               MR. MARK:  Ms. Lee, can we scroll down a little bit

1   and blow up the second paragraph under point 1.

2   Q.  Mr. Gassnola, can you read the first two sentences of that

3   document?

4   A.  "However, I am requesting that after every trip a short

5   written recap be sent to Jim and myself.  I am not concerned

6   with the format, although later in the year I will formalize,

7   but it is important that we have notes on who we are seeing and

8   how each of these touch points will help us in the short- and

9   long-term future."

10  Q.  Who is the Jim referred to in that e-mail?

11  A.  Jim Gatto.

12  Q.  When it says "every trip," what was that referring to?

13  A.  Trips that we were taking to visit prospective players,

14  guys we were recruiting in our grassroots system or

15  universities.

16  Q.  It mentioned the word "touch point."  What is a touch

17  point?

18  A.  A touch point is what they use back at the brand.  With a

19  family of a student-athlete that we were recruiting, or a

20  student-athlete itself, just saying hello, how are you, that's

21  a touch point; taking them to dinner, that's a touch point.

22  Q.  Like the meeting with Brian Bowen's family in Michigan, was

23  that a touch point?

24  A.  Yes.

25  Q.  Now, Mr. Gassnola, could you read the next sentence in that

1   paragraph?

2   A.   "Please don't include any confidential Black Opp's

3   information but make sure there is enough detail that validates

4   the money we spent, in addition to demonstrating how we are

5   building relationships that will help us in the draft signing

6   process."

7   Q.   What is the draft signing process?

8   A.   In the process of recruiting a player and hopefully sign

9   them at the draft.

10  Q.   Who would be the person who would be signing players at

11  Adidas?

12  A.   Jim Gatto.

13  Q.   Now, what is an "opp"?

14  A.   An operation.

15  Q.   What is a "black opp"?

16  A.   A black operation is an operation that's dark, underground,

17  and you don't want anybody to know about it.

18  Q.   Was there a group called the Black Opp's at Adidas?

19  A.   Yes.

20  Q.   Who did that group refer to?

21  A.   Other people on this e-mail that were in basketball sports

22  marketing.

23  Q.   Now, what is "confidential Black Opp's information"?

24  A.   Payments to players and families of players.

25  Q.   Was that a term that was used at Adidas?

1    A.  Yes.

2    Q.  Are you familiar with another term "underground stuff"?

3    A.  Yes.

4    Q.  Did you ever use that term?

5    A.  I did, yes.

6    Q.  What did that term refer to?

7    A.  The same thing, underground, quiet, keep away from people,

8    don't talk about it.

9    Q.  Returning to what Mr. Rivers wrote, what instruction, if

10   any, was he giving the people on this e-mail about confidential

11   Black Opp's information?

12   A.  He didn't want it in print; he didn't want any proof of it.

13   Q.  Did you follow that instruction?

14   A.  I did.

15   Q.  Now, let me direct your attention, Mr. Gassnola, to

16   Government Exhibit 1096.

17          MR. MARK:  Ms. Lee, if we can show that to the witness

18   only.

19   Q.  Do you recognize this document?

20   A.  I do.

21   Q.  Who is this e-mail from?

22   A.  Myself to Chris Rivers, a 90-day recap of the things I had

23   been doing, traveling, where I was going, who I was talking to,

24   just a 90-day recap of my adventure you can say.

25          MR. MARK:  The government offers Government Exhibit

1    1096.

2              THE COURT:  It's received.

3              (Government's Exhibit 1096 received in evidence)

4              MR. MARK:  May we publish, your Honor?

5              THE COURT:  Yes.

6    Q.  Now, the date that you sent this, was this March 2, 2015?

7    A.  Yes.

8    Q.  The subject, 90 days, what does that refer to?

9    A.  The 90-day period prior to this, where I had been, who I

10   had seen, who I had talked to, from the universities, to

11   players, to grassroots players.

12   Q.  You mentioned earlier Chris Rivers, who you sent this to,

13   was the head of grassroots basketball?

14   A.  He was.

15   Q.  Approximately how long had he been the head of grassroots

16   basketball?

17   A.  Four, five months.

18             MR. MARK:  Ms. Lee, can we go to page 3.

19             If we can just blow up the portion on February 13.

20   Q.  Mr. Gassnola, could you just read what you wrote there?

21   A.  "February 13.  Saginaw, Michigan, saw B. Bowen" -- which is

22   Brian Bowen -- "play Saginaw High.  He had 30 and 20.  Took

23   family to eat.  They are committed to us."

24   Q.  When you wrote 30 and 20, what does that refer to?

25   A.  30 points, 20 rebounds.

1    Q.   Was that good?

2    A.   Yeah.

3    Q.   This entry on February 13, does this relate to the meetings

4    you had after you saw Brian Bowen play that you talked about

5    earlier?

6    A.   Yes.

7    Q.   Was it the same one?

8    A.   Yes, it is.

9    Q.   You wrote, "Took the family to eat.  They are committed to

10   us."  What were you referring to there?

11   A.   Like I said, I had taken the family to eat, and they told

12   me at the time that they were going to play on our grassroots

13   circuit that coming year.

14   Q.   Did you include in this e-mail details about any payments

15   to Bowen's family?

16   A.   No.

17   Q.   Why not?

18   A.   I didn't want anybody to know about it.

19   Q.   Did there come another point in time later on that you

20   discussed with Mr. Dawkins a payment to Brian Bowen's family?

21   A.   Yes.

22          MR. MARK:  Your Honor, we are now entering another

23   larger section.  I am happy to go into this or if you want to

24   take a break now.

25          THE COURT:  It's just about 4:30 so we will break for

1    the day.

2              9:30 tomorrow morning, folks.

3              I will remind the jury not to discuss the case with

4    anyone, including among yourselves, until the end of the case.

5              (Jury exits courtroom)

6              THE COURT:  Be seated, everyone.

7              Anything else this afternoon, counsel?

8              MR. DISKANT:  Not from the government, your Honor.

9              MR. MOORE:  No, your Honor.

10             MR. HANEY:  No, your Honor.

11             MR. SCHACHTER:  No, your Honor.

12             THE COURT:  We are adjourned until tomorrow.

13             (Adjourned to October 11, 2018, at 9:30 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

CARRIE DOYLE

Cross By Mr. Schachter . . . . . . . . . . . 779

Redirect By Mr. Solowiejczyk . . . . . . . . 843

 JEFF SMITH

Direct By Ms. Flodr . . . . . . . . . . . . 845

Cross By Mr. Schachter . . . . . . . . . . 890

Redirect By Ms. Flodr . . . . . . . . . . . 911

THOMAS JOSEPH GASSNOLA

Direct By Mr. Mark . . . . . . . . . . . . . 913

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

1928   . . . . . . . . . . . . . . . . . . . 823

1920   . . . . . . . . . . . . . . . . . . . 824

1822   . . . . . . . . . . . . . . . . . . . 852

1824   . . . . . . . . . . . . . . . . . . . 856

1827   . . . . . . . . . . . . . . . . . . . 858

1808   . . . . . . . . . . . . . . . . . . . 863

1820   . . . . . . . . . . . . . . . . . . . 871

1806   . . . . . . . . . . . . . . . . . . . 874

1807   . . . . . . . . . . . . . . . . . . . 876

1823   . . . . . . . . . . . . . . . . . . . 880

1815   . . . . . . . . . . . . . . . . . . . 884

1813   . . . . . . . . . . . . . . . . . . . 886

1    34 and 34T  . . . . . . . . . . . . . . . 912

2    1145    . . . . . . . . . . . . . . . . . 918

3    306F and 306G  . . . . . . . . . . . . . 922

4    2003   . . . . . . . . . . . . . . . . . 936

5    1141   . . . . . . . . . . . . . . . . . 949

6    1096   . . . . . . . . . . . . . . . . . 953

7                    DEFENDANT EXHIBITS

8    Exhibit No.                        Received

9    1925   . . . . . . . . . . . . . . . . . 796

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25