Iabdgat1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                       17 Cr. 686 (LAK)

JAMES GATTO, a/k/a "Jim,"
MERL CODE,
CHRISTIAN DAWKINS,

               Defendants.

------------------------------x

                           October 11, 2018
                           9:35 a.m.

Before:

               HON. LEWIS A. KAPLAN,

                         District Judge
                          and a Jury

                    APPEARANCES

ROBERT S. KHUZAMI
     Acting United States Attorney for the
     Southern District of New York
BY:  EDWARD B. DISKANT
     NOAH D. SOLOWIEJCZYK
     ALINE R. FLODR
     ELI J. MARK
     Assistant United States Attorneys

WILLKIE FARR & GALLAGHER LLP
     Attorneys for Defendant Gatto
BY:  MICHAEL S. SCHACHTER
     CASEY E. DONNELLY

Iabdgat1

1                        APPEARANCES (Cont'd)

2   NEXSEN PRUET LLC
            Attorneys for Defendant Code
3   BY:  MARK C. MOORE
                -and-
4   MERL F. CODE

5   HANEY LAW GROUP PLLC
            Attorneys for Defendant Dawkins
6   BY:  STEVEN A. HANEY

7

8   Also present:  SONYA JACOBS, Paralegal
                   SYLVIA LEE, Paralegal
9                  ANTHONY CASOLA, FBI

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Iabdgat1

| | |
|---|---|
| 1 | (Trial resumed; jury not present) |
| 2 | THE COURT:  Good morning, all. |
| 3 | ALL COUNSEL:  Good morning, your Honor. |
| 4 | THE COURT:  Be seated. |
| 5 | I understand that someone wants to raise an issue. |
| 6 | MR. MARK:  Yes, your Honor.  We just wanted to flag an |
| 7 | issue that I think -- I will speak up since it seems like the |
| 8 | mics are down. |
| 9 | The government just wants to flag an evidentiary issue |
| 10 | we anticipate is going to come up during Mr. Gassnola's |
| 11 | testimony later this morning, which we understand that the |
| 12 | defense is going to object to an exhibit that we intend to |
| 13 | introduce.  I've got copies for your Honor. |
| 14 | THE COURT:  Thank you. |
| 15 | MR. MARK:  This has been marked as Government Exhibit |
| 16 | 113B-1, and this is a text chain from November 13, 2017, |
| 17 | between Billy Preston, who is identified as "It's Me" on this |
| 18 | text chain. |
| 19 | THE COURT:  Sorry.  Who is identified as? |
| 20 | MR. MARK:  "It's Me," the owner of the phone the text |
| 21 | messages come from. |
| 22 | THE COURT:  I see. |
| 23 | MR. MARK:  And the other participant in this text |
| 24 | chain is Billy Preston, his mother, who is -- sorry, Nicole |
| 25 | Player, his mother, who is identified as "Ma," M-a, on this |

Iabdgat1

1    text chain.

2         To put this text chain in context is at this time,

3    this is when Kansas commenced an investigation of NCAA rules

4    violations relating to Nicole Player and Billy Preston and

5    extra benefits.  Through this text chain, you see that she is

6    giving certain direction to her son to say that when somebody

7    comes to ask her son, that he doesn't know.  He confirms that

8    he understands that.  And she gives further instruction to say

9    to him:  "I don't know.  If they ask you about a person, say,

10   'I don't know, I would have to see their face.'"

11        At the same time that she is giving this instruction

12   to her son, Billy Preston, we are going to elicit testimony

13   from Mr. Gassnola that she is talking with Mr. Gassnola about

14   this investigation and is asking Mr. Gassnola to lie about the

15   investigation.  We think -- and about the money that

16   Mr. Gassnola has provided to her, Nicole Player, Billy

17   Preston's mother, and that that's necessary in order to

18   preserve Billy Preston's eligibility with the school.  She is a

19   member of the conspiracy.  These are statements in furtherance

20   of the conspiracy, and we anticipate these are going to be

21   admissible based on the foundation that is laid through

22   Mr. Gassnola's testimony.

23             THE COURT:  OK.

24             MR. SCHACHTER:  Your Honor, we do object to the

25   admission of this document.  This is related to an unrelated

Iabdgat1

1  investigation that was being conducted by Kansas relating to

2  potential unrelated benefits.  A little history is important.

3          So what happens is the University of Kansas --

4  Mr. Preston is involved in a car accident involving a Dodge

5  Charger, and the University of Kansas begins an investigation

6  into determining, well, where did he get the Dodge Charger

7  from.  They look into it, including getting records of the

8  certificate of title.  And the University of Kansas determines

9  that this Dodge Charger came from Nicole Player's recently

10  deceased sister.  And they are then satisfied that this Dodge

11  Charger had come from -- and the title records bear that out

12  that were produced by the University of Kansas -- that this

13  Dodge Charger comes from Ms. Player's deceased sister -- I'm

14  sorry, deceased grandmother.  Grandmother in Florida.  OK.

15  Sorry about that.

16          In any event, the car does not --

17          THE COURT:  I didn't think Dodge Chargers were hot on

18  the grandmother set.

19          MR. SCHACHTER:  I apologize to the grandmother.

20          Now, once they commence that investigation, as they go

21  down the path, they then learn that Mr. Gassnola has provided a

22  wire transfer to Nicole Player because they start looking

23  into -- the government has filed this indictment, and they

24  start to look into any connections between the University of

25  Kansas and Adidas.  And then, subsequent to this, they look

Iabdgat1

into a relationship between Mr. Gassnola and Nicole Player.

So my point is this communication between mother and child, which Mr. Gassnola, of course, has never seen before, knows nothing about this communication, is certainly an inappropriate witness to testify regarding this document. In any event, this should not be admitted during the course of Mr. Gassnola's testimony. In any event, this communication between mother and son is relating to the origin of a Dodge Charger, which comes from, as Ms. Donnelly reminds me, the grandmother, and the University of Kansas is satisfied by that.

So it's really -- this is a completely unrelated communication about an unrelated investigation into a potentially unrelated NCAA rule violation that Kansas concludes was not actually an NCAA rule violation because they are satisfied that this car comes from the grandmother. So, it's really irrelevant and certainly should not be admitted through this witness.

MR. MARK: Your Honor --

MR. MOORE: I just wanted to add something, your Honor, if I may?

At this point, the charges against our clients have already been brought. There is no evidence that my client or Mr. Dawkins or Mr. Gatto were involved in any sort of conspiracy to obstruct, and I'm sure that Mr. Mark is going to talk about conspiracy to obstruct. At best, this is a

Iabdgat1

1  separate, according to Mr. Schachter, and I agree with him,

2  completely unrelated argument -- unrelated incident, but, at

3  best, if it is a separate conspiracy to obstruct, it has

4  nothing to do with these defendants because if there is no

5  evidence that the conspiracy that's charged here continued

6  after the day of the arrests, then there is case law that says

7  that that is clearly not admissible because these are not

8  co-conspirator statements in furtherance of the conspiracy that

9  is charged here.

10         THE COURT:  It doesn't have to be in furtherance of

11  the conspiracy charged here.

12         MR. MOORE:  But I do believe, your Honor --

13         THE COURT:  As you know.

14         MR. MOORE:  I do believe it has to be in furtherance

15  of a conspiracy involving the defendants who are on trial, and

16  there is no evidence of that.

17         THE COURT:  I'm not even sure that's right, but I have

18  an open mind on it.

19         MR. SCHACHTER:  Your Honor, if I may just add one

20  additional point?

21         The government has no evidence linking any money

22  received from Mr. Gassnola to the purchase of this Dodge

23  Charger and certainly absent any predicate that this car

24  purchase, which is what's being discussed, has any relationship

25  to this, your Honor.

Iabdgat1

1        THE COURT:  Mr. Mark.

2        MR. MARK:  Your Honor, as the evidence will come out,

3   the timing of this text message between Nicole Player and Billy

4   Preston is the same timing as the conversations between Nicole

5   Player and TJ Gassnola about concealing and obstructing the

6   University of Kansas.  That will be established through his

7   testimony, through documents there.  We are not intending to

8   elicit his testimony about the texts of these messages.  He is

9   not on them.  We are not going to do that.  But obviously it is

10  important for context for the jury to put those two items

11  together.

12        As to just what Mr. Schachter was saying about what

13  Kansas' investigation did or did not know at different points

14  in time, candidly, a lot of those details are not in evidence.

15  The government actually disagrees with a lot of those different

16  details that he has proffered.  But they are really irrelevant

17  because the timing here demonstrates that this is part of

18  efforts to conceal to the University of Kansas and related to

19  Mr. Gassnola, related to the payments that were made by

20  Mr. Gassnola and Mr. Gatto and Adidas and Nicole Player.

21        THE COURT:  What it seems to me -- and I'm just

22  quickly running my eye over it, and I need to do more -- is

23  that it's indicative of an intent on the part of Nicole Player

24  and her son to cover these facts up.  And that's maybe evidence

25  that she had an intent to obstruct and cover up with respect to

Iabdgat1

1    other things, but I'm not sure that gets you all the way home.

2           In any case, this witness is not somebody who can put

3    these in, put any of this in, right?

4           MR. MARK:  So, your Honor, there is a stipulation to

5    the authenticity of these text messages.

6           THE COURT:  Yes.

7           MR. MARK:  What we intended to do was, as we're

8    discussing Ms. Player's conversations with Mr. Gassnola at this

9    time period about his efforts, her efforts, and their

10   discussions about concealing and obstructing Kansas'

11   investigation, that we would introduce these just for context

12   so that the jury understands that this is what's going on as

13   well at the same time.  We're not going to elicit from him any

14   comments about these text messages since he is not on them.

15          THE COURT:  None of this is offered to prove the truth

16   of any of it, is it?

17          MR. MARK:  No, it is not offered to prove the truth at

18   all.  And we further say that this is definitely related,

19   because you see the last line of these text messages -- and I

20   know your Honor is just seeing this for the first time -- it is

21   an instruction from Ms. Player to her son:  "If they ask you

22   about a person, say, 'I don't know, I would have to see their

23   face.'"

24          That doesn't sound like a comment about the grandma.

25          THE COURT:  No, clearly not.  But it might relate to

Iabdgat1

1    it anyway.

2           Look, there is no reason that it has to come in

3    through Mr. Gassnola.  You get an opportunity on closing

4    argument to put lots of pieces together, and if it is properly

5    admissible, you can do it later in the government's case and

6    that's what you're going to need to do.  And in the meantime, I

7    want memoranda on this.  You know the law in the Second Circuit

8    does not make any statements in furtherance of any

9    conspiracy -- and, indeed, I'm not sure this is even the right

10   analysis at the moment -- admissible under 801(d)(2)(E).  There

11   has got to be some relationship between the charged conspiracy

12   and the other conspiracy.  But to me the more fundamental

13   question seems to be, at first blush -- and I haven't had a

14   chance to really think about this -- how Player's apparent

15   intention to cover up the business with the car is relevant to

16   these defendants.  That's the more fundamental issue, I think.

17          MR. MARK:  OK.  Your Honor, we will take that under

18   advisement, and we are not going to seek to introduce this

19   during Mr. Gassnola's testimony.

20          THE COURT:  OK.  We have a jury.  Let's bring the jury

21   in.

22          (Continued on next page)

23

24

25

1        (Jury present)

2    THOMAS JOSEPH GASSNOLA,

3        Resumed, and testified further as follows:

4            THE COURT:  Please be seated, everyone.

5            We still have to wait for one juror.

6            (Pause)

7            All right.  The jury now is all present.

8            The witness is reminded he is under oath.

9            Mr. Mark, you may proceed.

10           MR. MARK:  Thank you, your Honor.

11   DIRECT EXAMINATION

12   BY MR. MARK:

13   Q.  Good morning, Mr. Gassnola.

14   A.  Good morning.

15   Q.  Right before we ended for the day yesterday, you were

16   discussing a payment in 2015 for Brian Bowen to switch playing

17   grassroots teams to an Adidas-sponsored one, is that right?

18   A.  Yes.

19   Q.  Did there come another point in time that you discussed

20   with Christian Dawkins a payment to Brian Bowen's family?

21   A.  Yes.  In May of 2017, Christian called me.

22   Q.  And at that time, what did Mr. Dawkins say to you and what

23   did you say to him about that?

24   A.  Christian explained to me -- told me that Brian Bowen had

25   an interest in going to the University of Louisville and the

1   family was looking for money for him to go to Louisville.

2   Q.  How far was Brian Bowen in school at that point in time?

3   A.  A senior in high school.

4   Q.  During that conversation with Mr. Dawkins about Brian Bowen

5   going to Louisville, was there any monetary figure that was

6   discussed in connection with that decision?

7   A.  Christian informed me the family was looking for money to

8   go to Louisville.  And I told Christian, I said, "We'll give

9   them 25 grand."

10  Q.  When you said we'll give you 25 grand, where would that

11  money have come from?

12  A.  Adidas.

13  Q.  After this conversation with Mr. Dawkins, did you

14  communicate with Mr. Gatto about that at all?

15  A.  Sometime thereafter I had a conversation with Jimmy.  I

16  told Jimmy the conversation that Christian and I had.  Jimmy

17  informed me that he had already had that conversation about

18  Brian with Merl Code, and don't worry about it, he was going to

19  run it through Merl and do it that way.

20  Q.  And what, if anything, did Mr. Gatto say about why he was

21  going to run a payment through Mr. Code?

22  A.  He said he had already talked to Merl, and he was going to

23  run it through Merl's stuff and he said there's enough going

24  through your account.  Let's just do it this way.

25  Q.  At the time, was there a lot of money going through your

Iabdgat1                    Gassnola - direct

1   account?

2   A.  Yes.

3   Q.  What was that money for?

4   A.  Expenses, salary, payments to players.

5   Q.  Mr. Gassnola, let me direct your attention to Government

6   Exhibit 107E.

7           MR. MARK:  Ms. Lee, could we just show this to the

8   witness only.

9           (Pause)

10  Q.  Mr. Gassnola, do you recognize this document?

11  A.  I do.

12  Q.  What is it?

13  A.  It's a text messages between myself, Christian Dawkins, and

14  Merl Code.

15          MR. MARK:  The government offers Government Exhibit

16  107E.

17          THE COURT:  Received.

18          (Government's Exhibit 107E received in evidence)

19          MR. MARK:  May we publish it, your Honor?

20          THE COURT:  Yes.

21  BY MR. MARK:

22  Q.  So, Mr. Gassnola, what is the date of this text message?

23  A.  May 31, 2017.

24  Q.  And where it says "Christian Vaugh," is that Christian

25  Dawkins?

Iabdgat1                    Gassnola - direct

1   A.  Yes.

2   Q.  Could you just read what you wrote?

3   A.  I need to speak with both of you ASAP.

4   Q.  Why did you want to talk with both of them ASAP?

5   A.  Because when -- after Jimmy and I had the conversation, you

6   know, I realized that Christian had called me when he had

7   already talked to Merl and he was trying to play me against

8   Merl, vice versa, and I wasn't very happy about it.

9   Q.  Why weren't you happy about that?

10  A.  Because he didn't need to call me; he already talked to

11  Merl.  They already talked to Jimmy, seeing it was that they

12  had an agreement.  So why he brought me into it, I felt he was

13  looking to get more money than what him and Merl talked about

14  and I wasn't very happy about it.

15  Q.  So after you sent this text message, did you talk with

16  Mr. Code and Mr. Dawkins?

17  A.  I did.  I don't think it was the same time but I did talk

18  to them, both of them.

19  Q.  And what did you say to each of them and what did they say

20  to you?

21  A.  I don't recall exactly what those two said to me, but I

22  made it clear to them that I wasn't happy about, as I called

23  it, the "he said, she said" stuff, or playing one against the

24  other.  I made it clear that I wasn't happy about that.

25              MR. MARK:  Now, Ms. Lee, could we show the witness

Iabdgat1                    Gassnola - direct

1   only Government Exhibit 107P-3.

2          Mr. Gassnola, do you recognize this document?

3   A.  I do.

4   Q.  What is it?

5   A.  It is a text message between myself and Merl Code.

6          MR. MARK:  The government offers Government Exhibit

7   107P-3 into evidence.

8          MR. SCHACHTER:  No objection.

9          THE COURT:  Received.

10         (Government's Exhibit 107P-3 received in evidence)

11         MR. MARK:  May we publish it, your Honor?

12         THE COURT:  Yes.

13  Q.  And you mentioned this is a text message between yourself

14  and Mr. Code?

15  A.  Yeah.

16  Q.  Is this the same date as the prior text message with

17  Mr. Code -- what you sent to Mr. Code and Mr. Dawkins?

18  A.  Yes.

19  Q.  Could you just read the first four lines of text?

20  A.  "By the way, this Bowen thing looks good for us perception

21  wise, I think.  Thanks bro'."

22  Q.  How did Mr. Code respond?

23  A.  "Thanks.  I think it's great for us.  Thanks for the

24  support.  Real talk."

25  Q.  When you say, "the Bowen thing," what were you referring

1    to?

2    A.   Brian Bowen going to Louisville and his commitment to

3    Louisville.

4    Q.   And when you said, "It looks good for us perception wise,"

5    perception with whom are you referring to?

6    A.   The outside world, people in the building at Adidas, that

7    we were working together as a basketball marketing brand and we

8    were trying to help our schools get players.

9    Q.   At this time, did you ever disclose to anyone at

10   Louisville, or anyone on the coaching staff at Adidas, that

11   Adidas was making a payment to Brian Bowen's family in

12   connection with that effort for him to go to Louisville?

13   A.   I never talked to any of the coaching staff at Louisville

14   about this at that time.

15            MR. MARK:   Now, Ms. Lee, could we just highlight the

16   lower portion.

17   Q.   Mr. Gassnola, could you read how you continued on with

18   Mr. Code?

19   A.   "You always have mine.  I was never upset at you.  I just

20   don't like sloppy stuff that makes people be look effin

21   stupid."

22   Q.   How did Mr. Code respond?

23   A.   "Agreed."

24   Q.   After this text message, did you have any further

25   involvement in facilitating a payment to the family of Brian

1    Bowen?

2    A.  I did not.

3    Q.  Now, let me direct your attention to what's been marked as

4    Government Exhibit 107R-2 and 107R-3.

5             Mr. Gassnola, do you recognize these two documents?

6    A.  I do.  It is a text message between myself and Christian

7    Dawkins.

8             MR. MARK:  The government offers 107R-2 and 107R-3

9    into evidence.

10            THE COURT:  Received.

11            (Government's Exhibits 107R-2 and 107R-3 received in

12   evidence)

13            MR. MARK:  Ms. Lee, or -- may we publish Government

14   Exhibit 107R-2 initially?

15            THE COURT:  Yes.

16   BY MR. MARK:

17   Q.  And what is the date on this text message?

18   A.  May 31, 2017.

19   Q.  Just shortly after the prior ones with Mr. Code?

20   A.  Yes.

21   Q.  OK.  Now, could you just read what you wrote on 8:31 p.m.

22   and Mr. Dawkins' response?

23   A.  "Bowen needs to commit this evening."  Chris responded, "He

24   committed to them tonight, but please don't tell anyone.  He

25   doesn't want anything out until he puts it out himself next

1    week.  I'll call you tomorrow."

2    Q.  Why did you write to Mr. Dawkins "Bowen needs to commit

3    this evening"?

4    A.  I don't recall exactly where my head was except for that I

5    wanted to act like I was involved and be involved.  Just that

6    was my personality, I wanted to act like I was involved with

7    it.

8    Q.  Did you want to assure that this -- that this happened?

9    A.  Yeah.

10   Q.  And as far as you knew, was there any reason Bowen needed

11   to commit that evening?

12   A.  I don't recall that.

13           MR. MARK:  Ms. Lee, could we show the witness

14   Government Exhibit 107K-4-5 and-10?

15           (Pause)

16   Q.  Mr. Gassnola, do you recognize each of those three text

17   messages, those documents?

18   A.  Yeah.

19   Q.  What are they?

20   A.  Text messages between myself and Jim Gatto.

21           MR. MARK:  The government offers Government Exhibit

22   107K-4-5 and -10 into evidence.

23           THE COURT:  Received.

24           (Government's Exhibits 107K-4-5 and -10 received in

25   evidence)

Iabdgat1                    Gassnola – direct

1          MR. MARK:  Permission to publish Government Exhibit

2    107K-4?

3          THE COURT:  Yes.

4          MR. MARK:  Could we just highlight, Ms. Lee, the top

5    portion.  Thank you.

6    Q.  Mr. Gassnola, could you please read what you wrote to

7    Mr. Gatto?

8    A.  "Pitino is ecstatic.  The kid called and committed.

9    Everyone did their part.  Call you tomorrow."

10   Q.  Who is Pitino?

11   A.  Rick Pitino.

12   Q.  And who is Rick Pitino?

13   A.  He is the head coach at Louisville.

14   Q.  When you wrote "Pitino is ecstatic," had you spoken with

15   Pitino already?

16   A.  No.

17   Q.  Why did you write that?

18   A.  Because I wanted Jimmy to feel -- to be happy, seem like I

19   pretend that I talked to be Pitino and put Jimmy in a good

20   place, make sure he was smiling, felt good about everything.

21   Q.  Did there come a point in time that you learned how much

22   money Adidas was going to provide to Brian Bowen's family to

23   get him to go to Louisville?

24   A.  I did.

25   Q.  And how much money did you learn Adidas was going to

Iabdgat1                    Gassnola - direct

1    provide?

2    A.   $100,000.

3         MR. MARK:   Now, going down the chain, Ms. Lee, could

4    we highlight the bottom part of it, the complete bottom half.

5    Q.   Could you tell us what that image is?  I know it is a

6    little hard to see on this document.

7    A.   It is a screenshot one of my coaches in my program sent me

8    where my program was ranked at that time.

9    Q.   How was it ranked at that time?

10   A.   Top five in the country.

11   Q.   Now, do you see where you ever wrote, "6 years ago NCAA

12   shut me down.  5 years ago Robbins cut me.  Appreciate you

13   man"?

14   A.   I do.

15   Q.   Just starting with "6 years ago NCAA shut me down," what

16   were you referring to there?

17   A.   2012, the NCAA suspended my basketball program for

18   participating in NCAA live events -- NCAA-sanctioned events.

19   My program couldn't continue to participate in those events.

20   Q.   Does the NCAA sanction certain grassroots events?

21   A.   They do.

22   Q.   And do those events have to follow NCAA rules?

23   A.   Yes.

24   Q.   And why did the NCAA sanction your team?

25   A.   They accused my program and myself of receiving money from

Iabdgat1                    Gassnola - direct

1   a sports agency; therefore, they said I was ineligible -- my

2   program was ineligible to continue moving forward.

3   Q.  Would that have violated NCAA rules?

4   A.  Yes.

5   Q.  At that time, did you take money from a sports agency?

6   A.  No.

7   Q.  Which sports agency were they concerned about?

8   A.  ASM Sports.

9   Q.  Is that Andy Miller's sports agency?

10  A.  It is.

11  Q.  Had you ever received money from ASM or Andy Miller in the

12  past?

13  A.  I did.

14  Q.  When was the last time, approximately?

15  A.  Around 2006, somewhere around there, 2005/2006.

16  Q.  And what were you doing for Mr. Miller at that time?

17  A.  I was a recruiter for Andy.

18  Q.  Now, you mentioned what they claimed you did was a

19  violation of the NCAA rules?

20  A.  Yes.

21  Q.  OK.  And from running a grassroots program and working at

22  Adidas, were you generally familiar with NCAA rules?

23  A.  Some of them, yes, I was.

24  Q.  Did you ever attend training sessions with NCAA employees?

25  A.  From time to time at our grassroots meetings, NCAA

Iabdgat1                    Gassnola – direct

1    representatives would come and speak about certain rule changes

2    or -- rule changes with kids' academic requirements moving

3    forward, that type of thing.

4    Q.  Were you familiar with NCAA rules regarding what players

5    are eligible to play in college?

6    A.  A little bit, yeah.

7    Q.  Are payments to a player's parent permissible?

8    A.  No.

9    Q.  Are payments to a player's legal guardian permissible?

10   A.  They are not.

11   Q.  What are the consequences to a player whose parent or

12   guardian accepted money?

13            MR. SCHACHTER:  Objection.

14            THE COURT:  Sustained.

15   Q.  What are the consequences to a college that the player

16   attends?

17            MR. SCHACHTER:  Objection.

18            MR. MOORE:  Position.

19            THE COURT:  Pardon me?

20            MR. MOORE:  Objection.

21            THE COURT:  Sustained.

22   BY MR. MARK:

23   Q.  Now, you mentioned that the NCAA banned you for a period of

24   time from competing in events?

25   A.  They did.

Iabdgat1                    Gassnola - direct

1   Q.  How long was that?

2   A.  Almost a year.

3   Q.  Did you contest the NCAA's ban?

4   A.  I did.

5   Q.  Were you successful in challenging NCAA's ban?

6   A.  I was.

7           MR. MARK:  Now, Ms. Lee, could we put that text back

8   up.

9   Q.  In your text, right below the discussion about the NCAA

10  shutting you down, you mentioned "Robbins."  Who is Robbins?

11  A.  Jeff Robbins at the time was the head of grassroots

12  basketball at Adidas.

13  Q.  And what were you referring to when you said, "5 years ago

14  Robbins cut me"?

15  A.  Jeff didn't renew my contract in 2013.

16  Q.  That was a year after the issue with the NCAA?

17  A.  That's correct.

18  Q.  And when you said "your contract," are you referring to the

19  New England Playaz team's contract?

20  A.  I am.

21  Q.  Did you discuss Robbins' cutting your contract with

22  Mr. Gatto at the time?

23  A.  I did.

24  Q.  And how did Mr. Gatto respond, if at all?

25  A.  Jimmy was right there for me.  He, as Jimmy does, he is a

1    great friend and he was right there for me, he took care of me

2    in moving forward with my program.

3    Q.  When you say he took care of your program, what did he do

4    to take care of your program.

5    A.  He got my program some money to continue to travel and

6    product to continue to travel and keep my program afloat.

7    Q.  Now, in this text message, you continue, you say,

8    "Appreciate you, man, more than you will ever know."  Is that

9    how you felt about Mr. Gatto?

10   A.  Still do.

11   Q.  Now, returning to the payment to Brian Bowen's family,

12   after you learned that Brian Bowen had committed, did you talk

13   with any of the coaches at Louisville about his commitment?

14   A.  I sent a brief text to Rick Pitino.  That's it.

15   Q.  Let me direct your attention to Government Exhibit 107Q-1.

16   Do you recognize this?

17   A.  I do.

18   Q.  And what is it?

19   A.  A text message between myself and Rick Pitino.

20            MR. MARK:  The government offers Government Exhibit

21   107Q-1 into evidence.

22            THE COURT:  Received.

23            (Government's Exhibit 107Q-1 received in evidence)

24            MR. MARK:  May we publish it, your Honor?

25            THE COURT:  Yes.

Iabdgat1                      Gassnola – direct

1    BY MR. MARK:

2    Q.  What is date of this text message?

3    A.  June 3, 2017.

4    Q.  So just a few days after the commitment that you learned

5    about from Mr. Dawkins?

6    A.  Yes.

7    Q.  Could you just read what you wrote to Coach Pitino?

8    A.  "Hall of Famer.  Hope you are in a good place.  Bowen will

9    help.  Talk soon."

10   Q.  What, if anything, did you say to Coach Pitino about Adidas

11   agreeing to pay Brian Bowen's family?

12   A.  I didn't.

13   Q.  At this point in time, as far as you knew, who knew about

14   the agreement by Adidas to pay money to Brian Bowen's family

15   for him to commit to Louisville?

16   A.  Myself, Merl Code, Christian Dawkins, and Jim Gatto.

17   Q.  Now, are you familiar with someone named Brad Augustine?

18   A.  Yeah, I am.

19   Q.  How did you know Brad Augustine?

20   A.  Brad was a grassroots director like myself, so I had been

21   in his company a few times at grassroots' events.  We played

22   against his team and grassroots teams.  I had never introduced

23   myself.  We played against each other in grassroots' meetings.

24   Q.  Was he affiliated with an Adidas program?

25   A.  Yeah, he was.

Iabdgat1                    Gassnola - direct

1   Q.  When did it come about that you first met him in person?

2   A.  In August of 2017 at Adidas Nations, Brad approached me,

3   asked me if I would talk to the Kansas coaching staff if they

4   had any interest in a player that he had by the name of Nassir

5   Little.

6   Q.  Now, you just mentioned Adidas Nations.  What is Adidas

7   Nations?

8   A.  It is an event that the brand puts on at the end of every

9   summer.  It is an Allstar event where the top hundred players

10  in the country, no matter what their shoe affiliation is, come

11  to an event that we put on.  You know, that year it was in

12  Houston, and we also have a lot of college players as well.

13  Q.  Was Nassir Little playing at Adidas Nations?

14  A.  He was.

15  Q.  What position did Mr. Little play?

16  A.  He was a wing player.

17  Q.  And you said that Mr. Augustine mentioned the school

18  Kansas?

19  A.  Yes.

20  Q.  Who was the athletic sponsor for Kansas again?

21  A.  Adidas.

22  Q.  Do you know any of the coaches at Kansas?

23  A.  I know all of them.

24  Q.  Who is the head coach at Kansas?

25  A.  Bill Self.

1    Q.   And who is the associate head coach?

2    A.   Kurtis Townsend.

3    Q.   After Mr. Augustine inquired about Kansas having interest

4    in Mr. Little, did you reach out to any of the Kansas coaches

5    about that player?

6    A.   I did.

7    Q.   Who did you reach out to?

8    A.   I don't recall who I talked with, whether it was Kurtis or

9    Bill Self, but when I talked to them, they didn't have at the

10   time, they had no interest in Nassir Little.

11   Q.   Did you relay that to Mr. Augustine?

12   A.   I did.

13   Q.   Did there come a time that you and Mr. Augustine discussed

14   Nassir Little's interest in attending any other schools?

15   A.   Yes.

16   Q.   What schools were discussed?

17   A.   I had a conversation with Brad, and he brought up that

18   Nassir Little had a lot of interest in attending the University

19   of Miami but it was between the University of Miami and

20   Arizona.

21   Q.   Who is the athletic sponsor of the University of Miami?

22   A.   Adidas.

23   Q.   How about for Arizona?

24   A.   Nike.

25   Q.   Did there come a time that you discussed with Mr. Augustine

Iabdgat1                    Gassnola – direct

1   any financial assistance in connection with Nassir Little

2   attending Miami?

3   A.  Yes.

4   Q.  What did you say to him and what did he say to you about

5   that topic?

6   A.  Brad brought up to me a conversation that he wanted to get

7   paid for Nassir Little to go to Miami, and he knew what the

8   brand had done to get Brian Bowen to Louisville.

9   Q.  And when he said he knew what the brand had done for Brian

10  Bowen, what did you understand him to be referring to?

11  A.  He was aware of the payment that was made to Brian Bowen to

12  go to Louisville.

13  Q.  And, once again, did he discuss the terms that he

14  understood that payment to be?

15  A.  Yes.  He knew the exact number.

16  Q.  And what was the number that he mentioned to you?

17  A.  A hundred thousand dollars.

18  Q.  And to whom was that hundred thousand dollars to go to?

19  A.  Brian Bowen.

20  Q.  And when he talked about you with Nassir Little, who was

21  the hundred thousand dollars to go to?

22  A.  To the best of my recollection, it was him and the family

23  or just him.  I don't remember the exact words but it was

24  either/or.

25  Q.  Did Mr. Augustine discuss Nassir Little's family at all

1  with you?

2  A.  I don't remember exact words -- I think he did bring it up,

3  yes.

4  Q.  And how, if at all, did Mr. Augustine say to you he knew

5  about the Brian Bowen deal?

6  A.  When he brought it up, I was a little taken back, but I got

7  pretty angry and I, you know, kind of went at him for

8  information how he knew.  And he explained to me that Christian

9  Dawkins had told him -- had told him about the Brian Bowen

10 situation and he could get the same if Nassir Little went to

11 University of Miami.

12 Q.  Why did you get angry at Mr. Augustine when he told you

13 that he knew about the Brian Bowen deal?

14 A.  Because I assumed that situation with Bowen would have been

15 kept between the guys I had talked to about before and not told

16 to somebody else.  You don't really talk about that stuff.

17 Q.  After this conversation with Mr. Augustine, did you reach

18 out to anyone?

19 A.  I reached out to -- I tried to get ahold of Christian

20 Dawkins, yes.

21       MR. MARK:  Your Honor, may we publish Government

22 Exhibit 107R-3, which is in evidence?

23       THE COURT:  Yes.

24 Q.  Mr. Gassnola, who is this text chain between?

25 A.  Text message between myself and Christian Dawkins.

1  Q.  What is the date of it?

2  A.  August 9, 2017.

3      MR. MARK:  And, Ms. Lee, could we just highlight from

4  just "FYI" down to "call me tomorrow."

5  Q.  Mr. Gassnola, could you just read what was exchanged

6  between the two of you on this text chain?

7  A.  "Just FYI.  Your loose lips are putting me and other people

8  in a bad spot."

9      He said, "In regards to what?"  "Louisville, Bowen,

10  money, etc.  I always say great things about you.  Take care of

11  you, if possible.  Etc., etc.  Let's make sure that this

12  doesn't happen again.  I never mentioned your name in regards

13  to Louisville and Bowen.  There should only be a very small

14  handful of people, never even spoke to Louisville staff about

15  anything."

16      "Came from you, bro'.  Saying exactly what Bowen got

17  and how.  Only you, me, Merl and Gatto knew that.  Not smart

18  business, telling people that.  Call me tomorrow."

19  Q.  After this text exchange, did there come a time that you

20  spoke with Christian Dawkins by phone about this subject?

21  A.  I think it was later that evening that me and Christian

22  finally got together on the phone, yes.

23      MR. MARK:  At this time, the government offers

24  Government Exhibit 45 and 45T as an aid to the jury.

25      Government Exhibit 45 is a phone call from August 10,

1  2017, between Christian Dawkins and Mr. Gassnola.

2              THE COURT:  They are received.

3              The same instruction about the transcript, folks.

4              (Government's Exhibits 45 and 45T received in

5  evidence)

6              MR. MARK:  And, Ms. Lee, could we just give the jury

7  one second to get to their binders, and then we can begin

8  playing the call.

9              If you could play now, Ms. Lee --

10             (Audio played)

11  Q.  Now, Mr. Gassnola, I just want to direct your attention up

12  to the top of the transcript on page 2, where you said, "The

13  best thing to do is send the kid to a contract -- I mean to an

14  Adidas school."  What does that refer to?

15  A.  That I said that?

16  Q.  Sorry.  Is that Mr. Dawkins who said that?

17  A.  Yes.

18  Q.  And what did you understand Mr. Dawkins to be referring to

19  there?

20             MR. MOORE:  Objection, your Honor.

21             THE COURT:  Sustained.

22  Q.  Did you have a view on -- as we talked about before, about

23  whether Adidas -- where Adidas program directors should send

24  their players to?

25             MR. MOORE:  Objection, your Honor.

Iabdgat1                    Gassnola – direct

1          THE COURT:  No.  It is his personal view.

2          Go ahead.

3   A.  That our grassroots players should go to our

4   Adidas-sponsored schools, yes.  That was my view.

5   Q.  Were you discussing this in part with Mr. Dawkins?

6   A.  Yes.

7   Q.  What did Mr. Dawkins say, if anything, about that during

8   this call?

9   A.  He was advising Brad to do that.  That's what he was

10  advising Brad to do.

11         MR. MARK:  Ms. Lee, could you continue playing the

12  call until page 3 at line 23.

13         (Audio played)

14  Q.  OK.  Now, Mr. Gassnola, could we go back to page 2, at line

15  19 to 21, and you said:  "But names and money, you can't do

16  that."  What were you referring to right there when you were

17  talking to Mr. Dawkins?

18  A.  Names of players, people involved with these players, and

19  giving money to these players, you can't do that.

20  Q.  Why couldn't you do that?

21  A.  People lose jobs.  There is a lot of people's lives at

22  stake with this if it got out.

23         MR. MARK:  Now, Ms. Lee, could we go back to the

24  transcript on page 3.

25  Q.  And, Mr. Gassnola, at line 7, you wrote, or you said:  "In

Iabdgat1                    Gassnola - direct

1    your world, there's no jurisdiction."

2              What were you referring to there?

3    A.  It was my opinion that in Christian's world, as a

4    recruiter, in the agent business at the street level, that

5    there really is no jurisdiction, you can do whatever you want.

6    Q.  And then you continued on, you said:  "But people could

7    lose their jobs is all I'm saying."

8              What people were you referring to?

9    A.  People at Adidas, the college coaches, and people at

10   universities.  That's what I was referring to.

11   Q.  And what did you expect could happen to the players if this

12   came out?

13             MR. MOORE:  Objection.

14             THE COURT:  Sustained in that form.

15   Q.  Did you have an understanding of what could happen -- you

16   just mentioned what could happen to Mr. Dawkins, what could

17   happen to players, what could happen to Adidas.

18             THE COURT:  He didn't say anything about players.

19             MR. MARK:  Oh, I didn't mean to say that.

20   Q.  What could happen to coaches.

21             Did you have an understanding of what could happen to

22   players in this situation?

23             MR. SCHACHTER:  Objection.

24             THE COURT:  Overruled.

25   A.  If it was found out that players had received money, they

1  would be deemed ineligible.  They would not be amateurs

2  anymore.

3        MR. MARK:  Ms. Lee, we could continue playing this

4  call until the end.

5        (Audio played)

6        Ms. Lee, we can take it down.

7  Q.  I'm just going to ask you, Mr. Gassnola, there are a number

8  of different names that were mentioned during the call.  If you

9  could just help identify who they are for us.

10        There was a name Caputo mentioned.  Who is Caputo?

11  A.  Chris Caputo is assistant coach at the University of Miami.

12  Q.  And Larranaga, who is that?

13  A.  Jim Larranaga is the head coach at the University of Miami.

14  Q.  Steve Pina, who is he?

15  A.  He is an agent.

16  Q.  Who did he work for?

17  A.  Andy Miller, ASM Sports.

18  Q.  Cutler was mentioned.  Who was he?

19  A.  Dan Cutler worked in grassroots at Adidas with us.

20  Q.  And when you were mentioning "Andy," who were you referring

21  to?

22  A.  Andy Miller.

23  Q.  And Sean was mentioned.  Who was Sean?

24  A.  Sean Miller, head coach at the University of Arizona.

25  Q.  There was a reference to Balsa.  Who is Balsa?

Iabdgat1                    Gassnola – direct

1    A.  All I know is Balsa.  I don't know his last name.  He was a

2    high school player in Florida at the time.

3    Q.  Do you understand where he played?

4    A.  I just knew he was a high school player in Florida; that's

5    all I knew.

6    Q.  And there was reference to Porzingis.  Who is Porzingis?

7    A.  Kristaps Porzingis, he plays for the New York Knicks.

8    Q.  And how about Dennis Smith?  He was referred to as well.

9    Who is that?

10   A.  Dennis Smith plays for the Dallas Mavericks.

11   Q.  OK.  And was he one of the individuals whose families you

12   arranged for payments to?

13   A.  He is.

14          MR. MARK:  The government now offers Government

15   Exhibit 6 and Government Exhibit 6T as an aid to the jury.

16          THE COURT:  Received.

17          The same instruction, members of the jury.

18          (Government's Exhibits 6 and 6T received in evidence)

19          MR. MARK:  This is a call from August 11, 2017,

20   between Merl Code and James Gatto.

21          Ms. Lee, could we play the call?

22          THE COURT:  Yes.

23          (Audio played)

24

25

1          MR. MARK:  Can we play the call?

2          THE COURT:  Yes.

3          (Audio played)

4          MR. MARK:  The government offers Government Exhibit 7

5    and 7T as an aid to the jury into evidence.

6          THE COURT:  Received.

7          Same instruction, folks.

8          (Government's Exhibits 7 and 7T received in evidence)

9          MR. MARK:  This is call dated August 11, 2016 which

10   appears based on the document to be 13 minutes after the last

11   call.  The participants are the same, Merl Code and James

12   Gatto.

13         Ms. Lee.

14         (Audio played)

15   BY MR. MARK:

16   Q.  Now, Mr. Gassnola, let's switch gears and talk about a name

17   that we just referred to earlier, Dennis Smith.

18         Where does he play again right now?

19   A.  Dallas Mavericks.

20   Q.  Did he play in college before that?

21   A.  He did, NC State.

22   Q.  Who is the athletic sponsor for NC State?

23   A.  Adidas.

24   Q.  Did he play in grassroots basketball before he was at NC

25   State?

1  A.  He did.  He played for Team Loaded.

2  Q.  Who, if anyone, sponsored Team Loaded?

3  A.  Adidas.

4  Q.  You mentioned that you were involved in facilitating

5  payments to Dennis Smith's family.  How many payments were you

6  involved with?

7  A.  Two.

8  Q.  When was the first one?

9  A.  When Dennis was in high school and was an AAU player in his

10 junior year of high school.

11 Q.  Why did you consider making a payment at that point in time

12 to Dennis Smith's family?

13 A.  Andy Miller reached out to me and told me he had knowledge

14 and a relationship with somebody in Dennis's family; that

15 Dennis was considering moving grassroots labels and was going

16 to go from an Adidas team to a Nike team, and that the family

17 needed some money to stay.  So I relayed that conversation to

18 Chris Rivers at Adidas.

19 Q.  Once again, Mr. Rivers was the head of grassroots at

20 Adidas?

21 A.  Yes.

22 Q.  After relaying this information about the family, that you

23 heard that the family wanted to get paid, did you take any

24 efforts to make a payment to the family of Dennis Smith?

25 A.  We went to North Carolina and had a meeting with his

1  family, the father and the kid's trainer, and Rivers and the

2  father had a conversation.  On the way back to our hotel,

3  heading to the airport the next morning, Rivers told me that he

4  had taken care of it, that the kid was going to stay with an

5  Adidas program, Team Loaded, and he would play the following

6  year with us.

7  Q.  Did Dennis Smith stay on an Adidas-sponsored team?

8  A.  Yes.

9  Q.  Mr. Gassnola, let me direct your attention to Government

10  Exhibit 1096.

11        MR. MARK:  This is already in evidence.  If we may

12  publish it to the jury.

13  Q.  We were looking at this yesterday, but just once again, Mr.

14  Gassnola, what does Government 1096 with the subject 90 days

15  refer to?

16  A.  It's a 90-day recap of my travels, people I was seeing,

17  places I was, people I talked to.

18        MR. MARK:  Ms. Lee, can we go to page 2 of this

19  document and go down to where it says "January 20."  If we can

20  just blow up those three lines of text.

21  Q.  Mr. Gassnola, could you just read what you wrote to

22  Mr. Rivers in this e-mail here?

23  A.  "AC, myself and Rivers went to Fayetteville to watch Dennis

24  Smith, Jr. play.  Worst game ever.  We took the dad and trainer

25  out to eat after.  As expected they fell in love with 3stripes.

1    AC had his hat on again at the table."

2    Q.  What does this entry refer to?

3    A.  Just a brief overview of our trip to North Carolina, our

4    sit-down with Dennis's family.

5    Q.  Is this the same trip you were just referring to that you

6    and Mr. Rivers took down to meet with the family?

7    A.  Yes.

8    Q.  AC, I think that's the first time we have seen that

9    reference.  Who is AC?

10   A.  Anthony Coleman.

11   Q.  You took the dad and the trainer out to eat after.  Who is

12   the trainer that is referred to there?

13   A.  Shawn Farmer.

14         THE COURT:  Who is Anthony Coleman?

15         THE WITNESS:  He worked with us at grassroots, your

16   Honor.  He was one of our marketing directors.

17         THE COURT:  Thank you.

18   Q.  3stripes, is that just another way to refer to Adidas?

19   A.  Yes.

20   Q.  From this meeting and from other dealings with Dennis's

21   family, what was your understanding of the relationship of

22   Shawn Farmer to Dennis Smith's family?

23   A.  He was portrayed to us that he was Dennis's longtime

24   trainer and now the go-between between anybody who was trying

25   to talk to the kid -- university, AAU coaches, shoe brands --

1  he was the go-between between them and the family.

2  Q.  Now, was this only trip you went down to see Shawn Farmer

3  and Dennis Smith?

4  A.  No.  Because I was on the East Coast, it's a two-and-a-half

5  hour flight from my airport in Hartford, Connecticut to

6  Raleigh, so it was easy for me to go down there, watch the

7  young man play, show that the brand had a lot of interest in

8  him, and just show face and keep the relationship going.  It

9  was easier for me than others.

10  Q.  What was your view of how talented Dennis Smith was at the

11  time?

12  A.  He was very talented.

13  Q.  Did you have any expectations whether he would play in the

14  NBA at the time?

15  A.  I thought so.

16  Q.  Are you familiar with the term "shoe kid"?

17  A.  Yeah.

18  Q.  I think you referred to that earlier in your testimony

19  yesterday.  What is a shoe kid?

20  A.  A shoe kid is an athletic player, under 6-6 and under, who

21  is very athletic and can jump quick.  Most kids can relate to

22  those guys.  So that's my opinion of what a shoe kid is.

23  Q.  At this point in time, did you have any view of whether

24  Dennis Smith was a shoe kid?

25  A.  I thought so.

1    Q.  After these trips, did there come a time that you discussed

2    a second payment for Dennis Smith's family?

3    A.  Yes.

4    Q.  When was that?

5    A.  In the fall of 2015, sister coach at NC State reached out

6    to me, Orlando Early reached out to me that there were some

7    issues surrounding Dennis and the people around him.  There

8    were certain things that were promised to the family, from who

9    I don't know, but there was a lot of minutia around it, and he

10   just seemed to be uncomfortable and he was having some issues

11   with keeping that situation together.

12   Q.  Mr. Early, how long had you known him before this call?

13   A.  15 years.

14   Q.  Now, at this point in time, in the fall of 2015, had

15   Mr. Smith verbally indicated where he was going to school?

16   A.  He did.

17   Q.  Where did he indicate?

18   A.  NC State.

19   Q.  Had he officially committed to NC State?

20   A.  I didn't know.

21   Q.  During your conversation with Mr. Early when he discussed

22   this sort of situation that was going on with Dennis Smith and

23   his family, how did you respond?

24   A.  I could tell he was uneasy and he was having some issues.

25   So I offered to bring him $40,000 to calm the situation.

1   Q.  When you say "calm the situation," what did you think that

2   money could do?

3   A.  Just make it easier and keep people happy, whether it was

4   the family or whoever he was referring to.  I just figured that

5   was the right thing to do for him.

6   Q.  When you offered the $40,000, how did Mr. Early respond?

7   A.  I don't recall, but he didn't say no.

8   Q.  Where was this $40,000 going to come from?

9   A.  Adidas.

10  Q.  How did you intend to get the money from Adidas?

11  A.  Ask Jimmy for it.

12  Q.  Did you in fact give Mr. Early the $40,000 that you

13  discussed with him?

14  A.  I did.

15  Q.  When was that?

16  A.  November 2015.

17  Q.  How did you give Mr. Early the $40,000?

18  A.  I gave it to him in cash.  I got on a plane, flew down to

19  Raleigh, and met him and gave him the cash in an envelope.

20  Q.  You said you delivered this in person?

21  A.  I did.

22  Q.  Where did you meet Mr. Early?

23  A.  At his house.

24  Q.  Why did you hop on a plane to deliver it in person?

25  A.  I wanted to conceal it.

1  Q.  Who were you concerned about concealing it from?

2  A.  The university.

3  Q.  When you delivered this money to Mr. Early, what, if

4  anything, did he say to you about what he was going to do with

5  the money?

6  A.  He informed me that he was giving the money to Shawn

7  Farmer.

8  Q.  Now, after you made this $40,000 payment, did you discuss

9  it with anyone from Adidas?

10  A.  Later on, sometime after, a few days to a week, I told

11  Jimmy what was going on.

12  Q.  What did you say to Mr. Gatto and what did he say to you

13  about that?

14  A.  I just told Jimmy that there was a situation at NC State

15  with Dennis that I had to take care of, that I gave Farmer 40

16  grand.

17  Q.  Were you reimbursed at all for this payment?

18  A.  I was.

19  Q.  By whom?

20  A.  Jim Gatto and Adidas.

21  Q.  Now, you mentioned that you wanted to conceal this payment

22  from North Carolina State.  Do colleges like North Carolina

23  State have compliance departments?

24  A.  They do.

25  Q.  What is the role of these college compliance programs?

1     MR. SCHACHTER:  Objection.

2     THE COURT:  Sustained.

3  Q.  What is your understanding of the role of these college

4  compliance programs are?

5     MR. SCHACHTER:  Objection.

6     THE COURT:  I will receive the evidence not for the

7  truth of the matter, but the jury can consider it as bearing on

8  why he made the payment in cash.

9     MR. MARK:  Thank you, your Honor.

10 Q.  You may answer.

11 A.  Can you repeat the question again?  I apologize.

12 Q.  What is your understanding of what college compliance

13 programs' roles are?

14 A.  To make sure their programs stay compliant with NCAA rules.

15    THE COURT:  Folks, we are going to break a little bit

16 early.  I will see you in about 15 minutes.

17    (Jury exits courtroom)

18    (Recess)

19    MR. MOORE:  My client and his father stepped out to go

20 to the rest room.  May I go get them?

21    THE COURT:  Yes.

22    Be seated, folks, while we wait.

23    MR. MOORE:  They are on their way.  I'm sorry.

24    (Jury present)

25    THE COURT:  The jurors are all present.  The

1    defendants are present.  The witness remains under oath.

2             You may continue, Mr. Mark.

3             MR. MARK:  Thank you, your Honor.

4    BY MR. MARK:

5    Q.  Before the break we just left off talking about a $40,000

6    payment that you delivered to Mr. Early in November 2015.

7    Where did you believe that money was going to go?

8    A.  To Dennis Smith's family.

9    Q.  Why did you make that payment?

10   A.  Because I was nervous that he was going to leave NC State.

11   Q.  Aside from Mr. Early, did you discuss your plan to pay

12   money to the family of Dennis Smith with anyone else at North

13   Carolina State University?

14   A.  I did not.

15   Q.  Did you discuss it with anybody at the compliance

16   department there?

17   A.  I did not.

18   Q.  Why not?

19            MR. SCHACHTER:  Objection.

20            THE COURT:  Overruled.

21   A.  Why didn't I speak to compliance?  Because that wouldn't

22   have helped anybody.  It would have hurt Dennis Smith and it

23   would have hurt the coaching staff.

24   Q.  How did you expect it would hurt Dennis Smith and hurt the

25   coaching staff?

1  A.  The coaches would have got fired and Dennis would have been

2  deemed ineligible; he would never have played there.

3  Q.  You mentioned this was the second payment that you were

4  involved with to the family.  The first payment you had talked

5  about that you discussed with Mr. Rivers, right?

6  A.  Yes.

7          MR. MARK:  Ms. Lee, can we just bring back up

8  Government Exhibit 1096, which is in evidence.

9          May we publish, your Honor.

10         THE COURT:  Yes.

11 Q.  This e-mail is between yourself and Mr. Rivers?

12 A.  It is.

13 Q.  I would like to go back to page 2 and the reference on

14 January 20.

15         Who are you updating about this meeting?

16 A.  Chris Rivers -- Jim Gatto and Chris.

17 Q.  Can we go back to the first page.

18         What is the date of this e-mail?

19 A.  March 2, 2015.

20 Q.  It's from you to Mr. Rivers?

21 A.  It's from me to Chris Rivers.

22 Q.  And the update that you're providing includes this entry on

23 January 20?

24 A.  Yes.

25 Q.  Which is an event that you attended with Mr. Rivers?

1  A.  Yes.

2  Q.  And you discussed with him?

3  A.  Yes.

4  Q.  And this was the one that after which you said Mr. Rivers

5  mentioned that there was going to be an agreement to make the

6  $25,000 payment to the family of Dennis Smith?

7  A.  Yes.

8  Q.  Did you mention that payment in this e-mail?

9  A.  I did not.

10  Q.  Why not?

11  A.  Because I didn't want anybody to know about it.

12  Q.  Anyone other than yourself and Mr. Rivers?

13  A.  That's it.

14  Q.  Now, let me direct your attention to a series of exhibits.

15          MR. MARK:  If we can show these each to the witness,

16  just slowly so he can take a look at the first page of each.

17  It's Government Exhibit 306D-1, 306A-1, 306A-2, 306A-3, and

18  306E.

19  Q.  Do you recognize these documents?

20  A.  I do.

21  Q.  What are they?

22  A.  They are bank statements from my bank account, for New

23  England Playaz account.

24  Q.  The last one, is that just a wire record?

25  A.  It's a copy of a wire.

1    MR. MARK:  At this time the government offers

2    Government Exhibit 306D-1, 306A-1, 306A-2, 306A-3, and 306E

3    into evidence.

4         THE COURT:  Received.

5         (Government's Exhibits 306D-1, 306A-1, 306A-2, 306A-3,

6    and 306E received in evidence)

7         MR. MARK:  Your Honor, permission to publish 306D-1.

8         THE COURT:  Yes.

9    Q.  You mentioned this was a bank statement for your New

10   England Playaz program?

11   A.  It is.

12   Q.  Let me direct your attention to the entry at 10/30.

13        What does that entry reflect?

14   A.  A withdrawal for $40,000.

15   Q.  What was that $40,000 withdrawal for?

16   A.  To give to Dennis Smith's family; it was a payment to

17   Dennis Smith's family.

18   Q.  Did you get reimbursed by Adidas for that payment?

19   A.  I did.

20   Q.  When you would get reimbursed, how would you get paid by

21   Adidas?

22   A.  Wires would come to my account.

23   Q.  Who would approve them?

24   A.  Jim Gatto.

25   Q.  Let me direct your attention to the next page of this

1  document.

2           MR. MARK:  Your Honor, may I have just one moment?

3           THE COURT:  Yes.

4           MR. MARK:  I am just going to proceed.  We might come

5  back.  There was a technical glitch.

6  Q.  Did you in fact get reimbursed for this payment that you

7  made?

8  A.  I did.

9  Q.  Now, let me direct your attention to Government Exhibit

10  309A.

11           Do you recognize this document, Mr. Gassnola?

12  A.  I do.

13  Q.  What is it?

14  A.  It's a Delta Airlines flight that I took from Raleigh to

15  Hartford, Connecticut.

16  Q.  Is this a statement reflecting that?

17  A.  Yes.

18  Q.  A statement of what?

19  A.  My American Express card.

20           MR. MARK:  The government offers 309A into evidence.

21           THE COURT:  It's received.

22           (Government's Exhibit 309A received in evidence)

23           MR. MARK:  May we publish, your Honor?

24           THE COURT:  You may.

25           MR. MARK:  If we could just highlight the entry down

1    at 11/1, Ms. Lee.

2    Q.  What is reflected in this entry on your credit card

3    statement?

4    A.  My Delta Airlines trip from Hartford, Connecticut to

5    Raleigh, North Carolina.

6    Q.  What did you do during that trip?

7    A.  I gave Orlando Early $40,000 to give to the family of

8    Dennis Smith.

9         MR. MARK:  Ms. Lee, can we turn to the next page.

10   Q.  What is reflected on those entries from November 2, 2015?

11   A.  My rental car when I was there.

12   Q.  After you took this trip to North Carolina to deliver this

13   money for Dennis Smith's family, did Dennis Smith play for the

14   North Carolina State University basketball team?

15   A.  He did.

16   Q.  Now, fast-forward a little bit to the summer of 2017.

17        From October-November 2017 to the summer of 2017, did

18   you discuss or continue to discuss Dennis Smith with Jim Gatto?

19   A.  From time to time, yes, I did.

20   Q.  Did you discuss him becoming professional?

21   A.  We had conversations about that, yes.

22   Q.  Did you discuss a shoe deal?

23   A.  We did.

24   Q.  Once again, what is a shoe deal?

25   A.  A deal between the apparel brand and the athlete.

1   Q.   Did part of Mr. Gatto's job include signing professional

2   players to shoe deals?

3   A.   That was his job.

4   Q.   From talking with Mr. Gatto, did you understand whether he

5   made any efforts to sign Dennis Smith to a shoe deal?

6   A.   He did.

7   Q.   Was Mr. Gatto able to sign Dennis Smith to a shoe deal?

8   A.   He was not able to sign him, no.

9   Q.   Who did?

10  A.   Under Armour.

11          MR. MARK:  May we publish Government Exhibit 107K-5,

12  which I believe is already in evidence.

13          THE COURT:  Yes.

14  Q.   Is this a text message between yourself and Mr. Gatto?

15  A.   Yes.

16  Q.   The date is July 4, 2017.  At this point in time, was

17  Dennis Smith a professional player?

18  A.   Yes, he was.

19  Q.   Had he been drafted?

20  A.   He did.

21  Q.   Could you just read what you wrote to Mr. Gatto?

22  A.   "Wish you would tell Dennis to beat it.  The disrespect is

23  out of line."

24          THE COURT:  K-5 is not in.

25          MR. MARK:  I apologize.  I thought I offered that with

1  K-3.  May we offer that into evidence?

2          THE COURT:  Received.

3          (Government's Exhibit 107K-5 received in evidence)

4          MR. MARK:  May we publish that again, Ms. Lee.

5          THE COURT:  Yes.

6  Q.  Could you just read what you wrote to Mr. Gatto in this

7  text message?

8  A.  "Wish you would tell Dennis to beat it.  The disrespect is

9  out of line."

10  Q.  What were you referring to?

11  A.  I felt that we had done nothing but good for Dennis Smith's

12  family over a period of time, and I just felt that Jimmy was

13  doing everything he could, and even going beyond what he

14  should, to sign that kid, and I didn't think it was mutual.

15  Q.  Now, changing gears a little bit.  You mentioned another

16  player yesterday whose family that you were involved in making

17  payments to was DeAndre Ayton?

18  A.  Yes.

19  Q.  Who is he?

20  A.  He was a former high school player and this past year he is

21  the number-one pick in the NBA draft.

22  Q.  When were you involved with making payments for the benefit

23  of DeAndre Ayton's family?

24  A.  The fall of 2015 -- the winter of 2015.  Winter.

25  Q.  How far along in school was DeAndre Ayton at that time?

1   A.  He was a junior in high school.

2   Q.  How much money was involved in those payments?

3   A.  $15,000.

4   Q.  Where did this money come from?

5   A.  Adidas.

6   Q.  To whom did you deliver the money?

7   A.  A family friend of DeAndre's named Larnell.

8   Q.  What did you believe Larnell was going to do with the

9   money?

10  A.  Give it to DeAndre's mother.

11  Q.  Why did you give that $15,000 payment for the benefit of

12  DeAndre Ayton's family?

13  A.  Because I felt bad for his family and I wanted to establish

14  a relationship between him, his family and Adidas.

15  Q.  Did you discuss this payment with anyone from Adidas?

16  A.  Yes.  I discussed it with Chris Rivers and Jim Gatto.

17  Q.  After you made this payment, did DeAndre Ayton ever play at

18  any Adidas events?

19  A.  One event.

20  Q.  Which one?

21  A.  Adidas Nations.

22  Q.  Is that the same one that you referred to that Nassir

23  Little had played at?

24  A.  The same type of event, but it was a year prior; same type

25  of event, but it was a year prior in Los Angeles.

1  Q.  After you made this payment, did DeAndre Ayton ever play

2  for an Adidas grassroots team?

3  A.  He did not.

4  Q.  After you made this payment, did he ever play for an

5  Adidas-sponsored university?

6  A.  He did not.

7  Q.  Where did he end up playing college basketball?

8  A.  University of Arizona.

9  Q.  Who was the athletic sponsor for Arizona?

10 A.  Nike.

11 Q.  Is Arizona the same school that Brad Augustine mentioned to

12 you with Nassir Little?

13 A.  It is.

14 Q.  Did DeAndre Ayton end up signing a shoe deal?

15 A.  He did.

16 Q.  With whom?

17 A.  Puma.

18 Q.  Now, I would like to talk to you about Silvio De Sousa.

19 Are you familiar with him?

20 A.  I am.

21 Q.  Who is he?

22 A.  Silvio De Sousa is now a sophomore at the University of

23 Kansas.

24 Q.  You mentioned earlier that Kansas is an Adidas-sponsored

25 school?

1  A.  It is.

2  Q.  Are you familiar with someone named Fenny Falmagne?

3  A.  I am.

4  Q.  Who is Mr. Falmagne?

5  A.  He is Silvio De Sousa's legal guardian.

6  Q.  Did there come a time that you discussed with Mr. Falmagne

7  making any payments to him?

8  A.  Yes.  As I got to know Fenny, later on in our relationship,

9  he informed me that Silvio had to leave IMG Academy where he

10  was attending.  He was going to attend online classes at night,

11  he said night classes, and he needed money to pay for those

12  classes.

13  Q.  How much money was discussed?

14  A.  $2500.

15  Q.  During your conversation with Mr. Falmagne, did he discuss

16  any other payments?

17  A.  He informed me that he was under the umbrella of a booster

18  that was paying him a salary throughout the year, and that he

19  was in the booster for $60,000.

20  Q.  Did Mr. Falmagne identify who the booster was?

21  A.  He didn't give me a name.

22  Q.  Did he identify what affiliation that booster had?

23  A.  University of Maryland.

24  Q.  Does the University of Maryland have an athletic sponsor?

25  A.  They do.

Q.  Who is it?

A.  Under Armour.

Q.  When you were talking with Mr. Falmagne, where were you
hoping Silvio De Sousa would play basketball?

A.  University of Kansas.

Q.  Did you agree to make any payment to Mr. Falmagne?

A.  I told Fenny I would give him $20,000 towards his $60,000.

Q.  Why did you do that?

A.  Because I wanted to help the situation and make sure that
the kid stayed at Kansas.

Q.  Did you in fact make any payments to Mr. Falmagne?

A.  I did not.

Q.  You did not, referring to the 20,000?

A.  I didn't give the 20,000.

Q.  Did you make any payments in relation to the money for
online courses so that he could graduate?

A.  I did do that, $2500.

Q.  How did you get Mr. Falmagne that money?

A.  I sent him cash overnight in an envelope inside a magazine.

Q.  Have you ever met Mr. Falmagne in person?

A.  I never have.

Q.  Taking a step back, how did you first get put in touch with
Mr. Falmagne?

A.  Assistant coach at the University of Kansas, Kurtis
Townsend, reached out to me prior to my meeting Fenny asking if

1    I would talk to this guy because he was looking for product for

2    his Angola national team.  He was affiliated with the Angola

3    national team and he wanted product for that team.

4    Q.  Where was Silvio De Sousa from?

5    A.  Angola.

6    Q.  So during this conversation you said Mr. Townsend discussed

7    that Fenny Falmagne was looking for product for the Angola

8    national team?

9    A.  Yes.

10   Q.  Product from whom?

11   A.  Adidas.

12   Q.  Did you discuss this situation also with any other coaches

13   from Kansas?

14   A.  I had a brief, brief conversation with Coach Self about it.

15   Q.  Once again, was Coach Self the head coach at Kansas?

16   A.  He is.

17   Q.  From your conversation with Mr. Townsend, did you

18   understand him to be requesting that Adidas make a cash payment

19   to Fenny Falmagne?

20   A.  No, not at all.

21   Q.  From your conversation with Bill Self, did you understand

22   Bill Self to be requesting that Adidas make a cash payment to

23   Mr. Falmagne?

24   A.  No, not at all.

25   Q.  How did you respond to Mr. Townsend and Mr. Self's request

1    regarding the Angola national team?

2    A.  I said I would take care of it.

3    Q.  Did you discuss the Angola national team with Mr. Falmagne?

4    A.  I did.

5    Q.  Did Adidas ever end up providing any assistance to the

6    Angola national team?

7    A.  As I can recall, I don't think so.

8    Q.  Now, did Silvio De Sousa end up committing to Kansas?

9    A.  He did.

10        MR. MARK:  Ms. Lee, can we show to the witness only

11   Government Exhibit 107K-10.

12        I believe this is in evidence, but just in case let's

13   go through this again.

14   Q.  Do you recognize this document?

15   A.  I do.  It's a test message thread between myself and Jim

16   Gatto.

17        MR. MARK:  We offer, if it's not already in evidence,

18   Government Exhibit 107K-10.

19        THE COURT:  It's received if it has not previously

20   been received.

21        (Government's Exhibit 107K-10 received in evidence)

22        MR. MARK:  May we publish?

23        THE COURT:  Yes.

24   Q.  Now, is the date of this text message between yourself and

25   Mr. Gatto August 28, 2017?

1  A.  Yes.

2  Q.  Could you just read at 12:42 what you wrote to Mr. Gatto

3  and his response and your response back to that?

4  A.  "Silvio De Sousa commits to KU today."

5          Jimmy replies back:  "Stinks."

6          I reply to Jimmy:  "Swings."

7  Q.  Did you understand Mr. Gatto's response "stinks" to be a

8  joke?

9  A.  It was a joke amongst me and him.  He said that to me quite

10  often about a lot of things.

11  Q.  Why did you think that was a joke here?

12  A.  Jimmy and I talked all the time so he would make comments

13  to me.  Eli Manning stinks.  That would be our conversation.

14  Q.  Eli Manning is quite good, right?

15  A.  I love him.

16  Q.  When you wrote "swings," what does that refer to?

17  A.  Sometimes throughout the days and nights I called Jimmy and

18  he would answer the phone in a bad mood.  I just hang up

19  because he was in a mood swing.  So I said swings.

20  Q.  During this time, did Mr. Gatto say anything to you about

21  his feelings toward his job at Adidas?

22  A.  Jim and I had started to have conversations about that,

23  yeah.

24  Q.  What did he say to you about it?

25  A.  I just knew he was uncomfortable, and I knew that he wasn't

1    as happy as he had been in previous years.  Jim was always

2    happy.  It seemed to me that he was not.

3    Q.  Who was Mr. Gatto's boss at that time?

4    A.  I'm not familiar with his last name.  His first name was

5    Michael.

6    Q.  What, if anything, did Mr. Gatto say about Michael?

7    A.  He was just having a hard time getting along with him,

8    working with him.  I think there was some philosophical

9    differences.

10   Q.  Now, returning to Silvio De Sousa, did you discuss any

11   payments to Mr. Falmagne with Mr. Gatto?

12   A.  I did.

13   Q.  What did you say to Mr. Gatto on that subject and what did

14   he say to you about it?

15   A.  I don't remember the exact date, but the conversation was,

16   you know, that I had to get Silvio's guy out from under his

17   deal they had with this booster from Maryland, and I told Jimmy

18   what it was going to cost and what we had to do to get it done.

19   Q.  Did you ever discuss your plan to pay Silvio De Sousa's

20   guardian with anyone at the University of Kansas?

21   A.  No, never.

22   Q.  Why not?

23   A.  They wouldn't have liked it very much, and I wouldn't have

24   done that because Silvio would have been deemed ineligible and

25   it wouldn't have helped at all.

1          MR. MARK:  At this time, the government offers

2    Government Exhibit 2 and 2-T as an aid to the jury.  It's a

3    September 11 call between James Gatto and TJ Gassnola.

4          THE COURT:  Received.

5          Same instruction, members of the jury.

6          (Government's Exhibits 2 and 2T received in evidence)

7          MR. MARK:  Ms. Lee, if we could play the call that

8    begins on page 1.

9          (Audio played)

10   Q.  So just going up a little bit to the beginning of the call,

11   Mr. Gassnola.  You referenced Olivia.  Who is Olivia?

12   A.  Olivia worked at Adidas at that time.

13   Q.  And the beginning of the conversation you were having with

14   Mr. Gatto, what did that discussion refer to?

15   A.  An invoice I was waiting for.  It was a new system that was

16   being inputted, and I wasn't too familiar with it so I was

17   having a hard time doing it to submit an invoice, and Olivia

18   was helping me with it.

19   Q.  Now, going down to the second part of this.

20        MR. MARK:  Ms. Lee, if we could highlight on line 16

21   to 17.

22   Q.  "I have got to send this guy another 20 grand out on

23   Wednesday."

24        Who is "this guy" that you were referring to?

25   A.  Fenny.

1  Q.  If we continue on a little bit further.

2         Then you continue, "Because I have got to get him out

3  from under this Under Armour deal."

4         What was the Under Armour deal you were referring to?

5  A.  I was just referring to -- I was just kind of condensing

6  the situation.  The kid had an Under Armour affiliation and

7  Fenny, I was just condensing it.

8  Q.  You had mentioned earlier that Maryland had an Under Armour

9  affiliation?

10 A.  They did.

11        (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Iabdgat3                    Gassnola - direct

1   Q.  Now, did you ever make this additional payment of $20,000

2   to Mr. Falmagne that you were discussing with Mr. Gatto?

3   A.  I did not.

4   Q.  Why not?

5   A.  Because of this investigation.

6        MR. MARK:  Ms. Lee, we can continue playing until page

7   4, line 14.

8        (Audio played)

9   Q.  OK.  Just so it's clear, on page 3 there is a reference to

10  Coach.  Who is Coach?

11  A.  His dog.

12  Q.  And now continuing on page 4, you are discussing your

13  expenses.  And you said, "So everything I've done this year,

14  not the underground stuff but everything else I've done."

15       What was the "underground stuff"?

16  A.  Payments to families of players.

17  Q.  And had you been having discussions with Mr. Gatto about

18  the underground stuff?

19  A.  Yes.

20  Q.  And what were you saying you would or wouldn't do with

21  regards to the underground stuff?

22  A.  I wouldn't put that in -- I wasn't going to put that in an

23  expense report.

24  Q.  And continue down.  What were you going to put in expense

25  reports?

Iabdgat3                    Gassnola – direct

1  A.  My expenses, my travel, my salary, that type of stuff, that

2  stuff.

3  Q.  And going down to page 4, line 10, Mr. Gatto said, "Put it

4  all down, put everything down."  Did that include the

5  underground stuff?

6          MR. SCHACHTER:  Objection.

7          THE COURT:  Sustained.

8  Q.  What did you understand Mr. Gatto to be saying about what

9  to put down?

10          MR. SCHACHTER:  Objection.

11          THE COURT:  Sustained.

12          MR. MARK:  Thank you, your Honor.

13  Q.  Let's turn to another player, Billy Preston.

14          Are you familiar with that name?

15  A.  I am.

16  Q.  And you mentioned earlier that you'd also arranged payments

17  to the family of Billy Preston?

18  A.  I did.

19  Q.  Where does -- where, if anywhere, does Mr. Preston

20  currently play?

21  A.  The Cleveland Cavaliers.

22  Q.  Where did he attend college?

23  A.  He attended University of Kansas.

24  Q.  Did you and others make payments to Billy Preston's family?

25  A.  Yes, myself and Jim Gatto did.

1   Q.  Who in Billy Preston's family do you know?

2   A.  His mother and her partner.

3   Q.  What's his mother's name?

4   A.  Nicole Player.

5   Q.  And what's his mother's partner's name?

6   A.  Timika Kirby.

7   Q.  Does she have any nicknames?

8   A.  TK.

9   Q.  How much money did you and Mr. Gatto give to the family of

10  Billy Preston?

11  A.  $90,000.

12  Q.  When did you and Mr. Gatto provide that money?

13  A.  Between the fall and winter of 2016 and 2017.

14  Q.  Who delivered money to Billy Preston's family?

15  A.  I did.

16  Q.  And where did the money come from?

17  A.  Adidas.

18  Q.  Who, if anyone at Adidas, approved you receiving this

19  money?

20  A.  Jim Gatto.

21  Q.  Let's start at the beginning.  With whom did you first

22  discuss giving money to Billy Preston's family?

23  A.  His mother and her partner.

24  Q.  So Ms. Player and TK?

25  A.  Yes, sir.

Iabdgat3                    Gassnola - direct

1    Q.  And when was that?

2    A.  Late Night in the Phog, early October of 2016.

3    Q.  And what is Late Night in the Phog?

4    A.  It is the opening night of practice for the University of

5    Kansas.  It is their opening, when they start to practice and

6    start the season.

7    Q.  And is that also a recruiting event?

8    A.  It is.

9    Q.  Why was Billy Preston's family there at that time?

10   A.  He was one of their top recruits.

11   Q.  And why were you at Late Night in the Phog then?

12   A.  As an ambassador with Adidas, as an outside consultant in

13   that space, being at the University of Kansas for that late

14   night is an important thing.

15   Q.  And were you at Late Night in the Phog at Kansas with

16   anyone else from Adidas?

17   A.  Jim Gatto.

18   Q.  Now, where did this initial discussion with Ms. Player and

19   TK take place when you first discussed making a payment?

20   A.  In my hotel room at the Oread Hotel in Lawrence, Kansas.

21   Q.  During that conversation, what did you say and what did

22   Ms. Player say and TK say?

23   A.  I had heard for awhile that they were take money from

24   outside influences, you know, whether it had been agents or

25   financial people, you know, that's what I heard.  So I told

1    those ladies that from now on stop taking money from those

2    entities and just come to me and I'll take care of it.

3    Q.  And why did you want Ms. Player and TK to stop take money

4    from other people and instead go to you?

5    A.  I didn't think those other people would conceal it very

6    good, and there was always the risk of it getting out that they

7    were take money from agents or whoever.  I just thought I could

8    conceal it better than those other people could.

9    Q.  And who were you concerned about concealing these payments

10   from?

11   A.  The coaching staff at the University of Kansas.

12   Q.  And what did you expect could happen if these payments

13   weren't concealed well?

14   A.  They would lose their eligibility, people would lose jobs,

15   and Kansas could have sanctions laid on them from the NCAA.

16   Q.  What sort of sanctions could -- did the NCAA give to

17   Kansas, in your understanding?

18             MR. SCHACHTER:  Objection.

19             THE COURT:  Again not for the truth of the matter but

20   to explain why the witness did what he did.

21   A.  They can be put on probation, lose scholarships, people

22   lose jobs, financial penalties, all of the above.

23   Q.  During this first conversation at the Oread Hotel with

24   Billy Preston's family, did you give them any money?

25   A.  I did not.

Iabdgat3                          Gassnola - direct

1   Q.  Did there come a point after this first discussion with the

2   family that you discussed a potential payment with Jim Gatto?

3   A.  The follow morning, Jim and I were on our way to the

4   airport, and I told Jim about my conversation with the

5   ladies -- that's what I referred to them as -- and I said -- I

6   told Jim what I was going to do, and he said, OK, do what you

7   got to do.

8   Q.  And when he said "Do what you got to do," what did you

9   understand him to mean?

10  A.  To go ahead and take care of the family as I needed.

11  Q.  And the approximately $90,000 in payments that you said you

12  and Mr. Gatto made, did those payments happen all at once?

13  A.  No.  They were throughout the year.

14  Q.  As you made those throughout the year, would you discuss

15  them with Mr. Gatto?

16  A.  I would.

17  Q.  Would you update him on them?

18  A.  Yes.

19  Q.  And how would you make those payments?

20  A.  In cash --

21          THE COURT:  How did you?

22  Q.  How did you?

23  A.  In cash or wires.

24  Q.  And did you submit any requests or invoices to Adidas for

25  that money?

Iabdgat3                    Gassnola - direct

1    A.  I did.

2    Q.  To whom did you submit those invoices or requests?

3    A.  Jim Gatto.

4    Q.  And did you discuss them with Mr. Gatto?

5    A.  I did.

6    Q.  And to the extent that there were invoices, did they

7    accurately reflect what they were for?

8    A.  No, they did not.

9            MR. MARK:  At this point in time, the government would

10   like to just read a portion of a stipulation between the

11   parties.

12           This is what's in evidence as Government Exhibit S-3.

13           If called as a witness at trial, a custodian of

14   records from Adidas would testify that a series of government

15   exhibits, which are listed in the stipulation, are true and

16   accurate copies of documents that were obtained from Adidas.

17   The dates, times and identifying information of senders and

18   recipients in these emails are accurate.

19           Included in this series of government exhibits is 1023

20   and 1040, and we offer those two exhibits at this time.

21           If we could just show it to the witness so the parties

22   could see Government Exhibits 1023 and 1040?

23           THE COURT:  Those two exhibits are received.

24           MR. MARK:  Thank you.

25           (Government's Exhibits 1023 and 1040 received in

Iabdgat3                    Gassnola - direct

1   evidence)

2   BY MR. MARK:

3   Q.  All right.  Now, let me direct, Mr. Gassnola, your

4   attention -- may we publish, your Honor, to the jury?

5          THE COURT:  Yes.

6   Q.  Let me direct your attention to the first page of that

7   email between Jim Gatto and Edwin Janes.

8   A.  Yes.

9   Q.  OK.  Then we can go to the next page.

10         Do you recognize -- Ms. Lee, if we could just show

11  page 2 of Government Exhibit 1023?  Thank you.

12         Directing your attention to this document,

13  Mr. Gassnola, what is this?

14  A.  An invoice from myself to Adidas.

15  Q.  OK.  And to whom were your invoices submitted when you

16  submitted them?

17  A.  Jim Gatto.

18  Q.  And the date on this is October 15, 2016, is that right?

19  A.  Yes.

20  Q.  What is the amount of this invoice?

21  A.  $50,000.

22  Q.  And what is the description?

23  A.  Basketball team tournament fees.

24  Q.  Is that description, basketball team tournaments fee,

25  accurate?

Iabdgat3                    Gassnola - direct

1    A.  No.

2    Q.  How much is a team tournament fee generally?

3    A.  Anywhere from 500 to a thousand dollars.

4    Q.  And what was -- after October 15, 2016, did you make a

5    payment to Ms. Player?

6    A.  I did.

7    Q.  What was the money referred to in this invoice at least in

8    part for?

9    A.  To give to the family of Billy Preston, I gave Nicole

10   Player $30,000 of this 50,000.

11   Q.  And approximately when was the first payment to Nicole

12   Player?

13   A.  November -- the first week in November, if I recall

14   correctly.

15   Q.  And you mentioned that it was $30,000?

16   A.  Yes, in cash.

17   Q.  OK.  And how did you give Billy Preston's mother that

18   money?

19   A.  In an envelope at her hotel room.

20   Q.  And where was the hotel room?

21   A.  Here in New York.

22           MR. MARK:  Your Honor, permission to publishing

23   Government Exhibit 306A-1, which was already received into

24   evidence?

25           THE COURT:  Yes.

Iabdgat3                    Gassnola - direct

1    Q.  Mr. Gassnola, what is reflected in entry 10-21?

2    A.  A wire deposit into my New England Playaz account from

3    Adidas for $50,000.

4    Q.  And prior to submitting the invoice that we just looked

5    about, had you had a conversation with Jim Gatto?

6    A.  Yes.

7    Q.  Did you discuss what you planned to do with the $50,000?

8    A.  Yes, I told him.

9    Q.  And what did you tell him about it?

10   A.  That I had a conversation with Nicole and that I need to

11   give them $30,000.

12              MR. MARK:  Now, let's continue on.  If we can look at

13   the next page, at 10-31.  Ms. Lee, it is I think the next page.

14              (Pause)

15              Did it freeze up on you?  OK.  We will proceed.

16   Q.  Did you withdraw this money?

17   A.  I did.

18   Q.  OK.  And is there a withdrawal that's reflected on your

19   bank records?

20   A.  Yes, for $50,000.

21   Q.  OK.  And was that withdrawal in cash?

22   A.  It was.

23   Q.  And you mentioned that you gave 30,000 of those dollars to

24   Ms. Player?

25   A.  I did.

Iabdgat3                    Gassnola - direct

1          MR. MARK:  Ms. Lee, can we bring up Government Exhibit

2     309C?  Thank you.

3     Q.  Do you recognize this document?

4     A.  Yes.

5     Q.  What is it?

6     A.  It's a parking lot fee for parking here in the city.

7          MR. MARK:  OK.  The government offers Government

8     Exhibit 309C into evidence.

9          THE COURT:  Received.

10          (Government's Exhibit 309C received in evidence)

11    Q.  And you said this refers to a parking lot fee.  Is that on

12    November 1, 2016?

13    A.  Yes.

14    Q.  And what were you doing -- did you incur that parking lot

15    fee yourself?

16    A.  Yes, I did.

17    Q.  And what were you doing in New York on that date?

18    A.  I was here to give Nicole Player $30,000.

19    Q.  Now, I think you mentioned that you had withdrawn $50,000

20    from your account?

21    A.  That's right.

22    Q.  30 of which went to Nicole Player.  What did rest of the

23    money go towards?

24    A.  I bought Super Bowl tickets for that coming year and FBS

25    tickets for the college football championship.

Iabdgat3                    Gassnola - direct

1    Q.  Did you use those tickets?

2    A.  I did not.

3    Q.  What did you do with them?

4    A.  I gave them to friends and colleagues in the business, some

5    people at Adidas.  My intention with the FBS tickets, we were

6    going to have a grassroots meeting with a choice few of us, and

7    I wanted to do it in Dallas that year at the national

8    championship game.

9    Q.  Now, did there come a point in time when you spoke with Jim

10   Gatto about this meeting you had with Ms. Player where you gave

11   her $30,000?

12   A.  Sometime after I -- you know, Jim and I had conversations

13   all the time.  One of my conversations was Billy Preston's

14   family is in a good place.

15   Q.  And when you would say Billy Preston's family was in a good

16   place, what would you be referring to?

17   A.  That they had gotten money from us and they are in a good

18   place.

19   Q.  Now, when did you make the next payment to Billy Preston's

20   mother?

21   A.  January 2017.

22   Q.  What were you -- were you at that time?

23   A.  Las Vegas, Nevada.

24   Q.  What were you doing in Las Vegas?

25   A.  It was our annual grassroots directors meeting in Las

Iabdgat3                    Gassnola – direct

1   Vegas.

2   Q.  And did you attend that meeting?

3   A.  I did.

4   Q.  Did NCAA representatives attend that event as well?

5   A.  They did.

6   Q.  When you were in Las Vegas, did you meet Nicole Player?

7   A.  Yes.  Nicole came and met me there, yes.

8   Q.  Where did you meet her?

9   A.  She came to my hotel room.

10  Q.  And where were you staining?

11  A.  At the SLS.

12  Q.  And when you met Ms. Player at the SLS, how much money did

13  you give her?

14  A.  $20,000.

15  Q.  Was that in cash?

16  A.  In cash in an envelope.

17  Q.  And where did that money, that $20,000, come from?

18  A.  Adidas.

19  Q.  Now, let me direct your attention to Government Exhibit

20  309D.

21          Mr. Gassnola, do you recognize this document?

22  A.  That's my credit card receipt.

23          MR. MARK:  The government offers 309D into evidence.

24          THE COURT:  Received.

25          (Government's Exhibit 309D received in evidence)

Iabdgat3                    Gassnola – direct

BY MR. MARK:

Q.  And what is reflected on this portion of the credit card?

A.  My dates and stays at the SLS Hotel, the Nines Hotel in
Portland, and how much I paid for them.

Q.  And the SLS Hotel, is that what is reflected up here in
part reflecting the time when you had met Ms. Player to give
her $20,000?

A.  That's correct.

        MR. MARK:  And, Ms. Lee, we can take that down.

Q.  Let me direct your attention now to Government Exhibit
306A-2, which I believe is already in evidence.

        MR. MARK:  May we publish, your Honor?

        THE COURT:  Yes, you may.

Q.  I believe you referred earlier, this is your bank statement
for the New England Playaz?

A.  It is.

Q.  OK.  And what is reflected on that January 18th entry?

A.  A wire to my New England Playaz account in Berkshire Bank
from Adidas for $90,000.

Q.  How did you get that $90,000?

A.  I submitted an invoice or asked Jim.

Q.  Let's go down just to the next entry of note.

        January 19th, if we could just extend that slightly,
Ms. Lee.  Thank you.

        What is reflected on that entry?

1   A.   A $27,000 -- $27,500 withdrawal from my account.

2   Q.   Is that withdrawal in cash?

3   A.   It was.

4   Q.   And what did you do with that $27,500?

5   A.   $20,000 of it went to Nicole Player, and 7500 I kept in my

6   pocket, gambled it, and went shopping.

7   Q.   Once again, when did you -- where did you give her that

8   money?

9   A.   Las Vegas, Nevada, my hotel room.

10  Q.   Did there come a point in time when you spoke with

11  Mr. Gatto about this meeting with Nicole Player where you gave

12  her 20,000 more dollars?

13  A.   Sometime thereafter, I told Jimmy that Billy Preston's

14  family was in a good place.

15  Q.   Did you make additional payments to Ms. Player after this

16  one in Vegas?

17  A.   I did.

18  Q.   Were any of those payments by wire?

19  A.   Two of them.

20  Q.   Why were those payments by wire instead of by cash like the

21  prior ones?

22  A.   Because I got lazy.

23  Q.   Did you ever direct anyone else to wire money to Ms. Player

24  or TK?

25  A.   I was out of town for a certain period of time in February,

1  I think, and Nicole needed -- seemed to be in dire straits for

2  the money, so I instructed my fiancée to wire money from her

3  account to TK.

4         MR. MARK:  And, Ms. Lee, may we show to the witness

5  only Government Exhibit 305B?

6  Q.  Mr. Gassnola, do you recognize this document?

7  A.  I do.

8  Q.  What is it?

9  A.  It is a copy of a wire that my fiancée Danielle sent to

10 Timika Kirby.

11        MR. MARK:  The government offers Government Exhibit

12 305B into evidence.

13        THE COURT:  Received.

14        (Government's Exhibit 305B received in evidence)

15        MR. MARK:  Now, Ms. Lee, could we just highlight the

16 effective date in the middle of the document.  That's great.

17 Q.  Is the effective date February 24, 2017 and the amount

18 $20,000?

19        (Pause)

20        Is that right?

21 A.  Yes.  I apologize.  Yes, $20,000.

22 Q.  And the originator, Danielle Labarre, is that your fiancée?

23 A.  It is.

24        MR. MARK:  And, Ms. Lee, if we could just go to the

25 next page, where it says "Beneficiary."

1   Q.  Who is Timicha Kirby?

2   A.  Nicole Player's partner.

3   Q.  Is that the woman who is also known as "TK"?

4   A.  Yes.

5   Q.  And there is a reference noted there to "basketball camp."

6   Is that reference for that payment accurate?

7   A.  No, it is not.

8   Q.  Why does it say basketball camp?

9   A.  We needed a reference when Danielle called me, and I just

10  instructed her to say basketball camp.

11  Q.  Did you tell your fiancée what this payment was for?

12  A.  Oh, I don't recall.

13  Q.  Did you ever get reimbursed for this wire payment that you

14  had your fiancée send to Timicha Kirby?

15  A.  I did.

16  Q.  From whom?

17  A.  Jim Gatto.

18  Q.  And did you discuss this payment with Mr. Gatto before you

19  got reimbursed?

20  A.  The same type of situation, that Billy Preston's family was

21  in a good place.

22  Q.  Now, let me direct your attention to Government Exhibit

23  1040, which is now in evidence.

24          Now, do you recognize what this document is?

25  A.  It is an invoice from myself, with my New England Playaz

Iabdgat3                        Gassnola - direct

1    account on it, to Jim Gatto.

2    Q.   And the date is May 1, 2017, with an amount of $70,000?

3    A.   Yes, that's correct.

4    Q.   What was the description for this invoice?

5    A.   "Tournament activation fee."

6    Q.   Was that description accurate?

7    A.   No.

8    Q.   Once again, how much is a tournament fee, typically?

9    A.   500 to a thousand dollars.

10   Q.   What was this money at least in part for?

11   A.   To give money to Billy Preston's family.

12   Q.   Now, let me direct your attention to Government Exhibit

13   306A-3, which is in evidence.

14           Could we look at the entry on May 31.  What is

15   reflected there?

16   A.   A copy -- it is a copy of a wire from Adidas into my New

17   England Playaz account at Berkshire Bank of $70,000.

18   Q.   Is that the same amount of money that was reflected in the

19   invoice that we just looked at?

20   A.   That's correct.

21   Q.   And now let's continue on this record to an entry on

22   June 14, 2017.

23   A.   It is an outgoing wire from my New England Playaz account

24   for $15,000 to Nicole Player.

25           MR. MARK:  And, now, Ms. Lee, could we publish

1    Government Exhibit 306E?

2    Q.  Once again, what is this document, Mr. Gassnola?

3    A.  It is a copy of an outgoing wire from my New England Playaz

4    account for $15,000, sent to Nicole Player.

5    Q.  Is this reflecting the same wires that we just looked at in

6    the statement?

7    A.  It is.

8    Q.  And is the date June 14, 2017, in the amount of $15,000?

9    A.  Correct.

10   Q.  And the beneficiary listed at the bottom is -- it says

11   Nichelle Player.  Is that the same person you know as Nicole

12   Player?

13   A.  Yes.  I had always known her as Nicole.  I had never heard

14   of Nichelle.

15   Q.  Did it send this wire to her account?

16   A.  It did.

17   Q.  Who, if anyone, at Adidas did you discuss this payment

18   with?

19   A.  Jim Gatto.

20   Q.  Did you give Billy Preston's mother any additional money?

21   A.  I did.

22   Q.  Approximately how much?

23   A.  $4,000.

24   Q.  When was that?

25   A.  Late summer/early fall of 2017.

Iabdgat3                    Gassnola - direct

1   Q.  Let me direct your attention to Government Exhibit 107S-1,

2   and 107S-5.

3          Do you recognize these two documents?

4   A.  Yes.  It is a text message thread between me and Nicole

5   Player.

6          MR. MARK:  The government offers them, Exhibit 107S-1,

7   and 107S-5.

8          MR. SCHACHTER:  Your Honor, may we have just a moment?

9          THE COURT:  All right.

10         MR. SCHACHTER:  No objection, your Honor.

11         THE COURT:  Received.

12         (Government's Exhibits 107S-1 and 107S-5 received in

13   evidence)

14         MR. MARK:  Your Honor, permission to publish first

15   Government Exhibit 107S-1?

16         THE COURT:  Yes.

17  Q.  Mr. Gassnola, could you just read the top portion from the

18  text chain on August 15, 2017?

19  A.  "All is well.  Got Billy a car.  Gonna drive it down to KU

20  on Saturday.  What kinda car did you get him?  You're a great

21  mama.  I got him a Dodge Charger.  Love it."

22  Q.  Now, could we just continue down to the portion of the text

23  chain on -- from Friday, September 22, 2017.

24         If we could just -- if you could just read what you

25  wrote, starting at "have"?

Iabdgat3                    Gassnola - direct

1   A.  Say that again.

2   Q.  From your side of the chain, just what you wrote that's

3   been highlighted.

4   A.  "Have money for you, 4K.  Gonna send it late today, early

5   tomorrow when I get out of Atlanta."

6           Do you want me to read hers, too?

7   Q.  Sure.  You can just read her response.

8   A.  "OK.  Couldn't remember what you told me.  Did something

9   change from what you told me yesterday?"

10  Q.  OK.  And then you wrote:  "No, get 4K in your account early

11  Tuesday"?

12  A.  Yes.

13  Q.  And with respect to all the payments that you made to the

14  family of Billy Preston, who at Adidas did you discuss them

15  with?

16  A.  Jim Gatto.

17  Q.  What, if anything, did Mr. Gatto say about whether he

18  approved them?

19  A.  He approved them.

20  Q.  And with respect to all the payments you've told us about

21  to the family of Billy Preston, what, if anything, did you say

22  about them to anyone at the University of Kansas?

23  A.  Never a thing.

24  Q.  When did you first hear about this investigation?

25  A.  September 26.

Iabdgat3                    Gassnola - direct

1   Q.  And who did you learn about this investigation from?

2   A.  Dan Cutler and Chris Rivers.

3   Q.  After learning about this investigation, did you transfer

4   any money?

5   A.  I did.

6   Q.  How much?

7   A.  $38,000.

8   Q.  From what account to what account?

9   A.  My New England Playaz account to my fiancée's account.

10  Q.  Is the New England Playaz account that you transferred

11  money from the one that we have been looking at a lot today?

12  A.  It sure is.

13  Q.  Did you attempt to communicate with anyone upon learning of

14  this investigation?

15  A.  I attempted to communicate with Rick Pitino at the

16  University of Louisville via text the day that I found out

17  about all of this and my attorney.

18  Q.  And why did you reach out to Coach Pitino?

19  A.  Everything had hit me.  I was coming through the airport,

20  and I was just looking for information.  So instinctively, I

21  don't know, I reached out to him.  I'm not sure why at this

22  time I did but I texted him.

23  Q.  And you mentioned that you made that transfer from your

24  account that we've been talking about to Ms. Labarre's account.

25  Why did you make that transfer?

Iabdgat3                    Gassnola - direct

1    A.  Because I had been doing the exact same thing and I figured

2    it was a matter of time before you guys knocked on my door.

3    Q.  Did Ms. Player also reach out to you on this date?

4    A.  She did.

5    Q.  Did there come a time after September 26th or after

6    September 2017 when you spoke again with Ms. Player?

7    A.  Yes.

8    Q.  Who initiated the contact?

9    A.  She did.

10   Q.  What, if anything, did she say about why she was initiating

11   contact with you?

12   A.  She -- Billy had the University of Kansas.  She had met

13   with the University of Kansas' lawyers, and she was telling me

14   that she was going to tell them that me and her had a -- a

15   relationship.  Therefore, it was OK that I was -- of the money

16   I was giving her because she was telling them that we were

17   intimate and hoped that it doesn't bother my fiancée.  I said,

18   "OK, Nicole.  Great.  Thanks."

19   Q.  Was that accurate at all?

20   A.  No.

21   Q.  And just so it's clear, what did she say to you about what

22   was her concern?

23   A.  Can you repeat that question?

24   Q.  What if anything did she say to you was her concern with

25   Kansas?

Iabdgat3                    Gassnola – direct

1  A.  That they were going to find out about the money that I had

2  given her.

3           MR. MARK:  Ms. Lee, may we publish Government Exhibit

4  107S-5, which was just received into evidence.

5           And could we just highlight the top, from 5:37 to

6  5:39.  Just a littler higher.  Great.

7  Q.  Could you just read for us what Ms. Player wrote to you and

8  how you responded?

9  A.  "My kid can't play."  I wrote, "This is awful."

10  Q.  You don't need to use the curse words.

11  A.  "Who you telling?"  She says.  "I can only say I am sorry

12  so much."  Nicole, "I'm sorry".  "It's OK."  "Is he OK?"  "No,

13  he's distraught."  "I don't know what to say" was my reply.

14  Q.  Could we go down on the chain and continue down.

15           What did you write?

16  A.  "I was always just trying to help you, to avoid the exact

17  situation."

18  Q.  And what situation were you referring to there?

19  A.  Her taking money, payments to her and her family.

20  Q.  And what had she just told you about what happened to her

21  son?

22  A.  That he wasn't able to play.

23           MR. SCHACHTER:  Objection.

24           THE COURT:  Overruled.

25  Q.  And now could we continue onto the next page and just

 1   highlight what is from 6:23 to 6:32.

 2          Could you read what she wrote to you and your

 3   response?

 4   A.  "So because you didn't talk to KU, Billy can't play."  I

 5   put question mark and call you in 20 minutes.

 6   Q.  Did you in fact speak with her?

 7   A.  I did.

 8   Q.  When you spoke with her, what did she say to you and what

 9   did you say to her?

10   A.  That I needed to speak to the university attorneys and tell

11   them that nothing happened between me and her in reference to

12   money, that Billy never -- that she never got any money.

13   Q.  When you say "the university attorneys," are you talking

14   about Kansas University attorneys?

15   A.  Yes.

16   Q.  Now, could we continue on down the chain, and just

17   highlight from 2:40 to 2:41.

18          This is now dated November 16, 2017.

19   A.  "Hey, hope all is well.  Did your lawyer get a chance to

20   get a statement to their lawyer?  Yes."

21   Q.  And had you discussed prior to this text message with

22   Ms. Player a statement going to Kansas' lawyer?

23   A.  Yes.

24   Q.  What had you discussed with Ms. Player about that?

25   A.  That I would instruct my attorney to write a letter to the

1  Kansas attorneys saying that nothing went on financially

2  between myself and her.

3  Q.  And did you direct anyone to make a statement to the

4  University of Kansas on your behalf?

5  A.  I directed my attorney, Danny Kelly, to write a letter

6  saying just that.

7  Q.  And when you say "just that," what did you direct him to

8  say?

9  A.  That there was no improprieties, that there was no money

10  given to Billy Preston or the family, therefore he should be

11  able to play.

12  Q.  And was that true, were there no improprieties related to

13  Billy Preston?

14  A.  Absolutely not.  It was not true.

15  Q.  And at this point in time, had you been approached by law

16  enforce.

17  A.  I had.

18  Q.  Had you started your cooperation with the government?

19  A.  No.

20  Q.  Why did you ask your attorney, Dan Kelly, to lie to the

21  University of Kansas about Billy Preston and Nicole Player?

22  A.  Because I didn't want it to be found out.  I wanted Billy

23  to play, and I didn't want anybody at Kansas, the coaching

24  staff, to find out that I did that.

25          MR. MARK:  No further questions, your Honor.

1    THE COURT:  All right.  Thank you.

2         Cross-examination.

3         MR. SCHACHTER:  Thank you, your Honor.

4    CROSS-EXAMINATION

5    BY MR. SCHACHTER:

6    Q.  Good afternoon, Mr. Gassnola.

7    A.  Good afternoon.

8    Q.  Hi.  My name is Mike Schachter and I represent Jim Gatto.

9         Sir, Adidas is a multi-billion-dollar company, is that

10   correct?

11   A.  Yes.

12   Q.  It makes sports apparel?

13   A.  They do.

14   Q.  For a lot of different sports, is that correct?

15   A.  That's correct.

16   Q.  Everything, soccer, running, tennis, you name it?

17   A.  Yep.

18   Q.  And everyday clothes as well?

19   A.  Yes.

20   Q.  And one of the types of apparel that Adidas sells is

21   basketball merchandise, is that correct?

22   A.  They do sell basketball merchandise, yes, they do.

23   Q.  Do you understand that to be a relatively small business

24   line at Adidas?  Do you know one way or the other?

25   A.  I don't.

1  Q.  OK.  You spoke about some of the ways that Adidas markets

2  its basketball apparel when Mr. Mark was asking you questions.

3          Sir, they do, they market basketball apparel in a

4  number of different ways, is that correct?

5  A.  I'm not exactly an expert on it, but, yes, they do.  I

6  don't really pay attention to it, to be honest with you, but

7  yes.

8  Q.  You mentioned that one way is through endorsement deals

9  with NBA players, is that right?

10  A.  That's correct.

11  Q.  They have, for example, relationships with, like, Kobe

12  Bryant or James Harden of the Houston Rockets, is that right?

13  A.  James Harden, yes.

14  Q.  I'm sorry, I misspoke.

15          So there is the NBA component of it.  And then Adidas

16  also sponsors colleges, is that correct?

17  A.  They are in partnership agreements with universities,

18  that's correct.

19  Q.  Do you understand that as part of those partnership

20  agreements, Adidas pays millions of dollars to those

21  universities for the right to be that sponsor?

22          MR. MARK:  Objection.

23          THE COURT:  Sustained.

24  Q.  Well, I think when Mr. Mark was asking you questions, he

25  asked you about the relationship that Adidas has, for example,

 1  with the University of Kansas.  Do you recall those questions?

 2  A.  Yes, I do.

 3  Q.  And can you describe to the jury what is the nature of that

 4  relationship?

 5  A.  Between basketball and Adidas?

 6  Q.  Yes, at the University of Kansas.

 7  A.  Could you rephrase that question again?  I'm sorry.

 8  Q.  Sure.  Can you describe your understanding of the nature of

 9  the relationship between Adidas and the University of Kansas?

10  A.  The only understanding that I have is the relationship that

11  we in the basketball marketing department had with the

12  University of Kansas coaching staff.  I never had a

13  relationship with anybody outside that with Kansas.

14  Q.  Do you understand that there is an Adidas logo on the

15  Kansas basketball team Jersey?

16  A.  I sure do.

17  Q.  Do you understand that Adidas pays money in order to have

18  that logo on the Kansas Jersey?

19  A.  I understand that.

20  Q.  Do you know if that amount is in the millions?

21          MR. MARK:  Objection.

22          THE COURT:  Sustained.

23          Now, Mr. Schachter, when I sustain an objection,

24  that's for good.  Do you understand?  We don't just recycle it

25  a few minutes later.

IABDGAT3                    Gassnola – cross

1          MR. SCHACHTER:  OK.  I'm sorry, your Honor.

2          All right.  Your Honor, may I be heard for just a

3   moment, please?

4          THE COURT:  No.

5   BY MR. SCHACHTER:

6   Q.  OK.  Do you understand, sir, that Adidas has its logo on

7   the Kansas Jersey so that it can be associated with a winning

8   team; is that your understanding?

9   A.  They have their logo on the Jersey.  Whether they win or

10  lose, the logo is still on there.

11  Q.  Sure.  But is the University of Kansas a successful

12  basketball team?

13  A.  Very successful.

14  Q.  And how about the University of Louisville, is that a

15  successful everything basketball team?

16  A.  Yes.

17  Q.  And does the University of Louisville basketball team's

18  Jersey also have an Adidas logo on it?

19  A.  Yeah.  Yeah, it does.

20  Q.  Now, Adidas also, talking about NBA and college, and then

21  Adidas also does something called grassroots marketing, is that

22  correct?

23  A.  Correct.

24  Q.  And you described that in your direct examination to some

25  extent, is that correct?

1   A.   Mm-hmm.

2   Q.   And, I'm sorry, you need to answer out loud just for the

3   court reporter.

4   A.   I apologize.  Yes, I did.

5   Q.   And grassroots marketing, that means support for teams at

6   the youth and high school level, is that right?

7   A.   I would agree with that, yes.

8   Q.   You are familiar with something called the AAU?

9   A.   Very much so.

10  Q.   And what does that stand for?

11  A.   Amateur Athletic Union.

12  Q.   And that is a summer league, is that correct?

13  A.   It can be all year long.  It can be 12 months.

14  Q.   Can you describe to the jury, what is relationship between

15  that AAU summer league -- or AAU league and college basketball

16  recruiting?

17            THE COURT:  If any.

18  A.   Because there's live periods where the universities can go

19  watch kids play on their summer teams -- because kids are in

20  school in the wintertime, so you have spring and you have

21  summer.  There are different weeks that are live events where

22  the colleges can go see them.  So it is very important that if

23  an Adidas college is watching, an Adidas grassroots program

24  that's sponsored by Adidas, and they see the kids playing,

25  there is some sort of synergy there.

1    Q.  Thank you.  And so college coaches and scouts will attend

2    summer tournaments at the AAU level, is that correct?

3    A.  Correct.

4    Q.  Now, Nike and Under Armour, do you understand they do the

5    same kind of marketing?

6    A.  I understand that.

7    Q.  Nike enters into endorsement deals with NBA players, is

8    that correct?

9    A.  Yeah.  Yes, they do, yeah.

10   Q.  And Nike sponsors way more colleges than Adidas does, is

11   that correct?

12          MR. MARK:  Objection.

13          THE COURT:  Sustained.

14   Q.  And Nike and Under Armour also do grassroots marketing, the

15   kind that you described with Mr. Mark, is that correct?

16   A.  They do.

17   Q.  Now, you talked a little bit about Jim's - Jim Gatto's role

18   at Adidas and his boss.  I believe Mr. Mark asked you about

19   that.  Do you recall that?

20   A.  Yep.

21   Q.  In 2017, the person that was in charge of basketball at

22   Adidas was a man named Kris Aman, is that correct?

23   A.  That's correct.

24   Q.  Jim was not the person in charge of basketball at Adidas,

25   is that correct?

1    A.  That's correct.

2    Q.  And you mentioned that Jim's boss was somebody named

3    Michael; do you remember that?

4    A.  I remember that.

5    Q.  And do you recall that that person's name is Michael

6    Ladinig?

7    A.  I heard his name pronounced 17 different ways.

8    Q.  OK.

9    A.  So I have no idea what this guy's last name was.

10   Q.  We'll try it that way.

11          Do you know that that Michael, whoever you pronounce

12   his name, perhaps Ladinig, was a senior director in charge of

13   global basketball sports marketing at Adidas?

14   A.  I never knew that.  I just knew that he was over Jimmy.

15   That is my lingo, how I thought of it.

16   Q.  I see.  Did you understand -- regardless of whether or not

17   you knew his title, did you understand that this guy Michael

18   was the person that was actually in charge of marketing for

19   basketball?

20   A.  I had some knowledge of it, yes, but I referred to him in

21   my mind as above Jimmy.

22   Q.  OK.  So Jim was not the person that was in charge of

23   basketball sports marketing at Adidas, that was this person

24   Michael, his boss, is that correct?

25          MR. MARK:  Objection.  Asked and answered.

1    THE COURT:  Sustained.

2    BY MR. SCHACHTER:

3    Q.  Jim worked in basketball sports marketing, is that correct?

4    A.  Yes.

5    Q.  And you described that you are familiar with, to some

6    extent, Jim's job at Adidas, is that correct?

7    A.  I think I'm familiar with it, yeah.

8    Q.  And within basketball sports marketing, Jim was mostly

9    focused on marketing by arranging for NBA players to wear

10   Adidas shoes and apparel, is that correct?

11   A.  Jim's first job -- his major job in my mind, that's my own

12   thought -- was to handle NBA athletes and sign them and

13   maintain a relationship.  I did know that, yeah.

14   Q.  That was the main part of job, is that correct?

15   A.  That is correct.

16   Q.  But part of his job was also to support the colleges that

17   Adidas sponsored, is that correct?

18   A.  Yes.

19   Q.  And you described yourself as sort of reporting to Jim, is

20   that correct?

21   A.  I reported to Jimmy.

22   Q.  And that was part of your job, is that correct?  You would

23   describe your job, in part as, doing whatever it took to help

24   the Adidas-sponsored schools, is that correct?

25   A.  I reported to Jimmy.  OK.

1           MR. MARK:  Objection.

2           THE COURT:  Overruled.  It has been answered.

3   A.  Repeat the question.

4   Q.  You say you reported to Jim, is that correct?

5   A.  That is correct.

6   Q.  And I just want to discuss with you your role, what you did

7   reporting to Jim, is that correct?  Do you understand what I am

8   asking?

9   A.  I'm following you so far.

10  Q.  OK.  And, sir, is it true that as part of -- you viewed

11  your job as doing whatever it took to help Adidas-sponsored

12  colleges?

13          MR. MARK:  Objection.

14          THE COURT:  Sustained.

15  Q.  Well, certainly you understood that part of your -- you

16  viewed part of your job as supporting the Adidas-sponsored

17  colleges, is that correct?

18          MR. MARK:  Objection.

19          THE COURT:  I think you are going to have to be a

20  little bit more specific.

21          MR. SCHACHTER:  OK.

22  Q.  OK.  Part of your job included helping the Adidas colleges

23  recruit top high school basketball players, is that correct?

24  A.  Part of my job, yes.

25  Q.  Now, you said that there was another Adidas employee named

1   Chris Rivers.  Do you remember testifying about him?

2   A.  Sure do.

3   Q.  And Mr. Rivers you described as the director of grassroots

4   marketing, is that correct?

5   A.  I said director of grassroots basketball, yes.

6   Q.  And his responsibility -- it was his responsibility to

7   decide which summer and -- or which AAU and high school

8   basketball teams Adidas would provide money to, is that

9   correct?

10  A.  He was the boss, yes.  It was his job in that space, yes.

11  Q.  Now, you said, sir, that -- I should say, in addition to

12  providing money to these high school and AAU basketball teams,

13  Adidas would also provide merchandise to those teams, is that

14  right?

15  A.  Right, yep.

16  Q.  And you are familiar with that because you ran one of these

17  AAU teams, is that correct?

18  A.  I ran the same program, yes.

19  Q.  Your team was called the New England Playaz, is that right?

20  A.  Correct.

21  Q.  That's P-l-a-y-a-z, right?

22  A.  I only went to high school.  I didn't go to college.

23  Q.  OK.  Very good.

24          Now, many of the -- and how long did you do that for,

25  did you run the New England Playaz?

1   A.  15 years.

2   Q.  Fair to say that many of the kids on your team came from

3   rough backgrounds, is that correct?

4           MR. MARK:  Objection.

5           THE COURT:  Sustained.

6   Q.  Well, many of the kids on your team did not have a lot of

7   money; is that fair to say?

8           MR. MARK:  Objection.

9           THE COURT:  Sustained.

10  Q.  Is it true, sir, that you gave money to some of the players

11  on your AAU team?

12  A.  For what?

13  Q.  Well, Martin -- you can tell us for what, but did you from

14  time to time give money to some of the players on your AAU

15  team?

16  A.  I did.

17  Q.  And can you describe to the jury for what, what kinds of

18  things?

19  A.  I've had kids over the years who did come from

20  single-income families, single-parent homes, and --

21          MR. MARK:  Objection.  Move to strike.

22          No objection to the purpose of it -- I mean, no

23  objection to where it went but as to the whole explanation.

24          THE COURT:  Yes.  Strike the answer.

25  BY MR. SCHACHTER:

1    Q.  OK, sir.  Why don't we try it this way.

2            Could you explain to the jury what you provided money

3    to those families or kids for but without describing their

4    backgrounds?

5            MR. MARK:  Objection.  Relevance.

6            THE COURT:  Sustained.

7            MR. SCHACHTER:  Your Honor, may I be heard on that?

8            THE COURT:  Sure.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (At the sidebar)

2   THE COURT:  Mr. Schachter.

3   MR. SCHACHTER:  Your Honor, the government --

4   according to the government's theory, each of these payments is

5   criminal activity.  I should certainly be able to explore with

6   this witness, a government cooperating witness, his prior

7   activity that the government considers to be criminal.  The

8   government's theory is that each time money is paid to an

9   athlete, it renders that child ineligible, and, therefore, the

10  result of that would be it would defraud colleges out of these

11  athletic scholarships that they would be obtaining.  So this

12  is, according to the government, criminal activity that I

13  should be able to explore with a cooperating witness what's the

14  activity that you engaged in that is criminal.

15  MS. DONNELLY:  I hate to interrupt.

16  THE COURT:  One lawyer at a time.

17  MS. DONNELLY:  Sorry.

18  THE COURT:  Mr. Mark.

19  MR. MARK:  I mean, I think, your Honor, Mr. Schachter

20  has already elicited the witness gave money.  That is not an

21  issue in dispute.  I don't think we need to get into what that

22  money was for for this purpose.  These are -- I don't think

23  there is any dispute that these are NCAA violations that are

24  being conducted here, and the witness will say that.

25  THE COURT:  I'm sorry.  You said what?  You don't

1    think there is any dispute that?

2              MR. MARK:  That these were NCAA violations and the

3    witness would say that.  We don't need to go down to what all

4    each of these payments were for.

5              MR. SCHACHTER:  Your Honor, it also goes to the

6    existence of a conspiracy, what was his state of mind when he

7    made all the different payments, similar payments that he had

8    made in the past.

9              THE COURT:  Mr. Schachter, you opened -- your

10   colleague -- by basically attempting to pitch this argument:

11   These are poor kids.  They come from ghettos.  They are very

12   needy.  Colleges and universities are making millions of

13   dollars.  And, therefore -- now I'm inserting, you didn't say

14   this in so many words -- therefore, the jury, regardless of

15   what actually happened here, should nullify because the NCAA

16   rules are unfair and unjust, which maybe they are and maybe

17   they aren't, but that's the pitch.

18             MR. SCHACHTER:  No, your Honor --

19             THE COURT:  You don't interrupt me, Mr. Schachter.

20             MR. SCHACHTER:  I apologize.

21             THE COURT:  That's the pitch.

22             Now, this man has testified for almost two days about

23   tens and indeed hundreds of thousands of dollars of illegal

24   payments that he facilitated, allegedly, with your client.

25   There is no doubt whatsoever that he has committed or

1  participated in the commission of innumerable NCAA rules

2  violations.  And I take the effect, and in all likelihood,

3  given the opening, the purpose of this line of examination to

4  be to solicit either jury sympathy or nullification, and I'm

5  excluding it under 403.

6          And if I hear another word about it, there is going to

7  be a problem.

8          MR. SCHACHTER:  Your Honor, for the record, I need to

9  make clear that my argument is not nullification.  My argument

10 is whether or not the activity is an NCAA rule violation or it

11 is wire fraud hinges on whether or not in their mind at the

12 time that they are making these payments they are thinking

13 about defrauding universities or whether there is something

14 different on their mind.  My intention --

15         THE COURT:  You examined him about the tens of

16 thousands of dollars that he paid to Billy Preston and Bowen

17 and all these other people.  We're not going down the line you

18 started on, and where you started was these are kids from tough

19 neighborhoods, single family -- single-parent families.  We are

20 just not going to do that, Mr. Schachter, and that's the end of

21 the subject.  Have I been clear?

22         MR. SCHACHTER:  You have been crystal clear, your

23 Honor.  I just wanted the opportunity to explain it in my

24 thinking.

25         THE COURT:  All right.

1    (In open court)

2         THE COURT:  Go ahead, Mr. Schachter.

3    BY MR. SCHACHTER:

4    Q.  OK, sir.  There was a point in time where there was a

5    newspaper article in which your management of the New England

6    Playaz was discussed, is that correct?

7    A.  There sure was.

8    Q.  And included in that article was discussions about, in

9    particular, a small payment that you had made to a family

10   associated with sending that child to Disney World, is that

11   correct?

12        MR. MARK:  Objection.  This is the same line of

13   questioning.

14        THE COURT:  It is.  Sustained.

15   Q.  The payments that you describe having made to the players

16   on your AAU team, those payments would have affected the

17   eligibility of -- potentially affected the eligibility of those

18   players to play in college, is that correct?

19   A.  Yes.

20   Q.  And you I believe described that more than 150 of the

21   players that were on your team went on to play -- get athletic

22   scholarships and play in college, is that correct?

23   A.  Yes.

24   Q.  Now, after this article came out in the Boston Globe -- I'm

25   sorry, that was around 2006, is that correct?

1   A.  Somewhere around there, yeah.

2   Q.  And in the years after -- well, withdrawn.

3       Sir, even after that article came out, Adidas entered

4   into a sponsorship arrangement with the New England Playaz, is

5   that correct?

6   A.  They stayed loyal to me after that article, that's correct.

7   Q.  And the person who was in charge of managing Adidas'

8   relationship with the New England Playaz, that was a man

9   named -- can you hold on for one second, please?  I'm sorry.

10  One moment, please.

11      THE COURT:  Mm-hmm.

12  Q.  Daren Kalish, is that correct, K-a-l-i-s-h?

13      MR. MARK:  Objection just as to the timing.

14      THE COURT:  I'm sorry?

15      MR. MARK:  Just as to the timing, if we could get a

16  clarification?

17      MR. SCHACHTER:  I will clarify.

18  Q.  In 2006, the person that was responsible for grassroots

19  marketing at Adidas was a man named Daren Kalish, is that

20  correct?

21  A.  Daren gave me my first contract, that's right.

22  Q.  And he was in charge of grassroots marketing at Adidas in

23  2006, around the time that this Boston Globe article came out,

24  is that right?

25  A.  That's right.

1   Q.  And after that Adidas' relationship with the New England

2   Playaz continued?

3   A.  It did.

4   Q.  Now, the government showed you an exhibit, 107K-4.

5           Can we just see that briefly?  This is in evidence.

6           And in this -- this is a text message between you and

7   Jim on -- I'm sorry, June 1, 2017, is that correct?

8   A.  Yep.

9   Q.  And you had sent him some kind of a ranking which was

10  reporting on the success of your kids' basketball program, is

11  that correct?

12  A.  It was a weekly ranking where my team was ranked that

13  particular week.  One of my an assistants sent it to me.  So we

14  were number five in the country then.

15  Q.  That is among how many teams?  Do you have any idea how

16  many teams are within that ranking?

17  A.  I don't know.

18  Q.  But your team was ranked very successfully?

19  A.  That week.

20  Q.  And you forwarded that to Mr. Gatto, correct?

21  A.  Sure did.

22  Q.  And then you wrote, "Six years ago NCAA shut me down.  Five

23  years ago Robbins cut me.  Appreciate you, man."  Right?

24  A.  Yep.

25  Q.  All right.  And you describe that you had -- you dealt with

1  an NCAA investigation, is that correct?

2  A.  I did.

3  Q.  And there was -- the result of that was a one-year

4  suspension, is that correct?

5  A.  I was banned from NCAA events as I was fighting that

6  particular ban.  I don't know if there was ever a suspension

7  but I was fighting them.

8  Q.  I see.  So you were temporarily suspended while that was

9  ongoing, and then ultimately you persuaded the NCAA that there

10  had been no -- nothing improper, is that correct?

11  A.  Persuaded them?

12  Q.  Well, they concluded that.  Withdrawn.  Withdrawn.

13       And then you said that five years ago Robbins cut you,

14  and that's a man named Jeff Robbins, is that correct?

15  A.  Yep.

16  Q.  And Mr. Robbins, fair to say that you and he had a

17  personality clash?

18  A.  Yeah.  We don't like each other at all.

19  Q.  And he -- OK.  But he wasn't the only person that you dealt

20  with at Adidas, is that right?

21  A.  That's right.

22  Q.  You also, as you said, worked with Chris Rivers?

23  A.  I worked with Chris Rivers and Jim Gatto.

24  Q.  And then also from time to time you would interact with

25  Chris McGuire, is that correct?

IABDGAT3                    Gassnola - cross

1    A.   From time to time.

2    Q.   He was the senior director of U.S. sports marketing, is

3    that right?

4    A.   Here we go again.  I don't know all this lingo.

5    Q.   That is fine.  If you don't know the answer, then it is OK

6    just to say you don't know.

7    A.   I don't know.

8    Q.   You also worked with somebody named Jim Murphy at Adidas?

9    A.   Yeah.

10   Q.   And what was Jim Murphy's -- do you know that he was the

11   director of U.S. sports marketing?

12   A.   No, but I know you are going to tell me that.

13   Q.   I'm not telling you anything.  I'm just asking questions.

14   A.   I don't know what his position is, what his title was, I

15   don't know.

16   Q.   What were their roles?  Can you describe what Mr. McGuire's

17   role was and Mr. Murphy's, as you understood it?

18   A.   I always would refer to Chris as the head of U.S. sports

19   marketing.  Whether I was right or wrong, I have no idea.

20            I have absolutely no idea what Jim's position was.  I

21   knew he handled -- he did a lot of universities, but I never

22   said, hey, Jim, let me have your business card, I want to go

23   over this.

24   Q.   I see.  Very good.

25            Now, in 2015, you and Adidas again entered into a

1    sponsorship agreement for your team, the New England Playaz?

2    A.  Yes.

3    Q.  And I would like to show you -- I would like to show the

4    witness, I don't think it is in evidence -- Government Exhibit

5    1053.

6         Do you recognize this?

7    A.  Yes.

8    Q.  And is this your sponsorship agreement with Adidas?

9    A.  It is.

10        MR. SCHACHTER:  We will offer Government Exhibit 1053.

11        MR. MARK:  No objection.

12        THE COURT:  Received.

13        (Government's Exhibit 1053 received in evidence)

14        MR. SCHACHTER:  May I publish it, your Honor?

15        THE COURT:  Yes, and then we are going to break for

16   lunch.

17        MR. SCHACHTER:  OK.  Showing -- this is -- can you

18   pull back, please, Mr. McCloud.

19   Q.  So this is your agreement with Adidas, and this is the

20   agreement that was entered into on February 15, 2015, is that

21   correct?

22   A.  Yep.

23   Q.  And it talks about how much in merchandise you will be

24   provided, is that correct?

25   A.  Correct.

1          MR. SCHACHTER:  And then could we turn to the second

2    page.

3          And the third page.

4          And the fourth page.

5          How about the last page.  OK.

6    Q.  And this agreement between you and Adidas was entered into

7    between you and Chris McGuire, the head of sports marketing, is

8    that correct?

9    A.  Yep.

10   Q.  And it was also entered into with or signed by Adidas

11   America's general counsel, Paul Ehrlich, is that correct?

12   A.  Yes.

13         MR. SCHACHTER:  Your Honor, this is a convenient time

14   to break.

15         THE COURT:  Yes.

16         Members of the jury, 2 o'clock, please.

17         THE CLERK:  All rise.  Would the jury please come this

18   way.

19         (Luncheon recess)

20

21

22

23

24

25

IAB8GAT4

AFTERNOON SESSION

2:00 p.m.

(Jury not present)

THE COURT:  I want to say something more about the ruling I made at the sidebar.

During the course of the opening statement on behalf of Mr. Gatto, counsel for Mr. Gatto went on for some time about how much money some college coaches make, how much revenue is brought in by some college teams, how much merchandise companies like Adidas make.

And then at page 71 of the transcript said, "The kids on the court, however, the ones whose blood, sweat and tears is making this game a billion dollar industry, they are not allowed to earn a dime.  And the NCAA, those bureaucrats who write the rule book and have decided that the athletes themselves don't get a share --"

At that point the government objected and I sustained the objection.

Counsel continued, "The NCAA made more than a billion dollars in 2017.

"Ladies and gentlemen, we are here today because the government alleges that Jim Gatto committed two federal offenses when Adidas took a tiny portion of the money that it brought in and shared it with the families of the players on the court."

1    And she went on from there to point to the $40,000

2    paid to the family of Dennis Smith and said, and I quote, "This

3    is a family that lived in public housing down in Fayetteville,

4    North Carolina."

5    I again sustained the objection.

6    And then a few pages later, at page 78 through 79 --

7    and I won't read the entire context -- counsel said, "The

8    evidence is also going to show that the families of these kids

9    know exactly how much value their sons are worth."

10    I sustained an objection, and told counsel to talk

11    about the case we are trying.

12    She continued by saying, "The evidence will show that

13    these families do what any smart business person would do.

14    They negotiate with the various colleges that are trying to

15    recruit their sons."

16    Now, the purpose of this trial is not to determine

17    whether the NCAA amateurism rules are good or bad.  It has

18    nothing to do with it.  And in the course of the jury

19    selection, efforts were made to ensure that we had a jury that

20    was able to put out of their minds any views they might hold on

21    that subject and to decide this case fairly, impartially, on

22    the basis of the evidence put forward in this trial and the

23    instructions of the Court at the conclusion of the trial.

24    The reason for that is because the government and

25    these defendants are entitled to a verdict that is not swayed

1    by extraneous considerations about the NCAA, the wisdom of its

2    rules.  The question is whether federal statutes were violated.

3    There is a relationship of the NCAA rules to that, perhaps, but

4    it's not the wisdom of the rules.

5             I sustained the objections during the opening because

6    it was my view, and it remains my view, that the introduction

7    by counsel for Mr. Gatto of the issue of the wisdom and impact

8    of those rules on college players and others doesn't belong in

9    this courtroom.  It belongs in the NCAA or the halls of

10   Congress or in the boardrooms of universities.  It has no

11   proper bearing on this case.

12            Now, right at the beginning of the cross-examination

13   of Mr. Gassnola, Mr. Schachter, counsel for Mr. Gatto, began by

14   asking, "Many of the kids on your team did not have a lot of

15   money, is that fair to say?"

16            And of course an objection was sustained again for the

17   same reason.  It doesn't matter if they were children of Bill

18   Gates or of welfare mothers.  That's not the issue.

19            Then he went on to the subject of whether Mr. Gassnola

20   had given money to players on his AAU teams.  And I sustained

21   objections.

22            Whether it was the intention, as I am inclined to

23   think, or not the intention of counsel to try to elicit the

24   sympathy of the jury for the college players who suffered

25   adverse consequences by reason of enforcement of the NCAA

rules, whether it was an invitation for the jury to put aside

the evidence in this case and the law and do what counsel was

suggesting in the opening statement was the equitable result,

which was to overlook payment of these kids, which would have

been highly improper, or something else, it was manifestly

inappropriately, and that's the basis for the ruling.

I have very significant doubt that evidence of the

kind that Mr. Gatto's lawyers opened on in this respect, and

that they sought to elicit earlier, is relevant, in the sense

that none of it has, in my view, any bearing, certainly any

significant bearing, on whether a crime was committed here.

But even if it had some small probative value, that probative

value is substantially outweighed by the danger of unfair

prejudice, which is defined as a tendency, evidence with a

tendency to produce a verdict that is not based on the law or

the evidence, but on some extraneous consideration, or

confusing the issue, misleading the jury, undue delay, wasting

time, or needlessly presenting cumulative evidence.  In my

view, all or substantially all of those factors were triggered

by that attempted cross-examination.  It was inappropriate in

my judgment.

Now, I should say also that counsel suggested to me at

the sidebar that, on the government's theory, every time Mr.

Gassnola gave some kid on an AAU team money to go to Disneyland

or to buy Cokes or anything else it was a rules violation.  It

1  may have been.  The bottom line is, so what?  Mr. Gassnola has

2  testified to his involvement in the payment of tens and

3  hundreds of thousands of dollars to high school players, or

4  their families, to influence them to go to particular schools.

5  Those were big violations, assuming of course they occurred.

6  It's not my job to decide that, and I don't.

7         Any additional contribution that could possibly have

8  been made to assessing Mr. Gassnola's credibility as a witness,

9  by whatever happened when he was running the New England

10 Playaz, in terms of giving some kid on the team some payment

11 for something or other, adds nothing, or nothing significant.

12 And I will not have it, Mr. Schachter.  I will not have it.

13        OK.  Now, I gather counsel had something else they

14 wanted to raise.

15        MR. SCHACHTER:  Yes, your Honor.  We heard the Court

16 loud and clear and understand the Court's concerns.

17        I raise a different issue, and I just wanted to let

18 the Court know where I was headed in portions of the

19 cross-examination of Mr. Gassnola just so the Court understands

20 the purpose of some of the questions.

21        Mr. Gassnola testified that he had concealed the

22 payments that he was making from certain college coaches and,

23 in particular, the college coaches at the University of Kansas.

24 Some of the questions that we will be exploring with Mr.

25 Gassnola on cross-examination are designed to undermine that

1  statement and to demonstrate through the evidence that in fact

2  he had communicated with the college coaches about these

3  payments at the University of Kansas.  What the University of

4  Kansas is and, more importantly, what the University of Kansas

5  was to these particular defendants may be an issue that is

6  argued before the jury, but I just wanted to let the Court know

7  that I would be exploring with Mr. Gassnola his relationship

8  with the Kansas coaching staff and, in particular, certain

9  communications he had with the Kansas coaching staff, which we

10  believe undermines his statement that he did not advise them of

11  the payments that he was making.

12      I just wanted to let your Honor know what one of the

13  subjects of the cross-examination would be so that your Honor

14  would have a sense of the purpose of where I was going.

15      MR. MARK:  Your Honor, we haven't heard the questions,

16  but in general we don't have an objection to that sort of line

17  of questioning as he describes it here.

18      THE COURT:  Yes.  I can't tell anything until I hear

19  the questions, can I?

20      All right.

21      MR. MOORE:  Can I ask one question?  I want to make

22  sure that I don't run afoul of your Honor's ruling, and I think

23  I understand.

24      THE COURT:  I think you do too.

25      MR. MOORE:  My only point here is that the government

1   has to prove a conspiracy to defraud the universities, and they

2   have to prove a specific intent, we believe, to defraud the

3   universities.  One of the things that Mr. Schachter did not get

4   to in his attempted cross-examination was a statement by Mr.

5   Gassnola, back in 2006, that when a payment of $100 to a star

6   player to go it Disney World was discovered he said, "The kid

7   has no money so I am helping him out.  You want to throw me in

8   jail for that, go ahead."  That was his statement in the paper.

9        I would like to inquire about that statement and not

10  the background of why he might have paid a kid money or what

11  the kid's financial status was, for this reason, your Honor.

12  To go into the issue of the alleged materiality of these

13  certifications.  Because at the end of the day, universities, I

14  think one can infer from this, that universities understood

15  that Mr. Gassnola was paying his players, and they didn't

16  disassociate themselves from him.

17       So that would be the point of that prospective

18  cross-examination.  I think I know what your Honor is going to

19  tell me, but I felt like I needed to put that on the record to

20  ask if that cross-examination is forbidden by your Honor's

21  ruling.  I am assuming it is.  I don't know.

22            THE COURT:  What is the government's view?

23            MR. MARK:  This is the exact same line of questions

24  Mr. Schachter went down, and we think, for all the reasons your

25  Honor just said, this should be foreclosed.

1       THE COURT:  You're not going there.

2       MR. MOORE:  Yes, sir.  I just wanted to make sure.

3       THE COURT:  Let's get the jury.

4       (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2     THOMAS JOSEPH GASSNOLA, resumed.

3          THE COURT:  Jurors are all present.  The defendants

4     are present.  The witness is still under oath.

5          Mr. Schachter, any further questions?

6          MR. SCHACHTER:  Yes, please, your Honor.

7     BY MR. SCHACHTER:

8     Q.  Mr. Gassnola, part of your job at Adidas was to support

9     three colleges, Kansas, Indiana University and NC State, is

10    that correct?

11    A.  Partially, yes.  I talked to other schools too, but that's

12    mainly right.

13    Q.  And Adidas competes with Nike and Under Armour to win

14    sponsorship arrangements with colleges, is that correct?

15    A.  That's correct.

16    Q.  You believe that Nike was very good at developing

17    relationships with college coaches?

18    A.  Yeah.  I agree with that, yes, they were.

19    Q.  And before 2012, it was your view that Adidas was bad at

20    that, is that correct?

21    A.  That was my view, yeah.

22    Q.  Adidas, before 2012, had lost a lot of sponsorships to

23    Nike, is that correct?

24    A.  Nike and Under Armour.

25    Q.  And part of your job with Adidas was to develop

1  relationships with the colleges, is that correct?

2  A.  Jim asked me to further our relationships with the college

3  coaching staffs, yes.

4  Q.  For example, when Nike's sponsorship of University of Miami

5  was ending, you were asked to try to focus on trying to develop

6  a relationship with the University of Miami, is that correct?

7  A.  I was asked to focus on my relationship for a few years

8  with Coach Larranaga.

9  Q.  And Coach Larranaga is the head basketball coach at the

10  University of Miami?

11  A.  He is.

12  Q.  Your efforts were successful, the University of Miami

13  entered into a sponsorship arrangement with Adidas, is that

14  correct?

15  A.  It did.  I don't know if I'm the reason for it.

16  Q.  Do you believe that you assisted in achieving that?

17  A.  I think I assisted explaining to Coach Larranaga where we

18  were as a basketball company; I think I succeeded in that.

19  Q.  I believe you described in part your job -- the way you

20  viewed your job was to be an ambassador for the Adidas brand,

21  is that right?

22  A.  I thought that, yes.

23  Q.  In your role running the youth basketball team, you got to

24  know a number of college coaches, is that right?

25  A.  I did.

1    Q.  You, for example, were very close with John Calipari, is

2    that correct?

3    A.  I have known him since I was 15.

4    Q.  That's the head coach of the University of Kentucky and

5    University of Massachusetts before that?

6    A.  He was at U Mass, then Memphis, and Kentucky.

7    Q.  You also had what you would describe as a great

8    relationship with University of Kansas head coach Bill Self, is

9    that correct?

10   A.  Very good relationship, yes.

11   Q.  You had known Bill Self for more than a decade, is that

12   right?

13   A.  Somewhere around there.  I would say that's right.

14   Q.  In fact, you and your fiance and Mr. Gatto had dinner with

15   Coach Self and his wife just before his Hall of Fame induction

16   ceremony, is that correct?

17   A.  We did.  He paid for it.

18   Q.  Coach Self, part of the way you got to know him is because

19   he had recruited basketball players from your youth basketball

20   team, is that correct?

21   A.  That's correct.

22   Q.  And then as you came to take on the role with Adidas of

23   developing relationships with college coaches, your

24   relationship with Coach Self improved at that point, is that

25   correct?

1    A.  I would say that's fair, yeah.  Correct.

2    Q.  Is it fair to say you feel strongly about your relationship

3    with Coach Self, is that right?

4    A.  Define strongly.  Define that.

5    Q.  Fair enough.  You would say that -- in fact, you are so

6    close to him that you have told him that you loved him, is that

7    correct?

8    A.  Yeah.

9    Q.  In the way that sometimes people do, not like -- I don't

10   mean to suggest that you have an emotional relationship with

11   Coach Self, but it's the kind of relationship that you have

12   with him where you would say, love you, man, for example?

13   A.  Yeah.  I said that to him.

14   Q.  I want to talk a little bit about Adidas's efforts, that

15   you were just a part of, to cultivate relationships with

16   college coaches.  OK?

17   A.  Yeah.

18   Q.  Adidas, for example, would host an annual college coaches

19   conference, is that correct?

20   A.  You mean retreat?

21   Q.  Thank you.  Retreat.  Yes.  An annual college coaches

22   retreat?

23   A.  Yes.

24   Q.  In 2017 the Adidas coaches retreat was at a fancy resort in

25   Costa Rica, is that correct?

1    MR. MARK:  Objection.  Relevance.

2    THE COURT:  Sustained.

3    Q.  Is it fair to say that, based on your work with Adidas, you

4    viewed it to be important to Adidas to keep the college coaches

5    happy, is that correct?

6    MR. MARK:  Objection.

7    THE COURT:  Sustained.

8    Q.  Did you understand that college coaches had a role in

9    making the decision as to whether a university would enter into

10   a sponsorship agreement with a particular apparel company?

11   MR. MARK:  Objection.  Relevance.

12   THE COURT:  Overruled.

13   A.  Can you rephrase that question?

14   Q.  Sure.  Did you understand that college coaches played a

15   role in deciding which apparel company a university may choose

16   to be its sponsor?

17   A.  That depends on the university coaches.  I can't answer

18   that for all of them.

19   Q.  But in your experience, do any of the college coaches have

20   a say in what apparel company a particular university is going

21   to choose as its sponsor?

22   A.  Again, a few of them do, not all of them, in my opinion.

23   Q.  Yes or no, did you view part of your role as trying to make

24   sure that universities didn't switch from Adidas to either one

25   of their competitors, Nike or Under Armour, did you view that

1  as part of your job?

2  A.  I viewed my job to make sure that the coaching staffs of

3  the basketball teams were happy with us and the basketball

4  marketing department.  I never talked to anybody at the

5  university.

6  Q.  A coach works with the university?

7  A.  I think so, yeah.

8  Q.  All right.

9        Now, you testified that you were paid, I believe,

10  $150,000 per year by Adidas separate and apart from your

11  receipt of money to support the New England Playaz basketball

12  club, is that correct?

13  A.  Last two years, that's correct.

14  Q.  And then separately Adidas would pay for expenses that were

15  associated with your team?

16  A.  Yes.

17  Q.  And then other expenses, as you testified in direct

18  examination?

19  A.  I travel, my travel expenses, yes.

20  Q.  And Jim arranged for these expenses to be paid out of the

21  marketing budget that he had at Adidas, is that correct?

22  A.  Yes.

23  Q.  Did you understand -- again, just yes or no.  If you didn't

24  have an understanding, please let us know -- did you understand

25  that Jim had a relatively large budget for marketing at Adidas?

1   A.  I never --

2           MR. MARK:  Objection.  Relevance.

3           THE COURT:  Sustained.  Stricken.

4   Q.  You were shown some invoices by Mr. Mark on direct

5   examination.  Do you remember that?

6   A.  Yeah.

7   Q.  I want to just ask you about these invoices that you were

8   shown.

9           MR. SCHACHTER:  Can we put up Government Exhibit 1023

10  in evidence.

11          May I publish that, your Honor?

12          THE COURT:  Yes.

13  Q.  This is the invoice for $50,000, October 15, 2016.  And

14  this is an invoice that was submitted that you received

15  reimbursement for, is that correct?

16  A.  That's correct.

17  Q.  And you understood that Jim submitted these invoices to

18  internal finance people at Adidas?  Did you understand that?

19  A.  I didn't have an understanding of that.  I assumed so.  I

20  didn't ask him the details.

21  Q.  Did you understand, though, that the purpose of these

22  invoices was so that Adidas would then disburse money to you?

23  A.  Yeah.

24  Q.  You understood that these invoices were to be used

25  internally at Adidas to determine which budget the money was

1  going to be paid to you from.  Did you have that understanding,

2  yes or no?

3        THE COURT:  Sustained.

4  Q.  You sent these invoices to Mr. Gatto, is that correct, at

5  Adidas?

6  A.  Yes.

7  Q.  You did not send these invoices to anybody on any coaching

8  staff at any university, did you?

9  A.  You're asking me if I sent an invoice to a college coach?

10  Q.  Exactly.  That's what I am looking to establish.

11        The answer is no, right, you didn't send this invoice

12  to any college coach?

13  A.  No.

14  Q.  You didn't send this invoice to anyone that worked with any

15  university, did you?

16  A.  No.  I never sent an invoice to a university employee or a

17  college coach.

18  Q.  These invoices are to be sent to Adidas, correct?

19  A.  Yeah.

20        THE COURT:  The repetition is beginning to get out of

21  hand, Mr. Schachter.  Let's move.

22        MR. SCHACHTER:  Yes, your Honor.

23        You can take that down.  Thank you.

24  Q.  All right.  In your first day of testimony, the government

25  asked you about the use of the term Black Opp's team at Adidas.

1   Do you remember that?

2   A.  Clearly.

3   Q.  Now, this was a term that Chris Rivers used to describe the

4   grassroots and college marketing team at Adidas, is that

5   correct?

6   A.  When he referred to Black Opp's, he was referring to the

7   guys in that e-mail, people in that e-mail, the people in that

8   e-mail.

9   Q.  Understood.  Did those people all work in the grassroots

10  college sports marketing team at Adidas?

11  A.  Worked in basketball sports marketing, yes.

12  Q.  Is it fair to say that that group, the sports marketing

13  team, viewed itself as being in fierce competition with the

14  basketball sports marketing people at Nike and at Under Armour,

15  is that correct?

16  A.  I would say you're spot on.

17  Q.  The basketball sports marketing team competed with Nike and

18  Under Armour not just over college sponsorships, but also over

19  the ability to sponsor successful youth basketball teams, is

20  that correct?

21  A.  Yes.

22          MR. SCHACHTER:  Can we put up Government Exhibit 1141.

23          Your Honor, may I publish that?

24          THE COURT:  Yes.

25  Q.  This is an e-mail that you received, that you were shown by

1     the government, on February 17, 2015.

2            MR. SCHACHTER:  Can we just blow up the very top?

3     Q.  You said that all of these people were a member of what you

4     said would refer to themselves as the Black Opp's team at

5     Adidas, is that correct?

6     A.  Rivers referred to these people as the Black Opp's.  I

7     didn't refer to them as the Black Opp's team.

8     Q.  It also says "Adidas Soul Patrol, a/k/a Black Opp's," is

9     that right?

10     A.  Yes.

11     Q.  Soul Patrol, is that a pun?

12     A.  Is it a what?

13     Q.  A pun.  It's a sneaker company.  Soul, S-O-U-L, or S-O-L-E.

14     A.  No.

15     Q.  OK.  I may be the only person that saw that.

16            These names were used by Mr. Rivers interchangeably,

17     he would call this group the Black Opp's team or he would call

18     them the Soul Patrol, is that correct?

19     A.  He called them the Black Opp's team.  There were certain

20     people that I called the Soul Patrol.

21     Q.  Now this group, this e-mail, these members, this shows that

22     there's nine members of the Black Opp's Soul Patrol team, is

23     that correct, according to Mr. Rivers?

24     A.  Yes.

25     Q.  But there's other people that you considered part of the

1  Black Opp's Soul Patrol team beyond just these nine, is that

2  correct?  In other words, there was a larger team than this?

3  A.  You have got to repeat that because I am getting lost here.

4  Q.  Let me ask a more direct question.

5       You, I believe, also would have thought of as part of

6  the Black Opp's Soul Patrol sports marketing team, you would

7  also include in that a man named Etop Udo-Ema, is that correct?

8  A.  I don't know if I personally would have included him in

9  that at this time back in 2015.  I can't recall that, but I

10  don't think I would have referred to Etop as part of this.

11  Q.  Thank you.

12       At any point in time did you consider Etop to be part

13  of the Black Opp's Soul Patrol sports marketing team?

14  A.  I don't recall.

15  Q.  I am going to show you what has been marked -- for the

16  witness only -- 3503-12, at 2.

17       Sir, if you could just look at that on the screen and

18  just review this to yourself, and then just let us know when

19  you're done.  The first sentence that's blown up, if you could

20  just read that to yourself and let us know when you're done.

21       Are you all done?

22       Does that refresh your recollection that you

23  considered Mr. Etop to be a member of the Black Opp's team?

24  A.  It refreshes my memory, yes.

25  Q.  So you did consider him to be a member of the Black Opp's

1   Soul Patrol team?

2   A.   A member, yeah.

3   Q.   In addition to that, there was a woman named Tracy Moore,

4   you considered her to be a member of the Black Opp's Soul

5   Patrol sports marketing team at Adidas?

6   A.   Can you refresh my memory who Tracy is?

7   Q.   I can only ask the questions.  If you don't remember that's

8   OK.

9   A.   I don't remember.

10   Q.   Do you recall being interviewed by the FBI and members of

11   the U.S. Attorney's Office on January 2, 2018?

12   A.   I don't.

13   Q.   You don't remember that?

14          I am just going to show you -- if I may, your Honor --

15   Exhibit 3503-12, just the first page.

16          Just look at this document, sir.

17          MR. SCHACHTER:  We don't need to blow it up yet.

18   Q.   I will direct your attention to the first paragraph, and

19   then also the date at the bottom.  Just let us know when you're

20   done.

21          The only question is, does that refresh your

22   recollection that you met with the government on January 2,

23   2018.

24          I see.  I apologize.  Does this refresh -- let me ask

25   a different question.

1          Do you remember meeting with the government on

2    December 28, 2017?

3    A.   Is this from December 28, 2017?

4    Q.   Without talking about the document, if you can just look at

5    that and if you see, there is a date on the very bottom, if you

6    can just look at that and see if that refreshes your

7    recollection that you met with the government on December 28,

8    2017.

9    A.   I am confused.  This document says January 9.

10         THE COURT:  Don't talk about the contents of the

11   document, Mr. Gassnola, please.

12   Q.   Putting aside the date, why don't we try this.

13         Do you recall telling the members of the FBI that

14   Tracy -- withdrawn.

15         How about somebody named --

16         MR. SCHACHTER:  You can take it down, Mr. McLeod.

17   Q.   Do you recall somebody named Tonie Hanson being a member of

18   the team?

19   A.   I remember Tonie Hanson being in e-mails, yes.

20   Q.   You viewed her as being part of the Black Opp's Soul Patrol

21   team?

22   A.   I viewed her as an assistant to Jimmy and Chris.

23   Q.   OK.  Sir, isn't it true that when you met with the

24   government on December 28, 2017, you identified Tonie Hanson as

25   being a member of the Black Opp's team?

1      MR. MARK:  Objection.  Relevance.

2      MR. SCHACHTER:  I will withdraw the question.  I will

3  put a different question.

4  Q.  In other words, sir, the number of members of the Black

5  Opp's Soul Patrol team, that was a larger number than just the

6  people that were on the e-mail that we saw a moment ago, is

7  that correct?

8  A.  OK.  That's correct.

9  Q.  OK.  Thank you.

10      Now, Mr. Mark asked you what a Black Opp was, and you

11  said that it's an operation that's dark and underground and you

12  didn't want anybody to know about it.  Do you recall that?

13  A.  I do.

14  Q.  Would you agree with me that if the Black Opp's Soul Patrol

15  team was responsible for dark, underground and secret missions,

16  that perhaps writing an e-mail among 15 different employees at

17  a global corporation would not be the best way to keep it dark

18  and secret?

19      MR. MARK:  Objection.  Argumentative.

20      THE COURT:  Sustained.

21  Q.  Now, you said that part of what the Black Opp's Soul Patrol

22  team did was arrange for payments to families of players, is

23  that right?

24  A.  Do that again.

25  Q.  Sure.  I think you described in your direct testimony that

 1  part of what this team did was arrange for payments to families

 2  of players, is that correct?

 3  A.  I think my statement was Black Opp's meant payments to

 4  families of players, yes.

 5  Q.  But this team that Mr. Rivers would call the Black Opp's

 6  Soul Patrol team did many more things other than providing

 7  those payments, is that correct?

 8  A.  That's correct.

 9  Q.  They would track the top 50 high school basketball players,

10  is that right?

11  A.  Yes.

12  Q.  They would provide weekly updates on what Nike and Under

13  Armour were doing?

14  A.  That's correct.

15  Q.  Members of the Black Opp's Soul Patrol team would work to

16  recruit new college programs for Adidas, is that correct?

17  A.  No, it's not correct.

18  Q.  OK.  Members of the Black Opp's Soul Patrol team were

19  assigned to support particular colleges, is that correct?

20  A.  That's correct.

21  Q.  And members of the Black Opp's Soul Patrol team worked to

22  develop relationships with NBA players?

23  A.  Some did, yes.  I did not.

24  Q.  Were they also responsible for identifying counselors for

25  Adidas Nations?

A.  Yes, some were, yes.

Q.  What does that mean?  When the Black Opp's Soul Patrol team

would identify counselors for Adidas Nations, what does that

mean?

A.  At Adidas Nations we wanted the best college counselors we

could get.  It was a competitive market because some of those

people we wanted, those kids we wanted, were affiliated with

other brands.  So we worked together in cohesion to identify

the players we could get to Adidas Nations, and we all worked

together to do that.

Q.  Now, Mr. Rivers would use the term Black Opp's Soul Patrol

team, in fact, in communications to all of the Adidas AAU

directors, is that correct?  He would send out e-mails to the

entire group of AAU directors?

A.  I don't recall that.

Q.  I am going to show you -- just for the witness -- Defense

Exhibit 1065.

          MR. SCHACHTER:  May I have just a moment, your Honor?

          THE COURT:  Yes.

          MR. SCHACHTER:  This is just, for the moment, to

refresh.  It's a thick binder.

Q.  I am only showing Defense Exhibit 1065 just for you to

review.

          Does this in any way refresh your recollection that

there were communications that went out to all of the AAU

1   directors that referenced the terms Black Opp's or Soul Patrol?

2   Does it refresh your recollection, without describing the

3   document?

4   A.   It doesn't refresh my recollection.

5   Q.   Very good.

6           MR. SCHACHTER:   You can take it down, Mr. McLeod.

7   Q.   Now, Chris McGuire was an Adidas employee that was senior

8   to both Mr. Gatto and to the other gentleman you mentioned,

9   Chris Rivers, is that correct?

10          THE COURT:   Do you mean that he had been there longer

11  or do you mean something else?

12  Q.   He had a senior role.  He had a higher title and

13  compensation level.  He was a more senior employee at Adidas

14  than Mr. Gatto or Mr. Rivers.  Did you know that?

15  A.   Yes.

16  Q.   He was not actually even involved in grassroots marketing,

17  was he?

18  A.   No.

19  Q.   Part of his job was to negotiate college sponsorships, is

20  that correct?

21  A.   It was one of his many jobs, yes.

22  Q.   He was sometimes, this gentleman Chris McGuire was

23  sometimes included in these Black Opp's Soul Patrol team

24  communications, is that correct?

25  A.   I don't recall that.

1   Q.  All right.  I am going to show you Defense Exhibit 101, if

2   you can just review that to yourself for a moment.

3           Sir, do you recognize this to be a group text message

4   that you received on November 13, 2015 from Mr. Rivers, but to

5   a group that included a man named Hulio Smith, Dan Cutler, Cory

6   Butler, Anthony Coleman, and also Chris McGuire?

7           MR. MARK:  Objection.

8           THE COURT:  Don't do that.  Don't do that.

9           MR. SCHACHTER:  Yes, your Honor.

10  Q.  Do you recognize this document?

11  A.  Yes.

12  Q.  Is Mr. McGuire included on this communication?

13          MR. MARK:  Objection.

14          THE COURT:  Sustained.

15          MR. SCHACHTER:  Your Honor, we will offer Defense

16  Exhibit 101.

17          MR. MARK:  Objection.

18          THE COURT:  Sustained.

19  Q.  All right.  You were shown Government Exhibit 1096 in

20  evidence.

21          MR. SCHACHTER:  Can we put that up on the screen,

22  please.

23  Q.  This is an e-mail that you sent to Mr. Rivers on March 2,

24  2015, is that correct?

25  A.  Yes.

1  Q.  Mr. Mark focused your attention on a couple of provisions.

2  I just want to focus you on a couple of others.

3          Can you please just take a look at the first entry,

4  October 10, 2014.

5  A.  Yeah.

6          MR. SCHACHTER:  Your Honor, if I could just take a

7  moment as I publish that for the jury.

8          THE COURT:  Yes.

9  Q.  Then, sir, I would also just like to focus you on the

10  portion in the middle of the page, October 25.

11          Tom Crean, who is he?

12  A.  The head coach of the University of Georgia.

13  Q.  Although it says, "I attended Midnight Madness at IU"?

14          Is that Indiana University?

15  A.  That is.

16  Q.  Was he at that point in 2015 involved in coaching at

17  Indiana?

18  A.  He was the head coach at Indiana.

19  Q.  Did you in fact on October 25 talk with Coach Crean and his

20  staff about how the coaching staff of Indiana would like Adidas

21  to help them as well?

22  A.  I wrote that here, yes.

23  Q.  I would like to focus you just a couple of lines down.

24          Can you focus on the November 17 section?

25          Did you write that you and Mr. Gatto attended an

1    Indiana University game against Texas Southern, and that you

2    spent time with the coaching staff at Indiana University?

3    A.  I wrote that, yes.

4    Q.  In that meeting, do you recall Mr. Gatto assuring Coach

5    Crean that we are here to help, and you asked him to call any

6    time if he needed anything, and in response, either physically

7    or metaphysically, you received hugs?

8    A.  Tom hugged me.

9    Q.  Physically.

10           Now, you in direct examination talked about funds that

11   you provided to the family of DeAndre Ayton, is that correct?

12   A.  Yeah.

13   Q.  You said, I believe, that you provided $15,000, is that

14   correct?

15   A.  $15,000 is correct.

16   Q.  And what, if anything, in addition to the $15,000 did you

17   provide to Mr. Ayton and his family?

18   A.  I don't recall.

19   Q.  Did you find them permanent housing and a job for

20   Mr. Ayton's mother?

21   A.  I tried to help in that regard.  I sure did.

22   Q.  Were you successful in finding her a job and permanent

23   housing?

24   A.  I was not.

25   Q.  Do you recall that around that time the Aytons had just

1 moved from the Bahamas so that Mr. Ayton could train in the

2 hopes of playing basketball?

3          MR. MARK:  Objection.  Relevance.

4          THE COURT:  Sustained.

5 Q.  Sir, that payment and any additional support would fall

6 within the definition of a Black Opp, as you described it the

7 first day of your testimony?

8 A.  Yes.

9 Q.  Now, in answering questions from Mr. Mark, you said that

10 the Bowen family was looking for money.  Do you recall using

11 those words?

12 A.  Yes.

13 Q.  I believe that you also said, either in words or substance,

14 that the family of Dennis Smith was looking for money.  Do you

15 remember that?

16 A.  I told you what Andy Miller told me and then I told you

17 what Orlando Early told me.

18 Q.  This was not the first time that you ever heard about

19 families of talented basketball players looking for money, is

20 that correct?

21          MR. MARK:  Objection.  Relevance.

22          THE COURT:  Sustained.

23 Q.  Are you familiar with a basketball player named Diamond

24 Stone?

25 A.  I am.

Q.  He plays in the NBA for the New Orleans Pelicans, is that
correct?

A.  I don't know where he plays in the NBA.

Q.  His high school basketball coach asked you to provide
$150,000 for Mr. Stone's family in order to recruit him to an
Adidas school, is that correct?

        MR. MARK:  Objection.  Relevance.

        THE COURT:  We will take a break.  15 minutes, members
of the jury.

        (Jury exits courtroom)

        (Continued on next page)

IAB8GAT4

1          THE COURT:  Mr. Gassnola, please step out while we

2    have this conversation.

3          Why is this relevant, Mr. Schachter?

4          MR. SCHACHTER:  Your Honor, obviously, this is, in our

5    view, a case that is all about whether or not this is an intent

6    to defraud.  The issue is, what is on Mr. Gatto's mind as he is

7    arranging for the payments that Mr. Gassnola is discussing?

8          It is our position that what is on his mind is he is

9    doing his job.  He is doing the same job that people at other

10   shoe companies do.  Part of his job that he is tasked with is

11   to try to, as Mr. Gassnola described, try to secure talented

12   basketball players to play at Adidas-sponsored universities.

13         THE COURT:  I think maybe you ought to try something

14   else, because the annals of this courthouse are filled with

15   people who did their jobs by fixing prices, insider trading,

16   securities fraud, and god knows what else.  So the fact that he

17   was doing his job gets you nowhere.  So maybe there is a

18   different explanation for this.

19         MR. SCHACHTER:  Your Honor may, of course, be

20   absolutely right that my argument will be unsuccessful.  But

21   the issue is, as he is involved in these communications and

22   arranging for these payments, what is he thinking about?  Is he

23   thinking, I am acting with an object to defraud universities,

24   or is it something else?  Is that not on his mind at all?

25         It is our position that that is not what is on his

1    mind.  On his mind, whether it's right, wrong, or otherwise,

2    and maybe your Honor is absolutely right --

3              THE COURT:  You understand there is no maybe about it.

4              MR. SCHACHTER:  Nonetheless, it is our intention to

5    argue to the jury that that is what is on his mind.

6              THE COURT:  The guys in the five families are doing

7    their jobs too.

8              MR. SCHACHTER:  Understood.

9              THE COURT:  I am drawing no comparison with respect to

10   your client.  I am just making a point about your argument.

11             MR. SCHACHTER:  Here there are only three families, I

12   suppose.

13             THE COURT:  I don't think you're admitting there are

14   three families.

15             MR. SCHACHTER:  It is not the five families.  And this

16   conduct, we think, while certainly --

17             THE COURT:  So explain to me how it is that whatever

18   went on with this guy Diamond Stone, if anything, sheds any

19   material amount of light on what your client was thinking when,

20   for example, he approved, if he did, $100,000 to Bowen Senior?

21             MR. SCHACHTER:  What he is thinking is an example like

22   this, where Diamond Stone's high school basketball coach says

23   the family wants $150,000, Adidas doesn't pay, and so he

24   doesn't go to an Adidas school, he goes to the University of

25   Maryland which is sponsored by Under Armour.  And there are a

1    number of other examples like that.

2         So what Mr. Gatto is thinking, we may argue to the

3    jury, is that he is thinking that part of his job of securing

4    talented high school recruits to go to certain colleges depends

5    on whether or not they are willing to make payments out of the

6    marketing budget.

7         Now, your Honor may be right, my argument to the jury

8    may be unsuccessful, but this is important evidence, we

9    believe, and maybe the jury will disagree, and I am sure the

10   government would disagree, and maybe your Honor will disagree,

11   but we believe it is relevant evidence to establishing what is

12   in Mr. Gatto's mind, what is his intent as he is arranging for

13   these payments, which we are not disputing were made.  The

14   question is the why and not the whether.  That's why we believe

15   it's 401 relevant.

16        Also, in light of the other evidence in the case, we

17   don't believe it is prejudicial.  And there aren't so many

18   examples so we don't believe the evidence is in any way

19   cumulative, but we do intend to explore with Mr. Gassnola just

20   a couple of similar examples like that.

21        THE COURT:  How many?

22        MR. SCHACHTER:  Maybe two.  Maybe one, actually.  One,

23   your Honor.  Maybe two.  Two.  Two.  That's my final answer.

24        THE COURT:  Mr. Mark.

25        MR. MARK:  I think exactly what Mr. Schachter is

1  trying to do by eliciting this testimony is, if you had an

2  insider trading trial, where you had one trader say what I was

3  doing was OK because the other trader at the other company was

4  also breaking the rule.

5      THE COURT:  It's the everybody's doing it defense.

6      MR. MARK:  Everybody is doing it.  And that is what he

7  is trying to go down with this road.  I don't think it's

8  relevant.

9      MR. SCHACHTER:  May I respond to that?

10     THE COURT:  Yes.

11     MR. SCHACHTER:  It is close, but very different.  The

12  reason why it is -- we are not, and certainly we would not

13  argue that, members of the jury, it's OK because everybody does

14  it.  That's not the point of this evidence.  The point of the

15  evidence is, because it is ubiquitous, it is why Mr. Gatto is

16  not thinking in his head that his conduct is defrauding a

17  university.  Because it happened so frequently, it is why one

18  can conclude that the universities want it.

19     Now, that view may be wrong, but it is as he is doing

20  his job.  As somebody in basketball sports marketing is doing

21  his job, when they become aware that there are many

22  circumstances where payments are made to families that then go

23  on to particular universities, one can conclude, or the jury

24  may infer from that evidence, that he may not have been

25  thinking that he was cheating a university; rather, he was

1    thinking that he was doing what the universities wanted, or he

2    was helping the universities accomplish their goal.  That is

3    the point of this evidence.  Not that it's OK because everybody

4    is doing it.  It is close, but the argument is it is relevant

5    to his intent to defraud.

6          The government may disagree, and your Honor may

7    disagree, it is also the truth.  It is exactly why Mr. Gatto is

8    not thinking to himself, as he is doing his job, I am

9    defrauding a university.  It's just not what is crossing his

10   mind.  That's, I believe, your Honor, the absolute truth.  I

11   think it never crosses his mind that he was going to be

12   cheating a university.  That's not why he is making these

13   payments.  And part of that is because he has lived in the

14   basketball world, as the government says, and this is what he

15   is aware of, where I can explore this admissible evidence of

16   that.

17         MR. MARK:  Well, Mr. Schachter said this is close to

18   the everybody-is-doing-it defense.  I would say it's as close

19   as one plus one equals two.  This is the everybody-is-doing-it

20   defense.  I don't think we can thought of cheat it in this way.

21         THE COURT:  I have a memory, but I haven't been able

22   to find it quickly.  The phrase plausible deniability came up

23   in the course of this trial, didn't it?

24         MR. MARK:  Yes, your Honor.

25         THE COURT:  Can somebody remind who used it and when?

1    MR. MOORE:  There is wiretap call where Mr. Code talks

2  about Rick Pitino and plausible deniability.  That is where it

3  came up, your Honor.  In a discussion with Mr. Dawkins.  And I

4  believe Mr. Sood was on that call.  The government will correct

5  me if I am wrong.

6    MR. MARK:  That's correct.

7    THE COURT:  Tell me the exhibit, please.

8    MR. MARK:  Government Exhibit 75A.  It was the June

9  20th recording, the video recording.

10    THE COURT:  I will give you an answer when we come

11  back.

12    (Recess)

13    (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

 1          (Jury not present)

 2          THE COURT:  Be seated, folks.  That means everyone.

 3          Mr. Moore, you want to be heard?

 4          MR. MOORE:  Yes, sir, your Honor, very briefly, and

 5   your Honor is quicker in all things than I am and I should have

 6   said this earlier.

 7          But my point would be, your Honor, that in listening

 8   to Mr. Mark compare this to insider trading or other types of

 9   cases, I agree with your Honor that the annals of the

10   courthouse are replete with a lot of cases, the annals of the

11   courthouse are replete with insider trading cases.  The annals

12   of the courthouse not replete, however, with cases like this

13   particular case where employees or affiliates of a shoe company

14   are charged with defrauding the schools, schools that their

15   companies sponsor.  And so I think that the analogy of

16   comparing this to an insider trading case falls somewhat flat

17   here, because there is no clear benchmark, no clear indication

18   to any of these folks that the conduct that is at issue here is

19   illegal, unlike you would see in --

20          THE COURT:  My point was different.

21          MR. MOORE:  I was responding to Mr. Mark's point, not

22   your Honor's, about the insider trading and the insider trading

23   analysis.

24          THE COURT:  OK.  Now, the $150,000 payment that

25   Mr. Schachter inquired about was to a high school -- was at the

1    request -- involved the request by a high school coach.  I

2    don't see how that sheds any light at all on whether the

3    colleges that the defendants are accused of having defrauded,

4    or conspired to defraud, were reasonably thought by anybody to

5    have approved these kinds of payments.

6              So, the objection with respect to the high school

7    coach asking for money for Mr. Stone's family is sustained.  If

8    you have another incident you propose to inquire about, I will

9    rule when you ask the question.

10             Let's get the jury.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Iabdgat5                    Gassnola - cross

1        (Jury present)

2            THE CLERK:  Please be seated, everyone.

3            THE COURT:  OK.  The jurors are present.  The

4    defendants are present.

5            The objection to the last question, ladies and

6    gentlemen, was sustained.

7            Next question.

8            MR. SCHACHTER:  Thank you, your Honor.

9    BY MR. SCHACHTER:

10   Q.  Mr. Gassnola, when you made these payments to the families

11   that you described, you didn't take any kickbacks from those

12   families, did you?

13   A.  I never took a kickback, no.

14   Q.  You weren't lining your own pockets as you paid these

15   families, were you?

16   A.  No, I was not.

17   Q.  You were doing your job, as you saw it, at Adidas, is that

18   correct?

19           MR. MARK:  Objection.

20           THE COURT:  Sustained.

21   Q.  You testified earlier about this player DeAndre Ayton, is

22   that right?

23   A.  Yep.

24   Q.  And you tried to recruit DeAndre Ayton for Coach Self to go

25   to the University of Kansas, is that correct?

Iabdgat5                    Gassnola - cross

1    A.  At the time I met DeAndre, at that time it was about

2    grassroots, putting him on one of our grassroots team.

3    Q.  Did Coach Self at Kansas ever tell you that he really

4    wanted to have DeAndre Ayton on the team at the University of

5    Kansas?

6    A.  He was the number one player in the country.  Everybody

7    wanted to recruit him.

8    Q.  Did you feel that you let Coach Self down when DeAndre

9    Ayton did not go to the University of Kansas?

10   A.  I did.

11   Q.  You believed that college coaches wanted shoe companies to

12   help get players to their schools, is that correct?

13   A.  Rephrase that.

14   Q.  Sure.  Did you believe that college coaches wanted shoe

15   companies to help recruit players to their schools?

16   A.  The colleges -- the colleges -- the basketball coaches,

17   yes, one of the assistants, yes.

18   Q.  And some coaches, you believe, knew that the shoe companies

19   provided money to families to help colleges recruit, isn't that

20   correct?

21             MR. MARK:  Objection.

22             THE COURT:  Sustained.

23   BY MR. SCHACHTER:

24   Q.  Fair to say that based on your interactions with college

25   coaches in your job, that you felt that some coaches simply did

1    not want to know that the shoe companies provided money to

2    families to help colleges recruit?

3         MR. MARK:  The same objection.

4         THE COURT:  Sustained.

5    Q.  You talked a lot about your interactions with Mr. Gatto

6    when Mr. Mark asked you questions.  Do you remember that?

7         And from those conversations, did you believe that you

8    and Jim shared an understanding that you both would do whatever

9    it took to help Adidas-sponsored schools, including helping

10   schools in ways that violated the NCAA rules?  Was that your

11   belief?

12   A.  Can you do that again?  I'm sorry.  Can you do that again?

13   Q.  Sure.  Do you believe, based on your interactions with

14   Mr. Gatto, that you both shared an understanding that you both

15   would do whatever it takes to help Adidas-sponsored schools,

16   including in ways that violated the NCAA rules?

17        MR. MARK:  I object to "whatever it takes."

18        THE COURT:  Sustained at least as to that.

19   Q.  You worked in basketball for almost 20 years, is that

20   correct, Mr. Gassnola?

21   A.  Yep.

22   Q.  And from that experience, you believed that the culture is

23   that everyone is breaking the NCAA rules, is that correct?

24        MR. MARK:  Objection.

25        THE COURT:  Sustained.

Iabdgat5                    Gassnola - cross

1   Q.  You testified, sir, about your awareness of payments made

2   in connection with the recruitment of Tugs Bowen to University

3   of Louisville, is that correct?

4   A.  Yes, I knew about it, yes.

5   Q.  And the University of Louisville you would call a flagship

6   school for Adidas, is that correct?

7   A.  I would, yeah.

8   Q.  And you believed that part of your job was keeping the

9   coaches at the University of Louisville happy, is that correct?

10            MR. MARK:  Objection.

11            THE COURT:  Sustained.

12  Q.  Do you recall that the University of Louisville wanted to

13  recruit a basketball player named Romeo Langford?

14            MR. MARK:  Objection as to "the University of

15  Louisville."

16            THE COURT:  I'm sorry?

17            MR. MARK:  Objection to the form of the question.

18            THE COURT:  I don't see a problem with the form.  Go

19  ahead.

20  Q.  Sir, do you recall that the University of Louisville wanted

21  to recruit a basketball player named Romeo Langford.

22  A.  They didn't want to, they were recruiting him.

23  Q.  And you spoke to the University of Louisville's associate

24  head coach, Kenny Johnson, about that recruiting?

25  A.  I did, yeah.

Iabdgat5                   Gassnola - cross

1   Q.  And you wanted to check in with Coach Johnson to make sure

2   that the brand was doing its part in helping Louisville recruit

3   Romeo Langford, is that correct?

4   A.  That's correct.

5   Q.  The athletic director of the University of Louisville was a

6   man named Tom George, is that correct?

7   A.  Yes.

8   Q.  And you would occasionally interact with both Mr. George

9   and Coach Pitino, is that correct?

10  A.  I never met Tom George a day in my life.

11  Q.  You meant Coach Pitino, is that correct?

12  A.  Yep.

13  Q.  And was it your impression, from your interactions with

14  him, that Coach Pitino was, in your words, steamrolling Adidas

15  to get what they wanted?

16          MR. MARK:  Objection.  Relevance.

17          THE COURT:  Sustained.

18  Q.  You said that after -- Mr. Mark asked you whether after the

19  charges in this case were announced, you texted Coach Pitino

20  about the case, is that correct?

21  A.  I texted Coach Pitino when I was on a plane coming home

22  from Atlanta, Georgia.

23  Q.  And you texted Coach Pitino because you believed that Coach

24  Pitino was involved in and aware of the Bowen deal, is that

25  correct?

Iabdgat5                    Gassnola - cross

1   A.  I texted Coach Pitino because my mind was going crazy and I

2   was looking for information.

3   Q.  Sir, do you recall meeting with the FBI and federal

4   prosecutors on December 5, 2007?

5           THE COURT:  Probably not.

6           MR. SCHACHTER:  May I show the witness --

7           THE COURT:  You are at least a decade off.

8           MR. SCHACHTER:  I apologize.

9   Q.  Do you recall meeting with the FBI and federal prosecutors

10  on December 5, 2017?

11  A.  Yes.

12  Q.  And, sir, did you say -- one moment -- that -- and did you

13  tell the FBI and members of the U.S. Attorney's Office that you

14  believed that Coach Pitino was involved in and aware of the

15  Bowen Junior deal and that is what motivated you to text

16  message Coach Pitino on September 26, 2017?  Did you tell that

17  to the FBI and members of the prosecution team?

18  A.  I don't remember saying that.  I don't remember.

19  Q.  Sir, I'm -- your Honor, may I show the witness 3503-10,

20  page 14?

21          THE COURT:  Yes.

22  Q.  Sir, if you can just read that to yourself and let us know

23  when you are done.

24          MR. MARK:  Your Honor, may we approach before the --

25          THE COURT:  Yes.

1          (At the sidebar)

2          THE COURT:  What is it?

3          MR. MARK:  What I think he is trying to elicit is pure

4    speculation out of Mr. Gassnola right now.  Mr. Schachter can

5    draw whatever inferences he potentially wants in closing, but

6    Mr. Gassnola has talked about what he knew, what he discussed

7    at the time, and what inferences to be drawn that might be in a

8    302 or might be drawn --

9          MR. DISKANT:  Your Honor, if I may?  The very next

10   sentence.

11         THE COURT:  One lawyer on a side.

12         MR. DISKANT:  Point him to the next sentence.  Just

13   point him to the next sentence in the 302 -- in the 302.

14         THE COURT:  I read it.

15         MR. SCHACHTER:  Your Honor, this is a prior

16   inconsistent statement of the witness.

17         THE COURT:  No, it is not.

18         MR. SCHACHTER:  I believe that I asked him the exact

19   question that was stated, but --

20         THE COURT:  He said he didn't remember.  He didn't

21   recall it.

22         MR. SCHACHTER:  He didn't recall making the statement

23   to the FBI, and now I am refreshing his recollection --

24         THE COURT:  What difference does it make if he made it

25   to the FBI?

1          MR. SCHACHTER:  I will withdraw it.  Your Honor, we

2     believe it is material impeachment, but we can withdraw it and

3     move on.

4          MR. MOORE:  Your Honor, he intends to withdraw it.  I

5     would like to inquire about it and point to the difference I

6     think it makes.

7          THE COURT:  Suppose he said the moon is made of green

8     cheese, does that come in?  Suppose he says he believes the

9     moon was made of green cheese.

10          MR. MOORE:  I think that, unfortunately, your Honor,

11     what he said --

12          THE COURT:  He sits and speculates to the FBI that he

13     thinks Pitino may have known, or knew, right?  And in the next

14     sentence he said but, of course, he never talked to them about

15     it.  So, he's speculating to the FBI, and now you want to offer

16     that for the truth?

17          MR. SCHACHTER:  Well, your Honor, the basis of I think

18     his statement was -- and I, of course, don't know, but I

19     believe his statement is based on his interactions with Coach

20     Pitino and his knowledge and awareness of the deal, not with

21     Coach Pitino in this particular circumstance but on his other

22     interactions with Coach Pitino.

23          THE COURT:  This is not appropriate.  It is sustained.

24          (Continued on next page)

25

Iabdgat5                    Gassnola - cross

1           (In open court)

2    BY MR. SCHACHTER:

3    Q.  Mr. Gassnola, I want to speak with you briefly about a

4    player named Nassir Little.

5           You spoke with a man named Brad Augustine about Nassir

6    Little, is that correct?

7    A.  I did.

8    Q.  And Nassir Little was a player -- do you know that he

9    played for Brad Augustine's AAU team, a team called One Family?

10   A.  I knew that.

11   Q.  And he -- Mr. Augustine told you, I believe you testified

12   on direct, that he was choosing between the University of Miami

13   and the University of Arizona; do you recall that testimony?

14   A.  That's what Brad told me, yes.

15   Q.  And you were pushing the University of Miami, is that

16   correct?

17   A.  I was hoping that the young man was going to go to the

18   University of Miami.

19   Q.  And you understood that -- well, Mr. Augustine talked to

20   you about support that Adidas was providing for his AAU team,

21   One Family, is that correct?

22   A.  We talked about it, yep.

23   Q.  He told you that he had what's called a merchandise deal,

24   is that right?

25           MR. MARK:  Objection.  Hearsay and relevance.

Iabdgat5                    Gassnola - cross

1          THE COURT:  Sustained.

2    Q.  Do you recall, sir, that Adidas did not provide financial

3    support for his youth basketball team, One Family?

4    A.  He told me that, yep.

5    Q.  And he was speaking to you because he wanted -- your

6    understanding was that he wanted your help in obtaining

7    financial support for his team in addition to merchandise?

8          MR. MARK:  This is the same line of questioning.

9          THE COURT:  It also calls for speculation about the

10   motives of Mr. Augustine in talking to him, which unless he is

11   a mind reader we don't have any way of knowing.

12         MR. SCHACHTER:  All right.

13   BY MR. SCHACHTER:

14   Q.  Sir, you told Mr. Augustine that if Nassir Little went to

15   Miami, that you would call Miami's head coach, is that correct?

16   A.  I told Brad that if Nassir Little had gone to Miami, that I

17   would have Coach Larranaga make a phone call and I will call

18   him.  Yes, I remember that.

19   Q.  You would speak to Coach Larranaga about making a call to

20   people at Adidas, is that correct?

21   A.  Yes.

22   Q.  About getting support for his team?

23   A.  About getting support for his team, that's correct.

24         THE COURT:  For Mr. Augustine's team, is that what you

25   meant?

1    THE WITNESS:  Yes, your Honor.

2    THE COURT:  Thank you.

3  BY MR. SCHACHTER:

4  Q.  And you also contacted two of Miami's assistant basketball

5  coaches, is that correct?

6  A.  Sometime around there, I talked to -- I talked to Chris

7  Caputo.  I forgot the other guy's name.

8  Q.  Is that Jamal Brunt?  Did you speak to an assistant coach

9  at Miami named Jamal Brunt also?

10 A.  That sounds right.

11 Q.  And did you tell them that if Nassir Little went to Miami

12 to play basketball, that it would be important for Coach

13 Larranaga to call Adidas about providing funding for Brad

14 Augustine's youth basketball team?

15 A.  I don't recall my conversation with them.  I might have had

16 a conversation with Caputo himself about that particular --

17 about that situation, yes.

18 Q.  Thank you.  All right.  Let's now talk about Dennis Smith.

19     You testified in your direct examination about a

20 $40,000 payment that you made that was I believe intended, you

21 said, for Dennis Smith's father, is that correct?

22 A.  I said his family.

23 Q.  Family.  OK.  Thank you.

24     I just want to talk a little bit about who Dennis

25 Smith was.

Iabdgat5                    Gassnola - cross

1          In 2015 -- well, do you recall what position Dennis

2    Smith played?

3    A.  I do.  A point guard.

4    Q.  And he grew up in North Carolina, is that correct?

5    A.  Yep.

6    Q.  And one of the colleges that you were responsible for

7    providing support to was NC State, is that correct?

8    A.  Yes.

9    Q.  You believed that it was a priority for Adidas to have

10   Dennis Smith play at NC State, is that correct?

11   A.  I believed that, yeah.

12   Q.  And did you also understand that recruiting Dennis Smith

13   was important to NC State?

14          THE COURT:  Sustained.

15          MR. MARK:  Objection.

16   Q.  Now, you testified, I believe, sir, that you made this

17   $40,000 payment in November of 2015, is that correct?

18   A.  Yep.

19   Q.  Now, Dennis Smith had committed publicly to NC State on

20   September 10th of 2015, is that correct?

21   A.  I'm not for sure of the date but I know that he had already

22   verbally committed.

23   Q.  In addition to verbally committing, do you recall if it was

24   covered by any news outlets?

25   A.  I don't follow social media, so I don't know.

Iabdgat5                    Gassnola - cross

1   Q.  Well, do you follow ESPN and other sports media outlets?

2   A.  Yes.

3   Q.  Do you have a recollection of whether that Dennis Smith

4   committing to NC State had already actually been publicly

5   announced in the media?

6   A.  Yes.

7   Q.  So this payment to Mr. Smith in November of 2015 was made

8   after he had already committed to NC State, is that correct?

9           THE COURT:  Asked and answered.

10          Could we have a new question, please?

11          MR. SCHACHTER:  Yes, your Honor.

12  Q.  Now, you said that this payment came from Adidas, is that

13  correct?

14  A.  I was reimbursed by Adidas for it, yes.

15  Q.  Sir, is it true that two weeks before the payment that you

16  made on November the 2nd, you had received a wire transfer from

17  a man named Martin Fox of the exact same amount, $40,000?

18  A.  That's true.

19  Q.  And is it -- and I would like to -- may I show the witness,

20  your Honor, an excerpt from Government Exhibit 306D?  It is

21  labeled in the binders as 306D, defense excerpt A.

22          THE COURT:  I'm sorry.

23          MR. SCHACHTER:  May I show the witness -- I'm sorry.

24  May I show the witness Government Exhibit 306D, which is a

25  lengthy document.  They are bank records, and I just want to

1    show him one page from them, which has been identified as

2    defense excerpt A.

3              THE COURT:  That is the part I am not getting.

4              MR. SCHACHTER:  There is a large government exhibit --

5              THE COURT:  I understand.  Big government exhibit and

6    you want to show him a part of the government exhibit that's

7    marked as a defense exhibit?

8              MR. SCHACHTER:  We didn't know precisely how to handle

9    this, your Honor.  There is a large government exhibit I didn't

10   want to introduce.  I don't think we need to introduce the

11   entire exhibit.  We intend to introduce one page of it.  So we

12   intended to call it -- we thought it would be less confusing

13   and perhaps incorrectly -- defense excerpt A of Government

14   Exhibit 306D.

15             THE COURT:  Is 306D in evidence, Andy?

16             MR. SCHACHTER:  I don't believe so, your Honor.  I

17   believe a portion of it is.  I believe the government

18   identified it as -- certain pages as Government Exhibit 306D

19   followed by a number.

20             (Pause)

21             THE COURT:  All right.  None of it is in.

22             MR. MARK:  This is not in evidence.

23             THE COURT:  So whatever you want to use, let's get it

24   marked and it will be a defense exhibit.

25             MR. SCHACHTER:  OK.  It has been marked as Government

1    Exhibit 306D.  If it is acceptable to the Court, we could offer

2    just 306D in its entirety and then show one page.  I think that

3    is easiest.

4              MR. MARK:  Objection, I mean, to the whole thing

5    coming in.  We can sort of address the page that he wants

6    but --

7              MR. SCHACHTER:  Perhaps we can number it --

8              THE COURT:  Is there one particular page?  Is that the

9    point?

10             MR. SCHACHTER:  Yes, your Honor.

11             THE COURT:  So we have Government Exhibit 306D, and am

12   I right that the page is Bates stamped with a number ending in

13   9293?

14             MR. SCHACHTER:  It is a series of pages starting with

15   9293, and then it is 334 and 335, it is those three pages.

16             THE COURT:  All right.  So those three pages of

17   Government Exhibit 306D, for identification, are received.  The

18   balance of Government Exhibit 306D is not received at this

19   time.

20             (Government's Exhibit 306D, pages 9293, 334 and 335

21   received in evidence)

22             THE COURT:  OK.  Go ahead.

23             MR. SCHACHTER:  Thank you, your Honor.

24   BY MR. SCHACHTER:

25   Q.  All right, sir.

1          So can we turn first, Mr. McCloud, just to the third

2    page of Government Exhibit 306D.

3          And at the bottom of that page, do you see $40,000

4    that you withdrew from your Berkshire bank account?

5          Sir, these are records of the New England Playaz bank

6    account, is that correct?

7    A.  Yep.

8    Q.  And you withdrew $40,000 in cash on October the 30th, is

9    that correct?

10   A.  Yep.

11         MR. SCHACHTER:  Oh, I'm sorry.  May I publish it to

12   the jury, your Honor?

13         THE COURT:  Yes.

14         MR. SCHACHTER:  I neglected to do that.

15   Q.  So, I'm sorry.  You withdrew $40,000 from this account on

16   October the 30th of 2015, is that right?

17   A.  Yep.

18   Q.  And then it was just a couple of days later, on November

19   the 2nd, I believe that you testified, that you provided the

20   $40,000 in cash to Coach Orlando Early at NC State, is that

21   correct?

22   A.  That's correct.

23         MR. SCHACHTER:  And then if we can, Mr. McCloud,

24   please just look at the page right before then, the wire

25   transfer on October the 20th.  It is in the middle of the page.

1    There.

2    Q.  Sir, is this a record of the $40,000 wire transfer that you

3    received ten days before October the 30th?

4    A.  It is.

5    Q.  And that's from a man named Martin Fox, is that correct?

6    A.  That's correct.

7    Q.  Now, Martin Fox, he was a man who occasionally helped an

8    agent named Andy Miller?  I believe Mr. Mark asked you about

9    Mr. Miller, is that correct?

10   A.  Martin Fox wears a lot of hats, but he worked with Andy for

11   a few years back, yeah.

12   Q.  And he also worked with other agents and financial

13   advisors, correct?

14   A.  As I said, he wore a lot of hats.

15   Q.  And one of the hats that he would wear is arranging for

16   money to be paid to players' families on behalf of Andy Miller

17   and those financial advisors and agents, is that correct?

18            MR. MARK:  Objection.

19            THE COURT:  Sustained.

20   Q.  All right.  Sir, you've known Mr. Miller for about 15

21   years, is that correct?

22   A.  Yep.

23   Q.  You have a personal friendship with Mr. Miller, is that

24   correct?

25   A.  I would like to think so.

Iabdgat5                    Gassnola - cross

1   Q.  And in all of your meetings with prosecutors, you never

2   said anything about Mr. Miller arranging for any payments to

3   players' families, is that correct?

4   A.  I don't recall that.

5   Q.  And you in fact -- well, withdrawn.

6           You told -- well, withdrawn.

7           The government did ask you on direct examination about

8   your relationship with Mr. Miller, is that correct?

9   A.  They did.

10  Q.  And you said that you were paid a salary by Mr. Miller in

11  2004, in 2005, about $1,500 a month, is that correct?

12  A.  Somewhere around those dates, yes.

13  Q.  But aside from that, you don't recall receiving any other

14  payments from him, is that correct?

15  A.  I don't recall.

16  Q.  Is it true, sir, that in 2014, Mr. Miller paid your fiancée

17  an additional $4,000?

18  A.  I don't recall that.  I don't remember that.  I don't

19  recall it.  I don't.

20  Q.  Is it true that in addition to those payments to your

21  fiancée, Mr. Miller, in April of 2014, advanced --

22          THE COURT:  Sustained as to form.  So far you've got

23  no evidence of payments.  You are assuming facts as to which

24  there is no evidence.

25          Go on.

Iabdgat5                    Gassnola - cross

1          MR. SCHACHTER:  I'm -- OK.  I was inquiring of the

2     witness with a good faith basis, your Honor.

3          THE COURT:  Just go on.

4     BY MR. SCHACHTER:

5     Q.  All right.  I'm sorry.  You said you don't recall whether

6     you received those payments?

7     A.  I do not.

8     Q.  I'm going to show you Defense Exhibit 1338.  It is in your

9     binder.

10          If you can just look at that to yourself, review it,

11     and let us know when you are done.

12          (Pause)

13     A.  OK.

14     Q.  Does that refresh your recollection as to any payments that

15     you received from Mr. Miller in 2014, and just whether it

16     refreshes your recollection or not?

17     A.  No.

18     Q.  OK.  Sir, if you could also look at Defense Exhibit 1335A.

19     Again, just review it to yourself, 1335A.

20          MR. SCHACHTER:  And, Mr. McCloud, if you could just

21     highlight for the witness, under -- yes.  Right.

22     Q.  Can you just review that to yourself and let us know when

23     you are done.

24     A.  I'm done.

25     Q.  Does that refresh your recollection as to any payments that

1  you received from Mr. Miller?

2  A.  It does.

3  Q.  Can you tell us what you now recall.

4  A.  I had a player that was at the University of Arizona and he

5  was entering the NBA draft, and he was working out with a

6  friend of mine who was working him out.  So he was reimbursed

7  for his expenses from flying back and forth to Tucson, staying

8  in hotels, paying for his fees.  So instead of putting it under

9  his name, he put that in a line item under my name, because I

10  am the one who introduced Andy to this person.

11  Q.  Do you recall --

12          THE COURT:  I'm sorry.  Maybe you can make that a

13  little clearer for the rest of us.

14          There were at least one or two "he"s in that

15  exposition.  Who did what to whom?

16          THE WITNESS:  The gentleman who coached my program for

17  a few years was working Kalib out.  Flying back and forth from

18  his home to Tucson, staying over, working him out, and Andy

19  reimbursed him but he reimbursed him in his line item under my

20  name because I introduced the two of them together.  I put that

21  together.

22          THE COURT:  And did you ever receive the money from

23  Andy Miller or did the money go to this other person?

24          THE WITNESS:  I never received money, your Honor.  It

25  went to John.

1    THE COURT:  OK.

2    MR. SCHACHTER:  OK.  Thank you, sir.

3  BY MR. SCHACHTER:

4  Q.  Prior to October the 20th, did you receive an additional

5  wire transfer from Mr. Fox also in the amount of $40,000?

6  A.  Yes.

7  Q.  And may I show you what is now unhelpfully Government

8  Exhibit 306D, defense excerpt B?  Maybe we can call it

9  Government Exhibit 306D-B, your Honor.

10    THE COURT:  No.  It is Government Exhibit 306D, for

11  identification.  Do you want to offer another part of it?

12    MR. SCHACHTER:  Yes, your Honor.

13    THE COURT:  Tell us what the page number is.

14    MR. SCHACHTER:  It is pages 29327 and 29328.

15    THE COURT:  Any objection?

16    MR. MARK:  On relevance, your Honor.

17    (Pause)

18    MR. SCHACHTER:  Your Honor, it may be helpful for me

19  to explain relevance at sidebar.

20    THE COURT:  Well, it may be, indeed.

21    Come on up.

22    (Continued on next page)

23

24

25

1    (At the sidebar)

2    THE COURT:  What is the relevance?

3    MR. SCHACHTER:  Your Honor, the evidence shows -- the

4    evidence will show, we believe, that a month earlier

5    Mr. Gassnola also took a wire transfer from Mr. Fox of $40,000.

6    THE COURT:  That he has already said.

7    MR. SCHACHTER:  And that on September the 7th, he

8    rented a car and went to Raleigh, North Carolina.  We submit

9    the evidence shows, or it will be our argument that in fact

10   these payments were being delivered to the Smith family on

11   behalf of Martin Fox in order to develop his relationship with

12   Andy Miller and also a business manager named Lester Knispel.

13   There are text messages which show --

14   THE COURT:  Why don't you ask him the questions.

15   MR. SCHACHTER:  OK.

16   THE COURT:  And how does any of this appear from the

17   bank statement?

18   MR. SCHACHTER:  Well, you see the wire transfer, as

19   the government showed the wire transfers.  We showed the wire

20   transfer, and then you see the cash withdrawal --

21   THE COURT:  The government should have done this in a

22   much more efficient way, too, that is clear.  But --

23   MR. SCHACHTER:  I can try just asking the questions

24   and we don't need the evidence -- or the records.

25   THE COURT:  If you need the records, you need the

Iabdgat5                    Gassnola – cross

1    records.

2                MR. SCHACHTER:  Yes, your Honor.

3                THE COURT:  Let's go on.

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Iabdgat5                    Gassnola - cross

1          (In open court)

2     BY MR. SCHACHTER:

3     Q.  Sir, on September 1, 2015, did Mr. Fox wire you an

4     additional $40,000?

5     A.  September 1st?

6     Q.  Yes.  September the 1st of 2015, so about a month and 20

7     days before the $40,000 wire transfer we just talked about.

8     A.  Yes.

9     Q.  And he wire transferred you an additional 40,000?

10    A.  He did.

11    Q.  And did you withdraw that amount, $40,000, in cash three

12    days later, on September the 4th, of 2015?

13    A.  I don't recall.  Do you have a record of it?

14          THE COURT:  This is 2015?

15          MR. SCHACHTER:  I'm terrible.  I'm sorry, your Honor.

16    Yes, 2015.  I apologize.

17    Q.  Do you recall that you withdrew $40,000 in cash three days

18    later, on September 4th, 2015?

19    A.  I don't.

20          MR. SCHACHTER:  Your Honor, may we now --

21          THE COURT:  Can't you stipulate?

22          MR. MARK:  Yes, your Honor.

23          MR. SCHACHTER:  OK.

24          THE COURT:  Mr. Moore?  Mr. Haney?

25          MR. HANEY:  Yes, sir.

Iabdgat5                    Gassnola - cross

1          MR. MOORE:  Yes, your Honor.

2          THE COURT:  All right.  It is stipulated, members of

3    the jury, that he withdrew $40,000 on September 4, 2015.

4          Next.

5    BY MR. SCHACHTER:

6    Q.  Did you three days later rent a car to Raleigh, North

7    Carolina, or in Raleigh, North Carolina on September 7, 2015?

8    A.  I don't recall.

9          MR. SCHACHTER:  Your Honor, will there be another

10   stipulation or I can show a different document?

11         THE COURT:  I don't know.

12         MR. MARK:  If could take a look?

13         MR. SCHACHTER:  309 -- 309C.

14         (Counsel conferred)

15         MR. SCHACHTER:  Your Honor, the government has no

16   objection to me showing the witness, just to refresh his

17   recollection, what has been marked as Government Exhibit 309C,

18   or 309 defense excerpt C.

19         THE COURT:  OK.

20   Q.  Sir, if you can just look to yourself -- your Honor, may we

21   just introduce this exhibit?

22         MR. MARK:  We would object --

23         MR. SCHACHTER:  I will lay a foundation.

24   Q.  Sir, do you recognize American Express records from your

25   American Express account?

Iabdgat5                    Gassnola - cross

1   A.  Yes.

2   Q.  And is this records from -- do they show charges in

3   September of 2015 on the last page?

4          MR. SCHACHTER:  On the last page, page C, please,

5   Mr. McCloud.

6   A.  What am I looking at?

7          MR. SCHACHTER:  We will offer Defense Exhibit --

8   Government Exhibit 309 defense excerpt C?

9   A.  OK.

10         MR. MARK:  Objection as to relevance.

11         THE COURT:  Can't we do this a little more

12  efficiently?  Can't we move this along?

13         MR. SCHACHTER:  I apologize, your Honor.

14  Q.  Sir, does looking at this document, Government Exhibit 309

15  defense excerpt C, refresh your recollection that you rented a

16  car in Raleigh, North Carolina, on September 8, 2015?

17  A.  Yes.  Now I can, yes.

18  Q.  OK.  And, sir, do you know a man named Lester Knispel?

19  A.  I know Lester, yes.

20  Q.  He is a business manager.  He represents athletes and

21  celebrities, is that correct?

22  A.  Yep.

23  Q.  And you had Mr. Fox set up a meeting with Dennis Smith

24  Senior and Shawn Farmer with Lester Knispel when they were in

25  California, is that correct?

1  A.  I never set that up.

2  Q.  Did you exchange text messages with Mr. Fox on that topic?

3  A.  Maybe I did but I never set anything up.

4  Q.  OK.  But did you communicate with Martin Fox about

5  arranging for a meeting with Dennis Smith Senior and Shawn

6  Farmer with a business manager named Lester Knispel?

7  A.  I don't remember that.

8  Q.  I'm going to show you what's been marked -- just you, your

9  Honor -- Defense Exhibit 185A.

10          You can just review this to yourself, sir.

11          Let us know when you are done.

12          (Pause)

13  A.  I recall some of it, yep.

14  Q.  OK.  Do you recall having communications with Martin Fox

15  about arranging for a meeting with Dennis Smith Senior and

16  Shawn Farmer with Lester Knispel?

17  A.  It says right here, yeah.

18  Q.  Sir, was the -- when you withdrew that $40,000 in cash on

19  September the 4th and then rented a car in Raleigh, North

20  Carolina, was that to take that $40,000 to Dennis Smith Senior?

21  A.  I never gave Dennis Smith Senior a dime.

22  Q.  OK.  Thank you, sir.

23          Now, I believe that Mr. Mark asked you about Dennis

24  Smith's shoe deal.  Do you recall those questions?

25  A.  Yeah.

Iabdgat5                    Gassnola - cross

1   Q.  And you testified, I believe, that Adidas had offered him a

2   shoe endorsement contract, is that correct?

3   A.  Yep.

4   Q.  And you said -- I believe you said that he turned down

5   Adidas and signed with Under Armour, is that correct?

6   A.  He signed with Under Armour, I know that.

7   Q.  And, well, do you know that's because Under Armour offered

8   him more money?  Do you know that?

9   A.  Yes.

10  Q.  And you communicated with Jim Gatto about Dennis Smith's

11  decision to sign a shoe contract with Under Armour rather than

12  Adidas, is that correct?

13  A.  Jim and I had a lot of conversations about it, but I don't

14  remember every one of them.

15  Q.  I'm going to show you what has been received in evidence as

16  Government Exhibit 107K-5.

17          You had communicated this text message to Mr. Gatto,

18  is that correct?

19  A.  I did.

20  Q.  And he did not respond to your communication regarding

21  Dennis Smith, did he?

22  A.  No.

23  Q.  And when you spoke to him, he expressed that he was

24  disappointed, but he said nothing to you about being upset that

25  Adidas lost out on Dennis Smith, isn't that correct?

Iabdgat5                    Gassnola - cross

1    MR. MARK:  Objection.

2    THE COURT:  What is the objection?

3    MR. MARK:  Hearsay, your Honor.

4    MR. SCHACHTER:  State of mind, your Honor.

5    THE COURT:  This is "hear non say."  He said nothing.

6    Overruled.

7  Q.  Sir --

8    THE COURT:  Answer the question, please.

9  A.  Can you repeat that again?  Sorry.

10  Q.  Sure.  Mr. Gatto didn't say anything to you about being

11  upset that Dennis Smith had signed with Under Armour despite a

12  payment of $40,000, did he?  He didn't say that to you?

13  A.  He didn't say anything in this text message, no, in

14  response to that.

15  Q.  And he didn't say anything like that -- he didn't say that

16  he was upset about this because he signed with Under Armour

17  even though this $40,000 payment had been made; he didn't say

18  anything about that either?

19    THE COURT:  That would be included in the word

20  "anything."  Next question.

21    MR. SCHACHTER:  I believe the witness said "anything"

22  in this text message but my question was --

23    THE COURT:  You didn't broaden your question.  Go on.

24    MR. SCHACHTER:  I will do that.

25  Q.  Putting aside this text message, Mr. Gatto never said to

1  you that he was outraged that Dennis Smith had signed with

2  Under Armour notwithstanding the $40,000 payment that you made;

3  he didn't say that to you, did he?

4  A.  Jim and I didn't really discuss this $40,000 payment.  The

5  only time we discussed it was when I wanted to get reimbursed

6  for it, that's it.  Never discussed it again.

7  Q.  OK.  Thank you, sir.

8      Let's speak briefly about Billy Preston.

9      Sir, you testified on direct examination about some

10  money that you paid to Billy Preston's mother, Nicole Player,

11  is that correct?

12  A.  Yes.

13  Q.  I want to ask you some questions about the timing of those

14  payments.

15      Sir, every payment that you made to Nicole Player was

16  made after Billy Preston had verbally committed to the

17  University of Kansas, is that correct?

18  A.  I think so.  I don't remember when he verbally committed.

19  I don't.

20  Q.  OK.  I'm going to show you 3503-12 at page 5.

21      And may I have just a moment, your Honor?

22      (Pause)

23      No, I think we have the wrong page.  May I have just a

24  moment, your Honor?

25      THE COURT:  Yes.

Iabdgat5                    Gassnola - cross

1           (Pause)

2           MR. SCHACHTER:  I'm sorry.  Can you zoom out,

3   Mr. McCloud.

4           It is the sentence that starts -- I'm sorry.  One

5   moment.

6           (Pause)

7           You've got it.

8           Let us know when you are done.

9           (Pause)

10  A.  I'm done.

11  Q.  Does that refresh your recollection that Billy Preston had

12  verbally committed to the University of Kansas in September or

13  October of 2016?

14  A.  It does.

15  Q.  And all of your payments that you described to Nicole

16  Player were made after he had verbally committed to the

17  University of Kansas, is that correct?

18  A.  That's correct.

19  Q.  And then after Mr. Preston had committed to Kansas, you

20  told Billy Preston's mother that if she needed anything, she

21  should come to you, is that correct?

22  A.  I told her mother and her partner that.

23  Q.  And you believed that having that kind of conversation with

24  a talented player for a flagship Adidas school was part of your

25  job, is that correct?

Iabdgat5                    Gassnola - cross

1    MR. MARK:  Objection.

2    THE COURT:  Sustained.

3  Q.  You believed that having that conversation was part of your

4  job, is that correct?

5    MR. MARK:  Objection.

6    THE COURT:  That is the same question.  Sustained.

7  Q.  You understood that Ms. Player was accepting financial

8  support from agents and a bunch of other people other than

9  Adidas.  I believe you testified to that on direct examination.

10 Is that correct?

11 A.  I heard that, yep.

12 Q.  And you were worried -- you were worried about that, is

13 that correct?

14 A.  I was.

15 Q.  Because you believed that if Ms. Player was receiving money

16 from a bunch of other sources, it would make it more likely

17 that those payments would be discovered by the NCAA, is that

18 correct?

19 A.  I thought I could conceal it better, yes.

20 Q.  And that would be -- if those payments were revealed, that

21 could result -- that could affect Billy Preston's eligibility,

22 is that correct?

23 A.  If it was found out that I was giving them money, yes, it

24 would affect his eligibility.

25 Q.  And you did not want that to happen, is that correct?

1  A.  No, I didn't.

2  Q.  Because that would be bad for Billy Preston, correct?

3  A.  It would be bad for Billy Preston and it would be bad for

4  the university, yes, sir.

5  Q.  And so -- withdrawn.

6        OK.  I would like to speak to you now about Silvio De

7  Sousa.

8        Sir, you testified on direct examination that you

9  gave -- well, let me make sure I understand.  You referred to

10  Fenny Falmagne as Silvio De Sousa's guardian, is that correct?

11  A.  That's what I was told, yes.  I was referred to him as

12  that.

13  Q.  His legal guardian?

14  A.  I was referred to him as his legal guardian.  That's how he

15  was referred to me.

16  Q.  And you would also refer to Mr. Falmagne as Silvio De

17  Sousa's handler, is that correct?

18  A.  I would.

19  Q.  And what does that term mean, what is a handler?

20        MR. MARK:  Objection.

21        THE COURT:  Overruled.  He used the term.

22        What did you mean by it?

23        THE WITNESS:  A handler is somebody who is a middle

24  person between the young man, the athlete, the family, between

25  AAU teams, agents, colleges.  They want to run the show.  They

Iabdgat5                    Gassnola - cross

1    want you to talk to them.  They want to act like they're

2    running the show.

3    BY MR. SCHACHTER:

4    Q.  And Fenny Falmagne was the handler of Silvio De Sousa as

5    you understood it, is that correct?

6    A.  I understood him to be his guardian.

7    Q.  OK.  Now, you testified that you gave Mr. Falmagne $2,500

8    for I believe you said online classes for Mr. De Sousa, is that

9    correct?

10   A.  Fenny told me they needed $2,500 for Silvio to attend

11   online classes, night classes.  That's what he asked me.

12   Q.  And you were played a recording in which you talked with

13   Mr. Gatto about getting a guy out from under a deal.  Do you

14   remember that?

15   A.  I do.

16   Q.  And on the call you talked about a payment of $20,000 with

17   Mr. Gatto, is that correct?

18   A.  Yep.

19   Q.  Sir, is it true that you had previously told the government

20   that there were never any payments to Silvio De Sousa?

21   A.  I don't remember that.

22           MR. SCHACHTER:  May I have a moment, your Honor?

23           THE COURT:  Mr. Gassnola, did you understand that

24   question --

25           THE WITNESS:  I did not.  I apologize.

Iabdgat5                    Gassnola – cross

1           THE COURT:  Well, let me finish.

2           Did you understand that question to be directed at

3    payments to Silvio De Sousa?  Did you understand it to be

4    directed at payments to Fenny Falmagne?  Or somebody else, or

5    something else?

6           THE WITNESS:  I understood it to be payments to Fenny

7    Falmagne, your Honor.

8           THE COURT:  All right.  Thank you.

9    BY MR. SCHACHTER:

10   Q.  Do you recall being interviewed by the government on

11   December 5, 2017?  I believe that is a meeting that we've

12   discussed.  Do you recall that?

13   A.  I remember I was here, yes, September 5th.

14   Q.  And is it true, sir, that you told the government on

15   December 5, 2017, that regarding Silvio De Sousa, you did not

16   recall any payments to De Sousa?

17   A.  I don't remember that.

18   Q.  I'm going to show you now what has been marked as 3503-10,

19   at page 12.

20           If you could just take a moment and review that to

21   yourself, sir.

22           (Pause)

23           Let us know when you are done.

24   A.  I'm done.

25   Q.  Does that refresh your recollection that you told the FBI

Iabdgat5

1    and members of the prosecution team that regarding Silvio De

2    Sousa, you did not recall any payments to De Sousa?

3    A.   I don't recall -- well, reading this, I could have thought

4    about it later.  I don't -- I could have refreshed my memory

5    later on in the day of the week.  I don't recall.

6    Q.   And, sir, you testified in a very early meeting that you

7    were not truthful with the government, is that correct?

8                MR. MARK:  Objection.  Mischaracterizes his statement.

9                THE COURT:  Sustained.

10   Q.   Did you testify that when you were initially approached by

11   government, you were not truthful?

12               MR. MARK:  Objection.  Mischaracterizes the statement.

13               Further, may I speak with Mr. Schachter --

14               THE COURT:  I'm sorry.  You dropped your voice.  I

15   can't hear you.

16               MR. MARK:  I apologize, your Honor.

17               Objection, it mischaracterizes his statement.  And I

18   also have a concern that there is a misimpression that is being

19   given to the witness right now based on how these documents are

20   being presented.

21               THE COURT:  All right.  Members of the jury, it's been

22   a long day.  Today is Wednesday, right?  9:30 tomorrow

23   morning -- Thursday.  9:30 Monday morning for you, and I'll

24   hear counsel after you leave.

25               THE CLERK:  Would the jury please come this way.

Iabdgat5

1           (Jury not present)

2           THE COURT:  And you are done for the day,

3    Mr. Gassnola.

4           (Witness excused)

5           THE COURT:  You can be seated.

6           Mr. Gassnola, we'll see you Monday.

7           THE COURT:  OK, Mr. Mark.  Mr. Mark, what's on your

8    mind?

9           MR. MARK:  Can we just wait one second for the witness

10   to exit.

11          (Witness not present)

12          MR. MARK:  OK.  Thank you, your Honor.

13          So what was being displayed on the screen --

14          THE COURT:  Could you get in some proximity of the

15   microphone, please.

16          MR. MARK:  I apologize, your Honor.

17          What was being displayed on the screen was just one

18   sentence from a longer 302, which I know your Honor is familiar

19   with.  But it's at 35 --

20          THE COURT:  I have read a lot but I don't promise to

21   have read every word in this case.

22          MR. MARK:  I don't recall --

23          THE COURT:  I'm not that old yet.

24          MR. MARK:  It's 3503-10, and there are two paragraphs

25   that discuss relating to Mr. Gassnola's statements to the FBI

Iabdgat5

1    about Silvio De Sousa.

2         THE COURT:  Where should I be looking?

3         MR. MARK:  So you can start at page 12 of 3503-10.

4         The conversation begins at "regarding," and there are

5    two paragraphs that go on to the next page for which only the

6    first sentence was highlighted for the witness.  What is clear

7    from these two paragraphs is that there was then a recording

8    that was played, the same recording that the jury heard during

9    this testimony.  And then Mr. Gassnola, with his recollection

10   refreshed from the recording, talked about two different

11   payments, the payment to Mr. De Sousa, so that -- the payment

12   to Mr. Falmagne so Mr. De Sousa would transfer from IMG Academy

13   and then the second payment to be made later to Mr. Falmagne.

14         (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1    MR. MARK:  So I think there was a misimpression that

2    was being brought here to the witness and through that line of

3    questioning through the demonstration of that 302 as it was

4    highlighted to Mr. Gassnola.  I don't know that that was

5    intentional at all, but it does lead to a concern for the

6    government.

7              THE COURT:  Mr. Schachter.

8              MR. SCHACHTER:  I don't know precisely how to

9    interpret the 302, your Honor.  I don't know precisely what

10   that means.  I am also looking at the underlying notes that the

11   agent took, which is 3503-9, at page 16, where the agent wrote

12   the words, "Silvio De Sousa never any payments.  TJ Gassnola

13   makes up story to Jim Gatto."  That's on page 16, right under

14   the word "Silvio De Sousa," that's the agent's notes as he is

15   taking them during the course of the interview.

16             I did not intend to mislead the witness.  I am happy

17   to have him read the entire 302.  I was trying to be efficient.

18             THE COURT:  Let me look at the notes, please.

19             I have to tell you, Mr. Schachter, that I don't see

20   any ambiguity here at all.  The notes and the 302 are entirely

21   consistent.  And they do not support your view of this.

22             MR. SCHACHTER:  I apologize, your Honor.  That's how I

23   understood it, is that he had said that he didn't recall any

24   payments to De Sousa and that he made up a story to Jim Gatto.

25             THE COURT:  Keep going.

1    MR. SCHACHTER:  It's not clear to me whether he is

2  talking about a discussion that he had with Mr. Falmagne, which

3  is different than the payment being made.

4    THE COURT:  The notes say "JG session 392."  Obviously

5  a reference to the Gatto wiretap session 392 that is referred

6  to in the memo, right?

7    MR. SCHACHTER:  Yes.

8    THE COURT:  Totally consistent with what the agent

9  says in the memo, namely, he said no payments.  Then they

10  played the wiretap with Gatto, right?  We agree so far?

11    MR. SCHACHTER:  Yes.

12    THE COURT:  Then the notes say "underground stuff."

13    "e.g., 4,000 to Fenny to get SDS to a different

14  school, not IMG.

15    "e.g., 20,000 to Fenny tomorrow.

16    "JG -- Mr. Gatto -- OK with this.

17    "But TJG -- meaning Gassnola -- never planning to pay

18  anything to Fenny further."

19    And it goes on.  I don't think what follows is

20  relevant.

21    MR. SCHACHTER:  No question they spoke about a

22  payment.  We heard the recording.  It's a different question.

23  Was a payment made is a different question than was it

24  discussed.  As I understood what he told the agent, he said

25  this is the discussion that is being made.  But I did not

1  understand it to change his answer that he did not make any

2  payments.  On the witness stand now he says he didn't make the

3  $20,000 payment, but he did provide $2500, I believe was his

4  testimony on direct, which would still be inconsistent,

5  although not materially so, from what he says is being

6  discussed on the wiretap.  I still read this, and I may be

7  completely wrong --

8  THE COURT:  Sir, after you showed him the 302, you

9  asked, "Does that refresh your recollection that you told the

10  FBI and members of the prosecution team that regarding Silvio

11  De Sousa you did not make any payments to De Sousa?"

12  He did not say, I made no payments then.  He said, "I

13  don't recall.  Well, reading this, I could have thought about

14  it later.  I could have refreshed my memory later on in the day

15  of the week.  I don't recall."

16  MR. SCHACHTER:  Two issues.  First, again, we are not

17  speaking about what was discussed.  We are talking about what

18  actual payments were made.

19  According to the 302, the 302 says, regarding Silvio

20  De Sousa, Gassnola did not recall any payments to De Sousa.

21  The notes that were taken contemporaneously in the interview

22  say, Silvio De Sousa never any payments.

23  THE COURT:  Both documents consistently say that

24  first.  We are talking about what you did here by showing only

25  that, and not showing him the next bit, which involves the

1  playing of the tape and his then saying additional things that

2  are, at least arguably, inconsistent with the no payments.

3          MR. SCHACHTER:  I understood him saying, now I have

4  heard this tape and I am telling you what we were discussing,

5  which is different from, as I understood it, what payments were

6  made.  I understood him to be telling the FBI what was being

7  discussed on the tape.

8          THE COURT:  Mr. Schachter, I am not happy about this

9  kind of behavior.

10          MR. SCHACHTER:  Yes, your Honor.

11          THE COURT:  You will be able to deal with it on

12  redirect.

13          Anything else?

14          MR. MARK:  Not from the government.

15          THE COURT:  OK.  Enjoy the weekend, folks.

16          (Adjourned to October 15, 2018, at 9:30 a.m.)

17

18

19

20

21

22

23

24

25

1    INDEX OF EXAMINATION

2    Examination of:                              Page

3      THOMAS JOSEPH GASSNOLA

4    Direct By Mr. Mark . . . . . . . . . . . . . 968

5    Cross By Mr. Schachter . . . . . . . . . . .1046

6                    GOVERNMENT EXHIBITS

7    Exhibit No.                               Received

8      107E   . . . . . . . . . . . . . . . . . 970

9      107P-3   . . . . . . . . . . . . . . . . 972

10     107R-2 and 107R-3   . . . . . . . . . . . 974

11     107K-4-5 and -10 . . . . . . . . . . . . . 975

12     107Q-1   . . . . . . . . . . . . . . . . 981

13     45 and 45T . . . . . . . . . . . . . . . 988

14     6 and 6T . . . . . . . . . . . . . . . . 992

15     7 and 7T . . . . . . . . . . . . . . . . 993

16     306D-1, 306A-1, 306A-2, 306A-3, and . . . . .1005

17           306E

18     309A   . . . . . . . . . . . . . . . . . .1006

19     107K-5   . . . . . . . . . . . . . . . . .1009

20     107K-10   . . . . . . . . . . . . . . . . .1015

21     2 and 2T . . . . . . . . . . . . . . . . .1018

22     1023 and 1040 . . . . . . . . . . . . . .1026

23     309C   . . . . . . . . . . . . . . . . . .1030

24     309D   . . . . . . . . . . . . . . . . . .1032

25     305B   . . . . . . . . . . . . . . . . . .1035

107S-1 and 107S-5   . . . . . . . . . . . . .1039

1053      . . . . . . . . . . . . . . . . . .1066

306D, pages 9293, 334 and 335   . . . . . .1120