IAF8GAT1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                17 Cr. 686 (LAK)

5   JAMES GATTO, a/k/a "Jim,"
    MERL CODE,
6   CHRISTIAN DAWKINS,

7           Defendants.

8   ------------------------------x

9                         October 15, 2018
                        9:40 a.m.
10

11   Before:
                HON. LEWIS A. KAPLAN,

12                         District Judge
                    and a Jury

13

14                   APPEARANCES

15   ROBERT S. KHUZAMI
        Acting United States Attorney for the
16         Southern District of New York
    BY:  EDWARD B. DISKANT
17         NOAH D. SOLOWIEJCZYK
        ALINE R. FLODR
18         ELI J. MARK
        Assistant United States Attorneys
19

20   WILLKIE FARR & GALLAGHER LLP
        Attorneys for Defendant Gatto
    BY:  MICHAEL S. SCHACHTER
21         CASEY E. DONNELLY

22

23

24

25

IAF8GAT1

1                        APPEARANCES (Cont'd)

2    NEXSEN PRUET LLC
          Attorneys for Defendant Code
3    BY:  MARK C. MOORE
               -and-
4    MERL F. CODE

5    HANEY LAW GROUP PLLC
          Attorneys for Defendant Dawkins
6    BY:  STEVEN A. HANEY

7

8    Also present:  SONYA JACOBS, Paralegal
                    SYLVIA LEE, Paralegal
9                   ANTHONY CASOLA, FBI

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IAF8GAT1

1     (Trial resumed; jury not present)

2     THE COURT:  Good morning.

3     In light of the mountain of paper that hit my desk

4     this morning, I won't ask how your weekends were.

5     I had a couple of questions of the government that

6     would be helpful in clarifying some things.

7     Is everybody in agreement that whatever else it might

8     require, proof of the substantive mail fraud counts requires

9     the making of material false statements, and that such

10    statements have been a means of an object of the alleged

11    conspiracy?  Everybody agree on that?

12    That can't possibly be a surprise at this point in the

13    trial, can it?

14    MR. DISKANT:  Your Honor, I think we would agree for

15    the substantive wire fraud counts the evidence of an intent to

16    deceive is required, and that usually the evidence of that is a

17    material false statement, that's correct.

18    THE COURT:  But you are not relying on any theory of

19    mail fraud here that would not require proof of a material

20    false statement, are you?

21    MR. DISKANT:  I think, actually, under the

22    right-to-control theory, that might not be entirely accurate.

23    This is obviously something we can get more into at the

24    charging conference.  I think for general purposes the

25    government would generally agree with that statement.

IAF8GAT1

| | |
|---|---|
| 1 | THE COURT:  What is the qualification? |
| 2 | MR. DISKANT:  I don't have our requests to charge in |
| 3 | front of me, and I would like to look at it.  I do believe on |
| 4 | the right-to-control theory a materially false -- I guess even |
| 5 | under the right-to-control theory there would have to be a |
| 6 | statement or omission that was materially false, that's |
| 7 | correct. |
| 8 | THE COURT:  Mr. Schachter, you are shaking your head. |
| 9 | MR. SCHACHTER:  The government's indictment does not |
| 10 | lay out an omission theory.  It is very specific, and if I can |
| 11 | put my hands on the indictment I can identify the specific |
| 12 | paragraph. |
| 13 | THE COURT:  So you even more adamantly agree with |
| 14 | what -- |
| 15 | MR. SCHACHTER:  I agree with your Honor completely |
| 16 | adamantly. |
| 17 | THE COURT:  Not with me, but even with your adversary. |
| 18 | MR. SCHACHTER:  Yes, absolutely.  Mr. Diskant |
| 19 | suggested that an omission theory could theoretically be |
| 20 | possible, and that is foreclosed by the charges. |
| 21 | THE COURT:  I understand.  But there has got to be a |
| 22 | statement in which there is an omission.  Everybody agrees on |
| 23 | that? |
| 24 | MR. SCHACHTER:  Yes. |
| 25 | MR. MOORE:  Yes. |

IAF8GAT1

1      MR. HANEY:  Yes.

2      THE COURT:  Secondly, the statements in question in

3 this case, whatever might be true in another case, are the

4 certifications by the students, is that right, and nothing

5 else?

6      MR. SCHACHTER:  That's all that is alleged in the

7 indictment, your Honor.

8      MR. DISKANT:  No, your Honor.  I don't think that's

9 true.  I think we have established evidence of an ongoing duty

10 on the part of both the coaches and the student-athletes to

11 bring NCAA rules violations to the attention of the

12 universities and the failure to do so -- I respectfully

13 disagree with Mr. Schachter on the omission issue, but we can

14 come to that later -- that that also would be a basis for a

15 materially false statement or omission.

16      THE COURT:  All that depends on the existence of a

17 legally cognizable duty, right?

18      MR. DISKANT:  Yes, your Honor.

19      THE COURT:  Insofar as the statements are concerned,

20 your theory of principal liability, or of membership in the

21 conspiracy, rests exclusively, does it not, on a

22 cause-to-be-made theory as distinguished from a making theory.

23 Do you follow what I am asking you?

24      MR. DISKANT:  I do, your Honor.  Again, I think that's

25 largely true.  I do think there has been evidence at this trial

1  that parents were required to sign paperwork and that some of

2  the paperwork parents signed included false statements they

3  were making.

4  THE COURT:  One of the points of my asking whether you

5  were relying for false statements only on false certification

6  by students, to which you said yes, was to find out what the

7  universe of false statements you are relying on was and you

8  didn't say anything about parents.

9  MR. DISKANT:  I apologize, your Honor.  It's the same

10  paperwork.  Some of the paperwork that we have offered, which

11  includes what we allege to be the false statements or

12  misrepresentations by the students is also signed by the

13  parents.  So, for example, we offered certain paperwork from

14  the University of Kansas that is signed both by Billy Preston

15  and by Nicole Player.  We also adduced testimony that the

16  University of Kansas sought to impose, and this would be a jury

17  question, but sought to impose a duty on parents to report any

18  known violations of NCAA rules as well.

19  THE COURT:  All right.  I raise this because it will

20  probably affect the structure of the charge, and given that we

21  are approaching that point, I just needed to know about it.

22  I have the government's letter of Sunday concerning

23  Government Exhibit 113B-1 and a response from Mr. Gatto's

24  counsel.  Anybody want to add anything to those letters?

25  MR. MARK:  Not from the government.

1    MS. DONNELLY:  Not for Mr. Gatto.

2    THE COURT:  Can anybody illuminate or refresh my

3    recollection as to the date or dates of the Gassnola payments

4    to Player.

5    MR. MARK:  The date of the payments began, the first

6    one was November 1, 2016, and they continued to right before

7    the investigation became overt.  There was text messages around

8    the third week of September of last year 2017 regarding a last

9    payment of $4,000 by Mr. Gassnola to Ms. Player.

10   THE COURT:  OK.  I am going to receive, assuming the

11   necessary foundation is or has been laid, Government Exhibit

12   113B-1.  I find that, to whatever extent it is offered for the

13   truth of the matters asserted, they were statements made by

14   members of the conspiracy, they were made during the course of

15   and in furtherance of the conspiracy, and the other

16   requirements are satisfied.

17       I take Mr. Gatto's argument that this was an unrelated

18   investigation sparked by an automobile accident and it related

19   only to the car, and in any case it would be excluded under

20   Rule 403.  But having read the materials, it seems quite clear

21   to me that the investigation was broader and it related to

22   improper payments more broadly to or for the benefit of Billy

23   Preston.

24       In Exhibit B to the Willkie Farr letter, at page 14,

25   which is a transcript of an interview involving a Kansas

compliance official, Billy Preston's mother, and outside

counsel to the University of Kansas, counsel for the university

asks Player, in relation to Mr. Gassnola:

"Q.  Can you tell us, has he provided you with anything?

"A.  Yes.

"Q.  Tell me what he has provided you with.

"A.  He has given me cash once.

"Q.  How much?

"A.  He gave me $15,000."

        She then has what I imagine she thought was an

exculpatory explanation, and may indeed be an exculpatory

explanation, but clearly the university was looking more

broadly than the auto accident.

        Likewise, at page 24, counsel to the university asks,

or states:

        "So someone has reported to the university that you

have been receiving, quote-unquote, payments related to --"

        Ms. Player says, "Never."

        Next question: "Is it -- again, I ask you this in

kind of an honest question and answer because again this

is -- this is -- the integrity of the university could be

impacted.  This is a federal indictment.  It's a very serious

issue.  Everybody should take notes.  But someone is coming to

the university and pointing at you and Billy saying you guys

are taking money or receiving payments or something from one of

1   the companies in order to go to KU.  Is there any evidence out

2   there that that's happening?  So I mean, like, this move to

3   Houston, who paid for this?"

4           And she responds, "Mr. Gassnola."

5           There is plenty of evidence that this inquiry was

6   broader and whatever she said here was an attempt to minimize

7   or conceal, at least I so find for preliminary purposes, what

8   transpired with respect to the matters in this indictment.  In

9   any case, the inquiry was inextricably intertwined with this

10  indictment.

11          Then I had Mr. Schachter's quite voluminous

12  submission, received this morning by e-mail.  I have barely had

13  a chance to skim it.  I can't deal with that now.  Does the

14  government intend to respond to this?

15          MR. MARK:  Your Honor, we are happy to respond orally

16  since I understand these are documents that they want to get in

17  with Mr. Gassnola.  Generally, our point would be we should

18  take this up at the appropriate juncture in Mr. Gassnola's

19  testimony.  But as more broadly, this is pure impeachment

20  evidence that they want to put in as to Mr. Gassnola, and this

21  is all evidence, as you see, that they really want to put

22  forward for the truth of the matter.  They go through and they

23  put together several pages of what they believe the real story

24  is that they believe Mr. Gassnola is lying about and how all of

25  these documents support what they consider is an alternate view

1    of the facts.

2           THE COURT:  Get the microphone somewhere in proximity

3    to you, please.

4           MR. MARK:  Do you want me to repeat anything?

5           THE COURT:  Just the last bit.

6           MR. MARK:  In Mr. Gatto's letter, they put together a

7    lengthy background of what they believe are the real facts

8    which they seek to impeach Mr. Gassnola about.  All of these

9    documents are really for the truth in order to try to impeach

10   Mr. Gassnola about an alternate view of those facts.  There

11   really isn't anything else they are put forward for, because by

12   their own submission they are saying that whatever happened

13   here Mr. Gassnola didn't inform Mr. Gatto about.

14          So this is not going to what they believe affects Mr.

15   Gatto's state of mind or why he took or didn't take any

16   particular actions.  This is purely focused on attempting to

17   impeach Mr. Gassnola's testimony about his interactions with

18   the University of Kansas coaching staff in relation to payments

19   or discussions related to payments or generally discussions

20   with the coaching staff regarding Fenny Falmagne, Silvio De

21   Sousa's guardian.

22          We don't object in the general to them asking

23   questions about them.  But these documents -- we will address

24   those questions as they come up, but these documents here are

25   all really trying to put in the facts of the matters from those

IAF8GAT1

1    documents into evidence as for the truth.

2            THE COURT:  Briefly, Mr. Schachter, anything?

3            MR. SCHACHTER:  Your Honor, the individual statements

4    in these text messages, what we tried to establish in our

5    lengthy submission is that each of those statements is

6    nonhearsay.  We are showing these text messages so that we can

7    reveal what we believe to be the truth to the jury, but that

8    doesn't make each individual statement a hearsay statement.

9            The thrust of Mr. Gassnola's testimony, as I

10   understand it, was that he was concealing these payments from

11   the coaching staff at the University of Kansas.  These

12   documents, which each statements, if you go through it one by

13   one, are nonhearsay statements, are relevant to showing that

14   Mr. Gassnola was lying about whether he had concealed these

15   payments from the University of Kansas coaching staff, or

16   rather, whether he was doing what he believed was being

17   requested of him of the University of Kansas coaching staff.

18   That is the relevance of these documents.  They are each

19   nonhearsay statements, and that's what we tried to go through

20   point by point in the too lengthy submission, and we apologize

21   for that, your Honor.

22           THE COURT:  What you're really saying is this, I

23   think, and it's very clever, I must say:  Of course we want it

24   for the truth, because if none of this is true, then your

25   alternative explanation for what went on between Gassnola and

IAF8GAT1

1    Kansas holds no water.  But you have constructed an argument

2    that particular pieces -- and you say all, and I haven't

3    verified that, but certainly some -- are not technically

4    hearsay, even though the whole purpose of it is to have the

5    jury assemble, with your good help on your closing argument,

6    what you say is the true story, without ever offering the

7    documents for the truth.  I understand what you're doing,

8    right?

9            MR. SCHACHTER:  Your Honor --

10           THE COURT:  So it's really a 403 problem.

11           MR. SCHACHTER:  I guess what I would say, your Honor,

12   is that all evidence is for the purpose of showing the truth to

13   the jury.  There are evidentiary rules that preclude the

14   introduction of statements that may be hearsay, where they are

15   offered for the truth of the matter asserted, because that goes

16   to the reliability of the statement.

17           THE COURT:  Right.

18           MR. SCHACHTER:  Our point is they are not hearsay, so

19   it's not an issue of whether or not that rule of evidence

20   precludes their admission, but they are, like all the evidence

21   that we try to submit, is to reveal the truth to the jury.

22           I will give you an example.  Mr. Gassnola says to

23   Coach Self, "Hall of famer, when you have five minutes and

24   you're alone, call me please."  That's a request.  It's

25   nonhearsay.  So it's not a hearsay issue.  And even if I am

1   presenting that evidence for the purpose of showing the truth

2   to the jury, it's not a hearsay issue.  The issue really is, I

3   suppose, a 401-403 issue, but it's not a hearsay issue.

4           So I think when Mr. Mark says that what I am trying to

5   do is I am trying to show the truth, and that makes all these

6   nonhearsay statements hearsay, I think that misses the mark.

7   That's really not the point.

8           THE COURT:  Look, I understand, it's a very clever

9   argument, and I will think about it some more.  And I haven't

10  had a chance to read each and every statement and each and

11  every explanation for why you say it's nonhearsay, and I would

12  commend to the government that exercise as well.

13          We will just deal with this in due course.

14          MR. SCHACHTER:  Thank you, your Honor.

15          THE COURT:  I am literally aware of your position here

16  in this big pile of paper for less than an hour.

17          MR. SCHACHTER:  We apologize.

18          THE COURT:  I have tried cases on your side and

19  sometimes things come uncomfortably late.

20          OK.  Do we have a jury?

21          THE DEPUTY CLERK:  Still missing an alternate.

22          The light just came on.

23          THE COURT:  The light just came on.  Let there be

24  light.

25          Bring in the jury.

IAF8GAT1

1          (Jury present)

2    THOMAS JOSEPH GASSNOLA, resumed.

3          THE COURT:  Good morning, everybody.

4          The jurors are all present.  The defendants all are

5    present.  The witness is reminded he is still under oath.

6          Before we resume the questioning, let me just bring

7    the jury up-to-date.  It is now my understanding that we will

8    complete the presentation of evidence by tomorrow afternoon.

9    So we are running probably a week ahead of schedule.  Assuming

10   that happens, the likelihood is that you will have -- well, I

11   shouldn't say -- there is a possibility that Wednesday will be

12   a partial day for you, because there are some legal work we

13   have to do before you get the case.

14         Is there likely to be a rebuttal?  No, I take it?  Is

15   that right?

16         MR. DISKANT:  Very brief, if any.  Probably not.

17         THE COURT:  And the Tuesday date still holds?

18         MR. DISKANT:  Certainly for the government.

19         THE COURT:  Mr. Schachter.

20         MR. SCHACHTER:  I believe so, your Honor.  There was

21   one issue that we should take up at another time.

22         THE COURT:  So, you see, I was a little quick about

23   Tuesday, but maybe we will make that.

24         Whenever we get finished, you may have a partial day

25   while we get the legal work done, and as soon as that's all

1   through, you will get closing arguments and get the case.  So

2   there is a reasonable chance you will get the case on Thursday.

3   Perhaps at lunchtime, or tomorrow, you ought to talk about

4   whether, if I can be available on Friday, you want to work on

5   Friday or not.  If that's a problem for anybody, of course we

6   won't.  And then if we need the time, we will just go into next

7   week.  But by that time you should be deliberating.

8            All right.  Let's go.

9   CROSS-EXAMINATION (Cont'd)

10  BY MR. SCHACHTER:

11  Q.  Good morning, Mr. Gassnola.

12  A.  Good morning.

13  Q.  At the end of your testimony on Thursday I had asked you

14  whether you had withdrawn $40,000 in cash in September of 2015

15  and then rented a car a few days later in Raleigh, North

16  Carolina.

17           Do you remember those questions?

18  A.  Yes.

19  Q.  I asked you if the purpose of your visit to North Carolina

20  was to deliver $40,000 to Dennis Smith, Sr., and you said you

21  have never given a dime to Dennis Smith, Sr.

22           Do you remember that testimony?

23  A.  I do.

24  Q.  I believe that I neglected to ask you if you gave any money

25  to Shawn Farmer when you were in North Carolina in September of

1   2015?

2   A.  I don't recall that.

3   Q.  Or did you give any portion of the $40,000 that you

4   withdrew on September 4, 2015 to anyone associated with the

5   Smith family or with NC State?

6   A.  Again, I don't recall any of that.

7   Q.  You just don't recall one way or the other?

8   A.  No.

9   Q.  Now, with respect to the payment that you said that you

10  made to Coach Early at NC State in November of 2015, do you

11  recall that testimony?

12  A.  I do.

13  Q.  And you had testified that you had previously, before

14  November 2015, been involved in facilitating an earlier payment

15  to Dennis Smith's family, is that right?

16  A.  Correct.

17  Q.  You had been involved with an Adidas employee named Chris

18  Rivers in facilitating a payment to Mr. Smith's family back

19  when Mr. Smith was a junior in high school, is that right?

20  A.  That's correct.

21  Q.  So to the extent that a payment to an athlete's family

22  would render an athlete ineligible to play, you had been

23  involved in rendering Mr. Smith ineligible to play back when he

24  was a junior in high school, is that correct?

25  A.  I helped facilitate a payment to him when he was in high

1   school.

2   Q.  You also testified that you had provided $90,000 to Billy

3   Preston's mother, approximately, is that correct?

4   A.  Yeah.

5   Q.  And you testified that before you had given her any money,

6   that you had heard that Mr. Preston's mother had already been

7   taking money from what I believe you called to the jury outside

8   influences, is that correct?

9   A.  Yes.

10  Q.  So to the extent that payments made to an athlete's family

11  would render an athlete ineligible, Mr. Preston was already

12  ineligible before you paid Mr. Preston's mom any money at all,

13  is that correct?

14              MR. MARK:  Objection.

15              THE COURT:  Sustained.

16  Q.  Let's turn to Silvio De Sousa.

17              You testified that you first came into contact with

18  somebody named Fenny Falmagne, is that correct?

19  A.  Fenny, yes.

20  Q.  We will call him Fenny.  That's probably easier.

21              You testified that you came into contact with Fenny

22  because Coach Townsend at the University of Kansas had put you

23  in touch with him, is that correct?

24  A.  Yes, he did.

25  Q.  And I am going to just hand you a much smaller binder.  I

1  think it will be easier to deal with.

2          MR. SCHACHTER:  Your Honor, may I approach the witness

3  and provide the Court with some smaller binders?

4          THE COURT:  Yes.

5  Q.  All right.  So just to place in time when Coach Townsend

6  put you in touch with Fenny, I am going to show you what has

7  been marked in that smaller binder as Defense Exhibit 160-1.

8          Can you turn to that?  In that binder there's first

9  some government exhibits, they say GX, and then behind those

10  are DX.  So if you turn to the DXs, you will see one that's

11  labeled DX 160-1.

12          Are you there?

13  A.  I have got it.  It was on the screen.

14  Q.  Can you turn to the second page of that document?

15  A.  160-1?

16  Q.  Is this a text message exchange that you had with Coach

17  Townsend in which he forwarded to you a contact?

18  A.  Where are you at again?

19  Q.  Second page of Defense Exhibit 160-1.

20  A.  Yes.

21          MR. SCHACHTER:  Defense offers Defense Exhibit 160-1.

22          MR. MARK:  No objection to this page, your Honor.

23          THE COURT:  Received.

24          (Defendant's Exhibit 160-1 received in evidence)

25          MR. SCHACHTER:  May I publish the second page of 160-1

IAF8GAT1                    Gassnola - Cross

1   to the jury?

2           THE COURT:  Yes.

3   Q.  All right.  So is this a contact that Coach Townsend sends

4   to you for Fenny on August 8, 2017?

5   A.  That's correct.

6   Q.  And you I believe in your testimony described Fenny as

7   Silvio De Sousa's guardian and handler.

8           Do you remember using those words?

9           MR. MARK:  Objection.  Mischaracterizes the testimony.

10          THE COURT:  Rephrase it.

11  Q.  You referred to Fenny as Silvio De Sousa's legal guardian

12  at times, is that correct, in your testimony?

13  A.  That's correct.

14          MR. SCHACHTER:  May I have just a moment, your Honor?

15  Q.  Do you also, sir -- transcript 1138, line 16 through 18 --

16  recall referring to Mr. Falmagne as Silvio De Sousa's handler?

17          Do you recall giving that testimony on October the

18  11th?

19          THE COURT:  Sustained.

20          Look, you asked him whether he had referred to him as

21  legal guardian.  He said yes.  What are you now doing,

22  impeaching that answer?

23  Q.  Did you also refer to Mr. Falmagne as Silvio De Sousa's

24  handler?

25  A.  Yes.

 1   Q.  Thank you.

 2        Now, I believe that you said in your testimony on

 3   Thursday that Coach Townsend told you that Fenny wanted Adidas

 4   to provide uniforms for the Angola National team.

 5        Do you remember providing that testimony?

 6   A.  I do.

 7   Q.  And that you said that you discussed that briefly with

 8   Coach Self, that request?

 9   A.  Yes.

10   Q.  And that you said that you would take care of it.  Was that

11   your testimony?

12   A.  Yes.

13   Q.  Now, in any of your meetings with the government, did they

14   show you a single document showing that anyone at Adidas had

15   actually ever ordered uniforms for the Angola National team?

16        MR. MARK:  Objection.

17        THE COURT:  Sustained.

18   Q.  Have you seen, sir, any documents showing that anyone from

19   Adidas had ever actually ordered uniforms for the Angola

20   National team?

21   A.  No.

22   Q.  Have you had any e-mail communications with anybody in

23   which you were asking anyone at Adidas to get uniforms for the

24   Angola National team?

25   A.  No.

1    Q.  Have you seen any designs for what the brand-new Adidas

2    uniforms for the Angola National team would look like?

3    A.  I have not.

4    Q.  Isn't it true, sir, that the Angola National team is

5    sponsored by Nike?

6    A.  I have no idea.

7    Q.  Do you know if they were sponsored by Nike back in August

8    of 2017?

9              MR. MARK:  Asked and answered.

10             THE COURT:  Overruled.

11   A.  I have no idea what the Angola National team is doing.

12   Q.  Have you ever seen any photographs of Silvio De Sousa in

13   his Angola National team uniform?

14   A.  No.

15   Q.  Now, you testified that later Fenny told you that he was

16   being paid $60,000 a year by a booster at Maryland.

17             Do you remember that testimony?

18   A.  That's what Fenny told me.

19   Q.  And Fenny told you that the Maryland booster was paying him

20   that amount in return for Silvio De Sousa going to Maryland.

21   Do you recall that?

22   A.  Yes.

23   Q.  And Fenny told you that Silvio De Sousa didn't want to go

24   to Maryland anymore.  Do you recall that?

25   A.  I do.

1  Q.  Fenny told you that Silvio De Sousa wanted to play

2  basketball for the University of Kansas, is that correct?

3  A.  That's what Fenny told me, yes.

4  Q.  And Fenny asked you if you could help Fenny and Silvio De

5  Sousa get out from this agreement with the Maryland booster, is

6  that correct?

7  A.  I don't recall the words.  I just know what Fenny told me

8  that he was under this umbrella from this booster, yes.

9  Q.  Can you describe what words you remember Fenny telling you?

10 A.  That he was being paid a certain amount of money from this

11 guy, and that the kid was going to go to the University of

12 Maryland and the kid didn't want to go to Maryland.

13 Q.  He wanted to go to Kansas.  You said that you had agreed to

14 pay Fenny $20,000, is that correct?

15 A.  That's correct.

16 Q.  But you said, I believe, that you never actually made that

17 payment, but you had agreed to it, is that correct?

18 A.  Absolutely correct.

19 Q.  And the reason why you had agreed to provide that $20,000

20 was to help Fenny get out from under this deal with this

21 Maryland booster, is that correct?

22 A.  That's correct.

23 Q.  Because you hoped that Silvio De Sousa would go to Kansas?

24 A.  I just wanted to get him out from under this deal that he

25 was in.

1    Q.   Thank you.

2         But your testimony is that your agreement to give

3    Fenny $20,000, you did not discuss that request for money with

4    Coach Townsend at Kansas, is that correct?

5    A.   I did not discuss that with Coach Townsend.

6    Q.   I believe it was also your testimony on Thursday that you

7    did not discuss this request for money with the head basketball

8    coach at Kansas, Bill Self, is that correct?

9    A.   I never talked to Bill Self about this deal.

10   Q.   That was your testimony on direct examination, yes?

11   A.   Yes.

12   Q.   I believe you testified, you used the word, I believe,

13   "concealed," you concealed your conversation with Fenny from

14   both Coach Self and Coach Townsend, is that correct?

15   A.   I only told him about the uniform situation.

16   Q.   Now, the day after Coach Townsend forwarded to you Fenny's

17   contact, you texted Coach Self, isn't that correct?

18   A.   Yes.

19   Q.   And I am now going to show you Defense Exhibit 156, if you

20   can turn to that in your binder, please.

21        Is this a text exchange between you and Coach Bill

22   Self on August 9, 2017, the day after Coach Townsend had sent

23   you this contact?

24   A.   It is.

25   Q.   And the subject matter of your text exchange with Coach

1  Self is your conversation with Fenny, isn't that correct?

2  A.  Yes.

3          MR. SCHACHTER:  We offer Defense Exhibit 156.

4          MR. MARK:  No objection.

5          THE COURT:  Received.

6          (Defendant's Exhibit 156 received in evidence)

7          MR. SCHACHTER:  May I publish it to the jury, your

8  Honor?

9          THE COURT:  Yes.

10 Q.  Just so that the jury is familiar, on the left side are

11 Coach Self's text messages to you, and on the right side are

12 your text messages to Coach Self, is that correct?

13 A.  That's correct.

14 Q.  And at 10:22, you texted Coach Self, "Hall of famer."

15         That's a reference to the fact that Coach Self is the

16 basketball Hall of Fame, is that correct?

17 A.  He wasn't yet.

18 Q.  Why did you call him hall of famer?

19 A.  That's what I thought.

20 Q.  You wrote, "When you have fine minute and you're alone,

21 call me P."  That's short for please, is that correct?

22 A.  No.  It's a typo.

23 Q.  OK.  You just wrote "call me P," right?

24 A.  It meant to be a period.

25         MR. SCHACHTER:  If I may offer a verbal stipulation,

1    your Honor, that I have entered into with the government.

2          May I have just a moment to let the government know

3    what I am about to say?

4    Q.  Sir, do you recall that on August the 9th, at 11:43, you

5    had a telephone conversation with Coach Self for about five

6    minutes?  Do you recall that?

7    A.  No.

8          MR. SCHACHTER:  Mr. Mark, may I proceed with the

9    stipulation?

10         Your Honor, the government and we have stipulated that

11   a phone number associated with Bill Self placed a call to a

12   phone number associated with Thomas Gassnola on August 9, 2017,

13   at 12:43 p.m.  The duration of the call was five minutes and

14   six seconds.

15         THE COURT:  All right.

16   Q.  Now, sir, do you recall what precisely you wanted to speak

17   with Coach Self about that you wanted to discuss alone, or when

18   he was alone?

19   A.  I don't.

20   Q.  You don't.

21         Do you recall that after your phone call with Coach

22   Self, that you then reached out to Coach Townsend at 5:24 that

23   day?  Do you recall that?

24   A.  No.

25   Q.  I am going to ask you to turn in your binder to Defense

1  Exhibit 160-2.

2         Sir, is this a text message exchange between you and

3  Assistant Coach Kurt Townsend at Kansas on August 9, 2017?

4  A.  Yes, it is.

5  Q.  Is the subject matter Fenny?

6  A.  Yes.

7         MR. SCHACHTER:  Your Honor, defense offers Defense

8  Exhibit 160-2.

9         MR. MARK:  Objection.  Hearsay, your Honor.

10         MR. SCHACHTER:  It's effect on the listener, your

11  Honor.

12         THE COURT:  Members of the jury, this exhibit is going

13  to be received but only for a limited purpose.  It is not

14  received for the truth of any statements made in it.  It is

15  received only, insofar as statements attributed to Coach

16  Townsend are concerned, for the fact that Coach Townsend made

17  these statements to Mr. Gassnola, for whatever relevance you

18  ultimately find that has, but not for the truth of what he

19  said.  It's my "moon is made of green cheese" example, if you

20  remember it.

21         Received for that purpose.

22         (Defendant's Exhibit 160-2 received in evidence)

23         MR. SCHACHTER:  May I publish it to the jury, your

24  Honor?

25         THE COURT:  Yes.

1   BY MR. SCHACHTER:

2   Q.  Sir, at 5:24 p.m. you texted Coach Townsend, "Hit me when

3   you can."

4        Then he responded, "Coach Self just talked to Fenny.

5   Let me know how it goes."

6        You responded, "I called, no answer.  I will do it

7   again now."

8        And Coach Townsend replies, "He was on with us."

9        Is that correct?

10  A.  Yes.

11       MR. SCHACHTER:  May I have just a moment?

12  Q.  So you reach out to Coach Townsend, "Hit me when you can,"

13  and then Coach Townsend, after he wrote that part about Coach

14  Self, then makes a request of you, is that correct?

15  A.  Can you repeat that?

16  Q.  Let me be more direct.

17       Coach Townsend says to you, "Let me know how it goes,"

18  isn't that correct?

19  A.  Yes.

20  Q.  After this text exchange did you then tell Coach Self that

21  you talked to Fenny?

22  A.  After this text message at 5:00?

23  Q.  At 5 and 6:00.

24  A.  I don't remember if I texted the coach or not.

25  Q.  I am going to show you what is marked as Defense Exhibit

1  156 -- I am sorry, this is back to Defense Exhibit 156 in

2  evidence.

3          MR. SCHACHTER:  May I publish that, your Honor?

4          THE COURT:  Yes.

5  Q.  Sir, this is in the evening on August the 9th, is that

6  correct?

7  A.  Yes.

8  Q.  And you wrote, "I talked to Fenny."

9          You wrote that to Coach Self, is that correct?

10  A.  Correct.

11  Q.  And Coach Self responds with a question, "We good?"  Is

12  that correct?

13  A.  Correct.

14  Q.  And when Coach Self asked you if you and he were good,

15  isn't it true that this was a reference to your agreeing to pay

16  Fenny to get him out from under the Maryland agreement?

17  A.  It's not true at all.

18  Q.  Unrelated to that?

19  A.  Not related at all.

20  Q.  And you responded, "Always.  That was light work.  Ball is

21  in his court now."  Do you see that?

22  A.  Sure do.

23  Q.  Is it your testimony that the light work that you reported

24  to Coach Self, that was not your agreement to pay Fenny

25  $20,000?

1  A.  It's just uniforms, bags and stuff that he wanted for

2  Angola.

3  Q.  You were just reporting to Coach Self about you seeking

4  uniforms for the Angola National team, is that correct?

5  A.  I was telling Coach Self that I talked to Fenny about him

6  wanting all this stuff for his Angola team.  He could have kept

7  the product for himself.  He told me that he needed it for his

8  Angola team.

9  Q.  Sir, at the end of that text message, you wrote, "Ball is

10  in his court now."

11         When you wrote that the ball was in his court, you're

12  referring to Fenny's court, aren't you?

13  A.  That's correct.

14  Q.  Now, if we can turn, please, to the second page of this

15  exhibit, which continues the text exchange.

16         I am sorry.  Just back to 156.

17         When you wrote, "Always.  That was light work.  Ball

18  is in his court now," that was at 9:34 p.m., is that correct?

19  A.  Yeah.

20  Q.  Then if we can just turn to the second page.

21         MR. MARK:  Objection, your Honor.  I didn't see this

22  page.

23         THE COURT:  I'm sorry?

24         MR. MARK:  We didn't see this page of the exhibit.

25         THE COURT:  I can't hear you, sir.

1            MR. MARK:  We didn't see the second page in the

2    exhibit when it was being admitted.

3            May we just have a brief sidebar?

4            THE COURT:  Sure.  Bring your book up.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. MARK:  Your Honor, the second page of DX 156 is in

3     our book.  We are looking at these very quickly.  Obviously,

4     Mr. Schachter did give this to us.  The second text message,

5     which wasn't shown to the witness when it was originally

6     introduced, has a different conversation.  This conversation is

7     now about Mr. Self's discussion with somebody who is Sean

8     Lester who is the athletic director at the University of

9     Kansas.  I think this sort of goes into a different level of

10    hearsay conversations that we have concern with being admitted.

11         MR. SCHACHTER:  Two things.  First, I provided these

12    exhibits to the government I believe on Friday.  We sent all of

13    these exhibits over to the government.

14         THE COURT:  He is not claiming you bagged him on this

15    one.

16         MR. SCHACHTER:  This one.  Thank you, your Honor.

17         This is the point of the testimony.  Coach Self

18    responds to this information about Fenny by linking it to

19    Kansas resigning the sponsorship agreement with Adidas.  In

20    fact, Mr. Gassnola, in a recorded wiretapped call, which has

21    been marked as Defense Exhibit 32T, says to Mr. Code, "I have

22    been going around dropping bags to that idiot Fenny in order to

23    get Kansas to resign with Adidas."

24         The point of this testimony is that what is happening

25    here is that Coach Self --

1     THE COURT:  What he is talking about is hearsay.

2     MR. SCHACHTER:  It's not hearsay.  This is not being

3  offered for the truth of the matter asserted.  "Will it be done

4  by Tuesday deadline?" is really the point of this, is that Mr.

5  Gassnola in his mind is linking this.  That's a question.

6     THE COURT:  Slow down.  I know you want to tell me all

7  18 pages of last night's letter again.  Your point is it's not

8  hearsay.

9     MR. SCHACHTER:  Yes, your Honor.  It's not being

10  offered for the truth of the matter asserted.

11     THE COURT:  Fine.

12     (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (In open court)

2      THE COURT:  The objection is overruled.

3      I remind the jury that none of the statements by Coach

4  Self are admissible, nor may they be considered by you as

5  evidence of the truth of the things he said.

6      Proceed.

7      MR. SCHACHTER:  May I publish again to the jury

8  Defense Exhibit 156?

9      THE COURT:  Yes.

10  BY MR. SCHACHTER:

11  Q.  Just to focus again on the first page.  At 9:34 was your

12  text:  "Always.  That was light work.  Ball is in his court

13  now."

14      If we can turn to the second page, Mr. Self responds

15  in the same minute, "Spoke to Sean.  All good."

16      Do you see that?

17  A.  Yep.

18  Q.  Now, the deputy athletic director at the University of

19  Kansas was a man named Sean Lester, is that correct?

20  A.  That's correct.

21  Q.  And Adidas at this time was trying to negotiate an

22  extension of its sponsorship agreement with the University of

23  Kansas, is that correct?

24  A.  Correct.

25  Q.  And then you asked at 9:35, "Will it be done by Tuesday

1    deadline?"  Is that correct?

2    A.  I did.

3    Q.  That's a reference to the negotiations between Adidas and

4    Kansas, is that right?

5    A.  That's correct.

6    Q.  Coach Self responds, "From what I was told, yes."  And you

7    say, Great.  Thank you, boss."  Right?

8    A.  I did.

9    Q.  Kansas did in fact extend Adidas's sponsorship of the

10   University of Kansas, is that correct?

11   A.  It is.

12   Q.  Well, I am going to show you in that binder Government

13   Exhibit 1812, and within Government Exhibit 1812 I will ask you

14   to turn to the page that has a little number in the lower

15   right-hand corner --

16          THE COURT:  Mr. Schachter, are you telling me he is

17   going to authenticate this exhibit?

18          MR. SCHACHTER:  You're right.  I apologize.

19          I will tell you what, the defense would like to offer

20   Government Exhibit 1812.

21          MR. MARK:  Objection.

22          THE COURT:  Sustained.

23   Q.  Sir, I would like to now show you Defense Exhibit 192 in

24   your binder.

25          Is this a text message exchange between you and Coach

IAF8GAT1                    Gassnola - Cross

1    Self on August 19, 2017?

2    A.  It is.

3    Q.  Does this relate to the extension between Adidas and

4    Kansas?

5    A.  It does.

6            MR. SCHACHTER:  The defense offers Defense Exhibit

7    192.

8            MR. MARK:  Your Honor, objection.  Relevance, hearsay

9    and 403.

10           MR. SCHACHTER:  None of this is offered for the truth.

11           THE COURT:  Members of the jury, the exhibit is

12   received, but again, none of the statements attributed to Coach

13   Self are to be considered as evidence of the truth of the

14   things he said.

15           (Defendant's Exhibit 192 received in evidence)

16           MR. SCHACHTER:  May I publish Defense Exhibit 192,

17   your Honor?

18           THE COURT:  Yes.

19   BY MR. SCHACHTER:

20   Q.  So on August the 19th you wrote to Coach Self, "Hall of

21   famer, thank you for the help with getting this extension done.

22   Thanks, brother."  Do you see that?

23   A.  I do.

24   Q.  Was that a reference to the extension of Adidas's

25   sponsorship agreement with the University of Kansas?

1    A.  Now I remember this.  Yes, it is.

2    Q.  Coach Self writes, "I'm happy with Adidas, just got to get

3    a couple of real guys."  Do you see that?

4    A.  Yeah.

5             MR. SCHACHTER:  Mr. McLeod, if we can turn to the

6    second page, please.

7    Q.  In this text message, at 3:06 on August the 19th, you

8    wrote, "In my mind it is KU, Bill Self.  Everyone else fall

9    into line, too f'ing bad, that's what is right for Adidas

10   basketball."  Do you see that?

11   A.  Sure do.

12   Q.  And you felt that supporting Kansas and Coach Self was what

13   was right for Adidas basketball, is that correct?

14   A.  Sure did.

15   Q.  And you write, "I know I am right.  The more you win, have

16   lottery pics and you happy, that's how it should work in your

17   mind."  Do you see that?

18   A.  Yes.

19   Q.  When you wrote "have lottery pics," can you explain to the

20   jury what that means?

21   A.  Have top 10 picks, top 13 picks in your program.

22   Q.  If you could explain to the jury, what is a lottery pick?

23   A.  An elite player that ends up being in the NBA.

24   Q.  Then Coach Self responds, "That's how your works at UNC and

25   Duke."  Do you see that?

IAF8GAT1                    Gassnola - Cross

1    A.  Yes.

2    Q.  You wrote, "Kentucky as well."

3            Then you wrote, "I promise you I have got this.  I

4    have never let you down except for DeAndre lol.  We will get it

5    right."  Do you see that?

6    A.  Yes.

7    Q.  UNC, Duke and Kentucky, are those schools sponsored by

8    Adidas?

9    A.  No.

10   Q.  Who sponsors those schools?

11   A.  Nike.

12   Q.  You wrote, "I promise you I have got this," and you say

13   "except DeAndre."  Is that a reference to DeAndre Ayton?

14   A.  It is.

15   Q.  Did you testify on October 11 that you had provided $15,000

16   and other support to DeAndre and his family?

17   A.  I did.

18           MR. SCHACHTER:  Your Honor, may I just confer with Mr.

19   Moore for just one moment?

20           THE COURT:  Yes.

21   Q.  Sir, in fact, you made the payment of $20,000 to Fenny in

22   order to make sure that Kansas re-signed its sponsorship

23   agreement with Adidas, isn't that correct?

24   A.  No, it's not correct.

25   Q.  Sir, did you make a statement that you were running around

1  dropping 30 grand here, 20 grand here, to make sure Kansas

2  re-signed at Adidas, my own money.  Do you recall making that

3  statement on August 31, 2017?

4  A.  I briefly remember that.

5  Q.  After your text exchange with Coach Self that we saw a

6  moment ago on August 19, you continued to have conversations

7  with Coach Townsend regarding Fenny, isn't that correct, in

8  your interactions with him?

9  A.  I talked to Coach Townsend almost every day.

10  Q.  I would like to show you Defense Exhibit 163.

11        Is this a text exchange that you had with Coach

12  Townsend on August 26, 2017?

13  A.  It is.

14  Q.  And in this text exchange is Coach Townsend forwarding to

15  you a message that he received from Fenny?

16  A.  Yes.

17        MR. SCHACHTER:  Defense offers Defense Exhibit 163.

18        MR. MARK:  Objection, your Honor.  Hearsay within

19  hearsay and it's not relevant.

20        MR. SCHACHTER:  It is not offered for the truth of the

21  matter asserted.  It is offered for the effect on the listener

22  and what he does next.

23        THE COURT:  Come up.

24        (Continued on next page)

25

1    (At the sidebar)

2    THE COURT:  Explain effect on the listener and explain

3    where it's going next.

4    MR. SCHACHTER:  What is happening here, in our view,

5    is that Coach Townsend forwards to Mr. Gassnola this text

6    message that Fenny had with Angola, which is code, we believe,

7    for Silvio De Sousa, who is from Angola.  And he says, "We are

8    good to go, we will commit tomorrow."  Then Mr. Gassnola says,

9    "I'll follow up tomorrow."  That following up tomorrow, as we

10   will continue to establish, is him actually meeting with Fenny

11   in Florida and dropping the bag, or paying the $20,000 which he

12   denies making.  And there are further communications with Coach

13   Townsend about that.

14   In addition, Coach Townsend says that he has a text

15   message with Mr. Gassnola subsequently, in which he talks about

16   getting this guy out from under his agreement.  And when Mr.

17   Gassnola then speaks to Mr. Gatto and says, "I am getting this

18   guy out from under an agreement," he hears those words -- maybe

19   he also heard it from Fenny, but our point is he heard those

20   words from Coach Townsend.  I am getting a little ahead of

21   myself.

22   MR. MARK:  This is being asserted for the truth of the

23   matter here.  This is definitely a hearsay purpose.

24   Second, the effect on the listener here is really

25   irrelevant because it is only being used for impeachment

1  because Mr. Schachter wants to assert a particular timeline.

2  Here, this is not an effect on the listener on Mr. Gatto or any

3  of the defendants.  It's an effect on the listener on Mr.

4  Gassnola, and he is trying to impeach saying there are certain

5  facts and timelines that are different than what he has

6  testified to.  So this is an improper purpose.  And to the

7  extent it's admitted with a limiting instruction it would lead

8  to confusion here.

9          THE COURT:  Remind me of the proposition that Gassnola

10  asserted on the stand that you say this impeaches?

11          MR. SCHACHTER:  Sure.  He testified (A) that he never

12  gave $20,000 to Mr. Falmagne and that he concealed it from the

13  University of Kansas coaching staff.

14          MR. MARK:  He can ask him those questions.  He can

15  talk about his trip down to Orlando.  That's not the issue

16  here.  The issue is what he is trying to do with these

17  particular documents and what he is trying to demonstrate to

18  the jury.

19          MR. SCHACHTER:  I am trying to demonstrate to the jury

20  that he did not conceal this from the University of Kansas

21  coaching staff.  We submit that these documents show that he

22  paid this money to Fenny at the direction, at the request, and

23  in coordination with the University of Kansas.

24          THE COURT:  Do you have any evidence that he ever paid

25  him?

1    MR. SCHACHTER:  We do, your Honor.  He says to

2  Mr. Code, in a recorded call on August the 31st, "I just

3  dropped a bag to that idiot Fenny."  He also in the same

4  conversation says, "I am dropping 20 or $30,000 dollar bag --"

5    THE COURT:  I heard that.

6    All right.  Overruled.  Limiting instruction.

7    (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (In open court)

2    THE COURT:  Exhibit 163 is received.

3    (Defendant's Exhibit 163 received in evidence)

4    THE COURT:  Again, the statements attributed to

5    Mr. Townsend are not received for the truth of anything he

6    said, they are received only for the limited purpose of

7    shedding light on the testimony of the witness.  And just so

8    the jury perhaps understands this little point of the law of

9    evidence, the statements are not received for the truth because

10   Coach Townsend is not here to testify that they're true, and

11   the government has no ability to cross-examine him.  And

12   therefore, it would be unfair to allow you to consider those

13   statements for the truth of the assertions that Townsend makes.

14   That's the point.  But you have here written evidence that he

15   said these things, and to the extent that's relevant as I

16   suggested to Mr. Gassnola's testimony, you may consider it.

17   Go ahead.

18   MR. SCHACHTER:  Thank you, your Honor.  May I publish

19   Defense Exhibit 163 for the jurors?

20   THE COURT:  Yes.

21   BY MR. SCHACHTER:

22   Q.  So in this text exchange with Coach Townsend on August 26,

23   2017, just so we understand the first two bubbles on the left

24   side at 11:06 p.m., Coach Townsend was forwarding to you a text

25   message that he received from Fenny, is that correct?

IAFTGAT2                        Gassnola - Cross

1    A.  Yes.

2    Q.  And that text message that he had received from Fenny was:

3    Coach, been on the phone with Angola.  We are good to go.  We

4    will commit tomorrow.

5            Do you see that?

6    A.  I do.

7    Q.  And Coach, been on the phone with Angola, that is -- you

8    understood to be Fenny's words, correct?

9    A.  Yes.

10   Q.  And Angola, that is a reference to Silvio De Sousa, the

11   basketball player, is that correct?

12   A.  I don't know who he is on the phone with.  I don't know

13   what that means.

14   Q.  Fair enough.  Silvio De Sousa is from Angela, is that

15   correct?

16   A.  Yes.

17   Q.  Then you wrote:  Great, I'll follow up tomorrow.

18           Do you see that?

19   A.  Yep.

20   Q.  So you were going to do some kind of follow up in response

21   to this message on August 26, isn't that correct?

22   A.  I was.

23   Q.  And so the follow up that you were going to do, sir, that

24   was, what your referencing to Coach Townsend, is paying $20,000

25   to Fenny Falmagne, isn't that correct?

IAFTGAT2                    Gassnola - Cross

1    A.  I don't know what I meant here by I'll follow up.  I could

2    have talked to him about night classes, about his online

3    classes, but I wasn't telling Kurtis Townsend I was going to

4    give him 20 grand.

5    Q.  Okay.  Sir, I would like to now show you Defense

6    Exhibit 199.  And sir, do you recognize this to be a text

7    message with Coach Townsend the next day on August 27, 2017?

8    A.  Yep.

9    Q.  And in this conversation does Coach Townsend forward a

10   communication from Fenny to you?

11   A.  Yes, he does.

12   Q.  And then do you forward to him a text exchange you had with

13   Fenny?

14   A.  Yeah.

15            MR. SCHACHTER:  The defense offers Defense

16   Exhibit 199.

17            MR. MARK:  Objection, relevance, hearsay and 403, your

18   Honor.

19            MR. SCHACHTER:  There is no statement capable of truth

20   or falsity, your Honor.

21            THE COURT:  Sustained.

22   Q.  Now Silvio De Sousa committed to the University of Kansas

23   on August 30, is that correct?

24   A.  I don't know when he committed.

25   Q.  I'm going to show you what's been marked as Government

IAFTGAT2                    Gassnola - Cross

1    Exhibit 107K-11.  Do you recognize this to be a text exchange

2    that you had with Jim Gatto on August 30, 2017?

3    A.  I do.

4    Q.  And is the subject matter of this text exchange:  Silvio De

5    Sousa committing to the University of Kansas?

6    A.  It is.

7           MR. SCHACHTER:  Your Honor, the defense offers Defense

8    Exhibit 107K-11.

9           MR. MARK:  No objection.

10          THE COURT:  Received.

11          (Defendant's Exhibit 107K-11 received in evidence)

12          MR. SCHACHTER:  May I publish it to the jury?

13          THE COURT:  You may.

14          MR. SCHACHTER:  The first page of the exhibit,

15   Mr. McLeod, could you blow up the top.

16   Q.  Mr. Gassnola, you forward a link to an article on August 30

17   to Mr. Gatto, is that correct?

18   A.  Yep.

19   Q.  And do you recall that that article was about Silvio De

20   Sousa committing to the University of Kansas on August 30?

21   A.  Yep.

22   Q.  And you wrote I know you don't give, and then Mr. Gatto

23   responds the kid is 25, and you said 32, and that's a little

24   joke back and forth, you and Jim?

25   A.  It is.

IAFTGAT2                    Gassnola - Cross

1   Q.  Could you explain to the jury -- let us all in on the joke?

2   A.  Just means Jimmy's humor, I don't know how else to say it.

3   Q.  Good enough.  Now the government in your direct testimony

4   played for you a call between you and Jim Gatto on

5   September 11.  Do you recall that?

6   A.  Yep.

7           MR. SCHACHTER:  And that was Government Exhibit 2T.

8   And what I would like to do is, if I may, your Honor, rather

9   than playing the whole recording, may I show the jurors an

10  excerpt of the transcript 2T of Government Exhibit 2?

11          THE COURT:  Yes.

12  Q.  And do you recall that you had said on September -- sorry,

13  September 11, that would be roughly eleven days after Silvio De

14  Sousa had committed to the University of Kansas?

15  A.  Yep.

16          THE COURT:  What you're displaying is page 2, lines 13

17  to 25.

18          MR. SCHACHTER:  I apologize, your Honor, I should have

19  said that.  Thank you.

20  Q.  In this conversation of September 11, you wrote:  I got to

21  send this guy another -- another 20 grand out on Wednesday

22  because I got to get him out from under this Under Armour deal

23  and the deal he's got with this guy who is taking care of him.

24  Do you recall that?

25  A.  This is between me and Merl?

1  Q.  No, I'm sorry, this you and Jim Gatto.

2  A.  Yes, I remember this.

3  Q.  You also said he wants his money back now because the kid

4  didn't go to Maryland, so I got to stay on top of that.

5  A.  I remember that.

6  Q.  Now you told Jim on September 11 that you got to send this

7  guy another 20 grand to get him out from under his Under Armour

8  deal, because you had in fact already paid $20,000 to Fenny in

9  order to get Kansas to resign with Adidas, is that correct?

10  A.  You said I paid this kid 20 grand so Kansas would resign

11  with Adidas?

12  Q.  Let me break it down.  When you say here I got to send this

13  guy another 20 grand, you say "another 20 grand" because you

14  had already paid $20,000 to Fenny back in August, isn't that

15  correct?

16  A.  In August I gave Fenny, whatever his last name is because I

17  can't spell it or pronounce it, I gave him $2,500 in cash to

18  take night classes or online classes.  I never gave Fenny 20

19  grand.  This is me talking to Jimmy.  I tend to talk lot, as

20  you can see by all these words, and I was just talking, per

21  usual.  There's no truth behind me giving him another 20 grand.

22  Q.  I see.  So when you said another 20 grand, you just meant

23  20 grand?

24  A.  I never gave Fenny 20 grand.

25  Q.  Okay.  Thank you, sir.  Now I would like to ask you about

1   where you heard about Fenny needing to get out from under a

2   deal.  You say that you heard that from Fenny Falmagne, is that

3   correct?

4   A.  Can you rephrase that question?

5   Q.  Sure.  Was it your testimony in your direct examination

6   that you had heard about Fenny needing to get out from under a

7   deal directly from Fenny, that that's what he told you?

8   A.  That's what Fenny told me, yeah.

9   Q.  And you also heard that directly from Coach Townsend,

10  didn't you?

11              MR. MARK:  Objection.

12              THE COURT:  Overruled.

13  A.  The only conversation I ever had with Curtis Townsend about

14  this guy was about Angola -- his request to help the Angola

15  national team.

16  Q.  You never spoke to Coach Townsend about Fenny needing to

17  get out from under a deal?

18  A.  I think we had a text message threat about it, but Kurtis

19  was referring to the Angola thing because that's what he kept

20  asking me, Kurtis.

21  Q.  I see.  I'm going to show you now what's been marked as

22  Defense Exhibit 162.

23              Sir, is this a text message exchange, in fact, perhaps

24  the text message exchange you were referring to between you and

25  Coach Townsend on August 16, 2017?

1   A.   Yep.

2   Q.   And in this text exchange does Coach Townsend forward to

3   you a text message he received from Fenny?

4              MR. MARK:  Objection.

5              THE COURT:  Sustained.  It's not in evidence, is that

6   right?

7              MR. SCHACHTER:  It's not yet in evidence, your Honor.

8   And I don't want to go too far at this point, your Honor.  The

9   defense will offer Defense Exhibit 162.

10             MR. MARK:  Objection, your Honor.  This is also not

11  necessary for the fact --

12             THE COURT:  I can't hear you.

13             MR. MARK:  Objection.  This is also not necessary for

14  the effect on the listener, since Mr. Gassnola testified about

15  a text message.

16             MR. SCHACHTER:  If I could focus the Court --

17             THE COURT:  Mr. Schachter, could you pass up a copy

18  that has print large enough for me to read it?

19             MR. SCHACHTER:  Yes.  Could we display it on the

20  Court's screen?

21             THE COURT:  It's already on screen.

22             MR. SCHACHTER:  We can blow it up, Mr. McLeod.

23             THE COURT:  I will get out my binoculars.

24             MR. SCHACHTER:  I see.  Yes, your Honor, could I focus

25  your Honor -- first we'll blow up the smaller part at the top.

1   Then I would like to show your Honor the part towards the

2   bottom.  If you can blow up from there to the bottom.

3            Your Honor, I focus the Court on Coach Townsend's text

4   message at 11:18.

5            THE COURT:  Back up to the tiny print again, please.

6            MR. SCHACHTER:  Your Honor, this is a forwarded

7   telephone message to Coach Townsend.

8            THE COURT:  Give me a moment to look up something.

9            (Pause)

10           THE COURT:  I better see you at the sidebar.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (At sidebar)

2            THE COURT:  The forwarded message is from Lasko to

3    Falmagne, is that right?

4            MR. SCHACHTER:  It is Fenny forwarding a text message

5    exchange that he had with his boss, a guy named John Lasko.

6            THE COURT:  Fenny works for John Lasko?

7            MR. SCHACHTER:  We would ask the witness, but our

8    understanding is yes.

9            THE COURT:  Who is John Lasko?

10           MR. MARK:  Well, I have no idea, and it's not clear

11   from the document that it's John Lasko.

12           MR. SCHACHTER:  Your Honor, the government asked

13   Mr. Gassnola about this very document in their interviews

14   during their investigation, and Mr. Gassnola explained what the

15   nature of this text message was.

16           THE COURT:  That's all well and good.  Right now I'm

17   trying to find out:  Who is John Lasko?

18           MS. DONNELLY:  John Lasko sits on the board of

19   directors of an AA team called the Florida Vipers.  It is an AA

20   team that is sponsored by Under Armour and for which De Sousa

21   played.

22           THE COURT:  All right.  Now do you have the larger

23   print here so I could read that text message again?

24           MR. SCHACHTER:  Your Honor, may I attempt to read it

25   to you?

1          THE COURT:  Go ahead.

2          MR. SCHACHTER:  This is from Lasko to Fenny:  Fenny, I

3   am in Indiana and Coach Ostrom asked me for an update.  They

4   are super willing to do what it takes to recruit Silvio.  Is

5   that something of interest for us?

6          Then Fenny forwards to Coach Townsend:  Coach, that's

7   my boss.  Still pushing the issue, coach.

8          And then Coach Townsend -- Mr. Gassnola asks him to

9   explain, and Mr. Coach Townsend says:  He needs to get out from

10  under this guy.  Doesn't mean anything, I was sending you what

11  he sent me.

12         That is the same language that Mr. Gassnola then

13  employs with Mr. Gatto on September 11.

14         THE COURT:  Well, somebody obviously used it

15  previously or he wouldn't have said that.

16         MR. SCHACHTER:  Correct.  However, he said he had no

17  such conversation with Coach Townsend, he got that exclusively

18  from Fenny because he was concealing all of these discussions

19  from Coach Townsend.

20         MR. MARK:  This is going to be offered for the truth

21  and it has no probative value if not offered for the truth, no

22  probative value for the effect on the listener here, on

23  Mr. Gassnola.

24         THE COURT:  What happens after this, Mr. Schachter?

25         MR. SCHACHTER:  I'm done with this line.  The last bit

1   is after Mr. De Sousa commits, Mr. Gatto told Mr. Gassnola that

2   Coach Self called to thank him, and Mr. Gatto didn't know why

3   Coach Self was thanking him.  And Mr. Gassnola then explains in

4   a recorded call 32T, he says Jimmy was like:  What did we do?

5   And then he says he texts me because I had to drop that

6   fucking -- sorry, your Honor, F-ing bag, too.

7            THE COURT:  I heard it before.

8            MR. SCHACHTER:  Then that is I believe the end of this

9   line, although we would like to play that Defense Exhibit 32.

10           THE COURT:  I will exclude 162.

11           MR. SCHACHTER:  Yes, your Honor.

12           (Continued on next page)

1        (In open court)

2        THE COURT:  The objection to Defense Exhibit 162 is

3    sustained.

4    BY MR. SCHACHTER:

5    Q.  Now after Mr. De Sousa committed to Kansas, you had a

6    conversation with Mr. Gatto, is that correct?

7    A.  Yes.

8    Q.  Jim Gatto told you that Coach Self had called him, is that

9    correct?

10   A.  Say that again?

11   Q.  Sure.  After Silvio De Sousa committed, Jim told you he got

12   a call from Coach Self thanking him, isn't that correct?

13   A.  Yeah.

14        MR. SCHACHTER:  May I have just a moment, your Honor?

15        THE COURT:  Yes.

16        (Pause)

17   Q.  Sir, in advance of this case, you have pled guilty to

18   criminal charges twice before, is that correct?

19   A.  Yeah.

20   Q.  And you avoided going to jail both times that you pled

21   guilty, is that correct?

22   A.  Yep.

23   Q.  You understood that you could go to jail for up to 20 years

24   for charges relating to making payments to players' families,

25   is that correct?

1    A.  Conspiracy, yep, I do.

2    Q.  And sir, you didn't pay taxes on any money that you

3    received from Adidas, did you?

4    A.  Not yet.

5    Q.  And you're not being prosecuted for that, or at least you

6    have not been prosecuted for that, isn't that correct?

7    A.  Not yet.

8    Q.  And you submitted a false statement to a bank in connection

9    with a loan, is that correct?

10   A.  I did.

11   Q.  And you are not being prosecuted for that, are you?

12   A.  Not yet.

13   Q.  When you were first interviewed by the FBI in October of

14   2017, I believe you told Mr. Mark that you were not entirely

15   forthcoming, is that correct?

16   A.  Say that again?

17   Q.  Sure.  When you were first interviewed by the FBI in

18   October of 2017, you were not entirely forthcoming, is that

19   correct?

20   A.  Yes.

21   Q.  And you know that it is a crime to lie to FBI agents?

22   A.  I do.

23   Q.  You know that's a crime that carries a term of imprisonment

24   of up to five years, is that correct?

25   A.  I do now.

1    Q.  And you're not being prosecuted for lying to federal

2    agents, are you?

3    A.  Not yet.

4    Q.  Sir, I believe that you -- well, by testifying today and

5    October 11, you hope to avoid spending a day in prison, isn't

6    that correct?

7    A.  I hope to.

8    Q.  Now sir, you have a seven-year-old daughter and

9    one-and-a-half-year-old son, is that correct?

10   A.  Six-year-old daughter.

11   Q.  And how old is your son?

12   A.  18 months.

13   Q.  Sir, isn't it true that you would say whatever you needed

14   in order to see them grow up?

15          MR. MARK:  Objection.

16          THE COURT:  Overruled.

17   A.  No, I'm just on the stand being truthful because that's

18   part of my cooperation agreement.  So I'm here, I'm being

19   truthful.

20          MR. SCHACHTER:  Thank you.  I have no further

21   questions, your Honor.

22          THE COURT:  Thank you.  We'll take our morning break

23   here.

24          (Recess taken)

25          (Continued on next page)

1              (Jury not present)

2              THE COURT:  Is there going to be any other cross for

3    this witness?

4              MR. MOORE:  Yes, your Honor, both myself and Mr. Haney

5    have some cross, but I shortened it.

6              MR. HANEY:  Mine's brief as well, your Honor.

7              THE COURT:  Okay.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Jurors and the defendants are present.

3          Witness, you're still under oath.

4          Cross-examination, Mr. Moore.

5          MR. MOORE:  Thank you, your Honor.

6    CROSS-EXAMINATION

7    BY MR. MOORE:

8    Q.  Good morning, Mr. Gassnola, my name is Mark Moore and I

9    represent Merl Code.

10   A.  Good morning.

11   Q.  I want to talk to you for a few minutes about some things

12   that I hope we can agree on.  First, you would agree with me

13   that Merl Code was not doing consulting work for Adidas when

14   you began making the payments to players' families that you say

15   you began in or around 2015, correct?

16   A.  I would agree with that.

17   Q.  And Merl was not at Adidas when you sent out the memo in

18   March of 2015 referencing your travels, which was admitted as

19   Government Exhibit 1096, right?  He wasn't there at that point.

20   A.  He was not.

21   Q.  And he was also not at Adidas and not copied on Government

22   Exhibits 1141, the February 2015 email referenced during your

23   direct testimony, right?

24   A.  That's correct.

25   Q.  And you know, and I believe you told Mr. Mark during direct

1  testimony, that you knew that Mr. Code worked as an employee at

2  Nike for a number of years, correct?

3  A.  That's correct.

4  Q.  Now I believe you told Mr. Mark on direct examination that

5  you made your initial payments to the Bowen family in 2015,

6  right?

7  A.  That's correct.

8  Q.  And you would agree with me that at that point Merl Code

9  was not affiliated with Adidas at the time when you chose to

10  make that payment, was he, Mr. Gassnola?

11  A.  He was not.

12  Q.  And you would agree with me that that payment standing

13  alone could affect Tugs Bowen's eligibility, correct?

14  A.  Could you say that again?

15  Q.  Yes, sir.  You would agree with me that that one payment

16  that you made back in 2015 could have affected Tugs Bowen's

17  eligibility at that point, correct?

18  A.  Yes.

19  Q.  Now I believe you also told -- again, I hope we can agree

20  on this -- that you told Mr. Mark on direct that you were first

21  visited by the FBI on October 18, 2017 at your home, is that

22  correct?

23  A.  That's correct.

24  Q.  And at the time you were visited by the FBI, you're aware

25  that the FBI had arrested my client along with the other two

1   defendants in this case a couple of weeks prior, right?

2   A.  I was aware of that, yes.

3   Q.  And you were aware of the charges that were in that

4   complaint, correct?

5   A.  Yes, I was.

6   Q.  And I believe you told Mr. Mark you used a phrase you

7   weren't completely truthful with the FBI in that first

8   interview, right?

9   A.  That's correct.

10  Q.  And I believe Mr. Schachter asked you about your awareness

11  that lying to the FBI is a federal crime, right?

12  A.  I'm aware of that.

13  Q.  And the government didn't make you plead guilty to lying to

14  the FBI, did they, Mr. Gassnola?

15          MR. MARK:  Objection, asked and answered.

16          THE COURT:  Sustained.

17  Q.  Mr. Gassnola, I believe that what you told Mr. Schachter on

18  cross-examination is that you haven't been prosecuted for that

19  crime yet.  Wasn't that the words that you used, Mr. Gassnola?

20  A.  That's what I said.

21  Q.  All right.  But in point of fact, in your plea agreement

22  the government has promised you that they will not prosecute

23  you for any other crimes related to the payment of players,

24  haven't they?  They promised you that, have they not,

25  Mr. Gassnola?

1   A.  I don't know if they promised me anything.

2   Q.  Well, Mr. Gassnola, let's look --

3         MR. MOORE:  If you could help me pull up Government

4   Exhibit 2003, which is in evidence, which is the plea agreement

5   that was introduced, and if we could look on page 2.

6   Q.  And the paragraph that says "It is understood," would you

7   read that to yourself?  The next line.  Would you read that to

8   to yourself for a moment, Mr. Gassnola?

9         It says that you will not be further prosecuted

10  criminally by this office for any crimes except criminal tax

11  violations -- which I will get to in a minute -- related to

12  your participation in this alleged scheme, correct?

13        THE COURT:  Sustained.  If.  You can't leave out the

14  "if," counsel.

15        MR. MOORE:  I understand, your Honor.

16  Q.  And there's also a provision in this plea agreement that

17  indicates that if you comply with the terms of your plea

18  agreement, you will not be prosecuted for this

19  misrepresentation that you made regarding a transfer of funds

20  in connection with the mortgage, correct?  They made you a

21  representation that they don't intend to prosecute you for that

22  if you comply with what they believe your obligations are,

23  correct?

24  A.  If, yeah.

25  Q.  And Mr. Gassnola, I'm also assuming that you and I can

1   agree that the FBI never had a wiretap on your phone, isn't

2   that right, sir?

3          MR. MARK:  Objection.

4          THE COURT:  Sustained.

5   Q.  Now Mr. Gassnola, in interviewing and in prep sessions with

6   the government -- and you've been in interviews with the

7   government, correct?

8   A.  Yep.

9   Q.  And you have also been in prep sessions to prepare you for

10  your testimony to give in this courtroom, have you not, sir?

11  A.  I have.

12  Q.  They didn't show you copies of any wiretapped calls that

13  they got from your phone, did they, sir?

14         MR. MARK:  Objection.

15         THE COURT:  Sustained.

16  Q.  Now I want to ask you about some specific things you said

17  during your direct testimony, and I believe you told Mr. Mark

18  that NC State University was one of Adidas' flagship schools,

19  correct?

20  A.  Yep.

21  Q.  And you also told him that when you made payments to Dennis

22  Smith and/or his family members or affiliates, at least one of

23  those payments was made through Orlando Early, an assistant

24  coach at NC State University, correct?

25  A.  I did.

1  Q.  And you were willing to make that payment to an assistant

2  coach who was an employee of NC State University, correct?

3  A.  Yep.

4  Q.  And as we heard during the playing of Government

5  Exhibit 45, you told Mr. Dawkins that Kenny Johnson, the

6  associate head coach of Louisville, was aware of the payments

7  made to Brian Bowen, correct?

8  A.  I said that, yes.

9  Q.  You said that.  You told him that.

10         And in that call, you didn't express any concerns to

11 Mr. Dawkins that Kenny Johnson might know about it, you were

12 only concerned about the fact that Brad Augustine knew about

13 it, correct?

14 A.  I was very upset that Brad Augustine knew about that.

15 Q.  I will repeat my question:  You didn't express any

16 reservations that Kenny Johnson, the associate head coach at

17 Louisville, might know about that payment, did you,

18 Mr. Gassnola?

19         MR. MARK:  Objection, mischaracterizes his statement.

20         THE COURT:  I'll allow it.

21 A.  Could you repeat the question?

22 Q.  Yes, sir.  You didn't express any reservations in that

23 recorded phone call about the fact that Kenny Johnson, the

24 associate head coach at Louisville, might know about the

25 payment, did you, Mr. Gassnola?

1   A.  No.

2   Q.  And you know from your years in basketball that Kenny

3   Johnson was the number two coach on that team, the right hand

4   to Rick Pitino, the guy you referred to in a text as Hall of

5   Famer, correct?

6           MR. MARK:  Objection.

7           THE COURT:  Sustained.

8   Q.  Now you told Mr. Mark on direct that you're aware that a

9   booster from the University of Maryland loaned Fenny Falmagne

10  $60,000 to get Silvio De Sousa to go to Maryland, right?

11          THE COURT:  I don't think the testimony was about a

12  loan.

13          MR. MOORE:  Then I'll rephrase, your Honor.

14  Q.  You told Mr. Mark on direct that a payment of $60,000 had

15  been made by a booster to Fenny Falmagne, correct?

16  A.  That's what Fenny told me.

17  Q.  That's what Fenny told you.  Okay.  And that didn't shock

18  or surprise you at all, did it, Mr. Gassnola?

19          MR. MARK:  Objection.

20          THE COURT:  Sustained.

21  Q.  Now are you aware as to whether that loan by a booster

22  would have been a violation of NCAA rules which could have

23  affected Mr. De Sousa's amateur status?

24          MR. MARK:  Objection.

25          THE COURT:  Sustained.

1   Q.  Now you also told Mr. Mark on direct that Nicole Player

2   told you that she was receiving money from others, correct?

3   A.  I never said that.

4   Q.  Did Nicole Player tell you that she had received payments

5   before you began playing her?

6   A.  I assumed that.  That's what I told her.

7   Q.  You assumed that.

8   A.  That she was taking money.  I told her, because I heard, in

9   the world we lived in, she had been taking money.  She never

10  told me that.

11  Q.  When you say the world you live in --

12  A.  Lived in.

13  Q.  The world you lived in was a world where various people

14  paid money to players and their families, correct?

15          MR. MARK:  Objection.

16          THE COURT:  Sustained, certainly in that form.

17  Q.  Well, what did you mean by the term "the world we lived

18  in," Mr. Gassnola?

19  A.  The basketball underground.

20  Q.  The basketball underground.  And what is the basketball

21  underground, Mr. Gassnola?

22          MR. MARK:  Objection, relevance.

23          THE COURT:  Overruled.

24  A.  Grassroots, runners, agents, all of that.

25  Q.  And all of that typically involves payments made to

1   players, correct?

2            MR. MARK:  Objection.

3            THE COURT:  The witness can answer it.

4   A.  It does.

5   Q.  And now did Ms. Player ever tell you who was paying her?

6   A.  No.

7   Q.  But you wanted to make sure that if somebody else had paid

8   Ms. Player that was kept quiet, correct?

9   A.  I thought that when I did it I had a better chance of

10  concealing it than others.

11  Q.  And you wanted to conceal it because you wanted to protect

12  the coaching staff at Kansas, Kansas, and Mr. Preston, correct?

13  A.  I wanted to keep it from the universities and the coaching

14  staff, correct.

15  Q.  In point of fact, you wanted to keep it from the NCAA so

16  that Mr. Preston ultimately wouldn't lose his eligibility,

17  isn't that correct, Mr. Gassnola?

18  A.  Yes.

19  Q.  And so thereafter you began making payments to Ms. Player.

20  That's what you told Mr. Mark on direct, correct?

21  A.  I did.

22  Q.  And in making those payments, you were hoping to help

23  Mr. Preston decide to go to Kansas, a school that was one of

24  your flagship schools, correct?

25  A.  He already made that decision to go to Kansas.

IAFTGAT2                    Gassnola - Cross

1    Q.  And you wanted to help Kansas keep that talented player,

2    correct?

3            MR. MARK:  Objection.

4            THE COURT:  Overruled.

5    A.  Repeat the question.

6    Q.  You wanted to help Kansas keep that talented player and

7    keep him and his family happy, isn't that correct?

8            MR. MARK:  Objection.

9            THE COURT:  Sustained as to form.

10   Q.  I will rephrase.

11           You wanted -- I will go back to my original question,

12   your Honor, which was:  You wanted to help Kansas keep that

13   talented player, did you not, Mr. Gassnola?

14   A.  I knew if I gave that young man's family money, I had a

15   better chance of concealing it than anybody else.

16   Q.  And you didn't just give that family money out of the

17   goodness of your heart, right?

18   A.  I'm a good guy.

19   Q.  Well, in point of fact, you gave that family money because

20   you thought that was in the interests of Kansas, isn't that

21   right?

22           MR. MARK:  Objection.

23           THE COURT:  Sustained.

24   Q.  Now I want to go back to this basketball underground for a

25   moment that you referred to.  You indicated that various people

1   paid players, correct, and their families?

2   A.  Yep.

3   Q.  And there are multiple ways to do that, aren't there,

4   Mr. Gassnola?

5   A.  Yep.

6   Q.  And you're familiar with those -- with some of those ways

7   to do it, aren't you, Mr. Gassnola?

8   A.  I have an idea.

9   Q.  And you know with the boosters, people who support

10  universities, make payments to players and their families,

11  correct?

12          MR. MARK:  Objection.

13          THE COURT:  Ground?

14          MR. MARK:  Initially hearsay and speculation, your

15  Honor.

16          THE COURT:  And what?

17          MR. MARK:  Speculation.

18          THE COURT:  Sustained.

19  Q.  What is a booster, Mr. Gassnola?

20  A.  Someone who donates money to a university.

21  Q.  And someone who supports that university, correct?

22  A.  Yep.

23  Q.  And you know boosters make payments to players and their

24  families, correct?

25          MR. MARK:  Objection.

1    THE COURT:  Sustained.  Look, the problem you're now

2    running into is that you haven't established personal

3    knowledge.

4    MR. MOORE:  Then I will rephrase, your Honor, and I

5    will attempt to lay a better foundation.

6  Q.  Mr. Gassnola, when you heard about Fenny Falmagne and the

7  booster, that wasn't the first time you had heard of a booster

8  making payments to a player or their family, correct?

9    MR. MARK:  Same objection.

10    THE COURT:  Sustained.

11  Q.  Well, let me ask you -- let me ask a different question

12  then.  Are you aware of your own personal knowledge about

13  players having housing arranged through boosters and their

14  alumni?

15    MR. MARK:  Objection, relevance.

16    THE COURT:  Well, look, personal knowledge here,

17  Mr. Gassnola, means that you saw it happen and heard it with

18  your own ears.  That's what it means.  It doesn't mean somebody

19  told you or you heard it somewhere or read it in the newspapers

20  or God knows what else.

21    So with that understanding, answer the question.

22  A.  Repeat it again?

23  Q.  Yes, sir.  Do you know of your own personal knowledge if

24  players and their families have arranged housing through

25  boosters and alumni?

1    A.  I have.

2    Q.  And do you know of your own personal knowledge whether

3    players and their families have their rents or mortgages paid

4    through boosters and alumni?

5              MR. MARK:  Objection, relevance.

6              THE COURT:  Yeah, I don't understand a lot about this

7    question.  Sustained.

8    Q.  Do you know of your own personal knowledge if prepaid debit

9    cards are provided to players and/or their families by boosters

10   and alumni, Mr. Gassnola?

11             MR. MARK:  Same objection.  If we go down this road, I

12   request a sidebar.

13             THE COURT:  Yeah, let's go.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1   (At sidebar)

2   MR. MOORE:  At this point I am simply trying to

3   establish his own personal knowledge of the various ways that

4   people try to pay players and their families under the table.

5   THE COURT:  Except you're not getting any personal

6   knowledge at all.

7   MR. MOORE:  He did tell me that he had personal

8   knowledge.

9   THE COURT:  I understand.

10  MR. MOORE:  If you want me to move on, I will move on.

11  THE COURT:  I think that's a better idea.

12  MR. MOORE:  I will do so.

13  THE COURT:  I have the discretion to make a factual

14  finding here.  The factual finding is he has no idea what

15  personal knowledge means, he thinks it's anything he ever

16  heard.  That's the finding.

17  MR. MOORE:  I understand, your Honor.

18  THE COURT:  Perfectly obvious.  If you have a case

19  where you will say were you present on an occasion when

20  Mr. Jones of somewhere handed to Mr. X a debit card, and you

21  have seen the bank statements indicating that there was a

22  prepayment on the debit card, I'm not even sure that gets you

23  far enough because the bank statement may be hearsay, but you

24  might be able to get it in under business records, that is

25  personal knowledge.

1          MR. MOORE:  I will move on.

2          THE COURT:  Good.

3          MR. MOORE:  Yes, sir.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court)

2   BY MR. MOORE:

3   Q.  Now Mr. Gassnola, I believe that you told Mr. Mark on

4   direct examination that you have known Andy Miller for years,

5   is that correct?

6   A.  I have.

7   Q.  And Andy Miller is a sports agent, correct?

8   A.  Yep.

9   Q.  Andy Miller is sort of a renowned sports agent in the

10  industry, isn't he?

11  A.  I would say so.

12  Q.  And you know from your time in college basketball that a

13  number of college coaches have agents, right?

14  A.  Agents who represent them?

15  Q.  Yes, sir.

16        MR. MARK:  Objection.

17        THE COURT:  Sustained.

18  Q.  Now you indicated that you helped recruit Merl Code to come

19  to Adidas in 2016, correct?

20  A.  I said I talked to Jimmy about it.

21        (Continued on next page)

22

23

24

25

IAF8GAT3                    Gassnola - Cross

1    Q.  And at that point you knew he had spent 14 years at Nike as

2    an employee, not a consultant, right?

3            MR. MARK:  Objection.

4            THE COURT:  What is the objection?

5            MR. MARK:  Hearsay, your Honor.

6            THE COURT:  Sustained until you lay a foundation.

7    Q.  And before you recommended him, you checked him out and

8    understood he did not have a criminal record, correct?

9            MR. MARK:  Objection.

10           THE COURT:  Sustained.

11           Come on, Mr. Moore.

12           MR. MOORE:  Yes, sir, your Honor.  I will move on.

13   Q.  You indicated to Mr. Mark on direct that you didn't have a

14   written consulting agreement, correct?

15   A.  With who?

16   Q.  With Adidas.

17   A.  I did.

18   Q.  Are you aware that Merl Code had a written consulting

19   agreement with Adidas, Mr. Gassnola?

20           THE COURT:  Personal knowledge, counsel.

21   Q.  Are you aware of your own personal knowledge that Mr. Code

22   had a written consulting agreement with Adidas?

23   A.  I'm not.

24   Q.  You're not.  So you didn't pay attention to his agreements

25   and/or his receipt of 1099s and the like, correct?

1    MR. MARK:  Objection.

2    THE COURT:  Sustained.

3  Q.  Now, I want to talk to you about your taxes for a moment,

4  Mr. Gassnola.

5    I believe you told Mr. Mark on direct that you didn't

6  declare any of the income that you received from Adidas on any

7  of your tax returns for the years you consulted there, correct?

8  A.  That's correct.

9  Q.  From 2004 to 2017, you didn't declare any of that income on

10  your tax returns, correct?

11  A.  From 2013 to 2017 is when I changed my position, I was

12  outside an consultant.  So from 2004 to 2017 was my program.

13  It's two different things.

14  Q.  You didn't declare any of the money that you received

15  through your program either, did you?

16  A.  Not in the past few years, no.

17  Q.  But you did file tax returns, right?

18  A.  I did.

19  Q.  So when you file a tax return, you're aware that part of

20  filing a tax return indicates that you state, under penalty of

21  perjury, that you're providing information about all income

22  that you received, correct?

23  A.  I am aware of that.

24  Q.  So you lied under penalty of perjury to the IRS with

25  respect to the income that you received on those tax forms,

1    correct?

2    A.   The past few years, yes.

3    Q.   While the government has agreed -- has not agreed,

4    according to the terms of your agreement, that it won't

5    prosecute you for tax crimes, because it was explained to you

6    that they can't bind the tax division, it has not prosecuted

7    you for any tax crimes, has it, Mr. Gassnola?

8              MR. MARK:  Objection.

9              THE COURT:  Ground.

10             MR. MARK:  Mischaracterized the document and as to the

11   word "explained."

12             THE COURT:  Objection sustained.

13   Q.   Let me ask a different question, Mr. Gassnola.

14             The government did not require you to plead guilty to

15   filing any false income tax returns, did they, Mr. Gassnola?

16   A.   No.

17   Q.   And you don't expect that you are going to have to plead

18   guilty to such a crime, do you, Mr. Gassnola?

19   A.   I don't know yet.

20   Q.   Mr. Gassnola, the government also agreed that it would not

21   prosecute you for this mortgage violation, correct?

22             THE COURT:  Mr. Moore, you know, you forgot the word

23   "if" the first go-around, and I will take that one as a

24   mistake.

25             MR. MOORE:  Yes, your Honor.

1  Q.  The government agreed that if you comply in their view with

2  the terms of your plea agreement, they will not prosecute you

3  for mortgage fraud based on this gift letter that you sent,

4  correct, Mr. Gassnola?

5          MR. MARK:  Objection, particularly to "their view."

6          THE COURT:  Sustained.

7  Q.  Mr. Gassnola, I believe you told Mr. Mark that you entered

8  a guilty plea in March of this year, correct?

9  A.  March 30.

10  Q.  At the time you pled guilty, a federal judge placed you

11  under oath and asked you a series of questions, correct?

12  A.  That's correct.

13  Q.  And one of the questions the judge asked you was for you to

14  tell her in your own words what you did, right?

15  A.  Yeah.

16  Q.  And when you began speaking, the judge stopped you and

17  indicated that she had observed that you were reading aloud

18  from a prepared statement, correct?

19  A.  I don't recall it.

20  Q.  And the judge asked you if your attorney had helped you

21  prepare that statement, and you said yes, correct?

22          MR. MARK:  Objection.  Relevance.

23          THE COURT:  Overruled.

24  A.  I don't recall that.

25  Q.  Now, the lawyer who helped you draft that -- well, let me

1   ask you this question, Mr. Gassnola.  You do recall that your

2   lawyer helped you draft a statement to take to that guilty

3   plea, correct, sir?

4   A.  I remember some of it, yeah.

5   Q.  And the lawyer who helped you draft that statement that you

6   used at the guilty plea is the same lawyer who you had draft a

7   false letter to Kansas denying that you had paid Billy Preston,

8   isn't that right, sir?

9   A.  That is the same lawyer.

10  Q.  You told that lawyer things that were untrue so that he

11  could send a letter to Kansas, correct?

12  A.  I instructed Danny, who was my lawyer, to do that, yes.

13  Q.  You lied to your lawyer to get him to send that letter,

14  correct?

15  A.  When it comes to that letter, I instructed Danny to do

16  that, yes.

17  Q.  You didn't answer my question.  You lied to your lawyer to

18  have him send that letter, right?

19  A.  I lied to my lawyer to send that letter to Kansas.

20  Q.  And you didn't do that at the request of Merl Code or have

21  any discussions with Merl Code about that, did you, sir?

22  A.  I did not.

23  Q.  Now, with respect to this gift letter that you sent to the

24  mortgage company, your fiance knew that that gift letter was

25  false, didn't she, Mr. Gassnola?

1    A.   I don't remember.

2    Q.   You don't remember?

3    A.   I don't remember what she was thinking that day.

4    Q.   You don't remember what she was thinking that day?

5    A.   I don't.

6    Q.   Mr. Gassnola, would you disagree with me that last week you

7    answered I don't remember or I don't recall at least 20

8    separate times when questions were posed to you?

9              MR. MARK:  Objection.

10             THE COURT:  Sustained.

11   Q.   Mr. Gassnola, you're aware that if you remember something

12   and you say you don't remember it, that's a lie, correct, Mr.

13   Gassnola?

14   A.   I have been truthful.  I just don't remember what you're

15   asking me.

16   Q.   Mr. Gassnola, you also told Mr. Mark, when he asked you on

17   direct examination if you had told your fiance the reason why

18   you wanted her to wire $20,000 to Nicole Player, your answer to

19   him at that point was, I don't recall, right?

20             MR. MARK:  Objection.  Mischaracterizes the issue.

21             THE COURT:  Just wait a minute, Mr. Gassnola.

22             MR. MOORE:  I will be happy to give your Honor the

23   transcript cite if your Honor would prefer.

24             THE COURT:  That would help.

25             MR. MOORE:  Page 1026.

1    THE COURT:  What day?

2    MR. MOORE:  October 11.

3    I think I understand Mr. Mark's objection.  It was to

4    Ms. Kirby, not Ms. Player.  So I misspoke.  And I will

5    rephrase.

6    BY MR. MOORE:

7    Q.  When Mr. Mark asked you if you had a discussion with your

8    fiance about why you wanted her to wire $20,000 to another

9    woman, your response was, I don't recall, isn't that right,

10   sir?

11   A.  If it's in the transcript, that's what I said.

12   Q.  All right.  In point of fact, one would typically recall

13   such a conversation with one's fiance, would one not?

14   THE COURT:  Sustained.  This is a jury argument.  This

15   is not cross-examination.

16   MR. MOORE:  Then I will move on, your Honor.

17   Q.  Let me ask you this question, Mr. Gassnola.  You don't want

18   to implicate your fiance in any crime, do you, Mr. Gassnola?

19   MR. MARK:  Objection.

20   THE COURT:  Sustained.

21   Q.  Now, Mr. Gassnola, please correct me if I am wrong, but

22   based on your testimony, Chris Rivers and Orlando Early and

23   Shawn Farmer were involved in the payments to Dennis Smith's

24   family, correct?  That's in your own testimony.

25   THE COURT:  Sustained.  He testified to a lot of

1    things, and you're now putting it into a little package and

2    characterizing it and doing so with legal implications, and

3    it's not a proper question.  The jury heard the testimony.

4            MR. MOORE:  I will attempt to ask the question a

5    different way, your Honor.

6    Q.  Did Orlando Early assist in making payments to Dennis

7    Smith's family?

8    A.  He did.

9    Q.  Did Chris Rivers know about the payments to Dennis Smith's

10   family?

11           MR. MARK:  Which payment are we talking about here?

12           THE COURT:  Sustained.

13   Q.  Did Chris Rivers know about any payments that you made to

14   Dennis Smith's family, Mr. Gassnola?

15   A.  The first payment that Chris Rivers made was to Chris

16   Rivers.  I knew about it.

17   Q.  So Chris Rivers made a payment to himself?

18   A.  The second payment I made to Dennis Smith's family Chris

19   Rivers knew nothing about.

20   Q.  But Chris Rivers made a payment himself, that's what you're

21   telling us?

22   A.  Yes.

23   Q.  And Shawn Farmer made a payment, or you made a payment to

24   Shawn Farmer, correct?

25   A.  I made a payment to Orlando Early, which he told me he was

1  giving to Shawn Farmer which was going to Dennis Smith's

2  family.

3  Q.  And Brian Bowen took money from you, correct, Brian Bowen

4  Senior?

5  A.  Yes, one time.

6  Q.  And Nicole Player took payments from you, correct?

7  A.  She did.

8  Q.  But when Mr. Mark asked you early on in your testimony

9  about who you conspired with, you only named the three

10  defendants who are on trial, isn't that correct, Mr. Gassnola?

11         MR. MARK:  Objection.

12         THE COURT:  Sustained.

13  Q.  Now, Mr. Gassnola, you told this jury on direct examination

14  that Bill Self didn't know anything about these payments to

15  Billy Preston, correct?

16  A.  No.

17  Q.  And you haven't said anything -- you haven't told the

18  government that Andy Miller was involved or knew about payments

19  to players or their families, correct?

20         MR. MARK:  Objection.

21         THE COURT:  Sustained.

22  Q.  Mr. Gassnola, you have been around the criminal justice for

23  a while, right?

24         MR. MARK:  Objection.

25         THE COURT:  Sustained.

1  Q.  What you told Mr. Schachter is you have pled guilty and not

2  gone to prison on two separate instances, correct?

3  A.  Yep.

4  Q.  And you're hoping to please the government in this case

5  because you're hoping that they will write a nice 5K letter for

6  you, isn't that right, sir?

7              MR. MARK:  Objection.

8              THE COURT:  Overruled.

9  A.  They are going to write a 5K letter.  I don't know if it's

10  going to be nice, but they are going to write one.

11  Q.  That's what you're hoping, you're hoping to earn a 5K

12  letter from the government, correct?

13  A.  Yes.

14  Q.  And you believe that the way you earn a 5K letter is by

15  testifying against these three gentlemen, and these three

16  gentlemen only, isn't that right, Mr. Gassnola?

17              MR. MARK:  Objection.

18              THE COURT:  Sustained.

19  Q.  And you knew before you started cooperating, Mr. Gassnola,

20  that the government would require you to plead guilty to

21  defrauding universities in order to get a deal; you knew that,

22  didn't you, Mr. Gassnola?

23              MR. MARK:  Objection.

24              THE COURT:  Sustained.

25  Q.  And you would plead guilty to defrauding the Harlem

1    Globetrotters if you thought that would get you probation,

2    isn't that correct?

3              MR. MARK:  Objection.

4              THE COURT:  Overruled.

5              Thank you, your Honor.

6    Q.  I will repeat the question, Mr. Gassnola.  You would plead

7    guilty to defrauding the Harlem Globetrotters if you thought

8    that would keep you out of jail, isn't that right, Mr.

9    Gassnola?

10   A.  If I paid them, yeah.

11             MR. MOORE:  No further questions.

12             THE COURT:  Thank you.

13             Mr. Haney.

14             MR. HANEY:  Thank you, your Honor.

15   CROSS-EXAMINATION

16   BY MR. HANEY:

17   Q.  Good morning, Mr. Gassnola.

18   A.  Good afternoon.

19   Q.  Two minutes.

20             You testified that you met Christian Dawkins in the

21   fall of 2008 when he came to try out for your AAU team, is that

22   correct?

23   A.  Yes.

24   Q.  What was the name of that team again?

25   A.  The New England Playaz.

1   Q.  And he came to a practice, is that what your testimony was?

2   A.  Correct.

3   Q.  And am I fair in saying he would have been around 15 years

4   old at that time?

5   A.  I don't know what his age was.

6   Q.  What was the age group of that particular team you were

7   coaching?

8   A.  I didn't coach a team.

9   Q.  Do you recall what practice that was at that Christian

10  Dawkins attended?

11  A.  It was a fall practice.

12  Q.  You testified that he was so bad you cut him after one

13  practice, isn't that right?

14  A.  I never said that.  I said he threw a ball at a rim.

15  Q.  So he was so bad you cut him after one practice?

16  A.  I waited till the end.

17  Q.  Was he really that bad?

18          MR. MARK:  Objection.

19          THE COURT:  Mr. Haney, we actually have a lawsuit

20  going on, and there are issues in it, and none of them have to

21  do with his basketball talent.

22          MR. HANEY:  Thank you.

23  Q.  Now, you testified that in 2015 you actually got Christian

24  Dawkins a job at a sports agency called ASM, is that correct?

25  A.  I said I made a phone call because I endorsed Christian for

1    that job.

2    Q.  Did that assist him getting the job, if you know?

3    A.  I don't know.

4    Q.  Who did you call to assist in making that effort to get

5    that job at ASM?

6    A.  I talked to Andy Miller.

7    Q.  So is it fair to say that between the point where he tried

8    out for your AAU team in 2008 and the point where you made the

9    phone call in 2015 you and Christian still had contact with one

10   another?

11   A.  I talked to Christian frequently, yes.

12   Q.  And you testified that you and Andy Miller were friends?

13   A.  Yes.

14   Q.  Is it fair to say you are still friends today?

15   A.  I haven't talked to him in a while.

16   Q.  You knew that Andy Miller represented a number of top NBA

17   players, is that a fair statement?

18   A.  That's fair.

19   Q.  You testified that sometime around 2011 or 2012 you

20   actually worked for Andy Miller, is that right?

21   A.  That was before that.  I testified it was before that,

22   around 2006.

23   Q.  So back in 2006 then you would have been a recruiter at

24   ASM, is that my recollection of your testimony?

25   A.  Yes.

1  Q.  So you have testified you're familiar with this basketball

2  underworld, is that correct?

3  A.  Yep.

4  Q.  It's fair to say you're not just familiar with it, you

5  actually worked in it then, didn't you?

6  A.  For a long time.

7  Q.  How many years did you work in the basketball underground,

8  as you call it?

9  A.  15, 16 years.

10  Q.  And you testified on direct that it was your understanding

11  that Christian's job at ASM as a recruiter was to find top

12  basketball prospects for the Andy Miller Sports agency, is that

13  correct?

14  A.  Yes.

15  Q.  That's in fact what you would have been doing as well when

16  you worked there some 12 years ago, is that a fair statement?

17  A.  I wasn't as good as Christian.

18  Q.  But that was your job too, fair statement?

19  A.  Yes.

20  Q.  And isn't it true, in the basketball underground of the

21  sports agency business that you worked in for years, that it

22  was common to pay the parents of prospective clients, correct?

23        MR. MARK:  Objection.

24        THE COURT:  Sustained.

25  Q.  While you worked at ASM as a recruiter, were you aware that

1   parents of top prospects were getting paid?

2           MR. MARK:  Objection.

3           THE COURT:  Sustained.

4           MR. HANEY:  Can I have a moment, your Honor?

5           THE COURT:  Yes.

6           MR. HANEY:  Thank you.

7   Q.  Now, you testified that you had personal knowledge that

8   Christian Dawkins was not a sports agent, correct?

9   A.  Say that again.

10  Q.  You testified you had personal knowledge that Christian

11  Dawkins was not a sports agent, correct?

12  A.  I referred to Christian as a recruiter.  I don't really

13  follow your line of questioning.

14  Q.  You know what a recruiter is at a sports agency because you

15  were one, right?

16  A.  I was a recruiter.

17  Q.  Are the recruiters licensed agents, yes or no, if you know?

18  A.  Some are, some aren't.

19  Q.  Were you?

20  A.  No.

21  Q.  Do you know if Christian Dawkins was?

22  A.  I don't know.

23  Q.  In fact, you described Christian Dawkins at one point as

24  having a real affinity for the basketball business, is that a

25  correct statement?

1    A.   Yes.

2    Q.   Then you testified, in the year of 2015, you travelled to

3    Saginaw, Michigan to watch a young player by the name of Tugs

4    Bowen play basketball, is that right?

5    A.   I said I went to watch Brian Bowen Junior play.

6    Q.   You know him as Tugs Bowen, don't you, sir?

7    A.   No.

8    Q.   So it's your testimony that you have never heard Brian

9    Bowen Junior referred to as Tugs Bowen?

10   A.   I thought that was the father.

11   Q.   I will refer him to as Brian Bowen Junior as we move

12   forward.

13        At that same time in 2015, you knew that Christian

14   Dawkins was working at ASM, right?

15   A.   I don't remember the timeline of when Christian started

16   with Andy.  I don't remember that.

17   Q.   But you did testify that in 2015 you placed the call to

18   Andy Miller to vouch for Christian Dawkins's employment at ASM,

19   is that right?

20   A.   I made many calls to Andy about Christian.

21   Q.   You testified that you did make a phone call in 2015 to

22   assist him in getting a job there, is that right?

23   A.   Yes.

24   Q.   Thank you.

25        Now, you testified also that on the same trip to

1    Saginaw, Michigan you had an occasion to meet the family of

2    Brian Bowen Junior at a restaurant in Saginaw, is that right?

3    A.  Yes.

4    Q.  Is that included meeting his mother and father, correct?

5    A.  Correct.

6    Q.  And you also testified that during 2015, during that

7    meeting, you learned that the father of Brian Bowen Junior, who

8    would be Brian Bowen Senior, wanted $25,000 for his son to

9    leave one AAU team to play for another, was that your

10   testimony?

11   A.  I don't recall when Christian told me about that, but it

12   was either over a phone call or face-to-face.  I don't remember

13   when.

14   Q.  But that request for $25,000 from the father did not

15   outrage you, did it?

16           MR. MARK:  Objection.

17           THE COURT:  Sustained.

18   Q.  Based on your personal knowledge of what occurred in the

19   basketball underground, was it outrageous to you that a father

20   would ask for money for his son?

21           MR. MARK:  Objection.

22           THE COURT:  Sustained.

23           Please don't do that, Mr. Haney.

24           MR. HANEY:  Thank you, your Honor.

25   Q.  Mr. Gassnola, you testified that you communicated the

1  $25,000 demand by Brian Bowen's father to your boss at Adidas,

2  Chris Rivers, is that correct?

3             MR. MARK:  Objection.

4             THE COURT:  What is the objection?

5             MR. MARK:  Mischaracterizes the testimony, "demand."

6             THE COURT:  What is the page reference, counsel?

7             MR. HANEY:  I don't have that.  I can rephrase the

8  question in a more general term.

9             THE COURT:  Go ahead.

10 Q.  Mr. Gassnola, isn't it true that you communicated the

11 $25,000 amount to your boss Chris Rivers at Adidas, is that

12 correct?

13 A.  I told the director of grassroots basketball at Adidas,

14 Chris Rivers at the time, what Brian Bowen's family wanted for

15 him to move from the Detroit family AAU team to the Michigan

16 Mustangs.

17 Q.  You knew that the Detroit AAU team to be the Nike family,

18 is that correct, Mr. Gassnola?

19 A.  Correct.

20 Q.  And then the Michigan Mustangs team would be the Adidas

21 team, is that correct?

22 A.  Correct.

23 Q.  Isn't it true that when you communicated that to Chris

24 Rivers at Adidas, he told you that it would be OK -- he would

25 be OK with paying the Bowens the $25,000 to secure the

1    commitment to an Adidas-affiliated AAU team, isn't that right?

2    A.  He was fine with it.

3    Q.  Isn't it true that he said that he would because that was

4    the business, correct?

5            MR. MARK:  Objection.

6            THE COURT:  Sustained.

7    Q.  Mr. Gassnola, do you recall on the date of December 5, 2017

8    being interviewed by the FBI?

9            MR. MARK:  Objection.

10           THE COURT:  Sustained.

11   Q.  Even before you -- strike that.

12           You testified you never actually saw Chris Rivers pay

13   players before, right?

14   A.  I didn't see Chris do that; no, I never have.

15   Q.  But isn't it true you assumed that Rivers did pay players

16   because that's how the business was run, correct?

17           MR. MARK:  Objection.

18           THE COURT:  Sustained.

19           MR. HANEY:  Your Honor, may we have a sidebar?  It's a

20   prior statement.

21           (Continued on next page)

22

23

24

25

1      (At the sidebar)

2      MR. HANEY:  Your Honor, he made a prior statement to

3  the FBI that that in fact is what Chris Rivers told him.

4      THE COURT:  Specifically what?

5      MR. HANEY:  He told the FBI, even though he had never

6  seen Rivers pay players, he assumed that Rivers did pay players

7  because that's how the business was run.

8      THE COURT:  You asked him that question.  I sustained

9  the objection.  He didn't answer it.  And you can't impeach a

10  nonanswer.

11      MR. HANEY:  May I refresh his recollection?

12      THE COURT:  He didn't say he didn't recall.

13      (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1    (In open court)

2    BY MR. HANEY:

3    Q.  Mr. Gassnola, isn't it true that you have previously stated

4    that you assumed that Chris Rivers did pay players because that

5    was how the business was run?

6         MR. MARK:  Objection.

7         THE COURT:  Sustained.

8         Now, if you would like to end your cross here, you're

9    heading for it right away.  Do you understand?

10        MR. HANEY:  Yes.

11        THE COURT:  You understand why I am telling you that?

12        MR. HANEY:  I do.

13        THE COURT:  Let's go on without repetition.

14   Q.  Mr. Gassnola, you testified in 2015 you personally made a

15   payment of 7 to $8,000 in an overnight package wrapped in a

16   magazine to Brian Bowen Senior, is that correct?

17   A.  $7,000.  I don't know if it was Brian Bowen Senior or

18   Christian.  I forgot.  It was somebody.  Christian or Senior.

19   Q.  Do you recall being interviewed by the FBI on the date of

20   December 5, 2017, and on that date you indicated that you made

21   the payment to Brian Bowen Senior?

22        MR. MARK:  Objection.

23        THE COURT:  Sustained.

24        MR. HANEY:  May we pull up 3503-10 for identification

25   purposes?

1    THE COURT:  Yes.

2  Q.  Mr. Gassnola, can you please review this document just to

3  yourself, please?  The highlighted portion, sir.

4  A.  Yes.

5  Q.  Thank you.

6    Does that refresh your recollection of where you made

7  that payment?

8  A.  It refreshes my statement I made that day.

9  Q.  What was your statement you made that day?

10   MR. MARK:  Objection.

11   THE COURT:  Sustained.

12   Does it refresh your recollection as to whether you

13  made the payment directly to Mr. Bowen Senior as opposed to Mr.

14  Dawkins?

15   THE WITNESS:  It does not, your Honor.  I sent it to

16  either or.  I can't remember exactly who I sent it to.

17   THE COURT:  Let's move on.

18   MR. HANEY:  Thank you, your Honor.

19  BY MR. HANEY:

20  Q.  Mr. Gassnola, you have testified that you understand that

21  you can't pay cash to parents or players or they could lose

22  their college eligibility, is that correct?

23  A.  Rephrase the question.

24  Q.  You have testified that you understand that you can't pay

25  cash to parents or players or they will lose their college

1    eligibility, correct?

2    A.   Yes.

3    Q.   That is exactly what you did, didn't you, back in 2015 when

4    you put that cash in that magazine and mailed it off to Tugs

5    Bowen's father, right?

6    A.   That's exactly what I did.

7    Q.   So is it your testimony that what you did back in 2015 in

8    and of itself could have caused Brian Bowen Junior to be

9    ineligible?

10             MR. MARK:  Objection.  Asked and answered.

11             THE COURT:  Yes, it has been.  It's repetitious.

12   Q.   You testified on direct that the balance of the $25,000

13   payment promised to Brian Bowen Senior was going to be taken

14   over by Chris Rivers from Adidas, is that correct?

15   A.   Chris said he would take it from there, yes.

16   Q.   That would be Chris Rivers, correct?

17   A.   Chris Rivers, correct.

18   Q.   You testified you're very familiar with what a five star

19   basketball player is, right?

20   A.   I think I am.

21   Q.   What is a five star basketball player in your opinion or

22   what you believe it to be?

23   A.   I have got to see him.

24   Q.   I'm sorry?

25   A.   I have got to watch him and evaluate him.

IAF8GAT3                    Gassnola - Cross

1    Q.  You would agree with me that such recruits labeled as five

2    star basketball players are the ones that are most heavily

3    recruited to college basketball, is that correct?

4            MR. MARK:  Objection.

5            THE COURT:  Sustained.  Apples and oranges, Mr. Haney.

6            MR. HANEY:  Thank you, your Honor.

7    Q.  Isn't it true that you knew that Christian Dawkins was like

8    a big brother to Brian Bowen Junior?

9            MR. MARK:  Objection.

10           THE COURT:  Sustained.

11   Q.  Isn't it true that you knew that Christian Dawkins wanted

12   to be Brian Bowen Junior's agent one day?

13   A.  Yes.

14   Q.  There came a point where you and Christian Dawkins had a

15   conversation about Brian Bowen Junior's recruitment to the

16   University of Louisville, is that correct?

17   A.  That's correct.

18   Q.  And that occurred in May of 2017, would that be your

19   recollection?

20   A.  Yes.

21   Q.  And you knew at that point as well that Brian Bowen Senior

22   was again looking for money, wasn't he?

23   A.  Christian told me his family was looking for money at that

24   time, yes.

25   Q.  And you had known from dealing with Brian Bowen Senior

1  three years earlier that he was looking for money then too,

2  correct?

3  A.  Yes.

4  Q.  Would you agree at the point you got involved in the

5  recruitment of Brian Bowen Junior in May of 2017, that would

6  have been extremely late for a top player to not be committed?

7  A.  Can you rephrase that question?

8  Q.  Would you agree at the point when you became involved in

9  Tugs Bowen's recruitment in May of 2017, that would have been

10 late for a top player to not be committed, is that correct?

11 A.  I agree.

12 Q.  In your experience, most of the top recruits would have

13 already been committed at that point in May of 2017, fair

14 statement?

15 A.  Yep.

16 Q.  And you knew in May of 2017 amongst the finalists for Brian

17 Bowen Junior included Oregon, Creighton, Arizona and MSU, is

18 that correct?

19 A.  That's what people told me.  I don't read that stuff.

20 Q.  How were you aware of that at that time?

21 A.  Christian told me.  I would have relied on Christian.  I

22 don't follow what goes on in the Internet.  I would have

23 listened to Christian.

24 Q.  Would you agree at that point in May of 2017 the University

25 of Louisville, to your knowledge, was not one of the finalists

1    for Tugs Bowen's college choice?

2    A.  I don't recall who his finalists were.

3    Q.  You testified that there came a point where Christian

4    Dawkins asked you what Adidas could do for the Bowens if Brian

5    Bowen Junior was to consider Louisville, is that correct?

6    A.  Christian called me, yes.

7    Q.  But Christian Dawkins never said to you that if you got

8    $100,000 from Adidas he would make sure Tugs Bowen went to

9    Louisville, did he?

10            MR. MARK:  Objection.

11            THE COURT:  What is the objection?

12            Overruled.

13            MR. MARK:  I will withdraw it.

14            THE COURT:  Answer the question.

15   Q.  Christian Dawkins never said to you that if you got

16   $100,000 from Adidas he would make sure Tugs Bowen went to the

17   University of Louisville, did he?

18   A.  That's not how the conversation went.

19   Q.  That's a yes or no.  Did he?

20   A.  No, he did not.

21   Q.  To your knowledge, Christian Dawkins had no alliance with

22   Adidas to steer Brian Bowen Junior to any particular Adidas

23   school, did he?

24            MR. MARK:  Objection.

25            THE COURT:  Sustained.

1  Q.  To your knowledge, Mr. Gassnola, Christian Dawkins wasn't

2  getting paid by Adidas to go out and influence kids to go to

3  their schools, was he?

4        MR. MARK:  Objection.

5        THE COURT:  Sustained.

6        MR. HANEY:  Can we please pull up GX 107Q-1.

7        It is my understanding this exhibit is already in

8  evidence.  Is that correct?

9        May we publish for the jury, your Honor?

10        THE COURT:  Yes.

11 Q.  Mr. Gassnola, do you recognize this document as a text

12 exchange between yourself and the University of Louisville head

13 coach Rick Pitino?

14 A.  Yes.

15 Q.  You testified last week that when Brian Bowen Junior

16 committed to the University of Louisville, you sent this

17 congratulatory text to the head coach Rick Pitino, is that

18 correct?

19 A.  I did.

20 Q.  In fact, in looking at this text you comment, "Hall of

21 famer.  Hope you are in a good place.  Bowen will help."  Is

22 that right?

23 A.  That's what I texted.

24 Q.  Then Rick Pitino texted back a thumbs up emoji, is that a

25 fair statement?

1    A.  He did.

2    Q.  And you testified that you and Christian were instrumental

3    in making the Brian Bowen Junior commitment to the University

4    of Louisville happen, is that right?

5    A.  Instrumental?

6    Q.  You were a factor in having that occur, Brian Bowen Junior

7    committing to the University of Louisville, correct?

8    A.  I acted like I did, but I didn't have that much to do with

9    it.

10   Q.  Would you agree that a player like Brian Bowen Junior could

11   be the type of basketball player that would help the University

12   of Louisville win games?

13           MR. MARK:  Objection.

14           THE COURT:  Sustained.

15   Q.  You texted the words help to Rick Pitino, didn't you, sir?

16   A.  I texted him that, yes.

17   Q.  So when you texted the head basketball coach at Louisville,

18   Rick Pitino, it was about the great news of the Brian Bowen

19   commitment, you weren't texting him about him being harmed,

20   were you?

21           MR. MARK:  Objection.

22           THE COURT:  Sustained.

23   Q.  Mr. Gassnola, you testified earlier today and last week

24   that you do in fact have a prior criminal history that involves

25   larceny and writing bad checks, is that right?

1  A.  That's right.

2  Q.  On another occasion you took money from investors in a real

3  estate deal and never gave them back their money, is that

4  right?

5  A.  A few times, yes.

6  Q.  And that you have somewhere in the neighborhood of five or

7  six judgments, correct?

8  A.  Yes.

9  Q.  You testified that you have multiple tax liens, including a

10  $60,000 lien or so, is that what I recall?

11  A.  One.

12  Q.  As you put it, when you testified, you engaged in what you

13  said were tax avoidance strategies, isn't that right?

14  A.  I did.

15  Q.  You testified that you got a lawyer and in December of 2017

16  you decided that it would be in your best interests to talk to

17  the government and be truthful then, right, Mr. Gassnola?

18  A.  That's correct.

19  Q.  But isn't it true really what you believed is that it would

20  be in the best interests to give the government the information

21  that they sought to prosecute my client so you can stay out of

22  prison for 20 years, right?

23          MR. MARK:  Objection.

24          THE COURT:  Sustained.

25  Q.  You're 46, sir?

1    A.  Do I look it?

2    Q.  Do you want me to answer that?

3    A.  Yeah.

4         THE COURT:  Don't.

5    Q.  Are you 46 or not?

6    A.  46.

7    Q.  So potentially, as you stated, you could go to prison for

8    20 years, right?

9    A.  I could.

10        THE COURT:  We are not going to cover again what the

11   last two lawyers covered.  So if you have new questions.

12        MR. HANEY:  Two more questions, your Honor.

13        One more question, your Honor.

14   Q.  Mr. Gassnola, is it fair to say that you have a lot to gain

15   here today by testifying against Christian Dawkins?

16   A.  I don't know how to answer that question.

17   Q.  You want me to ask it again?

18   A.  Yes, please.

19   Q.  Is it fair to say, sir, you have a lot to gain by being

20   here testifying today against Christian Dawkins, don't you?

21   A.  Yeah.

22        MR. HANEY:  Thank you.

23        Nothing further, your Honor.

24        THE COURT:  Thank you.

25        Any redirect?

1  REDIRECT EXAMINATION

2  BY MR. MARK:

3  Q.  Mr. Gassnola, are you here today because it was part of

4  your cooperation agreement with the government?

5  A.  Yes.

6  Q.  What is your understanding of what happens if you do not

7  testify truthfully today before this jury?

8  A.  My cooperation agreement is ripped up and my penalties

9  could be worse.

10  Q.  What would you anticipate would be the consequences if your

11  cooperation agreement would be ripped up?

12  A.  More jail time.

13  Q.  So is it really fair to say that you would -- I am just

14  going to move on.

15       You were asked a series of questions on

16  cross-examination by Mr. Schachter regarding an October payment

17  from Martin Fox which was in October 2015.  Do you recall that?

18  A.  Yes.

19  Q.  What was that payment for?

20  A.  I was behind in some money and I just asked Fox for a loan.

21  I had some stuff coming up, bills I couldn't make, and I asked

22  Fox for a loan.

23  Q.  Did you repay that loan?

24  A.  I did.

25  Q.  Let me direct your attention to what has been marked as

1   Government Exhibit 306H.

2           MR. MARK:  Ms. Lee, can we flip also to the second

3   page.

4           Now we can go back to the first.

5   Q.  Mr. Gassnola, do you recognize this?

6   A.  Wire transfers from my Berkshire Bank New England Playaz

7   account to Martin Fox.

8           MR. MARK:  The government offers Government Exhibit

9   306H.

10          THE COURT:  Received.

11          (Government's Exhibit 306H received in evidence)

12  Q.  Are there two wire transfers of $20,000 to Mr. Fox in the

13  bank records?

14  A.  Yes.

15  Q.  Was this you repaying the loan to Martin Fox?

16  A.  Yes.

17  Q.  Now, you were shown on direct your contract for the New

18  England Playaz.

19          Mr. Schachter directed your attention to a signature

20  for an executive at Adidas, Chris McGuire.  Do you remember

21  that?

22  A.  Yes.

23  Q.  Did you discuss your and Mr. Gatto's payments with Chris

24  McGuire at Adidas?

25  A.  Never.

1  Q.  Mr. Schachter asked you other questions about Mr. Gatto's

2  bosses and other more senior people at Adidas.  Do you recall

3  that?

4  A.  I do.

5  Q.  Did you discuss your and Mr. Gatto's payments with anybody

6  at Adidas more senior than him?

7  A.  Never.

8  Q.  Now, you were asked on cross-examination a lot of questions

9  about the payments that you agreed to make with Mr. Gatto and

10  others to the families of student-athletes, is that right?

11  A.  Yes.

12  Q.  Would you have made any of those payments to the families

13  of those student-athletes were they not going or considering to

14  go to Adidas schools or grassroots programs?

15  A.  I would not have.

16  Q.  Would you have agreed with Mr. Gatto and others to make

17  those payments to the families of student-athletes if they

18  weren't planning to go to or going to go to Adidas schools or

19  grassroots programs?

20  A.  Can you repeat the question?  I apologize.

21  Q.  Would you have agreed with Mr. Gatto and with others to

22  make those payments to the families of student-athletes were

23  they not planning to go to Adidas schools or Adidas grassroots

24  programs?

25  A.  No.

1    Q.  Is that true for Dennis Smith?

2    A.  Yes.

3    Q.  For Billy Preston?

4    A.  Yes.

5    Q.  And for the others as well?

6    A.  Yes.

7    Q.  Now, you were also asked a series of questions about

8    Government Exhibit 45, which was a call you had with Christian

9    Dawkins.

10            MR. MARK:  I am just going to ask, Ms. Lee, if we

11   could put that up.  And, your Honor, if we could publish that.

12            THE COURT:  Yes.

13   Q.  This is an August 10, 2017 call between you and Mr.

14   Dawkins.  Do you recall this?

15   A.  Yes.

16   Q.  You were asked by Mr. Schachter just earlier about Kenny

17   Johnson who is assistant coach at Louisville.  Do you recall

18   that?

19   A.  Yes.

20   Q.  Do you have firsthand knowledge of whether Kenny Johnson

21   knew about the payments that were made to Brian Bowen and his

22   family?

23   A.  I do not.

24   Q.  Now, I would like to focus your attention on page 3 of this

25   transcript.

1  Do you see on line 10 to 11, "But people could lose

2  their jobs is all I'm saying"?

3  A.  I do.

4  Q.  What were you referring to when you said "but people could

5  lose their jobs is all I'm saying"?

6  A.  People at the universities and Jimmy.

7  Q.  Why could people at the universities and Mr. Gatto lose

8  their jobs?

9  A.  Because NCAA rules, kids cannot get money; it hurts their

10  amateurism.  And I was always of the opinion if somebody above

11  Jimmy would find out, he would be in jeopardy of his job.

12  That's just my opinion.

13  MR. MARK:  No further questions.

14  THE COURT:  How would people at universities lose

15  their jobs if somebody above Jimmy found out?

16  Jimmy was Jimmy Gatto, right?

17  THE WITNESS:  I meant people at Adidas above Jimmy.

18  THE COURT:  But how does that affect jobs at the

19  universities?

20  THE WITNESS:  I just meant it would affect Jimmy's

21  job.  The people at the universities -- if the universities

22  found out that I was giving money to the athletes, it would

23  affect the athletes and people's jobs at the universities.

24  THE COURT:  Does counsel wish to examine further about

25  that?

IAF8GAT3

 1          MR. MOORE:  No, your Honor.

 2          MR. HANEY:  No.

 3          MR. SCHACHTER:  No, your Honor.

 4          THE COURT:  Witness is excused.  Thank you.

 5          (Witness excused)

 6          MR. MARK:  The government would plan to do just one

 7   thing before the break, which is to offer Government Exhibit

 8   113B.

 9          THE COURT:  B or B-1.

10          MR. MARK:  Sorry.  B-1.

11          THE COURT:  Is there anything further to be said about

12   this?

13          MR. MARK:  Just if we could publish it.

14          THE COURT:  I am directing that to the defendants.  I

15   ruled on this at the sidebar.  Is there anything else?

16          MR. MOORE:  Nothing from Mr. Code, your Honor.

17          MR. HANEY:  No, your Honor.

18          MR. SCHACHTER:  I think your Honor was talking about

19   foundation being laid for this document.  We have no objection

20   to authentication, but I wasn't sure what your Honor meant.

21          THE COURT:  I don't understand you.  Do you have an

22   objection to 113B-1 that I haven't ruled on already?

23          MR. SCHACHTER:  No, your Honor.

24          THE COURT:  It's received.

25          (Government's Exhibit 113B-1 received in evidence)

1    THE COURT:  You may publish it.

2    MR. MARK:  Ms. Lee, could you highlight the

3 participants to the call -- I'm sorry, on the text, to the left

4 where it says "it's me."

5    Ms. Lee, maybe just in yellow you can highlight the

6 custodian.  And continue over to the body, "The NCAA dude just

7 came to my floor."  And the date November 13, 2017.

8    Then it continues on November 13, 2017, from it's me,

9 which is the custodian Billy Preston.  "He said something about

10 my car and how it's bought in Florida and all that."

11    THE COURT:  Mr. Mark, anything you are saying is

12 inaudible.

13    MR. MARK:  Ms. Lee, if we can just highlight the from

14 lines of each and the body of each of these text messages.

15    Now, if we can just turn to the second page.

16    And here in the body it says, "IDC what they say to

17 you, you don't know -- know."

18    Then there is a response from it's me, "Got you."

19    And the last text message from MA, "If they ask you

20 about a person, say I don't know, I would have to see their

21 face."  And that was read on November 13, 2017.

22    THE COURT:  Do the parties agree on who the

23 participants in these texts are?

24    MR. MARK:  Yes.  The parties have agreed that the

25 participants in these texts are Billy Preston, who is "it's

1  me," and the "MA" is Nicole Player.

2        THE COURT:  Members of the jury, that is stipulated

3  and you now have the text messages before you.

4        You have another witness?

5        MR. DISKANT:  We do, your Honor.  Before doing that,

6  we would like to offer a couple of recordings and play them at

7  this time.

8        THE COURT:  All right.  Let's get started.

9        MR. DISKANT:  The government offers Government Exhibit

10  8, along with the accompanying transcript, which is 8T, which

11  is a call between Merl Code and Brad Augustine I believe on

12  August 19th of 2017.

13        With the Court's permission, the jurors I believe

14  should have this in their binders.

15        THE COURT:  Turn to Government Exhibit 8T, members of

16  the jury, please.

17        (Audio played)

18        THE COURT:  8 and 8T are received if I didn't say that

19  already.

20        (Government's Exhibits 8 and 8T received in evidence)

21        MR. DISKANT:  The government would like to read a

22  stipulation, which is S7, which is that:

23        On or about August 6, 2017, after Brad Augustine

24  requested money from Adidas for the stated purpose of providing

25  those funds to the family of Nassir Little, Augustine told

1    Christian Dawkins, in substance, that he did not intend to

2    provide that money to the Little family but instead intended to

3    use the money for his AAU team and other expenses.

4           On or about August 10, 2017, Christian Dawkins made

5    Merl Code aware of Augustine's intentions.

6           We would offer S7 at this time.

7           THE COURT:  S7 is received.

8           (Government's Exhibit S7 received in evidence)

9           MR. DISKANT:  The government would next offer and seek

10   to publish Government Exhibit 102F-41, which is a text chain

11   about this subject between Christian Dawkins and Brad

12   Augustine, dated August 6, 2017.

13          THE COURT:  Received.

14          (Government's Exhibit 102F-41 received in evidence)

15          MR. DISKANT:  If we can publish.  This is a text chain

16   between Christian Dawkins and Brad Augustine.

17          Ms. Lee, if we can highlight the third text from

18   Christian Dawkins to Brad Augustine:  "That's the issue with

19   him going to an Adidas school because the family isn't taking

20   it."

21          Highlight the response below that:  "So do I need to

22   say the family taking it?"

23          Then highlight the response:  "Yes.  I always just

24   worry about it ever getting back to them."

25          THE COURT:  Who is who on this chain?

1    MR. DISKANT:  I believe the parties agree that CV is

2 for Chris Vaughn Dawkins and Don King is the nickname for Brad

3 Augustine.

4    THE COURT:  So stipulated, members of the jury.

5    MR. DISKANT:  Next, the government would offer

6 Government Exhibit 1701, which is an employment contract

7 between Jim Larranaga and the University of Miami.

8    MR. SCHACHTER:  This one I think -- may I be heard?

9    Can I speak to the government one moment on this?

10    MR. DISKANT:  We will come back to 1701.

11    THE COURT:  All right.

12    Members of the jury, we will break now for lunch.  See

13 you at 2:00.

14    Counsel, remain for a minute, please.

15    (Jury exits courtroom)

16    THE COURT:  Mr. Diskant, what is left on the

17 government's case?

18    MR. DISKANT:  Your Honor, I have one more recording

19 and two more documents.  We are then going to call Lindsay

20 Harksen from Adidas.  I expect her direct is going to be

21 approximately 45 minutes.  Then we are going to call Ricky

22 Robertson.  I believe his direct is going to be 30 minutes.

23 And then finally we have Special Agent Casola who is our

24 summary witness.

25    THE COURT:  And Robertson is from where?

1     MR. DISKANT:  He is from South Carolina.

2          THE COURT:  So you are going to finish today, is that

3     right?

4          MR. DISKANT:  I think we are certainly going to get

5     through Ms. Harksen and Mr. Robertson today.  It is possible

6     that we won't get to Mr. Casola until tomorrow.

7          THE COURT:  What is coming on the defense side, if

8     anything?

9          MR. SCHACHTER:  Your Honor, we have had a number of

10    discussions with the government over the course of the weekend.

11    There are obviously a large number of wiretaps in this case.

12    There are a number of recordings and text messages and other

13    documents that the government objects to.  Specifically, it's

14    15 recordings, although that's less than an hour in total,

15    16 -- and these are all spread across all three defendants,

16    your Honor -- 16 test messages, six e-mails, excerpts from the

17    NCAA rule manual, some contracts between Adidas and

18    universities, and some documents relevant to revenue.

19          With respect to our agreement, the government has

20    agreed that we may play small portions of three --

21          THE COURT:  This is at the moment TMI.  You just gave

22    me the universe you would like to get in.

23          MR. SCHACHTER:  I was actually leading to a question

24    which is also not directly responsive to your Honor's question.

25          In any event, you asked what we would like to do in

1  the defense case.  That's the universe of what we would like to

2  do in the defense case, in addition to perhaps some

3  stipulations that we are still trying to work out with the

4  government.  I guess in theory we could have a custodial

5  witness to the extent that we were unable to work out the

6  stipulations, but hopefully we will be able to reach a

7  stipulation.

8          THE COURT:  And if all of that happens, rebuttal?

9          MR. DISKANT:  Well, your Honor, I think, at the risk

10  of giving you TMI, I think part of the concern with the

11  recordings is that they are going to branch off into all sorts

12  of characters and events the jury has otherwise heard nothing

13  about.  And so were the Court to allow the defendants to play

14  them, I do think we might have to offer some documents and

15  other materials to put them in context.  But that may assume

16  something that may or may not actually happen.

17          THE COURT:  I understand.  Thank you.

18          Just so we don't have any other misunderstandings, if

19  anybody intends to use on closing argument any PowerPoints or

20  similar materials, any demonstratives, in short, anything other

21  than the playing of an exhibit that's already in evidence, you

22  are going to tell your adversary, you are going to show it to

23  your adversary, and you're going to tell me.

24          See you at 2:00.

25          MR. SCHACHTER:  One more moment.  So with respect to

these recordings and what our argument is with respect to each

of these, we have been working on a submission for your Honor

to consider with respect to these, the best way of laying out

for your Honor what is the reason why we want these recordings.

I can't really think of a more efficient way of doing that.  We

anticipate getting that to your Honor after court today.  So

your Honor is forewarned, it is lengthy in part because it

contains quotes from the recordings that we intend to play, and

I just don't know what other way to effectively present this to

the Court.  And as the Court thinks about the week unfolding, I

wanted to advise the Court that was our thinking as the best

way to handle this.

          Your Honor will, as the Court thinks about the week,

your Honor may need time -- will need time to review those

materials in order to make those rulings.  I just wanted to let

your Honor know that it was coming so that your Honor wasn't

angry, or perhaps your Honor would otherwise be, receiving the

stack of paper because it will be voluminous.  So I wanted to

draw the sting from the papers that would be landing with the

Court.

          THE COURT:  I will go get my Benadryl.  See you at 2.

          (Luncheon recess)

IAF8GAT3

| | |
|---|---|
| 1 | AFTERNOON SESSION |
| 2 | 2:00 p.m. |
| 3 | (Jury not present) |
| 4 | THE COURT:  Good afternoon, everyone. |
| 5 | Mr. Diskant is your third witness available if we are |
| 6 | ready to reach him today? |
| 7 | MR. DISKANT:  He is sitting at the end of the row, |
| 8 | your Honor. |
| 9 | (Jury present) |
| 10 | THE COURT:  The jurors all are present.  The |
| 11 | defendants are present. |
| 12 | Mr. Diskant. |
| 13 | MR. DISKANT:  Your Honor, before the government calls |
| 14 | its next witness, we would like to offer a number of documents |
| 15 | pursuant to a stipulation between the parties.  It's |
| 16 | stipulation S3, which is in evidence.  It includes a |
| 17 | stipulation of a series of documents produced by the University |
| 18 | of Louisville, including 1601 through 16 and 17, are true and |
| 19 | correct copies of records obtained from the University of |
| 20 | Louisville, that the original records were made at or near the |
| 21 | time by or from information transmitted by -- |
| 22 | THE COURT:  You don't have to read all of that stuff. |
| 23 | MR. DISKANT:  The government offers -- |
| 24 | THE COURT:  The stipulation is in evidence. |
| 25 | MR. DISKANT:  It is indeed. |

1    The government offers 1612, 1613 and 1614, which are

2  University of Louisville records regarding financial aid to

3  Brian Bowen.

4    THE COURT:  Received.

5    (Government's Exhibits 1612, 1613 and 1614 received in

6  evidence)

7    MR. DISKANT:  Pursuant to the same stipulation, the

8  government offers 1701, which is a contract between the

9  University of Miami and Jim Larranaga.

10    THE COURT:  Received.

11    (Government's Exhibit 1701 received in evidence)

12    MR. DISKANT:  Finally, the government would like to

13  play the second portion of Government Exhibit 34, beginning at

14  page 8.  We had a technical difficulty with this clip last

15  week.  We are going to try again.  With the Court's permission,

16  we can both publish the transcript and the jurors should have a

17  copy in their binders.

18    THE COURT:  Members of the jury, you can turn to page

19  8 of Government Exhibit 34T.

20    (Audio played)

21    I should have mentioned that was a call between

22  Christian Dawkins and Merl Code, dated July 24, 2017.

23    Your Honor, the government calls Lindsay Harksen.

24    (Continued on next page)

25

1    LINDSAY HARKSEN,

2         called as a witness by the government,

3         having been duly sworn, testified as follows:

4              THE DEPUTY CLERK:  State your name and spell your last

5    name for the record.

6              THE WITNESS:  Lindsay Harksen, H-A-R-K-S-E-N.

7              THE COURT:  You may proceed, Mr. Diskant.

8    DIRECT EXAMINATION

9    BY MR. DISKANT:

10   Q.  Ms. Harksen, where are you currently employed?

11   A.  I work for Adidas North America.

12   Q.  What is your title?

13   A.  My title is senior finance manager.

14   Q.  How long have you been a senior finance manager at Adidas?

15   A.  Almost a couple of years.

16   Q.  Prior to that, did you have a different title at Adidas?

17   A.  I did.  I started with Adidas about five years ago as a

18   sports marketing finance analyst for a couple of years, and

19   then I was promoted to a finance manager.

20   Q.  All of your work has been in the finance area?

21   A.  Correct.

22   Q.  Were you employed prior to joining Adidas?

23   A.  I was.

24   Q.  How were you employed?

25   A.  I was employed as a senior accountant at a food

1    manufacturing company.

2    Q.  How far did you go in school?

3    A.  I got my bachelor's.

4    Q.  Are you familiar with someone named Jim Gatto?

5    A.  I am.

6    Q.  How are you familiar with him?

7    A.  I had worked with him at Adidas.

8    Q.  Very briefly, what is Adidas?

9    A.  Adidas is a sporting company that makes footwear and

10   apparel.

11   Q.  Where is it based?

12   A.  Our global headquarters are in Germany, and the North

13   American headquarters, co-global headquarters, are in Portland,

14   Oregon.

15   Q.  Where are you located?

16   A.  I am based in Portland, Oregon.

17   Q.  Which sport or sports does Adidas produce apparel and

18   footwear for?

19   A.  Pretty much all of them -- baseball, football, basketball,

20   soccer.

21   Q.  Which part or division of Adidas do you work for?

22   A.  I work in the marketing finance department.

23   Q.  And you mentioned previously that you're a senior finance

24   manager.  Are there particular budget or areas that you're

25   responsible for?

1  A.  Yes.  I oversee our marketing working budget for Adidas

2  U.S. as well as our marketing overheads.

3  Q.  We will come back to that in a minute.  But what generally

4  does your job entail?

5  A.  I basically plan the budgeting forecasts, do reporting for

6  the finance area.

7  Q.  Are you involved in making decisions about how or what

8  Adidas spends money on?

9  A.  No.

10 Q.  Who makes those decisions?

11 A.  Typically, the budget owner, the budget manager.

12 Q.  What is a budget owner or budget manager?

13 A.  Someone who oversees the day-to-day operations of the

14 budget.

15 Q.  Through your job, are you familiar with the basketball

16 sports marketing budget?

17 A.  Yes.

18 Q.  How are you familiar with that?

19 A.  I oversee it from a finance perspective.

20 Q.  Focusing your attention on the time period January 2015

21 through September of 2017, was there a budget manager for the

22 basketball sports marketing budget?

23 A.  Yes.

24 Q.  Who was that budget manager?

25 A.  Jim Gatto.

Q.  What is Mr. Gatto's title?

A.  He is the director of global sports marketing basketball.

Q.  And you mentioned that you have a role with respect to that budget as well?

A.  Yes.

Q.  Do you have a staff?

A.  I do.

Q.  How big is your staff?

A.  Currently there are three people.

Q.  Through your work with the basketball sports marketing budget, are you familiar with the general types of expenses that are covered by that budget?

A.  By just the basketball budget?

Q.  Correct.

A.  Yes.

Q.  What are some of the general types of expenses covered by the basketball sports marketing budget?

A.  We have a little bit of college basketball as well as grassroots basketball spends.

Q.  Does Adidas also work with NBA players?

A.  They do.

Q.  So you mentioned one of the types of expenses was grassroots.  What is grassroots?

A.  It's basically high-school aged players playing on elite or competitive travel teams.

1   Q.  What types of expenses does Adidas incur with respect to

2   grassroots?

3   A.  Team travel allotments, consultant fees, that sort of

4   thing.

5   Q.  Focusing on the first of those, for team travel allotments,

6   are there particular teams sponsored by Adidas?

7   A.  Yes.

8   Q.  For those teams, are the sponsorships typically documented?

9   A.  They are.

10  Q.  How are they typically documented?

11  A.  Through a contract.

12          MR. DISKANT:  Ms. Lee, if we can bring up what is

13  already in evidence as Government Exhibit 1145.

14  Q.  Ms. Harksen, do you recognize this document?

15  A.  I do.

16  Q.  What is it?

17  A.  It is a contract for the New England Playaz basketball

18  program.

19  Q.  One of the grassroots programs sponsored by Adidas?

20  A.  Yes.

21          MR. DISKANT:  Ms. Lee, if we can bring up next to that

22  what is also already in evidence as Government Exhibit 1053.

23  Q.  Ms. Harksen, focusing on the document on the left side of

24  your screen, Government Exhibit 1145, this appears to cover the

25  time January 2017 to December 2018.  Do you see that?

1   A.  Yes.

2   Q.  What time period is covered by the document on your right,

3   Government Exhibit 1053?

4   A.  February 15, 2015 through December 31, 2017 -- or 2016, and

5   then the contract can be extended one year to 2017.

6   Q.  Going back to the left-hand side, Government Exhibit 1145,

7   paragraph 2 provides for a team merchandise allotment in the

8   amount of $75,000.  Do you see that?

9   A.  Yes.

10  Q.  Then going over to the right, what was the annual allotment

11  under the prior contract?

12  A.  $60,000.

13          MR. DISKANT:  Ms. Lee, if we can go to the last page

14  of Government Exhibit 1053.

15  Q.  Ms. Harksen, these documents are signed by someone named

16  Chris McGuire.  Do you see that?

17  A.  Yes.

18  Q.  Who is that?

19  A.  He is our senior director of Adidas U.S. sports marketing.

20  Q.  Focusing on the basketball sports marketing budget that we

21  have been talking about, where does Mr. McGuire fit within the

22  corporate structure as opposed to Mr. Gatto?

23  A.  He oversees the entire sports marketing budget as opposed

24  to Jim who oversees just the basketball portion of that.

25  Q.  Now, you mentioned that a second type of expense you were

1  familiar with were for consultants, is that right?

2  A.  Yes.

3  Q.  Are Adidas's relationships with its consultants typically

4  documented?

5  A.  Typically, yes.

6  Q.  If they are documented, how are they documented?

7  A.  Through a contract.

8  Q.  I want to switch gears and talk very briefly about the

9  process by which Adidas makes payments.  Are you familiar with

10  that process?

11  A.  Yes.

12  Q.  Do you participate in that process?

13  A.  Yes.

14  Q.  So focusing your attention on the same time period, January

15  of 2015 to September of 2017, can you briefly describe for us

16  how Adidas processes and makes payments?

17  A.  From the sports marketing side, it's done either through a

18  contractual system that we download the contractual payments

19  from, gather the business signatures, and send it in to

20  accounting for payment.  There is also, in the noncontractual

21  side, where we get an invoice from the budget owner or manager,

22  again gather signatures, and send it in to accounting for

23  processing.

24  Q.  So for purposes of your testimony today, I think we are

25  largely going to focus on that second area where an invoice

1    comes in.

2           You mentioned that you would gather signatures.  Who

3    would typically need to sign off on an invoice?

4    A.  Typically the budget owner.

5    Q.  What role does the budget owner play with respect to an

6    invoice?

7    A.  They validate the invoice that it's something that needs to

8    be paid.  They provide a valid budget code for the invoice to

9    be expensed against.

10   Q.  Do you and your staff play any role with respect to an

11   invoice?

12   A.  We do.

13   Q.  What role is that?

14   A.  My staff oversees the invoice from a budget perspective,

15   validating things like the vendor number, the budget code, that

16   the business is signed off on it, and then ultimately I sign

17   off on it as well, typically.

18   Q.  We will look at a couple of examples of that.  But before

19   we do, in preparation for your testimony today, have you had a

20   chance to review certain e-mails and other documents copying

21   Jim Gatto, or to Jim Gatto, or from Jim Gatto, along with any

22   accompanying attachments?

23   A.  I have.

24   Q.  Ms. Harksen, there should be a binder sitting on the ledge

25   there in front of you.

1    A.  Yes.

2    Q.  Ms. Harksen, do you recognize the binder?

3    A.  I do.

4    Q.  How do you recognize it?

5    A.  I have initialed it.

6    Q.  Prior to initialing it, did you review its contents?

7    A.  I did.

8    Q.  Did it include Government Exhibits 1065, 1066, 1069, 1075,

9    1077, 1078, 1079, 1088, 1090, 1093 and 1100?

10   A.  Yes.

11   Q.  Are those all e-mails to, from, or copying Jim Gatto?

12   A.  Yes.

13   Q.  Do they all generally pertain to invoices or payments?

14   A.  They do.

15          MR. DISKANT:  The government offers Government

16   Exhibits, 1065, 66, 69, 75, 77, 78, 1079, 88, 90, 93, and 1100.

17          THE COURT:  Received.

18          (Government's Exhibits 1065, 1066, 1069, 1075, 1077,

19   1078, 1079, 1088, 1090, 1093 and 1100 received in evidence)

20   Q.  Ms. Harksen, in preparation for your testimony today, have

21   you also reviewed e-mails involving someone named Merl Code?

22   A.  Yes.

23          MR. DISKANT:  If we can bring up for the witness only,

24   Ms. Lee, what has been marked for identification as Government

25   Exhibit 1102.

1   Q.  Ms. Harksen, is this an e-mail from Merl Code to someone

2   with an Adidas.com e-mail address?

3   A.  Yes.

4   Q.  Does it pertain generally to invoices or payments?

5   A.  It does.

6           MR. DISKANT:  The government offers 1102.

7           MR. MOORE:  No objection.

8           THE COURT:  Received.

9           (Government's Exhibit 1102 received in evidence)

10  Q.  Ms. Harksen, are you familiar with an entity called the

11  Karolina Khaos?

12  A.  I am.

13  Q.  How are you familiar with that particular entity?

14  A.  They are a vendor that Adidas has paid.

15  Q.  Have you been involved in those payments?

16  A.  I have.

17          MR. DISKANT:  Ms. Lee, if we can bring up for the

18  witness only what has been marked for identification as

19  Government Exhibit 1002.

20  Q.  Ms. Harksen, do you recognize this particular invoice?

21  A.  I do.

22          MR. DISKANT:  Ms. Lee, if we can zoom out.

23  Q.  Does your signature appear on it?

24  A.  It does.

25  Q.  Is this one of the invoices you were involved in

1   processing?

2   A.  Yes.

3           MR. DISKANT:  The government offers 1002.

4           MR. MOORE:  No objection.

5           THE COURT:  Received.

6           (Government's Exhibit 1002 received in evidence)

7   Q.  Ms. Harksen, you had mentioned just a moment ago that your

8   signature appears on this.  Is that below your name in the

9   bottom right-hand side of the document?

10  A.  Bottom left-hand side, yes.

11  Q.  Is there another signature on the page?

12  A.  There is.

13  Q.  Whose signature is that?

14  A.  Jim Gatto.

15  Q.  When approximately did you become involved with this

16  particular invoice?

17  A.  Late July 2017.

18  Q.  We are going to come back to that in just a moment.

19          MR. DISKANT:  Before we do so, Ms. Lee, and with the

20  Court' permission, if we can publish what was just received as

21  Government Exhibit 1065.

22          THE COURT:  I thought you just offered -- excuse me.

23  Yes, you may.

24          MR. DISKANT:  This is an e-mail from Merl Code to Jim

25  Gatto, Monday, June 5, 2017, Karolina Khaos invoice.

1    "Jim, please see the invoice."

2         Ms. Lee, can you go to the next page of the exhibit?

3         June 8, 2017, $25,000 invoice for travel team

4    expenses.

5         If we can publish Government Exhibit 1066.

6         THE COURT:  Yes.

7         MR. DISKANT:  This is Jim Gatto to Trevor Ames, June

8    13.  Karolina Khaos Adidas invoice.

9         If Ms. Lee, if you can bring up next to it the second

10   page.

11   BY MR. DISKANT:

12   Q.  Ms. Harksen, are you familiar with someone named Trevor

13   Ames?

14   A.  I am.

15   Q.  How are you familiar with him?

16   A.  He is one of my employees.

17   Q.  Works on your staff?

18   A.  Yes.

19        MR. DISKANT:  Finally, Ms. Lee, if we can publish

20   Government Exhibit 1069.

21        This is an e-mail from Jim Gatto to Olivia Guidera,

22   June 19.  "Olivia, I sent you an invoice last week for them,

23   was for something else.  This is for some travel, can you

24   please process this one as well."

25        Ms. Lee, if we can turn to the second page.

1    It's an invoice for $5,000 from the Karolina Khaos.

2    BY MR. DISKANT:

3    Q.  Ms. Harksen, to process an invoice what information do you

4    or your staff typically require?

5    A.  We require the business sign-off, a vendor number, a budget

6    code.

7    Q.  Let's take those in turn.  When you say a business

8    sign-off, what does that mean?

9    A.  The budget approver, the business owner.

10   Q.  You have used a couple of different terms.  By budget

11   approver, business owner, business manager, are you talking

12   about the same thing?

13   A.  Yes.

14   Q.  Who was the budget owner, business manager for the

15   basketball sports marketing budget?

16   A.  Jim Gatto.

17   Q.  Why do you and your staff need the budget owner's sign-off?

18   A.  They basically validate that the invoice is appropriate and

19   needs to be paid.

20   Q.  By "they," you are referring to the budget owner?

21   A.  Yes.

22   Q.  The second thing I think you said that you needed was a

23   vendor number.  What is a vendor number?

24   A.  A vendor number is just a system-generated number that

25   gives the vendor address and the form of payment, how they are

1   going to get paid.

2   Q.  If a vendor hasn't previously done business with Adidas,

3   will it have a vendor number?

4   A.  No.

5   Q.  What steps, if any, need to be taken to get a vendor number

6   assigned for a particular vendor?

7   A.  Typically we need a W-9, an e-mail address, and if they

8   wish to be paid via direct deposit, some sort of banking

9   information and a voided check.

10  Q.  You also mentioned you and your staff need something called

11  a budget code?

12  A.  Yes.

13  Q.  What is a budget code?

14  A.  A budget code just basically describes where on our books

15  the payment will be made against.

16  Q.  Who, if anyone, has the ability to assign a particular

17  invoice to a particular budget code?

18  A.  Typically the budget owner.

19          MR. DISKANT:  Ms. Lee, if we can publish what is in

20  evidence as Government Exhibit 1093.

21          Turn to the second page, if you don't mind.  Just

22  highlight the e-mail in the middle.

23          It's an e-mail from Trevor Ames to Jim Gatto,

24  Thursday, June 22, 2017.

25          "Hey, Gatto.  I cannot find these guys in the system.

 1    We will need to set them up as a vendor.  Do you need the

 2    forms?"

 3            Ms. Lee, if we can publish Government Exhibit 1075.

 4    Highlight the top two-thirds of the e-mail.

 5            Starting at the bottom, Jim Gatto to Olivia Guidera,

 6    Thursday, July, 6, 2017.  "Did we combine two invoices for

 7    them?  Didn't we have a 25k and another for 5k?"

 8            Then the response above:  "Merl combined the two into

 9    one invoice."

10    BY MR. DISKANT:

11    Q.  Ms. Harksen, you testified that you became involved in

12    handling a Karolina Khaos invoice towards the end of July 2017?

13    A.  Correct.

14            MR. DISKANT:  Ms. Lee, can we bring up what is in

15    evidence as Government Exhibit 1079.

16            Starting at the top, this is an e-mail from Trevor

17    Ames to Jim Gatto, Wednesday, July 26, 2017.  "Sent it in

18    today.  They should be seeing payment soon."

19            Ms. Lee, can you go to the second page?

20    Q.  Ms. Harksen, is this the same invoice we were looking at a

21    little bit earlier with your signature on it?

22    A.  Yes.

23    Q.  Remind us, who else has signed this?

24    A.  Jim Gatto.

25    Q.  What, if anything, would you have done before signing this

1   particular document?

2   A.  I would have made sure that the budget owner had signed off

3   on it, that there was a vendor number, that there was a budget

4   code, and that it was an appropriate budget code.

5   Q.  So let's talk about each of those.

6          You said you would have made sure that the budget

7   owner had signed off.  Is the budget owner here Jim Gatto?

8   A.  Yes.

9   Q.  What is the significance, if any, to you that the budget

10  owner has signed off?

11  A.  They just validate that it's an invoice that needs to be

12  paid by Adidas.

13  Q.  In the course of your job, do you have any firsthand

14  knowledge of what this particular payment is for?

15  A.  I do not other than what is listed in the description.

16  Q.  So July travel team expenses?

17  A.  Correct.

18  Q.  Do you have any firsthand knowledge of what those

19  particular expenses were?

20  A.  No.

21  Q.  What, if anyone, at Adidas would be responsible for

22  verifying that information?

23  A.  On this invoice it would be Jim Gatto.

24  Q.  The next thing is you have talked at some length about

25  budget codes today.  Is there a budget code on this document?

1   A.  There is.

2   Q.  Is that the series of numbers above Mr. Gatto's signature?

3   A.  Yes.

4   Q.  Are you familiar with this particular budget code?

5   A.  Yes.

6   Q.  Who is the budget manager or the budget owner for this

7   budget code?

8   A.  Jim Gatto.

9   Q.  If supporting documentation explaining what the expense is

10  for is required who, if anyone, at Adidas is required to

11  request it?

12  A.  The budget owner, Jim Gatto.

13  Q.  Ms. Harksen, at the time that you signed this invoice,

14  what, if anything, did you know about a scheme to use Adidas

15  money to pay the family of a student-athlete named Brian Bowen?

16          MR. MOORE:  Objection.

17          THE COURT:  Overruled.

18  A.  I had no knowledge.

19  Q.  Had you received an invoice that indicated that a payment

20  was intended to be given to the family of a student-athlete in

21  connection with his decision to attend an Adidas-sponsored

22  school, would you have signed it?

23  A.  No.

24  Q.  What, if anything, would you have done?

25  A.  I most likely would have escalated it to my manager.

1   Q.  Why?

2   A.  Because I recognize that it's a violation of NCAA

3   regulation and Adidas policy.

4   Q.  In preparation for your testimony today, have you reviewed

5   other invoices paid by Adidas to the Karolina Khaos?

6   A.  Yes.

7           MR. DISKANT:  Ms. Lee, if we can bring up for the

8   witness only what has been marked for identification as

9   Government Exhibit 1004.

10  Q.  Ms. Harksen, do you recognize this document?

11  A.  Yes.

12  Q.  Is this another invoice submitted to Adidas by the Karolina

13  Khaos?

14  A.  It is.

15          MR. DISKANT:  The government offers 1004.

16          MR. MOORE:  No objection.

17          THE COURT:  Received.

18          (Government's Exhibit 1004 received in evidence)

19          MR. DISKANT:  At this time, the government would like

20  to play a portion of a call, which is Government Exhibit 12,

21  and offer as an aid to the jury Government Exhibit 12T, which

22  the jurors should have in their binders.

23          THE COURT:  Is this in evidence?

24          MR. DISKANT:  I am offering it.

25          MR. MOORE:  No objection.

1    THE COURT:  Received.

2    (Government's Exhibits 12 and 12T received in

3    evidence)

4    THE COURT:  Members of the jury, turn to Government

5    Exhibit 12T, please.

6    If we can go back to page 1.

7    This is a September 13, 2017 call between Merl Code

8    and James Gatto.

9    Go ahead, Ms. Lee.

10   (Audio played)

11   MR. DISKANT:  I believe there is a second clip, which

12   begins at page 15 of the transcript.

13   (Audio played)

14   MR. DISKANT:  Ms. Lee, if we can publish what is in

15   evidence as Government Exhibits 1088 and 1090, just next to

16   each other.

17   1088 is an e-mail the next day, Thursday, September

18   14, from Merl Code to James Gatto.  "Jim, per our discussion, I

19   am sending over the invoice requested for submission and

20   processing."

21   Ms. Lee, can you go to the next page?

22   It is an invoice from Karolina Khaos, $25,000,

23   November travel team expenses.

24   Then on the right is Jim Gatto to Olivia Guidera.

25   Q.  Ms. Harksen, focusing on the invoice on the left of your

1    screen, was that invoice paid?

2    A.  Yes, it was.

3    Q.  In addition to the two invoices we have already looked at

4    together from the Karolina Khaos, did Adidas make any other

5    payments to that particular organization?

6    A.  Yes.

7             MR. DISKANT:  Ms. Lee, if we can bring up for the

8    witness only what has been marked for identification as

9    Government Exhibit 1160.

10   Q.  Ms. Harksen, do you recognize this document?

11   A.  Yes.

12   Q.  Is this another invoice from the same organization to Jim

13   Gatto at Adidas?

14   A.  Correct.

15            MR. DISKANT:  The government offers 1160.

16            THE COURT:  Received.

17            (Government's Exhibit 1160 received in evidence)

18            MR. DISKANT:  If we can just briefly publish that,

19   Ms. Lee.

20   Q.  Last question on this organization.

21            MR. DISKANT:  If we can bring up for the witness only

22   what has been marked for identification as Government Exhibit

23   3004.

24   Q.  Ms. Harksen, do you recognize this particular chart?

25   A.  Yes.

1    Q.  Does it reflect certain payments made by Adidas to the

2    Karolina Khaos organization that we have been talking about

3    this afternoon?

4    A.  Yes.

5    Q.  Is it based on the underlying documents that we have been

6    looking at?

7    A.  Yes.

8    Q.  Does it fairly and accurately summarize those?

9    A.  Yes.

10            MR. DISKANT:  The government offers 3004.

11            THE COURT:  Received.

12            (Government's Exhibit 3004 received in evidence)

13            MR. DISKANT:  Ms. Lee, if we can publish, please.

14   Q.  So, Ms. Harksen, just starting on the left, there is a GX

15   number, the government exhibit number, and next to that is the

16   payee.

17            The payee for these is the Karolina Khaos?

18   A.  Yes.

19   Q.  Then there is an invoice date and an amount, and there is a

20   description header.  Where does the information for the

21   description header come from?

22   A.  It comes from the invoice.

23   Q.  Then, finally, there is an approver budget manager.  Who is

24   the approver budget manager for these invoices?

25   A.  Jim Gatto.

1  Q.  Ms. Harksen, you told us that you and your staff sometimes

2  have a role in reviewing invoices.  Does a finance person

3  always review and sign off on an invoice?

4  A.  No, not always.

5  Q.  To the extent that you were involved in some of these, for

6  example, we looked at together the second one, is that

7  reflected on this particular chart?

8  A.  No, it's not.

9  Q.  Just remind us, to the extent you were involved, would you

10 have had any knowledge of or involvement in verifying what the

11 payment was for?

12 A.  No.

13 Q.  Who would have done that?

14 A.  The budget manager, or Jim Gatto in this case.

15 Q.  Switching gears, we looked at an e-mail just a moment ago

16 involving someone named Merl Code.

17         Are you familiar with that name?

18 A.  Yes.

19 Q.  How are you familiar with it?

20 A.  It's someone that, or a person that Adidas has paid.

21 Q.  In preparation for your testimony today, have you reviewed

22 certain invoices and e-mails regarding invoices from him or

23 payments to him?

24 A.  Yes.

25 Q.  Do those include what has have been marked for

1    identification as Government Exhibits 1148, 1150, 1152, 1154,

2    1158, 1048, 1008, 1010 and 1162?

3    A.  Yes.

4            MR. DISKANT:  The government offers those exhibits.

5            THE COURT:  Received.

6            (Government's Exhibits 1148, 1150, 1152, 1154, 1158,

7    1048, 1008, 1010 and 1162 received in evidence)

8            MR. DISKANT:  With the Court's permission, if we can

9    publish what was just admitted as 1008.

10           THE COURT:  Yes.

11   Q.  Ms. Harksen, this is an invoice from Merl Code to Jim

12   Gatto, Adidas basketball, dated January 3, 2017, $50,000

13   consulting fee and $25,000 travel expenses.  Do you see that?

14   A.  Yes.

15           MR. DISKANT:  Ms. Lee, if we can turn to the second

16   page of the exhibit.

17   Q.  Who approved this particular invoice as the budget manager?

18   A.  Jim Gatto.

19           MR. DISKANT:  Ms. Lee, if we can bring up for the

20   witness only what has been marked for identification as

21   Government Exhibit 3005.

22   Q.  Ms. Harksen, do you recognize this chart?

23   A.  Yes.

24   Q.  Is it a chart of certain invoices submitted by and payments

25   made to Merl Code by Adidas?

1   A.  Yes.

2   Q.  Is it based on the various exhibits that we just

3   introduced?

4   A.  It is.

5   Q.  Does it fairly and accurately summarize the information

6   contained in those records?

7   A.  It does.

8           MR. DISKANT:  The government offers 3005.

9           MR. MOORE:  Your Honor, can we approach, please?

10          THE COURT:  Yes.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. MOORE:  I don't see how this is an appropriate

3     summary chart under Rule 1006.  These aren't voluminous

4     writings.  This is all evidence that is being admitted through

5     exhibits.  So if Mr. Diskant wants to admit the evidence and

6     then summarize it for the jury in the form of a chart.  There

7     is a case called *United States v. Whitehead*, a Fifth Circuit

8     case, which says that you should not allow summary charts in to

9     summarize the evidence that has already been admitted because

10    the true purpose behind the rule is to summarize truly

11    voluminous documents.  This isn't a voluminous document, Judge.

12    This is eight or nine invoices.

13         THE COURT:  This is the Second Circuit.

14         MR. MOORE:  I will look for a Second Circuit case,

15    Judge.

16         THE COURT:  It's coming in.  Overruled.

17         (Continued on next page)

18

19

20

21

22

23

24

25

1   (In open court)

2   THE COURT:  3005 is received.

3   (Government's Exhibit 3005 received in evidence)

4   BY MR. DISKANT:

5   Q.  Ms. Harksen, this is a chart of certain payments from

6   Adidas to Merl Code?

7   A.  Correct.

8   Q.  Starting over on the left, the payee for all of these is

9   Merl Code?

10  A.  Yes.

11  Q.  Then there is an invoice date, and an amount, and a

12  description.  And again, remind us, where is the description

13  coming from?

14  A.  It comes from the invoice.

15  Q.  And then, finally, over to the far right, there is the

16  approver and budget manager.  Do you see that?

17  A.  Yes.

18  Q.  A couple of questions about that.

19          If you look down, for example, at the second to last

20  entry, Government Exhibit 1010, which is I think the document

21  we were just looking at, there are multiple names listed in the

22  approver and budget manager category.  Do you see that?

23  A.  Yes.

24  Q.  Jim Gatto, Chris McGuire, and someone named Zion Armstrong.

25  Who is Mr. Armstrong?

1  A.  Currently he is the president of Adidas North America.

2  Q.  Do you have an understanding of why certain of these

3  invoices are approved only by Jim Gatto and certain are

4  approved by additional people?

5  A.  I don't.

6  Q.  Additionally, we have talked about the fact that you and

7  your staff, or the finance staff generally, may have some role

8  in approving invoices, correct?

9  A.  Yes.

10  Q.  Is that reflected on this particular chart?

11  A.  No.

12  Q.  If we can go back for just a minute to Government Exhibit

13  3004.

14      Ms. Harksen, when we were talking about the Karolina

15  Khaos just a moment ago, I meant to ask, as part of your job

16  responsibilities, do you have access to contracts between

17  Adidas and its AAU or grassroots programs?

18  A.  I do.

19  Q.  In preparation for your testimony today, was a search

20  conducted of Adidas records for a contract between Adidas and

21  the Karolina Khaos?

22  A.  Yes.

23  Q.  Does any such contract exist?

24  A.  No.

25  Q.  Let's switch gears and talk about the New England Playaz,

1    the team that we were looking at just a few moments ago.

2             Pursuant to the terms of the contract that we were

3    looking at --

4             MR. DISKANT:  Maybe, Ms. Lee, if you could help us by

5    bringing back up what is in evidence as Government Exhibit

6    1145.

7    Q.  Pursuant to the terms of the contract, approximately how

8    much money was the New England Playaz to receive on an annual

9    basis from Adidas?

10   A.  I believe this year it was -- or in the year of the

11   contract here, it was $70,000.

12   Q.  Take a look at paragraph 2.

13   A.  That's the team merchandise allotment.

14   Q.  I'm sorry.  Take a look at the second page.

15            The travel allotment, you were absolutely right,

16   $70,000?

17   A.  Yes.

18   Q.  In preparation for your testimony today, have you reviewed

19   various payments made by Adidas to the New England Playaz?

20   A.  Yes.

21   Q.  And there should be in front of you a stack of documents

22   that include Government Exhibits 1130, 1132, 1134, 1014, 1016,

23   1018, 1019, 1021, 1023, 1025, 1027, 1029, 1032, 1038, 1040,

24   1043, and 1046.

25            Are these all documents that pertain to payments made

1   by Adidas to the New England Playaz?

2   A.  Yes.

3           MR. DISKANT:  The government would offer those

4   exhibits.

5           THE COURT:  They are received.

6           (Government's Exhibits 1130, 1132, 1134, 1014, 1016,

7   1018, 1019, 1021, 1023, 1025, 1027, 1029, 1032, 1038, 1040,

8   1043, and 1046 received in evidence)

9           MR. DISKANT:  If we can then publish, Ms. Lee,

10  Government Exhibit 1023, starting with the second page.

11  Q.  Ms. Harksen, this is an invoice from Thomas Gassnola, New

12  England Playaz, to Adidas, October 15, 2016, for $50,000.

13          Do you see that?

14  A.  Yes.

15  Q.  Do you have any idea what a basketball team tournaments fee

16  is?

17  A.  I do not.

18  Q.  In the ordinary course of your work, would you have any

19  involvement in knowing that?

20  A.  No.

21          MR. DISKANT:  Ms. Lee, if we can go to the first page.

22  Q.  Who approved this particular invoice as a business manager?

23  A.  Jim Gatto.

24          MR. DISKANT:  Ms. Lee, if we can bring up what is in

25  evidence as Government Exhibit 1134.

1          This has got a whole bunch of payments on it, but if

2    we could blow up perhaps the very first line.

3    Q.   It's a little hard to read, but the contract says

4    "Gassnola, TJ, New England Playaz" over on the left.  Do you

5    see that?

6    A.   Yes.

7    Q.   Then there is a manager listed.  Who is that?

8    A.   Jim Gatto.

9    Q.   And some initials or writing next to it?

10   A.   Yes.

11   Q.   Down at the bottom of the page, there are a couple of other

12   signatures.  Can you see those?

13   A.   I can.

14   Q.   Starting with the one furthest to the right, do you

15   recognize the signature?

16   A.   Yes.

17   Q.   Whose is that?

18   A.   That's Chris McGuire's.

19   Q.   The same Chris McGuire that we have been talking about?

20   A.   Yes.

21   Q.   And all the way over to the left, whose signature is that?

22   A.   That one is mine.

23   Q.   What, if anything, would you have done before signing this

24   document?

25   A.   I would have made sure that the business manager or budget

1    owner has signed the payment, that there is a valid budget

2    code, the contract is set in force, there is a vendor number.

3    Q.  Any review of the underlying cost or expense?

4    A.  No.

5            MR. DISKANT:  Ms. Lee, if we can publish what was just

6    admitted as Government Exhibit 1029.  And turn to the second

7    page.

8    Q.  This is a January 4, 2017 invoice from Thomas Gassnola, New

9    England Playaz, to Adidas, for $90,000, 2017, first quarter

10   consultant fee and T&E for first quarter 2017.

11           Turning back to the first page, which budget manager

12   approved this particular invoice?

13   A.  Jim Gatto.

14   Q.  Finally, if we can look at Government Exhibit 1040.  An

15   invoice dated May 1, 2017, from Thomas Gassnola, New England

16   Playaz, to Jim Gatto, $70,000, tournament activation fee.

17           Who approved this invoice?

18   A.  I don't see a signature here.

19           MR. DISKANT:  Can we turn to the next page, Ms. Lee?

20   A.  Jim Gatto.

21           MR. DISKANT:  If we can bring up for the witness only

22   what has been marked for identification as Government Exhibit

23   3002.

24   Q.  Ms. Harksen, is this a chart summarizing certain payments

25   made by Adidas to the New England Playaz organization?

1    A.  Yes.

2    Q.  Is it based on the various exhibits that we just offered a

3    moment ago?

4    A.  Correct.

5    Q.  Does it fairly and accurately summarize the information in

6    those exhibits.

7    A.  Yes.

8            MR. DISKANT:  The government offers 3002.

9            THE COURT:  Received.

10           (Government's Exhibit 3002 received in evidence)

11           MR. DISKANT:  Ms. Lee, if we can publish that.

12   Q.  Ms. Harksen, looking at this now, the payee for all of

13   these particular invoices was the New England Playaz?

14   A.  Correct.

15   Q.  We have got the invoice dates and the amounts, the

16   description.  Does this also come from the invoices?

17   A.  Yes.

18   Q.  And then, finally, over on the approver budget manager,

19   there an entry for that as well?

20   A.  Correct.

21   Q.  Once again, Ms. Harksen, you and your staff, the finance

22   staff, are they always involved in a sign-off?

23   A.  Not necessarily.

24   Q.  To the extent you or your staff was involved in signing off

25   on any of these invoices, is that particular information

1  included in this chart?

2  A.  No.

3  Q.  And the total amount paid between January 2016 and August

4  2017, at least on these invoices, is approximately $761,810?

5  A.  Yes.

6  Q.  Remind us, how much under the terms of the contract was the

7  New England Playaz supposed to receive on an annual basis?

8  A.  70,000.

9  Q.  In addition to the New England Playaz, did Adidas make any

10  payments directly to the Thomas or TJ Gassnola that we have

11  seen on a couple of these documents?

12  A.  Yes.

13  Q.  In preparation for your testimony today, have you reviewed

14  certain documents and records relevant to those payments?

15  A.  Yes.

16  Q.  Do those include Government Exhibits 1110, 1112, 1114,

17  1116, 1118, 1120, 1124, 1126 and 1128?

18  A.  Yes.

19        MR. DISKANT:  The government would offer those

20  exhibits.

21        THE COURT:  I hope I don't have to repeat them back

22  from memory.

23        They are received.

24        (Government's Exhibits 1110, 1112, 1114, 1116, 1118,

25  1120, 1124, 1126 and 1128 received in evidence)

IAF8GAT3                    Harksen - Direct

1          MR. DISKANT:  For the sake of brevity, if we can go

2     straight, for the witness, to what has been marked for

3     identification as Government Exhibit 3003.

4     Q.  Ms. Harksen, do you recognize this chart?

5     A.  Yes.

6     Q.  Is it a chart of certain payments made by Adidas to Thomas

7     Gassnola?

8     A.  Yes.

9     Q.  Is it based on the exhibits that were just admitted?

10    A.  Yes.

11    Q.  Does it fairly and accurately summarize their contents?

12    A.  It does.

13          MR. DISKANT:  The government offers 3003.

14          THE COURT:  Received.

15          (Government's Exhibit 3003 received in evidence)

16    Q.  Ms. Harksen, just to confirm, these are payments made in

17    addition to the payments to the New England Playaz?

18    A.  Correct.

19    Q.  And the payee for these is Thomas Gassnola personally?

20    A.  Yes.

21    Q.  And there is an invoice date, correct?

22    A.  Yes.

23    Q.  And an amount?

24    A.  Correct.

25    Q.  What is the total amount for these particular invoices?

1   A.  $239,521.67.

2   Q.  Then there is a description that comes from the invoice?

3   A.  Yes.

4   Q.  And then, finally, there is an approver or budget manager

5   listed to the right?

6   A.  Yes.

7   Q.  Who is the approver or budget manager for all of these?

8   A.  Jim Gatto.

9   Q.  Finally, to the extent you or your staff or someone on the

10  finance side was involved in a sign-off, is that reflected in

11  this chart?

12  A.  No.

13  Q.  Ms. Harksen, in the ordinary course of your job

14  responsibilities, do you have access to consulting agreements

15  and contracts?

16  A.  Yes.

17  Q.  In advance of your testimony today, was a search conducted

18  of Adidas records for a consulting agreement between Adidas and

19  Thomas or TJ Gassnola?

20  A.  Yes.

21  Q.  Does a written agreement exist?

22  A.  No.

23          MR. DISKANT:  Your Honor, may I have just a moment?

24          THE COURT:  Yes.

25          MR. DISKANT:  Nothing further.

1       THE COURT:  Thank you.

2       Cross-examination.

3       MR. SCHACHTER:  Thank you, your Honor.

4  CROSS-EXAMINATION

5  BY MR. SCHACHTER:

6  Q.  Good afternoon, Ms. Harksen.

7  A.  Hi.

8  Q.  Mr. Diskant asked you about Mr. Gatto's title.  Do you

9  remember that question?

10 A.  Yes.

11 Q.  Are there different levels of seniority at Adidas?

12 A.  There are.

13 Q.  What are those levels -- I should ask you, is there sort of

14 a classification system to designate employees according to

15 their level of responsibility?

16 A.  Yes.

17 Q.  Can you describe that to the jury?

18 A.  There's P level, which is kind of our entry level

19 positions; M level, which are managerial; and S level, which

20 are senior executives.

21 Q.  Mr. Gatto is not a senior executive at Adidas, is he?

22 A.  Correct.

23 Q.  He is in the M level, is that correct?

24 A.  Yes.

25 Q.  Is that the same level as you?

1    A.  Yes.

2    Q.  Mr. Gatto is still employed at Adidas, is that correct?

3    A.  Yeah.  My understanding is he is on leave.

4    Q.  Are you familiar with an Adidas employee named Michael

5    Ladinig?

6    A.  I know the name.

7    Q.  What was his role at Adidas in 2017?

8    A.  I believe he was the senior director of global sports

9    marketing basketball.

10   Q.  Do you know if he was Mr. Gatto's boss?

11   A.  Yes, I believe he was.

12   Q.  Even Mr. Ladinig, was he a senior executive at Adidas?

13   A.  No.

14   Q.  Did Mr. Ladinig report to a man named Kris Aman?

15   A.  Yes.

16          MR. DISKANT:  Objection.  Relevance.

17          THE COURT:  That horse is out of the barn.

18          Next question.

19   Q.  Was Mr. Aman in charge of basketball at Adidas?

20   A.  Yes, global basketball.

21   Q.  He would be considered a senior executive at Adidas, is

22   that correct?

23          THE COURT:  Sustained as to form at least.

24   Q.  In those three tiers that you described, is he an S level?

25   A.  Yes.

1    Q.  Can you please describe for the jury the compensation

2    system at Adidas?

3              MR. DISKANT:  Objection.

4              THE COURT:  Sustained.

5    Q.  The government showed you a number of invoices that Mr.

6    Gatto asked be paid.  Do you recall that?

7    A.  Yes.

8    Q.  Was there a particular sports marketing budget that Jim

9    Gatto managed?

10   A.  Yes.

11   Q.  Did Jim Gatto decide the size of those budgets that he

12   managed?

13   A.  No.

14   Q.  Within those budgets, were there both contractual line

15   items as well as discretionary line items?

16   A.  Yes.

17   Q.  Can you explain the difference?

18   A.  Contractual would be those that were under contract with

19   Adidas, and discretionary would be a more flexible spend.

20   Q.  And Mr. Gatto's budget had both a contractual portion of

21   it, but also a discretionary or flex portion, is that correct?

22   A.  Yes.

23   Q.  And what authority did Mr. Gatto have to charge expenses

24   against the discretionary or the flex portion of his budget?

25   A.  My understanding is he had the discretion.

1   Q.   I am going to show you now --

2              MR. SCHACHTER:   May I approach, your Honor?

3              If I may have just one moment.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. SCHACHTER:  Your Honor, I would like to offer by

2     stipulation as business records of Adidas, Government

3     Exhibits 1140, 1139 and 1164.

4          THE COURT:  Is there any objection?

5          MR. DISKANT:  I don't think there is.

6          No objection.

7          THE COURT:  Received.

8          (Government's Exhibits 1139, 1140 and 1164 received in

9     evidence)

10          MR. SCHACHTER:  Your Honor, may I publish Government

11     Exhibit 1140?

12          THE COURT:  Yes.

13     Q.  Ms. Harksen, as an M level employee of Adidas, do you get a

14     letter that looks a lot like this each year?

15     A.  Yes.

16     Q.  Can you describe just in very general terms what is this

17     kind of letter you receive each year that looks like this?

18          THE COURT:  I think it's perfectly obvious.

19     Q.  I want you to explain some of the words on this page that

20     are not otherwise obvious.  Just to situate the jury, there's a

21     portion in the middle that identifies what the annual salary

22     is, is that correct?

23     A.  Correct.

24     Q.  So in this circumstance, it shows Mr. Gatto's salary was

25     $130,506 with a two percent increase over last year, is that

1   correct?

2   A.   Correct.

3   Q.   Then it also shows his bonus, is that correct?

4           THE COURT:  Mr. Schacter, this is perfectly obvious.

5           MR. SCHACHTER:  I was getting to the part that's not.

6           THE COURT:  Everyone knows what his salary is.

7           MR. SCHACHTER:  Sorry, your Honor.

8   Q.   Do you see where it says "good performance" in the middle?

9   A.   Yes.

10  Q.   Are there different levels of performance ratings at

11  Adidas, and if so, could you explain what those categories are?

12  A.   There are.  They range from minimal, fair, good, strong,

13  excellent.

14  Q.   And then do you see where it says that right below where it

15  says good performance for Mr. Gatto, it identifies target one,

16  30 percent Adidas group result, and then it says target two,

17  global Adidas brand objectives, do you see that?

18  A.   Yes.

19  Q.   Can you just explain to the jury what those terms mean,

20  which I think are not obvious?

21  A.   That's just the business performance, the results of their

22  target achievement.

23  Q.   When you say "the business," what do you mean?

24  A.   Adidas.

25  Q.   Adidas like the global company?

IAFTGAT4                    Harksen - Cross

1    A.  Yes.

2    Q.  And that's which one, that's the Adidas group or the global

3    Adidas brand?

4    A.  I'm not sure entirely.

5    Q.  So part of it is 30 percent and part of it is 70 percent?

6    A.  Right.

7    Q.  So part of it is based and how Adidas does globally, is

8    that right?

9    A.  Yes.

10   Q.  Then what's the other part of it?

11   A.  The personal performance.

12   Q.  And how about the Adidas -- what's the difference between

13   Adidas group and Adidas brand?

14   A.  I'm not sure.

15   Q.  Is one piece of that the basketball business?

16          MR. DISKANT:  Objection.

17          THE COURT:  Sustained.

18   Q.  Could you describe in general terms how bonuses are

19   calculated at Adidas, how your bonus is calculated at Adidas?

20          MR. DISKANT:  Your Honor --

21          THE COURT:  Sustained.  It's beyond the scope, it's

22   irrelevant.  Move on, please.

23          MR. SCHACHTER:  May I have just a moment?

24          I have no further questions, your Honor.

25          THE COURT:  Mr. Moore.

1      MR. MOORE:  Yes, your Honor.

2    CROSS-EXAMINATION

3    BY MR. MOORE:

4    Q.  Now Ms. Harksen, you mentioned the name Merl code, is that

5    right?

6    A.  Yes.

7    Q.  And you know that Merl Code was employed was a consultant

8    for Adidas, correct?

9    A.  That's my understanding.

10   Q.  And you're aware that Merl Code had signed consulting

11   agreements with Adidas, correct?

12   A.  I'm not sure on that, no.

13   Q.  Because the government didn't ask you to search for those,

14   is that right?

15        MR. DISKANT:  Objection.

16        THE COURT:  Sustained.

17   Q.  Well, let me rephrase it.  Did the government ask you to

18   search for any signed consulting agreements with Merl Code?

19        MR. DISKANT:  Objection.

20        THE COURT:  Sustained.

21   Q.  Do you know if Adidas provided 1099s to Merl Code?

22   A.  I don't know.

23   Q.  You don't know?

24   A.  No.

25   Q.  Would Adidas provide a 1099 to someone they didn't have a

1    signed consulting agreement with, if you know?

2              THE COURT:  Sustained.

3    Q.  Now with respect to these questions about teams,

4    Ms. Harksen, are you aware that all silver division teams are

5    not under contract, like for example, Karolina Khaos might not

6    be under contract with Adidas?  Are you familiar with that at

7    all?

8              MR. DISKANT:  I don't even understand that question.

9              THE COURT:  Sustained.

10             MR. MOORE:  I will rephrase, your Honor, because she

11   was asked some questions --

12             THE COURT:  Just put another question if you wish to

13   do so.

14             MR. MOORE:  Yes, sir.

15   BY MR. MOORE:

16   Q.  Do you know what triggers a team signing a contract with

17   Adidas, of your own personal knowledge, Ms. Harksen?

18   A.  I don't.

19   Q.  And are you aware that Adidas makes payments to some teams

20   that don't have formal contracts with it?  Are you aware of

21   that?

22   A.  Yes.

23   Q.  And so just because a team doesn't have a contract with

24   Adidas doesn't mean that there is anything improper about that

25   relationship, correct or incorrect?

1   MR. DISKANT:  Objection.

2   THE COURT:  Pardon me?

3   MR. DISKANT:  Objection.

4   THE COURT:  Overruled.

5   A.  Sorry, can you repeat the question?

6   Q.  Yes, ma'am.  Just because a travel team doesn't have a

7   signed agreement with Adidas but receives payments, that

8   doesn't mean that there's anything improper going on, correct?

9   A.  Correct.

10   MR. MOORE:  Thank you.

11   THE COURT:  Thank you.

12   Mr. Haney?

13   MR. HANEY:  No, your Honor.

14   THE COURT:  Thank you.

15   Any redirect?

16   MR. DISKANT:  No, your Honor, thank you.

17   THE COURT:  Thank you, Ms. Harksen, you're excused.

18   And we'll take our afternoon break now.

19   (Recess taken)

20   (Continued on next page)

21

22

23

24

25

1       (Jury not present)

2               THE COURT:  Before we bring the jury, I would like

3    some indication from counsel about the time for summations.

4               MR. DISKANT:  Your Honor, I believe the

5    government's -- I think Mr. Solowiejczyk is still in the

6    bathroom, but I believe his closing will be approximately two

7    hours.

8               THE COURT:  Including any rebuttal?

9               MR. DISKANT:  No, there will then be a separate

10   rebuttal.

11              THE COURT:  Mr. Schacter?

12              MR. SCHACHTER:  I think an hour 20, your Honor.

13              THE COURT:  An hour 20.  Thank you.

14              Mr. Moore?

15              MR. MOORE:  I think Mr. Code is going to be about an

16   hour 20 as well.

17              THE COURT:  Mr. Haney?

18              MR. HANEY:  I would be about that time, your Honor,

19   maybe a little less.

20              THE COURT:  So we're over a full day if I allow that.

21              MR. DISKANT:  Yes, your Honor.  I think I would expect

22   my rebuttal would be under an hour, but if there are three

23   defense summations --

24              THE COURT:  Okay.  Let's get the jury, Andy.

25              MR. DISKANT:  Before that, your Honor, I wanted to

 1  raise very briefly, we were about to offer three text chains

 2  that I understand Mr. Moore has an objection to.

 3          THE COURT:  Audibility is a problem here.

 4          MR. DISKANT:  Sorry.  I'm handing up three text chains

 5  that I understand Mr. Moore has an objection to.

 6          THE COURT:  I have them.  What's the problem?

 7          MR. MOORE:  Your Honor, I have a concern about

 8  relevance and I have a concern about 403.  I'm less concerned

 9  about 102S-13, frankly.

10          THE COURT:  You're less concerned?

11          MR. MOORE:  I'm less concerned about 102S-13 than I am

12  about the other two.  With respect to 102S-15, I know that

13  Mr. Diskant has a theory as to exactly what this is about, but

14  there's a word in here that says Vincent King, and I will get

15  birthday, so I don't agree with Mr. Diskant that his theory as

16  to what this particular text chain is about is correct.

17          And I also have a concerns, the same, about how the

18  government can tie in 104J with actual evidence and not just

19  conjecture.

20          THE COURT:  Okay.  Mr. Diskant?

21          MR. DISKANT:  So taking them in order, 102S-13 is a

22  text that follows --

23          THE COURT:  I take it "I don't have much of a problem

24  with that" means he has no problem with that.

25          MR. DISKANT:  Understood.

1          MR. MOORE:  That's correct, your Honor.  I withdraw

2     the objection to that one.

3          THE COURT:  Okay.

4          MR. DISKANT:  102S-15 bears directly on the next

5     witness's testimony.  We expect testimony and bank records will

6     show that on or about August 1st of 2017 Mr. Code caused his

7     AAU team, the Karolina Khaos, to transfer money from its

8     account to Mr. Dawkins' Loyd Inc. account, and we believe the

9     first two text messages are directly relevant to that.  We're

10    happy to redact the rest of this chain, if that's the concern.

11         MR. MOORE:  If Mr. Diskant agrees to redact the rest

12    of the chain, then I have no objection.

13         THE COURT:  That takes care of that.

14         MR. DISKANT:  Great.  And then the final one is

15    between Mr. Code and Mr. Rivers, and I think there's been a lot

16    of testimony about Mr. Rivers at this trial already.  It's

17    really the last testimony chain that we care the most about.

18    We already elicited testimony that Mr. code had multiple phones

19    on him at the time of his arrest, and he refers to one of them

20    as his bat phone in his last text to Chris Rivers.

21         MR. MOORE:  I think there was some testimony that

22    Mr. Code had another phone that the government did not seek to

23    tap.  As my recollection, that's been the sole mention of

24    Mr. Code having another phone.  There's been no testimony about

25    him using the phone for any sort of purpose that is related to

1    the charges in this case, and so I have an objection to that

2    comment.  I think it is taken out of context.  The government

3    has chosen not to call Chris Rivers.

4            THE COURT:  But the sender of this message is

5    Mr. Code, right?

6            MR. MOORE:  It says I dropped my phone and cracked the

7    screen, so I'm hitting you up from the bat phone.

8            THE COURT:  And the person who wrote those words or

9    typed them or whatever you call it, was your client.

10           MR. MOORE:  Yes, sir, your Honor, but again there's no

11   evidence that that phone, the bat phone, if you will, was used

12   for any purpose related to the facts of this particular case.

13           Hitting someone up from another phone --

14           THE COURT:  But it doesn't say I'll call you on

15   another phone, I'm hitting you from the bat phone.

16           MR. MOORE:  That's correct, your Honor.  That

17   euphemistic term of bat phone could mean a variety of things to

18   a variety of people.

19           THE COURT:  Certainly means Android to me, right?  Are

20   you kidding me?

21           MR. MOORE:  I know what it means to Brian Bowen.  I

22   referred to bat phones before myself, but not in this context

23   because I don't carry a secret phone that I didn't disclose to

24   other people.  And there's been no testimony that Mr. Code had

25   anything other than perhaps a personal phone that he used for

1    personal business.

2              THE COURT:  Okay.

3              MR. DISKANT:  If it helps, your Honor, I think we're

4    about, through the next witness, to offer some text from both

5    phones, and that may further solidify the relevance of the bat

6    phone.

7              THE COURT:  I won't rule for the moment on 104J, but

8    the others I will overrule the objection and receive them.

9              MR. MOORE:  Understood, your Honor.

10             THE COURT:  But you need to offer them.  Get the jury.

11             I'm anticipating that you're likely to finish this

12   witness before today.

13             MR. MOORE:  Yes, he flew in from South Carolina.  We

14   would like to get him on his flight home.

15             THE COURT:  He's fluent in South Carolina, just like

16   Mr. Moore?

17             I wish I could say that.

18             MR. MOORE:  Well, you can, Judge, you can always say

19   it.

20             THE COURT:  You can always say it, but not for the

21   truth of the matter asserted.

22             (Continued on next page)

23

24

25

1          (Jury present)

2          THE COURT:  Jurors are present, the defendants are

3    present.  Next witness for the government.

4          MR. DISKANT:  Your Honor, before calling our next

5    witness, the government would offer Government Exhibits 302-A,

6    through 302-E, which are certain bank records pertaining to

7    account maintained in the name of Loyd, Inc.

8          THE COURT:  Received.

9          (Government's Exhibits 302-A through 302-E received in

10   evidence)

11         MR. DISKANT:  The government would like to offer and

12   read a stipulation, which is S4, between the parties.

13         If called as a witness at the trial, a Bank of America

14   Corporation employee would testify that, among other services,

15   Bank of America allows customers who maintain accounts there to

16   send and receive money wire transfers.  Bank of America accepts

17   and sends certain money wire transfers on behalf of its

18   customers via Fedwire, a realtime transfer system operated by

19   the United States Federal Reserve Bank, which allows financial

20   institutions like Bank of America to electronically transfer

21   funds amongst each other.  Any money wire transfers that are

22   sent via Fedwire two or from Bank of America accounts must

23   travel through Bank of America's Federal Reserve Bank account

24   at the Federal Bank Reserve Bank of New York located in New

25   York, New York before reaching their ultimate destinations.

1   This has been the case since at least January 1st, 2011.

2           Government Exhibit 306E, which reflects a money

3   transfer sent from Berkshire Bank Corp. to Bank of America on

4   or about September 11, 2017 traveled through Bank of America's

5   Federal Reserve Bank account at the Federal Reserve Bank of New

6   York located in New York, New York before being deposited into

7   a Bank of America customer account.

8           And Government Exhibit 528, which reflects a money

9   wire transfer sent from Berkshire Bank Corp. to Bank of America

10  on or about August 22nd, 2017, traveled through Bank of

11  America's Federal Reserve Bank account at the Federal Reserve

12  Bank of New York located in New York, New York before being

13  deposited into a Bank of America customer account.

14          It is further stipulated that this exhibit, which is

15  S4, may be received, and we offer it at this time.

16          THE COURT:  Government Exhibit S4 is received.

17          (Government's Exhibit S4 received in evidence)

18          MR. DISKANT:  One additional stipulation between the

19  parties, which has been marked S8:

20          On June 15, 2017, the NCAA Division One Committee on

21  Infractions, which is known as the COI, found that on twelve

22  occasions, between approximately 2010 until approximately 2014,

23  the former director of basketball operations for the University

24  of Louisville men's basketball team committed NCAA recruiting

25  violations.  The COI further determined that through this

1   conduct the University of Louisville had committed level one

2   aggravated violations, i.e., ones which seriously undermine or

3   threaten the integrity of NCAA collegiate model because

4   provided or intended to provide a substantial or extensive

5   recruiting advantage.

6           The COI did not find that any other university

7   employee, including any basketball coach, was aware of or

8   involved in the aforementioned recruiting violations.  The COI

9   determined that Louisville's head men's basketball coach, Rick

10  Pitino, failed to rebut the presumption that he was responsible

11  for the actions of the former director of basketball operations

12  who had engaged in the recruiting violations.  Thus, the NCAA

13  found Coach Pitino had also committed a level one violation for

14  his failure to supervise the former director of basketball

15  operations.  The University of Louisville took no employment

16  action with respect to Coach Pitino because neither the

17  university nor the COI found that Coach Pitino was personally

18  aware of or involved in the activities giving rise to the

19  violations.

20          Prior to the COI's decision and upon learning of the

21  misconduct, the University of Louisville took several remedial

22  actions, including, A, withholding the men's basketball team

23  from post-season competition for the 2015/2016 season, B,

24  reducing by two the number of scholarships awarded in men's

25  basketball, one in 2017/2018 and one 2018/2019, C, reducing by

1  30 the number of days in which the men's basketball staff may

2  recruit, and D, reducing official visits in men's basketball by

3  two, one in 2016/2017 and one in 2017/2018.

4          On June 15, 2017, the COI imposed additional

5  penalties, including four years probation, a $5,000 fine, the

6  return of monies received from certain revenue sharing from

7  Louisville's appearance in NCAA tournament, which totaled

8  approximately $500,000 and the reduction in number of

9  scholarships available for men's basketball by a total of four

10  over the four years of probation.

11          Finally, because the COI determined the recruiting

12  violations occurred with respect to certain prospective and/or

13  current student athletes, and that some of those students

14  therefore competed while ineligible, the University of

15  Louisville was required to vacate all wins in which those

16  ineligible student athletes competed, which included forfeiture

17  of the 2013 NCAA Division One Men's Basketball Championship.

18          And finally it is agreed that this exhibit, which is

19  S8, may be received into evidence.  The government would offer

20  S8.

21          THE COURT:  Government Exhibit S8 is received in

22  evidence.

23          (Government's Exhibit S8 received in evidence)

24          THE COURT:  Ladies and gentlemen, that stipulation is

25  an agreement between the parties that those are the facts

1    recited therein.  Please give my deputy a copy for me.

2            Next witness.

3            MR. DISKANT:  Finally, and more quickly, before this

4    witness the government would finally offer a series of text

5    messages between Christian Dawkins and Merl Code, specifically

6    102S-1, S-2, S-3, S-5, S-6, S-9, S-10, S-11, S-12, S-13, S-16,

7    and S-17, along with 102T-2 and T-3.

8            THE COURT:  They are received.

9            (Government's Exhibits 102S-1, S-2, S-3, S-5, S-6,

10   S-9, S-10, S-11, S-12, S-13, S-16, S-17, 102T-2 and T-3

11   received in evidence)

12           MR. MARK:  The government now calls as its next

13   witness Ricky Robertson.

14    RICKY ROBERTSON,

15        called as a witness by the Government,

16        having been duly sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MR. MARK:

19   Q.  Good afternoon, Mr. Robertson.  How old are you?

20   A.  44.

21   Q.  Where do you currently live.

22   A.  Greenville, South Carolina.

23   Q.  Are you currently employed?

24   A.  Yes, District 25 Barber Shop.

25   Q.  And what do you do at the barber shop?

1   A.  I'm a barber.

2   Q.  And how far did you go in school?

3   A.  Two years of college.

4   Q.  What did you study when you were in college?

5   A.  Business management.

6   Q.  Did you play any sports while you were in school?

7   A.  Yes, basketball and football.

8   Q.  Have you been involved in coaching high school and

9   grassroots basketball?

10  A.  Yes, sir.

11  Q.  For how long?

12  A.  19 years.

13  Q.  Mr. Robertson, are you familiar with the grassroots program

14  named the Karolina Khaos?

15  A.  Yes, sir.

16  Q.  How are you familiar with that program, Karolina Khaos?

17  A.  I am the director of basketball operations under Merl Code.

18  Q.  Were there any other directors along with you at Karolina

19  Khaos?

20  A.  Yes, sir.

21  Q.  When did you become a director for Karolina Khaos?

22  A.  2016.

23  Q.  How did it come about that you became a program director

24  for Karolina Khaos, as you said, under Merl Code?

25  A.  We had some conversations about getting a program in South

1  Carolina, and Merl got us a program with Adidas.

2  Q.  When you say we had some conversations, who's the "we" that

3  you're talking about?

4  A.  Me and Merl Code.

5  Q.  And how long have you known Mr. Code?

6  A.  Over 30 years.

7  Q.  Prior to 2016 had you had other conversations with Merl

8  Code about sponsorship for a grassroots program?

9  A.  Yes, sir, when he worked for Nike.

10  Q.  Why were you interested in getting sponsorship for a team

11  by an athletics company?

12  A.  It would help us with travel expenses, pay for tournaments,

13  and get us product.

14  Q.  When you spoke with Mr. Code while he was at Nike about a

15  sponsorship, how did he respond to you then?

16  A.  He told me that you got to get the best players in the

17  state, and at the time we didn't have the best players.

18  Q.  And what program were you with at the time?

19  A.  At that time we were the South Carolina Elite.

20        THE COURT:  Was that the name of the team?

21        THE WITNESS:  Yes, sir.

22  Q.  And when Mr. Code was at Adidas, how did he respond to your

23  requests for a sponsorship of your grassroots team?

24  A.  He responded by -- he said he would get us one now.  We had

25  better players, so we could get a deal then.

1    Q.   Did Mr. Code explain to you the terms of any sponsorship by

2    Adidas of the Karolina Khaos team?

3    A.   He just told us it would be product and $25,000.

4    Q.   What, if anything, did he say the $25,000 was for?

5    A.   Travel expenses, hotels, and to take care of the

6    tournaments that we needed to play in.

7    Q.   Do some of the tournaments have fees associated with them?

8    A.   Yes, all of them do.

9    Q.   How much are the tournament fees?

10   A.   Around $500.

11   Q.   Now you mentioned Mr. Code worked for Adidas, is that your

12   testimony?

13   A.   Yes, sir.

14   Q.   What, if anything, did Mr. Code say to you about who his

15   boss was at Adidas?

16   A.   I thought it was Chris Rivers, but Jim Gatto was his boss,

17   though.

18   Q.   Meaning that Jim Gatto was the boss of Chris Rivers and

19   Merl Code?

20   A.   Yes, sir.

21   Q.   Have you ever met Mr. Jim Gatto?

22   A.   Once in Atlanta.

23   Q.   What were you doing in Atlanta?

24   A.   We were playing in a tournament.

25   Q.   Was that Karolina Khaos that was playing in that

1    tournament?

2    A.  Yes, sir.

3    Q.  And what tournament -- was it in Atlanta?

4    A.  It was one of the Adidas gauntlets we were playing in.

5    Q.  And did Karolina Khaos play on the Adidas gauntlet circuit?

6    A.  Yes, sir.

7    Q.  Did there come a time that you became responsible for

8    Karolina Khaos' finances?

9    A.  Yes, in 2017.

10   Q.  Now you mentioned that Adidas was the sponsor for Karolina

11   Khaos.  Did Karolina Khaos ever have a written contract with

12   Adidas, as far as you know?

13   A.  No, sir.

14   Q.  During the 2017 year when you were responsible for Karolina

15   Khaos' finances, did Adidas provide any products to Karolina

16   Khaos?

17   A.  Yes, sir.

18   Q.  And during the 2017 year, did Adidas provide the $25,000 in

19   funding to Karolina Khaos that Mr. Code had promised to you?

20   A.  Yes, sir.

21   Q.  When did the program get that $25,000 in funding from

22   Adidas?

23   A.  In May.

24   Q.  May of 2017?

25   A.  Yes, sir.

1  Q.  Did the program incur any expenses before May?

2  A.  Yes, sir.

3  Q.  How did the program pay for those expenses before it

4  received the $25,000 in May of 2017?

5  A.  Merl.

6  Q.  And when you say Merl, could you just elaborate?

7  A.  Merl Code.

8  Q.  Did Merl Code initially pay for the expenses before the

9  money came in from Adidas?

10  A.  Yes, sir.

11  Q.  And after Adidas provided that $25,000 in funding in May,

12  did you take any steps to reimburse Merl Code for expenses that

13  were initially incurred?

14  A.  Yes, sir.

15  Q.  What did you do?

16  A.  I went to withdraw the money from the bank.

17  Q.  After you withdrew the money, did you give it to Mr. Code?

18  A.  Yes, sir.

19  Q.  Did there come a point in time that you discussed with Merl

20  Code that Adidas would be sending additional money to the

21  Karolina Khaos program?

22  A.  Yes, sir.

23  Q.  When was that, approximately?

24  A.  Around June.  I'm not sure what date, but June of 2017.

25  Q.  And where were you when you had that discussion with

1   Mr. Code?

2   A.  At my church.

3   Q.  What did Mr. Code say to you about Karolina Khaos receiving

4   additional money, and what did you say to him about that

5   subject?

6   A.  He just told me that there would be some extra money

7   coming, to let him know when it came in, and I told him okay.

8   Q.  Did Merl Code tell you why there would be extra money

9   coming in to Karolina Khaos?

10  A.  No, sir.

11  Q.  Did you ask why there would be this money coming into your

12  program?

13  A.  No, sir.

14  Q.  And did there come a point in time that Karolina Khaos did

15  receive additional money from Adidas?

16  A.  Yes, sir.

17  Q.  How much money?

18  A.  $30,000.

19  Q.  Approximately when was that?

20  A.  August.

21  Q.  Were there any other payments that Karolina Khaos received

22  from Adidas?

23  A.  Yes, sir.

24  Q.  What was that?

25  A.  $25,000.

1   Q.  And when did that $25,000 payment happen?

2   A.  In September.

3   Q.  What, if anything, did Merl Code tell you to do with that

4   additional $30,000 and $25,000 that Karolina Khaos received

5   from Adidas in August and September of 2017?

6   A.  In August he told me to write a check for 25,000 and give

7   25,000 in cash and give it to him.

8   Q.  How about in September?

9   A.  The same, write a check for $25,000.

10  Q.  Did you do that?

11  A.  Yes, sir.

12  Q.  And to whom was the check written -- did he ask you to

13  write it to?

14  A.  Loyd Incorporated.

15  Q.  Had you ever heard of Loyd Incorporated before Mr. Code

16  asked you to write those two checks to it?

17  A.  No, sir.

18  Q.  Why, if you've never heard of Loyd Incorporated before, did

19  you write those two checks as Mr. Code requested?

20  A.  Because he asked me to.  He's a good friend of mine my

21  whole life, so just had me write a check, so I wrote checks.

22  Q.  Now let me direct your attention to Government

23  Exhibit 308E.

24          MR. MARK:  For the witness only.

25  Q.  Mr. Robertson, do you recognize Government Exhibit 308E?

1   A.  Yes, sir.

2   Q.  What is it?

3   A.  It's the deposit of $25,000.

4   Q.  Is this generally a bank statement?

5   A.  Yes, sir.

6   Q.  For which account?

7   A.  Karolina Khaos.

8           MR. MARK:  The government offers Government

9   Exhibit 308E into evidence.

10          THE COURT:  Received.

11          (Government's Exhibit 308E received in evidence)

12          MR. MARK:  May we publish, your Honor?

13          THE COURT:  You may.

14  Q.  Mr. Robertson, where did Karolina Khaos bank?

15  A.  Wells Fargo.

16  Q.  I would like to go through some of the transactions of the

17  program Karolina Khaos.

18          MR. MARK:  Go first, Ms. Lee, to page 3.  If we could

19  highlight the transaction May 31.

20          Do you see it says May 31, 2017, an e-deposit for

21  $25,000?

22  A.  Yes, sir.

23  Q.  What was that $25,000 deposit for?

24  A.  From Adidas for our travel and tournaments.

25  Q.  That's the first one that the program received?

1    A.  Yes, sir.

2             MR. MARK:  And now Ms. Lee, could we go to page 7.

3    Could we highlight the two transactions from June 1st.

4    Q.  And first, Mr. Robertson, for the ATM withdrawal for

5    $4,000, what did that relate to?

6    A.  That was money to pay back to all the coaches in the

7    program that we had spent some of our money to pay for travel

8    and tournaments.

9    Q.  And then there's another withdrawal for $16,000.  What did

10   that relate to?

11   A.  That was the money that Merl Code had put up for us for

12   before the money got turned in from Adidas for that.

13   Q.  That was the reimbursement you talked about for Mr. Code?

14   A.  Yes, sir.

15   Q.  The withdrawal, was that in cash?

16   A.  Yes, sir.

17   Q.  Why did you withdraw it in cash?

18   A.  Merl Code asked me to.

19   Q.  And where did you go to withdraw the cash?

20   A.  I had to go to two banks, two of them.  I went to the bank

21   on Augusta Road and a bank on Hayward Road in Greenville, South

22   Carolina.

23   Q.  And why did you have go to two banks?

24   A.  They didn't have enough money in the bank.

25   Q.  At the first bank they didn't have enough money to make the

1  whole withdrawal?

2  A.  Yes, sir.

3  Q.  Let me turn your attention to page 15.

4         MR. MARK:  And Ms. Lee, could we highlight the

5  August 1st transactions.

6  Q.  Looking first at the first transaction, August 1, Adidas

7  America $30,000, was this one of the additional payments that

8  you talked about earlier that Merl Code told you about?

9  A.  Yes, sir.

10  Q.  And do you know what that $30,000 was for?

11  A.  No, sir.

12  Q.  Now let's look at the next two entries, or I guess the

13  bottom two entries here from August 1, the withdrawal of $5,000

14  and the check for $25,000.  To whom was that check for $25,000

15  written?

16  A.  Loyd Incorporated.

17  Q.  And why did you write that check?

18  A.  Merl Code asked me to.

19  Q.  And what did you do with that check after you wrote it?

20  A.  I took it to Bank of America and deposited it.

21  Q.  Why did you take it to Bank of America to deposit that

22  check?

23  A.  That was the bank he told me to take it to.

24  Q.  And the withdrawal for $5,000, was that withdrawal in cash?

25  A.  Yes, sir.

1  Q.  What did you do with that cash?

2  A.  Gave it to Merl Code.

3  Q.  And where did you give Merl Code that $5,000?

4  A.  At my barber shop.

5  Q.  When you delivered that -- when you gave that $5,000 to

6  Mr. Code, what, if anything, did Mr. Code say to you?

7  A.  He just said thanks.

8        MR. MARK:  Now if we could go to page 19 of the bank

9  statement, please.  And Ms. Lee, if we could highlight the

10  entries from September 20 and September 21, and the first entry

11  is September 20, 2017, Adidas America, the deposit of $25,000.

12  Q.  What did that $25,000 relate to, Mr. Robertson?

13  A.  It was a check -- it was a deposit from Adidas of America.

14  Q.  And is it the second additional payment that Mr. Code told

15  you about?

16  A.  Yes, sir.

17  Q.  And what was this $25,000 for?

18  A.  I don't know.

19  Q.  And the next entry is from September 21, a check for

20  $25,000, to whom was that check written?

21  A.  Loyd Incorporated.

22  Q.  And what did you do with that check after you wrote it?

23  A.  I took it to Bank of America and deposited it.

24  Q.  Why did you take that $25,000 check and deposit it in Bank

25  of America?

1    A.  Merl Code asked me to.

2    Q.  Now may I direct your attention to Government Exhibit 308A.

3         Do you recognize 308A?

4    A.  Yes, sir.

5         MR. MARK:  The government offers 308A into evidence.

6         THE COURT:  Received.

7         (Government's Exhibit 308A received in evidence)

8         MR. MARK:  May we publish, your Honor?

9         THE COURT:  Yes.

10   BY MR. MARK:

11   Q.  Mr. Robertson, you said you recognized Government

12   Exhibit 308A?

13   A.  Yes, sir.

14   Q.  What is on the first page?

15   A.  A check for $25,000 to Loyd Incorporated.

16   Q.  And is this the check from the Karolina Khaos account?

17   A.  Yes, sir.

18   Q.  Did you fill out this check?

19   A.  Yes, sir.

20        MR. MARK:  And Ms. Lee, if we could highlight the

21   bottom left-hand corner where it says "For."

22   Q.  And Mr. Robertson, what does it say this $25,000 check to

23   Loyd Inc. was for?

24   A.  Consulting fees.

25   Q.  And had Loyd Inc. provided any consulting work to Karolina

1   Khaos at this time?

2   A.  No, sir.

3           MR. CODE:  Objection, your Honor, he doesn't know.

4           THE COURT:  As far as he knows.

5           MR. CODE:  As far as he knows.

6           THE COURT:  Are you going to handle this witness?

7           MR. CODE:  Yes, sir.

8   Q.  Why did you write "consulting fees" in a lower left portion

9   of this check from Karolina Khaos to Loyd Inc.?

10  A.  Merl Code asked me to.

11  Q.  And were you the person who handled the finances and was a

12  director of Karolina Khaos?

13  A.  Yes, sir.

14  Q.  And you said as far as you knew, you hadn't heard of Loyd

15  Inc. before?

16  A.  No, sir.

17  Q.  And as far as you know, Loyd Inc. had not provided any

18  consulting work for Karolina Khaos?

19  A.  No, sir.

20  Q.  Now let me direct your attention to page 2 of this

21  document.  Did you fill out this check as well?

22  A.  Yes, sir.

23  Q.  And this was the check that you also said Merl Code asked

24  you to write and deposit?

25  A.  Yes, sir.

1   Q.  And do you know what either of those checks that Merl Code

2   asked you to write were for?

3   A.  No, sir.

4   Q.  Now Mr. Robertson, have you seen any invoices from Karolina

5   Khaos to Adidas?

6   A.  Yes, sir.

7   Q.  Did you create any of the invoices from Karolina Khaos that

8   you have seen?

9   A.  No, sir.

10  Q.  Who, if anyone, showed you invoices for Karolina Khaos to

11  Adidas?

12  A.  Adidas and Merl Code.

13  Q.  And when you say Adidas, do you mean people at Adidas?

14  A.  Yes, sir.

15  Q.  Do you recall any names of the people at Adidas?

16  A.  No, sir.

17  Q.  And then you mentioned that Merl Code also showed you

18  invoices for Karolina Khaos to Adidas as well?

19  A.  Yes, sir.

20  Q.  Now let me direct your attention to Government

21  Exhibit 1072.  And do you recognize this email, the bottom

22  portion of it?

23  A.  Yes, sir.

24          MR. MARK:  The government offers Government

25  Exhibit 1072 into evidence.

1   THE COURT:  Received.

2   (Government's Exhibit 1072 received in evidence)

3   MR. MARK:  May we publish, your Honor?

4   THE COURT:  Yes.

5   BY MR. MARK:

6   Q.  Mr. Robertson, looks like the top portion email is from

7   Merl Code to Jim Gatto, but now the bottom portion email looks

8   like is what was forwarded, and says from Brian Chatman with a

9   to Chris Rivers, CC Merl Code and Ricky Robertson.

10          First, who is Brian Chatman?

11  A.  He was one of the parents of one our players on the

12  basketball team.

13  Q.  So the father of one players on the Karolina Khaos?

14  A.  Yes, sir.

15  Q.  Did he help out with the Carolina Khaos program from time

16  to time?

17  A.  Yes, sir.

18  Q.  And Chris Rivers, you mentioned earlier he was one of the

19  bosses of Merl Code at Adidas?

20  A.  Yes, sir.

21  Q.  And CC Merl Code and then CC you as well?

22  A.  Yes, sir.

23  Q.  And I'm now going to -- if we could take a look at page 2

24  of this document.  And is this an invoice from Karolina Khaos,

25  it says care of you, Ricky Robertson, to Chris Rivers at

1    Adidas?

2    A.  Yes, sir.

3    Q.  Dated March 17 with an amount of $25,000?

4    A.  Yes, sir.

5    Q.  Was this invoice generally accurate, as far as you know?

6    A.  Yes, sir.

7    Q.  Now did you end up seeing additional invoices later in the

8    year for Karolina Khaos to Adidas?

9    A.  Yes, sir.

10   Q.  Were the additional invoices you saw from Karolina Khaos to

11   Adidas later in the year accurate or inaccurate?

12   A.  Meaning?  Could you repeat that?

13   Q.  Were the additional invoices you saw from Karolina Khaos to

14   Adidas later in the year, were those additional invoices

15   accurate or not?

16   A.  Oh, no, sir.

17   Q.  Meaning they were not accurate?

18   A.  No, sir.

19          MR. MARK:  Now let me direct your attention to

20   Government Exhibit 1099.  The government offers 1099.

21          THE COURT:  Received.

22          (Government's Exhibit 1099 received in evidence)

23          MR. MARK:  May we publish, your Honor?

24          THE COURT:  Yes.

25   Q.  And Mr. Robertson, is this an email from Merl Code to

1  Olivia Guidera and cc'ing you on this email?

2  A.  Yes, sir.

3  Q.  From July 6, 2017?

4  A.  Yes, sir.

5  Q.  Do you know who Olivia Guidera is?

6  A.  No, sir.

7  Q.  Then it has an attachment, says Karolina Khaos, July travel

8  expenses, Adidas invoice 2017.

9  A.  Yes, sir.

10  Q.  Now let me direct your attention to the next page.  And

11  this is an invoice from Karolina Khaos, care of you, to Jim

12  Gatto dated June 18, 2017, is that right?

13  A.  Yes, sir.

14  Q.  With a description of July travel team expenses and an

15  amount of $30,000?

16  A.  Yes, sir.

17  Q.  Now is this an accurate invoice for Karolina Khaos to

18  Adidas?

19  A.  No, sir.

20  Q.  Had your team, Karolina Khaos, incurred $30,000 in travel

21  expenses in July of 2017?

22  A.  No, sir.

23  Q.  Had your team incurred additional expenses at this time

24  that exceeded Adidas' original funding of $25,000?

25  A.  No, sir.

1          MR. MARK:  Now Ms. Lee, could we turn back to page 1,

2     and could you highlight that first sentence.

3     Q.  Merl Code writes Ricky wanted me to pass along the invoice

4     with the vendor/customer number included.  Is what Mr. Code

5     wrote there true?

6     A.  No, sir.

7     Q.  Did you want Mr. Code to pass along that invoice that we

8     just looked at?

9     A.  No, sir.

10    Q.  Did you request that payment?

11    A.  No, sir.

12    Q.  Now let me direct your attention to Government Exhibit 603.

13         Do you recognize, Mr. Robertson, this document?

14    A.  Yes, sir.

15    Q.  Is this an email that you received?

16    A.  Yes, I received this email.

17         MR. MARK:  The government offers 603 into evidence.

18         THE COURT:  Received.

19         (Government's Exhibit 603 received in evidence)

20         MR. MARK:  Permission to publish, your Honor.

21         THE COURT:  Yes.

22    Q.  And Mr. Robertson, who is this email from?

23         THE COURT:  Which one?

24    Q.  Sorry, let's start actually at the top where it says on

25    Thursday, July 6, 2017.  Who is that email from?

1   A.  Merl Code.

2   Q.  And I know it doesn't have that full header, but who is it

3   to?

4   A.  Olive Guidera.

5   Q.  Just the top one, was that -- let me try to help was, that

6   email, where it said FYI, to you?

7   A.  Yes, sir.

8   Q.  Okay.  And then did it forward a chain of emails below

9   that?

10  A.  Yes, sir.

11  Q.  And if you look at the one from Merl Code to Olivia

12  Guidera, it says:  I've added the missing information

13  requested.  Thanks for all your help.  Do you see that?

14  A.  Yes, sir.

15  Q.  Now let me direct your attention to page 3.  Is this

16  another version of the invoice we looked at before, Government

17  Exhibit 1099?

18  A.  Yes, sir.

19  Q.  And this one now has a phone number and an email address?

20  A.  Yes, sir.

21  Q.  Is that your phone number and email address on the invoice?

22  A.  Yes, sir.

23  Q.  Did you ask anyone to add that to the invoice?

24  A.  No, sir.

25  Q.  Did you know that anyone added that to the invoice?

1   A.  No, sir.

2   Q.  Did you authorize anyone to add it to the invoice?

3   A.  No, sir.

4   Q.  And is this invoice from June 18 for $30,000 for July

5   travel team expenses from Karolina Khaos to Adidas accurate?

6   A.  No, sir.

7   Q.  Now Mr. Robertson, I would like to direct your attention to

8   Government Exhibit 1088.

9          MR. MARK:  And your Honor, this is in evidence and we

10  would like to request it be published.

11         THE COURT:  Yes.

12  Q.  Do you see this is an email from Merl Code to Jim Gatto in

13  September of 2017?

14  A.  Yes, sir.

15  Q.  And it says:  Attachment, Karolina Khaos, November travel

16  expenses, Adidas invoice 2017.  Do you see that?

17  A.  Yes, sir.

18  Q.  And then Merl Code writes to Jim Gatto:  Per our

19  discussion, I'm sending over the invoice requested for

20  submission and processing.

21         If we could go to the next page.  And this is an

22  invoice dated September 18 from Karolina Khaos to Jim Gatto for

23  November team travel expenses in the amount of $25,000.  Do you

24  see that?

25  A.  Yes, sir.

1  Q.  Is this invoice an accurate invoice from Karolina Khaos to

2  Adidas?

3  A.  No, sir.

4  Q.  Did Karolina Khaos anticipate $25,000 in November travel

5  team expenses?

6  A.  No, sir.

7  Q.  Did Karolina Khaos plan to travel in November?

8  A.  No, sir.

9  Q.  Does Karolina Khaos play any games in November?

10  A.  No, sir.

11  Q.  Did you have any telephone calls with Merl Code about the

12  additional money that Karolina Khaos received in August and

13  September 2017 from Adidas?

14  A.  Yes, sir.

15  Q.  Did you exchange any text messages with Merl Code about the

16  additional money Karolina Khaos received in August and

17  September 2017 from Adidas?

18  A.  Yes, sir.

19  Q.  The government at this time offers Government Exhibit 18

20  and 18T as an aid to the jury.

21          THE COURT:  Received.

22          (Government's Exhibit 18 and 18T received in evidence)

23          MR. MARK:  And this is a September 20, 2017 call

24  between Merl Code and Mr. Robertson.

25          Ms. Lee, may we play this?

1    THE COURT:  And members of the jury, you may turn to

2 Government Exhibit 18T.

3    (Audio recording played)

4 Q.  And Mr. Robertson, just as Mr. Code said, "I think I

5 deleted it because I didn't want that in my phone," he said,

6 "If you don't have it, just let me know and I'll ask him for

7 it."

8    When Mr. Code said he would be with him tonight, did

9 you know who "he" was referring to?

10 A.  No, sir.

11 Q.  Now let me direct your attention to Government

12 Exhibit 103D-2, D-3 and D-4.  And we can just flip through

13 these quickly.

14    Do you recognize these documents?

15 A.  Yes, sir.

16 Q.  What are they?

17 A.  Receipts from Bank of America when I deposited the check.

18 Q.  Are these, more precisely, text messages --

19 A.  Yes, sir.

20 Q.  -- relating to that?

21 A.  Yes, sir.

22    MR. MARK:  The government offers Government

23 Exhibit 103D-2, D-3 and D-4 into evidence.

24    THE COURT:  Received.

25    (Government's Exhibits 103D-2, D-3 and D-4 received in

IAFTGAT4                    Robertson - Direct

1    evidence)

2         MR. MARK:  Your Honor, may we publish?

3         THE COURT:  Yes.

4         MR. DISKANT:  Ms. Lee, please publish Government

5    Exhibit 103D-2 first.

6    Q.  Mr. Code is on the left asking, "Did you get a payment

7    confirmation email?"  And you wrote, "No, not yet."

8    A.  Yes, sir.

9    Q.  And what did that text message relate to?

10   A.  The payment that was coming through.

11   Q.  The additional money from Adidas?

12   A.  Yes, sir.

13   Q.  Did you eventually get a confirmation?

14   A.  Yes, sir.

15   Q.  Let me direct your attention to Government Exhibit 103D-3.

16   And here you're on the right sending Mr. Code a couple of

17   images, is that right?

18   A.  Yes, sir.

19   Q.  And what was in those images?

20   A.  Receipts for $25,000.

21   Q.  Is that the receipt of the Karolina Khaos check that you

22   deposited to Loyd Inc.?

23   A.  Yes, sir.

24   Q.  Why did you send Mr. Code the receipt?

25   A.  Because I tried to keep account of all the money that goes

1   in the account.

2   Q.  Meaning keep track of all the money --

3   A.  Yes, sir.

4   Q.  -- in the Karolina Khaos account?

5   A.  Yes, sir.

6   Q.  Flip to next page.  And then you wrote when the money is

7   available.  Is that a reference to the note on the receipt of

8   when it was available?

9   A.  Yes, sir.

10  Q.  Flip to next one.

11          And you replied thanks, on the bottom left?

12  A.  No, sir, that's Merl.

13  Q.  Right, Merl Code replied thanks?

14  A.  Yes, yes.

15  Q.  And can we now go to Government Exhibit 103D-4.

16          And here on the right, is that you sending Mr. Code an

17  image of a receipt?

18  A.  Yes, sir.

19  Q.  And is that the receipt of the second deposit of the

20  $25,000 check that you wrote from Karolina Khaos to Loyd Inc.?

21  A.  Yes, sir.

22          MR. MARK:  Now I would like to direct your attention

23  to Government Exhibit 102T-2, which is in evidence.  And this

24  was just offered, it's a text message from Merl Code to

25  Christian Dawkins, and says date stamp August 1, forward when

 1   the money is available, and has two images that were forwarded.

 2           Ms. Lee, can we go to the next page.

 3   Q.  Mr. Robertson, do you recognize those images?

 4   A.  Yes, sir.

 5   Q.  Were those the images that you just sent to Mr. Code?

 6   A.  Yes, sir.

 7   Q.  And Ms. Lee, could we take a quick look at Government

 8   Exhibit 102T-3, and blow that up quickly.

 9           And this is a text message from September 21 between

10   Christian Dawkins and Merl Code, and you see an image that's

11   right there.  And could we take a look at the next page.

12           Mr. Robertson, do you recognize that image?

13   A.  Yes, sir.

14   Q.  What is it?

15   A.  Receipt of deposit of $25,000 to Bank of America I put in.

16   Q.  And that's the one that you just sent to Mr. Code?

17   A.  Yes, sir.

18   Q.  And do you know who Christian Dawkins is?

19   A.  No, sir.

20   Q.  Do you know Brian Bowen?

21   A.  I have never met him, I know who he is from TV.

22   Q.  In 2017 had you heard where Brian Bowen committed to

23   school?

24   A.  Louisville.

25   Q.  What, if anything, had Merl Code ever told you about Brian

1    Bowen committing to Louisville?

2    A.   Nothing.

3    Q.   What, if anything, did Merl Code tell you about whether the

4    money he asked you to give to Loyd Inc. was to go to Brian

5    Bowen's family?

6    A.   Nothing.

7    Q.   What, if anything, do you believe would be the consequences

8    to your basketball program if you were involved in making a

9    payment to a high school player or his family?

10        MR. HANEY:  Objection.

11        THE COURT:  Sustained.

12   Q.   Mr. Robertson, you said earlier you didn't know what that

13   money -- those checks were for?

14   A.   No, sir.

15   Q.   What happened, if anything, to your program sponsorship

16   with Adidas after this investigation became public?

17        MR. SCHACHTER:  Objection.

18        THE COURT:  Let me hear it again.

19   Q.   What happened, if anything, to your program sponsorship

20   with Adidas after this investigation became public?

21        THE COURT:  Sustained.

22   Q.   Have you ever been involved in making a payment to a high

23   school player?  Have you ever knowingly been involved in making

24   a payment to a high school player or his family?

25   A.   No, sir.

1          MR. MARK:  No further questions.

2          (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        THE COURT:  Cross-examination.

2        Mr. Code.

3        MR. CODE:  May it please the Court.

4    CROSS-EXAMINATION

5    BY MR. CODE:

6    Q.  Mr. Robertson, you indicated that you did not have access

7    to a computer, did you not, on these invoices?

8        THE COURT:  I'm sorry?

9    Q.  On the invoices that you were shown on direct, it indicated

10   that you did not have access to a computer and Merl did, is

11   that not correct?

12       THE COURT:  Sustained.  It's not an accurate summary.

13   Q.  Let me change that.  Let me go somewhere else.

14       Do you remember talking to the FBI?

15   A.  Yes, sir.

16   Q.  Did you give them a statement?

17   A.  Yes, sir.

18   Q.  Were the things in that statement accurate and true?

19   A.  As far as I can recall.

20   Q.  All right, sir.

21       Let me step back one more minute.

22       You indicated that when Merl was at Nike you did not

23   get a sponsorship?

24   A.  Yes, sir.

25   Q.  Then you said, when he went to Adidas, you were able to get

1    a sponsorship because you had better players?

2    A.  Yes, sir.

3    Q.  Can you tell me who those better players were?

4    A.  We had Sharone Wright Jr. that plays at Wake Forest.  We

5    had Dontrell Shuler that plays at Charleston Southern.  We had

6    Travion McCray; he is still in high school, but he is going to

7    go to Radford.

8    Q.  Were those teams added to your roster for the

9    following -- from the year of 2016 to 2017?

10   A.  They were on --

11               MR. MARK:  Objection.  Relevance.

12               THE COURT:  Sustained.

13               First of all, he didn't talk about any teams.  Second

14   of all, it is not relevant.

15               MR. CODE:  I will go somewhere else, your Honor.

16   Q.  When you were interviewed by the FBI, did they believe that

17   you did not know Christian Dawkins?

18               MR. MARK:  Objection.

19               THE COURT:  He has no idea what the FBI believed, nor

20   is it relevant.

21   Q.  When the interview took place, there was an inference about

22   $40, a matter of $40 was investigated through you, is that

23   correct?

24               MR. MARK:  Objection.

25               THE COURT:  Sustained.

1   Q.  Were you asked about $40?

2   A.  I don't recall.

3   Q.  You don't recall?

4   A.  No, sir.

5   Q.  Did you tell the FBI that Merl owed you 40?

6   A.  Yes, sir.

7   Q.  Did the FBI think that 40 meant $40,000; did they tell you

8   that?

9           MR. MARK:  Objection.

10          THE COURT:  Sustained.

11  Q.  Did you tell the FBI that $40 was for a bookie?

12  A.  Yes, sir.

13  Q.  Can you define bookie for me, sir?

14          MR. MARK:  Objection.  Relevance.

15          THE COURT:  Sustained.

16  Q.  Let me ask it this way, Rick.

17          Were they yellow gambling cards?

18  A.  Yes, sir.

19          MR. MARK:  Objection.

20          THE COURT:  If you're going to object, the idea is to

21  do it before the answer is out.

22          MR. MARK:  I thought he was continuing with his

23  question.

24          THE COURT:  Next question.

25  Q.  Is a bookie someone who takes the bet?

1    MR. MARK:  Objection.

2    THE COURT:  Sustained.

3  Q.  You indicated that if you knew the money was going to the

4  family of a player, you would not have given it.

5  A.  No, sir.

6    THE COURT:  Meaning, no, you didn't indicate that, or

7  meaning that it's not correct?

8    THE WITNESS:  You're asking me, your Honor?

9    THE COURT:  I sure am.

10    THE WITNESS:  Could you repeat it?

11    THE COURT:  Did you mean that you didn't indicate that

12  or did you mean that what Mr. Code said is not correct?

13    THE WITNESS:  I am saying, if I knew it was going to a

14  family, I wouldn't have done it, no, sir.

15    THE COURT:  Thank you.

16    MR. CODE:  Ray, could you put up Defense Exhibit 35T,

17  please.  Don't publish it.  Just put it up for me.

18  Q.  Can you find page 4, first full paragraph, please.

19    THE COURT:  This is 35T, is it?

20    Is this 35T?  Who is putting it up?

21    Just give me a minute.

22    Somebody have a copy for me?

23    Thank you.

24    What are we doing?  What page?

25    MR. CODE:  I believe it is page 4, first full

1    paragraph, in which Mr. Robertson said, if he knew that that

2    money --

3              MR. MARK:  Objection.

4              THE COURT:  You don't say what it says, Mr. Code.

5              Is there a question?

6              MR. CODE:  Yes, sir.

7    BY MR. CODE:

8    Q.  Can you see that?  Is it on there, that paragraph,

9    Mr. Robertson?

10   A.  No, sir.

11   Q.  Do you know who Sharone Wright is?

12   A.  Yes, sir.

13   Q.  Sharone played with Merl at Clemson?

14             MR. MARK:  Objection.

15             THE COURT:  Sustained.

16   Q.  You indicated that his son played for your team in

17   Florence?

18   A.  Yes, sir.

19   Q.  Is it not true that Sharone Wright requested from you

20   payment to go to games?

21             MR. MARK:  Objection.  Relevance.

22             THE COURT:  To go to games?

23             MR. CODE:  To travel to games.

24             THE COURT:  He asked for travel money to go to games?

25             Go ahead.

1    Q.  Is that true?

2    A.  Yes, sir.

3    Q.  Isn't it true, Mr. Robertson, that you called Merl about

4    that request?

5    A.  Yes, sir.

6    Q.  And isn't it also true, Mr. Robertson, you actually gave

7    money to Sharone Wright?

8    A.  No, sir.

9          MR. CODE:  Mr. McLeod, if you can find the one that

10   has the -- I believe it is page 2 on 35T.

11   Q.  Can you look at that?

12   A.  Yes, sir.

13   Q.  Can you read it to yourself to make sure I don't.

14         Do you see it?

15   A.  Yes, sir.

16   Q.  Have you read it?

17   A.  Yes, sir.

18   Q.  Did you say, sir, Clemson is saying they want --

19         MR. MARK:  Objection.

20         THE COURT:  Overruled.

21         Go ahead.  You have a question?

22         MR. CODE:  Yes, sir.

23         THE COURT:  What is it?

24   Q.  Did you say that, "Clemson wants these kids.  South

25   Carolina I figured got them now.  These kids, if they want

1    them, it's going to cost them."  And then you say it again,

2    "It's going to cost them."

3             THE COURT:  Did you make that statement?

4    A.  I guess I did, yes, sir.

5    Q.  What did you mean?

6    A.  It wasn't about money.  It was probably about -- we talked

7    about a lot of kids that we try to get to stay in the state,

8    and also try to recruit other kids also, but it wasn't anything

9    to do with money.

10   Q.  What does "cost them" mean?

11   A.  It means that they will have to take another player that we

12   have in our program later on.

13   Q.  When you were involved in that travel team, did you all

14   play in Columbia, South Carolina?

15   A.  Yes, sir.

16   Q.  Atlanta?

17   A.  Yes, sir.

18   Q.  Dallas?

19   A.  Yes, sir.

20   Q.  Orlando?

21   A.  Yes, sir.

22   Q.  Orlando was 600 miles away, correct?

23   A.  Yes, sir.

24   Q.  You took three teams with you when you went?

25   A.  Two.

1   Q.  How many players on each team?

2   A.  Approximately 12 on each team.

3   Q.  And how many coaches?

4   A.  Four.

5   Q.  Who fronted that money for you to go?

6   A.  Merl Code.

7   Q.  On all of these occasions, sir?

8   A.  Yes, sir.

9   Q.  And some of those were three-day tournaments with travel,

10  lodging and food?

11  A.  Yes, sir.

12  Q.  And Orlando was a Wednesday through Sunday tournament?

13  A.  Yes, sir.

14  Q.  With travel, lodging and food?

15          MR. MARK:  Objection.  Relevance.

16          THE COURT:  What is the relevance?

17          MR. CODE:  He showed him invoices that Merl submitted,

18  and I am trying to show the relevance of the money that he got

19  was sponsoring these kids traveling 800 miles, 12 kids to a

20  team, lodging and food.

21          MR. MARK:  Objection.  We are testifying here right

22  now.

23          THE COURT:  Come to the sidebar.

24          (Continued on next page)

25

1    (At the sidebar)

2    THE COURT:  The contract had a stipulated amount for

3    travel expenses for the team, right?  Or am I misconstruing

4    this?

5    MR. CODE:  Your Honor, I don't think there was any

6    stipulated amount.  If Merl submitted an invoice for travel

7    that they made, he gets reimbursed.  That's all I am saying.

8    And they made those trips on behalf of the Karolina Khaos.

9    MR. MARK:  He testified that $25,000 was the amount of

10   money that he was going to get from Karolina Khaos.  That's it.

11   MR. CODE:  He couldn't put a cap on that.  All he

12   knows is -- he didn't know whether Merl could get more money

13   from Mr. Gatto or not.  He knows that the initial amount is

14   $25,000.

15   MR. MOORE:  I would just add one thing.  With respect

16   to the witness who testified prior to him, Ms. Harksen, I

17   believe Mr. Diskant got from Ms. Harksen that there was no

18   contract between Adidas and Karolina Khaos.

19   THE COURT:  I understand that.

20   Why shouldn't I allow it?

21   MR. MARK:  I don't think there is any dispute that he

22   could get the $25,000.  If he is trying to get into what Merl

23   Code dealt with on Adidas, that is something that this witness

24   can't speak to.

25   THE COURT:  The proposal is not that he do not.  If he

1   gets to that, it's another matter.

2           MR. DISKANT:  Your Honor, do you mind if I address

3   this briefly?

4           I don't think there is any dispute, with respect to

5   the second two payments, they weren't spent on travel expenses.

6           THE COURT:  How do you know that?

7           MR. DISKANT:  Because this witness has already stated

8   that he immediately wrote a check to Loyd Inc. with that money.

9           THE COURT:  What about that?

10          MR. CODE:  Your Honor, we never disputed that.  We

11  said that in our openings.  We told the jury in the opening he

12  got 25,000.

13          THE COURT:  So what is the point of this?

14          MR. CODE:  Because he is not telling the truth, first

15  of all.

16          THE COURT:  Tell me what the point of it is.

17          MR. CODE:  To talk about the expenses of the travel

18  team.  That $50,000 didn't go to the travel teams.  But there

19  were other expenses that he talked about.

20          THE COURT:  Where did the money come from?

21          MR. CODE:  Adidas.  Most of it was fronted by Merl and

22  he got it back.

23          THE COURT:  Am I missing something?  There was an

24  initial payment of 25,000 from Adidas that he testified where

25  it went.  Then there are two more $50,000 payments, and they go

 1   into the Loyd Inc. bank account.

 2          Now, what does it matter, given that, how much else

 3   Code spent?

 4          MR. CODE:  Because it showed invoices for all kind of

 5   expenditures that didn't go to Karolina Khaos.

 6          THE COURT:  What is the exhibit number of the Karolina

 7   Khaos?

 8          MR. DISKANT:  We will get it for you.  You're talking

 9   about the first invoice?

10          THE COURT:  I am talking about the summary that

11   indicates all the payments to Karolina Khaos.

12          MR. DISKANT:  It's 3004.  I hate to complicate that,

13   but that first payment is not going to be on there because it

14   was done off the books.

15          THE COURT:  The first payment?

16          MR. DISKANT:  Correct.

17          THE COURT:  Off whose books?

18          MR. DISKANT:  Off Adidas books.  We have not gotten

19   into it by agreement.

20          What we are talking about, there is a payment in May

21   of $25,000.  I believe Mr. Mark has elicited that the witness

22   immediately withdrew that in cash.

23          THE COURT:  $4,000 in one and $16,000 in the other.

24          MR. DISKANT:  There are then two additional payments

25   for 30 and then 25,000.

1    THE COURT:  Those went to Loyd.

2    Then there is a third payment, the March 11 payment,

3 for 25 grand.

4    MR. DISKANT:  That's from the prior year.

5    THE COURT:  What is the one that's off the books, what

6 is the date?

7    MR. DISKANT:  That's the May of 2017 payment that we

8 showed the witness a bank record of.  And that's the one that

9 he withdrew 4,000 and 16,000 in reimbursement.

10    THE COURT:  And the March 2016?

11    MR. DISKANT:  Is the prior year's travel expenses.

12    MR. MARK:  We didn't ask him about that one, but that

13 was just the regular $25,000 that Merl Code promised.

14    THE COURT:  Mr. Code, there is $105,000, tops.  And

15 50,000 of it indisputably went into the Loyd account.  So why

16 is this examination relevant?

17    MR. CODE:  To me it just shows that Merl is reimbursed

18 for the moneys he spent.  It was reimbursement to him for the

19 moneys that he spent.

20    THE COURT:  You said that about eight times.  But why

21 does that make a difference?

22    MR. CODE:  I will move on, Judge.

23    THE COURT:  If there is a real reason I want to know

24 it because I will let it in, but I am just not getting it.

25    MR. CODE:  Your Honor, I will leave it alone and go

1    somewhere else.

2            THE COURT:  If you are going to get on the stand and

3    say he hasn't been truthful, that's one thing.

4            MR. CODE:  I will move on, sir.

5            THE COURT:  You're withdrawing this?

6            MR. CODE:  I will withdraw that question.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (In open court)

2    THE COURT:  Members of the jury, if nobody has a truly

3    pressing problem, we are going to stay a little later and see

4    if we can finish this witness who has travel arrangements this

5    evening.

6    Mr. Code.

7    BY MR. CODE:

8    Q.  Mr. Robertson, you're aware that Merl worked at Nike?

9    A.  Yes, sir.

10   Q.  Were you aware he was the director of EYBL while at Nike?

11   A.  Yes.

12   MR. MARK:  Objection.

13   Q.  Have you ever heard of a magazine called Slam?

14   A.  Yes, sir.

15   Q.  What is Slam magazine?

16   A.  It's a basketball magazine.

17   Q.  Were you aware that Merl was considered running --

18   THE COURT:  Sustained.

19   Q.  Did you attend the Peach Jam in Augusta, Georgia?

20   THE COURT:  The what?

21   MR. CODE:  The Peach Jam.

22   A.  Yes, sir.

23   Q.  Did you attend the Gauntlet in Dallas?

24   A.  Yes, sir.

25   Q.  Did you go to the LeBron James Skills Academy?

1    A.  Yes, sir.

2              THE COURT:  I don't see what any of this has to do

3    with anything.

4              Let's continue in a relevant vein.

5              MR. CODE:  Nothing further, your Honor.

6              THE COURT:  All right.  Thank you.

7              Mr. Haney, anything?

8              MR. HANEY:  I have less than five minutes.

9    CROSS-EXAMINATION

10   BY MR. HANEY:

11   Q.  Mr. Robertson, good afternoon.

12   A.  Good afternoon.

13   Q.  Mr. Robertson, I represent a gentleman named Christian

14   Dawkins in this case.  You just testified that you do not know

15   Christian Dawkins, is that correct?

16   A.  Yes, sir.

17   Q.  You have never met or seen Christian Dawkins before, is

18   that a fair statement?

19   A.  Yes, sir.

20   Q.  You have never seen him, correct?

21   A.  I never seen him, no, sir.

22   Q.  Thank you, Mr. Robertson.

23             Correct me if I am wrong, but you have never even had

24   a conversation with Christian Dawkins before, is that correct?

25   A.  No, sir, no conversation.

IAF8GAT5                    Robertson - Cross

1   Q.  In connection with the operation of your AAU basketball

2   team, the Karolina Khaos, you never had any communication at

3   all with Christian Dawkins, is that a fair statement?

4   A.  Correct.  Yes, sir.

5              MR. HANEY:  Thank you.

6              I don't have anything further?

7              THE COURT:  Any redirect?

8              MR. SCHACHTER:  Your Honor, I just have two questions.

9   CROSS-EXAMINATION

10  BY MR. SCHACHTER:

11  Q.  Good afternoon.

12  A.  Good afternoon.

13  Q.  Sir, you testified during direct examination that you

14  believed that Merl Code's bosses were a man named Chris Rivers

15  and also a man named Jim Gatto, is that correct?

16  A.  Yes, sir.

17  Q.  I believe that you also may have said that Mr. Gatto was

18  Mr. Rivers' boss.  Do you remember saying that?

19  A.  Yes, sir.

20  Q.  You're not familiar with the Adidas organization chart, are

21  you?

22  A.  No, sir.

23  Q.  You don't actually have any personal knowledge as to

24  whether Mr. Rivers reports to Mr. Gatto, or Mr. Gatto reports

25  to Mr. Rivers, or whether they report to each other at all?

1  A.  No, sir.

2  Q.  Thank you, sir.

3            THE COURT:  Redirect?

4            MR. MARK:  No, your Honor.

5            THE COURT:  Thank you, Mr. Robertson.  You are

6  excused.

7            (Witness excused)

8            THE COURT:  Members of the jury, we are going to break

9  now.  I would ask you to wait in the jury room for just a few

10  minutes while I talk to counsel about the schedule so I can

11  tell you when you need to be in tomorrow.

12            (Jury exits courtroom)

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  I don't believe I have received yet, Mr.

2   Schachter, what you were telling me I was going to receive that

3   was voluminous, is that right?

4    MR. SCHACHTER:  That is correct.  We do have the

5   transcripts and electronic copy of the materials, although you

6   do not have the brief that lays out the basis for admission of

7   those documents.  I just brought those as a courtesy copy so

8   that your Honor would have them.  We anticipate getting the

9   brief, I have been in court all day, but we anticipate getting

10  it to you, I would say by 6 p.m.

11   THE COURT:  Look, I understand everybody is working

12  very hard, I really and truly do, but that's just not going to

13  work.

14    How long is this brief you're anticipating?

15   MR. SCHACHTER:  Your Honor, it is probably going to be

16  around 40 pages.  However, your Honor, a lot of that is quotes

17  from the transcript so that your Honor does not then need to go

18  into the actual transcript to read it.  So a lot of it is just

19  the language.

20    We can send it, we could hit send on it right now.  It

21  is not as polished as we would like it to be, but we could send

22  something to your Honor.  That's the answer.

23   THE COURT:  Does the government have any idea what is

24  coming?

25   MR. DISKANT:  We have some, although part of the

1    problem is the defendants have not finalized their list of what

2    they are or are not offering.  So we have a general sense of

3    the types of things they are offering.

4              THE COURT:  Give me a preview, Mr. Schachter, because

5    I have got the jury waiting and I have to come to grips with

6    the timing.

7              MR. SCHACHTER:  Each one is a separate discussion,

8    your Honor.

9              THE COURT:  How many disputed exhibits are there?

10             MR. SCHACHTER:  We did provide these to the government

11   before.

12             THE COURT:  How many?

13             MR. SCHACHTER:  There are 15 recordings, 16 text

14   messages, six e-mails, and then we have excerpts from the NCAA

15   rule manual, and the reinstatement guidelines, four contracts

16   between Adidas and universities, and some documents pertaining

17   to revenue.

18             THE COURT:  Do they fall into a few categories?

19             MR. SCHACHTER:  Those categories.

20             THE COURT:  Telling me there are 15 recordings may be

21   everything from the Nixon tapes to who knows what.  That

22   doesn't tell me a thing.  Subject matter.  Evidentiary problem

23   categories.

24             MR. SCHACHTER:  Your Honor, I am going to let Ms.

25   Donnelly, who is more familiar with the specific recordings,

IAF8GAT5

1    address it.

2            THE COURT:  Ms. Donnelly.

3            MS. DONNELLY:  Sure.  I would say that seven of the

4    recordings involve conversations between defendants and

5    Division 1 coaches regarding recruiting assistance.  I would

6    say a very small number of exhibits relate to the supposed

7    Miami scheme and Mr. Gatto's intent with respect to that

8    scheme.  There are two recordings between Mr. Dawkins and the

9    undercover agent, which we contend reflect his state of mind

10   with respect to the NCAA rules and whether they apply to his

11   conduct.  And there may be a one-off recording that I am

12   missing right here.

13           The text messages are all being offered for their

14   effect on the listener, which I think in every instance is one

15   of the defendants.  Although I think there -- I should take

16   that back.  I think there may be one or two text messages that

17   are exchanged between alleged co-conspirators that we think are

18   admissible to show the co-conspirator's state of mind.

19           There are a few e-mails between Mr. Gatto and the

20   family of Dennis Smith reflecting Mr. Gatto's response when

21   Dennis Smith signed with Under Armour as opposed to Adidas.

22           THE COURT:  Which would be relevant why?

23           MS. DONNELLY:  Because the allegation here -- excuse

24   me, one of the theories that the government has advanced is

25   that Mr. Gatto was motivated by greed, that he paid the Smith

1  family, or agreed the Smith family could be paid because he

2  hoped Dennis Smith, Jr. would sign an endorsement deal, a shoe

3  deal, once Dennis Smith became an NBA player.  So when Dennis

4  Smith did not in fact sign an endorsement deal with Adidas, we

5  contend that Mr. Gatto's reaction to that news is, how he

6  reacted is indicative of whether that was ever the reason for

7  the payments to begin with.

8          THE COURT:  Any other categories?

9          MS. DONNELLY:  There are five documents that -- I

10  don't want to speak on behalf of Mr. Haney, but they are

11  e-mails from ASM, which is the Andy Miller Sports agency that

12  we have heard about, in which Christian is talking to his boss,

13  Mr. Miller, about payments to amateur players, and Mr. Miller

14  is, we contend, authorizing those payments.  And under *United*

15  *States v. Litvak*, it is admissible evidence of Mr. Dawkins's

16  good faith.

17          And the NCAA rules, I think you probably have a sense

18  of what we are going for there, but they are not a hearsay.  I

19  think we just have a question about relevance.

20          THE COURT:  It seems to me that you should get into

21  our hands by 8:30, and the government's hands, a skeletal

22  outline by category of how you group these and what the theory

23  of admissibility is.  And it's not to exceed four pages

24  double-spaced.  And the government can respond by midnight.  I

25  do not guarantee I am going to be able to read these between

IAF8GAT5

1  these hours but at least we will be here, and we will start

2  tomorrow, without benefit of this 40-page opus because there is

3  no practical time to read it, at 9:30.

4        Now, how long should it take to go through this?

5        MS. DONNELLY:  Well, your Honor, if your Honor decides

6  to rule on categories of evidence, then I think it will go very

7  quickly, because in fact there are only going to be a few of

8  them and many of the calls are similar to each other.

9        I suspect that once defendants hear your Honor's

10  rulings on a few exhibits, we will almost certainly have a

11  sense for your Honor's view and we will not need to engage in

12  heated argument on matters that you have already decided with

13  respect to substantially similar items.

14        THE COURT:  So you think I am safe telling the jury to

15  come at 10:30?  11?

16        MS. DONNELLY:  I apologize, your Honor, but I do think

17  11 would be better.

18        THE COURT:  OK.  Tell the jury 11:00 tomorrow.

19        Now, let's talk about the rest of the schedule.

20        MS. DONNELLY:  Your Honor, just while we are on this,

21  just to save you from having to print or anything, I have what

22  we actually are going to look to offer.  May I give it to you?

23        THE COURT:  Yes.  Absolutely.  Thank you.

24        So we are going to wind up all the proof tomorrow,

25  yes, no matter what?

1   MR. DISKANT:  Yes.

2   THE COURT:  So the jury will have a short day.  And

3   then I can deal with motions tomorrow, I think, depending on

4   what time it is.

5   I think that it would be very helpful, Mr. Schachter,

6   if the government had a similar outline of your Rule 29

7   motion -- and that goes for your colleagues -- tonight.  And

8   the government can give me something or not.  We will handle it

9   orally if we get to it tomorrow.  Then I will plan Wednesday

10  morning for the charge conference, and at least for the moment

11  plan on bringing the jury in at 1 or 2:00 on Wednesday and

12  start summing up.

13  Now, you gave me some pretty expansive times for how

14  long you wanted for closing arguments.  The government two

15  hours, plus rebuttal.  The defense four hours.  That seems to

16  me a little unbalanced and probably excessive on both counts.

17  So can the government do it in an hour and 40 minutes

18  on their opening argument?

19  MR. DISKANT:  We will do our best.

20  THE COURT:  And the defendants an hour each or any way

21  you want to rack up three hours.  Is that OK?

22  MR. SCHACHTER:  Yes, your Honor.

23  MR. HANEY:  Yes, your Honor.

24  THE COURT:  Mr. Haney.

25  MR. MOORE:  Mr. Haney said yes.  Yes, your Honor.

1          THE COURT:  OK.  Anything else tonight?

2          MR. DISKANT:  Does your Honor intend to set a limit on

3   rebuttal?

4          THE COURT:  I will.  I have heard some great

5   rebuttals, and I have heard some rebuttals that were

6   re-summations.

7          MR. DISKANT:  I will try to be in the first category.

8   Would 45 minutes be appropriate?

9          THE COURT:  I wouldn't have a problem with 45 minutes.

10         OK.  Anything else?

11         MR. SCHACHTER:  I was unclear on the outline of the

12  Rule 29.  Your Honor would like a written outline or are we

13  just to share with the government?  I wasn't sure what your

14  Honor was asking us to submit.

15         THE COURT:  Both.  I am not sure I have ever actually

16  seen one, but in Britain they argue appeals on what is called a

17  skeleton argument.  Now, I have heard of a couple of very long

18  ones, but that is not the intention.  They are not like the

19  appellate briefs we file.  And somehow the British Supreme

20  Court and the Court of Appeals, they deal with it; they deal

21  with the subject headings and what the key cases are, and they

22  are at least intended to be short.  That's what I have in mind.

23         MR. SCHACHTER:  Yes, your Honor.

24         THE COURT:  If we had an open-ended schedule, which we

25  don't, it might be more reasonable to take a day off while we

1  all read this opus you have been preparing for god knows how

2  long, and the government could respond.  But I don't want to

3  leave the jury in the middle of summations without having heard

4  the charge before they begin deliberations.  I don't want to

5  split the summations over a weekend.  I don't think that's the

6  fairest way to do it.  So I am trying to work around the

7  calendar.

8           OK.  Thank you.

9           (Adjourned to October 16, 2018, at 9:30 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  INDEX OF EXAMINATION

2   Examination of:                     Page

3   THOMAS JOSEPH GASSNOLA

4   Cross By Mr. Schachter . . . . . . . . . . .1164

5   Cross By Mr. Moore . . . . . . . . . . . . .1207

6   Cross By Mr. Haney . . . . . . . . . . . . .1233

7   Redirect By Mr. Mark . . . . . . . . . . . .1253

8   LINDSAY HARKSEN

9   Direct By Mr. Diskant . . . . . . . . . . .1268

10   Cross By Mr. Schachter . . . . . . . . . . .1303

11   Cross By Mr. Moore . . . . . . . . . . . . .1310

12   RICKY ROBERTSON

13   Direct By Mr. Mark . . . . . . . . . . . . .1322

14   Cross By Mr. Code . . . . . . . . . . . . .1350

15   Cross By Mr. Haney . . . . . . . . . . . . .1364

16   Cross By Mr. Schachter . . . . . . . . . . .1365

17                GOVERNMENT EXHIBITS

18   Exhibit No.                Received

19    306H   . . . . . . . . . . . . . . . . . .1254

20    113B-1   . . . . . . . . . . . . . . . . .1258

21    8 and 8T . . . . . . . . . . . . . . . . .1260

22    S7   . . . . . . . . . . . . . . . . . . .1261

23    102F-41  . . . . . . . . . . . . . . . . .1261

24    1612, 1613 and 1614  . . . . . . . . . . .1267

25    1701   . . . . . . . . . . . . . . . . . .1267

1  1065, 1066, 1069, 1075, 1077, 1078, . . . . .1276

2          1079, 1088, 1090, 1093 and

3          1100

4  1102   . . . . . . . . . . . . . . . . . .1277

5  1002   . . . . . . . . . . . . . . . . . .1278

6  1004   . . . . . . . . . . . . . . . . . .1285

7  12 and 12T . . . . . . . . . . . . . . .1286

8  1160   . . . . . . . . . . . . . . . . . .1287

9  3004   . . . . . . . . . . . . . . . . . .1288

10 1148, 1150, 1152, 1154, 1158, 1048, . . . . .1290

11          1008, 1010 and 1162

12 3005   . . . . . . . . . . . . . . . . . .1293

13 1130, 1132, 1134, 1014, 1016, 1018, . . . . .1296

14          1019, 1021, 1023, 1025, 1027,

15          1029, 1032, 1038, 1040, 1043,

16          and 1046

17 3002   . . . . . . . . . . . . . . . . . .1299

18 1110, 1112, 1114, 1116, 1118, 1120, . . . . .1300

19          1124, 1126 and 1128

20 3003   . . . . . . . . . . . . . . . . . .1301

21 1139, 1140 and 1164  . . . . . . . . . . .1307

22 302-A through 302-E  . . . . . . . . . . .1318

23 S4   . . . . . . . . . . . . . . . . . . .1319

24 S8   . . . . . . . . . . . . . . . . . . .1321

25 102S-1, S-2, S-3, S-5, S-6, S-9, S-10,  . . .1322

1    S-11, S-12, S-13, S-16, S-17,

2    102T-2 and T-3

3    308E   . . . . . . . . . . . . . . . . . . .1330

4    308A   . . . . . . . . . . . . . . . . . . .1334

5    1072   . . . . . . . . . . . . . . . . . . .1337

6    1099   . . . . . . . . . . . . . . . . . . .1338

7    603   . . . . . . . . . . . . . . . . . . . .1340

8    18 and 18T   . . . . . . . . . . . . . . . .1343

9    103D-2, D-3 and D-4   . . . . . . . . . . . .1344

10                       DEFENDANT EXHIBITS

11   Exhibit No.                              Received

12   160-1   . . . . . . . . . . . . . . . . . . .1167

13   156   . . . . . . . . . . . . . . . . . . . .1173

14   160-2   . . . . . . . . . . . . . . . . . . .1175

15   192   . . . . . . . . . . . . . . . . . . . .1184

16   163   . . . . . . . . . . . . . . . . . . . .1191

17   107K-11   . . . . . . . . . . . . . . . . . .1194

18

19

20

21

22

23

24

25