IAG8GAT1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                       17 Cr. 686 (LAK)

JAMES GATTO, a/k/a "Jim,"
MERL CODE,
CHRISTIAN DAWKINS,

              Defendants.

------------------------------x

                              October 16, 2018
                              9:40 a.m.

Before:

                  HON. LEWIS A. KAPLAN,

                             District Judge
                             and a Jury

                      APPEARANCES

ROBERT S. KHUZAMI
     Acting United States Attorney for the
     Southern District of New York
BY:  EDWARD B. DISKANT
     NOAH D. SOLOWIEJCZYK
     ALINE R. FLODR
     ELI J. MARK
     Assistant United States Attorneys

WILLKIE FARR & GALLAGHER LLP
     Attorneys for Defendant Gatto
BY:  MICHAEL S. SCHACHTER
     CASEY E. DONNELLY

IAG8GAT1

APPEARANCES (Cont'd)

NEXSEN PRUET LLC
        Attorneys for Defendant Code
BY:  MARK C. MOORE
            -and-
MERL F. CODE

HANEY LAW GROUP PLLC
        Attorneys for Defendant Dawkins
BY:  STEVEN A. HANEY


Also present:  SONYA JACOBS, Paralegal
               SYLVIA LEE, Paralegal
               ANTHONY CASOLA, FBI

1    (Trial resumed; jury not present)

2    THE COURT:  Well, good morning, everybody.

3    I appreciate all the hard work you did last night.

4    Shall we start with the defendants' stack of exhibits?

5    MS. DONNELLY:  Yes, your Honor.

6    THE COURT:  Just give me a second.

7    Question number one, I noticed nothing in the

8    government's letter about defendants' proposed exhibit 220.  Is

9    that a mistake or are you not objecting to that one?

10    MR. DISKANT:  It most likely was a mistake.  Bear with

11    me, your Honor.

12    Your Honor, we did just miss it.  Looking at it now, I

13    don't think we have an objection to it.

14    THE COURT:  OK.  Fair enough.

15    Well, I have been through all of this material and I

16    will work from the Willkie Farr submission.

17    I am inclined at the outset to exclude the exhibits

18    listed under parts D and E, but if Ms. Donnelly or Mr.

19    Schachter or anybody else wants to address any of those, I will

20    hear you.

21    MR. SCHACHTER:  Your Honor, may we just have a moment?

22    THE COURT:  Yes.

23    MS. DONNELLY:  Your Honor, I would like to begin by

24    addressing DX 101, which is in the binder.

25    We would be offering DX 101 for a nonhearsay purpose.

1  We are not offering it for its truth but, rather, to

2  demonstrate the use of the word "Black Opp's."  In this text

3  message, which is exchanged between TJ Gassnola and other

4  members of the --

5          THE COURT:  I read it.  I got the point.  It's

6  cumulative.

7          MS. DONNELLY:  Yes, your Honor.

8          THE COURT:  Anything else on section E?

9          MS. DONNELLY:  Yes.  Technically the NCAA rules I

10  listed under E.  So is that something we should address here

11  now?

12          THE COURT:  OK.

13          MR. SCHACHTER:  Yes, your Honor.  So within E is our

14  proposed Government Exhibit 1503, which is a redacted version

15  of Government Exhibit 1503, which is the entire NCAA rule

16  manual.

17          May I hand up our proposed redaction of Government

18  Exhibit 1503?

19          THE COURT:  I should have had this yesterday.  So

20  should the government.

21          Did the government have this yesterday?

22          MR. SCHACHTER:  The government has had it since

23  Saturday.  As well as Government Exhibit 642.

24          May I approach?

25          THE COURT:  What is Government Exhibit 642?

1    MR. SCHACHTER:  It's the NCAA reinstatement

2  guidelines, a redacted version of that.

3         THE COURT:  So what are we talking about here?

4         MR. SCHACHTER:  We are talking about a limited portion

5  of the NCAA rules and the NCAA reinstatement guidelines that

6  are nonhearsay.  I would just like to briefly explain why we

7  believe that these are relevant, or I guess just add additional

8  things for the record.

9         First, Mr. Smith testified, transcript 848, line 18,

10  through --

11         THE COURT:  I want to suggest something else for where

12  you start.

13         MR. SCHACHTER:  Yes, your Honor.

14         THE COURT:  Why when you were belatedly yesterday

15  giving me a list -- not a list, but copies of everything you

16  were proposing to drop into evidence at the end of the

17  government's case was this material not in it?

18         MR. SCHACHTER:  Your Honor, the issue of the admission

19  of the NCAA rules is something that we have been trying to

20  introduce throughout the entire case and now would like to

21  revisit it one last time before the defense rests.

22         THE COURT:  Why wasn't the version you are trying to

23  introduce in this book yesterday, so that I could conceivably

24  have had the benefit of looking at it?

25         MS. DONNELLY:  The answer is as follows.  The exhibits

1  that your Honor has that I handed up yesterday were exhibits

2  pursuant to a 40-page motion that I was drafting regarding

3  state of mind evidence.  We were intending to submit a separate

4  letter brief regarding the NCAA rules, and the two exhibits

5  that you now have were part of that motion.  So the courtesy

6  copies of the exhibits that you looked at did not include those

7  two exhibits because we were planning to submit them separately

8  since they relate to a different issue.

9         THE COURT:  And you didn't say anything about that

10 yesterday.

11        MS. DONNELLY:  Well, your Honor, I said when we were

12 describing the evidence that we would discuss this morning, I

13 said that we would be discussing -- that we were intending to

14 discuss the NCAA rules.

15        THE COURT:  You did.  But you have extracted from what

16 you tell me is a four- or six-hundred page manual a handful of

17 redacted pages as to the reinstatement guide -- I have never

18 laid eyes on it before -- or reinstatement guidelines.  How am

19 I supposed to now make a judgment as to whether these extracts

20 are fair and reasonable?  How am I supposed to do that?  I have

21 never even read them.  You have given me no opportunity to do

22 that.

23        MR. SCHACHTER:  I understand.  These are the rules

24 that we referred to at sidebar when we tried to examine

25 witnesses on these particular rules.

1    THE COURT:  Yes, and I made clear at the sidebar that

2    it seemed to me that at least to the extent you were talking

3    about Article 12, and that's what you were talking about, not

4    Article 13 as I remember, though I might be mistaken, it seemed

5    to me that on a moment's inspection it was an unfair extraction

6    from the rule book.

7    MR. SCHACHTER:  I understand your Honor's concern.  We

8    believe that the definition of what is amateur status is

9    vitally important in this case, particularly given the fact

10   that the government has identified certifications that hinge

11   and that use the words amateurism and amateur status.

12   Therefore, it is our position that the jury has a right to see

13   the rule, which is a relatively limited one, on what in fact is

14   an amateur status.

15   THE COURT:  It is not a relatively limited one.  You

16   are trying to pretend that it is, but it isn't.

17   Let me hear from the government.

18   MR. SCHACHTER:  Your Honor, may I just add one other

19   thing to the record on this point?

20   Mr. Smith's testimony, the cite that I identified, he

21   was asked by the government whether payments to a

22   student-athlete as well as a payment to the family member of a

23   student-athlete would affect -- can that occur and can the

24   person remain an amateur?  Mr. Smith stated no, they may not.

25   And we believe that is inaccurate testimony based on these

 1    rules.

 2              We are also content with having the entire rule book,

 3    as identified by the government originally, offered into

 4    evidence.  But we thought that the excerpt would be more

 5    acceptable to the court as well as to the government.

 6              THE COURT:  All right.  Mr. Diskant.

 7              MR. DISKANT:  Your Honor, we think the court has

 8    already repeatedly and correctly ruled that the actual text of

 9    the rule is neither terribly relevant in this particular trial

10    and even if it had any probative value, that is substantially

11    outweighed by the risk of juror confusion given that this is a

12    several-hundred-page manual.  It is complicated and, again, the

13    precise language of the text is not terribly relevant.

14              I will note on this point that Mr. Schachter keeps

15    raising about whether we are exclusively talking about Rule 12

16    or not.  The very form that Mr. Schachter used to make this

17    point -- I can bring up 1609, page 6 -- it says just the

18    opposite, which is that -- bear with us.

19              Your Honor, if you look up at the top it says the

20    conditions that you must meet to be eligible and the

21    requirements to sign this form.  It lists a whole litany of

22    NCAA bylaws.  So the notion that by signing this form and

23    indicating that he is an amateur Mr. Bowen is only affirming

24    his compliance with Rule 12 is just a nonstarter.

25              I think the bigger issue is the relevance of getting

IAG8GAT1

1    into all of this stuff in the first place, since the core issue

2    is whether or not the information and the representations were

3    material to the universities.  We have had university witnesses

4    on the stand who have all testified unequivocally that this

5    information is, and to their understanding, which again is the

6    only relevant issue here, as to whether or not these payments,

7    and information about these payments, needed to be disclosed

8    and was material to their decision to issue the scholarship.

9              THE COURT:  But, look, this form that you have just

10   put up on the screen says that "the conditions you must meet to

11   be eligible and the requirement that you sign this form are

12   indicated in the following bylaws of the Division 1 manual."

13             Now, why isn't the Division 1 manual relevant to

14   assessing the truth or falsity of the statement in this form?

15             MR. DISKANT:  So I guess there are two responses to

16   that.

17             First is that the sections provided there span, by my

18   count, about 240 pages.  So therefore I really do think there

19   is a 403 issue even if they were probative.

20             The second response is that I don't think there is any

21   serious dispute in this case that the payments in question

22   violated some of these rules.  Even when Mr. Schachter was

23   arguing that Rule 12 wasn't violated, he was conceding that

24   Rule 13 was because Rule 13 deals with all recruiting

25   violations.

1    So asking the jury to parse through 250 pages of NCAA

2  rules to determine whether Mr. Bowen and his family had

3  violated bylaw 12 as opposed to bylaw 13 is really not of any

4  probative value here.

5    THE COURT:  Just give me a minute to get something up

6  on the screen.

7    All right.  Ms. Donnelly said in her opening, among

8  other things, the following, starting at page 66:

9    "The government made it seem like this is going to be

10  a trial about illicit payments and backroom dealings and the

11  knowing violation of NCAA rules.  And so I want to start today

12  right from the beginning to let you know that NCAA rules were

13  broken.  Jim, referring to Mr. Gatto, and Adidas helped out

14  financially a few families whose sons are amongst the most

15  talented athletes in America.  That happened.  We are not going

16  to waste your time pretending that those families did not get

17  funds.  But, ladies and gentlemen, if all the government had to

18  prove was that Jim helped these families, we wouldn't be having

19  a month-long trial.  But that's not what they have to prove.

20  Jim is not charged with NCAA rule-breaking."

21    And skipping down a few lines:  "We are going to fight

22  like mad over the next month in an effort to help you

23  understand that even if Jim broke an NCAA rule, that's a far

24  cry from committing wire fraud.  You see, the NCAA rules are

25  not part of the laws of the country."

1    And she goes on and says:  "The NCAA's rule that

2  college athletes and their families may not receive anything of

3  value in connection with their son's decision about where to go

4  to college, that's also not a law.  In fact, we know that."

5    Then at page 98, counsel for Mr. Code:  "This isn't

6  going to be a who did it kind of case or even so much of what

7  did he do kind of case.  This case is all about the why.

8  Because we agree that Merl Code helped facilitate payments to

9  the family of Tugs Bowen in order to get him go to Louisville,

10  an Adidas-sponsored school."

11    Skipping to the next page:  "And now, ladies and

12  gentlemen, while some of you might find this a little

13  troubling, while it might bother you a little bit, we are

14  telling you up front that Mr. Merl Code made these payments or

15  helped make these payments to the family of Tugs Bowen, and he

16  was willing to ignore NCAA rules in the process.  But Merl

17  isn't charged with defrauding the NCAA or breaking its rules.

18  Breaking an NCAA rule to help a flagship school in his words is

19  light years away from conspiring to defraud these schools."

20    Then Mr. Haney, at page 118, beginning at 118, really

21  119:  "And you will hear evidence that taking care of these

22  families meant paying them.  There is no denying that.  You

23  will hear evidence of that.  Paying them with other people's

24  money was not only preferred, but it was the model of the

25  agencies, pay them with the shoe company's money, don't use our

1   money.  And you will learn from the evidence that providing a

2   poor family with financial benefits, regardless of how much or

3   little, is a violation of NCAA rules."

4           Now, tell me, Mr. Schachter, if you can, why it is

5   that the defense did not concede on the openings that these

6   payments violated NCAA rules and that the issue of whether it

7   did so is really out of the case?

8           MR. SCHACHTER:  Your Honor, we conceded that they

9   violated the NCAA rules, but this is not a prosecution of

10  whether or not they violated the NCAA rules.  It's a fraud

11  case.  And so they have to prove that there were false

12  representations and there was an intention to make false

13  representations.

14          The representations at issue do not say, did you ever

15  violate the NCAA rules?  The specific representations

16  referenced the amateurism rules.  So that's one issue.

17          THE COURT:  At least one of them did.  The one that I

18  just saw on the screen did.

19          MR. SCHACHTER:  Even more so, your Honor, and we can

20  pull up the others, which definitely do mention specifically

21  the amateurism rules even in that same exhibit that Mr. Diskant

22  showed you one portion of.  The other portions they showed the

23  jury specifically referenced the amateurism rules of the NCAA,

24  which are not violated.  Whether or not that statement is true

25  or false we believe is an issue for the jury's consideration.

IAG8GAT1

1    So our concession that NCAA rules were violated is not

2    a concession that there were fraudulent representations, which

3    is a critical component.

4    THE COURT:  Explain to me how the concession that

5    these payments violated NCAA rules didn't violate amateurism

6    rules?  I am having a hard time getting my arms around that.

7    MR. SCHACHTER:  Sure.  Directing your Honor's

8    attention to the rule in chapter 12, in bylaw 12 of the NCAA

9    rules, in order for it to be a violation of one's amateurism

10    status it has to be an action by the individual.  The

11    individual athlete is the only one that can affect his own

12    amateur status.

13    Separately, in bylaw 13, there are rules that prohibit

14    recruiting violations, which we concede is -- there is a

15    recruiting violation for somebody to pay a member of the

16    family.  But that is not a violation of the amateur rules and

17    does not directly affect --

18    THE COURT:  Why do you suppose that they prohibit

19    payments to the families?  Could you shed a little light on

20    that?  Is that somehow unrelated to amateurism?

21    MR. SCHACHTER:  Yes, your Honor.  I believe it affects

22    competitive balance.  They don't want one university to get

23    help in recruiting that another university does not.  That is

24    what I believe.

25    We could have heard from somebody from the NCAA.  The

1  government chose not to call a witness from the NCAA.

2           THE COURT:  So did you.

3           MR. SCHACHTER:  Also true.  But of course, the

4  government has the burden.

5           My understanding is that's the reason for the

6  recruiting violation is because you don't want one school to

7  get the kind of help that the defendants offered and have

8  another school not get that kind of help.  So it has to do with

9  competitive balance as opposed to amateurism.

10          THE COURT:  And those are hermetically sealed

11  non-overlapping considerations.

12          MR. SCHACHTER:  I think that one can debate the

13  reasons for the NCAA rules, and your Honor has made abundantly

14  clear, and I agree, that's not the point of this case.  The

15  point of this case is, in part, were their false

16  representations made, and I don't know how the jury can assess

17  whether or not the false representations were made without

18  looking at the rules that are being addressed in the specific

19  representations.

20          For that matter, if I may add one additional point,

21  even the point Mr. Diskant made that you're certifying that

22  also you are eligible pursuant to all of these other

23  provisions, I think it is relevant to the jury's assessment of

24  materiality as to whether or not the universities, really

25  whether they believe that the athletes before signing these are

IAG8GAT1

1    wading through all of the chapters of the NCAA rule manual.

2    The mere voluminous nature of is also relevant to assessing

3    whether or not, in the eyes of the jury, who are the ones who

4    have to make this assessment of materiality, whether colleges

5    are really banking on the fact that athletes are poring through

6    the various chapters of this rule manual, because it's our

7    contention this is completely immaterial and these

8    representations don't mean anything to the universities.  But

9    that's a jury question and we think relevant to that jury's

10   assessment, is to be able to see the NCAA manual that the

11   universities are supposedly believing these athletes are

12   reviewing so carefully.

13            MR. DISKANT:  A couple of things.

14            First, I think your Honor is exactly right.  I think

15   the defendants conceded in the opening that this violated NCAA

16   rules.  I think some of those NCAA rules are the very form that

17   the student-athletes just signed and that is sufficient for

18   purposes of this case.

19            More important, the rule at issue here is not some

20   tiny minutia of the rules book.  It is arguably the most

21   significant and the most basic component of the rules manual,

22   something that is so basic that a 17-year-old kid would not

23   need to --

24            THE COURT:  So basic that it appears on page 1 of the

25   manual.

1          MR. DISKANT:  Exactly right.

2          Look, I am happy to respond with specificity because I

3     don't agree with Mr. Schachter about a lot of this and we can

4     get into the weeds on whether or not Rule 12 and Rule 13 apply.

5     I think they do.  I think the court has this right.  This is

6     such a basic general principle that putting in 400 pages of

7     rules is going to serve no purpose but to confuse the jury on

8     issues that really are not in dispute in this case.

9          THE COURT:  I thought I heard you say, did I not,

10    someone said, there is no objection to the whole manual coming

11    in.  Is that right?

12         MR. DISKANT:  That was Mr. Schachter.  We would have

13    an objection to that.

14         THE COURT:  You have an objection.

15         All right.  The answer is this.  I consider the

16    excerpt tendered by Mr. Schachter to be incomplete and

17    misleading, and I am not going to receive it.

18         If Mr. Schachter wants very swiftly to prepare a

19    fairer extract, I will consider that.  If the government wants

20    to work with Mr. Schachter on coming up with something that

21    would suit both of you, that's fine.  But it seems to me, from

22    reviewing this material, that Article 1 of the NCAA

23    Constitution, which starts and may occupy all of page 1, is

24    relevant on the subject of amateurism.

25         Article 2, particularly Section 2.9, states:  The

1    Principle of Amateurism.  It states that student-athletes shall

2    be amateurs in an intercollegiate sport and their participation

3    should be motivated primarily by education and by the physical

4    mental and social benefits to be derived.  Student

5    participation in intercollegiate athletics is an avocation and

6    student-athletes should be protected from exploitation by

7    professional and commercial enterprises.

8            It seems to me that at least arguably covers what went

9    on here.  Bylaw Article 10 relating to ethical conduct is

10   relevant.  Part of Article 11 is relevant.  Article 12 and 13

11   of course are relevant, at least in part.  Article 15 may have

12   relevance.  Article 16 appears to be of possible relevance, not

13   all of it in any one of these cases.

14           But you have an organization and a rule book and a set

15   of bylaws and a constitution that exalt, whether an

16   appropriately or not, the principle of amateurism.  And

17   obviously the rule breaking that went on here, concededly went

18   on here, violated that principle in a goodly number of ways.

19   And if you want any of this stuff in, Mr. Schachter, you are

20   going to have to have the relevant material.

21           MR. SCHACHTER:  May I just say one thing perhaps for

22   the record.  Very briefly, the principles --

23           THE COURT:  Just before -- excuse me for

24   interrupting -- just before we go on with that, I considered

25   the concessions made in the opening to be dispositive.  I am

IAG8GAT1

1  leaning over backwards here in taking any of this.  That's my

2  best judgment.

3      MR. SCHACHTER:  I understand, your Honor.  Again, very

4  quickly for the record.  Your Honor, I believe actually that

5  the principles are -- without risking the ire of the court; I

6  am just really speaking for the record, I believe -- the

7  principles, we believe, are hearsay.  Rules are nonhearsay.

8  The NCAA's use of the reasons for their rules are hearsay and

9  we believe are not relevant because you cannot be found to be

10 ineligible based on violating the principles of the NCAA rules.

11 You can only be found ineligible based on a violation of the

12 bylaws.

13      So it's our position, your Honor, that the bylaws of

14 the rule manual are admissible, but the principles are not.  I

15 know that's going to make your Honor angry.  It's not my

16 intention.

17      THE COURT:  Not angry.  I just don't agree with it.

18      MR. SCHACHTER:  Understood.

19      THE COURT:  The laws of Congress, the words of the

20 statutes, they are what they are.  But lots of things are

21 relevant in interpreting them.  And even more is relevant in

22 characterizing them.

23      What you are attempting to do, on behalf of your

24 client, and have every right to do it, is to say, for example,

25 when a student says I have told you, in substance, everything

1  that might bear on whether I am an amateur, the student's truth

2  or falsity in making that statement, or the accuracy, to be

3  more precise, of that statement should be determined with a

4  pair of blinkers on and focus on Article 12 only.  And it is as

5  if you were drafting a trust indenture in which you defined

6  excess revenue as meaning the number of dollars taken in in a

7  particular month above and beyond the sum total computed by a

8  formula somewhere else and that becomes a defined term and

9  every time the phrase excess revenue is used it means that, no

10  matter what it might mean to someone else.  It's not that kind

11  of document.  It's not that kind of case.  This is a corporate

12  bond argument.

13          MR. SCHACHTER:  With respect to the analogy to

14  Congress, juries may be instructed on what the law is.  They

15  are not generally instructed on the reasons why Congress chose

16  to pass that particular law.  I would suggest it's the same

17  thing.

18          THE COURT:  Indeed on occasion that is not the case,

19  having instructed quite a few more juries than perhaps you

20  have.

21          OK.  That takes care of E.

22          Anything on D?

23          MR. HANEY:  Yes, your Honor.

24          With respect to DX 1301, 1302 and 1313, these

25  particularly relate to my client, your Honor, and these are

IAG8GAT1

1    e-mails from the ASM principal Andy Miller.

2            They are not being offered for the truth.  They are

3    being offered for the effect on the listener, that being Mr.

4    Dawkins, that the statements by employer Andy Miller not only

5    condoned what actually encouraged Mr. Dawkins to pay the

6    families of respective college athletes and prospective

7    clients, and we cited the case *Litvak* that is on point to that

8    particular issue, where Mr. Dawkins's good faith belief was

9    that the supervisor was condoning it.  Therefore, he had no

10   belief it was improper and unlawful based on that endorsement

11   by Mr. Miller.

12           THE COURT:  What was the charge in *Litvak*?  Was it a

13   charge that he defrauded his employer?

14           MR. HANEY:  Your Honor, I am not sure exactly what the

15   charge was in *Litvak*.

16           THE COURT:  Don't you think it matters?

17           MR. HANEY:  As in relation to this, no.  I believe

18   reliance upon what Andy Miller was telling Mr. Dawkins goes to

19   his state of mind as to what he believes --

20           THE COURT:  So, in other words, if an employee of a

21   company is charged with embezzlement because he included in a

22   petty cash voucher, for the sake argument, alcohol, when in

23   fact employees theoretically are not reimbursed for alcohol,

24   that employee could rely on the fact that his supervisor has

25   told him, it's OK, you can be reimbursed for the alcohol, and

1  then take the view that there is no crime because the employer

2  condoned it, right?

3          MR. HANEY:  I would draw a distinction.  There is a

4  significant difference between what one should have a

5  reasonable belief is illegal, such as what your Honor just

6  described, and what we have in this case which nobody would

7  ever think would be illegal.

8          THE COURT:  What is illegal about an employee putting

9  in an expense voucher for a meal on a business trip and

10  charging for the drink he had?  Nothing, right?

11          MR. HANEY:  Not illegal, your Honor.  This context

12  though with NCAA rules violations is entirely outside the realm

13  or scope of anything that can be comparable in terms of --

14          THE COURT:  The difference between the hypothetical I

15  put to you and what you are putting to me is that in the

16  hypothetical I put to you it was a rule of the employer, which

17  the employer could adopt, not adopt, enforce, not enforce, and

18  it is wholly the province of the employer to do that.  And I

19  can certainly see an argument that, in the case of where the

20  employer knowingly and explicitly condoned the behavior,

21  whatever the general policy may have been, there is no

22  embezzlement from the employer when the employee claims the

23  expense.

24          But where what is going on is a violation of law or of

25  some external rule of behavior, the fact that the employer

1   condones it doesn't justify excuse, avoid fraudulent intent,

2   whatever.  Does it?  Maybe the employer, you know, is also a

3   criminal, or whatever it happens to be.

4        MR. HANEY:  Your Honor, in this case, I believe what

5   was being relayed and what was being conveyed to my client gave

6   him the belief that his conduct was not improper, certainly not

7   unlawful.

8        THE COURT:  Because Andy Miller is the authority on

9   what is improper and so forth, is that right?

10       MR. HANEY:  Because Andy Miller was not only

11  condoning, he was encouraging him and telling him to do it.  He

12  was being mandated to go do these things on behalf of his boss

13  which my client then believed was proper and not unlawful.

14       THE COURT:  So when the head of the Genovese family

15  tells somebody to hit some rat, the guy who pulls the trigger

16  can defend on the ground that the boss told me do it and so it

17  must have been all right.

18       MR. HANEY:  Your Honor, I think that is an unfair,

19  with due respect to your Honor, characterization comparing a

20  murder to paying a family money.  I don't think that's a fair

21  comparison your Honor, with all due respect.

22       THE COURT:  How about lending out money at usurious

23  rates.

24       MR. HANEY:  Again, that's illegal and killing people

25  is illegal.  Giving family members money is a violation of the

1  NCAA rules and is never going to be illegal until somebody

2  passes a law making it illegal.  And that is not what we have

3  in this case.  I think the genesis of this case three weeks

4  ago, and I respectfully agree with your Honor, I think we could

5  have tried this case with stipulations in maybe three days.

6         THE COURT:  I do too.

7         MR. HANEY:  I would have stipulated to the government

8  just about everything they have said I agree with.  I want the

9  jury to understand this is not a case about law, it's a case

10  about rules.

11         THE COURT:  You will get your closing argument at

12  another time.

13         MR. HANEY:  I said what I have to say.  Thank you.

14         THE COURT:  Government.

15         MR. DISKANT:  We certainly agree with everything the

16  court said.  I would just add one further point, which is that

17  the government has voluntarily agreed not to offer certain

18  evidence about the true nature of the relationship between

19  Christian Dawkins and Andy Miller, including conversations in

20  which they talk about destroying documents because they are

21  worried they may be investigated, conversations in which

22  Mr. Miller tells, and we quoted this in our papers, Mr. Dawkins

23  that you are literally immune to committing a federal crime.

24         All of that can be highly be probative if the argument

25  is going to be that Mr. Dawkins genuinely thought his employer

1  was telling him it was OK to do this.  We have voluntarily kept

2  it out of the case.  We thought it would be misleading to offer

3  this small snippet of their relationship to make a different

4  argument.

5            MR. HANEY:  May I respond briefly?

6            THE COURT:  Sure.

7            MR. HANEY:  The government knows that Andy Miller has

8  been chased by the NBA Players Association for years, has been

9  decertified a number of times, and is constantly ducking and

10  dodging the NCAA and NBPA.  They know that there was no

11  context, and they were talking in jest about violating federal

12  law.  They are being disingenuous in that position, your Honor,

13  and any conversation and concerns were about the NCAA.

14            THE COURT:  Do you think we can avoid the personal

15  attacks on one another?

16            MR. HANEY:  I will, your Honor.  Thank you.

17            THE COURT:  Let me just take a final look at *Litvak* to

18  be sure.

19            MR. SCHACHTER:  I can be helpful on what *Litvak* was

20  about.

21            THE COURT:  I will look myself.  Thank you, Mr.

22  Schachter.

23            Mr. Haney, explain to me which of these things show

24  Miller approving what you say he is approving.

25            MR. HANEY:  Your Honor, there is an example on August

1    12, 2016, Mr. Miller approving a payment of $1200 to the

2    handler of Markelle Fultz, who at that time was a college

3    student.

4              THE COURT:  Is that the only one?

5              MR. HANEY:  No, sir.

6              December 20, 2016, an e-mail between Mr. Miller and

7    Mr. Dawkins.  That would be DX 1307.

8              THE COURT:  1507?

9              MR. HANEY:  13, your Honor.

10             May I continue, your Honor?

11             THE COURT:  Yes.

12             MR. HANEY:  Thank you, sir.

13             Where there is an update on the outstanding payments

14   that Mr. Dawkins has made to the families of college athletes,

15   including Brian Bowen Junior and Markelle Fultz.

16             THE COURT:  So I saw nothing in 1301, 2 and 3, or

17   7 -- I'm sorry, or 13.  So those are certainly excluded.

18             Now, what does the government say about those other

19   two?

20             MR. DISKANT:  Two things.

21             First is both of these predate Mr. Dawkins's agreement

22   to make a $100,000 payment to Brian Bowen.  At the time he did

23   that he was no longer working for Andy Miller.  And two is the

24   point we made earlier, which I believe Mr. Haney agrees with,

25   which is, as he put it, Mr. Miller was constantly under

1    scrutiny from outside regulators, including the NBA Players

2    Association and the NCAA, because he knew what he was doing

3    violated those rules.  And there are conversations between Mr.

4    Dawkins and Mr. Miller about those subjects indicating, we

5    believe, that Mr. Dawkins could not reasonably have believed

6    that Mr. Miller was telling him it was A-OK to make these

7    payments.

8             THE COURT:  And that's the stuff you agreed not to

9    use.

10            MR. DISKANT:  Correct.

11            THE COURT:  How much stuff is there?

12            MR. DISKANT:  There are numerous recorded calls.

13            THE COURT:  Mr. Haney, if I let you introduce 1307 and

14   1309, what would your position be on the government introducing

15   all of that material?

16            MR. HANEY:  I have to give that some consideration,

17   some thought.  Without knowing exactly what materials they are

18   proposing to introduce, I would like to see that before I make

19   that decision at this point.

20            THE COURT:  I am not necessarily saying that's on the

21   table.

22            MR. HANEY:  I understand, sir.

23            THE COURT:  I am interested, and one of the things I

24   am interested in is how much time it will take to go through

25   all of that, even if the two of you agree.

1          MR. HANEY:  Perhaps at a break I could review what

2     information they have.

3          THE COURT:  I recommend that you do so.

4          So the material in D is out, with the possible

5     exception of 1307 and 1309, subject to that discussion.

6          OK.  Now, let's go back to the beginning.

7          Part A.  I am excluding without need for argument DX

8     25, DX 221 and 222, DX 102.  And that leaves us starting with

9     DX 6 and 28.

10          As to DX 6, the relevance of this is what?

11          MS. DONNELLY:  Your Honor, Will Wade is a Division 1

12     head coach of Louisiana State University.  And in this call, he

13     is communicating to Christian Dawkins that he can get him what

14     he needs, meaning money, if a high school player in Florida,

15     Balsa Koprivica, agrees to play for LSU.

16          This recording is being offered not for its truth, but

17     for the effect on Christian Dawkins who would have heard a

18     Division 1 head coach say, if you send Balsa to me, I will make

19     sure you get this money, which we think is indicative of -- we

20     think it's relevant to Mr. Dawkins's intent and his belief that

21     he was not hurting these universities, but in fact, based on

22     his understanding of Division 1 coaches, was giving them what

23     they wanted.

24          THE COURT:  Now, you said, I can get him what he

25     needs, or what you need.  That statement is made by Wade to

1    Dawkins, right?

2              MS. DONNELLY:  Correct.

3              THE COURT:  And what he said was, "I can get you" --

4    that is Dawkins -- "what you" -- that is Dawkins -- "needs."

5              How do I know what that is?

6              MS. DONNELLY:  I should have started at the very

7    beginning of the call because that is where the context lies.

8              So on the first page of the exhibit, there is Will

9    Wade and Christian Dawkins, and then Will Wade and Christian

10   Dawkins.

11             Dawkins says:  "My question for you was, so you said

12   to me in Atlanta there was a 2019 kid I wanted to recruit, they

13   can get him to LSU, you would have funded.  Would you want

14   Balsa?"

15             Then Mr. Wade says:  "Oh, the big kid?"  Because Balsa

16   is a real big, tall kid.

17             And Christian confirms.

18             Then Coach Wade says, and excuse my language:  "OK.

19   But there's other" -- expletive -- "involved in it."

20             Then he says, "I have got to shut my door."

21             And we go on to the next page and he says:  "Here's my

22   thing.  I can get you what you need, but it's got to work."

23             It is our understanding, and I think this is

24   consistent with the testimony that has come in, that Dawkins

25   was sort of a middle manager -- I don't want to use the word

IAG8GAT1

1  handler, that's not right, but he was the facilitator between

2  coaches or shoe companies and the families themselves.  And so

3  this is a perfect example of what in fact has been testified to

4  for two weeks.

5       THE COURT:  And therefore we don't need it, right?

6       MS. DONNELLY:  We do need it.  Because one of the

7  things that was made very clear during Mr. Bowen Senior's

8  testimony was that Christian told him these coaches were making

9  these offers for Tugs.  Perhaps it was me, but there was an

10  implication that perhaps Christian was making it up.  Perhaps

11  Christian was just saying this.  So this call is evidence that

12  in fact Division 1 coaches do make these offers to Christian.

13       THE COURT:  Government.

14       MR. DISKANT:  So a couple of things, your Honor.

15       First is this pertains to a coach and a player the

16  jury has heard nothing about.  The government has not made any

17  arguments at this trial about the player, has not made any

18  arguments about the coach.  So any effect on the listener to

19  Mr. Dawkins is irrelevant.  This is really more of an

20  everybody-is-doing-it type of an argument.

21       The second issue is I think there is indicia from this

22  call that Mr. Wade knows he is not supposed to be talking about

23  this, along the "let me shut my door" before he starts talking

24  about funding this particular situation with Mr. Dawkins, which

25  I think strongly undercuts the notion that the affect on the

IAG8GAT1

listener would be to believe that coaches thought this was A-OK

and he was permitted to do.

So we think its probative value is extremely limited.
We think the risk of juror confusion is exceptionally high.
And as Ms. Donnelly and the court just noted, there has been a
lot of evidence that coaches talked with Christian Dawkins
about payments. The evidence thus far has pertained to Brian
Bowen or to players that are relevant to this case. So to the
extent that is the point, this would simply be cumulative.

MR. HANEY: May I be heard briefly?

I wouldn't agree it has been cumulative. The only
evidence we have heard has been through third parties that said
Christian Dawkins was talking to coaches. This is evidence of
it actually occurring, where the head basketball coach -- not a
low-level assistant -- the head basketball coach of a major
university is actually talking with my client about the very
things that this case is about.

It's not Christian Dawkins puffing and saying, I
talked to this guy and I talked to that guy, which I think is
maybe the inference of what is being projected by his
testimony. But that is not true. He is talking to people at
the highest level of basketball. I do think it is relevant.

THE COURT: It is not the highest level of basketball.

MR. HANEY: Well, a pretty high level.

THE COURT: It is not the highest level of basketball.

1          THE COURT:  I think the prejudicial effect

2   substantially outweighs any probative value.  It is out.

3          DX28.

4          MS. DONNELLY:  DX28 is being offered for a similar

5   nonhearsay purpose.

6          THE COURT:  Excuse me for a minute Ms. Donnelly.  I am

7   trying to --

8          MS. DONNELLY:  I apologize.

9          THE COURT:  I may have misspoken before.  When I said

10  DX102 was out, I meant to say DX103.

11         Sorry for the interruption.  Go ahead.

12         MS. DONNELLY:  OK.  But to be clear, your Honor would

13  like me to address DX28 right now?

14         THE COURT:  Correct.

15         MS. DONNELLY:  DX28 is in our view relevant for

16  largely the same arguments that I just made with respect to the

17  previous call.  This is a conversation between Christian

18  Dawkins and Louisville Coach Jordan Fair in which they

19  discuss -- they discuss the recruitment of Balsa Koprivica.

20  And the jury, by the way, does know who that is.  I can give

21  you a transcript cite.  But what's important here is Mr. Fair's

22  comment on the bottom of page 1, where he says, "I keep my

23  relationship with Christian off the book."  On page 2, he says

24  something similar.  "Christian and I keep that," excuse me,

25  expletive, "off the book."  And, again, this is evidence that

Iagdgat2

1  Christian understands that these coaches like working with him,

2  they want to work with him, but at the same time they want to

3  make sure that this isn't being advertised.  For all the

4  reasons that -- I mean, the government can argue that that's

5  because they know that what they are doing is wrong.  We would

6  argue it is because nobody wants to be penalized by the NCAA

7  because it is not a pleasant experience.

8          And then I think that's -- those were are our

9  arguments with this.

10          THE COURT:  All right.  Mr. Diskant.

11          MR. DISKANT:  Look, I think for some of the reasons

12  Ms. Donnelly just highlighted, we can offer this and the

13  government can close on it.  There is evidence Mr. Dawkins knew

14  he wasn't supposed to be doing it.

15          Our concern is that, again, Jordan Fair and Balsa are

16  not people the jury has heard very much about.  There is

17  absolutely no context to this call whatsoever.  It takes place

18  on September 22, 2017, which is well after Mr. Dawkins --

19          THE COURT:  It is a couple of days before the

20  indictments, right?

21          MR. DISKANT:  Correct, your Honor.

22          THE COURT:  So it couldn't be evidence of his state of

23  mind that is relevant to this case because everything charged

24  in this case was over and done by then.

25          MR. DISKANT:  Absolutely right, your Honor.

Iagdgat2

1           THE COURT:  What do you say to that, Ms. Donnelly?

2           MS. DONNELLY:  I'm sorry.  I can't read the

3      transcript.  Was the idea that if everything in the case is

4      over and done with?

5           THE COURT:  Yes.

6           MS. DONNELLY:  But it's not over and done with.  The

7      arrests are September 26 and this is September 22.

8           THE COURT:  Right.  So what happened between 2/27 --

9      excuse me, 10/27 on the ninth -- I'm sorry, I'm reading the

10     wrong date.  What happened between September 22 and

11     September 26th as to which this would be helpful to any

12     defendant?

13          MS. DONNELLY:  Nothing happened after that date.

14          THE COURT:  That's my point.  How do you prove that

15     his state of mind was pure earlier by a call that happens after

16     he did everything?

17          MS. DONNELLY:  I think there are two answers.  One,

18     nothing in this call suggests to me that this is a change in

19     the state of mind.  I think we could argue this is what he is

20     thinking.

21          THE COURT:  But you just got finished explaining to me

22     that what you were relying on here was not what Dawkins said,

23     it's what Fair said to Dawkins.

24          MS. DONNELLY:  Sure.

25          THE COURT:  Fair doesn't say that until the whole

Iagdgat2

1    drama has been played out afterward.  So how does Fair saying

2    it to him after everything is over show that when he did what

3    he did he thought anything about what Fair thought?

4            MS. DONNELLY:  I think the answer is because -- is

5    because -- well, I think our argument is that Coach Fair is not

6    saying this is what I feel right now.  I would read this call

7    to say this is my approach to Christian Dawkins, and you can

8    take from that, and I think we would argue from that, that that

9    has been Coach Fair's approach to Mr. Dawkins throughout the

10   summer.

11           THE COURT:  Has there been any evidence of any other

12   contact between them that summer?

13           MS. DONNELLY:  Yes.  Coach Fair participated in a

14   meeting in Las Vegas in which he --

15           THE COURT:  As to which is there any evidence?

16           MS. DONNELLY:  There is a --

17           THE COURT:  Is there?

18           MS. DONNELLY:  No evidence.

19           THE COURT:  OK.

20           MR. MOORE:  It isn't in the indictment now, your

21   Honor.

22           THE COURT:  So what?

23           MR. MOORE:  I am just pointing that out.  It maybe

24   happened post indictment.

25           THE COURT:  It sounds like it but thank you.

Iagdgat2

1      This one is out, relevance and 403.  It comes too late

2 in time.

3      We've dealt with 221 and 222.  We've dealt with 103.

4      Let's go to 1011.

5      MS. DONNELLY:  Your Honor, we contend that this email

6 exchange is -- it is being offered for the nonhearsay purpose

7 of showing the effect on Jim Gatto.  In this email exchange,

8 Chris McGuire, who is a senior employee -- an employee senior

9 to Mr. Gatto, forwards a text that he received from the

10 athletic director at Miami in which the athletic director says

11 we signed with the -- I don't need to read it to you, you've

12 read it yourself.  We signed with Adidas and now we have two

13 commitments from ESPN top 30 players, and the implication is we

14 are thrilled that we got these commitments, that Adidas helped

15 us with this.  And for that reason we contend that this is

16 relevant to understanding why Jim -- excuses, Mr. Gatto may

17 have thought -- or did think, in fact, that these schools were

18 looking and happy to have recruiting assistance from Adidas.

19      THE COURT:  Government.

20      MR. DISKANT:  So the email doesn't actually say a lot

21 of the things that Ms. Donnelly inserted into it.  She is

22 effectively testifying for her client, which is the

23 government's objection.  This email in and of itself is not

24 terribly probative of anything.  It is two years before

25 Mr. Gatto is alleged to have agreed to make the payments to the

Iagdgat2

1    family of someone in Miami.  Absent an opportunity for the

2    government to either inquire as to the person who made the

3    payment or the person upon whom it had an effect, there will be

4    absolutely no context for this document whatsoever.

5    THE COURT:  It is out.  The meaning of it is entirely

6    speculative, totally speculative, at several different levels,

7    not the least of them being that there are various ways in

8    which the shoe companies, according to the record, did provide

9    assistance in recruiting that nobody has claimed violate NCAA

10    rules.  There is an email in this pile somewhere in which it is

11    made clear -- and I believe it is probably Defendants' Exhibit

12    6, let me just look back, but it is made clear that the

13    assistance that was wanted -- maybe it is not 6 but it is in

14    here somewhere -- was to use Dawkins' contacts with someone to

15    further the school's desire to recruit the player.

16    That's certainly a highly germane possibility.  I

17    understand there is a different inference that conceivably

18    might be drawn, but there is no real evidence pointing in any

19    direction.  So the probative value at best is extremely

20    liberal -- little, and the risk of jury confusion, expenditure

21    of unnecessary time is just not worth it.  OK.  That's 1011.

22    102 the government said they have no objection to,

23    right?

24    MR. DISKANT:  No, your Honor.  That was 220.

25    THE COURT:  Sorry.  You are right.  Let's go to 102.

Iagdgat2

1    MS. DONNELLY:  Your Honor, we would offer this text
2    message exchange not for its truth but for the effect on the
3    listener, or the recipient, Mr. Gatto.  This is a text message
4    exchange between Coach Townsend and Mr. Gatto.  I would -- as I
5    mentioned in our submission last night, in order for this call
6    to make sense, we would have to enter into a stipulation with
7    the government that in fact on this day Kansas won the
8    Conference title, and that is why -- I contend that that is why
9    Mr. Townsend is reaching out to Mr. Gatto and saying thanks for
10   all you've done for us.  And, you know, of course Mr. Gatto
11   says, thank you, or congrats.  But in our view this is
12   probative of the fact that Mr. Gatto believed he was helping
13   and doing a positive thing when he arranged or approved a
14   payment to Kansas players for the 2017/2018 season.
15        THE COURT:  How do we know that's what Mr. Townsend is
16   referring to?
17        MS. DONNELLY:  Well, I think that's -- assuming that
18   we got the stipulation -- and I would hope the government would
19   agree that Kansas did in fact win the Conference title that
20   day -- we would argue that that's what they were referring to
21   and the jury could decide.  The government could say there is
22   no evidence that that's what they were referring to, and the
23   jury could decide one way or another.
24        THE COURT:  Maybe they like the color of the
25   basketball shoes.

Iagdgat2

1    MS. DONNELLY:  That's also possible but I think it is

2    probably less likely.  I mean, it is a big deal to win a

3    Conference title.

4         THE COURT:  Mr. Diskant.

5         MR. DISKANT:  I am willing to concede for the sake of

6    argument that they are talking about the Conference title.  So

7    what?  None of the players were paid, hadn't even started

8    playing for Kansas at this point.

9         THE COURT:  Is that agreed, Ms. Donnelly?

10        MS. DONNELLY:  That is correct.  I am sorry, your

11   Honor, I misspoke.  The year 2017 threw me and I was thinking

12   it was the 2017/'18 season.  Correct.  So let me put it this

13   way.  We would still argue that this is relevant evidence that

14   the Kansas coaches believed that Mr. Gatto was helping them and

15   that they appreciated that help in whichever form it took.

16        THE COURT:  It has little or no probative value.  It's

17   just confusing.  It is excluded.  Moreover, it opens us up to a

18   waste of time on rebuttal to try to put this in proper context.

19        MR. MOORE:  Could I ask a question?

20        THE COURT:  Yes.

21        MR. MOORE:  I may have missed something.  DX25, did

22   your Honor rule on that?

23        THE COURT:  Yes.  It is not coming in.

24        MR. MOORE:  Could I be heard for a moment for the

25   record?

Iagdgat2

```
 1              THE COURT:  All right, if you want.

 2              MR. MOORE:  In this call between Mr. Code and

 3     Mr. Townsend, Mr. Townsend says, on page 2, when they are

 4     referring to this player, Zion Williams:  "Hey, but between me

 5     and you, you know, he asked about some stuff.  You know?  And I

 6     said, well, we'll talk about that you decide."

 7              And then Mr. Code says:  "I know what he's asking

 8     for."  This is the player.  "He's asking for opportunities from

 9     an occupational prospective.  He's asking for money in the

10     pocket.  And he's asking for housing for him and the family."

11              And they go on to talk.  And Mr. Townsend says:  "so,

12     I've got to just try to work and figure out a way.  Because if

13     that's what it takes to get him for ten months, we're going to

14     have to do it some way."

15              This is in the time period of the alleged conspiracy.

16     And so my client's state of mind for the entire time period of

17     the alleged conspiracy is relevant, we believe.  While I know

18     that it is some distance from the actual Bowen agreement, there

19     is evidence -- and the government argued this yesterday

20     through -- will argue it, and they put up evidence of the

21     payments that go into August, late August, not too far removed

22     from the date of this.

23              And as your Honor will recall, Mr. Gassnola testified

24     that he did not believe that Townsend knew anything about

25     payment to players or Coach Self knew anything about payment to
```

Iagdgat2

1    players, and that wasn't part of his understanding when he made

2    payments to players in Kansas.

3          Well, my client's understanding is different.  My

4    client's understanding is that the coaches want these payments

5    to be done.  This call references a discussion with Kurt

6    Townsend at Kansas which confirms my client's belief.  And it

7    shows that my client's understanding, let's assume -- let's

8    take Mr. Gassnola at his word for a minute, that my client's

9    understanding is very different from Mr. Gassnola's

10   understanding, and that goes to the issue of whether they have

11   a meeting of the minds, that they have the same agreement and

12   understanding here.  And so for all of those reasons we believe

13   that this call is extremely pertinent.

14         THE COURT:  Number one, Townsend is at Kansas, is that

15   right?

16         MR. MOORE:  Yes, sir.

17         THE COURT:  Your client is not charged with Kansas, is

18   he?

19         MR. MOORE:  My client is not charged with a

20   substantive offense relating to Kansas.  He is charged in a

21   conspiracy that involves a conspiracy to defraud four separate

22   universities, Kansas being one of them, and this goes to him --

23   the government may --

24         THE COURT:  He is charged with a conspiracy to commit

25   mail fraud.

Iagdgat2

1      MR. MOORE:  He is charged with a conspiracy to commit

2  wire fraud, I believe, your Honor.

3      THE COURT:  You are correct.

4      MR. MOORE:  OK.  Wire fraud that relates to defrauding

5  four separate schools, Kansas being one of them.  And while I

6  understand that the government -- and I thought about this long

7  and hard.  I thought about the issue of whether I really want

8  this, and I had some discussions with Mr. Diskant about that,

9  frank discussions with Mr. Diskant, but where I land on this,

10  your Honor, is that it goes to my client's state of mind.  It

11  goes to what my --

12      THE COURT:  It goes to your client's state of mind

13  twelve days before he was arrested and after whatever happened

14  here happened.

15      MR. MOORE:  Well, your Honor, at that point, during

16  those twelve days, my client was still a consultant for Adidas.

17  He was still working to further the interests of Adidas --

18      THE COURT:  What evidence came in about any alleged

19  misconduct by your client in that twelve-day period.

20      MR. MOORE:  There is no evidence of any alleged

21  misconduct by my client within that twelve-day period --

22      THE COURT:  I adhere to my ruling.

23      MR. MOORE:  But I do want to make this point.  Just as

24  there is no evidence that my client had any idea that twelve

25  days later the government was going to come a knocking.  OK?

Iagdgat2

1    And the government hasn't argued -- the government could have,

2    had it chose to do so, cut off this conspiracy at a particular

3    date.  They chose not to do so, your Honor.

4            THE COURT:  And they do not have to prove that it

5    continued from day one to day 400.  They have to prove only

6    some vague resemblance to the period alleged, at most.

7            MR. MOORE:  But they also have to prove, respectfully,

8    a meeting of the minds and an agreement.  And based on

9    Mr. Gassnola's testimony --

10           THE COURT:  All right.  Mr. Moore, I appreciate your

11   argument.  I thought about it, too.  I've made my ruling, and

12   we're going to move on.

13           MR. MOORE:  Yes, sir.  Thank you.

14           MR. DISKANT:  Just very quickly so that there is no

15   confusion.  There is actually one act that Mr. Code takes after

16   this date.

17           THE COURT:  And what was that?

18           MR. DISKANT:  That is the second payment for Brian

19   Bowen comes in from Adidas I believe on September 21st, and he

20   directs Mr. Robertson to move it on --

21           THE COURT:  On what date?

22           MR. DISKANT:  September 21st.  However, all of the

23   planning for that would have predated this.

24           THE COURT:  All right.

25           MR. DISKANT:  Nonetheless, I think the Court's ruling

Iagdgat2

1    here --

2              THE COURT:  The ruling stands.

3              MR. MOORE:  I appreciate Mr. Diskant offering that

4    information.  I do think that makes my argument better, but I

5    understand your Honor's ruling.

6              THE COURT:  Yep.  It introduces unnecessary confusion

7    and waste of time, in addition to having not very much to do

8    with the merits of the case.

9              OK.  Back to Defendants' Exhibit 220.  This is the one

10   the government objects to -- does not object to, is that right?

11             MR. DISKANT:  That is correct, your Honor.

12             THE COURT:  OK.  220 will come in.

13             (Government's Exhibit 220 received in evidence)

14             THE COURT:  Now we go to Section B, Defendants' 5.

15             MR. HANEY:  Your Honor, may I be heard on behalf of --

16             THE COURT:  You may.

17             MR. HANEY:  Thank you.

18             Your Honor, 5T is a conversation that is being offered

19   between my client and the undercover FBI agent Jeff DeAngelo,

20   and it is being offered not for the truth but the state of mind

21   of Mr. Dawkins.  We dealt with this at sidebar, if your Honor

22   will recall, where my client articulated to the agent that

23   because there is a longstanding relationship between himself

24   and the Bowen family, that they couldn't do anything to him.

25             But I would refer your Honor to 5T.  If we could pull

Iagdgat2

that up?  And the context of this, your Honor, as we are

accessing that, refers specifically to Brian Bowen Junior.  It

is on July 10, 2017.

        THE COURT:  I have it in front of me.

        @@CHECK whole para below with document@

        MR. HANEY:  OK.  Thank you, your Honor.

        Mr. Dawkins says:  "I was on his visits to school.

That's how deep it is.  I don't even believe that they could do

anything to me, if it came out that I was like taking gear to

him.  I don't even think they could do anything because I've

been knowing him his whole life.  I don't even think it's an

added benefit.  I Think it would be likely, OK, you know, they

just had a prior relationship before."

        And we also heard testimony during the trial from

Mr. Carns from Louisville that there does exist such a rule.

So this isn't Christian Dawkins just thinking that something

exists that doesn't.  There is actually a rule, the preexisting

relationship rule, that in certain circumstances allows

benefits to be paid to parents.  Whether Christian Dawkins is

right or wrong about that, I don't think we are going to have

an analysis of the rule, but it goes to his state of mind of

whatever he thought.

        Thank you, your Honor.

        THE COURT:  OK.  Thank you.

        Mr. Diskant.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Iagdgat2

1    MR. DISKANT:  Your Honor, I'm a little confused.  This

2    version of the transcript is a little different than the one I

3    reviewed from when the defendants last sent it to me.  But

4    leaving that aside, I think the problem with this is this isn't

5    state of mind because it is not forward looking.  It is a

6    backward statement of belief that the government is not going

7    to have an opportunity to cross-examine Mr. Dawkins about.

8          And, more important, the very next call they want to

9    play, which is DX7, which occurs a day later, is diametrically

10    opposed to this, in which Mr. Dawkins is talking about how all

11    of this stuff is NCAA rules violations and so he wants to cover

12    it up and do everything he can.  That is part of the problem,

13    we submit, with allowing these sort of the backward-looking

14    belief statements in without cross-examination.

15          THE COURT:  Put this timing.  There was a conversation

16    played between Mr. Code and I think Mr. Dawkins, but I may be

17    mistaken in the latter, in which Mr. Code was urging great care

18    in dealing with Jeff DeAngelo.  He suspected they were being

19    set up.

20          MS. DONNELLY:  I believe your Honor --

21          THE COURT:  What was the conversation and who were the

22    participants?

23          MS. DONNELLY:  I believe your Honor is referring to

24    GX34, which is a July 24, 2017 call between Mr. Dawkins and

25    Mr. Code.  I have a transcript.

Iagdgat2

1    THE COURT:  I have it in mind.  OK.

2    So why isn't the answer to let in 5 and 7 and you make

3    your arguments?

4    MR. HANEY:  Thank you, your Honor.

5    MR. DISKANT:  We certainly could, your Honor.  I think

6    for purposes of time, efficiency, not to mention, you know,

7    what the rules technically do and do not allow, I don't think 5

8    is an admissible state of mind statement because it is not a

9    forward-looking statement of his intention to act in conformity

10   with a particular state of mind he had at the time.  It is a

11   backward-looking attempt to justify what he has already done.

12   It does not bear any reliability -- any indicia of reliability

13   because, as noted, the very next day he goes on to say just the

14   opposite.  And so from a 403 perspective, if none other, we

15   think neither of these should come in.

16   THE COURT:  Give me one second, Mr. Haney, and I will

17   be with you.

18   MR. HANEY:  Thank you.

19   (Pause)

20   THE COURT:  OK, Mr. Haney, what about that?

21   MR. HANEY:  Your Honor, it is not being offered for

22   its truth, for one thing.  And my client had a history of

23   paying Bowen Senior prior to this statement that he made to

24   Jeff DeAngelo, and there is record of that.  Mr. Bowen

25   acknowledged that he would -- yes, your Honor.

Iagdgat2

1        THE COURT:  If it is not offered for the truth, what

2   is it offered for?

3        MR. HANEY:  For the state of mind of Christian

4   Dawkins, that is not doing anything wrong based on their

5   previous relationships.

6        THE COURT:  Now, Mr. Diskant says it doesn't come in

7   for state of mind unless it is forward-looking and this is in

8   fact backward-looking.

9        MR. HANEY:  I would submit that it is both backward

10  and forward-looking, and there were payments that occurred

11  after this phone call occurred on July 10th, your Honor.  Your

12  Honor, offering evidence under the state of mind exception to

13  the hearsay rule is different than offering it for a nonhearsay

14  purpose.  We're here to show that the declarant's state of

15  mind -- the exception to the hearsay rule is the statement is

16  offered for the truth of the matter asserted and shows the

17  declarant's state of mind.

18        THE COURT:  All right.  I am going to receive 5 and 7.

19        (Defendant's Exhibits 5 and 7 received in evidence)

20        MR. DISKANT:  Your Honor, could we at least ask for

21  completeness, 7 be continued to the top of page 2, where

22  Mr. Dawkins says, "mm-hmm"?

23        MS. DONNELLY:  In your Honor's binder, that's actually

24  what's --

25        THE COURT:  Well, there is nothing --

Iagdgat2

 1    MS. DONNELLY:  Excuse me.  Last night we sent a

 2   different transcript to the government, but I think we are

 3   happy to play -- oh, Steve --

 4    THE COURT:  Look, it is very hard to follow this

 5   because my copy is apparently not the same as Mr. Diskant's.

 6    So, Mr. Diskant, elaborate.

 7    MR. DISKANT:  Your Honor, it seems like we may be able

 8   to reach agreement with the parties.  Let me confer with

 9   Ms. Donnelly rather than wasting the Court's time on this.  We

10   will come back to this.

11    MR. HANEY:  We will reach an agreement, your Honor.

12    THE COURT:  Thank you.

13    21 -- well, 21, 18, 1006, 218 and 1016 I'm inclined to

14   exclude.  If anybody wants to take a last shot on one of these,

15   I will briefly hear you.

16    MR. MOORE:  I will give it a brief shot, if I may,

17   your Honor, only on 21.

18    21, the relevant portion of the call talks about -- it

19   is a call between my client and Christian Dawkins, his alleged

20   conspirator, and they are talking about the fact that this

21   father of this player is going to ask for a substantial sum of

22   money.  And they talk about the fact that if he has to be --

23   Mr. Dawkins says, "He has to be worth it for the school.  I'm

24   talking for the school, for the money they'll make off him."

25   And my client responds, "Oh, no question, no question."

Iagdgat2

1    What this call shows -- state of mind -- is it shows

2    that my client and Mr. Dawkins believed that a school would

3    want this money to be paid to this player because it was worth

4    it.  The player -- the financial value of the player was worth

5    it to the school.  they are being charged with trying to

6    defraud the schools.  I think that is a very important point.

7         Mr. Haney may want to add something to it, I don't

8    know, because this is a call between --

9         THE COURT:  Mr. Haney.

10        MR. HANEY:  I don't, your Honor.  Thank you.

11        THE COURT:  Mr. Diskant.

12        MR. DISKANT:  Very briefly.

13        We believe, first, that this is a statement of a

14   belief offered to prove the belief, which is not a permissible

15   basis to offer something under 803.  That is backward-looking

16   not forward-looking.

17        And, second, and more important, it makes a point that

18   the government will have no opportunity to cross-examine these

19   witnesses, the defendants on, and it is highly prejudicial.

20        THE COURT:  That is apparent in the admission of any

21   hearsay statement where the declarant's availability doesn't

22   matter.

23        MR. DISKANT:  True.  But that's precisely why Rule

24   803(3) is so tightly circumscribed, and we provided the Court

25   with a little bit of this law in our papers.  We can point the

Iagdgat2

1    Court to more.  That is precisely why 803(3) is limited to a

2    statement of forward-looking intention to take a specific act

3    to prove that the act was taken, because the government

4    otherwise would, or the opposing party otherwise would have no

5    opportunity to cross-examine the witness.

6                THE COURT:  I adhere to the ruling.

7                MR. SCHACHTER:  Your Honor, may I just be heard?  I

8    would like to be heard on two exhibits and also on that point.

9                Mr. Diskant is incorrectly conflating Rule 803, the

10   exception to the hearsay rule, and what is nonhearsay.  In our

11   opus that we had hoped to send to the Court, we laid out the

12   case law that makes that very clear.  Specifically, Smith v.

13   Duncan, a Second Circuit case from 2005, speaks to that, and it

14   speaks of the importance of not conflating two different

15   things.  803(3) speaks about a then existing state of mind,

16   which is an exception only when you are considering statements

17   which are hearsay which are being offered for the truth of the

18   matter asserted.  When you are talking about -- there is

19   separately state of mind evidence which is not being offered

20   for the truth of the matter asserted.  The fact that it was

21   said, you are not offering it to prove the accuracy of the

22   statement that perhaps a defendant or co-conspirator is making,

23   so therefore it is not nonhearsay.  You don't get to the

24   hearsay exceptions.

25                And I think it is important that the Court not

Iagdgat2

1    conflate those two concepts.  And <u>Smith v. Duncan</u> makes that

2    clear, as does McCormick On Evidence 274 and <u>United States v.</u>

3    <u>Southwind</u>, which is a Second Circuit case from 1985, on that

4    point.

5             I would also like your Honor to address 218 --

6             THE COURT:  Before you leave that, Mr. Diskant.

7             MR. DISKANT:  There is no probative value if the

8    statement is not being offered for the truth.  That is the

9    precise reason that they want it in.

10            THE COURT:  The only statement that really matters

11   here that we are arguing about is the last two lines above the

12   final redactions, right?

13            MR. DISKANT:  Yes, your Honor, on page 20.

14            MR. MOORE:  I would actually say, your Honor, just to

15   put it in context, that the two lines on the prior page, that's

16   the heart of it -- four lines, not just two.

17            THE COURT:  All right.  What is the answer to

18   Mr. Schachter's point, in your view, Mr. Diskant?

19            MR. DISKANT:  The first is the one that I just made,

20   which is that if this isn't being offered for the truth, it has

21   no probative value.  That is precisely the reason that the

22   defendants want it in, which is why I focused in my argument on

23   803(3), which would be the exception through which they would

24   get it in.

25            Second, we're not talking about a school -- a player

1    that is of any relevance to this case.  We're talking about

2    someone who is purely identified in this particular transcript,

3    I believe, as -- either way, it is not about someone we are

4    talking about in this case.  Neither Mr. Dawkins nor Mr. Code

5    have been alleged to be specifically involved in the Kansas

6    component of the conspiracy.  So it is of minimal probative

7    value with respect to the charges in this case.

8           And, finally, under 403, the government submits that

9    it would be extraordinarily prejudicial to the government to

10   allow the defendants to get in this uncrossed, unchallenged

11   statement, particularly when it has no bearing on any of the

12   payments that were actually made or actually at issue in this

13   case.

14          MR. MOORE:  Might I add some points to respond,

15   briefly?

16          THE COURT:  No.  No.  No.  All good things have to

17   come to an end.

18          It's excluded.

19          MR. SCHACHTER:  Your Honor, you had mentioned DX218

20   and 1016.  May I be heard on those?

21          THE COURT:  Yes.

22          MR. SCHACHTER:  So, your Honor, these are

23   communications between Mr. Gatto and Dennis Smith Junior and

24   Dennis Smith Senior, with Dennis Smith Senior alleged to be

25   coconspirator, according to the disclosure we received from the

government, regarding the fact that Mr. Smith has not signed a

shoe deal with Adidas.

You will recall, your Honor, that the government

specifically elicited from Mr. Gassnola during his direct

examination around the same time period of July of 2017

Mr. Gassnola's communications with Mr. Gatto regarding the fact

that Dennis Smith has not signed a shoe deal, and they offered

a text message between Mr. Gassnola and Mr. Gatto and then

elicited Mr. Gatto's –– Mr. Gassnola's belief about how

improper it was that Dennis Smith Junior did not sign a shoe

deal with Adidas given all that Adidas has done for him.  This,

your Honor, directly counters that evidence and we believe is

critical evidence, and I should say –– let me back up.  The

government has not really presented much in the way of evidence

of motive.  We anticipate, even from what they elicited from

Mr. Gassnola in his direct examination, that it will be the

government's argument that, you see, the reason why Mr. Gatto

was arranging for these payments is because an important part

of his job is signing shoe deals with athletes and that's why

he's doing it, and presumably that's why they specifically open

the door and elicited testimony from Mr. Gassnola regarding the

shoe deal.

In this evidence, this evidence is relevant because it

shows Mr. Gatto's state of mind with respect to whether or not

this shoe deal was in any way linked to the payments to

Iagdgat2

1    Mr. Smith's family.

2              THE COURT:  I'm sorry.  There are so many trees, I

3    have no idea what the forest you are in is.

4              MR. SCHACHTER:  I'm sorry, your Honor.

5              Your Honor, we believe that this is important evidence

6    to countering the government's argument that Mr. Gatto believed

7    that the deal was -- the criminal conspiracy was "I give you

8    money, you sign a shoe deal."  Here, Mr. Gatto's communications

9    with his alleged co-conspirator suggests nothing of the sort.

10   Rather, Mr. Gatto simply is wishing the Smith family the best,

11   and there is no reference to or no indication that he felt, as

12   Mr. Gassnola did, that this was some kind of betrayal from the

13   Smith family that Dennis Smith didn't sign a shoe deal.

14             The government opened the door to this evidence by

15   eliciting this testimony regarding Mr. Gassnola's

16   communications with Mr. Gatto in July of 017.  We certainly

17   think that it is relevant to the jury's consideration to see

18   what Mr. Gatto's communications are with Dennis Smith Senior

19   and Dennis Smith Junior at exactly the same point in time.

20             THE COURT:  Mr. Diskant.

21             MR. DISKANT:  So, first, these texts are entirely

22   consistent, I think, with what Mr. Gassnola said.  218,

23   Mr. Gatto expresses, "Even in my disappointment," which is

24   entirely consistent with what the government has said all

25   along, which is that part of the goal, part of the motive in

Iagdgat2

1    making these payments, was the hope that he can sign with them.

2    I don't see what the probative value of this is other than

3    offering the defendant's own statements.

4        MR. SCHACHTER:  Your Honor, the defendant is entitled

5    to offer his own statements for his state of mind, and

6    relevance has a very low hurdle.  And the government has just

7    said this is of no prejudice to them.  They think this

8    testimony is meaningless.  Given the low bar of 401 and the

9    brevity that this evidence comes in, we think that it is

10   relevant.

11       THE COURT:  You mean, the shorter it is, the more

12   relevant it is.  I am going to start applying that test.

13       MR. SCHACHTER:  Your Honor, I'm saying, your Honor,

14   that --

15       THE COURT:  We would be doing a lot better.

16       MR. SCHACHTER:  Your Honor, our suggestion is that

17   this is not cumulative.  This is not confusing.  This is a

18   communication that Mr. Gatto has at exactly the same point in

19   time of the government's introduced communication with

20   Mr. Gassnola.

21       THE COURT:  I'll take 218.  "Meaningless" is too

22   generous a description of it, but I'll take it.

23       (Defendant's Exhibit 218 received in evidence)

24       THE COURT:  1016 you wanted to be heard on?

25       MR. SCHACHTER:  Yes, your Honor.  It is really the

Iagdgat2

1  same.  It's a communication between alleged co-conspirators,

2  Mr. Gatto and Dennis Smith Senior.  It is really the same

3  point.

4        MR. DISKANT:  They can't offer statements of alleged

5  co-conspirators.

6        THE COURT:  I'm sorry, I can't hear you.

7        MR. DISKANT:  I said they can't offer statements of

8  alleged co-conspirators.

9        MR. SCHACHTER:  Your Honor, it's a statement by the

10 defendant that goes to the declarant's state of mind, which the

11 Second Circuit has made clear.  It's not a hearsay issue.

12       THE COURT:  It is a statement by the defendant that

13 goes to what?

14       MR. SCHACHTER:  The defendant's state of mind, that he

15 doesn't have a conspiracy with Dennis Smith Senior, that that

16 wasn't the reason why he paid -- he caused $40,000 to be paid

17 to Dennis Smith, and that he is not as upset as Mr. Gassnola

18 is.  The government elicited communications between

19 Mr. Gassnola and testimony from Mr. Gassnola.  It is really the

20 same argument as 218.  They are really the same.

21       THE COURT:  Well, I'll take it.  It hardly affects

22 anything.

23       (Defendant's Exhibit 1016 received in evidence)

24       THE COURT:  I think we have covered everything, right?

25       MR. SCHACHTER:  I'm sorry, your Honor?

Iagdgat2

1      THE COURT:  We've covered everything?

2      MR. SCHACHTER:  OK.

3      MR. DISKANT:  Section C.

4      THE COURT:  Did we not do Section C?  Sorry.

5      Defendant's 13.

6      MS. DONNELLY:  One moment, your Honor.

7      Your Honor, we actually no longer seek to offer DX13.

8      THE COURT:  Withdrawn.

9      219 I will take.

10     MR. DISKANT:  Even though there is no defendant on it?

11     THE COURT:  The rationale here is that somebody on it

12  is an alleged co-conspirator, right?

13     MR. DISKANT:  No, your Honor.

14     THE COURT:  Why is it listed under "evidence relevant

15  to the state of mind of a co-conspirator?"

16     MS. DONNELLY:  That is our contention, that --

17     THE COURT:  And who is the co-conspirator?

18     MR. SCHACHTER:  The two coaches from the University of

19  Miami that are on this text message, Jamal Brunt and Coach Jim

20  Larranaga.

21     THE COURT:  And they are co-conspirators here, you

22  say, by virtue of what authority?

23     MS. DONNELLY:  My understanding is that there is

24  evidence -- and I would probably need five minutes to put my

25  hands on the testimony -- that the University of Miami

Iagdgat2

1  basketball coaches were seeking improper assistance from Adidas

2  in order to send Mr. -- in order to get --

3          MR. SCHACHTER:  Your Honor, they offered at the very

4  end of the case Jim Larranaga's contract that showed that he

5  was bound to follow the NCAA rule violations.  Presumably, the

6  relevance of that was the government's view that Jim Larranaga

7  had been violating the NCAA rules, otherwise I don't know why

8  they were offering Jim Larranaga's contracts to show that he

9  was prohibited from doing so.  So, it is our understanding of

10  the government's contention than both Coach Larranaga and Coach

11  Brunt are involved in and acted improperly.

12          MR. DISKANT:  Your Honor, there is a call in which

13  there is reference made to Larranaga calling Jim Gatto.  That's

14  why we offered the contract.  It is also why we didn't object

15  to 220, because we concede that Larranaga reaching out to Jim

16  Gatto is of some probative value to Jim Gatto's state of mind.

17  This is a text chain between someone the jury has heard

18  literally nothing about --

19          THE COURT:  Has the government ever identified either

20  of the participants as a coconspirator?

21          MR. DISKANT:  No, your Honor.

22          MR. SCHACHTER:  Your Honor, I would just say that

23  there is a separate reason why this is admissible, and that is

24  the relevant part of this is did Mr. Gatto get a call from the

25  University of Miami to request assistance in recruiting

Iagdgat2

1    Mr. Little.  Whether that request was in the form of can you

2    make a payment or can you just assist, it is relevant to

3    Mr. Gatto's state of mind that he is helping by helping them

4    obtain this player.

5         THE COURT:  Is there evidence that he got such a call?

6         MR. SCHACHTER:  Yes.  That actually is in a call that

7    the government played.

8         THE COURT:  So you need this to prove that there was a

9    call?

10        MR. SCHACHTER:  He says it.  It doesn't mean that the

11   jury need believe it.  It is corroboration for the statement

12   that's made on tape.

13        MR. DISKANT:  We are not going to argue the call

14   didn't exist.

15        THE COURT:  You've talked me out of this one.  219 is

16   out.

17        MR. SCHACHTER:  We have shortened the trial, your

18   Honor.

19        THE COURT:  Well, yes, by one text message.

20        223.

21        MR. SCHACHTER:  Yes, your Honor.  I think I can

22   address this.

23        So this is between co-conspirators.  The government

24   identified Coach Pitino as a co-conspirator, and the relevance

25   here is that they are talking about the fact that these other

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Iagdgat2

1 schools are offering to pay money to Tugs Bowen.  Coach Pitino

2 says -- he's been told, "Coach, DePaul is trying to pay Bowen

3 $200,000 to come there.  Crazy world!"  Coach Johnson says,

4 "Oregon, DePaul ... desperate times."  And Coach Pitino says,

5 "Yep -- we will be OK."

6          Our point is Coach Pitino knows that they're going to

7 be OK because he is aware that Adidas is helping Louisville

8 balance and keep them in the running to recruit Tugs Bowen.

9 That is the relevance of this testimony.  None of it is offered

10 for truth of the matter asserted.  It is offered to show that

11 that's their understanding.

12          Whether in fact they will be OK is not what we're

13 trying to prove.  We are trying to prove the thought process,

14 that they understand that they're going to be OK because Adidas

15 will be paying.

16          THE COURT:  Mr. Diskant.

17          MR. DISKANT:  Your Honor, the only potentially

18 probative issue is whether or not the defendants believed that

19 Coach Pitino was or was not aware.  And their own statements on

20 this are very, very ambiguous and sometimes contradictory.  But

21 whether or not he was in fact aware of this unrelated payment

22 is of no probative value here.  There is nothing tying this

23 conversation to the defendants.  And, more important, it is

24 Pitino passing on a rumor he has heard from an agent.  We could

25 only speculate about what his response "We will be OK" is

Iagdgat2

1    about, which is the absolute most value it could have.

2                    THE COURT:  It's out.

3                    MR. SCHACHTER:  You said "out," right, your Honor?

4                    THE COURT:  Yes.

5                    MR. SCHACHTER:  OK.  Thank you.

6                    Your Honor, I would like to say I just don't think the

7    record on 221 and 222 but can I make a suggestion --

8                    THE COURT:  I can't -- I couldn't understand that.

9                    MR. SCHACHTER:  I apologize, your Honor.

10                    I believe that your Honor excluded 221 and 222, and we

11   would like to be heard briefly.  But can I make a suggestion

12   because I know that the jury is waiting?  And so I wonder if it

13   would be -- whatever defense case is going to exist is clearly

14   going to be extremely brief.  And so perhaps it makes sense,

15   while the jury is here, to hear -- the government has an

16   additional witness, Agent Casola.  Perhaps we could hear from

17   Agent Casola, the government can rest, and then we can continue

18   to -- I mean, we believe these issues are important.  We're

19   near conclusion but we are not there.  And perhaps we can offer

20   whatever -- right before summations, we can offer what will

21   probably be a matter of 15 minutes of evidence and then roll

22   right into summation.  I think we could adjust for summation to

23   whatever additional -- your Honor, we've gotten a lot of your

24   Honor's rulings, and we could get your Honor's rulings after

25   the jury has left.

Iagdgat2

1          THE COURT:  We would have been finished by now.

2          MR. SCHACHTER:  I apologize.  You are right, of

3    course, your Honor.

4          THE COURT:  So, let's finish.

5          MR. SCHACHTER:  OK.  Then may I be heard briefly on

6    221 and 222?

7          MR. DISKANT:  For what it's worth your Honor, I don't

8    think Mr. Schachter would even have a basis to offer these

9    exhibits.  Only Mr. Dawkins is involved in one of them.  Only

10   he could potentially have an argument for their admissibility.

11         MR. SCHACHTER:  Your Honor, this is a conspiracy case,

12   and so the state of mind of any conspirator is --

13         THE COURT:  I have ruled on them.

14         MR. SCHACHTER:  Yes, your Honor.

15         THE COURT:  All right.  So we were down to Defendants'

16   105, 102K-10, and 106D-9.

17         MS. DONNELLY:  Well, your Honor, I can make it a

18   little bit easier for you.  Defendants are no longer intending

19   to offer GX106D-9, so we could take that one off the list.

20         THE COURT:  All right.

21         MS. DONNELLY:  My understanding is that Mr. Haney

22   wants to argue these two exhibits.  I will defer to him.

23         THE COURT:  OK.  Mr. Haney, you are up.

24         MR. HANEY:  May I have one moment, please?  I'm sorry.

25         THE COURT:  Yes.

Iagdgat2

1   MR. SCHACHTER:  Your Honor, as Mr. Haney is reviewing

2   that, may I raise one additional set of exhibits that were not

3   in our submission but I want to explain why they are not in our

4   submission, but they are still at issue.  And those fall into

5   two categories -- three categories and I think we just need a

6   401/403 ruling from your Honor, and then I don't think the

7   issue is the documents.

8   THE COURT:  We are going to deal with Mr. Haney.

9   MR. SCHACHTER:  Yes, your Honor.

10  MR. HANEY:  Your Honor, may I proceed?

11  THE COURT:  Yes.

12  MR. HANEY:  Your Honor, Government Exhibit 102K-10 is

13  a text message.  It is between Christian Dawkins and Brian

14  Bowen Senior.  And the text conversation is where my client is

15  relaying to Mr. Bowen, "Go to Michigan State, keep it simple."

16  And, your Honor, we're not offering that for a hearsay purpose.

17  It is for the nonhearsay purpose to show the state of mind of

18  Christian Dawkins, that he believed it was in the best interest

19  for the son, Brian Bowen Senior, to go to Michigan State.

20  THE COURT:  I can't tell who is the author of which

21  email here.

22  MR. HANEY:  518, a 2017 email that says, "LOL, go to

23  Michigan State.  Keep it simple."  Then it is from the cell

24  phone, it says, "CV," which we already have an agreement, I

25  understand, from the government, "CV" is Christian Dawkins.

Iagdgat2

1          THE COURT:  Thank you for that.

2          MR. HANEY:  Thank you, Judge.

3          THE COURT:  Mr. Diskant.

4          MR. DISKANT:  I think at most it shows that on

5    May 18th, at 2:44 p.m., Mr. Dawkins said that.  They redacted

6    the rest of the text because they go on to talk about other

7    schools, I think.  And the other chain they want to offer is

8    five days later where they are talking about three or four

9    different schools.

10          I don't know what the probative value of any of this

11   is.  I think we explored with Mr. Bowen Senior on both direct

12   and cross-examination the fact that he and Mr. Dawkins talked

13   about a number of schools, including Michigan State.  So it is

14   not clear to me why this is of any probative value.

15          MR. HANEY:  May I respond, your Honor?

16          THE COURT:  Yes.

17          MR. HANEY:  Your Honor, the probative value is that

18   there is testimony that Michigan State University was not going

19   to pay, and Mr. Bowen, on cross-examination, acknowledged that

20   he knew Michigan State University would not pay for his son to

21   go to Michigan State, which is extremely relevant to what is

22   being alleged, that my client had some degree or role in

23   influencing the son to go to a school where they were going to

24   pay him.

25          THE COURT:  I will receive 105.

Iagdgat2

1          (Government's Exhibit 105 received in evidence)

2          MR. HANEY:  Thank you, your Honor.

3          THE COURT:  What about the other one?  Anything left

4    on the other one?

5          I'm sorry.  I may have misspoken.

6          MR. HANEY:  102K, your Honor.

7          THE COURT:  It is 102K-10 that I will receive.

8          (Defendant's Exhibit 102K-10 received in evidence)

9          MR. HANEY:  Thank you, your Honor.

10          105, your Honor, I would like to be heard on, if I

11    might?

12          THE COURT:  Yes.  Go ahead.

13          MR. HANEY:  I appreciate it.

14          OK, your Honor.  105 is a text message chain between

15    my client and Tugs Bowen, who is the son obviously of Brian

16    Bowen Senior.  And in that text conversation, my client is

17    telling Tugs Bowen, through the text message, they're having a

18    conversation about making a decision.  And Mr. Dawkins says,

19    "OK, cool.  Let me know if you have any questions or want to

20    know anything background wise about the coaches or the players

21    before you make the final call decision.  Whatever you do, you

22    will kill it."

23          Again, this is very relevant to the issue of who made

24    the decision --

25          THE COURT:  Got it.

Iagdgat2

1      MR. HANEY:  Thank you.

2      THE COURT:  Mr. Diskant.

3      MR. DISKANT:  Again, I think it is misleading,

4  particularly as to Brian Bowen Junior, for whom we've offered

5  no texts otherwise.  This is at very most an exhibit of what

6  Mr. Dawkins was saying at one particular moment in time.

7      THE COURT:  I will receive it.

8      MR. HANEY:  Thank you, your Honor.

9      (Government's Exhibit 105 received in evidence)

10      THE COURT:  OK.  That takes care of all of this stuff.

11  We are going to take -- what is it, Mr. Schachter?

12      MR. SCHACHTER:  There was the other categories where

13  we need a ruling from your Honor.

14      THE COURT:  Not now.

15      MR. SCHACHTER:  Yes, your Honor.

16      THE COURT:  We will take five minutes and then we will

17  bring in the jury.

18      THE CLERK:  All rise.

19      (Recess)

20      THE COURT:  All right.  Let's bring the jury in.

21      MR. MOORE:  Your Honor, I --

22      THE COURT:  No hope of moving forward, is there?

23      MR. MOORE:  Well, I'm not going to say that.

24      As I understand it, the government seeks to introduce

25  through their next witness summary charts and --

Iagdgat2

1        THE COURT:  And they are going to tell me about the

2   Fifth Circuit and summary charts.

3        MR. MOORE:  I am going to talk to you about the rule,

4   first of all, your Honor, because that is around where we

5   started.  Yesterday I found at the end of the day, your

6   Honor --

7        (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IAG8GAT3

1      MR. MOORE:  The government has provided us three

2  summary charts.  As your Honor knows, under Rule 1006 the

3  government can offer summaries of voluminous evidence.  The

4  summary charts the government intends to display through this

5  witness are not summaries of voluminous evidence.  They are

6  summaries.  And the reason behind the rule is so that you don't

7  have to, for example, admit 10,000 pages of phone records and

8  have the jury go painstakingly through the 10,000 pages.  The

9  agent can summarize the relevant calls from 10,000 pages.  That

10  is the purpose behind the rule.

11      THE COURT:  And the rule contains the word 10,000,

12  doesn't it?

13      MR. MOORE:  I am using that as an example, your Honor.

14  I am using it as an example.

15      THE COURT:  If I spoke fluent South Carolina, I would

16  get it.

17      MR. MOORE:  Maybe after this trial is over you can

18  come down.

19      THE COURT:  I have had many a pleasant time in South

20  Carolina.

21      MR. MOORE:  We would love to have you back.

22      THE COURT:  I bet.

23      MR. MOORE:  My point is that the reason behind the

24  rule is so that the jury does not have to pore through

25  voluminous --

IAG8GAT3

1    THE COURT:  Can we kindly get to the point?

2    MR. MOORE:  The point is that the government does not

3    seek to offer a summary of otherwise voluminous exhibits.  The

4    government seeks to offer summaries of evidence that it has

5    already admitted in trial.  Their summary charts are, if I can

6    borrow a phrase from art, mixed media.

7    For example, their summary charts aren't just a

8    summary of the number of text messages between Christian

9    Dawkins or Merl Code.  Their summary deals with calls, text

10   messages, and other pieces of testimony.  They are

11   attempting -- these summaries are in fact what are more

12   appropriately called demonstrative exhibits that can be used in

13   a closing.  None of these summaries, and I will be happy to

14   hand up --

15   THE COURT:  Government 3006, 3007 and 3008, right?

16   MR. MOORE:  Yes, sir.

17   I don't believe that any of these summary charts are

18   admissible under Rule 1006 because they don't summarize

19   otherwise voluminous evidence that would need a summary.

20   This is a summary of the government's evidence that it

21   has adduced through witnesses and through the introduction of

22   other testimony.  I do not believe it is appropriate, and I

23   cannot find a case that says the government can do what it

24   wishes to do here.

25   We have looked for Second Circuit law, and I did point

1  your Honor to a case yesterday, *United States v. Whitfield.*  It

2  is a Fifth Circuit case.  We did key cite it.  And while the

3  Second Circuit has not adopted the specific rule in *Whitfield*,

4  it has cited *Whitfield* with approval, albeit for another

5  purpose.

6          THE COURT:  Please, Mr. Moore.  I don't want to be

7  dismissive.  You haven't said anything today you didn't say

8  yesterday at the sidebar, not one word.

9          MR. MOORE:  Yesterday I was talking about some

10  specific charge with respect to Ms. Harksen.  Today I am

11  talking about charts that purport to connect the dots between

12  the government's three weeks of trial and I think it is

13  inappropriate.  I do not believe that it is admissible under

14  Rule 1006.  And so for all of those reasons --

15          THE COURT:  You agreed they could use them in

16  summation.

17          MR. MOORE:  I agreed that they could use them in

18  summation.  I think they are demonstrative exhibits.

19          THE COURT:  And you acknowledge that whether I allow

20  them in is committed to my discretion, right?

21          MR. MOORE:  That's correct.

22          THE COURT:  They are going to come in.

23          MR. MOORE:  OK.

24          Get the jury.

25          THE COURT:  So we are clear, this case is complicated

IAG8GAT3

1    enough without looking for ways to keep the weeds piled over

2    everything.

3           MR. DISKANT:  Your Honor, we intend to offer the text

4    message that your Honor didn't finally rule on yesterday in

5    which Mr. Mr. Code describes his bat phone to Mr. Rivers.  We

6    have now offered evidence of two different phones.  The phone

7    he used to text with Mr. Robertson yesterday and the phone from

8    which he sent the bat phone text message, and we would seek to

9    offer it with the court's permission.

10          MR. MOORE:  Obviously we object to that, but based on

11   your Honor's ruling I think it's appropriate.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

IAG8GAT3

1          (Jury present).

2          THE COURT:  Good morning, everybody.  I hope everybody

3     got a chance to sleep in.

4          The jurors all are present.  The defendants all are

5     present.

6          Mr. Diskant, call your next witness.

7          MR. DISKANT:  Before doing so, the government offers

8     102S-5, 102S-15, and 104J, which are text messages to phones

9     associated with Merl Code.

10          THE COURT:  102S or 102F?

11          MR. DISKANT:  S, as in Sam.

12          102S-5, 102S-15, and 104J.

13          MR. SCHACHTER:  Your Honor, may we have just a moment?

14          May we have that list again?

15          MR. DISKANT:  102S-5, 104J, and 102S-15.

16          MR. SCHACHTER:  One moment, your Honor.

17          THE COURT:  Do I have copies of these, Mr. Diskant?

18          MR. DISKANT:  You should, your Honor, but I can hand

19     them up.

20          MR. SCHACHTER:  Fine.  I apologize, your Honor.

21          THE COURT:  What did you do?

22          MR. SCHACHTER:  I'm sorry?

23          THE COURT:  I'm teasing you.  I asked you what you

24     did, for which you apologized.

25          The jury will disregard a little humor here.

IAG8GAT3

1          Thank you, Mr. Diskant.

2          Is there any objection to any of these?

3          MR. MOORE:  Based on your Honor's ruling yesterday, no

4     further objection.

5          THE COURT:  Those exhibits are received.

6          (Government's Exhibits 102S-5, 102S-15 and 104J

7     received in evidence)

8          MR. DISKANT:  Next the government would offer

9     Government Exhibit 39, which is a call between Brad Augustine

10    and Christian Dawkins, along with 39T, which is the

11    accompanying aid for the jury, and it's dated August 9th of

12    2017.

13         THE COURT:  Received.

14         (Government's Exhibits 39 and 39T received in

15    evidence)

16         MR. DISKANT:  With the Court's permission, we would

17    like to play the call and publish the transcript that the

18    jurors should also have in their binders.

19         THE COURT:  The jury may turn to Government Exhibit

20    39T in your binders.

21         Same instruction as with all the other tapes.

22         MR. DISKANT:  This is August 9, 2017, Christian

23    Dawkins, Jonathan Brad Augustine, and we are going to begin on

24    page 12.

25         (Audio played)

IAG8GAT3

1          MR. SOLOWIEJCZYK:  Your Honor, the government is going

2     to introduce a couple of other exhibits.

3          The government offers 203A-1, which are excerpts of

4     phone records from a phone number that the parties have

5     stipulated is used by Christian Dawkins.

6          The government also offers 201A-1 and 201A-2, which

7     are phone records from a telephone number that the parties have

8     stipulated was used by Jim Gatto.

9          The government also offers 206A-1, which are phone

10    records from a phone number that the parties have previously

11    stipulated was used by TJ Gassnola.

12         THE COURT:  All right.  Hearing no objection, they are

13    received.

14         (Government's Exhibits 203A-1, 201A-1, 201A-2 and

15    206A-1 received in evidence)

16         THE COURT:  Members of the jury, the parties have

17    stipulated that these phones were associated with the

18    particular individuals that were enumerated.

19         MR. SOLOWIEJCZYK:  At this time, the government also

20    offers Government Exhibit 104D, which contains text messages

21    between Christian Dawkins and Merl Code.

22         102L, which contains text messages between Christian

23    Dawkins and Rick Pitino.

24         102H-1, which contains text messages between Jim Gatto

25    and Merl Code.

1    101P, which contains text messages between Jim Gatto

2  and Christian Dawkins.

3    MR. SCHACHTER:  Your Honor, we do have objections to

4  101P and 102H-1.

5    THE COURT:  102L and 101P are received.

6    Do I have somewhere up here the two objected to?

7    MR. SCHACHTER:  Your Honor, at least the transcript

8  reads, you said 102L and 101P are received.  Our objections are

9  to 101P and 102H-1.

10    THE COURT:  If I said 101P, I misspoke.

11    No, I didn't misspeak.  Let's see.

12    You objected to 101P.  Yes, OK.  And 102H-1.

13    MR. SOLOWIEJCZYK:  101H-1, your Honor.

14    MR. SCHACHTER:  I believe you said 102H-1.

15    MR. SOLOWIEJCZYK:  That is my mistake then, your

16  Honor.  I apologize.

17    THE COURT: Let's start again.  How about that?

18    MR. SOLOWIEJCZYK:  I am going to start again.

19    The text messages we are offering are 104D, which are

20  text messages between Christian Dawkins and Merl Code.

21    THE COURT:  Any objection to that one?

22    MR. SCHACHTER:  No.

23    THE COURT:  Received.

24    (Government's Exhibit 104D received in evidence)

25    MR. SOLOWIEJCZYK:  102L.

IAG8GAT3

1        THE COURT:  Any objections?

2        MR. SCHACHTER:  No.

3        THE COURT:  That one is received.

4        (Government's Exhibit 102L received in evidence)

5        MR. SOLOWIEJCZYK:  101H-1, which is between Jim Gatto

6   and Merl Code.  I think it's a single text message.

7        MR. SCHACHTER:  No objection.

8        MR. MOORE:  Neither do I.

9        THE COURT:  101H-1 is received.

10        (Government's Exhibit 101H-1 received in evidence)

11        MR. SOLOWIEJCZYK:  101P, between Jim Gatto and

12   Christian Dawkins.

13        MR. SCHACHTER:  We just don't see the relevance to it.

14        THE COURT:  Can I see it in legible form?

15        MR. SOLOWIEJCZYK:  Sure.

16        THE COURT:  Maybe I could have read this with

17   assistance when I was 30, but I doubt it.

18        MR. SOLOWIEJCZYK:  Your Honor, I can focus you on

19   specific messages that are of particular relevance.  But

20   generally these text messages are relevant because they show

21   that Mr. Dawkins and Mr. Gatto had been dealing with each other

22   for quite some time.

23        We don't believe there is anything prejudicial in the

24   text messages.

25        THE COURT:  It's received.

1          (Government's Exhibit 101P received in evidence)

2          MR. SCHACHTER:  Given the very low bar, to which Mr.

3    Schachter is fond of referring.

4          MR. SOLOWIEJCZYK:  At this time, the government would

5    call Special Agent Anthony Casola.

6     ANTHONY CASOLA,

7         called as a witness by the government,

8         having been duly sworn, testified as follows:

9          THE DEPUTY CLERK:  State your name and spell your last

10   name for the record.

11         THE WITNESS:  Anthony Casola, C-A-S-O-L-A.

12         THE COURT:  You may proceed, counsel.

13   DIRECT EXAMINATION

14   BY MR. SOLOWIEJCZYK:

15   Q.  Good morning.

16         Special Agent Casola, where do you work?

17   A.  Federal Bureau of Investigation, New York division.

18   Q.  What is your position at the FBI?

19   A.  Special agent.

20   Q.  How long have you been with the FBI?

21   A.  About a year and a half.

22   Q.  Are you assigned to a particular squad or unit?

23   A.  C14, public corruption.

24   Q.  Have you been involved in this case?

25   A.  I have.

1   Q.   When did you first get involved?

2   A.   January of this year.

3   Q.   Generally speaking, what has your involvement been?

4   A.   I have conducted witness interviews and assisted with trial

5   preparation.

6   Q.   Did you personally participate in monitoring any wiretaps

7   associated with this case?

8   A.   I did not.

9   Q.   In connection with this case have you been asked to review

10  and analyze certain records and documents that were admitted

11  into evidence at this trial?

12  A.   I have.

13  Q.   What types of records and evidence?

14  A.   Call records, text messages, voice mails, university

15  documents.

16  Q.   Were you asked to review certain charts that had been

17  created in summarizing that evidence that you just described?

18  A.   Yes.

19  Q.   Did you compare those charts to the underlying evidence to

20  review the charts for accuracy?

21  A.   I did.

22  Q.   Did you have an opportunity to make corrections to the

23  charts for any inaccuracies that you found?

24  A.   I did.

25  Q.   I want to direct your attention to what has been marked

1   solely for identification as Government Exhibits 3006, 3007 and

2   3008.

3        MR. SOLOWIEJCZYK:  If you can just bring those up for

4   the witness.

5   Q.  Do you recognize those documents?

6   A.  I do.

7   Q.  What are they?

8   A.  They are a time line of events surrounding the commitment

9   of Brian Bowen Junior to the University of Louisville.

10  Q.  Do those charts fairly and accurately summarize the

11  information contained in the underlying records?

12  A.  They do.

13       MR. SOLOWIEJCZYK:  The government offers Government

14  Exhibits 3006, 3007 and 3008.

15       THE COURT:  Received.

16       (Government's Exhibits 3006, 3007 and 3008 received in

17  evidence)

18       MR. SOLOWIEJCZYK:  If we can publish stipulation S2

19  for a moment.

20       THE COURT:  Yes.

21  Q.  Special Agent Casola, if I could just direct your attention

22  to the second page at the top.  The very top two lines.

23       When these charts reflect that there was a phone call

24  or a text message with Jim Gatto, what telephone number does

25  that refer to specifically?

IAG8GAT3                    Casola - Direct

1    A.  It refers to telephone number 503-754-8013.

2    Q.  Looking at the second paragraph, when the chart reflects

3    that there was a phone call or a text message with Merl Code,

4    what telephone numbers does that refer to specifically?

5    A.  Merl Code's phone numbers would be 708-314-3402 and

6    912-401-8240.

7    Q.  Looking at the third paragraph, when this chart reflects

8    that there was a phone call or text message with Christian

9    Dawkins, what telephone number does it refer to?

10   A.  989-493-4317.

11        MR. SOLOWIEJCZYK:  Ms. Lee, if you could bring up

12   stipulation S1 for a moment.

13        Your Honor, actually at this time the government would

14   seek to offer stipulation S1.

15        Hold on one moment, your Honor.  I'm sorry.

16        My apologies.  There was a moment of confusion.

17        If we can bring up S1, Ms. Lee, and specifically

18   paragraph 2, which is on page 2.

19   Q.  Special Agent Casola, when this chart refers to calls or

20   text messages with Brian Bowen Senior, what number is it

21   specifically referring to?

22   A.  989-714-1864.

23   Q.  Looking at the next paragraph when this chart refers to

24   calls or text messages with TJ Gassnola, what phone number is

25   it specifically referring to?

1   A.  With TJ Gassnola --

2          MR. SOLOWIEJCZYK:  Ms. Lee, you have got the wrong

3   thing up.  We are still in S1, not S2.

4          Thank you.

5   A.  The telephone number associated with TJ Gassnola is

6   413-246-7038.

7   Q.  How is TJ Gassnola referred to in this chart?

8   A.  With his initials, TJG.

9   Q.  Looking at paragraph 7 of the same stipulation, which is

10  the next page, when the chart reflects that there was a phone

11  call or text message with Rick Pitino, what telephone number

12  does that specifically refer?

13  A.  502-599-2045.

14  Q.  So the second number that is listed there, is that

15  reflected to at any point in these charts?

16  A.  It's not referred to in the charts, no.

17         MR. SOLOWIEJCZYK:  Now you can take that down.

18         THE COURT:  Did you want to offer S1 at one point?

19         MR. SOLOWIEJCZYK:  We believe it has been offered.  It

20  hasn't?

21         THE COURT:  No.

22         MR. SOLOWIEJCZYK:  At this time the government would

23  offer stipulation S1 into evidence.

24         THE COURT:  Received.

25         (Government's Exhibit S1 received in evidence)

IAG8GAT3                    Casola - Direct

1    BY MR. SOLOWIEJCZYK:

2    Q.  Special Agent Casola, do the charts that we are about to go

3    through, do they reflect every call that you were able to find

4    in the telephone records between and among Jim Gatto, Christian

5    Dawkins, Merl Code, and TJ Gassnola during the time period of

6    May 18, 2017 to June 9, 2017?

7    A.  They do.

8    Q.  What about with respect to text messages, does this chart

9    reflect every text message that occurred between and among Jim

10   Gatto, Christian Dawkins, Merl Code, and TJ Gassnola during

11   that time period, or is it just selected messages?

12   A.  Selected messages.

13   Q.  What about Brian Bowen Senior, is every phone call and text

14   message that occurred with him during this time period

15   reflected in this chart?

16   A.  No.

17   Q.  And Rick Pitino, is it just selected messages and calls or

18   every single call and message?

19   A.  Selected messages and calls.

20             MR. SOLOWIEJCZYK:  Ms. Lee, if we can bring up 3006.

21             Permission to publish, your Honor.

22             THE COURT:  Yes.

23   Q.  So Special Agent Casola, just focusing on the heading, what

24   time period does this chart cover?

25   A.  This chart is May 18 through May 30th of 2017.

1    MR. SOLOWIEJCZYK:  If you could just zoom in on the

2    column headings, Ms. Lee, for a moment.

3    Q.  Can you just walk us through what each of these columns

4    mean, Special Agent Casola?

5    A.  Yes.  The column, first column indicates the date and time

6    that the content was noted.  So either in the call logs or text

7    message logs or the documents would have that date.

8        The event would include what parties were

9    participating in the item that is specifically delineated to

10   the right under content, which would include the text message

11   itself, a portion of the document, or the actual line from the

12   telephone call log indicating date, time and location of the

13   parties.

14       And the last section is source, which is the

15   underlying source document that that item was specifically

16   pulled from.

17   Q.  Just referring you back to the date and time column, were

18   all the records that you looked at all reflected in the same

19   time zone?

20   A.  They were not.

21   Q.  Did you have to convert them all to a single time zone?

22   A.  I converted all of them to Eastern Time.

23   Q.  All right.

24       MR. SOLOWIEJCZYK:  So just walking through the first

25   page, if we can zoom in on the second --

1    THE COURT:  Before you go walking anywhere, can I see

2    counsel at the sidebar, please.

3            (Continued on next page)

1    (At the sidebar)

2        THE COURT:  I am not sure that I understood in the

3    discussion of these three exhibits that they were in some

4    respects selective, nor do I understand that the objection was

5    on any ground other than the records were not sufficiently

6    voluminous.  Do I have both things right?  Did I miss something

7    here?

8        MR. MOORE:  My general objection was these records are

9    not voluminous, but now that I have heard testimony that these

10   exhibits are selective, I renew my objection and raise another

11   ground.  This is a selective summary that is not something that

12   is appropriate under Rule 1006.

13       MR. SOLOWIEJCZYK:  It does include every call record.

14   We didn't include every text message.  That's true.  We picked

15   out the ones that we believe to be the most relevant.

16       THE COURT:  That is the point.

17       MR. SOLOWIEJCZYK:  That's accurate.  I didn't

18   understand that was the issue the defense was raising.

19       THE COURT:  It was not the issue he raised.

20       MR. SOLOWIEJCZYK:  We think that's totally

21   appropriate.  This chart would be many pages longer if we had

22   to put every single text message in.

23       THE COURT:  I understand all of that.  Let's not take

24   any more of the jury's time about this at the moment, but I

25   will hold open the question of whether I am going to treat them

1   as demonstratives that will not go into the jury room or as

2   exhibits in evidence until later and will make that ruling

3   later on.

4           MR. MOORE:  Just so I understand your Honor's ruling,

5   he is not to continue to walk through this?

6           THE COURT:  I will let him walk through it.  You can

7   cross-examine him on it.

8           MR. MOORE:  I will.  Thank you.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (In open court)

2    BY MR. SOLOWIEJCZYK:

3    Q.  So, Special Agent Casola, if I could direct your attention

4    to the second line of the first page.  If you could just

5    describe when this message occurred, who it's from and who it's

6    two and what it says.

7    A.  Sure.  It occurred on 5/18/2017, at 3:52 p.m. Eastern.  It

8    is a text message between Dawkins and Code and the message

9    read --

10   Q.  Just to clarify, it's from Dawkins to Code, right?

11   A.  That's correct.

12       And the message read, "Any Adidas schools that make

13   sense for Bowen?"

14       MR. SOLOWIEJCZYK:  If we can go down, Ms. Lee, to the

15   line that's 5/22/17 at 12:47 p.m.

16   Q.  Who is this text message from and who is it to?

17   A.  It is a text message from Code to Dawkins.  It occurred on

18   25/22/2017, at 12:47 p.m.

19       The message read, "Don't send Bowen to Oregon! Call

20   me."

21       MR. SOLOWIEJCZYK:  Just the line right below that,

22   Ms. Lee.

23   Q.  What does this reflect?

24   A.  This reflects a telephone call between Dawkins and Code on

25   5/22/2017, that occurred at 12:48 p.m.

1    Q.   How long was the call?  Can you tell from the record?

2    A.   12 minutes.

3    Q.   How many minutes after that text message was the call?

4    A.   One.

5         MR. SOLOWIEJCZYK:  If we could go down to the line

6    that says 5/23/17, at 9:23 p.m., Ms. Lee.

7    Q.   Who is this message from and who is it to?

8    A.   It is from Dawkins and it went to Pitino.

9    Q.   What did it say?

10   A.   "Coach, this is Christian Dawkins.  I dealt with you on

11   Jaylen Johnson.  Would you have any interest in Brian Bowen or

12   are you done with recruiting?"

13   Q.   If you could go to the next line.

14   A.   Again, on 5/23/2017, this message was at 9:27 p.m.  It was

15   from Rick Pitino to Christian Dawkins.

16        And the message said, "We would love to have him."

17   Q.   Special Agent Casola, just going back to something I asked

18   you a minute ago, I asked you about the length of a phone call.

19   How were you able to tell that?

20   A.   If you look at the telephone calls under the content

21   section, at the very end of the line within the content

22   section, there is a number that is indicated.  That number

23   indicates the length of the telephone call in minutes.

24   Q.   In certain of the records, is that number in seconds

25   instead of in minutes?

1   A.  Yes.

2          MR. SOLOWIEJCZYK:  If we could go to the second page,

3   Ms. Lee, and down to the line that starts 5/27.  If you could

4   actually pull up 5/27/17, 9:27 a.m., all the way through 1:23

5   p.m.

6   Q.  So, Special Agent Casola, can you just walk us through

7   these series of messages and calls.

8   A.  Sure.  All of these messages and calls took place on

9   5/27/2017.  The first one in this series was at 9:27 a.m.  It

10  was a call between Dawkins and Code.

11         Then there was a text message that occurred at 1:09

12  p.m. from Code to Gatto that says, "Gimme a call."

13         A minute later, at 1:10 p.m., there is a call between

14  Gatto and Code.

15         At 1:19 p.m., there is a telephone call from Gatto to

16  Pitino where he leaves a voice mail.

17  Q.  Special Agent Casola, you have listened to that voice mail

18  during this trial?

19  A.  I have.

20         The voice mail says, "Coach, Jim Gatto with Adidas.

21  Hope all is well.  I am sorry to bother you over the weekend,

22  but I just got a call about a player I want to discuss with

23  you.  So when you get a chance, if you can call me at

24  503-754-8013.  Thanks, Coach.  Bye-bye."

25  Q.  At 11:21 p.m., there is a call between Gatto and Pitino.

1    Special Agent Casola, can you tell how long that call

2  was?

3  A.  Two minutes.  And again, indicated by the number 2 at the

4  end of the telephone record.

5    Then at 1:23 p.m., there is a call between Gatto and

6  Code.

7    MR. SOLOWIEJCZYK:  If we can go to the next page of

8  the chart, Ms. Lee, and if we can focus on the line 5/29/17, at

9  10:40 p.m.

10  A.  Christian Dawkins to Merl Code.

11  Q.  What does it say?

12  A.  "Tell Jim, let's get it done.  I have to discuss with you

13  the setup in the a.m."

14    MR. SOLOWIEJCZYK:  If we can go to the next chart,

15  Ms. Lee, Government Exhibit 3007.

16    Permission to publish, your Honor.

17    THE COURT:  Yes.

18    MR. SOLOWIEJCZYK:  Ms. Lee, if you can focus in on the

19  text message at 5/31/17, at 1:05 a.m.

20  Q.  Who is this message from and who is it to?

21  A.  This message is from Christian Dawkins to Merl Code.

22  Q.  What did it say?

23  A.  "Talked to Brian Senior and Tugs late last night.  The deal

24  is pretty much done.  Just need to get everything lined up with

25  Gatto and we can get scholarship papers signed.  I can hold

1  Oregon off, I'm pretty sure."

2          MR. SOLOWIEJCZYK:  If you could go down two lines,

3  Ms. Lee, to the text at 5/31/17, at 11:13 a.m.

4  Q.  Who is this text from and who is it to?

5  A.  Merl Code to Christian Dawkins.

6  Q.  What does it say?

7  A.  "It's done.  We just need to get the LOI signed.  Not just

8  the scholarship papers."

9          MR. SOLOWIEJCZYK:  If we can turn to the second page,

10  Ms. Lee.  If you could go to the message starting at 6/1/17, at

11  12:19 a.m.

12  Q.  Who is that message from and who is it to?

13  A.  From Christian Dawkins to Merl Code.

14  Q.  What did it say?

15  A.  "He's going to go to Louisville.  He committed to them

16  tonight.  But please don't tell anybody.  He wants it to go out

17  next week after he can go home and see his grandma and cousins.

18  I know it's a little different, but it is what it is.  I will

19  call you in a.m."

20          MR. SOLOWIEJCZYK:  Just looking at the next message,

21  Ms. Lee.

22  Q.  Who is this from and who is it to?

23  A.  Christian Dawkins to TJ Gassnola.

24  Q.  What does it say?

25  A.  "He committed to them tonight.  But please don't tell

1    anyone.  He doesn't want anything out until he puts it out

2    himself next week.  I'll call you tomorrow."

3              MR. SOLOWIEJCZYK:  Ms. Lee, just going down two more

4    lines to the 6/1/17, at 9:02 a.m.

5    Q.  Who is that message from and who is it to?

6    A.  Christian Dawkins to Brian Bowen Senior.

7    Q.  What did it state?

8    A.  "Make sure Tugs doesn't announce yet.  I have got to talk

9    to you about that."

10             MR. SOLOWIEJCZYK:  Ms. Lee, if we can go to the line

11   on June 1, 2017, at 12:14 p.m.

12   Q.  What does this reflect, Special Agent Casola?

13   A.  That reflects a telephone call between Jim Gatto and Merl

14   Code.

15   Q.  How long was the call?

16   A.  Four minutes.

17   Q.  At what time?

18   A.  The call occurred at 12:14 p.m., Eastern.

19             MR. SOLOWIEJCZYK:  If we can go down two lines,

20   Ms. Lee.

21   Q.  When did this event occur?

22   A.  6/1/2017, at 12:21 p.m.  It was a call from Jim Gatto to

23   Rick Pitino where Jim Gatto left a voice mail.

24   Q.  Can you read that?

25   A.  "Coach, Jim Gatto.  Hope all is well.  Checking in.  Heard

1  the good news.  It's going to be great.  I am excited for you

2  guys.  And just give me a call back or I'll try you soon.

3  Thanks, Coach.  Bye-bye."

4           MR. SOLOWIEJCZYK:  If we can go to the last page of

5  this one, Ms. Lee, and just the line that reads 6/1/17.

6           Four lines down.

7  Q.  What does this event reflect?

8  A.  This reflects Brian Bowen Junior signing his financial aid

9  agreement with Louisville.

10  Q.  Just going down two lines, when did Bowen publicly

11  announce?

12  A.  6/3/2017.

13           MR. SOLOWIEJCZYK:  Ms. Lee, if we can go to the last

14  chart, 3008.

15           Permission to publish, your Honor.

16           THE COURT:  Yes.

17           MR. SOLOWIEJCZYK:  If we could go to the line that

18  reads 6/5/17, at 4:31 p.m. Eastern.

19  Q.  Who is this message from and to?

20  A.  It's from Dawkins and it went to Gatto.

21  Q.  What did it read?

22  A.  "Jim, this is Christian Dawkins.  Just tried calling you.

23  Do you have five minutes to talk?"

24  Q.  Going down two lines, to 6/5/17, at 4:42 p.m.  What does

25  this entry reflect?

1  A.  A telephone call between Jim Gatto and Christian Dawkins

2  that occurred at 4:42 p.m.

3  Q.  Going to the line that reads 6/5/17, at 5:59 p.m.  What

4  does this reflect?

5  A.  This reflects an e-mail from Merl Code to Jim Gatto with

6  the Karolina Khaos invoice for $25,000.

7  Q.  Going down to the line that reads 6/5/17, at 6:06 p.m.

8  What does that entry reflect?

9  A.  That reflects a telephone call between Jim Gatto and Merl

10  Code.

11  Q.  Was that approximately seven minutes after the invoice was

12  sent?

13  A.  Yes.

14  Q.  Just looking at the last page, 6/1/17, at 11:49 a.m., the

15  top entry.

16          What does this entry reflect?

17  A.  A text message from Merl Code to Christian Dawkins.

18  Q.  What does it say?

19  A.  "Gatto and I spoke.  Call me."

20  Q.  Looking down to 6/8/17, at 8:25 p.m.

21          What occurred at that time?

22  A.  A call between Christian Dawkins and Merl Code.

23  Q.  Can you tell how long that call was?

24  A.  Approximately 40 minutes.

25  Q.  Just going to the very last line of the chart, what does

1  that reflect?

2  A.  6/9/17, Brian Bowen Junior for his student-athlete

3  statement.

4          MR. SOLOWIEJCZYK:  One moment, your Honor.

5          No further questions.

6          THE COURT:  Thank you.

7          Cross-examination.

8          MR. MOORE:  I believe I will begin, if I may.

9          THE COURT:  Yes.

10 CROSS EXAMINATION

11 BY MR. MOORE:

12 Q.  Special Agent Casola, I believe you told Mr. Solowiejczyk

13 that you have been employed by the FBI for approximately a year

14 and a half, is that right?

15 A.  That's correct.

16 Q.  And you have been involved in this case since January of

17 this year, is that correct?

18 A.  That's correct.

19 Q.  So you're familiar with the evidence that the government

20 has collected in its investigation, correct?

21 A.  Somewhat.

22 Q.  And you stated that you participated in the preparation of

23 the summary charts that were just introduced, correct?

24 A.  That's correct.

25 Q.  And when you say you participated, that means that other

1    people helped you draft the summary charts, isn't that correct?

2    A.   It was a collaborative effort.

3    Q.   It was a collaborative effort between you and the

4    prosecutors in this case, is that correct, sir?

5    A.   That's correct.

6    Q.   And in this collaborative effort you decided to include

7    certain things and not include certain other things, isn't that

8    correct?

9    A.   That's correct.

10   Q.   In fact, I believe the word that was used was selective, is

11   that correct?

12   A.   That's correct.

13   Q.   Because in point of fact, sir, there were a number of text

14   messages that were collected by the government in its

15   investigation of the recruitment of Tugs Bowen, correct?

16   A.   Yes.

17   Q.   And there were a number of text messages that were

18   collected from phones of people other than these defendants,

19   correct?

20   A.   Yes.

21   Q.   And there were text messages that were collected from the

22   phones of, for example, Kenny Johnson, the associate head coach

23   at Louisville, correct?

24   A.   Yes.

25   Q.   But none of those text messages that were collected from

1  the phone of Kenny Johnson were included in your selective

2  summary charts, correct?

3  A.  Correct.

4  Q.  So I want to talk to you for a few minutes about some dates

5  that may have been missing from your selective summary, if I

6  may.

7         MR. SOLOWIEJCZYK:  Objection to the characterization

8  in the question.

9         THE COURT:  Say it again.

10        MR. SOLOWIEJCZYK:  Objection to the characterization

11  by Mr. Moore.

12        THE COURT:  Overruled.

13  Q.  Now, Mr. Casola, you omitted in your summary text messages

14  on 5/23 multiple text messages between Christian Dawkins and

15  Brian Bowen Junior, isn't that correct, sir?

16        MR. SOLOWIEJCZYK:  Your Honor, what he is referring to

17  is not in evidence.

18        MR. MOORE:  This is a summary witness, your Honor.  He

19  has stated that he is --

20        THE COURT:  Answer the question, Agent.

21  A.  Can you pose the question again, counsel?

22  Q.  Yes, sir.

23        There were a number of text messages between Mr.

24  Dawkins and Brian Bowen Junior on 5/23/17 that were excluded

25  from your summary, isn't that correct, sir?

A.  I did not create the summary.  I have reviewed for accuracy

to see if what was included was accurate.  So I did not review

whatever text you're referring to.

Q.  So you're telling us that the summary that you're

testifying about was not created by you now, you're testifying

that you only reviewed the summary, is that correct?

A.  I reviewed the summary for accuracy and to see that

everything that was in there was accurate time wise and to make

sure that where it's referenced is actually where it came from.


Q.  But you're aware, I believe you told us a few minutes ago,

that there were other text messages which were included.  You

had to go through them to look and make sure that the text

messages on the summary were correct as far as dates and times,

correct, sir?

A.  Yes.  I looked at the text messages that were included,

looked at the underlying source document, and made sure that

the text message was accurate and the time was correct.

Q.  And are you aware, sir, that there was a text message from

Kenny Johnson to Rick Pitino on 5/23/17 that was also excluded?

A.  I didn't review that.

Q.  Are you aware that there was a text message from Mr.

Dawkins to Mr. Pitino, two texts back and forth,

between -- excuse me -- three texts between those folks on

5/24?

1      THE COURT:  Mr. Moore, start the question again.

2      MR. MOORE:  I'm sorry, your Honor.

3  Q.  Are you aware that there were three text exchanges between

4  Mr. Pitino, Rick Pitino, and Christian Dawkins on 5/24/17 which

5  were excluded from your summary chart?

6  A.  I didn't review those for the summary chart.

7  Q.  So you didn't think that in preparing your summary it was

8  important for you to review the whole universe of texts,

9  correct?

10      THE COURT:  Sustained.  It wasn't his job.

11      Move on.

12      MR. MOORE:  Yes, sir, your Honor.

13  Q.  And are you aware that there were text messages on 5/25/17,

14  which is included in the time period of Government's Exhibit

15  3008, text messages from Kenny Johnson and Jordan Fair to

16  Louisville assistant coaches which were excluded?

17      MR. SOLOWIEJCZYK:  Again, they are not in evidence.

18  A.  I didn't review those.

19  Q.  And are you also aware --

20      THE COURT:  Do you know whether any such things exist,

21  Agent?

22      THE WITNESS:  Yes, your Honor.

23      THE COURT:  Do you know whether any such messages

24  exist?

25      THE WITNESS:  Yes.

1    THE COURT:  Go ahead.

2    Q.  You're also aware that on 5/25/2017, during this time

3    period, that there were text messages from Kenny Johnson to Mr.

4    Pitino, Kenny Johnson to Michael Bowden, Michael Bowden to

5    Kenny Johnson, that were excluded from your summary, correct?

6            MR. SOLOWIEJCZYK:  Your Honor, can we approach very

7    briefly on this?

8            THE COURT:  Answer the question first.

9    A.  I am aware of the existence of the text messages.

10   Q.  And those text messages were excluded, not only the

11   existence of the text messages but the content of the text

12   messages were excluded from your summary, isn't that correct,

13   Special Agent Casola?

14   A.  Those text messages are not in the summary, correct.

15   Q.  And there are text messages on 5/30/2017, first between

16   Mr. Johnson to Mr. Dawkins --

17           THE COURT:  Let's come to the sidebar now.

18           (Continued on next page)

19

20

21

22

23

24

25

1         (At the sidebar)

2         THE COURT:  This is Mr. Solowiejczyk's witness.

3         MR. SOLOWIEJCZYK:  Your Honor, at this point, given

4    that none of this is in evidence, through his questions he is

5    basically telling the jury about the existence of various

6    things that are not actually evidence at this trial.  For that

7    reason we don't think that question is appropriate.

8         MR. MOORE:  Your Honor, the government offered this

9    witness as a summary witness to testify about the events

10   involving the recruitment of Brian Bowen that were relevant to

11   the recruitment of Brian Bowen, and so I think it is important

12   for the jury to understand.

13        I am not seeking to publish the content of any.  As

14   you know, I did not ask any questions about the content of any

15   text message because I realize that would be improper.  But I

16   do believe it is important for the jury to understand that

17   there are a number of other players involved.  The government

18   gathered evidence about that.  The government chose to exclude

19   it from this trial and to exclude it from its summary charts.

20        MR. SOLOWIEJCZYK:  This is just summarizing evidence

21   that's actually -- not every piece of, shred of paper that we

22   gathered in our investigation.  That's not what the chart

23   purports to be.

24        THE COURT:  Look, you have made your point.

25        MR. MOORE:  You want me to move on, is that correct?

IAG8GAT3                    Casola - Cross

1          THE COURT:  I want you to move on.

2          MR. MOORE:  I thought that that is what you would tell

3     me.

4          THE COURT:  You know the point was served up to you on

5     a silver platter and you have done what you could properly have

6     done with it, but now let's move on.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (In open court)

2    BY MR. MOORE:

3    Q.  Now, again, because you have been involved in this case

4    since January of this year, I take it you have been working

5    primarily on this case, correct, sir?

6    A.  That's not correct.

7    Q.  You have been working substantially on it, particularly as

8    we came closer to trial, correct, sir?

9    A.  Assisting for trial preparation.

10   Q.  Assisting for trial preparation.  Trial preparation

11   involves things like interviewing witnesses on multiple

12   occasions, correct?

13   A.  Yes.

14   Q.  You're aware -- and you have sat through this entire trial,

15   isn't that correct, Special Agent Casola?

16   A.  I have.

17   Q.  And you're aware that there were two undercover officers

18   who were involved in this investigation, correct?

19         MR. SOLOWIEJCZYK:  Objection.

20         THE COURT:  Sustained.

21   Q.  Now, you're also aware, are you not, Special Agent Casola,

22   that the government did not seek wiretaps on the phones of TJ

23   Gassnola or Andy Miller, is that correct or incorrect?

24         THE COURT:  Sustained.

25   Q.  You're also aware, are you not, Special Agent Casola, that

1   the government had not talked to Louisville before -- or Mr.

2   Carns or anyone from Louisville --

3                THE COURT:  Sustained.

4                MR. SOLOWIEJCZYK:  We object to continued questions

5   along this line.

6                THE COURT:  I certainly understand that.

7                I think you better move on.

8                MR. MOORE:  I actually think, your Honor, that I am

9   done.  Thank you.

10               THE COURT:  Thank you.

11               Anyone else?

12               MR. HANEY:  No questions.

13               MR. SCHACHTER:  No questions.

14               THE COURT:  Any redirect?

15               MR. SOLOWIEJCZYK:  Very briefly, your Honor.

16               Your Honor, permission to publish 102L.

17               THE COURT:  Yes.

18  REDIRECT EXAMINATION

19  BY MR. SOLOWIEJCZYK:

20  Q.  Special Agent Casola, you were asked a number of questions

21  about text message that is exchanged between Christian Dawkins

22  and Rick Pitino that weren't included in the chart.

23               Do you remember that?

24  A.  I do.

25  Q.  Were those text messages that were being referred to from

1    102L?  Was Mr. Moore asking you specifically about text

2    messages from 102L?

3              MR. MOORE:  I object.  I don't know how he can

4    possibly know what I was asking him about.

5              THE COURT:  I don't understand.

6              MR. SOLOWIEJCZYK:  I will withdraw it.

7    Q.  If we can just go down the page, what is included in the

8    chart, just zooming in on the first two lines, the first three

9    lines, these are the -- two of these three texts are included

10   in the chart?

11   A.  Correct.

12   Q.  Going down to the bottom of this page.

13             MR. SOLOWIEJCZYK:  If you can just zoom in, just the

14   rest of it Ms. Lee.

15   Q.  These text messages were not included in the chart, right?

16   A.  That's correct.

17   Q.  If we can go to the next page.

18             Just the top half of the page.

19             These text messages were not included in the chart

20   either, right?

21   A.  They were not.

22   Q.  Just going down to the bottom.

23             These weren't included in the chart either, were they?

24   A.  They were not.

25   Q.  And that last page, these weren't either?

1    A.  They were not.

2            MR. SOLOWIEJCZYK:  No further questions.

3            THE COURT:  Thank you.

4            MR. MOORE:  Just one brief question on recross, if I

5    may, your Honor.

6            THE COURT:  Yes.

7    RECROSS EXAMINATION

8    BY MR. MOORE:

9    Q.  Special Agent Casola, there were a number of text messages

10   which were not included on your chart which were not included

11   in Government's Exhibit 102L, isn't that correct?

12   A.  Can you rephrase that?

13   Q.  Yes, sir.

14           Mr. Solowiejczyk just showed you Government's Exhibit

15   102L.  There were a number of text messages in the relevant

16   time periods of these three charts which were not included in

17   your chart which are not on 102L, correct?

18   A.  Yes.

19           MR. MOORE:  Thank you.

20           THE COURT:  All right.  Agent, you are excused.

21           (Witness excused)

22           MR. SOLOWIEJCZYK:  Your Honor, the government would

23   also offer Government Exhibits 402 and 408, which are e-mails

24   from Christian Dawkins.

25           THE COURT:  Where will I find these?

1    MR. SOLOWIEJCZYK:  We will pass them up, your Honor.

2    THE COURT:  Is there any objection?

3    MR. HANEY:  Your Honor, one moment, please.

4    No objection, your Honor.

5    THE COURT:  They are received.

6    (Government's Exhibits 402 and 408 received in

7    evidence)

8    MR. SOLOWIEJCZYK:  If we can just publish those

9    exhibits briefly, your Honor.

10    THE COURT:  You may.

11    MR. DISKANT:  Your Honor, with that, the government

12    rests.

13    THE COURT:  All right.  I am just looking for the

14    amount on 408.  Can you give me some help?

15    MR. DISKANT:  Yes.

16    THE COURT:  That's not the same second page on the one

17    that you handed up.

18    MR. DISKANT:  I apologize.  We can get you a new hard

19    copy.

20    THE COURT:  So where is the amount on the page on the

21    screen?

22    MR. DISKANT:  Turn to the second page of this

23    particular exhibit.

24    THE COURT:  OK.  Thank you.

25    Members of the jury, we have a few things to work out,

1  the lawyers and I.  So you have got a long lunch hour.  We will

2  see you at 2:00.

3           Counsel, I will rejoin you at a quarter of 1.

4           (Jury exits courtroom)

5           (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Iagdgat4

| | |
|---|---|
| 1 | (Jury not present) |
| 2 | THE COURT:  OK.  I imagine I am going to hear some |
| 3 | motions.  Yes? |
| 4 | MR. SCHACHTER:  Yes, your Honor. |
| 5 | The defendants move for judgment of acquittal under |
| 6 | Rule 29 for the same reasons that we identified in our outline |
| 7 | that was sent to your Honor last night. |
| 8 | THE COURT:  Now, has that been e-filed so that is in |
| 9 | the record? |
| 10 | MR. SCHACHTER:  A fair question.  I don't believe so, |
| 11 | your Honor. |
| 12 | MS. DONNELLY:  We can file it this afternoon. |
| 13 | THE COURT:  All right.  You will file it this |
| 14 | afternoon. |
| 15 | (Discussion off the record) |
| 16 | THE COURT:  So maybe you could repeat for the benefit |
| 17 | of the reporter. |
| 18 | MR. SCHACHTER:  Yes, your Honor. |
| 19 | The defendants move for judgment of acquittal under |
| 20 | Rule 29 on all of the grounds that are identified in the |
| 21 | outline that we submitted to your Honor last evening.  The |
| 22 | government has failed to prove each of the elements of wire |
| 23 | fraud and conspiracy to commit wire fraud under the standards |
| 24 | set forth in Jackson v. Virginia, and we laid out in our |
| 25 | outline many of the ways that we believe that the government |

Iagdgat4

1   has failed to sustain its burden.  And on that basis we move

2   for judgment of acquittal.

3        THE COURT:  And that outline is joined by all

4   defendant, right?

5        MR. MOORE:  Yes, it is joined by all defendants, your

6   Honor.  I would say that, just to add for a moment --

7        THE COURT:  Let me hear from Mr. Haney first before

8   you go ahead.

9        MR. MOORE:  I'm sorry.

10       MR. HANEY:  Your Honor, I would concur that it is

11  joined by Mr. Dawkins as well.  I would add, just briefly,

12  though, my position to the Court that, based on the proofs,

13  there has been no evidence at all presented that Christian

14  Dawkins had any involvement at all with Kansas, North Carolina

15  State, or the University of Miami.

16       Thank you, your Honor.

17       THE COURT:  All right.

18       MR. MOORE:  What I was going to say, your Honor, is

19  that I do not believe that there is any evidence in this record

20  from which a reasonable jury could conclude that Mr. Code

21  entered into a conspiracy with anyone or joined in a scheme or

22  artifice to defraud with the specific intent of defrauding any

23  of the named victims of this case.

24       THE COURT:  Which would be in the outline, right?

25       MR. MOORE:  It is in the outline, just stating it for

Iagdgat4

1    the record, your Honor.

2              THE COURT:  OK.  Well, the outline did that.

3              Denied.

4              OK.  Now, do we have any remaining questions regarding

5    admissibility of evidence on the defense case?

6              MR. SCHACHTER:  Yes, your Honor, just several

7    categories.  First is several exhibits relating to whether

8    there was any order to purchase uniforms for the Angola

9    National Team, as Mr. Gassnola testified.

10             THE COURT:  We are heading right for the capillaries,

11   aren't we?

12             MR. SCHACHTER:  We do believe it is relevant, your

13   Honor.  We have two exhibits that demonstrate --

14             THE COURT:  We are going to have a geological survey

15   of Angola, too?

16             MR. SCHACHTER:  If only we had time.

17             We have two exhibits that show that the Angola

18   National Team was in Nike jerseys, and then also we have a

19   certification of no records from Adidas saying that they have

20   done a records search of any record -- of any request or order

21   for the purchase of Angola National uniforms, Angola National

22   Team, and that they found no such records.  So, it is those

23   three exhibits that we would seek to offer.

24             I'm sorry, Defense Exhibits 696, 697, which are

25   photographs of the Angola National Team, and Defense Exhibit

Iagdgat4

1  1019 is the certification by a custodian of records from Adidas

2  that they have searched and found no records, as I stated.

3         THE COURT:  And what is 696?

4         MR. SCHACHTER:  696 I could hand up to your Honor.  It

5  is photographs of Silvio De Sousa in the Angola National Team

6  uniform from a tournament July 1 to 9, 2017, with a Nike

7  swoosh.

8         THE COURT:  Any objections to any of this.

9         MR. DISKANT:  All of it.  None of it has any relevance

10  whatsoever to this trial.  I think it is being tried to prove

11  up some sort of impeachment of Mr. Gassnola, which would be

12  expressly precluded by 608 even if it were relevant.

13         MR. SCHACHTER:  Your Honor, I believe that

14  Mr. Gassnola testified that the nature of his -- he was

15  concealing all the records of payment -- any discussion of

16  payment from Coach Townsend and Coach Self, and that the nature

17  of the conversation that he had with Coach Self and Coach

18  Townsend was about a request that they had to assist in the

19  provision of uniforms for the Angola National Team.  So, we do

20  believe it is relevant to disproving that claim, which is --

21         THE COURT:  Disproving that there was a request.

22         MR. SCHACHTER:  Correct.

23         THE COURT:  By showing that they were wearing somebody

24  else's jerseys at some point in time?

25         MR. SCHACHTER:  It is not dispositive, I would be the

Iagdgat4

```
 1   first to concede.  We do believe, however, that it is relevant.

 2              THE COURT:  No.

 3              MR. SCHACHTER:  OK.

 4              THE COURT:  403.  Complete waste of time, if indeed it

 5   has any probative value.

 6              MR. SCHACHTER:  Yes, your Honor.  Understood.

 7              The second category, they are contracts between Adidas

 8   and the universities for their sponsorship agreements that

 9   would show from Adidas' perspective how much these

10   relationships -- how much Adidas had invested in these

11   relationships.  They are Defense Exhibits 1005, 1004, 1017 and

12   1901.

13              THE COURT:  And that is relevant why?

14              MR. SCHACHTER:  Because from Mr. Gatto's perspective,

15   these relationships, these sponsorship relationships are very

16   important to his employer.  They are very important to the

17   world of basketball sports marketing.  And that explains why,

18   when he sees how much money Adidas has invested in these

19   relationships so that the Adidas brand can be associated with a

20   winner, that's why -- that's his motivation is to help these

21   universities succeed, because he believes that that is

22   consistent with doing his job.  We believe it is probative of

23   that.

24              THE COURT:  No.  OK.

25              MR. DISKANT:  Your Honor, we think none of this has
```

Iagdgat4

1    any relevance whatsoever.  There has been enormous testimony

2    about the facts that the schools were important to Adidas and

3    flagship schools and the like.  The terms of the contract have

4    not probative value.

5         THE COURT:  And the terms of the contract have large

6    numbers in them, right?

7         MR. DISKANT:  Oh, yes.

8         THE COURT:  Oh, yes.  And so what's really going on is

9    an attempt to reopen the door into everybody makes money but

10   the kids and that's really terribly unfair, and that's at least

11   one highly prejudicial and confusing effect of admitting this.

12   It's cumulative as to the value of the relationships.  It is of

13   limited utility in light of everything else in the record.

14   They are not coming in.

15        MR. SCHACHTER:  Yes, your Honor.

16        I believe another category of documents are relevant

17   to a stipulation that your Honor had great confidence in the

18   government and we, that we could enter into, relating to the

19   different entities and what the money flow is for the payment

20   of the scholarships, and so we have been unable to enter a

21   stipulation.  From our perspective, we want the stipulation

22   that just laid out the facts of articles of incorporation,

23   bylaws, and money flows as reflected in the records.  And from

24   our perspective, the government wanted things that were much

25   more conclusory and were not supported by those records.  We

Iagdgat4

1  have been working.  I think that if we had an additional

2  week -- we have been working with Herculean efforts.  Whether

3  they were good efforts or not, I can't say, but there was a lot

4  of ink spilled back and forth in trying to work out these

5  stipulations.  We ultimately had come up empty.  Now we are at

6  the defense case, and so we seek to offer -- and I can list the

7  defense exhibits, but first I will just say they fall into

8  several categories.  They are articles of incorporation.  They

9  are bylaws.  They are Form 990s.  They are financial

10  statements.  They are MFRS forms, which are the revenue

11  reported to the NCAA.  And they are EADA forms, which the

12  universities report to the United States Department of

13  Education, which they are required to.  They would be excerpts

14  of those document which are reflective of the money flows, and

15  that is the category of evidence that we seek to introduce.

16      Also, they also contain evidence reflective of the

17  amount of revenue which is generated by men's basketball.  I

18  understand your Honor's view on that.  I am just -- we do not

19  believe -- that is not our intention, although we understand

20  that your Honor disagrees.  I just want to make the record on

21  that.

22      And I could -- may I list just the exhibits, your

23  Honor, for the record?

24          THE COURT:  By category.

25          MR. SCHACHTER:  OK.  Well, these all generally fall

1    into that category.

2            THE COURT:  And when you said you had a group that

3    related to the different entities, you said --

4            MR. SCHACHTER:  Yes.

5            THE COURT:  -- that these fall into several

6    categories.

7            MR. SCHACHTER:  Yes.  You are right, your Honor.

8            OK.  Your Honor, with respect to the University of

9    Kansas, Defense Exhibit 755 is the Articles of Incorporation of

10   Kansas Athletics, Incorporated.  742 is the Audited Financial

11   Statements of Kansas Athletics, Incorporated.

12           THE COURT:  And what is that going to show?

13           MR. SCHACHTER:  Well, the Articles of Incorporation

14   will show that Kansas Athletics, Incorporated --

15           THE COURT:  I didn't ask you anything about the

16   Articles of Incorporation.

17           MR. SCHACHTER:  The financial statement states that --

18   it makes clear that $13 million was paid to the University of

19   Kansas by Kansas Athletics, Incorporated for tuition, meals and

20   housing of student-athletes.  That is listed as an expense of

21   Kansas Athletics, Inc.

22           THE COURT:  Come on.  What is the next exhibit?

23   Right.  And it is, of course, hearsay.

24           MR. SCHACHTER:  Your Honor, I believe it to be a

25   business record.  I don't think there is a dispute as to the

Iagdgat4

1    nature -- that these are business records and nonhearsay.

2                  THE COURT:  What is the next exhibit?

3                  MR. SCHACHTER:  Defense Exhibit 604 is the MFRS, or

4    Membership Financial Reporting System, data which is reported

5    in the ordinary course of business --

6                  THE COURT:  What does it show?

7                  MR. SCHACHTER:  It shows that the total amount of

8    athletic student aid for the University of Kansas that was

9    disbursed in 2017 was $11.2 million, which is --

10                 THE COURT:  Disbursed by whom?

11                 MR. SCHACHTER:  The University of Kansas.

12                 THE COURT:  All right.  Go ahead.

13                 MR. SCHACHTER:  And it received that money -- this was

14   just to show the money flows, the amount of money -- it

15   received an amount that is somewhat close to but greater than

16   that amount that Kansas disbursed in athletic scholarships,

17   more than that was received by Kansas Athletics, Inc., and the

18   financial statements of Kansas Athletics, Inc. make clear that

19   what Kansas Athletics, Inc. does is it pays for the

20   scholarships which are issued by student-athletes.

21                 Defense Exhibit 604 is the MFRS data that Kansas

22   reports in the ordinary course of business to the NCAA --

23                 THE COURT:  You just told me about that.

24                 MR. SCHACHTER:  I apologize, your Honor.

25                 Defense Exhibit 611 is Kansas' filing with the U.S.

Iagdgat4

1  Department of Education under the Equity Athletics Disclosure

2  Act, which states that the amount of athletically-related

3  student aid it disbursed is roughly $10.8 million.  It also

4  makes clear in that document that Kansas Athletics is a

5  separate nonprofit corporation.

6           THE COURT:  Let me see that, please.

7           MR. SCHACHTER:  May I approach, your Honor?

8           THE COURT:  Yes.

9           I have been handed a whole pile of papers.  I see.  It

10  is at the bottom.

11          MR. SCHACHTER:  I'm sorry.  Your Honor, I may have

12  neglected to hand up Defense Exhibit 611.

13          THE COURT:  No.  I have it in front of me now.

14          MR. SCHACHTER:  OK.  Thank you, your Honor.

15          (Pause)

16          THE COURT:  Mr. Diskant.

17          MR. DISKANT:  Yes, your Honor.

18          THE COURT:  Is there any dispute that Kansas Athletic

19  Association is a separately incorporated entity from the

20  University of Kansas?

21          MR. DISKANT:  No, but.

22          THE COURT:  What's the "but"?

23          MR. DISKANT:  The but is that the Kansas Athletic,

24  Incorporated is wholly controlled by the University of Kansas,

25  and all of its revenues are controlled by the Chancellor of the

Iagdgat4

1   University of Kansas.

2          THE COURT:  And you draw that from what source?

3          MR. DISKANT:  From some of the documents that

4   Mr. Schachter and I have been talking about that he has chosen

5   not to mark.  So, for example, actually one of them, in

6   fairness to him, may be the Kansas not-for-profit Articles of

7   Incorporation itself.

8          Mr. Schachter and I, as you noted, have spent far more

9   time than I'm sure either of us would care to admit on this

10  particular issue, and they all say basically the same thing.  I

11  confess, I am slightly more familiar with the Louisville ones

12  than the Kansas ones.  But if you turn to page 2, for example,

13  of Defense Exhibit 755, which is the Kansas Athletic,

14  Incorporated, it says, "The Chancellor of the University of

15  Kansas has ultimate responsibility and final authority for the

16  conduct and administration of all aspects of the athletic

17  program."  KAI exists for no purpose other than to serve the

18  University of Kansas.

19         And, more importantly, I think, for these purposes, it

20  is not a distinction that is drawn by anyone relevant to this

21  case.

22         THE COURT:  Yes, I understand that.  But for

23  corporation A to have a certificate of incorporation that says

24  the chancellor of corporation A is responsible for corporation

25  A's athletic program does not address the question of the

1  chancellor's control over corporation B, which is the Kansas

2  Athletic Association.

3      MR. DISKANT:  Your Honor, perhaps I misspoke.  What

4  this document says is that the Chancellor of the University of

5  Kansas shall run the Kansas Athletic, Incorporated, Article 5.

6      THE COURT:  Well, where does it say that?

7      MR. DISKANT:  "The business of the corporation shall

8  be managed and its affairs shall be conducted by a Board of

9  Directors consisting of the Chancellor of the University of

10  Kansas, the University of Kansas Director of Intercollegiate

11  Athletics."  These are all university people.

12      THE COURT:  I see.  This is the KAI?

13      MR. DISKANT:  Correct.

14      THE COURT:  So your position, essentially, is that for

15  purposes of this case we disregard the separate corporate

16  existence of KAI?

17      MR. DISKANT:  That's exactly right.  Just to make that

18  point, in some of the documents that Mr. Schachter would

19  propose to offer, the universities are doing that themselves,

20  because it is the universities, and not KAI, that are

21  educational institutions and therefore required to file these

22  EADA reports, and it is the universities, not KAI, that are

23  members of the NCAA.  So, for example, Defense Exhibit 611,

24  which is this EADA report that the University of Kansas filed,

25  actually includes all sorts of costs and revenues that are as a

Iagdgat4

purely technical matter booked to KAI, but because KAI is
wholly controlled by the university and because the university
is the educational institution, the distinction is not drawn
for purposes of the form.

THE COURT:  Which document was that you were referring
to?

MR. DISKANT:  611.

I should add that the University of Kansas also files
an annual audited financial statement which includes all of the
revenues and costs of KAI, because, according to the auditor's
statement, the University of Kansas is financially responsible
for KAI and KAI exists solely to promote the business of the
University of Kansas.

THE COURT:  So you're telling me these revenue and
expense figures in 611 are basically consolidated?

MR. DISKANT:  That's exactly right, your Honor.

THE COURT:  And where does it say that.

MR. DISKANT:  I'm not sure it says it in this
particular form.  What I can tell you is that the reason for
this distinction, and certainly what the Form 990 that
Mr. Schachter would propose to offer will indicate, is that
both of these universities, that is, Kansas and Louisville, for
reasons of no real relevance to this case, book as a technical
matter the costs and revenues of their athletic programs to
these affiliated organizations.  So I don't believe that -- if

Iagdgat4

1   we're going to be hypertechnical about this, I don't believe

2   the University of Kansas has total expenses and total revenues

3   by team, I believe KAI has this.  But because the University of

4   Kansas is the educational institution and is required to file

5   these forms, they file them under the name of the University of

6   Kansas, because there is no meaningful distinction between

7   these two.  This is a hugely complicated issue that has zero

8   relevance to this case.  I'm really hard pressed to see what

9   probative argument Mr. Schachter would make of this.

10          THE COURT:  Well, do you agree, Mr. Schachter, that

11  the Louisville situation is comparable?

12          MR. SCHACHTER:  Not precisely.  I think that the

13  situation --

14          THE COURT:  In substance?

15          MR. SCHACHTER:  In substance.

16          THE COURT:  And the point of all of this, from your

17  standpoint, is that you want to be able to argue in the Court

18  of Appeals that notwithstanding all of these facts, if anybody

19  was injured, it was the Kansas Athletic Association, not the

20  University of Kansas?  That's the bottom line, right?

21          MR. SCHACHTER:  I would say it slightly differently.

22  I would say that the universities that are named as the victims

23  here actually lost nothing.

24          THE COURT:  Except the right to exercise its control

25  over the Kansas Athletic Association to cause the Kansas

Iagdgat4

1    Athletic Association to give or not to give scholarships to

2    particular people, right?

3              MR. SCHACHTER:  Well, as a technical matter, Kansas

4    Athletic, Incorporated makes the scholarship decisions.  The

5    employees that we've been talking about, for example, the

6    coaches, are employees of Kansas Athletic, Incorporated and not

7    the University of Kansas.  We have heard testimony I believe

8    from some of the compliance people who I believe were actually

9    not employees of the University but were, rather, employees of

10   these separate entities.  So it is on that basis that I differ,

11   your Honor.

12             THE COURT:  Do you think that the University of Kansas

13   has as its coach, or had as its coach, Rick Pitino by virtue of

14   some independent decision of the Kansas Athletic Association

15   without the participation of the top brass of the University of

16   Kansas?  Do you think that would be the case?

17             MR. SCHACHTER:  I don't believe so because the two

18   entities share board members.  So, I don't think that would be

19   correct.

20             THE COURT:  Right.  All right.  I'm going to give you

21   a last chance over our brief lunch hour to work out something

22   that will satisfy you; otherwise, you are going to take your

23   chances.

24             MR. SCHACHTER:  Yes, your Honor.

25             THE COURT:  Because it seems to me that if I let you

Iagdgat4

1  do what you want to do, Mr. Schachter, we're going to have a

2  continuance in the trial, possibly, and a rebuttal case that

3  could take ten days, and the bottom line will be the same.

4         MR. SCHACHTER:  Understood, your Honor.

5         And at some point -- I mean, I will attempt to work

6  out -- we will work it out.  If not, I will just have some

7  other exhibit numbers that I may need to read into the record.

8         THE COURT:  OK.

9         MR. SCHACHTER:  Thank you, your Honor.

10        THE CLERK:  All rise.

11        (Luncheon recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AFTERNOON SESSION

2:00 p.m.

(Jury not present)

THE COURT:  Good afternoon, folks.

OK.  Has the battle of Kansas been solved or not?

MR. SCHACHTER:  Unfortunately, it is not.  We provided

the last stipulation that we discussed with the government.

They responded with a stipulation that they would agree to, but

it didn't include any information about who fund scholarships,

which is really our point.

I was only able to look at it on my phone.  I don't

have access to a hard copy.

Your Honor, this is the stipulation that we had

proposed.

THE COURT:  Did you read paragraph 5, Mr. Schachter?

MR. SCHACHTER:  As I said, I got it ten minutes ago

when I was just trying to look at it on my phone, which is not

obviously in the courtroom.

May I have just a moment, your Honor?

THE COURT:  Yes.

MR. SCHACHTER:  Your Honor, we would be fine with it

if it said to fund all athletic scholarships, or athletic

scholarships in their entirety.  That would be acceptable.  I

don't think it's unclear that the sentence could mean ten

dollars.  I apologize that we are even bringing this to your

1    Honor's attention.

2              MR. DISKANT:  I don't know that that is true.  But in

3    the spirit of resolving this, I presume we could put the word

4    "all" in there.

5              I would ask, as a bigger picture, that your Honor

6    consider reading the stipulation and considering the

7    government's 403 argument again.  Because we think that, as the

8    stipulation makes clear, these issues are very complicated.

9    There will be absolutely no context or foundation for the jury

10   to appreciate them.  No witness is going to testify about these

11   issues.  We don't believe there is an appropriate argument that

12   can be made from them.  And by contrast, some of these issues

13   are incredibly confusing, such that a group of very smart

14   lawyers has spent way too much time going back and forth over

15   what all of this means.

16             THE COURT:  With the exception of the word "all," Mr.

17   Schachter, the government's proposed stipulation, which we will

18   mark as Court Exhibit A, will be acceptable to you, is that

19   right?

20             MR. SCHACHTER:  Your Honor, may I have just one

21   moment?  I believe so, your Honor.

22             May I have a moment with the government, your Honor?

23             THE COURT:  It's Court Exhibit B, I am told.

24             MR. SCHACHTER:  That's fine, your Honor.

25             THE COURT:  And you're good with that, Mr. Diskant?

IAG8GAT5

1        MR. DISKANT:  Assuming the Court overrules our 403

2   objection, we are prepared to sign the stipulation.

3        I should note, your Honor, these arrangements between

4   the institutions are different for each school.  So there is

5   going to be a different fact pattern for each of the next few

6   stipulations.

7        THE COURT:  I thought there were only two schools with

8   this problem.  You only mentioned two before lunch.

9        MR. DISKANT:  I presume Mr. Schachter is going to want

10  something on North Carolina State as well.

11       THE COURT:  He only mentioned Kansas.

12       MR. DISKANT:  Fair enough.

13       MR. SCHACHTER:  It is the same issue with Louisville

14  and -- may I have a moment?

15       THE COURT:  Who is trying the case, Mr. Schachter at

16  your table?

17       MR. SCHACHTER:  Really, your Honor?

18       THE COURT:  I want to have whoever is really doing it

19  do it.

20       MR. SCHACHTER:  I understand.  I have been very

21  involved in this issue.  We just got the stipulation.  It's

22  revised.  I don't know how it's precisely different.

23       So we have the issue with Louisville, Kansas, and NC

24  State is really a different issue.  It's really Kansas and

25  Louisville.

IAG8GAT5

1    THE COURT:  I think we established before lunch your

2  agreement that the government's position had all of them is

3  substantially the same as the one we have been looking at

4  closely, right?

5    MR. SCHACHTER:  I believe that to be accurate.

6    THE COURT:  And you're content to have me decide this

7  on that basis, right?

8    MR. SCHACHTER:  Yes, your Honor.  I would note the

9  Kansas stipulation, we have the same issue with respect to all

10  scholarships, that this language is not accurate with respect

11  to the flow of money.  I just wanted to lay that caveat out.

12  But I am comfortable with your Honor ruling on that basis.

13    THE COURT:  Why shouldn't I exclude all of this on the

14  ground that none of it ultimately matters?

15    MR. SCHACHTER:  Your Honor --

16    THE COURT:  I am not finished.

17    MR. SCHACHTER:  I apologize.

18    THE COURT:  It is clear from the stipulation that Mr.

19  Diskant and you have now agreed upon, on the contingency that I

20  overruled the government's 403 objection, that the University

21  of Louisville and Kansas each are in a position to exercise

22  substantial control over their respective athletic

23  associations, whatever the corporate mechanics are, right?

24    MR. SCHACHTER:  I would say that they share common

25  directors.  Whether or not that means one entity has control

IAG8GAT5

over another entity I think, as a technical matter, is probably

a different question, but I certainly agree that they share

common directors.

THE COURT:  It seems to me that the ability to control

or influence the athletic associations, which is what I will

call them, is an asset of the university in each case.  And the

effect of the alleged misrepresentations, and the other matters

that we are arguing about, could have impaired the ability of

those universities to control their assets.  And that being the

case, I think this entire argument is ultimately academic, and

I sustain the objection.

Not to mention the fact that getting into this morass

would be exceptionally confusing, take a good deal of time,

would have very little, if any, possible impact on the outcome,

require massive expansion of the jury instructions to deal with

when corporate identities are and are not disregarded, an issue

that has not yet been tried, and I sustain the 403 objection.

OK.  I think it does no substantial damage to either

side.  The likely appeal point that the defendant wishes to

raise may wish to raise, depending on what I do with the

charge, makes no difference at all by virtue of this.  The only

difference is we may reach it a week or two sooner.

Now, what else has got to be done before we bring in

the jury?

MR. SCHACHTER:  Your Honor, two things.  First, may I

1   list the defense exhibits that are relevant to that issue just

2   so it's in the record?

3          THE COURT:  Go ahead.

4          I will tell you what.  Submit it in writing.  I will

5   mark it Court Exhibit C.  Show it to Mr. Diskant first.  And

6   then if there is anybody who claims that my ruling might not be

7   governed by anything that appears on that list, you are to

8   raise it again or forever hold your peace.  Agreed?

9          MR. SCHACHTER:  Yes, your Honor.

10         THE COURT:  Mr. Diskant, is that agreed?

11         MR. DISKANT:  Yes.

12         MR. SCHACHTER:  The remaining issue is the NCAA rules

13   and what is or is not going to come in.  We were busy over the

14   break.  We have identified the portions of the rules that we

15   think should come in, and I don't know what else the government

16   wants beyond the portions that we proposed, or that the court

17   would like.  The court raised --

18         THE COURT:  I am not trying the case in the sense that

19   you're trying the case.

20         MR. SCHACHTER:  Understood, your Honor.

21         THE COURT:  What I said is that your excerpt is

22   misleading.

23         MR. SCHACHTER:  I understand, your Honor.  As the

24   record is right now, that is what we have presented as those

25   excerpts of Government Exhibit 1503 and 642 which are the

1  reinstatement guidelines.

2      THE COURT:  Let's not just constantly repeat all the

3  time.  Let's just move on.

4      MR. SCHACHTER:  Your Honor, I would be willing to add

5  whatever portions the government wishes to those sections.

6      MR. DISKANT:  Your Honor, our position remains that

7  none of this should come in, but if it is going to come in, we

8  think we should simply offer the manual in in its entirety.  Or

9  put slightly differently, I did not have time over the lunch

10  hour, dealing with all of these other things, to go through a

11  400-page manual with Mr. Schachter on particular redactions.

12      THE COURT:  Well, if you both agree that it's going to

13  come in in its entirety --

14      MR. DISKANT:  That was subject to our extended 403

15  argument on this issue.  Because we do think that the Court has

16  correctly ruled on this issue.  We think it is incredibly

17  complicated.  This is an issue the defendants opened on

18  agreeing with the government on.  No party has called a NCAA

19  witness to explain what these mean, nor is the meaning of them

20  all that relevant, above and beyond the high level

21  understanding that the jury has gotten.

22      THE COURT:  If it is offered, I will receive

23  government 1503.

24      MR. SCHACHTER:  And 642 is the reinstatement

25  guidelines.

IAG8GAT5

1          THE COURT:  What about 642?

2          MR. DISKANT:  We object to that as completely

3     irrelevant.

4          THE COURT:  What is the relevance, Mr. Schachter?

5          MR. SCHACHTER:  Your Honor, the jury heard testimony

6     from one of the compliance witnesses about the reinstatement

7     process.  In fact, it demonstrates that for a violation of the

8     recruiting rule, the maximum penalty is 30 percent of the

9     season for a player.  So we think that it's relevant to showing

10    that the potential penalties here are in fact not significant.

11         MR. DISKANT:  It has no relevance to this case because

12    it's talking about penalties to a player, not penalties to the

13    university, which is what this case is about, the harm to the

14    university.

15         MR. SCHACHTER:  Your Honor, the penalties for the

16    university are dependent upon -- the conduct is playing an

17    ineligible player.  So the institutional exposure to penalties

18    is based on to what extent they played a player who is

19    ineligible.  And under the reinstatement guidelines, there's

20    two things that they say.  One is that the length of time of

21    the ineligibility is cabined for violations of the recruiting

22    violations involving payment of more than $1,000.  And they

23    also say that the culpability of the player, or the lack

24    thereof, is a factor that should be considered.

25         THE COURT:  The objection to 642 is sustained.

1     Anything else unresolved on the defense case?

2     MR. MOORE:  I have some housekeeping issues, your

3 Honor, if your Honor will permit those.  They primarily refer

4 to scheduling.

5     THE COURT:  Later.

6     MR. MOORE:  OK.

7     THE COURT:  Let's bring in the jury.

8     MR. MOORE:  Your Honor, the only concern is it may

9 affect what your Honor tells the jury about what we do

10 tomorrow.  I suppose we can deal with it at a break.

11     THE COURT:  The defense case is going to consist of a

12 pile of paper, right?

13     MR. SCHACHTER:  The defense case will not take more

14 than 15 minutes.

15     THE COURT:  So then there will be a rebuttal case, or

16 not.

17     MR. DISKANT:  One moment, your Honor.

18     We understand Mr. Moore is going to seek to offer some

19 sort of document regarding the number of times the government

20 cooperator Munish Sood's order of continuance was extended to

21 allow the parties to explore a disposition.  It's not clear

22 what the relevance of this is, but Mr. Sood was a witness here;

23 he could have explored it with him on the stand.  He chose not

24 to, and it is of no relevance at this point.

25     MR. MOORE:  My understanding was that the government

IAG8GAT5

was willing to sign a sanitized version of the stipulation.  If
they are unwilling to sign the sanitized version of the
stipulation, then I would ask your Honor to admit the
stipulation.  I think that the relevance is that Mr. Sood was
not indicted, his case was extended ten separate times, and I
do think that is of some relevance.

THE COURT:  He was not indicted, but this case that
was never brought against him was extended?

MR. MOORE:  He was charged in a complaint.  He was not
indicted because, as your Honor knows, the Supreme Court clock
requires an indictment within 30 days unless there is an
extension order.  There were ten separate extension orders for
the government to have ongoing discussions with Mr. Sood and
his counsel, and then Mr. Sood ultimately pled guilty to an
information.  That is what the stipulation in essence says.  It
says no more.

THE COURT:  What is the docket number?

MR. MOORE:  Mr. Sood's docket number?  Give me one
moment, your Honor.

MR. SCHACHTER:  May I just confer with the government
for one moment?

THE COURT:  Yes.

MR. MOORE:  Your Honor, he is charged in two separate
complaints, but the docket number of the case to which he
ultimately pled is 1:18-CR --

1    THE COURT:  But these extensions you're talking about

2    would have been in the magistrate --

3    MR. MOORE:  I can give you both the miscellaneous

4    numbers.

5    THE COURT:  I have that.

6    I understand the point, Mr. Diskant, but I can

7    understand some remote bit of relevance.  The implication is

8    that it took him a long time finally to come up with whatever

9    he told the government.  That's an implication.

10   MR. DISKANT:  Correct.  And the reason that the

11   government objects is that, had Mr. Moore done this with the

12   witness on the stand, he could have explained or been

13   redirected on this issue, which is it had nothing to do with

14   that.  His first proffer with the government was within several

15   days of his being arrested.  There were other investigations,

16   and he was meeting with other U.S. attorney's offices, and

17   there was a conflict issue with his lawyer, all of which had to

18   be worked through, none of which had anything to do with Mr.

19   Sood's willingness to cooperate.

20   THE COURT:  Was there a discussion on the record here

21   about conversations with another U.S. attorney's office?

22   MR. DISKANT:  I believe there is a limited amount of

23   questioning about that.

24   MR. MOORE:  My recollection is that there was a

25   discussion about Mr. Sood, the date on which he first agreed to

1  cooperate.  I cross-examined him, as your Honor may recall,

2  about the number of times that he met with the government.  He

3  said a dozen.  In fact, it was 17.  So I do believe that it is

4  relevant.

5            THE COURT:  Well, in light of what you just said, I am

6  convinced it's cumulative.

7            MR. MOORE:  I thought you might say that, but I felt

8  like I needed to be frank with the court.

9            THE COURT:  I appreciate the candor when called upon.

10           That's the ruling on that.

11           Bring in the jury.

12           MR. MOORE:  I only have one final issue to visit with

13  the government on.  Can I have just a moment?

14           THE COURT:  The jury has now been sitting outside for

15  20 minutes.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Welcome back, folks.

3          The jurors are all present.  The defendants are all

4     present.

5          Members of the jury, I would be remiss if I didn't

6     express appreciation for your tolerance of these intermittent

7     delays.  In any case involving as many parties as this one,

8     that takes as long as this one, getting to the final moment

9     takes a fair amount of attention from the judge, discussions

10    between the parties, to which the jury can't be a party.  And

11    that's what has been going on, and we are this close.

12          We will now have the defense case.

13          MR. SCHACHTER:  Your Honor, may we proceed?

14          THE COURT:  Yes.

15          MR. SCHACHTER:  Your Honor, Mr. Gatto offers Defense

16    Exhibit 1014.

17          Can we put it up on the screen?

18          MR. DISKANT:  No objection.

19          THE COURT:  Received.

20          (Defendant's Exhibit 1014 received in evidence)

21          MR. SCHACHTER:  Your Honor, this is an internal

22    document from Adidas labeled, "Human Resources Information

23    System Employee Update Form."  I would just like to highlight

24    the date in the lower right-hand corner.  This is the employee

25    form of James Gatto.

1    May I publish it, your Honor?

2    THE COURT:  You have.

3    MR. SCHACHTER:  I would highlight the date of hire of

4    September 27, 1993.

5    Thank you.

6    Now, your Honor, I would like to offer Defense Exhibit

7    1018.

8    Mr. McLeod, can we first put it up, not for the

9    jurors.

10    MR. DISKANT:  No objection.

11    THE COURT:  1018 is received.

12    Publish.

13    (Defendant's Exhibit 1018 received in evidence)

14    MR. SCHACHTER:  This is an internal document at Adidas

15    showing Mr. Gatto's salary of $139,699 for 2017.

16    THE COURT:  I am going to take it that Mr. Schachter's

17    descriptions, as these flash by, are stipulated by the

18    government absent objection.

19    MR. DISKANT:  Yes, your Honor.

20    THE COURT:  The jury should accept that.

21    MR. DISKANT:  To be clear, this would not include his

22    bonus, I believe the parties also agree.

23    MR. SCHACHTER:  Salary.

24    Next, your Honor, the defense offers Government

25    Exhibit 1503, which is the NCAA rule manual.

1    THE COURT:  It's received.  And there is no way you

2    can publish it.

3    (Government's Exhibit 1503 received in evidence)

4    MR. SCHACHTER:  Next, your Honor, we would like to

5    read a stipulation, which has been marked as Defense Exhibit

6    S4.

7    THE COURT:  Go ahead.  S4 is received.

8    (Defendant's Exhibit S4 received in evidence)

9    MR. SCHACHTER:  It's been stipulated among the parties

10   that, for technical reasons, the following telephone

11   conversations were not recorded during the period of

12   court-authorized wiretaps on the phones of James Gatto and

13   Christian Dawkins, respectively.

14   First, a call between phone numbers associated with

15   James Gatto and Bill Self, dated August 31, 2017, from 5:21

16   p.m. to 5:26 p.m., Eastern Standard Time.

17   Also not recorded, for technical reasons, a call

18   between a phone number associated with Christian Dawkins and a

19   phone number associated with Kenny Johnson, dated September 18,

20   2017, from 11:52 a.m. to 12:12 p.m., Eastern Standard Time.

21   Next, your Honor, we offer another stipulation, which

22   has been marked as Defense Exhibit S3.

23   May I proceed with reading it?

24   THE COURT:  Yes.

25   (Defendant's Exhibit S3 received in evidence)

1          MR. SCHACHTER:  It is stipulated among the parties

2    that on June 22, 2017, the NBA draft was held at the Barclays

3    Center, in Brooklyn, New York, at 7 p.m. Eastern Time.

4          Next, your Honor, the defense offers Defense Exhibit

5    220.  And may I just put it on the screens and not publish it

6    yet.

7          MR. DISKANT:  No objection.

8          THE COURT:  Received.

9          (Defendant's Exhibit 220 received in evidence)

10          MR. SCHACHTER:  May I publish it, your Honor?

11          THE COURT:  Yes.

12          MR. SCHACHTER:  It is a text message, dated August 6,

13    2017, from Coach Jim Larranaga to Jim Gatto.  "Jim, please give

14    me a call.  It's important that I talk with you today.  Coach

15    L."

16          Your Honor, the defense next offers Defense Exhibit

17    1016.

18          THE COURT:  Received.

19          (Defendant's Exhibit 1016 received in evidence)

20          MR. SCHACHTER:  May I publish it, your Honor?

21          THE COURT:  Yes.

22          MR. SCHACHTER:  This is an e-mail from Jim Gatto to

23    Dennis Smith, Sr., dated July 31, 2017.

24          "Dennis, wanted to make sure you saw the last note I

25    sent to Glenn with the last offer I proposed.  I know Glenn

IAG8GAT5

1  said you guys were going in another direction, but just wanted

2  to make sure you saw everything.  Even though we didn't get

3  this done, just wanted to say thanks for everything and wish

4  you and Junior all the best.  Thanks, Jim."

5          You can take that down.

6          Next, your Honor, defense offers Defense Exhibit 218.

7          THE COURT:  Received.

8          (Defendant's Exhibit 218 received in evidence)

9          MR. SCHACHTER:  May I publish it, your Honor?

10          THE COURT:  Yes.

11          MR. SCHACHTER:  This is a text message between Jim

12  Gatto and Dennis Smith, Jr., dated July 28, 2017.

13          Dennis Smith, Jr. writes:  "I thank you for everything

14  you have done for me, and I also thank you for being

15  understanding of the situation.  Regardless of the current

16  deal, we have built a strong relationship worth honoring.  I

17  wish you nothing but the best.  Thank you."

18          Mr. Gatto responds --

19          MR. DISKANT:  I think Mr. Gatto's text is first.

20          MR. SCHACHTER:  OK.

21          THE COURT:  So it appears.

22          MR. SCHACHTER:  OK.  Very good.  You're right.  That's

23  right.  I stand corrected.

24          First Mr. Gatto writes:  "Dennis, I just wanted to say

25  it has been a pleasure watching you grow as a person and player

IAG8GAT5

1    these past few years.  I know you had to make a business

2    decision that was best for you, and I respect that even in my

3    disappointment.  However, that won't stop me from cheering you

4    on during your NBA career as I wish you all the best.  Stay who

5    you are and keep working hard and great things are going to

6    happen for you.  Look forward to seeing you in the near future.

7    Jim Gatto."

8            May I have just a moment, your Honor?

9            THE COURT:  Yes.

10            MR. SCHACHTER:  With that, James Gatto rests.

11            THE COURT:  Mr. Moore.

12            MR. MOORE:  Can I have just one moment, your Honor?

13            THE COURT:  Yes.

14            MR. MOORE:  Your Honor, I will provide this to the

15    government.

16            Defendant Code rests, your Honor.

17            THE COURT:  Mr. Haney.

18            MR. HANEY:  Thank you, your Honor.

19            Your Honor, Mr. Dawkins offers Exhibit 5, and as an

20    aid to the jury Exhibit 5T.

21            THE COURT:  Defendant's exhibit?

22            MR. HANEY:  Defendant's Exhibit 5 and 5T.

23            THE COURT:  Mr. Diskant.

24            MR. HANEY:  Defense Exhibit 5 is a July 10, 2017 call

25    between Christian Dawkins and the undercover FBI agent who is

1    known as the name Jeff DeAngelo.

2              With permission, may we publish DX 5T on the screen

3    and play DX 5 for the jury?

4              MR. DISKANT:  What I am looking at is not -- I'm

5    sorry.

6              THE COURT:  What is the problem, folks?

7              MR. HANEY:  One moment, your Honor.

8              Your Honor, we are going to come back to 5 and 5T, if

9    I may, and move on to the next defense exhibit.

10             THE COURT:  All right.

11             MR. HANEY:  Your Honor, we would offer Defense Exhibit

12   7 and as an aid to the jury Defense Exhibit 7T.

13             Defense Exhibit 7 is a July 11, 2017 call between

14   Christian Dawkins and the undercover FBI agent who is going by

15   the name of Jeff DeAngelo.

16             THE COURT:  All right.

17             MR. HANEY:  Permission to publish DX 7T and play DX 7

18   for the jury.

19             THE COURT:  Is there any objection to this?

20             MR. DISKANT:  No, your Honor.

21             THE COURT:  DX 7 is received.  But the DX 7 that you

22   are showing me on the screen certainly doesn't look like the

23   one I was given to rule on and that I have ruled on.

24             Has anybody compared them?

25             MR. DISKANT:  That was the issue with the last call.

IAG8GAT5

1     I think from the government's perspective this is accurate.

2           Can we just flip to the end of this particular

3     transcript?

4           The government has no objection to this.

5           THE COURT:  Received.

6           (Defendant's Exhibits 7 and 7T received in evidence)

7           MR. HANEY:  Mr. McLeod, would you play it?

8           (Audio played)

9           THE COURT:  Start again.

10          (Audio played)

11          MR. HANEY:  Thank you, your Honor.

12          Mr. McLeod, are we ready with 5?

13          I will move on to the next.

14          The defense will offer what has been marked as

15    Government Exhibit 102K-10.

16          THE COURT:  Received.

17          (Government's Exhibit 102K-10 received in evidence)

18          MR. HANEY:  May I publish to the jury, your Honor?

19          THE COURT:  You may.

20          MR. HANEY:  Can I highlight, if we could, the -- hold

21    on.

22          It is a text message between Christian Dawkins and

23    Brian Bowen Senior, dated May 18, 2017, at 2:44 p.m.

24          Christian Dawkins texts to Brian Bowen Senior, "LOL.

25    Go to Michigan State.  Keep it simple."

1          Christian Dawkins also texts after that text, at

2     2:44:56, "They want Tugs."

3          Brian Bowen Senior responds, "He just is not feeling

4     them.  I'll ask him again today.  I'm for MSU.  It's him."

5          Thank you, your Honor.

6          THE COURT:  OK.

7          MR. HANEY:  The defense would also offer what is

8     marked as Defense Exhibit 105.  It's a two-page exhibit, your

9     Honor.

10          THE COURT:  Yes.

11          MR. HANEY:  May I publish, please?

12          THE COURT:  It's received.

13          (Defendant's Exhibit 105 received in evidence)

14          MR. HANEY:  This is a text message on May 23, 2017

15     between Christian Dawkins and Brian Tugs Bowen.

16          Christian Dawkins texts to Tugs Bowen, "On a scale of

17     1 to 10, 10 being the worst, how tired are you of talking about

18     coaches?"

19          Tugs Bowen responds, "I know, man, it's stressful for

20     everyone."

21          I'm sorry.  Christian Dawkins also texts, "I know,

22     man, it's stressful for everyone.  The last one you should talk

23     to is Marvin Menzies at UNLV.  He's got a squad and a good

24     thing going and you can be the man.  And you really need to

25     have a final conversation with Dana Altman at Oregon.  It's a

terrible place but it's a good basketball situation."

Tugs Bowen responds, "OK, I will."

Then Christian Dawkins responds, "OK, cool.  Let me
know if you have any questions or want to know anything about,
background wise about the coaches or the players before you
make a final decision.  Whatever you do you will kill it."

Thank you, your Honor.

Your Honor, I would like to refer back to Defense
Exhibit 5, and as an aid to the jury 5T.  Before it's
published, I want to make sure we have concurrence with the
government that 5T is fairly represented to what we have agreed
to.

With no objections, I would like to publish as an aid
5T and then play 5.

MR. DISKANT:  No objection.

THE COURT:  Received.

(Defendant's Exhibits 5 and 5T received in evidence)

(Audiotape played)

MR. HANEY:  Thank you, your Honor.

And with that, Christian Dawkins rests.

THE COURT:  OK.  Members of the jury, I need a few
minutes with counsel without you, and we will see you very
shortly.

(Jury exits courtroom)

THE COURT:  Thank you.

1          Motions.  I assume you're renewing what you have done

2     already.

3          MR. SCHACHTER:  Yes, your Honor.

4          MR. MOORE:  Yes, your Honor.

5          MR. HANEY:  Yes, your Honor.

6          THE COURT:  Anything new and different?

7          MR. MOORE:  No, your Honor.

8          MR. HANEY:  No, your Honor.

9          THE COURT:  Denied.

10          What is the rebuttal case?

11          MR. DISKANT:  There is none, your Honor.

12          THE COURT:  No rebuttal.

13          All right.  We can have the charge available to you in

14     draft, picked up at chambers at 8:00 tomorrow morning.  A

15     charge conference here at 10.  I think we will bring the jury

16     in at 1 or 1:30.  What do you think?

17          MR. MOORE:  Your Honor, the housekeeping matter that I

18     referred to earlier, we are a little concerned on the defense

19     side that we are not going to have sufficient time to react to

20     your Honor's charge and include and deal with the portions of

21     your Honor's charge that we need to address in our closing

22     arguments given that schedule, and we were wondering if the

23     Court would consider doing closing arguments on Thursday.

24     Given the fact that the court has -- I think we now have

25     shorter, tighter times for closing arguments.  By my count, we

IAG8GAT5

1    have five and a half hours.  I don't know what, if anything --

2              THE COURT:  That's a full day.

3              MR. MOORE:  I don't know what, if anything, the jury

4    decided.  I know yesterday --

5              THE COURT:  They are not sitting Friday.  I got a

6    heavy nod.  The minute I said it, I think it was Juror No. 8 or

7    9 or 10 was going like this.

8              MR. MOORE:  I certainly saw at least two alternates

9    who were not happy about that idea.

10             THE COURT:  We are not going to sit Friday.

11             MR. MOORE:  So I don't know if your Honor would

12   consider the possibility that we have a charge conference

13   tomorrow, your Honor consider charging the jury before

14   arguments, and we argue on Thursday.  That gives everybody time

15   to react.

16             THE COURT:  I am not going to charge before you argue.

17             MR. MOORE:  Yes, sir.

18             So would you consider having us do all of it on

19   Thursday?

20             THE COURT:  Then we are talking about something like

21   an eight-hour day of jury time, which will translate into

22   something close to a ten-hour day, and I don't think that's

23   realistic.

24             MR. MOORE:  All right, your Honor.

25             So I take it what your Honor plans to do is we will

IAG8GAT5

1    do, perhaps, the government's argument and the first defense

2    argument tomorrow afternoon?

3             THE COURT:  Exactly.

4             MR. MOORE:  Then two defense arguments and a rebuttal

5    on Thursday.

6             THE COURT:  And charge.

7             MR. MOORE:  One of the things that your Honor talked

8    to us about yesterday is you said we can divide up -- you gave

9    us three hours and you said we can divide up the time as we

10   deem appropriate.  Is that correct?

11            THE COURT:  I did say that.  I assumed nobody would

12   want to break their argument in half.

13            MR. MOORE:  No one does.  But we have talked about who

14   might do what given that breakout.  So what we would like to do

15   is we would like to sort of go in reverse order, because Mr.

16   Schachter's argument will be the longest, and have Mr. Haney go

17   first, then Mr. Code, then Mr. Schachter.

18            THE COURT:  Let's just see how that will work out.  If

19   I bring the jury back at, for the sake of argument, 1, I think

20   what I said for the government was an hour --

21            MR. DISKANT:  An hour and 40 minutes.

22            THE COURT:  That takes us to 2:40.  They will need a

23   break.  Just for the sake of argument, let's say 3:00.

24            And Mr. Haney will go for how long?

25            MR. MOORE:  Mr. Haney will go approximately an hour.

1    THE COURT:  Then you will go for half a hour and

2  continue on Thursday morning?

3    MR. MOORE:  I would prefer just to do our's and Mr.

4  Schachter's on Thursday morning, if that was acceptable.

5    THE COURT:  That's where I thought we were going.  The

6  practical effect of that, if we do that, that means you and Mr.

7  Schachter will go for a total of how long?

8    MR. MOORE:  If Mr. Haney takes an hour, then we will

9  have approximately two hours.

10    THE COURT:  And then we have the rebuttal.

11    MR. MOORE:  Yes, sir.  Which is 45 minutes.

12    THE COURT:  Which gets us to about 12:30.

13    MR. MOORE:  Yes, sir.

14    THE COURT:  The charge will go to about, I am just

15  guessing -- the charge is going to take at least two hours.

16    MR. MOORE:  Yes, sir.

17    THE COURT:  OK.

18    MR. HANEY:  Your Honor, may I ask the Court if I be

19  excused for the charge conference and have Mr. Moore and Mr.

20  Schachter stand in my stead?  Given the timing of the fact that

21  I will be going first, I would like to have at least that time

22  that may otherwise be more productive for me and my client to

23  prepare for closing argument.

24    THE COURT:  Is that OK with your client?

25    Mr. Dawkins, is that OK with you?

IAG8GAT5

1           DEFENDANT DAWKINS:  Yes.

2           THE COURT:  Before I bring the jury back, let me raise

3      the question I raised with you folks at the beginning.

4           Mr. Gatto, you remember the discussion about your

5      right to testify?

6           DEFENDANT GATTO:  Yes, sir.

7           THE COURT:  You understand that's entirely your

8      decision whether you take the stand?

9           DEFENDANT GATTO:  Yes, your Honor.

10          THE COURT:  Have you consulted -- don't tell me what

11     he said, but have you consulted with your lawyers about whether

12     they think it's in your interest to testify?

13          DEFENDANT GATTO:  Yes, your Honor.

14          THE COURT:  Are you satisfied with their advice

15     regardless of whether you agree with it?

16          DEFENDANT GATTO:  Yes, your Honor.

17          THE COURT:  Do you wish to testify?

18          DEFENDANT GATTO:  No.

19          THE COURT:  Mr. Code, same questions to you.

20          Do you wish to testify?

21          DEFENDANT CODE:  No, your Honor.

22          THE COURT:  Do you understand it's totally your

23     decision?

24          THE DEFENDANT:  Yes, your Honor.

25          THE COURT:  Have you discussed it fully with your

1    lawyers?

2              DEFENDANT CODE:  Yes, I have.

3              THE COURT:  Putting aside whatever they may have

4    advised you, are you satisfied with their advice whether you

5    agree with it or not?

6              THE DEFENDANT:  Yes.

7              THE COURT:  Mr. Dawkins, do you wish to testify?

8              DEFENDANT DAWKINS:  No, your Honor.

9              THE COURT:  Have you consulted fully with Mr. Haney

10   about whether that's in your interest?

11             DEFENDANT DAWKINS:  Yes, your Honor.

12             THE COURT:  Putting aside whatever he may have advised

13   you, do you understand it's totally your decision?

14             DEFENDANT DAWKINS:  Yes, your Honor.

15             THE COURT:  Are you satisfied with his advice whether

16   you agree with it or not?

17             DEFENDANT DAWKINS:  Yes, your Honor.

18             THE COURT:  Any further inquiry?

19             MR. DISKANT:  No, thank you.

20             MR. MOORE:  Your Honor, yesterday your Honor talked to

21   us about the use of PowerPoints.

22             THE COURT:  Yes.

23             MR. MOORE:  So we are going to request a slight

24   modification.  Because as your Honor knows, the government has

25   the burden of proof.  We have no burden.  And while we have no

1  objection to sharing any demonstrative -- what I would call a

2  true demonstrative exhibit from a PowerPoint with the

3  government, and we have absolutely no objection to sharing an

4  entire PowerPoint with your Honor, we do not believe that we

5  should be required to share a whole PowerPoint that may address

6  points, not demonstratives, but points that we wish to make in

7  a closing argument.  And so we would ask your Honor for a

8  slight modification of your Honor's order.  I understand you

9  don't want a rerun, and I also understand that you're not going

10  to have a rerun of a few days ago.

11          THE COURT:  You can't imagine how many of my

12  colleagues were at least as horrified as I when I told them

13  what happened.

14          MR. MOORE:  I understand your Honor's concerns.  I am

15  simply asking that if -- and we are fine with the government

16  doing this as well.  Both sides providing the entire PowerPoint

17  to the Court for its review, but only requiring the parties to

18  exchange what would be truly demonstrative exhibits.

19          Is that something the Court would consider?

20          THE COURT:  What is the government's view on this?

21          MR. DISKANT:  We can talk with defense counsel about

22  this.  I think we may be able to reach agreement, provided we

23  are talking about all parties following the exact same

24  procedure.

25          THE COURT:  Look, the one exception that I made is

IAG8GAT5

1    that, to the extent you propose to project to the jury an image

2    of a document that's been received in evidence, that's fine.

3              MR. MOORE:  Yes, sir.

4              THE COURT:  And you don't have to exchange that.

5              And I understand the tactical point.

6              MR. MOORE:  Yes, sir.

7              THE COURT:  And it cuts both ways.

8              MR. MOORE:  Yes, sir, it does.

9              THE COURT:  The concern is especially heightened in

10   this case because of the openings, which went off the

11   reservation, one of them did, in a way that I considered

12   troublesome.  And I think both sides have a legitimate interest

13   in seeing that doesn't happen in closing argument.  So no, I am

14   not going to allow it.

15             MR. MOORE:  Thank you, your Honor.  We appreciate your

16   consideration.

17             THE COURT:  All right.  Bring the jury back in.

18             (Jury present)

19             THE COURT:  Jurors and defendants all are present.

20             Mr. Diskant, does the government have a rebuttal case?

21             MR. DISKANT:  No, your Honor.

22             THE COURT:  Members of the jury, you have now heard

23   all the evidence in this case.  The lawyers and I have a fair

24   amount of work to do before you start hearing closing

25   arguments.  So you will start hearing closing arguments

1    tomorrow at 1:00.  So be back here for 1:00.  We expect to

2    finish the closing arguments sometime Thursday.  I will

3    instruct you on Thursday.  I expect to give you the case

4    sometime Thursday afternoon, probably toward the later part of

5    the afternoon.  If there is no verdict on Thursday, and I am

6    not suggesting one way or the other whether there ought to be,

7    deliberations will resume next Monday.  That's the schedule.

8              OK.  Thank you very much.

9              (Jury exits courtroom)

10             THE COURT:  OK.  I would like to see lead counsel in

11   the robing room.

12             (In robing room)

13             THE COURT:  I just want to talk to you about the

14   charge conference for a minute.  I know everybody has got a

15   record to protect.  Everybody is going to have objections if I

16   correctly anticipate.  But I am asking you to be succinct,

17   clear, do what you have to do, and I will rule and move on.

18   OK?  Because I have tried much bigger criminal cases than this,

19   with charge conferences that lasted 20 minutes.  And I have

20   tried $100,000 civil cases where they went on for the better

21   part of the day.  So we don't have the time and you guys all

22   have been working too hard, and I appreciate that, for a lot of

23   wasted motions.

24             MR. MOORE:  I haven't put away my broom yet, your

25   Honor.  I just have two questions.

IAG8GAT5

1    Based on one of the comments that your Honor made when

2    we had the debacle in openings, for lack of a better word, I

3    need to know what your Honor permits with respect to talking

4    about the law.  Because as I understand it --

5         THE COURT:  Not a heck of a lot.  You are going to

6    know what I am going to charge.  The assistants in this

7    district in general walk the line pretty well, and it's

8    formulaic, and it goes something like this:  Now, of course

9    there is an issue in this case about intent, and I expect that

10   Judge Kaplan is going to charge you X or Y.  And just leave it

11   there, take it from there, and go.  Did I misstate it?

12        MR. DISKANT:  No, your Honor.

13        MR. MOORE:  That's what we intended to do.  I just

14   wanted to make sure that was permissible.  We can talk about

15   what your Honor has told us that you intend to charge with

16   respect to the elements of the offense, but not belabor it.

17        THE COURT:  Not belabor it.  And the risk, of course,

18   is to cherry pick.  Then you will have an objection and

19   trouble.  And my goal is objection-free closings.  If you have

20   got a legitimate objection, make it.  I am not telling you not

21   to do that.  But my goal is that there will be, I hope, no

22   legitimate objections to make.

23        MR. MOORE:  I do believe this is the final question.

24        MR. DISKANT:  Before we move on, it is the

25   government's intention that any language from your charge is

1   not going to be included in any PowerPoint; it's not going to

2   be published to the jury in that fashion.

3           MR. MOORE:  I don't think we were planning on doing.

4           MR. HANEY:  I am not.

5           THE COURT:  That's easy for you to say.

6           MR. MOORE:  (A) because I don't know that we are going

7   to have time, and (B) I didn't think your Honor was going to

8   permit it.

9           MR. SCHACHTER:  The only words I could think of using,

10  I can see intent to defraud universities being in a PowerPoint.

11  I wouldn't think of anything beyond that.

12          MR. DISKANT:  We don't have any objection to that.

13          MR. MOORE:  If we intend to include references to the

14  trial transcript in a PowerPoint, I am assuming that we can

15  just simply type out the lines and say page X.

16          THE COURT:  But put the record reference there.

17          MR. MOORE:  We don't have to cut and paste it from the

18  transcript.  It looks neater if we type it out.

19          THE COURT:  I don't have an objection to that.  Do

20  you?

21          MR. DISKANT:  No.

22          MR. HANEY:  So it is appropriate then to emphasize the

23  intent to defraud a university.

24          THE COURT:  If you do it like that, you may get an

25  objection, right?

1    MR. HANEY:  Based on the evidence.

2    THE COURT:  Obviously you have got a problem here, and

3  your problem is that an action can be taken to help a

4  university in one respect and to harm it in another.  And just

5  speaking hypothetically, these guys may have very much wanted

6  to help them have winning teams, and at the same time, they

7  basically could be said to have arrogated to themselves the

8  decision of whether the university was going to take the risk

9  of what comes with helping get a winning team in the way they

10  helped them.

11    This is a complicated scenario.  You all know that.

12  And it's got to be summed up in a fair way.  Advocacy I can

13  understand.  But if you get into an assertion that runs afoul

14  of what I am going to instruct on the law, it's going to be a

15  difficulty, I expect.  I expect you will get objections, and I

16  may sustain them.  And when I sustain on the ground that

17  somebody is misstating the law, I will usually correct it right

18  then and there, and nobody wants that.  I don't want to do it,

19  and you don't want me to do, right?

20    MR. HANEY:  That's correct.

21    MR. MOORE:  We definitely don't want you to do it.

22    MR. SCHACHTER:  That's why I think in this case, in

23  particular, the charge is so important.

24    THE COURT:  Sure it is.

25    MR. SCHACHTER:  Because that issue of -- we submitted

IAG8GAT5

1   a letter on this this morning.

2          THE COURT:  Another one.

3          MR. SCHACHTER:  I apologize for burying the Court.

4   But we do think --

5          THE COURT:  I was once accused by a member of this

6   court of carpet bombing.  So I know it comes from good

7   instincts, but it's not fun to be under the carpet bombing.

8          MR. SCHACHTER:  But it is a very interesting question,

9   that issue of mixed intent that your Honor raises, and it's

10  very rare that that issue comes up in a criminal case where you

11  have -- it's just very unusual to have a wire fraud case where

12  there are strong arguments that there is an intent to assist

13  the victim and how do you work in the question of potential

14  risk.  We obviously think that potential risk, while something

15  certainly should be considered, that the real issue for the

16  jury is, what was the defendant's purpose?  And here, the

17  language of the contemplated harm instruction, as the Second

18  Circuit identified in the case that we referenced, they

19  recognize that this is a confusing term "contemplated."  What

20  does contemplated mean?  And the Second Circuit made very clear

21  that contemplated means to act with the purpose of harming --

22  we think, to act with the purpose of harming.

23         THE COURT:  I think you are going to be unhappy

24  tomorrow.

25         MR. SCHACHTER:  I feared that.  But we do think that

IAG8GAT5

1    is an important issue, and we appreciate the Court's

2    consideration.

3         THE COURT:  It will shake out the way it shakes out.

4         MR. DISKANT:  I imagine your Honor does not want to

5    hear from me, but I can respond to that if you'd like.

6         THE COURT:  Go ahead.  You didn't write a letter.

7         MR. DISKANT:  I did not write a letter, but I read Mr.

8    Schachter's letter.  As we have indicated in our prior filings,

9    we think his reading of *Gabriel* is wrong.  We think the Second

10   Circuit has repeatedly used a contemplated harm formulation.

11        To his initial point, as someone who does public

12   corruption cases, this issue of dual intent, at least in my

13   limited experience, actually comes up with some frequency in

14   the work that we do.  For example, if we try a public official

15   who accepted a bribe in a particular action, his defense will

16   frequently be:  No, no, no, my action was intended to help my

17   constituents.  And the government is typically entitled, on

18   those facts, to a full intent instruction.  Because if the

19   public official both accepted the bribe and also wanted to do

20   something that was good for his constituents, he is still

21   guilty of the offense.

22        We have proposed a similar instruction here, which we

23   think is particularly important, because while we will not

24   dispute that some of the defendants thought that they were

25   helping the Louisville basketball team, for example, or helping

1  a coach, that in and of itself does not negate their intent to

2  also deceive the university as an institution.

3       MR. SCHACHTER:  But it's not an intent to deceive

4  test, it is an intent to defraud, which is different.  The mens

5  rea requirement for wire fraud is an intent to fraud, it's a

6  specific intent, and we believe that's where the wire fraud

7  statute parts company from some of the statutes that Mr.

8  Diskant may be referring to.

9       I will see you tomorrow.

10      (Adjourned)

11      (In robing room)

12      MR. DISKANT:  Two things.

13      First, the parties have reached agreement on this

14 PowerPoint issue.  We are going to exchange about an hour

15 beforehand, and we will give the Court a copy as well.

16      The bigger issue I wanted to raise with your Honor,

17 the Court received the rules manual, and we obviously accept

18 that.  I was wondering if the Court could provide some guidance

19 on what the Court believes would be an appropriate and

20 inappropriate use of the rules in summation.  Because my

21 concern is that we have not had any witness testify about what

22 any of these rules mean, and many of them are not self-evident,

23 and none of the lawyers in this room are experts on them or can

24 speak authoritatively to what they do or do not mean.  And my

25 concern is that if there is a defense closing which highlights

1  snippets on the rules manual and makes argument about what they

2  do or do not mean, I am going to need considerably more than 45

3  minutes to walk through other portions of the manual and try

4  and explain what those mean.  And I don't think that was the

5  spirit in which the Court allowed this to come in.  I certainly

6  don't think it's a good use of the jury's time, but I wanted to

7  raise that now before we all started writing our summations.

8      THE COURT:  What are you proposing, Mr. Schachter?

9  You're Mr. Rules.

10     MR. SCHACHTER:  Well, I don't think I am intending to

11 speak about any rule that I didn't address at sidebar.  We have

12 a very limited amount of time so it's very hard to figure out

13 what we will do.  I think what we could do is the government

14 has shown certifications that they allege to be false that

15 mention the amateurism rules.  I could see saying, the

16 amateurism rules are in chapter 12 and here is the rule on

17 amateur status.  I find it hard to imagine doing much more than

18 that.  I may address the relevant recruiting rule, but I may

19 not.  I can't foresee doing anything beyond that.  But I could

20 see doing that to show that the certifications are not false.

21 I may make that argument.

22     THE COURT:  I think you may be opening the door to

23 Alice's Wonderland.  It's a risk you may have to take if you

24 feel that way.

25     MR. SCHACHTER:  I can surely speak with Mr. Diskant

1  about what he believes is a response to that.  I don't intend

2  to take us down an avenue that isn't what I think is fair.  But

3  the certifications that the government has focused on, we

4  believe that they are not actually false statements, and we

5  think that's a relevant consideration for the jury.  And one of

6  the reasons why they are not false is because they do hinge on

7  the word amateur status or amateurism rules.  And so that seems

8  to me to be fair argument.  I don't know what that opens the

9  door to, and I don't want to do anything improper.  Mr. Diskant

10  asked me what my intent was and I told him what the thinking

11  is.  And I don't know that I have enough time in summation to

12  even reach that point, because I am not sure it's a major

13  point, but I think it is a significant one.  And I don't know

14  what that opens up to.  That seems to be the fair point.

15      THE COURT:  Suppose he makes the argument that the

16  amateurism rules are found in chapter 12, thus implying they

17  are found only in chapter 12.  Where do you go with that, Mr.

18  Diskant?

19      MR. DISKANT:  I think I start with the form itself,

20  which indicates that it is not limited to chapter 12.  It

21  includes 10 and 13 and 14 and 16 and 17.  And I may then,

22  depending on what he says, have to start showing portions of

23  the particular rules that are relevant to this.

24      I think, by the way, the same form specifically says,

25  in addition to certifying my amateur status, that I am in

1   compliance with NCAA rules, which is not so narrowly cabined.

2           MR. SCHACHTER:  That to me seems to be fair argument.

3   I may also, and I haven't real thought about it completely, but

4   I could see an argument, as I raised before the Court earlier,

5   that given the breadth of the rule book, are these

6   certifications truly material, as opposed to marching through

7   each of them.  I don't mind if Mr. Diskant says that this

8   athlete is also required to comply with chapter 10, 14, because

9   my argument is they don't really think that these athletes are

10  actually reading these rules, at least that may be my argument.

11  I don't know.  The case just ended.  That seems to me to be

12  fair.

13          THE COURT:  Let me ask you this.  Have you ever signed

14  a home mortgage?

15          MR. SCHACHTER:  I have.

16          THE COURT:  Read every word of it, did you?

17          MR. SCHACHTER:  No.

18          THE COURT:  You're stuck with the legal consequences

19  of them, aren't you?

20          MR. SCHACHTER:  Sure.  However, I don't know to what

21  extent I would be prosecuted for wire fraud for an inaccuracy

22  that happens to be --

23          THE COURT:  In reps and warranties?

24          MR. SCHACHTER:  We are not in civil litigation.  This

25  is a criminal case.  So I think the actual alleged false

1 statement, what the university is really making of this, I

2 think that's fair argument. And I think that Mr. Diskant's

3 response that -- whatever his response is seems fair. This is

4 an issue for the jury to sort out as to what people were

5 intending. Were they intending to make false representations

6 or not? That's the heart of a fraud case. It's not a

7 negligence case.

8 THE COURT: But the student doesn't have to intend to

9 make a false representation.

10 MR. SCHACHTER: Well, that's a spoiler alert for the

11 Court's charge. That may be right. Nonetheless, the truth or

12 falsity of the statement we think is relevant and fair

13 argument.

14 THE COURT: Maybe. And maybe it prompts a

15 supplemental instruction.

16 MR. SCHACHTER: It would be useful to know what line I

17 would cross that would result in a supplemental instruction

18 because it may cause me to pare back my argument. I would not

19 want to prompt a supplemental instruction, for sure.

20 THE COURT: For sure. You ought to think very

21 carefully about this. You guys conceded rule violations in

22 your openings. You're stuck with that. Your defense is really

23 something else. But you're the guys trying the case and you

24 will make your own decisions.

25 MR. SCHACHTER: It would be useful to know. Perhaps

IAG8GAT5

the Court can provide some degree of guidance, if the Court is

inclined tomorrow morning perhaps.  If the argument was, and,

ladies and gentlemen, the certification actually isn't even

false because it says the amateurism rules, and if you look at

the amateur rule it says that it has to be the individual that

is taking action to violate -- it lists the things that the

individual athlete has to do and therefore it's not even false.

Assume that's the argument, which is pretty much about as far

as I foresee going.  If that's going to prompt a supplemental

instruction, that would be very prejudicial to my client.  I

would want to know where that line is.  If that crosses a line,

I am not seeing the line that that crosses, but if that does

cross a line it would be very helpful to know so that I don't

cross that line.

THE COURT:  I don't know what is going to come out

with certainty, and I don't give advisory opinions.  I think

you ought to think very carefully about what it will do with

the rebuttal and you ought to think very carefully about

whatever you will say could produce.  I am not saying will.  I

need to think about it a good deal also.

MR. SCHACHTER:  It is complicated.  I understand.

THE COURT:  It is a complicated issue.  There's a big

forest here and don't get too close to the trees.  Look how the

42 pages turned into four pages when you had to, with no loss

of anything.  OK?

1    All right.  I don't know what else to say about NCAA

2  rules.  The idea that we have this monstrosity in here is

3  horrifying, but I bent over backwards and let it in.  That

4  doesn't mean it has to be used.  But it's your call.

5    MR. SCHACHTER:  Your Honor, may we excuse the

6  defendants from the charge conference?

7    THE COURT:  Yes.

8    MR. MOORE:  Just so we are clear on the PowerPoint

9  issue, I think our agreement is, so long as it's acceptable to

10  the Court, the folks who are speaking tomorrow, the exchange is

11  tomorrow; the folks who are speaking on Thursday, the exchange

12  is Thursday morning.  Is that acceptable to your Honor?

13    THE COURT:  If it's acceptable all around.

14    MR. MOORE:  It is.

15    THE COURT:  OK.

16    (Adjourned October 17, 2018, at 10:00 a.m.)

17

18

19

20

21

22

23

24

25

```
1                    INDEX OF EXAMINATION

2    Examination of:                        Page

3    ANTHONY CASOLA

4    Direct By Mr. Solowiejczyk . . . . . . . . . .1454

5    Cross By Mr. Moore . . . . . . . . . . . . .1472

6    Redirect By Mr. Solowiejczyk . . . . . . . .1481

7    Recross By Mr. Moore . . . . . . . . . . . .1483

8                    GOVERNMENT EXHIBITS

9    Exhibit No.                          Received

10    220  . . . . . . . . . . . . . . . . . . .1420

11    105  . . . . . . . . . . . . . . . . . . .1442

12    105  . . . . . . . . . . . . . . . . . . .1443

13    102S-5, 102S-15 and 104J . . . . . . . . .1450

14    39 and 39T . . . . . . . . . . . . . . . .1450

15    203A-1, 201A-1, 201A-2 and 206A-1  . . . .1451

16    104D  . . . . . . . . . . . . . . . . . . .1452

17    102L  . . . . . . . . . . . . . . . . . . .1453

18    101H-1  . . . . . . . . . . . . . . . . . .1453

19    101P  . . . . . . . . . . . . . . . . . . .1454

20    3006, 3007 and 3008  . . . . . . . . . . .1456

21    S1  . . . . . . . . . . . . . . . . . . . .1458

22    402 and 408  . . . . . . . . . . . . . . .1484

23    1503  . . . . . . . . . . . . . . . . . . .1516

24

25
```

1  102K-10 . . . . . . . . . . . . . . . . . . . .1521

2                          DEFENDANT EXHIBITS

3  Exhibit No.                                    Received

4  5 and 7 . . . . . . . . . . . . . . . . . .1424

5  218 . . . . . . . . . . . . . . . . . . . .1432

6  1016 . . . . . . . . . . . . . . . . . . . .1433

7  102K-10 . . . . . . . . . . . . . . . . . .1442

8  1014 . . . . . . . . . . . . . . . . . . . .1514

9  1018 . . . . . . . . . . . . . . . . . . . .1515

10 S4 . . . . . . . . . . . . . . . . . . . . .1516

11 S3 . . . . . . . . . . . . . . . . . . . . .1516

12 220 . . . . . . . . . . . . . . . . . . . .1517

13 1016 . . . . . . . . . . . . . . . . . . . .1517

14 218 . . . . . . . . . . . . . . . . . . . .1518

15 7 and 7T . . . . . . . . . . . . . . . . . .1521

16 105 . . . . . . . . . . . . . . . . . . . .1522

17 5 and 5T . . . . . . . . . . . . . . . . . .1523

18

19

20

21

22

23

24

25