Iahdgat1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                          17 Cr. 686 (LAK)

5  JAMES GATTO, a/k/a "Jim,"
   MERL CODE,
6  CHRISTIAN DAWKINS,

7            Defendants.

8  ------------------------------x

9                                       October 17, 2018
                                        10:09 a.m.
10
   Before:
11            HON. LEWIS A. KAPLAN,

12                                      District Judge
                                         and a Jury
13

14                    APPEARANCES

15 ROBERT S. KHUZAMI
        Acting United States Attorney for the
16      Southern District of New York
   BY:  EDWARD B. DISKANT
17      NOAH D. SOLOWIEJCZYK
        ALINE R. FLODR
18      ELI J. MARK
        Assistant United States Attorneys
19
   WILLKIE FARR & GALLAGHER LLP
20      Attorneys for Defendant Gatto
   BY:  MICHAEL S. SCHACHTER
21      CASEY E. DONNELLY

22

23

24

25

Iahdgat1

1                    APPEARANCES (Cont'd)

2  NEXSEN PRUET LLC
        Attorneys for Defendant Code
3  BY:  MARK C. MOORE
        ANDREW A. MATHIAS
4          -and-
   MERL F. CODE

5

6  HANEY LAW GROUP PLLC
        Attorneys for Defendant Dawkins
   BY:  STEVEN A. HANEY

7

8

9  Also present:  SONYA JACOBS, Paralegal
                  SYLVIA LEE, Paralegal
10                 ANTHONY CASOLA, FBI

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Iahdgat1

1              (Trial resumed; jury not present)

2              (Mr. Mark and Mr. Haney not present)

3              THE COURT:  Good morning, everybody.

4              ALL COUNSEL:  Good morning, your Honor.

5              THE COURT:  Be seated.

6              MR. MOORE:  Your Honor, Mr. Mathias, who was entered

7    in this case but has not been here for most of the trial is

8    sitting with us at counsel table this morning, if that is

9    acceptable to the Court.

10             THE COURT:  All right.  I would be happy to have him.

11             MR. MOORE:  Thank you, your Honor.

12             THE COURT:  OK.  So you all have the draft charge that

13   was distributed earlier today.  We will mark a copy Court

14   Exhibit E.

15             Two preliminary questions before we get down into the

16   details.  Is anybody contesting venue, or can we shorten this

17   by dropping the venue charge out?

18             MR. MOORE:  May I have one moment?  I think there are

19   some venue issues but I think that -- we are not contesting it.

20             THE COURT:  OK.  Does somebody have authority to

21   commit Mr. Haney on this?

22             MR. MOORE:  I have Mr. Haney's proxy.

23             THE COURT:  So we'll drop the venue charge.

24             I wanted to raise also what defendants' position is

25   with respect to the conscious avoidance charge in the sense

Iahdgat1

1    that I've put it in here based on my assumption of what the

2    defense might be contesting, or maintaining, but I don't know

3    what your positions are.  So, what about it?

4            MR. SCHACHTER:  Your Honor, we do object to a

5    conscious avoidance instruction because there has been no

6    factual predicate for that charge.  The government has not

7    presented any evidence of any defendant willfully blinding

8    themselves to the existence of false certifications, and absent

9    that factual predicate --

10           THE COURT:  That wasn't actually my question.

11   Mr. Schachter.

12           MR. SCHACHTER:  I apologize, your Honor.  Let me try

13   to answer it more directly.

14           I think that we very well -- I think we will argue

15   that there is no evidence that the defendants intended any of

16   these false certifications to be made or that they knew any of

17   them existed --

18           THE COURT:  OK.

19           MR. SCHACHTER:  -- for Mr. Gatto.

20           THE COURT:  And what about for the other two

21   defendants?

22           MR. MOORE:  I agree with Mr. Schachter, your Honor.

23           THE COURT:  OK.  Fine.  Well, then we'll come to the

24   question of factual predicate later, which we wouldn't have

25   reached but for the statement that was made, and I appreciate

Iahdgat1

1    the statement.

2              OK.  We'll begin at page 3.  Any objections from the

3    top of page 3 through page 7, line 17?

4              MR. DISKANT:  No, your Honor.

5              MR. SCHACHTER:  No, your Honor.

6              THE COURT:  Mr. Moore?

7              MR. MOORE:  No, your Honor.

8              THE COURT:  Page 7, line 18, through page 8, line 14.

9    Mr. Schachter?

10             MR. SCHACHTER:  Yes, your Honor.  We do object to the

11   language on page 8 at line 8, at the end of that line, through

12   line 14.

13             THE COURT:  On what ground?

14             MR. SCHACHTER:  Several, your Honor.  First, we do not

15   think it is appropriate to refer to anything that was said in

16   opening statement as a concession, not -- and I'm not

17   necessarily saying that we are contesting the point that your

18   Honor intends to instruct the jury about, but we don't think it

19   belongs in the Court's instructions.  In fact, it is

20   inconsistent with what the Court will instruct -- I think it is

21   in the instruction -- that what the lawyers say is not

22   evidence, and, therefore, I think it is inappropriate to --

23             THE COURT:  Yes, but a concession by a lawyer in

24   opening statement is binding on the client.

25             MR. SCHACHTER:  That may be, your Honor.  We still

Iahdgat1

1    don't think it is appropriate for the Court's charge.  And,

2    also, we think that the characterization of what the case is

3    essentially about we think is problematic, because it allows --

4    it invites the jury to shortcut the issues.  We don't actually

5    think -- I mean, given that there are specific elements of wire

6    fraud, we don't agree that this is what the case is essentially

7    about.  And given -- and I think it has the potential to

8    distract the jury from the Court's instructions on the elements

9    of wire fraud and the need to find each of those beyond a

10   reasonable doubt.  So it is our request, your Honor, that there

11   be no short gist of the indictment.  They should focus on each

12   of the elements.

13            THE COURT:  Mr. Diskant.

14            MR. SCHACHTER:  And I guess -- may I add to that, your

15   Honor?  I mean, it also -- I don't know that it is about

16   whether the universities were fraudulently misled.  It is about

17   whether there was a scheme to make false representations in

18   order to deprive the universities of money or property, and so

19   we don't think that the characterization is accurate.  I fear

20   it is dangerous because it distracts from the elements.

21            MR. DISKANT:  Your Honor, we think that is entirely

22   accurate and helpful.  And I would note that it is followed by

23   the Court immediately saying, "I will give you comprehensive

24   instructions on this point in a moment."  So that to the extent

25   this is in any way a shorthand, the Court is making clear more

Iahdgat1

1     is to come.

2              THE COURT:  I'll make two changes.  And, of course,

3     the bolded material won't be what goes in the jury room.  I'll

4     change the sentence starting at line 8 to read:  "There is no

5     dispute that NCAA rules were violated."  And I'll add at the

6     end of line 14, "which you will follow in all respects."

7              Is that satisfactory to everybody?

8              MR. SCHACHTER:  Just for the record, we do wish to

9     object to even that language.  We believe it presents a

10    potential variance.

11             THE COURT:  Overruled.

12             Page 8, line 15 through page 9, line 4.

13             MR. SCHACHTER:  Yes, your Honor.  And with the Court's

14    permission, with respect to our conference this morning, I hope

15    it will be acceptable to the Court if Ms. Donnelly also speaks.

16    We just didn't have enough time to coordinate everything that

17    we have to say.

18             THE COURT:  As long as you are not both dealing with

19    the same issue.

20             MR. SCHACHTER:  Yes, your Honor.

21             So, your Honor, we believe that this instruction is --

22    we do object to this instruction.  This focuses the jury

23    entirely on the concept of actual agency and not apparent

24    agency, which if it had been apparent agency is really the

25    entire issue in a wire fraud case.  It is all about what the

Iahdgat1

1  defendants believed about whether or not the corporate agents

2  that they were interacting with were acting on behalf of the

3  corporation and in the interest of the corporate objectives of

4  the entity.

5      Speaking of actual agency we think is inaccurate in

6  the context of wire fraud.

7      THE COURT:  And can you point me to where the word

8  "actual" appears?

9      MR. SCHACHTER:  It is just that the instruction here,

10  your Honor, is an actual agency instruction.  You say -- the

11  Court is instructing them that the intentions, statements and

12  actions are considered to be those of the university --

13      THE COURT:  Mr. Schachter, I remind you of the

14  conference we had yesterday afternoon, and then ask you again

15  to point out to me, if it is there, where the word "actual"

16  appears in conjunction with the word "authority."

17      MR. SCHACHTER:  I'm sorry, your Honor.  The word

18  "actual" does not appear.

19      THE COURT:  Thank you.  The objection is overruled.

20  The question is what the charge conveys as a whole.  This

21  charge is long enough without repeating in extenso absolutely

22  everything every time a concept is introduced.  The question of

23  authority along the lines of what you say needs to be there is

24  there elsewhere, and it clearly modifies this.

25      OK.

Iahdgat1

1          MS. DONNELLY:  Your Honor --

2          THE COURT:  Just a minute.

3          Anything else on this section?

4          MS. DONNELLY:  Yes, your Honor.

5          We would ask, if your Honor is going to give this

6     particular instruction here, that your Honor give the

7     instruction about agency that Judge Preska gave in United

8     States v. Davis.  I have it here.  We think this more fairly --

9     excuse me, more accurately reflects the statement of agency, so

10    that would be our request.

11         THE COURT:  Well, I'm glad you have it there.  I don't

12    have it here.

13         MS. DONNELLY:  Could I hand it up?

14         THE COURT:  That's a thought.

15         (Pause)

16         So this appears at pages 1148 and 1149 of the trial

17    transcript in United States v. Davis, 13 Criminal 923.

18         And what you've now done is you've objected to this

19    part of my charge on the ground that it relates to "actual"

20    rather than "apparent" authority, notwithstanding the lack of

21    the use of the word "actual."  And now Ms. Donnelly has asked

22    me to give an actual authority charge, to which Mr. Schachter

23    just objected.

24         Now, would you get it together, folks?

25         MR. SCHACHTER:  Your Honor, I apologize.  The

Iahdgat1

1  intention was that if your Honor was inclined to give this

2  instruction and overrule our objection on the apparent agency

3  concept, that we would then go into proposing this language.

4          THE COURT:  So your position is that if I'm going to

5  give an actual authority charge, which I don't propose to do,

6  but you characterize it as such, you object to an actual

7  authority charge, but if it's to be an actual authority charge,

8  you want me to charge actual authority, right?

9          MR. SCHACHTER:  Correct.

10         THE COURT:  Shall I tell the jury they won't be back

11  until Thursday?

12         MR. SCHACHTER:  I apologize.

13         THE COURT:  Friday?

14         I'm not going to give this.  I give a totally

15  appropriate, I believe, though I'll certainly hear you on it

16  later, charge about authority insofar as it relates to this

17  case.

18         Anything else -- and, by the way, we're not going to

19  do this again.  This part of the charge was yours,

20  Mr. Schachter.  It's not a tag team match.

21         Anything else up through page 9, line 4?

22         OK.

23         Page 9, line 9 through page 10, line 14?

24         MR. SCHACHTER:  Yes, your Honor.  Very briefly.

25         On line 16, we ask that the Court characterize the

Iahdgat1

1       charge as one of making or causing to be made material false

2       representations, as opposed to focusing on the payments,

3       because the payments are not the gravamen of the charge, it is

4       the false representations.

5               And the other objection is on line 17, it says, "in

6       connection with obtaining the commitment," and the charge is

7       actually "in connection with obtaining a scholarship."  The

8       commitment is neither money nor property, but the scholarship

9       is the money or property that is alleged.

10              THE COURT:  As to the second point, I think he is

11      probably right, right?

12              MR. DISKANT:  That is fine, your Honor, just say

13      "obtaining a scholarship for."

14              THE COURT:  Go back to the first point, please.

15              MR. SCHACHTER:  Yes, your Honor.  Very briefly.

16              The description of the charge is that they participate

17      in a scheme to defraud by causing -- by making or causing to be

18      made payments, when in effect given the nature of the charge it

19      is actually by making or causing to be made false -- material

20      false representations, not the payments.

21              THE COURT:  Mr. Diskant?

22              MR. DISKANT:  I don't have a conceptual problem with

23      that.  I would like to take a look at the language but I think

24      that's fine.

25              THE COURT:  I don't have a problem with

Iahdgat1

Mr. Schachter's suggestion, "material false representations."

MR. DISKANT: Then I think, just so I understand what will then follow is, "in connection with the university's decision to award a scholarship."

THE COURT: "Using interstate wires in connection with."

MR. DISKANT: Yes.

THE COURT: Yes.

MR. DISKANT: But it should then be the university's."

THE COURT: "In connection with obtaining a scholarship from the University of Louisville for Brian Bowen Junior to play basketball for that school."

Satisfactory all around?

MR. SCHACHTER: Yes, your Honor. And then the same change would be with respect to Count Three.

THE COURT: OK.

OK. Page 10, line 15 through page 13, line 2?

MS. DONNELLY: Yes, your Honor. On page 11, line 2, we would just ask that the line read "A person seeks to gain some unfair advantage over the victim," as opposed to "another person."

THE COURT: Any problem with that, Mr. Diskant?

MR. DISKANT: No, your Honor.

THE COURT: All right.

MS. DONNELLY: And then on line 3, it says, "false

Iahdgat1

suggestion or false pretenses."  It is not my understanding
that false suggestion is -- we would agree if it just said "by
intentional misrepresentation or false pretenses" and the words
"false suggestion" be struck.

            THE COURT:  Any problem, Mr. Diskant?

            MR. DISKANT:  I think false suggestion is appropriate
hear, particularly given some of Mr. Schachter's hypertechnical
arguments about the statement concerning eligibility.

            THE COURT:  Why not, Ms. Donnelly?

            MS. DONNELLY:  I don't know of any Second Circuit
cases that say a suggestion constitutes a false representation.
I agree, intentional misrepresentations, absolutely.  False
pretenses, that's in the language of the statute.  I don't know
of any cases that talk about false suggestion.

            THE COURT:  All right.  I will sustain that objection.
"False suggestion" will come out.  It is not in the statute,
Mr. Diskant.

            Anything else on this section from the defense?

            MS. DONNELLY:  Yes.  Line 9, on page 11.  Currently it
says, "A statement may also be fraudulent if it is ambiguous or
incomplete."  We have two objections.  First, this is a
half-truth instruction, and we don't believe that a half-truth
theory of wire fraud was laid out in the indictment, so we
object on that basis.  And then assuming that your Honor --

            THE COURT:  That one is overruled.

Iahdgat1

1          MS. DONNELLY:  Understood.

2          So, now that that will be in the charge, we would ask

3     that the word "purposefully ambiguous or incomplete" be added,

4     because statements may very well be ambiguous or incomplete to

5     the listener but they were not intended to be so, and so that

6     to us is an important distinction.

7          THE COURT:  Well, I take your point to a point, and I

8     think the better way of handling it is to restructure the

9     paragraph and to change one word.  In the third sentence, I

10    would change the word "fraudulent" to "false" and make it the

11    second sentence, and then alter the following sentence so that

12    it reads:  "A representation or statement is fraudulent if it

13    was made falsely and with the intent to deceive."

14         I think that covers your point.

15         MS. DONNELLY:  That is correct.  That would be

16    acceptable.

17         THE COURT:  OK.  Fine.

18         Anything else from the defense on this section?

19         MS. DONNELLY:  Would your Honor remind me of where you

20    said we should stop?  I just can't --

21         THE COURT:  13, line 2.

22         MS. DONNELLY:  13, line 2.  No other objections from

23    the defense.

24         THE COURT:  Thank you.

25         The government?

Iahdgat1

1          MR. DISKANT:  Yes, your Honor.

2          At page 12, line 6 and 7, we would request the Court

3    consider changing the language "willfully caused the

4    student-athletes to make false certifications" to "willfully

5    caused false certifications to be made by student-athletes,"

6    which is what this statute provides for, that is, willfully

7    causing an act to be on done.  Our concern is the way the facts

8    in this case have come in, we don't believe there is a

9    requirement that any defendant specifically told the

10   student-athletes to make a false statement.

11         THE COURT:  What is the defense's view on making that

12   change?

13         MR. SCHACHTER:  Your Honor, may we have a moment?  I

14   think we would need to look at Section 2.

15         (Pause)

16         MS. DONNELLY:  We agree with Mr. Diskant.  That's the

17   language of the statute.  So, we are OK with that.

18         THE COURT:  OK.  So I will make line 7 read "making of

19   a false certification by a student-athlete," and then go on as

20   it presently reads.  OK.

21         Anything else up to page 13, line 2?

22         MR. DISKANT:  No, your Honor.

23         THE COURT:  All right.  13, line 3 through 15, line

24   10.  Defense?

25         MS. DONNELLY:  Yes, a few things.

Iahdgat1

1          So, just for the record, because I don't want to

2     belabor the point, we object to the definition of the way the

3     Court is describing "authorized agents."  We've already

4     discussed this.  Your Honor has already ruled.  I don't need to

5     belabor it.  I just would like to make that objection for the

6     record.

7               Assuming I have now done that --

8               THE COURT:  You are referring to what lines?

9               MS. DONNELLY:  Oh, I'm sorry.  We are referring to

10    lines, on page 13, 11 through 13.

11              THE COURT:  All right.  Give me a minute to read it

12    over and make sure I'm convinced it is the same.

13              (Pause)

14         No, I am going to stick to the ruling.  I think it is

15    appropriate.  I understand the point that is being made here.

16    And "apparent authority" is what controls the good faith.  And

17    here, actual authority is relevant, which is different, and

18    that's the basis for my ruling.

19              OK.  Anything else?

20              MS. DONNELLY:  Yes, your Honor.  So I -- and I don't

21    want to belabor the point, but if your Honor agrees that actual

22    authority is relevant, we would renew our -- oh, forget that.

23         We have one additional sentence that we would like to

24    be added to the paragraph that goes from page 13, line 8 to

25    line 13.  There is a description, "interests of the

1  university."  We would just like your Honor to tell the jury

2  that it is a jury question of what those interests are, and

3  that's a factual question that the jury can decide.

4         THE COURT:  Mr. Diskant?

5         MR. DISKANT:  I'm sorry.

6         THE COURT:  Page 13, line 13.  She wants me to insert,

7  in substance, the question of whether interests are fully

8  aligned is a question for determination by the jury.

9         MR. DISKANT:  I don't think we have -- just to be

10  clear, the request is that the interests of the university is a

11  jury fact or whether or not --

12         THE COURT:  Whether the putative agent's interests are

13  aligned with those of the university is a jury fact.  That's

14  what she wants me to put in here.

15         MR. DISKANT:  I think that's fine.  I'm not sure we

16  need to say it here.  I think this has more to do with the

17  apparent authority, but I don't have an objection to it.

18         THE COURT:  All right.  Give me your language,

19  Ms. Donnelly.

20         MS. DONNELLY:  Well, what I had proposed was that

21  after the phrase "Interests of the university" on line 13, "It

22  is up to you, the jury, to decide what the defendants

23  understood the interests of the universities to be."

24         MR. DISKANT:  I object.

25         THE COURT:  That's different.

Iahdgat1

1      MS. DONNELLY:  Understanding, though, your prior

2  rulings, we don't have to put in what the defendants believe.

3  We can just say it is up to the jury to decide what the

4  interests of the universities are and whether they are --

5  whether the agent's interests are fully aligned with those.

6      MR. DISKANT:  Your Honor, now this is starting to get

7  more confusing.  I think this is better reserved for the

8  portion of the charge where the Court explores this at some

9  length on the issue of apparent authority.

10      THE COURT:  I agree with that.  I'm not going to do

11  it.

12      OK.  Anything else up to page 15, line 10?

13      MS. DONNELLY:  Yes, your Honor.

14      On page 13, at line 21, your Honor has, "officers or

15  employees of the University of Kansas might have considered

16  important in deciding whether to provide a scholarship to Billy

17  Preston."  I think the parties are in agreement that the

18  standard is really whether the representation was capable of

19  influencing the decision of the appropriately authorized and

20  unconflicted officers of the University of Kansas in deciding

21  whether to provide a scholarship.

22      MR. DISKANT:  That's fine.

23      THE COURT:  So the words "might have considered

24  important" on line 21 are stricken, and at the beginning of

25  line 20, the words "was capable of influencing" have been

Iahdgat1

1 inserted. Satisfactory?

2          MS. DONNELLY:  Yes, your Honor.

3          THE COURT:  Mr. Diskant?

4          MR. DISKANT:  Yes, your Honor.

5          THE COURT:  Anything else on this section from the

6 defense?

7          MS. DONNELLY:  Just one.  On page 14, at line 22,

8 currently it says, "must prove beyond a reasonable doubt that

9 the alleged scheme contemplated depriving the victim," and we

10 would just, because this is the first element of the statute,

11 not the second, we would like it to say it must prove beyond a

12 reasonable doubt that the object of the alleged scheme was to

13 deprive the victim, because this is about the object of the

14 scheme, not intent.

15          THE COURT:  Mr. Diskant?  I think this is a semantic

16 point.

17          MR. DISKANT:  I do, too.  I don't think it is a big

18 deal.  That is fine.

19          THE COURT:  I'm not going to change that.  It is

20 semantics.

21          Anything else from the defense through page 15, line

22 10?

23          MS. DONNELLY:  On page 15, at line 6 through 8 -- at

24 line 7, it says, "if, and only if, the scheme" was intended to

25 cause, or did cause -- I think we would like it to say "was

Iahdgat1

1  intended to cause or did cause tangible economic harm" as

2  opposed "to could have caused."

3          THE COURT:  We have been over this a hundred times,

4  right?  <u>Finazzo</u> says exactly the opposite.

5          MS. DONNELLY:  I just wanted to preserve that for the

6  record.

7          THE COURT:  Fair enough.  I just wanted to make sure

8  we were talking about the same point.  You know, I know you

9  have to make a record.

10         Anything else through here from the defense?

11         MS. DONNELLY:  No, your Honor.

12         THE COURT:  Mr. Diskant, the government?

13         MR. DISKANT:  No, your Honor.

14         THE COURT:  OK.  Page 15, line 22 through page 21,

15  line 3.  Defense?

16         MS. DONNELLY:  Yes, your Honor.

17         THE COURT:  Go ahead.

18         MS. DONNELLY:  Purely for the record -- I understand

19  your Honor's position -- we object to page 16, lines 9 through

20  10.  We think that the wire fraud statute requires the

21  defendant to act with the intent of obtaining something from

22  the university.  Purely for the record.

23         THE COURT:  Overruled.  I've already ruled on that.

24         MS. DONNELLY:  OK.  Again, just for the record, on

25  line 11, it says, "control money or property" was intended to

Iahdgat1

1    or did result.  Your Honor has already ruled.  Just for the

2    record.

3                THE COURT:  Overruled.

4                MS. DONNELLY:  OK.  And then on lines 14 through 16,

5    your Honor has what I'm going to refer to as a dual intent

6    instruction.

7                THE COURT:  As a what?

8                MS. DONNELLY:  As a dual intent instruction.  I could

9    use a different phase, if you want.

10               THE COURT:  No.  No.  That's what I call it.  I just

11   didn't hear you.

12               MS. DONNELLY:  OK.  So the two cases that your Honor

13   cites, which are the two that the government cited when it

14   asked for this instruction, are Skelos and Coyne, and both of

15   those are public corruption cases.  They are not wire fraud or

16   mail fraud.  I have scoured Second Circuit precedent to find a

17   dual instruction -- a dual intent instruction in the context of

18   wire fraud and have failed to find anything.  And so it is our

19   contention that it's not appropriate to give a dual

20   instruction -- a dual intent instruction in a wire fraud case,

21   and we object on those grounds.

22               THE COURT:  There is a first time for everything.

23   Overruled.

24               Anything else, Ms. Donnelly, on this section?

25               MS. DONNELLY:  Yes, your Honor.  Again, purely for the

1  record, because I realize your Honor has already ruled, line

2  18 -- excuse me, page 18, at line 2.  We would ask that your

3  Honor add, "or did not intend to expose them to the risk of

4  tangible economic harm."  I understand that that's been

5  overruled.

6          THE COURT:  Just let me focus for a minute.

7          MS. DONNELLY:  I'm sorry.

8          (Pause)

9          THE COURT:  What is your comment, Mr. Diskant?

10          MR. DISKANT:  So we actually have a comment on this

11  section as well, which could potentially --

12          THE COURT:  We'll come back to that, but I want to

13  hear what you have to say to this point.

14          MR. DISKANT:  So, I would object to the way she is

15  phrasing it.  The proposal I was going to make, that I think

16  may be responsive to her concern, is we would propose changing

17  the lines that -- page 17, line 21 through 18/2 to "The

18  defendants held an honest belief that the universities were not

19  being deprived of the ability to make an informed economic

20  decision in such a way as to expose them to the risk of

21  tangible economic harm," which I may be wrong but I think would

22  accomplish Ms. Donnelly's goal as well, because it focuses on

23  the defendants' intention to deprive them of this information.

24          THE COURT:  OK.  How does that sit with you,

25  Ms. Donnelly?

Iahdgat1

1          MS. DONNELLY:  I do better when I can read it as

2     opposed to listening.  I just want to make sure I'm getting it.

3          (Pause)

4          I think that would be fine.

5          THE COURT:  OK.  Look at the progress we have made in

6     12 days.  "Were not being deprived of the right to" -- now give

7     me the language, please, Mr. Diskant.

8          MR. DISKANT:  Actually, instead of "the right to," I

9     would say "of the ability to make an informed economic

10    decision," which is just the Court's language from page 15, "in

11    such a way as to expose them."

12         THE COURT:  OK.  Imagine that.  Peace breaking out.

13         OK.  Anything else from the defense through page 21,

14    line 3?

15         MS. DONNELLY:  Yes.  On page 18, line 16 through 22, I

16    believe at this point we are talking about intent, and so the

17    question here is an apparent authority instruction.

18         THE COURT:  Clearly.

19         MS. DONNELLY:  And it is our belief that at line 20,

20    it should say, as opposed to -- it says, "benefit of the victim

21    university and not to serve his or her own interests."  It

22    should say, "not to solely serve his or her own interests in a

23    manner that was not," and then we would object to the word

24    "fully" aligned -- I'll stop there because I have a couple more

25    but maybe you want to work on those two first.

Iahdgat1

1          THE COURT:  Mr. Diskant.

2          MR. DISKANT:  So, your Honor, we addressed this in our

3     objections to their requests.  We think they are misstating

4     D'Amato, which says just the opposite, which is that in order

5     to make this out, they have to prove that the agent was acting

6     exclusively in the interest of the corporation and not at all

7     in his own personal interest.

8          THE COURT:  Well, they don't have to prove anything.

9     That is the first point.

10         MR. DISKANT:  Fair enough.  I apologize.  The standard

11    is really what I should have said.

12         THE COURT:  But isn't that just what she asked me to

13    do?

14         MR. DISKANT:  No, your Honor.  Because what she is

15    asking you to do is, if I'm understanding it correctly, is to

16    suggest that if an agent is in part acting in the interests of

17    the school and in part acting in his own interests, then that

18    is sufficient.  And that is not what D'Amato says.  What

19    D'Amato says is that the agent has to be acting exclusively in

20    the interests of the employer.

21         THE COURT:  Yes.  But, look, I spent a lot of time

22    thinking about this, and I find it pretty subtle and I've tried

23    to come to the right answer.  So, let's just talk about it for

24    a minute.

25         Let's take the case, hypothetical, I suppose, but

Iahdgat1

1   let's take the case where the defendant is acting at the

2   request of a coach.  The coach appeared to be authorized to

3   make the request, and the agent knew, or believed -- excuse me,

4   the defendant knew, or believed, that the coach had a

5   compensation deal that was in substantial respects contingent

6   on performance -- getting into the Final Four, whatever.

7           Now, if the jury were to find that the university had

8   also interest in getting to the Final Four, that shouldn't

9   necessarily be the end of the discussion.  There is, first of

10  all, the question of the performance bonus, where the argument

11  could be made both ways, that the coach's interest in the

12  performance bonus is or is not fully aligned with those of the

13  university.  Paying the performance bonus is economically

14  disadvantageous in the short-term to the university but

15  advantageous to the coach.  One could argue it the other way by

16  saying, well, the university has an interest in attracting the

17  best coaching talent they can, and if they reasonably made a

18  business decision that it was in their interest to pay the

19  performance bonus, then the coach's receipt of the performance

20  bonus, or his interest in it, would be fully aligned with those

21  of the university.

22          On the other hand, the coach might have other

23  interests that are involved that are not coextensive with the

24  university, such as, hypothetically, getting an open coaching

25  position in the NBA, which he may perceive, depends on how he

Iahdgat1

1    does with the basketball team in the college.  And that's only

2    one example.  You could hypothesize a million examples.

3         That's why I felt that the ultimate jury question is

4    complete alignment, as opposed to the language that

5    Ms. Donnelly suggested, and I realize here we are on

6    interesting ground.

7              MS. DONNELLY:  May I respond?

8              THE COURT:  Yes.  Sure.

9              MS. DONNELLY:  So what your Honor just said is very

10   consistent with our concerns.  And I'm wondering if perhaps a

11   sentence that made clear that the fact that a person is

12   receiving compensation for good performance does not mean that

13   those interests are not aligned -- that that doesn't mean that

14   that performance is not aligned with the interests of the

15   university.  And I might want to think and talk with

16   Mr. Schachter about exactly what we would propose.

17        But our concern is, of course, that, you know, Rick

18   Pitino is going to get a giant bonus.  It is our view that the

19   reason he's getting a bonus is because the university agreed,

20   hey, we want to get to the Final Four, that's why we're going

21   to pay him to do it.  And so I'm worried that the jury is going

22   to say, well, Pitino is going to put money in his pocket and

23   that's not what the compliance folks wanted, and it is a very

24   fine distinction, as your Honor knows.

25             THE COURT:  Well, of course it is.  And I think my

Iahdgat1

bottom line -- I mean, I totally understand the concern.  And

the instruction that you're asking for ignores the fact that

there might be circumstances in which Pitino -- the poor man,

he's become a celebrity in ways he never imagined or certainly

can't like.  Coach X.  Coach X's interest in a performance

bonus may not be fully aligned with the university because

Coach X might want that performance bonus and might want to get

into the Final Four and do things that are not what the

university, if fully informed, would want done.  And on those

facts, your statement of it doesn't cover the point.  It's

wrong, actually, in my view.  I mean, I understand, total good

faith argument, absolutely.  Good argument.  I would be doing

my best with it if I were representing your client, but I don't

think it is right.

MS. DONNELLY:  Just for the record, would your Honor

consider parroting some of the language that is used in D'Amato

so that subpoint 3 here said the agent appeared to be

unconflicted and was acting in good faith for the benefit of

the victim university and not out of a desire for

self-enrichment, period?

THE COURT:  It is too narrow.

MS. DONNELLY:  OK.  Well, then, let me try one more

thing.  On line 21, it says, "that was not aligned with the

interests of the university."  Would your Honor consider adding

"was not aligned with what defendants believed were the

Iahdgat1

1    interests of the university?"  My fear is that the

2    defendants -- of course you are right, you might want that NBA

3    job, but I don't know that Mr. Gatto would know that you would

4    want that NBA job.  So I am hoping that we can come to an

5    instruction that makes clear that it has to be whether the

6    defendants think that the person is acting in the interests of

7    what the defendant understands the university --

8              THE COURT:  I think it is covered.  It is just a

9    restatement of what I've got here.

10             OK.  Moving on.  Anything else from the defense to

11   page 21, line 3?

12             MS. DONNELLY:  Yes.  On page 19.

13             THE COURT:  Yep.

14             MS. DONNELLY:  At line 14, we would ask that your

15   Honor strike "should have known."  This is not a civil case,

16   right?  This is a criminal case.  And so we think it is

17   important that the word "knew" be in there; just "knew," not

18   "should have known."

19             THE COURT:  Mr. Diskant.

20             MR. DISKANT:  I believe "should have known" is

21   directly from D'Amato, your Honor.

22             THE COURT:  I think it is, too.

23             MS. DONNELLY:  In that one respect, I disagree with

24   D'Amato.

25             THE COURT:  There you go.  I may or may not but I have

Iahdgat1

to follow it.

MR. MOORE:  Could we move to the Fifth Circuit, your Honor?  I thought we were in the Seventh.

THE COURT:  Maybe it is the right time of the year.

MR. MOORE:  I meant D'Amato.  Could we move D'Amato to the Fifth Circuit?

THE COURT:  You'll have to ask him.

OK.  Going once, page 21, line 3, defense?

MS. DONNELLY:  Just for I think the purposes of a record, because I think we've already covered this now, on line -- page 20, lines 5 through 8, you know, the issue of "entirely aligned with the interests of the university," that I just renew my objection, understanding that your Honor has already ruled on it.

THE COURT:  Overruled.

MS. DONNELLY:  OK.

MR. SCHACHTER:  May we have just a moment?

(Pause)

MS. DONNELLY:  Mr. Schachter reminds me of a question that I don't -- could I ask your Honor to explain a point of law to me that I may misunderstand?  That might solve some of them.

THE COURT:  Should I start the billing meter?

MS. DONNELLY:  Right.  The issue that we're having and that I said not very eloquently is that it seems to us that

Iahdgat1

1    every employee who gets paid has a self-interest in their

2    actions, and so this idea that you have to be fully aligned

3    with the university, that somehow suggests that employees must

4    be selfless, that they must not think of themselves.  But, you

5    know, when Mr. Schachter has me working until 3 o'clock in the

6    morning, I'm not doing it for Mr. Schachter, I'm doing it

7    because I want to buy a nice outfit, and so I am struggling

8    with the "fully aligned" portion.  And I guess my question is

9    are we misunderstanding what your Honor was intending to say

10   there, was intending to convey?

11           THE COURT:  I did the best I could here, and I think I

12   previously indicated that there are many circumstances in which

13   the employee's interest in compensation is fully aligned, and

14   there are some when it is not.

15           MS. DONNELLY:  Would your Honor be willing to say that

16   exact sentence to the jury?  There are many circumstances in

17   which the employee's interest in compensation is fully aligned

18   and there are some when it is not?  That would go a long way, I

19   think, to addressing our concerns, maybe even all the way.

20           THE COURT:  Yeah, but I wouldn't even entertain

21   indicating which is more often the case than the other.  That's

22   a first proposition.

23           MS. DONNELLY:  Understood.

24           THE COURT:  You know.

25           Mr. Diskant.

Iahdgat1

1           MR. DISKANT:  I think the problem with this entire

2    premise is that D'Amato is -- we are talking about a very

3    narrow set of circumstances.  We're not talking about what an

4    employee does day in and day out.  We're talking about a

5    circumstance in which the defendant contends an employee is

6    asking the defendant to lie to the employer.  That is why the

7    carve out in D'Amato is so narrow.  Right?

8           So, yes, there are lots of circumstances in which an

9    employee's compensation, you know, and the employer's interests

10   may align or may not align.  Those largely have nothing to do

11   with this case.  The reason the exception is so narrow is

12   because the nature of the conduct is so extraordinary, that is,

13   a defendant claiming an employee has instructed me to lie to

14   his employer.  And that is why it is so essential -- and that's

15   why D'Amato speaks of it being essential, that the employee be

16   acting unconflicted and in good faith.  We don't think saying

17   anything more about compensation is necessary or appropriate.

18          THE COURT:  That's my bottom line, I think.  I'm

19   reminded of having represented many years ago the head of M&A

20   for a big brokerage firm, and the charge against him was that

21   he manipulated the closing price on the New York Stock Exchange

22   of the stocks in which the brokerage firm held the ten largest

23   positions for its own account to build up the bonus pool for

24   himself and his buddies.  Now, there's a case where he had an

25   interest in his compensation, and it sure wasn't aligned with

Iahdgat1

1 the interests of his employer. So I just don't want to go any

2 farther into this. This is a matter for argument, I think.

3          OK. 21, line 3, going once? Going twice --

4          MS. DONNELLY: Yes. One more. Sorry. And we put

5 this in our jury requests and our objections to the government,

6 so I assume your Honor has already rejected our suggestion.

7 But on page 20, at line 18 through 19, your Honor has a line,

8 "As such, when the necessary result of a scheme is to injure

9 others, fraudulent intent may be inferred from the scheme

10 itself." We would just ask for the mirror instruction that

11 says, "As such, when the necessary result of a scheme is to

12 benefit others, a lack of fraudulent intent may be inferred."

13          MR. DISKANT: We would object to that.

14          THE COURT: No. OK.

15          MS. DONNELLY: With that, I have no more objections.

16          THE COURT: OK. Maybe we've broken the back of this,

17 which is good, because the jury will be here in three minutes,

18 we hope.

19          Mr. Diskant, this section for you?

20          MS. DONNELLY: Just to be clear, I think your Honor

21 asked the jury to come at 1, not 11.

22          THE COURT: I'm living in the past. Thank you. I do

23 that a little now and then.

24          MR. DISKANT: Your Honor, we just have one comment,

25 which is page 19, lines 4 through 6. We certainly would not

Iahdgat1

1  dispute that it is the government's burden to prove the

2  defendant guilty.  We think it is a little misleading to say it

3  is the government's burden to prove beyond a reasonable doubt

4  that the defendant you are considering did not facilitate a

5  payment at the request of the university-employed coach,

6  because the defendant could actually still be guilty.  And, in

7  fact, the government has conceded at least one of these

8  payments was facilitated by a university coach.  The question

9  is whether or not the coach was acting in good faith.

10      We think the better articulation of this by the Court

11  is just in the next paragraph, and we think that's sufficient

12  to cover both of these points.

13      THE COURT:  Let me read it.

14      (Pause)

15      What about that?

16      MS. DONNELLY:  Your Honor, it's my understanding that

17  what your Honor was trying to do is on page 18, you say, look,

18  there are three points here.  There is one, he's acting at the

19  request of an agent.  Point two, and point three.  And then

20  you've got the three -- then you've got the first point, the

21  second point and the third point.  So as I understand it, all

22  that your Honor is doing is saying you can get to the

23  conclusion I talked about on page 18, point one, with this

24  paragraph.  And we think it is true that unless the government

25  proves that -- the government can't prove that he was acting at

Iahdgat1

1    the request of an agent -- I mean, that to us seems like

2    something the government does have to prove.

3         THE COURT:  I think you each have a point here.  I

4    think the sentence that Mr. Diskant has a problem with is

5    redundant, actually, because on page 18, lines 3 through 5, I

6    charge that "A defendant has no burden to establish a defense

7    of good faith.  It remains the burden -- the government's

8    burden to prove fraudulent intent and the consequent lack of

9    good faith beyond a reasonable doubt."

10        I think that covers the whole following discussion of

11   the three points, and then I can just delete the sentence on

12   page 19, lines 4 to 6.  Anybody have a problem with that?

13        MS. DONNELLY:  I might.  Would you give me one moment

14   to consult with Mr. Schachter?

15        (Pause)

16        We liked it the way the Court had it.

17        THE COURT:  Give me a minute.

18        MS. DONNELLY:  Sorry.

19        (Pause)

20        THE COURT:  OK.  I'm sorry.

21        MS. DONNELLY:  All I was going to say is that, you

22   know, we preferred it the way the Court had it, but assuming

23   that our objection to Mr. Diskant's proposal is preserved, we

24   can move on.

25        THE COURT:  Assuming Mr. Diskant's proposal is

Iahdgat1

1    preserved, what does that mean?

2            MS. DONNELLY:  Meaning our objection.  Mr. Diskant

3    wants that language cut, correct?  We would like it in there.

4            (Pause)

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  I think a possible alternative way of

2    handling this is as follows.  Starting at page 19, I go through

3    each of the three points that we have been discussing.  And at

4    the end of the discussion of each of the three points, there

5    appears essentially the same statement that it is the

6    government's burden to prove each time.

7           Now, that's pretty repetitious, first of all.  And an

8    alternative way to handle this is to take out all three of

9    those repetitions, but to insert at page 20, after line 8 --

10   actually to repeat the first sentence that appears in the first

11   full paragraph on page 18 -- "that a defendant has no burden to

12   establish a defense of good faith.  It remains the government's

13   burden to prove fraudulent intent and the consequent lack of

14   good faith beyond a reasonable doubt."

15           What about that?

16           MS. DONNELLY:  Can I have one moment?

17           I would make one more addition along with that, and

18   that is on page 18, line 15, I would insert after the phrase

19   "they acted" "in good faith," which would make it all clearer,

20   I think.

21           How about that?

22           MS. DONNELLY:  Well, I guess what Mr. Schachter and I

23   have come to terms with is we would prefer to just go back to

24   what Mr. Diskant wanted, which was to strike the sentence on

25   page 19 from 4 to 6 and leave everything else as your Honor has

IAH8GAT2

1    it, except I would take you up on that last suggestion on page

2    18 to add to line 15 "in good faith" there.

3                 THE COURT:  Mr. Diskant?

4                 MR. DISKANT:  I think that's fine.  I would ask the

5    Court to consider, if we are doing that, actually cutting on

6    page 19, line 3, the sentence before, "I remind you, however,

7    that the burden is on the government to prove each defendant

8    guilty."  It just sort of seems random, and I think it is

9    covered by what you are then going to say starting at line 10

10   through 15.

11                THE COURT:  So the proposal is "in good faith" on page

12   18, line 15.

13                MR. DISKANT:  We have no objection to that.

14                THE COURT:  Striking the last sentence of the first

15   paragraph on 19.

16                MR. DISKANT:  The last two sentences.

17                THE COURT:  Does that work?

18                MS. DONNELLY:  That's fine, your Honor.

19                To move on very quickly, I have to make a confession.

20   When your Honor asked if the defense was done with this

21   section, I was nervous and I forgot that I have to make good

22   faith argument on behalf of Mr. Haney, and I am wondering if

23   your Honor would let me do that very quickly.

24                THE COURT:  Sure.

25                MS. DONNELLY:  In our proposed instructions we asked

1   for a good faith instruction that was based on *United States v.*

2   *Regan*, which is a Second Circuit case that says, and I want to

3   get this exactly right --

4           THE COURT:  Which of your instructions?

5           MS. DONNELLY:  So the ones that we started with.  So

6   those are the ones filed on August 23.

7           THE COURT:  So which one?

8           MS. DONNELLY:  Sorry.  Page 17, the first full

9   sentence.  "For example, if you determine that the defendant

10  you are considering believed in good faith that the NCAA rules

11  permitted him to act as he did, that good faith belief

12  precludes a finding of criminal liability and you must find the

13  defendant not guilty."

14          THE COURT:  Mr. Diskant.

15          MR. DISKANT:  Your Honor, we would object to that for

16  a number of reasons.  I can speak to it if you want.  I think

17  the most important point is that a belief that NCAA rules

18  permitted him to act as he did or didn't do would have very

19  little bearing on the particular facts of this case.

20          By contrast, in *Regan*, the issue is whether or he

21  believed the tax code allowed him to engage in the particular

22  tax conduct that he was engaged in in that case, which is not

23  what this one is about.

24          MS. DONNELLY:  I would disagree.  What was going on in

25  *Regan* was that the defendant was arguing, look, there is this

IAH8GAT2

1 other section of the tax code 1058. I think what I did was OK

2 there, and, therefore, your allegation that I defrauded someone

3 here, that's inappropriate. I was acting in good faith.

4 I don't see that as significantly different than Mr.

5 Diskant saying -- excuse me, Mr. Dawkins saying, I reasonably

6 believed that this preexisting rule exception applied to me, I

7 didn't therefore think it would be a NCAA rule violation for

8 Mr. Bowen to take the money from me, and therefore that

9 constitutes good faith.

10 Of course Mr. Diskant could argue to the jury that

11 that's crazy, but we would ask, based on the reversal in *Regan*,

12 that your Honor put in such an instruction.

13 MR. DISKANT: On these facts, your Honor, I don't

14 think this instruction would be necessary to that argument. If

15 he wants to argue he didn't believe the certifications were

16 false, because he believed he was allowed to do it, he is free

17 to do that. I don't think there is very much evidence from

18 which to make that argument, but he is free to make that

19 argument. This just invites more speculation into NCAA rules

20 when, as we all discussed at length, all the defendants opened

21 on the fact that the NCAA rules were violated.

22 THE COURT: Well, yes.

23 MS. DONNELLY: I know Mr. Haney isn't here, but he did

24 say in his opening statement, he talked about the preexisting

25 relationship.

IAH8GAT2

1          THE COURT:  Oh, I remember.  And I learned more about

2     Saginaw, Michigan than I ever wanted to know.

3          MS. DONNELLY:  Trust me, me too.

4          THE COURT:  I will think about it.  I will let you

5     know before Mr. Haney starts.

6          Anything else on this section from either side?

7          MR. SCHACHTER:  Your Honor, just if I may, now that I

8     am thinking about Mr. Haney, on the point about the defendants'

9     concessions in the opening statements, I have not had a chance

10    to study Mr. Haney's opening statement, and given that part of

11    his defense is that, at least from Mr. Dawkins's perspective, I

12    think the NCAA rules were violated, I ask your Honor to

13    consider the statement about the concession in light of Mr.

14    Haney's both comments and potential defense.

15         THE COURT:  Mr. Schachter, all good things come to an

16    end, including the charge conference.  Now, you delegated this

17    whole section to Ms. Donnelly, and no offense, I am just not

18    going to do it this way.

19         MR. SCHACHTER:  Yes, your Honor.

20         THE COURT:  All right.

21         We are done through page 21, line 13.

22         Page 21, line -- I said line 13, I meant line 3.

23         Page 21, line 4 through willful causation.  But before

24    you leap to that, I have made a change on line 6, page 23.

25    After the words "money or property," I am going to insert the

1    words "as I have defined that term previously."

2            OK.  Through 23, line 16.

3            Ms. Donnelly.

4            MS. DONNELLY:  Yes, your Honor.  No objection to

5    anything in the third element.

6            On willful causation, we have a small request.  On

7    line 5, your Honor says, "Accordingly, one who intentionally

8    causes another person to make a material false statement."  We

9    are concerned that the jury won't really understand what

10   "intentionally causes" means.  I confess, I didn't know what it

11   meant until this case.  I spent a lot of time looking at it.

12   For that reason, we would ask that your Honor add a sentence

13   concerning what it means to intentionally cause someone that is

14   consistent with the Third Circuit's instruction in *United*

15   *States v. Gumbs*.

16           THE COURT:  I am not going to charge *Gumbs*.  I

17   disagree with it.

18           MS. DONNELLY:  Understood, your Honor.

19           THE COURT:  It's not the law in this circuit.

20           MS. DONNELLY:  Then with that, the defense does not

21   have any other objections to that section.

22           Sorry.

23           THE COURT:  Mr. Diskant.

24           MR. DISKANT:  Nothing, your Honor.

25           THE COURT:  Conscious avoidance, which takes us to the

1    end of page 24.

2            MR. SCHACHTER:  Your Honor, Ms. Donnelly has one other

3    comment.

4            MS. DONNELLY:  As you have done throughout, if your

5    Honor would consider adding to the very end on line 10, "caused

6    to make that false statement," "if the government fails to

7    prove beyond a reasonable doubt that the defendant knew and

8    intended the false statement to be made, you may not find that

9    the defendant willfully caused."  Just to sort of sum up.

10            THE COURT:  I don't think it's necessary.

11            Next section.  I take it, in light of the discussion

12   before, there is really nothing further to be said on conscious

13   avoidance, right?

14            MR. SCHACHTER:  Beyond the lack of factual predicate,

15   your Honor?

16            THE COURT:  Well, what is the argument that there is

17   no factual predicate?

18            MR. SCHACHTER:  In order for there to be a conscious

19   avoidance instruction, as I understand the law, there needs to

20   be a factual predicate that the defendant was taking some

21   action to willfully blind him or herself from the fact that the

22   jury should infer knowledge of, and the government has not

23   presented any evidence of Mr. Gatto willfully blinding himself,

24   taking any particular action with respect to any rules.  The

25   government has not presented any evidence that suggested that

1  there was any rule that was -- they haven't shown any linkage

2  between him and the rule.  So absent some kind of basis to

3  suggest that he was taking some action to blind himself, then

4  there is no factual predicate for the charge.

5        THE COURT:  You mean we have got to bring in the black

6  hood he put over his head?

7        MR. SCHACHTER:  The instruction is designed for the

8  circumstance where, here's a bag, can you drive it across town?

9        THE COURT:  You are given $20,000 for it and you don't

10  ask whether it's heroin.  I understand.

11        MR. SCHACHTER:  Correct.  That's the factual predicate

12  that is necessary.

13        THE COURT:  What is the action that the person takes

14  in that hypothetical?

15        MR. SCHACHTER:  He drives and he is holding a bag and

16  he doesn't look in it.

17        THE COURT:  That's an action he didn't take.

18        MR. SCHACHTER:  That's right.  By not opening up the

19  bag he is blinding himself to what is in the bag, and

20  considering the fact that he has been given $20,000 to drive

21  across town, that's a factual predicate that the person has

22  willfully blinded himself.

23        Here, the government has not presented any evidence of

24  any action that Mr. Gatto took to blind himself to that.  So

25  that's one objection.  There's two.  The other is the

1    government proposes a conscious avoidance instruction really in

2    order to demonstrate intent.  And conscious avoidance has to do

3    with knowledge of a fact and not intent.  Here, the intentional

4    act --

5            THE COURT:  That is just inconsistent with what the

6    charge says.

7            MR. SCHACHTER:  Well, I guess my point is, when you're

8    talking about wire fraud, it is an intent to defraud through

9    false statements, and so the false statements have to be

10   intended.  And so you can't, in a wire fraud case, my view,

11   consciously avoid the making of false statements because that

12   is the mens rea that is required.

13           THE COURT:  No one is saying you have to consciously

14   avoid making false statements.  That's not the argument.  The

15   argument is that, if you claim that this guy had no idea, the

16   government has failed to prove this guy had any idea, that

17   anybody was going to certify that there were no payments, that

18   the kid was eligible -- you know what we are talking about --

19   it's the government's position that the facts in this case

20   demonstrate that if he was ignorant in that way, he could only

21   have been so by deliberately avoiding confirmation of the fact

22   that those statements had to be made to get the scholarships

23   that he was putting up the money to facilitate the kids

24   getting.

25           MR. SCHACHTER:  My point --

1          THE COURT:  That's the fact.

2          MR. SCHACHTER:  My point is the government needs to

3     present evidence of some action taken by Mr. Gatto to blind

4     himself.  In order to get that instruction, it cannot simply be

5     the government hasn't presented evidence and therefore --

6          THE COURT:  It can be like not asking, as you said.

7          Mr. Diskant, anything you want to add that?

8          MR. DISKANT:  No, your Honor.  We agree with the Court

9     on this.

10         THE COURT:  Overruled.

11         Anything from the government on conscious avoidance?

12         MR. DISKANT:  No.

13         THE COURT:  Anything from either side on aiding and

14    abetting?

15         MR. DISKANT:  No, your Honor.

16         MS. DONNELLY:  No, your Honor.

17         THE COURT:  Page 28, line 12 through page 31, line 13.

18         MS. DONNELLY:  I just want to check those numbers.

19         A small insertion, your Honor.  On page 28, at line

20    19, it says "to commit wire fraud," and we would propose that

21    your Honor say "to commit wire fraud by defrauding the

22    universities I mentioned earlier."

23         THE COURT:  Mr. Diskant.

24         MR. DISKANT:  That's fine, your Honor.  I don't think

25    we have an objection to that.

1           THE COURT:  I don't think it's fine.  Is it the

2   government's position that in order to convict they have to

3   find an agreement to defraud each and every one of the four?

4           MR. DISKANT:  Yes.  Thank you, your Honor.

5           THE COURT:  And you know that's where they are going

6   because it's in their requests to charge.

7           MR. DISKANT:  Yes, your Honor.  I apologize.  You're

8   correct.

9           MS. DONNELLY:  I understand that objection.  That

10  actually wasn't where we were going to go, so let me correct

11  what I would ask you to say.

12          "To commit wire fraud against universities."  I just

13  want to be clear it's not just wire fraud, right?  We don't

14  have to say "the four," we don't have to say "each of the

15  four," just "the universities."

16          THE COURT:  One or more?

17          MS. DONNELLY:  One or more would be fine.  That's

18  correct.

19          THE COURT:  I will give you that.

20          MR. DISKANT:  That's fine.

21          THE COURT:  That's at page 28, at the bottom of the

22  page?

23          MS. DONNELLY:  Correct.

24          Then we would ask that your Honor make that same

25  addition, exactly as we have just discussed, on page 30, at

1  line 17.  So it says "to commit wire fraud," and then you would

2  add it right in there.

3         THE COURT:  Right.  Fine.  Done.

4         MR. MOORE:  Can I have a moment to discuss something

5  with them very briefly?

6         THE COURT:  Yes.

7         MR. MOORE:  I am just wondering about the interplay of

8  that with the multiple conspiracy instruction given the facts

9  of my client's case.  But I will agree with it.  I think we can

10  still argue multiple conspiracies.

11         THE COURT:  Let's continue.

12         MS. DONNELLY:  Yes, your Honor.

13         To be clear, I think your Honor said to stop at 31.

14         THE COURT:  31, line 13.

15         MS. DONNELLY:  The defense has nothing further.

16         THE COURT:  Thank you.

17         Mr. Diskant.

18         MR. DISKANT:  Nothing, your Honor.

19         THE COURT:  31, line 15, through 34, line 14.

20         MS. DONNELLY:  Just one, your Honor.  On page

21  33 -- actually, I don't really care where it goes.

22         I'm sorry.  I don't mean it that way.

23         The instruction as written does not require the jury

24  to find a mental state of intent to defraud, and under *United*

25  *States v. Ingram*, which is a Supreme Court case, the Supreme

1   Court said, "Conspiracy to commit a particular substantive

2   offense cannot exist without at least" -- this is in italics --

3   "the degree of criminal intent necessary for the substantive

4   offense itself.  The substantive offense itself requires

5   knowledge, willfulness, and specific intent to defraud."

6          So we would just ask for "specific intent" to be added

7   here.

8          THE COURT:  Mr. Diskant.

9          MR. DISKANT:  Your Honor, I think the Court tells the

10  jury that in substance at page 31, lines 20 and 21, where it

11  says they must have "participated in the conspiracy with

12  knowledge of its unlawful purpose, and with an intent to aid in

13  the accomplishment of its unlawful objective -- that is, the

14  commission of wire fraud."

15         If it might solve this issue, the Court could add

16  something along the lines of, I have already instructed you on

17  what wire fraud consists of and you should follow those

18  instructions here.

19         THE COURT:  I think that covers it, doesn't it?

20         MS. DONNELLY:  The only thing I would say is that

21  specific intent to defraud is the most important part of

22  defendants' case.  So rather than just saying it's already

23  covered in substance, we would ask your Honor to add a short

24  sentence, or even to here, at the bottom of 23 -- excuse me,

25  page 31, line 23, that he unlawfully, willfully, and with a

1  specific intent to defraud entered into the conspiracy.  Those

2  five words and we would be satisfied.

3       MR. DISKANT:  Your Honor, I guess I think that's fine,

4  provided the Court reminds the jury that it has previously

5  instructed them on what that term means, because it is a little

6  bit confusing.  I think the easier way is to simply say, I have

7  instructed you on what wire fraud is.  You should follow those

8  instructions.

9       THE COURT:  But this is an occasion for subdividing

10  the baby.

11       Give me your language, please.

12       MS. DONNELLY:  So on page 31, there is a sentence at

13  line 22, it says "each defendant's own actions and conduct that

14  he unlawfully, willfully" -- I would get rid of "and."  I would

15  say "knowingly and with a specific intent to defraud entered

16  into the conspiracy."

17       MR. DISKANT:  I think you should add it at the end of

18  the sentence if you are going to do that.

19       THE COURT:  I am going to take Ms. Donnelly's version.

20       OK.  Anything else from either side?

21       MR. MOORE:  Your Honor, so what language would you use

22  exactly?

23       THE COURT:  Unlawfully, willfully, knowingly and with

24  specific intent to defraud.

25       MR. MOORE:  Yes, sir.  Thank you.

1          THE COURT:  Anything else from either side through 33,

2     line 14?

3          MS. DONNELLY:  No, your Honor.

4          THE COURT:  34, line 15, through 37, line 8.

5          MS. DONNELLY:  Nothing from the defense.

6          MR. DISKANT:  Your Honor, we are concerned about the

7     multiple conspiracies charge.  I won't reiterate what is in our

8     papers.  We don't believe that there is a factual predicate

9     that has been established in this case for the instruction

10    that's been given.

11         THE COURT:  What is missing?

12         MR. DISKANT:  So the Ninth Circuit's articulation of

13    this -- and I quote the Ninth Circuit only because I don't

14    believe the Second Circuit has directly addressed this issue --

15    provides that a multiple conspiracy instruction is appropriate

16    only where the proof at trial indicates that a jury could

17    reasonably conclude that some of the defendants were only

18    involved in separate conspiracies unrelated to the overall

19    conspiracy charged in the indictment.  And that's not the case

20    here.

21         THE COURT:  Obviously, we don't have to talk about

22    Gatto, but talk about the others.

23         MR. DISKANT:  The conspiracy alleged in the indictment

24    at a bare minimum includes the Louisville scheme, and I don't

25    believe that there is any dispute that all three of the

1  defendants participated in at least the conduct giving rise to

2  that scheme.

3          The argument, as I understand it, is a not a multiple

4  conspiracies argument.  It is an argument that Mr. Code and Mr.

5  Dawkins joined the conspiracy midway through because the

6  Louisville conduct was the last component of the conduct that

7  the government proved up.  That's not a multiple conspiracies

8  count.  That's an issue of when during the duration of the

9  conspiracy each defendant joined.

10          The government has no intention of arguing that

11  Mr. Code or Mr. Dawkins was involved in the payments to the

12  family of Billy Preston or Silvio De Sousa or Dennis Smith,

13  Jr., all of which we would agree predate their joining the

14  conspiracy.  But the fact that they joined the conspiracy

15  midway through, as the Court instructs the jury, doesn't defeat

16  a finding that they were members of the conspiracy.

17          We think instructing the jury on multiple conspiracies

18  on these facts would be very, very confusing because it is a

19  very confusing issue.  Going back to the Second Circuit, the

20  Second Circuit's leading case on this, the *Tramunti* case --

21          THE COURT:  Tell me the name again.

22          MR. DISKANT:  *United States v. Tramunti*,

23  T-R-A-M-U-N-T-I, is fundamentally distinct.  There, there were

24  two different and dueling competing drug trafficking crews that

25  the government sought to link by virtue of the fact that they

1    shared a common supplier.  So on those facts, there was a real

2    legitimate issue about whether or not there was one overarching

3    conspiracy or two different drug conspiracies that just so

4    happened to buy from the same source.

5        That is completely inapposite with the facts here,

6    where there is really no question that at least for a

7    significant -- for purposes of this trial -- moment in time,

8    all of these defendants were acting in concert to achieve the

9    same goal.

10        THE COURT:  Let's back up to *Tramunti* for a minute.

11        *Tramunti* holds, am I correct in understanding, error

12    to give or error not to give a multiple conspiracy charge?

13        MR. DISKANT:  Certainly not error not to give.  In

14    that case there was an instruction given.  The defendants on

15    appeal claimed that the instruction was insufficient, and the

16    Second Circuit said, no, we think the instruction was OK.

17        THE COURT:  But in terms of the instruction being OK

18    given the premise that it was an appropriate case in which to

19    give a multiple conspiracy charge.

20        MR. DISKANT:  It doesn't seem like -- and that's part

21    of the reason why I said the Second Circuit hasn't really ever

22    squarely addressed this issue.  That particular issue doesn't

23    seem to have been a significant point of discussion.

24        THE COURT:  That's my point.  You can sure have a

25    hub-and-spoke conspiracy, which is what your description of the

1    facts in *Tramunti* described.  You have a drug supplier who is

2    known, presumably, by his customers to be engaged in a drug

3    distribution operation, and each of the customers doesn't even

4    know the identities of the other customers.  But it would be

5    open to the government on those facts to argue that there was a

6    single overreaching conspiracy on the ground that, given the

7    nature of the business, and the nature of the role of the

8    supplier, it was more than reasonably foreseeable to each

9    customer that he was not the only customer, there were lots of

10   them, and that each of them had an understanding with the

11   distributor, the supplier, that they would move his drugs.  And

12   so a single conspiracy could be charged and result in a

13   conviction.  But I suppose -- and the defense would also have

14   an argument on those facts -- there might be just a whole

15   series of independent distribution deals between the supplier

16   and each customer.  Do I have that right?

17            MR. DISKANT:  Yes, your Honor.

18            THE COURT:  OK.  So that is an entirely different

19   case, particularly as it doesn't address this question.

20            Now, I suppose the issue here -- and I am sure Mr.

21   Moore is going to weigh in on this in about a minute.

22            MR. MOORE:  Only if invited, your Honor.

23            THE COURT:  Oh, come on, you're not that bashful.

24            -- is that it's a fair argument to say that Mr. Code

25   may have conspired with Gatto, but that doesn't mean he

1  conspired with everybody else and that's a different

2  conspiracy.  Is that your argument?

3          MR. MOORE:  That is a part of the argument, your

4  Honor.  The facts of this case, the jury can conclude that Mr.

5  Gassnola, when he made the earlier payments, was acting on his

6  own, perhaps with the imprimatur of Mr. Gatto, but that was a

7  separate agreement, a separate understanding, than the

8  understanding that Mr. Code had with Mr. Gatto in this

9  instance.

10          THE COURT:  Isn't there just a vast amount of evidence

11  in this case that Mr. Code, and certainly Mr. Dawkins, they

12  knew what was going on here.  They knew, or believed anyway, it

13  was widespread and that Adidas was putting up money to get kids

14  to Adidas schools.  Why isn't that enough to say no to the

15  multiple conspiracy?

16          MR. MOORE:  It's not enough to say no to the multiple

17  conspiracy, your Honor, because there is no evidence that they

18  knew that TJ Gassnola was running around making payments,

19  particularly with TJ Gassnola's claim that nobody at these

20  other universities, except for Orlando Early, knew about these

21  payments.

22          THE COURT:  But the conspiracy is Gassnola and Adidas,

23  at a minimum.

24          MR. MOORE:  Your Honor, there is no evidence that each

25  of these payments are connected as part of one unitary,

1   solitary scheme, we say.  And we think we ought to be allowed

2   to make that jury argument, given the facts of this case.

3   Mr. Code was not at Adidas when a number of these payments were

4   made.

5           THE COURT:  But that doesn't matter.  You know that

6   doesn't matter.

7           MR. MOORE:  It would not matter if he knowingly and

8   willfully joined the conspiracy, perhaps.  However, there is no

9   evidence that he knew about those payments, that he was

10  involved in those particular payments.

11          THE COURT:  He doesn't need to have known about the

12  payments, any more than the drug suppliers, in my hub-and-spoke

13  example, would need to know about even a single other purchase

14  of drugs by some other street seller.

15          MR. MOORE:  Your Honor, with respect to the Bowen

16  payments, you have got players who were separate and distinct

17  from what you had before.  Mr. Sood claims, for example, that

18  he is an alleged conspirator in this instance.  The government

19  claims that Mr. Dawkins is a participant in this alleged

20  conspiracy.  There is no explanation for how Mr. Sood might

21  have fit into the overall context of one unitary conspiracy.

22  And we believe, your Honor, that the facts in this case allow

23  for an argument of multiple conspiracies because we believe the

24  facts show that there is no one overarching agreement to which

25  Mr. Code knowingly and willfully joined.

1          THE COURT:  What is your best case?

2          MR. MOORE:  *McDermott*.

3          THE COURT:  Give me the citation, please.

4          MR. MOORE:  The cite is 245 F.3d at 133.  It's a

5    Second Circuit case.

6          THE COURT:  We are going to convert you yet.

7          MR. MOORE:  It takes me a while, Judge, but hopefully

8    I will ultimately get there.

9          MR. SCHACHTER:  Your Honor, I would just like to

10   channel Mr. Haney when your Honor has a moment.

11         THE COURT:  Channel away.

12         MR. SCHACHTER:  I think that Mr. Dawkins in particular

13   has a compelling argument for a multiple conspiracy

14   instruction.  I believe that Mr. Haney would say that Mr.

15   Dawkins is a free agent that is not joining anybody with any

16   common aims or objectives.  He doesn't really have any kind of

17   agreement that he ever wants to reach or cares to reach with

18   anybody.  He is all about just finding ways to provide money to

19   families so that they will hire him as an agent.  In fact, I

20   think he would say that the conspiracy -- really even in

21   paragraph 1 of the indictment -- talks about two distinct

22   objectives.  One is to convince family members to hire Mr.

23   Dawkins as a manager if they ever make it to the NBA.  And the

24   other is an objective that he couldn't care less about.  And I

25   think it's those two different objectives -- and for that

1    matter, Mr. Gatto certainly doesn't care if anybody hires Mr.

2    Dawkins as an agent or a business manager, that's not in any

3    way an objective of Mr. Gatto, and so I think Mr. Dawkins would

4    say that, given the very different objectives that are laid out

5    in the indictment, that's really what makes this case

6    appropriate for a multiple conspiracy instruction.

7              MR. MOORE:  If I could just try to gild that lily for

8    a moment, the same goes for Mr. Sood, who is an alleged

9    conspirator in this conspiracy.

10             THE COURT:  Can somebody direct me to the part of

11   *McDermott* that you say supports the giving of a multiple

12   conspiracy charge?

13             MR. SCHACHTER:  I can describe it because it's a fun

14   set of facts.

15             THE COURT:  No.

16             MR. SCHACHTER:  137 is the pin.

17             THE COURT:  Thank you.  I am sure it's a fun set of

18   facts.  Only lawyers talk about fun sets of facts.

19             Mr. Diskant, why shouldn't I give this instruction

20   once more, with feeling?

21             MR. DISKANT:  The short answer is that none of the

22   things that the defendants have said have taken away from the

23   fact that there was an agreement, a meeting of the minds to

24   make the Bowen payment, or at least that that is what is at the

25   center of this case.  So really what their arguments are about

1    are when they joined the conspiracy and what their objectives

2    were with respect to that conspiracy.

3           The *Berger* case, for example, that the Court cites in

4    support of the multiple conspiracies charge -- which in

5    fairness to the Court I am sure came from one of our

6    submissions -- says that, even if the evidence shows that more

7    than one conspiracy exists, you may still find the conspiracy

8    charged here in Count One exists if it happens to be one of

9    those conspiracies.

10          THE COURT:  But that's not the issue.

11          MR. DISKANT:  I understand that, your Honor.  The

12   point is there seems to be agreement -- and I think the

13   defendants would be hard-pressed to dispute this -- that under

14   a correct instruction of law, there is no basis for a jury to

15   find multiple conspiracies because at least one of the

16   conspiracies in these multiple conspiracies is the one charge.

17   Then this just becomes a hugely confusing distraction for the

18   jury.

19          There is really no basis for the jury to conclude on

20   these facts that there was never a meeting of the minds because

21   these were all -- to borrow the Court's example -- these

22   different spoke-and-wheel conspiracies.  I think the defendants

23   opened on the fact that they all participated in this plan to

24   pay Brian Bowen.  So at bare minimum there was a point when all

25   of the defendants charged in this case came to an agreement

IAH8GAT2

1    that the government alleges was criminal.  The only real

2    question is when during the period of the charged conspiracy

3    the various defendants joined.  And if they want to make

4    arguments about that fact that's perfectly fair game.  They

5    have every right to do that.  But getting into the issue of

6    multiple conspiracies, we just don't think there is a factual

7    predicate for it on this record and it is hugely confusing.

8        THE COURT:  All right.  I will let you know before you

9    start summations.

10       Nothing else through 37, line 8, right?

11       And venue is out.

12       MR. DISKANT:  One final thing.  If your Honor is

13   inclined to give a multiple conspiracies instruction, we would

14   ask that the Court consider substituting, at line 17 at page 35

15   through line 20, that final sentence, we would ask that the

16   Court instead consider the language I just read from *Berger*,

17   which is that even if the evidence shows that more than one

18   conspiracy exists, you may still find that the conspiracy

19   charged in Count One exists if it happens to be one of those

20   conspiracies.

21       THE COURT:  If I decide to give this, anybody object

22   to that language?

23       MR. MOORE:  No, your Honor.  I think that is an

24   accurate statement of the law.

25       MR. SCHACHTER:  We agree.

IAH8GAT2

1          THE COURT:  OK.  When we break, please give that

2     language to my law clerk.

3          Venue is out.

4          Section III, starting on page 39, anything on that

5     from the defense?

6          MS. DONNELLY:  No, your Honor.

7          THE COURT:  Government.

8          MR. DISKANT:  How far did the Court want us to go?

9          THE COURT:  It actually goes two pages.

10          MR. DISKANT:  No.

11          THE COURT:  Section IV, starting on page 41 and

12     running over to, way too far, page 50.

13          Defense.

14          MS. DONNELLY:  No, your Honor.

15          THE COURT:  Government.

16          MR. DISKANT:  It's a very small point, your Honor.  On

17     page 48, in the evidence obtained pursuant to searches, there

18     are actually multiple searches.  So we might suggest at line 25

19     you say "for example" rather than "in particular."

20          THE COURT:  Line 25?

21          MR. DISKANT:  Yes, your Honor.

22          THE COURT:  So you would say, "for example, e-mail

23     evidence"?

24          MR. DISKANT:  Yes, your Honor.

25          THE COURT:  I assume there is no objection to that.

IAH8GAT2

1      MS. DONNELLY:  No.  That's fine.

2      THE COURT:  Anything else through page 50?

3      Anything else from 51 to the end?

4      MR. SCHACHTER:  No, your Honor.

5      THE COURT:  OK.

6      MR. MOORE:  Could I confer with my folks for just a

7  second?

8      THE COURT:  Yes.

9      MR. MOORE:  Your Honor, we are rethinking a specific

10  venue issue with respect to Counts Two and Three.  Can we have

11  a moment to confer with the government?

12      THE COURT:  Briefly.

13      MR. MOORE:  Yes, sir.  I understand.

14      We adhere to our previous position.

15      THE COURT:  So I have two questions to get back to you

16  on.  One is whether I will give the multiple conspiracy

17  instruction as amended by Mr. Diskant or not give it at all.

18  And the other is the good faith language that was requested

19  with respect to the NCAA rules.  And I will tell you that

20  before we bring the jury in.

21      MR. MOORE:  Will we actually get a new written version

22  of your Honor's charge?

23      THE COURT:  We will when I am ready to charge.

24      MR. DISKANT:  I have two quick additions to propose.

25      THE COURT:  OK.

1    MR. DISKANT:  The first is that the government had

2  requested an instruction on motive and, in particular, the fact

3  that motive is not an element of the offense.  It's at page 32

4  of our requests.  Given some of the statements from Mr.

5  Schachter, in particular, we believe there is a predicate for

6  it here, and we would ask the Court consider giving such an

7  instruction.

8          Then the second --

9          THE COURT:  Let's take them one at a time.

10          You said it was at page 32 of your requests?

11          MR. DISKANT:  Yes, your Honor.  It's request 16.

12          THE COURT:  I see.  You're looking at different pages

13  than I am.

14          MR. DISKANT:  I can just hand it up if that's easier.

15          THE COURT:  All right.  Hand it up, please.

16          MR. MOORE:  Your Honor, again, I am from a different

17  district.  I am just wondering if when your Honor's actual

18  written version is final, even if it's final before tomorrow,

19  would your Honor consider allowing the parties to have copies

20  of the written instructions?  One of the reasons I am asking

21  for copies of your final written instructions is because I want

22  to adhere carefully to what your Honor told us in the robing

23  room yesterday.

24          THE COURT:  These are matters of mechanics at this

25  point.  I will accommodate you if I can and on reflection think

IAH8GAT2

1     it is right.  You know what I am trying.  You have been taking

2     notes.  Mr. Schachter has ever syllable down.

3              MR. MOORE:  I am not so sure that I do.

4              THE COURT:  Is there any objection to my charging the

5     government's request number 16?

6              MR. SCHACHTER:  Yes, your Honor.  Your Honor's

7     instruction already says twice that there is no obligation of

8     the government to show a financial interest in the outcome.  We

9     had asked and the government objected to us balancing that by

10    saying that a lack of financial interest is proof that there

11    isn't fraudulent intent.  But I think that the government's

12    request here on motive is subsumed in the Court's instructions

13    which twice already say that lack of financial --

14             THE COURT:  What page are you referring to?

15             MR. SCHACHTER:  One moment, your Honor.

16             Yes.  There's two.  There is one on page 32, lines 19

17    through 21.

18             THE COURT:  All right.  It seems to me that the way to

19    skin this cat is on line 19, after the word "outcome," to

20    insert the words "or other motive."  Insert the same two words

21    after the word "interest" on page 20.  And then pick up the

22    substance of the last sentence of the government's request

23    number 16, "The presence or absence of a financial interest or

24    other motive is, however," and then just following as was

25    requested.

IAH8GAT2

1          MR. SCHACHTER:  That's fine.

2          MR. DISKANT:  Yes.

3          THE COURT:  What else?

4          MR. DISKANT:  We had also requested that the Court

5    give a very brief instruction on the redaction of evidentiary

6    items.  There have been a lot of redactions in the case.  I

7    imagine this is uncontroversial, but we would ask the Court to

8    just instruct that certain things have been redacted and that

9    the jury doesn't need to concern itself with that.

10         THE COURT:  I am sure there are no objections to that,

11   right?

12         MR. SCHACHTER:  No objection.

13         THE COURT:  All right.  I am just going to make a note

14   to myself at page 52, when I talk about ignoring citations, I

15   will say something to that effect.  OK.

16         MR. SCHACHTER:  Just a last point.  We preserve for

17   the record the arguments that were made in our proposed jury

18   instructions and our objections to the government's proposed

19   jury instructions.  We heard your Honor loud and clearly,

20   although not successfully, that we should be brief today.

21         THE COURT:  My view of this is that we took into

22   account everything that was said in all of those voluminous

23   submissions.  Out of all of it comes this proposed charge.

24         MR. SCHACHTER:  Yes, your Honor.

25         THE COURT:  And if you haven't raised an objection or

IAH8GAT2

1    a request here this morning, in my view, it's not preserved.

2           There we are.  The Court of Appeals can do what it

3    wants should we ever get to that point.

4           There is a proposed verdict form.  I will have Rachel

5    pass it out, and it will become Court Exhibit F.

6           Do you have it already?

7           MR. MOORE:  She provided it this morning with the

8    charge.

9           THE COURT:  Any objections to the verdict form?

10          MR. SCHACHTER:  Our only request would be, when it

11   says Count One conspiracy to commit wire fraud, that just like

12   Count Two and three mention Louisville and Kansas, that that

13   have have a parenthetical that says university or universities.

14          THE COURT:  This is total trivial.

15          Thank you.  See you at 1:00.

16          (Luncheon recess)

17

18

19

20

21

22

23

24

25

1      **A F T E R N O O N   S E S S I O N**

2                              1:11 p.m.

3              (Mr. Mark and Mr. Haney present)

4              (Jury not present)

5              THE CLERK:  Please be seated.

6              THE COURT:  OK.  Are we ready to go?

7              I owe you an answer.  We are going to give the

8      multiple conspiracy charge as amended.  And the good faith

9      charge that was requested is in here, not in precise form but

10     in substance.

11             (The Court conferred with the law clerk)

12             THE CLERK:  Jury entering.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1    (Jury present)

2         THE CLERK:  Please be seated, everyone.

3         THE COURT:  Afternoon, folks.

4         The jurors and defendants all are present.

5         We are now going to hear closing argument, beginning

6    with the government.

7         Mr. Solowiejczyk.

8         MR. SOLOWIEJCZYK:  Thank you, your Honor.

9         THE COURT:  And let me just -- OK.  You anticipated

10   me.  Thank you.  Go ahead, Mr. Solowiejczyk.

11        MR. SOLOWIEJCZYK:  Good afternoon.

12        Ladies and gentlemen, you have now seen all of the

13   evidence.  You have heard all of the testimony.  And you now

14   know that these defendants are guilty.  Guilty because they

15   funneled tens of thousands of dollars in secret payments to the

16   families of student-athletes to get them to go to

17   Adidas-sponsored schools.  Guilty because they knew that those

18   secret payments made the student-athletes ineligible to

19   compete.  Guilty because they knew that the universities never,

20   ever, would have issued athletic scholarships to those

21   student-athletes had they known about these payments.  Guilty

22   because they went to great lengths to conceal and hide those

23   payments from the universities by arranging for envelopes

24   stuffed with cash to be handed off in New Jersey parking lots,

25   in Manhattan hotel rooms, by submitting bogus invoices to

1   Adidas to paper over the payments, by routing the payments

2   through multiple bank accounts in order to make them harder to

3   trace, and by using secret second phones to further conceal

4   their involvement.

5          Guilty because at bottom, ladies and gentlemen, they

6   committed fraud.

7          Now, ladies and gentlemen, you've learned a lot about

8   the underbelly of college basketball over the course of the

9   past two-and-a-half weeks.  You've heard about the five-star

10  recruits, the AAU basketball teams, the shoe wars, and the

11  black ops.  But when you cut through all of that, when you get

12  to the heart of the matter, this is a very simple case.  The

13  defendants caused lies to be told to universities.  They caused

14  information to be provided to them that was false in connection

15  with these universities' decision to award athletic

16  scholarships.  And as a result of those lies and that

17  concealment, universities provided athletic scholarship money,

18  actual money, to student-athletes who weren't even allowed to

19  compete in the sport for which they had received a scholarship.

20         If the universities had known about the defendants'

21  secret payment, they never would have issued those

22  scholarships, they never would have put themselves in harm's

23  way and risked NCAA penalties, fines, and forfeiture of

24  contests.  You now know all of that as well, ladies and

25  gentlemen, and, more importantly, so did the defendants.

1    In this country, when you lie to someone to get them

2    to part with their money, when you cause a university to issue

3    financial aid to students who aren't even entitled to it,

4    that's a crime.  It's called fraud.  And that's exactly what

5    the defendants did here.  Because let's be very clear about

6    something, ladies and gentlemen, just because this case happens

7    to take place in the world of college basketball, it doesn't

8    mean that the same laws do not apply.  They very much apply.

9    Plain and simple.

10   So, ladies and gentlemen, the purpose of this closing

11   statement is to walk through all of the evidence that proves to

12   you beyond a reasonable doubt that these defendants are guilty,

13   and that evidence in this case has been overwhelming.  So I

14   want to start out by talking to you about the key reasons why

15   you know these defendants are guilty.  So let's start with the

16   first reason.

17   You know the defendants are guilty because you know

18   that the defendants made these payments, secret payments, tens

19   of thousands of dollars, to the families of student-athletes in

20   connection with those student-athletes attending

21   Adidas-sponsored schools.  You know this is the case from the

22   overwhelming evidence that the government has presented over

23   the past two-and-a-half weeks.  Wiretap recordings, text

24   messages, bank records, phony invoices that were submitted to

25   Adidas, taken together they all show you that these defendants

1  were each integrally involved in the payments to the families

2  of student-athletes.

3          I'm just going to walk you through very briefly,

4  ladies and gentlemen, that evidence right now.

5          So let's start by talking about the plan that Jim

6  Gatto, Merl Code and Christian Dawkins cooked up to pay a

7  hundred thousand dollars to the father of Brian Bowen to get

8  his son to attend the University of Louisville, an

9  Adidas-sponsored university.  Ladies and gentlemen, you know

10  from all the evidence that we have presented to you exactly

11  what happened here.  In May of 2017, Brian Bowen Junior still

12  had not decided which school he was going to commit to.  And

13  Christian Dawkins seized on that opportunity.  He knew that Jim

14  Gatto and Merl Code were willing to pay tens of thousands of

15  dollars to get Bowen to go to an Adidas-sponsored university.

16          So, Dawkins reached out to Merl Code and he asked

17  him -- this was in the text messages -- "Any Adidas schools

18  that make sense for Bowen?"  that was May 18th of 2017.  And as

19  you know from the text messages, Merl Code wanted to make sure

20  that Bowen went to an Adidas school.  And he wanted to make

21  sure that Bowen did not attend the University of Oregon, which

22  was a Nike-sponsored school, as you heard.  And as you know,

23  Nike was a rival of Adidas.  You heard a lot about that during

24  this trial.

25          And Code said it himself in a text message to Dawkins

1  a few days later. "don't send Bowen to Oregon. Call me."

2  Because the only reason Code was doing this was he wanted to

3  make sure that Adidas got top players going to Adidas-sponsored

4  universities.

5          In the days that followed, Christian Dawkins, Merl

6  Code and Jim Gatto struck a deal. A dirty deal. Bowen Senior

7  would get a hundred thousand dollars in four installments of

8  $25,000 each. These payments would be funded using phony

9  invoices that Merl Code submitted to Adidas and that Jim Gatto

10  pushed through at Adidas. And Bowen Junior would commit to

11  Louisville.

12          And you saw Dawkins tell Code himself, on May 30th:

13  Tell Jim. Let's get it done. I have to discuss with you the

14  set up in the a.m.

15          And you saw it the next day, Dawkins telling Code

16  again: The deal is pretty much done. Just need to get

17  everything lined up with Gatto and we can get scholarship

18  papers signed. I can hold off Oregon, I'm pretty sure.

19          And Code responded minutes later, on May 31st, that

20  the deal was set. It's done. We just need to get the letter

21  of intent signed, not just the scholarship papers.

22          And as you know, ladies and gentlemen, the day after

23  these text messages were exchanged, Brian Bowen committed to

24  Louisville and signed his Financial Aid Agreement.

25          You also know what happened next, ladies and

1    gentlemen.  As you heard from the wiretap calls that were

2    played for you during the trial, there were issues getting that

3    first $25,000 funded.  The phony invoice that Merl Code put in,

4    it wasn't approved as quickly as Merl Code and Jim Gatto

5    wanted.  And you heard Dawkins tell Munish Sood all about this

6    in a wiretap call on July 7th of 2017.

7            He told him that the payment was for Brian Bowen to go

8    to Louisville, and he told him that the first $25,000 was held

9    up.  And so they had an ask.  The ask was they wanted Munish

10   Sood and Jeff DeAngelo, Christian Dawkins' new business

11   partners, to front the first $25,000.  And you heard the call

12   where Merl Code talked to both Munish Sood and Jeff DeAngelo

13   about that.  And he, just like Dawkins, explained exactly what

14   this money was for, ladies and gentlemen.  That's the next

15   exhibit.

16           He told them -- he told them that he was introducing

17   them to the shoe wars and how stuff happens with kids in

18   getting into particular schools, and this is kind of one of

19   those instances where we needed to step up and help one of our

20   flagship schools in Louisville, you know, secure a five-star

21   caliber kid.  So obviously that helps, you know, our potential

22   business in terms of, in terms of Adidas.

23           And, ladies and gentlemen, you know what happened

24   after that.  On July 13, 2017, Munish Sood met Brian Bowen

25   Senior in a parking lot in New Jersey, and he handed him an

1  envelope that contained close to $20,000 in cash.  Brian Bowen

2  Senior told you about that.  Munish Sood told you about that.

3  And you heard about it in all the wiretap calls around that

4  time.

5           And, ladies and gentlemen, you also know that the

6  defendants were in the process of making the second $25,000

7  payment.  You saw the second phony invoice that Merl Code

8  submitted to Gatto from the Karolina Khaos.  But, ladies and

9  gentlemen, you know that payment never happened because before

10  the payment could be made to Bowen Senior, the defendants'

11  scheme was stopped dead in its tracks and they were arrested.

12          And, finally, ladies and gentlemen, when it comes to

13  the Bowen scheme, you know that Jim Gatto was integrally

14  involved in all of this.  You know he was the one that was

15  approving the sham invoices to fund these payments.  And you

16  actually heard Gatto, on multiple occasions, talking about the

17  details of the payments.  And this is just one example where he

18  was talking to Merl Code, and he specifically acknowledged, he

19  asked Merl Code, "What do we do with Bowen?  A hundred?"  he

20  knows the amount of money they promised Brian Bowen.  Just like

21  Code and Dawkins, he was integrally involved in these payments.

22          So when you take all of that together, there can be no

23  dispute that these payments happened and that Jim Gatto,

24  Christian Dawkins and Merl Code were involved in these payments

25  from the outset.

1    Now, ladies and gentlemen, as you heard, the scheme to

2 funnel these payments to Brian Bowen's father, this wasn't the

3 first time that Jim Gatto had been involved in this.  This was

4 not his first rodeo.  In fact, you heard that he had been

5 involved in making very similar payments to the families of

6 other student-athletes to get them to go to other

7 Adidas-sponsored schools.

8    So, let's start with Dennis Smith Junior.  You heard

9 about him.  And TJ Gassnola told you all about this scheme.  He

10 told you that he went down to North Carolina and made a -- and

11 gave $40,000 to Orlando Early, an assistant coach at NC State,

12 and that money was intended for Dennis Smith's father.  And the

13 reason for the payment was because they were nervous that

14 Dennis Smith Junior wasn't going to actually commit to NC

15 State, that he was going to leave NC State.

16    And, Ms. Lee, if we could just go back to the previous

17 slide very briefly.

18    And what TJ Gassnola told you -- I'm going to walk you

19 through some examples of it -- it's corroborated by all of the

20 evidence that was presented to you.  So let's walk through a

21 couple of those things.

22    He told you that he went down to North Carolina in

23 early November.  Well, there is a credit card record from TJ

24 Gassnola showing that he went on a flight to Raleigh.  There is

25 a bank record showing that a few days before that, he took out

1    $30,000.  And there are also wire transfers from Adidas that

2    came in around this time that total $40,000 and that were used

3    to fund these payments by Gassnola, to reimburse him for these

4    payments, as you heard

5            So you know that what TJ Gassnola told you is

6    corroborated by all of the evidence.

7            And you know that Jim Gatto participated in this

8    scheme to make payments to the Smith family.  You heard about

9    it from TJ Gassnola, and you know it because the reason these

10   wire transfers were Adidas went to the New England Playaz, you

11   know why that happens.  Because Jim Gatto is the one that

12   approves the sham invoices.  That money doesn't get to the TJ

13   Gassnola without Jim Gatto approving it.

14           Ms. Lee, we can skip ahead to the phony invoices.

15           Go back one, Ms. Lee

16           One other thing you know, ladies and gentlemen, you

17   know that Dennis Smith committed to NC State less than two

18   weeks after TJ Gassnola made that payment, that payment that he

19   made with Jim Gatto.  That was less than two weeks after he

20   made that payment.  And that's no coincidence, ladies and

21   gentlemen.

22           So I want to also talk to you, ladies and gentlemen,

23   about another scheme that Jim Gatto was involved in.

24           You can move ahead a few slides, Ms. Lee.

25           And those are the payments to Billy Preston, the

1    payments to Billy Preston's mother, of Kansas.  And TJ Gassnola

2    told you about these payments.  They total $90,000, and they

3    were made in multiple installments.  And the first payment was

4    a $30,000 cash payment in Manhattan.  Mr. Gassnola told you

5    that he met Ms. Player, Billy Preston's mother, in a Manhattan

6    hotel room and gave her $30,000.  And I want to walk through

7    why you know that that's what happened, because it's all

8    corroborated by the evidence.

9         So, going on to the next slide, Ms. Lee.

10        TJ Gassnola told you that he came to New York on

11   November 1, 2016 to make this payment to Ms. Player.  Well, you

12   know he was in New York on November 1, 2016.  There is a

13   parking receipt.  He parked his car in New York.

14        And who did TJ Gassnola call the same day that he made

15   that $30,000 payment to Nicole Player?  He called Jim Gatto.

16   Because that's who he was coordinating with when it came to

17   these secret underground payments, like the payment to

18   Ms. Player.

19        And Gassnola told you, when he testified, about the

20   conversations that he had with Gatto when it came to the Billy

21   Preston payment.  He told you that:  Sometime after, Jim and I

22   had conversations all the time.  One of my conversations was

23   Billy Preston's family is in a good place.

24        And he told you what that meant.  It meant that they

25   had gotten money from us and that they are in a good place.  He

1   told Jim Gatto that.

2          You also know, ladies and gentlemen, that one day

3   before TJ Gassnola made that payment on November 1, 2016, you

4   know that he took $50,000 out of his bank account, out of his

5   New England Playaz bank account.  That is one day before the

6   November 1st meeting.  And you also know that that was money

7   that he had recently gotten from Jim Gatto at Adidas.  You've

8   seen the phony invoice that Gassnola submitted, and which you

9   know Gatto approved, that was submitted shortly before this

10  payment was made.

11         And that phony invoice was dated October 15, 2016.  It

12  was for $50,000.  And it was supposedly for basketball team

13  tournament fees.  But, ladies and gentlemen, as you heard from

14  both Mr. Gassnola and from Ricky Robertson, who ran the

15  Karolina Khaos, basketball tournament fees range from $500 to a

16  thousand dollars.  And everybody in the college basketball

17  world, in the grassroots world, knew that.  So this phony

18  invoice that Jim Gatto approved, it was fake on its face.  It

19  was pure fiction.  It was pure bogus invoice.  And there is no

20  way Gatto didn't know that when he approved it.

21         These phony invoice, ladies and gentlemen -- I'm going

22  to talk about them a little bit later in more detail -- they

23  are devastating evidence that Jim Gatto knew that what he was

24  doing was wrong.  They show the length that Jim Gatto would go

25  to to hide and conceal the payments, and that's very, very

1   important evidence that I am going to talk to you about in more

2   detail later.

3          And, ladies and gentlemen, you've also seen the wire

4   transfer record from Adidas in the amount of $50,000 on

5   October 21, 2016, just a few days before Gassnola made the

6   withdrawal of cash to give to Nicole Player, Billy Preston's

7   mother.

8          And all of this, that November 1st payment, once

9   again, just like the Dennis Smith payment, it comes right

10  before a very critical juncture, a very critical decision.  And

11  what decision does Billy Preston make?  Well, on November 9,

12  2016, he commits to the University of Kansas.  And that's no

13  coincidence either, ladies and gentlemen.

14         Ladies and gentlemen, we also showed you the other

15  phony invoices that were used in connection with the payments

16  to Preston's mother.  Again, tournament activation fees in the

17  amounts of $70,000, which were fake on their face and Jim Gatto

18  knew it.  And you also saw, as Mr. Gassnola told you, when it

19  came to the last few payments, he got what he described as

20  lazy, and he sent a straight wire transfer to Billy Preston's

21  mother.  And you saw evidence of that as well during this

22  trial.

23         So if you take all of that evidence together, ladies

24  and gentlemen, there can be no question that TJ Gassnola and

25  Jim Gatto were making payments to the mother of Billy Preston.

1    And how else do you know that Gatto and Gassnola made

2    these payments to Billy Preston, his family?  Well, remember

3    what Brian Bowen Senior told you.  He told you that Dawkins

4    used the payments that Gatto had agreed to make to Preston to

5    drive up the amount that Gatto and Code were going to have to

6    pay to get Bowen Senior to commit to Louisville.

7    If we could just bring up that testimony, Ms. Lee.

8    He told you, specifically, that the number started

9    around 60 or 80 and then it rose to a hundred.  And the reason

10   why?  There was a player kind of similar to my son, I guess

11   that went to an Adidas school, Kansas, Billy Preston, and he

12   had gotten $100,000.

13   So, that's another reason you know that this payment

14   happened.

15   And, ladies and gentlemen, you also heard about --

16   from TJ Gassnola about the player named Silvio De Sousa and

17   payments to his guardian to get him to commit to the University

18   of Kansas.  And you know that Gassnola and Gatto were planning

19   to make this payment before the charges in this case came to

20   light.  TJ Gassnola told you about it when he testified.  But

21   you also heard Jim Gatto and TJ Gassnola talk about that

22   payment in a wiretap recording, Government Exhibit 2.  And you

23   heard Gassnola describing to Gatto exactly what he needed.  He

24   told him:  "I gotta send this guy another 20 grand out on

25   Wednesday because I gotta get him out from under this Under

1   Armour deal, the deal he's got with this guy who was taking

2   care of him.  He wants his money bank now because the kid

3   didn't go to Maryland.  So I got to stay on top of that."  You

4   heard that call between Gassnola and Gatto.

5        In that same call, you heard Gassnola tell Gatto about

6   accounting for what he referred to as the "underground stuff."

7   Jim Gatto knew exactly what that meant.  The underground stuff

8   was these secret payments to the families of student-athletes

9   to get them to go to Adidas-sponsored schools.

10       And finally, ladies and gentlemen, you heard in

11  another wiretap call, on Jim Gatto's phone, that he was talking

12  about potentially making yet another payment to the family of

13  another student-athlete, Nassir Little, in connection with

14  seeking to have Nassir Little commit to the University of

15  Miami.  Gatto and Code had spoken.  Gatto -- Gatto knew that

16  they had another Louisville TJ situation except it's with Miami

17  this time.  And you heard on the call Gatto ultimately did not

18  go forward with those payments.  There was not budget for it,

19  among other things, as you heard.

20       But that's not the point.  The point of these calls is

21  to show you how Gatto operated, and that time and time again he

22  made or contemplated making payments to the families of

23  student-athletes to get them to attend Adidas-sponsored

24  schools.  That's what all the evidence in this case has shown

25  you.

Iahdgat3                    Summation - Mr. Solowiejczyk

1          So, ladies and gentlemen, let me turn now to the

2   second reason why you know these defendants are guilty, and

3   that's the reason why the defendants made these payments.

4          Gatto and Code, as you've seen from the timeline of

5   events, they weren't just -- and Christian Dawkins as well,

6   they weren't just paying any parent of any player.  They were

7   making payments to the families of specific players and for a

8   specific reason, players who they wanted to attend

9   Adidas-sponsored schools.  And they made those payments at a

10  specific juncture, right around the time when the

11  student-athlete was deciding which college to attend.  You saw

12  that from the timeline of events that we just reviewed.  Time

13  and time again the payments were made shortly before these

14  student-athletes committed to attend Adidas-sponsored schools.

15         And Gatto and Code wanted these student-athletes to

16  commit to Adidas-sponsored schools because it was important to

17  them and their ultimate objectives to make sure that Adidas won

18  what the defendants called the shoe wars.  They wanted high

19  school athletes playing on Adidas grassroots teams to go to

20  Adidas-sponsored schools and ultimately, when they turn pro, to

21  sign marketing deals with Adidas.  Merl Code told you about

22  that himself during a meeting in Manhattan in June of 2017 that

23  we showed you a video of towards the beginning of this trial.

24  This is what Code said:

25              (Audio played)

1    So, ladies and gentlemen, you know why Merl Code was

2    involved in making these payments.  He said it himself.  You

3    also know, ladies and gentlemen, why Christian Dawkins was

4    making these payments.  He wanted to sign these

5    student-athletes, kids like Brian Bowen, to lucrative contracts

6    with his new sports management company when these players

7    turned pro.  And he wanted to control these players from high

8    school to college and from college to the pros.  And getting

9    them some money from Adidas to go to an Adidas-sponsored

10   school, that helped him in that longterm goal, because there

11   was no better way for Dawkins to ingratiate himself with these

12   families than to facilitate a $100,000 payment to them.  That's

13   why he turned to Merl Code and Jim Gatto when it came to the

14   Brian Bowen deal.

15   Now, ladies and gentlemen, you also know that the

16   defendants are guilty because there is not and cannot be any

17   dispute that the defendants were not allowed to be making these

18   payments.  Indeed, defense counsel told you themselves during

19   their opening statements, there is no dispute that these

20   payments were all are flagrant NCAA rules violations.

21   Mr. Gatto's attorneys told you this.  Mr. Code's attorneys told

22   you this.  And Mr. Dawkins' attorneys also told you that.

23   But more significantly, ladies and gentlemen, there

24   also can be no dispute that the payments that these defendants

25   were involved in, they made the student-athletes, whose

1  families got those payments, ineligible to compete.  And that's

2  a very important point

3       As you heard from each of the compliance officers that

4  testified during this trial, the players were ineligible

5  regardless of whether they had knowledge of the payments to

6  their parents.  You heard that from each and every one of the

7  compliance officers.  John Carns, from Louisville, told you

8  that.  He told you that it didn't matter if the student-athlete

9  had no knowledge of the payment because regardless of whether

10  the student-athlete or their family member accepts a benefit,

11  the student-athlete is still culpable for that violation.

12       Carrie Doyle, from NC State, told you that.  She told

13  you that a payment to the parent of a student-athlete could

14  affect the student-athlete's eligibility irrespective of

15  whether the student-athlete knew of the payment.

16       Jeff Smith, from Kansas, told you the same thing when

17  it came to Billy Preston.

18       So, these payments, they made these players

19  ineligible.

20       Ladies and gentlemen, you also know these defendants

21  are guilty because you know, from all the evidence and all the

22  testimony, that these universities would not have issued

23  scholarships, athletic scholarships, to these student-athletes

24  had they known about this.  Because these universities don't

25  issue athletic scholarships to student-athletes that aren't

1  even eligible to compete.  And all of the evidence that was

2  presented to you, ladies and gentlemen, it shows you that these

3  schools, these large public universities that were actually

4  paying for these scholarships, they cared a great deal about

5  this.  These universities cared enough that they employed teams

6  of professional compliance officers whose job it was to ensure

7  that the universities did not violate NCAA rules.  And it was

8  their job to ensure that all the student-athletes that took to

9  court were actually eligible.

10       You saw that the universities had forms,

11  questionnaires, training sessions.  They asked lots of

12  questions.  And they had a right to expect honest answers,

13  ladies and gentlemen.  There could be no reasonable doubt that

14  had these universities known of the payments, the secret

15  payments that these men made of tens of thousands of dollars,

16  the payments that render these student-athletes ineligible to

17  compete, these universities never would have issued these

18  athletic scholarships.  Each and every university official who

19  testified during this trial told you that in no uncertain

20  terms.

21       John Carns, from the University of Louisville, told

22  you that.  He told you that if he had known about these

23  payments to Bowen's father, he would not have -- they would not

24  have issued a scholarship, or they would have canceled any

25  scholarship that had been issued.

1    The same is true for Carrie Doyle when it came to

2  Dennis Smith Senior.  She told you that if they had found out

3  about these payments, they would have investigated the

4  information, and if it was true, they wouldn't have provided an

5  athletic scholarship to Dennis Smith Junior, or if he had

6  already gotten aid, they would have canceled that aid.  And

7  Jeff Smith, from Kansas, he told you the same thing when it

8  came to Billy Preston.

9    And, ladies and gentlemen, I'm going to ask you at

10  multiple points during this summation to use your common sense,

11  and my colleague, Mr. Mark, asked you to do the same during his

12  opening.  Use your common sense when it comes to this point.

13  You heard that these athletic scholarships are highly coveted.

14  Each university only was allowed to award 13 athletic

15  scholarships every year.  So, why would a university waste a

16  scholarship on a student-athlete who wasn't even eligible to

17  compete?  The answer is simple.  They wouldn't.

18    Ladies and gentlemen, you also know these defendants

19  are guilty because you know that the information that was

20  provided to these universities, it was false.  There can't be

21  any dispute about that either.  And that was crucial.  That was

22  the whole point of these defendants' scheme.  To make their

23  scheme work, for the players to ever get on the court wearing

24  that Adidas Jersey, the defendants knew full well that these

25  universities had to be lied to, because each of these

1   universities required their student-athletes to complete

2   numerous forms in which they represented that they were

3   eligible to compete.  And when it comes to the student-athletes

4   we are talking about in this case, that simply wasn't true.  It

5   wasn't true because of these defendants, because of the secret

6   payments that these defendants had made to the parents of these

7   players.  Those payments made these players ineligible to

8   compete.

9           Every single student-athlete was required to complete

10  the same form.  It was called the student-athlete statement,

11  and you saw it multiple times during the trial.  And I'm just

12  going to put up Brian Bowen's form.  But all the other

13  players -- Dennis Smith, Billy Preston -- they all filled out

14  the same form.  And as you know, Brian Bowen signed this on

15  June 9th, just a couple of days after the dirty deal was

16  struck.

17          And I want to focus you in particular, ladies and

18  gentlemen, on the section of this document that's called the

19  "Statement Concerning Eligibility," which sort of speaks for

20  itself.  The point of this part of the document is that the

21  player is certifying their eligibility.

22          And I want to take a moment, ladies and gentlemen, to

23  just walk you through this form in a little bit of detail, and

24  to remind you what the compliance officers, who are versed in

25  these topics and these forms and rely on them and have -- deal

1  with these issues all the time, what they told you about the

2  meaning of these forms and what these forms meant to their

3  universities.

4        So, Carrie Doyle told you exactly what the athlete

5  certifies in this section of the student-athlete statement.

6  The words on the form mean exactly what they say.  In this

7  form, the student-athlete certifies that they're eligible for

8  competition.  Ms. Doyle was asked what Dennis Smith was

9  representing in this section of the document, and she told you

10  that he is eligible for competition.  Pretty basic point.

11        And you know, ladies and gentlemen, when these

12  student-athletes certify that they were eligible, in reality

13  they weren't.

14        In the student-athlete statement, the student-athlete

15  also certified that all information provided to the NCAA, the

16  NCAA Eligibility Center and the institution's admissions office

17  is accurate and valid, including ACT or SAT scores, high school

18  attendance, completion of course work and high school grades,

19  as well as your amateur status.  And John Carns, from

20  Louisville, explained to you what this section of the form

21  meant.  He told you that the NCAA Eligibility Center, he told

22  you about that during his testimony, and that the purpose of

23  the NCAA Eligibility Center was to make an initial

24  determination if student-athletes were eligible.  That was the

25  point of the NCAA Eligibility Center.

1    And he told you that the representation about amateur

2    status, it's what all these witnesses have been talking about

3    all the trial. A very basic concept. That when you're an

4    amateur athlete, you can't get paid to play and neither can

5    your parents.

6    And turning to the next portion of this form, just a

7    few lines down, the student-athlete also represents on the form

8    that they've reported to the director of athletics, or his or

9    her designee of your institution, any violations of NCAA

10   regulations involving you and your institution. Well, ladies

11   and gentlemen, that wasn't true, either, when it came to these

12   student-athletes, because all of them had been involved in a

13   violation of NCAA rules due to the fact their parents took

14   money and none of them had reported any such violations at the

15   time they signed the form. That is yet another statement in

16   this form that is not true

17   And let me direct you finally to the statement at the

18   bottom of the form which tells the player that they are

19   affirming that they understand that if they sign this statement

20   falsely or erroneously, they violate NCAA legislation on

21   ethical conduct and can further jeopardize their eligibility.

22   Ms. Doyle, who, as she testified, had worked at the

23   NCAA for years and had worked there as a compliance officer for

24   years after that told you about the significance of this. She

25   told you that it didn't matter whether the student-athletes

1    knew the form was false at the time they completed it.  It

2    doesn't matter.  Providing false information on this form,

3    that's yet another separate violation and that can also

4    jeopardize your eligibility.  So this section of this

5    student-athlete statement, the point is it contains multiple

6    statements that are demonstrably false.  And the reason the

7    information provided on the forms were demonstrably false is

8    because of these defendants and their secret payments.

9              Now you also heard, and you saw, that these

10   universities require the student-athletes to complete other

11   forms in which they made additional representations about their

12   eligibility, in compliance with NCAA rules.  I am just going to

13   go through a few of them.  I am not going to try to put you to

14   sleep with these forms.

15             But if you take a look at the Financial Aid Agreement,

16   this was the one signed by Brian Bowen.  In it, he indicated

17   that he understood that his scholarship could be immediately

18   reduced or canceled at any time if he rendered himself

19   ineligible for intercollegiate competition.  And John Carns,

20   the compliance officer from Louisville, told you exactly what

21   could cause him to be rendered ineligible from intercollegiate

22   competition -- not meeting NCAA amateurism or academic

23   requirements, not being admissible to the institution.

24             You saw that NC State had numerous forms above and

25   beyond the Financial Aid Agreement and the student-athlete

1    statement that Dennis Smith Junior completed, and those forms

2    were also filled with information that was false because of the

3    payments that Jim Gatto was involved in.  And this form says it

4    itself.  He represented that he had not been involved in a

5    possible violation of NCAA rules.  Obviously, ladies and

6    gentlemen, he had been because his father had taken money.

7    That was because of Jim Gatto.

8           And, finally, there were the Kansas forms, and they

9    also had a Financial Aid Agreement that contained similar

10   representations that Billy Preston made in connection with his

11   getting a scholarship at Kansas.

12          And, ladies and gentlemen, there can be no serious

13   dispute that the universities relied on the answers that were

14   provided on these forms.  Every single compliance officer told

15   you the same exact thing:  If these payments had been disclosed

16   on the forms, the universities never would have issued the

17   scholarships.

18          Ladies and gentlemen, let me say one other word about

19   these forms, briefly.  To be clear, the defendants did not

20   themselves make the misrepresentations to the universities that

21   are on these forms.  They didn't themselves complete the forms.

22   That's obvious.  But that isn't the question.  The question,

23   ladies and gentlemen, is whether the defendants willfully

24   caused false certifications to be made.  And, ladies and

25   gentlemen, of course they did.  Because they knew these forms

1   were going to be completed by the student-athletes.  They knew

2   the universities were going to ask these questions regarding

3   eligibility, because every university does, and by their

4   actions, by their payments, they caused the answers to those

5   questions on those forms to be false.  In short, they caused

6   false representations to be made to the universities.

7           And, ladies and gentlemen, the defendants of course

8   knew that the student-athletes and their parents would provide

9   false information.  And you don't have to guess as to this

10  point, because you heard, for example, that when the University

11  of Kansas started investigating Billy Preston's eligibility and

12  certain payments that involved TJ Gassnola to the mother of

13  Billy Preston, Nicole Player, you heard exactly what Nicole

14  Player did and you saw it in the text messages, as well.  She

15  what Jim Gatto and TJ Gassnola expected she would do.  She lied

16  about those payments.  And as you saw from the text message

17  exchange between Ms. Player and her son, she instructed her son

18  to lie as well.  She told him:  "you don't know, you don't

19  know.  I don't care what they say to you.  You don't know."

20  And Billy Preston responded, "Got you."

21          Ladies and gentlemen, you also know that the

22  defendants are guilty because you know that the defendants'

23  conduct caused the universities harm.  The universities were

24  harmed in two distinct ways.  First, they were deprived of

25  something of value, namely, the money used to fund these

1  athletic scholarships.  The scholarship that Louisville issued

2  to Brian Bowen, for example, consisted of approximately $40,000

3  in aid.  That's actual money that -- that's actual money that

4  went out the door.  This is Bowen attended summer school.  He

5  ate food.  He lived in a dorm.  Real costs the University of

6  Louisville bore under the false impression that Bowen was

7  eligible to receive an athletic scholarship when he wasn't.

8  The same is true for Silvio De Sousa, Dennis Smith and Billy

9  Preston.

10         But there's a second kind of harm that these

11  defendants exposed these universities to as well.  Because as I

12  expect Judge Kaplan will instruct you, a victim can be deprived

13  of money or property when it is deprived of the ability to make

14  an informed economic decision about what to do with its assets

15  in a way that could have caused or did cause tangible economic

16  harm to the universities.

17         And Judge Kaplan is going to instruct you on the law,

18  and his instructions govern and you should listen carefully to

19  those instructions.

20         But, ladies and gentlemen, you know that's exactly

21  what happened here.  Because as you heard, issuing a

22  scholarship to an ineligible player, allowing an ineligible

23  player to compete for the school, it exposed the universities

24  to the very real risk of fines and other penalties that could

25  be imposed by the NCAA.  You heard about this from the

1  compliance officers who testified.  Carrie Doyle, from NC

2  State, told you all about the types of penalties that could be

3  imposed.  There could be financial fines, recruiting

4  restrictions, scholarship reductions, post-season bans.  They

5  can be forced to forfeit games and vacate records.  And if a

6  student participated while ineligible during an NCAA

7  championship post-season, the institution might be required to

8  return revenue that they had received from the NCAA in

9  connection with that NCAA champion play.  So, these penalties

10  aren't hypothetical.

11        And as you heard through a stipulation that all of the

12  parties agreed to, a rogue employee at the University of

13  Louisville engaged in rules violations back in 2010 through

14  2014.  What was the result of that?  Because Louisville had

15  played athletes who turned out to be ineligible, Louisville was

16  stripped of its 2013 national championship and it was forced to

17  forfeit approximately $500,000, and those are among other

18  penalties that were imposed.

19        And you also heard that if a school is already on

20  probation at the time another violation occurs, like Louisville

21  was, that's an aggravating factor that can mean even more steep

22  penalties for the school.  Carrie Doyle explained that to you

23  as well during her testimony.  She told you about how being on

24  probation could be an aggravating factor for the NCAA

25        So that's a long way of saying that this is why the

1   universities cared about this, ladies and gentlemen.  They

2   cared because they had no choice but to comply with these

3   rules.  They could not and would not issue a scholarship to an

4   ineligible athlete like Brian Bowen because they didn't want to

5   run the risks of being exposed to these kinds of harms.

6           Now, ladies and gentlemen, you also know that the

7   defendants are guilty because you know that the defendants knew

8   all of this, everything that I just went through.  They knew

9   these payments weren't allowed.  Dawkins and Code told you that

10  themselves in recorded telephone calls and in recorded meetings

11  that you heard.  Christian Dawkins said it very simply.

12          (Audio played)

13          And, ladies and gentlemen, you also know that

14  Christian Dawkins and Merl Code, as well as Jim Gatto, men who

15  were steeped in the world of college basketball, they knew that

16  these universities had professional compliance departments, and

17  what they were trying to do is get around those people.  You

18  actually heard Mr. Code and Mr. Dawkins talk about this during

19  a recorded meeting in New York.  Merl Code talks about how

20  people can start asking questions, you know, folks, you know,

21  compliance officers at the schools.  I mean, I was getting

22  calls when he -- Christian Dawkins -- showed up at Clemson, I

23  was getting calls.  Why is he here?  They were calling to me.

24  I guess he's down there recruiting.  I don't know.

25          So, it's no secret to these defendants that there were

1  these compliance officials at these universities whose job it

2  is to ensure that these universities comply with NCAA rules.

3  Everybody knows that in the world of college basketball.

4      And the defendant also knew that if the payments were

5  discovered, the student-athletes would be deemed ineligible and

6  they would never get the scholarship.  And the defendants,

7  ladies and gentlemen, they knew that the student-athletes would

8  have to complete and submit paperwork to the universities in

9  order to get that athletic scholarship.  Of course they knew

10 the answers would be false; I've explained to you why.  And

11 they knew false answers had to be provided because if they

12 weren't, the entire scheme would go up in smoke if these

13 payments were disclosed.  The student-athlete would be deemed

14 ineligible.  They wouldn't play in college.  And as you heard,

15 that would greatly diminish their ability to ultimately get to

16 the pros.

17     And you know that as well from the defendants' own

18 words.  Just going back to some of the text messages I showed

19 you a little bit earlier about Brian Bowen's commitment, when

20 Dawkins tells Merl Code that Bowen has decided to commit to

21 Louisville, what are the next words out of Dawkins' mouth?

22 What's the obvious next step that has to happen?  "just need to

23 get everything lined up with Gatto and we can get scholarship

24 papers signed."  "Scholarship papers signed."  Because

25 everybody knows that that's the next thing you have to do if

1  you're committing to a university.  These defendants knew that.

2       And Merl Code responded that he understood the same.

3  "We need to get the letter of intent signed, not just the

4  scholarship papers."

5       So these defendants knew very well -- you can see it

6  in black and white -- that Brian Bowen would be submitting

7  paperwork to get the scholarship, and of course they knew the

8  information regarding his eligibility would be false.

9       You also know that the defendants knew about the risks

10 that their conduct imposed upon the universities.  They were

11 steeped in and knew an awful lot about the world of college

12 basketball, in grassroots basketball; that's become clear

13 during this trial from all the calls you heard and from all of

14 the testimony

15      And anyone who worked in college basketball knew that

16 payments of tens of thousands of dollars to the parents of

17 student-athletes in connection with their children attending

18 Adidas-sponsored schools could result in serious trouble,

19 serious problems for the universities.

20      And, ladies and gentlemen, there's been very little

21 evidence that the universities wanted to take on any of those

22 risks.  To the contrary, every university witness told you

23 exactly the opposite, that they had no desire to take on

24 players who were ineligible and could lead to penalties for the

25 universities.

1      And TJ Gassnola, another member of the defendant's

2  conspiracy, he told you that himself.  He was a consultant for

3  Adidas, just like Merl Code, and he knew that the secret

4  payments that he and Jim Gatto were funneling from Adidas to

5  Billy Preston's mother could spell big trouble for the

6  University of Kansas if those payments ever came out.  He knew

7  that NCAA sanctions could be imposed.  He told you that himself

8  when he testified.  He was asked, "Would did you expect could

9  happen if these payments weren't concealed well?"

10      "They would lose their eligibility, people would lose

11  jobs, and Kansas could have sanctions laid on them from the

12  NCAA."

13      And given the testimony you heard from the compliance

14  officers, ladies and gentlemen, that makes good sense, because

15  if the payments were discovered, there can't be any real

16  dispute that these universities were exposed to the risk of

17  serious harm.  The defendants knew that at the time they made

18  these payments.

19      so, ladies and gentlemen, I now -- I want to turn to

20  what is a core issue in this case.  Did the defendants, in

21  making these secret payments, and knowing the universities

22  would be misled and knowing the universities would issue

23  scholarships based on false and misleading information, did

24  they do all of that with the intention of defrauding the

25  universities?  Of course they did.  I expect Judge Kaplan will

1  tell you that a person acts with a specific intent to defraud

2  when he acts with the intent to deceive and for the purpose of

3  depriving the relevant university of something of value.

4          Now, ladies and gentlemen, you know the defendants

5  intended to defraud.  You know that in two ways.  First, they

6  deprived the universities of the value of the scholarship, and,

7  as we discussed, tens of thousands of dollars went out the

8  door.  And, second, they also deprived them of the ability to

9  make an informed economic decision about what to do with their

10  money or their property, that is, who to award scholarships to

11  in a way that could have caused or did cause tangible economic

12  harm to them.

13          Ladies and gentlemen, when you consider all of the

14  evidence in this case and you apply the law to that evidence,

15  there is only one logical conclusion to be drawn -- that the

16  defendants intended to defraud the universities.

17          So, how do you know that?  You know that because it

18  was the entire point of the defendants' scheme.  They had to

19  hide and conceal these payments from the universities, from the

20  NCAA, and from the outside world.  Because the defendants knew

21  that if the universities found out about these secret payments,

22  their whole plan was going to be ruined.  Kids wouldn't be able

23  to play in college, wouldn't wear the Adidas brand on national

24  TV.  It would be far more difficult for them to ever make the

25  pros and sign those lucrative contracts with Jim Gatto and Merl

1    Code of Adidas.  You heard that from Munish Sood and also the

2    signed lucrative contract with Christian Dawkins' management

3    company.

4          You heard that from Munish Sood, TJ Gassnola and from

5    Brian Bowen Senior, how important it was for these kids to play

6    in college if they were ever going to make it to the NBA, where

7    the defendants really hoped to cash in on them.

8          And, ladies and gentlemen, I'm going to walk you

9    through the many different ways that these defendants sought to

10   conceal what they were doing from the universities.  As you are

11   evaluating whether the defendants had the intent to defraud

12   these universities, stay focused on this evidence.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1    MR. SOLOWIEJCZYK:  Because the lengths these

2  defendants were willing to go to, to hide what they were doing,

3  it tells you an awful lot about their intentions.  And the fact

4  that these defendants tried to conceal what they were doing

5  from the outside world tells you something else that is

6  important.  It tells you that they knew what they were doing

7  was wrong.  Because when people know that what they are doing

8  is wrong, they try to hide it.  And that's exactly what they

9  these defendants did.

10    So what did the defendants do to conceal their scheme

11  to make payments to the families of student-athletes?  Well,

12  they paid in cash so the payments would be harder to trace.

13  They used phony invoices to paper over the payments.  They

14  routed the money through multiple bank accounts to further

15  conceal the payments.  And they took other steps to conceal

16  too, which included, among other things, using secret second

17  phones -- bat phones.

18    Let's talk about each of those one at a time.

19    So as you saw during the trial, the defendants made

20  payments to the parents of student-athletes almost exclusively

21  in cash.  Why?  Because when cash is used, the payments can be

22  more easily concealed.

23    Merl Code told you this himself in his own words.

24  When he was asked by Jeff DeAngelo and Munish Sood about how

25  they recommended that they make the $25,000 payment to Bowen

1    Senior, here is what he said.

2          He said," I would suggest, I would suggest, for

3    cleanliness and lack of questions, I would always assume cash

4    is better.  Right?"

5          "Cleanliness and lack of questions."  In other words,

6    pay the money in cash so that it's clean and so no one can ask

7    any questions about it later.

8          Because Merl Code, Jim Gatto, and Christian Dawkins

9    knew very well, ladies and gentlemen, that they were not

10   allowed to be making payments to Bowen's dad to get his son to

11   go to Louisville.  And they knew that for this scheme to

12   succeed, they absolutely had to conceal that payment in every

13   way that they could, and that included making the payments in

14   cash.

15         Ladies and gentlemen, you also know that the

16   defendants created and approved sham invoices.  These sham

17   invoices were meant to conceal the true nature of these

18   payments.  You have seen a number of these bogus invoices

19   already during this summation.  Jim Gatto at Adidas approved

20   and pushed through invoice after invoice, for things like

21   tournament fees or travel expenses.  He and the consultants who

22   worked for him, men like Merl Code and TJ Gassnola, worked to

23   create and approve bogus, phony invoices prepared for expenses

24   that were pure fiction.  Totally invented expenses.

25         Let's take a look at an example.  On June 5, right

1  around the time that the deal was struck to send Brian Bowen to

2  Louisville, Merl Code submitted a phony invoice to Jim Gatto

3  for $25,000 from the Karolina Khaos that was supposedly for

4  travel team expenses.

5       But, ladies and gentlemen, you know what this payment

6  was really for.  It wasn't for travel expenses.  You heard that

7  from Ricky Robertson, and you also heard that in all the

8  wiretapped calls.  It was the first $25,000 that Gatto, Code

9  and Dawkins had promised to Bowen Senior to get his son to

10  commit to Louisville.

11      This is one of many phony invoices that you saw during

12  this trial, and you saw, among other things, a chart of all the

13  various invoices that had been approved when it came to the New

14  England Playaz, which totaled a very substantial amount of

15  money, ladies and gentlemen, over $700,000 in invoices that

16  were approved.

17      The invoices that Jim Gatto was approving that had

18  fake expenses on them, and that he was pushing through, they

19  were to fund dirty payments, underground payments, to the

20  families of student-athletes in connection with their decision

21  to attend Adidas-sponsored schools.

22      And, ladies and gentlemen, you know that Merl Code and

23  Christian Dawkins were in on this too.  They were active

24  participants in the plan to push through phony invoices at

25  Adidas to fund their underground payments.  Merl Code explained

1    the whole thing to Dawkins in a wiretap call that you heard

2    during this trial.

3                Dawkins asked him, "Gatto wasn't put on the books, was

4    he?"

5                And Code said, "Yeah, I think he was.  But I think he

6    was doing it as a payment.  He's doing it as a payment to my

7    team, to my organization.  So it's on the books, it's not on

8    the books as what it's actually for."

9                That says it all, ladies and gentlemen.  Why the fake

10   invoices?  Because Jim Gatto, Merl Code, and Christian Dawkins

11   knew that they had to conceal these payments from everyone, and

12   that included concealing it from the universities and from the

13   NCAA.  And this scheme wouldn't have worked if they didn't

14   conceal it.  So they also had to be sure that they concealed it

15   on the books of Adidas.

16               Gatto knew that he couldn't possibly have any record

17   of these payments on Adidas's books.  He couldn't leave any

18   trace of the true purpose of these payments.  Otherwise the

19   whole scheme was going to be foiled.  More lying, more deceit,

20   more concealment by these defendants of what they were doing

21   because they knew what they were doing was wrong.

22               Ladies and gentlemen, you also heard about the

23   defendants' efforts to conceal these payments by routing money

24   through multiple accounts.  Adidas did not simply write a check

25   to Brian Bowen Senior or send a wire directly to him.  You know

1    that.  And the reason the money was routed through multiple

2    bank accounts before it made its way to its actual intended

3    recipient is simple.  The defendants wanted to make these

4    payments harder to trace.  So if anyone ever came looking or

5    asking any questions, it would harder to tell where the money

6    was coming from and where it was going to.

7          So let's look at the first payment to Bowen Senior as

8    an example.  What Gatto, Code, and Dawkins did was try to

9    conceal that payment by routing it through multiple bank

10   accounts.  You saw this in the financial records and you heard

11   about it in the testimony of Ricky Robertson, who is the head

12   of the Karolina Khaos amateur basketball team, and he

13   controlled the Karolina Khaos bank account.  And his account

14   was used to route payments to Brian Bowen unbeknownst to him.

15         So you saw that, first, there is a $30,000 wire that

16   was sent into the Karolina Khaos account from Adidas.  And that

17   was supposedly for some of these bogus expenses that we have

18   been talking about.  And that was on August 1.

19         Then you saw that same day, Ricky Robertson cut a

20   check to Christian Dawkins in the amount of $25,000, which he

21   labeled as consulting fees.  And Mr. Robertson was asked why he

22   wrote consulting fees on this check.  Because Merl Code asked

23   him to.

24         That was just another way these defendants were trying

25   to conceal what they were doing, by mislabeling these checks.

1   Because as you heard from Mr. Robertson, Christian Dawkins

2   never did any consulting work for the Karolina Khaos basketball

3   team.

4           And as you know, the plan was that Dawkins would

5   withdraw the funds from his bank account and give them in cash

6   to Brian Bowen.  There were multiple steps to these payments,

7   they went through multiple accounts, and the reason for that

8   was simple.  It was because these defendants were trying to

9   hide the fact of these payments, and they went to great lengths

10  to do that.

11          Ladies and gentlemen, you also heard about how Brian

12  Bowen Senior and Christian Dawkins used second phones to

13  communicate.  When they were talking about these prohibited

14  payments, they often switched over to their secret phones

15  which, as Brian Bowen Senior told you, they called "bat

16  phones."

17          This is but one example.  Bowen said to Dawkins, "Let

18  me use the other phone."  Then he said, "I don't call from my

19  other phone.  I answer it, but I don't F with this phone.  I

20  don't trust this phone."

21          "All right.  Hold on."

22          Then they switched over to their bat phones.

23          And Bowen told you why they were using bat phones when

24  he testified.  And you know why, ladies and gentlemen.  Why did

25  he use a bat phone to talk about the subjects of these

1    prohibited payments?  Because, he told you, "it wasn't

2    connected to my name.  I mean, if you're doing something wrong,

3    you don't want be connected to your name."

4         That's why Christian Dawkins had a second phone too.

5         And Dawkins and Bowen weren't the only ones with bat

6    phones.  Merl Code referred to having his own bat phone, as you

7    saw in text message that he sent to Chris Rivers at Adidas.  "I

8    am hitting you from the bat phone."

9         The defendants Christian Dawkins, Merl Code, they were

10   using bat phones for one reason, and one reason only.  Because

11   they wanted to hide what they were doing from the outside

12   world.  People who think that everything is on the up-and-up,

13   they don't have second and third phones, they are not switching

14   calls over from one phone to another.  This is what people do

15   when they know what they are doing is wrong.  And they wanted

16   to be sure that they didn't get caught.  Because they knew they

17   weren't allowed to be making these payments.  And they knew

18   that if these payments ever saw the light of day, this whole

19   scheme that they cooked up, it was foiled.  The universities

20   would declare the players ineligible.  No big profits for the

21   defendants.

22        Ladies and gentlemen, as if that weren't enough

23   evidence of the lengths these defendants were willing to go to

24   to conceal their wrongful conduct, there is more.  Because you

25   heard the defendants in their own words, time and time again,

1    talk about their suspicion and their concerns.  Because they

2    knew what they were doing was wrong, and they knew that only a

3    very small circle of trust can know about these secret payments

4    to the parents of student-athletes.  A need-to-know basis.

5            So I am just going to walk through one or two examples

6    of that, ladies and gentlemen.

7            You know that Dawkins and Code began, as you heard in

8    the call, to have suspicions about Dawkins' new business

9    partners, Jeff DeAngelo and Jill Bailey, who, as you heard,

10    turned out to be undercover FBI agents.  And you saw in one of

11    these calls, Code telling Dawkins, "You've got to be extra

12    cautious about who you're associating with.  That's why I am on

13    this whole work.  They ain't cutting me no checks for S.  They

14    gonna pay you and you gonna pay me."

15            In that same call, Code advised Dawkins, "Like, you

16    and I need to protect ourselves, man.  I'm saying this just as

17    a guy who's real skeptical about this S.  You and I need to get

18    some background information on Jeff and his chick."

19            Why all these concerns about Jeff and Jill?  Why all

20    these suspicions?  They also talked in this call, as you may

21    recall, about hiring private investigators to look into them.

22    Why do Code and Dawkins need to know who they are dealing with?

23    Because they know these payments that they are engaged in, they

24    are not supposed to be doing it, and they know they need to be

25    extra careful.  If Dawkins and Code were engaged in a business

1    venture that was totally on the up-and-up, would they be

2    talking about hiring private investigators and looking into

3    these people and being skeptical, and all the other things they

4    talked about in this call?  No, they wouldn't, ladies and

5    gentlemen.

6         You also heard Dawkins talk about his concerns and his

7    efforts to hide what he was doing in yet another call.  This is

8    a call with Munish Sood, and it occurred on the same day, a

9    little bit before Christian Dawkins was going to send an e-mail

10   to Jill Bailey, a new business partner, and Munish Sood.  And

11   that e-mail, as you saw, contained the names of various players

12   and the amounts of money that Dawkins was planning to provide

13   to them or their families or handlers.  And one of the players

14   discussed here is Brian Bowen.  That's what this whole e-mail

15   is full of.

16        And you heard in a call between Dawkins and Sood that

17   Dawkins had second thoughts about putting any of this

18   information in writing in an e-mail to his new business

19   partner, Jill Bailey.  Here is what Dawkins said to Munish Sood

20   before he sent an e-mail containing details of payments to

21   various players and their families.

22        (Audio played)

23        MR. SOLOWIEJCZYK:  Dawkins says it himself, ladies and

24   gentlemen.  He is worried about, if someone goes into Jill

25   Bailey's e-mail, they might discover the secret payments that

1    he has outlined in that e-mail.  Why is he paranoid, as he puts

2    it?  Because he knows the payments that he put in that e-mail,

3    payments to players and their families, including Brian Bowen's

4    father, they are not allowed, they are wrong, and he is

5    concerned about anybody from the outside world ever seeing that

6    e-mail.  Because for the defendants' scheme to work, they have

7    got to keep these payments concealed from everyone.

8              So in light of all that evidence, ladies and

9    gentlemen, there can't really be any dispute about the lengths

10   that these defendants went to to hide and conceal what they

11   were doing.  Who are the defendants concealing all this

12   information from?  Well, they are certainly trying to conceal

13   these payments from the universities.  Because if the

14   universities found out, then the student-athletes won't

15   continue to get a scholarship.  You know that.  The

16   universities can't find out for this scheme to work.

17             Were the defendants also trying to conceal what they

18   were doing from the NCAA as well?  Of course they were.

19   Because for the scheme to work, the defendants had to conceal

20   what they were doing from both the NCAA and the universities.

21   In fact, it would make little sense if the defendants wanted to

22   hide their payments from the NCAA but had no problem with the

23   universities knowing about the payments.  Because if the NCAA

24   found out about these payments, they would certainly inform the

25   universities, and that would spell the same outcome for these

1    defendants.  Players would be declared ineligible and the

2    defendants' scheme would be over.

3           And, ladies and gentlemen, when we refer to

4    universities, we are talking about big public universities in

5    this case; universities with boards of directors, and

6    chancellors, and a professional compliance staff, whose sole

7    job it is to ensure that these universities don't run afoul of

8    NCAA rules violations or give out scholarships to ineligible

9    athletes.  We are not just talking about a single coach on a

10   basketball team.  Universities are obviously far bigger than

11   just a coach.  Your common sense tells you that.

12          Now, ladies and gentlemen, during the defendants'

13   opening statements, and through their questioning, you have

14   heard two primary arguments.  First, that the defendants

15   supposedly were doing this -- all these secrets payments and

16   everything else I have discussed -- to help, not harm the

17   universities.  And, second, that they believed the coaches were

18   asking them to make these payments.

19          Now, ladies and gentlemen, I will remind you, of

20   course, that the defense has no burden in this case.  The

21   government bears the entire burden of proof, and we embrace

22   that burden.  But when the defense presents evidence to you,

23   makes arguments to you, you are entitled to, and you should,

24   scrutinize that evidence and those arguments, the same way that

25   you would scrutinize and analyze any other evidence and any

1   other arguments.  You should use your common sense as well.

2   And when you do that, ladies and gentlemen, you will see that

3   the defendants' arguments don't make any sense and are at

4   bottom irrelevant.

5          So let's start by talking about this notion that by

6   making these secrets payments to the families of

7   student-athletes to get them to commit to Adidas-sponsored

8   schools the defendants were really just trying to help those

9   universities.

10          Ladies and gentlemen, respectfully, that doesn't make

11  sense.  Sure, nobody disputes that universities want top-level

12  talent.  They want to win games.  But that doesn't mean that

13  the universities are willing to cheat and break the NCAA rules

14  to do so.  That doesn't mean they want to assume the risks of

15  NCAA penalties just to get a top recruit.

16          And here is another important point.  The mere fact

17  that if the defendants had gotten away with it, that if they

18  were never caught the schools might have won a few more

19  basketball games because of these top recruits, that's

20  irrelevant.  Because by exposing these universities to the

21  risks of harm, risks the universities didn't want to take,

22  these defendants took this decision out of the hands of the

23  university where it belonged.  And the defendants had no right

24  to do that.

25          Use your common sense when approaching this argument,

1    ladies and gentlemen.  You don't help someone by hiding

2    information from them that they are entitled to know in

3    deciding what to do with their money.  You don't help someone

4    by ensuring that they are provided with false information,

5    which is exactly what the defendants in this case did by making

6    these payments, and knowing full well the student-athletes

7    would seek athletic scholarships and would fill out forms that

8    contained false information.

9         You don't help someone by exposing them to all sorts

10   of risk of penalties and fines.  That's what these defendants'

11   supposed help did as well.  Thanks to these defendants, the

12   universities played ineligible players in contests, and as you

13   heard, that would likely lead to forfeiture of those contests

14   as well as a risk of a host of other significant NCAA

15   penalties, including fines and loss of revenue.

16        Does any of that sound like help, ladies and

17   gentlemen?  No, it doesn't.

18        Here is the bottom line.  This was not the defendants'

19   decision to make for the universities.  It was the

20   universities' choice who to give scholarships to, and they were

21   entitled to rely on the accuracy of the information that they

22   were receiving.  By making secret payments to the families of

23   student-athletes, taking steps to conceal those payments from

24   the universities, and ensuring that the forms submitted to the

25   universities would contain false statements, these defendants

1  took away from the universities their right to make informed

2  decisions with their money.  That isn't help.  It's fraud.

3          Ladies and gentlemen, let me also address the argument

4  that you heard defense counsel make in opening statements that

5  the coaches at these universities were asking the defendants to

6  make the payments to the families of these student-athletes,

7  that the coaches asked them to make these payments so that the

8  basketball teams could recruit these athletes to play for their

9  teams.

10          Let me say a few things about why that argument is at

11  the end of the day irrelevant.  First, there is very little

12  evidence to support the defendants' assertion that the coaches

13  were asking for each and every one of the payments with which

14  these defendants are charged.

15          Let's talk about the Brian Bowen scheme for a minute.

16  Christian Dawkins told you himself, in wiretapped calls with TJ

17  Gassnola, who knew the details of these payments.  He didn't

18  know anybody was listening when he had this conversation.  And

19  it was a very close circle of people that knew about these

20  payments.  According to Christian Dawkins, when he didn't think

21  that anyone was listening, that circle didn't include Assistant

22  Coach Kenny Johnson.

23          Gassnola said to Dawkins -- as you recall, Gassnola

24  had heard from Brad Augustine, who was an AAU coach of another

25  team, that he knew about the $100,000 payment to Bowen Senior,

1    and he was angry about that and he called Dawkins.

2              And Gassnola said:  "This guy ain't lying because

3    there's only four in the world that went down.  So five.  Me,

4    you -- so TJ Gassnola, Christian Dawkins, Merl Code, Jim Gatto,

5    and Kenny Johnson, the assistant coach at Louisville."

6              And how did Dawkins respond?  "Whoa.  Kenny didn't

7    even know.  I didn't tell Kenny.  The $100,000 number was not

8    mentioned."

9              So the notion that Merl Code, Christian Dawkins or Jim

10   Gatto made these payments to Brian Bowen Senior because they

11   were asked to do it by the coaching staff, it's undercut by the

12   evidence.  It's undercut by Christian Dawkins's own words.

13             Indeed, the only coach you know for certain was

14   involved in these payments was Orlando Early, an assistant

15   coach at NC State.  And you did hear from TJ Gassnola that he

16   was directly involved in the payment that went to Dennis

17   Smith's father.

18             But putting all of that aside, ladies and gentlemen,

19   here is what matters.  You don't need to decide which coaches

20   knew and which coaches didn't.  You don't need to decide which

21   coaches were asking for these payments and which coaches

22   weren't.  At the end of the day, it's utterly irrelevant.

23   Because any coaches who were involved in any such payments, or

24   had knowledge of them and didn't report them, were not

25   authorized to do this.  They were not acting on behalf of or in

1   the interests of their universities, period.

2        And the defendants knew that.  When Merl Code and

3   Christian Dawkins did not think anybody was listening, they

4   told you exactly what they thought.  That Rick Pitino might

5   have known something when it came to Brian Bowen, but that

6   Pitino had plausible deniability.

7        (Audio played)

8        MR. SOLOWIEJCZYK:  What does plausible deniability

9   mean?  It means the defendants know that Rick Pitino was not

10  allowed to be involved in such a payment.  And it means that

11  these defendants knew that Rick Pitino would not have the

12  authorization of his university if he asked for such a payment,

13  and that he would need a basis to deny that payment if it was

14  ever discovered.  Which tells you everything you need to know,

15  ladies and gentlemen.  These defendants didn't actually think

16  that, if Rick Pitino asked for such a payment, that he had the

17  authority from his university to do so, or that he was acting

18  purely for the interest of his school.  That's why Rick Pitino,

19  as they said, needed plausible deniability.

20       And you know what you do have evidence of, ladies and

21  gentlemen, loads and loads of evidence?  Is that any coach who

22  participated in or encouraged any such payments was acting

23  expressly contrary to the wishes of the university that

24  employed him, contrary to the express policies of those

25  universities, and contrary to the terms of their employment

1    agreements with these universities.

2            You saw many employment agreements during this trial.

3    This is just one, Rick Pitino's employment agreement.  And it

4    makes clear that he has duties to know, recognize, and comply

5    with, among other things, the rules of the NCAA.  And he has a

6    duty to diligently supervise compliance of assistant coaches

7    and any other employees for which Pitino is administratively

8    responsible for.  That includes making sure they don't violate

9    NCAA rules.

10           And you heard that there can be consequences if an

11   NCAA rules violation happens under these coaches' watch, or if

12   they are involved in a violation.  Indeed, you heard time and

13   time again, from each and every compliance officer that

14   testified, that any coach who engaged in making these sorts of

15   secret payments to the parents of student-athletes, they would

16   be subject to immediate termination.

17           And TJ Gassnola, he told you that he was well aware of

18   this as well at the time that he and Jim Gatto were making

19   their underground payments.

20           Why didn't TJ Gassnola tell the compliance staff at NC

21   State about the payments he and Gatto were involved in with

22   Assistant Coach Orlando Early?  Why?  Because that wouldn't

23   have helped anybody.  It would hurt Dennis Smith and it would

24   have hurt the coaching staff.  And then he was asked how he

25   expected it would hurt Dennis Smith and hurt the coaching

1   staff.  "The coaches would have got fired and Dennis would have

2   been deemed ineligible.  He would have never played there."

3        Because everybody working in the world of college

4   basketball knows that any coaches asking for payments like

5   these wouldn't be acting on behalf of their universities.

6   Quite the opposite.  They would be acting contrary to their

7   university's own interests.

8        Of course the defendants who worked in the industry

9   knew this.  Of course they knew that any coaches asking them to

10  make any such payments were not acting with the blessing of the

11  universities.  So at the end of the day this whole notion that

12  the coaches were asking for it, even if it was true, it's

13  irrelevant.

14       Now, ladies and gentlemen, for all of the conduct that

15  I just described the defendants are charged with three crimes.

16       In Count One, all three defendants are charged with

17  conspiracy to commit wire fraud.  I expect you to hear from

18  Judge Kaplan that a conspiracy is an agreement.

19       Ladies and gentlemen, if you find that the defendants

20  agreed to defraud the University of Louisville through their

21  agreement to pay $100,000 to the father of Brian Bowen, you can

22  stop there.  They are guilty as to Count One.

23       In Count Two, all three defendants are charged with

24  the substantive crime of wire fraud involving the scheme to

25  defraud the University of Louisville in connection with the

1    $100,000 payment to Brian Bowen's father.

2            If you find each defendant participated in that scheme

3    with the intent to defraud the University of Louisville, then

4    defendants are guilty of that count as well.

5            And in Count Three, solely Jim Gatto is charged with

6    the substantive crime of wire fraud involving a scheme to

7    defraud the University of Kansas.  This is in connection with

8    the payments that were made to Billy Preston's mother to get

9    Billy Preston to commit to the University of Kansas.

10           If you find that Jim Gatto participated in that scheme

11   with the intent to defraud the University of Kansas, then he is

12   guilty as to that count.

13           Ladies and gentlemen, I am about to sit down.

14           At the beginning of this case, we asked you to use

15   your common sense in evaluating the evidence, and I am going to

16   ask you to do that again.  Because if you use your common

17   sense, you will reach the only verdict that is consistent with

18   the law and with the evidence -- that the defendants are

19   guilty.

20           Thank you.

21           We will take a 15-minute break and then we will hear

22   from Mr. Haney.

23           (Jury exits courtroom)

24           (Recess)

25           THE COURT:  What is the defendants' time allocation?

1    MR. HANEY:  I will be one hour.

2    MR. MOORE:  We are not 100 percent sure how long

3  Mr. Code's closing argument is going to go, but it will

4  probably be slightly less than an hour.

5    THE COURT:  So then an hour and whatever for Mr.

6  Schachter.

7    MR. MOORE:  Yes, sir.

8    (Jury present)

9    THE COURT:  The jurors and the defendants all are

10  present.

11    We will now hear from Mr. Haney on behalf of Mr.

12  Dawkins.

13    MR. HANEY:  Thank you, your Honor.

14    Good afternoon.  Before I begin, on behalf of my

15  client, Christian Dawkins, he and myself deeply thank you for

16  all your patience and your attentiveness and the incredible

17  sacrifice that you all made to leave your lives to be here for

18  the period of time that you were here.

19    As I watched you all over the last several weeks

20  dutifully file in, just as you did now, one by one to take your

21  respective seats in the jury box, it struck me really, for the

22  first time in maybe 20 years of practicing law, the extent of

23  sacrifice you made by giving Christian Dawkins his day in

24  court.

25    Now, I totally would be remiss if I did not comment

1    and compliment Mr. Diskant, Mr. Mark, Mr. Solowiejczyk, and Ms.

2    Flodr -- they are very talented team of young lawyers who have

3    sat there in the front row -- for a fine argument today.  Now,

4    I don't agree, obviously, with what they said, but I listened

5    intently, and I hope you do the same of me.

6            I thank his Honor for his patience, as it was tried,

7    as you saw, at times during the course of the trial, and for

8    accommodating a couple of out-of-town guys, like me and Mr.

9    Moore, as we navigated our way through the Big Apple.

10            Ladies and gentlemen, for Christian Dawkins, this was

11    the fight for his life, like no other, to clear his name, fight

12    for his liberty, fight for his freedom.  And he is still in

13    that fight right now.

14            Despite the mistakes and missteps he has made, those

15    mistakes, those missteps, and the people that you saw in this

16    courtroom who testified against him that he met along the way

17    at such a young age, I submit to you never warranted him with

18    being charged with these very serious federal crimes.

19            Now, hopefully together these discussions that we are

20    having are going to be helpful to you in trying to arrive at a

21    decision in this case, where you don't compromise, you don't

22    sacrifice your beliefs, and where you don't betray your own

23    individual conscience, but instead, you do what you believe,

24    based on the evidence in this case, is the right thing to do.

25            Now, you, ladies and gentlemen, are empowered to

1    determine, based on your assessment of the evidence, not the

2    argument of the lawyers, of what that right thing is.  It's a

3    great and mighty privilege, a responsibility, and I submit to

4    you perhaps even a burden, to hold a 25-year-old man's future

5    in your hands, to be the purveyors of justice, and ultimately

6    make the decision that you will soon make of whether or not

7    Christian is guilty or not guilty.

8            So now the defendant, Christian Dawkins, is afforded

9    his opportunity to argue the case, if you will, but I am not

10   going to argue with you.  I am going to just try and discuss

11   with you the reasonable inferences, which I submit can be drawn

12   from the evidence in this case, and try to make sense of these

13   charges before the court.

14           Ultimately, it will be what you decide to be the facts

15   that is what is going to be important, and all of us can live

16   with that, and we will, because you took an oath.  And we are

17   mindful of that oath that you took as jurors, and we trust that

18   you as jurors will fulfill that oath and keep the promises you

19   made and follow the law.

20           Simply put, you are fair people.  We are confident you

21   will arrive at a fair and just outcome for both sides -- the

22   government and the defense -- because that's what fair people

23   do.

24           Now, after several, admittedly, tedious moments during

25   the course of this trial, you are now empowered to administer

1    justice.  No more lawyer arguments.  No more secret trips to

2    the sidebar.  You are now empowered to ensure that this great

3    system that we have works.  This is your time, ladies and

4    gentlemen, the ball is now in your court, and I submit that you

5    have this rare opportunity to be participants in this

6    administration of justice.  For, as you will see, the

7    government took this case of NCAA rule-breaking, and now you

8    must decide if NCAA rule-breaking is a federal crime.

9              The judge will instruct you on the law.

10             THE COURT:  Sustained.  That is most assuredly not the

11   jury's job.

12             MR. HANEY:  Thank you, your Honor.

13             The judge will instruct you on the law.  That is not

14   my job.  It's only my job to walk you through the evidence,

15   which we are about to do.  And it is your job to decide if my

16   client violated those laws.  And I submit to you that the

17   government has failed to prove that beyond a reasonable doubt.

18             So let's revisit the evidence in this case and take a

19   journey, if you will.  Remember in my opening statement I

20   talked about a journey for justice, that you would go on a

21   trip.  And it wouldn't be a straight line path; it would a path

22   that would take different routes.  It would meander a bit.  You

23   might even hit a dead-end road every now and then and have to

24   come back.  And I submit to you that trip that you took left

25   you empty of any sensible explanation for the theory in this

1   case that the universities were somehow harmed, and that my

2   client intended to harm them.

3        I submit that at the end of this trip it will be

4   evident that the government's theory is flawed, and the

5   government has failed to meet that burden of proof, and that

6   Christian Dawkins will not be guilty of the crime of wire fraud

7   and conspiracy.

8        So let me start this journey for justice by discussing

9   the charges against Christian Dawkins.

10       Now, after all the defendants have had a chance to get

11  up here and speak to you tomorrow, the government will get an

12  opportunity to address you again one last time, and then Judge

13  Kaplan is going to instruct you on the charges brought by the

14  government in the case.  So let's look at the charges.

15       Now, you will hear that the government is bringing

16  three different counts in this case.  It is important to

17  remember that my client, Christian Dawkins, is only being

18  charged with Count One and Count Two.

19       Count One, conspiracy to commit wire fraud, which

20  includes the universities Louisville, Kansas, Miami, and North

21  Carolina State.

22       Count Two, substantive crime of wire fraud with

23  Louisville.

24       Now, the judge will instruct you on the law.  But I

25  will tell you that in order to find my client, Christian

1   Dawkins, guilty of Count Two, the government must prove beyond

2   a reasonable doubt that Christian Dawkins acted with a criminal

3   intent, an intent to defraud.

4        I submit that it is the burden the government will not

5   be able to meet in this case to defraud Louisville.  That's

6   Count Two.

7        So what is Count One?  Count One is the conspiracy to

8   commit wire fraud.  Again, Louisville, Kansas, Miami, and North

9   Carolina State.  These are the four schools that the government

10  put forth to you as the victims in this case.

11       Now, I want to try to make sense with this for a

12  minute.  I really want you to think on this.  Where during the

13  last several weeks did you ever hear my client's name

14  associated with anything that occurred at either North Carolina

15  State or the University of Kansas?

16       Ladies and gentlemen, you didn't.  Because there

17  wasn't a suggestion from the government that Christian Dawkins

18  was involved in anything that had to do with North Carolina

19  State or Kansas.

20       Now, we have heard testimony from witnesses Carrie

21  Doyle and Jeff Smith, in the compliance departments of both

22  North Carolina State University and University of Kansas, both

23  who detailed a variety of rules improprieties associated with

24  Dennis Smith, Jr. at North Carolina State, and the same type of

25  NCAA rules violations with players Billy Preston and Silvio De

1    Sousa at the University of Kansas.  But, ladies and gentlemen,

2    ask yourselves when you deliberate, did you ever hear the name

3    Christian Dawkins come out of the university witnesses' mouths

4    one single time?

5        You heard the testimony of former Adidas consultant TJ

6    Gassnola, who detailed the facts and circumstances of cash

7    drops to the parents and guardians of those players at North

8    Carolina State and Kansas, more specifically, Dennis Smith, Jr.

9    at North Carolina and Billy Preston and Silvio De Sousa at

10   Kansas.  Ask yourselves again, did you ever hear the name

11   Christian Dawkins come out of the mouth of TJ Gassnola in

12   connection with those two schools, Kansas and North Carolina

13   State?  Was Christian Dawkins's name ever mentioned one time as

14   an actor or a participant in any scheme to the parents or

15   guardians of any of the players at either North Carolina State

16   or the University of Kansas?  No, you didn't.

17       If you have any doubt, I will tell you what.  Don't

18   take my word for it.  You can prove me wrong.  When you go back

19   into the deliberation room, after what we have all said, you

20   will have the ability to request the transcript of what you

21   heard in court over the past several weeks.  You can ask for

22   the transcript of the North Carolina State and the Kansas

23   compliance staff, and the testimony of TJ Gassnola, and review

24   it for yourself.  And I submit to you -- and hold me to what I

25   am going to say -- you won't find one shred of evidence

1  connecting Christian Dawkins to Kansas or North Carolina State.

2  Nothing.

3        It goes further than the transcript.  Was there a

4  single text message, wiretap, or an e-mail that ever made any

5  suggestion that my client, Christian Dawkins, was engaged in

6  some scheme to defraud North Carolina State or the University

7  of Kansas through the use of interstate wires?  The answer is

8  no.  Not one single shred of evidence.

9        So let's talk about another school that the government

10 has alleged is a victim in this case.  The University of Miami.

11 You heard the stipulation read into the record by the

12 government.  And that stipulation simply means that the

13 government and we agree that what is contained in that

14 stipulation is to be considered by you all as evidence.

15       So let's take a look at the most relevant portion of

16 that stipulation, which is Government Exhibit S7.

17       "On or about August 6, 2017, after Brad Augustine

18 requested money from Adidas for the stated purpose of providing

19 those funds to the family of Nassir Little, Augustine told

20 Christian Dawkins, in substance, that he did not intend to

21 provide that money to the Little family but instead intended to

22 use the money for his AAU team and other expenses."  Remember

23 that word "intended."

24       So, ladies and gentlemen, that's a fancy way of saying

25 Brad Augustine was trying to con Adidas out of money.  And,

1    therefore, there was never any conspiracy associated with an

2    attempt to steer or influence Nassir Little to the University

3    of Miami.  It was a sham.  Brad Augustine was lying.  No

4    parents ever received any money.  No kids were paid to attend

5    the University of Miami.  No kids or parents ever made any

6    certifications of eligibility to the University of Miami.

7    Therefore, the University of Miami never suffered any harm or

8    injury.  Absolutely nothing.

9         So I submit to you, ladies and gentlemen, based on

10   that evidence of what you know, what we have just talked about,

11   as we have taken this journey so far, no North Carolina State,

12   no Kansas, and no University of Miami.

13        Now, the government still alleges, despite that, that

14   Christian Dawkins was in a conspiracy with the two gentlemen

15   associated with Adidas, Mr. Gatto and Mr. Code.

16        Ladies and gentlemen, as you deliberate on whether

17   Christian Dawkins was involved in a conspiracy with the two

18   defendants associated with Adidas, ask yourselves how that's

19   possible, when the evidence has shown that Christian Dawkins

20   had nothing to do with three of the four Adidas schools even

21   referenced in Count One of the charges.

22        Not to mention, during the course of this trial you

23   were presented with evidence that Christian Dawkins was far

24   from exclusively working to help Adidas schools get players.

25   In fact, he was working just as much to help Nike schools as he

1  ever did with Adidas.

2          Let's take a look at some testimony from Brian Bowen

3  Senior, the father of Brian Bowen Junior.  We referred to him

4  as Tugs, and you all know by now who that is.  We heard that my

5  client, Christian Dawkins, discussed several options with Brian

6  Bowen Senior.  Here is the testimony, question to Brian Bowen

7  Senior by me:

8  "Q. And there was conversation about other schools with

9  yourself and Christian that were possible suitors for your son

10  at the college level, would you agree?

11  "A. Say that again.  I'm sorry.

12  "Q. There were other schools that you discussed including

13  DePaul, correct?

14  "A. Yes.

15  "Q. Creighton, correct?

16  "A. Yes.

17  "Q. Oregon, correct?

18  "A. Yes.

19  "Q. UNLV, correct?

20  "A. Yes.

21  "Q. And Michigan State obviously, correct?

22  "A. Yes."

23          Now, ladies and gentlemen, you know from the evidence

24  two of these schools, Michigan State and Oregon, they are both

25  Nike schools.

1    So, ladies and gentlemen, the conspiracy that the

2 government alleges with the Adidas defendants in Count One and

3 my client, I submit to you, based on all that evidence, it's

4 not there.  Forget about beyond a reasonable doubt.  There is

5 no evidence of it.  And notwithstanding the incredibly high

6 burden of proof in a criminal case, which is beyond a

7 reasonable doubt.  It's the highest burden of proof we have in

8 the America legal justice system.  In fact, it's a balancing

9 test.  You literally put the evidence on a scale and you weigh

10 it.  And it's not a little more than not; it's significantly

11 more than it's not.  In this case, ladies and gentlemen, there

12 is nothing even to put on the scale, I submit to you.

13    So what does that leave us with?  That leaves us with

14 one school, I contend, and one remaining count, and one very

15 opportunistic father.

16    Now, central to the government's case is that

17 Christian Dawkins, at the age of 23 years old, somehow

18 influenced the father of Tugs Bowen to get his son to attend

19 the Adidas-sponsored University of Louisville by paying Brian

20 Bowen Senior with money that Christian Dawkins obtained from

21 Adidas.

22    Now, I will not, and cannot, interject my own feelings

23 to that suggestion, but let's look at the evidence and focus on

24 how that simply did not happen.

25    First of all, when Brian Bowen Senior took that

1    witness stand I asked him on cross-examination, whose decision

2    was it for Tugs Bowen to go to Louisville?  And Brian Bowen

3    Senior's answer to my question was so important, so paramount

4    to this case I want you to see it for yourselves and read it.

5    I am not going to talk.  I want you to look at it.

6                (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    MR. HANEY:  There it is, ladies and gentlemen.  You

2    heard it from the government's own witness, Tugs Bowen -- not

3    his father, not Christian Dawkins -- Tugs Bowen made the

4    decision to go to Louisville.  I submit to you that this

5    statement, this testimony from Brian Bowen Senior is fatal to

6    the government's case.  I don't know how much clearer evidence

7    you can have than that statement by Brian Bowen Senior.

8    And, ladies and gentlemen, remember, that came from

9    the government's own witness, who is testifying and being

10   granted immunity from prosecution of multiple felonies he was

11   charged with.  Testifying in this case to potentially avoid

12   going to prison.  Testifying to help the government convict my

13   client.  And he told you that his son was the one who chose to

14   go to Louisville.

15   Now, you also heard Brian Bowen Senior testify that on

16   numerous occasions Christian Dawkins advocated and pushed for

17   his son to attend the hometown school of Michigan State

18   University.  Here's that testimony now.

19   (Pause)

20   I asked Mr. Bowen, on cross-examination:

21   "Q  Mr. Bowen, you testified on direct about conversations with

22   Christian Dawkins about where your son would go to school, is

23   that correct?

24   "A  Yes, that's correct.

25   "Q  One of those schools that was discussed was Michigan State

1   University, is that a correct statement?

2   "A  Yes, it is."

3        You also saw in Government Exhibit 102K-10 text

4   messages between Christian Dawkins and Brian Bowen Senior that

5   Christian Dawkins told Brian Bowen Senior that his son should

6   go to Michigan State, a Nike school.  And I want you to take a

7   look at that exhibit.

8        And right here on May 18, 2017, shortly before he made

9   his decision, you see my client, Christian Dawkins, sending a

10  text to Brian Bowen Senior, Christian telling Brian Bowen

11  Senior, on May 18, 2017, that Tugs should go to MSU, keep it

12  simple.  They want Tugs.

13       Brian Senior says, "He's just not feeling them.  I'll

14  ask him again today.  I'm for MSU.  It's him."

15       Understand, those are text messages.  Those two

16  gentlemen don't know they're being monitored by the FBI.  So

17  here we have, again, Christian Dawkins charged in a conspiracy

18  with Adidas, making a pitch, telling Brian Bowen Senior his son

19  should go to a school who is not sponsored by Adidas but

20  instead sponsored by Adidas' archrival Nike.

21       And Brian Bowen Senior says, as you can see from the

22  text message:  I'll ask him today.  Tugs is just not feeling

23  them.  I'm for MSU.  It's him.

24       Does that sound like to you, ladies and gentlemen,

25  that he is the decision maker?  Does it sound like, as the

government contends, Brian Bowen Senior was forcing his son to

do anything?  Does this sound like a text from a man who has

that kind of influence over his son?

        And, ladies and gentlemen, when I asked Brian Bowen

Senior in this courtroom why his son did not go to the hometown

school of Michigan State University, what did Brian Bowen

Senior say?  Look at what Brian Bowen Senior said.  I asked him

on cross-examination:

"Q  So it was your son's choice to go to Michigan State or not

to go to Michigan State, is that a fair statement?

"A  Of course.

"Q  Just like it was your son's choice to go or not to go to

Louisville, correct?

"A  Of course."

        How much clearer can that be?  Beyond a reasonable

doubt?  Tugs Bowen was the decision maker.  Not Brian Bowen

Senior.  Not Christian Dawkins.

        Let's take a look at some text messages between

Christian Dawkins and Tugs himself.  In Exhibit 105, Christian

Dawkins texts, on the date of May 23, 2017, shortly before -- a

couple of weeks before Tugs Bowen makes a decision.  Christian

Dawkins texts:  The last one you should talk to, though, is

Marvin Menzies at UNLV.  He's got a squad and a good thing

going.  And you can be the man.  And you need to really have a

final conversation with Dana Altman at Oregon.  It's a terrible

1    place but a good basketball situation.

2            Tugs responds:  OK, I will.

3            Then Christian responds:  OK, cool.  Let me know if

4    you have any questions or want to know anything background wise

5    about the coaches or players before you make a final decision.

6    Whatever you do, you will kill it.

7            Does this sound like somebody who was trying to

8    influence Tugs Bowen to go to any school, Adidas or otherwise?

9    Ladies and gentlemen, I submit to you, based on the evidence,

10   not all the secret accounts and invoices and backbones, based

11   on the evidence it makes no sense.

12           But let's not stop there.  Our journey for justice has

13   got a few more stops along the way.

14           Let's talk about motivation for a minute.  The

15   government's theory depends on Brian Bowen Senior taking money

16   to influence his son to go to Louisville.  But you heard Brian

17   Bowen Senior, the government's witness, called before you by

18   the government to help their burden.  Their witness told you

19   himself, the most important factor in making any basketball

20   decision with his son, since his son was in high school, was

21   not money but whether the situation was a good basketball fit.

22   You heard that Tugs Bowen, from his dad's testimony, was

23   offered $18,000 -- or the father was offered $18,000 for his

24   son to play AAU basketball for the Spiece Indy Heat.  Let's

25   take a look at that testimony now.

1   My question to Brian Bowen Senior:

2   "Q  And when your son was still in high school, you were

3   actually even offered $18,000 to play for a team out of

4   Indiana, called the Spiece Indy Heat, correct?"

5   So what happened after Brian Bowen Senior was offered

6   $18,000 by the Spiece Indy Heat, to play for that AAU team?  He

7   told you what happened.  My question to Brian Bowen Senior:

8   "Q  Tugs chose not to play for that team, didn't he?

9   "A  Correct."

10  And Tugs Bowen, as you heard from the testimony, he

11  didn't play for the Spiece Indy Heat.  He instead went and

12  played for another team, called the Mean Streets.  And why Mean

13  Streets?  Were they paying more money?  No.  Brian Bowen Senior

14  told you, the Mean Streets were only going to give him $5,000,

15  which he took.  And when I pressed Brian Senior on that point,

16  look at what he said:

17  "Q  So even though you could have been paid three times more

18  money to play for the Spiece Indy Heat, you didn't because you

19  felt the Mean Streets were a better basketball fit for your

20  son, correct?

21  "A  Correct."

22  In fact, Brian Bowen Senior accepted less than one

23  third of the amount of money he could have received from the

24  other AAU team, the Spiece Indy Heat.  He got only $5,000

25  instead of $18,000 for Tugs Bowen to play for the Mean Streets.

1    Because it was a better basketball fit for his son.

2           And that wasn't the only example.  The evidence showed

3    that Tugs' father was also made aware of an offer of $150,000

4    and an $80,000 car from an assistant coach at Oklahoma State

5    University for his son to play there.  Let's look at the

6    transcript.  The question to Brian Bowen Senior:

7    "Q  What did Mr. Dawkins say with respect to Oklahoma State

8    University?

9    "A  They were like $150,000 cash, $80,000 for a car, and some

10   undisclosed amount to buy a house, I guess, too."

11          Brian Bowen Senior also testified that his son was

12   going to the University of Arizona but only changed his mind

13   when two kids, who had previously declared for the NBA draft,

14   changed their minds and returned to school.  You heard his

15   testimony.  Rawle Alkins and Allonzo Trier.  When that

16   happened, the University of Arizona was ruled out.  Why?  It

17   wasn't a good basketball fit.

18          Brian Bowen Junior -- I'm sorry, Brian Bowen Senior

19   then testified not until the end of May of 2017 did the

20   University of Louisville even become a consideration for his

21   son's college choice.  Not because of money, but because

22   Christian Dawkins and Bowen Senior realized that a player named

23   Donovan Mitchell had left Louisville and went to the pros.  How

24   do we know that?  You can see it from his testimony.

25          He was asked:

1  "Q  Mr. Bowen, when Donovan Mitchell declared for the NBA

2  draft, did you feel at that point the University of Louisville

3  became a good basketball fit for your son?

4  "A  I mean, not immediately.  Once, you know, Christian had

5  mentioned it to me.  I didn't really think about Louisville."

6          "Best basketball fit."  We see it over and over, a

7  pattern.  That is why Tugs Bowen played for the Mean Streets.

8  That is why he played for his high school team, La Lumiere Prep

9  School.  Just like why he did not choose Michigan State.  Just

10  like he did not choose Arizona.  Each time, it was always Tugs

11  Bowen's decision.  And each time Tugs Bowen's decision was

12  based on basketball, not money.

13          And, ladies and gentlemen, the same thing happened in

14  this case, the same pattern continued.  Let's look at why Brian

15  Bowen Senior said Tugs Bowen chose Louisville.  The question

16  was posed:

17  "Q  And when Tugs made that decision to go to Louisville, you

18  felt that it was a good decision in picking the University of

19  Louisville, didn't you?

20  "A  I agreed with it.

21  "Q  There was no doubt that you believed the University of

22  Louisville had a great basketball program for your son,

23  correct?

24  "A  Yes.

25  "Q  And you thought that your son was a great fit for the

Iahdgat5                    Summation - Mr. Haney

1    University of Louisville basketball team, too, didn't you?

2    "A  Yes."

3          And given that pattern here, there is no wonder why

4    Tugs Bowen ended up at the University of Louisville.

5          And just like the evidence has shown, Louisville is

6    not the only school offering money for Tugs Bowen to attend

7    their school and play on their basketball team.  Brian Bowen

8    Senior, like he always had, he was going to get paid no matter

9    where his son ended up playing.

10          Ladies and gentlemen, I submit the government has not

11    come close to meeting the burden of proof in this case.  And I

12    submit to you, they have not presented any evidence at all that

13    my client ever influenced the dad, Brian Bowen Senior, to do

14    anything.  The government had my client's phones wiretapped,

15    obtained all of his emails, text messages.  And despite the

16    mountain of data they collected over the years of this

17    investigation, the government has not shown you in their case

18    one single phone call, one single text message, one single

19    email where my client ever told Tugs Bowen or his dad that if

20    Tugs Bowen went to the University of Louisville, then, and only

21    then, would he pay his dad a hundred thousand dollars or anyone

22    else would.  The evidence is silent on that because there isn't

23    any.

24          Beyond a reasonable doubt?  Again, use your common

25    sense and logic.  If that ever was agreed upon by Christian

1   Dawkins and Brian Bowen Senior, why wouldn't there be any

2   evidence of it?  Nothing.

3           Now, ladies and gentlemen, I submit that based on the

4   evidence and the testimony of Brian Bowen Senior, you can

5   infer, you can make a reasonable inference, and conclude that

6   Brian Bowen Senior was an opportunist.  You heard from the

7   testimony, he was a 46-year-old police officer, on disability,

8   who for six years had been committing food stamp fraud,

9   cheating poor people, not paying his taxes, and mooching off my

10  client, barely in his 20s.  You saw Brian Bowen Senior testify.

11  You are the determiners of credibility right now, not me.  My

12  opinion of him doesn't matter.

13          But ask yourselves -- you watched him testify -- does

14  Brian Bowen Senior strike you as a grown man who would ever let

15  a 20-something-year old kid like Christian Dawkins tell him

16  what to do with his son?  I submit to you, ladies and

17  gentlemen, and I contend the notion that Christian Dawkins, at

18  23 years old, could have ever influenced Brian Bowen Senior to

19  force his son, his pride and joy -- you heard him testimony,

20  working with him since he was little -- to suggest that he

21  could have gotten him to do anything he didn't want to do is

22  utterly ridiculous.

23          I submit, our trip could end right now, that the

24  journey is over, and you've arrived at your place that we

25  embarked upon during the opening statement of justice.  Let's

Iahdgat5                    Summation - Mr. Haney

1    go down the road a little bit further just in case we are not

2    all there.

3           You've heard over the course of the last two weeks

4    repeated testimony from government witnesses, multiple, who

5    have said paying money to parents of prospective

6    student-athletes is a violation of the NCAA rules and

7    compromises the eligibility of those student-athletes, in this

8    instance, Brian Bowen Junior, or Tugs Bowen.

9           OK.  Let's say for the sake of argument that's right.

10   Let's take a look at all the times Brian Bowen Senior broke the

11   NCAA rules long before July of 2017:  $8,000 wrapped in a

12   magazine sent to him from TJ Gassnola.  $12,000 over time from

13   Chris Rivers, who paid the rest of the $20,000 payment to play

14   for the Michigan Mustangs.  $5,000 from the former NFL wide

15   receiver, Tai Streets.  $1,500 from Tim Anderson, the head

16   coach of the Nike Mean Streets.  A $2,000 check from Adidas'

17   Chris Rivers.  $8,000 from Shane Heirman, the head basketball

18   coach at the La Lumiere Prep School.  By his own admission,

19   Brian Bowen Senior testified on at least seven occasions,

20   before he ever took that money in July of 2017 in the parking

21   lot of Morristown, New Jersey in that sandwich, he broke the

22   NCAA rules by taking money, not just from Adidas, but from the

23   coaches and from Nike-sponsored programs.

24          The government just stood up here during their closing

25   argument and told you that the July 2017 payment from Munish

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Sood to Brian Bowen Senior was the payment, the trigger that

2    made Brian Bowen Junior ineligible and caused the false

3    certification to be made to the Athletic Department and thereby

4    defrauding the University of Louisville.  Are you kidding me?

5          Ladies and gentlemen, think about that logic, if you

6    will.  If paying parents makes kids ineligible, which is what

7    they say, then I contend any one of those seven separate

8    occasions when Brian Bowen Senior broke the NCAA rules by

9    getting paid, long before he got paid in 2017, made his son

10   ineligible back then.  Arguably, Brian Bowen Junior was

11   ineligible seven times before he ever got to Louisville.

12         Beyond a reasonable doubt?

13         By his own admission, Brian Bowen Senior testified

14   that after the infamous July 2017 payment from Munish Sood on

15   the date of August 23rd, he received $1,300 in cash.  And who

16   did Brian Bowen Senior receive that cash from?  Let's look at

17   what Brian Bowen Senior said.  The government's own witness.

18   He told you, the question:

19   "Q  You testified on direct, Mr. Bowen, that there was an

20   occasion where the head associate basketball coach at the

21   University of Louisville, Kenny Johnson, gave you $1,300 cash

22   outside the Galt house apartment in Louisville, is that right?"

23         He answered, "Yes."

24   "Q  And you know that the head associate coach is the

25   number-two guy on the coaching staff behind the head coach,

1   isn't that right?

2   "A   Yes.

3   "Q   And that payment by you -- the head associate coach of the

4   University of Louisville, Kenny Johnson, that would be a

5   violation of the NCAA rules, wouldn't it?"

6           He answered, "Yes."

7           That's right, ladies and gentlemen.  Brian Bowen

8   Senior acknowledged, on cross-examination, that the University

9   of Louisville's head associate basketball coach, Kenny Johnson,

10  the second in command behind Rick Pitino, who was in the

11  Louisville basketball program, paid him $1,300.  And Brian

12  Bowen Senior knew when he took that money, just like he did

13  with all the other money he took, he was violating the NCAA

14  rules.  Brian Bowen Senior told you he knew that payment could

15  have compromised his son's eligibility in the exact same way it

16  could have when he received the money from Munish Sood in that

17  Morristown, New Jersey parking lot.

18          Here is the testimony on that.  A question to Brian

19  Bowen Senior was posed:

20  "Q   So this action by the head associate coach at the

21  University of Louisville, Kenny Johnson, paying you cash could

22  have affected Tugs' eligibility in the exact same way Christian

23  Dawkins did, agreed?

24  "A   Both violations."

25          And the government wants you to believe that the

1   University of Louisville is a crime victim?  A fraud victim?

2   Victimized by the actions of my client.  When their own second

3   in command of the basketball program was breaking the exact

4   same NCAA rules they allege was the harm that they suffered in

5   this case?

6           And to further exemplify the absurdity of the

7   situation in Louisville, you were presented with other

8   evidence, directly from the government, through a stipulation

9   that I'm about to show you again.  I am not going to read the

10  whole thing.

11          At the time the University of Louisville Head

12  Associate Basketball coach, Kenny Johnson, broke the NCAA rules

13  by paying Brian Bowen Senior that $1,300 cash, the Louisville

14  basketball program had just recently been placed on probation

15  for committing major rules violations.  Now, I want you to keep

16  in mind, these violations didn't have anything to do with these

17  defendants.  These violations were violations that occurred

18  between 2010 and 2014.  And I contend that this is an example

19  of Louisville, the OK for their basketball program violating

20  the rules of the NCAA to rack up wins.

21          Let's look at the stipulation.  The highlighted

22  portion, if you could turn your attention to that.

23          On the date of June 15, 2017, the NCAA Division I

24  Committee on Infraction ("COI") found that on twelve occasions,

25  between approximately 2010 until approximately 2014, the former

1  Director of Basketball Operations for the University of

2  Louisville's men's basketball team committed NCAA recruiting

3  violations.  The COI further determined that, through this

4  conduct, the University of Louisville had committed Level I

5  aggravated violations, i.e., ones which seriously undermined or

6  threatened the integrity of the NCAA collegiate model --

7  because the violations provided, or were intended to provide, a

8  substantial or recruiting advantage."

9      Just like that Miami stipulation that we saw before,

10  this is evidence; this is agreed to by the defense and the

11  government.

12      And I contend that the University of Louisville

13  baseball program had such little regard for the NCAA and their

14  rules, they thumbed their nose at the NCAA and within 90 days

15  of not just being placed on probation for four years, but also

16  being stripped of their 2013 national title, continued to

17  commit NCAA rules violations by making cash payments to

18  players.  I ask you, ladies and gentlemen, does that sound like

19  a crime victim to you?

20      As I told you in the opening statement, this case was

21  never a "who done it," for this case is simply what was in the

22  mind of the young man sitting over there.  And the Judge will

23  instruct you -- not me -- on the law of intent.  Always require

24  the government to prove their case beyond a reasonable doubt.

25      Now, you heard testimony from Munish Sood, who stated

Iahdgat5                    Summation - Mr. Haney

1    the obvious.  Munish Sood was the banker that testified at the

2    beginning of the trial.  One of the first witnesses, I

3    remember.  He testified that to be involved in the sports

4    business, he and Christian needed the universities.  Without

5    them, they wouldn't have any clients.  The schools were the

6    lifeblood of the sports agencies.  Kids went to these schools

7    arguably not to get an education but they went to these schools

8    to increase their draft status, so they could become

9    professionals, and become future clients perhaps of Munish Sood

10   and Christian Dawkins.  Therefore, you may ask yourselves, as

11   you deliberate -- and think of the logic of this and make

12   reasonable inferences -- what possible sense would it have made

13   in Christian Dawkins' mind that he would ever want to do

14   anything with the specific intent to defraud any of these

15   universities?  Christian Dawkins wasn't interested in hurting

16   universities.  It was in his best interest to help them.  And

17   the best way Christian Dawkins could help universities is help

18   them get players.

19            And the evidence backs this up completely -- not even

20   our evidence, the government's evidence.  Let's look back at

21   Government Exhibit 107Q-1, which is a text message between TJ

22   Gassnola and the head coach of Louisville, Rick Pitino himself.

23   Remember this text message.  TJ Gassnola is congratulating Rick

24   Pitino for the commitment of Brian Bowen Junior to play

25   basketball at Louisville.  Texting Rick Pitino how Tugs Bowen

Iahdgat5                    Summation - Mr. Haney

1    will help Louisville's basketball program.  Why?  Because Tugs

2    Bowen going to Louisville was a good thing for Louisville.  Not

3    a bad thing.  Not a fraudulent thing.  And Rick Pitino knew it.

4                 Rick Pitino:  Thumb's up.  Good job.  Thanks.

5                 Everything Christian Dawkins did with respect to Tugs

6    Bowen and Louisville was done with the best intentions in his

7    mind.  Not done for any purpose other than that.  The evidence

8    showed he helped Brian Bowen Senior get the money he

9    desperately needed in part to repair his house that had burned.

10   He helped Tugs Bowen find a top school that needed a player to

11   replace Donovan Mitchell, and offered a great stage to audition

12   for the NBA.  He helped the Louisville basketball team secure

13   one of the best high school basketball players in America.  And

14   in doing all these things, he scored points with the dad, he

15   got in good favor with Rick Pitino, and one day hopefully, if

16   he was lucky, got a step closer to being Tugs Bowen's manager

17   or agent.  Where possibly, ladies and gentlemen, based on any

18   of those facts can you find one scintilla that Christian

19   Dawkins acted with an intent to harm, defraud, or hurt anyone?

20                The government has tried to show you that because

21   money exchanged hands in cash form, because it was submitted

22   under a different name, travel expenses on invoices.  Don't

23   forget, a lot of that has nothing to do with my client.

24   Understand, he's being tried here alone.  And sometimes in a

25   case like this, all of the evidence is cumulated and it can be

Iahdgat5                    Summation - Mr. Haney

1    prejudicial to a particular client.  So keep Christian Dawkins,

2    if you will, separate to some of those transactions.

3         But you heard from Christian Dawkins himself why these

4    payments were happening in cash form and why they were being

5    concealed, the ones he was associated with.  Listen to the

6    phone call.  It is frankly rare that as a defense attorney you

7    get such a clear refutation of a government theory against your

8    client by and through a wiretap.  So I'm going to play right

9    now briefly phone call DX7 for you.  You could hear Christian

10   Dawkins describing in his state of mind his own words in the

11   transcript that the accompanies.

12        (Audio played)

13        Did you hear that, ladies and gentlemen?  The federal

14   agent asked Christian Dawkins is there any reason why this guy

15   didn't want to just wire it to him.  It sounds like a question

16   an FBI agent would ask.  Christian Dawkins' answer was, "I

17   guess from the standpoint of keeping everything as clean as

18   possible for -- you never know when the NCAA is going to come."

19   He didn't say, Well, we're committing wire fraud.  What if the

20   FBI finds out?

21        Christian Dawkins' paranoia was based on what he said

22   in this wiretap.  He's worried about the NCAA.

23        As we said in our opening statements, the NCAA rules

24   were violated.

25        You also heard the government reference in their

1  closing argument a Jeff and Jill.  You remember, Jeff DeAngelo

2  and Jill were these undercover investors that Munish Sood had

3  brought to Christian Dawkins and Merl Code.  And the government

4  suggested that the concern of Christian Dawkins and Merl Code

5  was that Jeff and Jill needed to be investigated.  Right?  Who

6  knows who these people are.  And here's testimony from Munish

7  Sood that could help clarify that to you, to why Christian

8  Dawkins was concerned, so there's not some misleading

9  information to cause you to think otherwise.  The question to

10 Munish Sood:

11 "Q  Isn't it true that you and Christian both had concern about

12 Jeff and Jill, the investors, because of the association they

13 had with Marty Blazer, right?

14 "A  Yes.

15 "Q  Because Marty Blazer introduced you to Jeff and Jill,

16 didn't he?"

17         He answered, "Yes."

18         "So you and Christian Dawkins had conversation about

19 the concern of the investigation of Marty Blazer with his

20 problems with the SEC, right?"

21         Mr. Sood answered:  "We had concerns about that and

22 also the fact that, as I said earlier, where the money was

23 coming from.

24 "Q  And that concern included being introduced to Jill because

25 she was associated and linked with this Marty Blazer guy,

1    right?

2    "A   Correct."

3           So any concerns that they had with Jeff and Jill were

4    because of this shady character named Marty Blazer who brought

5    them to the table.  So, I want you to understand that, and

6    that's what the evidence is.

7           Why did Christian Dawkins do the things that he did?

8    He definitely did things.  We sat here for three weeks and

9    heard that.  And because none of us are mind readers, we need

10   to look at the evidence to do our best in answering that

11   question.

12          And when the doors close behind you, and they will

13   soon, and you begin to deliberate in the jury room, I want you

14   to keep one simple phrase in mind and one simple concept.  I

15   believe it is a phrase that my client will never forget, and I

16   hope you won't, either.  "Preexisting relationship."  "Prior

17   relationship."  Though many things in this case are in dispute,

18   one thing I submit to you that is absolutely certain is the

19   fact that in the mind of Christian Dawkins, he believed,

20   whether he was right or wrong, that arranging to give Brian

21   Bowen Senior money was not an NCAA rules violation.  And,

22   again, whether he is right or wrong about that, what matters is

23   if he had a good faith belief for that.

24          How can we possibly know what was in Christian

25   Dawkins' mind at the time the payments were happening?  You

 1    could almost say it is not possible.  I submit we have

 2    evidence.  And, fortunately, if there is any good thing to

 3    happen when the FBI is monitoring your phone calls, fortunately

 4    they were on this occasion when they wiretapped his phone.

 5    Let's listen to a recording they took of Christian Dawkins, and

 6    there is a transcript that accompanies.

 7                (Audio played)

 8                So, we'll leave that up for a minute.  In his truist

 9    moments -- how truer a moment can you have than when you're

10    being wiretapped by the FBI -- Christian Dawkins says:  Yeah,

11    that's my son, Jeff.  Like, when I tell you to feed my guy,

12    like this is my guy, like his effing aunt used to babysit me,

13    I've been knowing this kid his whole life.  His cousin was my

14    first girlfriend.  Like, these are my people people.

15                He then goes on and says:  I don't even think they

16    could do anything, because I've been knowing him his whole

17    life.  I don't even think it is an added benefit.  I think it

18    would be like, OK, you know, they just -- they just had a prior

19    relationship before.  That's how long I've been knowing him.

20                That was what was in his mind.  That's the evidence.

21                Now, let's put that in context.  You may say, So what?

22    Who says that that's OK?  Well, you heard the testimony of John

23    Carns, the senior associate athletic director for compliance at

24    the University of Louisville, who testified very clearly, and

25    recognized the existence of such a rule, that under certain

circumstances those preexisting relationships are exempt from

NCAA the impermissible benefit rule and can even be paid cash.

Let's look at the Louisville compliance director's testimony

together.  The question was posed to Mr. Carns, from

Louisville:

"Q  You know there is a exception to the preferential treatment

rule that involves preexisting relationships, don't you?

"A  Yes, there is."

        But it gets better.  Here's the same compliance

director testifying that cash could even be paid under the

preexisting relationship rule.  Question to Mr. Carns:

"Q  As the director of compliance, would you agree that there

does exist a circumstance called a preferential -- under the

preferential treatment rule, where if there is a preexisting

relationship between parties, cash can be paid under certain

circumstances?

"A  Under the circumstances listed in that interpretation,

yes."

        So from the government's own witness, there is a

preexisting evidence -- existing relationship rule, where cash

can be paid to those who had a prior relationship, and there

was clearly evidence that Christian Dawkins had a preexisting

relationship with Tugs Bowen and his family, absolutely -- not

my opinion, from the evidence.  But let's look at the evidence

and not take Christian Dawkins' word for it.

1      Here is Government Exhibit 516.  It is an email from

2  Christian Dawkins to Munish Sood.  Christian Dawkins emails

3  Munish Sood, April 10, 2016.

4      Brian Bowen:  He's a kid that is a little bit more of

5  a longterm project.  $1,500 a month is what he will need.  He

6  is a Saginaw, Michigan kid.  I've known the family for years.

7  He's for sure a pro.

8      But it's not just Christian Dawkins who acknowledges

9  this, Munish Sood also acknowledged that Christian referred to

10  Tugs Bowen as his son.  Here's Munish Sood's testimony on that.

11  Mr. Sood was asked:

12  "Q  And you had on several occasions had heard Chris Dawkins,

13  my client, refer to Tugs Bowen as his son?"

14      He answered, "Yes."

15      Brian Bowen Senior acknowledged that he and Christian

16  Dawkins went way back.  Brian Bowen Senior's testimony:

17  "Q  And you and Christian Dawkins go way back; is that a fair

18  statement, is that fair to say?

19  "A  Yeah.  I knew him from the same city."

20      How far back is way back?  Brian Bowen Senior told you

21  that Christian Dawkins was in fact Tugs Bowen's AAU coach since

22  Tugs Bowen was 12 years old.  Question to Bowen Senior:

23      "In fact when Tugs was only 12 years old, Christian

24  was an AAU basketball coach, wasn't he?

25  "A  He was one of them.

1   "Q  On the Dorians Pride AAU team, correct?

2   "A  Yes."

3        So, based on the evidence, is there really any

4   question at all that Christian Dawkins and the Bowen family,

5   including both Brian Senior and Tugs, had a preexisting

6   relationship?  In fact, I have already played you the recording

7   where Christian Dawkins tells the undercover FBI agent that

8   Brian Bowen Senior's aunt used to babysit him.  Now, I played

9   that call.  We are not going to listen it to it again.  But I

10  want you to look at the transcript of that call, if you will,

11  because this is a very important point.

12        Here's a transcript of that phone call.  This is DX5T,

13  as evidence.  I want you to look closely at the date on the

14  phone call.  The date on the phone call, July 10th, 2017, three

15  days before the payment to Munish Sood in the Morristown, New

16  Jersey park lot.

17        "I don't even think they could do anything because

18  I've been knowing him his whole life.  I don't even think it's

19  an added benefit.  I think it would be like, OK, you know, they

20  just had a prior relationship before."

21        What better proof explains what was in Christian

22  Dawkins' mind than those words?

23        Understand, ladies and gentlemen, we don't have a

24  burden of proof.  Mr. Dawkins and I could sit down and not say

25  a word.  But I'm giving you evidence of way more than what a

1  reasonable doubt is.

2       Ladies and gentlemen, what we saw from the government

3  in this case is what we expected. Exceedingly predictable and,

4  I submit, underwhelming. The government inundated you with

5  weeks of phone calls, transcripts, emails and text messages

6  showing that in certain circumstances, mostly with others, NCAA

7  rules were violated. They played grainy videos of hotel

8  meetings, wiretaps of guys using bad language, talking about

9  breaking rules, cooperating witnesses testifying against

10 friends, just like we told you they would. Lined up the

11 witnesses one by one, spending weeks to emphasize just how much

12 these rules were broken. Witnesses who admitted testifying

13 against my client could possibly provide them relief from

14 lengthy prison terms.

15      They brought in a guy named TJ Gassnola. You sawed TJ

16 Gassnola. Let me ask you a question. Would you buy a used car

17 from TJ Gassnola? A better question: Would you buy a new car

18 from TJ Gassnola with a hundred-thousand-mile warranty? I

19 would submit, you probably wouldn't. In fact, TJ Gassnola, if

20 you recall, he said that he had a lot to gain by testifying

21 against Christian Dawkins. It was my last question I asked TJ

22 Gassnola. And he struggled with me, but eventually he admitted

23 it, that he had a lot to gain by being here to testify against

24 Christian Dawkins.

25      And so as you deliberate, I implore you to ask

1   yourself if the government has proved beyond a reasonable doubt

2   that Christian Dawkins committed the wire fraud, as it will be

3   instructed to you by the Judge, as it relates to the only

4   school, I submit to you, that is at issue in this case, the

5   University of Louisville.  And if he had a good faith belief.

6   You will get instructions on that.  The school's basketball

7   program was already on probation for breaking the rules and

8   continued to cheat the rules with no regard, and they are the

9   crime victims here?

10          Ask yourselves as you deliberate, what possibly did

11  Christian Dawkins do with any criminal intent?  What did he

12  have to gain from causing harm to Louisville?  Ask yourselves,

13  what proof did the government present that Louisville suffered

14  any harm?  The evidence showed that Tugs Bowen never even

15  played at Louisville.  He left.

16          I submit that as you deliberate, ask yourselves, based

17  on that phone call between Christian Dawkins and the undercover

18  FBI Agent known as Jeff DeAngelo, how could anyone conclude

19  anything other that in Christian Dawkins' mind what he was

20  doing was OK, in his 23-year-old mind as well.

21          Now, you'll be instructed by the Judge on the law.

22  You will be instructed on the definition of "reasonable doubt."

23  And as it's been emphasized, reasonable doubt is the highest

24  burden of proof that exists in the American legal justice

25  system, and there is a reason for that, because of the

1    consequences that can come with a conviction.

2              Ladies and gentlemen, even if you believe that --

3              MR. SOLOWIEJCZYK:  Objection.

4              MR. HANEY:  -- somehow the government --

5              THE COURT:  The objection is sustained.

6              MR. HANEY:  Thank you, your Honor.

7              THE COURT:  The question of punishment in the event of

8    a conviction is not an appropriate consideration by the jury,

9    and you will disregard counsel's last remark.

10             MR. HANEY:  Thank you, your Honor.

11             Ladies and gentlemen, even if you believe somehow the

12   government has proved their exists a high probability of guilt

13   that Christian Dawkins somehow intended to harm the

14   universities, that is not enough.  Even if you say to

15   yourselves as you deliberate and sit around together as a

16   group, "Eh, you know, I think he did it.  I think that guy's

17   guilty," in fact, that would not be enough.  That, in fact,

18   would be the definition of not being guilty, because that very

19   uncertainty that you articulate, that thought in your mind is

20   what reasonable doubt is.

21             Simply put, ladies and gentlemen, you must be moved by

22   the case they put on against my client, moved beyond --

23             MR. SOLOWIEJCZYK:  Objection.

24             THE COURT:  Sustained.

25             Members of the jury, I will instruct you about

Iahdgat5

1   reasonable doubt.  Counsel will not.  And he will stop right

2   now.

3           MR. HANEY:  Thank you, your Honor.

4           Ladies and gentlemen, as I leave you now, I will ask

5   you to remember what I said at the important -- on a very

6   important quote I gave you at the beginning of my opening

7   statement, the words of perhaps one of the greatest lawyers in

8   the history of this country, Clarence Darrow:  "Justice has

9   nothing to do with what goes on in the courtroom.  Justice has

10  everything to do with what comes out of a courtroom."

11          I respectfully ask you, on behalf of my client,

12  Christian Dawkins, to tell the government that that journey for

13  justice we took is now complete and you've arrived at that

14  destination, you have arrived at justice, and that Christian

15  Dawkins is not guilty.

16          Thank you.

17          THE COURT:  Thank you, Mr. Haney.

18          Members of the jury, we are done for today.  We will

19  resume at 9:30 tomorrow morning.  We will hear from Mr. Moore,

20  we will hear from Mr. Schachter, and the government will have a

21  rebuttal and I will then charge you.  I would appreciate it if

22  you could plan on staying past 5 tomorrow.  I won't hold you

23  late but past 5.

24          OK.  Thanks, folks.

25          THE CLERK:  Will the jurors please come this way.

Iahdgat5

1    (Jury not present)

2    THE COURT:  OK.  Be seated, folks.

3    Do we have any other business this afternoon?  No?

4    MR. HANEY:  No, your Honor.

5    THE COURT:  Have a good evening, everybody.

6    THE CLERK:  All rise.

7    (Adjourned to 9:30 a.m., October 18, 2018)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25