IAI8GAT1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                    17 Cr. 686 (LAK)

JAMES GATTO, a/k/a "Jim,"
MERL CODE,
CHRISTIAN DAWKINS,

        Defendants.

------------------------------x

                            October 18, 2018
                            10:00 a.m.

Before:

                HON. LEWIS A. KAPLAN,

                            District Judge
                            and a Jury

                    APPEARANCES

ROBERT S. KHUZAMI
      Acting United States Attorney for the
      Southern District of New York
BY:  EDWARD B. DISKANT
      NOAH D. SOLOWIEJCZYK
      ALINE R. FLODR
      ELI J. MARK
      Assistant United States Attorneys

WILLKIE FARR & GALLAGHER LLP
      Attorneys for Defendant Gatto
BY:  MICHAEL S. SCHACHTER
      CASEY E. DONNELLY

IAI8GAT1

APPEARANCES (Cont'd)

NEXSEN PRUET LLC
        Attorneys for Defendant Code
BY:  MARK C. MOORE
            -and-
MERL F. CODE

HANEY LAW GROUP PLLC
        Attorneys for Defendant Dawkins
BY:  STEVEN A. HANEY


Also present:  SONYA JACOBS, Paralegal
               SYLVIA LEE, Paralegal
               ANTHONY CASOLA, FBI

IAI8GAT1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning, folks.

3          Before we bring the jury in I just want to advise

4     counsel that, although I haven't made a decision yet, I am

5     contemplating breaking for the day after the rebuttal and

6     charging Monday.  If anybody has a view about that I'd be happy

7     to hear it, but I just haven't made up my mind.

8          MR. MOORE:  I want to make sure that, we sent over

9     PowerPoints this morning and the government had a concern about

10    one of the points we made in ours.  We have made the correction

11    that the government requested, which is to change the 37 agents

12    to, out of all of the agents --

13         THE COURT:  It was 35, wasn't it, two plus 35?

14         MR. MOORE:  By my count it was 40, but --

15         THE COURT:  Two out of 35 is what your slide said.

16         MR. MOORE:  So we have changed two out of all the

17    agents because we looked at Special Agent Eckstut's testimony.

18         THE COURT:  Just so you know I read this stuff.

19         MR. MOORE:  I have no doubt about that, your Honor.

20         THE COURT:  Let's go.

21         MR. DISKANT:  On that note, the government has told

22    defense counsel that anything we use in rebuttal is just going

23    either transcript excerpts or exhibits.  We have printed out a

24    copy and we will hand it around when it before.

25         (Continued on next page)

1    (Jury present)

2            THE COURT:  Good morning, everybody.

3            The jurors and defendants all are present.

4            We are now going to hear the closing argument on

5    behalf of Mr. Code by Mr. Moore.

6            MR. MOORE:  Mr. Code, your Honor.

7            THE COURT:  You may proceed.

8            MR. CODE:  Good morning.

9            Thank you for your patience.  Thank you for your

10   consideration.  We humbly recognize how tough it has been on

11   all of you, changing of your schedules, getting back and forth

12   to the court, and we appreciate the time you have spent and the

13   attention you have spent to this case.  We thank you.

14           In the prosecutor's opening statement he told you this

15   case was about lies, deceit, and greed.  You did not hear a

16   single bit of evidence that showed that Merl Code lied to any

17   university.  You did not hear any evidence that Merl Code made

18   a single solitary dime from sending a player to a particular

19   school.  There is no evidence that Merl intended to deceive,

20   cheat, or swindle any university in any way.

21           As we sit here almost three weeks later, I submit to

22   you that the government has not presented you any evidence that

23   Merl intended to harm these universities, let alone proof

24   beyond a reasonable doubt.  And because the government has

25   failed to show that evidence to you, you must find Merl not

1    guilty.

2         I am Merl Floyd Code.  This is our client, Merl Saint

3    Michael Code.  I am joined by Mr. Moore.  As you have heard,

4    Mr. Moore and I both practice in South Carolina with two

5    different law firms.  I admit this case is different for me

6    than any other I have had in a 40-year career.  But I spent

7    most of my years as a lawyer handling criminal cases in the

8    state courts of South Carolina as both a prosecutor and a

9    defense lawyer so I know how important it is to make sure that

10   every "I" is dotted, every "T" is crossed.  When you are making

11   decisions that affect someone's life, like the decision that

12   you are going to have to make in this case, it's important.

13   And let me tell you something.  In this case, there are a whole

14   lot of uncrossed Ts and undotted Is.

15        Throughout the trial, I am certain you observed that

16   the government called a number of witnesses who neither Mr.

17   Moore or myself cross-examined.  That is simply because none of

18   these witnesses knew anything about Merl Code.  In fact, I

19   submit you heard very little evidence about Merl during this

20   entire trial.

21        The government must prove to you beyond a reasonable

22   doubt that Merl specifically intended to harm University of

23   Louisville or other universities.  That's the highest proof

24   under our legal system.  The government carries the burden

25   because in America we have decided that no one can be found

1   guilty of a crime and lose their freedom unless or until the

2   government leaves each and every one of you with no reasonable

3   doubt that they are guilty of the offense charged.

4         We spoke to you earlier about your role.  I have

5   explained the concept to jurors this way.  You are to fold your

6   arms across your chest and say to prosecutors, Merl Code is

7   cloaked with the presumption of innocence until you prove to me

8   otherwise.  I am not going to speculate.  I am skeptical of

9   this prosecution to take away freedom of any citizen.  Because

10  that is the presumption of innocence, of each defendant, as

11  prescribed by law.  You are supposed to say, Mr. Prosecutor,

12  you must make me unfold my arms from across my chest based on

13  the evidence you put before me.  I must be convinced beyond a

14  reasonable doubt that he or she is guilty.  Freedom is too

15  precious to take away unless each and every one of you believe

16  beyond a reasonable doubt that the evidence warrants such

17  action.

18        THE COURT:  Mr. Solowiejczyk, you are standing.  Why?

19        MR. SOLOWIEJCZYK:  Objection.

20        THE COURT:  Members of the jury, counsel is entitled

21  to argue that the evidence doesn't prove guilt beyond a

22  reasonable doubt.  He is, indeed.  I will instruct you about

23  reasonable doubt, and that's what controls, not any lawyer's

24  suggestion of what the law of reasonable doubt is.

25        Go ahead, please, Mr. Code.

1  MR. CODE: In jury selection you heard folks tell the

2  Court that they could not listen to his Honor's instructions on

3  the law and follow the law. You were not one of them. Some of

4  the jurors not selected indicated they did not think they could

5  be fair to both sides because they formed opinions before the

6  trial began that were so strong for one side or the other.

7  You were not one of them. You all agreed that you could be

8  fair and impartial, listen to the evidence presented with an

9  open mind. Because a jury trial is supposed to be a search for

10  the truth in order to apply justice.

11  You find truth through the facts, evidence, and also

12  through the lack of evidence, through your common sense and

13  your life experiences. When you find the truth, the truth

14  shall lead you to justice. Our court system was designed to

15  empower the jury to decide the truth and do justice. And in

16  the attorney general's rotunda, in the Department of Justice in

17  Washington, D.C., there is a famous inscription which says the

18  United States wins in cases when justice is done to one of its

19  citizens in a court. The people of the United States win not

20  when the government gets a guilty verdict, but when justice is

21  done. And that's all we ask.

22  In the opening statement Mr. Moore candidly told you

23  Merl played a role in the NCAA rules violations, but this case

24  is not about what Merl Code did or how he did it. This case is

25  about why Merl did it. Why did Merl facilitate the payments to

1   the father of Tugs Bowen?  This is a case about what was in his

2   mind and what was his intent.

3       In this case, the government has attempted to shoehorn

4   NCAA rules violations into a federal statute, and the shoe just

5   doesn't fit.  As I am going to talk about later, to do this the

6   government has forgiven a litany of crimes, like tax evasion

7   and lying to the FBI, mortgage fraud, by admitted criminals

8   like Brian Bowen Senior and TJ Gassnola, in exchange for those

9   criminals' assistance to make a case against Merl, a case that

10  we submit defies common sense and does not hold water.

11      Throughout this trial you heard Merl's voice on the

12  FBI wiretap recordings.  Yet even with those hundreds of hours

13  of wiretapped calls, I submit to you you never heard once, not

14  once, Merl talking about wanting to defraud, rip off, swindle

15  or otherwise harm these universities in any way, in any shape,

16  or any form or fashion.

17      I am going to talk to you about the evidence that you

18  heard about Merl.  As we talk about that, I ask you to not be

19  distracted by the sleight of hand tricks that you heard during

20  this trial and in the government's closing argument.  The

21  government's sleight of hand comes in their so-called

22  consciousness of guilt evidence.  We submit that this evidence

23  is an effort to divert your attention from the government's

24  lack of evidence as to the crime charged.

25      The government wants to make you think that because

1   these payments were not out in the open, that means that Merl

2   thought he was violating a federal criminal law.  But because

3   of the NCAA rules, nobody was dumb enough to wave the red flag

4   to the bull that is the NCAA and say come get us.  There is no

5   evidence that anyone acted with specific intent to defraud any

6   university.

7           I want to remind you again that the most pervasive

8   piece of evidence you heard in this trial about Merl and what

9   he thought were the actual words that he spoke when he thought

10  nobody else was listening.  He didn't know anybody was

11  listening.  He didn't frame his words so that he could curry

12  favor from anybody.  He told you what he thought and he

13  believed, which shows that he did not act with specific intent

14  to defraud any university.  And you know this because you heard

15  Merl say twice in the same conversation that the government

16  introduced as Government's Exhibit 57.

17          (Audiotape played)

18          MR. CODE:  Remember, Merl did not know he was being

19  recorded.  He had no reason not to be candid with the

20  undercover agent, an undercover agent who the government chose

21  not to call as a witness.  And what he told the undercover was,

22  this is one of those instances where we need to step up and

23  help one of our flagship schools.  Merl wanted to help, not

24  harm any university.

25          Now, you heard the prosecutor describe to you Merl's

1    involvement in facilitating a payment to Brian Bowen Senior.

2    We agree with the prosecutor that Merl helped arrange payments

3    to Mr. Bowen and that the plan was that the payments be made

4    through Merl's Adidas-sponsored AAU team, the Karolina Khaos.

5         We also agree that Merl faced delays getting Adidas to

6    process the first $25,000 installment for Mr. Bowen in the

7    summer of 2017, and that Christian Dawkins told Merl that Mr.

8    Bowen needed the money right away.

9         You heard how an undercover FBI agent, who was posing

10   as an investor in Mr. Dawkins's management company, agreed to

11   cover the $25,000 installment.  And you heard that Merl agreed

12   to reimburse Mr. Dawkins's company once the Adidas money came

13   through.

14        We have tried our best to share the truth with you.

15   Throughout every day of this trial we tried our best to make

16   sure you understood the truth, because the truth ought to lead

17   you to the decision you have to make.  We have attempted to

18   hide nothing.  We told you on the first day of this trial we

19   violated NCAA rules.  First day.  We spent three and a half

20   weeks and all they have proven to you is that we violated NCAA

21   rules.  We could have saved you three weeks and two days,

22   because we told you in the beginning.

23        You heard from the program director of Karolina Khaos,

24   Ricky Robertson, that once the Adidas money hit the Karolina

25   Khaos bank account, Merl asked Robertson to transfer the money

1    to Mr. Dawkins's company.  And he did, every penny.

2          What we do dispute is why Merl assisted the payment.

3    Merl's intent, the reason he helped arrange the payment to

4    Brian Bowen is not hard to figure out.  Why not?  Because he

5    told you in his own words on a taped conversation that he had

6    no idea the government was recording.  You heard it.  He told

7    you himself.  We needed to step up and help one of our flagship

8    schools in Louisville secure a five-star caliber kid.

9          I don't know if you know anything about sports, but 1

10   is the lowest rating and 5 is the highest.  You could play.

11   You might be 15 or 16, but you could play.  Why would Merl want

12   to give a university the best basketball player in the world to

13   hurt them?  It doesn't make sense.

14         And there is another problem with the government's

15   case against Merl, and I am going to remind you in a timeline.

16   Stay with me, guys.

17         Mr. Haney showed you yesterday, according to the

18   testimony and evidence you heard, Brian Bowen Senior had been

19   receiving money for his son's basketball abilities beginning in

20   2014, from various sources, including, but not limited, to the

21   travel team Mean Streets, high schools La Lumiere and

22   Windermere, Chris Rivers and TJ Gassnola.  Merl did not assist

23   in providing any money to Bowen Senior until 2017.  Please

24   remember that even TJ Gassnola agreed that Merl was not a

25   consultant at Adidas when Gassnola made the first payment to

1    Brian Bowen Senior.

2           Stay with me.  Stay with me on this.  If, if, as all

3    of those compliance officers who came in here said to you, if

4    this is true what they said, if accepting money makes you

5    ineligible, Tugs Bowen had been rendered ineligible as far back

6    as 2014 because of his father, Brian Bowen Senior, receiving

7    money.  Ladies and gentlemen, if he was ineligible five, six

8    times, three years before, the money he received from Merl in

9    2017 didn't make him ineligible.  I analogize that to you can't

10   kill a dead man.  He was already dead.  And then Merl shot him

11   again three years later.  He didn't kill him.  He was already

12   dead.

13          The government has failed to prove the simplest part

14   of the case that Tugs Bowen was rendered ineligible by the

15   payment that Merl helped facilitate.  That's just not true.

16          As for the supposed Miami scheme involving the player

17   named Nassir Little, well, that never even happened.  Mr.

18   Diskant already told you the truth about the so-called scheme.

19   The truth is that Mr. Augustine, Nassir Little's AAU coach,

20   just wanted money from Adidas to pay for the expenses of

21   running his AAU team.  That's the truth.  And Merl learned

22   about this back in August of 2017, when this scheme supposedly

23   happened.  Nassir Little's family wasn't actually asking for

24   money in connection with their son's college choice.  And

25   because the family wasn't even asking for money, there was

1    never going to be any payment to the family.  No payment to the

2    Littles for Merl to help facilitate it.

3            What does this mean for you, ladies and gentlemen of

4    the jury?  It's simple.  It means Merl could not have been

5    conspiring to defraud Miami.  Nothing happened.  He ain't give

6    no money.  He ain't promise no money.  Nothing in the evidence

7    shows that he did.

8            Let's move on to the other schools in the so-called

9    conspiracy -- North Carolina State and Kansas.  The alleged

10   scheme to defraud North Carolina State, the one that involved

11   Dennis Smith, Jr., which Mr. Gassnola talked about, that took

12   place late in 2015.  Merl didn't even become a consultant at

13   Adidas until 2016.  He couldn't have been involved in any of

14   the NC State allegations, and he wasn't involved in them.  This

15   is why you have heard zero evidence about Merl and any payments

16   related to Dennis Smith, Jr.

17           The same thing with Kansas players Billy Preston and

18   Silvio De Sousa.  Mr. Gassnola testified for two days about

19   payments to those players and to the families of those two

20   players.  Not once did he ever mention Merl having anything to

21   do with those two players.  Indeed, there is no evidence that

22   Merl had anything to do with the payments to those players or

23   their families.

24           The government has charged one conspiracy involving

25   four separate schools.  You heard no evidence that Merl is

1   involved in making any payments to the players of three of

2   those four schools.  No North Carolina State.  No Kansas.  And

3   no Miami.  That's three of the four.  None.  Yet he is sitting

4   there on a conspiracy charge with folks he had nothing to do

5   with.

6            The government has taken acts in this case

7   independently, which are not crimes, and attempted to magically

8   bundle them into the federal crime of wire fraud.  I submit to

9   you there is no credible evidence to support the government's

10  charge of wire fraud or conspiracy.  And there is certainly no

11  evidence that comes close to meeting the burden of proof in

12  this case, which is beyond a reasonable doubt.

13           The government talked to you a lot about invoices,

14  including those from Merl's AAU team to the Karolina Khaos.

15  They want you to speculate, because Merl didn't write payments

16  to high school basketball players on his invoice, that he

17  somehow committed a crime.  Not so.

18           These were simply internal documents that allowed

19  Merl's colleagues at Adidas to track how they were spending

20  their money.  The government says that these were concealed

21  from universities.  Where is proof of that?  Where is the proof

22  that universities ever gave copies of any invoices from a shoe

23  company or from any other deal that they personally deal with?

24           The invoices were done in this way to conceal the

25  payments from the NCAA, not from the universities.  Don't let

1    the government confuse you here.  Just because they say they

2    were concealed from universities does not mean it's true.  None

3    of the government's cherry-picked university witnesses from the

4    compliance department discussed how they thought they were

5    entitled to look at any internal record from any shoe company.

6          Let's talk about another example of the government's

7    sleight of hand.  The government played a call between Merl and

8    Christian where Christian expressed some concern about business

9    people named Jeff DeAngelo and Jill Bailey, who turned out to

10   be undercover FBI agents.  Because they didn't know much about

11   their background, Merl said to Christian, You need to find out

12   who her family is.  This is New York.

13         I just again ask you to use your common sense.  In New

14   York City and Chicago, Illinois, and Atlanta, Georgia, it

15   doesn't matter what city you're in, anybody who has lots of

16   cash, in an unlimited amount, and likes to flash their cash

17   ought to make you scared.  You don't know who you dealing with.

18   Your first thought is not undercover agent.  Your first thought

19   ought to be, if I am trying to get them to invest in my

20   business, and I am going to take their money, and I am going to

21   promise them a return on their money, you need to be concerned

22   what happens if you don't match that return if you're dealing

23   with the wrong people.  That's what went through Merl's mind.

24   Nothing about that other mess they talking about.

25         The government wants you to conclude that Merl and

1    Christian were concerned that these people were undercovers.

2    They want you to engage in speculation.  Why would they think

3    these guys were undercovers?  That's not what they thought.

4    That's their opinion.  But it's just as reasonable for you to

5    conclude as I have already told you.

6            Now, let me give you another point to that.  Remember

7    there was a guy named Marty Blazer.  Marty Blazer introduced

8    Christian, as I understand it, to Jill, to DeAngelo.  And if

9    you remember, Mr. Haney talked about whether Mr. Blazer was

10   mixed up with shady people yesterday when he talked to you.  If

11   Blazer was mixed up with shady people, yes, you better check

12   them out before you take their money and you end up in the

13   Hudson River.  This is not evidence of a crime.  That's

14   somebody doing their due diligence to see who I'm dealing with.

15           During the trial the government called Ricky Robertson

16   as a witness, who played you the call between Merl and Ricky

17   about the Bowen payment, in which Merl said he didn't want that

18   stuff on his phone.  The government wants you to speculate

19   based on this statement that Merl wanted to conceal his

20   evidence of criminal conduct.  What criminal conduct?  But

21   that's their opinion.

22           We submit to you that it is perfectly reasonable for

23   someone in today's world to not want to store financial data

24   and account information on their cell phone.  In today's world,

25   you don't carry that stuff around on your cell phone.  That's

1    not the evidence of a crime.  That's just plain common sense.

2    We all have to be concerned about identity theft and data

3    breaches and that sort of thing.  I am not making this up.  You

4    all read the paper.  You see it on the news.  People take all

5    of your information.  Why would you not want to protect it if

6    you can?

7           The government talked quite a bit about these payments

8    were made in cash.  And yes, Merl and others did try to keep

9    these payments quiet, because they wanted to keep them away

10   from the NCAA scrutiny.  And why did he want to do that?

11   Because he did not want Louisville, Adidas's flagship

12   university, to suffer adverse consequences.  But we submit to

13   you that concealing these payments to protect the universities

14   from NCAA scrutiny is not fraudulent.  That's just being a good

15   sponsor and business partner.

16          I am befuddled as to how the government can assert any

17   of these activities indicate a specific intent to harm or

18   injure Louisville or any other school.  So if none of these

19   above activities alone are crimes, how does grouping them

20   together make them a crime?

21          No crime.  No crime.  No crime.  No crime.  No crime.

22   But you ball up your fist, put them all together.  Now Merl has

23   committed a crime.  It makes no sense.

24          You heard in Merl's own words why shoe companies had

25   to make payments in the manner that they did because coaches

1   like Rick Pitino needed plausible deniability.

2            (Audiotape played)

3            MR. CODE:  That's why these payments were made in the

4   way they were made, to avoid the scrutiny of the NCAA, and to

5   protect the athletes and the coaching staffs at these

6   universities, and not because of any concern on Merl's part

7   that these payments were somehow illegal and in violation of

8   federal law.

9            Hear me carefully.  There is no, there is no federal

10  statute that states you can't give money to a student-athlete.

11  None.  But that's what Merl and his codefendants are accused

12  of.  But what they didn't try to do is take acts that are not

13  federal law and put them under wire fraud where it just does

14  not fit.  Wire fraud requires some specific intent.  The wire

15  fraud statute says specific intent.  That's focused.  That's

16  what you are trying to do.  It's specific.  It is not there.

17           Please remember that, as Mr. Moore told you in his

18  opening, no one wants to wave a red flag in the face of the

19  NCAA.  And no one was dumb enough to do so.  The government

20  must prove to you beyond a reasonable doubt that Merl

21  specifically intended to harm any university.  He had no goal

22  to injure.  But the prosecution has been practicing

23  misdirection throughout these proceedings, a magician's term

24  for focusing the audience's attention on one thing in order to

25  distract his attention from another.

1    I don't know if you all watch television.  I don't

2   watch much of it except sports.  But I was flipping though the

3   channels and came across America's Got Talent this year.  The

4   winner of America's Got Talent was a magician by the name of

5   Shin Lim.  He's the best I have ever seen.  He would roll up

6   his sleeves and you could see his hands.  He'd put cards in his

7   hand and it would come out of his mouth.  Jesus Christ, is that

8   stuff misdirection.  That's what has been practiced at that

9   table.

10       You should be confused by the government's case

11   because I am too.  The government spent two and a half weeks

12   not producing to you any evidence that Merl contemplated any

13   harm or injury to the University of Louisville.  The government

14   has spent two and a half weeks not being able to produce any

15   evidence of specific intent to harm or injure any university, a

16   crucial element of a wire fraud case.

17       The government spent two and a half weeks without

18   producing any evidence of any joint agreement between Merl and

19   anybody to harm any university, which is a material element of

20   a conspiracy charged under wire fraud.

21       I am going to talk to you in a minute about the

22   government's cooperating witnesses, but first I want to talk to

23   you about what the government didn't produce to you.

24       The government presented the testimony of two FBI

25   agents, despite the fact that a huge number of agents worked

1   this case.

2         Let's talk about the two agents they called.  The

3   first one called was an FBI agent, a rotational wiretap

4   monitor, that worked in shifts and had no knowledge of the

5   facts pertaining to this investigation.  That's one agent that

6   they called.  Didn't know anything about the case except she

7   listened to some wire.  The second agent they brought to you

8   was I think a year and a half veteran of the FBI who testified

9   about a summary chart, which was prepared by the prosecutors

10  and only reviewed by them.

11        You saw two undercover FBI agents on a videotape.  You

12  saw two of them in that New York meeting.  You didn't hear in

13  this trial from either one of them.  You have the right to ask

14  yourself why the government didn't call these two agents.  If

15  you looked at the indictment, you will see a reference --

16        THE COURT:  Mr. Solowiejczyk, do you have something to

17  say or are you just exercising?

18        MR. SOLOWIEJCZYK:  Objection.

19        THE COURT:  Sustained.

20        Move on.

21        MR. CODE:  With respect to the summary charts -- may I

22  go there?

23        THE COURT:  You may go on.

24        MR. CODE:  With respect to the summary charts, you

25  heard that the prosecutor selected a limited number of texts

1   and presented them to you as a comprehensive timeline.  Well,

2   as you heard during cross-examination by my co-counsel, the

3   government had numerous other texts related to the recruitment

4   of Tugs Bowen that involved communication among and between the

5   defendants and Tugs Bowen, associate head coach Kenny Johnson,

6   Michael Bowden, the new director of basketball operations, and

7   others.  You should ask yourself why you heard about all of

8   these other texts for the first time in cross-examination of

9   the government's witness.

10          You heard from the government's own investigator that

11  they failed to include a vast amount of evidence in their

12  summary chart.  You should be concerned about that.  You should

13  be concerned that these four prosecutors wrote a summary that

14  skewed and omitted facts and tried to pass them off to you as

15  evidence.

16          You should also question the testimony of the

17  cooperating witnesses.  Three alleged co-conspirators the

18  government is willing to excuse and not prosecute in exchange

19  for their testimony against Merl.

20          Munish Sood testified that he was facing decades in

21  prison for multiple crimes before he took a plea deal from the

22  government.  He testified that he met with the FBI and the

23  prosecutors -- listen to this -- he met with the FBI and the

24  prosecutors at least 17 times, including several times right

25  before his testimony, so that he could get his story straight,

1    or in his own words, so that he could get his facts correct.

2    Did he strike you as someone who is being completely honest, or

3    did he strike you as someone who is attempting to please the

4    prosecutors who prepared them over 17 times for his testimony?

5              After all of these meetings with the government about

6    his testimony, he sat on the witness stand and claimed that

7    Merl promised Brian Bowen Senior money for Tugs Bowen to go to

8    Louisville.  But he admitted on the witness stand under

9    cross-examination he met Merl exactly one time.  And that was a

10   meeting with the undercover agents in New York.  And you saw

11   and did not see any activity that should cause you concern.

12             The government played you excerpts of that meeting,

13   and you can bet they played you every bit of evidence helpful

14   to their case, and you still didn't hear any discussion from

15   Merl reaching any agreement or understanding with Munish Sood

16   about defrauding Louisville.  He testified he had very few

17   communications with Merl, and the government played one of

18   those few communications and it didn't say anything about

19   wanting to defraud any university.

20             Brian Bowen Senior testified that he was facing

21   welfare fraud, tax evasion and other charges before he decided

22   to accept the government's offer to cooperate as a witness in

23   this case.

24             Brian Bowen said almost nothing about Merl.  And to

25   the extent that the government asks you to rely on his

1   testimony, the only actual thing he said was he was a

2   co-conspirator.  He testified that he told the FBI that he knew

3   the name Merl but he couldn't really recall who he was.  He

4   said he is an Adidas guy is all I know.  He works with Adidas,

5   I guess.  Does that sound like the way one co-conspirator would

6   describe another co-conspirator?  You don't have any kind of a

7   relationship?

8           TJ -- let me step back to Mr. Bowen.  I don't know

9   what you heard, but if you heard what I heard, Mr. Bowen had

10  been using his son's athletic ability since he is about 13 or

11  14 years old for his lifestyle, Bowen Senior.  Bowen Senior was

12  taking money for his son's talent and living his lifestyle.

13  The only thing I would have said to you, I saw Mr. Bowen as

14  having a pinky ring in my head.

15          MR. SOLOWIEJCZYK:  Objection.

16          THE COURT:  What is the objection?

17          MR. SOLOWIEJCZYK:  It's beyond the evidence.  It's

18  objectionable.

19          THE COURT:  I don't understand what counsel said.

20  Overruled.

21          MR. CODE:  I will move on.  I think the jury

22  understands what I am saying.

23          Mr. Gassnola is a man who lied to the FBI on several

24  occasions, to banks, to his friends.  He lied to John Gatto.

25  He lied to his own lawyer asking him to write a bogus letter to

1    Kansas.  He lied to his coworkers.  He lied to the IRS when he

2    didn't file tax returns for 13 years.  On the witness stand he

3    could not recall a lot of things when he was shown

4    inconsistencies in prior statements.  He still could not recall

5    the basic details.  And magically, the details he could not

6    remember was information that was helpful to the defendants.

7            TJ Gassnola has lived his life by the line.  He is

8    smart enough to admit to the facts he thinks that the

9    government can prove through the bank records and wiretapped

10   calls on the phones of defendants.  And we know he is willing

11   to lie when it serves his interest.  He lied to the IRS for

12   years.  He lied to the bank.  He lied to you during

13   cross-examination.

14           Look at what he said.

15           Mr. Gassnola testified that he had his fiancee wire

16   $20,000 to Timika Kirby.  But he testified he couldn't remember

17   if he ever told his fiancee why he was asking her to send that

18   much money to a woman she did not know.  Mr. Gassnola wants you

19   to believe he told his fiancee to wire that much money, and she

20   went ahead and did it, and he does not recall if she even asked

21   him why?

22           He told you under oath and he expects you to believe,

23   just like he told the IRS under oath, that he declared all of

24   his income.  Come on.

25           Does Mr. Gassnola really expect you to be as gullible

1   as the IRS or the bank that he defrauded to benefit his

2   fiancee?  Your life experience will tell you that.  I don't

3   know a husband in the world that will send that much money to a

4   woman that your wife don't know.  I don't know a husband in the

5   world that can do that.  But Mr. Gassnola told you that he did.

6           You simply cannot believe TJ Gassnola.

7           This case is supposed to be about why did Merl do what

8   he did.  On every wiretap, on every relevant text message, on

9   every relevant e-mail, every relevant act he engaged in, and

10  every meeting and interaction with undercover law enforcement

11  or personnel he had, he told you why.  To help Adidas flagship

12  schools by assisting the families of young people that the

13  coaching staff requests.

14          You have the right to question, how can the university

15  be defrauded when the university employees, head coach,

16  associate head coach, and the ones requesting recruiting help,

17  coaches identified the recruits they desired, coaches followed

18  negotiations closely, with cryptic messages that you saw during

19  this testimony, with things like thumbs up and we're good,

20  that's acknowledgement of no and thank you for helping us.  And

21  you heard Merl say exactly why he helped them.

22          The government didn't call the president, the

23  chancellor, the chair of any member of the board of trustees,

24  an athletic director, or any coach, or any influential or

25  alumni booster.  The government called compliance officers.

1    And while the government contends that these compliance people

2    speak for the university, they did not offer any evidence from

3    anyone else affiliated with the university to support such a

4    claim.  In fact, the evidence shows, from Merl's perspective,

5    it was someone else entirely who spoke for the university.  It

6    was the basketball coaches who were calling the shots on the

7    basketball program and asking him for help.  Merl had a good

8    faith belief that he was doing what the decision-makers at the

9    universities wanted him to do.

10         Let me ask you this.  If you go into a place and a guy

11   comes out with a white hat, a white smock, he's got a big knife

12   in his hand and a plate of food in his other, wouldn't you

13   assume he's the chef?  So if a guy running the basketball

14   program, making several million dollars a year, everybody in

15   the program reports to him, asks you for help, is it reasonable

16   that he has authority to speak for the basketball program he

17   runs?  Is that just reasonable?

18         The government wants you to ignore the evidence

19   relating to the coaches, particularly at Louisville.  Remember,

20   the prosecution did not mention to you in its closing the

21   payment to Brian Bowen Senior by associate head coach Kenny

22   Johnson at Louisville when Louisville was already on probation.

23   That's a fact.

24         The government has tried really hard to make it seem

25   that Merl had a motive to commit this crime.  The only reason

1  the government is talking generally about greed is because they

2  have no evidence that Merl profited or took something of value

3  from any university.  Using the word "greed" is just not

4  enough.

5          The government asks you to speculate that Merl made

6  these payments with the intent to defraud these universities in

7  hope that these athletes will one day sign a professional deal

8  with Adidas.  Merl was not an agent.  Merl was not a financial

9  manager.  He is a consultant to Adidas.  Whether they sell one

10 pair of shoes or ten million he doesn't make any money.  He

11 gets no bonus.  He has no financial interest whatsoever.

12 Whatsoever.

13         If this is accurate and the evidence I have just told

14 you is substantiated by the record, Merl is the worst criminal

15 known to mankind.  If you knowingly would commit a crime that

16 you don't profit by, you don't even know how to be a criminal.

17 There is no profit motive.  None.  They haven't proven to you

18 any profit motive.  None.

19         These prosecutors are in search of a crime, and the

20 search came up short.  The government is trying to ask you to

21 fit a square peg in a round hole.  You can't do it, even with a

22 sledgehammer, and they are trying to use a sledgehammer.

23 Unless you hear or saw evidence that Merl specifically intended

24 to harm or injure the University of Louisville, or any other

25 university, then you cannot, and you must not, and I implore

1   you not to find him guilty.

2           I am getting ready to close now.  The architects of

3   our criminal justice system gave every defendant the right to a

4   trial by jury of his peers.  You are Merl's peers.  You are the

5   finders of facts.  Through facts and evidence, you find the

6   truth.  Through truth, you render a verdict.  Through a

7   verdict, justice should be served.  Please have the courage to

8   return a verdict that speaks the truth.  Please be the kind of

9   jury that you would want sitting in judgment of you or someone

10  you love.

11          You have listened intently and taken notes.  We ask

12  that you be thorough and thoughtful in your deliberations.

13  Closely examine the evidence and apply your common sense.  We

14  are now at the stage of the trial where you actively

15  participate in making the crucial decision about whether the

16  government has proven to you beyond a reasonable doubt that

17  Merl specifically intended to defraud Louisville, Miami, or

18  entered into some type of conspiracy to harm Kansas and North

19  Carolina State, where no testimony or evidence was presented to

20  you in this two-and-a-half-week process.

21          Our system borrows much from the English system of

22  justice.  In England, there are three verdicts:  Not guilty,

23  guilty --

24          THE COURT:  Sustained.  Stop right there.  You have

25  got the law wrong, and it's not your function to discuss it in

1    any case.

2           MR. CODE:  As all of the defendants have candidly

3    admitted, there is no doubt that NCAA rules violations

4    occurred, but these violations are not crimes in and of

5    themselves.  I have observed how closely you have paid

6    attention and many of you have taken notes as you have listened

7    closely to the evidence.  Kindly review those notes to

8    determine if any day of this trial you heard or were provided

9    any evidence that Merl specifically intended to harm Louisville

10   or any other university.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. CODE:  I submit, you heard no such evidence.

2          It has been a long three weeks, and in some respects

3    your work is just beginning.  We very much appreciate the

4    sacrifices that you made to sit as judges of the facts of this

5    case.  I'm so proud, I am very proud of this special young man

6    that carries my name, because he values his principles and even

7    against great odds.

8          MR. SOLOWIEJCZYK:  Objection.

9          THE COURT:  Sustained.  That's improper.  Move on to a

10   different subject.

11         MR. CODE:  He believes in the jury process, and so do

12   I.  And we believe that if you apply the law to the facts and

13   use your common sense and your life experiences, you will find

14   him not guilty.

15         If I have said or done anything that has offended you,

16   I apologize.  I'm only trying to defend Merl.  Please don't

17   hold my conduct against him.  If you don't like a balded man

18   with a salt-and-pepper beard, with more salt than pepper,

19   please don't hold that against Merl.  If you don't care for a

20   man that wears oversized rings on his fingers, but I earned

21   those rings 48 and 44 years ago and they're precious to me, not

22   because of their monetary value but because of the memories

23   that I have with the friends who shared the experience of

24   earning them with me.

25         Only two entities in the universe -- only two entities

Iaidgat2

1    in the universe know Merl's intent, and you heard Merl.  I hope

2    the other entity speaks through me, that you've also heard His

3    intent.

4            I thank you for your time.

5            THE COURT:  Thank you, counsel.  We will take ten

6    minutes.

7            THE CLERK:  All rise.

8            (Recess)

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Jury not present)

2    THE COURT:  Before we get the jury, Mr. Code, I hated

3  to interrupt you, I really did, but it's not English law that

4  has three verdicts, it's Scottish law.  And it doesn't matter

5  what their law is.  They're probably countries that have

6  sentence first and trial afterward.  It doesn't matter.

7    MR. CODE:  Yes, sir.

8    THE COURT:  OK?

9    MR. CODE:  May I spoke to the Court?

10    I am a snitch, your Honor.  Mr. Moore said that.

11  Mr. Moore put that in my speech.  I didn't put that in my

12  speech.

13    THE COURT:  Well, that was very gentlemanly of you.  I

14  mean, it certainly has been a pleasure having North Carolinians

15  here in court.  And, you know, a colleague of mine once -- from

16  another state, and I -- you know, we were teaching trial

17  practice, we didn't really know each other, and we are two

18  judges with extraordinary different styles from two

19  extraordinarily different states.  But we got to talking about

20  swapping houses and courtrooms for two weeks, and we ultimately

21  rejected it on the idea that the bar of neither state would

22  ever recover.  And so things are different, but you are welcome

23  always.

24    And, Mr. Solowiejczyk, if you have an objection,

25  you've got to stand up and you've got to make a sound.

Iaidgat2

1    MR. SOLOWIEJCZYK:  I understand, your Honor.  I

2   apologize.

3    THE COURT:  You look like you are struggling to your

4   feet and I say "sustained."  I know what's coming.

5    MR. SOLOWIEJCZYK:  I understand.

6    THE COURT:  OK.  Let's get the jury in.  That is not

7   necessarily to encourage you to do it, but if you're going to

8   do it, do it.

9    (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Iaidgat2

1      (Jury present)

2              THE CLERK:  Jury entering.

3              THE COURT:  OK.  Please be seated.

4              The jurors and the defendants all are present.

5              Members of the jury, I am going to make one small

6      change in schedule.  We are going to hear, as scheduled, the

7      closing argument by Mr. Schachter next.  We are then going to

8      break for lunch.  We will hear the government's rebuttal right

9      after lunch.  And then we will recess for the rest of the day.

10     And you will come back on I think it is Tuesday, right?  If

11     not -- no, I am a week ahead.  Monday at 9:30, I'll charge you

12     and you will get the case Monday before lunch.

13             OK.  Let's go.  Mr. Schachter.

14             MR. SCHACHTER:  Thank you, your Honor.

15             Good morning.  The prosecution has proven that when

16     Jim here, that when one of the four Adidas schools wanted a

17     particular high school athlete to play for their school, Jim

18     would try to make that happen.  They proved that Jim arranged

19     for Adidas to give money to these families in the hopes that

20     their sons would play for one of those schools.  And they

21     proved that Jim knew that those payments violated the NCAA

22     rules, and so those payments to those families were not paid

23     out in the open.

24             But here's the problem with the prosecution's case.

25     They don't only have to prove that Jim gave some of Adidas'

Iaidgat2

money to these families.  Their theory is that when Jim

arranged for these payments, that his purpose was to defraud,

to harm, the Adidas schools that he hoped that their sons would

go to.  The federal government has accused Jim of scheming to

victimize colleges that it was his job to support.  But that

theory, ladies and gentlemen, makes no sense.  They have shown

you no evidence that Jim was trying to hurt any of these

schools.  There is no evidence that Jim was trying to defraud

any of these schools.  I want you to think about this.  Why

would he do that?  Why would Jim want to defraud a school that

Adidas sponsored?  For what possible reason?

He was definitely trying to help them recruit players

that the schools really wanted.  But why would Jim think that

he was defrauding a college by helping that school get a player

that they really wanted?  Jim had no motive to commit criminal

wire fraud.  Think back on the evidence that you've heard

during this trial.  Did you hear anything about Jim Gatto

getting anything in return for his efforts to send kids to

schools that Adidas sponsored?  He got nothing, literally

nothing, for providing payments that you've heard about during

the course of this trial.

Ladies and gentlemen, Jim didn't get involved in

arranging for these payments for the purpose of hurting the

schools.  He gave these parents the money that he had heard

they had asked for because he thought that Adidas schools would

Iaidgat2

1  be better off with those kids on the court.  That is all that

2  was in his mind.  Defrauding the schools?  That never crossed

3  his mind.  He thought he was helping, not committing federal

4  wire fraud.  To Jim, this was a win-win-win.  He was helping

5  the colleges recruit a great team, which would mean great

6  things for the schools.  He was helping a family.  And he was

7  helping Adidas by having its brand be associated with a winner.

8              Win-win-win.

9              Now, there is no question that these payments, they

10  violated the NCAA rules, but, as we expect Judge Kaplan will

11  instruct you, the NCAA rules aren't the law.  The law that

12  matters here is the law that you will hear from Judge Kaplan on

13  the law of criminal wire fraud.  The issue in this case, we

14  submit, ladies and gentlemen is whether Jim committed the

15  federal crimes of wire fraud and conspiracy to commit wire

16  fraud.

17              Specifically, the government has charged Jim with

18  scheming to defraud and conspiring to defraud four

19  universities -- Louisville, NC State, Kansas, and the

20  University of Miami -- defrauding Kansas and Louisville and

21  conspiring, or agreeing, to defraud Adidas-sponsored

22  universities.  And when you try to apply the law, that you'll

23  hear from Judge Kaplan, to what the evidence shows about why

24  Jim arranged for these payments, you will see that the

25  prosecutors have not come anywhere close to meeting their

SOUTHERN DISTRICT REPORTERS, P.C.

Iaidgat2

1  burden of proving to you, beyond a reasonable doubt, that he

2  committed the federal crimes that he's charged with.

3        I expect that Judge Kaplan may instruct you that in

4  order to find Jim guilty of either of those crimes, either wire

5  fraud or conspiracy to commit wire fraud, you have to be

6  convinced beyond a reasonable doubt that Jim was acting with

7  the specific intent to defraud these Adidas-sponsored colleges,

8  and that he was acting with a bad purpose, to disobey or

9  disregard the law.

10       Wire fraud and conspiracy to commit wire fraud have

11  differences, which Judge Kaplan explained to you at the

12  beginning of the case and will be explaining to you in great

13  detail.  But I expect that Judge Kaplan will instruct you that

14  they both require the same thing about Jim's mental state.  The

15  question you need to consider for every charge that he faces is

16  whether Jim was acting with the specific intent to defraud and

17  whether Jim was acting with a bad purpose, to disobey or

18  disregard the law.  And because of that, ladies and gentlemen,

19  we submit that Jim is not guilty of wire fraud and conspiracy

20  to commit wire fraud because that's not what he was thinking.

21  That was not his intent.

22       So, what is the evidence that the government has

23  presented you with in this trial that can help you think what

24  Jim was thinking when he arranged for these payments to these

25  families?  Well, one thing that they gave you was recorded

Iaidgat2

1    calls.  And I submit, ladies and gentlemen, that the best way

2    to figure out what someone was thinking is to take a look at

3    what they were saying.

4         Now, you've heard a lot of recordings in this case,

5    but you have actually only heard Jim's voice on tape a total of

6    seven times.  If you wish, you can write these down.  I'm going

7    to identify for you the government exhibits that identify each

8    of the times that you have heard Jim's voice on tape.  You

9    heard Government's Exhibits 6 and 7, and that was really one

10   conversation that he had with Merl Code about Nassir Little.  I

11   say it is one conversation because they got interrupted in the

12   middle and then the conversation went on.

13        You heard Government Exhibits 58 and 59.  Those are

14   two very short voicemails which Jim Gatto left for Coach Rick

15   Pitino of the University of Louisville.

16        You heard Government Exhibits 1 and 12, which are

17   short calls about the payments to Brian Bowen.

18        And then you heard Government Exhibit 2, which was a

19   call that he had with TJ Gassnola about Silvio De Sousa.

20        Do any of those recordings even hint that Jim's plan

21   was to defraud any of the schools that Adidas-sponsored?  Not

22   even close.

23        You can listen to each one.  Please do.  They are

24   really short.  And you're going to hear that Jim never says

25   anything that hints, suggests, that his purpose or his object

1  or his intent was to defraud one of these schools.

2          Let's start with Government Exhibits 6 and 7.

3          I'll play you portions of those.

4          (Audio played)

5          So, Merl called Jim and asked Jim if Adidas would be

6  willing to help the University of Miami, which wanted to

7  recruit a terrific basketball player named Nassir Little.  And

8  you can look at the words that they used, the words that you

9  just heard, and they talk about helping Miami.  Why did they

10  use those words?  Because that's what they're thinking.  Their

11  goal is to try to help the University of Miami, not defraud it.

12          You learned that Jim confirmed -- or you heard on this

13  tape Jim confirmed that Miami's head coach had spoken to him

14  about Nassir Little.  You heard that a moment ago.  And then

15  you also saw Defense Exhibit 220, which is Coach Larranaga's

16  text to Jim asking him to call him.  So, Coach Larranaga

17  reached out to Jim to discuss Nassir Little.

18          So what was Jim's intent?  What was his purpose?  I

19  submit to you, ladies and gentlemen, there is no mystery, you

20  don't need to guess, because there it is in this recording.

21  There is a great basketball player.  Miami thinks that it would

22  really help to have this terrific player on the court.  But

23  Arizona, which is sponsored by Nike, has offered $150,000 if

24  Nassir Little will go play there.  So Merl asked Jim if Adidas

25  would be willing to help Miami, because, as you just heard him

Iaidgat2

say, they, meaning the University of Miami, really wants the

kid.

Now, the government has made a huge deal about people

using two phones. I submit to you that a lot of people use two

phones, but to the extent it matters, Jim uses only one. No

second phone.

But more importantly about this call is that you focus

on the words. The government has the burden of proof. Does

this call prove to you that Jim was intending to defraud the

University of Miami? Does anything on this call suggest that

Jim or Merl were trying to victimize the University of Miami,

that that's what they were thinking, that that was their

intent, their goal? Of course not. Because his intent is to

help the University of Miami, not defraud it. He's not

committing wire fraud, and he's not conspiring to commit wire

fraud.

You heard the same kind of evidence with respect to

Tugs Bowen and the University of Louisville. You learned that

in late May of 2017, Merl called Jim to ask if Adidas would be

willing to help provide some money for the Bowen family. We

don't have a recording of that call. But the evidence suggests

that Merl's conversation with Jim about that sounded a lot like

the call that you just heard about Nassir Little and the

University of Miami. How do you know? Well, you heard Merl

Code describe what happened in a recorded meeting. Merl said

Iaidgat2

1  that Oregon, a Nike school, had made an astronomical offer to

2  try to recruit Tugs Bowen to the University of Oregon and that

3  he then worked his phones, in terms of my folks internally,

4  which I submit suggests that he spoke to Jim Gatto.

5          And, ladies and gentlemen, this, again, is what Merl

6  and Jim were intending.  A Nike school, the University of

7  Oregon, was offering a lot of money to recruit a great player

8  named Tugs Bowen, and Jim was asked if he could level the

9  playing field so that the University of Louisville would also

10  have a shot at recruiting this talented player that it really

11  wanted.  And that, ladies and gentlemen, is all Jim and Merl

12  were thinking about.  That's all that was in their mind.  As

13  Merl said, this was one of those instances where they needed to

14  step up and help one of their flagship schools in Louisville

15  secure a five-star caliber kid.  That's the only thing that

16  they are thinking.  And one of your important tasks is to

17  figure out what were they thinking.  Were they acting with the

18  specific intent to defraud the University of Louisville?

19          You also know Jim's intent because of what he did

20  minutes after he spoke with Merl, on May 27th.  What did he do?

21  His call, minutes later, after hearing this request, his first

22  call is to Louisville's Head Coach, Rick Pitino.  And you heard

23  that voicemail.  I'll play it again for you.

24          (Audio played)

25          If you're keeping track, this is the third of a total

1746

Iaidgat2

of seven recordings that you heard with Jim's voice on it.

And, ladies and gentlemen, there's two very important
things about this very short voicemail.  First, why did Jim
reach out to Coach Pitino?  Because he wanted to make sure that
before he had Adidas pay money to the Bowen family, before he
spends his employer's money, he wanted to make sure that this
was help that the University of Louisville really wanted.  It
suggests that his goal is to assist Louisville; that's why he's
checking with Coach Pitino.

Second, think about what this voicemail tells you
about whether Coach Pitino knows exactly what kind of help Jim
Gatto is offering to provide.  Why, precisely, would
Louisville's head coach think that a shoe company
representative wants to speak to him about a player?  How is a
shoe company representative going to assist Louisville in
recruiting an athlete?  Ladies and gentlemen, I submit to you
that the only explanation that makes any sense is that Coach
Pitino knows exactly why Jim is calling to discuss a player
with Coach Pitino.  Jim is reaching out to Coach Pitino, and
he's arranging this payment because he wants Louisville to be a
great basketball team, because the Adidas logo is on the Adidas
Jersey -- I'm sorry, is on the Louisville Jersey, and that has
his company associated with a winner.  That's a win-win.

If Tugs would have helped, if he would have heard from
Coach Pitino that Tugs would help Louisville, he'd arrange for

Iaidgat2

1    the payment.  If Coach Pitino would have said, no thanks,

2    that's not help we need, then he wouldn't have.  His only goal,

3    his only purpose, the only thing on his mind was whether this

4    would help a school that he was paid to support.

5        Now, you learned that Tugs Bowen committed to the

6    University of Louisville on June the 1st of 2017.  What did Jim

7    do?  He left this voicemail, which is Government Exhibit 59.

8        (Audio played)

9        This is the fourth of a total of seven recordings.  He

10    calls Coach Pitino to congratulate him.  What's the good news?

11    That Jim got away with a criminal scheme?  What's going to be

12    great?  Why is Jim excited for the University of Louisville?

13    Why does he think it's going to be great?  Because he thinks

14    that what he's done is help Louisville have a better basketball

15    team.  That's his intent.  That is what he's thinking about.

16        The NCAA rules may have been broken, but that does not

17    change the fact that Jim's purpose was not to defraud

18    Louisville; his purpose was to help the University of

19    Louisville achieve what he understood to be its goals.  And

20    what matters in this case is what Jim was thinking.

21        Now, the fifth and sixth recordings are Government

22    Exhibits 1 and 12, and they're just calls from Christian and

23    Merl that are following up on when Adidas is going to be able

24    to disburse the payments that are going to be made to Brian

25    Bowen.  And there is nothing in these calls -- please listen to

1    them -- that suggests in any way that Jim's goal or that Jim's

2    intent is to defraud the University of Louisville.

3         Now, how else do you know that the purpose of

4    providing this money to Brian Bowen was to help Louisville and

5    not to defraud it?  You also saw it in the text messages of TJ

6    Gassnola.  Mr. Gassnola was shown Government Exhibit 107P-3.

7    He wrote, "The Bowen thing looks good for us perception wise."

8    Merl Code responds, "I think it's great for us."  And

9    Mr. Gassnola was asked who he was referring to, what did he

10    mean when he said it looks good for us.  And he explained, he

11    says, "We were working together as a basketball marketing

12    brand, and we were trying to help our schools get players."

13         That was the goal.  That was the intent.

14         Even Mr. Gassnola never said that the intent, the

15    goal, was to defraud schools.  Even the government's witness

16    said that his goal was to help our schools.  He said the same

17    thing in a text message that he wrote to Coach Pitino that you

18    saw.  That was Government Exhibit 107Q1.  He wrote:  "Hall of

19    Famer.  Hope you are in a good place.  Bowen will help."

20         He wrote the same thing to Jim.  Government Exhibit

21    107K-4.  He wrote, "Pitino is ecstatic.  Kid called and

22    committed.  Everyone did their part."

23         And Mr. Gassnola was asked why he wrote that.  And he

24    explained:  Because he wanted Jimmy to feel -- to be happy,

25    seem like I pretend that I talked to Pitino and put Jimmy in a

1  good place, make sure he was smiling, felt good about

2  everything.

3        And think about that, ladies and gentlemen.

4  Mr. Gassnola is saying that he wants Jimmy to feel good about

5  everything.  And what does he think would make Jim Gatto happy?

6  Knowing that Coach Pitino is ecstatic.  In other words, the

7  thing that is motivating Jim is trying to help Coach Pitino.

8  His intent is to help, not to defraud, a university.

9        Now, Mr. Gassnola said basically the same thing about

10 the reasons that he provided money to Dennis Smith's family or

11 Billy Preston's mother or Silvio De Sousa's guardian.

12 Mr. Gassnola explained that Dennis Smith Junior had earlier

13 committed publicly to NC State.  And then he gets a call from

14 Coach Early of the NC State basketball staff, and he said, he

15 explained to Coach Early:  Reached out to Louisville.  He said

16 that there were certain things that were promised to the

17 family, from whom I don't know, but there was a lot of minutia

18 around it, and he just seemed to be uncomfortable and he was

19 having some issues keeping that situation together.

20       Now, that testimony was not a model of clarity, but it

21 sounds like Coach Early told Mr. Gassnola that another school,

22 or someone, was offering money to try to persuade Dennis Smith

23 to decommit from NC State and go to some other school.

24       Mr. Gassnola, in talking about this payment, said

25 nothing about desiring to deprive NC State of something of

1  value, or causing harm or injury to NC State.  Mr. Gassnola did

2  not tell you that he really wanted to victimize NC State.  He

3  did not say that he was intending to defraud NC State.  He

4  explained the reason for the payment.  And, ladies and

5  gentlemen, does a scheme that is meant to calm the situation,

6  keep people happy and do the right thing sound like a scheme to

7  defraud?

8          What are Mr. Gassnola and Mr. Gatto trying to do?

9  They're trying to make sure that NC State can compete with the

10  promises that are being made by others to the Smith family so

11  that Dennis Smith wouldn't go to a different college.  In other

12  words, they're intending to help NC State, not to defraud NC

13  State.

14          Why did Mr. Gassnola say that he gave money to Billy

15  Preston's mother?  He said he understood that there were a lot

16  of people providing her money, and he wanted to decrease the

17  chances that anything could affect Billy Preston's eligibility

18  to play basketball.  Why?  Because that would be bad for Billy

19  Preston, and it would be bad for the University of Kansas.

20          So what was motivating him?  He wanted to protect

21  Kansas.  He was not acting with the specific intent to defraud

22  Kansas.  He was making this payment to protect Kansas from the

23  NCAA.  He didn't want anything bad.  He didn't want to harm

24  Billy Preston or Kansas.  And that, ladies and gentlemen, is a

25  plan to protect and help.  That is not a scheme to defraud.

Iaidgat2

1      What did Mr. Gassnola say about Silvio De Sousa?  He

2   said that Silvio De Sousa's guardian told him that he was

3   getting paid $60,000 a year by a booster at the University of

4   Maryland, which was an Under Armour school.  But, you see,

5   Silvio De Sousa, he didn't want to go to the University of

6   Maryland, he really wanted to go and play for the University of

7   Kansas.  So, Mr. Gassnola agreed to give this guy, Fenny,

8   $20,000 so that Silvio De Sousa could go to the college that he

9   really wanted to go to.

10      Ladies and gentlemen, I submit that's not criminal

11   intent.  That's a good deed.

12      Think back and see if you can recall any examples

13   whatsoever in which Mr. Mark asked Mr. Gassnola whether the

14   purpose of the payments was to harm the universities, to hurt

15   them, to defraud them of their money or property.  I'll give

16   you the answer.  Mr. Mark never asked that question.  And

17   Mr. Gassnola, he never said that.  Mr. Gassnola's testimony

18   about his intent in making these payments shows that he had the

19   opposite of criminal intent.

20      Now, Mr. Gassnola did say that he concealed the

21   payments from universities.  OK.  But the government has to

22   prove that Jim's purpose, his specific intent, was to defraud

23   schools.

24      Now, I also submit to you, ladies and gentlemen, that

25   Mr. Gassnola's testimony that he was concealing these payments

Iaidgat2

1     from the universities was not the truth.  How do you know?

2     Well, you know that Coach Early, from NC State, he loaned TJ up

3     and asked for money to calm the situation.  So he certainly

4     wasn't concealing the payment from Coach Early.  The evidence

5     of his interactions with the University of Kansas coaching

6     staff?  Ladies and gentlemen, we submit that that proved that

7     he concealed nothing from the University of Kansas coaching

8     staff.

9          To the contrary, the evidence, I submit, shows that

10    Kansas' head coach knew of and asked for a payment to be made

11    to Silvio De Sousa's handler.  More than that, Coach Self

12    requested just the kind of help that Mr. Gassnola arranged as a

13    condition for Coach Self to permit Adidas to continue their

14    sponsorship agreement with the University of Kansas.

15         I'm going to take you through that evidence.

16         According to Mr. Gassnola, Coach Townsend asked

17    Mr. Gassnola to speak to Fenny, because Fenny was interested in

18    Adidas' assistance, according to Mr. Gassnola, in providing

19    team uniforms for the Angola National Team.  He said -- his

20    story -- he discussed that briefly with Coach Self and Coach

21    Townsend and said he would take care of it, and that was the

22    end of that.  He said that later he had this conversation with

23    Fenny about $20,000, to get him out from under an agreement

24    with a Maryland booster, and he agreed to make that payment.

25    But he says he definitely did not discuss that payment with

Iaidgat2

1    Coach Self or Coach Townsend -- definitely.

2            You will learn, ladies and gentlemen, I suggest to you

3    that that story was a complete fabrication.  You saw Defense

4    Exhibit 160-1.  August the 8th, Coach Townsend forwards a

5    contact to Mr. Gassnola for Fenny.  What happens the very next

6    day?  August the 9th, in the morning, TJ reaches out to Coach

7    Self, says:  "Hall of Famer.  When you have five minutes and

8    you're alone, call me."  Why, ladies and gentlemen, precisely

9    do you think he needed to speak with Coach Self alone?  Was the

10   design of the new Angola team uniforms some kind of top secret?

11           What does Coach Self respond, he asks:  "Are we good?"

12   TJ responds, "Always.  That was light work.  Ball is in his

13   court now."

14           And, ladies and gentlemen, there is only one

15   interpretation that makes any sense.  Coach Self and Coach

16   Townsend asked for Adidas' help in making this payment to

17   Fenny.  And then Coach Self wanted to know if Adidas told Fenny

18   that the payment would be made.  And then the ball is in his

19   court.

20           Now, the most important part of this is what comes

21   next.  And that's Defense Exhibit 156, the next page.

22           Can we go to the next slide, please, Mr. McCloud.

23           In the same minute, Coach Self responds to TJ and

24   says, "Spoke to Sean.  All good."

25           TJ says, "Will it be done by the Tuesday deadline?"

1    "From what I was told, yes."  "Great.  Thank you, boss."

2              Coach Self linked in the same minute the help that he

3    was getting from Adidas to the extension of Adidas' sponsorship

4    agreement.  You saw Defense Exhibit 192.  TJ says, "Hall of

5    Famer.  Thank you for the help with getting this extension

6    done."  Coach Self:  "I'm happy with Adidas.  Just got to get a

7    couple of real guys."

8              Again, linking -- linking the help that they're

9    getting -- linking the extension of the sponsorship agreement

10   to getting a couple of real guys is what he's telling TJ.

11             And TJ then responds in a text that really says it

12   all.  He says, "In my mind it's KU Bill Self.  Everyone else

13   fall into line.  That's what's right for Adidas basketball.

14   And I know I'm right.  The more you win, have lottery picks,

15   and you're happy.  That's how it should work in my mind."

16             Coach Self, in TJ Gassnola's view, speaks for Kansas,

17   and Kansas wants Adidas to help Kansas recruit.  That's what TJ

18   thinks.

19             Now, in this text exchange, does TJ Gassnola say

20   anything about defrauding Kansas?  No.  He just wants Coach

21   Self to be happy.  And he wants Kansas to be happy.  He views

22   this as a win-win.  He wants Kansas to win, and that's going to

23   help Adidas win because its brand will be associated with a

24   winner.  Not defrauding -- helping.

25             Now, Coach Self responds, "That's how your works.  At

Iaidgat2

1    UNC and Duke." And TJ responds, "Kentucky as well." And he

2    says, "I promise you. I got this. I've never let you down

3    except Dyondre." And you heard about Dyondre. "We will get it

4    right."

5            And this is what Mr. Gassnola is thinking. This is

6    his intent. The Nike schools do the same thing for their

7    schools. Nike does the same thing for their schools, and if

8    Adidas doesn't do the same, it's going to lose its sponsorships

9    to Nike.

10           Now, does everyone involved in making these payments

11   understand that these payments violate the NCAA rules? Of

12   course they do. But was Mr. Gassnola or Jim thinking that they

13   were defrauding these colleges by helping them recruit great

14   teams through payments that are being requested by the head

15   coaches? Of course not.

16           Now, you learned that back on August the 31st of 2017,

17   TJ said that he was dropping 30 grand here, 20 grand there to

18   make sure Kansas resigns with Adidas. And you heard, in

19   Government Exhibit 2 -- and that, ladies and gentlemen, is the

20   seventh of seven recordings where you heard Jim Gatto's

21   voice -- he tells Jim that -- this is, by the way, in

22   September -- that he would be paying another 20 grand.

23   Remember, he denied making this payment at all. But when he

24   talks to Jim in September, he says he needs to pay another 20

25   grand, suggesting that he had already paid $20,000.

Iaidgat2

1      Then you learned that the day after Silvio De Sousa

2  committed to the University of Kansas, Coach Self called Jim

3  Gatto.  Why?  To thank him.

4      Now, ladies and gentlemen, how is Jim supposed to be

5  thinking that he is defrauding the University of Kansas when he

6  gets a call from Kansas' Head Coach, a man that you saw Kansas

7  pays millions of dollars to, a man who Jeff Smith called a

8  legendary figure at the University of Kansas, who thanks Jim

9  for the help that Adidas and Mr. Gassnola have provided to help

10  Kansas land Silvio De Sousa?  Fraud is not entering Jim Gatto's

11  mind.

12      Now, there was a wiretap on Jim's phone that day.  But

13  do we have the recording?  Do we get to hear what the evidence

14  suggests would be Kansas' Head Coach thanking Jim for the help

15  that Adidas and TJ had provided to help them recruit Silvio De

16  Sousa?  Unfortunately, no.  Due to technical reasons, the FBI

17  didn't record that call.

18      So, ladies and gentlemen, in light of this compelling

19  evidence, that Coach Self and Coach Townsend asked Adidas to

20  give money to Fenny to help Kansas recruit Silvio De Sousa, why

21  did Mr. Gassnola say to you that he concealed these payments

22  from universities?  I submit to you, ladies and gentlemen, that

23  that's because he's trying to protect his relationships with

24  college coaches that he reveres.  This guy has been around

25  college basketball for 20 years.  He literally loves Coach Bill

Iaidgat2

1    Self.  Jim is under indictment.  So, we submit, he chose to

2    testify against Jim to stay out of prison, but he was going to

3    protect anyone else that he cared about.

4            So, why did TJ plead guilty?  I submit to you that he

5    did it because it was easier.  He has pled guilty twice before,

6    and he avoided going to jail both times.  And he told you here

7    that he hoped that by pleading guilty he would avoid -- and

8    cooperating, he would avoid jail again.  He told you that he

9    has two small children.  And I submit to you, ladies and

10   gentlemen, that your common sense and life experience tells you

11   why pleading guilty and cutting a deal with the government to

12   avoid jail can seem like an easier and much less agonizing path

13   than the experience of standing trial against the federal

14   government.  And I submit to you that that's what happened with

15   TJ.

16           Now, even if you believe every word that TJ said, even

17   if you accept it hook, line and sinker, that still doesn't

18   prove that Jim committed a crime.  Did TJ ever testify that he

19   had a conversation with Jim about defrauding a university?  The

20   only thing he said about his interactions with Jim was that he

21   would tell Jim about payments that he had made and that Jim

22   would cause Adidas to reimburse him.  For example, he told Jim

23   that he had taken care of Billy Preston's mom and the family is

24   in a good place.  So, in other words, they had conversations

25   about NCAA rule violations.

Iaidgat2

1    But the NCAA rules are not laws.  And as I expect that

2    Judge Kaplan will instruct you, it is not a crime in and of

3    itself to violate the NCAA rules.  And that is all Mr. Gassnola

4    says that he discussed with Jim Gatto are NCAA rule violations.

5    So, Jim's voice on tape does not prove beyond a

6    reasonable doubt that Jim intended to defraud any colleges, or

7    that Jim was acting with a bad purpose, to disobey or disregard

8    the law.  And Mr. Gassnola's testimony and nothing else

9    presented by the government proves that Jim was intending,

10   thinking, planning, to defraud these schools.

11   Now, I would like to spend a few minutes about why,

12   why Jim caused Adidas to provide these payments.

13   In his opening statement, Mr. Mark stood up and said

14   these words to you:  "Now, why did the defendants arrange that

15   payment?  One reason -- greed."

16   And you learned in this trial that this just wasn't

17   true.  There was no evidence whatsoever that Jim put one nickel

18   in his pocket from helping the Adidas schools recruit players.

19   The prosecution didn't even present any evidence of what Jim

20   was paid by Adidas.  We had to present it.  And what did you

21   learn when we presented the evidence?  You learned that Jim

22   joined Adidas in 1993.  You learned that after 25 years with

23   that company, Jim makes $139,000 a year in salary.  Now, that

24   is a good living, of course, but he's not exactly running

25   Adidas.

1759

Iaidgat2

1    Now, he could get a bonus, you learn, on top of that,

2  of about 20 percent, but that depends heavily on how Adidas,

3  the giant, global company, does.

4    (Continued on next page)

1     MR. SCHACHTER:  And to a far lesser extent on how

2  basketball merchandise sells globally.

3     Now, if Adidas did well globally and Jim gets a decent

4  review, here good, so middle of the road, he could get a bonus

5  of around 20 percent.  Compare that to the year before, 2015.

6  Jim got a strong performance, which is a much better person

7  performance rating.  What was his bonus?  5 percent.  6500

8  bucks.  Why?  Because Adidas, the giant global company, did not

9  have a good year.

10     Jim's bonus has very little to do with what he does

11  and much more to do with how Adidas does globally.

12     So why did the government say that Jim was motivated

13  by greed if they didn't have any evidence of it?

14     Well, ladies and gentlemen, the government doesn't

15  have to prove motive.  But they know that your common sense

16  tells you that people don't commit federal wire fraud for no

17  reason.  So they told you that he acted out of greed.  But

18  there is no evidence of Jim doing anything at all for greed.

19  There is no evidence of any kickbacks.  There is no evidence of

20  any secret payoffs to Jim Gatto.  He had no motive, no reason

21  to defraud these schools.

22     How would harming an Adidas school possibly help Jim?

23  Adidas did well when the colleges did well.  Their interests

24  were completely aligned.  Jim would only want to help the

25  Adidas schools.  There is no reason why he would want to harm

1  them.

2       Mr. Mark also told you in opening statements that Jim

3  was a senior executive.  And you learned that also just was not

4  accurate.

5       The government tried to suggest to you that Jim was

6  some kind of master of the universe, some kind of mastermind of

7  a criminal scheme.  But that just wasn't true.

8       There is not a single example where any of these

9  payments are Jim's idea, where he is announcing some plan, some

10  initiative to go out and pay families.

11       Mr. Gassnola told you that he acted on his own.  He

12  decided on his own to make the payments that he made and then

13  just asked Jim to have Adidas reimburse him.

14       For Nassir Little and Tugs Bowen, Jim was asked if

15  Adidas could help an Adidas school when some other shoe

16  company's school was offering money.

17       Why did Jim arrange for these payments?  Ladies and

18  gentlemen, that was his job as a middle manager in basketball

19  sports marketing.  Jim's job was in part to support the

20  colleges that Adidas sponsored.

21       We saw Government Exhibit 1096, all the list of

22  discussions with coaches who are asking for help from Adidas.

23       Ladies and gentlemen, what help do you think a coach

24  thought Jim Gatto was going to provide in persuading a kid to

25  go to their college?  Jim works for a shoe company.  He is not

1    a guidance counselor.  Kids don't turn to him for assistance in

2    where they should go to college.

3        The evidence and your common sense tells you exactly

4    what these coaches meant when they asked Jim for help.

5        As Mr. Gassnola told you, this is the world we lived

6    in.  And understanding that world is relevant to understanding

7    Jim's state of mind.

8        When Jim understands that so many colleges and their

9    sponsoring apparel companies are involved in providing money to

10    families, it appears to Jim that this is something that

11    colleges are aware of and encourage, even if only at times

12    implicitly, although sometimes explicitly.

13        Jim doesn't see this as something that defrauds

14    colleges.  And that's what matters.

15        You heard Merl in Government Exhibit 75T -- Merl

16    worked at Nike for 14 years -- say that Nike does exactly the

17    same thing.  And he explained, so do a lot of colleges.

18        You heard that the world of basketball sports

19    marketing is highly competitive, that apparel companies compete

20    against each other for the ability to sponsor colleges and have

21    their brands associated with winners.  And the evidence shows

22    you that schools look for help and, as Merl explains, it would

23    be a big deal to lose a big sponsorship like a Kansas or an

24    Indiana University.

25        Ladies and gentlemen, I want to be clear.  The

1    argument is not that it is OK because everyone is doing it.

2    The point is that when other colleges are also offering

3    payments to families, it is harder to imagine why Jim would

4    think that helping the Adidas colleges compete against the Nike

5    and Under Armour schools, who are doing the same thing, is

6    defrauding them.  That's the point.

7        Now, the prosecutor spent some time talking about the

8    invoices that Jim used to disburse money to both Mr. Gassnola

9    and Mr. Code.  So I want to talk about those invoices and what

10   they mean.

11       Now, there is no question that invoices support the

12   conclusion that Jim understood that these payments were in

13   violation of the NCAA rules.  No question.  And so he wanted to

14   hide the payments.  But they do not show that Jim's intent was

15   to defraud universities.

16       These invoices served one purpose and one purpose

17   only.  Jim used these invoices to get funds disbursed from the

18   sports marketing budget at Adidas.  These invoices, they never

19   left Adidas.  They were never sent to anyone at a college.

20       You may remember that I asked TJ if he sent these

21   invoices to anyone at a university?  And you may recall that he

22   looked at me like I was crazy.  And for good reason.  These

23   invoices have nothing to do with universities.  They weren't

24   sent to universities and so they couldn't deceive universities.

25   The universities never saw them.  The universities did not base

1    their scholarship decisions on internal invoices at Adidas.

2            The way that Jim arranged for these payments to be

3    disbursed from Adidas' sports marketing budget does not change

4    the fact that his intent, his purpose was to help these

5    universities recruit, and that's all he was thinking.  And that

6    in a criminal fraud case is what matters.

7            Now, did Adidas know what he was doing.  The

8    government called a finance employee at Adidas who said that

9    she didn't.

10           What about the people that Jim reported to?  What

11   about his boss, Michael Ladinig, or his boss's boss?  You heard

12   no evidence about what they understood.

13           You learned that Jim is on leave but he still works at

14   Adidas.  And you learned that Adidas gave Jim a sports

15   marketing budget and portions of that budget were called

16   discretionary, or flex.  And Jim was given authority to charge

17   expenses against his flex budget, with really no oversight.

18   Why do you think that was?

19           Mr. Solowiejczyk showed you Government Exhibit 3002

20   which was a summary chart of payments that were made to the New

21   England Playaz.  And I guess they totaled these up, however, to

22   a pretty large number.  But they forgot to mention that of

23   these payments that you heard Mr. Gassnola testify about, only

24   $40,000 was for Dennis Smith, 90,000 was Mr. Billy Preston's

25   mom, and $15,000 was for the family of DeAndre Ayton.

1    So that's it of the $761,000 that the New England

2    Playaz was paid that had anything to do with payments to

3    families.  If there was anything else improper about these

4    payments, according to Mr. Gassnola, I am sure the government

5    would have asked him about that.

6    So the rest of these payments are legitimate, at least

7    according to Mr. Gassnola.  But more importantly, Adidas

8    finance was aware that $750,000 was paid out to some AAU team

9    in Springfield, Massachusetts.

10   What does that tell you about whether Jim's bosses

11   knew what he was doing?

12   You also know that Jim was far from the only person at

13   Adidas who helped with payments to families.  You heard about

14   the director of Grass Roots, Chris Rivers, doing the same

15   thing.  In fact, you heard that there is a whole group of more

16   than ten Adidas employees, the so-called Black Opp's Soul

17   Patrol team, that were involved in discussions about payments

18   to families.

19   You learned that Chris Rivers called this team, this

20   Black Opp's Soul Patrol team.  Jim didn't come up with the

21   name.  TJ said he didn't use the term.  But Chris Rivers did.

22   You knew that it wasn't exactly a closely guarded secret

23   because this group was basically the entire basketball sports

24   marketing group.

25   Now, Mr. Solowiejczyk told you yesterday that whether

1   the head coach of the University of Louisville men's basketball

2   team or the University of Kansas men's basketball team, whether

3   they were asking Jim to provide these payment, he told you, was

4   at the end of the day, his words, irrelevant to your decision.

5   Jim knew, he argued, that a men's basketball coach like a Bill

6   Self or a Coach Pitino, they would not be authorized to make

7   such a request because the university could get in trouble with

8   the NCAA.

9           Ladies and gentlemen, the issue for you to decide is

10  what Jim was thinking.  Has the government proven to you that

11  Jim or Merl or Christian or anybody was thinking that they were

12  helping Coach Pitino but somehow intending to defraud the

13  University of Louisville?  Does that make any sense?

14          If you look at the evidence in this case, it shows

15  that the only people that Jim interacted with at Louisville

16  were Coach Pitino and his staff.  Jim's job was to support the

17  University of Louisville basketball.  There is no evidence that

18  he ever met John Carns or for that matter the chancellor or the

19  head of the English department.  To Jim, in Jim's mind, Coach

20  Pitino was the University of Louisville.

21          Now, the government says that it doesn't matter and

22  that that doesn't mean that he was in fact helping Louisville.

23  But ladies and gentlemen, that's not the point.  The issue

24  isn't what the prosecution thinks is good for Louisville.  It's

25  not even really what John Carns thinks is good for Louisville.

1    The issue is what Jim was thinking.  What was in his mind?  Has

2    the government met its burden of proving to you beyond a

3    reasonable doubt that what Jim was thinking about was intending

4    to defraud Louisville.  And the evidence doesn't support that.

5         Jim, and I submit to you certainly most of the sports

6    world, thinks of Rick Pitino as Louisville.  You learned that

7    Coach Pitino transformed Louisville.  John Carns told you about

8    how it was a commuter school when he started in 1998, and Coach

9    Pitino started in 2001, and it changed significantly.  He told

10   you about winning a national championship and caused Louisville

11   to be associated with winning.  It became a residential

12   college, attracted out-of-state students, built the Yum!

13   Center.

14        But the best evidence of how important Coach Pitino

15   was to the University of Louisville was what they paid him.

16   And you saw his contract.  You have it in evidence.

17        Louisville paid Rick Pitino $4.3 million a year.  Why?

18   You can infer that that's because winning basketball games,

19   that's really important to the University of Louisville.  And

20   when Jim helped Louisville recruit, when he helped them win, he

21   thought he was helping Louisville.  And the government has

22   certainly not proven to you beyond a reasonable doubt that his

23   goal, his intent was to harm Louisville.

24        The evidence proves that Louisville, the institution,

25   sure acted as if Coach Pitino was Louisville.

1    You learned that in June of 2017 the NCAA imposed a

2    level one infraction against the University of Louisville.  The

3    most severe infraction that there is.  And that's for matters

4    completely unrelated to this case.  The NCAA found that the

5    University of Louisville's director of basketball operations

6    had over a period of four years engaged in a series of 12

7    recruiting violations.

8    You learned that the NCAA didn't only find that

9    Louisville committed a level one infraction.  It also found

10   that Rick Pitino himself committed the most serious infraction,

11   level one, for his failure to monitor the director of

12   basketball operations.

13   Now, what did the University of Louisville do when the

14   NCAA found that he had committed a level one infraction?

15   Nothing.  The University of Louisville took no employment

16   action against Coach Pitino.

17   Now, you also learned that in order to try to mitigate

18   the penalty, the University of Louisville self-imposed some

19   restrictions on itself before the NCAA would impose a penalty.

20   And one of those restrictions was that it reduced the number of

21   scholarships that the University of Louisville would award in

22   men's basketball, from 13 down to 12.  One in 2017, they

23   reduced it from 13 to 12, and another one in 2018 to 2019.

24   So they reduced it from 13 to 12 as a self-imposed

25   restriction, until, of course, Tugs Bowen showed up.

1    What happened when Tugs Bowen walked in the door?

2    University of Louisville forgot all about the restriction that

3    it had self-imposed on itself and handed Tugs Bowen a 13th

4    scholarship.

5    And your common sense tells you why Louisville went

6    back on its self-imposed penalty.  That's because at Louisville

7    winning basketball games is more important than NCAA

8    restrictions.

9    There is no evidence that Jim intended to help Rick

10   Pitino but harm Louisville.

11   Consider also this.  The potential penalties that you

12   heard about that could be imposed by the NCAA.  Who gets hurt

13   by a loss of basketball scholarships or having basketball games

14   erased from the official records book, or even the loss of

15   revenue from basketball?  We submit that it's the basketball

16   program that gets penalized.  So from Jim's perspective, the

17   men's basketball program was making a decision that the

18   recruiting assistance was worth the risk of the penalties it

19   would face.

20   So the government hasn't proven beyond a reasonable

21   doubt that these payments were made because Jim wanted to

22   defraud universities.  But there is this other component of

23   Jim's state of mind that I just want to spent a moment talking

24   about the evidence of, and that is this idea of acting with a

25   bad purpose to disobey or disregard the law.

1    There is no evidence that Jim thought for one second

2    that these payments violated the law.  Think about this.  Look

3    at the prosecutor's questions to the compliance people in this

4    trial.  They asked each one what they would do if they learned

5    of a payment to an athlete's family member.  They each said

6    that they would investigate, perhaps suspend the athlete from

7    playing, and maybe call the NCAA.

8            Did a single one of them say that they would call the

9    FBI or the United States Department of Justice?  When the

10   government asked Lindsay Harksen what she would do if she knew

11   that the invoices were for payments to a family to persuade an

12   athlete to go do Louisville, what did she say?  She said she

13   would escalate it to her manager.

14           Why didn't these witnesses say that they would call

15   law enforcement if they learned that someone had paid a family

16   to choose a college?  Because we contend, ladies and gentlemen,

17   this was thought of as purely an NCAA issue.

18           MR. SOLOWIEJCZYK:  Objection.

19           THE COURT:  Sustained.  There is no such evidence.

20   Move on.

21           MR. SCHACHTER:  You also -- yes, your Honor.

22           Now, because the government has failed to prove to

23   you -- I will move on.

24           Now, Mr. Solowiejczyk also spent a fair amount of time

25   talking with you about the forms that you saw in this case.

1   But another problem with the government's case is that they

2   have not proven beyond a reasonable doubt that these forms were

3   actually material to the scholarship decisions.  You heard that

4   scholarship decisions are made by coaches with the approval of

5   the athletic director.  Compliance does not make decisions to

6   issue scholarships.

7          Has the government proven to you that any of these

8   coaches would have refused to provide a scholarship if they

9   suspected that Adidas was helping them recruit by providing

10  money to families?  Did you hear from a single coach they would

11  not have awarded a college scholarship had they suspected that

12  this was going on?

13         When you're talking -- when you're thinking about who

14  really makes these decisions at these colleges, coaches or

15  compliance, look at how NC State responded to potential

16  recruiting violations.

17         You learned that Coach Gottfried chartered a

18  helicopter to land at Dennis Smith's high school and to go

19  visit another player named Bam Adebayo.  And you learned that

20  it is an NCAA rule violation for a coach to invite the media to

21  a visit.  And the media happened to be present at both of these

22  helicopter landings.  Coach Gottfried said to Ms. Doyle that he

23  didn't notify the media, and that was good enough.

24         Compliance became aware that Dennis Smith, Sr. had a

25  relationship with someone who had been disassociated from the

1    university, a man named Eric Leak.  You saw Defense Exhibit

2    1925, and this was shown to you so that you can assess how NC

3    State's compliance responds to issues.

4         And you learned that Coach Gottfried had been told

5    that Eric Leak was Dennis Smith Senior's financial advisor.

6    Coach Gottfried indicated that he needed to be able -- next

7    slide -- he indicated that he needed to be able to recruit

8    talented young men.

9         MR. SOLOWIEJCZYK:  Objection, your Honor.  This is not

10   in for the truth.

11        MR. SCHACHTER:  This was offered to assess

12   compliance's response.

13        We agree with the government that it was not offered

14   for the truth.

15        THE COURT:  Well, that's clear.  The question is

16   whether the use you're making of it violates that.

17        MR. SCHACHTER:  Yes, your Honor.

18        THE COURT:  Sustained.

19        MR. SCHACHTER:  Then Ms. Doyle told you about steps

20   that were taken.  She said that Coach Gottfried never went to

21   speak to Dennis Smith himself.  Instead, they sent assistant

22   Coach Early, the same Coach Early that called TJ asking for

23   money to calm the situation.  And Coach Early reported back

24   that there had been communications.  Then you looked at what

25   compliance did next.

1          They got no explanation of the nature of the

2    relationship.  Compliance never tried to interview Dennis

3    Smith, Sr.  And compliance also later learned that the Smith

4    family had reported zero income.  But never looked into why a

5    family with zero income may have needed a financial advisor.

6          And the evidence showed you why compliance did or did

7    not do what they did.

8          Carrie Doyle explained to you that my understanding

9    and my memory is that Coach Gottfried was protective of his

10   recruiting relationships.  And figuring out what to do with

11   this information, Ms. Doyle also explained that one of the

12   considerations in compliance is to not harm recruiting.

13         Mr. Solowiejczyk spent a lot of time on the importance

14   of the forms that the athletes fill out.  And the evidence

15   suggests, ladies and gentlemen, that he spent way more time

16   than the athletes do.  These certifications asked for an

17   athlete to affirm their compliance with the NCAA rules.  You

18   learned that this is a manual that is 400 pages long.

19         And are these forms really important?  Well, the

20   University of Kansas, they apparently can't even find their

21   forms.  You saw student-athlete statements from Louisville and

22   NC State, but no such forms from the University of Kansas.

23         You saw that compliance often never even bothered to

24   fill out the forms.

25         You saw the University of Louisville's official visit

 1    form for Brian Bowen's visit at the University of Louisville

 2    and you learned that Louisville didn't complete this official

 3    visit form, that is, until there was a federal criminal

 4    investigation when they chose to fill in information with no

 5    indication that it was added after the fact.  And compliance

 6    still never signed the form, which at the bottom calls for

 7    compliance approval.

 8            And you learned that even after all these charges,

 9    after all that you saw about Coach Self's involvement in paying

10    Silvio De Sousa's handler, Kansas today has not canceled Silvio

11    De Sousa's scholarship and he is today, according to Jeff

12    Smith, a member of the Kansas men's basketball team.

13            Ladies and gentlemen, your common sense tells you that

14    these forms were not material to the universities' scholarship

15    decisions.  What mattered is whether the coach wanted the

16    player on the team.

17            I want to make one final point on what the government

18    said was why Jim arranged for these payments, or one of the

19    reasons.

20            Mr. Solowiejczyk told you that the motivation was in

21    part to get a player to sign a shoe deal later on if the player

22    ever makes it to the NBA.  Ladies and gentlemen, I submit to

23    you that makes no sense.

24            You learned that when Dennis Smith, Jr. years later

25    made it to the NBA, he signed a shoe deal with Under Armour.

1   Why?  Because Under Armour paid him more money.

2          Now, if the government is right that these payments to

3   families were part of some criminal conspiracy to pay off a

4   family to get the athlete to sign a shoe deal years later,

5   then, man, Jim Gatto must have been furious.

6          What did Jim do when he learned that Dennis Smith had

7   reneged on his end of the alleged criminal bargain?  What did

8   he do?  He wrote this text message to Dennis Smith, Jr.

9          "Dennis, I just wanted to say it has been a pleasure

10  watching you grow as a person and a player these past few

11  years.  I know you had to make a business decision that was

12  best for you, and I respect that even in my disappointment.

13  However, that won't stop me from cheering you on during your

14  NBA career as I wish you all the best.  Stay who you are, keep

15  working hard, and great things are going to happen for you.

16  Look forward to seeing you in the near future.  Jim Gatto."

17         Ladies and gentlemen, as Judge Kaplan just told you,

18  after I am done the prosecutor gets to speak with you one more

19  time.  As he speaks to you, please focus on the reason why the

20  prosecution gets the last word.  It is because the government

21  has the burden of convincing you of Jim's guilt beyond a

22  reasonable doubt.

23         Now, ladies and gentlemen, after you're done with your

24  deliberations, you may go home and forget all about this case.

25  To Jim, the decision that you reach will be the most important

1   moment in his entire life.

2          We are so grateful to you for your careful attention

3   to the evidence throughout this trial because the evidence

4   tells you exactly what Jim was thinking.  The government has

5   not proven to you beyond a reasonable doubt that Jim was

6   intending to defraud universities.  And the government has not

7   proven to you beyond a reasonable doubt that Jim was acting

8   with a bad purpose to disobey or disregard the law.

9          Jim is not guilty of these crimes.

10         We thank you for your time and your attention and your

11  service.

12         THE COURT:  Thank you, Mr. Schachter.

13         Members of the jury, 1:30.

14         (Jury exits courtroom)

15         (Luncheon recess)

16

17

18

19

20

21

22

23

24

25

1                        AFTERNOON SESSION

2                            1:30 p.m.

3           THE COURT:  Let's get the jury.

4           (Jury present)

5           THE COURT:  The jurors and the defendants are present.

6           We will now hear the rebuttal argument for the

7   government.

8           Mr. Diskant.

9           MR. DISKANT:  Thank you, your Honor.

10          On June 1st of 2017, the University of Louisville

11  issued athletic aid, a scholarship, to someone named Brian

12  Bowen Junior.  We have called him Tugs for purposes of this

13  trial.  The university did so for one reason.  The university

14  believed that Tugs Bowen was eligible to compete as a

15  student-athlete.  He was an essential requirement for the

16  scholarship.

17          That wasn't true.  And it wasn't true because,

18  unbeknownst to the university, these three men had struck a

19  deal to pay his father $100,000.  A payment the defendants have

20  conceded to you they knew they couldn't make under NCAA rules.

21  A payment the defendants knew rendered Tugs Bowen ineligible to

22  receive that scholarship.

23          So what did the defendants do?  They tried to conceal

24  it.  The cash handoffs.  The indirect money transfers.  The

25  fake documents.  The bat phones.  And as a result, the

1    University of Louisville was out real money, for a kid who

2    never played a single game, all because of what the defendants

3    had done.

4              And here's the thing.  Virtually none of that is in

5    dispute.  You have seen and you have heard the testimony and

6    the evidence on those facts for yourself.  And yet over the

7    course of several hours yesterday and today, three very

8    talented defense lawyers have tried to convince you to ignore

9    all of that.  They made arguments to you -- and I have great

10   respect for my colleagues -- I submit are meant to distract you

11   from the issues that are actually at hand, from the questions

12   that you actually have to decide.  Because I submit that if you

13   focus on the facts, most of them undisputed, if you just take a

14   deep breath and think about what this case is actually about,

15   about the evidence that you have seen, it paints a devastating

16   and a crystal clear picture of guilt.

17             Let's be very clear, folks.  This case is not about

18   the NCAA.  It's not about the wisdom of NCAA rules.  It's not

19   about the universities either and whether you like them or

20   dislike them, or you think they are good or bad institutions.

21   It's a case about defrauding public universities in connection

22   with financial aid.  It's about obtaining scholarships under

23   false pretenses.

24             Let me ask you this.  If you heard about a scheme to

25   inflate a student's grades, to lie about academic performance,

1    so that a student would seem like he had earned a merit

2    scholarship when in fact he hadn't, is there any doubt in your

3    mind that that's fraud?

4            How about this?  How about a scheme to lie about a

5    student's finances, to make it seem like a student and his

6    family couldn't afford college, so that the student could get

7    financial aid to which he was not entitled.  Is there any doubt

8    in your mind that that's wrong?

9            Folks, that at core is precisely what this case is

10   about.  That's precisely what these defendants were doing.

11   Except in this case the criteria for the scholarship wasn't

12   academic performance or financial need; it was athletic

13   eligibility.  And everyone who worked in college sports knew

14   what these defendants knew.  Which is that the number-one

15   requirement for the athletic scholarship -- that all of the

16   kids you have heard about wanted -- was eligibility.  And much

17   as colleges don't give out financial aid to families that don't

18   qualify for it, they don't give out athletic scholarships to

19   kids who are not actually eligible to compete.  And the kids

20   you have heard about during this trial, the young men -- Brian

21   Bowen, Billy Preston, Dennis Smith -- none of them were

22   eligible.  And they weren't eligible because the defendants had

23   paid or promised to pay their families large sums of money.

24           The defendants knew all of this.  The defendants knew

25   these universities could not and would not issue scholarships

1   to these kids, and so they concealed it.  And that's where the

2   bat phones come in, the cash deliveries, the fake documents,

3   the various false statements and certifications the defendants

4   caused to be made.  Because the defendants knew what they were

5   doing was wrong.  Plain and simple.

6        Folks, these scholarships, they are not coming from a

7   limitless pool.  Colleges had a set number of athletic

8   scholarships they could give out.  13 for men's basketball.

9   Meaning if the University of Louisville or the University of

10  Kansas issued a scholarship under false pretenses to a kid who

11  couldn't compete, not only had the school lost the scholarship,

12  but another student-athlete, one whose family hadn't taken

13  money, lost out on an opportunity.  And the harms to the

14  universities, they weren't just the loss of the scholarship.

15  They were the risk of the penalties to be imposed by the NCAA.

16        You heard a little bit about a prior violation

17  involving the University of Louisville, and we are going to

18  come back to that.  But here is something the defendants didn't

19  tell you.  The University of Louisville lost $500,000 as a

20  result of that.  $500,000.  That's enough money to fund

21  scholarships for an additional 12 people for a year.  Anyone

22  doubt that's real harm?

23        Folks, this is the government's chance to respond

24  briefly, and I am going to spend some time talking with you

25  about some of the arguments you have heard from the defendants

1    over the past few days.  But as I go through them, don't lose

2    sight of what this case is really about.  Don't lose sight of

3    the big picture.  Don't get distracted.

4          Now, let me reiterate something my colleagues said

5    yesterday.  The defendants here have no burden.  The burden is

6    on the government, and we embrace it.  But if the defendants

7    choose to make arguments to you, as all of them have, then you

8    have an obligation to scrutinize those arguments, just as you

9    would scrutinize the arguments the government makes.  Ask

10   yourself whether they make sense.  Ask yourself whether they

11   are supported by the evidence.  And I submit that if you do

12   that, you will readily find out that they are not.

13         Now, the defendants spent considerable time talking to

14   you about this term "specific intent to defraud."  And Judge

15   Kaplan is going to instruct you on that and you should his

16   instruction.  But I expect he will tell you that it means that

17   a defendant acted with the intent to deceive and for the

18   purpose of depriving the university you are considering of

19   something of value.  And that's actually a pretty

20   straightforward concept on these facts.  Because the

21   defendants' goal was to deceive the universities, to lead them

22   to believe, for example, that Tugs Bowen was eligible, even

23   though he wasn't.  And the defendants did that for the purpose

24   of depriving the University of Louisville of something of

25   value, a scholarship.  It's just that simple.

1    The defendants harmed the university in another way.

2    They deprived the university of the ability to make informed

3    economic decisions about what to do with their money or

4    property, in a way that exposed the university to the risk of

5    tangible harm, things like fines and penalties that you have

6    heard about during this trial.

7    So take Brian Bowen for example, Tugs Bowen.  He

8    committed in June of 2017 and he started summer school

9    immediately.  The university spent real money on him last

10   summer.  Remember Government Exhibit 1613.  Nearly $9,000 in

11   actual costs the University of Louisville paid, put out, to

12   have him on campus during the summer of 2017.  All money spent

13   under false pretenses.  Because Brian Bowen wasn't eligible to

14   receive this aid.  He wasn't eligible to play basketball.  And

15   the defendants knew that.

16   Now, the defendants' primary response, the one that

17   Mr. Schachter in particular spent a great deal of time on this

18   morning, is that the defendants wanted to help, not hurt.  They

19   wanted, as Mr. Schachter put it, for Louisville to be a great

20   basketball team.

21   Now, there is a big problem with that argument.  The

22   University of Louisville is not a basketball team.  It is a

23   public university.  It has over 20,000 students.  It has

24   graduate programs.  It has a board.  It has a financial aid

25   office.  It has an athletics department.  It has a compliance

1   office.  It is far bigger than just a basketball team.

2          It also has people with the authority to make

3   decisions, to set the rules, the policies, the procedures.  And

4   let's be very clear, ladies and gentlemen.  Rick Pitino, Coach

5   Pitino, he wasn't one of those people.  Rick Pitino may have

6   made a lot of money.  He may have been a great basketball

7   coach.  But just like Jim Gatto, and just like most of the rest

8   of us, Rick Pitino had a boss, he had a contract, one that you

9   have seen during this trial, one that specifically prohibited

10  him from engaging in the sort of conduct that the defendants

11  were engaged in.

12         And all of the defendants knew that.  We are going to

13  talk more about this issue in just a minute, but remember that

14  call that Mr. Code played for you earlier this morning, the one

15  in which Merl Code is talking about whether or not Rick Pitino

16  knows.  What is the term he uses?  "Plausible deniability."

17  Why?  Because the defendants know full well that if any coach

18  at any of these schools is aware of the scheme, he is not

19  supposed to be, he is not allowed to be.

20         Now, Mr. Schachter tried to suggest to you somehow

21  that the coaches were running rampant at these places, and

22  nothing can be further from the truth.  He showed you a very

23  selective portion of the testimony from two of the compliance

24  officers -- Ms. Doyle from NC State and Mr. Carns at the

25  University of Louisville -- to suggest to you that the coaches

1    were the ones to make the decisions about to whom to award

2    scholarships to.  And yeah, that is true.  Coaches get to

3    decide which players get scholarships.  But here is what he

4    left out.  Let's take a look at some of the testimony of John

5    Carns.  Because what John Carns told you is that while the

6    coach gets to decide which player he wants on its team, it's

7    only the university that decides whether or not the kid is

8    eligible to actually receive the scholarship.

9              By the way, if the coach and the university disagree,

10   look who wins.  It's the registrar's office that has the final

11   say.  Because at the University of Louisville, Coach Pitino is

12   not the final authority.  There is a registrar's office above

13   him, one that cares very deeply about these rules.

14             The same thing for Carrie Doyle at NC State.  Look at

15   her testimony on this subject.

16             We can bring that up, Ms. Lee.

17   "Q. Would it matter if the head coach disagreed with the

18   decision that the school made on eligibility?

19   "A. It would not matter."

20             This was not the coach's decision to make.  Compliance

21   was something the university as a whole took seriously.

22             You met some of these folks yourself.  You met John

23   Carns, the director of compliance at the University of

24   Louisville.  He told you about all of the things he and his

25   staff do to try and ensure compliance -- the training sessions,

1    the forms.  He told you unequivocally that he did not know

2    about the defendants' scheme to pay $100,000 to Tugs Bowen.

3    And more importantly, he told you, without hesitation, that had

4    he known, had the university been aware of that payment, the

5    university never would have issued the scholarship.  And that's

6    the point.

7         You also met Carrie Doyle at NC State and Jeff Smith

8    at Kansas.  And they both told you much of the same.  Do you

9    remember Ms. Doyle?  She had spent years at the NCAA before

10   coming to NC State.  She told you about an incident involving

11   Dennis Smith, Jr. in which she was so concerned that a

12   violation of rules may have occurred that she went out to a

13   site with her measuring tape to make sure that the distance

14   between where the coaches had been and where the media was was

15   appropriate.

16        Folks, does that sound like someone who doesn't take

17   her job seriously?  Does that sound like a director of

18   compliance who isn't concerned about making sure that the

19   university is following the rules?  Of course not.

20        Jeff Smith told you about what Kansas does, about the

21   training, not only for students and coaches and parents and

22   boosters.  NC State has 15 different forms they require

23   student-athletes to sign.  Does any of that suggest to you that

24   these universities, as institutions, as public institutions of

25   higher learning, do not care about these issues?  Of course

1    not.

2          Now, there is a second big problem with the

3    defendants' theory that they were only trying to help, not

4    hurt.  The defendants' theory of helping the universities

5    turned on them not getting caught.  Because if anyone found out

6    that these players' families had taken money, then it wasn't

7    going to be helpful at all.  The players weren't going to be

8    allowed to play.

9          And that's exactly what happened.  Brian Bowen never

10   played a single game for the University of Louisville.  Why?

11   Because the investigation made clear he wasn't eligible.  So

12   the University of Louisville didn't allow him to play.  They

13   still had to pay some costs, and they still faced the risks of

14   fines and penalties, but they didn't get any help.

15         The same thing for Billy Preston at the University of

16   Kansas.  What did Jeff Smith tell you?  Never played a game.

17   Why?  Because of concerns about his eligibility, concerns that

18   included the payments you have heard about in this case.

19         Silvio De Sousa, another player at the University of

20   Kansas.  Again, what did Jeff Smith tell you?  After the

21   university learned of the allegations in this case, he hasn't

22   played a game since.

23         So what kind of help is that, if the help turns on no

24   one ever finding out about it?  That's not help at all.  That's

25   a scheme.

1    Now, the third problem with the defendants' theory

2    that they were just trying to help out their friends at the

3    university basketball teams is that they knew what they were

4    doing was wrong.  And you know that because you know all of the

5    steps that they took to conceal it.  And ladies and gentlemen,

6    I submit to you that in their arguments the defense counsel

7    tried to make most of these steps disappear.

8         Remember the bat phones that Brian Bowen and Christian

9    Dawkins used to communicate with each other.  And remember why

10   Brian Bowen told you he used a bat phone.  He told you he

11   wasn't worried about the University of Louisville or the NCAA

12   listening in on his calls.

13        How about the cash drops, the indirect money

14   movements, the fake invoices?  Mr. Code talked to you a little

15   bit about Ricky Robertson.  Remember what Merl Code told Ricky

16   Robertson to do.  He got the money from Adidas and he

17   transferred it to Christian Dawkins.  And what did Merl Code

18   have him write on that check?  Consulting fees.

19        If Merl Code just thought he was trying to help out

20   his good friends at the University of Louisville, why does he

21   have to lie to Ricky Robertson about this?  Why did he have to

22   put a false piece of information on that check?  I submit to

23   you there is a very obvious and easy answer.  Merl Code knew

24   exactly what he was doing, and he knew what he was doing was

25   wrong.

1    The same thing for the fake invoices that Jim Gatto

2   created at Adidas.  We are going to talk a little bit more

3   about them, but the parties seem to agree that those invoices

4   weren't going to the universities.  Mr. Schachter told you that

5   himself.  So if they weren't going to the universities, why did

6   Mr. Gatto need to put fake information on them?  If this is

7   just an internal Adidas document, why do they need to be fake?

8   I submit to you again, ladies and gentlemen, there is a very

9   obvious and easy answer.  Because Mr. Gatto knew all along that

10  what he was doing was wrong, that he wasn't allowed to do this.

11   Now, the defendants played for you, and Mr. Code in

12  particular, a very small clip of a call in which Merl Code uses

13  the language that he wanted to help, to step up and help.  This

14  was Government Exhibit 57.  "One of those instances where we

15  need to step up and help one of our flagship schools in

16  Louisville."  But I submit to you, as you evaluate his use of

17  the term "help," as you think about what Mr. Code is actually

18  saying, you should look at the rest of the call.  Look at what

19  else he says in the exact same call.  He says we can't do it

20  directly.  Why not?  Because he knows they are not actually

21  allowed to do this.

22   This isn't helping the University of Louisville.  It's

23  helping themselves.  Merl Code talked to you in that same

24  conversation and others that you have heard during this trial

25  about how it's good for him and good for Adidas to get these

1   kids at particular schools.  That's who he is helping.

2          Look at the next part of this call.  How did Merl Code

3   propose making this payment?  "For cleanliness, for lack of

4   questions, I would always assume cash is better."  Does that

5   sound like Merl Code is trying to help the University of

6   Louisville, that this is just an aboveboard transaction?  Of

7   course not.

8          The defendants also tell you that the reason they are

9   trying to conceal this is because they know the NCAA rules

10  prohibit it and they are concerned about the NCAA.

11         Let me say a couple of things about that.  The first

12  is, of course they are.  That's the same reason they are

13  concealing it from the universities.

14         Folks, the fact that the defendants are trying to

15  conceal these payments from the NCAA is devastating evidence of

16  their guilt, because it is the exact same reason that they are

17  trying to conceal this information from the schools.

18         (Continued on next page)

19

20

21

22

23

24

25

1     MR. DISKANT:  If the NCAA or the universities find

2  out, these kids are not going to be allowed to play, and none

3  of the goals the defendants hoped to achieve are going to be

4  realized.  For Jim Gatto and Merl Code, these kids aren't going

5  to be wearing an Adidas uniform on national TV.  They are not

6  going to have great college careers that prompt them to go into

7  the NBA, where they can make even more money off them.

8     For Christian Dawkins, it is the exact same

9  calculation.  Being concerned about the NCAA is precisely why

10  the defendants were concealing it, and it's also precisely why

11  the defendants were concealing it from the universities.

12     But there's a second point I want to make here, which

13  is that the government would readily agree that a violation of

14  NCAA rules, standing alone, is not a crime.  And you should

15  listen to what Judge Kaplan tells you on this and follow his

16  instructions carefully.  Because while an NCAA rules violation

17  is not a crime, fraudulently misleading a college about a rules

18  violation, causing a college to issue a scholarship under the

19  false belief, under the false representation that a

20  student-athlete is eligible to compete is a very different

21  thing.  That's not just a rules violation, that's a federal

22  crime.  And if you use wires, interstate wires, like you have

23  seen and heard in this case, calls and text messages back and

24  forth between the defendants in various states, that's a

25  federal crime called wire fraud.

1    Now, another argument that Mr. Schachter made to you

2    this morning was about leveling the playing field.  And as he

3    told you, that's all that Jim Gatto and the defendants wanted

4    to do, they wanted to level the playing field, as if this was

5    just a matter of Adidas and Nike bidding to win a deal.  And

6    there are a couple of problems with this argument.  The first

7    is the way that Mr. Schachter tells the story, Nike or the

8    University of Oregon, for example, was making some sort of an

9    offer that Adidas had to match, as if this was some sort of

10   legitimate aboveboard bidding war.  That's not quite right.

11   Do you remember what Brian Bowen Senior told you about

12   this, about the various other offers that he learned about?  He

13   learned about essentially all of them in one way -- Christian

14   Dawkins told him about them.  And it was never the university

15   making the offer.  It was never Nike making the offer.  It was

16   someone like these defendants, a part of the basketball

17   underground, including, sometimes, a corrupt coach, someone who

18   shouldn't be doing this.

19   What did Mr. Bowen tell you?  If he had gone to

20   Arizona -- son had gone to Arizona, Christian Dawkins told him

21   that an assistant coach there would get him $50,000.  That was

22   "the Arizona opportunity."  It wasn't the University of Arizona

23   making an offer.  It wasn't Nike making an offer.  It was

24   another one of these corrupt, off-the-books, under-the-table

25   payments.

1    Now, the second problem with this argument is that the

2    only real evidence of these other offers is the defendants

3    themselves.  Christian Dawkins saying there is a particular

4    offer.  Merl Code saying there is an Adidas opportunity.  Did

5    these opportunities actually exist?  We don't really know.  Who

6    exactly was going to be making these payments?  We don't know

7    that either.  But I submit to you, ladies and gentlemen, based

8    on the evidence you have heard in this case, that it is fair to

9    assume that any opportunity these defendants were discussing

10   wasn't going to be paid by check, and it wasn't going to be

11   disclosed.

12   At core, folks, I think the argument is simply that

13   other similar corrupt people were doing this, too, so you

14   should look the other way.  And that makes no sense at all.

15   It's like getting pulled over for speeding or drag racing and

16   saying:  Officer, that other driver was speeding, too.  I was

17   just trying to level the playing field.

18   Anyone think that works?

19   And, of course, the consequences here are far more

20   serious than a speeding ticket.  The universities, not the

21   defendants, bore the costs of the scholarship.  The

22   universities, not the defendants, faced the risks of fines and

23   other penalties.

24   Let me talk about a final core component of this

25   argument that the defendants thought they were trying to help,

Iaidgat4                    Summation - Mr. Diskant

1    and that's the argument that the coaches were in on it.  A

2    couple of things on this.  The first is I expect Judge Kaplan

3    is going to instruct you on a concept called "good faith," and

4    I want to be very clear that the government bears the burden

5    here.  But I expect he will tell you that if you find that the

6    defendant was acting at the request of an agent of the

7    university, who had apparent authority to make the request, and

8    who appeared to be unconflicted and acting in good faith for

9    the benefit of the university and not to serve his own

10   interests in a manner that was not fully aligned with the

11   interests of the university, then the government hasn't met its

12   burden with respect to proving that the defendants had an

13   intent to defraud.

14        I think you know, because you have heard the evidence

15   in this case, that that wasn't what happened here.  Because you

16   know that the coaches weren't allowed to do this.  They didn't

17   appear to be unconflicted and acting in good faith for the

18   interests of the university.  And the defendants knew that.

19        Look at how the defendants talk about the coaches'

20   involvement.  I mentioned this a moment ago, but look at Merl

21   Code.  He refers to Rick Pitino as "needing plausible

22   deniability."  What does that mean?  Does that sound like

23   someone the defendants think has the authority, the apparent

24   authority, to ask them to make this payment?  Does that sound

25   like someone that the defendants believe is acting in good

1   faith?  Of course not.

2           TJ Gassnola and Christian Dawkins have the same

3   conversation, Government Exhibit 45, when Mr. Gassnola finds

4   out that Christian Dawkins has told someone else about the

5   Brian Bowen deal.  They talk about how people could lose jobs.

6           And Mr. Gassnola made clear that one of the people he

7   was talking about -- we are now watching ourselves -- that one

8   of the people that he was talking about were the coaches at the

9   universities.  Why could they lose their jobs?  Because the

10  coaches at the universities weren't allowed to be doing this.

11  You saw contract after contract that made that unequivocally

12  clear.  Coaches were required to follow the rules.  They faced

13  termination if they didn't.

14          Does that mean that some of the coaches didn't break

15  the rules?  No, it's possible they did.  But here's the point.

16  The point is that did the defendants genuinely believe, was it

17  apparent to them, that the coaches were unconflicted and acting

18  in good faith?  Absolutely not.  Because the defendants knew

19  the coaches weren't allowed to be doing this.

20          Take a look at Jim Gatto and the two text messages.

21          We can go back one, Ms. Lee, actually, now that we are

22  back up and running.

23          Look at what Christian Dawkins says about Rick Pitino.

24  He is talking about this payment to the family of Brian Bowen.

25  Look what he says:  "I would never tell Rick anything like this

1   because I don't want to put him in jeopardy."

2           Again, folks, does that make it seem like Christian

3   Dawkins thought that Rick Pitino had the authority to engage in

4   these kinds of dealings?  Of course not.  The defendants knew

5   full well that coaches weren't allowed to do this.

6           And look at Jim Gatto, his two voice messages for Rick

7   Pitino, Government Exhibits 58 and 59.  Mr. Schachter played

8   them for you this morning.  I am not going to spend a lot of

9   time on them here.  But look what's missing:  No mention

10  whatsoever of money.  No mention whatsoever of the deal he is

11  brokering during this very time period, to send a hundred

12  thousand dollars to the family of Brian Bowen.

13          Why not?  I submit to you, for the exact same reason.

14  Because Jim Gatto knew full well that Rick Pitino could not be

15  involved in such a payment, could not authorize such a payment,

16  and was not acting in good faith if he had.

17          Let me make one final point on this.  Mr. Schachter

18  suggested to you that TJ Gassnola, one of the government's

19  cooperators, was lying when he said that Bill Self didn't know

20  about some of the Kansas payments.  What he said next is this.

21  Mr. Schachter suggested to you that the reason that TJ Gassnola

22  lied about Coach Self's knowledge and involvement in the

23  payments is because Gassnola didn't want to get his good

24  friend, Bill Self, in trouble.  That's the point, folks.

25  Everyone knows that the coaches are not allowed to do this,

1  that they would be in big trouble if anyone found out that they

2  were doing so.

3          And that is sufficient, I submit, for you to find that

4  these defendants did not reasonably believe that if any coach

5  was asking them to make a payment like this, that if any coach

6  was aware of the payments they were making, that coach was not

7  acting in good faith, that coach was not conflicted, and that

8  coach did not have the apparent authority to make that request.

9  Instead, that coach was simply another scheme participant,

10  another member of this basketball underground, and another

11  person involved in defrauding his own employer.

12          Let me say one final point on this. There's nothing

13  improper about the defendants talking to coaches. It is not

14  even surprising. All three defendants had regular contact with

15  basketball coaches. And that's why the fact that Jim Gatto was

16  talking to Rick Pitino or Jim Larranaga or Bill Self doesn't

17  itself tell you anything at all. It certainly isn't evidence

18  that any one of those coaches made a specific request that Jim

19  Gatto make a secret payment to one of his players.

20          Let me talk next a little bit about motive. All three

21  defense lawyers suggested to you that the government hadn't

22  established the defendants' motive to participate in these

23  schemes. And starting with Mr. Gatto, if we're going to talk

24  about his compensation, let's at least get our numbers right.

25  In 2017, Mr. Gatto made a base salary of 139,699, but he also

 1  got a bonus of over $50,000, and that was way up from 2015.

 2  Now, you haven't heard a whole lot of testimony or a whole lot

 3  of evidence about how or why his compensation was calculated,

 4  and it doesn't particularly matter.  Here's the point.  It was

 5  a huge part of Jim Gatto's job at Adidas to go out and find top

 6  talent, to make sure that they ultimately signed with Adidas

 7  upon become being professionals.

 8          Why is Jim Gatto doing this?  To curry favor with the

 9  very families he is going to rely on to sign with him down the

10  road.  That's why he's paying Dennis Smith.  That's why he's

11  facilitating payments to the family of Billy Preston.  That's

12  why he's facilitating payments to the family of Brian Bowen.

13  Does he get Dennis Smith?  No.  And Mr. Schachter showed you

14  some of those communications.  What he didn't highlight was the

15  portion of that communication where Jim Gatto told up how

16  disappointed he was.  Why was Jim Gatto disappointed that he

17  hadn't gotten Dennis Smith?  Because he had been working to

18  recruit him for years, including authorizing a payment of

19  $40,000 to his family.  That's his motive.  That's his job.

20          The same thing for Merl Code.  His primary job as a

21  consultant is to go out and identify young players that Adidas

22  can bring to the brand, that they can sign when they become

23  professionals.  And it's a hyper-hypercompetitive area.  So

24  what did these two defendants do?  They tried to cheat a little

25  bit.  They thought they could curry some favor with the

1  families by sending them money they weren't allow to.

2          Finally, for Christian Dawkins it really is all about

3  greed, because for Christian Dawkins the hope was that these

4  kids were going to sign with him and his consulting company if

5  they made it to the NBA.  Brian Bowen Senior told you all about

6  this.  He told you about how he and Christian Dawkins had

7  talked about the fact that if Tugs made it to the NBA, they had

8  an agreement, an understanding, that Christian Dawkins would

9  get to sign Tugs.  That's why Christian Dawkins would make

10  money.  That's why Christian Dawkins is involved in

11  facilitating these payments.  He wants to maintain that

12  relationship.

13          I want to talk now about the University of Louisville

14  and this prior violation that you've heard a little bit about

15  from the defendants, because I submit to you that what the

16  defendants have told you about it is not entirely accurate.

17  Here's the stipulation that the parties reached.  Mr. Haney

18  yesterday showed you paragraph 1.  And he showed you this part

19  of the paragraph, in which it is true, a former rogue employee,

20  between 2010 and 2014, did something he wasn't authorized to

21  do.  And as a result of that, the university faced some real

22  penalties.  But here's the part he didn't highlight:  No

23  finding that anyone else at the university knew about this,

24  including any basketball coach, let alone was involved in it.

25          Let's go to the next page.  Mr. Schachter this morning

1   tried to argue to you that Rick Pitino was somehow above the

2   rules because the university took no employment action as a

3   result of this incident.  Here's what he didn't highlight for

4   you.  Why?  Because there was no evidence that Rick Pitino knew

5   it had been going on.  No indication or finding that he had

6   been personally involved.  So, the university took no

7   employment action.

8           But here's the most important point, the consequences.

9   The university, upon learning of the misconduct, took some

10  steps itself because it knew what it had done was wrong, and it

11  knew it was going to be penalized.  Here's the part you haven't

12  seen yet, the penalty the NCAA imposed:  $500,000, and the

13  forfeiture of a national championship.

14          Folks, when we talk to you about the risks of harm

15  that the defendants were exposing the universities to, keep

16  these facts in mind.  These are the risks of harm that

17  universities face if people like these defendants cause them to

18  issue scholarships to kids who are not eligible.  Does that

19  sound like help to you?

20          I want to address briefly a couple of arguments that

21  Mr. Haney made yesterday.  Mr. Haney spent a fair bit of time

22  yesterday trying to tell you that Christian Dawkins didn't

23  force Tugs Bowen to go to Louisville.  And let me be very

24  clear.  The government has never suggested otherwise.  You

25  don't need to find that the defendants forced any of these kids

1    to go somewhere they didn't want to go.  You don't need to find

2    that they pressured or even bullied Tugs Bowen to make a choice

3    he didn't want to make.  Why Tugs Bowen chose to go to

4    Louisville is not an issue you need to this decide.

5            Jim Gatto, Merl Code and Christian Dawkins are charged

6    with making a payment to the Bowen family and concealing that

7    payment from the university.  Whether they made the payment to

8    force him to go there or to reward his family for making that

9    decision, not really the point.  This is the point.  The reason

10   the defendants were making that payment was because Brian Bowen

11   had gone to Louisville.  You've heard a lot of testimony about

12   that.  In fact, the defendants on these recordings tell you

13   that themselves.  If he had gone to a different school, a

14   school sponsored by a different shoe company, Jim Gatto is not

15   approving that payment, Merl Code is not facilitating that

16   payment, and Christian Dawkins wouldn't be involved in helping

17   to broker that particular deal.

18           But let me also say this, because it is an important

19   point.  Mr. Haney left out a lot of the key facts.  I think the

20   journey for justice he talked about has just a few more stops.

21           Remember Mr. Bowen's testimony?  By May of 2018, Tugs

22   didn't really have a school to go to.  He had been hoping to go

23   to the University of Arizona, but that had fallen through.  So

24   who proposed the University of Louisville?  Christian Dawkins

25   did.  Previously, Tugs hadn't really expressed any interest in

1    it.  Louisville wasn't even on his radar at that point.

2              And remember Government Exhibit 3006, the timeline?

3    Mr. Solowiejczyk walked you through this at some length.  Look

4    up top.  May 18, 2017.  Any Adidas schools that make sense for

5    Bowen?

6              And then a couple of days later, Code and Dawkins

7    don't send Bowen to Oregon.  Why doesn't Code want Dawkins to

8    send Bowen to Oregon?  Because Oregon is a Nike school, and he

9    and Adidas want just the opposite.

10             Look at the next page, May 24th, look at what Bowen

11   Senior says May 24th at 7:54 p.m.  Remember Bowen's testimony

12   on this point?  He wasn't particularly happy with Adidas at

13   this time.  He didn't think they had been particularly good to

14   his son.  All that changes when Jim Gatto and Merl Code are

15   prepared to make a big payment, and his son does in fact end up

16   at the University of Louisville.

17             On the next page, May 29th, Dawkins to Code:  "tell

18   Jim.  Let's get it done.  I have to discuss the setup with you

19   in the a.m."  Folks, whether the defendants were forcing Brian

20   Bowen to go to the University of Louisville or just very

21   pleased that he made that decision, completely immaterial.  The

22   point is that the defendants were working together to make that

23   payment because he was going to Louisville and to conceal that

24   payment from the University of Louisville.

25             The story goes on.  May 31st.  Dawkins tells Code, "I

1    think I can hold Oregon off.  I'm pretty sure."  This is the

2    criminal agreement, the agreement to make the payment to Tugs

3    and his family because Tugs chose Louisville and, more

4    important, to conceal that payment from the University of

5    Louisville, because, as the defendants knew, if the University

6    found out about this, he couldn't get the scholarship and he

7    couldn't play.

8            Next Mr. Code and Mr. Dawkins tell you that they

9    weren't involved in the Kansas and NC State payments that Jim

10   Gatto made with TJ Gassnola and, therefore, I think, as the

11   argument would have it, they couldn't possibly be a member of

12   the conspiracy alleged in Count One.  And that's just wrong.

13   What Count One charges is a conspiracy that covers all of the

14   universities that you've heard about during this case.  I

15   expect Judge Kaplan will instruct you that to be a member of a

16   conspiracy, a defendant does not need to be involved in or even

17   aware of all of the conspiracy's activities.  Not every member

18   of a conspiracy needs to play the same role.  And not every

19   member of the conspiracy needs to have joined at the outset.  A

20   defendant may join at any time and, if he joined, still would

21   be held liable for the acts done before or after he joined.

22           So, folks, the question is not whether Merl Code and

23   Christian Dawkins were part of this from day one.  They

24   weren't.  And the government has never suggested otherwise.

25   The question is whether there came a time when Christian

1   Dawkins and Merl Code did join a conspiracy with Jim Gatto to

2   defraud universities by making payments to the families of

3   student-athletes and concealing those payments from the schools

4   issuing the scholarship.

5           On that issue, there is really no serious dispute.  We

6   just looked at the text messages together.  You have heard all

7   of the testimony and the evidence in this case.  And you know

8   that as of May 2017, Dawkins, Code and Gatto came together,

9   formed a meeting of the minds, to make a payment to the family

10  of Brian Bowen and to conceal that payment from the University.

11  And that's what the law requires.

12          By the way, one final point on this.  Count Two does

13  not allege a conspiracy.  It alleges what's known as a

14  substantive count of wire fraud.  Count Two focuses exclusively

15  on the University of Louisville, on no other schools.  Meaning

16  that if you find that each defendant participated in a scheme

17  to defraud the University of Louisville in connection with a

18  scholarship awarded to Brian Bowen, they are guilty on Count

19  Two.

20          Mr. Haney also tried to suggest to you that Dawkins

21  believed that he was allowed to facilitate this payment to the

22  family of Brian Bowen because he had known him for a long time.

23  They had what he called a preexisting relationship.  But that

24  doesn't make a whole lot of sense, because Christian Dawkins

25  wasn't the one making the payment.  The money was coming from

 1   Adidas -- from Jim Gatto, from Merl Code.  They didn't have a

 2   preexisting relationship with Brian Bowen.

 3         More importantly, Christian Dawkins' own words

 4   undercut that theory.  Mr. Haney showed you Defense Exhibit 5,

 5   which was the call in which Christian Dawkins says that he

 6   doesn't think they're going to be allowed to touch him because

 7   of the preexisting relationship.  And that call is on

 8   July 10th of 2017.

 9         But the very next day -- this is Defense Exhibit 7, if

10   you would like to look at it -- here we are.  Let's pull up

11   Defense Exhibit 5.  So, the one on top:  "I don't think they

12   could even touch me.  Don't think they could do anything to

13   me."  That's the call Mr. Haney pointed you to when he said

14   that Christian Dawkins thought it was OK for him to do this.

15         Look what he says the very next day:  "you never know

16   when the NCAA is going to come, right?  I wouldn't tell Rick

17   anything like this because I don't want to put him in

18   jeopardy."

19         Folks, this issue is a distraction.  Christian Dawkins

20   knew full well that he wasn't allowed to make this payment.  I

21   think it has basically been conceded at this point.  Everyone

22   knew these payments violated NCAA rules, and that included

23   Christian Dawkins.

24         Finally, Mr. Code this morning suggested to you that

25   because Brian Bowen Senior had already taken money from other

1   sources when his son was still in high school, that Tugs was

2   already ineligible, that what the defendants did couldn't

3   possibly have been wrong.  Folks, that makes no sense.  He gave

4   you the example of shooting a dead body.  Let me give you a

5   slightly different example.  If you are walking down the street

6   and you see a group of people robbing a bank, anyone think it

7   is OK to walk in and take some money on the theory the bank has

8   already been robbed?  Come on.  That doesn't make any sense.

9           But more importantly, far more importantly, because

10  this case is about misleading universities and not simply

11  violating NCAA rules, consider how what the defendants were

12  doing was directly tied to misleading the schools.  Back in

13  2015, when Bowen Senior was accepting $25,000 for his son to

14  switch AAU teams, did he know what he was doing violated NCAA

15  rules?  Sure.  But there was no college in the picture.  No

16  specific university from which this was going to be concealed.

17  And the purpose of those payments had nothing to do with

18  colleges or the NCAA.

19          By contrast, in May of 2017, when these defendants

20  were orchestrating a payment of a hundred thousand dollars to

21  his family, the primary purpose of the payment was because

22  Brian Bowen was going to the University of Louisville.  There

23  was no question in anyone's mind that this payment was going to

24  be concealed not in the abstract but from a very specific

25  institution, the University of Louisville, from its compliance

Iaidgat4                    Summation - Mr. Diskant

1    department.

2            And they took elaborate steps to make sure the

3    university did not find out.  Mr. Solowiejczyk walked you

4    through those yesterday.  I'm not going to do it again.  But

5    there can be no serious question that the defendants understood

6    that the universities were going to be misled on this subject.

7            Remember these texts between the Code and Dawkins?

8    They're joking, or at least talking, about the scholarship

9    papers that Brian Bowen is going to have to fill out.  The very

10   paperwork on which this information is going to be concealed.

11   The very false statements at the heart of this case.

12           Did the defendants know that the payments were going

13   to be concealed?  Of course they did.  That was the point.

14           Brian Bowen Senior told you the exact same thing.

15   Right?  Of course he knew these payments were going to be

16   concealed.  That was the point.

17           And look at Government Exhibit 75A.  This is Code and

18   Dawkins talking again about the fact of making this payment and

19   laughing about the scholarship.  The defendants know exactly

20   what's going on here.

21           Let me leave you with this.  Mr. Schachter drew your

22   attention to a part of the charge that's important.  It is the

23   question of whether or not the defendants were acting with a

24   bad purpose, to disregard the law.  And Judge Kaplan will

25   instruct you on that, and you should follow his instructions

1   carefully on everything.

2        Think about the facts in this case.  Think about all

3   of the deception.  Think about all of the deceit.  Think about

4   all of the steps the defendants took to conceal what they were

5   asking -- or what they were doing, rather.  And then think

6   about whether the defendants were acting with a bad purpose.

7   Of course they were.

8        If the defendants were just trying to help, why all of

9   this concealment?  You know, why couldn't Brian Bowen Senior

10  tell the admissions folks, tell the financial aid folks, that,

11  hey, by the way, I'm taking money from Adidas?  And if the

12  defendants were just trying to help the University of

13  Louisville, why did they do the same thing?  If Jim Gatto

14  thought he was just trying to help the University of

15  Louisville, that he was just doing his job, why the fake

16  invoices?  Why didn't he tell Lindsay Harksen, who also had to

17  sign off on this invoice, that, hey, by the way, this is a

18  payment for a family of a student-athlete?  You know why.  She

19  told you exactly what she would have done if she had found out.

20  She would have elevated it immediately because she knew it was

21  wrong.

22        And why did Gatto and Gassnola talk on these calls

23  about underground stuff?  Why the black ops?

24        If Merl Code thought he was just trying to help the

25  University of Louisville, why couldn't he pay Brian Bowen

1   directly rather than having the money routed through a team

2   account and on to Christian Dawkins?  Why did he have to lie to

3   his old friend Ricky Robertson about what all these payments

4   and money transfers were for?  Why couldn't he just tell him,

5   "Hey, Ricky, it's part of our job.  We're helping out the

6   University of Louisville"?

7          And why does he have Ricky Robertson conceal it

8   further by writing "consulting fees" on the check even though

9   Merl Code knew full well that no consulting fees had been

10  provided?

11         And if Christian Dawkins thought he was just trying to

12  help, why the bat phones?  Remember all the texts between Bowen

13  Senior and Christian Dawkins:  "Hit me on your other.  I'm

14  using the bat."

15         And when they were using their regular phones,

16  remember how they talked to each other?  This is Government

17  Exhibit 23T.

18         We can skip it.

19         They talk about a need to get something to you, right?

20  They talk in code.  The time the second payment is ready to

21  come up, what do they talk about?  "It's going to be Christmas

22  soon."  Who talks like that if they think they're doing

23  something legitimate?  That's Government Exhibit 56T, if you

24  would like to look back at it.

25         Why are the defendants doing all of this?  You know

why.  Christian Dawkins tells you himself at one point.  He
says, because it's illegal, against the NCAA rules.

        Why all of this?  Because the defendants knew what
they were doing was not helping the schools, they were helping
themselves.  And that's the bad purpose, right there.  Getting
elite players on Adidas teams made Jim Gatto and Merl Code look
good.  Getting money to Bowen's family helped Dawkins try to
secure him as a future client.  The defendants may have had
slightly different motivations for participating in this
scheme, but they all shared the same purpose -- get money to
the Bowen family and conceal it from the University.  Because
no matter what their individual goals, no matter what they
hoped to accomplish, none of that could happen if the
University found out, and the defendants knew that.  And in
fact that is what happened when the university found out, and
that's why Brian Bowen never played.

        Were the defendants making the Louisville basketball
theme a little bit better?  Sure.  But that's not the kind of
help the schools wanted.  And, more importantly, it wasn't the
defendants' right, it wasn't their place, to make that decision
for them.

        TJ Gassnola referred to this as the underworld of
college sports, a place where payments were made and concealed,
rules were broken, lies were told.  And these defendants were a
very big part of that.

1  We talked about this a bit at the beginning.  Keep

2  this in mind.  The University of Louisville is not just a

3  basketball team.  In fact, the basketball team is just one of

4  23 teams within the athletics department, and the athletics

5  department is just one part of a bigger university that is home

6  to more than 20,000 students, has an admissions department, a

7  financial aid office, graduate school, an administration, and

8  in awarding financial aid, in issuing scholarships to

9  prospective student-athletes, the University of Louisville has

10  a right not to be lied to.  It has a right to decide whether or

11  not to take on a risk.  It has a right to decide to play by the

12  rules.  And, of course, the same is true for the University of

13  Kansas, for North Carolina State University.

14  The defendants effectively ask you to take those

15  rights away, to allow them to be the arbiters of what is in the

16  best interest of the university.  Because at core, the defense

17  here is this:  We don't care about the rules, so the schools

18  probably don't either.  And that's just not true.  It is just

19  not right.

20  Did the defendants make these payments?  Of course

21  they did.

22  Did the defendants intend to conceal the payments from

23  the universities, that is, the actual institutions?  Yeah.  You

24  know that, too.

25  Did they cause student-athletes, like Tugs Bowen, to

Iaidgat4

1  falsely certify to the University of Louisville when he was

2  eligible when in fact he wasn't?  Yep, they did that.

3         And did the universities rely on those false

4  statements in making financial aid decisions?  They did that,

5  too.

6         This is not a case about the rules violations.  It is

7  a case about fraudulently misleading the universities about

8  those rules violations and causing public universities to issue

9  financial aid under false pretenses, about causing those

10  schools to assume the risks of financial aid that result --

11  excuse me, the risks of financial harm that result.  And that's

12  exactly what these defendants did.

13         Folks, that's what this case is about.  It is just

14  that simple.  It's that straightforward.  It is why we are here

15  today.  It is why the defendants are guilty.

16         THE COURT:  Thank you, Mr. Diskant.

17         Ladies and gentlemen, I remind you that we'll resume

18  at 9:30 Monday.  In the meantime -- you know this already --

19  you are not to discuss the case with anybody or among

20  yourselves.  You are not to have any exposure to TV, press,

21  social media, whatever, about it.  You are in a state of

22  sterilization from information about this case until I tell you

23  otherwise.

24         Thank you for your attention.  I will say, without

25  hesitation, you have heard a spectacular set of closing

Iaidgat4

1    arguments by some very fine lawyers, no question about it, on

2    both sides.

3                Thank you, folks.

4                THE CLERK:  Jurors, please come this way.

5                All rise.

6                (Adjourned to 9:30 a.m., October 22, 2018)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25