UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,

       -against-

                                      17-cr-0686 (LAK)

JAMES GATTO, a/k/a "Jim,"
MERL CODE, and
CHRISTIAN DAWKINS

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

       Edward B. Diskant
       Eli Jacob Mark
       Noah David Solowiejczyk
       Aline R. Flodr
       Assistant United States Attorneys
       ROBERT KHUZAMI
       ACTING UNITED STATES ATTORNEY

       Michael Steven Schachter
       Casey Ellen Donnelly
       WILLKIE FARR & GALLAGHER LLP

       *Attorneys for Defendant James Gatto*

       Mark C. Moore
       Andrew A. Mathias
       William W. Wilkins
       NEXSEN PRUET, LLC

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/17/2019

Merl F. Code
OGLETREE DEAKINS NASH SMOAK & STEWART, PC

*Attorneys for Defendant Merl Code*


Steven A. Haney, Sr.
HANEY LAW GROUP PLLC

*Attorney for Defendant Christian Dawkins*


LEWIS A. KAPLAN, *District Judge.*

      This case is about corruption in National Collegiate Athletic Association ("NCAA") Division I college basketball. All three defendants were convicted of conspiracy to commit, and the commission of, wire fraud.[1] During the trial, the Court granted in part and denied in part the government's motion to exclude testimony of the defendants' proposed expert witness.[2] It concluded that much of the proposed testimony would have been irrelevant and, in any case, was inadmissible under Rule 403 of the Federal Rules of Evidence. It concluded also that it lacked sufficient information to make a determination of admissibility as to other portions of the proposed testimony.[3] This opinion sets forth the reasoning behind the Court's decision.

---

[1]     All defendants were charged with and convicted on one count of participating in a conspiracy to commit wire fraud and one count of wire fraud in connection with an alleged scheme to defraud the University of Louisville. Defendant James Gatto alone was charged with and convicted on one additional count of wire fraud in connection with an alleged scheme to defraud the University of Kansas.

[2]     DI 215.

[3]     The Court offered to hold a *Daubert* hearing to determine the admissibility of those portions of the proposed testimony, but defendants withdrew the proffered testimony and thus obviated any need for a hearing. Trial Transcript ("Tr.") at 775:5-7, 17-24.

*Background*

It is helpful first to put the case, the proposed expert testimony, and the motion *in limine* in context.

*The College Basketball Context*

Division I men's basketball is a billion dollar activity from which the National Collegiate Athletic Association (the "NCAA") as well as prominent Division I colleges and universities (and the coaches of successful Division I teams) generate vast revenue. ESPN reported that the NCAA took in more than $1 billion during the 2016-2017 school year.[4] The University of Louisville alone, as one example, realized at least $29 million in revenue from its men's basketball program in 2017.[5]

But the student-athletes who actually play on these NCAA Division I men's basketball teams receive – or at least are supposed to receive – almost no financial benefits. They fundamentally are entitled to no more than the athletic scholarships they receive from these colleges and universities.

At the root of this situation is the NCAA's principle of amateurism. The amateur principle states that student athletes' participation in college sports "should be motivated primarily

---

[4]

Darren Rovell, ESPN, *NCAA Tops $1 Billion in Revenue During 2016-17 School Year* (Mar. 7, 2018), http://www.espn.com/college-sports/story/_/id/22678988/ncaa-tops-1-billion-revenue-first.

[5]

Tr. at 416:22-25.

by education and by the physical, mental and social benefits to be derived."[6]  To that end, student-athletes may play NCAA sports only if they qualify as amateurs.  And these students lose their status as amateurs if they or their family members accept prohibited financial assistance or other economic benefits, including inducements (other than an athletic scholarship) to attend a particular NCAA university.[7]  Likewise, the universities and colleges are stringently limited with respect to what they may do to recruit student athletes to their institutions.

These rules, though of long standing, are not free of controversy.  Some have argued that they unfairly prevent student-athletes from sharing in the financial benefits generated by the basketball games they play.[8]  But the alleged fraud in this case concerned something quite different.

---

[6]  NCAA Division I Manual § 2.9 (2017-2018).

[7]  *Id.* §§ 12.01.1, 12.1.2, 13.01.1, 13.2.1.

[8]  In response to the federal investigations leading to this case, among others, the NCAA established the Commission on College Basketball chaired by Dr. Condoleezza Rice (the "Rice Commission") to "fully examine critical aspects of Division I men's basketball" and "identify bold legislative, policy and structural modifications to improve the integrity of our processes and the well-being of our student athletes."  NCAA, *Commission on College Basketball Charter* § 1, available at http://www.ncaa.org/governance/commission-college-basketball-charter (last visited Nov. 29, 2018).  The Rice Commission published its report and recommendations in April 2018.  It called the state of men's college basketball "deeply troubled" and stated:

"College basketball, like college sports generally, is to be played by student-athletes who are members of the collegiate community, not paid professionals.  Over several decades, however, trends have emerged that call this understanding into question.  Millions of dollars are now generated by television contracts and apparel sponsorship for the NCAA, universities and coaches.  The financial stake in success has grown exponentially; and thus, there is an arms race to recruit the best talent – and if you are a coach – to keep your job.  Future stars and their families know their value – and can be tempted to monetize their worth as soon as possible since they will not be compensated in college.  Some agents, summer coaches and other third parties act as intermediaries and facilitators.  In other words, the environment surrounding college basketball is a toxic mix of perverse incentives to cheat."

COMM'N ON COLLEGE BASKETBALL, *Report and Recommendations to Address the Issues*

*The Alleged Fraud – What It Was and What It Wasn't*

The defendants in this case – two of whom worked in different capacities for the Adidas sportswear company and the third of whom is an aspiring sports agent – were charged principally with conspiring to commit and committing wire fraud by (a) making payments to families of prospective student-athletes to induce those student-athletes to attend particular NCAA Division I universities (the "Victim Universities") and (b) causing those student-athletes to submit certifications to the universities falsely stating that they were compliant with NCAA rules – essentially that they were amateurs. In doing so, defendants allegedly deceived the Victim Universities into giving athletic scholarships to players who in fact were ineligible to compete in NCAA basketball games, prevented the Victim Universities from making their own fully informed decisions with respect to the distribution of scholarships, and exposed the Victim Universities to financial and other penalties for non-compliance with NCAA rules.

Given the nature of the alleged crimes, the wisdom and fairness of the NCAA amateurism and recruitment rules were not at issue in this case. Indeed, all parties at least ostensibly so agreed from the outset.[9] Moreover, the parties agreed as to most of the central historical facts –

_____

*Facing Collegiate Basketball* at 1-2 (April 2018).

[9]     During jury selection the Court explained the case to the prospective jurors in a statement the accuracy of which was agreed by all parties. No new formulation is required:

"Let me just explain to all of you . . . what is and isn't in issue in this case. There is no claim here that a school decides to give an athletic scholarship to a young potential player, there is no claim that there is anything wrong with that. Everybody agrees on that. *These young people are supposed to be amateurs. They don't get paid to play. They are not supposed to get paid to play in college. They are not supposed to be paid to pick one college over another. And when I say 'paid,' I mean money or I mean other benefits. They*

most notably the fact that each of the defendants made or was involved in making payments to the

families of high school athletes,[10] which rendered those athletes ineligible to play NCAA sanctioned

college basketball.  The defense – ultimately rejected by the jury – instead was that the defendants

acted out of an intent to help, not harm, the universities by aiding them to improve their basketball

teams.  The universities, far from being victims, allegedly wanted that assistance.

In short, the NCAA amateurism and recruitment rules were not on trial here.

Reflecting that fact, the *voir dire* – without dissent from any party – was conducted so as to ensure

that jurors with views about the wisdom or fairness of those rules that could not be put aside in

---

*are entitled to get an athletic scholarship if the school so decides, but that's that.*

\*   \*   \*

"The allegation in this case is that these defendants were involved in paying, or causing money to be paid, to high school athletes to pick one school as opposed to another, Louisville instead of Michigan State, or whatever.

"When these young people selected their college and went for an education  and to play basketball, they had to sign certifications.  Those certifications, among other things, certified that neither they nor their families took money from anybody that they weren't supposed to take.  There may have been other certifications to that effect signed by other people who knew better.  The certification was signed, the government claims, with the object of deceiving the schools as to the eligibility of the players and their compliance with the NCAA rules that require them to be amateurs and not to take money other than the scholarships.  And those certifications had the object of reducing or preventing the schools from making their own decisions based on full disclosure of the facts, including whatever payments may have been made, about what to do with their money.

"That's the alleged charge.  *The alleged fraud was a fraud on the schools by portraying as pure amateurs high school athletes who in one way or another benefitted or paid money to pick school A rather than school B and then the false certifications – allegedly false certifications were made."  Voir dire* Tr. 50:9-51:19 (emphasis added).

[10]

*See, e.g.,* Tr. 66:8-13, 68:9-11, 70:4-5, 81:21-82:4, 82:21-83:2 (Gatto opening); Tr. 98:14-23, 99:3-8 (Code opening); Tr. 113:1-3, 118:24-119:17, 120:7-10, 121:2-6, 127:7-25, 128:7-22 (Dawkins opening); Tr. 1738:18-23, 1739:19-1740:1, 1741:22-25  (Gatto closing);Tr. 1711:22-1712:1, 1712:25-1713:2, 1714:2-4, 1714:23-1715:4 (Code closing); Tr. 1690:20-22, 1692:5-23, 1693:3-5 (Dawkins closing).

coming to a verdict were not seated.[11]  The rules – whether wise or fair – simply were contextual facts – part of the milieu in which the fraud allegedly was committed.  But the defendants took an approach – significantly but not entirely the bulk of their proposed expert testimony – the effects of which would have been to (1) threaten a jury verdict based on perceived economic unfairness of the NCAA rules to the student athletes rather than on the merits of the charges against the defendants and (2) confuse the issues to be tried.  Moreover, much of that proposed expert testimony would have been irrelevant to the real issues in the case.

*The Trial*

*Openings and Cross-Examination*

The defendants' approach came up first during defendant Gatto's opening statement. His counsel described at length the significant financial benefits to universities of having successful college basketball programs.[12]  She then stated that "[t]he kids on the court, however, the ones whose blood, sweat and tears is [*sic*] making this game a billion dollar industry, they are not allowed to earn

---

[11]

The Court asked potential jurors, for example, whether "the fact that the charges in this case relate to amateur college athletics, and specifically men's college basketball" would make it hard for them to be fair and impartial.  *Voir Dire* Tr. at 18:14-17. The Court inquired also whether any of the potential jurors thought "that a college or somebody connected with a college athletic program is or ought to be entitled to pay or cause the payment of money or give other benefits to high school athletes in order to induce them to come to that college and play a sport for it."  *Id.* at 18:20-24. Finally, the Court stated explicitly:

"There are, I suppose, in the world at least possibly different opinions about whether young people who play intercollegiate college sports ought to be paid for doing it. Recognizing that people hold different opinions, is there anybody here who feels so strongly about that issue one way or the other that it would be hard for you to be fair in this case?"  *Id.* at 45:16-22.

[12]

Tr. at 70:10-71:14.

a dime."[13]  And counsel then sought to frame the case by stating, "[l]adies and gentlemen, we are here today because the government alleges that Jim *Gatto committed two federal offenses when Adidas took a tiny portion of the money that it brought in and shared it with the families of the players on the court*" and then related that one such player lived in public housing in North Carolina.[14]  Defense counsel again raised the question of the students-athletes' financial well being during its cross-examination of cooperating witness TJ Gassnola when counsel asked Mr. Gassnola, a former amateur basketball team coach, whether it was fair to say that many of the kids on his team did not have a lot of money.[15]

Regardless of defendants' intention, this line of argument risked distracting the jury from the issues in this case.  It risked also eliciting the sympathy of the jury for student-athletes who suffered adverse consequences by reason of the enforcement of NCAA rules.  Most importantly, it suggested to the jury that the "equitable" result would have been to overlook any deception of the Victim Universities – in other words, to decide the case "on an improper basis, commonly [and in this case in part] . . . an emotional one."[16]  As noted, the Court sustained objections during the opening and cross-examinations when counsel went down this path.  And this line of defense set the

---

[13] *Id.* at 71:15-17.

[14] *Id.* at 71:24-72:3.  (Emphasis added).

The Court sustained objections to this line of argument throughout.  *E.g.*, *id.* at 71:20-21, 72:9-10.

[15] *Id.* at 1056: 6-7.

[16] FED. R. EVID. 403, Advisory Comm. Note, 1972 Proposed Rules.

stage for the proposed expert testimony.

*Proposed Expert Testimony*

Defendants proposed to call as an expert witness Daniel A. Rascher and supplied a Rule 16 disclosure (the "Rule 16 Disclosure") that indicated that Dr. Rascher was "an expert in the field of sports economics, including on issues concerning the quantitative and qualitative benefits that a successful [Division I] men's basketball . . . program can confer upon a university and the financial impact that NCAA sanctions . . . have had, historically, on universities that have been found to have violated the NCAA's recruiting rules."[17]

The Rule 16 Disclosure stated that Dr. Rascher proposed to testify that the economic value a Division I university realizes from recruiting an elite high-school men's basketball player was so substantial that it outweighed the risk of sanctions that might be imposed if a university were caught violating or countenancing the violation of NCAA rules.[18]  Although the Rule 16 Disclosure was not entirely clear on this point, the Court understood that Dr. Rascher would have testified that this calculus was true whether the expected cost of an NCAA rule violation was taken to be (a) the amount of economic penalties imposed by the NCAA assuming detection and enforcement or (b) the amount of those penalties discounted by the supposedly small probability that the violation would

---

[17] DI 196-1 at ECF 2.

Dr. Rascher has a Ph.D. in Economics from the University of California, Berkeley and is director of academic programs for the Sport Management Master's Program at the University of San Francisco, where he is a tenured professor. *Id.* at ECF 3.

[18] *Id.*

be detected and penalties imposed.

The proposed testimony was intended to be organized into three sections, namely: (1) the quantitative benefits to Division I universities of recruiting elite high-school men's basketball players, (2) the so-called "qualitative benefits" to Division I universities from the same, and (3) the expected cost to Division I universities of "major infractions" of NCAA recruiting rules.

The government moved to exclude all of Dr. Rascher's testimony under Rules 401, 403, 702, and 703 of the Federal Rules of Evidence. Defendants asserted that Dr. Rascher's testimony would have been relevant to the jury's consideration of whether the alleged scheme to defraud existed, whether the individual defendants possessed the requisite criminal intent in participating in that alleged scheme, and whether the false statements that defendants allegedly caused to be made to the Victim Universities in fact were material to those universities.[19]  Decision was deferred until during the trial.

*The Decision*

The Court considered the proposed testimony and concluded first that Dr. Rascher's testimony would have been entirely irrelevant to the jury's consideration of either the object of the alleged scheme to defraud or the individual defendants' states of mind.

The Court next considered whether the proposed testimony might have been relevant to the jury's consideration of materiality.  This question, the Court concluded, was closer with respect to at least certain portions of the proposed testimony.  Ultimately, however, the Court

---

[19]  *Id.*

concluded that the proposed testimony related to the supposed quantitative and qualitative benefits of recruiting elite high-school men's basketball players would not have been relevant to materiality, but reserved judgment on this question with respect to the proposed testimony on the expected cost to Division I universities of major infractions of NCAA recruiting rules.

The Court then concluded that, even assuming some probative value, Rule 403 weighed heavily against the admission Dr. Rascher's proposed testimony on the supposed quantitative and qualitative benefits to Division I universities of recruiting elite high-school men's basketball players. In the Court's view, the proposed testimony would have placed before the jury evidence that would have invited acquittal not because the government had failed to prove beyond a reasonable doubt that defendants had committed the charged crimes, but rather because the NCAA rules that occasioned the false representations at issue in this case (*i.e.*, the student-athletes' certifications to the Victim Universities) were unreasonable or unfair because at least some of the student-athletes were poor. The athletes in any case should be allowed to share in the economic benefits of their recruiters. Thus, any misrepresentations caused by defendants therefore should be ignored.

In sum, the testimony on alleged quantitative and qualitative benefits was inadmissible under Rules 401 and 403 of the Federal Rules of Evidence. While the remaining section of testimony related to the expected cost to Division I universities of major infractions of NCAA recruiting rules might have been of limited probative value, defendants had failed to satisfy the Court that such testimony otherwise was admissible under Article 7 of the Federal Rules of Evidence. Accordingly, the Court granted the government's motion in part, and denied it in part, and

offered to conduct a *Daubert* hearing with respect to certain portions of the proposed testimony.[20] Defendants ultimately decided not to seek to offer that portion of the testimony so no hearing was held.

*Discussion*

*Legal Framework*

*Relevancy of Evidence and the Balancing Test of Rule 403*

Rule 401 of the Federal Rules of Evidence states that evidence is relevant if (1) "it has any tendency to make a fact more or less probable than it would be without the evidence;" and (2) "the fact is of consequence in determining the action." Although relevant evidence generally is admissible,[21] Rule 403 permits a trial court to exclude even relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "Unfair prejudice," according to the Advisory Committee Note to Rule 403, "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." It is for the Court to balance any probative value of evidence against the risks that such evidence presents to the integrity of the jury's deliberations and verdict.[22]

---

[20]

DI 215.

[21]

*See* Fed. R. Evid. 402.

[22]

*See, e.g., United States v. Bermudez*, 529 F.3d 158, 161 (2d Cir. 2008) (citation omitted).

*Expert Testimony and the Court's Gatekeeping Role*

The Supreme Court has charged district courts with a gate keeping role to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[23]   This inquiry is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > "(b) the testimony is based on sufficient facts or data;
> >
> > "(c) the testimony is the product of reliable principles and methods; and
> >
> > "(d) the expert has reliably applied the principles and methods to the facts of the case."

The Court's threshold assessment therefore is "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue."[24]   This gatekeeping role "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."[25]

"[T]he proponent of expert testimony has the burden of establishing by a

---

[23] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

[24] *Id.* at 592-93.

[25] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting Fed. R. Evid. 702).

preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied."[26]  To be admissible, the proposed expert witness must "be qualified by virtue of specialized knowledge, skill, experience, training, or education."[27]  The witness' analysis must also be "'reliable at every step.'"[28]

"In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."[29]  The court's inquiry is "a 'flexible one'" and may take into account "(1) whether a theory or technique has been or can be tested; (2) 'whether the theory or technique has been subjected to peer review and publication;' (3) the technique's 'known or potential rate of error' and 'the existence and maintenance of standards controlling the technique's operation;' and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community."[30]  In sum, "the district court must 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level

---

[26]  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citing *Daubert*, 509 U.S. at 593 n.10).

[27]  *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004).

[28]  *United States v. Morgan*, 675 F. App'x 53, 55 (2d Cir. 2017) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)).

[29]  *Amorgianos*, 303 F.3d at 267.

[30]  *Williams*, 506 F.3d at 160 (quoting *Daubert*, 509 U.S. at 593-94).

of intellectual rigor that characterizes the practice of an expert in the relevant field.'"[31]

Although the Court must be rigorous in its evaluation of proposed expert testimony, "'a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible' – a 'judge should only exclude the evidence if the flaw is large enough that the expert lacks "good grounds" for his or her conclusions.'"[32] In the same breath in which it set out the district court's gatekeeping role, the Supreme Court maintained that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[33]

Throughout their consideration of the admissibility of evidence under Rule 702, courts must remain mindful of other applicable rules. Under Rule 703, for example, an expert may "testify to opinions based on inadmissible evidence, including hearsay, if 'experts in the field reasonably rely on such evidence in forming their opinions.'"[34] The expert may not, however, "simply transmit that hearsay to the jury."[35] As the Second Circuit has said:

"Instead, the expert must form his own opinions by applying his extensive experience

---

[31] *Amorgianos*, 303 F.3d at 265-66 (quoting *Kumho Tire*, 526 U.S. at 152). The focus of such inquiry, of course, must be entirely on the expert's principles and methodology, rather than on the conclusions that the expert generates. *Daubert*, 509 U.S. at 595.

[32] *Morgan*, 675 F. App'x at 55 (quoting *Amorgianos*, 303 F.3d at 267).

[33] *Daubert*, 509 U.S. at 596; *see also* Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments ("[T]he rejection of expert testimony is the exception rather than the rule.").

[34] *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (quoting *United States v. Locascio*, 6 F.3d 924, 938 (2d Cir. 1993)).

[35] *Id.* (citing *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003)).

and a reliable methodology to the inadmissible materials. Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever, a practice that allows the Government to circumvent the rules prohibiting hearsay."[36]

Even if a district court determines that proffered expert testimony is reliable under Rule 702, it must consider also whether such testimony "will help the trier of fact to understand the evidence or to determine a fact in issue."[37] As this Court has stated before:

> "This helpfulness requirement is 'akin to the relevance requirement of Rule 401, which is applicable to all proffered evidence [,][but] . . . goes beyond mere relevance . . . because it also requires expert testimony to have a valid connection to the pertinent inquiry.'"[38]

Finally, as discussed above, even expert testimony that is reliable and relevant nonetheless may be subject to exclusion under Rule 403. Indeed, the Second Circuit has highlighted "the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations."[39]

*General Points Regarding Dr. Rascher's Proposed Testimony*

The Court first makes a few observations on the admissibility of Dr. Rascher's opinion as a whole. It then discusses the relevance and reliability of each step in Dr. Rascher's

---

[36]     *Id.* (internal quotation marks and citations omitted).

[37]     Fed. R. Evid. 702(a).

[38]     *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 540 (quoting 4 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 702.03[1] (Joseph M. McLaughlin ed., 2d ed. 1997)).

[39]     *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (citations omitted).

analysis.

Dr. Rascher's proposed expert opinion essentially would have followed from two distinct analytical steps – *first*, that NCAA Division I universities reaped substantial quantitative and qualitative benefits when they recruited elite men's basketball players and, *second*, that the expected cost of NCAA rule violations to such universities was low, particularly taking into account the supposedly low probability that violations would be detected or NCAA penalties enforced. Taken together, these distinct points were the premises for Dr. Rascher's overarching opinion – that is, that the value to a Division I university of recruiting an elite men's basketball player was so substantial that, even if the recruitment of that player involved the violation of an NCAA rule, the benefits from recruiting that player generally would outweigh any costs associated with the rules violation.

Viewing his opinion as a whole, the Court's attention was drawn to a few initial points that weighed against the admission of the testimony.

First, there was no suggestion that Dr. Rascher's opinion existed or had been communicated to any of the defendants before or during the alleged criminal activities. His opinion therefore was not directly relevant to the defendants' states of mind at the time the crimes allegedly were committed.

Of course, that is not the end of the relevancy discussion. Had Dr. Rascher's opinion been received in evidence, defendants would have asked the jury to (1) accept it as correct and, far more importantly, (2) infer that defendants had the same view, presumably on the basis of the fact that they had been connected with NCAA Division I basketball for significant periods of time.

Even assuming that there were a proper basis for receipt of Dr. Rascher's overall

opinion, the fact that Dr. Rascher reached his conclusion as the result of a multiple linear regression analysis prepared for litigation well after the alleged commission of the crimes means that it would have shed no light on the defendants' states of mind at the time the crimes allegedly were committed. Nor would it have been a rational basis for the inference defendants would have asked the jury to draw. In short, Dr. Rascher's opinion, insofar as it related to defendants' states of mind, would not have made any fact at issue in this case more or less likely and would not have aided the jury.[40]

In any case, Rule 403 weighed heavily against the admission of Dr. Rascher's opinion as a whole. The question before the jury essentially was whether the Victim Universities were fraudulently misled as to whether violations of NCAA rules had occurred. But highlighting the economic benefits that NCAA Division I universities generally reap from college sports – even taking into account NCAA penalties for violations of its rules – would have been likely to turn the jury's focus to the wisdom or fairness of the NCAA rules that were violated. There would have been a substantial risk that the jury would have concluded that the NCAA rules were unreasonable and that it therefore should overlook the payments that defendants facilitated to the families of the student-athletes. Defendants of course could not properly have made this argument explicitly. And yet the admission of Dr. Rascher's proposed testimony, in the Court's view, would have created a substantial risk of leading the jury down precisely that improper path. Indeed, this risk appeared so substantial, particularly in light of defendants' conduct during trial, that it seemed likely to outweigh any probative value of the proposed testimony.

---

[40] Defendants, moreover, had other and better means of seeking to prove their states of mind, not least by testifying themselves or calling other witnesses with knowledge of any statements by defendants during the relevant time period that could have been admitted as non-hearsay.

Nevertheless, even as these factors weighed against the admission of Dr. Rascher's opinion, the Court took each section of his proposed testimony in turn and considered its admissibility under Articles 4 and 7 of the Federal Rules of Evidence.

*Proposed Testimony on Quantitative Benefits Was Inadmissible Under Rules 401 and 403*

In the first section of his testimony, Dr. Rascher intended to opine that Division I universities earn substantial revenue by recruiting elite high-school men's basketball players – specifically, "five-star athletes."[41]   In particular, he intended to assert, on the basis of a multiple regression analysis, that the incremental economic benefit of recruiting an additional five-star high-school men's basketball player would be 5 to 10 percent of a particular university's revenue from men's basketball.[42]

*Relevance*

*Object of Scheme and Intent to Defraud*

Defendant's first argument with respect to the relevance of this testimony focused on the object of defendants' alleged scheme and on the individual defendants' states of mind.  Because of the conceptual overlap between these two issues, the Court discusses them together.

In order to obtain a wire fraud conviction, the government must prove, among other

---

[41]

He defined a "five-star athlete" for purposes of his analysis as one that had been given a rating of five stars on Rivals.com, a popular college sports website.  According to defendants, only the top 2 percent of athletes attain this rating.  Each of the student-athletes involved in the allegations in this case had a five-star rating on Rivals.com.  DI 196-1 at ECF 5.

[42]

*Id.* at ECF 5-6.

things, that the alleged scheme contemplated depriving the victim of the alleged fraud of money or property.[43]  It must prove also that the defendant in question participated in the scheme with specific intent to deceive the victim for the purpose of depriving it of money or property.[44]  But it is not a defense to wire fraud to argue that the defendant honestly believed that everything would work out in the end so that the alleged victim ultimately would not lose money as a result of the scheme.[45]  The proper inquiry, rather, is whether the defendant intended to deprive the alleged victim of money or property in some immediate way.[46]

      Defendants here argued that Dr. Rascher's testimony on the significant incremental economic benefit to a Division I university of recruiting an additional five-star high-school men's basketball player would have been relevant to the jury's consideration of whether (1) the object of the alleged scheme was to deprive the Victim Universities of money or property, and (2) defendants acted with specific intent to deceive the Victim Universities for the purpose of depriving them of money or property.  This argument was premised on defendants' contention that "[f]or [defendants'] conduct to be harmful, [d]efendants would have had to expect the delivery of these talented athletes to have a net negative financial impact on the Universities."[47]  But defendants were mistaken.

---

[43]
     *See, e.g., United States v. Males*, 459 F.3d 154, 157 (2d Cir. 2006); *see also* 18 U.S.C. § 1343.

[44]
     *See, e.g., Males*, 459 F.3d at 158.

[45]
     *United States v. Ferguson*, 676 F.3d 260, 280 (2d Cir. 2011); *see also United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998).

[46]
     *Ferguson*, 676 F.3d at 280.

[47]
     DI 205 at 10.

The government alleged that the defendants endeavored to deprive the Victim Universities of (1) athletic-based scholarship funds, and (2) of "significant and necessary information regarding the non-compliance with NCAA rules by the relevant student-athletes and their families."[48] In other words, they sought to deprive the Victim Universities' of their "right to control the use of their assets, including the decision of how to allocate a limited amount of athletic scholarships, and further exposing the universities to tangible economic harm, including monetary and other penalties imposed by the NCAA."[49] The deprivation of property at issue in this case therefore concerned the Victim Universities' property at the time that those universities made the scholarship offers to the student-athletes, not the ultimate economic effect on the schools.

The proposed testimony concerning quantitative benefits, on the other hand, would have had a bearing only on the economic benefits a five-star student-athlete might have yielded to the Victim Universities *after* the student-athlete received the athletic scholarship at issue – that is, *after* the immediate deprivation of property alleged in this case took place. Accordingly, defendants in effect asked the Court to admit evidence that would have had a bearing only on an impermissible theory of defense – that is, that defendants believed that the Victim Universities ultimately would

---

[48]

Second Superseding Indictment at ¶¶ 3-4,

[49]

*Id.* at ¶ 49; *see also id.* at ¶¶ 51, 53.

Property in this context may consist of tangible or intangible interests, including, with respect to the latter, the ability to make informed economic decisions about what to do with one's money or property – or, in other words, the right to control the use of one's assets. The "right to control the use of one's assets" constitutes "money or property" for purposes of wire fraud if the scheme *could have caused* or did cause tangible economic harm to the victim. *United States v. Finazzo*, 850 F.3d 94, 113 n.20 (2d Cir. 2017); *see also United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015) ("[W]e have upheld convictions for mail and wire fraud where the deceit affected the victim's economic calculus or the benefits and burdens of the agreement.").

benefit from defendants' scheme. This proposed testimony therefore would have had no bearing on whether the alleged schemes contemplated depriving the Victim Universities of money or property or whether defendants acted with specific intent to deceive those universities.[50] If anything, as discussed below, this testimony probably would have succeeded only in distracting jurors and in encouraging them to approach these issues from an improper legal framework.

*Materiality*

Nor was the Court persuaded by defendants' second argument as to relevancy – that is, that this section of Dr. Rascher's proposed testimony might have undermined testimony related to materiality, particularly testimony given by officials from the Victim Universities that scholarships would not have been offered to the student-athletes in question had the schools known that the student-athletes or their families had accepted money from defendants.[51]

---

[50]

The Court is unmoved by defendants' reliance on *United States v. Russo*, 74 F.3d 1383 (2d Cir. 1996). In that case, the defendants were convicted of conspiracy to manipulate stock as well as mail fraud and securities fraud. The government proffered an expert at trial who testified on the transactions that the defendants had done and their effect on the stock price of the defendants' company. *Id.* at 1388-89. On appeal, the Second Circuit rejected the defendants' argument that the expert had drawn "legal conclusions about the defendants' state of mind in relation to the . . . transactions." *Id.* at 1394. It concluded that the expert testimony had "focused solely on factual conclusions and did not involve any legal characterizations" and "simply described certain stock transactions and his opinion of their effect on the market." *Id.* at 1395. To be clear, there is no argument that Dr. Rascher intended to testify that defendants in this case acted with a particular state of mind. The Court did not preclude his testimony on that basis. Rather, the Court determined that the proposed opinions on quantitative benefits were inadmissible insofar as they purported to bear on defendants' states of mind because they did not have any tendency to make any fact that was "of consequence in determining the action" "more or less probable than it would have been without" the proposed opinions. Fed. R. Evid. 401.

[51]

DI 205 at 15.

The false statements at issue in this case were certifications signed by student-athletes and, in certain instances, their parents, indicating in substance that the student-athletes were eligible to play basketball games sponsored by the NCAA. "[A] false statement is material if it has 'a natural tendency to influence, *or [is] capable of influencing*, the decision of the decisionmaking body to which it was addressed.'"[52] Defendants' relevancy argument therefore essentially was that had this testimony on the significant, subsequent economic benefit of recruiting elite student-athletes to NCAA Division I universities been admitted, the jury might have inferred that the fact of a student-athlete's ineligibility was not "capable of influencing" the Victim Universities.

The Court was not persuaded. Generalized testimony concerning the quantitative benefits of recruiting five-star high-school men's basketball players without controlling for the student-athletes' eligibility to compete at best would have been only tenuously relevant to the jury's materiality inquiry in this case. Defendants' argument depended also on an assumption by the Victim Universities that the ineligible student-athlete in question would have been able to play NCAA basketball games without detection by the NCAA. And in any case, the evidence was excluded under Rule 403.

*Rule 403*

As the Court mentioned above, the testimony as a whole posed a substantial risk of inviting the jury improperly to consider the wisdom or fairness of the NCAA rules that were violated. This point was particularly relevant to this section of testimony, which would have highlighted the

---

[52]

*Neder v. United States*, 527 U.S. 1, 16 (1999) (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995)) (emphasis added).

vast revenue universities earn from Division I athletics. But there is a bit more to say.

Defendants' arguments on the relevance of this section of proposed testimony risked misleading the jury on the law. Indeed, the testimony might have given undue support to defendants' improper line of argument that they wanted to help, rather than hurt, the Victim Universities. Defendants properly could have argued – and in fact did argue – that they lacked intent to defraud because they acted in good faith at the request of one or more of the Victim Universities' basketball coaches.[53] But that theory of defense is extremely narrow and would not have been supported by the proposed testimony at issue here. Defendants could have argued also that they honestly did not intend to deprive the Victim Universities of money or property in connection with the universities' distribution of scholarships. But this section of proposed testimony would have gone only to the question of the Victim Universities' long-term financial performance and, thus, whether defendants believed that those universities ultimately would be harmed by their scheme to defraud.

In addition, this proposed testimony would have risked improperly manipulating the materiality inquiry into a weighing of competing interests, rather than an assessment of the materiality of a single interest – that is, the jury improperly would have been invited to consider not whether the fact that a student-athlete was ineligible to play, in and of itself, was capable of influencing the Victim Universities in question, but whether those universities would have prioritized the opportunity to benefit financially from that student-athlete and therefore assumed the risk that the student-athlete in fact was ineligible to play.

* * *

---

[53] *See United States v. D'Amato*, 39 F.3d 1249, 1258-60 (2d Cir. 1994).

In the end, the Court was persuaded that the proposed testimony on the incremental economic benefit to a Division I university of recruiting an additional five-star high-school men's basketball player would have had no relevance to any fact "of consequence" in this case and thus was inadmissible under Rule 401.  In any event, any probative value of such testimony would have been outweighed substantially by the significant potential that such testimony would have confused or misled the jury or resulted in unfair prejudice.

*Reliability*

Although the Court ruled that Dr. Rascher's proposed testimony on the quantitative benefits of recruiting five-star high-school men's basketball players to Division I universities was inadmissible under Rules 401 and 403, it nonetheless briefly discusses the reliability of this proposed testimony.

In formulating his opinions for this section of his proposed testimony, Dr. Rascher apparently relied on a multiple regression analysis, which purported to isolate the contribution of a five-star men's basketball player to a university's revenue.[54]  His analysis sought to measure the relationship between the talent level of all recruits on a college basketball team and the amount of revenue that the team brought in each year by adding up the star ratings of all Division I men's basketball athletes recruited by college teams from the 2008-2009 academic year through the 2016-

---

[54] "Multiple regression analysis is a statistical tool used to understand the relationship between or among two or more variables."  FED. JUDICIAL CTR., *Reference Manual on Scientific Evidence* 305 (3d ed. 2011).  Multiple regressions increasingly are used in litigation and can be "well suited to the analysis of data about competing theories for which there are several possible explanations for the relationships among a number of explanatory variables."  *Id.* at 305-06.

2017 academic year and comparing those values by school to the amount of basketball revenue reported by each school.[55] Dr. Rascher's regression analysis purportedly allowed him to determine that one additional "point" of talent on a team (*i.e.*, one additional rating star from Rivals.com) corresponded to an increase of 1 to 2 percent of a particular university's revenue from men's basketball.[56] On this basis, as noted above, he concluded that the incremental economic benefit of recruiting an additional five-star high-school men's basketball player would be 5 to 10 percent of a particular university's revenue from its men's basketball team.[57]

The government first asserted that the regression analysis was unreliable as it used as a surrogate for a player's talent level the "star" rating data points assigned by Rivals.com to high-school recruits. In light of the Court's other conclusions on the admissibility of this section of proposed testimony, however, this question was immaterial.[58] Rather, the Court concluded that it

---

[55]

DI 196-1 at ECF 5.

[56]

*Id.*

[57]

*Id.* at ECF 5-6.

[58]

The subjective nature of the star rating data in and of itself may not have rendered the data unreliable. This point arguably could have gone to the weight and credibility of Dr. Rascher's analysis and been established on cross examination.

Defendants pointed the Court to numerous studies that used the Rivals.com star ratings as an measure of athletic talent, *see* Trent J. Herda et al., *Can Recruiting Rankings Predict the Success of NCAA Division I Football Teams? An Examination of the Relationships Among Rivals and Scouts Recruiting Rankings and Jeff Sagarin End-of-Seaon Ratings in Collegiate Football*, 5 J. QUANTITATIVE ANALYSIS IN SPORTS, no. 4, 2009, at art. 4 (DI 205-19); Peter K. Hunsberger & Seth R. Gitter, *What is a Blue Chip Recruit Worth? Estimating the Marginal Revenue Product of College Football Quarterbacks*, 16 J. SPORTS ECON., no. 6, 2015, at 664 (DI 205-20); Julianne Treme & Robert T. Burrus, *NCAA Basketball: When Does Recruiting Talent Translate Into Wins for Power Conferences?*, J. ECON. FIN., May 21, 2015, at 735 (DI 205-21); Matthew Philip Makofske, *Are You Hiring Johnny Football or Johnny Doe? Uncertain Labour Quality & The Measurement of Monopsony in College Football*, 50

lacked sufficient information to determine the reliability of the proffered testimony based on the multiple regression analysis. The Court was not provided with the regression analysis itself, nor was it given the opportunity to evaluate the variables for which Dr. Rascher apparently controlled in his study or his analysis of the potential limitations of the study.

In any event, as discussed above, the Court had concluded that this testimony was inadmissible under Rules 401 and 403. There being no utility in conducting a *Daubert* hearing, the Court granted the government's motion as to the first section of Dr. Rascher's proposed testimony on quantitative benefits.

*Proposed Testimony on Qualitative Benefits Also Inadmissible Under Rules 401 and 403*

In the second section of Dr. Rascher's proposed testimony, he would have testified that economists and the NCAA itself recognize that significant qualitative benefits follow from enrolling an elite high-school men's basketball player, including "all of the university-wide advertising effects generated by sports, such as the potential for increased donations to the university, increases in both the quantity of applications and enrolled students, and improved changes in the quality of the incoming freshman class (either due to better applicants or more to choose from)."[59] He would have said also that research supported the conclusion that "media coverage of intercollegiate athletics can have an impact on awareness and image of a university, especially if that

---

APPLIED ECON., no. 22, 2018, at 2415 (DI 205-22), including one apparently commissioned in November 2015 by the NCAA. *See* Yair Eilat et al., *An Econometric Analysis of the Matching Between Football Student-Athletes & Colleges* (unpublished report) (DI 205-17).

[59] DI 196-1 at ECF 6.

coverage is not accompanied by regular coverage of non-athletics activities on campus."[60]  Finally, Dr. Rascher would have said that these qualitative benefits could be observed directly in the context of the University of Louisville, one of the Victim Universities.[61]

The Court's analysis with respect to the relevance of this testimony was substantially identical to the Court's analysis with respect to Dr. Rascher's proposed testimony on the quantitative benefits Division I universities realize from recruiting elite high-school men's basketball players. Accordingly, although the government argued that Dr. Rascher was not qualified to testify on the qualitative benefits purportedly derived by recruiting elite athletes and that his proposed testimony on this subject merely would have regurgitated the opinions of other experts in the field, the Court determined that it need not reach those issues because the proposed testimony on qualitative benefits was inadmissible under Rules 401 and 403.[62]

---

[60]

*Id.* at ECF 9.

[61]

*Id.* at ECF 9-10.

[62]

Defendants did submit evidence in an effort to show that Dr. Rascher had undertaken university-specific analyses of qualitative benefits on previous occasions.  In particular, Dr. Rascher testified on the qualitative benefits listed above in *O'Bannon v. National Collegiate Athletic Association*, No. 4:09-cv-3329-CW, Trial Tr. (DI 205-10) at 860-63, and co-authored at least two publications in which he (1) reviewed and synthesized the relevant literature on the qualitative benefit findings discussed above and (2) analyzed such qualitative benefits in the specific context of the school in question.  *See* Jeremy Howell & Daniel Rascher, *An Analysis & Assessment of Intercollegiate Athletics at the University of San Francisco* (June 27, 2011) (unpublished report prepared for Board of Athletic Oversight at the University of San Francisco) (DI 205-8); Daniel Rascher & Andrew D. Schwartz, *The Incremental Benefits & Costs of Football, Bowling, & Rifle at the University of Alabama at Birmingham* (April 30, 2015) (unpublished report prepared for University of Alabama at Birmingham) (DI 205-9).  The Court noted, however, that there was no indication that either of Dr. Rascher's publications had been subject to peer review.

*Admissibility of Proposed Testimony on Risk and Cost of Sanctions for NCAA Rule Violations*

        In the final section of his proposed testimony, Dr. Rascher would have opined that the expected cost of penalties for a major infraction of the NCAA's recruiting rules – particularly if the amounts of prior NCAA penalties for such an infraction were discounted for the supposedly low probability that a university would be caught in the violation and then sanctioned for it – was minimal in comparison to the benefits generated by Division I universities from recruiting elite high-school men's basketball players.

        The Rule 16 Disclosure indicated that this testimony would have proceeded in several steps: First, Dr. Rascher would have opined that "recruiting violations often go undetected and unpunished."[63]  Second, he would have testified that the penalties imposed when NCAA rule violations were detected have had "no effect on the revenue of a [men's basketball] program" and tended to be merely a "slap on the wrist for a university from an economic perspective."[64]  Finally, he would have said that, from a purely cost-focused perspective, a university expended very few assets when awarding an athletic scholarship.[65]

*Relevance*

        As the Court concluded (1) that (a) Dr. Rascher was not qualified to testify as an expert on the frequency with which NCAA recruiting rules are violated or the extent to which any

---

[63]     DI 196-1 at ECF 10-11.

[64]     *Id.* at ECF 11-12.

[65]     *Id.* at ECF 12-13.

violations are detected and, as discussed below, (b) the defendants' showing was insufficient to justify admitting his testimony concerning the impact on Division I universities of the NCAA's historical penalties where it has detected violations, and (2) defendants then declined a *Daubert* hearing on the latter point, little need be said concerning the relevance of the proposed testimony. It suffices for present purposes to make two points.

First, Dr. Rascher's proposed testimony on this subject would not have been relevant on the issue of defendants' states of minds. That would have been so for reasons discussed earlier and for another reason as well. Property in the context of wire fraud includes a victim's right to control the use of its assets if the alleged scheme to defraud *could have caused* or did cause tangible economic harm to the victim.[66] There is no materiality or probability threshold on the risk of such tangible economic harm. Accordingly, it would have been sufficient for the government to prove only that defendants participated in the alleged scheme to defraud with intent to deprive the Victim Universities of their ability to make informed decisions about how to allocate their athletic scholarship funds in a way that *could have* subjected the Victim Universities to NCAA sanctions. In other words, it was enough for the government to prove that defendants intentionally subjected the Victim Universities "to an unbargained-for risk of economic loss."[67] Evidence of either the frequency or probable impact of NCAA sanctions for rule violations would have been irrelevant

---

[66]

    *Finazzo*, 850 F.3d at 111 ("The common thread [in Second Circuit case law] is that misrepresentations or non-disclosure of information cannot support a conviction under the 'right to control' theory unless those misrepresentations or non-disclosures can or do result in tangible economic harm."); *see also id.* at 113 n.20 ("The loss of the right to control money or property only constitutes deprivation of money or property if the scheme could cause or did cause tangible economic harm to the victim.").

[67]

    *Binday*, 804 F.3d at 574.

because *any* unbargained-for risk of NCAA sanctions would have been enough to support a conviction. To have allowed evidence that might have suggested that the risk and anticipated cost of any sanctions that might have been imposed was low would have supported only an improper interpretation of the law.

      Second, it ultimately was unnecessary for the Court to come to a final view concerning whether the proposed testimony, if the witness had been qualified and the opinion appropriately grounded, could have been relevant on the issue of the credibility of the government's materiality witnesses and, if so, whether it nonetheless would have been excluded under Rule 403.

*Reliability*

     *Rate of Detection and Enforcement of NCAA Rule Violations*

      With respect to the final section of Dr. Rascher's proposed testimony, the government argued that his opinion that recruiting violations often go undetected and unpunished should be precluded because he "ha[d] no experience in college basketball recruiting, or NCAA compliance or enforcement," and thus was unqualified to give this testimony.[68] Defendants, on the other hand, maintained that he was "one of the foremost experts in the country on issues of college sports economics vis-a-vis the NCAA's 'amateurism' rules" and "ha[d] served as an expert in nearly every high-profile litigation involving the NCAA over the last decade."[69]

      While Dr. Rascher's expert testimony in other cases, to the extent it was disclosed

---

[68] DI 196 at 10.

[69] DI 205 at 17.

to the Court by defendants, indicated that Dr. Rascher indeed had studied college sports as well as certain NCAA rules, it did not support their argument that he was qualified to render a reliable opinion on the frequency with which NCAA recruiting violations were detected and enforced.

Dr. Rascher had been involved in three federal trials: *O'Bannon v. National Collegiate Athletic Association*,[70] *In re. National Collegiate Athletic Association Grant-in-Aid Cap Antitrust Litigation*,[71] and *Rock v. National Collegiate Athletic Association.*[72] During *O'Bannon*, Dr. Rascher stated that most of his research was focused on "factors that affect demand for sporting events, sports teams, and sports leagues, including college sports, the NBA, the NFL, pricing and – even the impact of winning on . . . the demand for sporting contests."[73] He then testified on (1) the discrepancy between opinion surveys about the salary levels of various athletes and the popularity of the games in which such athletes competed,[74] (2) the potential impact on the competitive balance among NCAA Division I schools of lowering NCAA restraints on compensation to student-

---

[70]
    No. 4:09-cv-3329-CW (N.D. Cal. 2009).

[71]
    No. 4:14-md-2541-CW (N.D. Cal. 2014).

[72]
    No. 1:12-cv-01019 JMS-DKL (S.D. Ind. 2012).

[73]
    *O'Bannon v. NCAA*, No. 4:09-cv-3329-CW, Trial Tr. (DI 205-6) at 609-10.

[74]
    *O'Bannon v. NCAA*, 7 F. Supp. 3d 955, 976-77 (N.D. Cal. 2014), *aff'd in part and vacated in part on unrelated grounds*, 802 F.3d 1049 (9th Cir. 2015)

athletes,[75] and (3) the revenue generated by Division I colleges and universities from athletics.[76] With respect to *In re: National Collegiate Athletic Association Grant-in-Aid Cap Antitrust Litigation,* the Court received only excerpts of an expert report authored by Dr. Rascher, in which he concluded that recruiting in Division I college football "exhibits the hallmarks of a restrained-but-competitive market."[77] The Court received no information as to Dr. Rascher's contribution in *Rock*, other than the fact that he authored multiple expert reports.

Nor were Dr. Rascher's publications persuasive with respect to his qualifications to testify on the frequency of NCAA rule violation detection and enforcement. Defendants highlighted a study co-authored by Dr. Rascher, which endeavored to determine the factors that contribute to the likelihood of certain NCAA Division I football members being placed on probation.[78] In their report of the study, the authors provided background on the NCAA infraction classification system and conducted a logit regression to determine factors that contributed to the likelihood that an institution would be on probation during a given year.[79] This study, however, was not published; nor was there

---

[75]

    *Id.* at 978.

[76]

    *Id.* at 982; *see also O'Bannon v. NCAA*, No. 4:09-cv-3329-CW, Trial Tr. (DI 205-10) at 853-63.

[77]

    *In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig.*, No. 4:14-md-2541-CW, Expert Report of Daniel A. Rascher on Economic Liability Issues for the Injunctive Classes (DI 205-11).

[78]

    Mark S. Nagel, Richard M. Southall, Daniel A. Rascher & Nick Fulton, *Cartel Behavior in United States College Sports: An Analysis of National Collegiate Athletic Association Football Enforcement Actions from 1990 to 2011* (unpublished report) (DI 205-12).

[79]

    *Id.* at 6-14.

any indication that it had been peer reviewed. Moreover, it did not focus precisely on the *rates* of the NCAA's detection or enforcement of rule violations.

In sum, defendants set forth no persuasive basis for concluding that Dr. Rascher was qualified to testify on the extent to which NCAA recruiting rules were violated or, if violated, the extent to which the violations were detected and punished by the NCAA. The only related area to which Dr. Rascher conceivably could have testified concerned the types of sanctions imposed by the NCAA on Division I universities.

*Impact of Penalties*

The Rule 16 Disclosure provided few specifics on the methodology underlying Dr. Rascher's proposed opinions related to the impact on Division I universities of penalties that the NCAA historically has imposed for major infractions of NCAA recruiting rules. It first indicated that he conducted an analysis that measured the effects of being placed on probation by the NCAA for violations of recruiting rules. He reviewed also the NCAA's database for major infractions by Division I men's basketball programs for the last ten academic years to assess potential penalties imposed by the NCAA.[80] The Rule 16 Disclosure indicated that he would have opined, based on benchmarking and regression analyses, that "even in instances in which NCAA violations are detected and penalties imposed, the revenue of a university's basketball program are unaffected."[81]

As to the benchmarking analysis Dr. Rascher conducted, however, the Rule 16

---

[80]

DI 196-1 at ECF 11.

[81]

*Id.* at ECF 11-12.

Disclosure stated only that he compared the financial and competitive outcomes for all schools in the Power 5 men's basketball athletic conferences from the 2006-2007 to 2016-2017 academic years.[82]  The regression meanwhile "analyzed whether team revenues [we]re affected by a variety of factors, including the school being placed on probation, winning percentage, conference affiliation, and probation severity."[83]  On the basis of that analysis, Dr. Rascher intended to opine that "at worst, NCAA sanctions have no effect on the revenue of a [men's basketball] program" and that there was even "some evidence to suggest that schools placed on probation by the NCAA actually saw statistically significant increases in the revenue for their [men's basketball] programs."[84]

As was the case with Dr. Rascher's proposed regression on quantitative benefits, the Court was not provided with his benchmarking or regression analyses on the impact of NCAA enforcement.  Accordingly, the Court's initial conclusion that it lacked sufficient information to determine the admissibility of the proposed testimony should have come as no surprise to defendants.  As the Court entertained the possibility that this testimony conceivably might have been relevant to the jury's consideration of materiality, it offered to hold a *Daubert* hearing in the event that defendants wished to proceed with offering that evidence.[85]  As noted, however, defendants

---

[82]

   *Id.* at ECF 12.   The Power 5 refers to the group of the five major men's basketball conferences.

[83]

   In that regression, he controlled for a variety of factors, including "school fixed effects, conference-level fixed effects, year fixed effects, probation severity [measured by the number of years a school was on probation], and win/loss percentage for both the current and preceding year to account for the effect of the team's previous season's success on its current season's revenue."  *Id.*

[84]

   *Id.* at ECF 12.

[85]

   DI 215 at 2.   Tr. at 775:5-7, 17-24.

declined that proposal.

*Cost of Athletic Scholarships to Universities*

Finally, the Court need discuss only briefly Dr. Rascher's proposed opinion that a university in fact expends very few assets when it awards an athletic scholarship and that the list price of a scholarship therefore overstates the true cost of that scholarship to a university. This proposed testimony would have been far outside of any relevant issue in this case not least because it was not necessary for the government to prove that the Victim Universities suffered any actual loss in order to sustain its burden of proof on the counts charged in the Indictment.[86] Indeed, defendants offered no theory on the relevance of this proposed testimony. The Court therefore concluded that such testimony would not have been helpful to the jury and therefore was inadmissible under Rules 401 and 702 without reaching the question of reliability.

*Conclusion*

For the foregoing reasons, the Court concluded that (1) Dr. Rascher was not qualified as an expert to testify with respect to the extent to which NCAA recruiting rules are violated and, if violated, the extent to which the violations are detected by the NCAA, and that even if he were so qualified, defendants had failed to establish the admissibility of his opinions under Rules 702 and 703; (2) testimony concerning the types of sanctions imposed by the NCAA on Division I universities was admissible; (3) the proposed testimony with respect to any quantitative and

---

[86] *See Binday*, 804 F.3d at 569.

qualitative benefits to Division I universities attributable to the recruitment of star high school men's basketball players was excluded under Rules 401 and 403; (4) the proposed testimony with respect to the cost to Division I universities of athletic scholarships was excluded under Rules 401 and 403; and (5) the Court lacked sufficient information to determine the admissibility and relevance of the proposed testimony on the impact on a Division I university of penalties that the NCAA historically has imposed for NCAA rule violations.[87]

The Court offered to hold a *Daubert* hearing to determine the admissibility of the proposed testimony on the historic impact of penalties for NCAA rule violations, but defendants informed the Court that they no longer wished to offer Dr. Rascher as a witness,[88] rendering the motion moot.

SO ORDERED.

Dated:     January 17, 2019

Lewis A. Kaplan.
United States District Judge

---

[87]  DI 215.

[88]  Tr. at 775:5-7, 17-24.