# UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                         :
UNITED STATES OF AMERICA,                                :
                                                         :
    v.                                                   :
                                                         :   Case No. S2 17-cr-00686 (LAK)
JAMES GATTO,                                             :
a/k/a "Jim,"                                             :
MERL CODE, and                                           :
CHRISTIAN DAWKINS,                                       :
                                                         :
                                                         :
            Defendants.                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## SENTENCING SUBMISSION ON BEHALF OF JAMES GATTO

**WILLKIE FARR & GALLAGHER LLP**
Michael S. Schachter
Casey E. Donnelly
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

*Attorneys for Defendant James Gatto*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

ARGUMENT .....................................................................................................................5

I.  CONSIDERATION OF THE SECTION 3553(A) FACTORS MERITS A
    LENIENT SENTENCE. ..........................................................................................6

    A.  Mr. Gatto's History and Character...........................................................6

    B.  The Nature and Circumstances of the Offense. ....................................16

    C.  A Non-Custodial Sentence is Appropriate in Order to Avoid Unwarranted
        Disparities with Comparable Cases. ......................................................24

    D.  A Non-Custodial Sentence is Sufficient to Deter Others.....................28

II. THE SENTENCING GUIDELINES MERIT A LENIENT SENTENCE. .......................29

    A.  Mr. Gatto Did Not Intend to Cause Any Pecuniary Loss to the
        Universities. ..........................................................................................30

        1.  The Sentencing Commission Significantly Revised the Definition
            of "Intended Loss" In the 2015 Guidelines Amendments. ........................31

        2.  Mr. Gatto's Object Was Not to Deprive the Universities Out of
            Scholarship Funds..................................................................................34

    B.  The Probation Office Correctly Concluded That A Sophisticated Means
        Enhancement Is Inappropriate Here.......................................................36

III. THE PSR'S CALCULATION OF RESTITUTION TO LOUISVILLE AND
     KANSAS IS INCORRECT. ....................................................................................36

CONCLUSION................................................................................................................39

# TABLE OF AUTHORITIES

Cases                                                                                           Page(s)

*Gall v. United States,*
    552 U.S. 38 (2007)...........................................................................................5, 29

*Stinson v. United States,*
    508 U.S. 36 (1993)...........................................................................................31

*United States v. Adorno,*
    950 F. Supp. 2d 426 (E.D.N.Y. 2013) ...........................................................37

*United States v. Gray,*
    96 F.3d 769 (5th Cir. 1996) ...........................................................................27

*United States v. Gupta,*
    904 F. Supp. 2d 349 (S.D.N.Y. 2012)...........................................................5, 6

*United States v. Leonard,*
    529 F.3d 82 (2d Cir. 2008).............................................................................28

*United States v. Manatau,*
    647 F.3d 1048 (10th Cir. 2011) .........................................................31, 33, 35

*United States v. Marino,*
    654 F.3d 310 (2d Cir. 2011)...........................................................................36

*United States v. Nawaz,*
    555 F. App'x 19 (2d Cir. 2014).....................................................................36

*United States v. Piggie,*
    303 F.3d 923 (8th Cir. 2002) .........................................................................28

*United States v. Stewart,*
    590 F.3d 93 (2d Cir. 2009).............................................................................29

*United States v. Thompson,*
    792 F.3d 273 (2d Cir. 2015)...........................................................................37

*United States v. Walters,*
    997 F.2d 1219 (7th Cir. 1993) .......................................................................27

*United States v. Young,*
    No. 03-20400B, 2005 WL 3879034 (W.D. Tenn. Nov. 7, 2005)...................27

Statutes, Rules and Regulations

18 U.S.C. § 3553(a) ........................................................................................................5

U.S.S.G. at §2B1.1(b)(1) cmt. n.3 (A)(ii) .............................................................31, 32

U.S.S.G. at §2B1.1(b)(10)(c) cmt. n. 9(B) (Nov. 2018) ............................................36

U.S.S.G. at §5C1.1 cmt. n.4 ........................................................................................30

Defendant James Gatto respectfully submits this memorandum to aid the Court in his sentencing, currently scheduled for March 5, 2019.

## INTRODUCTION

James Gatto is a good man, deserving of this Court's mercy and leniency. More than one hundred people have written letters to the Court on Mr. Gatto's behalf, attesting to his character and integrity. Each one describes the man they know, and have known, for upwards of four decades. Each letter pleads with the Court to exercise compassion for a father and a family that have already suffered mightily.

As the letters attest, Mr. Gatto is, above all else, a loving and caring father to two children, Grace and Jack, both of whom are still in high school. Mr. Gatto has been a hands-on father for the entirety of his children's lives: he cooks dinner every night for his family, regularly volunteers at the kids' school, and spends his evenings and weekends cheering on his children at their basketball, baseball, and soccer games. Mr. Gatto and his wife Rachel were close friends in college, began dating soon after graduation, and have been married for twenty years. By all accounts, they are a close and loving family. Losing Mr. Gatto to a custodial prison sentence is a terrifying prospect not only for his family, but also for Mr. Gatto's wider community, for there are many who have come to depend upon him, as described in the many letters submitted to the Court.

Mr. Gatto has never demonstrated a proclivity towards the excesses and immorality often associated with white-collar criminals. Rather, he and Rachel, who works as a sales associate at an Ann Taylor store, have built a family life that revolves not around material possessions but rather around time spent with their large circle of relatives, friends and neighbors. Mr. Gatto is well known throughout his small town of Wilsonville, Oregon for his frequent volunteer work in the local public schools and his role as the parent coach of the many

1

youth basketball teams that his children played on.  He is described as a wonderful father, a warm and supportive role model for kids throughout the community, and a good friend with a demonstrated history of empathy and assistance in tough times.  He has never before been arrested or convicted of a crime.

Just as Mr. Gatto is different from most individuals who are convicted of fraud offenses, Mr. Gatto's conduct is far outside the heartland of fraud cases that are commonly prosecuted in this District.  This case bears almost no relation to typical fraud cases, where the criminal scheme was motivated by greed.  Mr. Gatto gained nothing for himself from his actions. While the Government's charges are unquestionably serious, we submit that the conduct giving rise to the charges in this case is far less venal than in the wire fraud cases usually brought in this District and for which prison time is deemed necessary.  For example, Judge Rakoff recently sentenced trader Paul Thompson to three months in jail on wire fraud charges predicated upon a scheme to rig the LIBOR benchmark interest rate—a global benchmark that is relied on every day by investors, financial institutions, and ordinary consumers around the world.[1]  Judge Droney, prior to his nomination to the Second Circuit, imposed a sentence of one year and one day for a defendant involved in a fraudulent reinsurance transaction that caused a loss of over $400 million.[2]  Judge Preska recently sentenced executives of the pharmaceutical company Valeant to a year and day in connection with their orchestration of a $9.7 million kickback scheme tied to a potential acquisition deal.[3]

---

[1] Judgment, *United States v. Thompson*, No. 14-cr-00272 (S.D.N.Y. Nov. 22, 2016), Dkt. 268.

[2] Judgment, *United States v. Graham*, No. 06-cr-137 (D. Conn. May 6, 2009), Dkt. 1269; Order, *Graham*, (D. Conn. Oct. 31, 2008), Dkt. 1164 at 21.

[3] Judgment, *United States v. Tanner*, No. 17-cr-00061-001 (S.D.N.Y. Nov. 27, 2018), Dkt. 222; *see also* Judgment, *United States v. Davenport*, No. 17-cr-00061-002 (Nov. 27, 2018), Dkt. 224.

In contrast, the offense here was never intended to lead to personal profit for Mr. Gatto. Rather, Mr. Gatto's motivation for paying the families of the talented basketball recruits was borne out of his desire to help Adidas-sponsored Universities field great basketball teams, and a perception, or rather a misperception, that supporting recruiting efforts in ways that violated NCAA rules was how he was supposed to support the Universities Adidas sponsored. The Government proceeded on a theory that Mr. Gatto's actions deprived the Universities not out of millions of dollars, but out of the ability to make a fully-informed scholarship decision. Indeed, the Government has never been able to show that Mr. Gatto sought to inflict *pecuniary* harm upon the Universities. To the contrary, helping the Universities recruit successful basketball teams—which even the Government's cooperating witnesses agree was the purpose of the alleged scheme—was understood by the scheme participants as one that could help the Universities bring in tens of millions of dollars in annual revenue. For example, when Dennis Smith Jr. played on N.C. State's men's basketball team, the school earned $14.6 million in revenue. For sentencing purposes, we submit that the value of the scholarship—$21,900, in the case of Smith Jr.—should be considered against the millions of dollars in revenue that N.C. State earned with Smith Jr. as its star player.

In addition to the lack of evidence of personal gain or pecuniary loss, the conduct that gave rise to the charges in this case differs from most fraud cases in that it was so widespread as to have become virtually an industry practice. The Rice Commission on College Basketball—a committee chaired by former United States Secretary of State Condoleezza Rice and established by the NCAA Board of Governors, D1 Board of Directors and NCAA President Mark Emmert—spent months investigating the world of college basketball. In its final report, the Commission rejected the idea that the conduct described in the Indictment was atypical, the

result of a few bad apples in an otherwise rule-abiding industry.  Instead, the Commission stated that it was an "uncomfortable fact" that this conduct has "been part of landscape of pre-professional basketball for many years," with no intervention from anyone in law enforcement and a tepid response even from the NCAA.  The pervasiveness of the offense conduct is brought to the Court's attention not to suggest that it excuses improper behavior, but rather so the Court, in fashioning a sentence, can avoid unwarranted sentencing disparities.  The fact is, Mr. Gatto's conduct was indistinguishable from that of many, many other people who will never see the inside of a prison cell.

Finally, Mr. Gatto's character and history are important considerations here.  Mr. Gatto has always been a law-abiding, responsible citizen, known for his kindness and commitment to his community.  The allegations, trial, and jury verdict against Mr. Gatto have already wreaked irrevocable harm on his life, and that of his family.  After the jury returned its verdict, Mr. Gatto was fired from Adidas, his employer of twenty-five years.  Mr. Gatto's reputation has been destroyed.  His picture has been published in newspapers around the country and all over the internet.  At various times over the last eighteen months, ESPN ran almost non-stop television coverage of the Government's allegations.  In short, Mr. Gatto's name will forever be linked to this trial and the jury's verdict.

Furthermore, given the media onslaught, the stress upon Mr. Gatto's family over the last eighteen months has been tremendous.  Mr. Gatto's two children have been bullied at school.  Despite his best efforts to reassure Grace and Jack that they are strong enough to get through anything, Mr. Gatto's two children are terrified of losing their father—who has been an extraordinarily involved parent throughout their lives—to a prison sentence.  Mr. Gatto's wife,

Rachel, is distraught, both by the verdict and the prospect of raising Grace and Jack alone, while Mr. Gatto is imprisoned.  In short, this is a man who has already been punished severely.

It is a man's whole life that matters at sentencing.  We respectfully submit that when Mr. Gatto's entire life, and the punishment he has already suffered, are weighed, the Court can determine that a custodial sentence would be greater than is necessary to achieve the sentencing purposes of § 3553(a).  In this instance, a non-custodial sentence would fully satisfy both the objectives of sentencing and the call of justice.

## DISCUSSION

As has been said, "imposing a sentence on a fellow human being is a formidable responsibility." *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012).  The responsibility carries with it the obligation to "consider every convicted person as an individual and every case as a unique study," and, for that reason, judges are given both flexibility and deference, so that they may freely exercise compassion in the face of the "the human failings" that can, and do, lead good people temporarily astray. *Gall v. United States*, 552 U.S. 38, 52 (2007).

Sentencing a man requires "great care and sensitivity" because the "facts and factors" that must be weighed are numerous and important. *Gupta*, 904 F. Supp. 2d at 350. While a sentencing court is required to "correctly calculat[e] the applicable Guidelines range," *see Gall*, 552 U.S. at 49-50, that calculation falls "second" to "the bedrock" of federal sentencing, 18 U.S.C. § 3553(a), which "requires a court to take account of a defendant's character in imposing sentence." *Gupta*, 904 F. Supp. 2d at 353-54.  Under § 3553(a), the Court must look at (1) the history and characteristics of the defendant; (2) the nature and circumstances of the offense; (3) the need to protect the public from further crimes of the defendant; (4) the need to afford adequate deterrence; and (5) the need to avoid unwarranted sentence disparities.

*Id.* at 49-50.  As these factors reflect, sentencing bestows a "moral responsibility" to "judge the man as a whole."  *Gupta*, 904 F. Supp. 2d at 350, 354.

Here, the Guidelines range, when calculated correctly, and consideration of the statutory factors under § 3553(a) leads to the same result:  a non-custodial sentence.

## I.      CONSIDERATION OF THE SECTION 3553(A) FACTORS MERITS A LENIENT SENTENCE.

### A.      <u>Mr. Gatto's History and Character.</u>

More than one hundred people have written to the Court in an effort to describe for Your Honor the kind of man that Jim Gatto is.  (*See* Ex. A (Letters to Judge Kaplan).)  These letters, while not sophisticated, are written from the heart, and they tell the story of a *good* man, a family man, whose focus has always been to provide his two young children, Grace and Jack, with the kind of wholesome, healthy, and happy childhood that all parents wish for their children.  As the letters detail, Jim has succeeded in that respect.  Jim, alongside Rachel, his wife of twenty years, have raised two "wonderful, polite, well-adjusted kids," *see* A-13, who work hard at their classwork, compete on their school's basketball, baseball, and soccer teams, and attend church each Sunday.  As family friend and neighbor Chris Roche writes:  "If you knew [Jack and Grace], Judge Kaplan, you would appreciate that Rachel and Jim *have to be* good people.  These kids are a credit to everyone around them, but most obviously to Jim and Rachel." (A-14) (italics in original).

Indeed, by all accounts, Jim is, and always has been, an extraordinarily "hands-on" dad.  (A-1.)  When the kids were little, that meant diaper changing and a lot of nights without sleep.  (A-5.)  Now that Grace has turned 14 and Jack is 17, Jim takes care of them in other ways.  It is Jim that does all the grocery shopping and the cooking for the family.  (A-1.) In a moment of quiet humor, Rachel describes for the Court how Jim gets truly excited about

"going to Costco," "wander[ing] the aisles," and ultimately finding some "new" food for the family to try. *Id.* He does the laundry, keeps the house vacuumed, and handles the kids' Sunday School carpool. *Id.* He hates to miss even a single one of the kids' games—and given that Jack plays both basketball and baseball, and Grace plays basketball, soccer, and competed in gymnastics, Jim spends an extraordinary amount of time with his children, cheering them on and making sure they understand how important they are to him. As Grace explains, her dad is "the backbone of our family." (A-2.)

Jim has always put family first. Even though Jim's responsibilities at Adidas involved a lot of travel, Jim still insisted upon coaching Jack's middle-school basketball teams, back before Jack began playing more seriously at the high school level. (Indeed, one year, the team Jim coached actually won the Oregon State Championship!) Jack recalls that his dad was "so excited" that he was literally "jumping up and down on the sidelines," although for Jack, the "most important" part of that day was not the moment of victory, but rather when Jim told his son how proud he was of him. (A-3.)

Cathie Ericson, a fellow parent whose children have always attended the same schools as Jack and Grace, wants Your Honor to know how involved Jim is, and has always been, in the lives of his children and their local schools. She recalls that Jim chaperoned "numerous elementary school field trips," and in-school events which "typically [are] the domain of moms, but [Jim] loved doing it." (A-28.) When Jack was studying for his Confirmation—the year-long, intensive process in the Catholic Church in which one reaffirms one's baptism and becomes a full-fledged member of the Church—Jim cancelled a work trip and rearranged his schedule because a volunteer was needed to chaperone all the kids in Jack's class at an overnight retreat in a nearby monastery. (A-18.) Jeremy Nesbitt, one of the teachers at the local high

school and a coach of both Jack and Grace, explains that in his line of work, he sees "so many parents not involved in their children's life," but that "Jim is the opposite of this." (A-9.) Mr. Nesbitt recounts: "I have seen [Jim's] children come home and immediately wrap their arms around him. I have seen Jim show up and support his friend's children at their events. I have seen him support his community through volunteer work." *Id.* He concludes with the highest praise: "Jim is the epitome of the type of father I want for all my students." (*Id.*)

Jim's approach to parenting and his commitment to his family above all else has its roots in his own happy childhood. Your Honor may have seen Jim's parents in the courtroom this past fall: they were there every single day and on many occasions, were accompanied by various neighbors and family friends who wanted to attend the trial as a way of expressing their support of, and love for, Jim. As Rachel explains in her letter to Your Honor, Jim's parents have always served as a model to her and Jim, both because of their "wonderful, loving, and kind" marriage of 54 years, but also because of the old-fashioned family values they raised their children to respect. (A-1.)

Jim's mother, Barbara, mostly stayed at home to raise Jim and his two siblings, Peter and Danielle. (A-5.) Jim's dad, after whom he is named, worked two, sometimes three, jobs when Jim was growing up. His primary occupation was as the gym teacher and the basketball coach at Mater Christi High School, later renamed St. John's Prep, in Astoria. For 30 years, Jim's dad also held a part-time job on the weekends at Shea Stadium, so that he could earn extra money for his family. Ultimately, Jim's parents were able to put all three of their kids through college: a true achievement and a testament to their commitment to hard work, self-sacrifice and a lifetime of responsible saving.

Jim and Rachel share his parents' values. Jim began working at adidas in 1993, after graduating from Elmira College, and his job was to tour local high schools in Atlanta and hand out Adidas sneakers and gear in an effort to promote the brand. The job paid $21,000/year. (DX1014.) For the next twenty-five years, Jim worked hard for the company and by 2017 was earning a salary of $139,000/year. (GX1018.) Jim's wife Rachel is equally loyal to her employer: she has worked as a sales associate at an Ann Taylor store for the past twenty years. (A-1.) Because Jim has always wanted Grace and Jack to have all the same opportunities that Jim's parents gave to him, Rachel and Jim started saving for their kids' college educations on the day that Jack was born. *Id.* They do not live extravagantly and are careful with the money they earn. Most family vacations are spent at a cottage in Michigan that was first owned by Jim's grandmother and then passed down to Jim's mother. (A-5.) As one long-time family friend, Joe Martino, put it, "Today, Jim personifies everything that Coach and Barbara wanted him to become…he is simply a regular guy who values family. He always puts family before his work. That is how he was raised. Nothing matters more to Jim than being a good husband to his wife Rachel, a good father to his children, Jack and Grace, a good son to his parents, a good brother to his siblings and a good uncle to his nieces and nephews." (A-42.)

As Mr. Martino's letter reflects, Jim's commitment to his family is not limited to his two children. Jim's younger brother Peter, who is now a gym teacher specializing in students with autism, explains that he and his brother remain very close. Growing up, it was Jim who "taught [Peter] to shave, to throw a curve ball and [who] would eat [Peter's] broccoli for [him] when he refused to clean [his] plate." (A-7.) More recently, Peter lost his home as a result of Hurricane Sandy and Jim immediately flew across the country to help Peter and his family, in

addition to other "countless acts of kindness and generosity" that followed in the months afterward. *Id.*

Jim's older sister, Danielle, an elementary school teacher, also describes Jim's strong commitment to family in her letter to Your Honor. Danielle explains that her son Rhett, Jim's nephew, was born with a developmental disorder and has been in special needs programs his whole life. (A-6.) As Danielle attests, "Jim always goes out of his way to make sure that Rhett is okay," patiently working with him during family vacations and ensuring that he is made part of every conversation and never ignored. *Id.* Indeed, should anything happen to Danielle or her husband, Jim and Rachel will assume care for both Rhett and for Danielle's daughter, Julia. *Id.*

Danielle, and virtually every other person who took the time to write to Your Honor, describes for the Court how she has found herself "overwhelmed with heartache" when she thinks about the "torment" that a custodial prison sentence would impose upon her niece Grace, who at the very sensitive age of 14, still turns to her father to help her build up "self-esteem and confidence," and upon Jack, who is still developing into a young man and very much needs his father's guidance. *Id.* Danielle admits: "It is hard for me to believe that society will be better off with my brother in prison—it seems to me that the only real consequence of a prison sentence will be to potentially ruin the childhoods of two wonderful kids…Whatever punishment is needed, I can assure [the Court] that it has already been administered through the incessant and sensationalized news coverage, the destruction of my brother's 25-year career, and the anguish of knowing that his children are likely forever changed by this experience." *Id.* For these reasons, she pleads with the Court to consider imposing a sentence of probation.

That plea is repeated by many members of Jim's community, who have lived alongside him for decades and can attest to the fact that he has long been a credit to their community. For example, as explained above, for years Jim served as the basketball coach for his son's youth basketball teams. As one parent explains, "[Jim] had a knack for connecting with every kid [on the team]. It did not matter if you were the best and most talented basketball athlete on the team or the boy with the longest way to go in the sport. [Jim] cared about the experience that every kid had and he invested energy in each boy. He had nicknames for everyone one of the boys and Jim's passion and care for each kid was obvious. We felt so lucky that Jim was willing to commit that time to the boys and the team." (A-14; *see also* A-25.)

Other parents explain that when Jim "mentored and coached" their children on various local teams, he "encouraged [their children] to be the bigger person, to try even when things weren't going [their] way and to always believe in [themselves]." (A-12; A-23.) These parents have written to inform the Court: "You will not find any parent who has a negative thing to say about Jim Gatto. He was a true mentor and taught our kids values through sports to make them better young men and successful citizens....We are sick at the thought of his absence from this community that cares deeply about him and his family." (A-12.) Indeed, the Associate Principal of the Wilsonville High School has written to Your Honor, pleading for leniency and a minimum sentence for Jim, given Jim's "positive impact [upon] many in [the Wilsonville] community." (A-10.)

Jim's contributions to his community extend beyond coaching. He has long volunteered at Covenant House, the shelter for homeless youth. (A-20.) When a local Little League team needed to raise funds, Jim helped organize a fundraising event and "through a combination of humor and good-natured shaming" was able to convince most of his friends and

neighbors to participate. (A-13.) Lisa Hawley-Love, a fifth grade teacher in the Wilsonville school system, writes to inform the Court of a particular instance in which a fellow teacher, who was in her first year of teaching, began to be bullied by a group of parents. Ms. Hawley-Love notes that it was Jim and Rachel who chose to "stand up" to the bullying parents and defend the young teacher, who is now a well-respected and admired educator in the district. (A-11.) Douglas Napoli, a local firefighter with 26 years of experience as a public servant, wrote to Your Honor to confirm that Jim has "volunteered countless hours in the classroom" and to let the Court know that in the larger Wilsonville community, Jim is "looked up to…not only as a volunteer who gives of his time but also as a great husband, father and friend." (A-26.) Mr. Napoli humbly offers the Court his observation, based on his 26 years of serving the public, that Jim is simply "not a man who deserves to be in prison." *Id.*

Jim's kindness and empathy towards others is particularly illustrated by the relationship he has with his neighbor, Bryan Rector. Bryan is 15 years old. In 2012, when Bryan was nine, his parents went through a painful divorce such that his father was no longer a frequent presence in Bryan's life. Both Bryan and his mom have written beautiful letters to the Court, explaining how Jim stepped in and has served as a father figure to Bryan for the past six years. (A-17; A-18.) Bryan himself—who is a teenage boy, a group not typically known for their emotional vulnerability—admits in his letter to Your Honor that he had really struggled, emotionally, after "it became apparent that my father would not be as involved in my everyday life anymore." (A-17.) Left without a consistent fatherly influence, Bryan began to "search for another role model." *Id.* He found that person in Jim. *Id.* Bryan became closer to Jim than anyone else in their community and he explains in his letter that his relationship with Jim was "integral" to his process of "healing" and trying to come to come to terms with his father's

absence. *Id.* Bryan writes that he now thinks of Jim as his "family," "because of how much we have done together and how much we have all gone through." *Id.*

Bryan's mother confirms her son's account, explaining that as a single mom, working full-time, she finds herself relying on Jim for all sorts of things: "giving rides to my son for various things, or taking care of my dog, or jumping in to help during medical crises." (A-18.) She confirms that Jim is always "immediately willing to help me with anything" and tells the Court that just knowing that Jim is there is "so very important to [her] sense of security." *Id.* Bryan's mother concludes her letter by explaining that Jim is, quite simply, "one of the best people I know" and by asking the Court to consider Jim's "lifetime of goodness" when determining a sentence. *Id.* Over and over again, the people who know Jim best insist to the Court that he is simply not a criminal, not in any ordinary sense of the word, and that a sentence of incarceration for Jim would not only provide no benefit to society, but would in fact create a deeply felt absence in a community that has come to rely upon him.

Nor is it the case that Mr. Gatto acted as one person to his friends and family and a different sort of person when he went to work. Dozens of his former colleagues and supervisors have written to the Court to confirm that, in their experience, Mr. Gatto is a man of integrity who cares deeply about other people. Lee Kromminga, an Adidas co-worker of Jim's for twenty years, has written to the Court to express his concern that, given the way the Government has tried to portray Jim, Your Honor will "assume [Jim] to be some sort of hyper-aggressive hustler or such." (A-39.) In "actuality," Mr. Kromminga writes, Jim is a "really humble, decent and well-grounded guy who tries to do his best, however he can, to help whoever needs it." *Id.* Even after "twenty years in the workforce, [Jim] wouldn't think twice about rolling up his sleeves and helping an intern pack boxes of shoes for hours, so that they could be

shipped out in time for the NBA start of season," explains another Adidas co-worker, Alex Zerzan. (A-19.) Mr. Zerzan writes, "It didn't matter who you were, or what you could do, or not do for him, Jim believed in treating people, regardless of title, gender or prestige with the same respect and genuine decency as the next person." *Id.*

Zach Fawcett, who spent many years working alongside Jim, says the same thing. He writes, "Never have I witnessed in 17 years working with Jim [him] being self-serving. The complete opposite of that, probably to a fault! Jim was ALWAYS looking out for every single person other than himself. Jim has a HUGE heart and was always helping others." (A-16.) Although Mr. Fawcett doesn't believe he has the "words" to "describe Jim's loyalty, character and integrity," he wishes for Your Honor to know that Jim was a different kind of colleague. *Id.* Mr. Fawcett recounts the day that his wife went into labor with their son. (*Id.*) It was supposed to be an ordinary delivery, but everything went wrong. Mr. Fawcett's wife and newborn son almost died. *Id.* Mr. Fawcett explains that when Jim heard the news, he didn't just send a note or call to express his support. *Id.* Instead, Mr. Fawcett remembers, Jim drove immediately to the hospital, to be "right there with me, to cry with me, pray with me, support me and tell me that he loved me and my wife…nothing in the world could have meant more to me than that." *Id.* Mr. Fawcett says that the world doesn't need to see Jim incarcerated but instead would be better off if there were "more people, fathers, husbands like Jim Gatto." *Id.*

In letter after letter, Jim's colleagues explain that he was a wonderful person to work with, that he cared deeply about both their professional development and their personal happiness and that he served as role model, especially in the way that he consistently put work "second" to the demands of his family. (*See e.g.* A-15; A-31, A-50, A-44.) The sports industry is a male-dominated place, but numerous women have written to Your Honor to inform the Court

of Jim's efforts to try to raise the profile of women, both within Adidas and within the sport more generally.  (A-52; A-53.)  Albert Hall, who has been part of the basketball business for more than twenty-five years, confirms:  "To see [Jim] painted as a criminal is just not accurate." (A-47.)  He explains that if "you were to ask anyone" in the business who knows Jim, whether "colleague or competitor, they will tell you that he is truly one of the nicest and highest character guys around."  *Id.*  Mr. Hall continues, "He's a selfless person, it's never about him," and he asks the Court to remember that "even in this situation [Jim's] in, he was doing his job and trying to benefit others."  *Id.*

Indeed, we wish address the suggestion by the Government at trial that Mr. Gatto is "greedy."  (Tr. 48:23-24.)  To the contrary, as many of the enclosed letters confirm, Mr. Gatto doesn't have a "greedy" bone in his body.  (A-1; A-39.)  Mr. Gatto didn't earn a nickel from this offense, nor would he ever have expected to, since his compensation at Adidas came in the form of a fixed salary and a bonus—which never exceeded $52,000—that was primarily based upon Adidas's worldwide revenues, which couldn't have been meaningfully affected by the offense conduct.  (Tr. 1308:14-1309:11.)  Indeed, given his compensation structure, the Government's speculation that Jim defrauded the adidas-sponsored Universities because of "greed" makes little practical sense.  Adidas paid each of the Universities tens of millions of dollars for the rights to sponsor their athletic teams.  (Exs. 1-4.)  In other words, the interests of Adidas were fully aligned with the interests of the Universities.  Moreover, we note that despite the Government's repeated suggestion that "greed" was at the heart of Mr. Gatto's conduct, in reality, the Government did not even *try* to prove at trial that Mr. Gatto obtained, or even expected to obtain, any personal benefit from the conduct described in the Indictment.

A more reliable source of evidence about Jim's motivations is Matt Candel. The two have been best friends since they were eight years old. (A-8.) Mr. Candell has written to the Court to express his wish that Your Honor and the jury "could have seen Jimmy" over the years, when Jim would talk about Louisville, and NC State, and Kansas, the schools that Jim worked with in connection with Adidas's sponsorship. Jim would "beam[ ] with pride" when he talked about the Universities' basketball teams, their coaches, and the players themselves. *Id.* If Your Honor or the jury "could have heard" Jim on these occasions, Mr. Candell writes, "you would know he cared deeply about [the Universities] and would never intentionally try to hurt them." *Id.*

## B.   The Nature and Circumstances of the Offense.

In November 2014, an ABA Criminal Justice Task Force on the Reform of Federal Sentencing for Economic Crimes, which included both Judge Gerard Lynch of the Second Circuit and Judge Rakoff of this District, submitted a proposal to the Sentencing Commission seeking substantial revisions to the Sentencing Guidelines for economic crimes. (Ex. 5 ("A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes," American Bar Association, Nov. 10, 2014).) The Task Force recommended that when a defendant has "zero criminal history points" and his "offense was not otherwise serious" as set forth in 28 U.S.C. § 994(j), a "sentence other than imprisonment is generally appropriate" to satisfy the objectives of sentencing. *Id.* at 2.

More specifically, the Task Force recommended the following sensible proposal:

> Where the motive for the offense was not entirely predatory, where the loss was largely intended rather than actual, where the defendant's gain from the offense was significantly less than the loss, where the offense was of limited sophisticated or duration, where significant and unusual extenuating circumstances contributed to the commission of the offense, or where the defendant took significant steps to

mitigate the harm caused by the offense, the guideline may produce an offense level that substantially overstates the seriousness of the offense. If so, a downward departure may be warranted. Where the totality of the circumstances demonstrate that the offense is not otherwise serious and the defendant is a first offender, a departure to a sentence other than imprisonment is generally appropriate.

*Id.* at 6-7; *see also* Ex. 6 (Testimony from the American Bar Association before the United States Sentencing Commission, March 12, 2015) at 12-16.

        In the present case, the conduct for which Mr. Gatto was convicted falls far outside the heartland of fraud cases that typify the offense and does not fall within the meaning of "serious" set forth in 28 U.S.C. § 994(j), and for that reason it would be appropriate for this Court to impose a non-custodial sentence. Unlike the typical fraud case, there is absolutely no evidence that Mr. Gatto sought to obtain any money or property from the Universities. Mr. Gatto did not seek to defraud the Universities of basketball scholarships in order to line his own pocket. Even if his conduct deprived the Universities of the ability to make fully informed scholarship decisions, his goal was to help the Universities secure some of the most highly sought after basketball recruits in the country, not to cause them pecuniary harm. As explained by Government cooperator T.J. Gassnola, the objective of the alleged scheme was to "make sure that the coaching staffs" of the Universities' basketball teams "were happy" with Adidas because he understood that the "basketball coaches" at the colleges "wanted shoe companies to help recruit players to their schools." (Tr. 1080:3-1081:7; 1107:14-17.) According to Mr. Gassnola, Mr. Gatto was "trying to help" the Adidas-sponsored Universities recruit talented players, who would hopefully play well for the Universities' basketball teams and lead the schools to athletic success. (Tr. 973:4-8; Ex. 7 at 11.) In considering Mr. Gatto's culpability, the Court should take into account the fact that the *intended beneficiary* of the alleged scheme was not Mr. Gatto's pocket, but rather the Universities themselves, who would hopefully reap the considerable

financial benefits associated with top-caliber players.  (Ex. 8 (Daniel Rascher et al., *Because It's Worth It: Why Schools Violate NCAA Rules and the Impact of Getting Caught in Division I Basketball*, J. Issues in Intercollegiate Athletics (forthcoming)).)

Indeed, the circumstances involving N.C. State and Dennis Smith Jr. illustrate this point. ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Gassnola agreed to provide the funds, because he "wanted to keep people happy" and thought it "was the right thing to do" for Coach Early.  (*Id.*)

Smith Jr. remained enrolled at N.C. State and played for its basketball team during the 2016-2017 season.  That season, N.C. State's men's basketball team achieved ███████ ████████████████████████ and brought in $14,600,000 in revenue.  (Tr. 842: 3-5; Ex. 10 at 25-26; ████████.)  Although the Government maintains that Mr. Gatto defrauded N.C. State out of its right to control its basketball scholarship funds, for purposes of sentencing, the value of those scholarship funds—$21,900—should be placed in context and evaluated against the *$14.6 million* that NC State earned with Smith Jr. as its star point guard.

This discrepancy between the harm caused and the financial benefit is also applicable to Kansas.  During the second semester of the 2017-2018 academic year, Kansas provided Silvio DeSousa with a scholarship worth $20,539.  (GX1823.)  During the 2017-2018 season, Kansas not only won its conference title but also advanced to the Final Four, an achievement directly traceable to four points scored by DeSousa in the Elite Eight—Kansas's

exact margin of victory.  Ultimately, the Kansas team brought in $18,800,000 in revenue that season.  (Ex. 12 at 34.)  Again, we bring these facts to the Court's attention not to excuse Mr. Gatto's conduct, but rather because at sentencing, the pecuniary harm caused by the defendant's conduct is often the driving factor in the length of his sentence.  Where the pecuniary harm is small or non-existent, and where there is no evidence that the defendant sought to inflict pecuniary harm on the victim, *see infra* at pg. 30-35, a non-custodial sentence is appropriate.

Furthermore, this case also falls well outside the heartland of fraud offenses because the alleged misrepresentations were not made to a victim to defraud him or her out of their hard earned savings, but rather were about compliance with the rules of a private organization where rule violations are so common as to be almost expected.  Almost all of the individuals implicated in this case admitted that significant violations of NCAA rules occur on a regular basis when it comes to elite college prospects.  In a wiretapped phone call, Mr. Code, who spent 14 years working at Nike, acknowledged that "Nike schools pay too," because "that's just part of the space."  (GX 75T at 42:11-15, 42:22-43:6.)  Mr. Gatto was informed that top prospect Nassir Little had been offered $150,000 to play for the Nike-sponsored University of Arizona.  (GX7T at 6-10.)  █████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████  .

Bowen Sr. received multiple monetary offers in exchange for his son's agreement to play basketball, ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████



Silvio DeSousa's guardian, Fenny Falmagne, received $60,000 in cash from a booster of the University of Maryland, which is sponsored by Under Armour. (Tr. 1012:2-1013:10.) Adidas only became involved when DeSousa decided he would rather play for Kansas than Maryland. (Tr. 1170:15-1171:25.) Mr. Falmagne told Mr. Gassnola that DeSousa couldn't play for Kansas unless Mr. Falmagne could get "out from under this Under Armour deal." *Id.* As Mr. Gassnola explained to the jury, he agreed to pay Mr. Falmagne $20,000 because he "wanted to help the situation and make sure that [DeSousa] stayed at Kansas." (Tr. 1013:6-10.)

Indeed, evidence demonstrates that the widespread nature of NCAA rule violations was an effectively an open secret. ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████

All of this evidence corroborates the conclusion of the Rice Commission. After months of investigation, the Commission issued a final report, in which it rejected attempts to claim that the allegations in the Indictment were an isolated incident. Instead, the Commission confirmed the "importan[ce]" of "confront[ing] the uncomfortable fact that the challenges identified in this report have been part of landscape of pre-professional basketball for many years." (Ex. 18 (Commission on College Basketball, Report and Recommendations to Address the Issues Facing College Basketball, 2, 9, 10, 16 (2018)).) Moreover, the fact that NCAA rules were regularly broken, with virtual impunity, was no secret to anyone interviewed by the Commission. The Commission explained: "Virtually all stakeholders and others providing information to the Commission at some point uttered the discouraging phrase, 'Everyone knows what's been going on.'" (*Id.*) What was novel about this case was not the conduct described in the Indictment, but rather the idea that an NCAA rule violation could be prosecuted as criminal wire fraud. (Exs. 19-21.)

The fact that this conduct has been going on for years, with the knowledge of virtually everyone in the basketball industry, and without any intervention by law enforcement, is another factor that merits leniency, as these facts militate against the conclusion that Mr. Gatto was brazenly flouting federal law. Indeed, each of the subject payments was made in response to information that *other* payments had already been made, either by other apparel companies pushing their sponsored schools or by boosters of rival colleges. (GX-7T, 1:3-17, 3:16-18 (Gatto informed that Nike-sponsored Arizona had offered $150k for Nasir Little's commitment); GX75A-T, 3:24-4:8 (Code learned that Nike-sponsored Oregon had made an "astronomical" offer for Brian Bowen Jr.); GX57T, 2:6-15 (Code describing "shoe wars" and the need, with respect to Bowen Jr., for Adidas to "step up and help one of our flagship schools in Louisville…secure a five-star caliber kid."); *supra* at pg. 20 (payment from Adidas made to family of Billy Preston after Gassnola learned family was taking money from agents and financial advisors); ████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████ Mr. Gatto facilitated these payments in an effort, albeit a misguided one, to ensure that the Adidas-sponsored Universities were not placed at a disadvantage in the highly-competitive world of college recruiting.

Indeed, this is not the first time these Universities have ever issued athletic scholarships to basketball players who were actually ineligible for competition because of NCAA recruiting violations. Recent history involving the very Universities at issue in this case demonstrates how widespread it is for athletes to falsely certify compliance with NCAA rules on their admission forms. In at least four recent cases, Kansas has awarded basketball scholarships to athletes who were deemed ineligible for play due to recruiting violations. Ex. 22 (Cheick

Diallo); Ex. 23 (Ben McLemore); Ex. 24 (Darnell Jackson); Ex. 25 (Josh Selby).  In each of these instances, Kansas simply applied to the NCAA asking for the athlete to be reinstated after some period of sitting on the bench and the NCAA agreed to do so.



      The same is true for Louisville and N.C. State.  In 2014, the NCAA found that Shaqquan Aaron, an incoming basketball player for Louisville, and his family, received over $50,000 in impermissible benefits prior to his enrollment.  Louisville took no action other than to apply for Aaron's reinstatement.  Aaron was ultimately forced to sit out just nine games of the regular season.  (Ex. 27, 28 (citing Ex. 29).)  With respect to N.C. State, when it was discovered that "prized recruit" Omer Yurtseven had been paid a professional salary for three years prior to enrolling at NC State—which meant that he was not an amateur—he was suspended for only nine games.  (Ex. 30.)  To our knowledge, none of the Universities have ever reported themselves as a victim of a crime to law enforcement authorities in connection with these determinations of ineligibility, even though each of the athletes described above falsely represented their NCAA eligibility on their admissions documents and the schools ostensibly awarded them scholarships on the basis of those representations.  Moreover, it bears noting that none of the Universities have terminated their sponsorship agreements with Adidas.  And,

notwithstanding the events of this case, Louisville currently has a top four recruiting class going into next season.  (Exs. 31, 32; *see also* Ex. 33.)

By setting forth this history, we do not mean to make light of the charges in this case.  The Government's charges are serious and Mr. Gatto has taken them seriously.  What we wish to convey, however, is that the conduct and harm that underlie the wire fraud charges in this case are very different than the conduct and harm at issue in other wire fraud cases tried in this District.  If NCAA rule violations are as ubiquitous as the evidence suggests, that means that misstatements about compliance with those rules must be equally common.  But notwithstanding the fact that "everyone knows what's been going on," *see* Ex. 18 at 16, these misstatements have not been addressed as a criminal matter until now.  That does not excuse the conduct, but we submit that in fashioning a sentence it is fair to view the crossing of this line as less culpable than crossing a line that is heavily policed and regularly the subject of criminal prosecution.  Under § 3553(a), these differences should be considered and they militate in favor of a non-custodial sentence.

### C.   A Non-Custodial Sentence is Appropriate in Order to Avoid Unwarranted Disparities with Comparable Cases.

One of the factors to be considered under Section 3553(a) is the need to avoid unwarranted sentence disparities.  In Mr. Gatto's case, this factor supports a non-custodial sentence.  Mr. Gatto may be sentenced to prison for engaging in conduct that has been going on for decades without criminal sanction.  As described above, in the vast majority of cases, NCAA rule-breaking resulting in scholarships to ineligible players, where detected, is handled outside the criminal justice system, almost always by the NCAA.

We don't make this argument as a challenge to the Government's ability to bring these charges, but rather to point out that for sentencing purposes, the applicable precedents are

not the wire fraud cases that have been previously prosecuted in this District, since the underlying conduct in those cases is meaningfully different than what took place here. Instead, we ask the Court to consider the fact that the most analogous cases are the ones that have been, up until this point, handled exclusively through the NCAA, without criminal charges and with no incarceration. Under Section 3553(a), which contemplates gradations of punishment based not on the formal charges themselves, but on the level of culpability, this distinction matters.

Furthermore, many of the other individuals that the Government knows participated in the same conduct as Mr. Gatto, including the men's basketball coaches at the Universities, have not been, and apparently will not be, criminally charged. ████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

With regard to the coaches at the Kansas, the evidence showed that Coach Self and Coach Townsend actually *expected* Mr. Gassnola to violate NCAA recruiting rules in order to help them recruit players, just as Nike does for the teams it sponsors. (Tr. 1184:20-1186:11; DX 192). ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████

      With respect to Louisville, its Associate Head Basketball Coach Kenny Johnson

blatantly violated NCAA rules when he paid $1,300 in cash to Brian Bowen Sr., the father of

Louisville player Brian Bowen Jr., *see* Tr. 701:25-703:18, ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████ Here as well, the actions of Coach Johnson and ████████ resulted in the ineligibility of

the recruit for NCAA competition and therefore did, or would have, caused Louisville to provide

a scholarship to an athlete ineligible for play—the exact same harm alleged to have been caused

by Mr. Gatto in this case.  Yet, Coach Johnson and ████████ have not been, and apparently

will not be, prosecuted, much less sentenced to jail, for their conduct.

      Moreover, even in the few other instances in which conduct that is arguably

somewhat similar to Mr. Gatto's has resulted in criminal charges, those defendants have ended

up being sentenced to little to no time in prison.  Most notable, of course, is the case of *United*

*States v. Walters*, where the defendant, a sports agent named Norby Walters, participated in a scheme to induce college football players to sign contacts with him, through payments of cash, cars, and other valuables. 997 F.2d 1219, 1221 (7th Cir. 1993). The Government charged Walters with mail fraud, alleging that Walters had defrauded the universities that the football players attended by "causing the universities to pay scholarship funds to athletes who had become ineligible as a result of the agency contracts." *Id.* While the Government maintains that the legal theory of wire fraud liability was different here, the theory of harm caused by the conduct here and in *Walters*—causing a university to award a scholarship to an ineligible player—is identical. But Walters did not go to prison. *Id.* at 1227.

Likewise, in *United States v. Gray*, three college basketball coaches were involved in a case of academic fraud at Baylor University. In short, the coaches helped prospective recruits obtain the academic credits required for athletic eligibility and possibly for scholarships by providing the students with written coursework or answers to correspondence exams. 96 F.3d 769, 772 (5th Cir. 1996). Such conduct violated NCAA rules on academic eligibility and rendered the students ineligible for competition, resulting in the same harm alleged here-colleges providing scholarships to ineligible players. At trial, the defendants were convicted of honest services fraud for depriving their employer (Baylor) of the honest services of its employees (the coaches). *Id.* Defendants received no jail time. Rather, they were sentenced to three years of probation and 50 hours of community service. *Id.*

In *United States v. Young*, No. 03-20400B, 2005 WL 3879034 (W.D. Tenn. Nov. 7, 2005), a fan of, and donor to, the University of Alabama gave $150,000 to the high school football coach of a highly sought after football recruit named Albert Means so that Means would agree to attend the University of Alabama and play football for the school's team. The donor,

Logan Young, was charged with: (1) one count of structuring the $150,000 to avoid filing cash transaction reports in violation of 31 U.S.C. § 1952, (2) one count of violating the Travel Act, § 18 U.S.C. 1952, by traveling across state lines to carry on illegal activity (here, bribing a public servant) and (3) one count of conspiracy under 18 U.S.C. § 371 for conspiring with the high school coach to carry out the first two offenses. Upon conviction, Young was sentenced to just 6 months in prison and 2 years of supervised release.[4]

It would be unjust for Mr. Gatto to be incarcerated, and his family punished, when so many people who have engaged in the exact same type of conduct have never been, and will never be, criminally charged. Under § 3553(a), Mr. Gatto's sentence should reflect this disparity, especially given that Mr. Gatto has always been a law-abiding and responsible citizen, a devoted husband, and a loving father to two young children.

### D.    A Non-Custodial Sentence is Sufficient to Deter Others.

Although § 3553(a) requires this Court to consider the need for deterrence before sentencing a defendant, that objective can be achieved in this case through a non-custodial sentence. As the Second Circuit has observed, "the need for further deterrence and protection of

---

[4] Although the defendant in *United States v. Piggie*, 303 F.3d 923 (8th Cir. 2002), was sentenced to 37 months, that case is not comparable. First, and most significantly, Piggie had two prior felony convictions, one involving weapons and the other for drug trafficking, which meant that he was in Criminal History Category V. (Ex. 36 at 5.) Jim Gatto has never had a brush with law enforcement. Second, unlike here, the defendant in *Piggie* was initially charged with 11 different counts of honest services fraud and tax evasion offenses. (*See* Docket, *United States v. Piggie*, Case No. 00-cr-00162 (W.D.M.O. 2000).) While he ultimately pled guilty to only two counts, the defendant's sentence also reflected these multiple and varied criminal acts. Third, Piggie was sentenced on the basis of an *actual* loss amount of $245,882.79, *see* 303 F.3d at 926, which equated to an offense level of 14 under the Guidelines at the time, and, when combined with his Criminal History Level V, and the fact that the Guidelines were still mandatory at that point, meant that the court had no choice but to sentence him to 37 months. If the Government were to advance an actual loss theory, Second Circuit law holds that it would first have to net out the revenue earned by the Universities as a result of the players' recruitment. *United States v. Leonard*, 529 F.3d 82 (2d Cir. 2008). Finally, unlike Mr. Gatto, the defendant in *Piggie* hoped to personally profit from his actions, as he had ambitions of representing the athletes as their agent once they turned pro. 303 F.3d at 925. Unlike nearly every fraud defendant, Mr. Gatto's actions were not motivated by the quest for personal gain.

the public is lessened" when conviction impacts a defendant's livelihood, because "the conviction itself already visits substantial punishment on the defendant." *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009). The permanent loss of one's reputation and career, especially in cases where a defendant has spent a lifetime working hard to achieve success in his field, is a tremendous blow. The public humiliation associated with being indicted, much less convicted, of a crime is acute, and that was especially true here, where a sensational story involving well-known college coaches, universities with prominent sports programs, and the involvement of household name apparel brand, combined to create an absolute media frenzy. Mr. Gatto's humiliation has been eagerly reported in virtually every sports-related periodical and television show in the country. Anyone paying attention has now received the message, loud and clear, that breaking the NCAA's rules is not a good idea. Mr. Gatto does not need to be incarcerated in order to send that message.

Finally, there is no need for specific deterrence in this case. Mr. Gatto is not a threat to the public. This is his first offense and an aberration in a life otherwise characterized by law-abiding behavior, as the many individuals who have wrote letters to the Court on Mr. Gatto's behalf can readily attest. There is no risk of recidivism: Mr. Gatto's career has been reduced to shambles as a result of this case. The public does not need to be protected from Mr. Gatto.

## II.   THE SENTENCING GUIDELINES MERIT A LENIENT SENTENCE.

Although a sentencing court does not need to follow the Sentencing Guidelines, it is required to "correctly calculat[e] the applicable Guidelines range" before imposing a sentence. *Gall*, 552 U.S. at 49-50. In the present instance, the Presentence Investigation Report, dated January 14, 2019 (the "PSR"), calculated an offense level of 21, which equates to a sentence between 37 and 46 months. (PSR, at p. 33.) However, the Probation Office itself concluded that

a variance below the Guidelines was appropriate here and recommended a sentence of 12 months. (PSR, at p. 36.)

Although Mr. Gatto is grateful for the Probation Office's acknowledgment that he is "upstanding member of society" and that this is a unique case, *see id.* at 35, Mr. Gatto respectfully disagrees with the calculation of the applicable Guidelines range found in the PSR. When the Sentencing Guidelines are calculated correctly, they result in an offense level of 7 and a Guidelines range between 0-6 months. As a first offender, the imposition of a non-custodial sentence is appropriate for Mr. Gatto. *See* U.S.S.G. at §5C1.1 cmt. n.4 (if a defendant is a "nonviolent first offender and the applicable guideline range is in Zone A or B of the Sentencing Table, the court should consider imposing a sentence other than a sentence of imprisonment.").

## A.     <u>Mr. Gatto Did Not Intend to Cause Any Pecuniary Loss to the Universities.</u>

The PSR calculates a 14-level increase in Mr. Gatto's Guidelines range based on an "intended loss" of $589,624. (PSR ¶¶ 58, 60.) The $589,624 figure is based upon the Government's contention, accepted by Probation, that it was "reasonably foreseeable" to Mr. Gatto that NC State, Kansas and Louisville would lose funds equal to the face value of a four-year athletic scholarship for Brian Bowen Jr., Billy Preston, Silvio DeSousa and Dennis Smith Jr. (*Id.*) Specifically, the Government contends that when Mr. Gatto approved of payments to the family of Brian Bowen, Jr., it was "reasonably foreseeable" that Louisville would lose $165,400, since the cost of an athletic scholarship at Louisville is $41,350 per year. (PSR ¶ 61.) Likewise, the face value of an athletic scholarship at Kansas is $41,078. (*Id.*) Accordingly, the Government contends that when Adidas funds were sent to the families of Kansas recruits Billy Preston and Silvio DeSousa, it was "reasonably foreseeable" to Mr. Gatto that Kansas would suffer loss an in amount equal to $328,624,00 (the value of two four-year scholarships). (*Id.*)

Finally, because in-state tuition at NC State is $23,900 per year, *see* Tr. 738:3-739:2, the

Government claims that it was "reasonably foreseeable" to Mr. Gatto that NC State would lose

$95,600 (the value of a four-year scholarship), when he approved of payments from Adidas to

the family of Dennis Smith Jr, even though Smith Jr. only attended N.C. State for one year

before going to the NBA.  Together, these "reasonably foreseeably" losses equal $589,624.

Mr. Gatto objects to this enhancement because the PSR's estimate of intended

loss is contrary to both controlling law and the factual record.

1.   *The Sentencing Commission Significantly Revised the Definition of "Intended Loss" In the 2015 Guidelines Amendments.*

The current definition of intended loss is the "pecuniary harm that the defendant

purposefully sought to inflict." U.S.S.G. at §2B1.1(b)(1) cmt. n.3 (A)(ii).  Intended loss is a

subjective standard.  (*See* Ex. 37 (U.S. Sentencing Comm'n, Amendments to Sentencing

Guidelines, dated April 30, 2015 at 24-25).)  Case law has long held that "commentary in the

Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the

Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that

guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993).

The Government's calculation of intended loss is inappropriate because it is based

on losses that are, at most, *unintended* repercussions of Mr. Gatto's conduct that Mr. Gatto had

no desire to see inflicted upon the Universities.  Instead of calculating the pecuniary losses that

Mr. Gatto "purposefully sought" to inflict upon the Universities, as required under the

Guidelines, the Government based its calculation on harms that would have been undesirable to

Mr. Gatto—*e.g.*, a determination that the talented athletes that Mr. Gatto hoped to see play for

the Universities were "ineligible" to play on the Universities' basketball teams.  Despite these

facts, the Government contends that these losses should be included in Mr. Gatto's intended loss

calculation because these losses would have been "foreseeable" to Mr. Gatto.  (PSR ¶ 60.)

        However, "foreseeable" losses are not a component of "intended loss" under the

Guidelines.  The current definition of "intended loss" was instituted as part of the Sentencing

Commission's 2015 revisions, which went into effect on November 1, 2015.  (Ex. 37 (U.S.

Sentencing Comm'n, Amendments to Sentencing Guidelines, dated April 30, 2015 at 24-25

(revising definition of intended loss to the "pecuniary harm that the defendant purposefully

sought to inflict.")))  When the Sentencing Commission issued the 2015 revisions to "intended

loss," the Commission specifically stated that it was "adopt[ing] the approach taken by the Tenth

Circuit" in *United States v. Manatau*, 647 F.3d 1048 (10th Cir. 2011).  *Id.*

        In *Manatau*, the Tenth Circuit, in an opinion authored by current Supreme Court

Justice Neil Gorsuch, confirmed that "intended loss does not mean a loss the defendant merely

knew would result from his scheme or a loss he might have *possibly and potentially*

contemplated." *Manatau*, 647 F.3d at 1050 (italics in original).  Instead, an "intended loss" is

only those losses which the defendant seeks to inflict "on purpose."  *Id.* (only financial losses

that a defendant "had a 'conscious object' to cause" may be included in the calculation of

intended loss).  Even losses that a defendant is "aware" are "practically certain" to result from

his conduct may not be included.  (*Id.*)

        Indeed, the text of the Guidelines themselves make clear that pecuniary losses that

a defendant did not "purposefully [seek] to inflict," but which were a "reasonably foreseeable"

result of his conduct should not be included in any "intended loss" calculation.  In contrast, the

Guidelines make clear that when calculating "actual loss," it is appropriate to include

"reasonably foreseeable pecuniary harm."  U.S.S.G. at §2B1.1(b)(1) cmt. n.3 (A) at (i), (iv).

However, the Guidelines do not include "reasonably foreseeable pecuniary harms" as appropriate to include when calculating "intended loss." *Compare id.* at (i) with *id.* at (ii).

Indeed, the Tenth Circuit pointed out this distinction in *Manatau.* 647 F.3d at 1051 ("The guidelines' definition of 'intended loss' makes no mention of knowledge or some lesser mens rea standard.  Yet, just a few lines later, the sentencing commission's definition of 'actual loss' does just that — defining 'actual loss' to include the 'harm that the defendant *knew . . . was a potential result of the offense.*'. . This contextual clue. . . .shows, too, that if the commission had wished to include the 'knowledge' concept in the definition of intended loss it well knew how to do so.") (italics in original).  If the Sentencing Commission believed that the Tenth Circuit, in *Manatau*, had misread the Guidelines on this point, it would have clarified this point in the 2015 Amendments.  Instead, the Commission specifically adopted *Manatau* as a correct articulation of the meaning of "intended loss."  (Ex. 37.)

Accordingly, it is inappropriate for the Government to base its intended loss calculation on a claim that it was reasonably "foreseeable" to Mr. Gatto that his conduct could deprive the Universities of $588,224 in scholarship funds.  Instead, the Government must demonstrate that Mr. Gatto "purposefully sought" to inflict these losses upon the Universities. The Government is unable to make this showing because there was no evidence presented at trial that Mr. Gatto *desired* the Universities to sustain financial losses.  Instead, the Government's point to the jury was that Mr. Gatto's conduct *exposed* the Universities to financial losses.  (Tr. 49:23-50:1, 58:16-19.)  For purposes of an "intended loss" enhancement, that is not enough. Accordingly, any sentencing enhancement for intended loss is unwarranted.

2.    *Mr. Gatto's Object Was Not to Deprive the Universities Out of Scholarship Funds.*

The Government will not be able to point to a single instance in which Mr. Gatto expresses an interest in depriving the Universities out of scholarship funds or demonstrating that he "purposefully sought to inflict" any pecuniary loss upon the Universities.  In fact, the means by which these four athletes paid for college—*e.g.*, through their parents, through student loans, or through an athletic scholarship—was entirely irrelevant to Mr. Gatto.  Mr. Gatto had no particular interest in whether the Universities offered athletic scholarships to these students (or not) since the scholarships—room, board, and the opportunity to take academic classes—did not benefit Mr. Gatto in the least.

Instead, as Government cooperator T.J. Gassnola testified, the objective of the alleged scheme was to "make sure that the coaching staffs of the [Universities'] basketball teams were happy" with Adidas.  (Tr. 1080:3-1081:7.)  According to Mr. Gassnola, it was important to keep the basketball coaches at the Universities happy because the Universities could switch their corporate sponsorships to Nike or Under Armour, Adidas's direct competitors, if the basketball coaches were displeased with the "support" they received from Adidas's marketing department.  (Tr. 1076:8-1077:18; 1084:12-21.)  Mr. Gassnola testified that his actions were based on his "belie[f] that college coaches wanted shoe companies to help recruit players to their schools." (Tr. 1107:8-17.)  Indeed, Mr. Gassnola said that the reason he was "running around dropping 30 grand here" and "20 grand here" on players' families was because he was trying to ensure that the Universities were happy and would "re-sign[]" their sponsorship agreements with Adidas. (Tr. 1186:25-1187:4; DX192.)

Mr. Gassnola was on the witness stand for three days.  Yet, he *never once* testified that he or Mr. Gatto were scheming to deprive the Universities out of athletic scholarships.  In

34

fact, the Government never even asked him that question.  While one result of the payments may have been that scholarships were awarded to athletes whom the NCAA, had it known of the payments, could have deemed ineligible, nothing in the record supports the Government's contention that it was Mr. Gatto's "conscious object[ive]" to deprive the Universities of scholarship funds by ensuring that the players would be prohibited from competing.  *Manatau*, 647 F.3d at 1050 ("intended loss does not mean a loss the defendant…might have *possibly and potentially* contemplated.") (italics in original).

To the contrary, the evidence demonstrates that Mr. Gatto wanted these students to compete in games and play well for their schools.  (Tr. 1017:19-25 (Gassnola wanted Silvio DeSousa to play in games, not be declared ineligible); 1000:21-1003:2 (Gassnola wanted Dennis Smith Jr. to play in games, not be declared ineligible); 1137:7-1138:4 (Gassnola wanted Billy Preston to play in games, not be declared ineligible).)  Unless the Government can point to some evidence that proves that Mr. Gatto's purpose was to deprive the Universities out of scholarship dollars, the value of the athletic scholarships should not be included in the calculation of any intended loss.[5]

---

[5] While we contend that Mr. Gatto did not intend *any* loss to the Universities, given the Guidelines' definition of "intended loss," to the extent that the Court finds that "foreseeable losses" should be included, the record demonstrates that Mr. Gatto and his co-defendants expected that the student athletes would each be "one and done" players who would only receive *one* year of scholarship funds before moving on to play professionally in the NBA. (*See e.g.*, Tr. 622:11-19, 820:17-21.)  Accordingly, the calculation of any intended loss, if "foreseeable losses" are included, would result in an intended loss amount of $147,406 and an enhancement of 8 levels.

| Name of Student | University | Face Value of Scholarship | Expected Time in College | Total |
|---|---|---|---|---|
| Brian Bowen, Jr. | Louisville | $41,000 / year | 1 Year | $41,350 |
| Billy Preston | Kansas | $41,078 / year | 1 Year | $41,078 |
| Silvio DeSousa | Kansas | $41,078 / year | 1 Year | $41,078 |
| Dennis Smith Jr. | NC State | $23,900 / year | 1 Year | $23,900 |

**B.      The Probation Office Correctly Concluded That A Sophisticated Means Enhancement Is Inappropriate Here.**

As the PSR correctly concludes, there is also no legitimate basis for applying a 2-level "sophisticated means" enhancement to Mr. Gatto's sentence and the Government's contention that such an enhancement should apply is wrong.  The "sophisticated means" enhancement is meant to punish against "especially complex or especially intricate offense conduct," such as the "use of fictitious entities, corporate shells or offshore financial accounts." U.S.S.G. at §2B1.1(b)(10)(c) cmt. n. 9(B) (Nov. 2018).  No such methods were employed by Mr. Gatto or his co-defendants.  Mr. Gassnola and Mr. Code sent Mr. Gatto inflated AAU team expense reports and Mr. Gatto had them paid.  (*See e.g.*, Tr. 1027:13-1028:3).  The money was then delivered to the families in cash.  (Tr. 276:11-18; 998:5-999:25; 1028:4-21; 1013:3-19.)

These arrangements were not "sophisticated," "complex," or "especially intricate," which is the type of conduct targeted by the sophisticated means enhancement. U.S.S.G. §2B1.1(b)(10)(c) cmt. n. 9(B); *see also United States v. Nawaz*, 555 F. App'x 19, 27 (2d Cir. 2014) (sophisticated means enhancement appropriate where fraud scheme "involved forged bank documents, fraudulent property appraisals, fictitious entities, straw buyers and corporate shells used to perpetrate fraudulent mortgage transactions.").  Accordingly, as the Probation Office correctly found, there is no basis for imposing a "sophisticated means" enhancement here.

III.      **THE PSR'S CALCULATION OF RESTITUTION TO LOUISVILLE AND KANSAS IS INCORRECT.**

When calculating restitution, "only...the victim's actual loss" may be considered. *United States v. Marino*, 654 F.3d 310, 319–20 (2d Cir. 2011).  Restitution is limited to "actual loss" because restitution is meant to return to the victim the money that was taken from them—

but if they didn't lose any money and actually profited, providing restitution would unjustly enrich the victim. *See United States v. Adorno*, 950 F. Supp. 2d 426, 428 (E.D.N.Y. 2013). As the Second Circuit has explained, "[t]he primary and overarching goal of the MVRA is to make victims of crime whole: to compensate these victims for their losses and to restore the[m] to their original state of well-being. To fulfill this objective without award[ing] the victim a windfall, *i.e.*, more in restitution than he actually lost, the MVRA caps the restitution award at the actual amount of the victim's loss." *United States v. Thompson*, 792 F.3d 273, 277 (2d Cir. 2015) (internal citations and quotation marks omitted).

The PSR concludes that Mr. Gatto is responsible for paying restitution to each of the Universities for the loss of "one year of tuition per student," that is (i) $41,350 to Louisville in connection with Brian Bowen Jr.; (ii) $41,078 to Kansas in connection with Billy Preston; (iii) $41,078 to Kansas in connection with Silvio DeSousa; and (iv) $23,900 to N.C. State in connection with Dennis Smith Jr. In total, the PSR imposes a restitution amount of $147,406.

Mr. Gatto objects to the amount of the restitution award to Louisville and Kansas. Louisville did not incur an actual loss of $41,350.00 in connection with Brian Brown Jr. That would have been the loss had Brian Bowen Jr. remained enrolled for *both* semesters of the 2017-2018 school year, but since he left the school after the first semester, *see* Tr. 529:19-20, Louisville did not disburse any scholarship dollars for the second semester. Accordingly, restitution should be owed to Louisville only in the amount of $20,675.

Likewise, Billy Preston only attended Kansas for the *first* semester of the 2017-2018 school year, and Silvio DeSousa only attended Kansas for the *second* semester of the 2017-2018 school year.[6] Accordingly, Mr. Gatto should only be responsible for restitution in the

---

[6] While Kansas did renew DeSousa's scholarship for the 2018-2019 season, it did so *after* the Superseded Indictment was filed and Kansas's NCAA compliance officers learned that DeSousa's guardian had

amount of $20,539/each, which is the cost of one semester, for a total restitution amount owed to Kansas of $41,078.

Accordingly, the correct restitution amount is $20,675 to Louisville; $41,078 to Kansas; and $23,900 to N.C. State.[7]

---

accepted funds from Adidas. (Tr. 888:22-889:5.) Accordingly, Mr. Gatto is not responsible for those tuition dollars.

[7] The existence of an actual loss for purposes of calculating restitution does not mean that there was an actual loss for purposes of calculating an offense level under § 2B1.1(b)(1). Under § 2B1.1(b)(1), there is only an actual loss if the victim sustained a loss after netting that loss against any gains received. Given the revenue earned by N.C. State and Kansas, there is no actual loss resulting from the offense, which is why the Government urged Probation to focus on intended loss.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court impose a non-custodial sentence, which we submit is sufficient, but not greater than necessary, to satisfy the objectives of sentencing.

Dated:   New York, New York
         February 12, 2019

**WILLKIE FARR & GALLAGHER LLP**

By: /s/ *Michael Schachter*

Michael S. Schachter
Casey E. Donnelly
787 Seventh Avenue
New York, New York 10019
Phone: (212) 728-8000

*Attorneys for Defendant James Gatto*