UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                    :
UNITED STATES OF AMERICA                            :
                                                    :
           - v. –                                   :
                                                    :          S2 17 Cr. 686 (LAK)
                                                    :
                                                    :
JAMES GATTO, a/k/a "Jim,"                            :
MERL CODE, and                                      :
CHRISTIAN DAWKINS,                                  :
                                                    :
           Defendants.                              :
                                                    :
------------------------------------------------------------------X


### THE GOVERNMENT'S SENTENCING MEMORANDUM


ROBERT S. KHUZAMI
Attorney for the United States
Acting Under Authority Conferred
by 28 U.S.C. § 515


Edward B. Diskant
Noah Solowiejczyk
Eli J. Mark
Aline R. Flodr
Assistant United States Attorneys
        - Of Counsel -

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................................................... 1

I.  The Offense Conduct ................................................................................................................ 2

A.  University of Louisville Scheme ..................................................................................... 5

B.  North Carolina State University Scheme ....................................................................... 7

C.  University of Kansas Scheme ......................................................................................... 8

D.  The Miami Conduct ...................................................................................................... 10

E.  The Harm Caused By the Defendants' Conduct .......................................................... 11

    1.  The Universities Suffered Significant Economic and Intangible Harm ................. 12

    2.  The Defendants' Scheme Significantly Harmed the Student-Athletes .................... 14

II.  The Guidelines Calculation .................................................................................................. 15

A.  The Probation Department Calculations ...................................................................... 15

B.  The Probation Department Correctly Calculated the Loss Enhancements ................. 16

C.  The Probation Department Erred In Declining to Apply a Sophisticated Means
Enhancement .................................................................................................................... 19

III.  Discussion .............................................................................................................................. 22

A.  A Sentence of Incarceration is Necessary to Reflect the Seriousness of the Offense, to
Promote Respect for the Law, and to Impose Just Punishment ....................................... 22

    1.  The Defendants' Conduct Caused Substantial Harm .............................................. 22

    2.  The Defendants' Conduct Was Repeated ................................................................ 24

    3.  The Defendants' Took Sophisticated Steps to Conceal Their Conduct ................... 25

    4.  The Defendants' Payments to the Families of Student-Athletes Were Sizable And For the
    Specific Purpose of Directing Them to Particular Universities .................................... 27

    5.  The Defendants Were Motivated By Personal Gain ................................................ 27

B.  A Sentence of Incarceration is Necessary to Promote General Deterrence ................ 29

C.  The Defense Submissions .............................................................................................. 30

IV.  Restitution ............................................................................................................................. 34

V.  Conclusion ............................................................................................................................. 36

## PRELIMINARY STATEMENT

Defendants James Gatto, Merl Code and Christian Dawkins (collectively, "the defendants") now stand convicted for their respective roles in orchestrating a scheme to make and then conceal large cash payments to the families of student athletes who were seeking athletic scholarships. The defendants did so in pursuit of personal gain and competitive advantage and, in so doing, they did not just flagrantly violate applicable NCAA rules, but also engaged in an intentional and sophisticated effort to conceal their conduct from universities the defendants knew full well could not and would not issue scholarships to the student-athletes whose families received these illicit payments.

Through their crimes, the defendants not only caused the Universities to issue athletic scholarships under false pretenses, but they also exposed the Universities to a wide range of harms – both tangible and intangible – that, as the victim impact statements submitted by the Universities make clear, entailed not just losses of millions of dollars, but reputational and human tolls that cannot be so easily measured. For example, as the University of Louisville writes, in its letter to the Court:

> [T]he University is so much greater than its basketball team. [And] the impact of the [defendants'] illegal scheme . . . had a greater impact on the University than just awarding a scholarship to a young student athlete whose eligibility to play had been compromised. This scheme impacted our current students, alumni and fans, whose beloved institution was relegated to a national scandal; it impacted all our student-athletes, young 18-23 year olds across a spectrum of sports; and it impacted every employee who worked with young Brian Bowen during the Summer and Fall of 2017, to ensure that the University treated him fairly, as an 18 year-old student-athlete who by all appearances had no idea that a handful of deceitful individuals were conspiring with his father to buy and sell his choice of school.

(Letter of Amy Elizabeth Shoemaker dated February 25, 2019 ("Louisville Ltr.") at 1).[1]

---

[1] A copy of the Louisville Letter is attached as Exhibit A to this submission.

In seeking non-custodial terms, the defendants principally rehash arguments that were made to, and rejected by, the jury at trial, among them arguments that they were really trying to "help" the universities, or that the defendants were engaged in conduct that was commonplace in the world of amateur sports.  These self-serving arguments, which are largely unsupported by and even contradicted by the trial record, bespeak a glaring lack of any acceptance of responsibility for the enormous harms the defendants have caused, harms that, as noted above, go well beyond "just awarding a scholarship to a young student athlete."   As detailed herein, and consistent with the recommendation of the U.S. Probation Department, the Government respectfully submits that a sentence that includes a term of incarceration is necessary to reflect, among other things, the seriousness of the defendants' conduct and the need to promote deterrence, and is thus sufficient but not greater than necessary to further the legitimate purposes of sentencing.

## I.        The Offense Conduct

As the Court is well aware, the defendants conspired to defraud the University of Louisville, the University of Kansas, and North Carolina State University (collectively, the "Universities"), by causing them to issue athletic scholarships to multiple student-athletes under false pretenses, and by intentionally concealing from them significant and material information necessary to the Universities' ability to exercise their right to control their financial assets. (Gatto PSR ¶ 14.)  Specifically, the defendants conspired to funnel illicit payments to the families of amateur student-athletes bound for National Collegiate Athletic Association ("NCAA") Division I schools for their own self-serving purposes, namely to ensure that the student-athletes matriculated at universities sponsored by Adidas, a global athletic apparel

2

company, and in the hopes that the defendants could profit off of these student-athletes if and when they became professionals.  (*Id.*)

As the evidence at trial established, in each instance, the defendants, working with their co-conspirators, made these payments at a specific juncture—right around the time when the student-athlete was committing to a particular school and, more specifically, in connection with their decisions to attend Adidas-sponsored schools.  (*See, e.g.*, Tr. 575:2-579:3; GX 1607.) Moreover, and so as to ensure the success of their scheme, the defendants took significant and, at times, elaborate steps to conceal the payments to the student-athletes' families from the Universities, including by creating sham invoices and passing the money indirectly through multiple accounts in order to conceal its source and purpose, (*e.g.*, GX 1065, 308A-1; Gatto PSR ¶¶ 49, 51-52), because as the defendants well knew – and as each and every university official who testified at trial made clear – had the Universities known of the illicit payments, they could not and would not have issued the athletic scholarships.  (*E.g.*, Tr.  398; 768-769; 882.).

The defendants, all experienced and sophisticated players in the world of collegiate athletics, fully understood that the amateur status of a student-athlete is the *sine quo non* of an athletic scholarship awarded by the Universities and that the substantial payments they conspired to make would not and could not be disclosed to the Universities as a result.  Defendant Gatto was employed by Adidas for over two decades and ultimately rose to become the Director of Global Sports Marketing for Adidas's Basketball Program.  In that role, Gatto oversaw significant components of Adidas's high school and college basketball programs.  (Gatto PSR ¶ 101.)  Defendant Code – who had previously held a role similar to Gatto's at a rival athletic apparel company and was a collegiate basketball player – served as a consultant for Adidas, working directly with high school and college basketball coaches and players.  (Code PSR ¶¶

105, 110, 113).  Defendant Dawkins had worked for several years for a professional sports agency recruiting athletes and maintaining client relationships before being terminated for allegedly misusing his athlete-client's funds.  (Dawkins PSR ¶¶ 105, 110, 113).

Accordingly, the defendants caused others, including the student athletes and their family members, to make materially false statements to the Universities. (*See, e.g.*, Tr. 757-58; GX 1607, 1609, 1820, 1915; Gatto PSR ¶¶ 38-39, 41, 45-46, 48, 53).  Moreover, the trial evidence left no doubt that the Universities relied upon these false statements and certifications in issuing scholarships.  Representatives from each University testified about their commitment to ensuring compliance with applicable NCAA rules, about rules education and training sessions conducted by compliance staff, and about their efforts to collect information about each student-athlete's eligibility to compete.  Most of all, each University required certifications from a student-athlete and his family about the student-athlete's amateur status.  (*See, e.g.*, Tr. 757-58; GX 1607, 1609, 1820, 1915.)  As the compliance officers explained, they took compliance seriously because allowing ineligible players to compete – issuing scholarships to student-athletes whose families received large payments from individuals like the defendants – would expose the University to substantial financial and other penalties for non-compliance with NCAA rules, including limitations on the ability to compete in lucrative post-season events like tournaments and championship games; financial penalties such as fines and the loss of profit-sharing distributions from the NCAA; and limitations on future scholarships or recruiting.  (Tr. 398; 768-69; 732-33; 740:12-20; 882; Gatto PSR ¶¶ 29, 34).

At trial, the Government introduced evidence of the defendants' efforts to defraud the University of Louisville, and Gatto and his co-conspirators' efforts to defraud the University of Kansas, and North Carolina State University—all public research universities that compete in

4

Division I and, at all relevant times, had a sponsorship contract with Adidas.  (Gatto PSR ¶¶ 19-21).  The scheme with respect to each school is summarized briefly below.

### A.  University of Louisville Scheme

As established through the testimony of Brian Bowen Sr. and Thomas "TJ" Gassnola, among others, beginning as early as 2015, both Dawkins and Adidas made efforts to funnel payments to Bowen Sr. to secure his son's willingness to play for an Adidas-sponsored team.  In particular, in February 2015, Dawkins, Gassnola and others secured a $25,000 payment for Bowen Sr. in return for his son's willingness to play for the Michigan Mustangs, and Adidas-sponsored AAU team.  (*E.g*., Tr. 535-36; 537-39.)

As Bowen Sr. and his son focused on college choices in the months that followed, Dawkins became particularly involved as an advisor to the family.  At various points during Bowen Jr.'s senior year of high school, Dawkins presented Bowen Sr. with opportunities to receive an illicit payment in connection with his son's selection of a particular university.  (*E.g*., 553-57).  However, as Bowen Sr. testified, as of May 2017 – or just weeks before graduation – his son had yet to commit to a particular school.  Around that time, Dawkins first suggested the possibility of Bowen Jr. attending Louisville, noting that he could secure a substantial illicit payment from Adidas in return for Bowen Jr.'s commitment. (*See, e.g.*, Tr. 553-54; 564-66.)  In particular, Dawkins knew that Gatto and Code at Adidas would be willing to pay tens of thousands of dollars to secure Bowen Jr.'s commitment to an Adidas-sponsored school, and in the days leading up to Bowen Jr.'s commitment to Louisville, Dawkins worked with Code and Gatto hashing out an agreement to pay $100,000 to Bowen Sr. in four installments of $25,000 each. (*E.g.*, GX 3006-08, 104D, Tr. 575-79; GX 102S-2; *see also* GX 7).

On June 1, 2017, one day after Code texted Dawkins that the deal was "done," Bowen, Jr. committed to the University of Louisville.  (*See* GX 102S-2.).  As the defendants knew full well,

in connection with his commitment, Bowen Jr. and his mother signed various forms and documents which specifically asked about NCAA rules violations, his amateur status and his eligibility to compete.  In those documents, Bowen Jr. falsely certified that he was an amateur and eligible to compete.  (*See* GX 102S-2, 1607; Gatto PSR ¶¶ 48, 53).

Moreover, and to further conceal the scheme, the defendants engaged in a sophisticated, multi-faceted effort to conceal the payments to Bowen Sr., by causing the money to be transferred indirectly from Adidas through a third-party before arranging for a cash delivery. (Gatto PSR ¶¶ 48, 53).   *First*, defendants Code and Gatto created and approved sham invoices purporting to justify the illegal $25,000 payment from Adidas to the family of Brian Bowen Jr. as one for "July Travel Team Expenses" to an AAU program in South Carolina affiliated with Code.  (GX 1002)  As Code explained to Dawkins in a recorded call introduced at trial, he and Gatto wanted to conceal the payments as one "to my team, my organization, so it's on the books, [but] it's not on the books for what it's actually for."  (*Id.* ¶ 50.)   Code in turn directed the head of the AAU program, his friend and Government witness Ricky Robertson, to transfer the money to a corporate entity controlled by Dawkins, ostensibly as a payment for "consultant fees." (Gatto PSR ¶¶ 49-50; *see, e.g.*, GX 1004).  Finally, Dawkins arranged for cash to be hand-delivered to Bowen and as Government witness Munish Sood testified, the first of those deliveries occurred in a New Jersey parking lot on July 13, 2017.  (Tr. 210).

At trial, John Carns, the Senior Associate Athletic Director for Compliance, a twenty-year employee of the University of Louisville, stated unequivocally that he had no knowledge of the defendants' payment to the family of Bowen Jr. and that had he been aware of such a payment or series of payments, it would have affected the University's decision to award a scholarship to Bowen Jr. (Tr. 398).  Carns further testified that, upon learning of allegations of

such payments, the University immediately withheld Bowen Jr. from competition in order "to protect the University" from, among other things, the range of financial penalties and other harms that could flow from allowing an ineligible student athlete to compete.  (*Id.* at 399.)

### B.  North Carolina State University Scheme

The defendants' scheme to funnel these payments to Bowen Sr. was not the first time Gatto, in particular, had been involved in making payments to the families of student-athletes to get them to attend Adidas-sponsored schools.  As Gassnola testified, in approximately 2015, after learning from an assistant coach at North Carolina State University that Dennis Smith Jr., a student-athlete who was, at the time, widely regarded as the top high school recruit in the state of North Carolina, was considering de-committing from the University, he and Gatto agreed to make a payment to Smith Jr.'s father to ensure Smith Jr. committed to North Carolina State University.  (Tr. 998-1002; Gatto PSR ¶ 35).

Specifically, in October and November 2015, Gassnola withdrew $40,000 from his bank account, flew down to Raleigh, North Carolina and gave the money to Coach-4, who told Gassnola that the money would be delivered to Smith Jr.'s trainer.  (Tr. 999-1000, GX 306D-1).  After Gassnola told Gatto about the situation, Gatto caused Adidas to reimburse Gassnola for the cash payment by approving multiple sham invoices intended to cover the payment.  (Tr. 1000; GX 1116, 1118; Gatto PSR ¶ 37).  Less than two weeks after Gassnola delivered the payment intended for the family of Smith Jr., Smith Jr. formally committed to attend North Carolina State University.  (*See* GX 1908).

Much as with the payment to Bowen Jr., Gatto and other scheme participants counted on the payments being concealed from the University through, among other things, a series of false statements and representations about the eligibility of Smith Jr.  As Gassnola explained during his testimony, he and Gatto knew full well that it was critically important to conceal the payment

7

from N.C. State because if the University discovered the payments that he and Gatto had provided to Smith Jr.'s family, Smith Jr. "would have been deemed ineligible; he would never have played there." (Tr. 1002-03).

Consistent with that testimony, at trial, Carrie Doyle, the Senior Associate Athletic Director for Compliance, a former NCAA enforcement representative who had spent much of her adult life working in the area of NCAA compliance, testified to the lengths the University goes to ensure its program remains fully compliant with NCAA rules and regulations. Doyle testified colorfully, at times, about the lengths she and her staff went to as part of their effort to promote a culture of compliance,[2] as well as the range of serious consequences that could befall the University if it were found to have played an ineligible student-athlete. (*E.g.*, *id.* 728-33; 741-43). Finally, Doyle confirmed that she had no knowledge of the scheme to funnel $40,000 to the family of Smith Jr., and that had she known of such a scheme, the University "would never have provided the athletics scholarship." (*Id.* at 768).

### C.  University of Kansas Scheme

In addition to the University of Louisville and North Carolina State University schemes, from approximately October 2016 until approximately November 2017, Gatto conspired with others, including Gassnola, to illicitly funnel approximately $90,000 from Adidas to the mother of Billy Preston in connection with his decision to attend the University of Kansas, another Adidas-sponsored school. Gatto further agreed to funnel money to the legal guardian of Silvio de Sousa in return for his commitment to de-commit from the University of Maryland and instead attend the University of Kansas. (Gatto PSR ¶¶ 40, 43-44).

---

[2] For example, Doyle recounted an episode where, concerned about a potential rules violation, she traveled to a local high school with a tape measure in hand to ensure there was sufficient distance between the media and NC State coaching staff. (Tr. 743-44.)

As the trial evidence established, beginning in the Fall of 2016, and around the time Preston committed to Kansas, Gassnola agreed to begin making a series of substantial payments to Preston's mother, all done with the blessing of Gatto who funded each of the payments with money from Adidas. (Tr. 1022-1026; *see also* GX 201A-2).  In particular, and over the course of nearly a year, Gatto and Gassnola funneled approximately $90,000 to Preston's mother, all funded by Adidas pursuant to a series of sham invoices submitted by Gassnola and approved by Gatto.   The first payment – a $20,000 cash delivery made by Gassnola to Preston's mother in a hotel room in Manhattan – occurred a mere week before Preston and his mother both signed the first of a series of documents and certifications required by the University of Kansas. (Tr. 1028:9-21; *see also* GX 306A-1, 1820).

As with the University of Louisville scheme, Gatto, Gassnola, and others, took significant steps to conceal the payments to Preston's mother by causing the money to be transferred indirectly from Adidas through sham invoices to an AAU team under Gassnola's control, who then facilitated the payments to Preston's mother.  (*See, e.g.*, Tr. 1027-28; GX 1023, 1040; Gatto PSR ¶¶ 40-42).   Moreover, as with the prior payments, Gatto understood that the payments would not be disclosed to the University and, to the contrary, that Preston and Player would falsely certify Preston's eligibility to compete in collegiate athletics.

In addition to the Preston payments, Gassnola additionally testified that in or around August of 2017, he and Gatto also agreed to cause Adidas to pay Silvio de Sousa's legal guardian to help secure De Sousa's commitment to attend the University of Kansas.  Gassnola made an initial $2,500 payment funded by Gatto in August 2017.  (Tr. 1013, 1017).  Then, as discussed on a call between Gatto and Gassnola played at trial, the payments were intended to help de Sousa de-commit from a rival school and, more specifically, to permit de Sousa's legal

guardian to repay illicit payments he had received from a supporter of that rival school. (*See* GX 2; Gatto PSR ¶¶ 43-44). Moreover, as Gassnola made clear, he did not discuss these payments with anyone at the University of Kansas, because "[t]hey wouldn't have liked it very much, … and because [de Sousa] would have been deemed ineligible and it wouldn't have helped at all." (Tr. 1017).

Finally, the Government called Jeff Smith, the senior director of compliance at the University of Kansas, who testified about the University's commitment to compliance, and its various efforts to ensure its student-athletes are in compliance with applicable NCAA rules and eligible to compete. With respect to the defendants' conduct, Smith testified that he had no knowledge of either a plan to funnel money to the family of Billy Preston or to Silvio de Sousa's handler, further testifying that had he been aware of the schemes, "the University would not have offered [either player] a scholarship since [they] would have been ineligible to play basketball." (Tr. 882, 888).

### D.  The Miami Conduct

In addition to the schemes described above, the Government offered evidence of communications between Dawkins, Code and Gatto in August 2017 about a potential payment of up to $150,000 to the family of another student athlete in an effort to secure his commitment to attend a fourth Adidas-sponsored school, the University of Miami. In two calls offered at trial, Code explained to Gatto how a rival school had "offered the kid 150" and how he and Dawkins were working to "keep him from going to one of their schools." (GX 7-T).

In fact, Dawkins and Code were lying to Gatto and planned to keep a substantial portion of the money for themselves. Nonetheless, Gatto was fully prepared to fund another payment, even comparing the scheme to the one for Bowen Jr. that he, Code and Dawkins had collectively

handled earlier that summer, asking Code to try to negotiate the number down closer to the $100,000 figure Gatto had agreed to provide to Bowen Sr. (GX 7-T). The payment, which as noted, would actually have ultimately benefited Code, Dawkins and a third scheme member, never happened, as the defendants were arrested shortly after these calls.

### E.  The Harm Caused By the Defendants' Conduct

Notwithstanding their repeated protestations to the contrary, the defendants' conduct caused real harm: harm to the Universities, harm to the student-athletes involved, and harm to other third parties impacted by the defendants' crimes. With respect to the Universities, and as detailed below and in the victim impact statements submitted by each University, the harm caused by the defendants' scheme extended vastly beyond the value of the scholarships awarded under false pretenses. The defendants' conduct caused both tangible and intangible harm to the schools as academic institutions, including reputational damage, decreased ticket sales and sports revenue, and significant legal fees and expenses incurred as a direct result of the defendants' conduct. And that, of course, does not even account for any potential and expected NCAA sanctions.[3]

Moreover, the defendants' conduct caused direct and meaningful harms to a number of the student-athletes at issue, at least some of whom appear to have been completely in the dark about the schemes being hatched by the adults around them, adults including these defendants, who sought to profit off of their talents and abilities. Many of the student athletes have been barred from competing in collegiate basketball as a result of the defendants' conduct, and two of

---

[3] The NCAA has not publicly announced the sanctions to be imposed as a result of the defendants' conduct, as the Government understands that the NCAA's inquiry into that conduct, which was largely delayed pending trial in this matter, remains ongoing.

them – Brian Bowen Jr. and Billy Preston – have had to forego the college experience entirely as a result of the defendants' conduct and the associated scandals now surrounding them.

### 1. The Universities Suffered Significant Economic and Intangible Harm

As the trial evidence established, each of the Universities – The University of Louisville, North Carolina State University and the University of Kansas – are far more than just their men's basketball teams. As detailed more fully in victim impact statements submitted in advance of sentencing, each of the schools as institutions suffered harms that extend far beyond the cost of the scholarships issued under false pretenses. Deputy University Counsel at the University of Louisville, for example, writes that a "dollar amount cannot explain the full impact that the University of Louisville felt when we learned we were the victim of the scheme hatched by the defendants," describing news of the defendants' arrests as a "shockwave felt by every student, faculty, staff, administrator and trustee." (Louisville Ltr. at 1). The Athletic Director for N.C. State University similarly describes how the defendants' conduct "has unquestionably damaged the reputation" of the University, which as an institution "strongly believe[s] in acting with integrity in all matters," adding that the defendants' conduct "is antithetical to both our identity and our deeply-rooted culture of compliance." (Letter from Deborah Yow dated February 22, 2019 ("NC State Ltr.") at 1).[4] And counsel for the University of Kansas notes that the "damage done by Mr. Gatto and his co-conspirators greed cannot be overstated." (Letter from William M. Sullivan Jr. dated February 22, 2019 ("Kansas Ltr.") at 1).[5]

The harms caused were both intangible and decidedly tangible. All three schools describe hundreds of thousands of dollars in losses stemming from the defendants' conduct, all

---

[4] A copy of the North Carolina State University Letter is attached as Exhibit B.
[5] A copy of the University of Kansas Letter is attached as Exhibit C.

in addition to the value of the lost scholarships.  The University of Kansas, for example, describes nearly $1 million in legal fees incurred as a direct result of the defendants' conduct, including nearly $350,000 addressing potential issues with the NCAA alone.  (Kansas Ltr. at 6). N.C. State similarly points to several hundred thousand dollars in legal fees incurred as a result of the defendants' conduct, with as much as $500,000 in additional fees anticipated as the university continues to deal with the NCAA and its investigation.  (NC State Ltr. at 2).   And Louisville, which of course also has retained outside counsel as a result of the defendants' conduct, more broadly describes "a demoralized alumni, a defeated fanbase, and a rapid decline in ticket sales, sponsorships, donations and revenue" adding that "[e]asily, the real financial impact is in the millions of dollars." (Louisville Ltr. at 2).  As Louisville concludes:

> The loss suffered by Louisville over the actions of these Defendants and the others involved reflects an impact way beyond just the cost of a scholarship. And it does not help to quantify the human toll the defendants' actions took on a host of individuals, 18- to 22-year-old students on their own for the first time and entrusted to us; and the professionals committed to supporting, developing, and educating them before launching them into the world. That development of students – not just good basketball – is the real purpose of the University of Louisville.

(*Id.* at 3).

While the implications of the defendants' scheme in the context of the NCAA's infractions process remains unknown at this time, each of these schools also faces the possibility of serious additional consequences in the form of penalties and fines from the defendants' actions.  This is particularly daunting for the University of Louisville, which was already serving probation for a prior infractions case, and could face even greater potential additional negative consequences as a result.

Simply put, the defendants' conduct significantly harmed these schools.  And the defendants repeated protestations to the contrary are not simply belied by the trial record and the jury's verdict, but the words of the victims themselves.

### 2. *The Defendants' Scheme Significantly Harmed the Student-Athletes*

The defendants' scheme also imposed a significant harm on the young talented teenagers off of whose backs the defendants were attempting to profit.  Although these student-athletes were not the statutory victims of the defendants' charged offense, they were nonetheless deeply and meaningfully impacted by the defendants' criminal conduct.  With respect to Brian Bowen Jr., for example, as the trial evidence established, Bowen Jr. had no knowledge of the illicit payments being funneled from the defendants to his father.  Nonetheless, he was immediately taken off the court when news of the defendants' arrests broke and never played a single game for the University of Louisville (or any other college) as a result.  Bowen Jr., who ultimately left Louisville after it became clear he would be unlikely to be able to reestablish his eligibility as a result of the defendants' conduct, is currently playing professional basketball in Australia.

Similarly, when the University of Kansas learned of potential financial improprieties involving the mother of Billy Preston before the start of his freshman season, Kansas similarly sidelined Preston who never played a game for Kansas and ultimately left the University in early 2018 when it became clear that he, too, would be unlikely to ever regain his eligibility as a result of the payments approved and facilitated by Gatto.  Preston, who played briefly in Bosnia, is now playing for a developmental league team in Texas.

And de Sousa, who played his freshman season before allegations regarding payments made to his guardian were made public, has not played since.  To the contrary, the NCAA

14

recently announced that de Sousa would be suspended for this upcoming season and the 2019-20 season as a result of the payments approved by Gatto.

And of course, those three individuals each played for teams that were counting on them and for schools whose students, faculty, fans and alumni suffered the consequences of their inability to participate.  As the University of Louisville notes, in its victim impact statement, for those players who were permitted to play "[w]hat was building up to be a very promising season for these young college student-athletes was turned upside down into what seemed to be a national spectacle.  With maturity and grit, these committed student-athletes pulled together and played, but their season was wildly different than they could have imagined."  (Louisville Ltr. at 2).

## II.     The Guidelines Calculation

As set forth below, with one exception, the Government generally agrees with the Probation Department's Guidelines calculations for each defendant as set forth in its Presentence Investigative Reports ("PSRs").

### A.  The Probation Department Calculations

The Probation Department calculated the offense conduct guidelines as follows:

For each defendant, the base offense level is 7.  The Probation Department then added a loss enhancement based on the four-year value of each scholarship issued under false pretenses. With respect to Code and Dawkins, that was solely the Bowen scholarship.  With respect to Gatto, that figure also included the scholarships issued to Preston, de Sousa and Smith Jr.  As such, the Probation Department added 10 levels for Code and Dawkins, and 14 levels for Gatto.

The Probation Department declined, however, over the Government's objection, to apply a sophisticated means enhancement.

Accordingly, the Probation Department calculated a total offense level of 21 for Gatto, resulting an advisory guidelines range of 37 to 46 months' imprisonment.  The Probation Department calculated a total offense level of 17 for Code and Dawkins, resulting in an advisory guidelines range of 24 to 30 months' imprisonment.  The Probation Department has recommended a sentence of one year of imprisonment for Gatto, and a sentence of eight months' imprisonment for Code and Dawkins.

The defendants have disputed the Probation Department's enhancement for loss, and contend the Probation Department appropriately declined to apply the sophisticated means enhancement.  For the reasons explained below, the Government believes the Probation Department's loss calculation is correct.

### B.  The Probation Department Correctly Calculated the Loss Enhancements

The defendants contend the Probation Department erred in its calculation of the loss enhancement because, as they contend here – as they did in their pre-trial briefing and at trial itself – they did not intend *any* loss, and that the Probation Department's calculation is based solely "on losses that are, at most, *unintended* repercussions" of their conduct.  (Gatto Sub. at 31).  The argument is without merit.

As an initial matter, the Government does not dispute that the proper measure of intended loss is "the pecuniary harm that the defendant purposely sought to inflict."  U.S.S.G. §2B1.1, app. n. 3(A)(ii).[6]  The defendants contend that the proper measure of loss, under this standard, is

---

[6] The Probation Department, while making clear that it was relying on an intended loss calculation, inadvertently quoted from the commentary defining *actual loss* as "the reasonably foreseeable pecuniary harm" caused by the defendant's conduct (Gatto PSR ¶ 60) (quoting U.S.S.G. § 2b1.1 cmt. 3A(i)).  However, as noted above, the mistaken citation to the definition of actual, rather than intended, loss is of no moment because as detailed above, the Probation Department's calculation meets the definition of intended loss.

zero because "there was no evidence presented at trial that Mr. Gatto *desired* the Universities to sustain financial losses." (Gatto Sub. at 33).

The argument completely distorts the trial record. At trial, the Government offered substantial evidence that the defendants knowingly and intentionally sought to cause the Universities to issue scholarships under false pretenses, thereby purposefully inflicting on those Universities a loss in the form of the value of the scholarship. Indeed, as the jury found, that was the unlawful purpose of the scheme. Gatto's self-serving assertion that he had "no particular interest in whether the Universities offered athletic scholarships to these students," (*id.* at 34) is not supported by citation to anything in the record, and is more importantly starkly belied by the trial evidence and the jury's verdict.

With respect to Bowen Jr., for example, the trial evidence thoroughly established that the primary purpose of the payments orchestrated by the defendants was to secure Bowen Jr.'s commitment to attend the University of Louisville. Indeed, far from having "no particular interest" in whether Bowen Jr. received a scholarship from Louisville, the trial record included extensive evidence establishing the payment to Bowen Jr. occurred *solely* because he attended the University of Louisville. Indeed, and among other things, defense counsel in summation pointed to multiple calls from Gatto to Louisville Head Coach Rick Pitino at and around the time of Bowen Jr.'s commitment, and the Government also offered texts between Code and Dawkins about the need to orchestrate the payment to ensure Bowen Jr. did not go to a rival school.

Similar testimony and evidence was adduced with respect to the payments to the families of student-athletes willing to attend N.C. State University and the University of Kansas. Indeed, Gassnola, during his testimony, plainly stated that the purpose of the scheme and the payments he helped facilitate with Gatto was to ensure the student-athletes attended – and thus received

scholarships from – particular universities, *i.e.*, those sponsored by Adidas.  (*E.g.*, Tr. 915, 941.)

Gatto's counsel himself made this very point to the jury in summation, arguing that Gatto

thought Adidas would be "better off" with those students playing for Adidas-sponsored schools,

(Tr. 1739-40), a result that was of course dependent on those schools issuing athletic

scholarships to the players in question.

By orchestrating the payments – knowing they would be concealed from the University –

the defendants purposefully sought to cause the University to issue an athletic scholarship under

false pretenses.  The value of that scholarship is thus properly included as a harm the defendants

purposefully sought to inflict through their conduct.  That the defendants did not want to get

*caught* – that they "wanted these students to compete in games and play well for their schools"

(Gatto Sub. at 35) – is irrelevant because whether the defendants' scheme had been uncovered or

not, the defendants still fully intended for the scholarship to issue under false and fraudulent

pretenses.  Its value is thus properly included in the loss amount.[7] *Cf. United States v. Carboni*,

204 F.3d 39, 47 (2d Cir. 2000) ("'Intended loss' is tantamount to the probable loss from a

particular misstatement 'because one is presumed to intend the natural and 'probable'

consequences of one's acts."); *see also United States v. Ajermian*, 193 F. Supp. 3d 298, 302-03

(S.D.N.Y. 2016) (in insurance fraud scheme, intended loss is appropriately measured by full

value of the disability benefits issued under false pretenses).

---

[7] By contrast, neither the Government nor the Probation Department is seeking to hold the
defendants accountable for other losses, for purposes of the Guidelines calculation, such as
potential NCAA fines or penalties, lost ticket sales or sponsorships, or legal fees incurred by the
Universities as a result of the defendants' conduct, all of which could be said to be "reasonably
foreseeable" to the defendants but might not qualify as losses the defendants purposefully sought
to inflict.

Finally, in a footnote, defendant Gatto argues that the proper measure of intended loss is the value of just one year of the scholarship because "Mr. Gatto and his co-defendants expected that the student athletes would each be 'one and done' players who would only receive *one* year of scholarship funds." (Gatto Sub. at 35 n.5).   While there is no question that the defendants hoped some of these players might enter the NBA draft before graduation, the defendants' intent was to cause each University to issue an athletic scholarship, which in each instance relevant here, entailed a four-year commitment by the school.  Indeed, as is presently the case with de Sousa, each University was required, under the terms of its commitment, to continue to fund the scholarship potentially for multiple years if the student-athlete returned, and even if the player was not able to participate in collegiate athletics.[8]  As such, the Probation Department appropriately calculated the intended loss resulting from the defendants' fraudulent scheme as the full value of the athletic scholarships extended under false pretenses as a direct result of the defendants' conduct.

### C.  The Probation Department Erred In Declining to Apply a Sophisticated Means Enhancement

The Government respectfully disagrees with the Probation Department's determination not to apply a two-level enhancement to reflect the defendants' use of "sophisticated means" in furtherance of their fraudulent scheme.  In declining to include the enhancement, the PSRs note that "there were no fictitious entities, corporate shells, or offshore financial accounts created making the offense particularly sophisticated in nature, as compared to other financial frauds." (*See, e.g.*, Gatto PSR ¶ 70).  However, as the Guidelines make clear, the enhancement applies

---

[8] Moreover, as the commentary makes clear, the measure of intended loss includes "intended pecuniary harm that would have been impossible or unlikely to occur."  U.S.S.G. §2B1.1 cmt. 3(A)(ii). Thus, even if it was "unlikely" that each of the players would have stayed for four years, the full value of the scholarship is properly considered in determining intended loss.

broadly to conduct "pertaining to the execution or concealment of the offense."  2B1.1 cmt. 9(B).

The Guidelines even provide an example – "in a telemarketing scheme, locating the main office

of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction" – in

which the scheme is designed in a manner intended to make detection particularly difficult, but

does not necessarily involve any "fictitious entities, corporate shells or offshore financial

accounts."

      The Second Circuit has similarly made clear that no particular act or acts are required to

trigger the enhancement, because the inquiry should focus more broadly on the defendants'

course of conduct as a whole.  *See, e.g.*, *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003)

("[E]ven if each step in the scheme was not elaborate, the total scheme was sophisticated in the

way all the steps were linked together.");  *United States v. Lewis*, 93 F.3d 1075, 1083 (2d Cir.

1996) (sophisticated means enhancement applied in tax case even when "each step in the planned

tax evasion was simple, [because] when viewed together, the steps comprised a plan more

complex than merely filling out a false tax return").

      Here, as established at trial, the defendants engaged in a course of conduct that, as a

whole, amounted to a significant and complex effort to conceal the illicit and illegal nature of

their conduct.  *First*, Code and Gatto created and approved sham invoices purporting to justify

the illegal $25,000 payments from Adidas to the family of Brian Bowen Jr.  *Second*, the

defendants caused the money to be routed to the Bowen family indirectly through multiple

transfers intended to conceal the nature and purpose of the payment.  Specifically, Gatto caused

Adidas to wire the money to the account of an AAU program under the control of Code,

ostensibly as payment for "travel fees"; Code in turn caused the AAU program to transfer the

money to a corporate entity controlled by Dawkins, ostensibly as "consultant fees."  Finally, Dawkins caused the money to be delivered, in cash, to the Bowen family, by an intermediary.

Taken collectively, these steps plainly evidence a sophisticated effort to execute and conceal the charged conduct.  Indeed, rather than directly transfer the money from Adidas to the families of student athletes pursuant to internal documents accurately reflecting what the payments were for, the defendants took elaborate and sophisticated steps to conceal their conduct.  Under similar circumstances, courts have approved of a two-level sophisticated means enhancement.  *See, e.g.*, *United States v. Sosa*, 777 F.3d 1279, 1302 (11th Cir. 2015) (affirming application of enhancement in health care fraud scheme because participants "were not paid directly, but in a surreptitious manner" to evade detection, including through falsely writing on checks used to pay participants that the payments were for innocuous sounding purposes such as "transport"); *United States v. Stitsky*, 536 F. App'x 98, 112 (2d Cir. 2013) (affirming application of enhancement where defendants' conduct included "a 'careful effort to conceal the fraud by lying'" to others around them, including business partners and the "creation of fictitious documents" as part of the execution of the scheme).

In sum, the Government respectfully submits that the defendants' conduct meets the criteria for application of the sophisticated means enhancement.  Applying that enhancement, defendant Gatto's total adjusted offense level becomes 23, resulting in an applicable Guidelines range of 46 to 57 months' imprisonment, while the Code and Dawkins total adjusted offense level becomes 19, resulting in an applicable Guidelines range of 30 to 37 months' imprisonment.

Alternatively, to the extent the Court declines to apply the enhancement, the Government submits the conduct described above and the elaborate steps the defendants took to conceal their

criminal scheme remains highly relevant to consideration of the factors set forth in 18 U.S.C. § 3553(a) and should be considered in that respect by the Court in imposing sentence.

## III.    Discussion

Consistent with the recommendation of the Probation Department, the Government respectfully submits that a sentence that includes a period of incarceration is appropriate for each defendant and would be sufficient but not greater than necessary to promote the legitimate goals of sentencing.  Indeed, consideration of the factors set forth in 18 U.SC. § 3553(a) militates strongly in favor of a custodial sentence.

### A.    A Sentence of Incarceration is Necessary to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Impose Just Punishment

*First*, a sentence of incarceration is necessary to reflect the seriousness of the offense conduct and the magnitude of the harm the defendants caused.  *See* 18 U.S.C. § 3553(a)(1) & (2)(A).  As Gatto himself admits, "the Government's charges are unquestionably serious." (Gatto Sub. at 2).  For a period of years, these defendants repeatedly sought to steer talented student-athletes to play basketball at specific Adidas-sponsored universities by making tens of thousands of dollars in under-the-table payments to the families of those student-athletes.  The defendants engaged in a pattern of fraudulent, deceitful, and sophisticated conduct that depended on making false statements and certifications to the Universities in order to obtain scholarships under false pretenses.  Moreover, and notwithstanding the defendants' repeated protestations to the contrary, as detailed herein, the defendants' conduct was extraordinarily harmful to the Universities, among others.  Indeed, for at least five reasons, the seriousness of the defendants' conduct weighs in favor of a custodial sentence.

### 1.   *The Defendants' Conduct Caused Substantial Harm*

First, the seriousness of the defendants' offense is reflected in the significant harm it caused not simply to the Universities but to others affected by the defendants' illicit payments. These consequences, even if not "desired" by the defendants (*e.g.*, Gatto Sub. at 33), were unquestionably substantial and a direct result of their conduct.  With respect to the Universities, the most direct harm, of course, was the loss of a scholarship issued under false pretenses, one worth tens of thousands of dollars over up to a four-year period.  But in some respects the scholarships paled in comparison to the far more significant financial and reputational harms that flowed from the defendants' conduct, including the lingering possibility of NCAA fines and penalties, as well as significant investigative and legal costs. (*E.g.*, Gatto PSR ¶ 63).

Indeed, as described more fully above, each of the victim impact statements submitted by the Universities details a panoply of tangible and intangible harms that go well beyond the value of the athletic scholarships.  North Carolina State University and the University of Kansas have incurred substantial costs and attorneys' fees through the inquiries, including the criminal investigation stemming from the defendants' conduct.  (NC State Ltr., at 2; Kansas Ltr. at 6). The University of Louisville, in its letter to the Court, describes the ripple effects of the defendants' actions that extended not simply to the remainder of the basketball team and its young players, but to the broader University of Louisville community.  Louisville describes the real financial impact as "easily" in the millions of dollars, due to, among other things, a "rapid decline in ticket sales, sponsorships, donations and revenue," with attendance at Louisville basketball games plummeting by 19% during the 2017-2018 season that immediately followed the defendants' arrest.  (Louisville Ltr. at 2).  And, of course, there are also reputational costs that are hard to quantify.  As the Athletic Director of NC State makes clear, the defendants' actions and the resulting trial and "attendant publicity" has "unquestionably damaged the

23

reputation of our University." (NC State Ltr. at 1).  Counsel for the University of Kansas similarly describes damage to the University that "cannot be overstated." (Kansas Ltr. at 1).

The Universities were not the only ones deeply harmed by the defendants' conduct.  The defendants' scheme also had devastating effects on the student-athletes themselves, many of whom, the trial evidence strongly suggested, had no idea the defendants were scheming with the adults around them for their own benefit.  With respect to Brian Bowen Jr., who never knew about the payments to his father (Tr. at 596:23-25), as a consequence of the defendants' conduct, Bowen Jr. never played a game at Louisville or on any other NCAA team and is presently playing for a professional team in Australia.  Billy Preston and Silvio de Sousa, both of whom have declared, in public statements, a similar lack of any knowledge of the conduct of those acting and working around them, have also seen their collegiate careers sidelined or completely ruined as a result of the defendants' conduct.  Preston never played a game at Kansas and ultimately left the school as a result of the payments to his mother orchestrated by Gatto.  And de Sousa, who played in his freshman season, has since been suspended by the NCAA for the entire 2018-19 and 2019-20 seasons as a result of the conduct established at trial.[9]

The defendants' repeated refrain that none of these harms was "desirable" to them is, even if true, beside the point.  The defendants caused substantial damage through their conduct, damage that they seem unwilling to acknowledge, let alone accept responsibility for.  And that damage – and the seeming lack of any remorse – counsels strongly in favor of a custodial term.

    2.  *The Defendants' Conduct Was Repeated*

---

[9] As was further established at trial, a basketball prospect's ability to participate in NCAA Division I basketball is critically important to that athlete's future prospects of playing professionally in the NBA.  (*See, e.g.,* Tr. at 273:16-21).

Moreover, the defendants' conduct was hardly the result of a single mistake or lapse in judgment but was instead part of a concerted effort and, with respect to Gatto, in particular, an ongoing and repeated pattern of illicit payments and concerted efforts to conceal those payments. With respect to Gatto, the trial evidence established at least five different players whose families or handlers Gatto was prepared to make substantial payments to over a multi-year period: Dennis Smith Jr.; Billy Preston; Brian Bowen Jr.; Silvio De Sousa; and Nassir Little.  In each instance, Gatto approved substantial payments that he then concealed by paying them indirectly, generally through Adidas' consultants, and pursuant to sham invoices and other documents intended to further conceal them.

With respect to Code and Dawkins, while each was convicted principally for their involvement in the Louisville scheme, the trial evidence established that, in the months leading up to their arrest, they both were plotting again to participate in a similar scheme, one to funnel $150,000 to the family of Nassir Little to cause him to attend the University of Miami.  Instead, both Code and Dawkins decided they would actually pocket a substantial portion of the money, but they continued to lead Gatto to believe they were facilitating the payment to secure Little's willingness to attend the University of Miami.

More generally, and as noted above, both Code and Dawkins were immersed in a world that turned on illicit payments intended to help them make money by recruiting top student-athletes.  At trial, the Government offered ledgers kept by Dawkins documenting various typically smaller payments he made to the families of student-athletes and, in conversations intentionally redacted for trial, both discussed plans to pay bribes to corrupt college basketball coaches in a further effort to obtain a corrupt advantage in signing top talent.

   3.   *The Defendants' Took Sophisticated Steps to Conceal Their Conduct*

Third, the defendants' conduct was sophisticated and intentional.  It involved fake invoices – ones reflecting bogus expenses for reimbursement, including for seemingly legitimate costs like "tournament fees" and "travel costs" (*see, e.g.,* GX 1065 and 1004) – and indirect money movements intended to conceal the source of the funds and the true nature of the payments.  As described more fully above, the Bowen Sr. payment, for example, which was approved as an invoice for travel fees to an AAU program in South Carolina, was paid by Adidas to the Karolina Khaos; was then routed via a check for purported "consulting fees" from the Khaos to Loyd Inc., a company controlled by Dawkins; and finally was given to Bowen Sr. in cash because, as Code noted in a recorded conversation offered at trial, "for cleanliness and . . . lack of questions, I would always assume cash is better." (GX 57, at 7:6-11).

In this respect, Gatto's role in the scheme was particularly crucial: he provided access to the multi-million dollar Adidas slush fund he controlled, money necessary to fund the payments.  As the Director of Global Sports Marketing for Basketball, Gatto had substantial discretion to allocate substantial sums with little oversight. (*E.g.*, Tr. 1270-25-1271, 1274-75; 1280).  And, as the trial evidence established, Gatto abused that authority repeatedly to authorize payments intended for the families of student-athletes.

With respect to Dawkins and Code, trial evidence established that both used "bat phones" at various points.  Dawkins, in particular, not only used a secret second phone but spoke in coded terms when using his regular phone, all further indicia of the defendants' clear understanding that what they were doing was wrong and their efforts to conceal their conduct and evade detection.  (*See, e.g.*, GX 25; Tr. 606).  In sum, the defendants' elaborate efforts to conceal the existence of the payments bespeaks the seriousness of the offense, as well as the defendants' own knowledge that what they were doing was wrong and illegal.

26

4.  *The Defendants' Payments to the Families of Student-Athletes Were Sizable And For the Specific Purpose of Directing Them to Particular Universities*

The fourth aspect of the defendants' conduct that bears particular mention is that the payments here were made with the specific knowledge that the student-athlete at issue would be attending a particular school and with the specific intent to conceal the payment from that school. Indeed, while the defendants devote considerable energy to arguing that payments to college athletes are "typical," they all but ignore the fact that what makes these payments particularly nefarious is that they were, for this particular universe, quite large – from $40,000 to $150,000 – and made with the specific intent of concealing them from particular Universities.  Indeed, and as is addressed in further detail below, while the defendants claim that payments to student-athletes and their families are rampant in college basketball, the defendants' conduct was in many respects unprecedented in magnitude, scope and sophistication. Marshaling the full resources of a large, international apparel company, the defendants did not just provide marginal "improper benefits" to star athletes but steered tens of thousands of dollars at a time to the families of student-athletes for the very purpose of causing them to accept specific athletic scholarships under false pretenses.  That intent – and that course of conduct more generally – formed the core of the Government criminal theory and it, too, warrants a sentence of incarceration.

5.  *The Defendants Were Motivated By Personal Gain*

Finally, while each of the defendants professes not to have been motivated by personal gain (*see* Gatto Sub. at 3 (the offense here was never intended to lead to personal profit for Mr. Gatto."); *id.* at 17 ("Mr. Gatto did not seek to defraud the Universities of basketball scholarships in order to line his own pockets."); Code Sub. at 15; Dawkins Sub. at 12), the trial evidence

established, at bare minimum, that each of the scheme participants had personal (and generally financial) motivations for their participation.

For Gatto, sending top recruits to Adidas-sponsored universities was critical to the long-term success of Adidas's basketball brand and to Gatto's role at the company.  As Gatto himself stated in his interview with the Probation Department "his primary responsibility [as the Director of Global Sports Marketing] was to secure endorsement deals for basketball players, both currently in the NBA and those coming out of the college ranks." (Gatto PSR ¶ 101).  And as the trial evidence established, by making these illicit payments, Gatto sought to give himself a leg up in securing those sorts of deals, by currying favor with the families of top prospects and developing a relationship between them and the Adidas brand.

For Code, an Adidas consultant, delivering high-caliber players to Adidas-sponsored universities was similarly critical to his ability to demonstrate his value to the Adidas brand, and it was intended to ensure that he would continue to be paid by Adidas in the years to come.  Moreover, at the time that Code began working with Dawkins to funnel payments to Brian Bowen Sr. in order to send his son to the University of Louisville, Code had already made pans to go into business with Dawkins, thereby ensuring he would directly profit from any top-tier athletes Dawkins and their new company were able to sign as a result of the scheme.

Finally, Dawkins was unquestionably motivated by personal profit.  By providing Brian Bowen Sr. with $100,000 from Adidas in order to matriculate to Louisville, Dawkins increased his own chances of ultimately signing Bowen Sr.'s son as a client when he turned pro, where Dawkins and Code would then be able to reap large fees.[10]

---

[10] Moreover, during a June 20, 2017 meeting between Dawkins, Code, Munish Sood, and others, Dawkins spoke at length about his use of Bowen Jr.'s recruiting process to serve his own professional ends, including his plans to use Bowen Jr. as a means to secure other clients already

Those motivations, alone, are important to the Court's consideration of an appropriate sentence.  But the actual record is particularly important to belie the self-serving notion, based principally on misleading snippets of testimony, that the defendants were purely "trying to help" the various Universities.  (*E.g.*, Gatto Sub. at 17-18).   That is simply not the case – certainly the victim impact statements make clear the Universities did not view this as helpful – and more important, such a narrative completely overlooks the very personal motivations the defendants had for committing these crimes.

### B.  A Sentence of Incarceration is Necessary to Promote General Deterrence

A substantial sentence is also necessary to promote deterrence. *See* 18 U.S.C. § 3553(a)(2)(B).  While the Government is prepared to accept the defendants' representations that further specific deterrence is unnecessary, general deterrence, in particular, is arguably the most important factor this Court should consider in imposing sentence.  Indeed, as the defendants themselves argue at some length, there is some reason to believe that others are involved in making similar payments to the families of student-athletes.  And while the Government has never, and does not now, suggest that any payment of any size, or any rules violation more generally, constitutes a federal crime, to the extent – as the defendants' suggest – others are similarly conspiring to cause universities to issue athletic scholarships under false pretenses, then this Court should send a strong message that such conduct is harmful, criminal, and will result in prison time.

---

bound for the NBA.  *See* GX 75T at 37-38 ("And I say this openly: Brian Bowen got me [Justin] Patton this year. I don't know if Brian Bowen is going to be a pro. He probably will be. If he doesn't at the end of the day, because all the coaches was coming to me for his for his recruitment, I was able to get a kid that's going to be a top 15 pick in two days . . . . [A]ll those schools had a guy who was a top 15 pick and I . . . like, listen, whoever gets me the guy is gonna have the best chance to be put in a position to to get the kid [Bowen Jr.].  I mean, it was just the bottom line.").

Furthermore, the fact that clandestine payments like those made by the defendants to the families of student-athletes are particularly difficult for universities and others to detect should be considered by the Court in imposing sentence. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."); *see also United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) (same).  As N.C. State University, for example, tells the Court, "there is no detection technique to identify an individual who intentionally chooses to violate an NCAA rule and then hides the misconduct from both the University and the NCAA."  (NC State Ltr. at 2).

That is particularly true where, as here, the defendants took sophisticated steps to conceal their conduct, including, as detailed above, the use of fake invoices and related financial documents; multiple, indirect money transfers resulting in cash deliveries; and the use of "bat phones" to communicate in furtherance of the scheme, all of which counsel in favor of sending a strong message to those who might be tempted to engage in similar conduct by the potential upsides to such payments – *i.e.*, landing the student-athlete as a revenue-generating client or signing him to a lucrative endorsement deal –  that the risks, if they are caught, are even greater, and in particular that the consequences will include prison time.

## C.  The Defense Submissions

The defendants, in their various submissions, make a series of arguments, many of which have been addressed above but at least three of which warrant further specific response:

*First*, the defendants reiterate one of the same core arguments the jury squarely rejected – that they were trying to "help" the Universities who, as the defendants would have it, were the

30

"*intended beneficiar[ies]* of the" defendants' scheme. (Gatto Sub. at 17). As argued extensively above, the Universities do not see the defendants' conduct in that light and, to the contrary, had no interest in the sort of "help" the defendants were offering. To the extent the defendants reiterate related arguments that one or more coaches at the various schools were aware of, or even invited, the payments – issues as to which the trial evidence was decidedly mixed – the defendants knew full well those coaches were not allowed to do so. Indeed, in a key recorded conversation about the Bowen Jr. payment, Code noted that the coaching staff had to be able to maintain "plausible deniability," (GX 75A) because Code and his co-defendants knew the coaching staff could not authorize or condone this conduct.[11]

    *Second*, the defendants contend, as they did at trial, that rules violations are common, that "misstatements about compliance with those rules must be equally common," and, therefore, that this Court should be lenient in imposing sentence because their conduct is "indistinguishable from that of many, many other people who will never see the inside of a prison cell." (Gatto Sub. at 4, 24). As an initial matter, much of the "evidence" the defendants cite of others engaging in "similar" misconduct comes in the form of the defendants' own untested and, in some cases, unsourced statements on wire recordings offered at trial, as well as rumors or

---

[11] In this respect, it bears mention that the defendants' selective use of the Government interview of Kansas Athletic Director David Reed with respect to de Sousa is extremely misleading. (*E.g.* Gatto Sub. at 23). At the time de Sousa was offered a scholarship, he disclosed to the University an allegation that he had previously signed with an agent. De Sousa claimed the allegation was untrue, and the University – having been informed of the allegation – made the decision to issue him a scholarship, understanding the risk that he might be declared ineligible on that basis. The University then sought to convince the NCAA that the allegations were untrue and that de Sousa deserved to maintain his eligibility. At no point did Reed suggest, as the defendants seem to imply, that the University is indifferent to potential eligibility issues, let alone tens of thousands of dollars in illicit cash payments. On the contrary, as the full Reed interview makes clear, precisely because the University of Kansas takes compliance seriously, it only agreed to issue a scholarship to de Sousa because de Sousa disclosed all of the relevant facts such that the University could investigate them and satisfy itself of his eligibility.

frequently anonymous and unproven complaints made to the NCAA.  Whether such conduct, in fact, occurred is unknown.

With respect to misconduct that has been investigated, the defendants' conduct is far more serious, sophisticated and nefarious in nature than many of the other rules violations the defendants point to.  For example, the defendants point to the case of a former University of Louisville student-athlete.  (*Id.* at 23).  There, the University of Louisville apparently learned that, while in high school, the student-athlete's family had accepted subsidized housing – specifically, the student-athlete, his mother, and his sister were allowed to live with someone either without paying rent or paying below-market rent for a period of time.[12]  Louisville self-reported the conduct to the NCAA and did not permit the student-athlete to compete until the NCAA reinstated him, a process that involved a suspension, a personal fine for the student-athlete, and a mandate that he complete community service.  That conduct, while clearly taken seriously by Louisville and the NCAA, is hardly "indistinguishable" from the sophisticated, intentional operation the defendants ran, one that included, among other things, numerous steps to conceal and cover up a $100,000 cash payment financed by an apparel company.

Moreover, and perhaps more important, while the Government could not and does not dispute the finding of the Rice Commission that the provision of improper benefits of varying forms and to varying degrees to top student-athletes have "been part of the landscape of pre-professional basketball for many years,"  (Report and Recommendations to Address the Issues Facing Collegiate Basketball dated Apr. 2018 (the "Rice Commission Report") at 16), that only further counsels in favor of a custodial sentence where, as here, the conduct is not simply a

---

[12] The $50,000 figure cited by the defendants reflects monthly rent, based on the NCAA's determination of the fair market value of the housing, for a period of more than two-and-a-half years.

modest violation of NCAA rules but a gross and intentional effort to thwart those rules and, more important, to cause universities to issue scholarships based on false statements and other efforts to conceal those flagrant violations.  Indeed, the Rice Commission, relied upon so heavily by the defendants, specifically pointed to apparel companies and the influx of money those companies – and people like Gatto – as a core cause of some of the problems identified in that Report, which similarly counsels in favor of sending a strong message to those in a position to abuse their positions to corrupt amateur sports that criminal conduct like that for which the defendants have been convicted will result in prison time.

Finally, and in a related vein, the defendants cite a series of other cases in which they contend similar conduct resulted in little to no prison time: *United States v. Walters*, 997 F.2d 1219, 1221 (7th Cir. 1993), *United States v. Gray*, 96 F.3d 769, 772 (5th Cir. 1996), and *United States v. Young*, No. 02-20400B, 2005 WL 3879034 (W.D. Tenn. Nov. 7, 2005).[13]  As an initial matter, and as this Court is obviously well aware, the facts of every case are different, and drawing direct comparisons between sentences on different facts is virtually impossible.  That said, a more complete examination of cases arising from at least arguably relevant facts suggests that the sorts of sentences recommended by the Probation Department fall very comfortably within the range of punishments meted out in those cases.

In *Walters*, which involved payments that were both considerably smaller and far less sophisticated than those at issue here, the lead defendant, Norby Walters, was sentenced to 18 months' imprisonment and a $25,000 fine before his conviction was reversed on factual and legal grounds familiar to the Court and immaterial to the instant case.

---

[13] It bears mention that the very existence of these cases draws in question the defendants' assertion that they are "the first to have been convicted of federal crimes" for the conduct at issue in this trial.  (*E.g.*, Code Sub. at 4).

In *Gray*, which involved basketball coaches helping prospective recruits obtain academic credits they were not entitled to so as to ensure they remained eligible to play basketball, the defendants were sentenced to three years' probation.

In *Young*, which involved a single, $150,000 illicit payment from a booster to a football recruit, the defendant received a sentence of 6 months' imprisonment followed by a term of 6 months' home incarceration.

Finally, in *United States v. Piggie*, 303 F.3d 923 (8th Cir. 2002), which involved a sports agent making payments considerably smaller than those at issue here (ranging from approximately $2,000 to approximately $17,000 over a period of years) in the hopes of signing the student-athletes should they turn pro, the defendant was sentenced to 37 months' imprisonment, although the defendant did have a significant criminal history.

In sum, the range of penalties imposed in the cases cited by the defendants, even assuming their relevance, is entirely consistent with the recommendation of the Probation Department and the position of the Government that a term of incarceration is appropriate.

## IV.   Restitution

Finally, pursuant to the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A, all three defendants owe restitution to the University of Louisville, and Gatto alone owes restitution to North Carolina State University and the University of Kansas as well.  (Gatto PSR ¶ 122; Code PSR ¶ 131; Dawkins PSR ¶ 125).  The MVRA requires the court to order restitution, and provides guidance on the types of losses and harms for which a victim may recover.  *See generally* 18 U.S.C. § 3663A.

Here, the University of Louisville has informed the Government that it only seeks to recover the amount expended on Bowen Jr., or approximately $31,922.75, which is based on

Bowen Jr.'s attendance during the spring and fall semesters in 2017.  (GX 1613-14). [14]   The

University of Kansas and North Carolina State University have each informed the Government

that they seek not only the cost of lost scholarships but also legal fees incurred in connection

with the prosecution.  *See* 18 U.S.C. § 3664A(b)(4).   The University of Kansas, thus, seeks a

total of $1,136,424.52, which includes both the value of the athletic aid paid actually out under

false pretenses for the time Preston was, and de Sousa remains, on campus, and their attorney's

fees and related costs.[15]   North Carolina State University seeks the value of the one-year of

tuition covered for Smith Jr., or $23,900, as well as attorney's fees in the amount of $234,685,

for a total amount of $258,585.

---

[14] The defendants dispute that they should owe restitution to Louisville for a full-year's
scholarship because they contend that Bowen did not attend Louisville for a full year, and Gatto
contests that he owes restitution for Kansas for a full-year's scholarship for Preston because
Preston did not attend Kansas for a full year.  (Gatto Sub. 37).  The Government does not dispute
that restitution should be limited to actual costs incurred, but believes the numbers above reflect
those figures.

[15] Gatto contests that he owes restitution for de Sousa's scholarship after the indictment was
filed.  However, at that point Kansas had already issued a four-year scholarship to de Sousa and
was obligated to continue it; therefore, he should be obligated for the full amount of athletic
scholarship. Gatto provides no citation to support his argument that losses incurred after an
indictment was filed should not be considered.

**V.     Conclusion**

For the reasons set forth above, the Government respectfully submits that, consistent with the recommendation of the Probation Department, sentences that include terms of incarceration for each defendant are appropriate on these facts and would be sufficient but not greater than necessary to further the legitimate purposes of sentencing.

Respectfully submitted,


ROBERT S. KHUZAMI
Attorney for the United States, Acting
Under Authority Conferred by 28 U.S.C. § 515


By:     ___/s/_____
Edward B. Diskant
Noah Solowiejczyk
Eli J. Mark
Aline R. Flodr
Assistant United States Attorneys
(212) 637- 2294/2473/2431/1110