J357GAT1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        17 Cr. 686 (LAK)

5   JAMES GATTO, a/k/a "Jim,"
    MERL CODE,
6   CHRISTIAN DAWKINS,

7              Defendants.

8   ------------------------------x

9                                       March 5, 2019
                                        11:30 a.m.
10
    Before:
11                  HON. LEWIS A. KAPLAN,

12                                      District Judge

13

14                      APPEARANCES

15  GEOFFREY BERMAN
         United States Attorney for the
16       Southern District of New York
    BY:  EDWARD B. DISKANT
17       NOAH D. SOLOWIEJCZYK
         ALINE R. FLODR
18       ELI J. MARK
         Assistant United States Attorneys
19
    WILLKIE FARR & GALLAGHER LLP
20       Attorneys for Defendant Gatto
    BY:  MICHAEL S. SCHACHTER
21       CASEY E. DONNELLY

22

23

24

25

J357GAT1                        Sentencing

                        APPEARANCES (Cont'd)

1

2    NEXSEN PRUET LLC
          Attorneys for Defendant Code
3    BY:  MARK C. MOORE
              -and-
4    MERL F. CODE

5    HANEY LAW GROUP PLLC
          Attorneys for Defendant Dawkins
6    BY:  STEVEN A. HANEY

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J357GAT1                        Sentencing

1            (In open court)

2            (Case called)

3            MR. DISKANT:  Good morning, your Honor.  Edward
4    Diskant, Noah Solowiejczyk, Eli Mark and Aline Flodr for the
5    government.

6            MR. SCHACHTER:  Good morning, your Honor.  Michael
7    Schachter and Casey Donnelly on behalf of Mr. Gatto, who is
8    present in court.

9            THE COURT:  Good afternoon.

10           MR. MOORE:  Good morning, your Honor.  Mark Moore and
11   Merl Code for defendant Merl Code, and we are ready.

12           MR. HANEY:  Good morning, your Honor.  Steve Haney
13   appearing on behalf of Mr. Dawkins.

14           THE COURT:  Mr. Haney.

15           Have all of the defendants and all of their counsel
16   had the presentence reports for the necessary period?
17   Mr. Schachter?

18           MR. SCHACHTER:  Yes, your Honor.

19           THE COURT:  And Mr. Moore?

20           MR. MOORE:  Yes, your Honor, we have.

21           THE COURT:  And Mr. Haney?

22           MR. HANEY:  Yes, your Honor.  Thank you.

23           THE COURT:  OK.  Mr. Gatto, have you read the
24   presentence report and discussed it with fully with your
25   attorneys?

J357GAT1                      Sentencing

1          DEFENDANT GATTO:  Yes, your Honor.

2          THE COURT:  Same question to you, Mr. Code.

3          DEFENDANT CODE:  Yes, your Honor.

4          THE COURT:  And Mr. Dawkins.

5          DEFENDANT DAWKINS:  Yes, your Honor.

6          THE COURT:  The presentence reports will be sealed and

7    available to counsel in the event of an appeal.

8          Now, I take it we have two unresolved objections to

9    the presentence report.  One has to do with the loss amount,

10   and the other has to do with sophisticated means.

11         Is there anything else?

12         MR. DISKANT:  Not from the government.

13         MR. SCHACHTER:  No, your Honor, other than there is a

14   restitution issue as well.

15         THE COURT:  Yes.  As for that, I'm not going to deal

16   with that today; we're going to put that off --

17         MR. MOORE:  No, your Honor.

18         THE COURT:  -- because you all filed so many papers so

19   late.

20         OK.  Let's deal first with the sophisticated means

21   point.  Obviously, I've read what you've submitted on it.  I've

22   read what you have submitted on it, but if anybody wants to add

23   anything briefly, I will certainly hear it.  Mr. Schachter, why

24   don't we start with you.

25         MR. SCHACHTER:  No, your Honor.  We are aware that the

J357GAT1                       Sentencing

1    Court reads everything before the Court.  We have nothing to

2    add beyond what is in our papers.

3             THE COURT:  Mr. Moore?

4             MR. MOORE:  I agree completely with Mr. Schachter.  I

5    think our positions are well set out in the papers, your Honor.

6             THE COURT:  Mr. Haney?

7             MR. HANEY:  I would concur, your Honor.

8             THE COURT:  Mr. Diskant?

9             MR. DISKANT:  I also agree, your Honor.

10            THE COURT:  There will be a two point adjustment for

11   sophisticated means.  I think that probation rejected it

12   essentially by taking too narrow a view of what the guidelines

13   provide.

14            The defendants' conduct in this case went well beyond

15   a simple fraud.  A simple fraud in the context of this case

16   would have been making the payments and causing the false

17   certifications to be submitted.  They did that, and they did it

18   intentionally, but their other conduct was designed to conceal

19   the source and the true nature of the payments.  It included

20   phony invoices, indirect movement of money, and in the case of

21   Mr. Dawkins and Mr. Code, the use of the second and secret

22   telephone that was referred to at trial as the bat phone, and

23   was in my judgment yet another means to conceal what was truly

24   going on to hide what they were doing.  So, this is well beyond

25   the garden variety wire fraud, and it warrants the upward

J357GAT1                         Sentencing

adjustment.

         The upward adjustment in this case finds ample support

in the cases.  I could cite a lot, but I will just refer to

two:  United States v.  Fofanah, 765 F.3d 141 and United States

v. Loles, 628 Fed. App. 7, both in the Second Circuit.  Fofanah

said, among other things, that the creation and use of false

documents and other tactics to conceal offense conduct are

indicia of the sophistication of the offense.  I think that

applies here.  I don't want to be misunderstood as necessarily

concluding that an adjustment for sophisticated means in this

case is required as a matter of law.  I think, rather, it's

permitted, and I think it's appropriate in the exercise of my

discretion.  So, that takes care of that piece of it.

         Then we have the loss issue, the question of whether

there should be any upward adjustment for the amount of loss.

Both sides agree the relevant loss is the intended loss.  They

certainly don't agree on what the intended loss was.  The

defendants, as I understand it, argue that it's zero or, worse

case, the sum of one year of scholarship support for each of

the four players or athletes that everybody agrees are the

appropriate focus.  The government contends it's four years of

scholarships.  I've read what you had to say.  I'm happy to

hear any further discussion at this point.

         MR. SCHACHTER:  We have nothing beyond our papers,

your Honor.

J357GAT1                      Sentencing

1          MR. MOORE:  The only point I would make in response to

2     what your Honor said, that at least for my client, as I think

3     for Mr. Dawkins, it's just one school, it's not four players,

4     it's just one player, that's Mr. Bowen.

5          THE COURT:  You're right, and I understand that.

6          MR. MOORE:  Yes, sir.  But other than that, your

7     Honor, we rest on what we said in our papers.  I know your

8     Honor understands the issue.

9          THE COURT:  OK.  Mr. Haney?

10          MR. HANEY:  I would agree with Mr. Moore that it does

11     relate only to the matter with Louisville, and we have

12     articulated in the papers as well.

13          THE COURT:  Thank you.

14          Now, I should say that unless I am surprised

15     significantly in the course of the proceedings this morning,

16     the resolution of this is going to be immaterial.  I think the

17     same is likely true as to the ruling I've already made on

18     sophisticated means.  I think by the end of the morning it may

19     well be clear that the sentences I impose -- though I reserve

20     judgment until the last second -- will be within any of the

21     guideline ranges that would result on any combination of these

22     potential adjustments or none at all, or that I would vary to

23     reach them in any case.

24          That said, my view of the loss is that I agree with

25     the government and probation.  The intended loss in my view in

J357GAT1                    Sentencing

1   fact was four years of scholarships for these players.

2   Certainly there was a loss of scholarship money.  The only

3   serious question, in my view, was the one year/four year

4   assessment.  The government argues four because these were four

5   year scholarships -- of course, there were circumstances in

6   which it might not work out that way -- that were conceivable.

7   But the intention was that these individuals received those

8   scholarships.  In several cases they were $40,000 a year; in

9   one case they were $20,000 some a year.

10          The defendants' fallback position on this, the one

11  year argument, appears at page 35 of Mr. Gatto's brief, in

12  footnote 5, in which the assertion is made that the record

13  demonstrates that Mr. Gatto and his codefendants expected that

14  the student athletes would each be "one and done" players -- I

15  think everybody here knows what that means -- who would receive

16  only one year of scholarship funds before moving on to the NBA.

17  The record, in my view, does not in fact support any such

18  thing.  The brief cites two parts of the transcript as

19  supposedly establishing that these fellows all would have been

20  "one and done" players, and that was the only intention of the

21  defendants.  Those references do not even come remotely close

22  to establishing any such thing.

23          The first is at page 622 of the trial record, and I

24  will read it because it's quite short.  The witness was

25  Mr. Bowen, Sr.

J357GAT1                    Sentencing

1   "Q.  Mr. Bowen, you and Mr. Dawkins both use a phrase "one and

2   done."  What does that mean?

3   "A.  That's going to college for one year and then going to the

4   pros the next year.

5   "Q.  When you said Tugs" -- referring to Tugs Bowen -- can be

6   one and done, what did you mean by that?

7   "A.  He can go to school for one year and then get drafted.

8   It's possible."

9          That certainly doesn't prove that anybody intended

10  that that is what was going to happen or thought it likely.

11         The second reference is at page 820, and it's during

12  the cross-examination of a witness named Doyle, and it referred

13  to Dennis Smith, Jr. at North Carolina State, who by that time

14  had in fact played only one year at NC State and then gone on,

15  I believe, to professional basketball.  But that's after the

16  fact.  In hindsight -- and it certainly doesn't establish the

17  proposition that these defendants, any of them, intended these

18  folks to go to college for only one year.  Thus, I reject the

19  one year option.  I certainly reject the no loss option for

20  reasons that are implicit in what I have said already.

21         Now, in light of those rulings, I believe the correct

22  calculations are that Mr. Gatto's adjusted offense level is 23

23  and his guideline range is 46 to 57 months; and the guideline

24  ranges for Mr. Code and Mr. Dawkins are 30 to 37 months in each

25  case, with an adjusted offense level of 19.  And have I got my

J357GAT1                    Sentencing

arithmetic and references right, counsel?  Mr. Schachter?  Mr.

Diskant?  I know you don't agree with the bottom line, speaking

to the defense.

          MR. DISKANT:  We think you calculated that OK.

          MR. SCHACHTER:  Yes.

          MR. MOORE:  Based on your Honor's ruling, that is the

correct guidelines range for my client.

          MR. HANEY:  I would agree, your Honor.

          THE COURT:  Just so nobody is at risk of a heart

attack, that's not what I propose to do.  I don't propose to

sentence in that range.  We're going to talk about it more, but

I must calculate the guideline range as I see it, and I've done

it.  And I would also point out, as I've said before, the

rulings I made will turn out to be academic.

          That said, I think we can move on and hear from

counsel and the defendants, and then hear from the government.

          So, Mr. Schachter, on be on behalf of Mr. Gatto.

          MR. SCHACHTER:  Your Honor, when I was a prosecutor I

was always relieved that my role at sentencing was mostly to

provide what I believe the sentencing guidelines stated and

provide the court with facts that I thought were important, and

I was relieved that I did not have to be the one wearing the

robes and shouldering the burden of deciding what sentence

should be imposed.  Sentencing always seemed to me to be one of

the most daunting parts of an already incredibly challenging

J357GAT1                    Sentencing

1   job.

2          How does the court decide when justice is served by

3   locking a person in prison, separated from their family and

4   their community?  What is the right amount of time that a

5   person needs to be incarcerated in order to serve the interests

6   of justice?  I cannot imagine a more challenging decision that

7   any human being would need to make.

8          There are just a few things, your Honor, that I want

9   to emphasize that I think would be important to the Court's

10  decision.  I want to emphasize what a good and decent person

11  Jim is, and what a wonderful family that he and his wife Rachel

12  have built.

13          Jim and Rachel met in college and have been married

14  for 20 years.  They have two young children who are in the

15  courtroom today:  Grace, who is 14 and Jack, who is 17.  Jim is

16  a loving father who is deeply involved in their lives.  He's

17  the one who cooks the meals; he volunteers for class trips; he

18  coaches their basketball teams; he is the cornerstone of their

19  family.

20          THE COURT:  Excuse me for one moment.  I just don't

21  want you to think I'm totally distracted.

22          Andy.

23          Excuse me a minute.  I'm looking for something.  Go

24  ahead, Mr. Schachter.  I'm sorry.

25          MR. SCHACHTER:  Thank you, your Honor.  Unlike many

J357GAT1                    Sentencing

white collar defendants, Jim and Rachel live comfortably, but

they are not wealthy people by any means, and most importantly

their lives are not focused on striving for money.

        After 25 years with Adidas, Jim made a salary of

$139,000.  Rachel has worked as a sales associate at Ann Taylor

for 20 years.  Their lives revolve around their children and

their extended family, Jim's parents and sister, many of whom

attended a lot of the trial in order to show their support for

Jim during this very difficult time, and are also in the

courtroom today.

        We hope, your Honor, that the letters submitted to the

Court provide a picture of the man that Jim is.  He is a good

family man who is kind to others, a hard worker who has made a

lot of lives better.  He has never committed a crime.  This has

been the first time in his life that he has ever had a brush

with law enforcement.  He has led a good, honest life that

anyone would be proud of, and we submit that the good life that

Jim led merits the Court's mercy here.

        There are also a number of things about this case

which we hope the Court will see as different from a vast

majority of criminal prosecutions and will enable the Court to

treat Jim differently.  Most importantly, unlike a vast

majority of white collar defendants, Jim did not do the things

that he is convicted of out of greed; he wasn't hurting others

with the purpose of lining his own pockets, as the Court sees

J357GAT1                          Sentencing

1    in so many white collar cases.

2            There are many other ways that we submit this case is

3    different but, as I said earlier, we have come to know that

4    your Honor reads and absorbs everything that is in the parties'

5    papers and that nothing escapes the Court's attention, so I

6    won't repeat what we have put in writing.

7            I will close with this:  No sentence is necessary to

8    make sure that Jim Gatto is punished for his actions.  Short of

9    being diagnosed with a fatal disease, I cannot imagine a life

10   experience which is more painful than standing trial, having

11   been charged with a federal crime.  From the moment that Jim

12   was charged, his life has been turned upside down.  He knew

13   from that moment that nothing about his life would ever be the

14   same.  He lost his job, his reputation, his livelihood.  He has

15   needed to worry about how he will ever provide for his family.

16   He has had to consider each day as the trial approached, and

17   then during the trial, he has had to consider that he may be

18   separated from his wife and children, that he won't be able to

19   be there for them, to raise them, to watch them grow.

20           I cannot imagine the pain and incalculable stress that

21   he has suffered.  If Jim Gatto never spends a day in prison, he

22   has been punished in ways that most will never have to endure,

23   and we ask that your Honor take all of this into account in

24   fashioning a just sentence for a good and decent man.  Thank

25   you, your Honor.

J357GAT1                         Sentencing

1        THE COURT:  Thank you.  I think I will hear all the

2   lawyers first and then hear from the defendants.

3        Mr. Moore?

4        MR. MOORE:  Yes, your Honor.  Thank you.  I will try

5   to be brief, and your Honor will be the judge as to whether I

6   succeed.

7        Like Mr. Schachter, I was a prosecutor actually for a

8   very long time, and I started when the guidelines were

9   mandatory, and I was very pleased when the guidelines no longer

10  became mandatory and judges like your Honor could look not only

11  at the offense and the facts that you heard in a trial, but

12  could actually look at the person who came before you and make

13  decisions about an appropriate sentence based on the person.

14       You didn't hear from Mr. Code during this trial.  You

15  don't know the Merl Code that perhaps I have come to know, but

16  I do hope, your Honor, that the letters that you received shed

17  some light on exactly who Merl Code is.  He is 45, he is

18  married to his wife Candace, who is here today; she is an

19  occupational therapist.  He has two children, one of whom was

20  born during the pendency of this case.  He is a loving and

21  doting father.

22       You know, one of the things that struck me about

23  Mr. Code, when we were up here preparing for trial, Candace

24  brought August with her for several days, and at a period of

25  time what I would think is one of the most stressful time in a

J357GAT1                      Sentencing

1    person's life, he spent so much time with that young child.

2    And the bond I saw between the two of them was very special,

3    and I could think -- I thought what a great father he is; he

4    has handled this case with grace and dignity and probably far

5    more grace and dignity than I would be able to handle if I were

6    going through what he is going through.

7           I know you read our papers.  I know you don't need me

8    to summarize what the letters say about Merl as a person.  Here

9    with him today is his wife Candace, his father Mr. Code, who is

10   my cocounsel, his mother Denise and his sister.

11          I could spend an awful lot of time talking about the

12   offense here; I'm going to try not to.  I would say that it is

13   something of an unusual offense.  It's not an offense that you

14   see lots of people convicted of similar offenses.  And there

15   has been evidence -- and we have touched on this in our papers,

16   and the Rice Commission bore this out -- that the conduct here

17   has been going on in college basketball for a long, long time.

18   And there is no evidence that Mr. Code -- unlike some others in

19   college basketball -- really profited from doing what he did.

20   And he did what he did, your Honor, and there is no getting

21   away from it.  OK?  But he did not make any money.  He was a

22   consultant with Adidas, he did what he thought his employer or

23   client wanted him to do, and he got no bonuses or awards from

24   it.

25          Now, I know that the government has pointed out in

J357GAT1                    Sentencing

their papers that there was some talk between he and

Mr. Dawkins about the fact that perhaps at some point they

might secure these folks as clients.  That's all speculative.

The bottom line is he didn't make any money from his

participation in the payments to Mr. Bowen.

        And I would point out, your Honor, that like

Mr. Gatto, his life has been turned upside down.  Not only did

he not profit from this offense; he has been financially

devastated by it.  He was not indemnified by Adidas; they

canceled his contract.  He has made almost no money from any

source since he was arrested, and he now faces a racketeering

suit in the District of South Carolina where we're from.  He

truly has been financially devastated.

        THE COURT:  State or federal?

        MR. MOORE:  Federal, your Honor, before Judge

Anderson -- in Columbia, actually.

        I can't help but mention here that in this particular

case the universities here -- I guess if we were trying this in

equity, we may perhaps invoke the doctrine of unclean hands.

I'm going to focus on Louisville because Louisville was the

school in which Mr. Bowen was going to attend.  And, as your

Honor will recall, there was some evidence that assistant head

coach Kenny Johnson and assistant head coach Jordan Fair were

involved, and yet they have not been prosecuted.  And Adidas

had financial contracts with Louisville through which

J357GAT1                      Sentencing

Louisville obtained millions of dollars in benefits each year.

          One of the things that I found a little interesting is
that since this prosecution was concluded, what you have not
seen is you have not seen Louisville or any of the other
schools try to get out of their contracts with Adidas.  And so
I think that when you look at that, your Honor, when the
schools talk about the losses that they have suffered, it
reminds me of something a wise man once told me:  Don't just
listen to what people say; listen to what they do.

          You have before you a 45 year old man with absolutely
no criminal history.  I talked about the fact that he is a
loving, caring father.  And when you read the letters that were
written to your Honor, I think one of the things that sticks
out -- and it really rings true for the Merl Code that I have
come to know -- is that he is someone who really cares about
young people and cares about people.

          One of the things that you don't know, your Honor, is
that shortly before this trial my mother lost her fiancee of
four years, and my sister and I, trying to distract her, I took
her to another trial I had a month before this one, and then my
sister brought her here.  And she observed some of this trial.
Now, my mother lives about 30 miles from the Codes.  She had
never met any of them before, but my mother -- who is one of
the best judges of character and one of the best people that I
will ever meet -- with the possible exception of your Honor --

J357GAT1                          Sentencing

1          THE COURT:  That Southern charm.

2          MR. MOORE:  I do think your Honor is a very good judge

3     of character.

4          THE COURT:  It's not going to help.

5          MR. MOORE:  Well, you can't fault me for trying.

6          THE COURT:  It won't hurt either.

7          MR. MOORE:  So long as it doesn't hurt, Judge.

8          One of the things, my mother became very, very close

9     to the Code family, and there is not a day that goes by that

10    she doesn't ask me about them.  Over the holidays, Thanksgiving

11    and Christmas, she wanted to call them on those holidays, and

12    she just absolutely adores every person in the family.  And I

13    think she is a really good judge of character, and I think that

14    speaks a lot more to me about them than my own observations,

15    because maybe sometimes I am not as good a judge of character

16    as my mom.

17         I would suggest, your Honor, that a sentence of

18    incarceration is not necessary in this case to reflect the

19    seriousness of the offense, to promote respect for the law or

20    to provide just punishment.  Merl Code has already been

21    devastated.  You will never see him again.  No other federal

22    judge will have to deal with Merl Code ever again.  Merl Code

23    is embarrassed about the fact that he had to stand before a

24    federal judge.  And I know he is charged in a separate offense,

25    but we're dealing with that in April.

J357GAT1                         Sentencing

1          My point is that you will never have to worry about

2    seeing Merl Code again.  And as to general deterrence, all that

3    anyone has to do if they want to make a decision about how not

4    to do what has been charged in this case, is look at the

5    consequences that have been meted out to Mr. Code, because

6    again he has been devastated.

7          I could spend a lot of time talking about unwarranted

8    sentencing disparities, but I know your Honor has read the

9    papers.  Your Honor doesn't need me to remind you of some of

10   the exhibits that were entered into evidence and offered into

11   evidence, perhaps not admitted, about other folks who were

12   involved in similar conduct but have evaded and escaped

13   prosecution.  And I would respectfully suggest that that is

14   something that the Court ought to consider in meting out an

15   appropriate sentence.

16         I can tell you that if Merl Code had to do it over

17   again, if he thought that anyone would ever conceive that what

18   he did here was a crime, he would have never done it.  He

19   values his relationships with his friends, his relationship

20   with his wife Candace and his role as a loving and present

21   father to his sons too much to risk that.  He is sorry for what

22   he did, and I simply ask that your Honor take all of this into

23   consideration when your Honor passes sentence.

24         THE COURT:  All right.  Thank you.

25         Mr. Haney?

J357GAT1                    Sentencing

1          MR. HANEY:  Thank you, your Honor.  Your Honor,

2     myself -- as with Mr. Schachter and Mr. Moore -- also as a

3     former prosecutor, I to tell young men like Christian Dawkins

4     it's very easy to get into trouble; it's very difficult to get

5     out of trouble, and this perhaps is a cautionary tale for those

6     that would disagree.

7          Your Honor, Christian Dawkins stands before this court

8     because he made poor choices, period.  He made those choices of

9     his own volition, and if he had not, he would not be standing

10    here today.  That I know.

11         Now, back in October we regrettably lost a hard fought

12    battle that rule breaking was not law breaking.  Today is not a

13    whining, deflecting, relitigating or excuse making, but instead

14    a day of ownership and accountability, and with ownership comes

15    acceptance, reactions and the realization there are

16    consequences for bad choices, and that is where Christian

17    Dawkins stands today.

18         Christian Dawkins, your Honor, also stands before the

19    Court uniquely distinguishable, I would submit, from his

20    codefendants in that at the time of his actions he was 22 years

21    old.  Certainly, we all know as men part of growing up and

22    becoming a man is part of failing, falling down and making

23    mistakes.  Your Honor, we all have -- every man sitting in this

24    courtroom today has fallen down and made mistakes, and I would

25    even bet that your Honor has too.  It is a cycle of growth and

J357GAT1                        Sentencing

1   an evolution of manhood, your Honor.  Regrettably for Christian

2   he made were deemed by a jury of his peers to be federal

3   crimes.  For that, these mistakes are going to come at a far

4   greater price for Christian.  But we respectfully ask the Court

5   at least to give some consideration, if not some degree of

6   deference, and understand that at the age of 22 years old there

7   is an undeniable reality that mistakes are going to be made

8   that perhaps would not have been made with greater maturity and

9   life experience.

10        Now, the request of this consideration in no way

11  trivializes, justifies, excuses, or discounts the conduct that

12  occurred; it is merely asking your Honor to review this conduct

13  in its proper light.

14        Now, as noted in our sentencing memorandum as well,

15  and the submission of character letters, Christian has

16  tremendous community and family support, many of whom are in

17  the courtroom today.  Undoubtedly, the gravity of this matter

18  has taught him at the very young age the importance of playing

19  by the rules; and perhaps just as important is surrounding

20  yourself with good people and good mentors.  Because of his

21  age, he has been an easy target for the national media, truly

22  an infamous figure in the annals of college basketball, and has

23  been vilified, perhaps in some ways deservedly so.  But one

24  thing is for certain, your Honor, his young life will never be

25  the same.  Now a convicted felon, it is likely if not certain

J357GAT1                    Sentencing

1    he will never work again in the business of basketball, and

2    must find a new direction in life, with monumental barriers

3    that lie ahead.

4              In short, Christian Dawkins's poor choices have

5    altered a young and promising career of a man in his early 20s,

6    whose real punishment would never be a term of incarceration

7    but certainly will be a lifetime of regret.

8              Your Honor, I would submit that the sentiments that I

9    am offering here today are not mere zealous advocacy of a

10   biased lawyer.  Mr. Dimaria from the probation department also

11   in his presentence interview and subsequent report highlighted

12   many of the factors that I have offered for consideration to

13   the Court today and made a substantial guideline recommendation

14   of a downward departure.

15             Your Honor, I will close with this:  I have known

16   Christian Dawkins over half his life, his family longer.  I

17   call his dad my brother more than my own because he is.  I have

18   watched Christian grow and evolve into a young man, a civic

19   leader, an inspiration and a shining example of other young men

20   in very socially and economically challenged community.  Your

21   Honor, I know Lou and Tish Dawkins did not raise a criminal --

22   that I know, not on their watch -- and I respectfully ask the

23   Court to consider sparing this young life in a manner that a

24   noncustodial sentence would afford.  Thank you, your Honor.

25             THE COURT:  Thank you.

J357GAT1                    Sentencing

1          Mr. Gatto, you have the right to speak.  Is there

2     anything you would like to say?

3          DEFENDANT GATTO:  Yes, your Honor.

4          Your Honor, thank you for the opportunity to address

5     you today.  The game of basketball has been a part of my entire

6     life and is part of my DNA, but the fact is, your Honor, I

7     didn't play by the rules of that game, and my actions and poor

8     judgment have had terrible consequences, including on my

9     family, who are the ones I am most worried about today.

10          My parents who are here today -- as they were ever day

11     of the trial -- raised me to conduct my life personally and

12     professionally with integrity, respect and concern for others.

13     I believe wholeheartedly in those lessons, and I wish I had

14     executed better judgment in this instance.

15          I am disappointed in myself with my actions, and that

16     is something that I will live with for a very long time.

17     Although I am very scared about the prospect of going to

18     prison, my real fear is not for myself but merely for my son

19     Jack and my daughter Grace.  They both have already suffered

20     enormous stress and strain, and I almost can't bear to think

21     about our family being torn apart and the impact on them.

22          The well being of my family has been my motivation

23     since I got married and had children.  It is a helpless feeling

24     for me, because I have always tried to take care of them as

25     best I can, but I recognize that I soon may not be able to do

J357GAT1                    Sentencing

1    so.

2              My son Jack turns 18 in a few days and on his way to

3    college in the fall.  My daughter Grace is about to finish her

4    freshman year of high school, and my wife of 21 years, Rachel,

5    is the love of my life.

6              Even though I have made mistakes and, as a result, put

7    them through something that no family could ever imagine, they

8    have not abandoned me.  I want them to know that I will always

9    believe in them, and I will forever be their adoring father and

10   husband, and I will continue to spend my lifetime loving them

11   even if we are separated, as difficult as that would be.

12             Your Honor, I deeply regret my actions, and I want you

13   to know that I am more than what you heard during the trial.

14   You have received many letters from my family, friends and

15   coworkers, for which I am grateful and full of emotion.  I hope

16   the letters give you insight on what kind of person I really

17   am.  I know you must issue a sentence today, and I wish to

18   thank you for whatever consideration you can give to my family

19   and my words here today.

20             Thank you again for your time.

21             THE COURT:  Thank you.

22             Mr. Code?

23             DEFENDANT CODE:  Yes, your Honor.  Thank you for

24   allowing me to speak to the Court today.

25             I would like you to know that I deeply regret what has

J357GAT1                    Sentencing

brought me before you today.  I have been very fortunate in
that I played the game at all levels -- Little League, high
school, college and professionally abroad -- and while I love
the game, I really feel there are some things that need to be
changed about college basketball, and hopefully after I put
this episode behind me, I will be able to help families and
young men.

        I regret the pain I have caused my family.  I want to
thank them for their support and their love throughout this
entire process.  My wife has stood by me.  My mother, my father
and my sister, my community, my friends, and even some folks
who are still in the basketball business, have all reached out
just to say they love me and they appreciate the struggle.
Even though they haven't had to go through it themselves, they
can appreciate what I've had to deal with.

        So, I thank you for allowing me to speak to you today.
I appreciate your consideration in reading the letters that
have been brought before you.  I hope they give you some
insight as to who I am as a man, who I aspire to be as a
father, and I respect the authority of the Court and pray that
you will have leniency on me not just for the sake of myself
but for my wife and two sons.  Thank you for your time.

        THE COURT:  Thank you.

        Mr. Dawkins.

        DEFENDANT DAWKINS:  Your Honor, thank you for the time

J357GAT1                      Sentencing

1   to say a few words here today.

2           Your Honor, I stand here today realizing the
3   situation, and my choices have not just impacted my life but
4   those closest and dearest to me.  That reality hurts me beyond
5   any words I can offer to the Court.  My remorse is not for
6   myself but for the pain and embarrassment I have caused others.
7   I realize now more than ever that none of this was worth it.

8           I was raised by my parents to accept the consequences
9   of my own actions, and even though I was offered the chance to
10  do so, I never pointed the finger at others in this case to
11  make it easier on me.  In my quest to get ahead, I broke rules
12  and made some really bad decisions.  Nobody forced me to do
13  either.

14          Over the last 18 months I have learned a lot about
15  life, friendship and loyalty that I wish I could have instead
16  read in a book.  My personal feelings about the social
17  dysfunction of college basketball and the inequity in what I
18  believe is a system that takes advantage of kids and their
19  families undoubtedly clouded much of my judgment but really
20  what was allowed me in my mind to justify my own actions.

21          There was a point I decided to play by my own set of
22  rules and not those that I willingly and knowingly broke.  For
23  that I was wrong then and I stand wrong today.

24          My intentions were never to hurt anyone, but I realize
25  that in the end I did.  So, I will stake this very difficult

J357GAT1                           Sentencing

1    experience, learn from it and become a better person.

2              Thank you.

3              THE COURT:  Thank you.

4              Mr. Diskant.

5              MR. DISKANT:  Your Honor, just a few brief comments in

6    response.  You know, your Honor noted in the context of

7    calculating the guidelines -- which of course, the Court has to

8    do -- that in this case they are or may prove to be in some

9    respects immaterial.  And I confess that as I was thinking

10   about the sentencing in this case I had the same conclusion.

11             Leaving aside whatever sentence gets imposed, the

12   guidelines here and the statutory and guidelines calculation of

13   loss really doesn't begin to capture the harm that these

14   defendants caused.

15             Certainly the value of the scholarships, as the Court

16   has now concluded, is properly attributable to them as a loss

17   for purposes of guidelines, but as each of the universities --

18   both through their representatives who testified during the

19   trial, and also in the victim impact statements that they have

20   provided to the Court before today -- detail a far broader

21   range of harms, both tangible and intangible, that have

22   unquestionably befallen them as a result of the defendants'

23   conduct.

24             The University of Louisville, for example, talks about

25   its efforts to build itself as a university, getting its first

J357GAT1                        Sentencing

Rhodes Scholar in 2009.  It describes itself as a school that
is so much more than as basketball team, and yet has been
relegated to a national scandal as a result in large part to
the defendants' conduct.  There are, of course, tangible harms
as well.

THE COURT:  Well, they were involved with some
problems before, weren't they?

MR. DISKANT:  They were, your Honor, but
respectfully -- because I think this is a point that the
defendants raise as well -- you know, I think it is a fine line
to walk in blaming a victim for being revictimized.  There is
no question that the University of Louisville had difficulty in
the past, but they didn't invite this, they didn't want this,
and they didn't deserve it.

As North Carolina State University writes in its
letter to your Honor -- which is certainly true -- and that is
a university that highlighted its various efforts to support a
compliance mission -- there is no detection technique to
identify an individual who intentionally chooses to violate an
NCAA rule and then hides the misconduct from both the
university and the NCAA.  There is virtually nothing that
Louisville could have done differently to prevent this from
happening, and respectfully I don't think it is fair to blame
them in effect for this having befallen them as a result.

More broadly though -- and the defendants are

J357GAT1                        Sentencing

certainly not the only ones responsible for this -- but there
are a whole number of young men who have suffered, you know,
very, very serious harm as a result of the defendants' conduct:
Student athletes who will never play in the NCAA because of the
scandal associated with them as a result of this conduct;
entire teams that were left without players they were counting
on; young students who were planning on supporting their
school's athletic program that particular year, that were left
with a team that had been substantially tarnished, all
unquestionably harmed as a result of the defendants' conduct.

          Let me talk a little bit about the notion that, you
know, everyone is doing it or that these kinds of violations
are rampant, you know, as Mr. Gatto puts in his submission,
that his conduct is indistinguishable from that of many, many
other people who will never see the inside of a cell.  We would
beg to disagree with that.  And let's be clear, there is no
question that there is a long and unfortunate history
undoubtedly of boosters giving a few hundred or a few thousand
dollars to kids here and there.  This is something
fundamentally different.  This is something that when the world
learned of it in September of 2017 was rightfully considered to
be shocking, to be extraordinary, to be brazen.  It is in many
respects unprecedented in its sophistication, in its
coordination, and with respect to Mr. Gatto in particular, in
its repetitive nature over a period of time.

J357GAT1                          Sentencing

1          Those are all factors that prompted the NCAA to

2     convene the Rice Commission, the fact that this was so unusual,

3     so outside the bounds of what anyone had expected or thought

4     was possible at the time.  And those are factors that we

5     believe very strongly weigh in favor of some sort of a

6     custodial sentence in this case.  Indeed, it was cited by the

7     probation department the need for general deterrence in this

8     matter -- which is really what this point gets to -- as the

9     paramount factor that the Court should consider in imposing

10    sentence, and we agree with that.

11         Finally, let me talk about the defendants as

12    individuals and their motivations for engaging in this conduct.

13    The Court doesn't need to make a factual finding as to whether

14    any one of them in particular was greedy -- which is a word

15    into they have each taken umbrage with -- but there is no

16    question that each of these defendants were acting for personal

17    and competitive advantage.  With respect to Mr. Gatto, it was a

18    core part of his job to recruit and sign top-tier student

19    athletes once they became professionals, and this gave him a

20    leg up in connect withing that student athlete and his family

21    at a young age.

22         For Mr. Code, for Mr. Dawkins, same thing, they were

23    in the business of signing young student athletes, or at least

24    they hoped to be in the business of signing young student

25    athletes when they became professionals, and facilitating these

J357GAT1                        Sentencing

payments to their families was a way of developing that

connection, by gaining a leg up in their competition to sign

these kids once they became pros, something that of course

would reap millions for them should it happen.

        But more generally the defendants talk -- and the

letters that I have read, and I am sure the Court has read,

speak in glowing terms of people who have led in many respects

led very commendable lives, and the government does not in any

way, shape or form mean to dispute that each of the defendants

has done commendable things with various parts of his life.

But the descriptions in those letters and the descriptions the

defense counsel would leave the Court with, are simply at odds

with some of the conduct in this case.

        Jim Gatto over a period of years was abusing his

position at Adidas, his control over a multi-million dollar

budget, and routinely approving large cash payments to the

families of student athletes.  He knew he shouldn't and

couldn't be doing that, so he approved fake invoices and

documents ostensibly justifying these costs as legitimate

Adidas expenses to cover his tracks.

        Merl Code was on the front lines brokering these

illicit deals for Adidas.  He was the one creating some of

these invoice, helping to route the money indirectly through

his friend's AAU team account.  And as the trial evidence shows

with respect to the Miami scheme -- the last scheme before the

J357GAT1                        Sentencing

1   defendants were arrested -- he was prepared to lie even to his

2   coconspirators, to Mr. Gatto, in the hopes of siphoning off

3   some of the money that Mr. Gatto thought was going to the

4   family of another student athlete.

5           And finally there is Christian Dawkins, who lost his

6   job at ASM after racking up tens of thousands of dollars in

7   unauthorized credit card charges on a client's credit card,

8   that prompted him to want to go out on his own to facilitate

9   and broker these deals on his own, he was the one who used the

10  bat phone, he was the one who made all of these various offers

11  and brokered all of these various offers for Brian Bowen, Sr.,

12  and he himself described the payments he was working to

13  facilitate on a call played at trial.

14          I leave the Court simply with this, because again the

15  government would not question that these are men who have done

16  great things in their lives, but for better or for worse they

17  have also lost their moral compass at various points, and that

18  is what this trial was about, that is what we believe is

19  warranting a punishment including a term of incarceration.

20          THE COURT:  Thank you, Mr. Diskant, and thank you all.

21          If one doesn't know it before one has the privilege

22  and the duty to sit in judgment of other human beings, one

23  learns it very quickly.  There aren't any saints, and there

24  aren't any pure sinners on this earth, not one.  The question

25  is what the mix is in individual cases.  I have been here for

J357GAT1                       Sentencing

almost 25 years.  I have sentenced murderers who were great

family men, I've seen a lot of things, and in that respect this

case really isn't any different at all.

         I certainly accept that all three of the defendants

have lived good and productive lives in almost all respects.

From what I understand, they are terrific in their families,

and in most cases in their communities.  I also surely

understand that each of them has suffered enormously simply by

virtue of the prosecution and the trial -- aggravated of course

by the jury's finding -- and I don't think there is any need to

impose a sentence which is so often required and in many cases

that I see to put these three men away so that they don't do

any harm to anybody else.  They're not going to; they've

learned their lesson; and that truly argues for leniency, and

within limits I intend to grant it.

         I assume also -- although I want to be clear I'm not

making any finding on the point -- that conduct such as what

happened in this case has occurred with some frequency --

possibly to understate it significantly -- although in other

cases the incidents I have heard rumor of in the evidence

involved in most cases a lot less money.  I don't buy the

argument that that means I should impose a lenient sentence to

avoid unwarranted disparities, because when the sentencing

guidelines and the statute talk about unwarranted disparities,

they're talking about disparities in sentences, not disparities

J357GAT1                          Sentencing

1    that result because somebody else didn't get caught and you

2    did, which is what we're mostly dealing with here.

3              (Continued on next page)

J353GAT2                    Sentencing

1          THE COURT:  (Continuing) Nonetheless, I certainly

2    understand that this prosecution was possibly the first and, in

3    any event, one of a very small number of prosecutions for

4    conduct anything like this, and I take that into account.

5          There is a problem in taking it into account, though,

6    because it cuts both ways.  Sure, I understand the defendants'

7    arguments, why should they be punished when other people

8    presumably have done similar things and gotten away with it and

9    not been prosecuted.  I understand that argument.  And to some

10   degree, I have some sympathy with it.

11         But it cuts in the other direction, too.  There is

12   really a serious need to impose a sentence that will be

13   sufficient to deter others, to make other people think more

14   than twice before engaging in this kind of behavior.  And I am

15   going to try and walk the line between fairness and appropriate

16   leniency on the one hand, and fulfilling my duty to impose a

17   sentence that will be a great big warning light to the

18   basketball world.

19         The "everybody's doing it" argument, in short, is not

20   a get-out-of-jail-free card.  And I happened to come across,

21   from preparing for this morning, a Second Circuit case that

22   dealt, I believe, with a tax evasion prosecution, but it

23   doesn't really matter.  The issue was whether the means that

24   had been used to carry out that particular tax evasion was

25   sophisticated or not.  And the court of appeals said, you know,

J353GAT2                    Sentencing

we really have to take into account -- and the sentencing

commission took into account -- the fact that the incidents of

tax evasion in the United States is much greater than the

number of criminal tax cases that get brought.  And therefore,

enhanced sentences are appropriate, sometimes, to deter all

those folks out there.

        Now, I understand it was under a slightly different

guideline, but the point nonetheless is valid.  If this is the

only prosecution of its kind thus far, and I guess we still

have two pending that are comparable, it's important that I

reflect the need for general deterrence here.

        The next point I want to make is that these defendants

all knew what they were doing was wrong.  Make no mistake about

it.  They took very substantial steps to conceal what they were

doing.  It reflects their knowledge that it was wrongful

conduct.

        One of the pretty unforgettable moments during the

trial was listening to a recording of a conversation which, if

memory serves, someone will correct me if I don't get it right,

was between Mr. Code and Mr. Dawkins, and I think the subject

of it was whether the coach at Louisville knew what they were

doing.  And one of them said, well, he knows something, but he

doesn't know everything.  And the other person said something

that sort of suggested that he didn't understand why he knew

something, but he didn't know anything or what doesn't he know.

J353GAT2                        Sentencing

And the other party to the conversation, the one who said he

knows something, but he doesn't know everything, said, no,

we've got to give him plausible deniability.

            I will never forget that line.  They knew it was

wrong, they were covering their tracks, they were making sure

Rick Pitino's tracks were covered, to the extent they could.

And why were they protecting Rick Pitino?  They knew.  They

knew he was out if he got caught with this.

            And in any event, regardless of what Rick Pitino did

or didn't do, and I certainly make no finding about that, I

didn't hear that case, if there ever is a case.  The point of

it is these men knew what they were doing, and they knew it was

wrong, and they were covering it up.

            Other point I want to mention is I don't fully accept

Mr. Schachter's argument and those of the other defense lawyers

about economic motives.  Now, I don't want to overstate this.

I know that none of these three men took home a nickel extra as

a result of committing these crimes for which they were

convicted.  But that doesn't mean that there were no economic

motives.

            Mr. Dawkins was building a business.  He had an

economic motive.  He was trying to land Tug Bowen, ultimately,

as an NBA player client.  That's what this was about from his

point of view.

            Mr. Code was a consultant, basically, an at-will

1    employee of Adidas.  What was he doing there?  His job was to

2    bring in players.  Players to Adidas schools.  His paychecks

3    depended on how successful that was, not only in amount, but in

4    duration.  Were they going to keep him on.

5            And what was said about Mr. Gatto is right.  I mean,

6    to call him "greedy" would be wrong.  It would be an

7    exaggeration.  But to say that he didn't understand that his

8    job was producing players for Adidas-sponsored schools, and

9    then shoe deals down the road to the extent any of them went

10   public, and that's what he was being paid for.  And that's

11   ultimately what his job and his family security depended on.

12           I don't mean to exaggerate it.  But these are not

13   like, you know, insider traders who are stealing information to

14   make millions of dollars.  That wasn't this case.  But it's

15   wrong to say there was no economic motive.

16           So I've tried to take all these factors into account

17   as well as all of the other evidence, and I've certainly

18   considered all of the 3553(a) factors, and tried to fashion a

19   sentence that would appropriately reflect the seriousness of

20   the offenses, the nature and characteristics of the defendants,

21   just punishment for what I regard, even though one of the

22   defendants' briefs quarreled with the term, I regard as a

23   serious crime, and to achieve adequate general deterrence.  And

24   that, to me, is the driver above and beyond other factors.

25           So the sentences I'm going to impose are, with one

1    possible exception, lower than any conceivable guideline range

2    that any possible outcome of that analysis could have produced.

3    Because I think that's what's appropriate in this case for

4    these individuals this time only, given all of the

5    circumstances.  If this were not the first prosecution of its

6    kind, if the characteristics of these defendants were

7    different, and if other things were different, I might take a

8    very different view of the appropriate sentences.  But the

9    sentences I'm about to impose are what I think is right here,

10   and I think they are the right sentences, regardless of what

11   the technical answer to the guideline computation is.

12           The one other thing I think bears mention is one point

13   that Mr. Diskant made.  There was a lot greater harm inflicted

14   by this behavior than can be measured in dollars, and

15   Mr. Diskant mentioned some of it.  I'll just make an anecdotal

16   comment about it.

17           To me, probably the worst victim, most seriously

18   injured victim of the Louisville scheme was Tug Bowen.  Those

19   of you who were at the trial will remember the testimony of his

20   father who brought the whole thing about in a very important

21   way.  He broke down in tears on the stand with the realization

22   or acknowledgment that he had wrecked his son's life.  He did.

23   He never got the education he hoped to get.  He never got an

24   opportunity to play in the NBA.  Last I heard, he was playing

25   basketball in Australia.  I'm sure it's a great country, but

J353GAT2                    Sentencing

1    it's not the life he wanted.

2           Now, Mr. Bowen Senior may have set these events in

3    motion with respect to Louisville.  I'm not saying he did, but

4    he may have.  He certainly had a significant role.  These three

5    defendants, they participated in wrecking Tug Bowen's life.

6    And that's never going to be reflected in money in this case.

7    It's not reflected in the guidelines.  And people who commit

8    this crime run the risk of wrecking a lot of other lives.  And

9    there are times when the sentencing guidelines, admirable an

10   effort as they are, just haven't anticipated all the factors in

11   human existence that can manifest harm.

12          I remember a case I had many years ago in which

13   somebody would conceal himself in the rare book room at

14   Columbia University, and razor pages out of 600-year-old

15   manuscripts to sell on a black market.  And his argument was,

16   well, what's the market value of these pages, that's what the

17   loss amount is.  Well, no, it isn't.  And no, it wasn't.

18          This is a case, obviously, that has nothing to do with

19   rare books, but the guidelines don't capture it all.  And I

20   think we need to recognize some of the things they don't

21   capture.

22          Okay.  With that, I'm going to ask the defendants to

23   rise for the imposition of sentence.

24          It is the judgment of this Court that each of you be

25   committed to the custody of the Attorney General of the United

J353GAT2                         Sentencing

1    States or his designee for a term of imprisonment, that you

2    thereafter each serve a term of supervised release of two

3    years, that you pay the mandatory special assessment, and that

4    you will pay such restitution as I may impose on the terms that

5    I may impose at a later date, which we're going to talk about.

6            The term of imprisonment in the case of Mr. Gatto is

7    nine months.

8            The term of imprisonment in the case of Mr. Code and

9    in the case of Mr. Dawkins is six months.

10           The special assessment is $300 for Mr. Gatto, and $200

11   for each of the other two defendants.

12           The term of supervised release shall be subject to the

13   mandatory and the standard conditions of supervision 1 through

14   13, in addition to the following special conditions:

15           Each of you shall provide your probation officer with

16   any financial information he or she may request, as long as

17   there is any restitution obligation upon you that remains less

18   than fully satisfied.

19           Second, in the event restitution is imposed, you shall

20   comply with the provisions of the restitution order which will

21   involve, assuming it's imposed, a payment schedule.

22           I decline to require drug testing.  I don't see a need

23   for it.

24           I advise each of you that you each have the right to

25   appeal from the judgment imposing this sentence.  If you wish

J353GAT2                      Sentencing

1    to appeal, you must file a written notice of appeal within 14

2    days after the date on which judgment is entered.  I'll say

3    another word about that in a minute.  If you wish to appeal,

4    and you can't afford to pay the fees necessary to do so, you

5    have the right to apply for permission to appeal as a poor

6    person.  If that application were granted, you would be

7    permitted to appeal without payment of the fees.  And if you

8    couldn't afford a lawyer, a lawyer would be appointed for you

9    at public expense.

10             You may be seated.

11             With respect to the running of the time for appeal, I

12   am deferring the imposition of restitution because the papers

13   came in so late.  We'll fix a date.  I leave to you and your

14   lawyers figuring out whether the date of entry of the judgment

15   will be almost immediately, which may occur in one sense, or

16   whether it doesn't occur until the restitution order is

17   entered.  I'm not going to give advice on that subject at this

18   point.

19             With respect to restitution, I think what I'd like to

20   do is set a date about 30 days out, more or less, and you can

21   come back together and see where we are on that.

22             Now, Mr. Schachter, you had quite a lot to say about

23   claiming that the government had been too late with its request

24   for restitution.  I'm not sure I view it that way.  But, I take

25   it that if we defer restitution for another 30 days, the

J353GAT2                        Sentencing

1    defendants are happy to withdraw any objection about the

2    government being too late.  Or am I mistaken, Mr. Schachter?

3             MR. SCHACHTER:  Your Honor, may I have one moment?

4             THE COURT:  Yes.

5             (Pause)

6             MR. SCHACHTER:  Your Honor, I believe it is our view

7    that, by virtue of the deadlines that were missed, that the

8    Court cannot impose restitution as we read 3664.  It only

9    provides delay past sentencing or past the deadlines that are

10   set forth if the victims' losses are not ascertainable by a

11   date that is 10 days prior to sentencing, and the attorney for

12   the government shall inform the Court.

13            And so I believe that by virtue of the government's

14   failure to inform the Court that --

15            THE COURT:  You want me to fix it right now?  I could

16   do that.

17            MR. SCHACHTER:  No.  No, your Honor, that's not our

18   request.

19            THE COURT:  Listen to the music, Mr. Schachter, not

20   the notes.

21            MR. SCHACHTER:  What I would say is nothing about the

22   delay between now and the next 30 days, certainly, we don't

23   believe that would have any impact on the ability to seek

24   restitution.

25            THE COURT:  All right.  Mr. Diskant?

1          Do the other defendants join in this?

2          MR. MOORE:  I don't know that we're so much affected

3     by it.  But I suppose for the record, we'll join in it.

4          MR. HANEY:  I would concur.  I don't think we are

5     affected either, but I will stay with the seamen.

6          THE COURT:  You are all in the same boat, and we'll

7     see whether there is a waterfall on the stream.

8          Okay, Mr. Diskant, I'll hear from you.

9          MR. DISKANT:  On that last point, they are not in the

10    same boat.  With respect to Mr. Code and Mr. Dawkins, the

11    restitution amount is fixed, there has never been a challenge

12    to it other than the defendants' broad argument that they

13    didn't intend to cause any loss at all.

14         We have prepared orders of restitution for them.  The

15    amount is $28,261.  We have provided copies to the defendants

16    and to the Court.  I have copies here.

17         As far as the government is concerned, there has been

18    no objection to this amount, which is based purely on the

19    actual loss suffered by the University of Louisville and these

20    can be entered today.

21         MR. HANEY:  I have no objection to that.

22         MR. MOORE:  I conferred with co-counsel.  I don't

23    think I do either.  I don't.  I'll terminate the qualifier, I

24    don't.  As I understand it, the proposed restitution orders say

25    that the restitution is joint and several.  Not only between

J353GAT2                         Sentencing

1    myself and Mr. Dawkins, but also with Mr. Gatto, whatever

2    restitution order you ultimately impose, as well as

3    Ms. Gassnola, Mr. Sood, and/or any other person who gets

4    convicted of this offense.  With that caveat, I join.

5              MR. DISKANT:  That is the way the order is drafted.

6              THE COURT:  Hand it up, please.

7              All right.  I'm signing the restitution orders with

8    respect to Mr. Code and Mr. Dawkins.

9              In the case of Mr. Code, the sentence includes a

10   requirement he pay restitution in the amount of $28,261, as

11   specified in the order of restitution.  Likewise, in the case

12   of Mr. Dawkins, the amount is the same, and is payable as set

13   forth in the order of restitution.

14             Okay, Mr. Schachter, you're in this ship on your own.

15             Mr. Diskant.

16             MR. DISKANT:  As an initial matter, the government is

17   not aware of any authority, and Mr. Schachter does not cite

18   any, that suggests that, assuming for the sake of argument,

19   there was a failure to comply with the timing provisions of the

20   MVRA, that that would impose a bar to seeking any restitution.

21   To the contrary, when the Supreme Court has most recently

22   addressed this statute, it has said just the opposite, in the

23   context of interpreting a similar provision.  That's the *Lagos*

24   case, which I know the Court is familiar with, which makes

25   clear that the timing provisions of the MVRA are meant to

J353GAT2                        Sentencing

1   ensure that the victims get speedy recovery, and not to protect

2   the defendant.

3           Second, if Mr. Schachter feels strongly about this, we

4   could of course have the Court, as the Court has already

5   suggested doing, postpone formally imposing sentence for

6   another 30 days or however much time Mr. Schachter --

7           THE COURT:  You mean formally imposing restitution.

8           MR. DISKANT:  Either/or.  If Mr. Schachter's initial

9   point is because he did not have notice of the amount to be

10  sought 60 days prior to sentencing, we could set the formal

11  sentence of Mr. Gatto 53 days from today.

12          THE COURT:  I think he's already been sentenced.

13          MR. DISKANT:  Fair enough.  The statute has an

14  expressed mechanism for dealing with a situation like this

15  where the dispute over restitution is not resolved at the time

16  of sentencing.  It provides for at least 90 additional days.

17  The *Lagos* decision seems to suggest if additional time is

18  necessary beyond that, that is also permissible.

19          Mr. Schachter is on notice of the amount being sought.

20  He has made a request for additional discovery regarding that

21  amount.  We are prepared to get that from the victim

22  universities and produce it to him.  So consistent with the

23  Court's suggestion, we would recommend that we get that to the

24  victims and come back or at least brief the issue in the next

25  30 days or so.

J353GAT2                    Sentencing

1          THE COURT:  Well, Mr. Schachter, any change of view?

2          MR. SCHACHTER:  May I have just a moment?

3          (Pause)

4          MR. SCHACHTER:  Your Honor, as I read the statute, it

5     says that restitution can only be imposed, or the government is

6     required to seek restitution 60 days before sentencing and it

7     can only be delayed under circumstances where the victims'

8     losses are not ascertainable by a date that is 10 days prior to

9     sentencing.  Then it requires the government to come forward

10    and advise the Court in advance of sentencing that there is an

11    issue with respect to --

12         THE COURT:  And you are the one who wrote me the big

13    long letter the other night telling me you needed discovery

14    because the losses were uncertain.  Right?

15         MR. SCHACHTER:  I think what I intended to say, your

16    Honor, is simply --

17         THE COURT:  I'm asking what you said.  Not what you

18    intended to say.

19         MR. SCHACHTER:  It is not a matter of us seeking

20    discovery.  It was a matter that the restitution claims that

21    were put forward are insufficient to justify an order of

22    restitution.

23         THE COURT:  You didn't mention discovery at all, did

24    you.  Is that what you are telling me?

25         MR. SCHACHTER:  I'm not saying that, your Honor.

J353GAT2                         Sentencing

1           THE COURT:  Did you write the letter?

2           MR. SCHACHTER:  Yes, your Honor.

3           THE COURT:  All right.  I'll see you on April 9, at

4    10 o'clock in the morning.  Mr. Gatto needn't be there.

5           Which comes to the question of bail.  Any

6    applications?

7           MR. MOORE:  We do have an application, your Honor, on

8    behalf of all three of the defendants for bail pending appeal.

9    And I'm prepared to address that if the Court wishes me to.

10           THE COURT:  Let me see if you have any opposition.

11           MR. MOORE:  That would be -- I hope we don't.

12           MR. DISKANT:  We do oppose bail pending appeal.  Not

13    on the basis of either a risk of flight or safety, but on the

14    second prong of the requirement.  That is the appeal is likely

15    to raise a substantial question of law or fact.

16           THE COURT:  Well, you better address it.

17           MR. MOORE:  Yes, sir, your Honor.  Do you want me to

18    come to the rostrum?

19           THE COURT:  Yes.

20           MR. MOORE:  And I will try to be brief, and I hope

21    that your Honor will appreciate that almost all of these cases

22    are Second Circuit cases that I intend to rely on.

23           But we have five basic arguments, and I will try to go

24    over those briefly.  Obviously, your Honor knows the standard,

25    I know your Honor has dealt with the issue of appeal bonds

1    before.

2              The Court shall order the release of convicted

3    defendant if the Court finds by clear and convincing evidence

4    that the person is not likely to flee or pose a danger to the

5    safety of any other person in the community if released.  The

6    government has conceded that, as I understand it.

7              THE COURT:  I so find.

8              MR. MOORE:  So, the issue is that the appeal is not

9    for purpose of delay, and raises a substantial question of law

10   or fact that is likely to result in reversal or a new trial.

11   To be substantial, the question need only be one of substance

12   that would be necessary to a finding it is not frivolous.  In

13   other words, it is a close question or one that could very well

14   be decided the other way, or one that is novel.

15             THE COURT:  So, basically, the gloss on the statute is

16   that it doesn't have to be in the judgment of the district

17   court likely to result in reversal, it just has to be

18   non-laughable.

19             MR. MOORE:  That's correct, your Honor.  It has to be

20   non-frivolous.  It has to be substantial.  If it were

21   otherwise, almost no district judge would find that the case is

22   likely to be reversed, correct?

23             THE COURT:  Well, you never know.  I actually got a

24   stay like this in the District of Rhode Island about 40 years

25   ago by persuading the district judge he was likely to be

1    reversed.  You could look it up.

2           MR. MOORE:  I'm probably not going to take that tack,

3    your Honor, here.  But, because we don't have to prove that we

4    are likely to succeed.  It's sufficient that if he does

5    succeed, reversal or a new trial is likely.

6           And the Second Circuit has held, in *United States v.*

7    *Abuhamra*, that the statute establishes a right to liberty that

8    is not simply discretionary, but mandatory, if the substantial

9    showing in question is made.

10          The first substantial question that we believe is

11   presented here is based on the exclusion of Dr. Rascher's

12   expert testimony.  Your Honor ruled from the bench during the

13   trial, but your Honor also issued a 37-page decision on

14   March 17, 2019, and we would point out that the fact that your

15   Honor chose to wrote on this issue after trial, and write in

16   such an extensive fashion explaining your reasoning, is

17   indicative of the fact that your Honor recognizes the exclusion

18   of this testimony is likely to be a substantial question on

19   appeal.  The Second Circuit has reversed several convictions on

20   basis of the defendants' expert testimony was excluded.  Most

21   recently in 2015, in the case that we've discussed at various

22   times, the *Litvak* case.  The Second Circuit reversed that

23   decision when his expert witness, who was to present testimony

24   that the witness contended was relevant to materiality and good

25   faith, was excluded.

J353GAT2                          Sentencing

1          Your Honor does not have to find, again, that the

2     exclusion of the expert testimony was erroneous.  The issue is

3     whether it presents a substantial issue.  And there is another

4     case, *United States v. Onumonu*, 967 F.2d 782, where the Second

5     Circuit also reversed and remanded for a new trial.

6          THE COURT:  Well, you know, one problem you have here

7     with respect to this point, is that, even assuming the circuit

8     disagreed on admissibility, my view is that there is not a

9     close question, or at least it's my tentative view, subject to

10    what you say on whether the error was not harmless or was

11    harmful.  Because I don't think it would have changed a thing.

12         MR. MOORE:  I think that --

13         THE COURT:  In short, the evidence was overwhelming.

14         MR. MOORE:  I think, however, your Honor, that is a

15    matter that is subject to debate.  It is possible that the

16    circuit could rule the other way.  And it is also possible that

17    that issue, when supplemented by several other issues, presents

18    not one, but multiple substantial questions.

19         THE COURT:  Let's get on to your other issues.

20         MR. MOORE:  Yes, sir.  The Second Circuit held in

21    *United States v. Randell*, 761 F.2d 122, that issues of first

22    impression are appropriate for bail pending appeal.  And in

23    this case, your Honor gave a dual intent instruction.  And I'm

24    sure your Honor recalls the debate about the dual intent

25    instruction.  We objected to this instruction on the basis that

J353GAT2                     Sentencing

1   a dual intent instruction had, at least based on our research,

2   never been given in a 1343 wire fraud or 1341 mail fraud case.

3   And at the charge conference your Honor told Ms. Donnelly that

4   there is a first time for everything, and you overruled our

5   objection.  As a novel question we believe this issue, standing

6   alone, because it is novel, merits bail pending appeal, period.

7   Because as your Honor knows, this case was an intent case.  The

8   facts weren't so much in dispute.  The intent issue was.

9           THE COURT:  Come to your next point.

10          MR. MOORE:  Yes, sir, all right.  The next issue is

11  the apparent authority instruction.  Your Honor may also recall

12  a long dialogue, again with Ms. Donnelly, who argued most of

13  the points, about the charge regarding the apparent authority

14  instruction that was given as a part of the good faith

15  instruction to the jury.  And particularly the instruction

16  regarding when coaches could be considered to be acting for

17  their own self-enrichment, under the Second Circuit's decision

18  in *United States v. D'Amato* was fiercely debated.  And your

19  Honor charged the jury certain things, one of the parts of that

20  charge was an agent of a university is unconflicted if his or

21  her actions are fully aligned with the interests of the

22  university, and any time an agent takes an action, the agent

23  might simultaneously be acting for the benefit of the

24  university for whom the agent works, and have an additional

25  interest in profiting personally or otherwise benefiting him --

J353GAT2                         Sentencing

1          THE COURT:  You've got to get back to that slow

2     Southern way of talking.

3          MR. MOORE:  All right.  I will endeavor to do that.  I

4     did not want to try your Honor's patience, but I understand the

5     court reporter has to take down what I have to say.

6          Your Honor's charge went on to say that the agent's

7     personal interest might be financial, they might be

8     non-financial, and to be unconflicted, the agent's personal

9     interest, to the extent the agent has any personal interest,

10    must be completely aligned with the interests of the

11    university.

12         Ms. Donnelly, on behalf of all defendants, objected on

13    the basis that this instruction went beyond the language that

14    the Second Circuit approved in *D'Amato*, and we argued that the

15    instruction was too broad.  We argued that an agent's action

16    does not need to be fully aligned with the interests of the

17    master, with respect to your statement second of agency Section

18    236.  Your Honor, at the charge conference, we recall,

19    indicated that this was a close question.

20         Indeed, after Ms. Donnelly objected, your Honor said,

21    look, I spent a lot of time thinking about this, and I find

22    it's pretty subtle, and I've tried to come to the right answer.

23         THE COURT:  Maybe I should hear from Mr. Diskant.

24         MR. DISKANT:  Sure.  So, of the issues raised thus

25    far, on the expert, as the Court began to note, leaving aside a

J353GAT2                    Sentencing

1    very significant harmlessness question, what the Court did is
2    the Court precluded the defendants from calling their expert to
3    testify to a series of things that were, one, wildly beyond his
4    realm of expertise; and two, had no relevance to this case.
5    The Court then reserved on certain areas of his proposed
6    testimony, that might have been relevant to this case, but
7    agreed with the government that a Daubert hearing would be
8    required in order to fully develop their evidence.  The
9    defendants declined to pursue a Daubert hearing, and declined
10   to pursue their expert.

11        So it seems extraordinarily unlikely that whatever
12   component of that claim they have not waived by not pursuing a
13   Daubert hearing would overcome a harmlessness review, even if
14   there was a finding that the Court got that one wrong.

15        With respect to dual intent, my recollection, and
16   since I'm hearing these for the first time now, I don't have
17   the transcript in front of me.  Is that the government's
18   position was that a dual intent instruction is routinely given
19   in cases such as this one, where there is an argument that
20   there is both a lawful and unlawful explanation for the
21   defendant's conduct.  We pointed the Court to a series of
22   cases, including honest services wire fraud theories, which are
23   in fact wire fraud cases, in which that instruction was given.
24   I can point the Court to several within the last year.  And so,
25   again, it seems very unlikely that the circuit is either going

J353GAT2                    Sentencing

1    to find that to be erroneous, or, when reviewing the charge as

2    a whole, which of course the Second Circuit will, that that

3    isolated error constituted reversible error.

4             With apparent authority, my recollection is that the

5    Court, as I recall having this discussion with your Honor

6    during the charge conference, the government's request was that

7    the Court instruct the jury very in line with the instruction

8    in *D'Amato*.  The defendants wanted the exact opposite.  The

9    defendants kept trying to invert the language of *D'Amato*.  The

10   Court overruled those requests.  My memory is the jury was

11   instructed consistent with the language in *D'Amato*.

12            THE COURT:  The standard for granting bail pending

13   appeal is, shall we say, a very low hurdle.  I need not be

14   persuaded that any defendant is likely to prevail.  I really

15   don't have to say much more than that the arguments are not on

16   their face ridiculous.

17            I'm prepared to essentially say that, and grant bail

18   pending appeal in light of the fact that I see no risk to the

19   public and certainly no risk of flight.

20            So bail pending appeal is granted.  Defendants' bail

21   is continued on the same terms and conditions that have applied

22   up to now.

23            With respect to the sentence of incarceration, I

24   recommend to the bureau of prisons that the defendants all be

25   designated to minimum security facilities, and unless a

J353GAT2                          Sentencing

1  defendant has a different wish, I'll recommend that it be as

2  close to their residence as possible.  Anybody want something

3  else?

4           MR. SCHACHTER:  Your Honor, with respect to Mr. Gatto,

5  I believe the only correctional institution in Oregon is FCI

6  Sheridan, and that's the closest one to his home.  We ask that

7  the Court recommend he be designated there.

8           THE COURT:  I so recommend.

9           MR. MOORE:  We believe that the closest facility to

10  Mr. Code's home that has a minimum security facility is FCI

11  Edgefield.  It has a camp there.  We would ask your Honor

12  recommend he be incarcerated at the camp.

13           THE COURT:  Tell me again?

14           MR. MOORE:  FCI Edgefield in South Carolina.

15           THE COURT:  So recommended.

16           MR. HANEY:  We would request for Morgantown, West

17  Virginia.

18           THE COURT:  So recommended.

19           Anything else, folks?

20           MR. DISKANT:  There is an underlying indictment that

21  the government would move to dismiss at this time.

22           THE COURT:  Granted.  Anything else?

23           MR. SCHACHTER:  Nothing further.

24           MR. MOORE:  No, thank you.

25           THE COURT:  Thank you all.